Martin A. Sosland (18855645)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile:  (214) 746-7777

Ronit J. Berkovich (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for the Debtor and
Debtor in Possession

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

```
------------------------------------------------------------------------x
                                         :
In re                                    :        Chapter 11
                                         :
TEXAS RANGERS BASEBALL PARTNERS,         :        Case No. 10-43400 (DML)
                                         :
            Debtor.                      :
------------------------------------------------------------------------x
```

### DECLARATION OF KELLIE L. FISCHER IN SUPPORT OF
### DEBTOR'S CHAPTER 11 PETITION AND REQUEST FOR FIRST DAY RELIEF

I, Kellie Fischer, being fully sworn, hereby declare that the following is true to the

best of my knowledge, information and belief:

1.      I am the Chief Financial Officer and Secretary of Texas Rangers Baseball

Partners, a Texas general partnership ("**TRBP**"), debtor and debtor in possession in the above-

referenced chapter 11 case (collectively, the "**Debtor**" or the "**Company**").  I have been

responsible for and have overseen the financial operations of the Company since 2005 and, in my

current capacity, I am familiar with the day-to-day operations, business, and financial affairs of the Company.

2.     I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case (the "**Chapter 11 Case**") and in support of (i) the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Commencement Date**") and (ii) the relief, in the form of motions and applications, that the Debtor has requested of the Court (the "**First Day Pleadings**").  Prior to the Commencement Date, the Debtor prepared the Debtor's *Prepackaged Plan of Reorganization of Texas Rangers Baseball Partners Under Chapter 11 of the Bankruptcy Code* (the "**Prepackaged Plan**") and the related *Disclosure Statement* (the "**Disclosure Statement**").  Under the Prepackaged Plan, all creditors of TRBP will be paid in full from the proceeds of the Sale (as defined below) or will have its obligations assumed by the Purchaser (as defined below), and the general partners of TRBP will retain their equity interests in TRBP.  Thus, I am advised that **there are no impaired classes of creditors or equity holders under the Prepackaged Plan.**

3.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other employees and representatives of the Company, my review of relevant documents, or my opinion based upon my experience and knowledge of the Company's operations and financial condition.  If I were called to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

4.     This Declaration is intended to provide a summary overview of the Company's business and the Chapter 11 Case.  Sections I through III provide a description of the

Company's business, history, and organizational structure, prepetition indebtedness, and the circumstances giving rise to the commencement of the Chapter 11 Case.  Part IV summarizes the First Day Pleadings and the relief they seek, which the Debtor believes is crucial to its successful reorganization.

## I.  THE COMPANY'S BUSINESS

### TRBP Partnership Structure

5.  Texas Rangers Baseball Partners owns and operates the Texas Rangers Major League Baseball Club, a professional baseball club (the "**Texas Rangers**") in the Dallas/Fort Worth Metroplex, pursuant to the Major League Constitution (the "**Major League Constitution**") and the Membership Agreement, dated as of November 18, 1960, by and between The American League of Professional Baseball Clubs, as assumed by the Office of the Commissioner of Baseball (the "**BOC**"), and WBC Baseball Club, Inc., as assumed by TRBP pursuant to an Assumption Agreement, dated as of June 16, 1998.

6.  TRBP is a Texas general partnership, in which Rangers Equity Holdings, L.P. ("**Rangers Equity LP**") holds a 99% partnership interest and Rangers Equity Holdings GP, LLC ("**Rangers Equity GP**") holds a 1% partnership interest.  Rangers Equity GP, a Texas limited liability company, is a wholly-owned subsidiary of Rangers Equity LP.  Both Rangers Equity LP and Rangers Equity GP are holding companies with no operating assets and are indirect, wholly-owned subsidiaries of HSG Sports Group LLC ("**HSG**").  HSG is a sports and entertainment holding company, which is an affiliate of, and indirectly controlled by, Thomas O. Hicks ("**Mr. Hicks**").  HSG also indirectly wholly-owns Dallas Stars, L.P., which owns and operates the Dallas Stars National Hockey League franchise (the "**Dallas Stars**").  Attached to the Disclosure Statement as <u>Exhibit B</u> is a current TRBP organizational chart.

### Major League Baseball

7.      With a history and tradition dating back to 1869, professional baseball is one of America's oldest organized league sports.  From April through the end of September every year, Major League Baseball ("**MLB**") runs a 162-game regular season.  MLB's clubs are divided into two leagues (American and National) and six divisions (AL East, AL Central, AL West, NL East, NL Central and NL West).

8.      Major League Baseball continues to demonstrate its preeminence as America's "national pastime."  In 2009, MLB continued its strong attendance with over 73.4 million fans attending games.  MLB is America's most-watched sport in-person with annual attendance greater than that of the National Football League, the National Basketball Association, and the National Hockey League combined.

9.      The BOC, doing business as Major League Baseball, is an unincorporated association of its 30 member clubs. It is headquartered in New York City and is governed by the Major League Constitution.  The primary purpose of the BOC is to undertake centralized activities on behalf of the 30 clubs.  Among other things, the BOC hires and maintains the sport's umpiring crews, and negotiates marketing, labor, and television contracts.

10.      Like every other MLB club, the Texas Rangers benefit from their interests in MLB's collective ventures.  These include MLB Advanced Media, L.P. ("**MLBAM**"), The MLB Network, LLC ("MLB Network"), and Major League Baseball Properties, Inc. ("**MLBP**"). MLBAM operates the highly successful MLB.com website and serves as the exclusive licensee for the interactive media rights of every club in the league.  The MLB Network is a cable television network in which the clubs hold a controlling interest.  MLBP licenses team-branded caps, apparel and other consumer products, places advertising worldwide, arranges corporate sponsorship and handles a wide range of other marketing, media and promotional activities.

**The Texas Rangers**

11.     The Texas Rangers are an exceptional club, located in the fourth largest

metropolitan area and the largest metropolitan market with a single MLB franchise.  The Texas

Rangers are one of only 30 MLB franchises and one of two MLB clubs in the state of Texas and

its bordering states.  The Texas Rangers have a rich and colorful history and have established

themselves as a young, up-and-coming contender supported by a strong fan base.  The club's

executives have successfully combined players from their farm system with key veterans to

produce a club that today is in first place in the American League West.  Founded in 1961 as the

second incarnation of the Washington Senators, the franchise moved to Texas in 1972 and

currently competes in the American League West, together with the Los Angeles Angels of

Anaheim, the Oakland Athletics, and the Seattle Mariners.

12.     The Texas Rangers 2010 roster includes core players Michael Young, Ian

Kinsler, Josh Hamilton, and Vladimir Guerrero.  TRBP's front office and coaching staff include

10 key members that collectively have over 200 years of experience with Major and Minor

League Baseball.  As described more fully below, TRBP employs approximately 320 full-time

and 1,275 seasonal employees.  All positions would be preserved under the Prepackaged Plan.

13.     The Texas Rangers' home field, the Rangers Ballpark in Arlington (the

"**Ballpark**"), is located in Arlington, Texas and is an open-air, natural grass ballpark that was

designed and built with tradition and intimacy in mind.  The proximity of the fans to the action is

one of the closest in MLB.  The overall seating of the Ballpark is 49,170 seats on five levels,

making it MLB's sixth largest ballpark.

14.     The Texas Rangers have had five owners since the club moved to

Arlington in 1972.  Mr. Hicks became the fifth owner in the history of the Texas Rangers on

June 16, 1998, when HSG completed the acquisition of the franchise from the George W.

Bush/Edward W. Rose partnership.

## II.     PREPETITION INDEBTEDNESS

*First/Second Lien Credit Agreement*

   15.  TRBP is a limited guarantor under (i) that certain Amended and Restated

First Lien Credit and Guaranty Agreement, dated as of December 19, 2006, by and among HSG

Holdings LLC ("**HSGH**"), HSG, certain subsidiaries of HSG as guarantors, the lenders party

thereto from time to time, JP Morgan Securities Inc., as joint lead arranger, joint bookrunner and

co-syndication agent, Barclays Capital Inc., as joint lead arranger, joint bookrunner, Barclays

Bank PLC, as co-syndication agent and JP Morgan Chase Bank, N.A., as administrative agent

and collateral agent (as amended or otherwise modified from time to time, the "**First Lien**

**Credit Agreement**") and (ii) that certain Second Lien Credit and Guaranty Agreement, dated as

of December 19, 2006, by and among HSGH, HSG, certain subsidiaries of HSG, as guarantors,

the lenders party thereto from time to time, JP Morgan Securities Inc. as joint lead arranger, joint

bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger, joint

bookrunner, GSP Finance LLC, as successor-in-interest to Barclays Bank PLC, as administrative

agent, collateral agent and co-syndication agent (as amended or otherwise modified from time to

time, the "**Second Lien Credit Agreement**" and together with the First Lien Credit Agreement,

the "**HSG Credit Agreement**").  The HSG Credit Agreement is guaranteed by certain of HSG's

subsidiaries, although the guaranties of the Stars and Rangers are limited.  The First Lien Credit

Agreement is secured by a first lien on substantially all of the assets of HSGH, HSG, and HSG's

subsidiaries, including a pledge of the equity interests those entities have in its subsidiaries,

including TRBP, and the Second Lien Credit Agreement is secured by a second lien on

substantially all of the assets of HSGH, HSG, and HSG's subsidiaries, including a pledge of the equity interests those entities have in its subsidiaries, including TRBP.

16.     Notwithstanding the foregoing, TRBP's guaranty of obligations under the HSG Credit Agreement and the security interests granted in its assets pursuant to the HSG Credit Agreement are limited to a maximum aggregate amount of $75 million (the "**TRBP Guaranty Cap**").

*Baseball Finance Note*

17.     As described in more detail below, TRBP is also party to that certain Amended and Restated Secured Revolving Promissory Note, dated November 25, 2009, by TRBP in favor of Baseball Finance LLC, an affiliate of the BOC (the "**Baseball Finance Note**"). Pursuant to the Baseball Finance Note, Baseball Finance agreed to make available to TRBP a secured revolving loan facility in an aggregate principal amount not to exceed $25 million.  The loans under the Baseball Finance Note are secured by liens on substantially all of the assets of TRBP and are junior in priority to the liens granted pursuant to the HSG Credit Agreement that are subject to the TRBP Guaranty Cap.  As of the Commencement Date, approximately $18.45 million in principal is outstanding under the Baseball Finance Note, plus accrued interest.

*Overdraft Protection Agreement*

18.     On or about April 30, 2009, Mr. Hicks agreed to provide an overdraft protection line of credit in the principal amount of $15,000,000 to TRBP and certain of its affiliates pursuant to that certain Overdraft Protection Line of Credit Agreement dated as of April 30, 2009, by and among Thomas O. Hicks, HSG, HSG Partnership Holdings LLC, TRBP and the Dallas Stars (the "**Overdraft Protection Agreement**").  On June 29 2009, Mr. Hicks suspended his obligation to make future advances of principal amounts under the Overdraft Protection

Agreement.  As of the Commencement Date, TRBP's obligations under the Overdraft Protection

Agreement are $5 million in principal, plus accrued interest.

*Emerald Diamond Note*

19.     Emerald Diamond, L.P. is a Texas limited partnership in which Rangers

GP is the general partner owning 1% of its partnership interest and Rangers Equity LP is the

limited partner owning 99% of its partnership interests ("**Emerald Diamond**").  Emerald

Diamond leased and operated certain land and improvements known as the Centerfield Office

Building that is adjacent to the Ballpark pursuant to the terms of that certain Centerfield Office

Building Lease, dated as of June 13, 2007, by and between Arlington Sports Facilities

Development Authority, Inc. and Emerald Diamond (the "**Centerfield Office Lease**").  TRBP

and its affiliates entered into several transactions in order to facilitate the Sale contemplated in

the Prepackaged Plan, including that certain Emerald Diamond Asset Purchase Agreement

between Emerald Diamond and TRBP, dated May 23, 2010 (the "**Emerald Diamond Purchase**

**Agreement**"), wherein Emerald Diamond sold to TRBP certain rights, title and interest in, to and

under all of Emerald Diamond's assets other than the ED Land Note (hereinafter defined),

including the Centerfield Office Lease (the "**ED Assets**").  As consideration for the ED Assets

and pursuant to the Emerald Diamond Purchase Agreement, TRBP issued to Emerald Diamond

that certain Promissory Note in the amount of $15,055,081 (the "**Emerald Diamond Note**").

### III.     KEY EVENTS LEADING TO TRBP'S CHAPTER 11 FILING

*TRBP's Financial Position Declines.*

20.     Since 2005, TRBP has experienced, and continues to experience, cash

flow deficiencies.  For the entire period that Mr. Hicks has owned the Texas Rangers, he has

provided financial support to the club through capital contributions and loans to HSG in excess

of $100,000,000.  Due to the unprecedented downturn in the U.S. economic and housing industry

and global economic recession, other commitments and contractual restraints, Mr. Hicks was no longer willing to provide the same material financial support he had in the past.

21.     As a result, in 2008, HSG and TRBP began evaluating TRBP's financial position relative to projections for 2009, 2010, and beyond and determined that reductions in all expense categories were required to compensate for current and projected shortfalls.  Despite the cost reduction initiatives over the last two years, the cash deficiencies have continued.

*Financial Advisors are Retained.*

22.     Beginning in August 2008, HSG retained advisors to provide financial advice and assistance in connection with a capital raise, potential restructuring or sale, including Perella Weinberg Partners ("**PWP**"), Merrill Lynch, Pierce, Fenner & Smith ("**Merrill**"), and Raine Advisors LLC ("**Raine**").  Initially, HSG worked with Merrill exploring a variety of possible solutions for a capital raise, minority sale, or other recapitalization.

23.     While HSG and TRBP explored their options, TRBP continued to suffer cash flow deficiencies.  As a result of such cash flow deficiencies and the concurrent cash flow deficiencies and operating losses suffered by the Dallas Stars, HSG was unable to service its $525 million long-term debt obligations under the HSG Credit Agreement.  On March 31, 2009, HSG failed to make a scheduled interest payment under the HSG Credit Agreement, and on April 7, 2009, the lenders to the HSG Credit Agreement (the "**Lenders**") accelerated the entire amount of indebtedness thereunder.  As a result of the acceleration, the Lenders under the HSG Credit Agreement have claims against TRBP on account of TRBP's secured guaranty of $75 million of such indebtedness, as discussed above.

*TRBP Secures Funding to Address Cash Flow Deficiencies.*

24.     In order to address cash flow deficiencies, Mr. Hicks funded a total of $5,000,000 under the Overdraft Protection Agreement on May 15, 2009 and June 1, 2009.

Thereafter, on June 29, 2009, facing continuing significant liquidity challenges, TRBP entered

into that certain Secured Revolving Promissory Note with Baseball Finance ("**Original Baseball**

**Finance Note**") to fund ongoing working capital needs.  Pursuant to the Original Baseball

Finance Note, Baseball Finance agreed to make available to TRBP a secured revolving loan

facility in an aggregate principal amount not to exceed $15 million.  On the same date, Mr. Hicks

suspended his obligation to make future advances of principal amounts under the Overdraft

Protection Agreement.

*TRBP is Marketed.*

25.      During the summer of 2009, HSG and TRBP, in conjunction with their

advisors, canvassed a broad group of prospective buyers and investors, at least 15 of which

executed confidentiality agreements.  Beginning on July 2, 2009, confidential information

memoranda were distributed to at least ten parties that had executed confidentiality agreements

and received MLB approval to participate in the sale process.  TRBP and HSG received six

initial bids by the August 18, 2009 initial bid deadline and selected three of those bidders to

participate in the second round of bidding.  At the same time, HSG and TRBP explored a variety

of other financing transactions.

*MLB Voluntary Support Agreement.*

26.      As a condition to entering into the Original Baseball Finance Note, TRBP

along with HSGH, HSG, Thomas O. Hicks, Rangers Equity GP and Rangers Equity LP entered

into that certain Voluntary Support Agreement with the BOC on June 29, 2009 (the "**Original**

**VSA**"), pursuant to which the BOC, at the request of HSG and TRBP, agreed to provide certain

operational support to HSG and TRBP, including support with respect to conducting a sale of the

Texas Rangers.  Pursuant to the terms of the Original VSA, John McHale, Jr. was designated by

the BOC to act as the lead monitor thereunder (the "**Lead Monitor**").

27.     In November 2009, the Original Baseball Finance Note was amended and restated to provide an additional $10 million in borrowing capacity to TRBP.  As a condition to entering into the amended and restated Baseball Finance Note, TRBP, along with HSG, HSGH, Mr. Hicks, Rangers Equity GP, Rangers Equity LP and the BOC, amended and restated the Original VSA and entered into that certain Amended and Restated Voluntary Support Agreement dated November 25, 2009 (the "**Modified VSA**").  Pursuant to the Modified VSA, MLB agreed to continue providing operational and logistical support to HSG and TRBP and to monitor the day-to-day operations of the Texas Rangers.  The Modified VSA also set forth a timetable for concluding a sale of the Texas Rangers, including an obligation to enter into a definitive agreement by January 15, 2010.  Ultimately, HSG and TRBP concluded that the sale of the Texas Rangers franchise was the only viable course of action.

**Sale Process**

28.     After the consummation of the Original VSA, HSG and TRBP directed their advisors to run an auction for the sale of the Texas Rangers. The advisors oversaw the creation of a data room and actively solicited parties interested in buying the club to perform due diligence. The affiliate-owned land that is the subject of the Land Sale Agreement described below was not originally included in the process, but became a part of the overall transaction as potential purchasers indicated they would not proceed unless they could also acquire the land. On August 18, 2009, six interested parties submitted non-binding bids for the purchase of the Texas Rangers. After reviewing the bids with the financial advisors, in consultation with the BOC, and in accordance with the Original VSA, HSG and TRBP chose three finalists to submit final bids. The three bidders were given three months to complete all their diligence, including extensive meetings with the management of TRBP. On November 20, 2009, the three final bidders submitted final binding bids. During the following two weeks, HSG and TRBP and their

financial advisors negotiated with all three bidders and were successful at getting two of the

bidders to substantially enhance their original offers.  HSG and TRBP selected Rangers Baseball

Express LLC (the "**Purchaser**"), whose principals include the current President of the Texas

Rangers, Nolan Ryan, and Chuck Greenberg, a sports lawyer and minor league club owner, as

the most viable bidder for the sale of the Texas Rangers franchise.

*Rangers Baseball Express LLC is Named Winning Bidder.*

29.     On December 15, 2009, when TRBP and HSG selected the Purchaser as

the winning bidder, they believed that the Purchaser's offer was the best offer and in the best

interests of both TRBP and HSG and indirectly their creditors.  From December 15, 2009 until

January 15, 2010, HSG and TRBP continued to negotiate with both the Purchaser and one other

bidder.

30.     Despite extensive negotiations, no definitive agreement had been executed

by January 15, 2010.  On January 16, 2010, MLB notified TRBP and HSG that it was exercising

certain rights under the Modified VSA with respect to the sale process; provided, that MLB

would permit HSG and TRBP to continue to negotiate with the Purchaser solely toward the goal

of executing a definitive agreement.  As the negotiations continued, the Purchaser increased its

offer by $10 million.  On January 23, 2010, the parties entered into that certain Asset Purchase

Agreement (the "**January APA**"), governing the sale of the Texas Rangers franchise and certain

related assets to the Purchaser.

31.     As a result of the extended negotiations, the final purchase price was

higher than the original offer by the Purchaser.  In addition, TRBP received favorable terms

regarding the assumption of liabilities, the scope of seller indemnification, representations and

warranties and other deal points.  Equally important, TRBP believed that the Purchaser could get

the approval of MLB.

***Lenders Refuse Consent to Sale.***

32.     Pursuant to the terms of the January APA, consummation of the sale required, among other closing conditions, the consent of the Lenders pursuant to the terms of the HSG Credit Agreement.  Despite HSG's, TRBP's, and the Purchaser's lengthy good faith negotiations with the Lenders since the execution of the January APA, the Lenders have refused to consent to the transactions contemplated by the January APA and have prevented TRBP from moving forward with the sale of the Texas Rangers.  TRBP became increasingly concerned about the lengthy stalemate with the Lenders and TRBP's ability to continue to fund working capital needs.  Because of TRBP's inability to obtain the consent of the Lenders, TRBP, in consultation with MLB, concluded that a chapter 11 filing designed to facilitate a sale of TRBP's assets to the Purchaser (the "**Sale**") pursuant to a prepackaged plan of reorganization was the most efficient manner in which to consummate the Sale and was, therefore, in the best interests of the Texas Rangers franchise, its fans, MLB and all other parties involved.  As described herein, the Prepackaged Plan will facilitate the sale of the Texas Rangers franchise to the Purchaser and the payment of all of TRBP's creditors in full, allowing the Texas Rangers franchise to compete successfully on and off the field with assurance of long-term financial stability.

***The Interim Agreement and Second Amended and Restated VSA.***

33.     On May 23, 2010, in anticipation of the implementation and consummation of the Sale through chapter 11, the Modified VSA was bifurcated and amended and restated by (i) that certain Second Amended and Restated Voluntary Support Agreement (the "**Second Amended and Restated VSA**") by and among the BOC, TRBP and certain affiliates of TRBP and (ii) that certain Interim Agreement (the "**Interim Agreement**", together with the Second Amended and Restated VSA, the "**Support Agreements**") by and between the BOC and

TRBP.  The Support Agreements provide for the affirmation of a prior delegation to the Lead

Monitor of certain monitoring functions connected to the day-to-day operations of TRBP and its

subsidiaries and TRBP is required to consult with the Lead Monitor before taking certain

material actions.  In addition, the BOC has access to TRBP's books and records and may attend

important meetings.  Under the Support Agreements, TRBP has agreed to reimburse the BOC for

all prepetition and postpetition costs and expenses (including attorneys' fees) incurred by them in

connection with, among other things, the Modified VSA, the Support Agreements, the Sale and

the Prepackaged Plan.  As discussed below, TRBP intends to seek approval from the Bankruptcy

Court to enter into an interim support agreement (the "*Interim Support Agreement*") with the

BOC for the postpetition period on terms substantially similar as those provided for under the

Interim Agreement.

***Other Material Transactions Ancillary to Sale.***

      34.    In order to accurately memorialize the historic operational make-up of the

Texas Rangers organization, including properly documenting the use and ownership of certain

assets and equipment in accordance with past operational practices, and to facilitate the Sale,

prior to the Commencement Date, TRBP and its affiliates entered into a series of agreements and

transactions to appropriately reflect the ownership and operation of the Texas Rangers and

certain related assets and effectuate an orderly disposition of the assets being sold to the

Purchaser.  The material transactions, as more particularly described in the Disclosure Statement,

entered into by TRBP immediately prior to the Commencement Date, include the following:

    (i)    **HSG Contribution Agreement.**  HSG has historically provided certain
business and administrative services (including but not limited to
insurance and benefit plans) to its subsidiaries and affiliates and entered
into various contracts, including but not limited to sponsorship and
advertising agreements, broadcasting agreements, information technology
agreements, real property leases, equipment leasing agreements and
service agreements, on behalf of and for the benefit of TRBP.  TRBP has

traditionally been financially responsible for its allocable portion of the services provided by HSG, and HSG has contributed to TRBP, its allocable portion of the benefits under any such contracts executed by HSG on its behalf.

To reflect the operations of the Texas Rangers more accurately, on May 23, 2010, HSG and TRBP entered into that certain Contribution Agreement (the "**HSG Contribution Agreement**"), wherein HSG directly contributed and assigned to TRBP, its rights, title and interest in all of the assets and agreements which HSG had entered into principally for the benefit of TRBP. Pursuant to the HSG Contribution Agreement, TRBP assumed all of the rights, benefits, obligations and liabilities relating to such agreements and assets.

(ii)     **Rangers Ballpark Transactions.** Historically, the City of Arlington and/or the Arlington Sports Facilities Development Authority, Inc, ("**ASFDA**"), have leased the Ballpark to entities under the control or indirect control of Thomas O. Hicks, for the benefit of the Texas Rangers franchise, and TRBP has traditionally paid all expenses in connection with the maintenance of the Ballpark. On June 13, 2007, ASFDA, as lessor, and Rangers Ballpark, as lessee, entered into that certain Ballpark Lease Agreement, as amended by that certain First Amendment to Ballpark Lease Agreement dated February 12, 2009, and further amended by that certain Second Amendment to Ballpark Lease Agreement dated May 13, 2010, wherein ASFDA leased to Rangers Ballpark the Ballpark (the "**Ballpark Lease**").

To reflect the operations of the Texas Rangers more accurately, on May 23, 2010, Rangers Ballpark assigned to TRBP all its rights and benefits in and to the Ballpark Lease and certain agreements relating to the stadium (the "**Ballpark Assignment and Assumption Agreement**"). Pursuant to the Ballpark Assignment and Assumption Agreement, TRBP assumed the obligations and liabilities arising under and related to the Ballpark Lease and the agreements relating to the Ballpark.

### Asset Purchase Agreement.

35.     On May 23, 2010, after further negotiation, in anticipation of the

implementation and consummation of the Sale through a chapter 11 plan of reorganization, the

parties to the January APA terminated the January APA and entered into that certain Asset

Purchase Agreement (the "**Asset Purchase Agreement**"), for the sale of the Texas Rangers

franchise and certain related assets, which is attached to the Disclosure Statement as <u>Exhibit C</u>.

      36.    As described below, under the Asset Purchase Agreement, substantially all

of Texas Rangers' assets, including the Texas Rangers franchise and substantially all contractual

rights related the operation of the Texas Rangers will be sold to the Purchaser.  In turn, the

Purchaser will also assume virtually all of the obligations of the Texas Rangers, including

deferred compensation obligations, sponsorship, ticketholder, certain employee and specified tax

obligations, with the exception of certain excluded liabilities that will be paid under the

Prepackaged Plan.  Under the Asset Purchase Agreement and the Prepackaged Plan, TRBP also

intends to assume and assign to the Purchaser all contracts relating to the Texas Rangers

franchise, including all marketing, media, advertising, and merchandising contracts, all minor

league and major league player contracts and the Ballpark Lease and the Centerfield Office

Lease.  The Sale anticipates a complete and orderly transition of the operations of the club — all

tickets to games and other events will be fully honored, and all employees will keep their jobs.

Although accomplished through a chapter 11 plan, the Sale will resemble in all significant

respects the sale of any other sports franchise.

      37.    The material terms of the Asset Purchase Agreement are as follows

(defined terms used in this summary and not otherwise defined herein have the meanings

ascribed to such terms in the Asset Purchase Agreement):

    (i)    **Description of Purchased Assets.**  Upon the Closing, the assets sold to
the Purchaser include all of TRBP's right, title, and interest in
substantially all of its assets (collectively, the "**Purchased Assets**"),
including all rights and privileges held by TRBP associated with MLB
(which includes rights to membership in MLB and the Texas Rangers
franchise) and all assets and interests (tangible and intangible) related to
the Texas Rangers and the Ballpark, and TRBP's interests in Rangers Club
Trust, which is the borrower under the League-Wide Facility.  More

specifically, the Purchased Assets include, among other things, TRBP's rights to any minor league, little league, hall of fame and foreign operations affiliated with the Texas Rangers and the spring training facilities of the Texas Rangers (excluding the 2.4995% limited partnership interest in RoughRiders Baseball Partners, L.P. (f/k/a Mandalay Baseball Partners, L.P.) held by Southwest Sports Group Baseball, L.P.).

(ii)    **Assumed Obligations/Liabilities.**  As part of the sale of the Purchased Assets, Purchaser will assume, and agree to pay and perform, all liabilities and obligations of TRBP (except as specifically excluded in the Asset Purchase Agreement), including, among others, (i) all liabilities under the Purchased Contracts, (ii) certain taxes of TRBP, (iii) the balance outstanding and attributable to Rangers Club Trust under the League-Wide Facility, (iv) the aggregate amount of gross deferred compensation owed by TRBP to current or former players of the Texas Rangers as of the Closing Date, and (v) certain liabilities relating to the employment or termination of employment of Former Rangers Employees and Rangers Employees (as such terms are defined in the Asset Purchase Agreement).

(iii)   **Total Consideration.**  The aggregate consideration paid and obligations assumed by the Purchaser at the Closing will consist of (i) cash paid by the Purchaser totaling (A) $304,000,000, <u>less</u> (B) $3,637,592, representing certain fees and expenses in excess of $3,100,000 that TRBP (and its subsidiaries) paid between November 1, 2009 and the date of execution of the Asset Purchase Agreement, <u>less</u> (C) an amount necessary to pay in full the ED Land Note; (ii) assumption of the Assumed Liabilities by the Purchaser; and (iii) delivery by the Purchaser to TRBP of a certain promissory note in the amount of $10 million (the "**Contingent Note**"). Under the terms of the Contingent Note, the Purchaser is not obligated to make any payments in any given year if the net revenue of the Rangers is not in the top five for all MLB clubs for such year.

(iv)    **Closing Date.**  The consummation of the transactions contemplated by the Asset Purchase Agreement (the "**Closing**"), including the sale of the Texas Rangers franchise to the Purchaser, will occur not later than the third Business Day after the satisfaction or waiver by the applicable party of the following conditions, among others:

(a)    each of TRBP and the Purchaser have performed or complied with all covenants, obligations and agreements required of such party under the Asset Purchase Agreement;

(b)    all applicable approvals of the Bankruptcy Court and MLB shall have been received;

(c)    there shall not have been or occurred since December 31, 2009, any event, change, occurrence or circumstance that, individually or

in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect; and

(d)     the transactions contemplated by the Land Sale Agreement (as defined below) will have occurred, or will occur simultaneously, with the Closing.

(v)     **Termination Rights**.  The Asset Purchase Agreement provides termination rights to each of the parties thereto upon the occurrence of certain specified events or the failure to occur of certain specified events. Such termination rights include, among others, that either TRBP or Purchaser may terminate if the Closing does not occur prior to August 12, 2010, provided that either party can extend for additional periods of time up to the earlier of (i) the earliest date that any of the Purchaser's financing commitments expire and (ii) October 31, 2010.

(vi)    **Termination Fee.**  If the Asset Purchase Agreement terminates because the Closing does not occur prior to the expiration of the Termination Date and, at the time of the termination, Purchaser or TRBP is in material and deliberate breach of any representations, warranties or covenants in any provision of the Asset Purchase Agreement, then such breaching party is obligated to pay the non-breaching party a fee in the amount of $1,500,000 (the "**Termination Amount**").  In addition, a party has an obligation to pay the same fee if the Asset Purchase Agreement is terminated by the other party because such party has materially breached any representations, warranties or covenants in the Asset Purchase Agreement and failed to cure any such breach within 30 days.  Purchaser has deposited $1,500,000 in an escrow account to cover the its contingent obligation to pay the Termination Amount.  In addition, the Purchaser and TRBP executed a letter agreement that provides that TRBP will pay to Purchaser $10,000,000 (the "**Termination Fee**") if, among other things, and subject to certain exceptions, TRBP (i) withdraws or fails to seek confirmation of the Plan, (ii) seeks to amend the Plan in a manner materially inconsistent with the Asset Purchase Agreement, or (iii) fails to consummate the Sale after the Approval Order has been entered.  The Asset Purchase Agreement also provides for such Termination Fee in the case of clause (iii).  The Termination Fee would be reduced by the amount, if any, of any Termination Amount paid by TRBP.

(vii)   **Representations, Warranties and Covenants.**  The Asset Purchase Agreement contains standard and customary representations, warranties and covenants.

(viii)  **TRBP Employees.**  Prior to the Closing, the Purchaser will offer employment to each Rangers Non-Player Employee (as such term is defined in the Asset Purchase Agreement) who is not a party to a Purchased Contract, to commence employment with Purchaser

immediately following the Closing under terms and conditions that are in the aggregate substantially similar to the then-current terms and conditions of his or her employment with TRBP or any of its Affiliates. In addition, with respect to all Rangers Non-Player Employees who actually commence employment with the Purchasers and all Rangers Player Employees, the Purchaser will provide (subject to certain limitations) severance benefits and payments no less favorable than the severance benefits and payments that would have been provided immediately prior to Closing. The contracts of all current Rangers Player Employees and certain Rangers Non-Player Employees are included as part of the Purchased Assets and each such Rangers Player Employees and Rangers Non-Player Employees will remain under the employment of the Purchaser on and after the Closing pursuant to the terms of his or her contract. The Asset Purchase Agreement also provides for the Purchaser's assumption of liabilities related to the employment or termination of employment by TRBP of any individual to the extent related to the Business before, on or after the Closing Date (including liabilities relating to Rangers Employees or Former Rangers Employees), except for workers compensation liabilities that are covered by Insurance Policies (as defined in the Asset Purchase Agreement). In addition, the Asset Purchase Agreement also contains certain other standard and customary provisions related to employee benefits.

(ix)     **Indemnification.** The Asset Purchase Agreement includes customary provisions obligating each of TRBP and Purchaser to indemnify the other party and its affiliates for losses caused by a breach of the indemnifying party's representations, warranties or covenants. In addition, Purchaser indemnifies TRBP for losses arising from Assumed Liabilities and TRBP indemnifies Purchaser for losses arising from Excluded Liabilities. In each instance, the representations and warranties of the parties survive a maximum of one year in the absence of intentional fraud and two years if a breach arose from intentional fraud. The indemnification obligations of each party are limited by certain deductibles and a cap of $30 million, except that certain Purchaser indemnification claims for losses in excess of the cap can be offset against the Contingent Note.

38.     As described above, under the Asset Purchase Agreement, substantially all of TRBP's assets, including the Texas Rangers franchise, and substantially all the contractual rights related thereto will be sold to the Purchaser. The Purchaser will also assume virtually all of the obligations of TRBP, including employee obligations, with the exception of certain liabilities that will be paid under the Prepackaged Plan, including, but not limited to, TRBP's guaranty obligations under the HSG Credit Agreement and TRBP's obligations under the

Baseball Finance Note.  Under the Asset Purchase Agreement and the Prepackaged Plan, TRBP

also intends to assume and assign to the Purchaser all contracts relating to the Texas Rangers

franchise, including all marketing, media, advertising, and merchandising contracts, and all

leases.

39.     The Sale will allow TRBP's creditors that are Lenders under the HSG

Credit Agreement to recover 100 percent of their guaranty claims against TRBP.  As described

more fully below, subject to Court approval, the Sale is expected to be completed by mid-

summer, allowing the franchise to exit the chapter 11 process expeditiously in order to reduce

any potential adverse impact to the Texas Rangers and its operations.

***Land Sale Agreement.***

40.     Ballpark Real Estate, L.P., a Texas limited partnership ("**BRE**"), which is

an affiliate of, and indirectly owned by Thomas O. Hicks, owns and has a leasehold interest in

certain real property adjacent to the Ballpark, including, but not limited to, the improvements

located thereon, easements, mineral rights, future development rights and contractual rights

associated with such real property interests (collectively, the "**BRE Property**").  The BRE

Property includes parking lots, a greenbelt, a lake, an irrigation system, and certain other

amenities.  TRBP operates, manages and maintains the BRE Property for the benefit of the Texas

Rangers and TRBP's affiliates pursuant to the Memorandum Regarding Existing Land Use

Arrangement, dated as of May 20, 2010 (the **"Existing BRE Land Use Arrangement"**), which

sets forth in writing the terms of the prior oral agreement between TRBP and BRE that had

existed since 1998.

41.     The BRE Property is not controlled by HSG or TRBP, and TRBP has no

rights to the BRE Property other than as set forth in the Existing BRE Land Use Arrangement.

When HSG and TRBP began marketing the Texas Rangers, the BRE Property was not included

in the marketing materials and, to my knowledge, BRE was not marketing the BRE Property.

Without exception, however, each of the three final bidders clearly indicated that their purchase

of the Texas Rangers would be conditioned on acquiring the BRE Property.  As a concession to

such bidders and to facilitate the sale of the Texas Rangers, BRE indicated a willingness to sell

certain of the BRE Property in connection with the sale of the Texas Rangers.

42.     Under the terms of the Existing BRE Land Use Arrangement, TRBP uses

the BRE Property for the following purposes, *inter alia*: (i) access to and use of parking areas

during Texas Rangers events, (ii) access to the bodies of water on the BRE Property for

irrigation, (iii) access to and use of parking areas for the employees and guests of TRBP and the

Diamond Club restaurant located at the Ballpark and the tenants and guests of TRBP's affiliates,

(iv) access and use of the north lawn area and a smaller baseball facility that hosts youth baseball

games and tournament play next to the Ballpark (the "**Youth Ballpark**") and Parking Lot B

Pavilion Area (Coca Cola Pavilion)  (the "**Pavilion**") for Texas Rangers events, (v) access across

BRE Property for use of the helipad, media bay, and the east underground entrance and the west

underground entrance to the Ballpark as necessary for the reasonable operation of the Ballpark,

(vi) as agreed to from time to time by BRE and TRBP, the right to extend limited licenses for use

of the BRE Property by third parties (outside of event hours for Texas Rangers baseball games )

in connection with prepaid parking for non-Rangers events, (vii) sponsorships, advertising

agreements, activations, Pavilion use, north lawn use and other special events (for which TRBP

or BRE may receive sponsorship revenues as agreed to from time to time), and (viii) and such

other purposes as agreed to from time to time by BRE and TRBP.

43.     TRBP is responsible for all costs and expenses related to the operation,

management, and maintenance of the BRE Property (other than certain Direct Non-Texas

Rangers Event Parking Costs (as defined below)), including but not limited to, costs and expenses related to use of, maintenance of, and providing access for ingress and egress to the parking lots, as well as the use and maintenance of the bodies of water, the greenbelt, and the other undeveloped land included in the BRE Property.

44.    TRBP manages the parking lots on the BRE Property for both Texas Rangers events and non-Texas Rangers events.  TRBP is entitled to all Texas Rangers event parking revenues and BRE is entitled to all non-Rangers event parking revenues net of direct costs associated with such non-Rangers event parking such as sales tax, on-site security and attendants during event hours, the City's portion of the parking revenues generated from the Shared Parking Areas in connection with non-Rangers Events (as provided in the New Convention Center Parking Agreement dated June 13, 207, among Arlington Sports Facilities Development Authority, Inc., the City and BRE (the "**New Convention Center Parking Agreement**")), and a management fee to TRBP equal to 4% of receipts net of sales tax ("**Direct Non-Texas Rangers Event Parking Costs**").  TRBP or BRE may also receive revenue from agreements, as agreed to by TRBP and BRE from time to time, to extend limited licenses to third parties for use of the BRE Property in connection with prepaid parking, sponsorships, advertising agreements, activations, Pavilion use and other special events.

45.    TRBP and BRE each have the right, in its sole discretion, at any time after the end of the last game of a season in which the Texas Rangers are eligible to play and on or before the beginning of the first game of the following new season in which the Texas Rangers are eligible to play, to terminate the Existing BRE Land Use Arrangement as to all or any portion of the BRE Property by written notice to the other party.  If BRE terminates the Existing BRE Land Use Arrangement in whole or in part before the beginning of the first game of any season,

and as a result of such termination the number of parking spaces provided by BRE available for

Texas Rangers baseball games is reduced below 9,000 parking spaces, BRE and TRBP agreed to

use commercially reasonable efforts to negotiate and enter into a lease arrangement to provide

TRBP with parking spaces for Texas Rangers baseball games during such season on the BRE

Property, such that TRBP will have access to at least 9,000 parking spaces provided by BRE

during such season.  The lease would be triple net and at fair market value, so that BRE is able to

make a reasonable profit from the lease. The lease arrangement would include the 660 parking

spaces on Lot I to the extent that BRE has the right, under the New Convention Center Parking

Agreement, to use such spaces for Texas Rangers baseball games, and would make allowance for

the relocation, from parking lots F and G to another location on the BRE Property, of the 540

spaces that are required to be provided by BRE to the City on a first-priority basis under the New

Convention Center Parking Agreement (such that parking lots F and G are no longer burdened

by such shared-parking obligation).  Whether or not TRBP continues to operate parking on the

BRE Property for non-Rangers Events during such season (for a reasonable fee) on behalf of

BRE would be the subject of a separate negotiation.  For purposes of the lease negotiation, the

parties would assume that TRBP is entitled to all Texas Rangers baseball-game parking revenues

and that BRE is entitled, in addition to fair market rent payable under the lease, to all non-

Rangers Event parking revenues.

46.     Recognizing that the sale of the BRE Property to the Purchaser is a

condition precedent to closing a sale of the Texas Rangers franchise, BRE agreed to sell the BRE

Property to the Purchaser notwithstanding that BRE had no desire to sell the BRE Property.  To

that end, after extensive negotiations, BRE and the Purchaser entered into that certain Land Sale

Agreement, dated January 23, 2010 (the "**January LSA**"), under which BRE agreed to sell its

right, title and interest in the BRE Property (except for Lots F and G), including all of its option

rights to acquire and develop such Property, as well as other assets of BRE (collectively, the

"**Land Sale Assets**"), to the Purchaser.

47.     As a result of the termination of the January APA and the change in

circumstances that led to the execution of the Asset Purchase Agreement, BRE and the Purchaser

amended and restated the January LSA and entered into that certain Amended and Restated Land

Sale Agreement, dated May 23, 2010 (the "**Land Sale Agreement**"), which is attached to the

Disclosure Statement as Exhibit D, pursuant to which the Land Sale Assets are to be sold to the

Purchaser on substantially similar terms as those contained in the January LSA.

48.     The sale of the Land Sale Assets to Purchaser pursuant to the Land Sale

Agreement is intended to close simultaneously with the consummation of the Asset Purchase

Agreement and is an integral part of the overall sale transaction.

49.     In exchange for the sale of the Land Sale Assets, BRE shall receive

consideration consisting of the following:  (a) cash equal to $5,000,000, (b) a promissory note in

the principal amount of $53,158,991.04 (with interest at 4.1% per annum), (c) a 1% equity

interest in the Purchaser, (d) the assumption and payment in full by the Purchaser of BRE's

obligation to Emerald Diamond of approximately $12.8 million related to BRE's acquisition of

the Land Sale Assets from Emerald Diamond in 1998 (the "**ED Land Note**"), and (e) the

assumption by the Purchaser of the certain liabilities associated with or related to the Land Sale

Assets.

50.     As further inducement to BRE to sell the BRE Property, TRBP has agreed

to indemnify BRE and certain of its affiliates in connection with any litigation arising from or

related to the Sale.

51.     The sale of the Texas Rangers franchise and the Ballpark Lease, together with the separate sale of the Land Sale Assets, have an aggregate transaction value of approximately $575 million.

52.     Additionally, pursuant to a separate letter agreement between Thomas O. Hicks and the Purchaser, based on his status as the former Chairman of the Board, Mr. Hicks will receive certain perquisites in connection with the Land Sale Agreement, including, but not limited to, seat tickets and parking passes for future years, the title of "Chairman Emeritus" for three years and other rights customary to former owners in the sale of professional sports teams.

*MLB Approval.*

53.     The Debtor, as a member of Major League Baseball, is subject to the rules and regulations of MLB.  In particular, any sale of the Texas Rangers franchise cannot be consummated without first obtaining the requisite approval from the Commissioner of MLB and 75% of the MLB clubs.  The sale of any MLB club must comply with the process set forth in the Major League Constitution and the MLB ownership guidelines.  Accordingly, TRBP has worked very closely with MLB throughout the negotiation of the Asset Purchase Agreement and all related events leading to the filing of the Chapter 11 Case.  As of the date hereof, the Debtor is not aware of any opposition by MLB or the requisite percentage of MLB clubs required to consent to the Sale.

*Use of Cash Collateral/DIP Financing.*

54.     The Debtor does not have sufficient unencumbered sources of working capital and financing to carry on the operation of its business and fund the Chapter 11 Case without utilizing the cash collateral of the Lenders and Baseball Finance and obtaining postpetition financing.  Baseball Finance has agreed to provide TRBP with a debtor in possession credit facility (the "**DIP Facility**") in the amount of $11,500,000 to fund any amounts

necessary above the cash collateral on the terms set forth in the DIP Facility.  As described

further below, in connection with the use of cash collateral, the interests of Lenders and MLB are

adequately protected by the substantial equity cushion that currently exists, as the cash proceeds

TRBP is expected to receive from the Sale (approximately $287 million) are substantially in

excess of the aggregate secured claims of the Lenders and MLB against TRBP.  TRBP believes

that the use of cash collateral, along with the proceeds of the DIP facility, will provide the

Debtor with the necessary, additional capital to operate its business in the ordinary course of

business, pay all its personnel, including, but not limited to, the Texas Rangers ballplayers,

maximize value, and successfully facilitate the transactions to be effectuated in the Prepackaged

Plan.

### The Prepackaged Plan

55.    As stated above, concurrently herewith, the Debtor has filed its

Prepackaged Plan.  The primary purpose of the Prepackaged Plan is to bridge the impasse

between TRBP and the Lenders under the HSG Credit Agreement and to effectuate the Sale of

the Texas Rangers franchise to the Purchaser and satisfy TRBP's creditors in full.

56.    The Prepackaged Plan provides for the Sale to be consummated on the

effective date (the "**Effective Date**") and sets forth the distribution that each class of the

Debtor's creditors and equity holders is to receive on the Effective Date under the Prepackaged

Plan.  All TRBP's creditors will be paid in full under the Prepackaged Plan or have their claims

assumed by the Purchaser under the Asset Purchase Agreement.  Specifically, each holder of an

(i) Allowed Priority Non-Tax Claim, (ii) Allowed First Lien Holder Claim, (iii) Allowed Second

Lien Holder Claim, (iv) Allowed MLB Prepetition Claim, (v) Allowed Secured Tax Claim,

(vi) Allowed Other Secured Claim, (vii) Allowed Assumed General Unsecured Claim,

(viii) Allowed Non-Assumed General Unsecured Claim, (ix) Allowed Emerald Diamond Claim,

(x) Allowed Overdraft Protection Agreement Claim, (xi) Allowed Intercompany Claim, and

(xii) Allowed TRBP Equity Interest (all as defined in the Prepackaged Plan) is unimpaired and

will be paid in full.

57.     Additionally, TRBP believes that the Purchaser will build on past team

successes and that the future of the Texas Rangers will be in the hands of an ownership group

that will be a good steward for the game.

58.     TRBP believes that because the Prepackaged Plan satisfies in full all

claims against TRBP, is supported by TRBP's equity holders, and will lead to the least

disruption to the Texas Rangers' business of playing baseball, the Prepackaged Plan is in the best

interests of the Texas Rangers franchise and all parties in interest.

## IV.     SUMMARY OF FIRST DAY PLEADINGS

59.     Concurrently with the filing of its chapter 11 petition, the Debtor has filed,

for the Court's approval, a number of First Day Pleadings, which the Debtor believes are

necessary to enable it to operate in chapter 11 with a minimum of disruption and loss of

productivity.  The Debtor respectfully requests that each of the First Day Pleadings be granted,

as they are a critical element to facilitating the Debtor's smooth and orderly operations with

minimal disruption during the pendency of this Chapter 11 Case.  A description of the relief

requested and the facts supporting each of the First Day Pleadings is set forth below.

**A.     Debtor's Motion for Authority to Pay Prepetition Use Taxes, Property
        Taxes, and Certain Other Governmental Assessments**

60.     By this motion (the "**Tax Motion**"), the Debtor requests authorization to

pay all prepetition sales and use taxes, and other certain governmental assessments of franchise

fees to various Taxing Authorities, including those obligations subsequently determined upon

audit to be owed for periods prior to the Commencement Date.  A list of the Taxing Authorities

is annexed as <u>Exhibit A</u> to the Tax Motion.[1]  Although the Debtor believes the list of Taxing

Authorities set forth therein is substantially complete, the relief requested in the Tax Motion is to

be applicable with respect to all Taxing Authorities and is not limited to those Taxing Authorities

set forth therein.

61.    In the normal course of business, the Debtor sells products directly to

consumers in the form of tickets, merchandise, concessions, and other items.  The Debtor is

required to collect sales taxes (the "<u>Sales Taxes</u>") from such customers on behalf of the

applicable Taxing Authorities.  Typically, Sales Taxes accrue as tangible goods and services are

sold to customers and are calculated based on a fixed statutory percentage of the sale price

invoiced to the customer.  The Debtor calculates the Sales Taxes and includes the Sales Taxes in

the total amount paid by the customer for the tangible good or service.  The Debtor then remits

the collected Sales Taxes in one payment on the 20th of each month to the Texas Comptroller's

Office, a Taxing Authority.  This monthly payment is then divided by the Texas Comptroller's

Office among the State of Texas, Tarrant County, Dallas County, the City of Arlington, the City

of Fort Worth and the City of Dallas, each a Taxing Authority that levies Sales Taxes based on

the statutory percentage of the sale price paid by the customer.

62.    The Debtor also incurs and collects use taxes (the "<u>Use Taxes</u>," and

together with the Sales Taxes, the "<u>Sales and Use Taxes</u>").  The Debtor incurs Use Taxes in

connection with the purchase of taxable equipment and supplies for its own use, in circumstances

where the vendor of such equipment and supplies is not required to collect a sales tax from the

---

[1] The Debtor remits taxes to Taxing Authorities in respect of federal, state, and local income taxes, social security, and Medicare that the Debtor withholds from employees' wages.  Remittance of these taxes to the applicable taxing authorities is addressed in the *Debtor's Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing Payment of Wages, Compensation, and Employee Benefits*.

Debtor.  Generally, the Debtor remits the Use Taxes to the applicable Taxing Authorities on the same terms as its remits Sales Taxes.  The Debtor primarily incurs Use Taxes in the State of Texas, but may also incur Use Taxes in the State of Arizona during spring training.

63.    As of May 24, 2010, the Debtor estimates that approximately $520,000 in Sales and Use Taxes, relating to the prepetition period will become due and owing to the Taxing Authorities in the ordinary course of business.  This amount reflects Sales and Use Taxes accrued by the Debtor in the month May.

64.    The Debtor is required to pay franchise fees on its capital stock in certain states (the "Franchise Taxes").  The Franchise Taxes are typically paid annually to the applicable Taxing Authorities.

65.    As of May 24, 2010, the Debtor estimates that it owes approximately $13,500 to certain Taxing Authorities on account of Franchise Taxes, relating to the prepetition period.

66.    Payment of the prepetition Sales and Use Taxes, and Other Governmental Assessments (each as defined in the Tax Motion) is critical to the Debtor's continued, uninterrupted operations.  Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtor from conducting business in the applicable jurisdictions, or seeking to lift the automatic stay, any of which would disrupt the Debtor's day-to-day operations and could potentially impose significant costs on the Debtor's estate.

67.    Moreover, many federal and state statutes hold officers of collecting entities personally liable or criminally responsible for certain taxes owed by those entities.  To the extent that any Sales and Use Taxes remain unpaid by the Debtor, the Debtor's officers and

directors may be subject to lawsuits or criminal prosecution during the pendency of this Chapter

11 Case.  The threat of a lawsuit or criminal prosecution, and any ensuing liability, would

distract the Debtor and its personnel from important tasks, to the detriment of all parties in

interest.  The dedicated and active participation of the Debtor's officers and other employees is

not only integral to the Debtor's continued, uninterrupted operations, but also essential to the

orderly administration of this Chapter 11 Case.

68.     Consequently, I believe the relief requested in the Tax Motion is in the

best interests of the Debtor, its estate, and all parties in interest, and should be granted.

**B.     Debtor's Motion Pursuant to Sections 105(a), 363(c) and 345(b) of the Bankruptcy
        Code for (I) Authorization to (A) Continue Using the Existing Cash
        Management Systems (B) Maintain Existing Bank Accounts, and (II) An Extension
        of Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code**

69.     By this motion (the "**Cash Management Motion**"), the Debtor seeks

entry of an order, pursuant to sections 105(a), 363(c) and 345(b) of the Bankruptcy Code,

granting it (i) authorization to (a) continue its existing Cash Management System (as defined

below) and (b) maintain existing bank accounts, and (ii) an extension of time to comply with

section 345(b) of the Bankruptcy Code.  Without the requested relief, it is my belief that the

Debtor would be unable to maintain its financial operations effectively and efficiently, which

would cause significant harm to the Debtor and to its estate.

70.     To manage its business efficiently and seamlessly, the Debtor utilizes a

centralized cash management system (the "**Cash Management System**") to collect and transfer

the funds generated by its operations and to disburse funds to satisfy its financial obligations.

The Cash Management System facilitates the Debtor's cash monitoring, forecasting, reporting,

and enables the Debtor to maintain control over the administration of its bank accounts (the

"**Bank Accounts**"), all but one of which is held at PlainsCapital Bank ("**PlainsCapital Bank**") [2].
The Debtor has one Bank Account for minor league petty cash disbursements ("**TRBP Minor
League Account**"), which is held at Bank of America ("**Bank of America**").

71.     The Cash Management System has five main components: (i) cash
collection, including the collection of payments made to the Debtor by customers,
(ii) concentration; (iii) disbursements; (iv) corporate credit card; and (v) payroll.  For
demonstrative purposes, a diagram generally illustrating the Cash Management System is
annexed as Exhibit B to the Cash Management Motion.

72.     The Cash Management System constitutes an ordinary course and
essential business practice that provides significant benefits to the Debtor, including, among
other things, the ability to (i) control corporate funds; (ii) ensure the maximum availability of
funds when and where necessary; and (iii) reduce administrative expenses by facilitating the
movement of funds and the development of more timely and accurate account balance
information.  Based upon the foregoing, maintenance of the existing Cash Management System
is in the best interest of the Debtor and its estate.

73.     I am informed by counsel that the Office of the United States Trustee (the
"**U.S. Trustee**") for the Northern District of Texas "Guidelines for Chapter 11 Debtors-in-
Possession" (the "**U.S. Trustee Guidelines**") mandate the closure of the Debtor's prepetition
bank accounts and the opening of new accounts, including special accounts for the payment of
taxes and segregation of cash collateral. If the Debtor was required to comply with all of these
guidelines, it is my belief that its operations would be severely harmed by the disruption,

---

[2] Although the Bank Accounts at PlainsCapital Bank were specifically dedicated to the Debtor's sole use, the Bank
Accounts were previously held in the name of HSG.  Prior to the Commencement Date, the ownership of the Bank
Accounts was changed from HSG to the Debtor.

confusion, delay, and cost that would most certainly result from the closure of its existing Bank

Accounts and the opening of new accounts.

74.     The Debtor believes, therefore, that its transition to chapter 11 will be

more smooth and orderly, with minimal disruption and harm to its operations, if the Bank

Accounts are continued following the Commencement Date with the same account numbers;

provided, however, that checks issued or dated prior to the Commencement Date will not be

honored, absent a prior order of this Court.  By preserving business continuity and avoiding the

disruption and delay to the Debtor's collection and disbursement procedures that would

necessarily result from closing the Bank Accounts and opening new accounts, all parties in

interest, including employees, vendors, and customers, will be best served.  Accordingly, the

Debtor respectfully requests authority to maintain the Bank Accounts in the ordinary course of

business, to continue utilizing the Cash Management System to manage cash in a manner

consistent with prepetition practices, and to pay any ordinary course Bank fees that may be

incurred in connection with the Bank Accounts prior to or following the Commencement Date.

75.     Furthermore, the Debtor requests that the Banks be authorized to accept

and honor all representations from the Debtor as to which checks should be honored or

dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior

to, on, or subsequent to the Commencement Date.  The Debtor further requests that the Banks

not be liable to any party on account of following the Debtor's instructions or representations

regarding which checks should be honored.  The Banks should be permitted to accept and

process chargebacks against the Bank Accounts arising out of returned deposits into such

accounts without regard to the date such return item was deposited.

76.     By the Cash Management Motion, the Debtor also seeks a forty-five day extension of the time to comply with section 345(b) of the Bankruptcy Code.  During the extension period, the Debtor proposes to engage the Office of the United States Trustee in discussions to determine what modification to its investment guidelines, if any, would be appropriate under the circumstances.  The Debtor believes that the benefits of the requested extension far outweigh any harm to the estate.

77.     The Debtor's Bank Accounts are held at PlainsCapital Bank and Bank of America, which are banks that have been approved by the United States Trustee for the Northern District of Texas (the "**U.S. Trustee**") as authorized depositories ("**Authorized Depositories**"). Accordingly, I believe that any funds that are deposited in the Debtor's Bank Accounts are secure and, thus, the Debtor are in compliance with section 345 of the Bankruptcy Code.

78.     In addition, the Debtor believes that funds held in its Bank Accounts, even those in investment accounts and in excess of the usual limits insured by the FDIC, are secure and that obtaining bonds to secure those funds, as required by section 345(b) of the Bankruptcy Code, is unnecessary and detrimental to the Debtor's estate and creditors.  The Debtor submits that "cause" exists pursuant to section 345(b) of the Bankruptcy Code to extend the time to comply with this section's requirements because, among other considerations, (i) the Debtor's Banks are federally or state chartered banks subject to supervision by federal banking regulators, (ii) the Debtor retains the right to remove funds held at the Banks and establish new bank accounts as needed, (iii) the cost associated with satisfying the requirements of section 345 is burdensome, and (iv) the process of satisfying those requirements would lead to needless inefficiencies in the management of the Debtor's business.  Moreover, strict compliance with the requirements of section 345 of the Bankruptcy Code would not be practical in this Chapter 11

Case.  A bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such bond is available at all.

79.    Moreover, I further believe that maintaining TRBP's corporate credit card is critical to the continued operation of the Debtor's business.  The nonpayment of any corporate credit card expenses could result in JP Morgan terminating the corporate credit card. Termination of the corporate credit card could result in significant disruption to the current Major League Baseball season by causing the Texas Rangers to be unable to attend baseball games outside of Arlington, Texas due to the inability to reserve and pay for airline and hotel expenses—a risk that is not prudent in these circumstances.  In addition, payment of the corporate credit card expenses will not be to the detriment of other creditors in this case.  As discussed herein, JP Morgan is a secured creditor and holds a security deposit of $590,000 in an account it controls.  The nonpayment of any corporate credit card expenses could result in the forfeiture of the security deposit and the termination of the corporate credit card.

80.    Based on the foregoing, the relief requested in the Cash Management Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtor's estate and its creditors.  Accordingly, I believe the relief requested in the Cash Management Motion should be granted.

**C.    Debtor's Motion (i) Authorizing The Debtor to Pay Wages, Salaries, Compensation, And Employee Benefits, And (ii) Authorizing and Directing the Debtor's Financial Institutions to Honor and Process Checks and Electronic Funds Transfers Related to Such Obligations**

81.    By this motion (the "**Employee Motion**"), the Debtor requests, pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code, entry of an order (i) authorizing, but not requiring, the Debtor to (a) pay, in its sole discretion, wage, salary and commission obligations, payroll taxes, garnishments, expense reimbursements, employee benefits, bonuses,

certain severance obligations, and retirement plan and benefit obligations, and costs incident to

the foregoing (each as defined in the Employee Motion, and collectively, the "**Employee**

**Obligations**"), and (b) maintain and continue to honor its practices, programs, and policies for

its employees (the "**Employee Benefits**") as they were in effect on the Commencement Date,

and as they may be modified, amended, or supplemented from time to time in the ordinary

course of business, and (ii) authorizing the Debtor's banks and financial institutions to receive,

honor, process, and pay any and all checks or electronic funds transfers drawn on the Debtor's

accounts in satisfaction of Employee Obligations and Employee Benefits.

*The Debtor's Prepetition Employee Obligations.*

82.      In the ordinary course of its business, the Debtor incurs payroll and

various other obligations and provides other benefits to its employees for the performance of

services.  As of the Commencement Date, the Debtor employs approximately 320 regular, full-

time individuals whose services are required by the Debtor year-round, including administrative,

sales, customer service, marketing, maintenance and security personnel, as well as broadcasters,

coaches, scouts, and player development and other baseball operations personnel (collectively,

the "**Full-Time Employees**").  In addition to the Full-Time Employees, the Debtor also employs

(i) approximately 45 part-time individuals (collectively, the "**Part-Time Employees**");

(ii) approximately 1,275 individuals who provide services to the Debtor only during the MLB's

active season, including, among others, statisticians, event staff, broadcast crews, and technical

staff (collectively, the "**Seasonal Employees**"); (iii) 265 Rangers players (the "**Players**"), and

(iv) approximately 24 part-time interns (the "**Interns**" and, together with the Full-Time

Employees, the Part-Time Employees and the Seasonal Employees, the "**Non-Player**

**Employees**" and, the Non-Player Employees together with the Players, the "**Employees**").

83.     Out of the 265 Players, there are currently 42 Players on the Texas

Rangers' MLB roster (the "**MLB Players**"), and the remaining Players play in the minor leagues

(the "**Minor League Players**").  Of the 42 MLB Players, only 25 MLB Players play in the MLB

at any time, with the remainder playing in the minor league or not playing due to injury.  The

Players' contracts are all individually negotiated and their compensation varies according to the

terms of their contracts and whether they are playing in MLB or the grade of club for which they

are playing in the minor leagues.

84.     The approximately 1,664 Non-Player Employees and 223 Minor League

Players not under the terms of a Major League contract are not members of any union.  However,

the MLB Players, who are under the terms of a Major League contract whether they are currently

in the Major Leagues or the Minor Leagues, are members of the Major League Baseball Players

Association union.

85.     Of the approximately 1,664 Non-Player Employees, two are officers of the

Debtor—Lynn Nolan Ryan, Jr. as President[3] and myself as Chief Financial Officer and

Secretary.

86.     The extent of the Debtor's payroll obligations to a particular Full-Time

Employee depend primarily upon whether such Full-Time Employee is salaried or, alternatively,

compensated for services on an hourly basis.  As of the Commencement Date, the Full-Time

Employees consist of approximately (i) 320 salaried Employees and (ii) 69 non-salaried

Employees, who accrue wages on an hourly basis and are entitled to overtime compensation for

hours worked in excess of 40 hours per week, or on weekends, equal to 1.5 times their regular

---

[3] Mr. Ryan is one of the Highly Compensated Non-Player Employees (as defined below) as well as one of the
Purchasers under the Prepackaged Plan.

hourly pay rate.  Most of the Part-Time Employees, Seasonal Employees, and Interns earn wages

on an hourly basis.

87.     Pursuant to the terms of that certain Interim Transition Services

Agreement (the "**ITSA**"), dated May 23, 2010, five of the Debtor's Full-Time Employees (the

"**Shared Cost Employees**") provide services to both the Debtor and the Debtor's affiliate, Dallas

Stars, L.P (the "**Stars**").  These Shared Employees provide human resources services, legal

services, information technology services and payroll and accounting services to both the Debtor

and the Stars.  As contemplated by the ITSA, the Debtor and the Stars each pay a percentage of

the Shared Cost Employees' salaries, based on the approximate individual breakdown of time

spent performing services for each entity.  The Debtor is responsible for between 60%-80% of

the total salaries and benefits of the Shared Cost Employees based on the established individual

breakdowns.  Pursuant to the terms of the ITSA, the Debtor pays the salaries of the Shared Cost

Employees and the Stars reimburse the Debtor on a monthly basis in advance for the Stars'

portion of the Shared Cost Employees' salaries.  As of the Commencement Date, the Debtor is

not in possession of any money that would be a prepayment of the Stars for its monthly share of

the Shared Employees' salaries.  Contemporaneously with the Sale, as contemplated by the

Prepackaged Plan, the Shared Cost Employees will continue to work for both the Purchaser and

the Stars.  All payroll and benefits amounts provided within this Motion reflect only the amounts

payable by the Debtor to the Shared Cost Employees and do not include any amounts payable to

the Shared Cost Employees by the Stars.

88.     The Debtor, in the ordinary course of its business, also incurs payroll and

various other obligations to the Players.  As discussed in more detail below, the nature and extent

of the Debtor's payroll and Employee Benefits obligations to the Players is governed by the

MLB's collective bargaining agreement with its players, effective as of December 20, 2006 (the

"**CBA**") and are regulated by MLB and by individual contracts with each Player.

89.    HSG processes Employee payroll obligations (including payroll

obligations related to both Non-Player Employees and Players) for the Debtor.  The Debtor first

transfers the funds to HSG and HSG then pays those Employee Obligations.[4]  The Debtor

intends to maintain its current payroll system until the completion of the Sale on the Effective

Date, as contemplated by the Prepackaged Plan.

90.    The Debtor has incurred costs and obligations in respect of the Employees

that remain unpaid because they accrued, either in whole or in part, prior to the Commencement

Date.  As a result of the Debtor's payroll practices, even though accrued prior to the

Commencement Date, these obligations will become due and payable in the ordinary course of

the Debtor's business only on or after the Commencement Date.  In addition, the Debtor will

continue to incur payroll and other obligations to the Employees on a prospective basis.

91.    Due to the fact that a major league baseball club's roster is continually

changing, as players are moved from MLB to the minor leagues and vice versa or are moved

within the minor leagues, it is impossible to estimate the Debtor's average monthly gross payroll

with complete accuracy.  However, based on payments made for the May 15, 2010 payroll date,

the Debtor estimates that they pay approximately $16,870,000 in wages per month during the

baseball season (including amounts withheld for Withholding Taxes, contributions to the 401(k)

---

[4] This arrangement is discussed further in the Motion of Debtor, Pursuant to Sections 105(a), 345(b), 363(c) and
364(a) of the Bankruptcy Code, for (i) Authority to Continue to Use Existing Cash Management Systems,
(ii) Authority to Maintain Existing Bank Accounts and Business Forms and (iii) an Extension of the Debtor's Time
to Comply with Section 345(b) of the Bankruptcy Code (the "**Cash Management Motion**").

Plan and the Flex Program), of which approximately (i) $3,675,000 relates to Non-Player

Employee obligations and (ii) $13,195,000 relates to Player Employee obligations.

## A.      Non-Player Employee Obligations

### I.      Wages, Salaries and Compensation Expenses

92.      Prior to the Commencement Date and in the ordinary course of business,

the Debtor typically pays obligations relating to wages, salary, and compensation for its

Non-Player Employees on a semi-monthly basis on the 15th and last day of each month (the

"**Non-Player Wage Obligations**").  Full-Time Employees are paid current each pay period,

while the Part-Time Employees, Seasonal Employees, and Interns are paid on the 15th of each

month for hours worked through the 5th of the month, and on the last day of the month for hours

worked through the 20th of the month.

93.      In addition to typical wages, the Non-Player Wage Obligations include

certain commissions earned by Non-Player Employees including, but not limited to, those

Non-Player Employees involved in the sale and renewal of season and group ticket packages and

the sale of sponsorship packages.  The Debtor estimates that, as of the Commencement Date,

approximately $2,500,000 of Non-Player Wage Obligations (including $50,000 of commissions)

owed to Non-Player Employees remain accrued and outstanding.  The Debtor estimates that of

the Non-Player Wage Obligations, other than the Highly Compensated Non-Players Employees

(as defined below) no individual is owed wages or commissions in excess of $11,725 and thus

the full amounts of claims based on those obligations would be entitled to priority under section

507(a)(4) of the Bankruptcy Code.

94.      The Debtor has two highly compensated Non-Player Employees (the

"**Highly Compensated Non-Player Employees**") who are responsible for the overall

management and operations of the Debtor.  As of the Commencement Date, the Debtor estimates

that it owes the Highly Compensated Non-Player Employees $35,156.25 and $25,781.06,

respectively.  However, as discussed in greater detail herein, Debtor believes that due to the

unique circumstances of this chapter 11 case, wherein all unsecured claimants are being paid in

full, the Debtor should be allowed to pay the Highly Compensated Non-Player Employees in full

in the ordinary course, notwithstanding the provisions of section 507(a)(4) of the Bankruptcy

Code.

95.     In general, the payroll obligations of the Debtor, especially as to its

Seasonal Employees, vary greatly from pay period to pay period depending on the number of

home games the baseball club plays in that particular period.  The Debtor estimates that it pays

Seasonal Employees approximately $62,500 per game in hourly wages, not including overtime.

The Debtor estimates that average monthly overtime it pays to Part-Time Employees and

Seasonal Employees is approximately $100,000 during the season.

96.     In addition to the foregoing Non-Player Wage Obligations and

commissions, certain of the Debtor's Non-Player Employees incur various expenses in the

discharge of their duties, such as travel and meal expenses.  Because such expenses are incurred

in connection with the performance of duties that fall within the scope of such individuals'

employment, the Debtor reimburses such authorized business expenses in full (the "**Non-Player**

**Expense Reimbursements**") after submission of appropriate documentation to the employee's

immediate supervisor and the Debtor's accounting department.  Certain Non-Player Expense

Reimbursements are travel-related expenses, and include transportation, hotel and other

accommodations, and meals.  Non-Player Expense Reimbursements are paid by the Debtor on

the 15th day of the month, for approved expense reports received by the Debtor's accounting

department by the 6th day of the month, or on the last day of the month for reports received by

the 20th day of the month.  All Non-Player Expense Reimbursement obligations are administered

internally by the Debtor.  Due to the seasonality associated with expenses, it is difficult to

estimate a gross monthly average.  However, based on May 15, 2010 payroll, the Debtor

estimates the Non-Player Expense Reimbursements average approximately $160,000 per month

during the season.  The Debtor estimates that approximately $75,000 of prepetition Non-Player

Expense Reimbursements will be outstanding as of the Commencement Date.

*Obligations in Respect of Payroll Taxes.*

    97.  The Debtor is required by law to withhold from the wages of Employees

certain amounts related to federal, state, and local income taxes, as well as social security and

Medicare taxes (collectively, the "**Withholding Taxes**") and to remit any such withheld amounts

to the appropriate taxing authorities (collectively, the "**Taxing Authorities**").  Based on the May

15, 2010 payroll, the Debtor estimates that it withholds approximately $395,000 per pay period

for obligations relating to Non-Player Wage Obligations during the baseball season.  As with

other payroll numbers, these amounts vary greatly from pay period to pay period, depending on

the number of home games the baseball club plays.  The Debtor is also required to make

matching payments from its own funds on account of social security and Medicare taxes, and to

pay, based upon a percentage of gross payroll and subject to state-imposed limits, additional

amounts for, among other things, state and federal unemployment insurance (collectively, with

the Withholding Taxes, the "**Payroll Taxes**").  The Debtor estimates that it does not owe any

amount for federal Payroll Taxes as of the Commencement Date.  However, the Debtor also

withholds certain state Payroll Taxes of Non-Player Employees for Taxing Authorities in

Arizona, California, Colorado, Iowa, Illinois, Louisiana, Michigan, Missouri, North Carolina,

Nebraska, New Jersey, New Mexico, Oklahoma and Pennsylvania (the "**Taxing States**"), where

certain Non-Player Employees reside.  These Payroll Taxes are remitted to the Taxing States at

various frequencies, dependent upon the laws of the Taxing States.  Some state Payroll Taxes are

remitted bi-monthly, while other state Payroll Taxes are remitted as infrequently as quarterly.

The Debtor estimates that approximately $20,000 of Withholding Taxes and Payroll Taxes have

been withheld from the Non-Player Employees and remain outstanding as of the Commencement

Date.

## A.    Non-Player Employee Benefit Plans.

98.    In the ordinary course of business, the Debtor has established various

benefit plans and policies for its Non–Player Employees, which can be divided into the following

categories: (a) bereavement leave, holiday pay, jury duty, family and medical leave, military

leave, personal leave, short term disability, personal days, and vacation days (collectively, the

"**PTO Plans**"), (b) medical, dental and vision benefits, life insurance, long-term disability

insurance, and flexible benefit plans (collectively, the "**Health and Welfare Plans**"), (c) 401(k)

plan benefits (the "**401(k) Plan**"), (d) the severance plans, (e) employee ticket programs

merchandise discount programs (the "**Discount Programs**"), and (f) The Employee Assistance

Plan ((i)-(v) collectively, the "**Non-Player Employee Benefit Plans**").  In connection with the

provision by the Debtor of the Health and Welfare Plans and the 401(k) Plan, the Debtor directly

deducts specified amounts from otherwise payable Non-Player Wage Obligations.

### (a)    Paid Time Off Benefits

99.    Under the PTO Plans, all of which are administered internally by the

Debtor, eligible Non-Player Employees accrue paid time off and related benefits based on the

following:

(i)    *Vacation and Personal Days*

100.    Full-Time Employees receive up to eight paid personal days each calendar

year, to be used at the employees' discretion for sick days or personal days.  Personal days

accrue from the date of hire at the rate of 2.5 hours per pay period, with an eight day annual maximum.  In the event of termination, unused personal days are not paid.  Unused personal days are also not paid or carried over at the end of the year.

101.    In addition, Full-Time Employees accrue ten vacation days in their first year of employment, which increases to: (i) fifteen vacation days from the fifth to ninth years of employment, and (ii) twenty vacation days for more than ten years of service.  A maximum of five unused vacation days may be accrued from one year to the next but must be used in the first quarter of the next year.  The Debtor does not remit payment in lieu of vacation days, unless an employee terminates his or her employment.  The Debtor also reimburses terminated Employees for accrued vacation days, as required by law.

(ii)    *Holiday Pay*

102.    Full-Time Employees are allowed up to eight paid holidays on specified public holidays during the calendar year.  If a Full-Time Employee is required to work on a scheduled holiday, such Employee will be entitled to compensatory days, at a time agreed upon by his or her supervisor, in lieu of the worked holiday.

(iii)    *Other Paid Time Off Benefits*

103.    Under the Family & Medical Leave Act 1993, employees are entitled to twelve weeks of unpaid, job-protected leave for certain family and medical reasons (such as the birth or adoption of a child, the care of a spouse, child or parent of the employee or due to the employee's own serious health condition) (the "FMLA Leave").  Under the policy, employees who have been employed for at least one year and for 1,250 hours during the twelve month period immediately preceding the requested leave time are eligible.  Employees are entitled to a total of twelve work weeks of FMLA Leave in a rolling 12-month period.  If an employee has health benefits through the Debtor, the employee's benefits will continue while on leave.

104.    In addition, under the short-term disability policy, Full-Time Employees who exhaust their sick leave days and remain medically disabled may be eligible for salary continuation for up to a maximum of six weeks in a 12-month period (the "Short-Term Disability Pay").  Short-term disability may run concurrent with FMLA Leave.  Short-Term Disability Pay is intended to compensate employees absent from work due to a temporary medical disability (including pregnancy and childbirth).  Full-Time Employees with more than six months service qualify for two weeks of Short-Term Disability Pay per 12-month period.  This increases to four weeks pay per 12-month period for Full-Time Employees with between one and two years' service, and to six weeks pay per 12-month period for those with more than two years of service.  Short-Term Disability Pay covers base pay only, and an Employee's health coverage will continue at the same level during the leave.

105.    In addition, Full-Time Employees are also given reasonable paid bereavement time in the event of a death within the immediate family.  The standard amount of time off on account of bereavement is up to three days, but may be increased on an unpaid basis upon approval by the Debtor.  In addition, Full-Time Employees also are eligible for up to ten days of paid leave for jury duty.  Finally, the Debtor will grant leaves of absence as required by law for Employees who are members of the military service.  Such Employees will be granted a military leave of absence without pay, but Employees who are on short-term Reserves or National Guard duty will be paid the difference between their normal base pay and military pay for up to two weeks per year.

**(b)      Health and Welfare Benefits**

106.    The Debtor sponsors several Health and Welfare Plans to provide benefits to Full-Time Employees, including, without limitation, plans such as (i) medical, dental, and vision, (ii) flexible benefit programs, (iii) life insurance and accidental death and dismemberment

("**AD&D**") insurance, (iv) long-term disability benefits, and (v) executive long-term disability insurance and supplemental income protection insurance.  Part-Time Employees are not entitled to participate in the Health and Welfare Plans.

(i)      <em>Medical, Dental, and Vision Benefits</em>

107.      The Debtor offers various health benefits, including, among others, medical, dental, and vision benefits.  All three plans are preferred provider organizations ("**PPOs**"), under which improved benefits are available when using a network doctor, dentist, or provider.  These plans are offered to Full-Time Employees and are available to their families. The medical PPO is provided by Highmark Blue Cross Blue Shield, and offers two levels of benefits, depending on whether the provider is in or out of network (the "**Medical PPO**"). Under the Medical PPO, the Debtor is required to submit an annual premium of $2,138,341.20, payable in equal monthly installments.  The Debtor takes a portion of the wages paid to the over 250 Full-Time Employees that subscribe to the Medical PPO and applies that toward the annual premium (the "**Employee Contribution**").  The annual Employee Contribution is $367,498.56, leaving the Debtor's portion of the Medical PPO at $1,770,842.64 annually.  Because it prepays its monthly obligations for the Medical PPO, the Debtor does not believe that as of the Commencement Date it owes any amounts based on the Medical PPO.  Further, the Debtor has remitted the Employee Contribution withheld as part of the May 15, 2010 pay period to Highmark Blue Cross Blue Shield for the Medical PPO.

108.      Dental benefits are provided through United Concordia (the "**Dental PPO**"), and operate on a similar basis to the Medical PPO.  Under the Dental PPO, the Debtor is required to submit an annual premium of $118,838.88, payable in equal monthly installments. As with the Medical PPO, the 190 Full-Time Employees that subscribe to the Dental PPO make an Employee Contribution directly from their paychecks.  The annual Employee Contribution for

the Dental PPO is $27,258.72, leaving the Debtor's portion of the Dental PPO at $91,580.16

annually.  Because it prepays its monthly obligations for the Dental PPO, the Debtor does not

believe that as of the Commencement Date it owes any amounts based on the Dental PPO.

Further, the Debtor has remitted the Employee Contribution withheld as part of the May 15,

2010 pay period to United Concordia for the Dental PPO.

109.    Vision benefits are provided through Davis Vision Inc. (the "**Vision
PPO**"), and include reduced fees for examinations and eyewear from a network provider.  Under

the Vision PPO, the Debtor pays an annual premium of $2,899.20, payable in equal monthly

installments, which is covered entirely by the 170 electing employees.  The Debtor has remitted

the Employee Contribution withheld as part of the May 15, 2010 pay period to Davis Vision, Inc.

for the Vision PPO.

(ii)    *Flexible Benefits*

110.    The Debtor employs a flexible benefit plan that provides Full-Time

Employees the opportunity to pay for eligible expenses, including health insurance premium

contributions, out-of-pocket health care expenses, and dependant care expenses, with pre-tax

dollars through payroll deductions programs (the "**Flex Program**").  Currently 76 Employees

participate in the Flex Program.  The Flex Program allows Full-Time Employees to contribute up

to $2,500 per year of pre-tax income through payroll deductions to be used for eligible out-of-

pocket medical expense of the Employee or a dependent family member and up to an additional

$5,000 per year to be used for dependent care.  Taxsaver Plan administers the Debtor's Flex

Program, but the Debtor holds the balance of the employee money that has been contributed to

the Flex Program.  As of May 17, 2010, the Debtor estimates it is in possession of $2,184

withheld from Full-Time Employees Salaries under the Flex Program, which amounts are

expected to be used by Taxsaver to administer the Flex Program.

(iii)    *Life Insurance and AD&D Insurance*

111.    The Debtor maintains basic life and additional voluntary insurance

coverage for all active Full-Time Employees working 30 or more hours per week in the event of

serious illness or death.  Lincoln National Life Insurance ("**Lincoln**") provides the Debtor's life

insurance plan and AD&D plans, which are maintained under the same insurance policy.  The

life insurance and AD&D insurance plans provide life and AD&D benefits on behalf of all

qualifying Full-Time Employees.  In the event that death occurs from a covered accident, both

the life and the AD&D benefit would be payable, each of which generally pays 150% of such

Full-Time Employees annual compensation (excluding bonuses) up to a maximum $300,000

benefit.  Benefits available under the above-described life insurance and AD&D Programs are

reduced by 35% upon the employee reaching the age of 65, and by an additional 15% at the age

of 70.  Benefits terminate at retirement.  The insurance coverage is provided at a fixed annual

premium paid by the Debtor on a monthly basis in advance.  The Debtor estimates its average

monthly cost of the life and AD&D insurance plans is $7,900.  The Non-Player Employees do

not pay to participate for the life and AD&D insurance plans.  The Debtor estimates that it does

not owe any money at this time for the life and AD&D insurance plans.

112.    In addition, all active Full-Time Employees working thirty or more hours

per week who have served the eligibility waiting period may purchase additional life insurance

through Lincoln, on a payroll deduction basis.  Such employees may purchase protection up to

five times their annual salary (rounded to the next higher $10,000) up to a maximum of

$500,000.  Under the policy, it is also possible to insure spouses and dependent children.  The

Debtor collects money from the electing Non-Player Employees each pay period, but remits

payment to Lincoln once per month.  As such, the Debtor estimates that it currently holds $1,420

collected from the electing Non-Player Employees for the June premiums on the additional life insurance.

(iv)    *Disability Benefits*

113.    The Debtor maintains and administers long-term disability plans through Lockton.  In addition, as described further above, the Debtor provides Short-Term Disability Pay, administered by Lincoln, for Full-Time Employees, according to their length of service. The long-term disability plan is provided to cover active Full-Time Employees working 30 or more hours per week (the "**Long-Term Disability Plan**").  At the Commencement Date, 320 Full-Time Employees were covered under the Long-Term Disability Plan.  There are two separate classes under the Long-Term Disability Plan.  For most Employees, the Long-Term Disability Plan provides 60% of regular monthly base salary, up to a maximum of $5,000 per month, to qualifying employees who may become disabled due to a covered injury or sickness and are unable to work past their 90th day of disability.  In addition, approximately twelve employees[5] are provided a maximum of $10,000 per month due to the occurrence of a disability as described above.  Benefits are reduced by certain other disability or retirement benefits. Employees who are eligible under the Long-Term Disability Plan receive this benefit until the age of 65 or the Social Security Normal Retirement Age, provided the employee continues to meet the definition of disability.  The insurance coverage is provided at a fixed annual premium of $55,000, paid by the Debtor on a monthly basis.  The Debtor estimates its average monthly cost of the life insurance and AD&D insurance plans is $4,600.  The Debtor prepays this amount

---

[5] The coverage states that eligible employees are: All full-time active Presidents, Executive Vice Presidents, Senior Vice Presidents, General Managers, Former General Managers, Assistant General Managers, Consultants, On-Air Commentators, Director-Scouting and Chief Operating Officers working 30 or more hours per week.

on the first of each month, and therefore estimates it does not owe any money on account of the

Supplemental Plan.

(v)    *Executive Benefits*

114.    In addition to the basic Long-Term Disability Plan, the Debtor maintains a

supplemental income protection plan through Unum Life Insurance Company of America (the

"**Supplemental Plan**") for selected full-time executives earning $200,000 or more.  At the

Commencement Date, three executives of the Debtor were covered under the Supplemental Plan.

The Supplemental Plan provides 60% of regular monthly base salary above the $10,000 per

month available under the basic Long-Term Disability Plan, to the three qualifying employees

who become totally disabled due to a covered injury or sickness and unable to work past their

90th day of disability.  The Employees who are eligible for the Supplemental Plan receive this

benefit until the age 65.  The Debtor estimates that its portion of the premium due on the

Supplemental Plan is approximately $161 per month.  The Debtor prepays this amount on the

first of each month, and therefore estimates it does not owe any money on account of the

Supplemental Plan as of the Commencement Date.

115.    Based on the Debtor's total expenditure on the April 30, 2010 payroll date,

the Debtor estimates that average monthly expenditure under the Health and Welfare Plans is

approximately $216,000, and it estimates that nothing will be outstanding under the Health and

Welfare Plans as of the Commencement Date.

**(c)    401(k) Savings Plan**

116.    The Debtor also sponsors a retirement investment plan for its Non-Player

Employees (the "**401(k) Savings Plan**") and automatically withholds 3% of the wages of

participating Non-Player Employees, unless the employee elects a different percentage or elects

not to contribute towards the 401(k) Savings Plan (the "**Withholding Contributions**").  All

Non-Player Employees who have reached the age of 21 are eligible for enrollment in the 401(k)

Savings Plan.  Participants may elect to defer up to 25% of their salary subject to limitations

imposed by current tax law.  Under the 401(k) Savings Plan, for every dollar contributed by an

employee up to 6% of their pay, HSG Holdings, LLC ("**HSG Holdings**") makes contributions of

50% of that portion (the "**Matching Contributions**").

117.    HSG Holdings may also elect to make profit sharing contributions to the

401(k) Savings Plan.  In the ordinary course, profit sharing contributions from the 2009 fiscal

year are scheduled to be allocated among participants by Milliman, Inc. with the June 15, 2010

payroll.  These profit sharing contributions from 2009, totaling $440,000, have already been

contributed by HSG Holdings and will move directly into the participant's individual 401(k)

plans.  In addition, the Debtor remits $10,000 each pay period, which is held in trust throughout

the year and is intended to be the 2010 profit sharing contributions for all participating

Employees.  To date, the Debtor has placed $80,000 into a trust for this purpose.

118.    Contributions made by participating Employees immediately vest each

pay period.  Matching Contributions vest over a 5-year period at a rate of 20% per year.  Profit

sharing contributions do not vest until after five years of service for contributions made prior to

2007, and until after three years of service for contributions made after 2006, upon which time

they vest 100%.  Any non-vested portion of a terminated participant's account balance is

forfeited and such amounts are used to pay plan expenses or to meet HSG Holdings' obligation

to make contributions under the 401(k) Plan.  The 401(k) Plan is provided and administered by

HSG Holdings, with the assistance of Milliman, Inc.  The 401(k) Plan is charged a monthly fee

for administration services (recordkeeping, accounting, trustee, reporting services etc.), which is

charged directly to the 401(k) Plan.  Based on payments made for the May 15, 2010 payroll date,

the Debtor estimates monthly fees for the maintenance of the 401(k) Plan to be approximately

$3,097.79.  As of the Commencement Date, the Debtor does not believe it owes anything based

on those maintenance fees.  The Debtor matched Non-Player Employee Contributions in the

amount of $379,675.03 in 2009.  As of the Commencement Date, the Debtor estimates it does

not owe any amount for Matching Contributions.

   **(d)**  **Severance Policies**

    119.  As of the Commencement Date and in the ordinary course of its business,

the Debtor maintains an internally-administered severance plan for all Full-Time Employees and

Part-Time Employees, which provides for payment of one week's salary for each completed year

of employment (the "**Severance Policy**").  Generally, an Employee is eligible for severance

benefits under the Severance Policy if the Employee is permanently terminated by the Debtor as

a result of a reduction in the Debtor's workforce or an elimination of the Employee's present job

position.  The Severance Policy also provides that the Debtor will provide medical insurance,

typically for a period of time equal to the time wages will continue to be paid, in exchange for an

Employee's waiver and release of all claims against the Debtor.

    120.  As of the Commencement Date, the Debtor estimates that approximately

three Employees terminated prepetition remain entitled to continued severance payments.  None

of the former Employees currently receiving benefits under the Severance Policy are former

insiders of the Debtor.  As of the Commencement Date, outstanding payments remaining in

respect of the Severance Policy are $59,361.09.  All obligations with respect to severance and the

Severance Policy and programs are hereinafter referred to as "Severance Obligations."  As with

the Deferred Compensation obligations (as defined below), the Debtor believes it could cause

potential business disruptions and could even affect the morale of current Employees to not

continue to pay the Severance Obligations in the ordinary course when all unsecured claims are

being paid in full under the Prepackaged Plan and when the Debtor has requested the payment in full of all of its vendors in the ordinary course.  With respect to Employees severed subsequent to the Commencement Date, if any, the Debtor intends to pay all Severance Obligations in the ordinary course of business.

       **(e)**       **Discount Merchandise Programs**

       121.    The Debtor also offers all Full-Time Employees 120 vouchers and Interns 60 vouchers per season that may be redeemed for tickets to specific Texas Rangers' home games (collectively, the "**Ticket Vouchers**").  In addition, if a Full-Time Employee or Intern uses all of his or her vouchers in a season, he or she may be allotted, upon on executive approval, up to 50 more Ticket Vouchers for that season.  Unless otherwise approved, only four Ticket Vouchers can be redeemed at any time and the Ticket Vouchers may not be redeemed for certain restricted games.  However, the Full-Time Employees and Interns have an option to purchase tickets for restricted games at a 50% discount (the "**Ticket Discount**").  Provided they do not join near the end of the season, Full-Time Employees and Interns hired after the start of the season are entitled to a *pro rata* allocation of Ticket Vouchers.  Seasonal Employees are given one voucher per month at the time of their paycheck, where each voucher may be redeemed for four non-restricted games.

       122.    In addition, all Full-Time Employees are entitled to receive a 30% discount on all regularly priced merchandise in the Texas Rangers retail stores, excluding sale and autographed merchandise.  Part-Time Employees, Seasonal Employees, and Interns are offered a 15% discount on all regularly priced merchandise in the Texas Rangers retail stores, excluding sale and autographed merchandise.

(f)    **Relocation Benefits**

123.    The Debtor provides reimbursable expenses to either (i) employees who, at the Debtor's request, relocate to the another city in connection with their employment by the Debtor, or (ii) new employees hired for a senior management level position who are required to relocate (the "**Relocation Benefits**").  The Debtor estimates, that as of the Commencement Date, it has no outstanding Relocation Benefits due to any Employees.

B.    **Player Obligations**

124.    As a Major League Baseball Club, the Major League Constitution and Major League Rules govern the affairs of the Debtor.  As a member of MLB, the Debtor is also subject to the rules and regulations set forth in the CBA.  Pursuant to the CBA, MLB dictates permissible terms of MLB player compensation.  The current CBA has been in effect since December 20, 2006 and will terminate on December 11, 2011.  Labor relations between MLB and the Players are governed by the CBA.  Minor League Players are not covered by the provisions of the CBA until such time as they may become MLB Players.

I.    **Player Salaries**

125.    The current amount of guaranteed MLB Player contracts is $63,024,540 for the 2010 season, and no performance bonuses are currently due and payable to MLB Players. Prior to the Commencement Date and in the ordinary course of business, the Debtor typically paid obligations relating to player salaries (the "**Player Salaries**" and, together with the Non-Player Wage Obligations, the "**Wage Obligations**") on the same semi-monthly basis as Non-Player Employees.  On the 15th and last day of each month, the Players are paid current based on their individual earned Player Salaries.  The Debtor estimates that, as of the Commencement Date, $3,830,806 in Player Salaries has accrued but not been paid.  The Player

Salaries owed to many of the MLB Players are in excess of the $11,725 priority cap set forth in section 507(a)(4) of the Bankruptcy Code.

126.    In addition to Player Salaries, certain Players receive signing bonuses. Signing bonuses for 2009 domestic drafts have been fully paid, and most international signings are pending approval by the MLB; however, the Debtor is aware of approximately $10,000 in obligations for signing bonuses outstanding as of the Commencement Date.  Further, while the Debtor is aware of only $10,000 in outstanding signing bonuses, certain personnel within the Debtor's organization have the authorization to sign new Players and provide signing bonuses. Due to the worldwide nature of the Debtor's business and scouting operations, these signing bonuses may not be reported by the personnel authorizing the signing bonus for a short period of time, meaning the Debtor may owe additional prepetition obligations for signing bonuses. However, the Debtor believes that these additional, as yet unreported signing bonuses, if any, would be less than $20,000 per signing bonus and are not substantial amounts in comparison the Debtor's entire Compensation Obligations.

## II.    Obligations in Respect of Payroll Taxes

127.    Unlike the majority of the Non-Player Employees, who primarily work in Texas and thus do not have state Withholding Tax obligations, the Players incur both federal Withholding Tax obligations, and, depending on where any particular game is being played, state Withholding Tax obligations.  As the Players travel to various states and Canada to play baseball games, they earn income based on their performance in those individual states and are required to pay taxes to the Taxing Authorities of the specific state they are playing in, or Canada, as

applicable.[6]  Thus, the MLB Players pay taxes to various state Taxing Authorities throughout the

season, depending on the schedule of the baseball club.  The aggregate amounts withheld from

Players for the various state Taxing Authorities and Canadian Taxing Authorities from pay

period to pay period vary substantially.  As explained above, it is extremely difficult to

determine an average state Withholding Tax for any particular pay period.  As part of the May

15, 2010 payroll, the Debtor withheld $132,193 for payroll taxes for various state Taxing

Authorities and Canadian Taxing Authorities.  In addition to the state Withholding Taxes, as part

of the May 15, 2010 payroll, the Debtor withheld $3,162,390 in federal Withholding Taxes.  As

of the Commencement Date, the Debtor estimates that it holds no unremitted Withholding Taxes

attributed to the Players.

### III.    Player Benefits

128.    The Players have various benefit plans and policies, which can be divided

into the following categories: (i) medical insurance, dental insurance, vision care and business

travel accident insurance for MLB Players collectively, "**Players Association Health and

Welfare Plan**"), (ii) a multiple employer defined benefit plan for MLB Players and other

employees (the "**Players Association Pension Plan**," and together with the Players Association

Health and Welfare Plan, the "**MLB Plan**")), (iii) medical insurance, dental insurance, and

vision care for the Minor League Players, (iv) a multiple employer defined benefit plan for minor

league players ("**Minor League Pension Plan**") and (v) 401(k) plan benefits (the "**Player

401(k) Plan**").

---

[6] By way of example, if the 25 MLB Players on the current roster travel to Oakland, California to play a game against the Oakland Athletics, those MLB Players are deemed to have earned their salaries for that game in California, and are required to remit payments for California state income tax to the appropriate California Taxing Authority.

**(a)     General**

129.    Pursuant to the current CBA, MLB and the MLB Players Association have established the MLB Plan.  Contributions to the MLB Plan are made from the Major League Central Fund (the "**Central Fund**") established under the Major League Constitution.  Under the Central Fund provision, MLB collects certain revenues from designated sources on behalf of each  Major League Baseball club (each, a "**Club**") and holds those funds for payment of certain designated obligations, including the agreed annual funding of the MLB Plan.  The Trustees of the MLB Plan allocate the CBA required contribution by the Clubs between the Players Association Health and Welfare Plan and the Players Association Pension Plan.  Revenues in excess of designated expenses are returned to the Clubs on an annual basis.  To the extent that revenues were not sufficient to satisfy the contribution obligation to the MLB Plan, each Club would be obligated to fund its pro rata share of any short-fall.

**(b)     Players Association Health and Welfare Plan**

130.    The MLB Players, five Rangers coaches and various miscellaneous employees (including former players who still have coverage and employees included under the MLB Plan under their employment contract) and spouses and unmarried dependent children, unless such children are full-time students, through a number of separate policies with different providers receive first dollar medical, dental and vision coverage under the Players Association Health and Welfare Plan.  The Players Association Health and Welfare Plan offers various health benefits, including, among others, medical, orthodontia, vision, prescription drugs, skilled nursing, out-patient psychiatric, emergency health services, out-patient surgery, and well child-care.  The Debtor's obligations with respect to the Players Association Health and Welfare Plan is funded out of the Central Fund on behalf of Debtor.  The Debtor estimates that the average monthly cost to the Debtor for the Players Association Health and Welfare Plan is $18,000 per

MLB Player covered, or an aggregate of $756,000, and that as of the Commencement Date nothing is outstanding.  Participation of Debtor in the Players Association Health and Welfare Plan is a requirement of membership in MLB and the CBA and is essential to the ongoing operation of the Debtor's business.

  **(c)**  **Players Association Pension Plan**

   131. MLB Players also participate in the Players Association Pension Plan, which was established pursuant to the CBA.  The Debtor has no contribution obligation to the Players Association Pension Plan.

  **(d)**  **The Minor League Medical PPO**

   132. The Debtor offers medical, dental and vision benefits to the Minor League Players.  The health plan for the Minor League Players is a PPO, under which improved benefits are available when using a network doctor (the "**Minor League Medical PPO**").  The Minor League Medical PPO is offered to all Minor League Players, and is available to their families. The Minor League Medical PPO is provided by Highmark Blue Cross Blue Shield, and offers two levels of benefits, depending on whether the provider is in or out of network, and through which the Employee coordinates his or her own care.  The Debtor pays an annual premium of $325,000 in respect of the Minor League Medical PPO, paid in monthly installments in advance, and estimate that as of the Commencement Date no amount is outstanding.  The Debtor is responsible for all payments to the Minor League Medical PPO.

   133. Dental benefits for Minor League Players are provided through United Concordia, under which the plan pays for a percentage of dental treatment, if covered, depending on the level of services provided.  The Debtor does not pay any portion of the Minor League Dental PPO, and as such the Debtor estimates that as of the Commencement Date no money is outstanding.

134.     Vision benefits are provided through Davis Vision Inc., and include reduced fees for examinations and eyewear from a network provider.  The Debtor does not pay any portion of the Minor League Vision PPO, and as such the Debtor estimates that as of the Commencement Date no money is outstanding.

### (e)     Player 401(k) Plan

135.     Major League Baseball also maintains a retirement investment plan for Players that choose to participate.  Players may contribute the maximum amount allowed by law. The Debtor does not contribute to the Player 401(k) Plan.

### IV.     Player Expenses

### (a)     Contract Assignment Expenses

136.     Under the CBA, the Debtor has the obligation to reimburse a Player for "reasonable" expenses related to the assignment of the Player's contract from one baseball club to another, including, but not limited to, the obligation to reimburse actual expenses incurred in moving to the home territory of such Player's new club (collectively, the "**Assignment Expenses**").  The Debtor estimates that, as of the Commencement Date, no money is accrued but unpaid in respect of Assignment Expenses.

### (b)     Travel Related Expenses

137.     The Debtor estimates, that as of the Commencement Date, no money is accrued but unpaid in respect of travel related expenses owed to Players resulting from obligations pursuant to the CBA.  The Debtor, through the lease of a private plane, provides transportation to the MLB Players for road games.  The Debtor also pays for the hotel expenses of the MLB Players and provides the MLB Players a *per diem* in cash at the start of any road trip.  The Debtor has similar arrangements with its Minor League Players.

C.        **The Deferred Compensation**

138.     In addition to the foregoing, under the CBA, the Debtor is permitted to defer payment of certain portions of the Player Salaries or signing bonuses (the "**Deferred Compensation**").  The Debtor seeks to continue to make such deferred payments in the ordinary course.  As of the Commencement Date, the Debtor has Deferred Compensation obligations outstanding to six players, some of whom are former MLB Players of the Debtor, while others are current MLB Players of the Debtor.  Obligations range from approximately $970,000 to approximately $24,892,000 per player.  In total, the Debtor owes approximately $45,795,000 in Deferred Compensation.

139.     While most of the Deferred Compensation obligations are paid once per year in either January or March, two of the Deferred Compensation obligations are made in the form of recurring payments, one every pay period and one at the end of each month (the "**Monthly Deferred Compensation Obligations**").  The Debtor seeks by this Motion, the authority of this Court to continue payment of the Monthly Deferred Compensation Obligations in the ordinary course.  The Debtor estimates that in the first 21 days of this Chapter 11 Case, $126,078 will come due on account of the Monthly Deferred Compensation Obligations.  Following the consummation of the Sale pursuant to the Prepackaged Plan, the Purchaser will assume all Deferred Compensation obligations as part of the Sale.

140.     The Debtor believes that many of the Employee Obligations and Employee Benefits relating to the period prior to the Commencement Date constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code in that they do not exceed $11,725 per Employee.  Accordingly, the relief requested will affect only the timing of the payment of these priority obligations, and should not prejudice the rights of general unsecured creditors or other parties in interest.

141.    Further, payments made in connection with the Employee Obligations and Employee Benefits are justified by the facts and circumstances of the case.  In this case, any delay or failure to pay wages, salaries, expense reimbursements, benefits, severance, and other similar items could irreparably impair the Employees' morale, dedication, confidence, and cooperation, and could adversely impact the Debtor's relationship with the Employees at a time when the Employees' support is critical to the success of the Debtor's Chapter 11 Case.  The Debtor simply cannot risk the substantial damage to its business that would inevitably attend any decline in its Employees' morale.  Moreover, because the Chapter 11 Case is advancing under a compressed schedule and because all claims and equity interests are unimpaired under the Prepackaged Plan, paying the Employees in the ordinary course of business will enable the Debtor to operate smoothly during this case.  Further, pursuant to the All Vendors Motion (as defined below), the Debtor contemplates paying all vendors in full in the ordinary course of its business.  Such relief allows the Debtor to focus on consummating the Prepackaged Plan for the benefit of the Debtor, its estate, and its creditors.  Under these circumstances, approval of the requested relief is appropriate.

142.    Absent an order granting the relief requested in the Employee Motion, the Employees could suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question may be needed to enable certain of the Employees to meet their own personal financial obligations.  Without the requested relief, the stability of the Debtor will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives.  In addition, it would be inequitable to require the Employees to bear personally the cost of any business expenses they incurred prepetition on behalf of the Debtor with the understanding that they would be reimbursed.

143.    With respect to Payroll Taxes in particular, the payment of such taxes will not prejudice other creditors of the Debtor, as I have been informed that the relevant Taxing Authorities generally would hold priority claims under the Bankruptcy Code with respect to such obligations.  Moreover, the portion of the Payroll Taxes withheld from an employee's wages on behalf of an applicable Taxing Authority are held in trust by the Debtor.  As such, I have been informed that these Payroll Taxes are not property of the Debtor's estate under section 541 of the Bankruptcy Code.

144.    In addition, the Debtor believes it is necessary to continue payment of administrative fees to the administrators of the Debtor's Employee Obligations and to the administrators of programs related to Employee Benefits.  Without the continued service of these administrators, the Debtor will be unable to continue to honor its obligations under these programs in an efficient and cost-effective manner.

145.    The Debtor does not seek to alter any of the Employee Benefits at this time.  The Employee Motion is intended only to permit the Debtor, in its discretion, to (i) make payments consistent with existing policies to the extent that, without the benefit of an order approving the Employee Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and (ii) continue to honor practices, programs, and policies with respect to its Employees, as such practices, programs, and policies were in effect as of the Commencement Date.  Payment of all Employee Obligations and Employee Benefits in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor's estate, its creditors, and all parties in interest, and will enable the Debtor to continue to operate its business in an economic and efficient manner without disruption.  The Debtor's Employees are central to its business and are vital to this Chapter 11 Case, and failure to pay the Employee

Obligations and Employee Benefits would have a detrimental impact on the Debtor, its value,

and its reorganization efforts.

146.    The Debtor submits that as set forth above, payments made in connection

with the Employee Obligations and Employee Benefits are justified by the facts and

circumstances of the case.

147.    Based on the foregoing, the relief requested in the Employee Motion is not

prejudicial to any party in interest and, in fact, only benefits the Debtor's estate and its creditors.

Accordingly, I believe the relief requested in the Employee Motion should be granted.

**D.    Debtor's Motion for Interim and Final Orders Pursuant to Sections 105(a), 362(d), 363(b), 363(c) and 503(b) of the Bankruptcy Code for Authorization to (A) Continue its Workers' Compensation, Liability, Property, and Other Insurance Programs and (B) Pay All Obligations in Respect Thereof**

148.    By this motion (the "**Insurance Motion**"), the Debtor seeks interim and

final orders authorizing it to continue its workers' compensation and employer's liability policies

and programs (the "**Workers' Compensation Programs**") and its various liability, property,

directors and officers' liability, and other insurance policies and programs (together with the

Workers' Compensation Programs, the "**Insurance Programs**") uninterrupted and to honor its

undisputed prepetition obligations thereunder (the "**Insurance Obligations**").[7]  As of the

Commencement Date, the Debtor estimates that there are no unpaid and outstanding prepetition

Insurance Obligations.

149.    To the extent any of the Debtor's employees hold valid claims under the

Workers' Compensation Programs, the Debtor also seeks authorization to modify section 362 of

---

[7]  In addition to the Insurance Programs discussed in the Insurance Motion, the Debtor maintains numerous insurance programs with respect to, among other things, employee health, dental, disability, and life insurance benefits.  These policies are addressed in a separate motion pertaining to the Debtor's employee wage policies and benefits programs and summarized above.

the Bankruptcy Code to permit these employees to proceed with their claims under the Workers'

Compensation Programs.  This modification of the automatic stay pertains solely to claims under

the Workers' Compensation Programs.  Any claims relating to any other insurance policy or

otherwise will remain subject to the automatic stay.

150.    The Debtor is required by state law to maintain, for its employees,

workers' compensation coverage for claims arising from or related to their employment with the

Debtor.  The Workers' Compensation Program covers claims asserted by employees of the

Debtor.  Obligations relating to the Workers' Compensation Program arise under policies

obtained from insurance carriers (the "**Insurance Carriers**") that are selected by Major League

Baseball and Minor League Baseball Trust (the "**Administrator**").  The combined 2010 annual

premium for the Workers' Compensation Program is $822,410.  The Debtor pays certain

premiums in full at the beginning of the 2010 Policy Period (the "**2010 Policy Period**") and

other premiums on a quarterly installment basis in advance.  As of the Commencement Date, the

Debtor is current on all of its Workers' Compensation Program premiums and therefore does not

owe any amounts on account of premiums under its Workers' Compensation Program for

periods arising prior to the Commencement Date.  For the remainder of the 2010 Policy Period,

the Debtor will owe premium payments totaling $487,671.25 to the Administrator to maintain

coverage under the Workers' Compensation Program.

151.    In connection with the operation of the Debtor's business, the Debtor

maintains, through the Administrator, workers' compensation, various liability and property

insurance programs.  The Insurance Programs provide the Debtor with insurance coverage for

claims relating to, among other things, damage to Debtor's real and personal property, workers'

compensation, excess liability, automobile liability, fiduciary liability, media liability, foreign

liability, employment practices liability and general liability.  The Administrator negotiates and

procures the Insurance Programs on behalf of the Major League Clubs, including the Debtor,

from several different Insurance Carriers.  The motion sets forth an accurate description of the

Insurance Programs.

      152.    In addition to the Workers' Compensation Program, the Debtor is required

to pay premiums in connection with its other Insurance Programs (collectively, the "**Insurance**

**Premiums**").  The Insurance Premiums are based upon a fixed rate established by each

Insurance Carrier or by means of a proportional allocation maintained by the Administrator.  The

Insurance Premiums for most of the Insurance Programs are determined annually and are paid in

full or in quarterly installments in advance over the 2010 Policy Period.  Additionally, the Debtor

has various deductible and coinsurance obligations that are paid based on the amount of claims

made against the Insurance Programs, and that are calculated in accordance with the applicable

Insurance Program. As of the Commencement Date, approximately $125,487[8] will be due under

the current existing insurance policies for the remainder of the 2010 Policy Period.

      153.    I believe that the nonpayment of any premiums, deductibles, or related

fees under one of the Insurance Programs could result in one or more of the Insurance Carriers

terminating its existing policies, declining to renew its insurance policies, or refusing to enter

into new insurance agreements with the Debtor in the future.  If the Insurance Programs are

allowed to lapse without renewal, the Debtor could be exposed to substantial liability for

damages resulting to persons and property of the Debtor and others, which exposure could have

an extremely detrimental impact on the Debtor's ability to reorganize successfully.  The Debtor

---

[8] This amount excludes premiums due under the Workers' Compensation Program.

would then be required to obtain replacement policies on an expedited basis at what it expects to be a significantly higher cost to its estate.

154.    In addition, pursuant to the U.S. Trustee Guidelines, the Debtor is obligated to remain current with respect to certain of its primary Insurance Programs.  Should any insurance policy lapse during the pendency of the Debtor's chapter 11 case, the U.S. Trustee Guidelines mandate that the Debtor forward proof of policy renewal of that policy to the U.S. Trustee.  Therefore, the continuation and renewal of the Insurance Programs, on an uninterrupted basis, and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Programs, is not only essential to preserve the Debtor's business and the value of the Debtor's estate for all creditors, but also compulsory pursuant to the U.S. Trustee Guidelines.  Accordingly, the Debtor must make all payments with respect to the Insurance Programs and be permitted to renew for the 2010-2011 year.

155.    Moreover, the Insurance Programs are vital to the Debtor's continued operations.  Applicable state law mandates that the Debtor maintain workers' compensation coverage for its employees.  Failure by the Debtor to pay the premiums associated with its Workers' Compensation Programs would jeopardize its coverage and expose the Debtor to substantial liability in fines by various state workers' compensation authorities.

156.    In addition, the risk that eligible workers' compensation claimants will not receive timely payments for prepetition employment-related injuries could have a devastating effect on the financial well-being and morale of the Debtor's current employees – perhaps resulting in employee departures.  Employee departures at this critical time may result in a severe disruption of the Debtor's business with a substantially adverse impact on the Debtor, the value of its assets and business, and its ability to reorganize.  The retention of the Debtor's qualified

and dedicated senior management is also linked to the continuation of the directors' and officers'

liability insurance policies.  As discussed above, pursuant to MLB requirements, as well as the

U.S. Trustee Guidelines, as I am informed by counsel, the Debtor is obligated to remain current

with respect to certain of its primary Insurance Programs.  Therefore, the continuation of the

Insurance Programs, on an uninterrupted basis, and the payment of all prepetition and

postpetition Insurance Obligations arising under the Insurance Programs are essential to preserve

the Debtor's business and preserve the value of the Debtor's estate for all creditors.

**E.      Debtor's Motion for Authorization to Pay Prepetition Claims of Certain
         Creditors in the Ordinary Course of Business**

157.    By this motion (the "**All Vendors Motion**"), the Debtor seeks entry of an

order that authorizes, but does not direct, the Debtor to pay the Debtor's allowed, fixed,

liquidated, noncontingent, and undisputed prepetition claims (the "**Payable Claims**") of holders

of General Unsecured Claims and Other Secured Claims[9] (each as defined in the Prepackaged

Plan) (collectively the "**Prepetition Creditors**"), including claims of its prepetition suppliers of

goods and services according to their ordinary business terms and in the ordinary course of

business.

158.    Given the nature of the Debtor's business – the operations of a MLB

club – any cessation in the delivery of goods and services to the Debtor, even for a short period

of time, would imperil the Debtor's restructuring efforts and damage the goodwill established

with its customers.  This is especially so now, in the middle of the busy baseball season, when

the Texas Rangers play a game almost every single day.  Delays in the delivery of goods or

services could, for example, leave the team without the proper equipment to play, or could leave

---

[9] Certain of the Debtor's prepetition trade creditors, such as shippers and mechanics, may be secured creditors
because of their capacity to assert liens on the Debtor's property.

visitors without certain amenities that they not only expect at the park, but that provide additional

sources of income for the Debtor.  The Debtor cannot risk alienating or losing valuable

customers during the expected short period of this chapter 11 case.  The risk of disruption is one

the Debtor should not have to take under the facts of this case.

159.    Paying the Prepetition Creditors in the ordinary course of business further

minimizes disruption to the Debtor's operations by preventing the initiation of reclamation

claims, adversary proceedings and other motions filed by the Prepetition Creditors seeking

payment of their prepetition claims, and ensuring Prepetition Creditors agree to continue

supplying the Debtor postpetition under current trade terms.  Maintaining current trade terms

allows the Debtor to avoid the inherent operational inefficiencies of paying cash on demand and

managing billing processes for numerous vendors that require cash in advance or shorten their

trade terms to less than a week.  The Debtor is not seeking to pay these amounts immediately,

but only such portions thereof as become due in the ordinary course of the Debtor's business and

consistent with prepetition business practices.

160.    Concurrently herewith the Debtor has filed the Prepackaged Plan and

Disclosure Statement.  Further, the Debtor anticipates Completion of the Sale contemplated by

the Prepackaged Plan and emergence from chapter 11 within a short time period.  The Debtor is

seeking approval of the Disclosure Statement and confirmation of the Prepackaged Plan as soon

as possible.  The Prepackaged Plan provides, *inter alia*, that the Payable Claims will be paid in

full and thus be unimpaired.  As a result, assuming confirmation of the Prepackaged Plan within

40-60 days, granting the relief requested in the Payable Claims Motion will not affect the timing

of payments to the Debtor's vendors and other holders of unimpaired General Unsecured Claims

or Other Secured Claims and will not affect or impair the rights of other creditors in this Chapter

11 Case.

161.     The Debtor estimates that, as of the Commencement Date, it owes a total

of approximately $3,500,000 on account of undisputed Payable Claims.[10]  Of those claims, the

Debtor estimates that approximately $2,400,000 would also be entitled to administrative priority

status pursuant to section 503(b)(9) of the Bankruptcy Code because they relate to goods

delivered to the Debtor in the ordinary course of business within twenty (20) days of the

Commencement Date.  Furthermore, $200,000 of the Payable Claims may be secured.  None of

the Payable Claims arise from capital projects with vendors that may be able to assert

mechanics' liens on the Debtor's property and a *de minimus* amount arise from transporters who

may be able to assert possessory liens on the Debtor's property.  The Debtor estimates that

approximately $2,400,000 of Payable Claims will become due and payable within the first

twenty (20) days of this Chapter 11 Case.  These amounts of Payable Claims are typical for the

Debtor in the ordinary course of its business.  Further, the Debtor is current with virtually all of

its payments to Prepetition Creditors as of the Commencement Date.  Many of Payable Claims

are on rolling, 30 or 45-day terms, and the Debtor does not intend to pay the Payable Claims

until they would come due in the ordinary course of its business.

162.     In light of the prepackaged nature of this case, the short duration of time

which the Debtor expects to be in bankruptcy, and the fact that the Prepackaged Plan provides

that General Unsecured Creditors and Other Secured Creditors will be unimpaired and that

administrative and priority claims will be paid in full, I believe the relief requested in the Payable

---

[10] This figure does not include the value of goods in transit and not received by the Debtor as of the Commencement Date because amounts due for such goods will be paid in the ordinary course as administrative expense priority claims.

Claims Motion is in the best interests of the Debtor, its creditors, and all parties in interest and,

therefore, the All Vendors Motion should be granted.

**F.      Debtor's Motion (i) for Authorization to Obtain Postpetition
Financing on a Superpriority and Priming Basis pursuant to Sections
105, 361, 362 and 364 of the Bankruptcy Code, (ii) for Granting
Priming Liens and Superpriority Claims to Postpetition Lenders
pursuant to Section 364(c) and (d) of the Bankruptcy Code, (iii) for
Authorization to use Cash Collateral pursuant to Section 363 of
the Bankruptcy Code, (iv) for Granting Adequate Protection to
Prepetition Secured Lenders pursuant to Sections 361, 362, 363 and 364
of the Bankruptcy Code, (v) for Modifying the Automatic Stay and
(vi) to Schedule a Final Hearing pursuant to Bankruptcy Rule 4001**

163.    By this Motion (the "**DIP and Cash Collateral Motion**") [11], the Debtor

requests an order of this Court authorizing TRBP to enter into the DIP Credit Agreement with

the DIP Lender, pursuant to the terms of the motion and the Interim DIP Order.  Pending entry of

a final order, the Debtor requests that the Court authorize the Debtor, on an interim basis, to

(i) borrow up to $6 million from the DIP Commitment, (ii) use Cash Collateral as provided in the

Interim Order, (iii) grant to the DIP Lender the liens and superpriority claims described herein

and in the Interim Order, and (iv) provide adequate protection in favor of the Prepetition Secured

Creditors.  Moreover, the Debtor requests that the Court approve the proposed notice of the Final

Hearing and the adequacy of the proposed service thereof, and schedule the Final Hearing.  The

proposed financing will be junior to the Prepetition Obligations, subject to the TRBP Guaranty

Cap and Lien Cap; as such, the liens created under the Postpetition Financing Documents are not

priming liens with respect to liens currently held by the Prepetition Secured Creditors.

164.    Prior to the Commencement Date, the Debtor financed its operations with

cash from operating activities, such as television and radio rights fees, ticket sales, season ticket

---

[11] Capitalized terms used in this section but not defined herein shall have the meanings ascribed to them in either the
DIP and Cash Collateral Motion or the proposed Interim DIP Order, as applicable.

and suite license sales, merchandise and concessions sales, a variety of sponsorship agreements, and loans under the Prepetition Third Lien Financing Documents.  The Debtor projects that it will need the liquidity provided by the proposed DIP Credit Agreement in addition to the use of the cash that it generates, including any Cash Collateral to which the Prepetition Secured Creditors have an interest, to fund its operations and to pay the costs and expenses of administering this Chapter 11 Case and effectuate the Sale contemplated under the Prepackaged Plan.

165.    In exploring its options for postpetition financing, the Debtor recognized that the obligations owed to the Prepetition Secured Creditors are secured by substantially all of the Debtor's assets, such that either (i) the liens of the Prepetition Secured Creditors would have to be primed to obtain postpetition financing, or (ii) the Debtor would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Secured Creditors.  Accordingly, prior to the commencement of the Debtor's Chapter 11 Case, the Debtor approached the Prepetition Third Lien Lender, which the Debtor knew was supportive of the Prepackaged Plan, and requested a postpetition financing facility that did not include the priming of the liens of the Prepetition Secured Creditors.

166.    Ultimately, the DIP Lender was willing to extend postpetition financing on the terms and conditions described herein, including being secured by a lien junior to the Prepetition Secured Creditors and with favorable pricing.  The Debtor and the DIP Lender engaged in extensive, arms'-length negotiations with respect to the terms and conditions of the DIP Credit Facility.

167.    As discussed above, in connection with, and as a condition of, the DIP Lender's agreement to provide postpetition financing, the DIP Lender and the Debtor propose to

enter into to an ISA).  The ISA also requires the Debtor to deliver financial information

requested by MLB and grants MLB complete access to the Debtor's records and personnel.

Lastly, the ISA provides for the reimbursement by the Debtor of all of MLB's expenses incurred

in connection with their monitoring activities, their extensions of credit pursuant to the VSA and

their extensions of credit pursuant to the DIP Credit Agreement.

      168.    The Debtor and the DIP Lender have agreed upon a budget projecting cash

flow for the next 13 weeks (the "**Budget**", attached to the DIP and Cash Collateral Motion as

Exhibit B).  The Budget will be updated by the Debtor on a weekly basis, subject to the DIP

Lender's consent, and will show receipts and disbursements as budgeted.  The Debtor has also

agreed to provide the DIP Lender with a weekly report on the Budget.  The material terms and

conditions of the DIP Credit Agreement are summarized in paragraph 1 of the DIP and Cash

Collateral Motion.

      169.    The Debtor is seeking authorization to enter into the DIP Credit

Agreement on an interim basis pending a Final Hearing.  Based on its cash needs during the

interim period (as reflected in the Budget), the Debtor has determined that during the interim

period and until the Final Order is entered, it will need to borrow approximately $6 million from

the DIP Lender.  I believe an immediate and critical need exists for the Debtor to obtain funds in

order to continue the operation of its business.  At this time, the ability of the Debtor to finance

its operations through the incurrence of new indebtedness for borrowed money is vital to the

preservation and maintenance of the going-concern value of the Debtor's estate.  Without such

funds, the Debtor will not be able to meet its payroll obligations, including paying salaries for

coaches, players and front, back and box office staff and maintenance and grounds keepers; pay

for utilities and other expenses of operating the Ballpark and its training facilities; or pay for

advertising and other promotional expenses; or professional and other expenses needed to carry

on its business during this sensitive period.  I believe the Debtor would not be able to carry on its

essential business activities without the requested postpetition finance, the result of which would

cause swift and irreparable harm to the Debtor's estate.

170.    Moreover, having adequate financing will enable the Debtor to complete

the plan process, including consummation of the sale of the Texas Rangers contemplated in the

Prepackaged Plan, with the aim of maximizing value for creditors and other stakeholders.  The

Debtor is not in a position to pursue consummation of a successful chapter 11 plan without an

outside source of liquidity.  The Debtor is unable to obtain the required funds in the form of

unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as

an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code.

171.    Additionally, the Debtor does not have available sources of working

capital and financing to carry on the operation of its business without the use of Cash Collateral.

To operate in chapter 11 in a manner consistent with its ordinary course practice, the Debtor

must have access to cash that is encumbered by the liens of the Prepetition Secured Creditors.

Cash collateral will be used to make payments to vendors and employees and to satisfy the other

ordinary costs of operations, including rent, taxes and insurance.  In the absence of authority to

use Cash Collateral, I believe the continued operation of the Debtor's businesses even for a

limited period of time would not be possible, and serious and irreparable harm to the Debtor and

its estate would occur.  I believe the use of Cash Collateral is therefore critical to preserve and

maintain the going concern value of the Debtor.

172.    Recognizing the importance of obtaining authority to continue to use Cash

Collateral in the ordinary course, the Debtor approached the Prepetition Third Lien Lender prior

to the Commencement Date of this case to discuss the terms upon which the Prepetition Third

Lien Lender would agree to the use of Cash Collateral.  After extensive arm's-length

negotiations, the parties agreed on the form of Interim Order, filed concurrently herewith, that

will allow the Debtor to continue to operate its business in the ordinary course during this

chapter 11 case.  Specifically, the Debtor's authority to use Cash Collateral pursuant to the

Interim Order will continue through the entry of the Final Order.

      173.     The Debtor did not seek the Prepetition Senior Creditors' consent to use

Cash Collateral (or to provide postpetition financing) because of the unique features of the case.

As explained in detail in the Motion, however, the Debtor believes that the Prepetition Senior

Creditors' interests are more than adequately protected under the facts of this case.

Consequently, the Debtor seeks authority to use Cash Collateral on an interim basis pending a

Final Hearing.

      174.     To the extent necessary, the Prepetition Secured Creditors have either

consented to the Debtor's use of the Prepetition Collateral and Cash Collateral or their respective

interests therein are being adequately protected, primarily by the substantial equity cushion that

exists between the value of the Prepetition Collateral, as evidenced by the consideration being

provided to the Debtor under the Asset Purchase Agreement and the amount of the Prepetition

Obligations.  As discussed below in more detail, the Debtor submits that the adequate protection

provided to the Prepetition Secured Creditors, for, among other things, any decline in the value

of such parties' respective interests in the Prepetition Collateral and any Cash Collateral, subject

to the TRBP Guaranty Cap and Lien Cap, is consistent with and authorized by sections 361, 362,

363, and 364 of the Bankruptcy Code.

175.    In addition to the equity cushion, as adequate protection of its Prepetition Obligations and the Prepetition Liens subject to the TRBP Guaranty Cap and Lien Cap, and pursuant to sections 361, 363, 364, and 507(b) of the Bankruptcy Code, the Debtor is seeking to grant the Prepetition Secured Creditors the "adequate protection" described in paragraph 2(xiii) of the DIP and Cash Collateral Motion against the diminution in the value of their Collateral and for the use of their Cash Collateral during the Chapter 11 Case, subject to the TRBP Guaranty Cap and Lien Cap.

176.    Substantially all of the Debtor's assets are encumbered and with diligent efforts, the Debtor has negotiated the best terms available to obtain the funding it needs to maintain sufficient liquidity to preserve its assets over the course of this chapter 11 case and effectuate the Sale contemplated in the Prepackaged Plan.  The Debtor submits that the circumstances of this case requires the Debtor to obtain financing under section 364(c) of the Bankruptcy Code, and accordingly, the Postpetition Financing Documents reflect the exercise of its sound business judgment.

177.    I believe the terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length.  Moreover, the Debtor is in the middle of its playing season; unless these expenditures are made, the Debtor will be forced to cease operations in the middle of the baseball season, which would result in immediate and irreparable harm to its business and going-concern value.  If the Debtor's season were interrupted, value far in excess of the amount of postpetition financing sought would be lost in terms of ticket, merchandise and concessions sales alone.  Moreover, any loss of confidence would jeopardize the Debtor's Prepackaged Plan and the Sale contemplated thereunder.

178.    The credit provided under the DIP Credit Agreement and the use of Cash Collateral will enable the Debtor to continue to pay its players and other employees, continue its customer programs, provide customer service, and operate its businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all of its stakeholders.  The availability of credit under the DIP Credit Agreement will provide confidence to the Debtor's fans and other creditors that will enable and encourage them to continue their relationships with the Debtor.  Finally, the implementation of the DIP Credit Agreement will be viewed favorably by the Debtor's employees, customers and vendors, thereby promoting a short and successful prepackaged chapter 11 case, intended to effectuate the Sale. Accordingly, I believe the timely approval of the relief requested herein is imperative.

179.    Cash is necessary for ordinary course operating costs and expenses at the outset of, and during, this Chapter 11 Case.  The Debtor does not have sufficient sources of working capital and financing to carry on the operation of its business without the use of Cash Collateral.  The Debtor's ability to maintain business relationships with its vendors, suppliers, and fans and to meet payroll and other operating expenses is essential to the value of its business and is particularly important in the context of this Chapter 11 Case which contemplates the Sale of TRBP under the Prepackaged Plan that was filed concurrently with the DIP and Cash Collateral Motion.  The use of Cash Collateral is therefore critical to the preservation and maintenance of the going concern value of the Debtor, as well as the value of the Collateral.

180.    The proposed adequate protection offered by the Debtor to the Prepetition Senior Creditors is both sufficient and appropriate.  In this case, the Prepetition Senior Creditors are adequately protected by (i) a significant equity cushion and (ii) the fact that the use of their Cash Collateral will enhance and protect the value of their Collateral.

181.    The Prepetition Senior Creditors are oversecured and the surplus of the

Prepetition Senior Creditors' Collateral's value in excess of the amount outstanding under the

HSG Credit Agreements constitutes more than sufficient adequate protection for the use of Cash

Collateral.  The Prepetition Senior Creditors' significant equity cushion is evidenced by the

consideration being provided to the Debtor under the Asset Purchase Agreement compared to the

amount of the Prepetition Obligations.  The Asset Purchase Agreement filed as part of the

Prepackaged Plan contemplates a cash purchase price of approximately $300 million, subject to

any required adjustments, while the Guaranty and Prepetition Secured Credit Facility Liens on

the Prepetition Collateral are limited by a $75 million cap.  I understand from my legal advisors

that case law in this circuit and elsewhere supports that the equity cushion—of approximately

triple its estimated debt—as evidenced by the purchase price in the Asset Purchase Agreement,

adequately protects the Prepetition Senior Creditors.  Even though the Prepetition Secured

Creditors are oversecured, the Debtor proposes to provide them additional adequate protection in

the form of adequate protection liens and a superpriority claim to protect them further.

182.    In addition to the equity cushion, which itself would be enough, the

Prepetition Secured Creditors are further adequately protected by receiving Adequate Protection

Liens and superpriority claims in the same priority as existed prior to the Commencement Date

to adequately protect against the diminution of the value of their Collateral on the terms set forth

in the Interim Order.  The Debtor offered this additional adequate protection because it believes

that it is in the best interests of its estate, creditors, and all parties in interest, that it reach a

consensual rather than a litigated resolution with the Prepetition Secured Creditors regarding the

use of Cash Collateral.  This adequate protection will sufficiently protect the Prepetition Secured

Creditors' interests in the Cash Collateral, as well as any diminution resulting from the Debtor's

use of the Prepetition Collateral and the imposition of the automatic stay.  Accordingly, I believe

the proposed adequate protection is fair and reasonable.

183.    Absent authorization from the Court to enter into postpetition financing

and use Cash Collateral on an interim basis pending a Final Hearing, I believe the Debtor will be

immediately and irreparably harmed.

**G.    Motion of Debtor Pursuant to Bankruptcy Rule 1007(c) and Local Rule 1007-1(b) for an Order (i) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Final Affairs and (ii) Waiving the Requirements to File Same Upon Confirmation of the Plan**

184.    By this motion, The Debtor requests, pursuant to section 521 of the

Bankruptcy Code and Rule 1007(c) of the Bankruptcy Rules and Local Rule 1007.1, (i) an

extension of time to file its (a) schedules of assets and liabilities; (b) schedules of current income

and expenditures; (c) schedules of executory contracts and unexpired leases; and (d) statements

of financial affairs (collectively, the "**Schedules and SOFAs**") and (ii) a waiver of the

requirements to file the Schedules and SOFAs upon confirmation of the Prepackaged Plan.

185.    Due to the demands on the limited resources available to the Debtor at this

time, the Debtor anticipates that it will be unable to complete its Schedules in the mere fourteen

(14) days provided by the Bankruptcy Rules.  To prepare the Schedules, the Debtor must

compile information from its books, records, and other sources relating to its assets, contracts,

and creditors.  Assembling the necessary information will be a significant task for the Debtor.

Therefore, the Debtor is requesting a twenty one (21) day extension of the applicable time period

to a total of thirty-five (35) days after the Commencement Date, without prejudice to its right to

request a further extension of time.

186.    Since the Prepackaged Plan provides for the payment in full of all

Allowed Claims, Allowed Administrative Expense Claims and Allowed Equity Interests (each as

defined in the Prepackaged Plan), *i.e.* the Debtor's creditors and equity holders, do not need the

Schedules to determine how their claim is being treated, and will not be prejudiced by any

extension in the deadline to file the Schedules and SOFAs.  Similarly, the Debtor submits that

upon confirmation of the Prepackaged Plan, the Schedules and SOFAs will provide no benefit to

creditors that could justify incurring the costs of creating them and, accordingly, the requirement

of filing the Schedules and SOFAs should be waived at that time.

187.    Accordingly, I respectfully submit that in light of (i) the large amount of

information that must be assembled and compiled, (ii) the significant amount of employee time

that must be devoted to the task of completing the Schedules and SOFAs, (iii) the many pressing

items that must be addressed at the inception of this case, and (iv) the payment in full of the

Debtor's creditors and equity holders under the Prepackaged Plan, ample cause exists for the

Court to grant the requested extension for filing its Schedules and SOFAs and the waiver of the

requirements to file the Schedules and SOFAs upon confirmation of the Prepackaged Plan.

**H.    Motion for an Order Authorizing the Debtor to Employ Professionals
       <u>Used in the Ordinary Course of Business</u>**

188.    By this motion (the "**OCP Motion**"), the Debtor seeks entry of an order

authorizing the Debtor to employ professionals used in the ordinary course of business (each, an

"**Ordinary Course Professional**," and collectively, the "**Ordinary Course Professionals**")

effective as of the Commencement Date, without the (i) submission of separate employment

applications or (ii) issuance of separate retention orders for each individual professional.  A list

of the Debtor's current Ordinary Course Professionals is annexed to the OCP Motion as

<u>Exhibit A</u>.

189.    The Debtor seeks the continued employment of the Ordinary Course

Professionals to render a wide variety of professional services to its estate in the same manner

and for the same purposes as the Ordinary Course Professionals were retained before the Commencement Date.  In the past, these professionals have provided professional services relating to various litigation, regulatory, general corporate counseling, intellectual property, and tax issues as well as other services relating to issues that have a direct and significant impact on the Debtor's day-to-day operations.  To avoid disruption of the Debtor's normal business operations, it is essential that the Debtor be permitted to continue to employ these Ordinary Course Professionals, many of whom already are familiar with the Debtor's business and financial affairs.

190.    The proposed employment of the Ordinary Course Professionals and the payment of monthly compensation on the terms set forth in the OCP Motion are in the best interests of the Debtor's and its estate and creditors.  The relief requested will save the estate the substantial expense associated with applying separately for the employment of each Ordinary Course Professional.  Further, the relief requested will avoid the incurrence of additional fees relating to the preparation and prosecution of fee applications for each Ordinary Course Professional.  Likewise, the procedures outlined will relieve the Court, the Office of the United States Trustee and any committees appointed in this case of the burden of reviewing numerous fee applications involving relatively small amounts of fees and expenses.

191.    Based on the foregoing, coupled with the prepackaged nature of the Chapter 11 Case and the short duration of time which the Debtor expects to be in bankruptcy, I believe that the relief requested in the OCP Motion is in the best interests of the Debtor, its creditors, and all parties in interest and, therefore, the OCP Motion should be granted.

192.    The Debtor has also submitted a list of entities which are deemed by the Debtor not to be "professionals" because their services are not central to administration of the

estate and therefore the Debtor requests that they need not be retained under the same procedures

as the Ordinary Course Professionals listed in <u>Exhibit A</u> of the Motion.

**I.    Motion for an Order (i) Scheduling a Hearing to Consider
Confirmation of the Prepackaged Plan; (ii) Establishing an Objection
Deadline to Object to the Prepackaged Plan; (iii) Approving the Form
and Manner of Notice Thereof; and (iv) Granting Related Relief**

193.    By this motion (the "**Scheduling Motion**"), the Debtor seeks entry of a

scheduling order (i) scheduling a hearing (the "**Confirmation Hearing**") to consider the

confirmation of the Prepackaged Plan pursuant to section 1128 of the Bankruptcy Code and

Bankruptcy Rule 3017(c); (ii) establishing an objection deadline to object to the confirmation of

the Prepackaged Plan; (iii) authorizing and approving the form and manner of notice thereof and

of the commencement of the Chapter 11 Case; and (iv) granting related relief.

194.    Below is a table highlighting the dates relevant to the confirmation of the

Prepackaged Plan and setting forth the Debtor's proposed dates for the mailing of the

Commencement/Plan Notice (as defined below), the Confirmation Hearing, and the Objection

Deadline (as defined below):

| Proposed Timetable | |
| --- | --- |
| Commencement Date | May 24, 2010 |
| Hearing on Motion | May 25, 2010 |
| Mailing of Commencement/Plan Notice | May 25, 2010 |
| Objection Deadline | June 25, 2010 |
| Reply Date (if any) | June 30, 2010 |
| Confirmation Hearing Date | July 2, 2010 |

195.    The Debtor respectfully submits that it is not necessary to hold a hearing

in the Chapter 11 Case to consider the approval of the Debtor's Disclosure Statement Relating to

the Prepackaged Plan of Reorganization for Texas Rangers Baseball Partners Under Chapter 11

of the Bankruptcy Code (the "**Disclosure Statement**"), because all holders of claims or equity

interests are unimpaired under the Prepackaged Plan and thus conclusively presumed to have

accepted the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged

Plan.

196.    I am informed that pursuant to section 1126(f) of the Bankruptcy Code,

the holders of claims or equity interests in each of these unimpaired classes are conclusively

presumed to accept the Prepackaged Plan and do not need to be solicited.  Because the Debtor is

not soliciting votes on the Prepackaged Plan, it is my understanding that it is not subject to the

requirement of section 1125(b) to have a disclosure statement.  As such, the Disclosure

Statement was filed by the Debtor for the sole purpose of providing creditors, equity holders,

customers, fans, and all other parties in interest with more information regarding the Sale and the

Prepackaged Plan, not for the purpose of solicitation.  Therefore, the Debtor is not seeking Court

approval of the Disclosure Statement.

197.    In any case, the Debtor has included in the Disclosure Statement the type

of information that would typically be included in a disclosure statement used to solicit votes,

including a description of the Prepackaged Plan, summaries of the relevant statutory provisions,

the Asset Purchase Agreement, the prepetition capital structure, the events leading up to the key

filing of the Chapter 11 Case, as well as anticipated events during the Chapter 11 Case.  The

Disclosure Statement also includes a summary of the treatment and estimated recovery for

holders of claims or equity interests under the Prepackaged Plan, and explains that all claims will

be paid in full on the Effective Date or assumed by the Purchaser.  In addition, the Disclosure

Statement explains that no solicitation is being conducted because all classes of claims and

equity interests are unimpaired and thus conclusively deemed to have accepted the Prepackaged

Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, it is my belief that the

Disclosure Statement provides adequate information to creditors and other parties in interest

regarding the Debtor's Prepackage Plan, despite the fact that, in accordance with the Bankruptcy

Code, its adequacy in that regard is not required to be court-approved.

198.    The most critical and complex task required to effectuate a successful

reorganization – the negotiation and formulation of a chapter 11 plan of reorganization – has

already been accomplished.  Thus, the Debtor respectfully submits that there is no reason to

delay consideration of the confirmation of the Prepackaged Plan.  It is in the best interests of the

Debtor's estate and creditors to proceed with the confirmation process as expeditiously as

possible.

199.    Accordingly, the Debtor respectfully requests that the Court schedule the

Confirmation Hearing to be held as soon as practicable but on not less than twenty-eight days'

notice.  The Debtor respectfully requests the Court schedule the Confirmation Hearing for July 2,

2010.  The proposed schedule affords creditors and all other parties in interest ample notice of

the proceedings and time to evaluate the Prepackaged Plan and, therefore, does not prejudice any

party.  Moreover, the proposed schedule is in the interests of all parties in interest in the Debtor's

reorganization case.  The relief sought herein is necessary to the efficient prosecution of this

Chapter 11 Case and will assist in the expeditious confirmation of the Prepackaged Plan, which

will enable the sale of the Texas Rangers to occur seamlessly and all of the Debtor's creditors to

be paid in full.  In addition, it is appropriate that the Scheduling Order be entered at this time so

that the Debtor's fans and employees, who are critical to the value of the Debtor, can be

informed as promptly as possible of the anticipated scheduling of events preceding confirmation

of the Prepackaged Plan and can see a quick and clear path out of this Chapter 11 Case.

Scheduling a hearing to occur as expeditiously within the confines of the Bankruptcy Code and

Bankruptcy Rules will demonstrate progress to fans and employees and will thus preserve value.

200.    The Debtor respectfully requests that the Court set a date that is at least

twenty-eight calendar days after the mailing of the Commencement/Plan Notice (as defined

below) as the last date to file objections to confirmation of the Prepackaged Plan (the "**Objection**

**Deadline**").  This date will provide creditors and holders of equity interests twenty-eight days'

notice of the deadline for filing objections to the Prepackaged Plan, while still affording the

Debtor and other parties in interest time to file a responsive brief and, if possible, resolve any

objections received.  The Debtor also requests that the Court set any reply deadline (the "**Reply**

**Deadline**") at least four business days after the Objection Deadline.  Specifically, the Debtor

requests that the Objection Deadline be June 25, 2010 and the Reply Deadline be June 30, 2010,

each at 4:00 p.m. (Central Time).

201.    The Debtor further requests that the Court direct that any objections to the

Prepackaged Plan be in writing, filed with the Clerk of the United States Bankruptcy for the

Northern District of Texas, Fort Worth Division together with proof of service thereof, set forth

the name of the objector, and the nature and amount of any claim or interest asserted by the

objector against the estate or property of the Debtor, and state the legal and factual basis for such

objection and be served upon the parties specified in the Scheduling Motion so as to be received

no later than the Objection Deadline.

202.    The Debtor intends to provide notice to all contract counterparties of the

assumption and assignment of executory contracts and/or unexpired leases and instructions for

filing an objection to the assumption and assignment to the Purchaser in the

Commencement/Plan Notice (as defined below).

203.     The Debtor does not believe that any cure amounts are owed under section

365(b)(1) of the Bankruptcy Code because any monetary amounts owed under any executory

contract and unexpired lease to be assumed and assigned under the Prepackaged Plan will be

satisfied by the Purchaser upon assumption and assignment thereof in the ordinary course of

business; however, to the extent there is a dispute regarding (i) the cure amount; (ii) the ability of

the Purchaser to provide "adequate assurance of future performance" (within the meaning of

section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be

assumed as assigned; or (iii) any other matter pertaining to assumption and assignment that is

unresolved as of the Effective Date, the Prepackaged Plan provides that cure shall occur

following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving

the assumption or assumption and assignment, as the case may be.

204.     The Debtor submits that any counterparty that does not object to the

assumption and assignment of its executory contract or unexpired lease by the Debtor under the

Prepackaged Plan should be deemed to have consented to such assumption or assumption and

assignment.  The Debtor believes that this provision is appropriate under the circumstances as

counterparties to such executory contracts and unexpired leases will have the same or more

notice to respond or to object to such assumptions and assignments as they would have if the

Debtor chose to accomplish such assumptions and assignments through a motion brought under

sections 365(a) and (f) of the Bankruptcy Code.  Moreover, in order to provide counterparties to

assumed and assigned executory contracts and unexpired leases with the sufficient notice of the

assumptions and assignments, the proposed Commencement/Plan Notice includes a conspicuous

notice concerning the treatment of executory contracts and unexpired leases under the

Prepackaged Plan and detailed instructions on how to object to the assumptions and assignments.

205.   The Debtor requests that the Court determine that it is not required to distribute copies of the Prepackaged Plan to any holder of a claim against or equity interest in the Debtor under the Prepackaged Plan, because all classes are unimpaired and deemed to accept the Prepackaged Plan.

206.   In lieu of furnishing each such holder of a claim against or equity interest in the Debtor with a copy of the Prepackaged Plan, the Debtor proposes to send to such parties the Commencement/Plan Notice (as defined below), which sets forth the manner in which a copy of the Prepackaged Plan may be obtained.  Specifically, the Commencement/Plan Notice will provide that the Prepackaged Plan (and the Disclosure Statement) is available on the website created by the Debtor's claims agent and that Debtor's counsel will provide hard copies of the Prepackaged Plan to any party that makes a specific request in writing for the same. Accordingly, the Debtor submits that such notice satisfies the requirements of Bankruptcy Rule 3017(d).

207.   The Debtor proposes to serve a notice of the commencement of the Chapter 11 Case and filing the Prepackaged Plan (the "**Commencement/Plan Notice**"), substantially in the form annexed as Exhibit "1" to the Scheduling Order, by first-class mail or deposit with a reputable overnight delivery service on or before May 25, 2010 upon all parties in interest.  The Commencement/Plan Notice contains, among other things:  (i) notice of the commencement of this Chapter 11 Case; (ii) instructions for obtaining copies of any filing in the Chapter 11 Case, including the Disclosure Statement and the Prepackaged Plan; (iii) notice that all creditors and equity holders are unimpaired and deemed to accept the Prepackaged Plan; (iv) the Objection Deadline and the procedures for filing objections to the confirmation of the Prepackaged Plan; and (v) the date, time, and place of the Confirmation Hearing.

208.    In addition, I am informed that Bankruptcy Rule 2002(l) permits a court to "order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice."  The Debtor requests that this Court authorize the Debtor, in its discretion, to give supplemental publication notice of the Confirmation Hearing on a date no less than twenty-eight calendar days prior to the Confirmation Hearing.  I believe the proposed notice schedule, as described above, affords parties in interest ample notice of these proceedings.

209.    As set forth above, the classes consisting of holders of claims and equity interests materially affected by the Prepackaged Plan have already been deemed to accept the Prepackaged Plan in excess of the statutory thresholds specified in section 1126(c) and 1126(d) of the Bankruptcy Code.  The Prepackaged Plan contemplates an expeditious emergence from chapter 11 and the Debtor intends to proceed accordingly.  The Debtor submits that cause exists for this Court to direct the U.S. Trustee not to convene a meeting of creditors or equity security holders unless the Prepackaged Plan is not confirmed within ninety days after the Commencement Date.

210.    In light of the prepackaged nature of this case and the short duration of time that the Debtor expects to be in bankruptcy, I believe the relief requested in the Scheduling Motion is in the best interests of the Debtor, its creditors, and all parties in interest and, therefore, the Scheduling Motion should be granted.

**J.      Debtor's Motion Pursuant to Sections 105(a), 363(b), And
         503(b)(1) of the Bankruptcy Code for Authorization to Honor
         Prepetition Obligations to Customers and Otherwise Continue
         Customer Programs in the Ordinary Course of Business**

211.    Prior to the Commencement Date, in the ordinary course of business and as is customary in professional sports, the Debtor instituted and engaged in certain activities, programs, and promotions to develop and sustain a positive reputation and relationship with its

fans, who are its customers.  To that end, the Debtor implemented various customer programs and policies (collectively, the "**Customer Programs**") designed to ensure customer satisfaction, drive ticket and merchandise sales, meet competitive pressures, develop and sustain fan relationships and loyalty, improve profitability, and generate goodwill for the Debtor among its fans and the community at large.

212.    By this motion (the "**Customer Programs Motion**"), the Debtor seeks, pursuant to sections 105(a), 363(b), and 503(b)(1) of the Bankruptcy Code, authorization to continue its Customer Programs in the ordinary course of business and to perform and honor, at the Debtor's sole discretion, its prepetition obligations thereunder.  The Debtor does not believe that it needs Court approval to continue its Customer Programs in the ordinary course of business, including honoring tickets purchased prepetition, but has filed the motion out of an abundance of caution in order to provide fans with the comfort of a Court order with respect to the Debtor's treatment of Customer Programs during the chapter 11 case.

213.    I believe the relief requested in the Customer Programs Motion is imperative to preserve fan confidence and loyalty to the club, while minimizing the impact of the filing of this case.  In order to maintain its relationship with both fans and the community, maximize the value of its estate, and effectuate the transactions contemplated by the Prepackaged Plan, it is vital that the Debtor be able to satisfy its obligations related to the Customer Programs.

214.    The business of the Texas Rangers is to play baseball for its fans, and the value of that business lies in the continued support of its loyal fans.  Inasmuch as the Debtor has filed this Chapter 11 Case in order to the facilitate the Sale of the club to preserve value, the intention of the Debtor is to continue to provide its fans with what they have come to expect — first and foremost, great baseball and a great day at the Ballpark.  I believe we must show that

TRBP is committed to doing all that it can to ensure that its fans are not affected by the filing of its Chapter 11 Case and the Prepackaged Plan. To that end, the Debtor is seeking to honor all tickets sold and commitments made to its fans. The Customer Programs are integral to the Debtor's efforts to maintain fan loyalty to the club, increase sales of tickets, concessions, and club merchandise, and ultimately deliver the most value to all stakeholders in the Debtor's prepackaged chapter 11 case. The benefits of the Customer Programs far outweigh any costs associated with continuing them.

### *Outstanding Texas Rangers Tickets*

215.    The Debtor's business is dependent on the advance sales of tickets to its games. Hundreds of thousands of tickets were purchased by the club's loyal fans prior to the start of the 2010 Major League Baseball season. Although the club has played a number of games already this season, hundreds of thousands of individual game tickets have been purchased for games that remain this season (the "**Outstanding Texas Rangers Tickets**"). The Debtor estimates that approximately $3,660,000 of Outstanding Texas Rangers Tickets, not including tickets sold in connection with Season Ticket Packages (defined below), are outstanding as of the Commencement Date.

### *Season Ticket Packages*

216.    Like all MLB franchises, the Debtor sells packages of tickets that provide the purchaser entrance to home games during the Major League Baseball season (the "**Season Ticket Packages**"), along with a number of important benefits depending on the particular package purchased (the "**Rangers Rewards**"). Current holders of Season Ticket Packages have already been provided tickets to the remaining home games in the 2010 Major League Baseball season. In addition, the Debtor may be obligated to provide certain Rangers Rewards postpetition on account of Season Ticket Packages purchased prior to the Commencement Date.

As of the Commencement Date, the Debtor estimates that $21,500,000 in tickets are outstanding under Season Ticket Packages for games yet to be played in the 2010 season and it owes holders of Season Ticket Packages approximately $33,500 in outstanding Rangers Rewards.

### *Private Suites Packages*

217.    The Ballpark houses a variety of private suites located on the suite levels within the ballpark (the "**Private Suites**").  The Texas Rangers offer a variety of packages for a single game or long-term use of the Private Suites (the "**Private Suites Packages**").  The Debtor may have obligations to provide certain benefits arising under the Privates Suites Packages or maintain the Private Suites Amenities postpetition on account of Private Suites Packages purchased prior to the Commencement Date.  In addition, the Debtor may incur certain costs associated with the Privates Suites Parking Privileges postpetition on account of Private Suites Packages purchased prior to the Commencement Date.  As of the Commencement Date, the Debtor estimates that $3,300,000 in Private Suites Packages have been purchased but not yet honored.

### *Promotional Ticket Pricing*

218.    The Texas Rangers offer a variety of promotional ticket pricing programs (the "**Promotional Ticket Pricing Programs**") to certain affinity and other groups and for various events in order to increase attendance at games and increase sales of concessions and Texas Rangers merchandise.  In addition, several of the Promotional Ticket Pricing Programs require the purchase of a full-price ticket in addition to tickets purchased at this discounted price, which further promotes attendance at games and events by families and groups and the sale of concessions and club merchandise, which are a significant source of revenue.  As of the Commencement Date, the Debtor does not believe it owes any outstanding obligations on account of the Promotional Ticket Pricing Programs.

219.    Additionally, the Debtor has a joint ticket promotion with Six Flags Over
Texas ("**Six Flags**"), a theme park located within miles of the Ballpark.  Six Flags has joined the
Debtor in a ticket promotion that includes a lower box ticket to a "non-premier" Texas Rangers
game and one adult ticket to Six Flags Over Texas for a discounted price (the "**Rangers/Six
Flags Double Play**").  TRBP collects the proceeds from sales of Rangers/Six Flags Double Play
packages and remits half of the gross sales, net of sales tax, to Six Flags.  As of the
Commencement Date, the Debtor estimates that it owes $8,910 to Six Flags on account of
proceeds collected under the Rangers/Six Flags Double Play promotion.

*Customer Credits*

220.    In the ordinary course of business, the Debtor's books and records reflect
amounts owed to certain ticket and suite holders on account of, among other things, the
overpayment for tickets, transferred seats and other such accommodations made by the Debtor
for customer relations purposes (the "**Accommodations Credits**").  Prior to the Commencement
Date, the Debtor allowed its customers to seek a refund of their Accommodations Credits at any
time.

221.    Additionally, the Debtor offers advance sales of postseason home game
tickets to certain ticket and suite holders (the "**Advance Postseason Ticket Sales**") as an
exclusive benefit to such holders and to promote sales of tickets, season tickets, suites, and
postseason tickets.  In seasons when the club does not play postseason games, the ticket and suite
holders' accounts with the Debtor reflects a credit for the postseason tickets purchased in
advance (the "**Advance Postseason Ticket Sales Customer Credits**", and together with the
Accommodations Credits, the "**Customer Credits**").  Prior to the Commencement Date, the
Debtor allowed its customers to seek a refund of their Advance Postseason Ticket Sales

Customer Credits at any time.  As of the Commencement Date, the Debtor estimates $2,850,000

is due and owing to customers on account of Customer Credits.

***Group Ticket Pricing, Incentives and Deposits***

      222.    The Debtor offers a number of group ticket sales promotions in order to

increase ticket sales (the "**Group Ticket Pricing**").  The Debtor also offers free tickets and

Texas Rangers merchandise and memorabilia as incentives to purchase group ticket sales (the

"**Incentives**").  As of the Commencement Date, the Debtor does not believe it owes any amounts

under the Group Ticket Pricing or Incentives programs.

      223.    In order to reserve group tickets, the Debtor requires that customers post a

portion of the total ticket cost in the form of a deposit (the "**Group Ticket Deposits**").  As of the

Commencement Date, approximately $370,000 is owed on account of Group Ticket Deposits.

***Faith Concert Series Ticket Promotion***

      224.    The Debtor has offered free upper level seats to customers buying a

minimum of twenty tickets to certain concerts being offered at the Ballpark this season

(the "**Faith Concert Series Promotion Tickets**").  The Debtor estimates that approximately

$24,000 of Faith Concert Series Promotion Tickets are outstanding as of the Commencement

Date.

***Jr. Rangers Club***

      225.    In order to promote fan loyalty to the club by families, the Texas Rangers

sponsor an official fan club and an exclusive club for the junior members of its fan club (the "**Jr.**

**Rangers Club**").  Pursuant to the terms of the promotion, Jr. Rangers Club members are entitled

to certain official fan gear and, among other things, ticket vouchers for certain 2010 Rangers

home games (the "**Jr. Rangers Ticket Vouchers**").  The Debtor estimates that approximately

$24,000 of Jr. Rangers Ticket Vouchers are outstanding as of the Commencement Date.

*Camps and Clinics Ticket Promotions and Deposits*

226.    The Debtor holds several camps and clinics for fans.  These camps and clinics are held at the Youth Ballpark.  Members of youth teams practicing at the Youth Ballpark can receive discounts on attendance at Texas Rangers camps and clinics (the "**Youth Ballpark Practice Sessions Camp Promotions**").  The costs of the camps and clinics are covered by third-party sponsorships and registration fees collected from campers.  In certain circumstances, a deposit or prepayment is required in order to reserve a ticket to the camps and clinics (the "**Camps and Clinics Deposits and Prepayments**").  As of the Commencement Date, the Debtor estimates that it owes approximately $26,000 on account of Camps and Clinics Deposits and Prepayments.

*Ultimate Tailgating Promotion*

227.    Discount tickets are available for Texas Rangers fans participating in "Ultimate Tailgating" at the Youth Ballpark (the "**Ultimate Tailgating Promotion**").  As of the Commencement Date, the Debtor does not believe that it has any outstanding obligations with respect to the Ultimate Tailgating Promotion.

*Lexus Free Valet*

228.    Under a sponsorship agreement between Lexus and the Debtor, Lexus pays a fee to the Debtor to promote Lexus at the Ballpark.  The promotion entitles Lexus-branded vehicles to valet park for free at any Texas Rangers home game (the "**Lexus Free Valet Promotion**").  Approximately 22,000 Lexus vehicles park for free during the season as a benefit of the Lexus Free Valet Promotion, which cost is covered in full in advance by the sponsorship fee paid by Lexus.  As such, as of the Commencement Date, the Debtor does not believe that it owes any amounts under the Lexus Free Valet Promotion.

*Chevy Women's Series*

229.    Under a sponsorship agreement between Chevy and the Texas Rangers, Chevy pays a fee to the Debtor to promote Chevy at the Ballpark.  As part of the promotion, the Debtor holds a series of events designed especially for women; however, all fans are invited to participate, regardless of gender (the "**Chevy Women's Series Promotion**").  The cost of the Chevy Women's Series Promotion is covered in full in advance by the sponsorship fee paid by Chevy.  As such, as of the Commencement Date, the Debtor does not believe that it owes any amounts under the Chevy Women's Series Promotion.

*All-Star Voting Promotion*

230.    In order to promote support during balloting for MLB's annual All-Star game (the "**All-Star Game**"), the Texas Rangers offer fans several incentives to participate in voting, including free and half-price tickets (the "**All-Star Voting Promotions**").  The All-Star Voting Promotions were established to garner votes for the Rangers' representation at the All-Star Game and promote fan support for the Texas Rangers — each of which enhances the value of the Debtor's business.  As of the Commencement Date, the Debtor does not believe that it owes any amounts under the All-Star Voting Promotions.

**K.    Motion of Debtor to Assume Interim Support Agreement**

231.    By this Motion, the Debtor requests entry of the Interim Order and Final Order for authority pursuant to sections 363(b) and 105 of the Bankruptcy Code to enter into and perform the ISA with MLB.  The ISA provides the Debtor with day-to-day logistical and operational support.  Through the ISA, the Debtor, aided by MLB, will have additional means to achieve the goals of keeping the Rangers Franchise (defined below) operationally functional, maintaining the team's value, ensuring compliance with MLB rules and regulations, and facilitating an orderly transfer of the Debtor's assets to the new owner in connection with the

Prepackaged Plan.  To facilitate MLB's ability to assist the Debtor effectively, the ISA provides

MLB with access to the Debtor's records, financial information, and employees necessary to

MLB's support.

        232.    I believe ample business justification exists to approve the ISA.  The

Debtor benefits from the continued expertise and support of MLB.  The guidance and knowledge

brought to the Rangers Franchise by the Lead Monitor has been and remains important to the

efforts to keep the Rangers Franchise operational, maintain its value, and facilitate an

expeditious and orderly transfer of ownership consistent with MLB rules and regulations.  All

constituents will benefit from MLB's ongoing assistance to the Debtor.  I am informed by

counsel that the monitoring rights contemplated by the ISA are not substantially different from

rights granted frequently to lenders making loans to debtors-in-possession.  As noted, an affiliate

of MLB is providing postpetition financing to the Debtor and the approval of the ISA by the

Court is a condition precedent to the Debtor obtaining postpetition financing.  Therefore, I

believe the Debtor's decision to enter into the ISA to ensure that the critical support provided by

MLB remains in place falls well within the proper exercise of the Debtor's business judgment.

233.    I respectfully request that the Court grant all relief requested in the First

Day Pleadings and such and other further relief as may be just.

Dated:      May 24, 2010

By: */s/ Kellie L. Fischer*
Name:  Kellie L. Fischer
Title:  Chief Financial Officer and Secretary
of Texas Rangers Baseball Partners