Martin A. Sosland (18855645)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
Telephone:  (214) 746-7700
Facsimile:   (214) 746-7777

Ronit J. Berkovich (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtor and
Debtor in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

```
----------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
TEXAS RANGERS BASEBALL PARTNERS,          :        Case No. 10-43400 (DML)-11
                                          :
             Debtor.                      :
                                          :
----------------------------------------------------------------x
```

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR IN POSSESSION TO (I) ENTER INTO POSTPETITION FINANCING DOCUMENTS AND OBTAIN POSTPETITION FINANCING PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE, (II) GRANT LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, (III) USE CASH COLLATERAL PURSUANT TO SECTIONS 105, 361, 362, 363, AND 507 OF THE BANKRUPTCY CODE, (IV) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS, AND (V) SET FINAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Texas Rangers Baseball Partners ("TRBP" or the "Debtor") hereby files this

motion (the "Motion") seeking entry of an interim order (the "Interim Order")[1] authorizing the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them either in the DIP Credit Agreement (defined below) or the proposed Interim Order, as the case may be.

Debtor to: (i) enter into postpetition financing documents and obtain postpetition financing; (ii) grant security interests, liens, and superpriority claims, (iii) use cash collateral; (iv) grant adequate protection to prepetition secured creditors; (v) vacate and modify the automatic stay; and (vi) schedule a final hearing (the "<u>Final Hearing</u>") to consider the relief requested herein on a final basis. In support of the Motion, the Debtor submits the Declaration of Kellie L. Fischer in Support of the Debtor's Chapter 11 Petition and Requests for First Day Relief (the "<u>Fischer Declaration</u>"), filed contemporaneously herewith, and respectfully represents as follows:

<u>**Summary of Relief Requested**</u>

1.      By this Motion, the Debtor requests, pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), entry of the Interim Order (i) authorizing borrowing with priority over administrative expenses and secured by liens on property of the estate, junior to certain existing liens, on an interim basis, in an amount not to exceed $6 million under that certain Secured Debtor-in-Possession Credit and Security Agreement, as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "<u>DIP Credit Agreement</u>"; together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and the DIP Orders (defined herein), collectively, the "<u>DIP Documents</u>"), substantially in the form attached hereto as <u>Exhibit A</u>; (ii) authorizing the Debtor to use cash collateral (as defined in section 363(a) of the Bankruptcy Code, "<u>Cash Collateral</u>"); (iii) granting adequate protection to the Prepetition Secured Creditors (as defined herein); (iv) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the

terms and provisions of the Interim Order; and (v) scheduling a final hearing (the

"Final Hearing") to consider the relief requested in the Motion on a final basis and the entry of a

final order (the "Final Order", and together with the Interim Order, the "DIP Orders") approving

the relief requested herein on a final basis, including up to an aggregate committed amount of

$11.5 million in financing.

## Bankruptcy Rule 4001 Concise Statement

2.　　In accordance with Bankruptcy Rule 4001, a summary[2] of the material

provisions of the DIP Credit Agreement is set forth below:

(i)　　DIP Credit Agreement Debtor:　TRBP, as debtor in possession
(the "Debtor").

(ii)　　DIP Credit Agreement Lender:　Baseball Finance LLC, a Delaware
limited liability company (the "DIP Lender"), which is affiliated with
MLB (as defined herein).

(iii)　　DIP Commitment:　The DIP Lender agrees to provide a secured term loan
credit facility of up to $11.5 million (the "DIP Commitment"), provided
that no more than $6 million, as approved by this Court in the Interim
Order, shall be available through the date of the entry of the Final Order.
The remainder of the DIP Commitment will be available after the entry of
the Final Order.

(iv)　　Closing Date:　The Closing Date will occur upon the entry of the Interim
DIP Order and the satisfaction of certain conditions precedent
(the "Closing Date").

　　DIP Credit Agreement, Section 1.1, definition of "Closing Date"; DIP Credit
Agreement, Section 5.1.

(v)　　Maturity Date:　the earlier to occur of (a) October 31, 2010 and (b) the
consummation of the Sale (the "Maturity Date").

　　DIP Credit Agreement, Section 1.1, definition of "Maturity Date."

(vi)　　Termination Date:　The DIP Commitment shall terminate on the Maturity
Date (the "Termination Date").

---

[2] To the extent anything in this Motion is inconsistent with the proposed Interim Order and DIP Credit Agreement,
annexed hereto, the proposed Interim Order and DIP Credit Agreement shall control.

DIP Credit Agreement, Section 3.4.

(vii)     <u>Availability and Term</u>:  From the Closing Date until the Termination Date.

(viii)    <u>Interest Rate</u>:  Each loan under the DIP Credit Facility (a "<u>Term Loan</u>") shall bear interest at a per annum rate equal to 5.75%. During such time as an Event of Default (as defined in the DIP Credit Agreement) shall have occurred and be continuing, all outstanding Term Loans under the DIP Credit Agreement shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto <u>plus</u> 2%.

DIP Credit Agreement, Section 3.3.

(ix)     <u>Use of Proceeds</u>:  The DIP Credit Facility shall be available solely:

1.   for working capital and other general corporate purposes of the Group Members (as defined in the DIP Credit Agreement) including the payment of professional fees and expenses, in each case, in accordance with the Budget (as defined herein);

2.   to make adequate protection payments to any Person, to the extent required under the Interim DIP Order or Final DIP Order;

3.   to pay the fees and expenses of the DIP Lender;

4.   to make such payments to MLB as are required under the Interim Support Agreement; and

5.   to pay claims in respect of certain prepetition creditors, including but not limited to employees, taxing authorities and trade vendors in the ordinary course, in each case, to the extent authorized by orders of this Court reasonably acceptable to the DIP Lender.

DIP Credit Agreement, Section 4.12; Interim Order ¶ 6.

(x)     <u>Collateral</u>:  To secure payment and performance of all Obligations (as defined in the DIP Credit Agreement), the Debtor is granting to the DIP Lender a continuing security interest in, a lien upon and assigning to the DIP Lender, as security, all property, and interests in such property, of the Debtor, whether now owned or hereafter acquired or existing, and wherever located (all of which being collectively referred to as the "<u>Collateral</u>"), including: all Accounts (as defined in the DIP Credit Agreement); all general intangibles, including, without limitation, all Intellectual Property (as defined in the DIP Credit Agreement); all goods, including, without limitation, Inventory and Equipment (as each term is defined in the DIP Credit Agreement (as defined in the DIP Credit Agreement); all chattel paper, including, without limitation, all tangible and electronic chattel paper; all instruments, including, without limitation, all promissory notes; all documents; all Insurance; all deposit accounts; all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights; all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of receivables and other Collateral, including

(i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, receivables or other Collateral, including returned, repossessed and reclaimed goods, (iv) deposits by and property of account debtor or other persons securing the obligations of account debtors; (v) all investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts); and (vi) monies, credit balances, deposits and other property of the Debtor now or hereafter held or received by or in transit to the DIP Lender or its affiliates or at any other depository or other institution from or for the account of the Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise; all commercial tort claims, including, without limitation, those identified on <u>Schedule 8.1(l)</u> to the DIP Credit Agreement; to the extent not otherwise described above, all receivables; all records; and all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral; in each case subject to the exclusions set forth in Section 8.2 of the DIP Credit Agreement.

DIP Credit Agreement Section 8.1; Interim Order ¶ 3.

(xi) <u>Carveout</u>:  An administrative expense carve-out (the "<u>Carveout</u>") in the amount of (i) the unpaid fees of the US Trustee pursuant to 28 U.S.C. § 1930; and (ii) the fees and expenses of the professionals retained by the Debtor and the Committee appointed in this chapter 11 case and allowed by the Court, so long as such fees and expenses were incurred (a) prior to an Event of Default (as defined in the DIP Credit Agreement) and are otherwise provided for in the Budget regardless of whether the Budget provides for such fees to be paid before or after the Event of Default or (b) following an Event of Default of up to $1,000,000 in the aggregate. Notwithstanding the foregoing, the Debtor shall, subject to the terms of the Interim Order, be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code and such orders of the Court authorizing the payment of compensation and reimbursement of expenses that have been incurred prior to the occurrence of an Event of Default and such amounts paid will not reduce the Carveout.

Interim Order ¶ 4.

(xii)   <u>Events of Default</u>:  If any of the following events shall occur and be continuing:[3]

    a.    the Debtor shall fail to pay any principal of any Term Loan when due in accordance with the terms of the DIP Credit Agreement; or the Debtor shall fail to pay any interest on any Term Loan or any other amount payable under the DIP Credit Agreement or under any other Loan Document (as defined in the DIP Credit Agreement), within 3 days after any such interest or other amount becomes due in accordance with the terms of the DIP Credit Agreement;

    b.    any representation or warranty made or deemed made by any Loan Party (as defined in the DIP Credit Agreement) in the DIP Credit Agreement or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with the DIP Credit Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made;

    c.    any Loan Party shall default in the observance or performance of any agreement contained in Section 6.1 or Section 7 of the DIP Credit Agreement;

    d.    any Loan Party shall default in the observance or performance of any other agreement contained in the DIP Credit Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of Section 10.1 of the DIP Credit Agreement), and such default shall continue unremedied for a period of 15 business days after receipt by the Debtor of a written notice from the DIP Lender of such default;

    e.    any Group Member (as defined in the DIP Credit Agreement) (i) defaults in making any payment of any principal of any Indebtedness (as defined in the DIP Credit Agreement; including any Guarantee Obligation (as defined in the DIP Credit Agreement)), but excluding the Term Loans) on the due date thereof (after taking into account any applicable grace periods and notice requirements); or (ii) defaults in making any payment of any interest on any

---

[3] The Interim Order provides that the DIP Lender must give five business days' notice to the Debtor, the Committee, the US Trustee, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent, and their respective counsel, before the DIP Lender may exercise any such rights or remedies described in the Interim Order or the DIP Credit Agreement upon an Event of Default.  Interim Order at ¶ 10.

such Indebtedness on the due date thereof (after taking into account any applicable grace periods and notice requirements); or (iii) defaults in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating to such Indebtedness (after taking into account any applicable grace periods and notice requirements), or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; <u>provided</u>, that (1) references to "Indebtedness" contained in paragraph (e) thereunder shall refer to Indebtedness incurred after the Commencement Date, (2) a default, event or condition described in clauses (i), (ii) or (iii) of paragraph (e) thereunder shall not at any time constitute an Event of Default if the Group Member is stayed from making such payment as a result of this chapter 11 case and (3) a default, event or condition of the type described in clauses (i), (ii) and (iii) of paragraph (e) thereunder shall not at any time constitute an Event of Default unless such default, event or condition shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $100,000;

f.   (i) any Person (as defined in the DIP Credit Agreement) shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA (as defined in the DIP Credit Agreement) or Section 4975 of the Code (as defined in the DIP Credit Agreement)) involving any Plan (as defined in the DIP Credit Agreement), (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien (as defined in the DIP Credit Agreement) in favor of the PBGC (as defined in the DIP Credit Agreement) or a Plan shall arise on the assets of any Group Member or any Commonly Controlled Entity (as defined in the DIP Credit Agreement), (iii) a Reportable Event (as defined in the DIP Credit Agreement) shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan (as defined in the DIP Credit Agreement), which Reportable Event or commencement of

proceedings or appointment of a trustee is, in the reasonable opinion of the DIP Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) any Group Member or any Commonly Controlled Entity shall, or in the reasonable opinion of the DIP Lender is likely to, incur any liability in connection with a withdrawal from, or the Insolvency (as defined in the DIP Credit Agreement) or Reorganization (as defined in the DIP Credit Agreement) of, a Multiemployer Plan (as defined in the DIP Credit Agreement), or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the DIP Lender, reasonably be expected to have a Material Adverse Effect (as defined in the DIP Credit Agreement);

g.      after the Commencement Date, one or more judgments or decrees shall be entered against any one or more Group Members involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $100,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed (or subject to the automatic stay) or bonded pending appeal within 60 days from the entry thereof;

h.      any termination, revocation, impairment, modification or non-renewal of one or more licenses, registrations or memberships granted to any Group Member, or any other failure to meet regulatory requirements or comply with law, if such termination, revocation, impairment, modification, non-renewal or failure could reasonably be expected to result in a Material Adverse Effect;

i.      any of the Security Documents (as defined in the DIP Credit Agreement) shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate (as defined in the DIP Credit Agreement) of any Loan Party shall so contest in writing, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby;

j.      the termination of (i) the Asset Purchase Agreement or (ii) the Interim Support Agreement, in each case without DIP Lender's consent;

k.      any Change of Control (as defined in the DIP Credit Agreement) shall occur, other than pursuant to the Prepackaged Plan; or

l.      the Debtor or any Affiliate of the Debtor shall seek to have the DIP Credit Agreement or any of the Loan Documents modified (or any court shall issue an order or take other action purporting to modify the DIP Credit Agreement or any of the Loan Documents) without the consent of the DIP Lender;

m.      except in accordance with the Prepackaged Plan, the automatic stay under Section 362 of the Bankruptcy Code and applicable to the Debtor or any Affiliate of the Debtor, to the extent applicable, shall be modified or vacated in this chapter 11 case for any secured claim or claims aggregating an amount in excess of $100,000, or to the extent that as a result thereof enforcement of such claim against any Collateral would be permitted;

n.      any of the following shall occur:  (i) non-compliance by the Debtor in any material respect with any of the terms or provisions of the DIP Orders, which non-compliance shall continue unremedied for a period of 5 business days after receipt by Debtor of a written notice from DIP Lender of such non-compliance; (ii) entry of an order by this Court, without the consent of the DIP Lender, directing the appointment of a trustee in the chapter 11 case or of an examiner with enlarged powers to control, manage or direct substantially all of the operations of the Debtor and such order shall not be vacated within 30 days after the entry thereof; (iii) entry of an order by this Court converting the chapter 11 case to a case under chapter 7, or dismissing the chapter 11 case; (iv) the filing by the Debtor, or the entry by the Bankruptcy Court of an order confirming a plan of reorganization of the Debtor other than the Prepackaged Plan or an alternative plan that is not adverse to the interests of the DIP Lender and provides for the termination of the DIP Commitment and payment in full of the Obligations and the satisfaction of all other obligations of the Debtor; (v) the reversal, vacatur, stay, amendment, supplementation or other modification of the DIP Orders in any way without DIP Lender's consent (which consent for non-material matters shall not be unreasonably withheld), or the Debtor shall apply for authority to do so without such DIP Lender consent having been obtained; (vi) the Final DIP Order shall not be entered by the date that is 45 days from the Commencement Date (or such later date as the DIP Lender may agree to in its sole discretion).

DIP Credit Agreement, Section 10.1.

(xiii) <u>Adequate Protection</u>:  As adequate protection to the Prepetition Secured Creditors for the use of Cash Collateral (and the use of Collateral), pursuant to the Interim DIP Order (the "<u>Adequate Protection</u>"):

      a.      a replacement security interest and lien upon all the Postpetition Collateral to secure the Prepetition Obligations, subject in all respects to the TRBP Guaranty Cap and the Lien Cap with respect to the Prepetition Senior Creditors, in the same order of priority as the Prepetition Collateral secures the Prepetition Obligations (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtor of security agreements, pledge agreements, financing statements or other agreements), subject and subordinate only to (a) the Other Prepetition Liens to the extent such liens are otherwise senior to the Prepetition Liens and attach to the Postpetition Collateral, and (b) the Carveout; and

      b.      subject to the payment of the Carveout, to the extent the liens granted in clause (i) are insufficient, a superpriority claim for any diminution to the extent provided for in section 507(b) of the Bankruptcy Code and in the same order of priority as the liens granted pursuant to clause (i) above; but subject in all respects to the TRBP Guaranty Cap with respect to the Prepetition Senior Creditors; and

      c.      to the extent such interest is allowable under section 506(b) of the Bankruptcy Code, interest on the Prepetition Obligations shall continue to accrue (but shall not be paid in cash on a current basis) on and after the Petition Date at the contractual default rate; <u>provided,</u> <u>however,</u> that this subsection (iii) shall not apply to claims against the Debtor limited by the TRBP Guaranty Cap.

Interim Order ¶ 11.

(xiv) <u>Indemnification</u>:  The Debtor agrees (a) to pay or reimburse the DIP Lender for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, the DIP Credit Agreement and the other Loan Documents (as amended and in effect from time to time, the "<u>Postpetition Financing Documents</u>"), and the consummation and administration of the transactions contemplated thereby, including the reasonable and documented out-of-pocket fees and other charges of counsel (including the allocated fees and expenses of in-house counsel) to the DIP Lender and reasonable and documented out-of-pocket filing and recording fees and expenses, with statements with

respect to the foregoing to be submitted to the Debtor prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the DIP Lender shall deem appropriate, (b) to pay or reimburse the DIP Lender for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under the DIP Credit Agreement, the other Loan Documents and any such other documents, including the reasonable and documented out-of-pocket fees and other charges of counsel (including the allocated fees and expenses of in-house counsel) to the DIP Lender, (c) to pay, indemnify, and hold the DIP Lender harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise, sales and other taxes that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, the Postpetition Financing Documents, and (d) to pay, indemnify, and hold the DIP Lender and its officers, directors, employees, affiliates, agents, advisers and owners (direct or indirect) (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, claims, losses, damages, penalties, actions, judgments, proceedings, investigations, inquiries, costs, expenses or disbursements of any kind or nature whatsoever, including the reasonable and documented out-of-pocket fees and other charges of counsel (including the allocated fees and expenses of in-house counsel) to the Indemnitees, with respect to the execution, delivery, enforcement, performance and administration of the DIP Credit Agreement, the other Postpetition Financing Documents and any such other documents (regardless of whether any Loan Party is or is not a party to any such actions, proceedings, investigations or inquiries, including any brought by any Indemnitee against any Loan Party under any Postpetition Financing Document), including any of the foregoing relating to the use of proceeds of the Term Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member (as defined in the DIP Credit Agreement) or any of the Group Properties (as defined in the DIP Credit Agreement, all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that no Loan Party shall have any obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, each Loan Party agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts

due under Section 11.6 of the DIP Credit Agreement shall be payable within a commercially reasonable time, but not later than 15 days after written demand therefor, and copies of any such invoices shall be provided to the Committee and the US Trustee as required by the DIP Order. The agreements in Section 11.6 of the DIP Credit Agreement shall survive the termination of the DIP Credit Agreement and the repayment of the Term Loans and all other amounts payable thereunder.

DIP Credit Agreement Section 11.6

3.      The provisions described in Bankruptcy Rule 4001(b)(1)(B)(i)–(iv) are set forth at the following sections of the Interim Order:

(a)     ***Name of Each Entity with Interest in Cash Collateral***.  Interim Order Findings of Fact ¶¶ D–G.

(b)     ***Purposes of Use of Cash Collateral***.  Interim Order ¶ H.

(c)     ***Liens, Cash Payments, or Other Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral***.  Interim Order ¶ 8.

4.      In addition, the provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)–(xi) are set out at the following sections of the DIP Credit Agreement and the Interim Order:

(a)     ***Grant of Priority or a Lien on Property of the Estate***.  DIP Credit Agreement Sections 8.3–8.4; Interim Order ¶ 8.

(b)     ***Adequate Protection or Priority for a Claim that Arose before the Commencement of the Case***.  DIP Credit Agreement Section 8.4; Interim Order ¶ 8.

(c)     ***Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case***.  Interim Order, Findings of Fact ¶ G, Conclusions of Law ¶ 7.

(d)     ***Waiver or Modification of the Automatic Stay***.  DIP Credit Agreement Section 10.2(a); Interim Order ¶ 10.

(e)     ***Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien***.  None.

(f)     ***Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate***.  None.

(g)     ***Indemnification of Any Entity***.  DIP Credit Agreement Section 11.6.

(h)     ***Release, Waiver or Limitation on Rights under Section 506(c)***.  None.

(i)     ***Liens Granted on Claims Arising Under Chapter 5***.  None.

5.     In addition, the provisions of Bankruptcy Rule 4001(d)(1)(A) require, among other things, an agreement (i) to provide adequate protection; (ii) an agreement to prohibit or condition the use, sale, or lease of property; (iii) an agreement to modify or terminate the automatic stay provided in section 362; (iv) an agreement to use collateral; and (v) an agreement between the debtor an entity that has a lien or interest in property of the estate pursuant to which the entity consents to the creation of a lien senior or equal to the entity's lien or interest in such property.  FED. R. BANKR. PROC. 4001(d)(1)(A).  Although the Debtor has the consent of the Prepetition Third Lien Lender (the DIP Lender) to use cash collateral, as embodied in the DIP Credit Agreement, the Debtor was unable to approach the HSG Credit Agreement Lenders (as defined herein) regarding the use of cash collateral because of the unique circumstances of the case, as described in more detail in the Fischer Declaration.

## Background

6.     On the date hereof (the "Commencement Date"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").  The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**TRBP Partnership Structure**

7.     TRBP owns and operates the Texas Rangers Major League Baseball Club, a professional baseball club (the "Texas Rangers") in the Dallas/Fort Worth Metroplex, pursuant to the Major League Constitution (the "Major League Constitution") and the Membership Agreement, dated as of November 18, 1960, by and between The American League of Professional Baseball Clubs, as assumed by the Office of the Commissioner of Baseball

(the "BOC"), and WBC Baseball Club, Inc., as assumed by TRBP pursuant to an Assumption Agreement, dated as of June 16, 1998.

**Major League Baseball**

8.      With a history and tradition dating back to 1869, professional baseball is one of America's oldest organized league sports.  From April through the end of September every year, Major League Baseball ("MLB") runs a 162-game regular season.  MLB's clubs are divided into two leagues (American and National) and six divisions (AL East, AL Central, AL West, NL East, NL Central and NL West).

9.      The BOC, doing business as Major League Baseball, is an unincorporated association of its 30 member clubs. It is headquartered in New York City and is governed by the Major League Constitution.  The primary purpose of the BOC is to undertake centralized activities on behalf of the 30 clubs.  Among other things, the BOC hires and maintains the sport's umpiring crews, and negotiates marketing, labor, and television contracts.

**The Texas Rangers**

10.      The Texas Rangers are located in the fourth largest metropolitan area and the largest metropolitan market with a single MLB franchise.  The Texas Rangers are one of only 30 MLB franchises and one of two MLB clubs in the state of Texas and its bordering states.  The Texas Rangers have a rich and colorful history and have established themselves as a young, up-and-coming contender supported by a strong fan base.  The team's executives have successfully combined players from their farm system with key veterans to produce a team that today is in first place in the American League's West Division.  Founded in 1961 as the second incarnation of the Washington Senators, the franchise moved to Texas in 1972 and currently competes in the American League West together with the Los Angeles Angels of Anaheim, the Oakland Athletics, and the Seattle Mariners.

11.     The Texas Rangers' home field, the Rangers Ballpark in Arlington (the "Ballpark"), is located in Arlington, Texas and is an open-air, natural grass ballpark that was designed and built with tradition and intimacy in mind.  The proximity of the fans to the action is one of the closest in MLB.  The overall seating of the Ballpark is 49,170 seats on five levels, making it MLB's sixth largest ballpark.

**Events Leading to TRBP's Chapter 11 Filing**

12.     Since 2005, TRBP has experienced, and continues to experience, cash flow deficiencies.  For the entire period that Mr. Hicks has owned the Texas Rangers, he has provided financial support to the team through capital contributions and loans to HSG in excess of $100 million.

13.     Beginning in August 2008, HSG retained advisors to provide financial advice and assistance in connection with a capital raise, potential restructuring, or sale.  While HSG and TRBP explored their options, TRBP continued to suffer operating losses.  As a result of such losses, HSG was unable to service its $525 million long-term debt obligations under the HSG Credit Agreement.  On March 31, 2009, HSG failed to make a scheduled interest payment under the HSG Credit Agreement, and on April 7, 2009, the lenders to the HSG Credit Agreement accelerated the entire amount of indebtedness thereunder.  As a result of the acceleration, the lenders under the HSG Credit Agreement have claims against TRBP on account of TRBP's secured guaranty of $75 million of such indebtedness, as discussed above.

**Sale Process**

14.     During the second half of 2008 and throughout 2009, HSG and TRBP, in conjunction with their advisors, pursued a variety of options for a capital raise or a sale of the Texas Rangers.  Ultimately, they concluded that a sale of the Texas Rangers was the only viable option.  A lengthy and active marketing process culminated with an agreement among HSG, TRBP and Rangers Baseball Express LLC (the "Purchaser"), whose principals include the

current President of the Texas Rangers, Nolan Ryan, and Chuck Greenberg, a sports lawyer and minor league club owner, dated as of January 23, 2010 (the "January APA"), governing the sale of the Texas Rangers franchise and certain related assets.

15. Pursuant to the terms of the January APA, consummation of the sale required, among other closing conditions, the consent of the Lenders pursuant to the terms of the HSG Credit Agreement. Despite HSG's, TRBP's, and the Purchaser's lengthy good faith negotiations with the Lenders following the execution of the January APA, the Lenders refused to consent to the transactions contemplated by the January APA and thus prevented TRBP from moving forward with the sale of the Texas Rangers. Ultimately, TRBP, in consultation with MLB, concluded that a chapter 11 filing designed to facilitate a sale of TRBP's assets to the Purchaser (the "Sale") pursuant to a prepackaged plan of reorganization ("the Prepackaged Plan") was the most efficient manner in which to consummate the Sale and was, therefore, in the best interests of the Texas Rangers franchise, its fans, MLB and all other parties involved, including TRBP's creditors. As described herein, the Prepackaged Plan will facilitate the sale of the Texas Rangers franchise to the Purchaser and the payment of all of TRBP's creditors in full, allowing the Texas Rangers franchise to compete successfully on and off the field with assurance of long-term financial stability.

**Asset Purchase Agreement**

16. On May 23, 2010, after further negotiation, in anticipation of the implementation and consummation of the Sale through a chapter 11 plan of reorganization, the parties to the January APA terminated the January APA and entered into that certain Asset

Purchase Agreement (the "Asset Purchase Agreement") for the sale of the Texas Rangers franchise and certain related assets.[4]

17.     Under the Asset Purchase Agreement, substantially all of the Debtor's assets, including the Texas Rangers franchise and substantially all contractual rights related the operation of the Texas Rangers will be sold to the Purchaser.  The aggregate consideration paid and obligations assumed by the Purchaser at the Closing will equal more than $500 million.  Pursuant to the Sale, the Purchaser will also assume virtually all of the obligations of the Texas Rangers, including deferred compensation obligations, sponsorship, ticketholder, employee and specified tax obligations, with the exception of certain excluded liabilities that will be paid under the Prepackaged Plan.  Under the Asset Purchase Agreement and the Prepackaged Plan, TRBP also intends to assume and assign to the Purchaser all contracts relating to the Texas Rangers franchise, including all marketing, media, advertising, and merchandising contracts, all minor league and major league player contracts and certain real property Leases.  The Sale anticipates a complete and orderly transition of the operations of the team—all tickets to games and other events will be fully honored, and all employees will keep their jobs.  Although accomplished through a chapter 11 plan, the Sale will resemble in all significant respects the sale of any other sports franchise.

18.     The Sale will allow TRBP's creditors that are Lenders under the HSG Credit Agreement to recover 100 percent of their guaranty claims against TRBP.  As described more fully below, subject to Court approval, the Sale is expected to be completed by mid-summer, allowing the franchise to exit the chapter 11 process expeditiously in order to reduce any potential adverse impact to the Texas Rangers and its operations.

---

[4] A more thorough description of the Asset Purchase Agreement and the Prepackaged Plan are contained in the Fischer Declaration, filed contemporaneously herewith and incorporated herein by reference.

**MLB Approval**

19.     The Debtor, as a member of Major League Baseball, is subject to the rules and regulations of MLB.  In particular, any sale of the Texas Rangers franchise cannot be consummated without first obtaining the requisite approval from the BOC and 75% of the MLB clubs.  The sale of any MLB club must comply with the process set forth in the Major League Constitution and the MLB ownership guidelines.  Accordingly, TRBP has worked very closely with MLB throughout the negotiation of the Asset Purchase Agreement and all related events leading to the filing of the chapter 11 case.  As of the date hereof, the Debtor is not aware of any opposition by MLB or the requisite percentage of MLB clubs required to consent to the Sale.

**The Prepackaged Plan**

20.     As stated above, concurrently herewith, the Debtor has filed its Prepackaged Plan.  The primary purpose of the Prepackaged Plan is to bridge the impasse between TRBP and the Lenders under the HSG Credit Agreement and to effectuate the Sale of the Texas Rangers franchise to the Purchaser and satisfy TRBP's creditors in full.

21.     The Prepackaged Plan provides for the Sale to be consummated on the effective date (the "Effective Date") and sets forth the distribution that each class of the Debtor's creditors and equity holders is to receive on the Effective Date under the Prepackaged Plan.  All TRBP's creditors will be paid in full under the Prepackaged Plan or have their claims assumed by the Purchaser under the Asset Purchase Agreement.  Specifically, each holder of an (i) Allowed Priority Non-Tax Claim, (ii) Allowed First Lien Holder Claim, (iii) Allowed Second Lien Holder Claim, (iv) Allowed MLB Prepetition Claim, (v) Allowed Secured Tax Claim, (vi) Allowed Other Secured Claim, (vii) Allowed Assumed General Unsecured Claim, (viii) Allowed Non-Assumed General Unsecured Claim, (ix) Allowed Emerald Diamond Claim, (x) Allowed Overdraft Protection Agreement Claim, (xi) Allowed Intercompany Claim, and

(xii) Allowed TRBP Equity Interest (all as defined in the Prepackaged Plan) is unimpaired and will be paid in full.

22.     Additionally, TRBP believes that the Purchaser will build on past team successes and that the future of the Texas Rangers will be in the hands of an ownership group that will be a good steward for the game.

23.     TRBP believes that because the Prepackaged Plan satisfies in full all claims against TRBP, is supported by TRBP's equity holders, and will lead to the least disruption to the Texas Rangers' business of playing baseball, the Prepackaged Plan is in the best interests of the Texas Rangers franchise and all parties in interest.

### Jurisdiction

24.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Prepetition Funding of the Debtor's Operations

25.     Rangers Equity Holdings, L.P., a Delaware limited partnership ("Rangers Equity LP") holds a 99% partnership interest in the Debtor and Rangers Equity Holdings GP, LLC, a Texas limited liability company ("Rangers Equity GP") holds a 1% partnership interest in the Debtor.  Rangers Equity GP is a wholly owned subsidiary of Rangers Equity LP.  Both Rangers Equity LP and Rangers Equity GP are holding companies with no operating assets and are subsidiaries of HSG Sports Group LLC, a Texas limited liability company ("HSG").  HSG is a sports and entertainment holding company, which is an affiliate of, and indirectly controlled by, Thomas O. Hicks ("Mr. Hicks").  The Texas Rangers have had five owners since the team moved to Arlington in 1972.  Mr. Hicks became the fifth owner in the history of the Texas Rangers on June 16, 1998, when HSG completed the acquisition of the franchise from the George W. Bush/Edward W. Rose partnership.

26.     The Debtor is a guarantor under (i) that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement"), by and among HSG Sports Group Holdings LLC ("HSGH"), HSG, certain subsidiaries of HSG (including the Debtor) as guarantors, the lenders party thereto from time to time (the "Prepetition First Lien Lenders"), JP Morgan Securities Inc., as joint lead arranger and joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger, joint bookrunner, Barclays Bank PLC, as co-syndication agent, and JP Morgan Chase Bank, N.A., as administrative agent and collateral agent (the "Prepetition First Lien Agent") and (ii) that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Second Lien Credit Agreement" and together with the First Lien Credit Agreement, collectively, the "HSG Credit Agreements"), by and among HSGH, HSG, certain subsidiaries of HSG, as guarantors, the lenders party thereto from time to time (the "Prepetition Second Lien Lenders", and together with the Prepetition First Lien Lenders, collectively, the "HSG Credit Agreement Lenders"), JP Morgan Securities Inc. as joint lead arranger, joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger and joint bookrunner, and GSP Finance LLC, as successor in interest to Barclays Bank PLC, as administrative agent (the "Prepetition Second Lien Agent and, together with the Prepetition First Lien Agent and the HSG Credit Agreement Lenders, collectively, the "Prepetition Senior Creditors"), collateral agent and co-syndication agent.

27.     The Debtor's guaranty of the obligations under the HSG Credit Agreements (the "Guaranty") is expressly limited thereunder to a maximum amount of $75 million (the "TRBP Guaranty Cap").  The Debtor's obligations with respect to the Guaranty, subject to the TRBP Guaranty Cap, are secured by (i) a first priority lien in favor of the

Prepetition First Lien Agent (the "Prepetition First Lien") and (ii) a second priority lien in favor of the Prepetition Second Lien Agent (the "Prepetition Second Lien" and, together with the Prepetition First Lien, collectively, the "Prepetition Senior Credit Facility Liens") on substantially all of the Debtor's assets (the "Prepetition Collateral"), however, each of (i) the Amended and Restated Pledge and Security Agreement dated as of December 19, 2006 (the "First Lien Security Agreement"), by and among HSGH, HSG, and certain subsidiaries of HSG (including TRBP), as grantors, and the Prepetition First Lien Agent and (ii) the Amended and Restated Second Lien Pledge and Security Agreement dated as of December 19, 2006 (the "Second Lien Security Agreement"), by and among HSGH, HSG, and certain subsidiaries of HSG (including TRBP), as grantors, and the Prepetition Second Lien Agent, entered into in connection with the HSG Credit Agreements expressly limits the aggregate amount of Indebtedness (as defined in the HSG Credit Agreements) constituting Prepetition First and Second Lien Obligations (as defined below) secured by the Prepetition Senior Credit Facility Liens to no more than $75 million (the "Lien Cap").  The Debtor's obligations under the HSG Credit Agreements, as limited by the TRBP Guaranty Cap and the Lien Cap, are referred to herein as the "Prepetition First and Second Lien Obligations."

28.     Pursuant to that certain Amended and Restated Secured Revolving Promissory Note, dated as of November 25, 2009 (together with the other agreements and instruments related thereto, the "Prepetition Third Lien Financing Documents"), by and between the Debtor and Baseball Finance LLC, as lender (in such capacity, the "Prepetition Third Lien Lender", together with the Prepetition Senior Creditors, the "Prepetition Secured Creditors"), the Prepetition Third Lien Lender agreed to make available to the Debtor a secured revolving loan facility in an aggregate principal amount not to exceed $25 million (the loans and other amounts outstanding under the Prepetition Third Lien Financing Documents are collectively referred to herein as the "Prepetition Third Lien Obligations" and together with the Prepetition First and

Second Lien Obligations, collectively, the "Prepetition Obligations").  The Prepetition Third

Lien Lender—also the DIP Lender—is an affiliate of MLB.  The Prepetition Third Lien

Obligations are secured by liens (the "Prepetition Third Liens" and, together with the Senior

Credit Facility Liens, collectively, the "Prepetition Liens") on the Prepetition Collateral, but on a

basis junior to the Prepetition Senior Credit Facility Liens (subject to the Lien Cap), and are

supported by guarantees provided by certain non-debtor affiliates.  As of the Commencement

Date, loans in the principal amount of approximately $18,450,000 are outstanding under the

Prepetition Third Lien Financing Documents, plus interest, fees, and expenses and other amounts

due in respect thereof.

### The Debtor's Cash Management System

29.     To manage its business efficiently and seamlessly, the Debtor utilizes a

centralized cash management system (the "Cash Management System") to collect and transfer

the funds generated by its operations and to disburse funds to satisfy its financial obligations.

The Cash Management System facilitates the Debtor's cash monitoring, forecasting, reporting,

and enables the Debtor to maintain control over the administration of its bank accounts

(the "Bank Accounts"), all but one of which is held at PlainsCapital Bank

("PlainsCapital Bank")[5].  The Debtor has one Bank Account for minor league petty cash

disbursements ("TRBP Minor League Account"), which is held at Bank of America ("Bank of

America").  The Cash Management System can be broken down into several distinct segments:

cash collection, concentration, disbursements, credit card, and payroll.

30.     The Debtor generates revenue from, among other things, (i) ticket sales for

Rangers home games, (ii) merchandise and other game-related sales, (iii) television and radio

---

[5] Although the Bank Accounts at PlainsCapital Bank were specifically dedicated to the Debtor's sole use, the Bank Accounts were previously held in the name of HSG Sports Group Holdings LLC ("HSG"), the indirect parent of the Debtor.  Prior to the Commencement Date, the ownership of the Bank Accounts was changed from HSG to the Debtor.

broadcast sales, and (iv) advertising sales.  The funds generated from these sources, along with the funds generated from the Debtor's other business segments, are deposited into various Bank Accounts (the "Collection Accounts").  The Collection Accounts are "zero balance accounts" which means the Debtor maintains a zero end-of-day balance.  At the end of each day, funds flow out of the Collection Accounts to the centralized holding account (the "TRBP Operating Account").

31.     The Debtor maintains several disbursement accounts (the "Disbursement Accounts") from which the Debtor meets its payment obligations.  Funds in the TRBP Operating Account are transferred, as needed, into Disbursement Accounts used to fund the Debtor's operating expenses, including, but not limited to, (i) accounts payable, (ii) operations, and (iii) petty-cash and other *de minimis* cash needs.  To the extent a check is drawn on a Disbursement Account that is underfunded at the time of the transaction, the Disbursement Account is automatically credited with funds from the TRBP Operating Account.  By linking the TRBP Operating Account to the various Disbursement Accounts, the Debtor ensures that sufficient funds are available.  Payments made on behalf of the Debtor are processed from these primary Disbursements Accounts.  One exception is the TRBP Minor League Account which is not directly linked to the TRBP Operating Account.

**The Proposed Postpetition Financing Documents**

32.     As described in detail in the Fischer Declaration, prior to the Commencement Date, the Debtor financed its operations with cash from operating activities, such as television and radio rights fees, ticket sales, season ticket and suite license sales, merchandise and concessions sales, a variety of sponsorship agreements, and loans under the Prepetition Third Lien Financing Documents.  The Debtor projects that it will need the liquidity provided by the proposed DIP Credit Agreement in addition to the use of the cash that it generates, including any Cash Collateral to which the Prepetition Secured Creditors have an

interest, to fund its operations and to pay the costs and expenses of administering this chapter 11 case and effectuate the sale contemplated under the Prepackaged Plan.

33.     In exploring its options for postpetition financing, the Debtor recognized that the obligations owed to the Prepetition Secured Creditors are secured by substantially all of the Debtor's assets, such that either (i) the liens of the Prepetition Secured Creditors would have to be primed to obtain postpetition financing, or (ii) the Debtor would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Secured Creditors.  Accordingly, prior to the commencement of the Debtor's chapter 11 case, the Debtor approached the Prepetition Third Lien Lender, which the Debtor knew was supportive of the Prepackaged Plan, and requested a postpetition financing facility that did not include the priming of the liens of the Prepetition Secured Creditors.

34.     Ultimately, the DIP Lender was willing to extend postpetition financing on the terms and conditions described herein, including being secured by a lien junior to the Prepetition Secured Creditors and with favorable pricing.  The Debtor and the DIP Lender engaged in extensive, arms'-length negotiations with respect to the terms and conditions of the DIP Credit Facility.

35.     In connection with, and as a condition of, the DIP Lender's agreement to provide postpetition financing, the DIP Lender and the Debtor propose to enter into to an Interim Support Agreement, subject to this Court's approval, that provides for, among other things, the affirmation of a prior delegation to MLB of certain monitoring authority over the day-to-day operations of TRBP and its subsidiaries and TRBP is required to consult with John McHale, Jr., in his capacity as lead monitor before taking certain material actions (the "Interim Support

Agreement" or the "ISA").[6]  In addition, the BOC has access to TRBP's books and records and may attend important meetings.  Under the ISA, TRBP has agreed to reimburse the DIP Lender for all prepetition and postpetition costs and expenses (including attorneys' fees) incurred by them in connection with, among other things, the ISA and the Prepackaged Plan.

36.  The Debtor and the DIP Lender have agreed upon a budget (the "Budget," annexed hereto as Exhibit B) projecting cash flow for the next 13 weeks.  The Budget will be updated by the Debtor on a weekly basis, subject to the DIP Lender's consent, and will show receipts and disbursements as budgeted.  The Debtor has also agreed to provide the DIP Lender with a weekly report on the Budget.  The material terms and conditions of the DIP Credit Agreement are summarized in paragraph 1 of this Motion.

37.  The Debtor is seeking authorization to enter into the DIP Credit Agreement on an interim basis pending a Final Hearing.  Based on its cash needs during the interim period (as reflected in the Budget), the debtor has determined that during the interim period and until the Final Order is entered, it will need to borrow from the DIP Lender approximately $6 million.  An immediate and critical need exists for the Debtor to obtain funds in order to continue the operation of its business.  At this time, the ability of the Debtor to finance its operations through the incurrence of new indebtedness for borrowed money is vital to the preservation and maintenance of the going-concern value of the Debtor's estate.  Without such funds, the Debtor will not be able to meet its payroll obligations, including paying salaries for coaches, players and front, back and box office staff and maintenance and grounds keepers; pay for utilities and other expenses of operating the ballpark and its training facilities; or pay for advertising and other promotional expenses; or professional and other expenses needed to carry

---

[6] Concurrently herewith the Debtor has filed a motion to seek approval of the ISA under section 363 of the Bankruptcy Code.

on its business during this sensitive period. The Debtor would not be able to carry on its essential business activities without the requested postpetition finance, the result of which would cause swift and irreparable harm to the Debtor's estate.

38. Moreover, having adequate financing will enable the Debtor to complete the plan process, including consummation of the sale of the Rangers contemplated in the Prepackaged Plan, with the aim of maximizing value for creditors and other stakeholders. The Debtor is not in a position to pursue consummation of a successful chapter 11 plan without an outside source of liquidity. The Debtor is unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code.

**The Proposed Use of Cash Collateral**

39. Even with the proposed DIP Commitment, the Debtor does not have available sources of working capital and financing to carry on the operation of their businesses without the use of Cash Collateral. To operate in chapter 11 in a manner consistent with their ordinary course practice, the Debtor must have access to cash that is encumbered by the liens of the Prepetition Secured Creditors. Cash collateral will be used to make payments to vendors and employees and to satisfy the other ordinary costs of operations, including rent, taxes and insurance. In the absence of authority to use Cash Collateral, the continued operation of the Debtor's businesses even for a limited period of time would not be possible, and serious and irreparable harm to the Debtor and its estate would occur. The use of Cash Collateral is therefore critical to preserve and maintain the going concern value of the Debtor.

40. Recognizing the importance of obtaining authority to continue to use Cash Collateral in the ordinary course, the Debtor approached the Prepetition Third Lien Lender prior to the Commencement Date of this case to discuss the terms upon which the Prepetition Third Lien Lender would agree to the use of Cash Collateral. After extensive arm's-length

negotiations, the parties agreed on the form of Interim Order filed concurrently herewith, that will allow the Debtor to continue to operate its business in the ordinary course during this chapter 11 case. Specifically, the Debtor's authority to use Cash Collateral pursuant to the Interim Order will continue through the entry of the Final Order.

41.     The Debtor did not seek the Prepetition Senior Creditors' consent to use Cash Collateral (or to provide postpetition financing) because of the unique features of the case. As explained below, however, the Debtor believes that the Prepetition Senior Creditors' interests are more than adequately protected under the facts of this case.

42.     Consequently, the Debtor seeks authority to use Cash Collateral on an interim basis pending a Final Hearing.

**Proposed Adequate Protection**

43.     To the extent necessary, the Prepetition Secured Creditors have either consented to the Debtor's use of the Prepetition Collateral and Cash Collateral or their respective interests therein are being adequately protected, primarily by the substantial equity cushion that exists between the value of the Prepetition Collateral, as evidenced by the consideration being provided to the Debtor under the Asset Purchase Agreement (as described in the Prepackaged Plan) and the amount of the Prepetition Obligations. As discussed below in more detail, the Debtor submits that the adequate protection provided to the Prepetition Secured Creditors, for, among other things, any decline in the value of such parties' respective interest in the Prepetition Collateral and any Cash Collateral, subject to the TRBP Guaranty Cap and Lien Cap, is consistent with and authorized by sections 361, 362, 363, and 364 of the Bankruptcy Code.

44.     In addition to the equity cushion, as adequate protection of its Prepetition Obligations and the Prepetition Liens subject to the TRBP Guaranty Cap and Lien Cap, and pursuant to sections 361, 363, 364, and 507(b) of the Bankruptcy Code, the Debtor is seeking to grant the Prepetition Secured Creditors the "adequate protection" described in paragraph 2(xiii)

above against the diminution in the value of their Collateral and for the use of their Cash Collateral during the chapter 11 case, subject to the TRBP Guaranty Cap and Lien Cap.

## Relief Requested

45.     By this Motion, the Debtor requests an order of this Court authorizing TRBP to enter into the DIP Credit Agreement with the DIP Lender, pursuant to the terms of this Motion and the Interim DIP Order.

46.     Pending entry of the Final Order, the Debtor requests that the Court authorize the Debtor, on an interim basis, to (i) borrow up to $6 million from the DIP Commitment, (ii) use Cash Collateral as provided in the Interim Order, (iii) grant to the DIP Lender the liens and superpriority claims described herein and in the Interim Order, and (iv) provide adequate protection in favor of the Prepetition Secured Creditors, as described herein and in the Interim Order.  Moreover, the Debtor request that the Court approve the proposed notice of the Final Hearing and the adequacy of the proposed service thereof, and schedule the Final Hearing.  As described in greater detail herein, the proposed financing will be junior to the Prepetition Obligations, subject to the TRBP Guaranty Cap and Lien Cap; as such, the liens created under the Postpetition Financing Documents are not priming liens with respect to liens currently held by the Prepetition Secured Creditors.

**A.     The Proposed Postpetition Financing Documents Should Be Approved**

47.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that

is subject to a lien.  11 U.S.C. § 364(c).  The Debtor is not seeking to grant a priming lien under section 364(d) of the Bankruptcy Code.

48.     As discussed above, despite its efforts, the Debtor has been unable to (a) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), or (iii) in exchange for the grant of a super-priority administrative expense claim pursuant to section 364(c)(1).  Therefore, the Debtor proposes to obtain the financing set forth in the DIP Credit Agreement by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), and (3) of the Bankruptcy Code.

49.     Having determined that financing is available only under sections 364(c) of the Bankruptcy Code, the Debtor negotiated the Postpetition Financing Documents with the DIP Lender extensively and at arms' length.  Provided that a Debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also In re Funding Sys. Asset Mgmt. Corp. v. Key Cap. Corp. (In re Funding Asset Mgmt. Corp.)*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

50.     Substantially all of the Debtor's assets are encumbered and with diligent efforts, the Debtor has negotiated the best terms available to obtain the funding it needs to maintain sufficient liquidity to preserve its assets over the course of this chapter 11 case and effectuate the sale contemplated in the Prepackaged Plan.  The Debtor submits that the circumstances of this case requires the Debtor to obtain financing under section 364(c) of the Bankruptcy Code, and accordingly, the Postpetition Financing Documents reflect the exercise of its sound business judgment.

51.     The terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length.  The ability of the Debtor to continue to operate its business and reorganize under chapter 11 of the Bankruptcy Code depends upon its ability to obtain the financing memorialized in the DIP Credit Agreement.  Without the proposed financing, the Debtor will not have the funds necessary to pay postpetition wages and salaries, payroll taxes, and costs related to trade vendors, as well as other expenses required to be paid by the Debtor to maintain its business as a going concern.  The Debtor is in the middle of its playing season; unless these expenditures are made, the Debtor will be forced to cease operations in the middle of the baseball season, which would result in immediate and irreparable harm to its business and going-concern value.  If the Debtor's season were interrupted, value far in excess of the amount of postpetition financing sought would be lost in terms of ticket, merchandise and concessions sales alone.  Moreover, any loss of confidence would jeopardize the Debtor's Prepackaged Plan and the sale transaction contemplated thereunder.

52.     The credit provided under the DIP Credit Agreement and the use of Cash Collateral will enable the Debtor to continue to pay its players and other employees, continue its customer programs, provide customer service, and operate its businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the

benefit of all of its stakeholders.  The availability of credit under the DIP Credit Agreement will provide confidence to the Debtor's fans and other creditors that will enable and encourage them to continue their relationships with the Debtor.  Finally, the implementation of the DIP Credit Agreement will be viewed favorably by the Debtor's employees, customers and vendors, thereby promoting a short and successful prepackaged chapter 11 case, intended to effectuate the a sale of the Rangers.  Accordingly, the timely approval of the relief requested herein is imperative.

**B.      The Use of Cash Collateral is Warranted and Should Be Approved**

53.      Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  It is universally acknowledged that a debtor's cash "is the life blood of the business" and the bankruptcy court must assure that such "is available for use even if to a limited extent."  *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981).  Courts typically authorize a debtor to use cash collateral to continue its operations so long as the interests asserted by affected creditors in such cash are adequately protected.

54.      The Debtor requires the use of the Cash Collateral to fund its day-to-day operations.  Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with damaging consequences for the Debtor and its estate and creditors.  The interests of the Prepetition Secured Creditors in the Cash Collateral will be protected by the adequate protection set forth herein.

55.      As set forth above, cash is necessary for ordinary course operating costs and expenses at the outset of, and during, this chapter 11 case.  The Debtor does not have sufficient sources of working capital and financing to carry on the operation of its business without the use of Cash Collateral.  The Debtor's ability to maintain business relationships with its vendors, suppliers, and fans and to meet payroll and other operating expenses is essential to

the value of its business and is particularly important in the context of this chapter 11 case which contemplates the sale of TRBP under the Prepackaged Plan that was filed concurrently with this Motion. The use of Cash Collateral is therefore critical to the preservation and maintenance of the going concern value of the Debtor, as well as the value of the Collateral.

## C.     The Proposed Adequate Protection Should Be Approved

56.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). If a secured creditor objects to the debtor's proposed use of cash collateral, the court must ensure that the creditor's interests are adequately protected. *Id.* Thus, courts are required to balance the protection offered to a secured creditor against the debtor's need to use cash in its reorganization effort. *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982). In determining whether a creditor is adequately protected, courts "will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections . . . ." *In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

57.     "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in § 361." *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection, including a cash payment or periodic cash payments, additional liens, replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

58.     Inasmuch as value is the essential consideration in making an adequate protection determination, adequate protection is a question of fact. *Martin v. U.S. (In re Martin)*, 761 F.2d 472 (8th Cir. 1985). What constitutes adequate protection must be decided on a case-by-case

basis. *See MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *Martin*, 761 F.2d at 472; *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted). *Beker*, 58 B.R. at 736; *see In re WorldCom, Inc.*, 304 B.R. 611, 618–19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy."). "However, neither the legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by the parties." *Id.* at 619; *see Beker*, 58 B.R. at 741 ("*Adequate* protection, not *absolute* protection, is the statutory standard.") (emphasis added).

59. The proposed adequate protection offered by the Debtor to the Prepetition Secured Creditors is both sufficient and appropriate. In this case, the Prepetition Secured Creditors are adequately protected by (i) a significant equity cushion and (ii) the fact that the use of their Cash Collateral will enhance and protect the value of their Collateral.

There Exists A Significant Equity Cushion.

60. The Prepetition Secured Creditors are oversecured and the surplus of the Prepetition Secured Creditors' Collateral's value in excess of the amount outstanding under the HSG Credit Agreements and the Prepetition Third Lien Financing Documents constitutes more than sufficient adequate protection for the use of Cash Collateral. The Prepetition Secured Creditors' significant equity cushion is evidenced by the consideration being provided to the Debtor under the Asset Purchase Agreement compared to the amount owed to the Prepetition

Secured Creditors. The Asset Purchase Agreement filed as part of the Prepackaged Plan contemplates a purchase price of approximately $300 million, subject to any required adjustments, while the (i) Guaranty and Prepetition Secured Credit Facility Liens on the Prepetition Collateral are limited by a $75 million cap and (ii) the Prepetition Third Lien Obligations are limited to $18,450,000 plus interest, fees, and expenses and other amounts due under the Prepetition Third Lien Financing Documents. As will be demonstrated below, case law in this circuit and elsewhere supports that the equity cushion—of approximately triple its estimated debt—as evidenced by the purchase price in the Asset Purchase Agreement, adequately protects the Prepetition Secured Creditors. Even though the Prepetition Secured Creditors are oversecured, the Debtor proposes to provide them additional adequate protection in the form of adequate protection liens and a superpriority claim to protect them further.

61. The Bankruptcy Code does not require a debtor to provide a secured lender with "absolute protection" but only "adequate protection." *Beker*, 58 B.R. at 741. An equity cushion is the "value of the property, above the amount owed to the creditor with a secured claim, that will shield that interest from any loss due to any decrease in the value of the property during the time the automatic stay remains in effect." *In re New Era Co.*, 125 B.R. 725, 728–29 (S.D.N.Y. 1991); *In re Elmira Litho., Inc.*, 174 B.R. 892, 904) ("It is beyond cavil that any equity cushion can, under certain circumstances, serve as a form of adequate protection.")

62. Courts routinely hold that an equity cushion of twenty percent or more provides sufficient adequate protection. *See, e.g.*, *In re Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997) (recognizing that courts routinely find that a twenty percent equity provides sufficient adequate protection); *Bray v. Shenandoah (In re Snowshoe Co., Inc.)*, 789 F. 2d 1085, 1090 (4th Cir. 1986) (same); *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1401 (9th Cir. 1984) (twenty percent equity cushion sufficient to constitute adequate protection); *In re Wilson*,

378 B.R. 862, 890 (Bankr. D. Mont. 2007) (thirty-nine percent equity cushion sufficient to constitute adequate protection).

63.     Here, the Prepetition Secured Creditors cannot deny that they remain substantially oversecured and adequately protected in accordance with the Bankruptcy Code; the purchase price, which evidences the value of the enterprise, is over $300 million well in excess of (i) the $75 million lien arising out of obligations (by more than three times) owed to the Prepetition Senior Creditors and (ii) the outstanding Prepetition Third Lien Obligations of $18,450,000 plus interest, fees, and expenses and other amounts due under the Prepetition Third Lien Financing Documents.  Any argument that adequate protection is needed in order to protect against diminution in value of the Prepetition Collateral is without merit.

64.     In addition to the equity cushion, which itself would be enough, the Prepetition Secured Creditors are further adequately protected by receiving Adequate Protection Liens and superpriority claims in the same priority as existed prior to the Commencement Date to adequately protect against the diminution of the value of their Collateral on the terms set forth in the Interim Order.  The Debtor offered this additional adequate protection because it believes that it is in the best interests of its estate, creditors, and all parties in interest, that it reach a consensual rather than a litigated resolution with the Prepetition Secured Creditors regarding the use of Cash Collateral.  This adequate protection will sufficiently protect the Prepetition Secured Creditors' interests in the Cash Collateral, as well as any diminution resulting from the Debtor's use of the Prepetition Collateral and the imposition of the automatic stay.  Accordingly, the proposed adequate protection is fair and reasonable and sufficient to satisfy the requirement of section 363(c)(2) and (e) of the Bankruptcy Code.

The Use of Cash Collateral Will Preserve and Enhance the Collateral.

65.     In addition to the existence of the substantial equity cushion, the case law supports that where the use of cash collateral will preserve or enhance the collateral, the use of

cash collateral—even over the objection of secured creditors—is justified. Here, the use of the Prepetition Secured Creditors' cash will enable continued operations and, therefore, preserve or enhance the creditors' collateral.

66. Indeed, courts have repeatedly recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. *See, e.g.*, *Dynaco*, 162 B.R. at 394 (granting motion for the use of cash collateral and stating that "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary in order to operate a business"); *Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc. (George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017, 1020 (11th Cir. 1984) (allowing debtor to use cash collateral over secured creditor's objection after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); *O'Connor*, 808 F.2d at 1399 (permitting debtor to use cash collateral to expand operations after finding there was only a low risk that secured creditor's interest would diminish); *Stein*, 19 B.R. at 459 (granting cash collateral motion and declaring that access to cash is imperative for a debtor to operate its business). Courts have also authorized similar relief in other chapter 11 cases. *See*, *e.g.*, *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (recognizing that the debtor's use of cash collateral to operate and maintain office building would serve to preserve or enhance the value of the building, which in turn would protect the collateral covered by the lender's mortgage); *In re 499 W. Warren Street Assocs., L.P.*, 142 B.R. 53, 58 (Bankr. N.D.N.Y. 1992) (allowing the use of cash collateral to maintain property).

67. In this case, the failure to allow the Debtor to use its Cash Collateral could have disastrous effects on the Debtor's business, including the rapid diminution in the value of the Prepetition Collateral. The Debtor's chapter 11 case was filed in order to effectuate the sale

contemplated in the Prepackaged Plan that was filed concurrently with this Motion. However inconvenient, the case was filed in the middle of the baseball season. The Debtor must have access to the cash generated from its business activity in order to fund its operations; that is, to fund player salaries and other essential functions of a baseball game. Without access to its generated cash, operations would cease almost immediately, which would only serve to rapidly depreciate the value of the business.

68.     As described above and in the Fischer Declaration, if the Debtor is prohibited from using its cash, the Debtor would cease operating; *i.e.*, the Debtor would be unable to pay salaries of coaches or players or otherwise pay to host baseball games at the ballpark. This would result in, among other things, the Debtor losing revenues from loss of sales of tickets, merchandise, concessions and sponsorships. Moreover, this type of disruption in the business would likely cause the Debtor's fan base to deteriorate, likely decreasing the revenue base not just in the near term, but future revenues as well. This would cause the value of the collateral to plummet. Because this result would contravene the rehabilitative purpose of chapter 11, approval of the Debtor's motion is warranted. *Dynacorp*, 162 B.R. at 394 (noting that "it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible") (quoting *In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)). Therefore, Debtor's use of collateral as a means to preserve and maintain the collateral is well supported under the facts and the case law.

**D.      The Automatic Stay Should Be Modified on a Limited Basis**

69.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to (i) grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lender to exercise, upon the occurrence and during the continuance of an event of default and after five (5) business

days' notice thereof, all rights and remedies under the DIP Credit Agreement; and

(iii) implement the terms of the proposed DIP Orders.

70.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

**E.      Interim Approval Should Be Granted**

71.     Bankruptcy Rule 4001(b) and (c) provides that a final hearing on a motion to enter into postpetition financing and to use cash collateral may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize postpetition financing and the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a Debtor's estate pending a final hearing.

72.     Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on the Motion and (i) authorize the Debtor to enter into postpetition financing and use the Cash Collateral of the Prepetition Secured Creditors in order to (a) maintain and finance the ongoing operations of the Debtor, and (b) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest, and (ii) schedule the Final Hearing on the relief requested herein.

73.     Absent authorization from the Court to enter into postpetition financing and use Cash Collateral on an interim basis pending a Final Hearing, the Debtor will be immediately and irreparably harmed.  As set forth above, the Debtor's ability to enter into postpetition financing and use Cash Collateral on the terms described herein is critical to its ability to operate its business in the ordinary course.  Without the liquidity provided by the postpetition financing and use of Cash Collateral, the Debtor will simply be unable to conduct normal business operations, will be unable to pay basic expenses, such as player payroll and

other employee payroll; utilities, including the utilities that serve the ballpark; and supplier payments. The Debtor will suffer a precipitous loss of value to the detriment of all parties in interest. Indeed, absent the interim use of Cash Collateral and postpetition financing, the Debtor's business will be brought to an immediate halt and one of the principal objectives of the Debtor's Prepackaged Plan—to ensure that vendors and fans would be unimpaired by an orderly and expedited chapter 11 case in order to effectuate the sale of the Rangers contemplated therein—would be frustrated. Moreover, this case was filed in the middle of baseball season when it became clear that a chapter 11 filing was needed to effectuate the sale of the Rangers under the Prepackaged Plan. Serious and irreparable harm to the Debtor and its estate would occur, with disastrous consequences for the Debtor, its estate, and creditors, if the Debtor does not obtain entry of the Interim Order.

### The Relief Requested is Appropriate

74. The requested relief is further supported by the prepackaged nature of this case. As set forth above and in greater detail in the Fischer Declaration, the Prepackaged Plan contemplates the payment of all classes in full, in cash, or reinstates the claims and equity interest of all classes. The most critical and complex task required to effectuate a successful reorganization—the negotiation and formulation of a chapter 11 plan of reorganization—has already been accomplished. Thus, the Debtor respectfully submits that given the backdrop of this case, the relief requested herein is appropriate inasmuch as such relief will assist the Debtor to move towards expeditious confirmation of the Prepackaged Plan with the least possible disruption or harm to its business. Based on the foregoing, the Debtor submits that the relief requested is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted in all respects.

## Notice

75.     No trustee, examiner or statutory creditors' committee has been appointed in this chapter 11 case.  Notice of this Motion has been provided to:  (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the Debtor's thirty largest unsecured creditors; (iii) counsel to the Purchaser; (iv) counsel to MLB, (v) counsel to the Major League Baseball Players Association (vi) counsel to JPMorgan Chase Bank, N.A., as administrative agent under the First Lien Credit Facility, (vii) counsel to GSP Finance LLC, as successor in interest to Barclays Bank PLC, as administrative agent under the Second Lien Credit Facility, and (viii) all parties known to assert liens in the Prepetition Collateral (collectively, the "Notice Parties").  The Debtor respectfully submits that no further notice of this Motion is required for the interim approval thereof.  Notice of the Final Hearing will be given as set forth in the proposed Interim Order.

## No Previous Request

76.     No previous request for the relief sought herein has been made by the Debtor to this or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: May 24, 2010
         Fort Worth, Texas


/s/ Martin A. Sosland
Martin A. Sosland (18855645)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone:  (214) 746-7700
Facsimile:   (214) 746-7777

Ronit J. Berkovich (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue

New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtor and
Debtor in Possession

<u>**Exhibit A**</u>

**Form of DIP Credit Agreement**

$11,500,000

SECURED DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

among

TEXAS RANGERS BASEBALL PARTNERS,
as Borrower,

and

BASEBALL FINANCE LLC,
as Lender

Dated as of May [__], 2010

# TABLE OF CONTENTS

SECTION 1. DEFINITIONS ...................................................................................................1
    1.1    Defined Terms ..............................................................................................1
    1.2    Other Definitional Provisions ....................................................................15

SECTION 2. AMOUNT AND TERMS OF TERM COMMITMENTS ...............................16
    2.1    Term Commitment .......................................................................................16
    2.2    Procedure for Term Loan Borrowing .........................................................16
    2.3    Repayment of Term Loan ............................................................................16
    2.4    Voluntary Nature of Term Loans.................................................................16

SECTION 3. GENERAL PROVISIONS APPLICABLE TO TERM LOANS ...........................16
    3.1    Optional Prepayments .................................................................................16
    3.2    Mandatory Prepayments .............................................................................16
    3.3    Interest Rates and Payment Dates ..............................................................17
    3.4    Termination of Commitment .......................................................................17
    3.5    Evidence of Debt..........................................................................................17

SECTION 4. REPRESENTATIONS AND WARRANTIES ..............................................18
    4.1    Budgets ........................................................................................................18
    4.2    No Change ...................................................................................................18
    4.3    Corporate Existence; Compliance with Law ...............................................18
    4.4    Power; Authorization; Enforceable Obligations.........................................18
    4.5    No Conflict .................................................................................................19
    4.6    Litigation.....................................................................................................19
    4.7    No Default....................................................................................................19
    4.8    Ownership of Property; Liens......................................................................19
    4.9    Taxes ...........................................................................................................19
    4.10    Investment Company Act; Other Regulations .............................................20
    4.11    Subsidiaries.................................................................................................20
    4.12    Use of Proceeds..........................................................................................20
    4.13    Accuracy of Information, etc. .....................................................................20
    4.14    Security Documents.....................................................................................21
    4.15    Deposit and Securities Accounts ................................................................21
    4.16    Margin Regulations.....................................................................................21
    4.17    Labor Matters..............................................................................................21
    4.18    ERISA .........................................................................................................21
    4.19    Environmental Matters................................................................................22

SECTION 5. CONDITIONS PRECEDENT .....................................................................23
    5.1    Conditions to Effectiveness of Credit Agreement .................................23
    5.2    Conditions to Each Extension of Credit......................................................24

SECTION 6. AFFIRMATIVE COVENANTS.....................................................................25

6.1 Certificates; Other Information ............................................................25
6.2 Maintenance of Existence; Compliance ................................................26
6.3 Maintenance of Property; Insurance ....................................................26
6.4 Inspection of Property; Books and Records; Discussions ....................26
6.5 Payment of Obligations ......................................................................26
6.6 Notices ...............................................................................................27
6.7 Environmental Laws ...........................................................................27
6.8 Cash Management ...............................................................................27
6.9 Plan, Disclosure Statement and Other Documents. .............................28
6.10 Interim Support Agreement ...............................................................28
6.11 Further Assurances .............................................................................28

SECTION 7. NEGATIVE COVENANTS .........................................................29
7.1 Indebtedness .......................................................................................29
7.2 Liens ...................................................................................................29
7.3 Fundamental Changes ..........................................................................30
7.4 Disposition of Property ........................................................................31
7.5 Restricted Payments ............................................................................31
7.6 Capital Expenditures ...........................................................................31
7.7 Investments .........................................................................................31
7.8 Transactions with Affiliates ................................................................32
7.9 Sales and Leasebacks ..........................................................................32
7.10 Hedge Agreements ..............................................................................32
7.11 Changes in Fiscal Periods ..................................................................32
7.12 Negative Pledge Clauses .....................................................................32
7.13 Proceeds of Term Loan ......................................................................33
7.14 Clauses Restricting Subsidiary Distributions .....................................33
7.15 Lines of Business ...............................................................................33
7.16 Amendments to Material Agreements .................................................33
7.17 Payments of Indebtedness ..................................................................33
7.18 Prepetition Debts ...............................................................................34

SECTION 8. GRANT AND PERFECTION OF SECURITY INTEREST ...................34
8.1 Grant of Security Interest ....................................................................34
8.2 Exclusions from Collateral ..................................................................35
8.3 Perfection of Security Interests ...........................................................36
8.4 Priority of the Lender's Liens ..............................................................37

SECTION 9. [RESERVED] ............................................................................37

SECTION 10. EVENTS OF DEFAULT ............................................................37
10.1 Events of Default ...............................................................................37
10.2 Remedies ...........................................................................................40
10.3 Public or Private Sale ........................................................................42

Doc#: US1:6411707v4

SECTION 11. MISCELLANEOUS ...................................................................................42

    11.1    Amendments and Waivers ...............................................................42

    11.2    Notices ............................................................................................42

    11.3    No Waiver; Cumulative Remedies ..................................................44

    11.4    Reservation of Rights......................................................................44

    11.5    Survival of Representations and Warranties....................................44

    11.6    Payment of Expenses and Taxes .....................................................44

    11.7    Successors and Assigns; Assignments.............................................45

    11.8    Adjustments; Set-off .......................................................................45

    11.9    Counterparts....................................................................................46

    11.10  Severability; Section Headings .......................................................46

    11.11  Integration ......................................................................................46

    11.12  DIP Order to Take Precedence ........................................................46

    11.13  **GOVERNING LAW** ....................................................................46

    11.14  Acknowledgments...........................................................................46

    11.15  Releases of Liens ............................................................................47

    11.16  MLB Requirements.........................................................................47

    11.17  Usury Savings Clause .....................................................................48

Doc#: US1:6411707v4

SCHEDULES:

| | |
|---|---|
| 1.1 | Copyright Licenses |
| 1.2 | Copyrights |
| 1.3 | Patent Licenses |
| 1.4 | Patents |
| 1.5 | Trademark Licenses |
| 1.6 | Trademarks |
| 4.4 | Consents, Authorizations, Filings and Notices |
| 4.7 | Existing Defaults |
| 4.9 | Existing Tax Claims |
| 4.11 | Subsidiaries |
| 4.15 | Deposit and Securities Accounts |
| 7.1(b) | Existing Indebtedness |
| 7.2(f) | Existing Liens |
| 7.12 | Agreements with Negative Pledge Clauses |
| 7.14 | Agreements with Clauses Restricting Subsidiary Distributions |
| 8.1(l) | Commercial Tort Claims |

EXHIBITS:

| | |
|---|---|
| A | Form of Interim DIP Order |
| B | Form of Promissory Note |
| C | Form of Interim Support Agreement |

Doc#: US1:6411707v4

SECURED DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT, dated as of May [__], 2010, among TEXAS RANGERS BASEBALL PARTNERS, a Texas general partnership and a debtor-in-possession (the "Borrower"), and BASEBALL FINANCE LLC, a Delaware limited liability company (the "Lender").

W I T N E S S E T H:

WHEREAS, on May 24, 2010 (the "Petition Date"), the Borrower filed a voluntary petition for relief (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court");

WHEREAS, contemporaneously with the filing of the Chapter 11 Case, the Borrower has filed a plan of reorganization (the "Prepackaged Plan") pursuant to which it intends to effectuate a sale of all or substantially all of the assets of the Borrower, including, without limitation, the Franchise (as hereinafter defined) on the terms and conditions described therein (the "Sale");

WHEREAS, the Borrower has requested that the Lender provide it with a secured term loan credit facility of up to $11,500,000 (the "DIP Facility") to fund the day-to-day working capital needs of the Borrower during the pendency of the Chapter 11 Case and to allow the Borrower to confirm the Prepackaged Plan and effectuate the Sale.

NOW, THEREFORE, the Lender is willing to extend such financing to the Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

SECTION 1.

DEFINITIONS

1.1     Defined Terms. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"2010 Rangers Annual Budget": as defined in Section 5.1(b).

"Accounts": as to the Borrower, all present and future rights of the Borrower to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a secondary obligation incurred or to be incurred, or (iv) arising out of the use of a credit or charge card or information contained on or for use with the card.

"Affiliate": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons

performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement":  this Secured Debtor-in-Possession Credit and Security Agreement.

"Asset Purchase Agreement": that certain Asset Purchase Agreement, dated as of May 23, 2010, by and among the Borrower and Rangers Baseball Express LLC.

"Bankruptcy Code":  as defined in the Recitals to this Agreement.

"Bankruptcy Court":  as defined in the Recitals to this Agreement.

"Bankruptcy Rules":  the Rules of Practice and Procedure in Bankruptcy for cases under the Bankruptcy Code and, to the extent applicable, local rules of the United States Bankruptcy Court for the Northern District of Texas.

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"BOC": the Office of the Commissioner of Baseball, an unincorporated association comprised of the Major League Clubs who are party to the Major League Constitution, and any successor organization thereto.

"Borrower":  as defined in the preamble to this Agreement.

"Borrowing Date":  any Business Day specified by the Borrower as a date on which the Borrower requests the Lender to make a Term Loan hereunder in accordance with the terms set forth in Section 2.2.

"Business Day":  a day other than a Saturday, Sunday or other day on which the Lender is closed.

"Capital Expenditures":  for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that should be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries.

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests

in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Equivalents":  (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 180 days from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Ratings Services ("S&P") or P-1 by Moody's Investors Service, Inc. ("Moody's"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of 180 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least AA by S&P or Aa by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition; or (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition or money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Change of Control":  means the occurrence of any of the following events: (a) Thomas O. Hicks shall cease to be the Control Person; or (b) Thomas O. Hicks shall cease to own or control, directly or indirectly, or shall cease to be, directly or indirectly, the "beneficial owner" (within the meaning of Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended) of a majority of the general or limited partner interests in the Borrower or the Franchise.

"Chapter 11 Case": as defined in the Recitals to this Agreement.

"Closing Date":  the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied (or waived by the Lender in its sole discretion).

"Club Cash Flow Forecast":  as defined in Section 6.1(c).

"Code":  the Internal Revenue Code of 1986, as amended from time to time, all regulations promulgated thereunder and all rulings issued thereunder.

"<u>Collateral</u>":  as defined in Section 8.1.

"<u>Commissioner</u>": the Commissioner of Baseball as elected under the Major League Constitution or, in the absence of a Commissioner, any Person succeeding to the powers and duties of the Commissioner pursuant to the Major League Constitution.

"<u>Commitment</u>":  eleven million five hundred thousand dollars ($11,500,000).

"<u>Commonly Controlled Entity</u>":  an entity, whether or not incorporated, that is under common control with the Borrower or a Subsidiary within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower or a Subsidiary and that would be deemed to be a "single employer" within the meaning of Section 414 of the Code.

"<u>Contractual Obligation</u>":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound, in any case, to the extent issued or entered into after the Petition Date or, if issued or entered prior to the Petition Date, to the extent the failure of such Person to comply with its obligations under such agreement, instrument or other undertaking could reasonably be expected to result in a Material Adverse Effect.

"<u>Control Person</u>":  shall mean the person approved by the Major League Clubs in accordance with the Major League Constitution who, subject to the right to delegate such powers with the consent of the Commissioner, (i) is accountable to Major League Baseball for the operation of the Texas Rangers Major League Baseball Club (the "<u>Club</u>") and for the Club's compliance with MLB Rules and Regulations, (ii) is the single individual with ultimate authority and responsibility for making all decisions for the Club and (iii) has the full power and authority to direct the business affairs of the Club

"<u>Copyright Licenses</u>": any and all agreements providing for the granting of any right in or to Copyrights (whether the applicable Loan Party is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 1.1 (as such schedule may be amended or supplemented from time to time).

"<u>Copyrights</u>": all United States copyrights (including Community designs), including but not limited to copyrights in software and databases, and all Mask Works (as defined under 17 U.S.C. 901 of the US. Copyright Act) and, with respect to any and all of the foregoing:  (i) all registrations and applications therefor including, without limitation, the registrations and applications referred to in Schedule 1.2 (as such schedule may be amended or supplemented from time to time), (ii) all extensions and renewals thereof and (iii) all proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages and proceeds of suit.

"<u>Default</u>":  any of the events specified in Section 10.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"<u>DIP Order</u>":  the Interim DIP Order unless the Final DIP Order shall have been entered, in which case it shall mean the Final DIP Order.

"Disclosure Statement": as defined in Section 5.1 (d).

"Disposition":  with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollars" and "$":  dollars in lawful currency of the United States.

"Environmental Laws":  any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"Equipment":  as to Borrower, all of Borrower's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, rolling stock, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time, all regulations promulgated thereunder and all rulings issued thereunder.

"Event of Default":  any of the events specified in Section 10.1, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Executive Council": the Executive Council of Major League Baseball that is governed by Article III of the Major League Constitution, and any successor body thereto.

"Existing Baseball Finance Loan Documents": that certain Amended and Restated Secured Revolving Promissory Note, dated as of November 25, 2009, made by the Borrower in favor of the Lender, and the other "Loan Documents" as defined therein.

"Existing First Lien Loan Documents": that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among HSG Sports Group Holdings LLC (f/k/a Hicks Sports Group Holdings LLC, "Holdings"), HSG Sports Group LLC (f/k/a Hicks Sports Group LLC, "HSG") and certain direct and indirect subsidiaries of HSG, including the Borrower, the lenders from time to time party thereto, JPMorgan Securities Inc., as joint lead arranger, joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger and joint bookrunner, Barclays Bank PLC, as co-syndication agent, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the other "Credit Documents" as defined therein.

"Existing Second Lien Loan Documents": that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among Holdings, HSG and certain direct and indirect subsidiaries of HSG, including the Borrower, the lenders from time to time party

thereto, JPMorgan Securities Inc., as joint lead arranger, joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger and joint bookrunner, and Barclays Bank PLC, as administrative agent, collateral agent and co-syndication agent, and the other "Credit Documents" as defined therein.

"Existing Senior Loan Documents": refers to the Existing First Lien Loan Documents and Existing Second Lien Loan Documents.

"Final DIP Order":  an order entered by the Bankruptcy Court under Sections 364(c), (d) and (e) of the Bankruptcy Code, substantially in the form of the Interim DIP Order or in such other form as shall be satisfactory to the Lender, which approves the DIP Facility on a final basis.

"Franchise": the rights granted by Major League Baseball to own and operate the Major League Baseball franchise currently known as the Texas Rangers Major League Baseball Club in the operating territory set forth in the Major League Constitution.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, arbitrator, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members":  the collective reference to  the Borrower and its Subsidiaries.

"Group Properties":  the facilities and properties owned, leased or operated by any Group Member.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee

Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Hedge Agreements":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Hedge Agreement.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business and not past due), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (j) all obligations of such Person in respect of Hedge Agreements.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Liabilities":  as defined in Section 11.6.

"Indemnitee":  as defined in Section 11.6.

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"<u>Insurance</u>":  (i) all insurance policies covering any or all of the Collateral (regardless of whether the Lender is the loss payee thereof) and (ii) any key man life insurance policies.

"<u>Intellectual Property</u>":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks, Trademark Licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"<u>Interim DIP Order</u>":  an order entered by the Bankruptcy Court under Sections 364(c), (d) and (e) of the Bankruptcy Code, substantially in the form of Exhibit A hereto or in such other form as shall be satisfactory to the Lender, which approves the DIP Facility on an interim basis.

"<u>Inventory</u>":  as to the Borrower, all of the Borrower's now owned and hereafter existing or acquired goods, wherever located, which (i) are leased by the Borrower as lessor; (ii) are held by the Borrower for sale or lease or to be furnished under a contract of service; (iii) are furnished by the Borrower under a contract of service; or (iv) consist of raw materials, work in process, finished goods or materials used or consumed in its business.

"<u>Investment</u>":  the making of any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or the purchase of any Capital Stock, bonds, notes, debentures or other debt securities of, or the purchase of any assets constituting a business unit of, or the making of any other investment in, any Person.

"<u>League Revenues</u>":  "Revenues" as defined in the MLB Trust Indenture.

"<u>League Rights</u>":  "Rights" as defined in the MLB Trust Indenture.

"<u>League-wide Investments</u>": any entity or investment owned (wholly or partially) by all or substantially all of the Major League Clubs, directly or indirectly.

"<u>Lender</u>":  as defined in the preamble to this Agreement.

"<u>Lien</u>":  any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"<u>Loan Documents</u>":  this Agreement, the Security Documents, the Notes and all other certificates, documents, instruments or agreements executed and delivered by a Loan Party in connection herewith.

"<u>Loan Parties</u>":  each Group Member that is a party to a Loan Document.

"<u>Major League Baseball</u>" or "<u>MLB</u>": depending on the context, any or all of (a) the BOC, each other MLB Entity and/or all boards and committees thereof, including, without limitation, Executive Council and the Ownership Committee, and/or (b) the Major League Clubs acting collectively.

"<u>Major League Baseball Club</u>" or "<u>Major League Club</u>": any professional baseball club that is entitled to the benefits, and bound by the terms, of the Major League Constitution.

"<u>Major League Constitution</u>": the Major League Constitution adopted by the Major League Clubs (which amended and superseded the Major League Agreement dated January 1, 1975, the Agreement in re Major Leagues Central Fund dated as of December 8, 1983, as amended, and the respective constitutions of the former American and National Leagues of Professional Baseball Clubs) as the same may be amended, supplemented or otherwise modified from time to time in the manner provided therein and all replacement or successor agreements that may in the future be entered into by the Major League Clubs.

"<u>Material Adverse Effect</u>": a material adverse effect on (a) the business, assets, property, condition (financial or otherwise) or results of operations of the Borrower and its Subsidiaries taken as a whole (excluding the filing of the Chapter 11 Case and the events or circumstances leading up to the Chapter 11 Case that are known to the Lender or disclosed in the Borrower's financial statements provided to Lender prior to the Closing Date or in the Disclosure Statement filed with the Chapter 11 Case) or (b) the validity or enforceability against any Loan Party of this Agreement or any of the other Loan Documents or the rights or remedies of the Lender hereunder or thereunder or the validity, perfection or priority of the Lender's Liens upon the Collateral.

"<u>Materials of Environmental Concern</u>": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"<u>Maturity Date</u>": the earlier to occur of (a) October 31, 2010 and (b) the consummation of the Sale.

"<u>MLB Approval</u>": with respect to the Major League Baseball Clubs, the Commissioner, the BOC or any other MLB Entity, any approval, consent or no-objection letter required to be obtained from such Person(s) pursuant to the MLB Rules and Regulations (as exercised in the sole and absolute discretion of such Person(s)).

"<u>MLB Entity</u>": each of the BOC, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The MLB Network, LLC, MLB Advanced Media, L.P., and/or any of their respective present or future affiliates, assigns or successors.

"<u>MLB Facility</u>": the credit facility established under the MLB Trust Indenture, each "NPA" referred to therein and each of the other MLB Facility Documents.

"<u>MLB Facility Documents</u>": the "Transaction Documents" as defined in the MLB Trust Indenture and each of the documents related to the Rangers Club Trust "Club Trust Sub-Facility" as defined in the MLB Trust Indenture.

"<u>MLB Governing Documents</u>": the following documents as in effect from time to time and any amendments, supplements or other modifications thereto and all replacement or successor documents thereto that may in the future be entered into: (a) the Major League Constitution, (b) the Basic Agreement between the Major League Baseball Clubs and the Major League Baseball Players Association, (c) the Professional Baseball Agreement between the BOC, on behalf of itself and the Major League Baseball Clubs, and the National Association of Professional Baseball Leagues, (d) the Major League Rules (and all attachments thereto), (e) the Interactive Media Rights Agreement, effective as of January 20, 2000, by and among the BOC, the various Major League Baseball Clubs, MLB Advanced Media, L.P. and various other MLB Entities and (f) each agency agreement and operating guidelines among the Major League Baseball Clubs and any MLB Entity, including, without limitation, the Amended and Restated Agency Agreement, effective as of November 1, 2006, by and among Major League Baseball Properties, Inc., the various Major League Baseball Clubs and the BOC (and the Operating Guidelines related thereto).

"<u>MLB Ownership Guidelines</u>": the "Control Interest Transfers Guidelines & Procedures" issued by the Commissioner on November 9, 2005 as the same may be amended, supplemented or otherwise modified from time to time.

"<u>MLB Rules and Regulations</u>": (a) the MLB Governing Documents, (b) any present or future agreements or arrangements entered into by, or on behalf of, the BOC, any other MLB Entity or the Major League Baseball Clubs acting collectively, including, without limitation, agreements or arrangements entered into pursuant to the MLB Governing Documents, and (c) the present and future mandates, rules, regulations, policies, practices, bulletins, by-laws, directives or guidelines issued or adopted by, or behalf of, the Commissioner, the BOC or any other MLB Entity as in effect from time to time, including, without limitation, the MLB Ownership Guidelines.

"<u>MLB Trust Indenture</u>": that certain Second Amended and Restated Indenture dated as of December 8, 2009 by and among Major League Baseball Trust, as issuer, Wells Fargo Bank, National Association, as indenture trustee and as collateral agent, and Bank of America, N.A., as administrative agent.

"<u>Multiemployer Plan</u>": a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>": (a) in connection with any Disposition of Property (or series of related Dispositions of Property) or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment or earn-out receivable or purchase price adjustment receivable or by the Disposition of any non-cash consideration received in connection therewith or otherwise, but only as and when received), net of reasonable attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of

Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Disposition of Property or Recovery Event (other than any Lien pursuant to a Security Document) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (b) in connection with any issuance or sale of Capital Stock, any capital contribution or any incurrence of Indebtedness, the cash proceeds received from such issuance, contribution or incurrence, net of reasonable attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"Notes":  the collective reference to any promissory notes evidencing Term Loans.

"Notice Requirement": shall have the meaning assigned to such term in the DIP Order.

"Obligations":  the unpaid principal of and interest on (including interest accruing, at the then applicable rate provided in this Agreement, after the maturity of the Term Loans) the Term Loans and all other obligations and liabilities of the Borrower to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, or any other document made, delivered or given in connection herewith or therewith, in each case whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees and other charges of counsel to the Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"Patent Licenses": all agreements providing for the granting of any right in or to Patents (whether the applicable Loan Party is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 1.3 (as such schedule may be amended or supplemented from time to time).

"Patents": all United States and foreign patents and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including, but not limited to:  (i) all patents and patent applications, including, without limitation, those referred to in Schedule 1.4 hereto (as such schedule may be amended or supplemented from time to time), (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (iii) all rights corresponding thereto throughout the world, (iv) all inventions and improvements described therein, (v) all rights to sue for past, present and future infringements thereof, (vi) all licenses, claims, damages, and proceeds of suit arising therefrom, and (vii) all proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date": as defined in the Recitals to this Agreement.

"Plan":  any "employee benefit plan" as defined in Section 3(3) of ERISA which is maintained or contributed to by the Borrower or a Commonly Controlled Entity.

"Prepackaged Plan": as defined in the Recitals to this Agreement.

"Property":  any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"Rangers Club Trust":  the Rangers Club Trust, a Delaware statutory trust.

"Rangers Club Trust Facility":  the lending facility made available to the Rangers Club Trust under the terms of the MLB Facility Documents.

"Rangers Operating Account":  the deposit account at Plains Capital Bank (ABA #111322994) with the account number 3100036221 that is in the name of "Texas Rangers Baseball Partners" and is owned and controlled by the Borrower.

"Rangers Revenue": revenues and or cash receipts attributable to the Borrower or any Subsidiary of the Borrower or the Franchise.

"Receivables":  all of the following now owned or hereafter arising or acquired property of the Borrower:  (i) all Accounts; (ii) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account; (iii) all payment intangibles of the Borrower; (iv) letters of credit, indemnities, guarantees, security or other deposits and proceeds thereof issued payable to the Borrower or otherwise in favor of or delivered to the Borrower in connection with any Account; and (v) all other accounts, contract rights, chattel paper, instruments, notes, general intangibles and other forms of obligations owing to the Borrower, whether from the sale and lease of goods or other property, licensing of any property (including Intellectual Property or other general intangibles), rendition of services or from loans or advances by the Borrower or to or for the benefit of any third person (including loans or advances to any Affiliates or Subsidiaries of the Borrower) or otherwise associated with any Accounts, Inventory or general intangibles of the Borrower (including, without limitation, choses in action, causes of action, tax refunds, tax refund claims, any funds which may become payable to the Borrower in connection with the termination of any Plan or other employee benefit plan and any other amounts payable to the Borrower from any Plan or other employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, casualty or any similar types of insurance and any proceeds thereof and proceeds of insurance covering the lives of employees on which the Borrower is a beneficiary).

"Records":  as to the Borrower, all of the Borrower's present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of the Borrower with respect to the foregoing maintained with or by any other person).

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member.

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event":  any of the events set forth in Section 4043(b) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .22, .27, .28,  .29, .30, .31, .32, .34 or.35 of PBGC Reg. § 4043.

"Requirement of Law":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer":  as to any Person, the chief executive officer, president or chief financial officer of such Person, but in any event, with respect to financial matters, the chief financial officer of such Person.

"Restricted Payment":  the declaration or payment of any dividend (other than dividends payable solely in common stock of the Person making such dividend) on, or any payment on account of, or setting apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, or any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any Group Member.

"Sale": as defined in the Recitals to this Agreement.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Security Documents":  the collective reference to Section 8 hereof, the DIP Order and all other security documents hereafter delivered to the Lender granting a Lien on any

property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Single Employer Plan":  any Plan that is covered by Section 412 of the Code or Title IV of ERISA, but that is not a Multiemployer Plan.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless the context otherwise requires, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Super-Priority Claims": shall mean a claim against the Borrower under Section 364(c)(1) of the Bankruptcy Code having priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"Term Loan":  as defined in Section 2.1.

"Trademark Licenses": any and all agreements providing for the granting of any right in or to Trademarks (whether the applicable Loan Party is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 1.5 (as such schedule may be amended or supplemented from time to time).

"Trademarks": all United States and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, all registrations and use-based applications for any of the foregoing including, but not limited to:  (i) all registrations and use-based applications, including, without limitation, those referred to in Schedule 1.6 (as such schedule may be amended or supplemented from time to time), (ii) all extensions or renewals of any of the foregoing, (iii) all of the goodwill of the business connected with the use of and symbolized by the foregoing and (iv) all proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"UCC":  the Uniform Commercial Code as in effect in the State of New York and any successor statute, as in effect from time to time (except that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Lender may otherwise determine); provided, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect on or after the date hereof in any other jurisdiction, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes

of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy.

"United States": the United States of America.

"U.S. Trustee": the United States Trustee for the Northern District of Texas.

1.2    Other Definitional Provisions.  (a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, unless the context requires otherwise, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, (v) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any applicable restrictions hereunder), (vi) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments and transfers set forth herein), and (vii) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall refer to such law or regulation as amended, modified or supplemented from time to time.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP; provided that, if the Borrower notifies the Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Lender notifies the Borrower that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before

such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## SECTION 2.

## AMOUNT AND TERMS OF TERM COMMITMENTS

2.1    Term Commitment.  Subject to the terms and conditions hereof, the Lender agrees to make a term loan facility available to the Borrower in multiple draws (each, a "Term Loan") in an aggregate amount not to exceed the Commitment.  Amounts borrowed hereunder and subsequently repaid may not be reborrowed.  Until such time as the Final DIP Order shall become effective, the Lender shall not be obligated to extend credit under this Agreement in an aggregate principal or face amount in excess of that approved under the Interim DIP Order.

2.2    Procedure for Term Loan Borrowing.  The Borrower shall give the Lender irrevocable notice (which notice must be received by the Lender prior to 12:00 P.M. (noon), New York City time, at least three Business Days prior to each anticipated Borrowing Date) requesting that the Lender make a Term Loan on such Borrowing Date and specifying the amount to be borrowed.  Subject to Section 5, the Lender shall credit the Rangers Operating Account with the amount specified in immediately available funds no later than the requested Borrowing Date.

2.3    Repayment of Term Loan.  The Borrower shall pay the entire outstanding principal amount of the Term Loans and any interest due thereon on the Maturity Date.

2.4    Voluntary Nature of Term Loans.  The parties hereto hereby acknowledge the voluntary nature of the Lender's provision of the Term Loans pursuant to the terms of this Agreement.

## SECTION 3.

## GENERAL PROVISIONS APPLICABLE
## TO TERM LOANS

3.1    Optional Prepayments.  (a)  The Borrower may at any time and from time to time prepay the Term Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Lender no later than 12:00 P.M. (noon), New York City time, one Business Days prior thereto, which notice shall specify the date and amount of prepayment. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid.  Partial prepayments of the Term Loans shall be in an aggregate principal amount of $100,000 or a whole multiple thereof.

3.2    Mandatory Prepayments.  (a)  If on any date the Borrower or any of its Subsidiaries shall receive Net Cash Proceeds of more than $50,000 from any Disposition of Property (or series of related Dispositions of Property) or Recovery Event (except for

Dispositions of Property permitted by Sections 7.4(a), (b) and (d)), then an amount equal to 100% of such Net Cash Proceeds shall be applied on such date toward the prepayment of any Term Loans outstanding.

(b)     Amounts to be applied in connection with any prepayments made pursuant to Section 3.2(a) shall be applied, first, to the payment of all accrued and unpaid expenses and fees owed to the Lender hereunder and, second, to the prepayment of the Term Loans.  Any prepayment of the Term Loans shall be accompanied by the payment of accrued and unpaid interest on such prepaid amounts.

(c)     Notwithstanding the foregoing provisions of this Section 3.2, and subject to the terms of the DIP Order, no mandatory prepayment of the Term Loans shall be made under this Section 3.2 until (i) such portion of indebtedness owed by the Borrower under the Existing Senior Loan Documents has been paid, subject to the TRBP Guaranty Cap (as defined in the DIP Order) and (ii) all obligations under the Existing Baseball Finance Loan Documents have been paid in full; provided, however, that Borrower shall be required to make prepayments of the Term Loans with all mandatory prepayment amounts that lenders party to the Existing Senior Loan Documents or Existing Baseball Finance Loan Documents, as the case may be, elect to waive the right to receive and that are not applied to repay the applicable indebtedness owed under the Existing Senior Loan Documents or Existing Baseball Finance Loan Documents.

3.3     Interest Rates and Payment Dates.  (a)  Each Term Loan shall bear interest for the period beginning on the Borrowing Date with respect to such Term Loan and ending on the date such Term Loan is fully repaid at a per annum rate equal to 5.75%.

(b)     During such time as an Event of Default shall have occurred and be continuing, all outstanding Term Loans (whether or not overdue) shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 3.3 plus 2%, from the date such Event of Default shall have occurred and until such amounts are paid in full (as well as after and before judgment).

(c)     Interest shall be payable on the Maturity Date; provided that interest and fees accruing pursuant to paragraph (b) of this Section shall be payable from time to time on demand.

3.4     Termination of Commitment.  The Commitment shall terminate on the Maturity Date, and the Lender shall have no obligation to make Term Loans to the Borrower after such date.

3.5     Evidence of Debt.  (a)  The Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to the Lender resulting from each Term Loan of the Lender from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time under this Agreement.

(b)     The accounts of the Lender maintained pursuant to Section 3.5(a) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of the

Lender to maintain any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Term Loans made to the Borrower by the Lender in accordance with the terms of this Agreement.

(c)     The Borrower agrees that, upon the request by the Lender, the Borrower will execute and deliver to the Lender a promissory note of the Borrower evidencing any Term Loan of the Lender, substantially in the form of Exhibit B, with appropriate insertions as to date and principal amount.

## SECTION 4.

## REPRESENTATIONS AND WARRANTIES

To induce the Lender to enter into this Agreement and to make the Term Loans, the Borrower hereby represents and warrants to the Lender that:

4.1     <u>Budgets</u>.  The 2010 Rangers Annual Budget delivered by the Borrower to the Lender has been submitted by the Borrower in good faith and is based on good faith estimates and assumptions believed to be reasonable at the time prepared, it being understood that since the time the 2010 Rangers Annual Budget was prepared, nothing has come to the Borrower's attention that causes the Borrower to believe that such good faith estimates and assumptions are materially inaccurate.

4.2     <u>No Change</u>.  Since January 23, 2010, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect other than the commencement of the Chapter 11 Case.

4.3     <u>Corporate Existence; Compliance with Law</u>.  Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) subject to the entry of the DIP Order and the "first day orders", has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other entity and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except in jurisdictions where the failure to be so qualified or in good standing has not had and could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4     <u>Power; Authorization; Enforceable Obligations</u>.  Subject to the entry of the DIP Order, each Loan Party has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder.  Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement.  Other than the DIP Order, no material consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other

Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except such consents, authorizations, filings and notices (a) obtained or made prior to the date hereof, described in <u>Schedule 4.4</u> and which remain in full force and effect or (b) the failure of which to make or obtain is excused by operation of the Bankruptcy Code or any order of the Bankruptcy Court reasonably acceptable to Lender.  Subject to the entry of the DIP Order, each Loan Document executed on the date hereof has been duly executed and delivered on behalf of each Loan Party party thereto.  Subject only to the entry of the DIP Order, this Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

4.5     <u>No Conflict</u>.  The execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof (a) will not violate any Requirement of Law or any Contractual Obligation of any Group Member except as could not reasonably be expected to have a Material Adverse Effect or to the extent that such violation is excused by operation of the Bankruptcy Code or any order of the Bankruptcy Court reasonably acceptable to Lender and (b) (except for the Liens permitted under Section 7.2) will not result in, or require, the creation or imposition of any Lien or Liens on any of their respective properties or revenues having a fair market value of more than $100,000 in the aggregate pursuant to any Requirement of Law or any Contractual Obligation.

4.6     <u>Litigation</u>.  Except for the Chapter 11 Case or as may occur in connection with the entry of the DIP Order or have been stayed in connection with the filing of the Chapter 11 Case, no litigation, investigation or proceeding of or before any Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against any Group Member or against any of their respective properties or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

4.7     <u>No Default</u>.  Except as set forth on <u>Schedule 4.7</u>, no Group Member is in default under or with respect to any of its Contractual Obligations that could reasonably be expected to have a Material Adverse Effect (unless the exercise of remedies under such default is stayed or such default is excused by operation of the Bankruptcy Code or any order of the Bankruptcy Court reasonably acceptable to Lender).  No Default or Event of Default has occurred and is continuing.

4.8     <u>Ownership of Property; Liens</u>.  Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property is subject to any Lien, except for Liens arising under Section 8.1(a) or permitted under Section 7.2 hereof.

4.9     <u>Taxes</u>.  Except as set forth on <u>Schedule 4.9</u> or in accordance with Section 6.5 or where the failure to do so is excused pursuant to any order of the Bankruptcy Court

reasonably acceptable to Lender, each Group Member has filed or caused to be filed all Federal, state and other material tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or its Subsidiaries, as the case may be).

4.10    <u>Investment Company Act; Other Regulations</u>.  No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

4.11    <u>Subsidiaries</u>.  <u>Schedule 4.11</u>, as amended by the Borrower in a writing delivered to the Lender from time to time after the Closing Date, sets forth the name and jurisdiction of organization of each Subsidiary of the Borrower and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party, and there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any Capital Stock of the Borrower or any Subsidiary.

4.12    <u>Use of Proceeds</u>.  Subject to the terms of the DIP Order, the proceeds of the Term Loans are being used solely (a) for working capital and other general corporate purposes of the Group Members including the payment of professional fees and expenses, in each case, in accordance with the 2010 Rangers Annual Budget, (b) to make adequate protection payments to any Person, to the extent required under the DIP Order, (c) to pay the fees and expenses of the Lender, (d) to make such payments to BOC as are required under the Interim Support Agreement, and (e) to pay claims in respect of certain pre-petition creditors, including but not limited to employees, taxing authorities and trade vendors in the ordinary course, in each case, to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the Lender.

4.13    <u>Accuracy of Information, etc.</u>  No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement (other than projections or any statement or information of a general economic or industry specific nature) furnished by or on behalf of any Loan Party to the Lender for use in connection with the transactions contemplated by this Agreement or the other Loan Documents contained, as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.  Any projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lender that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.  There is no fact known to any Loan Party (other than matters of a general economic or industry specific nature) that could

reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lender for use in connection with the transactions contemplated hereby and by the other Loan Documents.

4.14  Security Documents.  Subject to entry of the DIP Order, the grant of a security interest pursuant to Section 8 hereof is effective to create in favor of the Lender, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof. Upon the entry of the DIP Order, the Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral contemplated hereunder and the proceeds thereof, as security for the Obligations, shall be fully perfected, having the priority contemplated by the DIP Order.

4.15  Deposit and Securities Accounts.  Schedule 4.15, as amended by the Borrower in a writing delivered to the Lender from time to time after the Closing Date, lists all banks and other financial institutions at which any Loan Party maintains deposit accounts, securities accounts or other accounts, and such Schedule 4.15 correctly identifies the name, address and telephone number of each depository, the name in which each such account is held, a description of the purpose of the account, the complete account number therefor and the type of account (securities, deposit, etc.).

4.16  Margin Regulations.  No part of the proceeds of any Term Loans, and no other extensions of credit hereunder, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board.  If requested by the Lender, the Borrower will furnish to the Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

4.17  Labor Matters.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

4.18  ERISA.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the six-year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied in all material respects with the applicable provisions of ERISA and the Code or other applicable Requirements of Law; (b) no termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen, during such six-year period; (c) the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of

the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by a material amount; (d) neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has, within the past six years, resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Borrower nor any Commonly Controlled Entity would become subject to any material liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made; (e) no such Multiemployer Plan is in Reorganization or Insolvent; (f) each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code; (g) all contributions required to be made with respect to a Plan have been timely made. Neither Borrower nor any Commonly Controlled Entity has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan; (h) no proceedings have been instituted to terminate or appoint a trustee to administer any Plan which is subject to Title IV of ERISA; (i) no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, expected or, to the best knowledge of Borrower or any Commonly Controlled Entity, threatened; (j) each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Borrower or any Commonly Controlled Entity has at all times been operated in compliance with the provisions of Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code; and (k) Borrower and its Subsidiaries do not maintain or contribute to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA or any other applicable continuation of coverage laws or regulations).

4.19    Environmental Matters.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    the Group Properties do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability under, any Environmental Law;

(b)    no Group Member has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Group Properties or the business operated by any Group Member, nor does the Borrower have knowledge or reason to believe that any such notice will be received or is being threatened;

(c)    Materials of Environmental Concern have not been transported or disposed of from the Group Properties in violation of, or in a manner or to a location that could

give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Group Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

(d)     no judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Group Properties or the business operated by any Group Member, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Group Properties or the business operated by any Group Member;

(e)     there has been no release or threat of release of Materials of Environmental Concern at or from the Group Properties, or arising from or related to the operations of any Group Member in connection with the Group Properties or otherwise in connection with the business operated by any Group Member, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws;

(f)     the Group Properties and all operations at the Group Properties are in compliance, and have in the last five years been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Group Properties or violation of any Environmental Law with respect to the Group Properties or the business operated by any Group Member; and

(g)     no Group Member has assumed any liability of any other Person under Environmental Laws.

## SECTION 5.

## CONDITIONS PRECEDENT

5.1     <u>Conditions to Effectiveness of Credit Agreement</u>.  The effectiveness of this Agreement is subject to the entry by the Bankruptcy Court of the Interim DIP Order and to the satisfaction of the following conditions precedent on or prior to the Closing Date:

(a)     <u>Credit Agreement</u>.  The Lender shall have received (i) this Agreement, executed and delivered by the Borrower and the Lender, and (ii) any Notes required by the Lender, executed and delivered by the Borrower.

(b)     <u>Budgets and Forecasts</u>.  The Lender shall have received (i) the 2010 operating budget for the Borrower (as updated from time to time with the consent of the Lender, the "<u>2010 Rangers Annual Budget</u>"),  in form and substance satisfactory to the Lender, and which shall be attached as an exhibit to the DIP Order, it being understood that the 2010 Rangers Annual Budget delivered to the Lender prior to the Petition Date is satisfactory to the Lender, and (ii) any other financial information relating to the Borrower that the Lender has reasonably requested be delivered prior to the Closing Date.

(c)     Asset Purchase Agreement.  The Borrower and Rangers Baseball Express LLC shall have entered into the Asset Purchase Agreement, in form and substance satisfactory to the Lender, with respect to the Sale.

(d)     Interim Support Agreement.  The Bankruptcy Court shall have entered an order in form and substance reasonably satisfactory to the Lender authorizing and approving entry by the Borrower into the Interim Support Agreement with the BOC, in the form attached as Exhibit C hereto (the "Interim Support Agreement").

(e)     Prepackaged Plan.  Concurrently with the filing of the Chapter 11 Case, the Borrower shall have filed the Prepackaged Plan and an accompanying disclosure statement (the "Disclosure Statement"), in form and substance reasonably satisfactory to the Lender, with the Bankruptcy Court.

(f)     First Day Orders.  All of the "first day orders" of the Borrower entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Case, whether entered on a final basis or on an interim basis pursuant to Federal Bankruptcy Rule 6003, shall be in form and substance reasonably satisfactory to the Lender, and otherwise consistent with the 2010 Rangers Annual Budget.

(g)     Closing Certificate.  The Lender shall have received a certificate of a senior officer of each Loan Party, dated the Closing Date, in form and substance satisfactory to the Lender, with appropriate insertions and attachments including the organizational documents of each Loan Party and (ii) if readily obtainable, a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(h)     Legal Opinion.  The Lender shall have received a legal opinion from Weil, Gotshal & Manges LLP, as counsel to the Loan Parties, in form and substance reasonably satisfactory to the Lender.

(i)     Insurance.  The Lender shall have received insurance certificates satisfying the requirements of Section 6.3(b) hereof, and naming Lender as "loss payee" or "additional insured" thereunder, but only to the extent such insurance is not provided by or through MLB.

(j)     Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date.

(k)     No Default.  No Default or Event of Default shall have occurred and be continuing after giving effect to this Agreement and the other Loan Documents.

(l)     Other Documents.  The Lender shall have received such other documents, instruments and certificates as it shall reasonably request.

5.2     Conditions to Each Extension of Credit.  The agreement of the Lender to make any extension of credit requested to be made by it on any date is subject to the satisfaction of the following conditions precedent:

(a)  <u>Representations and Warranties</u>.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such credit extension date as if made on and as of such date (except to the extent they relate specifically to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date).

(b)  <u>No Default</u>.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

Each additional borrowing request by the Borrower hereunder shall be accompanied by a statement of a Responsible Officer of the Borrower certifying that as of the date of such request (including as of the date of the extension of credit) the conditions contained in this Section 5.2 have been satisfied.

SECTION 6.

AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitment remains in effect or any Term Loan or other amount is owing to the Lender hereunder, the Borrower shall and shall cause each of the Borrower's Subsidiaries (other than with respect to Section 6.1) to:

6.1  <u>Certificates; Other Information</u>.  Furnish to the Lender:

(a)  within 5 days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any Indebtedness of the Borrower and, within 1 Business Day after the same are filed, copies of all financial statements and reports that the Borrower may file with the Bankruptcy Court or U.S. Trustee;

(b)  promptly, such additional financial and other information (including financial and actuarial information related to any Plan) as the Lender may from time to time reasonably request; and

(c)  (i) no later than the fourth Business Day of each calendar month, a rolling 12-month cash flow forecast of cash receipts and cash expenditures for the Borrower and its Subsidiaries on a stand-alone basis, which shall include a comparison against actual results (each, a "<u>Monthly Club Cash Flow Forecast</u>") certified by a Responsible Officer, including by way of a statement to such effect in an email transmission to the Lender, that such Monthly Club Cash Forecast was prepared by the Borrower in good faith based upon good faith estimates and assumptions believed to be reasonable at the time prepared and (ii) no later than the fourth Business Day of each week, a rolling 13-week cash flow forecast of cash receipts and cash expenditures for the Borrower and its Subsidiaries on a stand-alone basis certified by a Responsible Officer, including by way of a statement to such effect in an email transmission, that such 13-week cash flow forecast was prepared by the Borrower in good faith based upon good faith estimates and assumptions believed to be reasonable at the time prepared (each, a "<u>Weekly</u>

<u>Club Cash Flow Forecast</u>," and together with the Monthly Club Cash Flow Forecast, each, a "<u>Club Cash Flow Forecast</u>").

    6.2  <u>Maintenance of Existence; Compliance</u>. (a) (i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.3 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith is excused by the commencement of the Chapter 11 Case or any order of the Bankruptcy Court reasonably acceptable to Lender or could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

    6.3  <u>Maintenance of Property; Insurance</u>. (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted and (b) maintain with financially sound and reputable insurance companies insurance on at least such property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business and any insurance specifically required by the Security Documents.

    6.4  <u>Inspection of Property; Books and Records; Discussions</u>. (a) Keep proper books of records and accounts in which full, true and correct entries in conformity with GAAP and all applicable Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired upon reasonable advance notice to the Borrower and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants (provided that any officer or legal counsel of the Borrower may, if it so chooses, be present at such discussions).

    6.5  <u>Payment of Obligations</u>. Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent (taking into account applicable grace periods), as the case may be, all taxes, assessments, water rates, sewer rents, governmental impositions, and other charges levied or assessed or imposed against real properties or any part thereof, all ground rents, maintenance charges and similar charges levied or assessed or imposed against real properties or any part thereof, and all charges for utility services provided to the real properties, except (a) when the amount or validity thereof is being (or shall be) contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower, as the case may be, (b) for trade and other accounts payable in the ordinary course of business which could not give rise to a Lien on real properties by operation of law, are not overdue for a period of more than 180 days from the later of the date hereof and the date of accrual of such accounts or, if overdue for more than such period, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of the Borrower and (c) for any of the foregoing, to the extent arising prior to the

Petition Date, unless authorized pursuant to the Borrower's "first day orders" or other order of the Bankruptcy Court reasonably acceptable to Lender.

6.6    Notices.  Promptly upon any Responsible Officer of the Borrower obtaining knowledge thereof, give notice to the Lender of:

(a)    the occurrence of any Default or Event of Default;

(b)    the institution of, or any written threat of, any litigation, investigation or proceeding between any Group Member and any Governmental Authority that, in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)    the commencement of any litigation or proceeding affecting any Group Member (i) in which the amount involved is $100,000 or more (including in which injunctive or similar relief is sought) or (ii) which relates to any Loan Document or the Collateral;

(d)    the following events, as soon as possible and in any event within one (1) Business Day after the Borrower knows or has reason to know thereof:  (i) the occurrence of any Reportable Event with respect to any Single Employer Plan, a failure to make any required contribution to a Plan, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Plan; and

(e)    any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.6 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower or the relevant Group Member proposes to take with respect thereto.

6.7    Environmental Laws.  (a)  Comply with, and ensure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(b)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

6.8    Cash Management.  Maintain and operate its cash management system in a manner satisfactory to the Lender, and in connection therewith shall (a) deposit the proceeds of any Term Loans into the Rangers Operating Account, (b) deposit all current and future Rangers Revenue into the Rangers Operating Account, (c) pay all expenses of the Borrower and the

Franchise out of the Rangers Operating Account, (d) maintain the Rangers Operating Account separate and apart from any other bank account, and (e) not open any new deposit account without first receiving the Lender's prior written consent therefor.

6.9     Plan, Disclosure Statement and Other Documents.

(a)     The Borrower shall authorize, execute and file with the Bankruptcy Court the Prepackaged Plan and accompanying Disclosure Statement concurrently with the commencement of the Chapter 11 Case, and shall seek approval of the Disclosure Statement and confirmation of the Prepackaged Plan on the timeline set forth in clause (b) below.

(b)     The Company shall use commercially reasonable efforts, subject to the calendar of the Bankruptcy Court, to:

(i)     obtain from the Bankruptcy Court an order (the "Confirmation Order") confirming the Prepackaged Plan by no later than 5:00 pm (local time) on August 31, 2010; and

(ii)     cause the effective date of the Prepackaged Plan to have occurred by no later than September 15, 2010, including consummation of the Sale.

(c)     The Borrower shall (i) provide to the Lender a copy of (A) any proposed amendments, supplements, changes or modifications to the Prepackaged Plan, the Disclosure Statement and the Asset Purchase Agreement and (B) the proposed form of Confirmation Order, the proposed form of any Plan Supplement and any proposed amendments, supplements, changes or modifications to any of the foregoing, (ii) provide a reasonable opportunity to the Lender to review and comment on such documents prior to authorizing, agreeing to, entering into, implementing, executing or, if applicable, filing with the Bankruptcy Court or seeking Bankruptcy Court approval or confirmation of, any such documents, and (iii) consider, in good faith, any comments consistent with this Agreement and the Prepackaged Plan, and any other reasonable comments of the Lender.

6.10     Interim Support Agreement.  A final order in form and substance reasonably satisfactory to the Lender approving the Interim Support Agreement shall have been entered by the Bankruptcy Court no later than the entry of the Final DIP Order.

6.11     Further Assurances.  From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Lender may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lender with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with  respect to any other property or assets hereafter acquired by any Group Member which is deemed to be part of the Collateral) pursuant hereto or thereto.  Upon the exercise by the Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording qualification or authorization of any Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certifications, instruments and other

documents and papers that the Lender may be required to obtain from any Group Member for such governmental consent, approval, recording, qualification or authorization.

## SECTION 7.

## NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitment remains in effect or any Term Loan or other amount is owing to the Lender hereunder, the Borrower shall not permit the Borrower or any of its Subsidiaries to, directly or indirectly:

7.1     <u>Indebtedness</u>.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)     Indebtedness of any Loan Party pursuant to any Loan Document;

(b)     Indebtedness outstanding on the date hereof and listed on <u>Schedule 7.1(b)</u> and any refinancings, refundings, renewals or extensions thereof (without voluntarily increasing, or shortening the maturity of, the principal amount thereof);

(c)     Indebtedness incurred pursuant to the MLB Rules and Regulations;

(d)     unsecured Indebtedness of any Group Member to any other Group Member incurred in the ordinary course of such Person's operations, and consistent with past practice, provided that, from the date hereof and until the repayment in full of all Obligations hereunder, the aggregate amount of all such Indebtedness shall not exceed $100,000; and

(e)     Indebtedness incurred in the ordinary course of such Person's operations, consistent with past practice and the 2010 Rangers Annual Budget other than Indebtedness for borrowed money, provided that, from the date hereof and until the repayment in full of all Obligations hereunder, the aggregate amount of such Indebtedness incurred shall not exceed $100,000.

7.2     <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except for:

(a)     Liens for taxes, assessments, water rates, sewer rents or other governmental impositions and levies not yet due or that are being contested in good faith by appropriate proceedings, <u>provided</u> that (i) adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP and (ii) the enforcement of any Lien securing such obligation and the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)     deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, utilities, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)     Liens in existence on the date hereof and listed on Schedule 7.2(f), securing Indebtedness permitted by Section 7.1(b), provided that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased, in each case, except (A) as permitted by the DIP Order or other orders of the Bankruptcy Court acceptable to the Lender, (B) after-acquired property that is affixed to or incorporated in the property covered by such Lien and (C) the proceeds and products thereof;

(g)     Liens created pursuant to the Security Documents;

(h)     any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased;

(i)     statutory Liens over any of the Borrower's deposit accounts acquired by any depository institution in the ordinary course of business to cover customary unpaid fees and expenses incurred by the Borrower in connection with the Borrower's routine maintenance and operation of such deposit accounts;

(j)     Liens imposed by the MLB Rules and Regulations;

(k)     with respect to the Rangers Club Trust, Liens securing Indebtedness relating to the MLB Facility; and

(l)     Liens incurred in the ordinary course of such Person's operations, consistent with past practice or customary for businesses engaged in the same or similar line of business other than Liens securing Indebtedness for borrowed money and except that, from the date hereof and until the repayment in full of all Obligations hereunder, the aggregate of all such Liens shall not secure amounts in excess of $100,000.

7.3     Fundamental Changes.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of, all or substantially all of its property or business, other than pursuant to the Prepackaged Plan or, with the Lender's consent (not to be unreasonably withheld or delayed), pursuant to the merger of any Group Member with or into the Borrower where the Borrower is the surviving Person.

7.4     <u>Disposition of Property</u>.  Dispose of any of its property, whether now owned or hereafter acquired, or issue or sell any shares of its Capital Stock to any Person, without the prior written consent of the Lender, except for:

(a)     Dispositions of inventory or obsolete or worn out property, in each case, in the ordinary course of business;

(b)     Dispositions in the ordinary course of such Person's operations, consistent with past practice or customary for businesses engaged in the same or similar line of business, provided that, from the date hereof and until the repayment in full of all Obligations hereunder, the aggregate value of all property Disposed pursuant to this Section 7.4(b) will not exceed $100,000;

(c)     the Sale and other Dispositions under the Prepackaged Plan; and

(d)     Dispositions from any Group Member to any Loan Party to the extent set forth in the 2010 Rangers Annual Budget or otherwise consented to by the Lender.

7.5     <u>Restricted Payments</u>.  Make or commit to make any Restricted Payment, except that (a) any Subsidiary may make Restricted Payments to the Borrower and (b) Borrower and its Subsidiaries may make Restricted Payments to the extent (1) required to effectuate the payment of the Group Members' payroll expenses, taxes or corporate credit card expenses, (2) done in the ordinary course of such Person's operations and consistent with past practice and (3) in accordance with the 2010 Rangers Annual Budget, provided that such Restricted Payments (described in this clause (b)) must have been specifically described and provided for in a Weekly Club Cash Flow Forecast without the Lender having objected thereto within 2 Business Days following the delivery thereof upon reasonable grounds, including that such expenditures are not for the benefit of the Borrower or its Subsidiaries.

7.6     <u>Capital Expenditures</u>.  Make or commit to make any Capital Expenditure other than (i) in accordance with the 2010 Rangers Annual Budget or (ii) in the ordinary course of such Person's operations, consistent with past practice and customary for businesses engaged in the same or similar line of business, provided that, in the case of each of clauses (i) and (ii), such Capital Expenditure must have been specifically described and provided for in a Weekly Club Cash Flow Forecast without the Lender having objected thereto within 2 Business Days following the delivery thereof upon reasonable grounds, including that such expenditures are not for the benefit of the Borrower or its Subsidiaries.

7.7     <u>Investments</u>.  Make or commit to make any Investment except:

(a)     Investments (including extensions of trade credit) made in the ordinary course of such Person's operations, consistent with past practice and customary for businesses engaged in the same or similar line of business in the ordinary course of business, provided that, from the date hereof and until the repayment in full of all Obligations hereunder, the aggregate cost of all such Investments shall not exceed $100,000;

(b)     Investments in Cash Equivalents;

(c)    loans and advances to directors, officers and employees of any Group Member as required pursuant to indemnification provisions of any constituent documents or made in the ordinary course of business (including for travel, entertainment and relocation expenses), provided that, in each case, such loans and advances must have been specifically described and provided for in a Weekly Club Cash Flow Forecast without the Lender having objected thereto within 2 Business Days following the delivery thereof upon reasonable grounds, including that such expenditures are not for the benefit of the Borrower or its Subsidiaries;

(d)    League-wide Investments;

(e)    intercompany Investments by any Group Member in any Loan Party; and

(f)    intercompany Investments by any Loan Party in any Group Member to the extent in accordance with the 2010 Rangers Annual Budget or otherwise in the ordinary course of such Person's operations, consistent with past practice and customary for businesses engaged in the same or similar line of business, provided that, from the date hereof and until the repayment in full of all Obligations hereunder, the aggregate amount of all such intercompany Investments shall not exceed $100,000;

(g)    Investments under the Prepackaged Plan; and

(h)    Investments constituting Indebtedness permitted under Section 7.1.

7.8    <u>Transactions with Affiliates</u>.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrower) unless such transaction is authorized by the Bankruptcy Court (and acceptable to the Lender) or is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the relevant Group Member, and (c) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.

7.9    <u>Sales and Leasebacks</u>.  Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property that has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member.

7.10    <u>Hedge Agreements</u>.  Enter into any Hedge Agreement or speculative transaction.

7.11    <u>Changes in Fiscal Periods</u>.  Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

7.12    <u>Negative Pledge Clauses</u>.  Enter into or suffer to exist or become effective any agreement that prohibits, limits or imposes any condition upon the ability of any Group

Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents or any refinancing thereof other than (a) this Agreement and the other Loan Documents, (b) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby) and (c) the agreements in existence on the date hereof listed on Schedule 7.12.

       7.13    <u>Proceeds of Term Loan</u>.  Use the proceeds of the Term Loans for any purpose other than as provided in Section 4.12.

       7.14    <u>Clauses Restricting Subsidiary Distributions</u>.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of the Borrower to (a) make Restricted Payments to the Borrower or any Subsidiary of the Borrower or pay any Indebtedness owed to the Borrower or any other Subsidiary of the Borrower, (b) make loans or advances to, or other Investments in, the Borrower or any other Subsidiary of the Borrower or (c) transfer any of its assets to the Borrower or any other Subsidiary of the Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary otherwise permitted hereby or (iii) the agreements in existence on the date hereof listed on Schedule 7.14.

       7.15    <u>Lines of Business</u>.  Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement or that are reasonably related thereto.

       7.16    <u>Amendments to Material Agreements</u>.  (a) Amend, supplement, terminate or otherwise modify the terms and conditions of any material Contractual Obligation or the certificate of incorporation, by-laws or other organizational documents of the Borrower or any of its Subsidiaries, except for any such amendment, supplement or modification that could not reasonably be expected to have a Material Adverse Effect or (b) amend, supplement, terminate or otherwise modify the subordination provisions of any subordinated Indebtedness in any manner adverse to the Lender or the priority of the Liens in favor of the Lender.

       7.17    <u>Payments of Indebtedness</u>.  Except as contemplated by the DIP Order or the Prepackaged Plan, pay or make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

       (a)    payment of Indebtedness created under the Loan Documents or incurred pursuant to the MLB Rules and Regulations;

(b)     payment of Indebtedness to the extent permitted under the DIP Order or as contemplated by Section 3.2;

(c)     with respect to the Rangers Club Trust, payments required pursuant to the Rangers Club Trust Facility;

(d)     payments required pursuant to the terms of the Existing Baseball Finance Loan Documents; and

(e)     payments required pursuant to the terms of any Indebtedness permitted under Sections 7.1(d) and (e) but only to the extent incurred after the Petition Date.

7.18     <u>Prepetition Debts</u>.  Except as permitted by the DIP Order or any other order of the Bankruptcy Court acceptable to the Lender, pay any prepetition debts or other obligations without the consent of the Lender authorizing it to do so; <u>provided</u> that the Rangers Club Trust may make any payments required pursuant to the Rangers Club Trust Facility.

SECTION 8.

GRANT AND PERFECTION OF SECURITY INTEREST

8.1     <u>Grant of Security Interest</u>.  To secure payment and performance of all Obligations, the Borrower hereby grants to the Lender a continuing security interest in, a lien upon, and hereby assigns to the Lender, as security, all  property, and interests in such property, of the Borrower, whether now owned or hereafter acquired or existing, and wherever located (all of which being collectively referred to as the "<u>Collateral</u>"), including:

(a)     all Accounts;

(b)     all general intangibles, including, without limitation, all Intellectual Property;

(c)     all goods, including, without limitation, Inventory and Equipment;

(d)     all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(e)     all instruments, including, without limitation, all promissory notes;

(f)     all documents;

(g)     all Insurance;

(h)     all deposit accounts;

(i)     all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(j)       all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(k)       all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property of the Borrower now or hereafter held or received by or in transit to the Lender or its Affiliates or at any other depository or other institution from or for the account of the Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(l)       all commercial tort claims, including, without limitation, those identified on Schedule 8.1(l);

(m)       to the extent not otherwise described above, all Receivables;

(n)       all Records; and

(o)       all products and proceeds of any of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

8.2       Exclusions from Collateral.  Notwithstanding anything to the contrary contained in Section 8.1 above, the types or items of Collateral described in such Section shall not include (a) any rights or interests in any contract, lease, permit, license, charter or license agreement covering real or personal property, as such, if under the terms of such contract, lease, permit, license, charter or license agreement, or applicable law with respect thereto, the valid grant of a security interest or lien therein to the Lender is prohibited and such prohibition has not been or is not waived or the consent of the other party to such contract, lease, permit, license, charter or license agreement has not been or is not otherwise obtained or under applicable law such prohibition cannot be waived; provided that the foregoing exclusion shall in no way be construed (i) to apply if any such prohibition is unenforceable under Sections 9-406, 9-407, 9-408 or 9-409 of the UCC or other applicable law including the Bankruptcy Code or (ii) so as to limit, impair or otherwise affect the Lender's unconditional continuing security interests in and liens upon any rights or interests of the Borrower in or to monies due or to become due under any such contract, lease, permit, license, charter or license agreement (including any Receivables), (b) any Equipment which is subject to a purchase money mortgage or other purchase money lien or security interest (including capital leases) permitted under Section 7.2 if: (i) the valid grant of a security interest or lien to the Lender in such item of Equipment is prohibited by the terms of the agreement between the Borrower and the holder of such purchase money mortgage or other purchase money lien or security interest or under applicable law and

such prohibition has not been or is not waived, or the consent of the holder of the purchase money mortgage or other purchase money lien or security interest has not been or is not otherwise obtained, or under applicable law, including the Bankruptcy Code, such prohibition cannot be waived and (ii) the purchase money mortgage or other purchase money lien or security interest on such item of Equipment is or shall become valid and perfected; (c) the League Rights and League Revenues transferred by the Borrower to the Rangers Club Trust in connection with the Rangers Club Trust Facility; (d) the Borrower's ownership interest (as opposed to its rights to receive revenues, dividends, distributions and the like) in any League-wide Investments; (e) applications for any Trademarks that have been filed with the U.S. Patent and Trademark Office on the basis of an "intent-to-use" with respect to such marks, unless and until a statement of use or amendment to allege use is filed or any other filing is made or circumstances otherwise change so that the interests of the Borrower in such marks is no longer on an "intent-to-use" basis, at which time such marks shall automatically and without further action by the parties be subject to the security interests and liens granted by the Borrower to the Lender hereunder; and (f) the capital stock of any subsidiary organized under the laws of a jurisdiction outside the United States of America, its territories or its possessions that is a "controlled foreign corporation" (as such term is defined in Section 957(a) of the Code or a successor provision thereof) in excess of sixty five (65%) percent of all of the issued and outstanding shares of capital stock of such subsidiary entitled to vote (within the meaning of Treasury Regulation Section 1.956-2).

8.3 <u>Perfection of Security Interests</u>. (a) Without in any way suggesting that the entry of the DIP Order is not sufficient for such purpose, the Borrower irrevocably and unconditionally authorizes the Lender (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming the Lender or its designee as the secured party and the Borrower as debtor, as the Lender may require, and including any other information with respect to the Borrower or otherwise required by part 5 of Article 9 of the UCC of such jurisdiction as the Lender may determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the date hereof. The Borrower hereby ratifies and approves all financing statements naming the Lender or its designee as secured party and the Borrower as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of the Lender prior to the date hereof and ratifies and confirms the authorization of the Lender to file such financing statements (and amendments, if any). The Borrower hereby authorizes the Lender to adopt on behalf of the Borrower any symbol required for authenticating any electronic filing. In no event shall at any time the Borrower file, or permit or cause to be filed, any correction statement or termination statement with respect to any financing statement (or amendment or continuation with respect thereto) naming the Lender or its designee as secured party and the Borrower as debtor.

(b) Without in any way suggesting that the entry of the DIP Order is not sufficient for such purpose, the Borrower shall take any other actions reasonably requested by the Lender from time to time to cause the attachment, perfection and priority of, and the ability of the Lender to enforce, the security interest of the Lender in any and all of the Collateral, including the filing of a financing statement, or the taking of delivery or control or by appropriate filings with the United States Patent and Trademark Office or United States

Copyright Office, in accordance with the laws and regulations of the United States of America, Puerto Rico and their political subdivisions, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that the Borrower's signature thereon is required therefor, (ii) causing the Lender's name to be noted as secured party on any certificate of title for a titled good other than motor vehicles if such notation is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States of America as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, and (iv) use commercially reasonable efforts to obtain the consents and approvals of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, and taking all actions required by any earlier versions of the UCC or by other law, as applicable in any relevant jurisdiction.

8.4    Priority of the Lender's Liens.

(a)    The priority of the Lender's Liens on the Collateral shall be junior to all Liens existing as of the Petition Date, as set forth in the DIP Order, and except as permitted hereunder or under the DIP Order, upon the Closing Date, and for so long as any Obligations shall be outstanding, the Borrower and each Loan Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, unless otherwise permitted or provided for in the DIP Order or effective upon the granting of any such Lien or priority, the Obligations shall be paid in full in cash and the Commitment shall be terminated.

(b)    Upon entry of, subject to and in accordance with the DIP Order, the Obligations of the Borrower hereunder and under the other Loan Documents and the DIP Order, shall at all times constitute allowed Super-Priority Claims pursuant to Section 364(c)(1) of the Bankruptcy Code.

SECTION 9.

[RESERVED]

SECTION 10.

EVENTS OF DEFAULT

10.1    Events of Default.  If any of the following events shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal of any Term Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Term

Loan or any other amount payable hereunder or under any other Loan Document, within 3 days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)     any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)     any Loan Party shall default in the observance or performance of any agreement contained in Section 6.1 or Section 7 of this Agreement; or

(d)     any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 10.1), and such default shall continue unremedied for a period of 15 Business Days after receipt by the Borrower of a written notice from the Lender of such default; or

(e)     any Group Member (i) defaults in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Term Loans) on the due date thereof (after taking into account any applicable grace periods and notice requirements); or (ii) defaults in making any payment of any interest on any such Indebtedness on the due date thereof (after taking into account any applicable grace periods and notice requirements); or (iii) defaults in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating to such Indebtedness (after taking into account any applicable grace periods and notice requirements), or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that (1) references to "Indebtedness" contained in this paragraph (e) shall refer to Indebtedness incurred after the Petition Date, (2) a default, event or condition described in clauses (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default if the Group Member is stayed from making such payment as a result of the Chapter 11 Case and (3) a default, event or condition of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless such default, event or condition shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $100,000; or

(f)     (i) any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Group Member or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be

appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) any Group Member or any Commonly Controlled Entity shall, or in the reasonable opinion of the Lender is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Lender, reasonably be expected to have a Material Adverse Effect; or

(g)     after the Petition Date, one or more judgments or decrees shall be entered against any one or more Group Members involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $100,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed (or subject to the automatic stay) or bonded pending appeal within 60 days from the entry thereof; or

(h)     any termination, revocation, impairment, modification or non-renewal of one or more licenses, registrations or memberships granted to any Group Member, or any other failure to meet regulatory requirements or comply with law, if such termination, revocation, impairment, modification, non-renewal or failure could reasonably be expected to result in a Material Adverse Effect; or

(i)     any of the Security Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so contest in writing, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(j)     the termination of (i) the Asset Purchase Agreement or (ii) the Interim Support Agreement, in each case without Lender's consent; or

(k)     any Change of Control shall occur, other than pursuant to the Prepackaged Plan; or

(l)     the Borrower or any Affiliate of the Borrower shall seek to have this Agreement or any of the Loan Documents modified (or any court shall issue an order or take other action purporting to modify this Agreement or any of the Loan Documents) without the consent of the Lender; or

(m)     except in accordance with the Prepackaged Plan, the automatic stay under Section 362 of the Bankruptcy Code and applicable to the Borrower or any Affiliate of the Borrower, to the extent applicable, shall be modified or vacated in the Chapter 11 Case for any secured claim or claims aggregating an amount in excess of $100,000 or to the extent that as a result thereof enforcement of such claim against any Collateral would be permitted; or

(n)     any of the following shall occur:

(i)     non-compliance by the Borrower in any material respect with any of the terms or provisions of the DIP Order, which non-compliance shall continue unremedied for a period of 5 Business Days after receipt by the Borrower of a written notice from the Lender of such non-compliance;

(ii)     entry of an order by the Bankruptcy Court, without the consent of the Lender, directing the appointment of a trustee in the Chapter 11 Case or of an examiner with enlarged powers to control, manage or direct substantially all of the operations of the Borrower and such order shall not be vacated within 30 days after the entry thereof;

(iii)     entry of an order by the Bankruptcy Court converting the Chapter 11 Case to a case under chapter 7, or dismissing the Chapter 11 Case;

(iv)     the filing by the Borrower, or the entry by the Bankruptcy Court of an order confirming a plan of reorganization of the Borrower other than the Prepackaged Plan or an alternative plan that is not adverse to the interests of the Lender and provides for the termination of the Commitment and payment in full of the Obligations and the satisfaction of all other obligations of the Borrower;

(v)     the reversal, vacatur, stay, amendment, supplementation or other modification of the DIP Order in any way without Lender's consent (which consent for non-material matters shall not be unreasonably withheld), or the Borrower shall apply for authority to do so without such Lender consent having been obtained; or

(vi)     the Final DIP Order shall not be entered by the date that is 45 days from the Petition Date (or such later date as the Lender may agree to in its sole discretion);

then, and in any such event, the Lender may (i) upon written notice to the Borrower and subject to the terms of the DIP Order, declare the Commitment to be terminated forthwith, whereupon the Commitment shall immediately terminate; (ii) upon written notice to the Borrower and subject to the terms of the DIP Order, declare the Term Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable; and (iii) subject to the Notice Requirement, exercise any and all remedies available to it under this Agreement (including pursuant to Section 10.2 hereof), the DIP Order or any other Loan Document or applicable law, without presentment, demand, protest and any other notices of any kind, all of which are hereby expressly waived by the Borrower.

10.2    Remedies.

(a)     Subject to the terms of the DIP Order and Section 11.16, if any of the Events of Default shall have occurred and shall be continuing and the Obligations shall have become or been declared to be due and payable as a result thereof as provided in the last paragraph of Section 10.1, then, subject to the Notice Requirement, the automatic stay under

Section 362 of the Bankruptcy Code applicable to the Borrower and its estate shall be vacated, whereupon the Lender shall be free to do any or all of the following:

(i)       exercise all rights and remedies available to it hereunder or under any of the Security Documents, including the DIP Order, or under applicable law, including the Bankruptcy Code, without having to obtain any further authorization from the Bankruptcy Court, and in connection with such exercise, the Lender may also require the Borrower to, and the Borrower hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties;

(ii)      without limiting any of the foregoing, sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Lender deems advisable, in its sole discretion, and in connection therewith the Lender is hereby granted a license or other right to use, without charge, any of the Borrower's Intellectual Property, in completing production of, advertising or selling any Collateral, and the Borrower's rights under all licenses and all franchise agreements shall inure to the Lender's benefit for such purpose;

(iii)     without limiting any of the foregoing, subject to applicable law, license, whether on an exclusive or nonexclusive basis, or utilize, whether in connection with the operation of the Borrower's business or otherwise, any of the Borrower's Intellectual Property (in each case, to the extent constituting part of the Collateral) throughout the world for such term or terms, on such conditions, and in such manner, as the Lender shall in its sole discretion determine, and in order to implement the assignment, license, use, sale or other disposal of any of the Borrower's Intellectual Property pursuant to the terms of this Section 10.2, the Lender may, at any time, and the Borrower hereby irrevocably appoints and authorizes the Lender to, execute and deliver on behalf and in the name of the Borrower, one or more instruments of assignment of such Trademarks, Patents, Copyrights or other Intellectual Property (or any application of registration thereof), in form suitable for filing, recording or registration in any country; or

(iv)     without limiting any of the foregoing and without assuming any obligations or liability thereunder, at any time, enforce (and shall have the exclusive right to enforce) against any licensee or sublicensee all rights and remedies of the Borrower in, to and under any one or more license agreements with respect to the Collateral, and take or refrain from taking any action under any thereof, and the Borrower hereby releases the Lender from, and agrees to hold the Lender free and harmless from and against any claims arising out of, any action taken or omitted to be taken with respect to any such license agreement.

(b)     Subject to the terms of the DIP Order and Sections 3.2(c) and 11.16, all cash proceeds received by the Lender pursuant to the exercise of any and all remedies available

to it under this Agreement (including pursuant to Section 10.2 hereof), the DIP Order or any other Loan Document or applicable law, including, without limitation, in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, and then or at any time thereafter applied in whole or in part against, all or any part of the Obligations in such order as the Lender shall elect.  Any surplus of such cash or cash proceeds held by the Lender and remaining after payment in full of all the Obligations and termination of the Commitment, shall be paid over to the Borrower or to whomsoever may be lawfully entitled to receive such surplus.

10.3    Public or Private Sale.  Without limiting any of the foregoing, the Lender shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any public or private sale pursuant to Section 10.2 hereof.  The Borrower hereby waives any claims against the Lender arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Lender accepts the first offer received and does not offer the Collateral to more than one offeree.

## SECTION 11.

## MISCELLANEOUS

11.1    Amendments and Waivers.  Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 11.1.  Subject to the terms of the DIP Order, (a) this Agreement and the other Loan Documents may be amended, supplemented, or otherwise modified upon the written consent of the Lender and the Loan Parties party hereto and thereto, (b) the Lender may waive, on such terms and conditions as the Lender may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences.  Any such waiver and any such amendment, supplement or modification shall be binding upon the Loan Parties and the Lender.  In the case of any waiver, the Loan Parties and the Lender shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

11.2    Notices.  All notices, requests, and other communications hereunder shall be in writing and shall be given by personal delivery, facsimile or electronic mail, sent electronically, sent by nationally recognized overnight courier service, or sent by certified, registered or first-class United States mail, as the case may be, to the Lender or the Borrower at the address set forth, or to such other address or to the attention of such other contact as the recipient party has specified by prior written notice to the sending party:

|              |                                        |
|--------------|----------------------------------------|
| The Borrower: | Texas Rangers Baseball Partners       |
|              | 1000 Ballpark Way                      |
|              | Suite 400                              |
|              | Arlington, Texas 76011                 |

Attention: Kellie Fischer
Fax: (817) 273-5278
Email: kfischer@texasrangers.com

with a copy to: Weil, Gotshal & Manges LLP
200 Crescent Court
Suite 300
Dallas, Texas 75201
Attention: Glenn West
Fax: (214) 746-7780
Email: gdwest@weil.com

with a copy to: Weil, Gotshal & Manges LLP
200 Crescent Court
Suite 300
Dallas, Texas 75201
Attention: Martin Sosland
Fax: (214) 746-7730
Email: martin.sosland@weil.com

The Lender: Baseball Finance LLC
c/o Major League Baseball
245 Park Avenue
New York, New York 10167
Attention: Jonathan Mariner
Fax: (212) 931-7791
Email: jonathan.mariner@mlb.com

with a copy to: Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention: Jordan Yarett
Fax: (212) 492-0126
Email: jyarett@paulweiss.com

Any notice shall be deemed received by the addressee, unless earlier received, (a) if given by personal delivery, upon receipt, (b) if sent by overnight courier service, on the next Business Day, (c) if sent by certified or registered United States mail, return receipt requested, when actually received, (d) if sent by United States mail, first class, five Business Days after posting in the United States mail, (e) if sent by facsimile, upon the sender's receipt of electronic confirmation of error free delivery, and (f) if sent by electronic mail, when sent.

11.3　No Waiver; Cumulative Remedies.　No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof.　No single or partial exercise of any right, remedy, power or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.　The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights, remedies, powers and privileges provided by law.

11.4　Reservation of Rights.　Neither the making of the Term Loans, nor any provision of this Agreement shall in any way act, or be construed, as a waiver by the Lender, the BOC, the Commissioner or any Major League Baseball Club of their respective rights under the Major League Constitution or any other MLB Rule and Regulation.　Each of the BOC, the Commissioner, the Lender and the Major League Baseball Clubs expressly reserves and continues to reserve all of their powers, rights, privileges and remedies under (i) the Major League Constitution and each other MLB Rule and Regulation and (ii) applicable law; and the making of the Term Loans is without prejudice to any of the powers, rights, privileges and remedies so reserved.

11.5　Survival of Representations and Warranties.　All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Term Loans and other extensions of credit hereunder.

11.6　Payment of Expenses and Taxes.　The Borrower agrees (a) to pay or reimburse the Lender for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable and documented out-of-pocket fees and other charges of counsel (including the allocated fees and expenses of in-house counsel) to the Lender and reasonable and documented out-of-pocket filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Lender shall deem appropriate, (b) to pay or reimburse the Lender for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the reasonable and documented out-of-pocket fees and other charges of counsel (including the allocated fees and expenses of in-house counsel) to the Lender, (c) to pay, indemnify, and hold the Lender harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise, sales and other taxes that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay,

indemnify, and hold the Lender and its officers, directors, employees, affiliates, agents, advisers and owners (direct or indirect) (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, claims, losses, damages, penalties, actions, judgments, proceedings, investigations, inquiries, costs, expenses or disbursements of any kind or nature whatsoever, including the reasonable and documented out-of-pocket fees and other charges of counsel (including the allocated fees and expenses of in-house counsel) to the Indemnitees, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents (regardless of whether any Loan Party is or is not a party to any such actions, proceedings, investigations or inquiries, including any brought by any Indemnitee against any Loan Party under any Loan Document), including any of the foregoing relating to the use of proceeds of the Term Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Group Properties (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that no Loan Party shall have any obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, each Loan Party agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 11.6 shall be payable within a commercially reasonable time, but not later than 15 days after written demand therefor. The agreements in this Section 11.6 shall survive the termination of this Agreement and the repayment of the Term Loans and all other amounts payable hereunder.

11.7 Successors and Assigns; Assignments. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby. The Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). The Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Term Loans at the time owing to it) (a) to any Affiliate of the Lender without the prior written consent of any Loan Party and (b) so long as no Event of Default has occurred and is continuing, to any other Person with the consent of the Borrower.

11.8 Adjustments; Set-off. In addition to any rights and remedies of the Lender provided by law, the Lender, while any Event of Default has occurred and is continuing, shall have the right, without prior notice to the Borrower, except as provided in the DIP Order, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or

indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Lender or any branch or agency thereof to or for the credit or the account of the Borrower.

11.9    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lender.

11.10    Severability; Section Headings.  (a) Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(b)    The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

11.11    Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower and the Lender with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the parties hereto relative to the subject matter hereof and thereof not expressly set forth or referred to herein or in the other Loan Documents.

11.12    DIP Order to Take Precedence.  In the event of any inconsistency between the DIP Order and this Agreement or any of the other Loan Documents, the provisions of the DIP Order shall be controlling.

11.13    **GOVERNING LAW.  EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PROVISION THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW)**.

11.14    Acknowledgments.  Each Loan Party hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    the Lender has no fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Lender, on one hand, and each Loan Party, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the any Loan Party and the Lender.

11.15   Releases of Liens.  At such time as all outstanding Term Loans, all accrued interest thereon, all accrued fees and all other obligations under the Loan Documents and all other Obligations then due and payable shall have been paid in full, all Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Borrower and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

11.16   MLB Requirements.  Any contrary provisions contained herein notwithstanding:

(a)     This Agreement, the other Loan Documents, the rights of the Lender hereunder and thereunder, including the granting, attachment and enforcement of all security interests and the exercise of any rights or remedies hereunder, thereunder or, in addition thereto, whether existing by statute, law or as a matter of equity (including any rights or remedies available to the Lender in any case or proceeding under the Bankruptcy Code, and the obligations of the Borrower or any other Loan Party hereunder and thereunder, shall be and are subject to the MLB Rules and Regulations, the application or enforcement of which the Lender shall not directly or indirectly oppose, interfere with or seek to limit, whether by action or inaction, in any fashion whatsoever, whether or not explicit reference thereto is made herein or therein, and nothing herein is intended to violate or breach any such MLB Rules and Regulations; provided that the provisions of this Section 11.16 are not intended to and shall not limit in any manner the obligations of the Borrower and the other Loan Parties to pay and perform the Obligations in full.

(b)     In furtherance of, and without limiting, the foregoing:

(i)      the Lender by accepting the benefits hereof is aware of the provisions contained in Article V, Section 2(b)(2) of the Major League Constitution, and recognizes that the Commissioner has issued the MLB Ownership Guidelines.

(ii)     the Lender by accepting the benefits hereof acknowledges the "best interests of baseball" powers held by the Commissioner under the Major League Constitution.

(iii)    the Lender by accepting the benefits hereof acknowledges that the MLB Rules and Regulations require that all necessary MLB Approvals be obtained for, and prior to, any sale or transfer of the Franchise or the Borrower and other Loan Parties, or any interest in any of them, or any sale, transfer, assignment, license, sublease or other conveyance of any Collateral related to the operation of the Franchise or being a member of Major League Baseball, to a

third party as well as to the Lender, and that each such transaction (including, without limitation, any transaction implemented by (x) a sale of the Franchise or the Borrower or any other Loan Party under section 363 of the Bankruptcy Code or (y) the terms of any plan under any chapter of the Bankruptcy Code providing for (1) the sale of any of the foregoing or an interest in any of the foregoing or (2) the acquisition or distribution of direct or indirect ownership interests in any of the foregoing (as to clauses (x) and (y), a "Bankruptcy Transfer")) shall be subject to and made in accordance with the MLB Rules and Regulations, including, without limitation, the Major League Constitution and the MLB Ownership Guidelines. The Lender by accepting the benefits hereof also acknowledges that Article V, Section 2(b)(2) of the Major League Constitution and the MLB Ownership Guidelines require that the transfer of a control interest in any of the Franchise or the Borrower and the other Loan Parties is subject to the approving vote of the Major League Baseball Clubs in their absolute discretion.

(iv)    The Lender by accepting the benefits hereof covenants and agrees that it shall not effect the transfer of any interest in the Franchise or the Borrower or any other Loan Party (including, without limitation, through the exercise of remedies under this Agreement, any other Loan Document or by means of a Bankruptcy Transfer or otherwise), in each case, without first obtaining all necessary MLB Approvals.

(v)    The Lender acknowledges that any temporary or permanent management of the Franchise or the Borrower or any other Loan Party shall be subject to first obtaining all necessary MLB Approvals.  In the event the Lender desires to operate the Franchise or the Borrower and the other Loan Parties for its own account on a temporary or permanent basis as a result of a permitted exercise of rights and remedies under the Loan Documents, the Lender shall seek the prior approval of the Commissioner, the BOC and/or Major League Baseball Clubs in accordance with the MLB Rules and Regulations, including, without limitation, the Major League Constitution and the MLB Ownership Guidelines, and such operation shall be subject to first obtaining all necessary MLB Approvals.

(c)    Neither the Borrower, any other Loan Party nor any other Person (other than the Commissioner or MLB) shall have any right to enforce any provision of this Section 11.16, and each of the Commissioner and the BOC, in its sole and absolute discretion, shall have the right to waive or enforce any provision of this Section 11.16 that is for the benefit of the Commissioner, MLB or the Major League Baseball Clubs.

11.17    Usury Savings Clause .  The Borrower and the Lender intend to comply at all times with applicable usury laws.  If at any time such laws would render usurious any amounts due under this Agreement under applicable law, then it is each of the Borrower's and the Lender's express intention that the Borrower not be required to pay interest under this Agreement at a rate in excess of the maximum lawful rate, that the provisions of this Section 11.17 shall control over all other provisions of this Agreement which may be in apparent conflict hereunder, that such excess amount shall be immediately credited to the principal balance of this Agreement, and the provisions hereof shall immediately be reformed and the amounts thereafter

decreased, so as to comply with the then applicable usury law, but so as to permit the recovery of the fullest amount otherwise due under this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized representatives as of the day and year first above written.

TEXAS RANGERS BASEBALL PARTNERS, as Borrower

By:   Rangers Equity Holdings GP, LLC, its
      Managing Partner


By: _____
    Name:
    Title:


BASEBALL FINANCE LLC, as Lender

By: Baseball Finance, Inc., its Manager


By: _____
    Name:
    Title:

## __Exhibit B__

## Budget

| | 5/24/2010 | 5/25/2010 | 5/26/2010 | 5/27/2010 | 5/28/2010 | 5/31/2010 | 6/1/2010 | 6/2/2010 | 6/3/2010 | 6/4/2010 | 6/7/2010 | 6/8/2010 | 6/9/2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projected | Projected | Projected | Projected | Projected | Holiday | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| Beginning Invested Cash | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 |
| MLB Funding | | | | 3,800,000 | | | 200,000 | | | | 750,000 | | |
| **Outside Funding Needed** | | | | | | | | | | | | | |
| Plans Capital Beginning Cash | (1,716,936) | (1,473,540) | (1,184,481) | (1,023,231) | 2,938,019 | (2,184,791) | (2,184,791) | (2,549,883) | (2,237,183) | (2,017,483) | (2,722,283) | (2,490,583) | (2,174,883) |
| Total Current Cash Available | 1,351,617 | 1,595,013 | 1,884,072 | 5,845,322 | 6,006,572 | 883,761 | 1,083,761 | 518,669 | 831,369 | 1,051,069 | 1,096,269 | 577,969 | 893,669 |
| **Total cash available** | 1,351,617 | 1,595,013 | 1,884,072 | 2,045,322 | 6,006,572 | 883,761 | 883,761 | 518,669 | 831,369 | 1,051,069 | 346,269 | 577,969 | 893,669 |
| **Inflows:** | | | | | | | | | | | | | |
| Ticket/Suites Sales - Rangers | 95,000 | 100,000 | 100,000 | 100,000 | 158,193 | | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| Post-Season Tickets/Suites | | | | | | | | | | | | | |
| Central Fund | | | | | | | | | | | | | |
| Properties | | | | | | | | | | | | | |
| Revenue Sharing | | | | | 2,500,000 | | | | | | | | |
| MLBAM | | | | | | | | | | | | | |
| Fox and KXTA, Channel 11 | | | | | | | | | | | | | |
| KRLD | | | | | | | | | | | | | |
| Rangers Sponsorship | | | | | 52,572 | | | | | | | | |
| Ranger DOG Cash & Other Merch | 134,896 | 96,059 | 61,250 | 61,250 | 131,229 | | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 |
| Misc Cash | | | | | | | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 |
| **Transfer in from HSG** | | | | | | | | | | | | | |
| One Time Inflows | | | | | | | | | | | | | |
| **Total Inflows** | 229,896 | 196,059 | 161,250 | 161,250 | 2,841,994 | - | 312,700 | 312,700 | 312,700 | 312,700 | 312,700 | 312,700 | 312,700 |
| **Outflows:** | | | | | | | | | | | | | |
| Check Outflows : | | | | | | | | | | | | | |
| A/P Outstanding Aged | | | | | | | | | | | | | |
| A/P O/S Last check run | | | | | | | | | | | | | |
| P/R Outstanding Aged | | | | | | | | | | | | | |
| P/R Outstanding Current | | | | | | | | | | | | | |
| **Check Outflows Total** | - | - | - | - | (800,000) | - | - | - | - | (871,500) | - | - | - |
| Pending Outflows: | | | | | | | | | | | | | |
| Rangers SB/Def Comp | | | | | (250,000) | | | | | | | | |
| Payroll | | | | | | | (50,000) | | | | | | (5,000) |
| Sales Tax/Other Tax | | | | | | | | | | | | | |
| Rangers DOG Change | 31,000 | 93,000 | | | | | | | (93,000) | (31,000) | (31,000) | 62,000 | |
| Misc | (17,500) | | | | (67,860) | | | | | | | (59,000) | - |
| Charters | | | | | | | (661,125) | | | | | | |
| Rent | | | | | | | (166,667) | | | | | | |
| Sweep | | | | | | | | | | | | | |
| **Transfer out to HSG Payroll** | | | | | (6,781,944) | | | | | | | | |
| **Transfer out to HSG Pcard** | | | | | | | | | | | (800,000) | | |
| **Transfer out to HSG AP** | | | | | | | | | | | | | |
| **Transfer out ot HSG Health and Dental** | | | | | | | | | | | | | |
| Interest and Swap Payments | | | | | | | | | | | | | |
| 401k | | | | | | | | | | (90,000) | | | |
| Vanguard Players Pension | | | | | | | | | | (25,000) | | | |
| Umpire Share | | | | | (65,000) | | | | | | | | |
| Pending Outflows Total | 13,500 | 93,000 | - | - | (7,164,804) | - | (877,792) | - | (93,000) | (146,000) | (831,000) | 3,000 | (5,000) |
| **Total Outflows** | 13,500 | 93,000 | - | - | (7,964,804) | - | (877,792) | - | (93,000) | (1,017,500) | (831,000) | 3,000 | (5,000) |
| **Net Cash Available/(Borrow)** | (1,473,540) | (1,184,481) | (1,023,231) | 2,938,019 | (2,184,791) | (2,184,791) | (2,549,883) | (2,237,183) | (2,017,483) | (2,722,283) | (2,490,583) | (2,174,883) | (1,867,183) |
| **Investment Activity** | | | | | | | | | | | | | |
| End Sweep Invest Cash | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 |
| Ending Cash - not invested | (1,473,540) | (1,184,481) | (1,023,231) | 2,938,019 | (2,184,791) | (2,184,791) | (2,549,883) | (2,237,183) | (2,017,483) | (2,722,283) | (2,490,583) | (2,174,883) | (1,867,183) |
| **Ending Cash in Bank** | 1,595,013 | 1,884,072 | 2,045,322 | 6,006,572 | 883,761 | 883,761 | 518,669 | 831,369 | 1,051,069 | 346,269 | 577,969 | 893,669 | 1,201,369 |
| Anticipated AP Check Runs | | | | (800,000) | | | | | | (871,500) | | | (871,500) |
| AP Outstanding checks | | | | | | | | | | | | | |
| PR Outstanding checks | | | | | | | | | | | | | |
| Refund Outstanding checks | | | | | | | | | | | | | |
| **MLB Revolver** | 6,550,000 | 6,550,000 | 6,550,000 | 2,750,000 | 2,750,000 | 2,750,000 | 2,550,000 | 2,550,000 | 2,550,000 | 2,550,000 | 1,800,000 | 1,800,000 | 1,800,000 |
| **Other Funding Required** | - | - | - | - | - | - | - | - | - | - | - | - | - |

| | 6/10/2010 | 6/11/2010 | 6/14/2010 | 6/15/2010 | 6/16/2010 | 6/17/2010 | 6/18/2010 | 6/21/2010 | 6/22/2010 | 6/23/2010 | 6/24/2010 | 6/25/2010 | 6/28/2010 | 6/29/2010 | 6/30/2010 | 7/1/2010 | 7/2/2010 | 7/5/2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| Beginning Invested Cash | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 |
| MLB Funding | | | | | | | | | | | | | | | | 1,000,000 | 600,000 | |
| **Outside Funding Needed** | | | | | | | | | | | | | | | | | | |
| Plains Capital Beginning Cash | (1,867,183) | (1,698,483) | (2,226,283) | (1,882,583) | 2,648,135 | 2,960,835 | 3,273,535 | 2,599,735 | 2,396,975 | 2,678,675 | 2,960,375 | 3,211,075 | 2,930,541 | 3,174,241 | 3,479,941 | (2,481,081) | (2,170,183) | (2,527,233) |
| Total Current Cash Available | 1,201,369 | 1,370,069 | 842,269 | 1,185,969 | 5,716,687 | 6,029,387 | 6,342,087 | 5,668,287 | 5,465,527 | 5,747,227 | 6,028,927 | 6,279,627 | 5,999,094 | 6,242,794 | 6,548,494 | 1,587,462 | 1,141,320 | |
| **Total cash available** | 1,201,369 | 1,370,069 | 842,269 | 1,185,969 | 5,716,687 | 6,029,387 | 6,342,087 | 5,668,287 | 5,465,527 | 5,747,227 | 6,028,927 | 6,279,627 | 5,999,094 | 6,242,794 | 6,548,494 | 587,462 | 898,370 | 541,320 |
| **Inflows:** | | | | | | | | | | | | | | | | | | |
| Ticket/Suites Sales – Rangers | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 150,000 | 150,000 | 139,659 | 200,000 | 200,000 | 200,000 |
| Post-Season Tickets/Suites | | | | | | | | | | | | | | | | | | |
| Central Fund | | | | 1,825,532 | | | | | | | | | | | | | | |
| Properties | | | | | | | | | | | | | | | | | | |
| Revenue Sharing | | | | | | | | | | | | | | | | | | |
| MLBAM | | | | | | | | | | | | | | | | | | |
| Fox and KXTA, Channel 11 | | | | 9,158,825 | | | | | | | | | | | | | | |
| KRLD | | | | | | | | | | | | | | | | | | |
| Rangers Sponsorship | | | | | | | | | | | | | | | 1,800,000 | | | |
| Ranger DOG Cash & Other Merch | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 57,593 | 58,500 | 58,500 | 58,500 |
| Misc Cash | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,300 | 4,200 | 4,200 | 4,200 |
| Transfer in from HSG | | | | | | | | | | | | | | | | | | |
| One Time Inflows | | | | | | | | | | | | | | | | | | |
| **Total Inflows** | 312,700 | 312,700 | 312,700 | 11,297,057 | 312,700 | 312,700 | 312,700 | 312,700 | 312,700 | 312,700 | 312,700 | 312,700 | 212,700 | 212,700 | 2,101,542 | 262,700 | 262,700 | 262,700 |
| **Outflows:** | | | | | | | | | | | | | | | | | | |
| Check Outflows : | | | | | | | | | | | | | | | | | | |
| A/P Outstanding Aged | | | | | | | | | | | | | | | | | | |
| A/P O/S Last check run | | | | | | | | | | | | | | | | | | |
| P/R Outstanding Aged | | | | | | | | | | | | | | | | | | |
| P/R Outstanding Current | | | | | | | | | | | | | | | | | | |
| Check Outflows Total | - | (871,500) | - | - | - | - | (871,500) | - | - | - | - | (599,233) | - | - | - | - | (610,750) | - |
| Pending Outflows: | | | | | | | | | | | | | | | | | | |
| Rangers SB/Def Comp | | | | (250,000) | | | | | | | | | | | (250,000) | | (9,000) | |
| Payroll | | | | | | | | | | | | | | | | | | |
| Sales Tax/Other Tax | | | | | | | | (484,460) | | | | | | | ######## | | | |
| Rangers DOG Change | 31,000 | 31,000 | 31,000 | | | | | (31,000) | (31,000) | (31,000) | (92,000) | 31,000 | 31,000 | 93,000 | | (124,000) | | (31,000) |
| Misc | | | | | | | | | | | | (25,000) | | | | | | |
| Charters | | | | (30,250) | | | | | | | | | | | (91,000) | | | |
| Rent | | | | | | | | | | | | | | | | (661,125) | | |
| Sweep | | | | | | | | | | | | | | | | (166,667) | | |
| **Transfer out to HSG Payroll** | | | | (6,404,589) | | | | | | | | | | | ######## | | | |
| **Transfer out to HSG Pcard** | | | | | | | | | | | | | | | | | | |
| **Transfer out to HSG AP** | | | | | | | | | | | | | | | | | | (600,000) |
| **Transfer out ot HSG Health and Dental** | | | | | | | | | | | | | | | | | | |
| Interest and Swap Payments | (175,000) | | | | | | | | | | | | | | | | | |
| 401k | | | | | | | | (90,000) | | | | | | | | | | |
| Vanguard Players Pension | | | | | | | | (25,000) | | | | | | | | | | |
| Umpire Share | | | | (81,500) | | | | | | | | | | | (81,500) | | | |
| Pending Outflows Total | (144,000) | 31,000 | 31,000 | (81,500) | - | - | (115,000) | (515,460) | (31,000) | (31,000) | (82,000) | 6,000 | 31,000 | 93,000 | (81,500) | (651,792) | (9,000) | (031,000) |
| **Total Outflows** | (144,000) | (840,500) | 31,000 | (6,766,338) | - | - | (986,500) | (515,460) | (31,000) | (31,000) | (82,000) | (593,233) | 31,000 | 93,000 | ######## | (651,792) | (619,750) | (831,000) |
| **Net Cash Available/(Borrow)** | (1,698,483) | (2,226,293) | (1,882,583) | 2,648,135 | 2,960,835 | 3,273,535 | 2,599,735 | 2,396,975 | 2,678,675 | 2,960,375 | 3,211,075 | 2,930,541 | 3,174,241 | 3,479,941 | ######## | (2,170,183) | (2,527,233) | (2,495,533) |
| **Investment Activity** | | | | | | | | | | | | | | | | | | |
| End Sweep Invest Cash | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 |
| Ending Cash - not invested | (1,698,483) | (2,226,293) | (1,882,583) | 2,648,135 | 2,960,835 | 3,273,535 | 2,599,735 | 2,398,975 | 2,678,675 | 2,960,375 | 3,211,075 | 2,930,541 | 3,174,241 | 3,479,941 | ######## | (2,170,183) | (2,527,233) | (2,495,533) |
| Ending Cash in Bank | 1,370,069 | 842,269 | 1,185,969 | 5,716,687 | 6,029,387 | 6,342,087 | 5,668,287 | 5,465,527 | 5,747,227 | 6,028,927 | 6,279,627 | 5,999,094 | 6,242,794 | 6,548,494 | 587,462 | 898,370 | 541,320 | 573,020 |
| Anticipated A/P Check Runs | | | | | | | | | | | | | | | | | | |
| AP Outstanding checks | | | | (871,500) | | | | | | (599,233) | | | | | (610,750) | | | |
| PR Outstanding checks | | | | | | | | | | | | | | | | | | |
| Refund Outstanding checks | | | | | | | | | | | | | | | | | | |
| **MLB Revolver** | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 600,000 | 600,000 | 200,000 |
| **Other Funding Required** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

| | 7/6/2010 | 7/7/2010 | 7/8/2010 | 7/9/2010 | 7/12/2010 | 7/13/2010 | 7/14/2010 | 7/15/2010 | 7/16/2010 | 7/19/2010 | 7/20/2010 | 7/22/2010 | 7/23/2010 | 7/26/2010 | 7/27/2010 | 7/28/2010 | 7/29/2010 | 7/30/2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| Beginning Invested Cash | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 |
| MLB Funding | | | | | | | | | 200,000 | | | | | | | | | |
| Outside Funding Needed | | | | | | | | 760,000 | 300,000 | | | | | | | | | 1,250,000 |
| Plans Capital Beginning Cash | (2,495,533) | (2,378,833) | (1,973,133) | (1,722,433) | (2,029,483) | (1,910,783) | (1,805,083) | (1,392,383) | (2,320,015) | (2,534,565) | (2,341,865) | (758,004) | (576,304) | (306,604) | (804,654) | (291,954) | (19,254) | 355,446 | 699,146 |
| Total Current Cash Available | 573,020 | 686,720 | 1,095,420 | 1,346,120 | 1,039,070 | 1,157,770 | 1,463,470 | 2,626,170 | 1,048,538 | 543,988 | 726,688 | 2,310,549 | 2,492,249 | 2,761,949 | 2,463,899 | 2,776,599 | 3,049,299 | 5,917,699 |
| **Total cash available** | 573,020 | 686,720 | 1,095,420 | 1,346,120 | 1,039,070 | 1,157,770 | 1,463,470 | 1,676,170 | 748,538 | 543,988 | 726,688 | 2,310,549 | 2,492,249 | 2,761,949 | 2,463,899 | 2,776,599 | 3,049,299 | 3,767,699 |
| **Inflows:** | | | | | | | | | | | | | | | | | | |
| Ticket/Suites Sales - Rangers | 300,000 | 250,000 | 250,000 | 250,000 | 200,000 | 150,000 | 150,000 | 150,000 | 150,000 | 120,000 | 150,000 | 150,000 | 300,000 | 250,000 | 300,000 | 250,000 | 250,000 | 322,808 |
| Post-Season Tickets/Suites | | | | | | | | | | | | | | | | | | |
| Central Fund | | | | | | | | | 1,825,532 | | | | | | | | | |
| Properties | | | | | | | | | | | | | | | | | | |
| Revenue Sharing | | | | | | | | | | | 2,000,000 | | | | | | | 1,750,000 |
| MLBAM | | | | | | | | | | | | | | | | | | |
| Fox and KXTA, Channel 11 | | | | | | | | | 1,750,000 | | | | | | | | | |
| KRLD | | | | | | | | | 1,012,958 | | | | | | | | | |
| Rangers Sponsorship | | | | | | | | | | | | | | | | | | 1,800,000 |
| Ranger DOG Cash & Other Merch | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 58,500 | 57,583 |
| Misc Cash | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,300 |
| Transfer in from HSG | | | | | | | | | | | | | | | | | | |
| One Time Inflows | | | | | | | | | | | | | | | | | | |
| **Total Inflows** | 362,700 | 312,700 | 312,700 | 312,700 | 262,700 | 212,700 | 212,700 | 4,801,190 | 212,700 | 182,700 | 2,212,700 | 212,700 | 362,700 | 312,700 | 362,700 | 312,700 | 312,700 | 3,734,491 |
| **Outflows:** | | | | | | | | | | | | | | | | | | |
| **Check Outflows:** | | | | | | | | | | | | | | | | | | |
| A/P Outstanding Aged | | | | | | | | | | | | | | | | | | |
| A/P O/S Last check run | | | | | | | | | | | | | | | | | | |
| P/R Outstanding Aged | | | | | | | | | | | | | | | | | | |
| P/R Outstanding Current | | | | | | | | | | | | | | | | | | |
| **Check Outflows Total** | - | - | - | (610,750) | - | - | - | (610,750) | - | - | - | (610,750) | | | | - | - | (600,000) |
| **Pending Outflows:** | | | | | | | | | | | | | | | | | | |
| Rangers SB/Def Comp | | | | | | | | (250,000) | | | | | | | | | | (300,000) |
| Payroll | | | | | | | | | | | | | | | | | | |
| Sales Tax/Other Tax | | | | | | | | | | | | | | | | | | |
| Rangers DOG Change | (31,000) | 93,000 | (62,000) | 31,000 | 31,000 | 93,000 | | | | (513,839) | | (31,000) | (93,000) | | (31,000) | 62,000 | 31,000 | 31,000 |
| Misc | | | | (40,000) | | | | (30,250) | | | | (59,000) | | | | | | (76,000) |
| Charters | | | | | | | | | | | | | | | | | | |
| Rent | | | | | | | | | | | | | | | | | | |
| Sweep | | | | | | | | | | | | | | | | | | |
| Transfer out to HSG Payroll | | | | | | | | (6,398,672) | | | | | | | | | | (7,019,843) |
| Transfer out to HSG Pcard | | | | | | | | | | | | | | | | | | |
| Transfer out to HSG AP | | | | | | | | | | | | | | | | | | |
| Transfer out to HSG Health and Dental | | | | | (175,000) | | | | | | | | | | | | | |
| Interest and Swap Payments | | | | | | | | | | | | | | | | | | |
| 401k | (90,000) | | | | | | | | | (90,000) | | | | | | | | |
| Vanguard Players Pension | (25,000) | | | | | | | | | (25,000) | | | | | | | | |
| Umpire Share | | | | | | | | | (106,500) | | | | | | | | | (106,500) |
| Pending Outflows Total | (146,000) | 93,000 | (62,000) | (9,000) | (144,000) | 93,000 | - | (6,678,922) | (106,500) | (628,839) | (31,000) | (93,000) | | - | (90,000) | 62,000 | 31,000 | (8,071,343) |
| **Total Outflows** | (146,000) | 93,000 | (62,000) | (619,750) | (144,000) | 93,000 | - | (6,678,922) | (17,250) | (628,839) | (31,000) | (93,000) | (610,750) | - | (90,000) | 62,000 | 31,000 | (8,071,343) |
| **Net Cash Available/(Borrow)** | (2,378,833) | (1,973,133) | (1,722,433) | (2,029,483) | (1,910,783) | (1,805,083) | (1,392,383) | (2,320,015) | (2,524,565) | (2,341,865) | (758,004) | (576,304) | (306,604) | (804,654) | (291,954) | (19,254) | 355,446 | (2,387,705) |
| **Invest-ment Activity** | | | | | | | | | | | | | | | | | | |
| End Sweep Invest Cash | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 | 3,088,552 |
| Ending Cash - net invested | (2,378,833) | (1,973,133) | (1,722,433) | (2,029,483) | (1,910,783) | (1,805,083) | (1,392,383) | (2,320,015) | (2,524,565) | (2,341,865) | (758,004) | (576,304) | (306,604) | (804,654) | (291,954) | (19,254) | 355,446 | (2,387,705) |
| Ending Cash in Bank | 686,720 | 1,095,420 | 1,346,120 | 1,039,070 | 1,157,770 | 1,463,470 | 1,676,170 | 748,538 | 543,988 | 726,688 | 2,310,549 | 2,492,249 | 2,761,949 | 2,776,599 | 3,049,299 | 3,423,999 | 3,767,699 | 680,547 |
| Anticipated AP Check Runs | | | | (610,750) | | | | (610,750) | | | | (610,750) | | | | | | (600,000) |
| AP Outstanding checks | | | | | | | | | | | | | | | | | | |
| PR Outstanding checks | | | | | | | | | | | | | | | | | | |
| Refund Outstanding checks | | | | | | | | | | | | | | | | | | |
| **MLB Revolver** | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | - | - | - | - | - | - | - | - | - | - | - |
| Other Funding Required | - | - | - | - | - | - | - | 760,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 2,300,000 |

| | 8/2/2010 | 8/3/2010 | 8/4/2010 | 8/5/2010 | 8/6/2010 | 8/9/2010 | 8/10/2010 | 8/11/2010 | 8/12/2010 | 8/13/2010 | 8/16/2010 | 8/17/2010 | 8/18/2010 | 8/19/2010 | 8/20/2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| Beginning Invested Cash | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 |
| MLB Funding | | | | | | | | | | | | | | | |
| Outside Funding Needed | 2,750,000 | | | 650,000 | | | 1,000,000 | | | 2,900,000 | | | | | |
| Plains Capital Beginning Cash | (2,387,705) | (2,421,842) | (2,284,187) | (2,186,532) | (2,123,877) | (2,546,972) | (2,365,317) | (2,483,662) | (2,289,007) | (2,035,352) | (2,509,006) | 6,907,224 | 7,212,879 | 7,310,534 | 7,498,189 |
| Total Current Cash Available | 3,430,847 | 646,710 | 784,365 | 1,532,020 | 944,675 | 521,580 | 1,703,235 | 584,890 | 779,545 | 3,933,200 | 559,546 | 9,975,776 | 10,281,431 | 10,379,086 | 10,566,741 |
| Total cash available | 680,847 | 646,710 | 784,365 | 882,020 | 944,675 | 521,580 | 703,235 | 584,890 | 779,545 | 1,033,200 | 559,546 | 9,975,776 | 10,281,431 | 10,379,086 | 10,566,741 |
| **Inflows:** | | | | | | | | | | | | | | | |
| Ticket/Suites Sales - Rangers | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 225,000 | 225,000 | 200,000 | 225,000 | 225,000 | 150,000 | 150,000 | 125,000 | 125,000 |
| Post-Season Tickets/Suites | | | | | | | | | | | | | | | |
| Central Fund | | | | | | | | | | 1,816,243 | | | | | |
| Properties | | | | | | | | | | | | | | | |
| Revenue Sharing | | | | | | | | | | | | | | | |
| MLBAM | | | | | | | | | | | 9,158,825 | | | | |
| Fox and KXTA, Channel 11 | | | | | | | | | | | | | | | |
| KRLD | | | | | | | | | | | | | | | |
| Rangers Sponsorship | | | | | | | | | | | | | | | |
| Ranger DOG Cash & Other Merch | 58,450 | 58,450 | 58,450 | 58,450 | 58,450 | 58,450 | 58,450 | 58,450 | 58,450 | 1,813,766 | 58,450 | 58,450 | 58,450 | 58,450 | 58,450 |
| Misc Cash | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 | 4,205 |
| Transfer in from HSG | | | | | | | | | | | | | | | |
| One Time Inflows | | | | | | | | | | | | | | | |
| **Total Inflows** | 212,655 | 212,655 | 212,655 | 212,655 | 212,655 | 212,655 | 287,655 | 287,655 | 262,655 | 3,859,234 | 9,446,480 | 212,655 | 212,655 | 187,655 | 187,655 |
| **Outflows:** | | | | | | | | | | | | | | | |
| Check Outflows : | | | | | | | | | | | | | | | |
| A/P Outstanding Aged | | | | | | | | | | | | | | | |
| A/P O/S Last check run | | | | | | | | | | | | | | | |
| P/R Outstanding Aged | | | | | | | | | | | | | | | |
| P/R Outstanding Current | | | | | | | | | | | | | | | |
| **Check Outflows Total** | - | - | - | (636,750) | - | - | - | - | - | (636,750) | - | - | - | - | (636,750) |
| Pending Outflows: | | | | | | | | | | | | | | | |
| Rangers SB/Def Comp | | | | | | | | | | (250,000) | | | | | |
| Payroll | | | | | | | | | | | | | | | (474,075) |
| Sales Tax/Other Tax | 31,000 | | | | | (31,000) | (31,000) | (93,000) | 31,000 | 31,000 | | | | | (31,000) |
| Rangers DOG Change | (2,200,000) | | | | | | (1,200,000) | | (40,000) | | | 93,000 | | | |
| Misc | (561,125) | | | | | | | | | | (30,250) | | | | |
| Charters | (166,667) | | | | | | | | | | | | | | |
| Rent | | | | | | | | | | | | | | | |
| Sweep | | | | | | | | | | | | | | | |
| **Transfer out to HSG Payroll** | | | | | | | | | | (6,575,130) | | | | | |
| **Transfer out to HSG Pcard** | | | | (800,000) | | | | | | | | | | | |
| **Transfer out to HSG AP** | | | | | | | | | | | | | | | |
| **Transfer out of HSG Health and Dental** | | | | | | | | | | | | | | | |
| Interest and Swap Payments | | | | | | | (175,000) | | | | | | | | |
| 401k | | | (90,000) | | | | | | | | | | (90,000) | | |
| Vanguard Players Pension | | | (25,000) | | | | | | | | | | (25,000) | | |
| Umpire Share | | | | | | | | | | | | | | | |
| Pending Outflows Total | (2,996,792) | (75,000) | (115,000) | (800,000) | | (31,000) | (1,406,000) | (93,000) | (9,000) | (6,597,130) | (30,250) | 93,000 | (115,000) | - | (580,075) |
| **Total Outflows** | (2,996,792) | (75,000) | (115,000) | (800,000) | (636,750) | (31,000) | (1,406,000) | (93,000) | (9,000) | (7,232,880) | (30,250) | 93,000 | (115,000) | - | (1,216,825) |
| **Net Cash Available/(Borrow)** | (2,421,842) | (2,284,187) | (2,186,532) | (2,123,877) | (2,546,972) | (2,365,317) | (2,483,662) | (2,289,007) | (2,036,352) | (2,509,006) | 6,907,224 | 7,212,879 | 7,310,534 | 7,498,189 | 6,470,019 |
| Investment Activity | | | | | | | | | | | | | | | |
| End Sweep Invest Cash | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 | 3,068,552 |
| Ending Cash - not invested | (2,421,842) | (2,284,187) | (2,186,532) | (2,123,877) | (2,546,972) | (2,365,317) | (2,483,662) | (2,289,007) | (2,036,352) | (2,509,006) | 6,907,224 | 7,212,879 | 7,310,534 | 7,498,189 | 6,470,019 |
| Ending Cash in Bank | 646,710 | 784,365 | 882,020 | 944,675 | 521,580 | 700,235 | 584,890 | 779,545 | 1,033,200 | 559,546 | 9,975,776 | 10,281,431 | 10,379,086 | 10,566,741 | 9,538,571 |
| Anticipated A/P Check Runs | | | (636,750) | | | | | | (636,750) | | | | (636,750) | | |
| *A/P Outstanding checks* | | | | #REF! | | | | | | | | | | | |
| *P/R Outstanding checks* | | | | #REF! | | | | | | | | | | | |
| *Refund Outstanding checks* | | | | | | | | | | | | | | | |
| **MLB Revolver Available** | | | | | | | | | | | | | | | |
| Other Funding Required | 5,050,000 | 5,050,000 | 5,050,000 | 5,700,000 | 5,700,000 | 5,700,000 | 6,700,000 | 6,700,000 | 6,700,000 | 9,600,000 | 9,600,000 | 9,600,000 | 9,600,000 | 9,600,000 | 9,600,000 |