Martin A. Sosland (18855645)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
Telephone: (214) 746-7700
Facsimile:  (214) 746-7777

Ronit J. Berkovich (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Debtor and
Debtor in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

```
-----------------------------------------------------------------------x
                                          :
In re                                     :     Chapter 11
                                          :
TEXAS RANGERS BASEBALL PARTNERS,          :     Case No. 10-43400 (DML)-11
                                          :
        Debtor.                           :
                                          :
-----------------------------------------------------------------------x
```

## DEBTOR'S MOTION PURSUANT TO
## SECTIONS 105(a), 363(b), AND 503(b)(1) OF THE
## BANKRUPTCY CODE FOR AUTHORIZATION TO HONOR
## PREPETITION OBLIGATIONS TO CUSTOMERS AND OTHERWISE
## CONTINUE CUSTOMER PROGRAMS IN THE ORDINARY COURSE OF BUSINESS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Texas Rangers Baseball Partners ("TRBP" or the "Debtor") hereby files this

motion (the "Motion") for an order authorizing the Debtor to honor prepetition obligations to

customers and otherwise continue customer programs in the ordinary course of business.  In

support of the Motion, the Debtor submits the Declaration of Kellie L. Fischer in Support of the

Debtor's Chapter 11 Petition and Requests for First Day Relief (the "<u>Fischer Declaration</u>"), filed contemporaneously herewith, and respectfully represents as follows:

<b><u>Preliminary Statement</u></b>

1.      TRBP's business – the Texas Ranger Major League Baseball Club, a professional baseball club (the "<u>Texas Rangers</u>") – is critically dependent on its base of dedicated fans.  It is essential to assure Texas Rangers fans that they will be unaffected by the filing TRBP commenced to effectuate a sale of the team.  To that end, TRBP intends to, and by this Motion seeks Court approval to, honor all tickets sold and other commitments it has made to its fans, the greatest in baseball.

<b><u>Background</u></b>

2.      On the date hereof (the "<u>Commencement Date</u>"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>").  The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**TRBP Partnership Structure**

3.      TRBP owns and operates the Texas Rangers in the Dallas/Fort Worth Metroplex, pursuant to the Major League Constitution (the "<u>Major League Constitution</u>") and the Membership Agreement, dated as of November 18, 1960, by and between The American League of Professional Baseball Clubs, as assumed by the Office of the Commissioner of Baseball (the "<u>BOC</u>"), and WBC Baseball Club, Inc., as assumed by TRBP pursuant to an Assumption Agreement, dated as of June 16, 1998.

4.      TRBP is a Texas general partnership, in which Rangers Equity Holdings, L.P. ("<u>Rangers Equity LP</u>"), a Delaware limited partnership, holds a 99% partnership interest

and Rangers Equity Holdings GP, LLC ("Rangers Equity GP"), a Texas limited liability company, holds a 1% partnership interest. Rangers Equity GP is a wholly-owned subsidiary of Rangers Equity LP. Both Rangers Equity LP and Rangers Equity GP are holding companies with no operating assets and are indirect, wholly-owned subsidiaries of HSG Sports Group LLC ("HSG"). HSG is a sports and entertainment holding company, which is an affiliate of, and indirectly controlled by, Thomas O. Hicks ("Mr. Hicks"). The Texas Rangers have had five owners since the team moved to Arlington in 1972. Mr. Hicks became the fifth owner in the history of the Texas Rangers on June 16, 1998, when HSG completed the acquisition of the franchise from the George W. Bush/Edward W. Rose partnership.

**Major League Baseball**

5.      With a history and tradition dating back to 1869, professional baseball is one of America's oldest organized league sports. From April through the end of September every year, Major League Baseball ("MLB") runs a 162-game regular season. MLB's clubs are divided into two leagues (American and National) and six divisions (AL East, AL Central, AL West, NL East, NL Central and NL West).

6.      The BOC, doing business as Major League Baseball, is an unincorporated association of its 30 member clubs. It is headquartered in New York City and is governed by the Major League Constitution. The primary purpose of the BOC is to undertake centralized activities on behalf of the 30 clubs. Among other things, the BOC hires and maintains the sport's umpiring crews, and negotiates marketing, labor, and television contracts.

**The Texas Rangers**

7.      The Texas Rangers are located in the fourth largest metropolitan area and the largest metropolitan market with a single MLB franchise. The Texas Rangers are one of only 30 MLB franchises and one of two MLB clubs in the state of Texas and its bordering states. The

Texas Rangers have a rich and colorful history and have established themselves as a young, up-and-coming contender supported by a strong fan base. The team's executives have successfully combined players from their farm system with key veterans to produce a team that today is in first place in the American League's West Division. Founded in 1961 as the second incarnation of the Washington Senators, the franchise moved to Texas in 1972 and currently competes in the American League West together with the Los Angeles Angels of Anaheim, the Oakland Athletics, and the Seattle Mariners.

8.     The Texas Rangers' home field, the Rangers Ballpark in Arlington (the "Ballpark"), is located in Arlington, Texas and is an open-air, natural grass ballpark that was designed and built with tradition and intimacy in mind. The proximity of the fans to the action is one of the closest in MLB. The overall seating of the Ballpark is 49,170 seats on five levels, making it MLB's sixth largest ballpark.

**Prepetition Indebtedness**

9.     Pursuant to that certain First Lien Credit Agreement and that certain Second Lien Credit Agreement (together, the "HSG Credit Agreement"), HSG and certain affiliates of HSG are indebted to the Lenders (as defined below) in the amount of $525 million. The HSG Credit Agreement is guaranteed by certain of HSG's subsidiaries, although the guaranties of the Texas Rangers and the security interests securing them are limited to $75 million (the "TRBP Guaranty Cap"). The First Lien Credit Agreement is secured by a first lien on substantially all of the assets of HSG and its affiliates including a pledge of the equity interests those entities have in their subsidiaries, including TRBP, and the Second Lien Credit Agreement is secured by a second lien on substantially all of the assets of HSG, its affiliates,

including a pledge of the equity interests those entities have in their subsidiaries, including TRBP.

10. TRBP is also party to that certain Amended and Restated Secured Revolving Promissory Note, dated November 25, 2009, by TRBP in favor of Baseball Finance LLC, an affiliate of the BOC (the "Baseball Finance Note"). Pursuant to the Baseball Finance Note, Baseball Finance agreed to make available to TRBP a secured revolving loan facility in an aggregate principal amount not to exceed $25 million. The loans under the Baseball Finance Note are secured by liens on substantially all of the assets of TRBP that are junior in priority to the liens granted pursuant to the HSG Credit Agreement that are subject to the TRBP Guaranty Cap. As of the Commencement Date, approximately $18.45 million in principal is outstanding under the Baseball Finance Note, plus accrued interest.

**Events Leading to TRBP's Chapter 11 Filing**

11. Since 2005, TRBP has experienced, and continues to experience, cash flow deficiencies. For the entire period that Mr. Hicks has owned the Texas Rangers, he has provided financial support to the team through capital contributions and loans to HSG in excess of $100 million.

12. Beginning in August 2008, HSG retained advisors to provide financial advice and assistance in connection with a capital raise, potential restructuring, or sale. While HSG and TRBP explored their options, TRBP continued to suffer operating losses. As a result of such losses, HSG was unable to service its $525 million long-term debt obligations under the HSG Credit Agreement. On March 31, 2009, HSG failed to make a scheduled interest payment under the HSG Credit Agreement, and on April 7, 2009, the lenders to the HSG Credit Agreement (the "Lenders") accelerated the entire amount of indebtedness thereunder. As a result

of the acceleration, the Lenders under the HSG Credit Agreement have claims against TRBP on

account of TRBP's secured guaranty of $75 million of such indebtedness, as discussed above.

**Sale Process**

13.       During the second half of 2008 and throughout 2009, HSG and TRBP, in

conjunction with their advisors, pursued a variety of options for a capital raise or a sale of the

Texas Rangers.  Ultimately, they concluded that a sale of the Texas Rangers was the only viable

option.  A lengthy and active marketing process culminated with an agreement among HSG,

TRBP and Rangers Baseball Express LLC (the "Purchaser"), whose principals include the

current President of the Texas Rangers, Nolan Ryan, and Chuck Greenberg, a sports lawyer and

minor league club owner, dated as of January 23, 2010 (the "January APA"), governing the sale

of the Texas Rangers franchise and certain related assets.

14.       Pursuant to the terms of the January APA, consummation of the sale

required, among other closing conditions, the consent of the Lenders pursuant to the terms of the

HSG Credit Agreement.  Despite HSG's, TRBP's, and the Purchaser's lengthy good faith

negotiations with the Lenders following the execution of the January APA, the Lenders refused

to consent to the transactions contemplated by the January APA and thus prevented TRBP from

moving forward with the sale of the Texas Rangers.  Ultimately, TRBP, in consultation with

MLB, concluded that a chapter 11 filing designed to facilitate a sale of TRBP's assets to the

Purchaser (the "Sale") pursuant to a prepackaged plan of reorganization ("the Prepackaged

Plan") was the most efficient manner in which to consummate the Sale and was, therefore, in the

best interests of the Texas Rangers franchise, its fans, MLB and all other parties involved,

including TRBP's creditors.  As described herein, the Prepackaged Plan will facilitate the sale of

the Texas Rangers franchise to the Purchaser and the payment of all of TRBP's creditors in full,

allowing the Texas Rangers franchise to compete successfully on and off the field with assurance of long-term financial stability.

**Asset Purchase Agreement**

15.     On May 23, 2010, after further negotiation, in anticipation of the implementation and consummation of the Sale through a chapter 11 plan of reorganization, the parties to the January APA terminated the January APA and entered into that certain Asset Purchase Agreement (the "Asset Purchase Agreement") for the sale of the Texas Rangers franchise and certain related assets.[1]

16.     Under the Asset Purchase Agreement, substantially all of the Debtor's assets, including the Texas Rangers franchise and substantially all contractual rights related the operation of the Texas Rangers will be sold to the Purchaser.  The aggregate consideration paid and obligations assumed by the Purchaser at the Closing will equal more than $500 million. Pursuant to the Sale, the Purchaser will also assume virtually all of the obligations of the Texas Rangers, including deferred compensation obligations, sponsorship, ticketholder, employee and specified tax obligations, with the exception of certain excluded liabilities that will be paid under the Prepackaged Plan.  Under the Asset Purchase Agreement and the Prepackaged Plan, TRBP also intends to assume and assign to the Purchaser all contracts relating to the Texas Rangers franchise, including all marketing, media, advertising, and merchandising contracts, all minor league and major league player contracts and certain real property Leases.  The Sale anticipates a complete and orderly transition of the operations of the team — all tickets to games and other events will be fully honored, and all employees will keep their jobs.  Although accomplished

---

[1] A more thorough description of the Asset Purchase Agreement and the Prepackaged Plan are contained in the Fischer Declaration, filed contemporaneously herewith and incorporated herein by reference.

through a chapter 11 plan, the Sale will resemble in all significant respects the sale of any other sports franchise.

17. The Sale will allow TRBP's creditors that are Lenders under the HSG Credit Agreement to recover 100 percent of their guaranty claims against TRBP. As described more fully below, subject to Court approval, the Sale is expected to be completed by mid-summer, allowing the franchise to exit the chapter 11 process expeditiously in order to reduce any potential adverse impact to the Texas Rangers and its operations.

**MLB Approval**

18. The Debtor, as a member of Major League Baseball, is subject to the rules and regulations of MLB. In particular, any sale of the Texas Rangers franchise cannot be consummated without first obtaining the requisite approval from the BOC and 75% of the MLB clubs. The sale of any MLB club must comply with the process set forth in the Major League Constitution and the MLB ownership guidelines. Accordingly, TRBP has worked very closely with MLB throughout the negotiation of the Asset Purchase Agreement and all related events leading to the filing of the chapter 11 case. As of the date hereof, the Debtor is not aware of any opposition by MLB or the requisite percentage of MLB clubs required to consent to the Sale.

**The Prepackaged Plan**

19. As stated above, concurrently herewith, the Debtor has filed its Prepackaged Plan. The primary purpose of the Prepackaged Plan is to bridge the impasse between TRBP and the Lenders under the HSG Credit Agreement and to effectuate the Sale of the Texas Rangers franchise to the Purchaser and satisfy TRBP's creditors in full.

20. The Prepackaged Plan provides for the Sale to be consummated on the effective date (the "Effective Date") and sets forth the distribution that each class of the Debtor's creditors and equity holders is to receive on the Effective Date under the Prepackaged Plan. All

TRBP's creditors will be paid in full under the Prepackaged Plan or have their claims assumed by the Purchaser under the Asset Purchase Agreement.  Specifically, each holder of an (i) Allowed Priority Non-Tax Claim, (ii) Allowed First Lien Holder Claim, (iii) Allowed Second Lien Holder Claim, (iv) Allowed MLB Prepetition Claim, (v) Allowed Secured Tax Claim, (vi) Allowed Other Secured Claim, (vii) Allowed Assumed General Unsecured Claim, (viii) Allowed Non-Assumed General Unsecured Claim, (ix) Allowed Emerald Diamond Claim, (x) Allowed Overdraft Protection Agreement Claim, (xi) Allowed Intercompany Claim, and (xii) Allowed TRBP Equity Interest (all as defined in the Prepackaged Plan) is unimpaired and will be paid in full.

21.    Additionally, TRBP believes that the Purchaser will build on past team successes and that the future of the Texas Rangers will be in the hands of an ownership group that will be a good steward for the game.

22.    TRBP believes that because the Prepackaged Plan satisfies in full all claims against TRBP, is supported by TRBP's equity holders, and will lead to the least disruption to the Texas Rangers' business of playing baseball, the Prepackaged Plan is in the best interests of the Texas Rangers franchise and all parties in interest.

## Jurisdiction

23.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

24.    Prior to the Commencement Date, in the ordinary course of business and as is customary in professional sports, the Debtor instituted and engaged in certain activities, programs, and promotions to develop and sustain a positive reputation and relationship with its

fans, who are its customers.  To that end, the Debtor implemented various customer programs

and policies (collectively, the "Customer Programs") designed to ensure customer satisfaction,

drive ticket and merchandise sales, meet competitive pressures, develop and sustain fan

relationships and loyalty, improve profitability, and generate goodwill for the Debtor among its

fans and the community at large.  By this Motion, the Debtor hereby requests, pursuant to

sections 105(a), 363(b), and 503(b)(1) of the Bankruptcy Code, authorization to continue its

Customer Programs in the ordinary course of business and to perform and honor, at the Debtor's

sole discretion, its prepetition obligations thereunder.[2]  The Debtor does not believe that it needs

Court approval to continue its Customer Programs in the ordinary course of business, including

honoring tickets purchased prepetition, but it is filing this Motion out of an abundance of caution

and to provide fans with the comfort of a Court order with respect to the Debtor's treatment of

them during the chapter 11 case.

### The Customer Programs

25.  The business of the Debtor's most valuable asset, the Texas Rangers, is to

play baseball for its fans, and the value of that business lies in the continued support of its loyal

fans.  Inasmuch as the Debtor has filed this chapter 11 case in order to the facilitate the sale of

the team to preserve value, the intention of the Debtor is to continue to provide its fans with what

they have come to expect — first and foremost, great baseball and a great day at its state-of-the-

art ballpark.  The Debtor believes it must show that it is committed to doing all that it can to

ensure that its fans are not affected by the filing of its chapter 11 case and the Prepackaged Plan.

To that end, the Debtor is seeking to honor all tickets sold and commitments made to its fans.

---

[2] The Debtors have filed a motion contemporaneously herewith requesting authorization to pay any prepetition
amounts owed to trade creditors in the ordinary course of business; however, the Debtors are filing this Motion
separately because of the special importance of its fans and customers.

The Customer Programs described herein are integral to the Debtor's efforts to maintain fan loyalty to the team, increase sales of tickets, concessions, and team merchandise, and ultimately deliver the most value to all stakeholders in the Debtor's prepackaged chapter 11 case. The benefits of the Customer Programs far outweigh any costs associated with continuing them.

26.     The Debtor's Customer Programs are summarized below and are detailed in two exhibits attached hereto: Exhibit A is a description of the Customer Programs and Exhibit B is a schedule of promotions and events for the remainder of the 2010 Major League Baseball season.

**A.     Outstanding Texas Rangers Tickets**

27.     The Debtor's business is dependent on the advance sales of tickets to its games. Hundreds of thousands of tickets were purchased by the team's loyal fans prior to the start of the 2010 Major League Baseball season. The Debtor encourages the advance sales of tickets and markets heavily in the preseason in order to maximize the number of tickets it sells in a season. Although the team has played a number of games already this season, hundreds of thousands of individual game tickets have been purchased for games that remain this season (the "Outstanding Texas Rangers Tickets"). The Debtor estimates that approximately $3,660,000 of Outstanding Texas Rangers Tickets, not including tickets sold in connection with Season Ticket Packages (defined below), are outstanding as of the Commencement Date.

**B.     Season Ticket Packages**

28.     Like all Major League Baseball franchises, the Debtor sells packages of tickets that provide the purchaser entrance to home games during the Major League Baseball season (the "Season Ticket Packages"), along with a number of important benefits depending on the particular package purchased, as described in greater detail in Exhibit A

(the "Rangers Rewards").  These Season Ticket Packages not only constitute a significant

portion of the Debtor's revenue and encourage repeat visits to the games during the season, but

also provide the ongoing community support that is integral to the sale of the Debtor's business

that is effectuated by the Prepackaged Plan.  Further, sales of the Season Ticket Packages, along

with the advanced sale of tickets described above, ensure increased frequency of visits by fans,

which, in turn, promotes increased sales of concessions and team merchandise at the Ballpark.

Sales of Season Ticket Packages also provide an attendance base in advance of the season, which

hedges against decreased game attendance based on factors such as economic decline and

inclement weather.

29.     Current holders of Season Ticket Packages have already been provided

tickets to the remaining home games in the 2010 Major League Baseball season.  In addition, the

Debtor may be obligated to provide certain Rangers Rewards postpetition on account of Season

Ticket Packages purchased prior to the Commencement Date.  As of the Commencement Date,

the Debtor estimates that $21,500,000 in tickets are outstanding under Season Ticket Packages

for games yet to be played in the 2010 season and it owes holders of Season Ticket Packages

approximately $33,500 in outstanding Rangers Rewards.

**C.     Private Suites Packages**

30.     The Ballpark houses a variety of private suites located on the suite levels

within the Ballpark (the "Private Suites").  The Texas Rangers offer a variety of packages for a

single game or long-term use of the Private Suites, as described in greater detail in Exhibit A (the

"Private Suites Packages").  The Private Suites are equipped with three color televisions, a

private restroom, heating and air conditioning, a wet bar, a refrigerator, a speaker channel for

radio play-by-play, a telephone, and private elevator access to the suite levels (the "Private Suites

Amenities"). In addition, holders of Private Suites Packages are entitled to certain parking privileges at the Ballpark (the "Private Suites Parking Privileges").

31.     The Debtor may have obligations to provide certain benefits arising under the Privates Suites Packages or maintain the Private Suites Amenities postpetition on account of Private Suites Packages purchased prior to the Commencement Date. In addition, the Debtors may incur certain costs associated with the Privates Suites Parking Privileges postpetition on account of Private Suites Packages purchased prior to the Commencement Date. As of the Commencement Date, the Debtor estimates that $3,300,000 in Private Suites Packages have been purchased but not yet honored.

**D.     Promotional Ticket Pricing**

32.     The Texas Rangers offer a variety of promotional ticket pricing programs (the "Promotional Ticket Pricing Programs") to certain affinity and other groups and for various events in order to increase attendance at games and increase sales of concessions and Texas Rangers merchandise. In addition, several of the Promotional Ticket Pricing Programs require the purchase of a full-price ticket in addition to tickets purchased at this discounted price, which further promotes attendance at games and events by families and groups and the sale of concessions and team merchandise, which are a significant source of revenue. As of the Commencement Date, the Debtor does not believe it owes any outstanding obligations on account of the Promotional Ticket Pricing Programs.

33.     In addition, as described in Exhibit A, the Debtor has a joint ticket promotion with Six Flags Over Texas ("Six Flags"), a theme park located within miles of the Ballpark. Six Flags has joined the Debtor in a ticket promotion that includes a lower box ticket to a "non-premier" Texas Rangers game and one adult ticket to Six Flags Over Texas for a

discounted price (the "Rangers/Six Flags Double Play").  TRBP collects the proceeds from sales

of Rangers/Six Flags Double Play packages and remits half of the gross sales, net of sales tax, to

Six Flags.  As of the Commencement Date, the Debtor estimates that it owes $8,910 to Six Flags

on account of proceeds collected under the Rangers/Six Flags Double Play promotion.

**E.      Customer Credits**

34.      In the ordinary course of business, the Debtor's books and records reflect

amounts owed to certain ticket and suite holders on account of, among other things, the

overpayment for tickets, transferred seats and other such accommodations made by the Debtor

for customer relations purposes (the "Accommodations Credits").  Prior to the Commencement

Date, the Debtor allowed its customers to seek a refund of their Accommodations Credits at any

time.

35.      Additionally, the Debtor offers advance sales of postseason home game

tickets to certain ticket and suite holders (the "Advance Postseason Ticket Sales") as an

exclusive benefit to such holders and to promote sales of tickets, season tickets, suites, and

postseason tickets.  In seasons when the team does not play postseason games, the ticket and

suite holders' accounts with the Debtor reflects a credit for the postseason tickets purchased in

advance (the "Advance Postseason Ticket Sales Customer Credits", and together with the

Accommodations Credits, the "Customer Credits").  Prior to the Commencement Date, the

Debtor allowed its customers to seek a refund of their Advance Postseason Ticket Sales

Customer Credits at any time.  As of the Commencement Date, the Debtor estimates $2,850,000

is due and owing to customers on account of Customer Credits.

F.    **Group Ticket Pricing, Incentives and Deposits**

36.    As described in greater detail on <u>Exhibit A</u>, the Debtor offers a number of group ticket sales promotions in order to increase ticket sales (the "<u>Group Ticket Pricing</u>").  The Debtor also offers free tickets and Texas Rangers merchandise and memorabilia as incentives to purchase group ticket sales (the "<u>Incentives</u>").  As of the Commencement Date, the Debtor does not believe it owes any amounts under the Group Ticket Pricing or Incentives programs.

37.    In order to reserve group tickets, the Debtor requires that customers post a portion of the total ticket cost in the form of a deposit (the "<u>Group Ticket Deposits</u>").  As of the Commencement Date, approximately $370,000 is owed on account of Group Ticket Deposits.

G.    **Faith Concert Series Ticket Promotion**

38.    The Debtor has offered free upper level seats to customers buying a minimum of twenty tickets to certain concerts being offered at the Ballpark this season (the "<u>Faith Concert Series Promotion Tickets</u>").  The Debtor estimates that approximately $24,000 of Faith Concert Series Promotion Tickets are outstanding as of the Commencement Date.

H.    **Jr. Rangers Club**

39.    In order to promote fan loyalty to the team by families, the Texas Rangers sponsor an official fan club and an exclusive club for the junior members of its fan club (the "<u>Jr. Rangers Club</u>").  Pursuant to the terms of the promotion, Jr. Rangers Club members are entitled to certain official fan gear and, among other things, ticket vouchers for certain 2010 Rangers home games (the "<u>Jr. Rangers Ticket Vouchers</u>").  The Debtor estimates that approximately $24,000 of Jr. Rangers Ticket Vouchers are outstanding as of the Commencement Date.

I.    **Camps and Clinics Ticket Promotions and Deposits**

40.    The Debtor holds several camps and clinics for fans, as described in greater detail on <u>Exhibit A</u>.  These camps and clinics are held in a smaller training facility next to the Ballpark that can host practice sessions for area youth baseball teams (the "<u>Youth Ballpark</u>"). Members of youth teams practicing at the Youth Ballpark can receive discounts on attendance at Texas Rangers camps and clinics (the "<u>Youth Ballpark Practice Sessions Camp Promotions</u>"). The costs of the camps and clinics are covered by third-party sponsorships and registration fees collected from campers.  In certain circumstances, a deposit or prepayment is required in order to reserve a ticket to the camps and clinics (the "<u>Camps and Clinics Deposits and Prepayments</u>"). As of the Commencement Date, the Debtor estimates that it owes approximately $26,000 on account of Camps and Clinics Deposits and Prepayments.

J.    **Ultimate Tailgating Promotion**

41.    Discount tickets are available for Texas Rangers fans participating in "Ultimate Tailgating" at the Youth Ballpark (the "<u>Ultimate Tailgating Promotion</u>").  As of the Commencement Date, the Debtor does not believe that it has any outstanding obligations with respect to the Ultimate Tailgating Promotion.

K.    **Lexus Free Valet**

42.    Under a sponsorship agreement between Lexus and the Debtor, Lexus pays a fee to the Debtor to promote Lexus at the Ballpark.  The promotion entitles Lexus-branded vehicles to valet park for free at any Texas Rangers home game (the "<u>Lexus Free Valet Promotion</u>").  Approximately 22,000 Lexus vehicles park for free during the season as a benefit of the Lexus Free Valet Promotion, which cost is covered in full in advance by the sponsorship

fee paid by Lexus. As such, as of the Commencement Date, the Debtor does not believe that it owes any amounts under the Lexus Free Valet Promotion.

**L.      Chevy Women's Series**

43.     Under a sponsorship agreement between Chevy and the Texas Rangers, Chevy pays a fee to the Debtor to promote Chevy at Rangers Ballpark in Arlington. As part of the promotion, the Debtor holds a series of events designed especially for women; however, all fans are invited to participate, regardless of gender (the "Chevy Women's Series Promotion"). The cost of the Chevy Women's Series Promotion is covered in full in advance by the sponsorship fee paid by Chevy. As such, as of the Commencement Date, the Debtor does not believe that it owes any amounts under the Chevy Women's Series Promotion.

**M.      All-Star Voting Promotion**

44.     In order to promote support during balloting for Major League Baseball's annual All-Star game (the "All-Star Game"), the Texas Rangers offer fans several incentives to participate in voting, including free and half-price tickets (the "All-Star Voting Promotions"). The All-Star Voting Promotions were established to garner votes for the team's representation at the All-Star Game and promote fan support for the Texas Rangers — each of which enhances the value of the Debtor's business. As of the Commencement Date, the Debtor does not believe that it owes any amounts under the All-Star Voting Promotions.

**Ample Cause and Support Exists to Authorize
the Debtor to Continue its Customer Programs**

45.     The Debtor believes that the continuation of the Customer Programs constitutes "ordinary course of business" practices, and, therefore, does not require court approval. However, out of an abundance of caution, the Debtor seeks authorization, but not direction, pursuant to sections 105(a), 363(b), and 503(b)(1) of the Bankruptcy Code to continue,

renew, replace, implement, modify, and/or terminate the Customer Programs as they deem appropriate, in the ordinary course of business, without interruption, in accordance with its prepetition practices.

46.     Sections 1107(a) and 1108 of the Bankruptcy Code authorize a debtor in possession to continue to operate its business.  11 U.S.C. §§ 1107(a), 1108.  Pursuant to section 503(b)(1) of the Bankruptcy Code, a debtor may incur, and the court, after notice and a hearing, shall allow as administrative expenses, among other thing, "the actual, necessary costs and expenses of preserving the estate."  *Id*. § 503(b)(1).  In addition, pursuant to section 363(b) of the Bankruptcy Code, a debtor may, in the exercise of its sound business judgment and after notice and a hearing, use property of the estate outside of the ordinary course of business.  *Id*. § 363(b). The Debtors' Customer Programs are ordinary course programs that are standard in the sports industry.  Moreover, as described below in more detail, the Debtor believes the continuation of the Customer Programs is necessary for the Debtor to retain its valuable and loyal fans and customers and maintain the value of the Debtor's business for the benefit of all parties in interest.

### Ample Cause Exists to Authorize the Debtor to Honor Prepetition Obligations Arising Under the Customer Programs

47.     To the extent amounts or obligations are outstanding under the Customer Programs as of the Commencement Date, the Debtor seeks authorization, but not direction, pursuant to sections 105(a), 363(b), and 503(b)(1) of the Bankruptcy Code to honor its undisputed prepetition obligations in respect thereof in accordance with its prepetition practices. Although the pre-plan payment of general unsecured claims is generally disfavored in this district, the Debtor submits that given the unique nature of this chapter 11 case — particularly the fact that all Claims and Equity Interests are unimpaired under the Prepackaged Plan and, therefore, will be paid in full by the Debtor or the Purchaser — the payment of any prepetition

obligations on account of the Debtor's Customer Programs, as requested herein, is justified and supported by existing case law.

48.     The relief requested in this Motion is imperative to preserve fan confidence and loyalty to the team, while minimizing the impact of the filing of this case.  In order to maintain its relationship with both fans and the community, maximize the value of its estate, and effectuate the transactions contemplated by the Prepackaged Plan, it is vital that it the Debtor be able to satisfy its obligations related to the Customer Programs.

49.     The Debtor submits that the Court has the authority under section 105(a) of the Bankruptcy Court to enter an order authorizing the relief requested herein as necessary and appropriate to carry out the Debtor's duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code, which provides that a debtor in possession shall perform all the functions and duties of a trustee, contains an implied duty that a debtor in possession act as a fiduciary "to protect and preserve the estate, including an operating business's going-concern value," on behalf of the debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).

50.     Moreover, pursuant to section 105(a) of the Bankruptcy Code, "[t]he [C]ourt may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The purpose of section 105(a) is to "assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction."  COLLIER ON BANKRUPTCY ¶ 105.01 (15th ed. rev. 2007). Moreover, section 105(a) of the Bankruptcy Code, in conjunction with other provisions of the Bankruptcy Code, empowers the Court to issue any order "necessary or appropriate" to allow a

debtor in possession to fulfill its duty to preserve the going-concern value of the business,

including an order authorizing payment in full or in part of certain prepetition claims of

unsecured creditors prior to confirmation of a plan.  *See CoServ*, 273 B.R. at 496–97 (court may

use section 105(a) to allow the payment of prepetition claims if necessary to performance of

debtor in possession's fiduciary duty); *see also In re Mirant Corp., et al.*, 296 B.R. 427, 429–30

(Bankr. N.D. Tex. 2003) (court recognizing that a company operating in chapter 11, especially

early in the case, is in a "precarious position", and that serious damage could occur to a debtor's

business if prepetition claims could not be paid outside of a confirmed plan).

       51.     The court in *CoServ* acknowledged that there are occasions when a debtor

in possession's duty to preserve the business "can only be fulfilled by the preplan satisfaction of

a prepetition claim." 273 B.R. at 497.  Payment of prepetition claims is necessary, and may be

authorized, when it is established that (1) it is critical the debtor deal with the claimant, (2) a

failure to deal with the claimant risks probable harm or eliminates an economic advantage

disproportionate to the amount of the claim, and (3) there is no practical or legal alternative to

payment of the claim.  *Id.* at 498.  The *CoServ* court provided an illustrative list of situations

where payment of prepetition obligations by a debtor in possession may be a necessary predicate

to preservation of the business. For example, the court noted that "[c]laims may require payment

to avoid loss of a license through the exercise of a jurisdiction's police power."  *Id.* at 497.  In

addition, prepetition warranty or refund claims of consumer customers fell into this category

because, if not honored, they "could so harm the debtor's good will as to destroy its going

concern value." *Id.* The court stated that, "like employees, the bankruptcy court cannot force

consumers to deal with the debtor, nor is there any practical alternative to satisfying warranty or

refund claims." *Id.* The court also noted that where "payment of a prepetition unsecured claim is

the only means to effect a substantial enhancement of the estate . . . payment would be justified."
*Id.*

52.     The prepetition obligations owed by the Debtor to its customers qualify for postpetition payment because if the Debtor does not honor its obligations, the Debtor's goodwill and going-concern value will be severely and irreparably harmed.  *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) (holding that "such a failure to pay and its consequent loss of customer base would impair value of the business on either a going concern or liquidation basis").

53.     The honoring of prepetition obligations under the Customer Programs — including ensuring all ticket holders for individual games, season ticket packages, or other promotional giveaways — is imperative to the ongoing operations of the Debtor.  As described above, the Customer Programs are part and parcel of the Debtor's business and the baseball experience that fans have come to expect.  Refusing to honor prepetition obligations arising under the Customer Programs during the time that ownership of the team will be transitioning could have disastrous effects on the Debtor's business, as fans who have been turned away at the gate or otherwise spurned by the team will be unlikely to continue to support them.  A loss of fan support could impact the chapter 11 case and the sale contemplated under the Prepackaged Plan.

54.     Texas Rangers fans are the cornerstone to the Debtor's business and success, and as such, were an essential consideration for both the Debtor and the Purchaser throughout the sale negotiations resulting in the Debtor's Prepackaged Plan.  It is essential to the Debtor's business that the Debtor be permitted to continue the Customer Programs and honor the prepetition obligations thereunder.  The benefits to the Debtor and its stakeholders in doing so will far outweigh any cost to the estate of the Customer Programs.  Moreover, the Debtor cannot

risk alienating or losing valuable fans during the expected short period of this chapter 11 case. The relief requested herein preserves the value of the Debtor's estate by enabling the Debtor to maintain good relationships with its fans to enhance value and allow for a smooth transition of the business to the Purchaser, and thus is supported by sections 1107(a) and 105(a) of the Bankruptcy Code.

55.    The Debtor expects to have more than sufficient resources available to maintain all Customer Programs.  Moreover, the Purchaser under the Asset Purchase Agreement is assuming all outstanding obligations of the Customer Programs as of the Effective Date of the Prepackaged Plan.  Considering the potential for loss of fan loyalty, goodwill, and relationships absent the relief requested herein, and the resulting negative impact on the Debtor's business, this request for authorization to continue the Customer Programs in the ordinary course of business and to perform and honor the prepetition obligations thereunder, as the Debtor deems appropriate in its sole business judgment, is in the best interest of the Debtor, its estate, and its creditors, and should be approved in all respects.

56.    Moreover, the relief requested in this Motion does not change the relative positions of the parties or otherwise affect the rights of creditors in this case, as the Prepackaged Plan filed by the Debtor concurrently with this Motion provides for the payment in full or reinstatement of all general unsecured claims on the Effective Date.  Therefore, the payment of any prepetition obligations related to the Customer Programs merely affects the timing of the payment and no parties will be prejudiced by the payment of such prepetition obligations.

57.    Courts in this and other districts have granted relief similar to that requested herein in other chapter 11 cases where retaining the loyalty and patronage of customers was critical.  *See*, *e.g.*, *In re Premier Int'l Holdings Inc.*, Case No. 09-12019 (CSS) (Bankr. D.

Del. June 15, 2009) (approving continuation of, among other things, season tickets program, group tickets sales programs, and ticket discounts in chapter 11 cases of Six Flags theme parks); *In re Pilgrim's Pride Corp.*, Case No. 08-45664 (DML) (Bankr. N.D. Tex. Dec. 3, 2008); *In re Keys Fitness Prods.*, *L.P.*, Case No. 08-31790 (HDH) (Bankr. N.D. Tex. Apr. 18, 2008); *In re Bombay Co.*, *Inc.*, Case No. 07-44084 (DML) (Bankr. N.D. Tex. Sept. 20, 2008); *In re Steve & Barry's Manhattan LLC*, *et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. July 10, 2008); *In re Sharper Image Corp.*, Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008); *In re New York Racing Association*, *Inc.*, 06-12618 (JMP) (Bankr. S.D.N.Y. Nov. 3, 2006).[3]

### Request for Authority for Banks to Honor and Pay Checks Issued and Electronic Funds Transfers Requested to Honor Prepetition Customer Programs Obligations

58. As part of their cash management system, the Debtor maintains disbursement accounts (collectively, the "Disbursement Accounts") at various banks and other financial institutions (collectively, the "Banks"). The Debtor draws upon funds in its Disbursement Accounts to satisfy obligations arising from the Customer Programs. The Debtor requests that the Court authorize and direct the Banks and any other applicable financial institutions to receive, process, honor, and pay any and all checks drawn or electronic funds transferred to pay obligations arising under the Customer Programs, whether such checks were presented prior to or after the Commencement Date. The Debtor also seeks authority to issue new postpetition checks, or effect new electronic funds transfers, on account of such claims to replace any prepetition checks or electronic funds transfer requests that may be dishonored or rejected as a result of the commencement of the Debtor's chapter 11 case. The Debtor submits

---

[3] Because of the voluminous nature of the unreported decisions cited herein, they are not attached to this Motion. Copies of these orders are available upon request of the Debtor's counsel.

that it has sufficient liquidity to pay such amounts as they become due in the ordinary course of the Debtor's business.

### The Requested Relief Satisfies Bankruptcy Rule 6003

59.     Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that, except to the extent the relief requested herein is necessary to avoid the immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition.  As detailed above and as set forth in the Fischer Declaration, the Debtor submits that such relief is necessary to avoid immediate and irreparable harm to the Debtor and its estate and, accordingly, submits that Bankruptcy Rule 6003 is satisfied.

### Waiver of Bankruptcy Rules 6004(a) and (h)

60.     Unless the Court orders otherwise, Bankruptcy Rule 6004(a) requires the Debtor provide 21 days notice to all creditors and certain other parties in interest of the use of property outside the ordinary course of business.  Moreover, unless the Court orders otherwise, Bankruptcy Rule 6004(h) automatically stays for 14 days any order granting such relief.  As described above and in the Fischer Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor that would otherwise be caused by a delay in the relief requested herein.  Therefore, to the extent applicable, the Debtor requests the Court waive (i) the notice requirements under Bankruptcy Rule 6004(a) and (ii) the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

61.     Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtor, (ii) a waiver of the Debtor's or any party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.  Finally, the relief requested herein shall not oblige the Debtor to accept any services, to accept the shipment of goods, or prevent the Debtor from returning or rejecting goods.

**The Relief Requested is Appropriate**

62.     The requested relief is further supported by the prepackaged nature of this case.  As set forth above and in greater detail in the Fischer Declaration, the Prepackaged Plan contemplates the payment of all classes in full, in cash, or reinstates the claims and equity interest of all classes.  The most critical and complex task required to effectuate a successful reorganization — the negotiation and formulation of a chapter 11 plan of reorganization — has already been accomplished.  Thus, the Debtor respectfully submits that given the backdrop of this case, the relief requested herein is appropriate inasmuch as such relief will assist the Debtor to move towards expeditious confirmation of the Prepackaged Plan with the least possible disruption or harm to its business.  Based on the foregoing, the Debtor submits that the relief requested is necessary and appropriate, is in the best interests of its estates and creditors, and should be granted in all respects.

**Notice**

63.     No trustee, examiner or statutory creditors' committee has been appointed in this chapter 11 case.  Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the Debtor's thirty largest unsecured creditors; (iii) counsel to the Purchaser; (iv) counsel to Major League Baseball, (v) counsel to the Major League Baseball Players Association (vi) counsel to JPMorgan Chase Bank, N.A., as administrative agent under the First Lien Credit Facility, (vii) counsel to GSP Finance LLC, as successor in interest to Barclays Bank PLC, as administrative agent under the Second Lien Credit Facility, and (viii) the Banks.  The Debtor respectfully submits that no further notice of this Motion is required.

**No Previous Request**

64.     No previous request for the relief sought herein has been made by the Debtor to this or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: May 24, 2010
      Fort Worth, Texas

 

                                    */s/ Martin A. Sosland*
                                    Martin A. Sosland (18855645)
                                    WEIL, GOTSHAL & MANGES LLP
                                    200 Crescent Court, Suite 300
                                    Dallas, Texas 75201
                                    Telephone:  (214) 746-7700
                                    Facsimile:   (214) 746-7777

                                    Ronit J. Berkovich (*pro hac vice* pending)
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York  10153
                                    Telephone:  (212) 310-8000
                                    Facsimile:   (212) 310-8007

                                    Attorneys for Debtor and
                                    Debtor in Possession

## Exhibit A

## Summary of Customer Programs

Summary of Customer Programs

| Customer Program[1] | Description |
|---|---|
| Promotional Ticket Pricing Programs | The Texas Rangers offer a variety of promotional prices to certain affinity and other groups and for certain events, including:<br>• Active Senior Thursdays: Fans 65 and older may take advantage of savings for all Thursday home games in areas regularly priced up to $40. Fans 65 and older will receive one free ticket in certain sections with each regularly priced ticket.<br>• Free Kid Tuesdays: Tickets for kids 13 and under are free for most seating sections for Tuesday home games with every full-price adult ticket purchased.<br>• Military Mondays: One free ticket is available with each regularly priced ticket with an active or retired military ID in most seating sections for Monday home games.<br>• Ozarka Website Wednesdays: Tickets for Wednesday home games are half price in certain sections when purchased on texasrangers.com.<br>• FANtastic Fireworks Fridays: The Texas Rangers offer $10 tickets in select areas and $5 cash parking for 10 Friday home games this season (all Fridays except May 21, August 13 and September 10). Fans may purchase $10 tickets in Lexus Club Terrace, Bleachers, Upper Box, and Upper Reserved seating areas. In addition, each game will feature a post-game fireworks show.<br>• Coca-Cola Family Tickets: Includes four tickets, four jumbo hot dogs, four Coke soft drinks, $20 in Sports Park tokens, and one general parking pass.<br>• All You Can Eat Seats: Includes all you can eat concessions, regularly priced at $34 with "premier" games at $39.<br>• Rangers/Six Flags Double Play: Includes one Lower Box ticket to a non-premier Texas Rangers game and one adult ticket to Six Flags Over Texas, both offered for a discount.<br>• Diamond Club Combo: Dinner at the Diamond Club is only $10 extra when you purchase a Diamond Club Combo Ticket.<br>• Dr. Pepper Cans Discounts/Coupons: Half-price tickets in certain sections of the ballpark.<br>• Clubhouse Cap Combo: Includes day pass valid for the Crowne Plaza Invitational at Colonial May 27-30, a Lexus Club Box ticket to a Texas Rangers home game in May or June, and a cap with Rangers and Colonial logos, for a discounted price.<br>• Weekday Golf & Baseball Combo: Includes a free Monday– |

---

[1] This summary is provided for the convenience of the Court and interested parties and is not intended to confer rights on any parties to these Customer Programs. Certain exclusions and other conditions may apply.

| Customer Program[1] | Description |
|---|---|
| | Thursday round of golf at WaterChase Golf Club, $10 cash card for Golfsmith, and a ticket for a Texas Rangers regular-season home game, excluding blackout dates, for a discounted price.<br>• Weekend Golf:  Includes a free Friday–Sunday round of golf at WaterChase Golf Club, $10 cash card for Golfsmith, and a ticket for a Texas Rangers regular-season home game, excluding blackout dates, for a discounted price.<br>• Rangers Showdown Sweepstakes:  Fans have an opportunity to complete a short survey on texasrangers.com to enter a contest to win four (4) tickets to the Houston Astros v. Texas Rangers game scheduled to be played Saturday, June 26, 2010, one (1) parking pass, one (1) game program, and up to three (3) guest passes to a post-game concert to be held at the North Lawn of the Ballpark. |
| Customer Credits | In the ordinary course of business, the Debtor's books and records reflect Accommodations Credits owed to certain ticket and suite holders on account of, among other things, the overpayment for tickets, transferred seats and other such accommodations made by the Debtor for customer relations purposes.  Prior to the Commencement Date, the Debtor allowed its customers to seek a refund of their Accommodations Credits at any time.<br><br>Additionally, the Debtor offers advance sales of post-season home games tickets to certain season ticket and suites holders as an exclusive benefit and to promote postseason ticket sales.  In seasons when the team does not play postseason games at home, the ticket holder's account reflects a credit for the post-season tickets purchased in advance. |
| Season Ticket Packages | The Texas Rangers offer several Season Ticket Packages to encourage loyalty and encourage repeat visits to the Ballpark.  Depending on the package purchased, "Rangers Rewards" include, among other things:<br>• Discounts off of gate prices;<br>• Opportunity to purchase discounted food and beverage vouchers;<br>• Opportunity to purchase additional discounted 2010 individual game tickets before the general public, including Opening Day;<br>• Bonus online ticket vouchers for select games;<br>• Personalized season ticket holder name plate on seats (certain restrictions apply);<br>• Flexible ticket exchange program;<br>• Private season ticket entrances;<br>• Guaranteed seating location for all 2010 post-season games (option of right of first refusal);<br>• Opportunity to purchase up to four additional post-season tickets, at a discount. |
| Private Suites Packages | The Texas Rangers offer a variety of packages for the nightly or long-term use of the Private Suites, including:<br>• Nightly Suite Rentals:  The Texas Rangers offer a variety of |

| Customer Program[1] | Description |
|---|---|
| | nightly suites packages, that, in certain cases, include food and beverage credits or a food and beverage package, in addition to use of a Private Suite.  Other benefits and features include parking passes, game programs, wait staff service, game day admittance to the Cuervo Club behind home plate and group name welcomed on the Coca-Cola Matrix Board.<br>• Long-Term Private Suite Agreements:  The Texas Rangers offer a variety of long-term Private Suites agreements that include, among other things, parking privileges, repair and maintenance on the Private Suites, certain food and beverage catering services, certain permanent finish-out and furnishings for the Private Suite, and certain exclusive options to purchase additional postseason tickets. |
| Group Ticket Pricing and Incentives | The Texas Rangers offer a variety of group ticket pricing promotions and certain incentives for group leaders:<br>• Group leaders of 20-99 receive two complimentary ticket e-vouchers for a future non-premier game in 2010.<br>• Group leaders of 100-499 receive four complimentary ticket e-vouchers for a future non-premier game in 2010.<br>• Group leaders of 500+ receive one Rangers player-autographed baseball or picture. |
| Group Ticket Deposits | In order to reserve group tickets, the Debtor requires that customers post a deposit. |
| Faith Concert Series Ticket Promotion | Customers buying a minimum of 20 tickets to both Faith Concerts will receive 20 complimentary upper level tickets to any* regular-season Texas Rangers home game in 2010 (*certain date exclusions apply). |
| Jr. Rangers Club | Official Fan Club of the Texas Rangers.  Junior members receive Texas Rangers gear, including:<br>• Jr. Rangers Drawstring Bag<br>• 5' x3' Jr. Rangers Banner<br>• VIP Membership Pass and Lanyard<br>• 8 Ticket Vouchers for 2010 Rangers home games (some restrictions apply)<br>• Coupons redeemable at Rangers Ballpark in Arlington<br>• 15% off Rangers merchandise in the Majestic Grand Slam Gift Shop (some restrictions apply)<br>• Invitations to "Members Only" Jr. Rangers events<br>• VIP "Front of the Line" access to every Sunday afternoon Run the Bases. |

| Customer Program[1] | Description |
|---|---|
| Camps and Clinics Ticket Promotions | Each camper receives a t-shirt, hat, and gift mix.  All sessions will be held at the Texas Rangers Youth Ballpark and in the Texas Rangers Major League Batting Cages near the Rangers Clubhouse inside Rangers Ballpark in Arlington.<br><br>Father/Son Baseball Experience:  Each pair of campers will receive two complimentary ticket vouchers good for two seats for a 2010 Texas Rangers home game.<br><br>Operation Backpack Promotion:  While not required to participate in a camp, the Texas Rangers accept donations for school supplies through Operation Backpack from campers. Campers donating to Operation Backpack will be rewarded with two tickets to a 2010 Texas Rangers home game.<br><br>Members of youth teams practicing at the Texas Rangers Youth Ballpark can discounts for a 2010 Texas Rangers Baseball camp. |
| Ultimate Tailgating Promotion | Discounts on Texas Rangers group tickets are available for customers participating in Ultimate Tailgating events at the Youth Ballpark. |
| Lexus Free Valet | Lexus vehicles may valet for free at any home game. |
| Chevy Women's Series | Chevy and the Texas Rangers have partnered to host a series of events designed especially for women (all fans are invited to participate, regardless of gender):<br>• Moms on the Mound:  Camp provides on-field drills and pointers from baseball and training staff and includes a gift mix.<br>• 7th Inning Stretch Yoga:  Event will include complete yoga instruction and a custom Yoga mat for each guest.  Tickets to the 7th Inning Stretch Yoga will include a voucher for two tickets to a 2010 Rangers regular season home game. |
| All-Star Voting Promotion | In order to promote support during All-Star balloting, the Texas Rangers are offering fans several incentives:<br>• Two free Rangers tickets in sections regularly priced up to $25 to an eligible home game for fans voting for the Rangers as a "favorite" or "other favorite" club more than twenty (20) times between 3:30 p.m. (central time) Tuesday, April 20, 2010 and 10:59 p.m. (central time) July 1, 2010.<br>• Half-price tickets to eligible home games for fans voting for the Rangers as a "favorite" or "other favorite" club more than twenty (20) times between 3:30 p.m. (central time) Tuesday, April 20, 2010 and 10:59 p.m. (central time) July 1, 2010.<br>• Chance to win the opportunity to sit in a luxury suite with 19 friends for free during a regular season game in September or October. |

## Exhibit B

## Schedule of Promotions/Events

Schedule of Promotions/Events

| Date | Promotion/Event | For | Sponsored By |
|---|---|---|---|
| Fri, Jun 4 | FANtastic Fireworks Fridays | | |
| Sat, Jun 5 | Coca-Cola Red Texas T-Shirt | First 20,000 fans, fans 14 & older | Coca-Cola |
| Sun, Jun 6 | Ian Kinsler Red Jersey | First 8,500 fans, fans 13 & under | |
| Sun, Jun 6 | Dreyer's $1 Ice Cream Sunday | Fans 13 & under | Dreyer's |
| Wed, Jun 9 | Dr Pepper Autograph Wednesday | Fans 13 & under | |
| Wed, Jun 9 | Dollar Hot Dog Night | | |
| Wed, Jun 23 | Dr Pepper Autograph Wednesday | Fans 13 & under | Dr. Pepper |
| Wed, Jun 23 | Dollar Hot Dog Night | | |
| Fri, Jun 25 | FANtastic Fireworks Fridays | | |
| Sat, Jun 26 | Coca-Cola & La Michoacana Rangers Fiesta Dip & Chips Platter | First 20,000 fans, fans 14 & older | Coca-Cola |
| Sat, Jun 26 | Reckless Kelly Post-Game Concert | | Budweiser |
| Sun, Jun 27 | Los Tigres del Norte Pre-Game Concert | | Budweiser, I Am Second, Ozarka, Coca-Cola, State Farm |