United States Department of Justice
Office of the United States Trustee
1100 Commerce St.  Room 976
Dallas, Texas  75242
(214) 767-8967 x 226

Lisa L. Lambert and Meredyth A. Kippes,
for the United States Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

-----------------------------------------------------------------------x
:
**In re**     :     **Chapter 11**
:
**TEXAS RANGERS BASEBALL PARTNERS**     :     **Case No. 10-43400 (DML)**
:
**Debtor.**     :
:
-----------------------------------------------------------------------x

## UNITED STATES TRUSTEE'S BRIEF IN CONNECTION
## WITH FIRST DAY MATTERS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The United States Trustee for Region 6 submits this brief in connection with the First

Day Matters and respectfully states:

### Overview

The parties differ as to whether creditors are impaired and therefore whether the

proposed plan is truly prepackaged.  While the United States Trustee might agree that much of

the requested relief is appropriate in a truly prepackaged chapter 11, here the Debtor has not

solicited voting before the case filing.  No ad hoc committee of unsecured creditors exists.  The

JP Morgan Chase lender group ("Lenders") did not participate in developing the plan. The Texas

Rangers Baseball Partners (the Debtor) contends voting is unnecessary because it has no impaired classes. Depending on the position that the Lenders take, however, unsecured creditors may be impaired. Moreover, some of the unsecured creditors are impaired as a matter of law because their claims are disputed, payment will be deferred until adjudication, and interest is barred under the proposed plan. Under the facts, fairness and procedural due process support assuming impairment, requiring disclosures, and treating this case as a traditional bankruptcy filing.

## Factual Summary

### *Corporate Structure:*

1.      Thomas O. Hicks ("Hicks") is the Chairman of the Board and Chief Executive Officer of the Debtor as well as of its parent entities. *Proposed DS, Corporate Structure and Current Officers, ¶B(2).*

2.      HSG Sports Group, LLC ("HSG"), is the direct and indirect parent of the intermediary entities (Rangers Equity Holdings, L.P. and Rangers Equity Holdings GP, LLC), and therefore of the Debtor. *Proposed DS, Corporate Structure and Current Officers, ¶B(1).* HSG indirectly owns the Dallas Stars in addition to the Texas Rangers. *Proposed DS, Corporate Structure and Current Officers, ¶B(1).*

3.      By August of 2008, HSG, the parent, had begun experiencing financial difficulties, and it retained financial advisors, including Perella Weinberg Partners, which is now the proposed financial advisor for the Debtor. *Proposed DS, ix (referencing Debtor's financial advisor); Proposed DS, Key Events Leading to the Chapter 11 Case: Advisors Are Retained, ¶D(2).*

4.      HSG had entered into $525 million in long-term debt obligations (the "HSG Credit Agreement"),  but it defaulted on these obligations in March of 2009, and the Lenders accelerated in April of 2009.  *Proposed DS, Key Events Leading to the Chapter 11 Case: Advisors Are Retained ¶D(2).*

5.      Ultimately, in January of 2010, HSG and the Debtor entered an Asset Purchase Agreement (the "HSG APA") with Rangers Baseball Express LLC, whose principals include Chuck Greenberg, a well-known sports attorney, and Nolan Ryan, the current president of the Texas Rangers.

6.      The HSG APA never closed.  *Proposed DS, Events Leading to the Chapter 11 Case: Lenders Refuse Consent, ¶D(8).*  On information and belief based on recent news articles, the Lenders contended they should receive the approximately $300 million in net sales proceeds while Hicks, individually, sought $30 million of that amount.  The Lenders sought to open the bidding to competing offers. Ken Belson, *Sale of Texas Rangers Is Delayed by Dispute With Banks,* N.Y. Times, April 16, 2010, at D5 http://www.nytimes.com/2010/04/17/sports/baseball/17rangers.html.

7.      The HSG APA discloses, "HSG provides certain shared services to each of TRBP, Emerald Diamond and Rangers Ballpark."  *HSG APA, p. 2; see also Proposed DS, Material Prepetition Transactions Ancillary to Sale, Interim Transition Services Agreement, ¶10.* HSG provided certain business and administrative services (including, but not limited to, services of certain employees, insurance and benefit plans) to its subsidiaries and affiliates.   For example, the television contract with Fox Networks is listed as a contract that HSG held.  *HSG APA, Shared Contracts, Exhibit 1.1(d).*  Other advertising and promotional agreements also are

listed as being with HSG rather than the Debtor.  *HSG APA, Shared Contracts, Exhibit 1.1(d).*
The health and vision plans were sponsored and maintained by HSG.  *HSG APA, Insurance Policy Schedule,  Schedule 5.18.*  The Debtor did hold some valuable contracts of its own.  It appears the radio broadcast rights have been in the Debtor's name.  *HSG APA, Conflicts, Schedule 5.3(a), Radio Broadcasting Rights, Item 34.*

*Agreements Transferred Into the Debtor May Have Value:*

8.      The Debtor concedes that HSG transferred some agreements into the Debtor before the bankruptcy filing.  *Proposed DS, Material Prepetition Transactions Ancillary to Sale, Interim Transition Services Agreement, ¶10.*  For example, many, if not all, of the health and vision contracts that were listed on the HSG APA are the same ones included on the schedule of insurance attached to the Debtor's Motion for Authorization to Continue Its Workers' Compensation, Liability, Property, and Other Insurance Programs.  *Insurance Programs and Policies, Exhibit A.*

9.      As of the filing of the bankruptcy, the Transfer of Contracts section of the Proposed Disclosure Statement had not been provided to the United States Trustee, and the Debtor contemplates deferring the filing of schedules and a statement of financial affairs.   Thus, for example, it is not known whether the television rights were transferred from HSG to the Debtor.

10.      The Debtor first contends that transferring these contracts into the Debtor has no net impact because after paying the Debtor's obligations, the excess sales proceeds will be treated as equity, returned to HSG, and ultimately paid to the Lenders. *Cf. Declaration of Kellie L. Fischer in Support of Debtor's Chapter 11 Petition and Request for First Day Relief, ¶ 15.*

11.     The Lenders, however, may contend that their lien attaches to the transferred contracts, or they may pursue tort theories.  Under these facts, valuation or other issues may result, and the Debtor's unsecured creditors may not receive the sales proceeds as contemplated under the Proposed Plan.

12.     An additional concern is that the Proposed Disclosure Statement and Plan bar interest on unsecured claims.  Some claims may be deferred for quantification.  First, based on the HSG APA Schedules, the Debtor had pending litigation arising from ballpark incidents.  Second, the Proposed Disclosure Statement references rejecting contracts and quantifying rejection damages.  Third, other litigation issues may arise.  *See Proposed DS, Provisions Governing Distributions, No Postpetition Interest on Claims & Procedures for Treating Disputed Claims, ¶(F)(1); Plan ¶7.12.*

## Impairment

13.     The Bankruptcy Code includes "a presumption of impairment" so creditors have the opportunity to vote on a plan.  *E.g. Solow v. PPI Enterps. (In re PPI Enterps., Inc.)*, 324 F.3d 197, 203 (3d Cir. 2003) (citations omitted); *see* 11 U.S.C. §1126(f) (no solicitation required when class is not impaired). The Debtor's plan and first day pleadings hinge on the premise that the Debtor has met its burden to overcome the presumption.  *See Id.* (describing burden).

14.     The Debtor has not overcome the presumption of impairment.

15.     The Bankruptcy Code defines two situations when a claim or interest is not impaired.

16.     First, a claim or interest is unimpaired if a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder."  11 U.S.C. §1124(1).

17.     Second,  generally speaking, a claim is unimpaired when a plan:

   a.  Cures any . . . default . . . other than a default of a kind specified in section 365(b)(2) . . . or of a kind that section 365(b)(2) expressly does not require to be cured;

   b.  Reinstates the maturity . . . as such maturity existed before such default;

   c.  Compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance . . . on [a] . . . contractual provision or . . . . applicable law;

   d.  If such claim or such interest arises from any failure to perform a nonmonetary obligation . . . compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss; and

   e.  Does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder.

11 U.S.C. §1124(2).

18.     These five requirements are conjunctive.  Each one must be met.  Two of the requirements are at issue under the Debtor's plan: the Debtor's financial ability to cure and the provision of interest.

19.     First, regarding the Debtor's ability to cure, the funds may be insufficient to reach the Debtor's unsecured creditors.  The Debtor's Proposed Plan contemplates that all of the sales proceeds, approximately $300 million, will be used to pay the $75 million backstop guaranty, priority tax obligations, unsecured claims, and then equity.  The entire $300 million, however, may not ultimately be attributed to the Debtor, and the Lenders may object to paying

the unsecured creditors of the Debtor when, de facto, the asset transfers have allowed the Debtors' unsecured creditors to jump in front of the Lenders' claims to the HSG assets. The Plan contemplates paying Intercompany Claims and equity. While these payments may ultimately benefit the Lenders, that process involves delay and some risk. The Lenders may prefer to receive direct payment.

20.     Second, assuming that the Debtor overcomes the Lenders' objections, the Debtor has generally barred postpetition interest. *Plan, ¶7.12.* When a Debtor is solvent, as the Debtor implicitly contends here, the Bankruptcy Code requires interest. 11 U.S.C. §1124; *In re PPI Enterp., Inc.*, 324 F.3d 197, 203 (3d Cir. 2003); *In re G.L. Bryan Investments, Inc.*, 340 B.R. 386, 390-91 (Bankr. D. Colo. 2006) (unsecured judgment creditors impaired when plan paid 100% percent but provided them with federal judgment rate rather than state judgment rate). While the Debtors may argue that they can modify the plan or confirmation order to acknowledge bankruptcy and nonbankruptcy law, the provision is unnecessary unless its intent is to deny interest. If the sales proceeds are sufficient to pay creditors in full and unsecured creditors are unimpaired, the plan should specify that interest is provided, and it should define the rate of interest. As of the First Day hearings, unsecured creditors are impaired.

21.     The differing positions regarding impairment lead to the conflicting analysis of the first day motions. Using the Debtor's agenda as the organizational framework, the United States Trustee's positions are as follows:

**Debtor's Motion Pursuant to Bankruptcy Rules 1007 and 2002(d) for an Order (I) Extending the Time to File Schedule of Assets and Liabilities; Schedule of Executory Contracts and Unexpired Leases, List of Equity Security Holders, Schedule of Current Income and Expenditures and Statement of Financial Affairs and (II) Waiving the Requirements to File Same Upon Confirmation of the Plan**

22. The United States Trustee has agreed to a 35 day extension. The Debtor needs additional time to file its schedules and statement of financial affairs given the recent transfers and agreements. *See Declaration, ¶33-35 (Modified Voluntary Support Agreement entered May 23, 2010; other agreements that HSG historically entered with others and serviced now transferred to Debtor; TRBP Asset Purchase Agreement entered May 23, 2010 ).*

23. Parties do not, however, have solid disclosure regarding the transferred assets. They lack a template defining the ownership and value. They lack the statement of financial affairs setting forth historical events. The Proposed Disclosure Statement provided to the United States Trustee had many blanks. While the filed Disclosure Statement may cure many of these issues, the United States Trustee opposes deferring the schedules and statement of financial affairs to a date after the plan is confirmed. At this juncture, the deferment should be to a date certain and subject to extension at that date.

24. The Debtor initially asked the United States Trustee to defer soliciting and appointing a committee, but the Bankruptcy Code requires the United States Trustee to appoint a committee when, as here, the case is not a small business. *Cf. 11 U.S.C. §1102(a)(1), (3).* Accordingly, the United States Trustee intends to solicit interest in a committee.

**Debtor's Motion for Interim and Final Orders Authorizing (I) Postpetition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) the Granting of Liens, Security Interests and Superpriority Claims, (III) Debtor's Use of Cash Collateral Pursuant to Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code and Providing Adequate Protection to Prepetition Lenders, (IV) Modifying the Automatic Stay and (V) Scheduling a Final Hearing ("DIP Motion")**

25.     The DIP Motion requests permission for Baseball Finance, LLC ("Baseball Finance"), a Major League Baseball related entity, to loan six million dollars on an interim basis to the Debtor.

26.     The Proposed DIP Order accompanying the DIP Motion includes a number of findings and makes all the decretal paragraphs findings.  *See Proposed Order, ¶A-O; ¶26.*  The only finding required for interim financing is that "immediate and irreparable injury, loss, or damage will result," *Fed. R. Bankr. P. 4001(a)(2); see also Fed. R. Bankr. P. 7052(a)* (contemplating findings and conclusions after evidence and in a separate document from judgment), *made applicable under Fed. R. Bankr. P. 9014.*  If unsecured creditors, a trustee, or another party in interest pursues avoidance actions, they should not then be bound by findings made on the first day of the case.  *See Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 252-53 (5th Cir. 1988) (holding committee could acquire causes of action belonging to debtor-in-possession under defined circumstances); *Proposed Order, ¶18* (Debtor gives these rights to creditors). As the Attorney Checklist and Certificate of Counsel Concerning Motion and Order Pertaining to Post-Petition Financing and Use of Cash Collateral implicitly recognizes, provisions should be phrased as stipulations that apply for purposes of the first day hearings.  *See Attorney Checklist,* ¶ 2.  Alternatively, the Court should add a paragraph stating that none of the provisions bind other parties.

27.     The DIP Order contemplates that the DIP Lender will succeed to liens that are avoided.  *Proposed DIP Order, ¶¶ 3-4.*  While avoidance actions are supposed to be excluded from the liens, this adjustment to the lien avoidance remedy de facto gives the DIP Lender a lien in avoidance actions and undermines any incentive for the unsecured creditors' committee or another party to challenge liens for the benefit of the estate.  11 U.S.C. §551 and *e.g. Retail Clerks Welfare Trust v. Van de Kamp's Dutch Bakery (In re Van de Kamp's Dutch Bakery)*, 908 F.2d 517, 519 & n. 2 (9th Cir. 1990) (citations omitted).  Especially as the DIP Lender contends it is loaning on a non-priming basis, this provision should be stricken.

28.     The DIP Order allows the Lender to pursue remedies and act immediately after an Event of Default.  *DIP Order, ¶9.*  This provision should clarify that the Event of Default is subject to Notice and Cure before the Lender may act.  The DIP order bars application of the marshaling doctrine.  *DIP Order, ¶10.*  While at this point a sale is contemplated, marshaling could become important if another strategy develops to address the multiple tiers of liens.

29.     Regarding the reimbursement of professional fees attendant to the DIP loan, the DIP Order properly contemplates circulating the fees and expenses to any committee and the United States Trustee.  *DIP Order, ¶14.*  If the Court is considering a fee examiner or fee committee, the provision should be tailored to reference that appointment.  The provision also should clarify that parties may request Court review of any submitted fees that seem excessive or unreasonable under applicable standards.

30.     The DIP Order constrains the Court's ability to dismiss, convert, or abstain.  The DIP Order mandates repaying the DIP Loan prior to entry of any order invoking these statutory rights.  *DIP Order, ¶19.*  While any of those events may have an impact on further lending, the

repayment of loaned amounts should not modify the Bankruptcy Code or the ability to enforce bankruptcy protections. Additionally, the provisions discussing the discharge of the DIP Loan in the confirmation process should be moved to the plan, and the Debtor's waiver should be stricken or limited to the Debtor. *DIP Order, ¶21.*

31.     Paragraph 24 of the DIP Order properly specifies that the DIP Order controls over conflicting language in the DIP Agreement. In addition, the Court should clarify that the DIP Motion is granted only to the extent specified in the DIP Order.

**Debtor's Motion for Interim and Final Orders Pursuant to Sections 363 and 105(a) of the Bankruptcy Code for Authority to Enter Into the Interim Support Agreement (the "ISA Motion")**

32.     The Debtor has not shown under Fed. R. Bankr. P. 6003 that approval of the ISA Motion is necessary to avoid immediate and irreparable harm within the first 21 days of this case. The ISA Motion seek this Court's approval of the Interim Support Agreement (the "ISA") between Major League Baseball ("MLB") and the Debtor whereby MLB will provide certain support to the Debtor's day-to-day operations and to the marketing and sale of the Debtor. The ISA would replace the Voluntary Support Agreement (the "VSA") entered into by the Debtor and MLB on June 29, 2009, as amended and restated on November 25, 2009. ISA Motion, ¶ 21. According to the ISA Motion, on May 23, 2010, the VSA was further amended and the Debtor and MLB entered into an Interim Agreement (the "IA"), the terms of which are alleged to be substantially similar to the terms of the ISA. *Id*. at n. 2. The United States Trustee and, on information and belief, others parties in interest were not provided with a copy of the ISA Motion, the VSA, the IA, or the ISA prior to the filing of the petition. Accordingly, parties in interest have not have time to analyze the ISA Motion and the ISA. Neither the ISA Motion nor

the Fischer Declaration articulate a reason why the ISA must be approved on an emergency basis within the first 21 days of this case.

33.     Additionally, the ISA Motion seeks approval of the payment of prepetition and postpetition fees and expenses (including attorneys fees) of MLB, the Lead Monitor (as such term is defined in the ISA Motion) and any other Monitor (as such term is defined in the ISA Motion), but does not provide an actual amount of the prepetition fees and expenses or an estimated amount of the postpetition fees and expenses.  To the extent the prepetition fee and expense claims are to be paid, they should meet the test set forth by this Court for payments to unsecured creditors outside of a plan in *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002) ("*CoServ*").  Additionally, the ISA provides for the release and indemnification of MLB, the Lead Monitor, and any other Monitor.

34.     The United States Trustee recognizes that it is important to the survival of the Texas Ranger baseball franchise that it retain a solid relationship with MLB, however, parties in interest should be afforded ample time to evaluate this agreement on more than 24 hours' notice.  Accordingly, the United States Trustee requests that the Court defer making a decision on the ISA Motion until adequate notice may be given to parties in interest.

**Debtor's Motion Pursuant to  Sections 105(a), 362(d), 363(b), 363(c), and 503(b) of the Bankruptcy Code for Authorization to (A) Continue its Workers' Compensation, Liability, Property, and Other Insurance Programs and (B) Pay All Obligations in Respect Thereof (the "Insurance and Workers' Compensation Motion")**

35.     The United States Trustee request that interim relief on the Insurance and Workers' Compensation Motion be limited to those premiums and other obligations that are presently owing or will become due and owing within the first 21 days of this case in accordance with Fed. R. Bankr. P. 6003.

36.     With regard to the requested relief from stay as to the seventeen presently outstanding workers' compensation claimants, and any future workers' compensation claimant, the United States Trustee asserts that the Debtor should be required to identify such claimants. The United States Trustee has suggested that the Debtor provide an initial list of such claimants, which may be supplemented from time to time as additional claimants are identified. Creditors and parties in interest have a right to know the universe of such claimants against the Debtors, even if the Debtor's liability is limited to a $25,000 deductible for each incident.

**Debtor's Motion Pursuant to Sections 105(a), 363(b), and 541 of the Bankruptcy Code for Authorization to Pay Prepetition Sales and Use Taxes and Certain Other Government Assessments (the "Prepetition Tax Motion")**

37.     The United States Trustee requests that interim relief on the Prepetition Tax Motion be limited to those liabilities that are presently owing or will become due and owing within the first 21 days of this case in accordance with Fed. R. Bankr. P. 6003. The United States Trustee further requests that the Court deny relief to the extent the Debtor seeks to prepay any tax liability.

**Debtor's Motion Pursuant to Sections 105(a), 363(b), and 503(b)(1)  of the Bankruptcy Code for Authorization to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business ("Customer Motion")**

38.     The United States Trustee has no objection to the Customer Motion.

**Debtor's Motion Pursuant to Sections 105(a), 363(c) and 345(b) of the Bankruptcy Code for (1) Authorization to (A) Continue Using the Existing Cash Management System (B) Maintain Existing Bank Account and Business Forms, and (2) an Extension of Time to Comply with the Requirements of §345(b) ("Banking Motion")**

39.     Plains Capital Bank, the Debtor's primary banking institution, has not opted out of the FDIC's Transaction Account Guaranty Program ("TAG Program"). The program has been recently extended through December 31, 2010. http://www.fdic.gov/news/news/financial/2010/fil10015.html.  An additional opt out period

through July 2010 is provided under the extension, but Plains Capital has not informed the United States Trustee of an intent to opt out.  Accordingly, the Debtor's agreement to alter its investments and re-designate the account as a checking account protects the funds and is acceptable to the United States Trustee.  If Plains Capital opts out of the TAG, it is also an authorized depository, and the United States Trustee will require it to re-designate the accounts and to post collateral when the operation account exceeds the FDIC guaranty.  At this time the Debtor is compliant with section 345(b).

40.     Although Bank of America has opted out of TAG, the Bank of America account is under the FDIC guaranty amount at all times and, therefore, the account is in compliance with section 345(b) and the United States Trustee's Guidelines.

41.     The Debtor references transferring funds to HSG, its parent, for payroll.  *Banking Motion ¶32*.  This account is not monitored by the United States Trustee. The Debtor should be required to open its own payroll account, subject to monitoring.  To avoid disruption, the HSG payroll account may be used for First Day payroll requests, but the Court should mandate that HSG provide the United States Trustee and any committee with a copy of the bank statement reflecting transfers from the Debtor and payments under the First Day Orders, and the Debtor should open its own payroll account by the second day hearings.

42.     The request to continue the $500,000 in credit card account charges is a request for post-petition lending.  The Debtor has posted $590,000 into an account maintained by HSG and controlled by JP Morgan Chase.  This account should be paid directly by the Debtor and re-defined as a Debtor account.  To avoid disruption pending the second day hearings, the Debtor should provide the United States Trustee and any committee with an accounting for the charges and payments.

**Debtor's Motion Pursuant to Sections 105(a), 363(b), and 507(a) of the Bankruptcy Code for Interim and Final Orders for Authorization (I) to Pay Certain Employee Compensation and Benefits and (II) to Maintain and Continue Such Benefits and Other Employee-Related Programs (the "Employee Wage Motion")**

43.     Initially, the United States Trustee requests that any interim relief granted with regard to the Employee Wage Motion not include approval of any non-player policies or employee programs, but only include approval of the payment of wages and salaries up to the

priority cap of $11,725 in accordance with 11 U.S.C. § 507(a)(4). The United States Trustee asserts that the Debtor will not suffer immediate and irreparable harm within the meaning of Fed. R. Bankr. P. 6003 if such non-player policies and employee programs are not approved within the first 21 days of this case.

44.     Second, the Debtor argues that, because all unsecured claims should be paid in full, the Debtor should be authorized to pay in full the prepetition salary claims of two highly compensated non-player employees (one of whom is a proposed purchaser, Nolan Ryan) in the amounts $35,156.25 and $25,781.06, notwithstanding that they exceed the cap under 11 U.S.C. § 507(a)(4). As set forth more fully in the discussion regarding the Prepetition Creditors Claims Motion, it is not at all clear, given the Lenders' anticipated opposition to the proposed plan and anticipated opposition to a carve out for unsecured creditors, that all unsecured creditors will be paid in full. Accordingly, the United States Trustee opposes the payment of prepetition claims of highly compensated non-player employees.

45.     Next, by the Employee Wage Motion, the Debtor seeks to pay player salaries and honor player benefit programs. The Debtor is bound to abide by the collective bargaining agreement as between MLB and the Major League Baseball Players Association (the "MLBPA"). The Debtor cannot survive without its players and the benefit of the collective bargaining agreement. Notwithstanding that the players' compensation exceeds the cap under 11 U.S.C. § 507(a)(4), payment and honoring of the obligations of the players meets this Court's *CoServ* test. The Debtor must deal with the players or it will not be "baseball time in Texas." Failure to pay and honor these player claims risks possible cessation of play by some or all of the players and further risks claims being asserted by the MLBPA against the Debtor. And, finally,

the United States Trustee sees no practical legal alternative to payment of the players' claims.

*See In re CoServ, L.L.C.*, 273 B.R. at 498.  Accordingly, the United States Trustee does not

oppose honoring of all obligations owing to the players.

**Debtor's Motion for Interim and Final Orders Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to Pay the Prepetition Claims of Certain Creditors in the Ordinary Course of Business ("Prepetition Creditor Claims Motion")**

46.     The Debtor seeks to pay approximately $3.5 million in liquidated, noncontingent,

and undisputed prepetition claims in the ordinary course of business.  Of this $3.5 million, the

Debtor estimates that $2.4 million of these claims fall under 11 U.S.C. § 503(b)(9), such that

they are actually priority unsecured claims.[1]  An additional $200,000 in claims are alleged to be

subject to mechanics' liens or the possessory liens of certain transporters.  Taking these numbers

as true, it leaves approximately $900,000 in purely general unsecured vendor claims.

47.     Initially, the Prepetition Creditor Claims Motion does not articulate grounds

under Fed. R. Bankr. P. 6003 why the relief requested "is necessary to avoid immediate and

irreparable harm" if the Court does not grant relief within 21 days after the petition date.  The

Prepetition Creditor Claims Motion provides that the prepetition creditors claims "are on rolling,

30 or 45-day terms, and the Debtor does not intend to pay [the claims] until they would come

due in the ordinary course of business."  Prepetition Creditor Claims Motion, ¶ 29.  The Debtor

estimates that approximately $2.4 million of such claims would be due and payable within the

first twenty days of the case.  *Id*.  Accordingly, as to these $2.4 million in claims, the Debtor

predicts immediate and irreparable harm, but as to at least $1.1 million in claims, the Debtor has

not even alleged immediate and irreparable harm.

---

[1] The Court in *In re CoServ, L.L.C.*, 273 B.R. 487, 493 n. 10 (Bankr. N.D. Tex. 2002) has recognized that prepayment of priority unsecured claims is less controversial because they have already, by act of Congress, been

48.     Second, this Court in *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002) ("*CoServ*") defined what a Debtor must show in order to obtain the extraordinary relief of prepayment of unsecured claims.  The Court has recognized that a debtor in possession's fiduciary duties provide the necessary justification for the Court to utilize its powers under 11 U.S.C. § 105(a) to authorize the payment of general unsecured prepetition claims.  *Id*. at 496-97. In that regard, the Court has established a three pronged test to resolve whether a general unsecured prepetition claim should be paid.  *Id*. at 498.  "The debtor must show three elements are present.  First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim."  *Id*.

49.     Prior to the bankruptcy filing, the United States Trustee requested that the Debtor's affiant attest to a table of claims that the Debtor sought to pay and include summary points addressing the *CoServ* factors.  Instead, the Debtor seeks to be excused from making a showing under *CoServ* "because all creditors are being paid in full under the Prepackaged Plan" such that "none of them are prejudiced or have their priorities affected as a result of the payment of the" prepetition general unsecured claims.  Prepetition Creditor Claims Motion, ¶ 35. Additionally, at least with regard to the alleged section 503(b)(9) claims, the Debtor asserts that payment does not upset the priority scheme.  Were it the case that all claims of any type were being paid in full, the concerns regarding elevation of certain unsecured creditors over other

elevated above other unsecured claims.

similarly situated creditors and the threat of coercion by disgruntled creditors would dissipate. *See, e.g., CoServ*, 273 B.R. at 494-95.

50.     However, the Debtor's position assumes that the proposed plan will be met with no resistance.  On information and belief, the Lenders oppose the proposed plan and may seek to unwind certain prepetition transactions such as the transfer of various contracts from HSG into the Debtor.  Additionally, upon further information and belief, the Lenders are not prepared to agree to a carve out that will pay unsecured creditors 100 percent.  Under such facts, it is not at all certain that all creditors will be paid in full.  The Debtor, therefore, has not shown good cause why it should be excused from the requirement to meet the *CoServ* test.

51.     The Debtor relies on this Court's opinion in *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) ("*Mirant*") in which the Court acknowledged that it is "acutely aware of the precarious position of a company operating in chapter 11 (especially early in the case)" and noted that "the consequences of the failure of a given vendor to provide goods or services could be disastrous."  The *Mirant* critical vendor motion sought to pay up to $5.2 million in prepetition unsecured claims in an estate where total unsecured claims were in excess of $9 billion and the total unsecured trade debt was over $400 million.  *See* Debtor's Motion for Order Authorizing the Payment of Certain Critical Prepetition Claims Owing on Account of (i) Shipping, Storage and Related Costs and (ii) Essential Services, and Granting Related Relief, *In re Mirant Corporation et al.*, ¶ 6, Docket Entry No. 14, Case No. 03-46590-DML-11, United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.  The debtor in *Mirant* described the relief requested, therefore, as being "narrowly tailored to facilitate the Debtors' restructuring efforts."  *Id.* at ¶ 7.  By contrast, this Debtor wants the broadest possible

relief from this Court, in a case where the universe of total unsecured claims and total unsecured trade debt is not disclosed, and wishes a complete exemption from the Court's *CoServ* test.

52.     However, the Court did not, even in *Mirant*, grant to the debtor a waiver of the requirement to meet the *CoServ* test.  Instead, the Court created a scheme whereby the debtor could pay certain prepetition claims and bear a reduced burden with regard to *CoServ*.  *Id*. at 429-30. With regard to claims believed to be secured or believed upon advice of counsel to come within the *CoServ* test, such claims could be paid, but the debtor in *Mirant* was required to provide an accounting to the United States Trustee and any committee of each such claim paid. With regard to those claims asserted to meet the *CoServ* test, the Debtor was also required to include the basis upon which such claims satisfied the *CoServ* test.  *Id*.  Finally, with regard to those prepetition claims of an entity that refused to deal with the debtors on any basis absent payment of the prepetition claim, the Court created a procedure whereby such entities were required to come before the Court to justify their demand for payment.  *Id*.  Accordingly, the Court did not, wholesale, permit the debtor in *Mirant* to pay every prepetition claim without regard to *CoServ*.  The Court should similarly enforce *CoServ*  in this case.

**Debtor's Motion for an Order (I) Scheduling a Hearing to Consider Confirmation of the Prepackaged Plan, (II) Establishing an Objection Deadline to Object to the Prepackaged Plan, (III) Approving the Form and Notice Thereof, (IV) and Granting Further Relief**

53.     The Debtor contemplates combining the disclosure statement hearing with the confirmation hearing.  The proposed disclosure statement was not circulated to creditors prior to the filing.  Two drafts with many omitted sections were provided to the United States Trustee. The final version of the disclosure statement was uploaded at 6:00 p.m. Central time after the filing of the petition at approximately ten o'clock in the morning.

54.     In a large case, the Bankruptcy Code generally requires that before soliciting votes for a plan, the Debtor will transmit "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. §1126(b); compare 11 U.S.C. 1126(f) (contemplating pre-approval and combined disclosure statement hearing and plan).

55.     Given questions about transfers immediately before the bankruptcy filing, the sale, impairment, and the timing of the filing, enforcing the bifurcated disclosure statement and plan procedures fosters transparency. In addition to the benefit of affording parties an opportunity to check the sufficiency and accuracy of the disclosure, the disclosure statement hearing could result in a full evidentiary record on the impairment and solicitation issue.

56.     The United States Trustee contemplates having a committee formation meeting on Thursday, June 3, 2010. When the Court sets the hearings on disclosure and confirmation, the United States Trustee requests that the Court afford the committee sufficient time to organize. While the United States Trustee seeks bifurcation of the disclosure statement hearing and the confirmation hearing, the United States Trustee does not oppose shortening the 28 day notice periods for the hearings on disclosure and confirmation. Fed. R. Bankr. P. 2002(b).

### Conclusion

57.     The United States Trustee has endeavored to provide accurate information, but the review of pleadings and preparation of this brief have necessarily occurred in a limited time frame. The United States Trustee requests that the Court consider the United States Trustee's comments and tailor the orders accordingly.

DATED: May 25, 2010                                        Respectfully submitted,

WILLIAM T. NEARY
UNITED STATES TRUSTEE

_____/s/___Meredyth A. Kippes_____
Lisa L. Lambert
Trial Attorney
TX State Bar No. 11844250
Meredyth A. Kippes
Trial Attorney
TX State Bar No. 24007882
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242
(214) 767-8967; (214) 767-8971 (FAX)

**<u>Certificate of Service</u>**

I certify that on May 25, 2010, I served a true copy of this document either by electronic

case filing or by email on the following parties and on those requesting notice by ECF:

*Debtor Texas Rangers – Weil,Gotshal*
Ronit Berkovich – Ronit.Berkovich@weil.com
Marty Sosland – Martin.Sosland@weil.com
Charles Persons – Charles.Persons@weil.com

*JP Morgan Chase – Latham Watkins*
Ronan Wicks – Ronan.Wicks@LW.com
David.Teh – David.Teh@LW.com
Mitchell A. Seider – Mitchell.Seider@LW.com
Joe Fabiani – Joseph.Fabiani@LW.com

*GSP Finance- Clifford Chance*
Jason Young - Jason.Young@cliffordchance.com

*Major League Baseball – Paul Weiss*
Jordan E. Yarett – jyarrett@paulweiss.com

*Ranger Baseball Express (Proposed Purchaser)- Foley*
Mary K. Braza – Mbraza@Foley.com
Kevin R. Schulz – Kschulz@Foley.com

*/s/  Meredyth A. Kippes*
Meredyth A. Kippes