Martin A. Sosland (18855645)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

Ronit J. Berkovich (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor and
Debtor in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

-----------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **TEXAS RANGERS BASEBALL PARTNERS,** | : | **Case No. 10-43400 (DML)** |
| | : | |
| **Debtor.** | : | |
| | : | |

-----------------------------------------------------------------------x

**APPLICATION OF DEBTOR PURSUANT TO SECTIONS 327(a)
AND 328(a) OF THE BANKRUPTCY CODE AND RULE 2014 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR
AUTHORIZATION TO EMPLOY AND RETAIN PERELLA
WEINBERG PARTNERS LP AS FINANCIAL ADVISOR AND
INVESTMENT BANKER TO THE DEBTOR *NUNC PRO TUNC*
<u>TO THE COMMENCEMENT DATE</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

   Texas Rangers Baseball Partners ("<u>TRBP</u>" or the "<u>Debtor</u>"), hereby files this

application (the "<u>Application</u>") for authorization to retain Perella Weinberg Partners LP ("<u>PWP</u>")

as financial advisor and investment banker to the Debtor in this chapter 11 case. In support of the Application, the Debtor submits the Declaration of Michael A. Kramer in Support of Debtor's Application for Order under sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing Employment and Retention of Perella Weinberg Partners LP as Financial Advisor and Investment Banker (the "<u>Kramer Declaration</u>"), attached hereto as <u>Exhibit A</u>, and respectfully represents as follows:

<b><u>Background</u></b>

1.     On the date hereof (the "<u>Commencement Date</u>"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>"). The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**TRBP Partnership Structure**

2.     TRBP owns and operates the Texas Rangers Major League Baseball Club, a professional baseball club (the "<u>Texas Rangers</u>") in the Dallas/Fort Worth Metroplex, pursuant to the Major League Constitution (the "<u>Major League Constitution</u>") and the Membership Agreement, dated as of November 18, 1960, by and between The American League of Professional Baseball Clubs, as assumed by the Office of the Commissioner of Baseball (the "<u>BOC</u>"), and WBC Baseball Club, Inc., as assumed by TRBP pursuant to an Assumption Agreement, dated as of June 16, 1998.

3.     TRBP is a Texas general partnership, in which Rangers Equity Holdings, L.P. ("<u>Rangers Equity LP</u>"), a Delaware limited partnership, holds a 99% partnership interest and Rangers Equity Holdings GP, LLC ("<u>Rangers Equity GP</u>"), a Texas limited liability company, holds a 1% partnership interest. Rangers Equity GP is a wholly-owned subsidiary of

Rangers Equity LP. Both Rangers Equity LP and Rangers Equity GP are holding companies with no operating assets and are indirect, wholly-owned subsidiaries of HSG Sports Group LLC ("HSG"). HSG is a sports and entertainment holding company, which is an affiliate of, and indirectly controlled by, Thomas O. Hicks ("Mr. Hicks"). The Texas Rangers have had five owners since the team moved to Arlington in 1972. Mr. Hicks became the fifth owner in the history of the Texas Rangers on June 16, 1998, when HSG completed the acquisition of the franchise from the George W. Bush/Edward W. Rose partnership.

**Major League Baseball**

4. With a history and tradition dating back to 1869, professional baseball is one of America's oldest organized league sports. From April through the end of September every year, Major League Baseball ("MLB") runs a 162-game regular season. MLB's clubs are divided into two leagues (American and National) and six divisions (AL East, AL Central, AL West, NL East, NL Central and NL West).

5. The BOC, doing business as Major League Baseball, is an unincorporated association of its 30 member clubs. It is headquartered in New York City and is governed by the Major League Constitution. The primary purpose of the BOC is to undertake centralized activities on behalf of the 30 clubs. Among other things, the BOC hires and maintains the sport's umpiring crews, and negotiates marketing, labor, and television contracts.

**The Texas Rangers**

6. The Texas Rangers are located in the fourth largest metropolitan area and the largest metropolitan market with a single MLB franchise. The Texas Rangers are one of only 30 MLB franchises and one of two MLB clubs in the state of Texas and its bordering states. The Texas Rangers have a rich and colorful history and have established themselves as a young, up-and-coming contender supported by a strong fan base. The team's executives have successfully

combined players from their farm system with key veterans to produce a team that today is in first place in the American League's West Division. Founded in 1961 as the second incarnation of the Washington Senators, the franchise moved to Texas in 1972 and currently competes in the American League West together with the Los Angeles Angels of Anaheim, the Oakland Athletics, and the Seattle Mariners.

7.     The Texas Rangers' home field, the Rangers Ballpark in Arlington (the "Ballpark"), is located in Arlington, Texas and is an open-air, natural grass ballpark that was designed and built with tradition and intimacy in mind. The proximity of the fans to the action is one of the closest in MLB. The overall seating of the Ballpark is 49,170 seats on five levels, making it MLB's sixth largest ballpark.

**Prepetition Indebtedness**

8.     Pursuant to that certain First Lien Credit Agreement and that certain Second Lien Credit Agreement (together, the "HSG Credit Agreement"), HSG and certain affiliates of HSG are indebted to the Lenders (as defined below) in the amount of $525 million. The HSG Credit Agreement is guaranteed by certain of HSG's subsidiaries, although the guaranties of the Texas Rangers and the security interests securing them are limited to $75 million (the "TRBP Guaranty Cap"). The First Lien Credit Agreement is secured by a first lien on substantially all of the assets of HSG and its affiliates including a pledge of the equity interests those entities have in their subsidiaries, including TRBP, and the Second Lien Credit Agreement is secured by a second lien on substantially all of the assets of HSG, its affiliates, including a pledge of the equity interests those entities have in their subsidiaries, including TRBP.

9.     TRBP is also party to that certain Amended and Restated Secured Revolving Promissory Note, dated November 25, 2009, by TRBP in favor of Baseball Finance

LLC, an affiliate of the BOC (the "Baseball Finance Note").  Pursuant to the Baseball Finance Note, Baseball Finance agreed to make available to TRBP a secured revolving loan facility in an aggregate principal amount not to exceed $25 million.  The loans under the Baseball Finance Note are secured by liens on substantially all of the assets of TRBP that are junior in priority to the liens granted pursuant to the HSG Credit Agreement that are subject to the TRBP Guaranty Cap.  As of the Commencement Date, approximately $18.45 million in principal is outstanding under the Baseball Finance Note, plus accrued interest.

**Events Leading to TRBP's Chapter 11 Filing**

10.     Since 2005, TRBP has experienced, and continues to experience, cash flow deficiencies.  For the entire period that Mr. Hicks has owned the Texas Rangers, he has provided financial support to the team through capital contributions and loans to HSG in excess of $100 million.

11.     Beginning in August 2008, HSG retained advisors to provide financial advice and assistance in connection with a capital raise, potential restructuring, or sale.  While HSG and TRBP explored their options, TRBP continued to suffer operating losses.  As a result of such losses, HSG was unable to service its $525 million long-term debt obligations under the HSG Credit Agreement.  On March 31, 2009, HSG failed to make a scheduled interest payment under the HSG Credit Agreement, and on April 7, 2009, the lenders to the HSG Credit Agreement (the "Lenders") accelerated the entire amount of indebtedness thereunder.  As a result of the acceleration, the Lenders under the HSG Credit Agreement have claims against TRBP on account of TRBP's secured guaranty of $75 million of such indebtedness, as discussed above.

**Sale Process**

12.     During the second half of 2008 and throughout 2009, HSG and TRBP, in conjunction with their advisors, pursued a variety of options for a capital raise or a sale of the

Texas Rangers.  Ultimately, they concluded that a sale of the Texas Rangers was the only viable option.  A lengthy and active marketing process culminated with an agreement among HSG, TRBP and Rangers Baseball Express LLC (the "Purchaser"), whose principals include the current President of the Texas Rangers, Nolan Ryan, and Chuck Greenberg, a sports lawyer and minor league club owner, dated as of January 23, 2010 (the "January APA"), governing the sale of the Texas Rangers franchise and certain related assets.

13.     Pursuant to the terms of the January APA, consummation of the sale required, among other closing conditions, the consent of the Lenders pursuant to the terms of the HSG Credit Agreement.  Despite HSG's, TRBP's, and the Purchaser's lengthy good faith negotiations with the Lenders following the execution of the January APA, the Lenders refused to consent to the transactions contemplated by the January APA and thus prevented TRBP from moving forward with the sale of the Texas Rangers.  Ultimately, TRBP, in consultation with MLB, concluded that a chapter 11 filing designed to facilitate a sale of TRBP's assets to the Purchaser (the "Sale") pursuant to a prepackaged plan of reorganization ("the Prepackaged Plan") was the most efficient manner in which to consummate the Sale and was, therefore, in the best interests of the Texas Rangers franchise, its fans, MLB and all other parties involved, including TRBP's creditors.  As described herein, the Prepackaged Plan will facilitate the sale of the Texas Rangers franchise to the Purchaser and the payment of all of TRBP's creditors in full, allowing the Texas Rangers franchise to compete successfully on and off the field with assurance of long-term financial stability.

**Asset Purchase Agreement**

14.     On May 23, 2010, after further negotiation, in anticipation of the implementation and consummation of the Sale through a chapter 11 plan of reorganization, the parties to the January APA terminated the January APA and entered into that certain Asset

Purchase Agreement (the "Asset Purchase Agreement") for the sale of the Texas Rangers franchise and certain related assets.[1]

15. Under the Asset Purchase Agreement, substantially all of the Debtor's assets, including the Texas Rangers franchise and substantially all contractual rights related the operation of the Texas Rangers will be sold to the Purchaser. The aggregate consideration paid and obligations assumed by the Purchaser at the Closing will equal more than $500 million. Pursuant to the Sale, the Purchaser will also assume virtually all of the obligations of the Texas Rangers, including deferred compensation obligations, sponsorship, ticketholder, employee and specified tax obligations, with the exception of certain excluded liabilities that will be paid under the Prepackaged Plan. Under the Asset Purchase Agreement and the Prepackaged Plan, TRBP also intends to assume and assign to the Purchaser all contracts relating to the Texas Rangers franchise, including all marketing, media, advertising, and merchandising contracts, all minor league and major league player contracts and certain real property Leases. The Sale anticipates a complete and orderly transition of the operations of the team — all tickets to games and other events will be fully honored, and all employees will keep their jobs. Although accomplished through a chapter 11 plan, the Sale will resemble in all significant respects the sale of any other sports franchise.

16. The Sale will allow TRBP's creditors that are Lenders under the HSG Credit Agreement to recover 100 percent of their guaranty claims against TRBP. As described more fully below, subject to Court approval, the Sale is expected to be completed by mid-

---

[1] A more thorough description of the Asset Purchase Agreement and the Prepackaged Plan are contained in the Declaration of Kellie L. Fischer in Support of Debtor's Chapter 11 Petition and Request for First Day Relief, filed contemporaneously herewith and incorporated herein by reference.

summer, allowing the franchise to exit the chapter 11 process expeditiously in order to reduce any potential adverse impact to the Texas Rangers and its operations.

**MLB Approval**

17.     The Debtor, as a member of Major League Baseball, is subject to the rules and regulations of MLB.  In particular, any sale of the Texas Rangers franchise cannot be consummated without first obtaining the requisite approval from the BOC and 75% of the MLB clubs.  The sale of any MLB club must comply with the process set forth in the Major League Constitution and the MLB ownership guidelines.  Accordingly, TRBP has worked very closely with MLB throughout the negotiation of the Asset Purchase Agreement and all related events leading to the filing of the chapter 11 case.  As of the date hereof, the Debtor is not aware of any opposition by MLB or the requisite percentage of MLB clubs required to consent to the Sale.

**The Prepackaged Plan**

18.     As stated above, concurrently herewith, the Debtor has filed its Prepackaged Plan.  The primary purpose of the Prepackaged Plan is to bridge the impasse between TRBP and the Lenders under the HSG Credit Agreement and to effectuate the Sale of the Texas Rangers franchise to the Purchaser and satisfy TRBP's creditors in full.

19.     The Prepackaged Plan provides for the Sale to be consummated on the effective date (the "Effective Date") and sets forth the distribution that each class of the Debtor's creditors and equity holders is to receive on the Effective Date under the Prepackaged Plan.  All TRBP's creditors will be paid in full under the Prepackaged Plan or have their claims assumed by the Purchaser under the Asset Purchase Agreement.  Specifically, each holder of an (i) Allowed Priority Non-Tax Claim, (ii) Allowed First Lien Holder Claim, (iii) Allowed Second Lien Holder Claim, (iv) Allowed MLB Prepetition Claim, (v) Allowed Secured Tax Claim, (vi) Allowed Other Secured Claim, (vii) Allowed Assumed General Unsecured Claim,

(viii) Allowed Non-Assumed General Unsecured Claim, (ix) Allowed Emerald Diamond Claim, (x) Allowed Overdraft Protection Agreement Claim, (xi) Allowed Intercompany Claim, and (xii) Allowed TRBP Equity Interest (all as defined in the Prepackaged Plan) is unimpaired and will be paid in full.

20.     Additionally, TRBP believes that the Purchaser will build on past team successes and that the future of the Texas Rangers will be in the hands of an ownership group that will be a good steward for the game.

21.     TRBP believes that because the Prepackaged Plan satisfies in full all claims against TRBP, is supported by TRBP's equity holders, and will lead to the least disruption to the Texas Rangers' business of playing baseball, the Prepackaged Plan is in the best interests of the Texas Rangers franchise and all parties in interest.

**Jurisdiction**

22.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

23.     By this Application, the Debtor requests, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), entry of the proposed order authorizing the employment and retention of PWP as financial advisor and investment banker to the Debtor *nunc pro tunc* to the Commencement Date in accordance with the terms and conditions of that certain engagement letter by and among Weil, Gotshal & Manges LLP ("WGM"), the Debtor, and PWP dated as of May 23, 2010 and the related indemnification provisions (such letter, together with the

indemnification provisions in <u>Annex A</u>, is collectively referred to as the "<u>Engagement Letter</u>")[2] and attached hereto as <u>Exhibit B</u>.

## **PWP'S Qualifications**

24. PWP is a financial services firm providing corporate advisory, private placement and asset management services to clients around the world. Today, PWP and its affiliates have offices in London, England; San Francisco, CA; Austin, TX; New York, NY; Denver, Colorado; and Stamford, CT with 42 partners and over 300 employees recruited from a wide variety of leading financial institutions. PWP's corporate advisory practice is focused on providing clients with advice related to mergers and acquisitions and financial restructurings. PWP's mergers and acquisitions practice works with both public and private companies. Its financial restructuring practice works with companies, investors and other parties-in-interest in turn-around and distressed situations. In addition, PWP has an affiliated asset management business, which offers multiple investment vehicles focused on alternative investment products.

25. Prior to the Commencement Date, WGM retained PWP on behalf of HSG Sports Group Holdings LLC ("<u>HSG</u>"), the indirect parent of the Debtor, in connection with WGM's representation of HSG (the "<u>Prior Engagement</u>"). PWP assisted HSG in various matters, including restructuring and sale efforts involving the Debtor. The Debtor subsequently selected PWP as its financial advisor and investment banker based upon, among other things, (a) the Debtor's need to retain a financial advisory and investment banking firm to provide advice with respect to the Debtor's restructuring activities and (b) the extensive experience and

---

[2] WGM has entered into the Engagement Letter solely for the purpose of engaging PWP on behalf of the Debtor. WGM shall incur no liability to any party for entering into the Engagement Letter, including any amounts payable or any indemnification obligations due under the Engagement Letter.

excellent reputation of PWP's professionals in providing financial advisory and investment banking services in complex chapter 11 cases.

26.     On May 23, 2010, WGM engaged PWP, on behalf of the Debtor, to provide general financial and investment banking advice in connection with WGM's representation of the Debtor.  In providing prepetition services to the Debtor and HSG in connection with matters involving the Debtor, PWP's professionals have worked closely with the Debtor's management and other professionals and have become well acquainted with the Debtor's operations, debt structure, creditors, business and operations and related matters. Accordingly, PWP has developed significant relevant experience and expertise regarding the Debtor that will assist it in providing effective and efficient services in this chapter 11 case.

27.     In addition to PWP's understanding of the Debtor's financial history, business operations and the industries in which the Debtor operates, PWP and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out of court and in chapter 11 cases.  PWP's employees have advised debtors, creditors, equity constituencies and government agencies in many complex financial reorganizations.

28.     The professionals of PWP have been employed as financial advisors and as investment bankers in a number of troubled company situations, including the chapter 11 cases of Accuride Corporation, Allegiance Telecom Inc., American Color Graphics, Inc., Calpine Corporation, Delta Air Lines Inc., Maxxim Medical, Solutia Inc., Panolam Industries, Pierre Foods, Inc. and Spectrum Brands, Inc.

29.     With its experienced senior professionals, PWP fulfills a critical need that complements the services offered by the Debtor's other restructuring professionals.  The Debtor

believes it will require the services of a capable and experienced financial advisory and investment banking firm such as PWP because, among other reasons, PWP's resources and capabilities, together with its prepetition experience with respect to advising the Debtor, are crucial to the Debtor's success in this chapter 11 case.

## Services to be Rendered[3]

30.     The financial advisory and investment banking services provided by PWP have included and will include the following:

      a.      Familiarize itself with the business, operations, properties, financial condition and prospects of the Debtor;

      b.      Review the Debtor's financial condition and outlook;

      c.      Assist in the development of financial data and presentations to the Debtor's officers, various creditors and other parties;

      d.      Analyze the Debtor's financial liquidity and evaluate alternatives to improve such liquidity;

      e.      Evaluate the Debtor's debt capacity and alternative capital structures;

      f.      Participate in negotiations among the Debtor and its creditors, suppliers, lessors and other interested parties with respect to any of the transactions contemplated by the Engagement Letter;

      g.      Advise the Debtor and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

      h.      Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of any of the transactions contemplated by the Engagement Letter, as requested and mutually agreed;

---

[3] Capitalized terms used in this summary and the summary regarding Professional Compensation below, but not otherwise defined herein, shall have the meanings set forth in the Engagement Letter.  This summary is solely for the benefit of the Court and parties-in-interest.  To the extent that this summary and the terms of the Engagement Letter are inconsistent, the terms of the Engagement Letter shall control.

i. Analyze various Restructuring scenarios and the potential impact of these scenarios on the value of the Debtor and the recoveries of those stakeholders impacted by the Restructuring;

j. Provide strategic advice with regard to restructuring or refinancing the Debtor's obligations;

k. Provide financial advice and assistance to the Debtor in developing a Restructuring;

l. Provide financial advice and assistance to the Debtor in structuring any new securities to be issued under a Restructuring;

m. Assist the Debtor and/or participate in negotiations with entities or groups affected by the Restructuring;

n. Provide financial advice to the Debtor in structuring and effecting a Financing, identify potential Investors and, at the Debtor's request, contact and solicit such Investors;

o. Assist in the arranging of a Financing, including identifying potential sources of capital, assisting in the due diligence process, and negotiating the terms of any proposed Financing, as requested;

p. Provide financial advice to the Debtor in structuring, evaluating and effecting a Sale, identify potential acquirers and, at the Debtor's request, contact and solicit potential acquirers; and

q. Assist in the arranging and executing a Sale, including identifying potential buyers or parties in interest, assisting in the due diligence process, and negotiating the terms of any proposed Sale, as requested.

31. In addition, PWP will provide any additional financial advisory and investment banking services in connection with the engagement as the Debtor may reasonably request from time to time.

## Professional Compensation

32. PWP's decision to continue with this engagement to advise and assist the Debtor is conditioned upon its ability to be retained in accordance with its customary terms and conditions of employment and compensated for its services and reimbursed for the expenses it incurs in accordance with its customary billing practices.

33. PWP intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with this chapter 11 case, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter (the "<u>Fee Structure</u>"). Further, because the Debtor is seeking to retain PWP under section 328(a) of the Bankruptcy Code, the Debtor believes that PWP's compensation should not be subject to the additional standard of review under section 330 of the Bankruptcy Code.

34. In summary, the Fee Structure provides for the following compensation to PWP:

a. a monthly financial advisory fee of $87,500, payable in advance; plus

b. a one-time Transaction Fee in the amount of $1,500,000, payable promptly upon consummation of a Transaction (which, for the avoidance of doubt, shall only be payable upon the consummation of one Sales Transaction or one Restructuring Transaction).

35. The Debtor has also agreed to reimburse PWP for certain reasonable expenses incurred in connection with the performance of the engagement, including travel costs, document production, and other expenses of this type, including the reasonable expenses of outside counsel.

36. The Fee Structure is consistent with and typical of compensation arrangements entered into by PWP and other comparable firms in connection with the rendering of similar services under similar circumstances. In determining the Fee Structure to be paid to PWP and the reasonableness of such compensation, the Debtor compared PWP's fee proposal to other proposals received by the Debtor in the financial advising and investment banking selection process. After such comparison, the Debtor believes, as does PWP, that the Fee

Structure is in fact reasonable, market-based, and designed to compensate fairly PWP for its work and to cover fixed and routine overhead expenses under the standards set forth in section 328 of the Bankruptcy Code.

37.     PWP's strategic and financial expertise as well as its capital markets knowledge, financing skills, restructuring capabilities, and mergers and acquisitions expertise, some or all of which have been and may be required by the Debtor during the term of PWP's engagement, were all important factors in determining the Fee Structure.  The Debtor believes that the ultimate benefit of PWP's services hereunder cannot be measured by reference to the number of hours to be expended by PWP's professionals in the performance of such services. Indeed, the Debtor and PWP have agreed upon the Fee Structure in anticipation that a substantial commitment of professional time and effort will be required of PWP and its professionals in connection with this chapter 11 case and in light of the fact that (a) such commitment may foreclose other opportunities for PWP and (b) the actual time and commitment required of PWP and its professionals to perform its services under the Engagement Letter may vary substantially from week to week and month to month, creating ''peak load'' issues for PWP.

38.     PWP will seek compensation and reimbursement of expenses, as specified in the Engagement Letter, from the Debtor's estate with the payment of such fees and expenses to be approved in accordance with section 328(a) of the Bankruptcy Code, the Bankruptcy Rules, and any orders of this Court that may apply in the chapter 11 case.

### Termination of Engagement

39.     PWP's engagement may be terminated by the Debtor or PWP with or without cause at any time upon ten (10) days written notice and without liability or continuing obligation to the Debtor or PWP.  If the Debtor terminates PWP's engagement, PWP will remain

entitled to full payment of any fees if any Restructuring, Financing or Sale (as defined in the Engagement Letter) occurs within one year following such termination or expiration.

**Proposed Indemnification Provisions**

40.     The Debtor has agreed to indemnify and to make certain contributions to PWP in accordance with the indemnification provisions set forth in <u>Annex A</u> of the Engagement Letter (the "<u>Indemnification Provisions</u>").

41.     The Indemnification Provisions are customary and reasonable terms of consideration for financial advisors and investment bankers, such as PWP, for proceedings both out of court and in chapter 11.  The Indemnification Provisions were fully negotiated between the Debtor and PWP at arm's-length and the Debtor respectfully submits that the Indemnification Provisions, viewed in conjunction with the other terms of PWP's proposed retention, are reasonable and in the best interests of the Debtor, its estate and creditors.

**PWP's Disinterestedness**

42.     As discussed above, prior to the Commencement Date, WGM retained PWP on behalf of HSG, the indirect parent of the Debtor, in connection with WGM's representation of HSG.  A copy of the engagement letter, dated May 7, 2009, entered into by and among WGM, HSG and PWP in connection with the Prior Engagement is attached hereto as <u>Exhibit C</u>.  Pursuant to a separate letter agreement, dated May 18, 2010 and attached hereto as <u>Exhibit D</u>, PWP waived any restructuring fees owed by HSG to PWP under the Prior Engagement for a transaction involving TRBP.  In consideration for PWP's waiver, PWP and TRBP entered into the Engagement Letter whereby TRBP will pay PWP a Transaction Fee upon the sale of TRBP to the Purchaser, as set forth in <u>Exhibit B</u>.

43.     To the best of the Debtor's knowledge, information, and belief, and except and to the extent disclosed herein and in the Kramer Declaration, (a) PWP is a "disinterested

person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and holds no interest adverse to the Debtor or its estate in connection with the matters for which PWP is to be retained by the Debtor, and (b) PWP has no connection with the Debtor, its creditors, the U.S. Trustee, or other parties in interest in this chapter 11 case.

44. The Debtor has paid PWP for all fees incurred and expense reimbursement billed to the Debtor prior to the Commencement Date.[4]  Accordingly, PWP is not a prepetition creditor of the Debtor.

45. The Debtor's knowledge, information, and belief regarding the matters set forth herein are based upon, and made in reliance on, the Kramer Declaration.  To the extent that PWP discovers any additional facts bearing on the matters described herein during the period of PWP's retention, PWP will supplement the information contained in the Kramer Declaration.

### PWP's Engagement under Section 328 of the Bankruptcy Code is Reasonable and Appropriate Under the Circumstances

46. The Debtor seeks approval of the Engagement Letter and Fee Structure contained therein pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis . . . ."  11 U.S.C. § 328(a).  Accordingly, section 328 of the Bankruptcy Code permits the compensation of professionals, including financial advisors and investment bankers, on more flexible terms that reflect the nature of their services and market conditions.

---

[4] The Debtor has paid PWP a total of $1,787,731.85 in fees and expenses prior to the Commencement Date.

As the United States Court of Appeals for the Fifth Circuit recognized in <u>Donaldson Lufkin &</u>

<u>Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)</u>:

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

123 F.3d. 861, 862 (5th Cir. 1997) (internal citations and emphasis omitted).

47.     Furthermore, under the recently enacted Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, certain modifications were made to section 328(a) of the Bankruptcy Code, which now provides as follows:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, <u>on a fixed or percentage fee basis</u>, or on a contingent fee basis.

<u>See</u> 11 U.S.C. § 328(a) (emphasis added). Section 328(a) of the Bankruptcy Code, as amended, now makes clear that debtors may retain, subject to bankruptcy court approval, a professional on a fee basis such as the Fee Structure with PWP proposed by the Debtor herein.

48.     In light of the fact that PWP is not entitled to hourly compensation under the Engagement Letter and the fact that PWP does not maintain or have time recording systems to maintain time records, the Debtor requests permission for PWP to submit a monthly summary which shall set forth a description of the services rendered by the restructuring professionals in rendering services on behalf of the Debtor. As set forth above, notwithstanding approval of the

Engagement Letter under section 328 of the Bankruptcy Code, PWP intends to apply for compensation of professional services rendered and reimbursement of expenses incurred in connection with this chapter 11 case, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter.

49.     The Debtor submits that the Fee Structure and Indemnification Provisions are reasonable terms and conditions of employment in light of the following:  (a) the nature and scope of services to be provided by PWP; (b) industry practice with respect to the fee structures and indemnification provisions typically utilized by leading investment banks and financial advisors that do not bill their clients on an hourly basis; (c) market rates charged for comparable services both in and out of the chapter 11 context; (d) PWP's substantial experience with respect to financial advisory services and investment banking; and (e) the nature and scope of work already performed by PWP prior to the Commencement Date.

50.     In negotiating PWP's Engagement Letter and Indemnification Provisions, among other things and as described in this Application, the Debtor considered the following factors:

a.      The decision by the senior management that the Debtor required the services of a financial advisor and investment banker;

b.      The financial advisor and investment banker's experience and level of expertise;

c.      The fact that the financial advisor and investment banker would not agree to remove indemnity provisions from the Engagement Letter; and

d.      The terms of the Engagement Letter were negotiated at arms' length and the fees were comparable to the fees charged in similarly sized chapter 11 cases.

51. The Debtor believes that the Fee Structure and Indemnification Provisions set forth in the Engagement Letter are reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code.

52. Indeed, similar fixed and contingency fee arrangements in other chapter 11 cases have been routinely approved and implemented by courts in this circuit. Likewise, similar indemnification arrangements have been approved and implemented. See, e.g., In re Pilgrim's Pride Corp., Case No. 08-45664 (DML) (Bankr. N.D. Tex. Jan. 13, 2009) (order authorizing the retention of Lazard Freres & Co. LLC as Debtors' investment banker and granting indemnification provisions subject to standard of review set forth in section 328(a)); In re Lothian Oil, Inc., Case No. 07-70121 (RBK) (Bankr. W.D. Tex. June 18, 2007) (order authorizing the retention of Blackhill Partners, LLC as Debtors' financial advisor on similar indemnification terms and with compensation subject to standard of review set forth in section 328(a)); In re The National Benevolent Association of the Christian Church (Disciples of Christ), Case No. 04-50948 (RBK) (Bankr. W.D. Tex. Feb. 23, 2004) (order authorizing retention of Cain Brothers and Company, LLC, as investment bankers for debtors on similar indemnification terms and similar contingency fee arrangements); In re American Plumbing & Mechanical Inc., Case No. 03-55789 (LMC) (Bankr. W.D. Tex. Nov. 12, 2003) (order authorizing retention of Conway Del Genio Gries & Co., LLC., as financial advisors for debtors on similar indemnification terms and with compensation subject to standard of review set forth in section 328(a)); In re Encompass Services Corporation, Case No. 02-43582-H4-11(WRG) (Bankr. S.D. Tex Jan 8, 2003) (order authorizing retention of Hunt, Patton & Brazeal, Inc. as Debtors' consultants, pursuant to 327(a) and 328(a) of the Bankruptcy Code). See also In re VeraSun Energy Corporation, Case No. 08-12606 (BLS) (Bankr. D. Del. Jan. 6, 2009) (order authorizing

retention of Rothschild Inc., as financial advisors for debtors on similar indemnification terms and subjecting compensation to same standard of review); <u>In re FLYi, Inc.</u>, Case No. 05-20011 (MFW) (Bankr. D. Del. Jan. 12, 2006) (order authorizing retention of Miller Buckfire & Co., LLC on substantially the same terms); <u>In re Kaiser Aluminum Corp.</u>, Case No. 02-10429 (JFK) (Bankr. D. Del. Mar. 19, 2002) (order authorizing retention of Lazard Freres & Co. LLC on similar indemnification terms and subjecting compensation to same standard of review); <u>In re Covad Comm. Group, Inc.</u>, Case No. 01-10167 (JLW) (Bankr. D. Del. Nov. 21, 2001) (order authorizing retention of Houlihan, Lokey, Howard & Zukin Capital with compensation subject to standard of review set forth in section 328(a)) [5].

53.     In light of the foregoing, and given the numerous issues that PWP may be required to address in the performance of its services hereunder, PWP's commitment to the variable level of time and effort necessary to address all such issues as they arise and the market prices for PWP's services for engagements of this nature, the Debtor believes that the terms and conditions of the Engagement Letter are fair, reasonable and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

54.     Denial of the relief requested herein will deprive the Debtor of the assistance of uniquely qualified financial advisors and investment bankers, and certainly would effect an unjust disadvantage to the Debtor and all parties-in-interest.  Indeed, the Debtor will be forced to engage new financial advisors and investment bankers who lack such a thorough understanding of the Debtor's business and the restructuring initiatives that have been implemented over the course of PWP's engagement and which will continue through the pendency of this chapter 11 case.  A commitment of significant resources would be required to

---

[5] Because of the voluminous nature of the orders cited herein, they are not annexed to this Motion.  Copies of these orders are available upon request of Debtor's counsel.

get a substitute up to speed given the steep learning curve involved and, further, comparable financial advisors and investment bankers would charge an equivalent level of fees.

## Notice

55. No trustee, examiner or statutory creditors' committee has been appointed in this chapter 11 case. Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the Debtor's thirty largest unsecured creditors; (iii) counsel to JPMorgan Chase Bank, N.A., as administrative agent under the First Lien Credit Facility; (iv) counsel to GSP Finance LLC, as successor in interest to Barclays Bank PLC, as administrative agent under the Second Lien Credit Facility; (v) counsel to Major League Baseball; (vi) counsel to the Major League Baseball Players Association; (vii) counsel to the Purchaser; (viii) counsel to the Ad Hoc Group of First Lien Holders; (ix) all parties required to be served notice pursuant to Rule 2002 of the Bankruptcy Rules. The Debtor respectfully submits that no further notice of this Motion is required.

## No Previous Request

56. No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: June 7, 2010
      Fort Worth, Texas

                TEXAS RANGERS BASEBALL
                PARTNERS

                By:    */s/ Kellie Fischer*
                        Name:  Kellie Fischer
                        Title:  Chief Financial Officer