Martin A. Sosland (18855645)
Vance L. Beagles (00787052)
Yolanda C. Garcia (24012457)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

Ronit J. Berkovich (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor and
Debtor in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

---------------------------------------------------------------x
:
**In re** : **Chapter 11**
:
**TEXAS RANGERS BASEBALL PARTNERS,** : **Case No. 10-43400-DML-11**
:
:
**Debtor.** :
---------------------------------------------------------------x

## DEBTOR'S MEMORANDUM OF LAW REGARDING LEGAL ISSUES TO BE ADDRESSED AT JUNE 15, 2010 HEARING

# TABLE OF CONTENTS

I.  Preliminary Statement ........................................................................... 1

II. Relevant Factual Background ................................................................. 4

    A.  TRBP Partnership Structure ........................................................ 4

    B.  Major League Baseball Must Consent to Any Transfer of a Control
        Interest In TRBP .......................................................................... 5

    C.  TRBP Guaranteed $75 Million of Its Ultimate Parent Company's
        Obligations .................................................................................. 6

    D.  The Lenders Agreed to MLB's Consent Rights In the Pledge
        Agreements and the Credit Agreements ...................................... 8

    E.  The Lenders Notified TRBP of Events of Default, But Did Not
        Attempt to Exercise Any Claimed Control Rights ................................. 10

    F.  TRBP Engaged in an Extensive Market Canvass to Secure the Best
        Bid For the Texas Rangers ...................................................................... 11

    G.  The Asset Purchase Agreement Provides A Significant Price for
        the Texas Rangers With Maximum Deal Certainty ............................... 12

III. Arguments and Authorities .................................................................. 14

    A.  The Plan Does Not Impair the Rights of Any Class of Creditors or
        Equity ......................................................................................... 14

        1.  TRBP Equity Interests Are Not Impaired Under the
            Plan ............................................................................... 14

        2.  Unsecured Creditors Are Not Impaired Under the
            Plan ............................................................................... 16

    B.  The Bankruptcy Code Does Not Impose an Independent Duty to
        Maximize Value Through a Plan of Reorganization ............................. 17

        1.  The Plan Need Not Provide for the "Highest"
            Recovery. ...................................................................... 18

        2.  The Existence of a Potential Alternative Bid Does
            Not Prevent Confirmation of the Debtor's Plan
            Within the Exclusivity Period ...................................... 20

        3.  The Plan Satisfies the Requirements of Section
            1129(a) of the Bankruptcy Code, and the Court
            Should Permit the Plan to Move Toward
            Confirmation ................................................................. 23

C.    Even if Rangers Equity Were Required to Vote on the Plan, The Creditors of Rangers Equity Have No Right to Speak For or Dictate the Vote of Rangers Equity in this Chapter 11 Case .................. 24

    1.    The Involuntary Bankruptcy Filings of Rangers Equity Does Not Alter the Conclusion that Rangers Equity Supports the Plan .................................................. 25

    2.    The Pledge Agreements Provide No Authority to the Lenders to Exercise Control over Rangers Equity .............................................................................. 27

        (a)    The Pledge Agreements Do Not Permit the Collateral Agent, on Behalf of the Lenders, to Assume Control Over Rangers Equity ............. 27

        (b)    This Court Should Recognize and Enforce the Limits Agreed to By the Collateral Agent, on Behalf of the Lenders, in the Pledge Agreements ................................................. 31

        (c)    The MLB Subservience Provisions Are Subordination Agreements that Should Be Enforced ................................................................. 32

        (d)    The Automatic Stay Prohibits the Collateral Agent, on Behalf of the Lenders, From Exercising Control Over Rangers Equity or Attempting to Control Rangers Equity's Vote Under TRBP's Plan ..................................... 34

    3.    The Creditors of Rangers Equity Lack Standing to Object to the Plan ................................................................. 36

D.    A Vote In Favor of the Plan Would Be An Exercise of Rangers Equity's Sound Business Judgment ........................................................ 38

    1.    The Management of Rangers Equity Owe Fiduciary Duties to Rangers Equity to Exercise Sound Business Judgment; Upon Insolvency or Bankruptcy, Creditors Become the Beneficiaries of These Duties ..................................................................... 38

    2.    Management of Rangers Equity Appropriately Exercised Business Judgment in Approving TRBP's Entry Into the APA and Would Likewise Do So By Voting in Favor of the Plan ............................................. 42

E.    No Disclosure Statement Is Required; Regardless, the Disclosure Statement Satisfies the Requirement of the Bankruptcy Code. ............... 44

    1.    No Disclosure Statement Is Required ............................. 44

    2.    The Debtor's Disclosure Statement Provides Adequate Information ....................................................... 46

IV.    CONCLUSION AND REQUESTED RELIEF ................................................. 49

# TABLE OF AUTHORITIES

## CASES

*In re Acequia, Inc.*,
    787 F.2d 1352 (9th Cir. 1986) ........................................................................16

*In re Adelphia Commc'ns Corp.*,
    352 B.R. 578 (Bankr. S.D.N.Y. 2006) .....................................................20, 23

*Am. Bankers Ins. Co. of Fla. v. Maness*,
    101 F.3d 358 (4th Cir. 1996) ........................................................................32

*In re Am. Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988) ..........................................................14

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle Str. P'ship*,
    526 U.S. 434 (U.S. 1999) ..............................................................................22

*In re Bankston*,
    No. 09-10675, 2010 WL 1027806 (Bankr. W.D. La. Jan. 15, 2010) ...............47

*In re Bel Air Assocs., Ltd.*,
    4 B.R. 168 (Bankr. W.D. Okla. 1980) .....................................................46, 48

*Berliner Handels Und Frankfurter Bank v. E. Tex. Steel Fac., Inc.*
    *(In re E. Tex. Steel Fac., Inc.)*, 117 B.R. 235 (Bankr. N.D. Tex. 1990) ...........32

*In re Bicoastal Corp.*,
    No. 89-8191-8P1, 1989 WL 607352 (Bankr. M.D. Fla. Nov. 21, 1989)...........35

*In re Bombay Co., Inc.*,
    No. 07-44061-DML-11, 2007 WL 2826071
    (Bankr. N.D. Tex. Sept. 26, 2007) ................................................................19

*Bren v. Capital Realty Group Senior Hous., Inc.*,
    No. Civ. A. 19902-NC, 2004 WL 370214 (Del. Ch. Feb. 27, 2004).................39

*In re Brooklyn Hosp. Ctr.*,
    341 B.R. 405 (Bankr. E.D.N.Y. 2006)............................................................41

*Butner v. United States*,
    440 U.S. 48 (1979)........................................................................................31

*Carauna v. Saligman*,
    Civ. A. No. 11135, 1990 WL 212304 (Del. Ch. Dec. 21, 1990) ......................43

*In re Celotex Corp.*,
204 B.R. 586 (Bankr. M.D. Fla. 1996) ....................................................19, 21

*In re Century Glove, Inc.*,
No. 90-400, 1993 WL 239489 (D. Del. Feb. 10, 1993)....................................38

*Citron v. Fairchild Camera & Instrument Corp*,
569 A.2d 53 (Del. 1989) ................................................................................43

*In re Clamp-All Corp.*,
233 B.R. 198 (Bankr. D. Mass. 1999) ............................................................22

*In re Cogar*,
210 B.R. 803 (B.A.P. 9th Cir. 1997)...............................................................37

*In re Comcoach Corp.*,
698 F.2d 571 (2d Cir. 1983)...........................................................................38

*Consol. Partners Inv. Co. v. Lake (In re Consol. Partners Inv. Co.)*,
152 B.R. 485 (Bankr. N.D. Ohio 1993) ..........................................................26

*In re Cont'l Air Lines, Inc.*,
780 F.2d 1223 (5th Cir. 1986) .......................................................................18

*In re Credit Indus. Corp.*,
366 F.2d 402 (2d Cir. 1966)...........................................................................31

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ...........................................19, 36, 47

*In re Dakota Rail, Inc.*,
104 B.R. 138 (Bankr. D. Minn. 1989) ............................................................48

*In re El Paso Refinery, LP*,
37 F.3d 230 (5th Cir. 1994) ...........................................................................37

*In re Erickson Ret. Cmtys., LLC*,
425 B.R. 309 (Bankr. N.D. Tex. 2010)...........................................................33

*In re Feldman*,
53 B.R. 355 (Bankr. S.D.N.Y. 1985)...............................................................45

*In re Frezzo*,
217 B.R. 985 (Bankr. E.D. Pa. 1998),
*aff'd in part, dism'd in part*, 225 B.R. 581 (E.D. Pa. 1998) ............................43

v

*Geriatrics Nursing Home v. First Fid. Bank, N.A.*
　　*(In re Geriatrics Nursing Home, Inc.)*,
　　187 B.R. 128 (D.N.J. 1995) ...............................................................20, 22, 23

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.*
　　*(In re Briscoe Enters., Ltd., II.)*, 994 F.2d 1160 (5th Cir. 1993) ......................................24

*In re Hutchinson*,
　　No. 01-46374-BJH-11, 2002 Bankr. LEXIS 2014
　　(Bankr. N.D. Tex. Jan. 18, 2002) .....................................................................35

*In re Inerco, Inc.*,
　　137 B.R. 999 (Bankr. E.D. Mo. 1992) ..............................................................20

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd.*
　　*(In re Ion Media Networks, Inc.)*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009)..................32, 34

*In re Keisler*,
　　No. 08-34321, 2009 WL 1851413 (Bankr. E.D. Tenn. June 29, 2009)............................48

*Khanna v. McMinn*,
　　No. Civ. A. 20545-NC, 2006 WL 1388744 (Del. Ch. May 9, 2006) ...............................42

*Lamie v. U.S. Tr.*,
　　540 U.S. 526 (2004)........................................................................................15

*In re Laughlin*,
　　602 F.3d 417 (5th Cir. 2010) ...........................................................................31

*In re Lernout & Housie Speech Prods. N.V*,
　　308 B.R. 672 (D. Del. 2004)............................................................................23

*In re Lifeco Inv. Group, Inc.*,
　　173 B.R. 478 (Bankr. D. Del. 1994) .................................................................38

*In re Lionel Corp.*,
　　722 F.2d 1063 (2d Cir. 1983)...........................................................................18

*In re Little*,
　　126 B.R. 861 (Bankr. N.D. Miss. 1991) ...........................................................47

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-op, Inc.)*,
　　150 F.3d 503 (5th Cir. 1998) ...........................................................................47

*Madeline Marie Nursing Homes v. Collins*
    *(In re Madeline Marie Nursing Homes)*, 694 F.2d 433 (6th Cir. 1982) ...........................32

*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) ........................................................................24

*In re Martin Paint Stores*,
    199 B.R. 258 (Bankr. S.D.N.Y. 1996),
    *aff'd*, 207 B.R. 57 (S.D.N.Y. 1997)...............................................................37

*In re Marvel Entm't Group*,
    209 B.R. 832 (D. Del. 1997).........................................................................35

*McGowan v. Ferro*,
    859 A.2d 1012 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005) ...........................42, 43

*In re Metrocraft Publ'g Servs., Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ...............................................................47

*Mid-Towne v. United States Dep't Hous. & Urban Dev.*
    *(In re Mid-Towne Assocs.)*, No. 93-3290, 1994 WL 487347,
    36 F.3d 1097 (6th Cir. 1994) ........................................................................45

*In re Mirant Corp.*,
    No. 03-46590, 2005 WL 6440372 (Bankr. N.D. Tex. May 24, 2005) ...........................15

*Mission Iowa Wind Co. v. Enron Corp. (In re Enron Corp.)*,
    291 B.R. 39 (S.D.N.Y. 2004)........................................................................19

*In re Monnier Bros.*,
    755 F.2d 1336 (8th Cir. 1985) .......................................................................47

*In re Montgomery Court Apartments of Ingham County, Ltd.*,
    141 B.R. 324 (Bankr. S.D. Ohio 1992)..............................................................24

*In re Mortgage Inv., Co. of El Paso*,
    111 B.R. 604 (Bankr. W.D. Tex. 1990).............................................................24

*In re Mt. Vernon Plaza Cmty. Urban Redevelopment Corp. I*,
    79 B.R. 306 (Bankr. S.D. Ohio 1987)........................................................20, 21, 22

*In re O.P.M. Leasing Servs.*, Inc.,
    21 B.R. 983 (S.D.N.Y. 1981).......................................................................38

*In re PMH Corp.*,
  116 B.R. 644 (Bankr. N.D. Ind. 1989)..........................................................................26

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)........................................................................................22

*Priddy v. Edelman*,
  883 F.2d 438 (6th Cir. 1989) .....................................................................................43

*In re Quigley Co., Inc.*,
  391 B.R. 695 (Bankr. S.D.N.Y. 2008)..................................................................36, 37

*In re Rajabali*,
  365 B.R. 702 (Bankr. S.D. Tex. 2007) .......................................................................39

*Richmond Leasing Co. v. Capital Bank, N.A.*,
  762 F.2d 1303 (5th Cir. 1985) .......................................................................25, 40, 41

*In re Rimsat, Ltd.*,
  193 B.R. 499 (Bankr. N.D. Ind. 1996).......................................................................36

*In re Rocha*,
  179 B.R. 305 (Bankr. M.D. Fla. 1995) ..................................................................16, 17

*In re Royal Props. & Invs., Inc.*,
  68 B.R. 245 (Bankr. S.D. Fla. 1986)......................................................................37, 38

*S. Blvd., Inc. v. Martin Paint Stores*,
  207 B.R. 57 (S.D.N.Y. 1997)......................................................................................38

*In re Sec. Asset Capital Corp.*,
  390 B.R. 636 (Bankr. D. Minn. 2008) .......................................................................40

*In re Sharon Steel Corp.*,
  871 F.2d 1217 (3d Cir. 1989).....................................................................................41

*Solow v. PPI Enters.(U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*,
  324 F.3d 197 (3d Cir. 2003).......................................................................................16

*In re Sound Radio, Inc.*,
  93 B.R. 849 (Bankr. D.N.J. 1988), *aff'd*, 909 F.2d 964 (3d Cir. 1990) ...........................24

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) .......................................................................20, 21

viii

*In re Stanley Hotel, Inc.*,
    13 B.R. 926 (Bankr. D. Colo. 1981) ........................................................................45

*In re Stoll*,
    252 B.R. 492 (B.A.P. 9th 2000) ..............................................................................37

*In re Sun Country Dev., Inc.*,
    764 F.2d 406 (5th Cir. 1985) ..................................................................................24

*In re TOCFHBI, Inc.*,
    413 B.R. 523 (Bankr. N.D. Tex. 2009) ...................................................................39

*In re Tex. Extrusion Corp.*,
    68 B.R. 712 (N.D. Tex. 1986), *aff'd*, 836 F.2d 217 (5th Cir. 1988) .......................23

*In re Texaco, Inc.*,
    81 B.R. 806 (Bankr. S.D.N.Y. 1988) ......................................................................18

*In re United States Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ..............................................................47, 48

*In re Uno Broad. Corp.*,
    167 B.R. 189 (Bankr. D. Ariz. 1994) .................................................................29, 30

*In re Victory Constr. Co., Inc.*,
    42 B.R. 145 (Bankr. C.D. Cal. 1984) ......................................................................45

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005),
    *aff'd*, 906 A.2d 27 (Del. 2006)..........................................................................38, 39

*Waverly Corp. v. City of N.Y.*,
    48 A.D. 3d 261 (N.Y. App. Div. 2008) ...................................................................30

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ...........................................................20, 22, 24

## STATUTES

11 U.S.C. § 303(f) .......................................................................................................26

11 U.S.C. § 362(a)(3)..............................................................................................35, 36

11 U.S.C. § 363(a) ................................................................................................27, 36

11 U.S.C. § 510(a) ................................................................32

11 U.S.C. § 541(a)(2) ...........................................................35

11 U.S.C. § 1107 ..................................................................25

11 U.S.C. § 1109(b) .............................................................36

11 U.S.C. § 1121(b) .............................................................18

11 U.S.C. §1123(b)(4) ..........................................................18

11 U.S.C. § 1124(1) ..........................................................13, 14

11 U.S.C. § 1125 .........................................................45, 46, 48

11 U.S.C. § 1126 ..................................................................24

11 U.S.C. § 1126(f) .......................................................19, 24, 44

11 U.S.C. § 1129 ..................................................................45

11 U.S.C. § 1129(a) ...................................................18, 19, 23, 44

11 U.S.C. § 1129(a)(3) ...........................................................23

Fed. R. Bankr. Proc. 3017(d) ....................................................46

Tex. Bus. Org. Code, Ch. 152, § 152.706 ........................................14

## **MISCELLANEOUS**

Collier on Bankruptcy ¶ 303.22 ..................................................26

Collier on Bankruptcy ¶ 1129.02[7] ..............................................19

H.R. Rep. No. 103-835, at 47-48 (1994), *reprinted in*
　　　1994 U.S.C.C.A.N. 3340, 3356-57 .........................................16

In advance of the hearing on June 15, 2010, debtor and debtor in possession Texas Rangers Baseball Partners (the "Debtor" or "TRBP") files this brief to address the issues raised by the Court in its Order dated June 2, 2010.

## I.   PRELIMINARY STATEMENT

TRBP and its equity holders[1] exercised their sound business judgment in connection with TRBP's entering into the May 23, 2010 Asset Purchase Agreement (the "APA") with Rangers Baseball Express LLC (the "Purchaser") and proposing the Prepackaged Plan of Reorganization of Texas Rangers Baseball Partners Under Chapter 11 of the Bankruptcy Code (the "Plan").  The APA was the result of an extensive market canvass.  At least fifteen potential acquirers entered into confidentiality agreements with TRBP, six bidders made offers to TRBP, and three bidders were invited to participate in the second round of bidding.  At the conclusion of this lengthy and substantive process, TRBP entered into the APA, with the partner consent of Rangers Equity, and with the bidder that TRBP believes provided the best overall bid (*i.e.*, the best combination of price with the least amount of execution risk).

After certain of the Lenders now comprising the "Ad Hoc Group" refused to consent to the transaction contemplated by the APA and to release their liens, the entry into the APA and the commencement of this chapter 11 case was the most efficient manner in which to consummate the sale of the Texas Rangers franchise.  These actions, therefore, were in the best interests of the Texas Rangers franchise, its fans, Major League Baseball ("MLB"), and all other parties involved, including TRBP's creditors, and certainly satisfied the standards for the appropriate exercise of business judgment.

---

[1] TRBP's equity holders are Rangers Equity Holdings, L.P. ("Rangers Equity LP") and Rangers Equity Holdings GP, LLC ("Rangers Equity GP") (collectively, "Rangers Equity").

Now, however, certain secondary holders of the debt of TRBP's ultimate parent company (collectively, the "Lenders"),[2] whose guarantee claims against TRBP indisputably will be satisfied in full under the Plan, are trying to second guess TRBP's and Rangers Equity's business judgment with respect to TRBP's execution of the APA. These attempts should be rejected.

First, the Bankruptcy Code allows the Debtor to control the timing of its chapter 11 case and to propose its own plan of reorganization during the exclusivity period. During this time, the Debtor's proposed plan should be confirmed if it satisfies the requirements of section 1129 of the Bankruptcy Code; creditors are not permitted to prevent plan confirmation by offering an alternative plan, even if those creditors believe a different course of action might offer more value. Here, all creditors of TRBP are being paid in full, and Rangers Equity already consented to the sale when the APA was entered. Thus, there are no impaired classes, and the Plan should be confirmed.

Second, the Court is not required to consider whether the Plan results in maximum value for Rangers Equity's equity interest in TRBP. Specifically, none of the requirements of Bankruptcy Code section 1129 consider whether the debtor's plan "maximizes value." To the contrary, section 1129 is designed to foster consensual resolution of disputed issues between creditors and equity holders. If such consent is reached, the Debtor does not need to establish – and the Court need not determine – that the Plan "maximizes value." Therefore, even if Rangers Equity's equity interests in TRBP are held to be impaired (which it is not), the vote of Rangers Equity in favor of the Plan is all that is required to satisfy the requirements of section 1129.

---

[2] Specifically, the Lenders are the lenders under the Credit Agreements (defined below).

Third, even if Rangers Equity are required to vote on the Plan as the holders of TRBP's equity, there is no reason to believe that Rangers Equity would vote any differently as part of the plan confirmation process than they did when they consented to the execution of the APA and the filing of the Plan. The fact that involuntary bankruptcy petitions were subsequently filed against Rangers Equity does not provide creditors of Rangers Equity the ability to dictate a different result. As alleged bankruptcy debtors or as debtors in possession, Rangers Equity still retain the ability to manage their businesses in accordance with the business judgment of their management. The management of Rangers Equity owes a duty of care and loyalty to Rangers Equity, which is the duty to exercise business judgment without self interest. The Lenders, as creditors of Rangers Equity, would become the beneficiaries of those duties upon insolvency or bankruptcy, but the nature of the duties does not change. The same reasons that justified their consent to the execution of the APA and the filing of the Plan would likewise justify their vote in favor of the Plan.

Fourth, the Lenders have no contractual right to dictate a different result. Although the Lenders received a pledge of the equity interests in Rangers Equity under the Pledge Agreements (as defined below), this pledge and the contractual right to control Rangers Equity following an event of default were made explicitly subject to MLB's prior consent. The Lenders neither sought nor received such consent from MLB in more than a year since the first event of default and never attempted to exercise control over Rangers Equity. Moreover, any effort at this stage to exercise such control would also be precluded by the automatic stay in Rangers Equity's involuntary chapter 11 cases because any such conduct would constitute an attempt to exercise control over property of the estates of Rangers Equity.

Fifth, if Rangers Equity must vote on the Plan, and does vote to confirm it, such a vote would certainly be consistent with any business judgment. The exercise of business judgment, by definition, means that Rangers Equity does not need to vote in the same way that their creditors would have voted if permitted to cast the votes. Rangers Equity's management needs only to exercise business judgment and fiduciary duties in voting. Here, as explained above and below, there are ample reasons to believe that the transaction as contemplated under APA and the Plan is in the best interest of both TRBP and Rangers Equity. Therefore, consenting to TRBP's entry into the APA in the first place and any vote in favor of the Plan would be within the sound exercise of business judgment and thus any fiduciary duties of Rangers Equity's management. These decisions may not be modified by Rangers Equity's creditors, particularly not in TRBP's bankruptcy case.

Finally, as explained below, the Plan requires no disclosure statement. But even if this Court determines that a disclosure statement is required, the disclosure statement filed with this Court on May 24, 2010 (the "<u>Disclosure Statement</u>") is more than adequate.

## II.     <u>RELEVANT FACTUAL BACKGROUND</u>

Below is the relevant factual background that, if necessary, will be proven as part of a plan confirmation hearing.[3]

### A.     <u>TRBP Partnership Structure</u>.

TRBP owns and operates the Texas Rangers Major League Baseball Club (the "<u>Texas Rangers</u>") pursuant to the Major League Constitution (the "<u>Major League Constitution</u>") and the Membership Agreement, dated as of November 18, 1960, by and between The American League of Professional Baseball Clubs, as assumed by the Office of the Commissioner of

---

[3] A more thorough description of the factual background is contained in the Declaration of Kellie L. Fischer in Support of Debtor's Chapter 11 Petition and Request for First Day Relief, filed on May 24, 2010.

Baseball (the "<u>Commissioner</u>"), and WBC Baseball Club, Inc., as assumed by TRBP pursuant to an Assumption Agreement, dated as of June 16, 1998.

TRBP is a Texas general partnership, in which Rangers Equity LP, a Delaware limited partnership, holds a 99% partnership interest, and Rangers Equity GP, a Texas limited liability company, holds a 1% partnership interest and is the managing partner of TRBP. Rangers Equity GP is a wholly-owned subsidiary of Rangers Equity LP. Therefore, control over either Rangers Equity GP or Rangers Equity LP is the same as control over TRBP.

**B.** **<u>Major League Baseball Must Consent to Any Transfer of a Control Interest In TRBP</u>.**

TRBP, as a member of Major League Baseball, is subject to the rules and regulations of MLB. In particular, any sale or transfer of a control interest of the Texas Rangers franchise cannot be consummated without first obtaining the requisite approval from the Commissioner and 75% of the MLB clubs.

The "sale or transfer of a control interest" of any MLB club must comply with the process set forth in the Major League Constitution and the MLB ownership guidelines. Article V, Section 2 of the MLB Constitution provides that:

> (b) The vote of three-fourths of the Major League Clubs shall be required for the approval of any of the following:
>
> . . .
>
> (2) The sale or transfer of a control interest in any Club. . . . *For purposes hereof, the term "control" shall mean the possession by the transferee, directly or indirectly, of the power or authority to influence substantially the management policies of the Club.* A sale or transfer of a non-control interest in any Club shall require only the approval of the Commissioner.

(emphasis added).

The MLB Control Interest Transfer Guidelines provides that:

There must be within each ownership structure a clearly designated person who is accountable to Baseball for the Club's operation and its compliance with the Rules of Baseball and responsible for and empowered solely to make all Club decisions, whether player-related, operational, business or financial. . . . A change in the single person in control, regardless of how it is effected, will constitute a control interest transfer and may not occur without all required [Baseball] approvals.

The MLB Control Interest Transfer Guidelines further provide that:

Ownership of a control interest in a Club other than by an individual, for instance by a corporation, LLC or partnership, creates the potential for effective change in control of the Club through a change in ownership or management of the ownership entity or any parent company. *Therefore, a change in control in any such entity, or a change in the individual designated by, for instance, the corporate owner to make all Club decisions, shall be deemed to be a control interest transfer.* . . . All corporate, LLC or partnership documents must reflect that any Club control or non-control interest transfer must receive the appropriate Baseball approvals.

(emphasis added).

## C. TRBP Guaranteed $75 Million of Its Ultimate Parent Company's Obligations.

The ultimate parent company of TRBP and Rangers Equity is HSG Sports Group LLC ("HSG"). Pursuant to that certain Amended and Restated First Lien Credit and Guaranty Agreement and that certain Second Lien Credit and Guaranty Agreement (together, the "Credit Agreements"), HSG and certain affiliates of HSG are indebted to the Lenders in the outstanding principal amount of approximately $525 million. Importantly, however, the guaranties of TRBP and the liens on the assets of TRBP securing such guaranties are limited to $75 million (the "TRBP Guaranty Cap").

In connection with the Credit Agreements, HSG's obligations are secured by a first lien and second lien on substantially all of the assets of HSG and certain of its affiliates

including a pledge of the equity interests owned by such affiliates, including TRBP and Rangers Equity.[4]

Upon the occurrence and during the continuance of an Event of Default (as defined in each Credit Agreement), Section 4.4.1(c)(i)(3) of each Pledge Agreement provides that:

> (A) all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant [thereto] shall cease and all such rights shall thereupon become vested in the Collateral Agent who shall thereupon have the sole right to exercise such voting and other consensual rights . . . .
>
> (B) in order to permit the Collateral Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant [thereto] . . . (1) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Collateral Agent . . . all proxies, dividend payment orders and other instruments as the Collateral Agent may from time to time reasonably request and (2) each Grantor acknowledges that the Collateral Agent may utilize the power of attorney set forth in Section 6.1 (emphasis added).

As explained below, however, these rights are made explicitly subject to MLB's consent and approval.

---

[4] These pledges are contained in (i) the Amended and Restated First Lien Pledge and Security Agreement, dated as of December 19, 2006 (the "First Lien Pledge and Security Agreement"), by and among JPMorgan Chase Bank N.A., as collateral agent for the Lenders under the First Lien Credit Agreement (in such capacity, the "First Lien Collateral Agent"), and the grantors party thereto (collectively, the "Grantors") and (ii) the Amended and Restated Second Lien Pledge and Security Agreement, dated as of December 19, 2006 (the "Second Lien Pledge and Security Agreement" and, together with the First Lien Pledge and Security Agreement, collectively, the "Pledge Agreements"), by and among Barclays Bank PLC, as collateral agent for the Lenders under the Second Lien Creidt Agreement (in such capacity, the "Second Lien Collateral Agent" and, together with the First Lien Collateral Agent, the "Collateral Agent") and the Grantors. Pursuant to the provisions of the Intercreditor Agreement dated as of December 19, 2006, by and among HSG, the First Lien Collateral Agent and the Second Lien Collateral Agent, the First Lien Collateral Agent has the authority to exercise rights in respect of all of the collateral that is subject to the Pledge Agreements until the obligations under the First Lien Credit Agreement are paid in full.

**D.** **The Lenders Agreed to MLB's Consent Rights In the Pledge Agreements and the Credit Agreements.**

In the Pledge Agreements and Credit Agreements, the Lenders' explicitly agreed to MLB's right to consent before there could be a transfer of control (directly or indirectly) over TRBP. Specifically, Section 11 of each of the Pledge Agreements provides, in relevant part:

Notwithstanding *any* contrary provisions contained in this Agreement or any other Credit Document:

(a)      *the Collateral Agent is aware of the provisions contained in Article V, Section 2(b)(2) of the Major League Constitution*, and recognizes that the Ownership Committee of Baseball has issued "Control Interest Transfers – Guidelines & Procedures", dated November 9, 2005 (such document and any successor guidelines, as may be amended from time to time, the "MLB Control Interest Transfer Guidelines");

(b)      *the Collateral Agent acknowledges that Article V, Section 2(b)(2) of the Major League Constitution and the MLB Control Interest Transfer Guidelines require that the transfer of a control interest in either the Rangers Franchise or the Rangers be subject to the approving vote of the Major League Baseball clubs in their absolute discretion.* The Collateral Agent also acknowledges the "best interests of baseball" powers held by the Commissioner under the Major League Constitution. Accordingly, the Collateral Agent acknowledges that such approvals would be required for any sale or transfer of the Rangers Franchise or the Rangers, or an interest in either the Rangers Franchise or the Rangers . . . to a third party as well as to any Lender, and that each such transaction shall be subject to and made in accordance with the Major League Constitution, the each agency agreement and operating guidelines among the Major League Baseball clubs and an MLB Entity (as defined below) and the MLB Control Interest Transfer Guidelines.

(c)      *the Collateral Agent acknowledges that any temporary or permanent management of the Rangers Franchise or the Rangers shall be subject to the prior approval of the Commissioner and the Clubs. In the event the Collateral Agent desires to operate the Rangers Franchise or the Rangers for its own account on a temporary or permanent basis, the Collateral Agent shall seek the prior approval of the Commissioner and the Major League Baseball clubs in accordance with the Major League Constitution and the MLB Control Interest Transfer Guidelines.*

(emphasis added).

Section 11 of each Pledge Agreement further provides that:

> THIS AGREEMENT . . . SHALL IN ALL RESPECTS BE
> SUBJECT TO [THE MLB DOCUMENTS], AS MAY BE
> AMENDED FROM TIME TO TIME.

Section 10.23 of the Credit Agreements contains virtually identical provisions to Section 11 of the Pledge Agreements, with the Lenders providing the same acknowledgements regarding any control of the team or sale of the team being subject to MLB consent as the Collateral Agent provides in the Pledge Agreement.

"MLB Documents" is defined in the Pledge Agreements and Credit Agreements to be:

> any present or future agreements entered into by, or on behalf of,
> (i) any of the Major League Baseball entities or affiliates (each, an
> "MLB Entity"), or the Major League Baseball clubs acting
> collectively, including, without limitation, agreements entered into
> pursuant to the Major League Constitution, the American and
> National League Constitutions (to the extent of any continuing
> applicability), the Professional Baseball Agreement, the Major
> League Rules, the Interactive Media Rights Agreement, and each
> agency agreement and operating guidelines among the Major
> League Clubs and an MLB Entity, or (ii) the present and future
> mandates, rules, regulations, policies, bulletins or directives issued
> or adopted by the Commissioner or the MLB Entities.

As stated above, the MLB Constitution and the MLB Control Interest Transfer Guidelines require three-fourths approval of the MLB clubs before the "sale or transfer of a control interest," *i.e.*, the "possession by the transferee, directly or indirectly, of the power or authority to influence substantially, the management policies of the club."  Thus, the Lenders agreed in the Pledge Agreements and the Credit Agreements, that their control rights over the TRBP and Texas Rangers franchise (direct or indirect) are explicitly subject to MLB's consent, which, to date, the Lenders have neither requested nor received.

9

E. **The Lenders Notified TRBP of Events of Default, But Did Not Attempt to Exercise Any Claimed Control Rights.**

Since 2005, TRBP has experienced, and continues to experience, cash flow deficiencies. For the entire period that Mr. Hicks has owned the Texas Rangers, he has provided financial support to the team through capital contributions and loans not repaid in excess of $100 million.

Beginning in August 2008, HSG retained advisors to provide financial advice and assistance in connection with a capital raise, potential restructuring, or sale. While HSG and TRBP explored their options, TRBP continued to suffer cash flow deficiencies. As a result of these deficiencies, HSG was unable to service its approximately $525 million long-term debt obligations under the Credit Agreements. On March 31, 2009, HSG failed to make a scheduled interest payment under the Credit Agreements, and on April 7, 2009, the administrative agent for the Lenders delivered a notice of an Event of Default and accelerated the entire amount of indebtedness thereunder. As a result of the acceleration, the Lenders under the Credit Agreements have claims against TRBP on account of TRBP's secured guaranty of $75 million.

On September 21, 2009, and again on March 24, 2010, the administrative agent for the Lenders delivered a second and third notice alleging additional Events of Default. Nonetheless, the Collateral Agent never sought to obtain the consent of MLB or to otherwise attempt to exercise any control over TRBP or Rangers Equity. As a result, TRBP and Rangers Equity have continued to operate their business as they did before the Events of Default. Rangers Equity have been exercising their voting and other consensual rights concerning TRBP in all respects, free of limitation and without any objection from, and with the full knowledge of, the Collateral Agent. Moreover, the Collateral Agent never (i) evidenced any intent to exercise the voting and other consensual rights in respect of the pledged equity interests in TRBP by use

of the powers of attorney (the first step of which (as described above) would be to obtain MLB consent), (ii) requested that any grantor deliver a proxy to the Collateral Agent evidencing such rights, or (iii) indicated in any manner whatsoever that Rangers Equity's or TRBP's exercise of such voting and other consensual rights since the date of the initial Event of Default was improper.

F. **TRBP Engaged in an Extensive Market Canvass to Secure the Best Bid For the Texas Rangers.**

During the second half of 2008 and throughout 2009, HSG and TRBP, in conjunction with their advisors, pursued a variety of options to raise capital or sell the Texas Rangers. Ultimately, they concluded that a sale of the Texas Rangers was the only viable option.

By the summer of 2009, HSG and TRBP, in conjunction with their advisors, canvassed a broad group of prospective buyers and investors, at least fifteen of which executed confidentiality agreements. Beginning on July 2, 2009, confidential information memoranda were distributed to at least ten parties that had executed confidentiality agreements and received MLB approval to participate in the sale process, as MLB procedures require. TRBP and HSG received six initial bids by the August 18, 2009 initial bid deadline and selected three of those bidders to participate in the second round of bidding. As a result of this lengthy and active marketing process, HSG, TRBP, and the Purchaser, whose principals include the current President of the Texas Rangers, Nolan Ryan, and Chuck Greenberg, reached an agreement dated as of January 23, 2010 (the "January APA").

Pursuant to the terms of the January APA, consummation of the sale required, among other closing conditions, the consent of the Lenders pursuant to the terms of the Credit Agreements. Despite HSG's, TRBP's, and the Purchaser's lengthy, good-faith negotiations with the Lenders following the execution of the January APA, coupled with the additional requests for

approval thereof by MLB, the Lenders refused to consent to the transactions contemplated by the January APA because of their dissatisfaction with the proposed amount of sale proceeds. The Lenders, thus, prevented TRBP from moving forward with the sale of the Texas Rangers. Ultimately, TRBP, in consultation with MLB, concluded that a chapter 11 filing designed to facilitate a sale of TRBP's assets to the Purchaser pursuant to the Plan was the most efficient manner in which to consummate the sale and was, therefore, in the best interests of the Texas Rangers franchise, its fans, MLB, and all other parties involved, including TRBP's creditors.

G. **The Asset Purchase Agreement Provides a Significant Price for the Texas Rangers With Maximum Deal Certainty.**

On May 23, 2010, after further negotiation, the parties to the January APA terminated the January APA, and TRBP and the Purchaser entered into the APA. On the same day, Rangers Equity, along with certain other affiliates, entered an Omnibus Resolution consenting to the entry of the APA by TRBP.

Under the APA, substantially all of TRBP's assets, including the Texas Rangers franchise and substantially all contractual rights related to the operation of the Texas Rangers, will be sold to the Purchaser. The aggregate consideration paid and obligations assumed by the Purchaser at the closing will equal more than $500 million. Pursuant to the APA, the Purchaser also will assume virtually all of the obligations of the Texas Rangers, including deferred compensation obligations, sponsorship, ticketholder, employee, and specified tax obligations, with the exception of certain excluded liabilities that will be paid under the Plan. The sale anticipates a complete and orderly transition of the operations of the team — all tickets to games and other events will be fully honored, and all employees will keep their jobs. Although accomplished through a chapter 11 plan, the sale will resemble in all significant respects the sale of any other sports franchise.

The APA provides significant value to TRBP in several respects.  First, the sale will allow TRBP's creditors that are Lenders under the Credit Agreements to recover 100 percent of their guaranty claims against TRBP.  Second, the APA provides a price that is very close to, if not the actual, highest bid that was received as part of the process described above.[5]  Further, the APA provides, *by far*, the greatest deal certainty to TRBP because the Purchaser (1) the Commissioner of Baseball has indicated his support for the transaction, and there do not appear to be any obstacles to MLB approval; and (2) has fewer financing contingencies than other bidders.  Moreover, because TRBP is losing money every month, the sooner the deal can be completed, the greater the recovery will be for TRBP's equity holders.  Finally, TRBP believes that the Purchaser will build on past team successes and that the future of the Texas Rangers will be in the hands of an ownership group that will be a good steward for the game.

The Plan provides for the sale to be consummated on the effective date.  All of TRBP's creditors will be paid in full under the Plan or have their claims assumed by the Purchaser under the APA.  TRBP's equity holders, Rangers Equity, will, in accordance with TRBP's partnership agreement, be entitled to the proceeds remaining after paying all of TRBP's creditors in full – a recovery estimated to be in excess of $150 million.

Because the Plan satisfies in full all claims against TRBP, is supported by MLB, and will lead to the least disruption to the Texas Rangers' business, the Plan is in the best interests of the Texas Rangers franchise and all parties in interest.

---

[5] Because different bids had different contingencies, it is hard to easily compare the bids "apples to apples."

# III.    ARGUMENTS AND AUTHORITIES

## A.    The Plan Does Not Impair the Rights of Any Class of Creditors or Equity.

### 1.    TRBP Equity Interests Are Not Impaired Under the Plan.

Under section 1124(1) of the Bankruptcy Code, a class is deemed unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). Section 1124 of the Bankruptcy Code is clear on its face. If the plan does not affect the legal, equitable, and contractual rights of a class, then the class is unimpaired. *See In re Am. Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988) (finding that a plan which "leaves unaltered" the legal rights of a claimant does not impair the creditor).

Rangers Equity's interests in TRBP are unimpaired under the plain meaning of section 1124(1) because the Plan maintains the legal, contractual, and equitable rights to which Rangers Equity are entitled under non-bankruptcy law. Specifically, Texas general partnership law provides that upon the disposition of assets in a partnership, the proceeds will first be applied to discharge the obligations to creditors and any surplus will be distributed to the partners. *See* Tex. Bus. Org. Code, Ch. 152, § 152.706. Under the Plan, Rangers Equity, as the holders of TRBP's equity, will receive the full residual value from the sale after the obligations to creditors of TRBP are satisfied. The residual value to Rangers Equity, estimated to be in excess of $150 million, represents a substantial recovery to Rangers Equity. Moreover, the Plan does not amend TRBP's partnership agreement or make any other modification that arguably would affect the rights of Rangers Equity vis-à-vis the partnership. On the effective date, Rangers Equity will remain 100% owners of TRBP and have the exact same rights in TRBP as they currently have. Thus, the sale of assets under the Plan does not impair Rangers Equity's rights as equity holders in any manner.

The Lenders attempt to read into section 1124 (among other sections of the Bankruptcy Code) a requirement that the Court make a finding that the Debtor must attempt to maximize value before Rangers Equity's interest in TRBP can be deemed to be unimpaired. However, no such requirement exists in section 1124 or elsewhere. Nor is there a requirement under the Bankruptcy Code to perform a valuation of TRBP's assets to determine whether Rangers Equity's interests in TRBP are impaired. If Congress wanted to include a valuation requirement in section 1124(1) (*i.e.*, that if all creditors are being paid in full, the Court must also find that a plan maximizes value for equity holders in order for equity holders to be unimpaired), it easily could have done so. Congress did not.

The Court should apply the plain language of section 1124. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (where language of statute is plain, sole function of court is to enforce statute in accordance with its terms). Neither Rangers Equity nor the Lenders may expect more of section 1124 than what is clearly offered under the language of the statute. *See In re Mirant Corp.*, Case No. 03-46590, 2005 WL 6440372, at *2 (Bankr. N.D. Tex. May 24, 2005).

The Lenders appear to suggest that because they do not like the results of the Plan, this fact somehow leads to the conclusion that Rangers Equity's interests in TRBP are impaired. However, the Lenders' disapproval of the Plan is not relevant for the impairment analysis. The only relevant question is the effect the Plan will have on Rangers Equity on the Plan's effective date. *See id.* at *4 (rejecting certain creditors' arguments that substantive consolidation under plan and cross-defaults under indenture constituted impairment because conditions were temporary and resolved upon effective date of plan). In this case, as of the effective date, Rangers Equity will be entitled to receive cash upon the closing of the APA after all obligations of TRBP's creditors are satisfied. This is precisely the right of Rangers Equity

outside of bankruptcy and is the exact type of plan treatment contemplated by section 1124 of the Bankruptcy Code for an unimpaired class of equity holders.

This Plan is clearly distinguishable from bankruptcy plans under which equity holders are held to be impaired. Such plans generally dilute or cancel equity holders' interest or alter equity holders' rights in the debtor.[6] By contrast, the economic interests and legal rights of Rangers Equity are not affected under the Plan. Rangers Equity supports the Plan, approved the APA, will receive all proceeds from the sale of assets remaining after the payment of creditors, and will retain all of their prepetition rights under TRBP's partnership agreement.

### 2. Unsecured Creditors Are Not Impaired Under the Plan.

No class of unsecured creditors (collectively, the "Unsecured Creditors") is impaired under the Plan. TRBP will modify the Plan to provide that Unsecured Creditors will receive payment in full, in cash, upon the effective date of the Plan, plus postpetition interest at the rate specified by the Bankruptcy Court or the federal judgment rate. In this case, the Unsecured Creditors are unimpaired under the plain meaning of section 1124 because their rights are unaltered under the Plan and they will receive payment in full, plus postpetition interest.

In 1994, section 1124(3), which provided that a class of claims was unimpaired if the claimant received the "allowed amount of such claim," was repealed to ensure that, consistent with the requirement that a plan be fair and equitable, unsecured creditors of solvent debtors should be entitled to receive payment of postpetition interest if the debtor was entitled to

---

[6] *See, e.g., In re Acequia, Inc.*, 787 F.2d 1352, 1357, 1360 (9th Cir. 1986) (finding that equity interest was impaired where key shareholder rights were modified under the plan; one shareholder was provided all of the rights to manage the debtor and appoint directors, and the other shareholder was deprived of such rights); *In re Pilgrim's Pride Corp.*, Case No. 08-45664 (DML) (Bankr. N.D. Tex. Dec. 10, 2009) [Docket No. 4399] (order confirming plan held that certain class of equity interests that were cancelled and re-issued new shares were impaired and other classes of equity interests that were reinstated were unimpaired.); *In re Crescent Resources, LLC*, Case No. 09-11507 (CAG) (Bankr. W.D. Tex. May 24, 2010) [Docket No. 1069] (order confirming plan held that equity interests would be impaired when equity holders received no distribution and interests were cancelled on the effective date).

any recovery.  *See* H.R. Rep. No. 103-835, at 47-48 (1994), *reprinted in* 1994 U.S.C.C.A.N.

3340, 3356-57.  Therefore, so long as a plan provides for the payment in full of unsecured

claims, plus postpetition interest, the class of unsecured creditors is not impaired.  *See Solow v.*

*PPI Enters.(U.S.), Inc.* (*In re PPI Enters. (U.S.), Inc.*), 324 F.3d 197, 206 (3d Cir. 2003); *In re*

*Rocha,* 179 B.R. 305, 307 (Bankr. M.D. Fla. 1995).  In this case, on the effective date, the

Unsecured Creditors will receive payment of all Allowed Claims in full with postpetition interest

before Rangers Equity will receive any recovery.  This is exactly the type of plan treatment

unsecured creditors are entitled to under section 1124 of the Bankruptcy Code in order to be

deemed unimpaired.

**B.      The Bankruptcy Code Does Not Impose an Independent Duty to Maximize**
**Value Through a Plan of Reorganization.**

There is no independent obligation to ensure that the Plan "maximizes value."

The Lenders have not cited – and cannot cite –any provision of the Bankruptcy Code that

requires a finding that a plan proposed by a debtor must "maximize value," because no such

provision exists.  If Congress had thought it prudent that such a requirement be satisfied, it could

have easily, and presumably would have, included it in chapter 11.  It did not do so.  Instead,

chapter 11 is a carefully constructed statutory scheme that balances various interests and rights in

its goal to rehabilitate the debtor.  Congress definitively decided that maximization of value is

*not* a requirement to confirmation.  Rather, it provided that a debtor has the exclusive right to file

a plan of its choosing for a period of time and that the Court *must* confirm the plan if it satisfies

the requirements of section 1129 of the Bankruptcy Code.  As explained below, there is

intentionally no requirement that the plan be the "best" plan or that the plan "maximize value" or

that the lenders to the debtor's equity holder like the plan.  The Court should decline the

Lenders' invitation to rewrite the Bankruptcy Code.

The chapter 11 scheme begins with exclusivity. Under section 1121(b) of the Bankruptcy Code, "*only* the debtor may file a plan until after 120 days after the date of the order for relief . . . ." 11 U.S.C. § 1121(b) (emphasis added). As the Court is well aware, the purpose of this "exclusivity period" is to provide a debtor, at the outset of a chapter 11 case, with "the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests." *In re Texaco, Inc.,* 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988). The Debtor submitted its Plan on the commencement date, well within the 120-day exclusivity period provided by the Bankruptcy Code.

If a filed plan meets all of the requirements under section 1129(a), then "[t]he court *shall* confirm" the plan. 11 U.S.C. § 1129(a) (emphasis added). Here, the Plan meets all the requirements of section 1129 and should be confirmed at a confirmation hearing on July 9, 2010. The Plan contemplates the sale of substantially all of the assets of the estate, which is an acceptable type of plan specifically contemplated by the Bankruptcy Code. 11 U.S.C. §1123(b)(4). The advancement or promotion of any alternatives to the proposed Plan by the Lenders or any other interested parties would directly violate the Debtor's specific, statutory rights under the Bankruptcy Code to present its own plan during the exclusivity period.

### 1. The Plan Need Not Provide for the "Highest" Recovery.

The Plan need not be (nor need it include) the preferred proposal of each creditor constituency, nor does the Plan even need to satisfy each constituency. In fact, Congress rejected the notion that a plan of reorganization must provide for the "greatest recovery" or be the "best."[7] Instead, it chose a different standard: the "best interests of the creditors" test, as set forth

---

[7] Any cases the Lenders might cite regarding a duty to maximize value in a sale under section 363 of the Bankruptcy Code are not applicable to a determination of whether to confirm a chapter 11 plan under section 1129. In determining whether to approve pre-plan sales of substantially all of a debtor's assets under section 363, courts are concerned that such sales may affect stakeholders' rights without affording them the procedural protections of

in section 1129(a)(7) of the Bankruptcy Code, which requires solely that creditors be at least as well off under a plan as they would be in a hypothetical liquidation. "With this guaranty in place, the Code assumes that *any value over and above liquidation value is subject to negotiation and debate, and its allocation subject to group vote rather than individual demand*." COLLIER ON BANKRUPTCY ¶ 1129.02[7] (16th ed. 2010) (emphasis added). As one court noted:

> under Section 1129(a)(7) of the Bankruptcy Code, the Plan
> Proponents must prove that the distribution to creditors under the
> Plan is no less valuable, as of the Effective date of the Plan, than
> the distribution such creditors would receive if the Debtors were
> liquidated under Chapter 7 of the Bankruptcy Code.

*In re Celotex Corp.*, 204 B.R. 586, 611-12 (Bankr. M.D. Fla. 1996). The court held that "[t]he Plan Proponents are not required to prove that the distribution to creditors under the Plan is more favorable than in connection with a hypothetical plan or a hypothetical auction sale." *Id.* (emphasis added).[8] Additionally, courts in this district and others have confirmed plans without specifically finding that value has been maximized by a sale through the plan, regardless of whether equity was impaired. *See generally In re Pilgrim's Pride Corp.*, Case No. 08-45664

---

section 1129. As such, the courts apply heightened scrutiny to such sales and generally review evidence regarding the price obtained for an asset. In doing so, however, the courts note that sales under plans are different from 363 sales and are governed by different standards. *See In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (holding that sale of all assets under section 363 requires additional business justification for the proposed transaction); *In re Bombay Co., Inc.*, No. 07-44061-DML-11, 2007 WL 2826071, at *3 (Bankr. N.D. Tex. Sept. 26, 2007) (articulating a preference for sales under section 1129 because of the additional protections afforded creditors by the Bankruptcy Code); *In re Lionel Corp.*, 722 F.2d 1063, 1071-72 (2d Cir. 1983) (holding that evidence that sale was not to a highest and best bidder compelled conclusion that sale did not meet standards under section 363); *Mission Iowa Wind Co. v. Enron Corp. (In re Enron Corp.)*, 291 B.R. 39, 43 (S.D.N.Y. 2004) ("Where a debtor attempts to sell substantially all of its assets pursuant to 11 U.S.C. § 363(b), instead of waiting for confirmation of a reorganization plan and the safeguards that that process provides, more than cursory scrutiny is required by the Bankruptcy Court."); *see also In re Moore*, Civ no. is 09-10604, 2010 U.S. App. LEXIS 11118 (5th Cir. June 2, 2010) (holding that a litigation claim was property of the estate that could be sold pursuant to section 363, and that bankruptcy court should have considered whether to conduct an auction).

[8] In any case, the "best interest of the creditors test" is entirely inapplicable to the Debtor's situation. On its face, it does not apply to any holder of a claim or interest that accepted the plan. The provision is meant to ensure that "reorganization is in the best interest of individual claimholders *who have not voted in favor of the plan.*" *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) (emphasis added). In this case, all creditors are conclusively presumed to have accepted the Plan because none of the classes are impaired. 11 U.S.C. § 1126(f).

(DML) (Bankr. N.D. Tex. Dec. 10, 2009) [Docket No. 4399] (order confirming plan without specific finding regarding maximized value where certain classes of equity were impaired while other equity classes were not).

>    **2.    The Existence of a Potential Alternative Bid Does Not Prevent Confirmation of the Debtor's Plan Within the Exclusivity Period.**

At the May 26, 2010 hearing, counsel to the Ad Hoc Group alluded to the existence of an alternative bidder and asked the Court to "open the assets up to auction." (Tr. of May 26, 2010 Hearing at 9.) But courts repeatedly have found that it is not appropriate for other parties to suggest alternatives to a confirmable plan filed by a debtor during its exclusivity period, regardless of the supposed attractiveness of the proposed alternative. *See, e.g.*, *In re Spansion, Inc.*, 426 B.R. 114, 140 (Bankr. D. Del. 2010) (rejecting creditors' committee's proposed alternative to debtor's plan that would have provided a better deal for some creditors); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 106 (Bankr. D. Del. 1999) (rejecting equity committee's desire to reformulate plan that would have placed equity in reorganized debtor "on the market" and available to only the highest bidder); *In re Mt. Vernon Plaza Cmty. Urban Redevelopment Corp. I*, 79 B.R. 306, 310 (Bankr. S.D. Ohio 1987) (overruling objection by creditors that plan should not be confirmed because alternative courses of action not contemplated in debtors' plan might yield greater payout).[9]

---

[9] Courts also have held that a creditor's desire for another auction of the assets of the Debtor does constitute cause, as required by section 1121(d), to modify the exclusivity period. *See, e.g.*, *Geriatrics Nursing Home v. First Fid. Bank, N.A.* (*In re Geriatrics Nursing Home, Inc.*), 187 B.R. 128, 134 (D.N.J. 1995) (holding that possibility of alternatives that might lead to better recoveries for creditor classes is not sufficient cause to justify termination of the exclusivity period); *In re Inerco, Inc.*, 137 B.R. 999, 1000 (Bankr. E.D. Mo. 1992) ("A party requesting an immediate termination of the exclusive period . . . bears a heavy burden."); *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 n.14 (Bankr. S.D.N.Y. 2006) ("the notion that creditor constituency unhappiness, without more, constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period has been judicially rejected"). This is particularly so where, as here, the Plan satisfies the requirements of the Bankruptcy Code and the proposed alternative would inevitably entail additional delay, turmoil and unnecessary administrative costs.

In a case relying heavily on Fifth Circuit law in evaluating the merits of alternatives to a proposed plan, the bankruptcy court for the Middle District of Florida clarified a court's responsibility with respect to a chapter 11 plan as being one of evaluating the applicable standards of confirmation and not of evaluating alternatives to confirmation:

> This Court's responsibility with respect to consideration of the Plan is to consider as a matter of law (i) whether the Plan Proponents have met their burden under the Bankruptcy Code, (ii) whether each impaired class has accepted the Plan and (iii) the merits of any timely filed objections to the Plan. *The Court need not and ought not consider if a proposed plan is the "best" plan of reorganization that could be promulgated, providing for the highest return to creditors of the Debtors' Estates.* Instead, the Chapter 11 process is controlled by the various constituencies in a case, including holders of Claims and Interests. It is not the Bankruptcy Court's role to substitute its judgment for the judgment of the various classes of creditors who have voted overwhelmingly in favor of the Plan. *Accordingly, the Bankruptcy Court is not required to compare the Plan to a hypothetical plan.*

*In re Celotex Corp.,* 204 B.R. at 611-12 (emphasis added).

The Bankruptcy Court for the District of Delaware in the recent *Spansion* case echoed this sentiment when it refused to allow creditors to present an alternative, purportedly "better" plan, holding "[i]t is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors . . . ." *Spansion*, 426 B.R. at 141. Similarly, the court in *Mt. Vernon* looked at the argument for an alternative proposal in the context of a plan seeking to sell substantially all of the assets of the debtor:

> [T]he assertion is made that a sale may not be necessary, that such a sale frustrates the purposes of Chapter 11, and that another Plan has been filed by [objectors to the proposed plan]. None of these reasons, however, are appropriate or sufficient as a matter of law
> . . . .

*Mt. Vernon*, 79 B.R. at 310. Of particular relevance here, the *Mt. Vernon* court concluded that:

"[s]o long as a proposed plan satisfies the tests for confirmation set forth in 11 U.S.C. § 1123(a)

and § 1129, *the Court does not decide if the Plan is correct in proposing a sale*." *Id.* (emphasis

added). Further, the *Mount Vernon* court added that even though the alternative plan proposed

by the creditors also might meet all the requirements for confirmation, that alone was "not reason

to delay confirmation of this Plan nor impose control of that process by the Court." *Id.*[10]

    The Debtor's exclusive right to file the Plan goes beyond its right to submit a

document to the Court. The exclusive right to submit a plan for confirmation—provided

statutorily to a debtor—is a debtor's quintessential right to guide and manage the reorganization

and confirmation process in a way consistent with the Bankruptcy Code and the debtor's beliefs

regarding what is best for the company going forward. *See In re Clamp-All Corp.*, 233 B.R. 198,

207-08 (Bankr. D. Mass. 1999) ("the exclusivity period gives the debtor . . . the opportunity to

retain control over the reorganization process"). The Debtor is prepared to move forward with

its Plan and continue on to a confirmation hearing on July 9. To compel the Debtor to

reconceptualize its reorganization and reopen a bidding process the Debtor already completed,

solely to satisfy the Lenders' preferred manner of reorganization, would plainly and inexorably

deprive the Debtor of its exclusive right to formulate and propose a plan of reorganization it

believes is best—subject to the limitations imposed by the Bankruptcy Code. Indeed, such relief

is both statutorily and fundamentally unwarranted: "[t]he fact that one creditor constituency is

---

[10] The Supreme Court's decision in *Bank of America National Trust & Sav. Association v. 203 N. Lasalle Street Partnership*, 526 U.S. 434 (U.S. 1999) suggests that an auction may be required under a plan in the limited circumstance when an ownership interest is being provided to old equity holders in exchange for new capital over the objection of creditor classes. The auction may be necessary to ensure that such ownership interest is not "on account" of the old equity interest, which would have indisputably violated the absolute priority rule in that case. Those circumstances are not relevant here. Indeed, courts have noted that the ruling in the *203 North LaSalle* case is limited to its facts, holding that it does not mean an auction is required in every case. As one court noted, to extend the Supreme Court's ruling in that case would "require in all cases that a debtor be placed 'on the market' for sale to the highest bidder. Such a requirement would eliminate the concept of exclusivity contained in section 1121(b) and the broad powers of the debtor to propose a plan in whatever format it desires." *Zenith Elecs. Corp.*, 241 B.R. at 106; *see also In re PWS Holding Corp.*, 228 F.3d 224, 239 n.11 (3d Cir. 2000) (refusing to interpret *203 North LaSalle* in a way that would override the exclusivity period specifically provided by the Bankruptcy Code).

not happy with the debtor's plan" does not "constitute[] cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period." *In re Geriatrics Nursing Home*, 187 B.R. at 134; *see also In re Adelphia Commc'ns Corp.*, 352 B.R. at 587 n.14 ("[T]he notion that creditor constituency unhappiness, without more, constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period has been judicially rejected.") (internal quotation marks omitted).

The possibility of an alternative to the Plan, even one that might hypothetically provide greater value to creditors of TRBP's equity holders, does not provide the Court with adequate justification to substitute the business judgment of TRBP with that of the Lenders. Therefore, this Court should disregard any alternative proposal to the Plan put forth by the Lenders, which thus far has not even been made public, and proceed to a confirmation hearing.

**3.     The Plan Satisfies the Requirements of Section 1129(a) of the Bankruptcy Code, and the Court Should Permit the Plan to Move Toward Confirmation.**

In order for a plan to be confirmed, it must meet the requirements of section 1129 of the Bankruptcy Code.  Specifically, if a plan meets the sixteen requirements established by section 1129(a)(1)-(16), the "[t]he court *shall* confirm" the plan.  11 U.S.C. § 1129(a) (emphasis added).  The Plan meets the requirements of section 1129 (or, at least, is not unconfirmable on its face) and therefore should be scheduled for confirmation.[11]

---

[11] Most of the requirements for confirmation under section 1129(a)(1)-(16) are not in question in this case, either because no classes are impaired under the Debtor's Plan, because the Debtor is not an individual, or for various other reasons.  As a result, the Debtor believes the Lenders may rely on the requirement of whether the Plan was offered in "good faith," as required by section 1129(a)(3) of the Bankruptcy Code.

Although the Debtor does not believe that the Court is requiring it to brief the confirmation standards at this time, any argument that the Plan is not confirmable on its face under this standard should be rejected.  In order to satisfy section 1129, the Plan must have been proposed in good faith and not by any means forbidden by law.  11 U.S.C. § 1129(a)(3).  "The Bankruptcy Code does not define the term 'good faith.'"  *In re Lernout & Housie Speech Prods. N.V*, 308 B.R. 672, 675 (D. Del. 2004).  "The test for good faith is whether there is a reasonable likelihood that the plan will achieve a result consistent with the standards under §1129."  *In re Tex. Extrusion Corp.*, 68 B.R. 712, 723

C.   **Even if Rangers Equity Were Required to Vote on the Plan, The Creditors of Rangers Equity Have No Right to Speak For or Dictate the Vote of Rangers Equity in this Chapter 11 Case.**

As noted above, the APA was consented to by Rangers Equity, and the Plan has the support of Rangers Equity.  There is no basis for this Court to re-open the question of Rangers Equity's support of the Plan.  But even if Rangers Equity's interests in TRBP are held to be impaired and Rangers Equity were required to vote on the Plan, there is no reason to believe that Rangers Equity would vote differently at the time when votes are solicited for the Plan than they did when Rangers Equity originally consented to the entry by TRBP into the APA.  Importantly, even if Rangers Equity are permitted to vote on the Plan, Rangers Equity would be doing so in the exercise of business judgment, the same business judgment that resulted in the execution of the APA by TRBP in the first place.  Creditors of equity holders, of course, would have no ability to vote on the Plan.  *See* 11 U.S.C. § 1126 ("The holder of a claim or interest allowed under Section 502 may accept or reject a plan.").

Nor do Rangers Equity's creditors have the power to dictate the vote of Rangers Equity.  Although certain of those creditors subsequently filed involuntary petitions against Rangers Equity, this does not change the conclusion that Rangers Equity's management retains

---

(N.D. Tex. 1986); *aff'd*, 836 F.2d 217 (5th Cir. 1988).  Good faith requires a legitimate, honest purpose to reorganize and a reasonable probability of success.  *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985); *In re Mortgage Inv., Co. of El Paso*, 111 B.R. 604, 611 (Bankr. W.D. Tex. 1990).

The satisfaction of every creditor or constituency is not a requirement for a showing of good faith.  *See, e.g., Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters., Ltd., II.)*, 994 F.2d 1160, 1168 (5th Cir. 1993) ("A plan may not be the one that the creditors would themselves design . . . and yet still pass the good faith requirement"); *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 329 (Bankr. S.D. Ohio 1992) ("The Court fails to see how [a creditor's] unhappiness with the Plan's terms can give rise to a finding of bad faith on the part of the Debtor under 11 U.S.C. § 1129(a)(3)."); *In re Zenith Elec.*, 241 B.R. at 107 (fundamental fairness not offended by one group receiving better treatment than another under plan).

Further, courts have held that a plan which contemplates the payment of all claims in full is, on its face, submitted in good faith.  *See In re Madison Hotel Assocs.*, 749 F.2d 410 (7th Cir. 1984) (payment or reinstatement of all creditors in full was important factor in determining plan was filed in good faith); *In re Sound Radio, Inc.*, 93 B.R. 849, 854 (Bankr. D.N.J. 1988) (same), *aff'd*, 909 F.2d 964 (3d Cir. 1990).

the exclusive ability to cast a vote on behalf of Rangers Equity at plan confirmation in the instant chapter 11 case. A debtor in possession is given the same right to exercise its business judgment within bankruptcy as it is outside of bankruptcy. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1312 (5th Cir. 1985) ("Although § 1107 provides that a court may limit the debtor's exercise of the rights of the trustee, including the § 1108 right to operate the business, in the absence of special circumstances or a specific Code provision, we see no reason to require the debtor to do more than justify its actions under the 'business judgment' standard if creditors object."). Likewise, the Pledge Agreements do not permit creditors to dictate the decision-making at Rangers Equity. Any control rights given to the Lenders under the Pledge Agreements are explicitly subject to the MLB Documents and MLB's approval, which approval has neither been requested nor obtained. Moreover, the Lenders are now prohibited from exercising control over Rangers Equity because of the automatic stay that governs Rangers Equity's chapter 11 cases. Finally, creditors of equity do not even have standing to contest the Plan, much less the power to control Rangers Equity's position vis-à-vis the Plan. And these Lenders in particular have contractually waived their right to advocate for a sale of the team to a buyer or in a manner that is not approved by MLB.

1.      **The Involuntary Bankruptcy Filings of Rangers Equity Does Not Alter the Conclusion that Rangers Equity Supports the Plan.**

It is a fundamental principle of United States bankruptcy law that a debtor in possession be permitted to continue to operate its business during a bankruptcy. *See* 11 U.S.C. § 1107. The debtor in possession is permitted to operate and make decisions pursuant to its business judgment. *See Richmond Leasing*, 762 F.2d at 1312 ("[I]n the absence of special circumstances or a specific Code provision, we see no reason to require the debtor to do more than justify its actions under the business judgment standard if creditors object."). Indeed, such

continuity benefits creditors by allowing the debtor to apply its greater experience in the management of the business.  *See In re PMH Corp.*, 116 B.R. 644, 645 (Bankr. N.D. Ind. 1989) ("In the usual situation, Chapter 11 of the Bankruptcy Code permits a debtor in possession to continue managing its business operations.  This policy is based upon the fact that very often the creditors will be benefited by continuation of the debtor in possession, both because the expense of a trustee will not be required, and the debtor, who is familiar with his business, will be better able to operate it during the reorganization case.") (internal quotation marks omitted).  Here, in deciding to cast a vote on the Plan, Rangers Equity would be exercising the same business judgment that resulted in the commencement of this case and the entry into the APA in the first place.  As explained below, see *infra at* 41-43, the entry into the APA was a sound exercise of business judgment because it minimized execution risk and thus maximized the returns for TRBP.

The fact that involuntary bankruptcy petitions have been filed against Rangers Equity does not alter this result in any way.  Indeed, until an order for relief is entered in the case, a party subject to an involuntary petition may conduct its business as if no petition even was filed.  *See* 11 U.S.C. § 303(f) ("Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in the case, any business  of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property *as if an involuntary case concerning the debtor had not been commenced*.") (emphasis added); 2 COLLIER ON BANKRUPTCY ¶ 303.22 (16th ed. 2010) (citing *Consol. Partners Inv. Co. v. Lake (In re Consol. Partners Inv. Co.*), 152 B.R. 485, 490-91 (Bankr. N.D. Ohio 1993) ("Section 303(f) was designed to make sure that the involuntary filing does not affect the debtor or its business.")).  As noted below, however, the automatic stay applies at the time the involuntary

petition is filed. *See* 11 U.S.C. § 363(a) (stay comes into effect upon the filing of a petition "under section . . . 303 of this title"). Thus, neither the involuntary filing itself nor the potential that Rangers Equity may become chapter 11 debtors alters the conclusion that Rangers Equity may continue to act pursuant to their sound business judgment.

      2.      **The Pledge Agreements Provide No Authority to the Lenders to Exercise Control over Rangers Equity.**

The Lenders may argue that, under Section 4.4.1(c)(i)(3) of the Pledge Agreements, the Collateral Agent is permitted to exercise the voting rights of Rangers Equity. Such an argument is fundamentally at odds with the terms of the Pledge Agreements, which explicitly recognize that the rights under the Pledge Agreements are subject to the MLB Documents, which in turn explicitly require MLB's consent for any transfer of a direct or indirect control interest in a major league franchise. Regardless, even if such a right to control Rangers Equity existed outside of bankruptcy, the automatic stay in Rangers Equity's involuntary cases bars the exercise of such a right at this time.

      (a)      **The Pledge Agreements Do Not Permit the Collateral Agent, on Behalf of the Lenders, to Assume Control Over Rangers Equity.**

Although Section 4.4.1(c)(i)(3) of each Pledge Agreements provides that the Collateral Agent shall have the right to exercise the voting rights of Rangers Equity upon an Event of Default, such right was made explicitly subservient to the MLB Documents and MLB's consent.

The rights of the Lenders and the Collateral Agent under the Pledge Agreements and Credit Agreement contain the following significant limitations:

      (1)      The Collateral Agent and Lenders acknowledge that they are "aware of the provisions contained in Article V, Section 2(b)(2) of the Major League Constitution, and recognize[] that the Ownership Committee of Baseball has issued 'Control Interest

Transfers – Guidelines & Procedures.'" (Pledge Agr. § 11(a); Credit Agr. § 10.23(a));

(2)     The Collateral Agent and Lenders "acknowledge[] that Article V, Section 2(b)(2) of the Major League Constitution and the MLB Control Interest Transfer Guidelines *require that the transfer of a control interest in either the Rangers Franchise or the Rangers be subject to the approving vote of the Major League Baseball clubs in their absolute discretion*." (Pledge Agr. § 11(b) (emphasis added); (Credit Agr. § 10.23(b));

(3)     Article V, Section 2(b)(2) of the MLB Constitution provides that a three-fourths vote of the MLB clubs is required for approval of the "sale or transfer of a control interest in any Club . . . . *For purposes hereof, the term 'control' shall mean the possession by the transferee, directly or indirectly, of the power or authority to influence substantially the management policies of the Club*." (MLB Const. Art. V. § 2(b)(2) (emphasis added));

(4)     The MLB Control Interest Transfer Guidelines provide that: "Ownership of a control interest in a Club other than by an individual, for instance by a corporation, LLC or partnership, creates the potential for effective change in control of the Club through a change in ownership or *management of the ownership entity or any parent company*. Therefore, *a change in control in any such entity*, or a change in the individual designated by, for instance, the corporate owner to make all Club decisions, *shall be deemed to be a control interest transfer*. . . . All corporate, LLC or partnership documents must reflect that any Club control or non-control interest transfer must receive the appropriate Baseball approvals." (MLB Control Interest Transfer Guidelines (emphasis added));

(5)     The Collateral Agent agreed that it must obtain the prior approval of the Commissioner and the Clubs before exercising "the temporary or permanent management of the Rangers Franchise or the Rangers." (Pledge Agr. § 11(c));

(6)     Section 2.5 of TRBP's partnership agreement provides, in part, that any "change in the identity or control of any Partner . . . . shall be subject to and made in accordance with the [MLB Documents]," including, but not limited to, the MLB Control Interest Transfer Guidelines. (TRBP's P'ship Agr. § 2.5.)

Individually and collectively, these provisions preclude the Lenders or the

Collateral Agent, on behalf of the Lenders, from attempting to exercise any control over Rangers

Equity without first obtaining the consent of MLB. Having the right to control the voting power of Rangers Equity or TRBP's equity would constitute direct or indirect power or authority to influence the management of TRBP. Therefore, in order to exercise control over Rangers Equity (and therefore control over TRBP), the Collateral Agent agreed that it first needs to obtain the consent of MLB. Because the Collateral Agent never sought nor obtained such consent, the Collateral Agent did not – by its own recognition and agreement through the Pledge Agreements, and the Lenders' own recognition through the Credit Agreements – have the ability to control Rangers Equity. The Collateral Agent, on behalf of the Lenders, has no ability to control Rangers Equity at this time, and the existing management of Rangers Equity is the only appropriate party to speak for Rangers Equity in this chapter 11 case.

In *In re Uno Broadcasting Corp.*, the Bankruptcy Court for the District of Arizona considered a similar provision in a pledge agreement that conditioned voting rights on the prior approval of another party, namely the FCC, in certain circumstances. The Court stated that "[i]f FCC approval of the transfer is required, the provisions [in the pledge agreement requiring the FCC's prior approval] effectively gut the provisions [in the pledge agreement granting the pledgee the right to exercise all voting powers pertaining to the pledged stock], by conditioning the lender's voting power on that approval." *In re Uno Broad. Corp.*, 167 B.R. 189, 193 (Bankr. D. Ariz. 1994). As the court recognized, "[t]his sort of uncertainty is unavoidably involved in broadcast lending." *Id.*

Like Section 11 of each Pledge Agreement that subjects the Pledge Agreements to the MLB Documents and MLB's consent rights and approvals required thereby, the pledge agreement in *In re Uno* provided that "notwithstanding any of the provisions of [the pledge agreement] to the contrary," transfer of control over the stock in the debtor and the exercise of

any related rights are subject to "any required consent of the FCC to the transfer of such control to [the pledgee]." *Id.* Like in *In re Uno*, lenders to MLB teams or their parent companies accept a certain level of uncertainty as a result of MLB's consent rights. Although the court in *In re Uno* ultimately held that FCC approval was not required in connection with the specific transaction at issue, *In re Uno* demonstrates that voting rights given under a pledge agreement can be rendered inoperative if they are granted subject to the consent of a third party and such consent is not obtained.

Moreover, even if the Pledge Agreements were deemed ambiguous as to the Collateral Agent's rights on behalf of the Lenders (and they are not), the Collateral Agent's own behavior decisively resolves any claimed ambiguity in favor of the Debtor. New York law (which governs the Pledge Agreements) uses extrinsic evidence to divine the parties' intent in the face of contractual ambiguities. And "[t]he best evidence of the intent of parties to a contract is *their conduct after the contract is formed*." *See, e.g.*, *Waverly Corp. v. City of N.Y.*, 48 A.D. 3d 261, 265 (N.Y. App. Div. 2008) (emphasis added). In this case, the Collateral Agent never did anything to suggest it or the Lenders had the right to exercise the alleged voting rights of Rangers Equity, let alone exhibiting any other indicia of control.[12] Indeed, these parties apparently believed that the only way to have a "say" in the Debtor's plan was by filing involuntary petitions against Rangers Equity. This is hardly conduct that would be taken by a stakeholder with actual control rights under the Pledge Agreements. In the year and more since the first alleged event of default, the Lenders never have sought to exercise their control rights, or instructed the existing management of Rangers equity to refrain from exercising control. As a

---

[12] Further factual development through discovery or otherwise also may establish that the Lenders or the Collateral Agent also waived or are estopped from asserting their rights under applicable law.

result, the existing management of Rangers Equity has remained in control and remained empowered to make decisions on behalf of Rangers Equity.

As discussed above, because the necessary consents of MLB have not been obtained, the Collateral Agent does not have the ability to control Rangers Equity. The Lenders therefore cannot dictate any required vote of Rangers Equity as part of plan confirmation.

> **(b)** **This Court Should Recognize and Enforce the Limits Agreed to By the Collateral Agent, on Behalf of the Lenders, in the Pledge Agreements.**

It is axiomatic that the Lenders are not entitled to greater protections after TRBP filed for bankruptcy than the protections that they had beforehand:

> In bankruptcy, the parties claiming rights to participate in the assets of the bankrupt must do so in accordance with such contractual rights against the debtor as they may have purchased or acquired. Bankruptcy does not provide a forum for the realignment of rights or priorities but serves only as a forum for the recognition of rights already acquired.

*In re Credit Indus. Corp.*, 366 F.2d 402, 407 (2d Cir. 1966).

Indeed, the Lenders' position is directly contrary to the Supreme Court's ruling that a creditor is not to be provided greater rights in bankruptcy than it had under its contract outside of bankruptcy. *See Butner v. United States*, 440 U.S. 48, 55 (1979). As the Supreme Court stated: "Unless some federal interest requires a different result, there is no reason why such [property] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id*. Moreover, the Supreme Court further stated that "uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and *to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy*." *Id*. (emphasis added and internal citations omitted); *see In re Laughlin*, 602 F.3d 417, 422 (5th Cir. 2010) (same); *Am. Bankers*

*Ins. Co. of Fla. v. Maness*, 101 F.3d 358, 363 (4th Cir. 1996) (same); *Madeline Marie Nursing Homes v. Collins (In re Madeline Marie Nursing Homes)*, 694 F.2d 433, 438 (6th Cir. 1982) (same).

Here, the Lenders agreed prepetition to the MLB subservience provisions and specifically agreed that any sale or transfer of control of TRBP or Rangers Equity would be subject to the prior approval of MLB; this Court should not "rewrite the contract between the parties to afford [the bank] greater protection than that for which it bargained." *Berliner Handels Und Frankfurter Bank v. E. Tex. Steel Fac., Inc.* (*In re E. Tex. Steel Fac., Inc.*), 117 B.R. 235, 243 (Bankr. N.D. Tex. 1990).

**(c)** **The MLB Subservience Provisions Are Subordination Agreements that Should Be Enforced.**

The MLB subservience provisions described above essentially are subordination agreements – subordinating certain rights of the Lenders and the Collateral Agent under the Credit Agreements and Pledge Agreements to the prior consent of MLB.[13] As such, these provisions also should be recognized and enforced under section 510(a) of the Bankruptcy Code "to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).

Courts enforce these types of subordination provisions. For example, a similar situation was presented in *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)* where:

---

[13] These provisions were clearly intended to subordinate the rights of the Lenders. Although not expressly referred to as "subordination" provisions, there can be no doubt that the intention of the parties negotiating the Credit Agreements — including the Lenders — was to make clear that notwithstanding the extension of credit by the Lenders, that such rights of the Lenders are "subject" or subordinate to the MLB rules and regulations as described therein.

> The Court conclude[d] that the Intercreditor Agreement is strictly enforceable in accordance with its terms. Moreover, plainly worded contracts establishing priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled. The Intercreditor Agreement is an enforceable contract under section 510(a), and *the Court will not disturb the bargained-for rights and restrictions governing the second lien debt currently held by [the junior creditor]*.

419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009).

Courts have also held that Creditors who agree prepetition that their actions are subject to the consent of another party cannot raise contrary positions in bankruptcy because they have waived those arguments and they lack standing to make them. Following *Ion Media*, Judge Jernigan recently held that junior creditors violated a provision of a subordination agreement that prohibited the creditors from "exercis[ing] any rights or remedies to take any action or proceeding to collect any of the Subordination Obligations" without "the prior written consent of the Agent" by filing a motion to appoint an examiner. *In re Erickson Ret. Cmtys., LLC*, 425 B.R. 309, 314 (Bankr. N.D. Tex. 2010). There, the court held that the actions violated the intercreditor agreement and that the junior creditors lacked standing and/or waived their right to pursue the examiner motion due to their prepetition agreement. *See id.*

Moreover, enforcing prepetition agreements as written comports with general principles of public policy. As described by the *Ion Media* court:

> Affirming the legal efficacy of unambiguous intercreditor agreements leads to more predictable and efficient commercial outcomes and minimizes the potential for wasteful and vexatious litigation. The sophisticated parties who entered into the Intercreditor Agreement were certainly aware of the nature of ION's business and the well-known restrictions and limitations applicable to security interests in FCC licenses. This reality adds credence to the notion that the parties fully intended to place the Second Lien Lenders in an indisputably subordinate position and to prevent interference with the stipulated senior rights of the First Lien Lenders.

*Ion Media*, 419 B.R. at 595 (emphasis added).

Like the sophisticated parties in *Ion Media*, the Lenders and the Collateral Agent understood the intricate relationship between TRBP and MLB before agreeing to the Pledge Agreements and Credit Agreements that contained the specific MLB consent provisions described above.[14]  Public policy favors the enforcement of the MLB consent provisions for the reasons described by the *Ion Media* court, namely to ensure more predictable and efficient commercial outcomes and to minimize the potential for wasteful and vexatious litigation.  Here, the actions of the Lenders and the Collateral Agent threaten to derail a prepackaged plan of reorganization that provides a full recovery to all parties, thwart a sale to a buyer that has the support of MLB, prolong the time TRBP will spend in chapter 11, and increase administrative costs for all involved.  Such an attempt should be rejected.

      **(d)**      **The Automatic Stay Prohibits the Collateral Agent, on Behalf of the Lenders, From Exercising Control Over Rangers Equity or Attempting to Control Rangers Equity's Vote Under TRBP's Plan.**

Finally, because the involuntary petitions were filed against Rangers Equity, the automatic stay bars the Collateral Agent from (1) exercising any right to vote to control Rangers Equity; and (2) otherwise attempting to dictate Rangers Equity's vote under the Plan.

When a creditor of a bankrupt entity seeks to enforce contractually agreed-upon control rights over that entity in order to protect the creditor's interest as creditor, such an action

---

[14] On May 4, 2010 Andrew J. Herrenstein of Monarch Alternative Capital, Bret W. Johnston, Managing Director of GSP Finance LLC, and Jeff Robinson of Sankaty Advisors, LLC (upon information and belief, all members of the Ad Hoc Group) wrote to Allan H. Selig, Commissioner of Baseball and said, in part "We have no interest in controlling the sale process for the Texas Rangers.  We have no interest in selecting the next owner of the Texas Rangers.  We respect Major League Baseball's right to consent to the purchaser of the team outside of bankruptcy." (emphasis added).  As parties that knowingly agreed to all of the terms of the Pledge Agreements and Credit Agreements, including the MLB subservience provisions, these members of the Ad Hoc Group are trying to draw a false distinction between the binding force of the MLB consent provisions on their conduct outside of bankruptcy and their conduct inside of bankruptcy.  TRBP's chapter 11 filing, though, does not give them a "bankruptcy out" from their contractual obligations.  The members of the Ad Hoc Group must, in their own words, "respect Major League Baseball's right to consent to the purchaser of the team" whether the team is in bankruptcy or not.

constitutes an attempt to exercise control over property of the estate and is subject to the automatic stay under 11 U.S.C. § 362(a)(3). *See In re Bicoastal Corp.*, No. 89-8191-8P1, 1989 WL 607352, at *5 (Bankr. M.D. Fla. Nov. 21, 1989) (holding that 11 U.S.C. § 362(a)(3) applies to a situation where "Mesa is not a stockholder who desires to obtain control of the management of Bicoastal for the reason stockholders undertake such actions at all, but only to obtain control of the management in order to assure that this promissory note is repaid."); *cf. In re Marvel Entm't Group*, 209 B.R. 832, 839 (D. Del. 1997) (stating that courts have "applied the automatic stay provisions of §362(a)(3) in order to prevent creditors of debtors from gaining control of the debtors' estates through the exercise of corporate governance rights").

As these cases recognize, there is a critical distinction between a *creditor* exercising voting rights (which implicates the automatic stay as an exercise of control over property of the estate) and a *shareholder* exercising voting rights (which is part of traditional corporate governance, and not affected by the automatic stay). *See In re Hutchinson*, No. 01-46374-BJH-11 2002 Bankr. LEXIS 2014, *4-5 (Bankr. N.D. Tex. Jan. 18, 2002). As Judge Hauser recognized in *Hutchinson*:

> The cases make clear that where the entity voting stock shares derives its ability to vote them from its status as a creditor, then traditional notions of corporate governance, which ordinarily allow shareholders to vote their shares to replace management notwithstanding the fact that a corporation is in bankruptcy, are not implicated. Rather, those cases hold that in such a situation, the automatic stay is implicated.

*Id.* (citations omitted).

Likewise, the right to vote on any bankruptcy plan is property of Rangers Equity's estates. *See* 11 U.S.C. § 541(a)(2) (estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case"). Thus, any attempt to control any right

held by Rangers Equity to vote on the Plan also would be an effort to exercise control over property of the estate and is subject to the automatic stay.  *See* 11 U.S.C. § 362(a)(3).

The automatic stay of section 362(a) comes into effect upon the filing of an involuntary petition under section 303, just as it does when a voluntary petition is filed.  *See* 11 U.S.C. § 363(a) (stay comes into effect upon the filing of a petition "under section . . . 303 of this title").  Thus, because the automatic stay applies to Rangers Equity's involuntary cases, the Lenders or the Collateral Agent are prohibited from taking any action (1) to control Rangers Equity and (2) to control the vote of Rangers Equity as part of plan confirmation.

**3.      The Creditors of Rangers Equity Lack Standing to Object to the Plan.**

Not only do the Lenders lack the ability to change Rangers Equity's consent to the execution by TRBP of the APA, they do not even have standing to object to the Plan.  TRBP's creditors will be paid in full under the Plan and, therefore, the Lenders have no standing to object to the Plan based on their position as creditors of TRBP.  As creditors of TRBP, the Lenders plainly have standing under 11 U.S.C. § 1109(b) to be heard with respect to their interest *as a creditor of TRBP*.  However, "the court should decide questions of standing, particularly, in multi-party, multi-issue confirmation proceedings, on an issue-by-issue basis."  *In re Quigley Co., Inc.*, 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008).  Thus, creditors of TRBP have standing only to protect their interest as creditors of TRBP; numerous courts have recognized that creditors lack standing to assert an objection for other parties.  *See, e.g., In re Cypresswood Land Partners, I*, 409 B.R. 396, 418 (Bankr. S.D. Tex. 2009) ("Courts across the nation have determined that parties-in-interest may only object to plan provisions that 'directly implicate its own rights and interests.'") (quoting *In re Quigley*, 391 B.R. at 705); *In re Rimsat, Ltd.*, 193 B.R. 499, 502 (Bankr. N.D. Ind. 1996) (holding that a prepetition receiver in an involuntary chapter 11 had no standing to seek a dismissal or conversion of the case because "to qualify as a party in

interest requires more than merely being interested in the outcome of the bankruptcy. It requires a direct legal interest in the case"). *Cf. In re El Paso Refinery, LP*, 37 F.3d 230, 234 (5th Cir. 1994) (rejecting creditor's argument that it had standing to file a motion where the motion "did not really seek to assert its rights as creditor" and finding assertion of standing to be "specious and disingenuous" because creditor did not argue that "its position as creditor might be compromised, i.e., that funds expended [by the debtor] would jeopardize [the creditor's] chance of being paid"). Where, as here, the creditors of TRBP themselves are being paid in full and are unimpaired by the Plan, the Lenders lack standing because any objection necessarily is made on behalf of other parties. *See In re Quigley*, 391 B.R. at 703 ("[A]lthough '[a] party in interest may object to confirmation of a plan,' 11 U.S.C. 1128(b), it cannot challenge portions of the plan that do not affect its direct interests.") (collecting cases).

To the extent that the Lenders claim standing because of their interest as creditors of Rangers Equity, this too should be rejected as a basis for standing. In general, "[t]o have standing a party must assert its own legal rights and interests and cannot rest its claim to relief on the legal rights or interest of third parties." *In re Cogar*, 210 B.R. 803, 808 n.7 (9th Cir. B.A.P. 1997); *see also In re Stoll*, 252 B.R. 492, 495 (9th Cir. B.A.P. 2000) (same). Courts have long recognized that parties asserting an interest only *through* a party in interest, *i.e.*, creditors of creditors or equity holders of equity holders, lack standing to raise an objection. *See In re Martin Paint Stores*, 199 B.R. 258 (Bankr. S.D.N.Y. 1996) ("[A] creditor of the debtor's creditor is not a 'party in interest' . . . and the term does not encompass a person who is merely 'concerned' with the results of the proceeding."), *aff'd*, 207 B.R. 57 (S.D.N.Y. 1997); *In re Royal Props. & Invs., Inc.*, 68 B.R. 245, 246 (Bankr. S.D. Fla. 1986) ("[A] stockholder of a parent corporation is not a party in interest entitled to intervene in the reorganization proceeding

of its subsidiary.").[15]  The result should be no different in this case, where the Lenders are

objecting to the Plan merely in their role as creditors of Rangers Equity.

> **D.**      **<u>A Vote In Favor of the Plan Would Be An Exercise of Rangers Equity's Sound Business Judgment</u>.**

>> **1.**      **<u>The Management of Rangers Equity Owe Fiduciary Duties to Rangers Equity to Exercise Sound Business Judgment; Upon Insolvency or Bankruptcy, Creditors Become the Beneficiaries of These Duties</u>.**

In its June 2, 2010 order, this Court asked what fiduciary duties are owed by

Rangers Equity to their creditors.  Assuming that Rangers Equity are insolvent entities, their

creditors are beneficiaries of the fiduciary duties owed by management of Rangers Equity to the

limited liability company (in the case of Rangers Equity GP), and the limited partnership (in the

case of Rangers Equity LP).  Likewise, in the event that Rangers Equity become bankruptcy

debtors, creditors would be beneficiaries of the fiduciary duties owed by Rangers Equity's

management.  Importantly, however, under either scenario, the nature of the duties do not

change, just the identity of the parties that can enforce those duties.  That is, the duty owed by

Rangers Equity's management is the duty to act with due care and with loyalty (*i.e.*, the duties to

act in good faith, without conflict of interest, consistent with business judgment).  *See, e.g., In re

Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 745 (Del. Ch. 2005) (explaining that the two

---

[15] *See also In re Comcoach Corp.*, 698 F.2d 571, 573-74 (2d Cir. 1983) ("Bankruptcy Courts were established to provide a forum where creditors and debtors could settle their disputes and thereby effectuate the objectives of the statute. Necessarily, therefore, the Bank must be either a creditor or a debtor to invoke the court's jurisdiction."); *S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997) ("A creditor, under the Code, is one who has a claim against the debtor or the estate. The concept does not, according to the Second Circuit, encompass a creditor of one of the debtor's creditors.") (internal citations omitted); *In re Lifeco Inv. Group, Inc.*, 173 B.R. 478, 487 (Bankr. D. Del. 1994) ("I find no statutory or judicial support to conclude that a creditor of a creditor has standing in a bankruptcy case."); *In re Century Glove, Inc.*, No. 90-400, 1993 WL 239489, at *8 (D. Del. Feb. 10, 1993) ("[A] stockholder of a parent company is not a party in interest in the bankruptcy of the subsidiary."); *In re O.P.M. Leasing Servs.*, Inc.), 21 B.R. 983, 986 (S.D.N.Y. 1981) (same); *In re Royal Props. & Invs., Inc.*, 68 B.R. 245, 246 (Bankr. S.D. Fla. 1986) ("[A] stockholder of a parent corporation is not a party in interest entitled to intervene in the reorganization proceeding of its subsidiary.").

fiduciary duties on corporate directors are the duty of care and the duty of loyalty), *aff'd*, 906 A.2d 27 (Del. 2006).

Given the lengthy and substantive process used to select the Purchaser, the entry into the APA and any vote in favor of the Plan would be an appropriate exercise of business judgment. Indeed, the purpose of giving deference to reasoned business judgment of management is to avoid the time, expense, and delay of having a court second guess the business judgment of management. Those justifications apply with particular force for the Court in *TRBP*'s chapter 11 case. Moreover, TRBP respectfully submits that there is no basis in case law (or elsewhere) for a bankruptcy court reviewing a chapter 11 plan of a debtor to question the decision made by any creditor or equity holder to vote for or support the plan or to ensure that management of such parties are adhering to their fiduciary duties. Nonetheless, as explained below, management of Rangers Equity would satisfy any fiduciary duties by voting in favor of the Plan.

First, assuming that Rangers Equity are insolvent entities, then the creditors of Rangers Equity become beneficiaries of the fiduciary duties owed by Rangers Equity's management. *See In re Rajabali*, 365 B.R. 702, 708 (Bankr. S.D. Tex. 2007) ("Director's and officer's fiduciary duties are not directly to creditors; rather, when a corporation is insolvent, creditors have the ability to enforce such duties which continue to exist as to the corporation."); *In re TOCFHBI, Inc.*, 413 B.R. 523, 539 (Bankr. N.D. Tex. 2009) ("Officers and directors owe no *direct* fiduciary duty to creditors of the corporation, *even during insolvency or the zone of insolvency*. The duty owed is to the corporation.") (emphasis added); *Bren v. Capital Realty Group Senior Hous., Inc.*, No. Civ. A. 19902-NC, 2004 WL 370214, at *4-6 (Del. Ch. Feb. 27, 2004) (describing the alleged wrongdoing in a breach-of-fiduciary duty suit as primarily a

"wrong to the Partnership" while recognizing that fiduciary duties protected a noteholder when limited partnership became insolvent).

Although fiduciary duties may be enforceable by creditors upon insolvency, this does not mean that Rangers Equity must act according to the specific requests or demands of certain creditors by, for example, voting against the Plan. The fiduciary duties owed by Rangers Equity's management are to act in the best interest of the entity and not in a way that any particular creditor independently believes best. *See, e.g., In re Sec. Asset Capital Corp.*, 390 B.R. 636, 642 (Bankr. D. Minn. 2008) ("While protection by the performance of fiduciary duties is expanded to include creditors of insolvent corporations . . . duties are still owed to the corporations, not to any specific group or class of protected beneficiaries."). This is because "[a]ssigning duties of performance for the benefit of specific groups or classes would often result in performance paralysis, even if limited to unsecured creditors. Interests of priority claims, unsecured bondholders, trade creditors, and general unsecured creditors are often conflicting. And, not all creditors of a particular class or group might agree on what might be best for the class or group." *Id*. As stated below, TRBP and Rangers Equity believe that the execution of the APA was, and consummation of the Plan is, in the best interest of TRBP and all interested parties. Therefore, even if a vote in favor of the Plan is not a vote that the Lenders would cast, it is entirely within the business judgment of Rangers Equity's management.

Second, the result is no different in the event that Rangers Equity become bankruptcy debtors. In the absence of a specific code provision governing particular conduct, a debtor in possession's fiduciary duties to the estate must be exercised consistent with broad business judgment that mirrors the business judgment that exists outside of bankruptcy. *See Richmond Leasing*, 762 F.2d at 1312. As the Fifth Circuit stated in *Richmond Leasing*:

> [I]n the absence of special circumstances or a specific Code provision, we see no reason to require the debtor to do more than justify its actions under the "business judgment" standard if creditors object. More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.

*Id.*

Courts applying the business judgment rule in the bankruptcy context apply the same test as in the non-bankruptcy context:

> The business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." This presumption "shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: '(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets.'" Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity.

*In re Brooklyn Hosp. Ctr.*, 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006) (citations omitted).

Again, in exercising this business judgment, the debtor in possession should act in the best interest of its creditors, but that does not mean that the debtor in possession has a fiduciary duty to act in the same way that the creditors would act. Indeed, the reason that a debtor in possession maintains control over the entity in bankruptcy is because the debtor is presumed to have a superior ability to manage its affairs than any other party. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) ("[V]ery often the creditors will be benefited by continuation of the debtor in possession, both because the expense of a trustee will not be required, and the debtor, who is familiar with his business, will be better able to operate it during the reorganization case.") (citation and internal quotation marks omitted).

2. **Management of Rangers Equity Appropriately Exercised Business Judgment in Approving TRBP's Entry Into the APA and Would Likewise Do So By Voting in Favor of the Plan**.

TRBP entered into the APA with the best bidder for the Texas Rangers franchise, that is, the bidder that offered the best combination of price and least execution risk. Although the Lenders may speculate that there is a bidder that will pay marginally more for the Texas Rangers franchise, such a bidder faces significant execution risk, including (1) negotiating an acceptable asset purchase agreement; (2) reaching agreement with any non-debtor that will contribute assets as part of the asset purchase agreement; (3) a potential uphill battle to obtain MLB consent (or litigation with MLB regarding its consent rights); and (4) potentially greater financing uncertainty than the Purchaser. Given these execution risks, TRBP then believed and still believes that the only prudent choice was to enter into the APA with the Purchaser. But, at the very least, the decision to enter into the APA rather than fight a potential uphill battle with MLB over its consent rights, and risk financing problems and continuing mounting losses in the interim, is the exact type of business decision that is afforded great deference under the business judgment rule. *See Khanna v. McMinn*, No. Civ. A. 20545-NC, 2006 WL 1388744, *26 (Del. Ch. May 9, 2006) (rejecting argument that corporation's settlement was inappropriate exercise of business judgment: "[i]t is not . . . outside the realm of business reasonableness to conclude that Covad was better off settling with Dishnet and putting the Dishnet ordeal behind it than to engage in a drawn-out battle with the risk of losing").

Indeed, courts routinely recognize that a litany of factors beyond purchase price play into exercising sound business judgment. One such factor is that selecting a deal that is fully funded and ready for consummation — *i.e.*, a "bird in the hand" — is frequently a better business decision than taking risks on alternatives ostensibly promising better dollar values. *See McGowan v. Ferro*, 859 A.2d 1012, 1021, 1034-35 (Del. Ch. 2004) (agreeing with directors'

consideration of the "bird in the hand" in concluding that "the director defendants were not required to abandon the transaction simply because a better deal might have become available in the future"), *aff'd*, 873 A.2d 1099 (Del. 2005); *In re Frezzo*, 217 B.R. 985, 993 (Bankr. E.D. Pa. 1998) ("There is no evidence that passing on the present offer in hopes of 'marketing' Guido's shares to third parties would produce a greater return.  That is merely speculation.  It strikes the Court, moreover, as an unfair criticism, for while it cannot be disproven, relinquishing a binding 'bird in the hand' offer in the hopes of securing the proverbial 'two in the bush,' would in the present circumstances strike the Court as a somewhat rash decision on the part of the Trustee."), *aff'd in part, dism'd in part*, 225 B.R. 581 (E.D. Pa. 1998).[16]  Here, a vote against the Plan may allow the Purchaser to terminate with no assurance that there will be a better alternative transaction, and under certain circumstances the Purchaser may even argue for a break-up fee. This puts the Debtor at risk of having no buyer or a second process where the winning bidder's bid could be lower than the transaction under the APA.  It is certainly an exercise of proper business judgment not to "roll the dice" and end up in a worse position.  Nor does the business judgment rule compel a search for proposals that face a high risk of non-consummation.  *See, e.g.*, *Priddy v. Edelman*, 883 F.2d 438, 444 (6th Cir. 1989) (holding that relevant to business judgment was the board's "reason to believe that the deal might have fallen through").  And here, where consummation of an alternative transaction may require significant time and expense seeking and obtaining approval, or potentially litigating issues with MLB, there are even stronger

---

[16] *See Carauna v. Saligman*, Civ. A. No. 11135, 1990 WL 212304, *5 (Del. Ch. Dec. 21, 1990) (rejecting plaintiff's argument that no person of sound business judgment would have agreed to sell the company for $178 million while an offer for $190 million was on the table and holding "[t]he monetary difference is insignificant, alone, and especially in light of factors not addressed by the complaint, *i.e.*, timing, structure and certainty of financing, that could account for the board's acceptance of the lower offer. This Court has long recognized that the highest bid is not necessarily the best bid."); *Citron v. Fairchild Camera & Instrument Corp*, 569 A.2d 53, 65-67 (Del. 1989) (business judgment rule barred suit where the board accepted a lower offer after considering other factors such as the higher offerer's financial ability to complete the transaction).

reasons why accepting the most viable bid on the table was in the best interests of TRBP, Rangers Equity, and TRBP's creditors. Therefore, the entry into the APA in the first place and any later vote in favor of the Plan would be within the sound exercise of the business judgment of Rangers Equity's management and thus any fiduciary duties. These decisions may not be overturned by Rangers Equity's creditors.[17]

> **E.** **No Disclosure Statement Is Required; Regardless, the Disclosure Statement Satisfies the Requirement of the Bankruptcy Code.**

The Debtor is not required to submit a disclosure statement for approval by the Court because all holders of claims or equity interests are unimpaired under the Plan and are not entitled to vote to accept or reject the Plan. Both the Bankruptcy Code and case law support the Debtor's position that it is not required to solicit acceptances for its Plan, and the Court also has the discretion to find that the Disclosure Statement need not be approved based on the facts of this case. Nevertheless, if this Court finds that the Debtor is required to submit a disclosure statement for approval, the Disclosure Statement, as drafted, satisfies the standards for adequate information under section 1125 of the Bankruptcy Code.

> **1.** **No Disclosure Statement Is Required.**

Under section 1126(f) of the Bankruptcy Court, no disclosure statement is required if all holders of claims or equity interests are unimpaired under the Plan and are not entitled to vote to accept or reject the Plan. *See* 11 U.S.C. § 1126(f) ("a class that is not impaired under a plan, and each holder of a claim or interest of such class, are *conclusively presumed to have accepted the plan, and solicitation of acceptances* with respect to such class from the

---

[17] The Lenders have not articulated any reason why the business judgment rule would not apply to any potential vote in favor of the Plan; but even if the standard of evaluating any potential vote in favor of the plan were governed by another test, such as the "entire fairness" standard, a vote in favor of the plan would likewise satisfy that test for the reasons explained above.

holders of claims or interests of such class *is not required*.") (emphasis added). Importantly, the Bankruptcy Code nowhere states that a disclosure statement must be approved by the court as a requirement of confirmation; it only provides that *prior to solicitation*, the court must approve a disclosure statement. 11 U.S.C. § 1125(b) ("[A]n acceptance of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."). If Congress had wanted disclosure statements to be required regardless of the need to solicit, it could have made that an explicit requirement of confirmation. *See* 11 U.S.C. § 1129 (listing seventeen explicit requirements for confirmation, none of which include submission of a disclosure statement for approval regardless of the need to solicit).

   Although the Fifth Circuit has not spoken directly on the issue of whether a disclosure statement is required when all classes are unimpaired, case law also supports a finding that a disclosure statement is not required where solicitation is unnecessary. *See, e.g., Mid-Towne v. United States Dep't Hous. & Urban Dev. (In re Mid-Towne Assocs.)*, No. 93-3290, 1994 WL 487347, at *3, 36 F.3d 1097 (6th Cir. 1994) (finding that a disclosure statement was not necessary where solicitation of votes was not required) (unpublished); *In re Feldman,* 53 B.R. 355, 357 (Bankr. S.D.N.Y. 1985) (explaining that "no disclosure statement is required for [unimpaired classes] since a disclosure statement is required only for the purpose of soliciting an acceptance or rejection of the plan"); *In re Victory Constr. Co., Inc.*, 42 B.R. 145, 154 (Bankr. C.D. Cal. 1984) (observing that no disclosure statement was required when no class was impaired under the plan); *In re Stanley Hotel, Inc.*¸ 13 B.R. 926, 929 (Bankr. D. Colo. 1981) ("if

acceptances need not be solicited, a disclosure statement is not required"); *In re Bel Air Assocs., Ltd.*, 4 B.R. 168, 175 (Bankr. W.D. Okla. 1980) ("[Section 1125] seems only to require disclosure statements in the event there are solicitations of acceptances or rejections of the plan.").

Finally, the Court has the discretion under Bankruptcy Rule 3017(d) and section 105(a) of the Bankruptcy Code to find that a disclosure statement is unnecessary. Bankruptcy Rule 3017(d) indicates that a judge has discretion to find a disclosure statement is unnecessary with respect to unimpaired classes. *See* Fed. R. Bankr. Proc. 3017(d) (stating that all creditors and equity security holders shall receive a copy of the disclosure statement approved by the court "except to the extent that the court orders otherwise with respect to one or more unimpaired classes of creditors"). Here, too, the Court should find in its discretion that a disclosure statement is unnecessary because the Plan does not impair any classes of claims.

## 2. The Debtor's Disclosure Statement Provides Adequate Information.

Even though the Debtor does not believe it must file or distribute a disclosure statement, the Debtor filed the Disclosure Statement, which provides adequate information to creditors and other parties in interest regarding the Plan. The Disclosure Statement satisfies section 1125(b) of the Bankruptcy Code because the information contained in the Disclosure Statement is sufficient in detail, as far as reasonably practicable, and would enable a claimholder to make an informed judgment about the Plan. *See* 11 U.S.C. § 1125(a)(1).

The Debtor has included in the Disclosure Statement the type of information that would typically be included in a disclosure statement used to solicit votes, including a description of the Plan (pp. 20-38), the APA (pp. 12-15), and the events leading up to the filing of the chapter 11 case (p. 7), as well as anticipated events in the chapter 11 case (pp. 17-20). Summaries of relevant statutory provisions (pp. 38-40) and the prepetition capital structure (p. 2)

are also included, along with a summary of the treatment and estimated recovery for holders of claims or equity interests under the Plan (pp. 21-27).

Bankruptcy courts may use their discretion and evaluate on a case-by-case basis whether a disclosure statement meets the "adequate information" standard under section 1125 of the Bankruptcy Code. *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-op, Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998); *In re Bankston,* No. 09-10675, 2010 WL 1027806, at *8 (Bankr. W.D. La. Jan. 15, 2010) ("[T]he primary purpose of a disclosure statement is to give creditors and interest holders the information they need to decide whether to accept the plan.") (citing *In re Monnier Bros.,* 755 F.2d 1336, 1352 (8th Cir. 1985)).  Thus, what is deemed "adequate" will be considered in light of the "reliance placed upon the disclosure statement by the creditors and the court." *In re Little,* 126 B.R. 861, 867 (Bankr. N.D. Miss. 1991).

Bankruptcy courts in the Fifth Circuit also have looked to the factors announced in *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984) in determining whether a debtor's disclosure statement contains "adequate information."[18]  *See In re Cypresswood*, 409 B.R. at 424 (applying the *Metrocraft* Factors in determining that the debtor's disclosure statement did contain adequate information); *see also In re United States Brass Corp.*,

---

[18] The relevant factors for evaluating the adequacy of a disclosure statement may include: (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectibility of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a non-bankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with the affiliates.  *Id.* at 568 (the "*Metrocraft* Factors").

194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996). However, courts also have noted that "[d]isclosure of all [*Metrocraft*] [F]actors is not necessary in every case." *Id.*

In *In re Bel Air Associates*, the court overruled the equity holder's objection that the disclosure statement did not provide adequate information, finding that the information to enable a reasonable investor to make an informed judgment about the plan was available from sources other than the disclosure statement, including (i) information that it had access to as an equity security holder, and (ii) information covered by the plan itself such as the terms of the proposed sale and the sale agreement which provided "all of the procedures to be followed and dollar amounts involved, and the priority of all creditors and interest holders and how there were to be paid." 4 B.R. at 175. In this case, the Lenders, which are the likely parties to object to the adequacy of the Disclosure Statement, are likely in possession of much of the information that they may argue should be provided in the Disclosure Statement.

Applying the *Metrocraft* Factors to the information included in the Disclosure Statement, the Disclosure Statement provides adequate information because all of the relevant factors have been included. Moreover, because the Debtor has not seen any objections to the Disclosure Statement, it cannot know what alleged inadequacies it contains. However, the Debtor is confident that its Disclosure Statement would overcome certain of the more typical objections that are made to disclosure statements in general, such as bad faith, feasibility, in addition to objections based on failure to provide inadequate information. *See In re United States Brass*, 194 B.R. at 427-29.[19]

---

[19] In addition, section 1125(b) of the Bankruptcy Code specifically provides that "[t]he court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets." *See In re Keisler*, No. 08-34321, 2009 WL 1851413, at *5 (Bankr. E.D. Tenn. June 29, 2009) ("valuation is not a necessary component in the determination of whether a disclosure statement contains adequate information" pursuant to 11 U.S.C. § 1125(b)); *In re Dakota Rail, Inc.*, 104 B.R. 138, 144 (Bankr. D. Minn. 1989) ("a formal appraisal of the debtor's properties is not required to meet the test of adequate disclosure."). As explained above, because there is no

# IV. CONCLUSION AND REQUESTED RELIEF

The commencement of this chapter 11 case was necessary to ensure that TRBP's creditors would be paid in full without any interruption to the operation of TRBP's business. The APA was entered into by TRBP after a value-maximizing process, based on sound business reasons, and with the consent of Rangers Equity. There is no reason to require another time-consuming process, that will only impose further expense, delay, and/or risk upon TRBP, its employees, creditors, equity holders, the Texas Rangers fans, and MLB. All of the Lenders (including the members of the Ad Hoc Group) entered into a financing relationship with HSG and certain affiliates with full awareness of explicit provisions that made certain of their rights subservient to MLB, and clearly should have expected that there may be limitations in the event that the Texas Rangers ever were to be sold. These were the risks the Lenders accepted. They should not be permitted to use this bankruptcy case to change their bargain. Therefore, TRBP requests that the Court promptly schedule a hearing on confirmation of the Plan and approve the Plan at the conclusion of that hearing.

---

requirement that the Debtor demonstrates that the Plan maximizes value and all classes are unimpaired, the Disclosure Statement need not include a valuation to provide adequate information.

Dated: June 11, 2010

/s/ Martin A. Sosland
Martin A. Sosland (18855645)
Vance L. Beagles (00787052)
Yolanda C. Garcia (24012457)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

Ronit J. Berkovich (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtor and Debtor in
possession