Henry W. Simon, Jr.
Texas Bar No. 18394000
Robert A. Simon
Texas Bar No. 18390000
BARLOW GARSEK & SIMON, LLP
3815 Lisbon Street
Fort Worth, Texas 76107
Telephone: (817) 731-4500
Facsimile: (817) 731-6200

Mary Kay Braza
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Telephone: (414) 297-5505
Facsimile: (414) 297-4900

Michael J. Small
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60654
Telephone: (312) 832-5832
Facsimile: (312) 832-4700
**Attorneys for Rangers**
**Baseball Express, LLC**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORTH WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO.   10-43400-dml-11** |
| | § | |
| **TEXAS RANGERS BASEBALL PARTNERS,** | § | **CHAPTER 11** |
| | § | |
| **DEBTOR.** | § | |
| | § | |


## BRIEF OF INTERESTED PARTY RANGERS BASEBALL EXPRESS, LLC

# TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................................................................i

TABLE OF AUTHORITIES .................................................................................................iv

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 1

      A.     The Sale ............................................................................................... 1

      B.     The Lenders' Contentions As To the Sale ........................................ 2

      C.     Major League Baseball Provides the Legal and Practical
            Framework Surrounding the Debtor, Its Assets and Its Owners. .................... 2

      D.     TRBP is a Limited Guarantor Of HSG Obligations. ....................................... 6

      E.     The Loan Documents Recognize and Incorporate the Rules and
            Restrictions Governing TRBP As an MLB Entity............................................7

      F.     Real Estate Controlled Outside the HSG Family Of Entities ........................ 10

      G.     Events Leading To the Sale ........................................................................... 12

      H.     Advisors Are Retained................................................................................... 13

      I.      Tom Hicks and MLB Provide Loans To TRBP. ........................................... 14

      J.      The Auction Commences................................................................................ 14

      K.     The Sale Process Was Professional and Comprehensive. ............................ 15

      L.     The Lenders' Actions Necessitate Filing Of the TRBP
            Bankruptcy.................................................................................................... 16

DISCUSSION .................................................................................................................... 17

I.      THE CREDITORS AND EQUITY HOLDERS ARE NOT IMPAIRED
        UNDER THE PLAN WITHIN THE MEANING OF BANKRUPTCY
        CODE § 1124.................................................................................................. 17

II.     UNDER TEXAS OR DELAWARE LAW, THE LENDERS MAY NOT
        PURSUE CLAIMS FOR BREACH OF FIDUCIARY DUTIES BY
        TRBP MEMBERS OR ITS PARENT COMPANIES, AND IN ANY
        EVENT, THERE IS NO BREACH. ........................................................... 20

A.      The Lenders Do Not Have Standing To Raise Claims for Breach Of Fiduciary or Similar Duties Against the Debtor, Either Directly or Indirectly. ..................................................................... 20

B.      The Lenders' Claims for Breach of Fiduciary Duty Would Be Barred By Their Inability to Show Damages Flowing from a Breach. .................................................................................................. 22

C.      The Agreements Establishing TRBP and Its Parent Entities Sharply Limited the Scope of Fiduciary Duties............................... 23

D.      Even If the Court Found That the Lenders Are Owed Fiduciary Duties, the Lenders Cannot Show That They Would Be Breached By Proceeding with the Plan........................................................... 25

E.      Proceeding As the Lenders Request Would Likely Constitute a Breach Of Duty Owed To All Creditors......................................... 29

III.      IN A SOLVENT DEBTOR CASE, DEBTOR'S DUTY IS TO ACT IN THE BEST INTERESTS OF THE ESTATE FOR THE BENEFIT OF CREDITORS AND INTEREST HOLDERS. ........................................... 30

A.      The Use of "Value Maximization" in Insolvent and Solvent Cases Contexts ....................................................................................... 30

B.      During Exclusivity Period, Fulfillment of § 1129 Criteria, Not Maximization ................................................................................ 32

C.      Non-Monetary Factors in the Section 363 Context Support the *Spansion* Approach. .......................................................... 34

IV.      THE LENDERS CANNOT SPEAK FOR TRBP OR ITS EQUITY HOLDERS, NOR CAN THEY PROPOSE AN ALTERNATIVE PLAN OR SALE ....................................................................................... 36

A.      The Loan Documents and Formational Agreements Preclude Lenders From Exercising Control Over TRBP, Rangers Equity LP or Rangers Equity GP's Respective Rights to Govern the Texas Rangers or Dispose of the Team's Assets........................... 36

B.      Lenders Cannot Force TRBP to Assume and Assign the Major League Constitution to Another Party ........................................... 37

V.      THOUGH NOT REQUIRED, THE DISCLOSURE STATEMENT COMPLIES WITH BANKRUPTCY CODE § 1125 AND IS SUFFICIENT FOR PARTIES TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. ............................................. 41

CONCLUSION...........................................................................................................................43

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Cinicola v. Scharffenberger*,
    248 F.3d 110 (3d Cir. 2001)...............................................................41

*Commodity Futures Trading Commission. v. Weintraub*,
    471 U.S. 343 (1985)...........................................................................31

*E. Air Lines, Inc. v. Ins. Co. of State of Pa. (In re Ionosphere Clubs, Inc.)*,
    85 F.3d 992 (2d Cir. 1996).................................................................40

*FDIC v. Benson*,
    867 F. Supp. 512 (S.D. Tex. 1994) .....................................................27

*Floyd v. Hefner*,
    556 F. Supp. 2d 617 (S.D. Tex. 2008) ................................................23

*Floyd v. Hefner*,
    Civ. No. 03-5693, 2006 WL 2844245 (S.D. Tex. Sept. 29, 2006) ...................................21, 30

*Gearhart Indus., Inc. v. Smith Int'l, Inc.*,
    741 F.2d 707 (5th Cir. 1984) ........................................................ 26-28

*Hirsch v. Pennsylvania Textile Corp.*
    (*In re Centennial Textiles, Inc.*), 227 B.R. 606 (Bankr. S.D.N.Y. 1998) ...............................31

*In re Am. Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988)............................................ 17-19

*In re Ames Dep't Stores, Inc.*,
    No. 01-42217, 2005 WL 1000263 (Bankr. S.D.N.Y. Apr. 29, 2005)....................................40

*In re Bakalis*,
    220 B.R. 525 (Bankr. E.D.N.Y. 1998)............................................11, 35

*In re Bankston*,
    No. 09-10675, 2010 WL 1027806 (Bankr. W.D. La. Jan. 15, 2010) .....................................18

*In re Barrington Oaks Gen. P'Ship*,
    15 B.R. 952 (Bankr. D. Utah 1981) ....................................................19

*In re Block Shim Dev. Co.-Irving*,
    118 B.R. 450 (Bankr. N.D. Tex. 1990)................................................18

*In re Cajun Elec. Power Co-op, Inc.*,
    150 F.3d 503 (5th Cir. 1998) .............................................................42

*In re Catron*,
    158 B.R. 629 (E.D. Va. 1993) ...................................................................................40

*In re CoServ, L.L.C.*,
    273 B.R. 487 (Bankr. N.D. Tex. 2002) .....................................................................29

*In re Dews*,
    152 B.R. 982 (D. Colo. 1993) ...................................................................................40

*In re E-Z Serv. Convenience Stores, Inc.*,
    289 B.R. 45 (Bankr. M.D.N.C. 2003) .......................................................................41

*In re Ferandos*,
    402 F.3d 147 (3d Cir. 2005) ...............................................................................6, 37

*In re Fleming Co.*,
    499 F.3d 300 (3d Cir. 2007) .....................................................................................41

*In re Fortunoff Fine Jewelry & Silverware, LLC*,
    No. 08-10353, 2008 WL 618986 (Bankr. S.D.N.Y. 2008.) .......................................35

*In re I.G. Servs., Ltd.*,
    2008 WL 783551 (Bankr. W.D. Tex. Mar. 19, 2008) ...............................................21

*In re Idearc, Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009) .....................................................................20

*In re M.B.S. Mgmt. Servs., Inc.*,
    No. 07-12151, 2008 Bankr. LEXIS 1459 (Bankr. E.D. La. May 2, 2008) ...............32

*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) ....................................................................................17

*In re Manor Place Dev. Assocs., L.P.*,
    144 B.R. 679 (Bankr. D.N.J. 1992) ..........................................................................40

*In re McConnell*,
    122 B.R. 41 (Bankr. S.D. Tex. 1989) .......................................................................37

*In re MCorp Fin., Inc.*,
    160 B.R. 941 (Bankr. S.D. Tex. 1993) .....................................................................34

*In re Mirant Corp.*,
    No. 03-46590, 2007 Bankr. LEXIS 3241 (Bankr. N.D. Tex. Sept. 19, 2007) (Lynn, J.) ........34

*In re Moody Nat'l. SHS Houston H, LLC*,
    426 B.R. 667 (Bankr. S.D. Tex. 2010) .....................................................................20

*In re Murexco Petroleum, Inc.*,
   15 F.3d 60 (5th Cir. 1994) ................................................................................37

*In re National R.V. Holdings, Inc.*,
   390 B.R. 690 (Bankr. C.D. Cal. 2008) ...............................................................31

*In re O'Connor*,
   258 F.3d 392 (5th Cir. 2001) ........................................................................ 39-40

*In re Pilgrim's Pride Corp.*,
   407 B.R. 211 (Bankr. N.D. Tex. 2009) ........................................................... 30-31

*In re PPI Enters. (U.S.), Inc.*,
   324 F.3d 197 (2d Cir. 2003) ..............................................................................19

*In re Priestley*,
   93 B.R. 253 (Bankr. D.N.M. 1988) ...................................................................40

*In re Spansion, Inc.*,.
   426 B.R. 114 (Bankr. D. Del. 2010) .............................................................32, 34

*In re Sweetwater*,
   57 B.R. 354 (D. Utah 1985) ..............................................................................17

*In re Valley View Shopping Center*,
   260 B.R. 10 (Bankr. D. Kan. 2001) ...................................................................19

*In re VarTec Telecom, Inc.*,
   No. 04-81694-HDH-7, 2007 WL 2872283 (Bankr. N.D. Tex. Sept. 24, 2007) .....................21

*In re Washington Group, Inc.*,
   476 F. Supp. 246 (M.D.N.C. 1979) ...................................................................31

*Jewel Recovery, L.P. v. Gordon*,
   196 B.R. 348 ....................................................................................................21

*Kane Enters. v. McGregor (USA), Inc.*,
   322 F.3d 371 (5th Cir. 2003) ............................................................................27

*La. World Exposition v. Fed. Ins. Co.*,
   858 F.2d 233 (5th Cir. 1988) ............................................................................32

*Mann v. GTCR Golder Rauner, LLC*,
   483 F. Supp. 884 (D. Ariz. 2007) ......................................................................29

*McBeth v. Carpenter*,
   565 F.3d 171 (5th Cir. 2009) ............................................................................25

*Rajabali v. Rajabali*,
　365 B.R. 702 (Bankr. S.D. Tex. 2007) ..................................................22

*Resolution Trust Corp. v. Acton*,
　844 F. Supp. 307 (N.D. Tex. 1994) ......................................................27

*Resolution Trust Corp. v. Holmes*,
　Civ. No. H-92-0753, 1992 WL 533256 (S.D. Tex. Aug. 7, 1992) .........27

*Resolution Trust Corp. v. Norris*,
　830 F. Supp. 351 (S.D. Tex. 1993) ..................................................27, 29

*S. Blvd., Inc. v. Martin Paint Stores (In re Martin Paint Stores)*,
　207 B.R. 57 (S.D.N.Y. 1997)................................................................40

*Torch Liquidating Trust ex rel. Bridge Assocs., L.L.C. v. Stockstill*,
　561 F.3d 377 (5th Cir. 2009) ...............................................................23

*Weaver v. Kellogg*,
　216 B.R. 563 (Bankr. S.D. Tex. 1997) ....................................11, 26, 29

*Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions, Inc.*,
　157 B.R. 100 (Bankr. S.D. Tex. 1993) .................................................42

STATE CASES

*Big Lots Stores, Inc. v. Bain Captial Fund, Inc.*,
　922 A.2d 1169 (Del. Ch. 2008)............................................................29

*Brehm v. Eisner*,
　746 A.2d 244 (Del. 2000) ............................................................... 26-27

*Cede & Co. v. Technicolor, Inc.*,
　634 A.2d 345 (Del. 1993) ............................................................... 26-29

*Cline v. Grelock*,
　Civ. No. 4046, 2010 WL 761142 (Del. Ch. Mar. 2, 2010)....................23

*Fagan v. La Gloria Oil & Gas Co.*,
　494 S.W.2d 624 (Tex. App. 1973)........................................................22

*Milford Power Co., LLC v. PDC Milford Power, LLC*,
　866 A.2d 738 (Del. Ch. 2004).......................................................... 38-39

*N. Am. Catholic Educ. Programming Found. v. Gheewalla*,
　930 A.2d 92 (Del. 2007) ......................................................................21

*Plas-Tex v. Jones*,
Civ. No. 03-99-286, 2000 WL 632677 (Tex App. May 18, 2002)........................................22

*RJ Assocs., Inc. v. Health Payors' Org.L.P.*,
No. 16873, 1999 WL 550350 (Del. Ch. July 16, 1999).......................................................26

*Thornton v. Bernard Techs., Inc.*,
Civ. No. 962-VCN, 2009 WL 426179 (Del. Ch. Feb. 20, 2009)........................................23

*Tigrett v. Pointer*,
580 S.W.2d 375 (Tex. App. 1978)...................................................................................22

**FEDERAL STATUTES**

11 U.S.C. § 365 ..................................................................................................... 19, 39-40

11 U.S.C. § 365(c)(1)..................................................................................................37, 39

11 U.S.C. § 704(1) ............................................................................................................35

11 U.S.C. § 1124(1),(2)(B) ..............................................................................................17

11 U.S.C.§ 1125(a)(1).......................................................................................................42

11 U.S.C. § 1125(b) ..........................................................................................................42

11 U.S.C. § 1126(f).............................................................................................................20

11 U.S.C. § 1129................................................................................................................32

**STATE STATUTES**

6 Del. Code. § 15-404(b) ...................................................................................................28

6 Del. Code § 15-404(c).....................................................................................................26

6 Del. Code § 17-1101(d): .................................................................................................24

Tex. Bus. Org. Code §§ 1.101-1.105 ................................................................................21

Tex. Bus. Org. Code §101.401 ..........................................................................................25

Tex. Bus. Org. Code § 152.002 .........................................................................................23

Tex. Bus. Org. Code § 152.204 ....................................................................................24-25

Tex. Bus. Org. Code § 152.205 ....................................................................28

Tex. Bus. Org. Code § 152.206 ....................................................................26

Article 9 of the Uniform Commercial Code ..........................................6, 14

Rangers Baseball Express, LLC ("***Baseball Express***" or "***Purchaser***"), by its attorneys, submits this Brief pursuant to the Court's instructions, and states the following:

## INTRODUCTION

After a professional and thorough sale process which included a multiparty private auction, Baseball Express was selected by the Debtor and its owners as having made the best offer to purchase the assets of the Debtor and to assume certain of the Debtor's liabilities. Sellers made this selection with the full understanding of their rights and obligations under their formational documents, the loan documents to which they are parties and the requirements of Major League Baseball. The Lenders, in apparent zeal to exploit perceived hostage leverage, and in direct conflict with their contractual rights and remedies, have sought to block the sale. Their first attempt led to the filing of this case. Their latest attempts have cost all parties in interest a great deal of time and money, but have not and cannot serve any legitimate purpose, and do not conform to the requirements of the Bankruptcy Code.[1]

## STATEMENT OF FACTS

### A.    The Sale

In its summary of the Prepackaged Plan (alternatively, the "***Plan***"), set forth at page (i) of the Disclosure Statement (Docket No. 34), Texas Rangers Baseball Partners ("***TRBP***" or the "***Debtor***") states:

> TRBP's Prepackaged Plan provides for the sale of substantially all of the assets of TRBP – including the Texas Rangers Major League Baseball Club – to Rangers Baseball Express LLC (the "***Purchaser***"), an entity controlled by Chuck Greenberg and Nolan Ryan, through the Prepackaged Plan (the "***Sale***").
> As a result of the Sale, all creditors of TRBP will receive payment in full of all of their allowed claims. Most claims will be assumed by the Purchaser. Claims that are not assumed by the Purchaser will be paid in full by TRBP

---

[1]    Capitalized terms in this Introduction are used as defined herein below.

from the proceeds of the Sale, including the $75 million of obligations under the HSG Credit Agreement (as hereinafter defined) guaranteed by TRBP.

***After months of negotiations, numerous discussions with the Office of the Commissioner of Baseball, and extensive analysis of its options, TRBP believes that consummation of the Sale is in the best interest of all creditors and equity holders, and is in the best interest of the Texas Rangers franchise and Major League Baseball***.

(italics and bold in final paragraph added).

### B. The Lenders' Contentions As To the Sale

The Lenders (as defined below) claim i) that guarantors of debt—TRBP, and its owners, Rangers Equity Holdings, L.P., a Delaware limited partnership ("***Rangers Equity LP***") and Rangers Equity Holdings GP, LLC, a Texas limited liability company ("***Rangers Equity GP***")— have failed to fulfill fiduciary duties purportedly owed to the Lenders by pursuing the Sale as contemplated in the Prepackaged Plan and ii) that the Sale and Prepackaged Plan are the products of *ultra vires* acts. The Lenders complain that a) the Sale is inferior to a supposed offer from another suitor, and b) the owners of TRBP cannot be seen as acting in good faith or exercising due care in connection with the Sale, because the Sale involves the sale of real estate by an entity that is controlled by Tom Hicks. The Lenders' contentions are flatly incorrect, and are interposed solely to extract the equivalent of ransom from the parties in interest who favor the Prepackaged Plan.

### C. Major League Baseball Provides the Legal and Practical Framework Surrounding the Debtor, Its Assets and Its Owners.

TRBP owns and operates the Texas Rangers Major League Baseball Club (the "***Texas Rangers***") in the Dallas/Fort Worth Metroplex pursuant to the Major League Constitution (the "***Major League Constitution***") and the Membership Agreement, dated as of November 18, 1960 (the *"**Membership Agreement**"*), by and between The American League of Professional Baseball Clubs, as assumed by the Office of the Commissioner of Baseball ("***BOC***"), and WBC

Baseball Club, Inc., as assumed by TRBP pursuant to an Assumption Agreement, dated as of June 16, 1998. TRBP is an indirect, wholly-owned subsidiary of HSG Sports Group LLC ("*HSG*"). (Disclosure Statement at 1.)

TRBP exists by virtue of and is constrained by the provisions of the Major League Constitution. Any attempt to extricate TRBP from this context would be futile. The following are among the provisions of the Second Amended and Restated General Partnership Agreement of TRBP, dated as of June 2, 1999 (as amended, the "*Partnership Agreement*") which demonstrate the same.[2] The very purpose of TRBP is to own and run a Major League baseball franchise:

> **2.4** <u>**Purposes**</u>**.** The purposes of the Partnership are:
> (a) *to acquire, own, develop, exploit, manage, operate, dispose of and otherwise deal with the Texas Rangers and/or a direct or indirect ownership interest therein*; and
>
> (b) to do all other acts and things necessary, incidental or convenient to carry on the Partnership affairs as contemplated under this Agreement (collectively, the "business of the Partnership").

Not surprisingly, the Partnership Agreement itself sets forth a specific section entitled "Compliance with Baseball Rules." Understandably, the Partnership Agreement requires that the Sale contemplated under the Prepackaged Plan, as well as any transaction that might be advocated by the Lenders, conform with Baseball Rules:

---

[2] A true and correct copy of TRPB's Second Amended and Restated General Partnership Agreement is attached hereto as Exhibit A. As explained below, the MLB Constitution is an executory contract. A transfer in bankruptcy of the assets of or control over a party to the MLB Constitution of necessity must satisfy the requirements of section 365(b)(1) of the Bankruptcy Code to both cure defaults and provide adequate assurance of future performance. The sale of a team in the absence of MLB consent or otherwise in violation of MLB requirements would create a default under the MLB Constitution. An attempt to transfer the assets of TRBP or control over TRBP over the objection of and without the support of MLB would therefore fail as a simple matter of contract assumption and assignment.

**2.5** **Compliance with Baseball Rules.** Notwithstanding anything to the contrary contained in any part of this Agreement: (i) any sale, transfer, assignment, gift or bequest, grant of a security interest, pledge or other encumbrance of any interest in the Partnership, any Partner or the Texas Rangers (including, without limitation, any Control Interest (as defined in the Major League Agreement)), any change in the identity of the Managing Partner, any change in the identity or control of any Partners, including change in the identity of the Chief Executive Officer of the Managing Partner, and any admission of a new Partner, any issuance of additional interests in the Partnership, or any amendment to this Agreement shall be subject to and made in accordance with the Major League Agreement, the Constitution of the American League, the Major League Rules and any other rules, guidelines, regulations, or requirements of the applicable Baseball Authority, all as the same now exist or may be amended or adopted in the future; (ii) any such sale, transfer, assignment, gift or bequest, grant of a security interest, pledge, encumbrance, change, admission, issuance or amendment that requires the consent of any Baseball Authority is prohibited and shall be null and void unless all applicable consents are obtained in advance; and (iii) any such consent may be withheld at the sole and absolute discretion of any applicable Baseball Authority….

(emphasis added).

Further, under Article IV of the Partnership Agreement, the rights and powers of the CEO of

TRBP are carefully and explicitly limited by requirements of conformity with Baseball Rules

and the requirements of the appropriate Baseball Authority:

**4.1** **Rights and Powers of Managing Partner and Dealings with Baseball**
(a)      The Chief Executive Officer of the Managing Partner (the "CEO") shall have sole power and authority to control the business of the Partnership, and, except as otherwise expressly provided in this Agreement, shall possess all rights, powers and authority generally conferred by applicable law or necessary, advisable, appropriate, incidental or consistent in connection therewith, including, without limitation, the authority and power to perform all acts and enter into and perform all contracts and other undertakings that the CEO may, in the exercise of his discretion, deem necessary, advisable, appropriate, incidental or consistent in connection therewith.  The CEO shall be authorized to act on behalf of the Partnership on matters relating to the business of the Partnership, including without limitation, all baseball matters and at meetings of the American League and any other body of Major League Baseball as may be required or necessary in connection with the Partnership's activities as Managing Partner of the holder of the Texas Rangers Major League Baseball Club franchise.  *Notwithstanding anything to the contrary contained herein, any replacement of the CEO shall be made in accordance with the terms and provisions of (i) the Membership Agreement by and among the American League, members of the American*

*League, the Partnership and other parties thereto, (ii) the Constitution of the American League, (iii) the Rules of the American League, (iv) the Major League Agreement by and among the American League, the National League, the members of American League and the members of the National League, (v) the Major League Rules, and (vi) the bulletins, policies and directives of the American League President, the Commissioner of Baseball and the Ownership Committee of Major League Baseball (each as the same may now exist or as they may be amended or adopted from time to time).*

(b)      Notwithstanding the foregoing or any other provisions to the contrary contained in this Agreement, the CEO is specifically authorized to delegate certain of his management power, responsibility and duties in accordance with the Bylaws of the Managing Partners; ***provided, however, that (i) the CEO shall obtain the consent of the applicable Baseball Authority to the selection of any person to whom such powers, responsibilities and duties are delegated, and the designation of any replacement thereof to represent the Texas Rangers and the Partnership in dealings with the American League and Major League Baseball***, and (ii) notwithstanding anything to the contrary contained herein, the CEO shall be ultimately responsible for all such dealings with the applicable Baseball Authority, the American League and Major League Baseball….

**4.2      Illustrative Rights and Powers**.  In addition to any other rights and powers that it may possess by law, ***and subject to obtaining any necessary approvals of an applicable Baseball Authority***, the CEO or his designee shall have all the specific rights including without limitation, all rights and powers relating to the operation and management of the Partnership which, by way of illustration, but not by way of limitation, shall include the rights and powers, subject to the provisions of Sections 4.03(sic) and 4.04 (sic), to act or cause the Partnership to act***…(e) to acquire, hold, dispose, mortgage, pledge, encumber, hypothecate or exchange any of the assets of the Partnership***…and ***(p) to execute, acknowledge, deliver, file and record instruments or documents affecting the foregoing.***

(emphasis in bold italics added)

In addition, and consistent with the foregoing restrictions, the Partners of TRBP cannot provide a secured creditor with the ability to be substituted as a Partner or to have a vote on Partnership affairs, nor can any security interest be granted independent of the Compliance with Baseball Rules provisions of Section 2.5.

5.3      **Encumbrance of Partner's Interest**.  Subject to the provisions of 2.05 (sic)of this Agreement, any Partner may pledge, mortgage, hypothecate or otherwise encumber his Partnership Interest for any purpose whatsoever as long as such pledge, mortgage, hypothecation or other encumbrance shall in no manner entitle any assignee or successor Partner, in this regard either before or after

foreclosure, to (a) admission as a substituted Partner, or (b) any right to vote on any Partnership matters.

It is well established law that a secured creditor can receive no better rights in collateral than its borrower can grant. *See, e.g., In re Ferandos*, 402 F.3d 147, 156 (3d Cir. 2005) (dealing with assignment of rents).[3] Accordingly, the Lenders cannot exercise control over Rangers Equity LP or Rangers Equity GP or TRBP in the manner they have suggested to the Court.

### D. TRBP is a Limited Guarantor Of HSG Obligations.

TRBP is a limited guarantor under (i) that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006, by and among HSG Sports Group Holdings LLC ("*HSGH*"), HSG, certain subsidiaries of HSG as guarantors, the lenders party thereto from time to time, JP Morgan Securities Inc., as joint lead arranger, joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger, joint bookrunner, Barclays Bank PLC, as co-syndication agent and JP Morgan Chase Bank, N.A., as administrative agent and collateral agent (as amended or otherwise modified from time to time, the "*First Lien Credit Agreement*") and (ii) that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006, by and among HSGH, HSG, certain subsidiaries of HSG, as guarantors, the lenders party thereto from time to time, JP Morgan Securities Inc. as joint lead arranger, joint bookrunner and co-syndication agent, Barclays Capital Inc., as joint lead arranger, joint bookrunner, GSP Finance LLC, as successor-in-interest to Barclays Bank

---

[3] Prior to the filing of this case, the Lenders did not foreclose on or take control of Rangers Equity LP or Rangers Equity GP's respective partnership rights in TRBP under the Texas or New York enactments of Article 9 of the Uniform Commercial Code. The filing of involuntary petitions against the parent entities, however, may well have violated the automatic stay established upon the filing of the above-captioned case. While the ownership of TRBP is not property of the Debtor's estate, an attempt to control ownership is an attempt to control TRBP's assets in a manner designed to thwart the Debtor's ability to do so.

PLC, as administrative agent, collateral agent and co-syndication agent (as amended or otherwise modified from time to time, the "***Second Lien Credit Agreement***" and together with the First Lien Credit Agreement, the "***Credit Agreement***").  (Disclosure Statement at 4.)

The Credit Agreement is guaranteed by certain of HSG's subsidiaries, although the guaranty of TRBP is limited.  The First Lien Credit Agreement is secured by a first lien on substantially all of the assets of HSGH, HSG, and HSG's subsidiaries, including a pledge of the equity interests those entities have in their subsidiaries, including TRBP, and the Second Lien Credit Agreement is secured by a second lien on substantially all of the assets of HSGH, HSG, and HSG's subsidiaries, including a pledge of the equity interests those entities have in their subsidiaries, including TRBP.  Notwithstanding the foregoing, TRBP's guaranty of obligations under the Credit Agreement and the security interests granted in its assets pursuant to the Credit Agreement are each limited to a maximum aggregate amount of $75 million (the "***TRBP Guaranty Cap***").  As a result, upon the payment of $75 million to the Lenders under the Credit Agreement from the proceeds of a sale of TRBP, all obligations owed by TRBP to the Lenders will be satisfied in full.  (Disclosure Statement at 4.)

### E.  The Loan Documents Recognize and Incorporate the Rules and Restrictions Governing TRBP As an MLB Entity.

Long before the Lenders entered into the Credit Agreement and the associated Amended and Restated First Lien Pledge and Security Agreement (the "***HSG Pledge Agreement***"), TRBP's formational document wove into TRBP's very fiber the obligation to comply with the Major League Constitution and the Membership Agreement.[4]  Accordingly, the Credit Agreement and the HSG Pledge Agreement repeatedly and explicitly limit the rights and

---

[4] True and correct copies of the First Lien Credit Agreement and the HSG Pledge Agreement are attached hereto as Exhibits B and C, respectively.

remedies of the Lenders to conform to the requirements of Major League Baseball and the BOC. The Definitions section of the Credit Agreement, at page 21 thereof, sets forth the specific meanings of the following terms: "MLB," "MLB Advanced Media," "MLB Advanced Media Disposition," "MLB Documents," "MLB Facility," and "MLB Rules."

The Credit Agreement recognizes that even when the Lenders have approved an amendment, such amendment is not effective unless and until it is approved by MLB, if it directly affects the Rangers or MLB:

> **10.5    Amendments and Waivers.**
> (a)      <u>Requisite Lenders' Consent</u>.  Subject to Sections 10.5(b) and 10.5(c) and except for actions expressly permitted to be taken by an Agent, ***no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by Holdings or any Credit Party therefrom***, shall in any event be effective ***without the written concurrence of*** the Requisite Lenders and, ***to the extent any amendment has a direct effect on the Rangers or the MLB, the MLB***.

Likewise, an entire section of the Credit Agreement is devoted to the varied and comprehensive framework of MLB approval surrounding TRBP and its agreements and relationship with the Lenders:

> **10.23.  Major League Baseball Requirements.**      Notwithstanding any contrary provisions contained in this Agreement or any other Credit Document:
> (a)      each of the Lenders is aware of the provisions contained in Article V, Section 2(b)(2) of the Major League Constitution, and recognizes that the Ownership Committee of Baseball has issued "Control Interest Transfers – Guidelines & Procedures", dated November 9, 2005 (such document and any successor guidelines, as may be amended from time to time, the **"MLB Control Interest Transfer Guidelines"**);
> (b)      each of the Lenders acknowledges that Article V, Section 2(b)(2) of the Major League Constitution and the MLB Control Interest Transfer Guidelines require that the transfer of a control interest in either the Rangers Franchise or the Rangers be subject to the approving vote of the Major League Baseball clubs in their absolute discretion.  Each of the Lenders also acknowledges the "best interests of baseball" powers held by the Commissioner under the Major League Constitution.  Accordingly, each Lender acknowledges that such approvals would be required for any sale or transfer of the Rangers Franchise or the Rangers, or an interest in either the Rangers Franchise or the Rangers, or any sale, transfer,

assignment, license, sublease, or other conveyance of the trademarks, trade names and other intellectual property rights owned by the Rangers, to a third party as well as to any Lender, and that each such transaction shall be subject to and made in accordance with the Major League Constitution, the each agency agreement and operating guidelines among the Major League Baseball clubs and an MLB Entity (as defined below) and the MLB Control Interest Transfer Guidelines.

(c)     Each Lender acknowledges that ay temporary or permanent management of the Rangers Franchise or the Rangers shall be subject to the prior approval of the Commissioner and the Clubs.  In the event any Lender(s) desires to operate the Rangers Franchise or the Rangers for its own account on a temporary or permanent basis, such Lender(s) shall seek the prior approval of the Commissioner and the Major League Baseball clubs in accordance with the Major League Constitution and the MLB Control Interest Transfer Guidelines.

(d)     This Agreement and any rights or exclusivities granted by the Rangers hereunder, in respect of the Collateral and other intellectual property rights owned by the Rangers, shall in all respects be subject to each of the following, as may be amended from time to time (collectively, **"MLB Documents"):**  (i) any present or future agreements entered into by, or on behalf of, any of the Major League Baseball entities or affiliates (each, an **"MLB Entity"**), or the Major League Baseball clubs acting collectively, including, without limitation, agreements entered into pursuant to the Major League Constitution, the American and National League Constitutions (to the extent of any continuing applicability), the Professional Baseball Agreement, the Major League Rules, the Interactive Media Rights Agreement, and each agency agreement and operating guidelines among the Major League Clubs and an MLB Entity, or (ii) the present and future mandates, rules, regulations, policies, bulletins or directives issued or adopted by the Commissioner or the MLB Entities; provided, however, that the foregoing is not intended to require any Lender to subordinate the security interests granted to it hereunder in favor of any Person.

In turn, the HSG Pledge Agreement comprehensively renders itself subject to numerous MLB approval and consent requirements.  As a result, the default remedy provisions of Section 4 are subservient to the provisions of Section 11:

**SECTION 11.  MISCELLANEOUS.**

Notwithstanding any contrary provisions contained in this Agreement or any other Credit Document:

(a)     The Collateral Agent is aware of the provisions contained in Article V, Section 2(b)(2) of the Major League Constitution, and recognizes that the Ownership Committee of Baseball issued "Control Interest Transfers – Guidelines & Procedures", dated November 9, 2005 (such document and any successor guidelines, as may be amended from time to time, the "MLB Control Interest Transfer Guidelines");

(b)    the Collateral Agent acknowledges that Article V, Section 2(b)(2) of the Major League Constitution and the MLB Control Interest Transfer Guidelines require that the transfer of a control interest in either the Rangers Franchise or the Rangers be subject to the approving vote of the Major League Baseball clubs in their absolute discretion.  The Collateral Agent also acknowledges the "best interests of baseball" powers held by the Commissioner under the Major League Constitution.    Accordingly, the Collateral Agent acknowledges that such approvals would be required for any sale or transfer of the Rangers Franchise or the Rangers, or an interest in either the Rangers Franchise or the Rangers, or any sale, transfer, assignment, license, sublease, or other conveyance of the trademarks, trade names and other intellectual property rights owned by the Rangers, to a third party as well as to any Lender, and that each such transaction shall be subject to and made in accordance with the Major League Constitution, the each agency agreement and operating guidelines among the Major League Baseball clubs and an MLB Entity (as defined below) and the MLB Control Interest Transfer Guidelines.

(c)    the Collateral Agent acknowledges that any temporary or permanent management of the Rangers Franchise or the Rangers shall be subject to the prior approval of the Commissioner and the Clubs.  In the event the Collateral Agent desires to operate the Rangers Franchise or the Rangers for its own account on a temporary or permanent basis, the Collateral Agent shall seek the prior approval of the Commissioner and the Major League Baseball clubs in accordance with the Major League Constitution and the MLB Control Interest Transfer Guidelines.

## F.    Real Estate Controlled Outside the HSG Family Of Entities

None of TRBP, Rangers Equity LP, Rangers Equity GP or HSG own or control the vast majority of land (and therefore, parking lots) surrounding the Ballpark.  This was true before December 19, 2006, when the Credit Agreement and the Pledge Agreement were executed.  Ballpark Real Estate, L.P., a Texas limited partnership ("**BRE**"), which is indirectly owned by Thomas O. Hicks, owns and has leasehold interests in certain real property adjacent to the Ballpark, including, but not limited to, the improvements located thereon, easements, mineral rights, future development rights and contractual rights associated with such real property interests (collectively, the "***BRE Property***").  The BRE Property includes parking lots, a greenbelt, a lake, an irrigation system, and certain other amenities.  TRBP operates, manages and maintains the BRE Property for the benefit of the Texas Rangers and TRBP's affiliates pursuant to the Memorandum Regarding Existing Land Use Arrangement, dated as of May 20, 2010 (the

"***Existing BRE Land Use Arrangement***"), which sets forth in writing the prior oral agreement between TRBP and BRE that had existed since 1998. (Disclosure Statement at 7-8.) BRE is not a borrower from or guarantor of debt to the Lenders. The property of BRE is not collateral for the HSG loans.

The Lenders essentially argue, however, that because BRE is ultimately controlled by Tom Hicks, either (i) BRE must be held to act for the benefit of the Lenders, and not for its own benefit, or (ii) that TRBP and its owners cannot properly undertake a transaction that includes an agreement with BRE. That argument is wrong as a matter of law, and is undermined by the very formational documents of Rangers Equity LP and Rangers Equity GP, of which the Lenders were aware when they required that Rangers Equity LP and Rangers Equity GP become guarantors under the Credit Agreement and the HSG Pledge Agreement. Were BRE controlled by an outsider, it would be unremarkably presumed that BRE had properly negotiated in its own best interests and that TRBP had exercised sound business judgment in agreeing to a Sale that included BRE. The involvement of an insider does not, however, establish that TRBP has acted improperly or has not obtained the best result possible under the circumstances. *See, e.g., Weaver v. Kellogg*, 216 B.R. 563, 581 (Bankr. S.D. Tex. 1997) (finding Texas and Delaware law identical on this issue); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) ("It is not 'per se bad faith' for an insider to purchase assets of a debtor, and a sale to him without more would not suffice to show a lack of good faith.'") (quoting *In re Andy Frain Servs., Inc*., 798 F.2d 1113, 1125 (7th Cir. 1986)). In point of fact, the relevant formational documents provide that owners of TRBP can engage in other transactions:

**AGREEMENT OF LIMITED PARTNERSHIP**
**OF RANGERS EQUITY HOLDINGS, L.P.**

…

**13.** <u>**Other Activities of the General Partner.**</u>  The General Partner shall not be required to manage the Partnership as its sole and exclusive function and may have other business interests and may engage in other activities in addition to those relating to the Partnership.  Such other business interests and activities may be of any nature or description, and may be engaged in independently or with others.  Neither the Partnership nor any Partner shall have any right, by virtue of this Agreement or the Partnership Relationship created hereby, in or to such other ventures or activities of the General Partner or any Affiliates of the General Partners, or to the income or proceeds derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Partnership, shall not be deemed wrongful or improper, except to the extent set forth in any Employment Agreement between any Partners or any of its Subsidiaries.  The General Partner shall have the right to take for its own account or to recommend to others, including affiliates of the General Partner, any investment opportunity including investment opportunities that may be competitive with or involve the same line of business as that conducted or proposed to be conducted form time to time by the Partnership, and shall have no obligation whatsoever to present or otherwise make available any such investment opportunities to the Partnership….

and,

## RANGERS EQUITY HOLDINGS GP, LLC
## AMENDED AND RESTATE LIMITED LIABILITY COMPANY AGREEMENT

…

**12.** <u>**Other Activities.**</u>  Neither this Agreement nor any principle of law or equity shall preclude or limit, in any respect, the right of the Member or any affiliate thereof to engage in or derive profit or compensation from any activities or investments….

A Major League Baseball team in Arlington, Texas is far less valuable without adequate and appropriate parking.  Importantly, the Lenders propose to initiate an auction process that would not include an agreement with BRE to secure parking for the Rangers.  If the Lenders succeed at thwarting the Sale, BRE is under no obligation to make a separate agreement with any other purported buyer.  Moreover, as set forth in the Disclosure Statement at 15 and in the Kellie Fischer Declaration ¶ 41, it was prospective purchasers, not TRBP or Hicks, who require sale of the BRE property as part of the team sale transaction.

**G.    Events Leading To the Sale**

Since 2005, TRBP has experienced, and continues to experience, cash flow deficiencies. For the entire period that Mr. Hicks has owned the Texas Rangers, he has provided financial support to the team through capital contributions and loans to HSG in excess of $100,000,000. Due to the unprecedented downturn in the U.S. economic and housing industry and global economic recession, other commitments and contractual restraints, Mr. Hicks was no longer willing to provide the same material financial support he had in the past. (Disclosure Statement at 7.)

As a result, in 2008, HSG and TRBP began evaluating TRBP's financial position relative to projections for 2009, 2010, and beyond and determined that reductions in all expense categories were required to compensate for current and projected shortfalls. Despite the cost reduction initiatives over the last two years, the cash deficiencies have continued. (Disclosure Statement at 7.)

### H.     Advisors Are Retained.

Beginning in August 2008, HSG retained advisors to provide financial advice and assistance in connection with a capital raise, potential restructuring, or sale, including Perella Weinberg Partners ("**PWP**"); Merrill Lynch, Pierce, Fenner & Smith ("**Merrill**"), and Raine Advisors LLC ("**Raine**"). Initially, HSG worked with Merrill exploring a variety of possible solutions for a capital raise, minority sale, or other recapitalization. While HSG and TRBP explored their options, TRBP continued to suffer cash flow deficiencies. As a result of such cash flow deficiencies and the concurrent cash flow deficiencies suffered by the Dallas Stars, HSG was unable to service its $525 million long-term debt obligations under the Credit Agreement. On March 31, 2009, HSG failed to make a scheduled interest payment under the Credit Agreement, and on April 7, 2009, the Lenders to the Credit Agreement accelerated the entire amount of indebtedness thereunder. As a result of the acceleration, the Lenders under the Credit

Agreement have claims against TRBP on account of TRBP's secured guaranty of $75 million of such indebtedness, as discussed above. (Disclosure Statement at 9; Decl. of Kellie Fischer ¶ 23 (Docket No. 14) "***Kellie Fischer Decl.***")). Importantly, at no point have the Lenders exercised rights under Article 9 of the New York or Texas Uniform Commercial Code to foreclose on the ownership interests of Rangers Equity LP or Rangers Equity GP in and to TRBP.

### I. Tom Hicks and MLB Provide Loans To TRBP.

In order to address cash flow deficiencies, Mr. Hicks funded a total of $5,000,000 under the Overdraft Protection Agreement on May 15 and June 1, 2009. Thereafter, on June 29, 2009, facing continuing significant liquidity challenges, TRBP entered into that certain Secured Revolving Promissory Note with Baseball Finance ("***Original Baseball Finance Note***") to fund ongoing working capital needs. Pursuant to the Original Baseball Finance Note, Baseball Finance agreed to make available to TRBP a secured revolving loan facility in an aggregate principal amount not to exceed $15 million. On the same date, Mr. Hicks suspended his obligation to make future advances of principal amounts under the Overdraft Protection Agreement. (Disclosure Statement at 5; Kellie Fischer Decl. ¶¶ 9-10.)

### J. The Auction Commences.

By the summer of 2009, HSG and TRBP, in conjunction with their advisors, canvassed a broad group of prospective buyers and investors, at least fifteen of which executed confidentiality agreements. Beginning on July 2, 2009, confidential information memoranda were distributed to at least ten parties that had executed confidentiality agreements and received MLB approval to participate in the sale process. TRBP and HSG received six initial bids by the August 18, 2009 initial bid deadline and selected three of those bidders to participate in the second round of bidding. At the same time, HSG and TRBP explored a variety of other financing transactions. (Disclosure Statement at 7; Kellie Fischer Decl. ¶ 25.)

### K. The Sale Process Was Professional and Comprehensive.

After the consummation of the Original VSA, HSG and TRBP directed their advisors to run an auction for the sale of the Texas Rangers. The advisors oversaw the creation of a data room and actively solicited parties interested in buying the club to perform due diligence. The affiliate-owned land that is the subject of the Land Sale Agreement described below was not originally included in the process, but became a part of the overall transaction as potential purchasers indicated they would not proceed unless they could also acquire the land. (Disclosure Statement at 8; Kellie Fischer Decl. ¶ 28.) On August 18, 2009, six interested parties submitted non-binding bids for the purchase of the Texas Rangers. After reviewing the bids with the financial advisors, in consultation with the BOC, and in accordance with the Original VSA, HSG, and TRBP chose three finalists to submit final bids. The three bidders were given three months to complete all their diligence, including extensive meetings with the management of TRBP. On November 20, 2009, the three final bidders submitted final binding bids. During the following two weeks, HSG and TRBP and their financial advisors negotiated with all three bidders and were successful at getting two of the bidders to substantially enhance their original offers. HSG and TRBP selected Rangers Baseball Express LLC (the "*Purchaser*"), whose principals include the current President of the Texas Rangers, Nolan Ryan, and Chuck Greenberg, a sports lawyer and minor league club owner, as the most viable bidder for the sale of the Texas Rangers franchise. (Disclosure Statement at 9; Kellie Fischer Decl. ¶ 28.)

On December 15, 2009, when TRBP and HSG selected the Purchaser as the winning bidder, they believed that the Purchaser's offer was the best offer and in the best interests of both TRBP and HSG and indirectly their creditors. Nonetheless, from December 15, 2009 until January 15, 2010, HSG and TRBP continued to negotiate with both the Purchaser and one other bidder. (Disclosure Statement at 9; Kellie Fischer Decl. ¶ 29.)

Despite extensive negotiations, no definitive agreement had been executed by January 15, 2010. On January 16, 2010, MLB notified TRBP and HSG that it was exercising certain rights under the Modified VSA with respect to the sale process, provided, that MLB would permit HSG and TRBP to continue to negotiate <u>with the Purchaser solely toward the goal of executing a definitive agreement</u>. (Disclosure Statement at 9; Kellie Fischer Decl. ¶ 30.) As the negotiations continued, the Purchaser increased its offer by $10 million. On January 23, 2010, the parties entered into that certain Asset Purchase Agreement (the "***January APA***"), governing the sale of the Texas Rangers franchise and certain related assets to the Purchaser. (Disclosure Statement at 9; Kellie Fischer Decl. ¶ 30.)

As a result of the extended negotiations, the final purchase price was higher than the original offer by the Purchaser. In addition, TRBP received favorable terms regarding the assumption of liabilities, the scope of seller indemnification, representations and warranties and other deal points. Equally important, TRBP believed that the Purchaser could get the approval of MLB. (Disclosure Statement at 9; Kellie Fischer Decl. ¶ 31.)

**L.      The Lenders' Actions Necessitate Filing Of the TRBP Bankruptcy.**

Pursuant to the terms of the January APA, consummation of the sale required, among other closing conditions, the consent of the Lenders pursuant to the terms of the Credit Agreement. Despite HSG's, TRBP's, and the Purchaser's lengthy good faith negotiations with the Lenders since the execution of the January APA, the Lenders have refused to consent to the transactions contemplated by the January APA and have prevented TRBP from moving forward with the sale of the Texas Rangers. TRBP became increasingly concerned about the lengthy stalemate with the Lenders and TRBP's ability to continue to fund working capital needs. Because of TRBP's inability to obtain the consent of the Lenders, TRBP, in consultation with MLB, concluded that a chapter 11 filing designed to facilitate a sale of TRBP's assets pursuant

to a prepackaged plan of reorganization was the most efficient manner in which to consummate

the sale of the Texas Rangers and was, therefore, in the best interests of the Texas Rangers

franchise, its fans, MLB, and all other parties involved.  As described herein, the Prepackaged

Plan will facilitate the Sale of the Texas Rangers franchise to the Purchaser and the payment of

all of TRBP's creditors in full, allowing the Texas Rangers franchise to successfully compete on

and off the field with assurance of long-term financial stability.  (Disclosure Statement at 9;

Kellie Fischer Decl. ¶ 31.)

## DISCUSSION

I.  **THE CREDITORS AND EQUITY HOLDERS ARE NOT IMPAIRED UNDER THE PLAN WITHIN THE MEANING OF BANKRUPTCY CODE § 1124.**

A class of claims or interests is unimpaired under the Bankruptcy Code if a plan "leaves

unaltered the legal, equitable, and contractual rights" of each class member, or provides for the

"cure" of any prepetition default along with the "reinstatet[ment]" of maturity to pre-default

status.  *See* 11 U.S.C. § 1124(1),(2)(B); *see In re Am. Solar King Corp.*, 90 B.R. 808, 821 n.21

(Bankr. W.D. Tex. 1988) ("Stockholders, for example, have only a right to share in the

company's good fortunes, and that only if the board of directors authorizes stock redemption or

dividends."); *In re Sweetwater*, 57 B.R. 354 (D. Utah 1985) (affirming confirmation of plan that

allowed post-confirmation challenge to creditor's liens where creditor was unimpaired because

plan itself made no determination as to validity of lien); *See also In re Madison Hotel Assocs.*,

749 F.2d 410 (7th Cir. 1984) (holding that abrogation of judgment of foreclosure is not

impairment by plan where reinstatement provisions of § 1124(2) were fulfilled).  Here, the

Prepackaged Plan leaves the legal, equitable and contractual rights of all Classes unaltered.

Specifically, Classes 1 through 4 and 9 through 10 are unimpaired because those class members

will receive payment in full on the Effective Date, the date the claims become allowed, as

otherwise agreed between the Debtors and the claimants, or as soon as practicable thereafter.

Classes 5 and 6 are unimpaired because the claims therein shall retain their existing liens, if any, and will also be paid in cash when the allowed claims become due and owing in the ordinary course of business. Similarly, Class 7 is unimpaired because each holder of an allowed claim in such class will be paid as such claim becomes due in the ordinary course of business. Class 8 is also unimpaired because the claims held therein will be paid in full as of the Effective Date, when they become due, or as soon as practicable thereafter, or otherwise receive treatment that leaves their rights unaltered. *See In re Block Shim Dev. Co.-Irving,* 118 B.R. 450, 454 (Bankr. N.D. Tex. 1990) (claim is unimpaired if full amount of allowed claim is paid on the effective date of the plan); *In re Bankston*, No. 09-10675, 2010 WL 1027806, at *5 (Bankr. W.D. La. Jan. 15, 2010) (same). Finally, Classes 11 and 12 are unimpaired because their legal, equitable and contractual rights are not being altered by the Plan.

With respect to Class 12—the class of equity holders—the Plan expressly provides that the rights of such claimants will remain unaltered. Indeed, the Prepackaged Plan provides for distribution to Class 12 of the proceeds of the Sale remaining after satisfaction of Classes 1-11 under the Plan. Accordingly, Class 12 members will receive what they would have received as of the Petition Date (subject to any requirements of the Bankruptcy Code itself) in the event of a sale of assets of TRBP. Therefore, they remain unimpaired. *Am. Solar King Corp.*, 90 B.R. at 821 n.21.

Impairment under Section 1124 is a question of rights, not value. The value of a claim is not relevant for purposes of determining whether such claim is impaired:

> [T]he purpose of Section 1124 to avoid cram down would be defeated by requiring valuation of claims to determine impairment. By driving a wedge between the concept of impairment and the vagaries of value, parties may know with greater certainty, whether

> or not they are impaired. This certainty should reduce litigation
> and aid negotiation toward a plan, the goals which Section 1124
> was established to further.

*In re Barrington Oaks Gen. P'Ship*, 15 B.R. 952, 962-63 (Bankr. D. Utah 1981) (footnotes

omitted) (noting that where new obligor had not met requirements of section 365 in connection

with plan, impairment was found). Therefore, the <u>amount</u> of any distribution the Class 12

members will receive has no bearing on whether the Class 12 members are impaired. For

example, in *In re Valley View Shopping Center*, 260 B.R. 10, 31 (Bankr. D. Kan. 2001), the court

held that a class of limited partners in the debtor were not impaired even though they received <u>no</u>

<u>distribution</u> whatsoever under the plan. After reviewing the applicable terms of the partnership

agreement that set forth the class members' rights, the court found that the limited partners were

"entitled to share in the net cash flow in proportion to their share of ownership." *Id.* Therefore,

if there was "no net cash flow, the limited partners [were] not entitled to a distribution." *Id.* The

debtor projected "insufficient cash flow to make distributions to limited partners, after making

plan payments." *Id.* According to the court, the plan's "failure to make any distributions to the

limited partners during the first two years of the Plan is no departure from the Debtor's pre-

bankruptcy practice, and no alteration of the limited partners' rights under the partnership

agreement." *Id.* at 31-32. Here, as was the case in *Valley View*, the Plan provides for no

departure from the Debtors' pre-bankruptcy practice, since the Class 12 members are receiving

what they would have received just prior to the Petition Date.

In addition, the rights in question—the ones which must remain unaltered to be

unimpaired—are measured as of the filing date, since this is when a debtor's estates arises. *See*

*Am. Solar King*, 90 B.R. at 820. A creditor's claim outside of bankruptcy is not the relevant

barometer for impairment; one must examine whether the plan itself is a source of limitation on a

creditor's legal, equitable, or contractual rights. *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 204

(2d Cir. 2003) (finding plan implementing statutory cap under section 502(b)(6) does not impair a class, as "Code impairment" is not impairment under section 1124).

Accordingly, because the Plan provides for full payment to all creditors and expressly provides for no alteration of any contractual, legal or equitable rights, including those of interest holders, none of the Classes are impaired. Because none of the Classes under the Plan are impaired, all creditors and holders of interests are conclusively presumed to have voted in acceptance of the Plan, pursuant to 11 U.S.C. § 1126(f). *See In re Idearc, Inc.*, 423 B.R. 138, 163 (Bankr. N.D. Tex. 2009); *In re Moody Nat'l. SHS Houston H, LLC*, 426 B.R. 667, 670 (Bankr. S.D. Tex. 2010).[5]

## II. UNDER TEXAS OR DELAWARE LAW, THE LENDERS MAY NOT PURSUE CLAIMS FOR BREACH OF FIDUCIARY DUTIES BY TRBP MEMBERS OR ITS PARENT COMPANIES, AND IN ANY EVENT, THERE IS NO BREACH.

### A. The Lenders Do Not Have Standing to Raise Claims for Breach Of Fiduciary or Similar Duties Against the Debtor, Either Directly or Indirectly.

The Court has asked the parties to address the question of what duties are owed by the Debtor in this proceeding and to whom. (June 15, 2010 Notice Order at 2.) As a preliminary matter, the Debtor is a Texas general partnership, governed by the law of Texas, and its parents, Rangers Equity Holding LP and Rangers Equity Holding GP, LLC, are a Delaware limited partnership and a Texas LLC, governed by the law of Delaware and Texas, respectively. The Lender Group consists of creditors, not partners.[6] Texas and Delaware law generally provide

---

[5] Moreover, the Lenders have no standing to challenge portions of the Plan that do not effect them. *Cf. Keck, Mahin & Cate*, 241 B.R. 583, 596 (Bankr. N.D. Ill. 1999) (finding that non-creditor could not object to plan provisions that did not affect its interests).

[6] Although Baseball Express would argue that Texas law exclusively governs in this matter because TRBP is a Texas General Partnership, this brief also takes into account Delaware law, which governs the duties owed by one of TRBP's parent entities, Rangers Equity Holding, LP,

that debtors owe contractual duties to creditors, not fiduciary duties. The only exception is when the debtor is insolvent and, in Texas, has ceased operations. *Floyd v. Hefner*, Civ. No. 03-5693, 2006 WL 2844245, at *24 (S.D. Tex. Sept. 29, 2006) ("*Floyd I*") (construing Texas law); *N. Am. Catholic Educ. Programming Found. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (construing Delaware law); *Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348, 355 (Bankr. N.D. Tex. 1996 (noting the difference between Texas and Delaware law). In those circumstances only, creditors may bring claims for breach of fiduciary duty derivatively on behalf of the debtor. *In re I.G. Servs., Ltd.*, 2008 WL 783551, at *2-4 (Bankr. W.D. Tex. Mar. 19, 2008); *Gheewalla*, 930 A.2d at 101. Texas law does not permit creditors to bring derivative claims against directors of entities that continue to operate, and nothing suggests that the Texas Supreme Court would change that precedent. *See Floyd I,* 2006 WL 2844245, at *19 (citing *Hunter v. Fort Worth Capital Corp.*, 620 S.W. 2d 547, 550 (Tex. 1981)).[7]

The Texas Rangers continue to play baseball, and the Proposed Plan of Reorganization provides for full payment to TRBP's creditors. Thus, TRBP is a solvent, operating entity. The Debtor owes its creditors no fiduciary obligations, and its creditors have no right to bring derivative actions on its behalf. The Lenders' argument that somehow, they may act as the

---

should the Court find it necessary to examine the duties owed by the members of that entity. The internal affairs doctrine in Texas provides that courts apply the law of the state of incorporation when the matter involves fiduciary duties and the internal workings of the corporation. *See* Tex. Bus. Org. Code §§ 1.101-1.105. In construing the duties of the members of Rangers Equity Holding LP, Delaware law would apply.

[7] To the extent that the Lenders would seek to rely on *In re VarTec Telecom, Inc.*, No. 04-81694-HDH-7, 2007 WL 2872283 (Bankr. N.D. Tex. Sept. 24, 2007), it should be noted that the case is, at most, persuasive authority and represents a misconstruance of Texas law. Moreover, although the *VarTec* decision questioned the *Floyd I* court's holding that an entity needed to be insolvent (not merely in the "zone of insolvency") in order for creditors to pursue direct claims for breach of fiduciary duty against directors, it did not address the condition that the entity have ceased to be a going concern.

Debtor's partners for the Debtor's benefit finds no support under either Delaware or Texas law.

Even if the Lenders had a basis to make a derivative claim, the facts of this case would not support such a claim. The Plan provides for full payment of creditors. The Lenders are not partners, and they are only entitled to payment of their claims, not to an investment return as would be available to partners.

**B.      The Lenders' Claims for Breach of Fiduciary Duty Would Be Barred By Their Inability to Show Damages Flowing from a Breach.**

Even if the Lenders' had (for the sake of argument) the right to bring a breach of fiduciary duty claim, such a claim would be fruitless, as the Lenders would have no non-duplicative damages. As Baseball Express understands it, the Lenders' opposition to the Plan is based on a theory that if the Plan is confirmed, the Lenders would be deprived not of any amount owed to them by the Debtor, but of some hypothetical extra amount that would flow to HSG and then to the Lenders *if* TRBP were able to find a buyer (1) willing to pay more than Baseball Express, (2) able to pay more than Baseball Express, and (3) that MLB and at least 75% of MLB owners would approve. This is precisely the kind of speculative interest on which creditors may not rely. *See, e.g., Rajabali v. Rajabali*, 365 B.R. 702, 708-09 (Bankr. S.D. Tex. 2007); *Plas-Tex v. Jones*, Civ. No. 03-99-286, 2000 WL 632677, at *4 (Tex App. May 18, 2002) (not selected for publication); *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W.2d 624, 628 (Tex. App. 1973). Instead, a creditor properly bringing derivative claims is only allowed to sue to "hold the directors liable for that portion of the assets that would have been available to satisfy his debt if they had been distributed pro rata to all creditors." *Tigrett v. Pointer*, 580 S.W.2d 375, 384 (Tex. App. 1978) (citing *Fagan*, 494 S.W. 2d at 632); *Plas-Tex,* 2000 WL 632677, at *5. Because the Plan provides for the creditors, including the Lenders, to be paid in full, exactly the measure that they could seek from TRBP, there can be no viable allegation that the creditors will suffer any

such damages.  Where no damages are articulated—much less possible—no claim may stand.

*See, e.g., Torch Liquidating Trust ex rel. Bridge Assocs., L.L.C. v. Stockstill*, 561 F.3d 377, 390

(5th Cir. 2009) (affirming dismissal of derivative claims where no "actual, quantifiable damages"

incurred by plaintiff that were attributable to breach of fiduciary duty were properly pleaded);

*Floyd v. Hefner*, 556 F. Supp. 2d 617, 652 (S.D. Tex. 2008) ("*Floyd II*") (finding that

"uncertainty as to the fact of legal damages is fatal" to claims for breach of fiduciary duty and

underscoring requirement of showing causation and damages); *cf. Cline v. Grelock*, Civ. No.

4046, 2010 WL 761142, at *2 n.11 (Del. Ch. Mar. 2, 2010) (finding, in post-trial posture, that

claims for breach of fiduciary duty fail where plaintiff cannot show that injuries allegedly

suffered are "not speculative or uncertain"); *Thornton v. Bernard Techs., Inc.*, Civ. No. 962-

VCN, 2009 WL 426179, at *4 (Del. Ch. Feb. 20, 2009) (finding that court will not find standing

to bring breach of fiduciary duty claims where plaintiff has not shown an injury-in-fact or that

such injury was proximately caused by alleged conduct).

### C. The Agreements Establishing TRBP and Its Parent Entities Sharply Limited the Scope of Fiduciary Duties.

Even if the Court were to find that TRBP and/or its partners, Rangers Equity Holding LP

and Rangers Equity Holding GP, LLC, theoretically owed a duty of loyalty to the Lenders, the

agreements that govern those entities limit those duties such that the Lenders' allegations do not

support a claim of breach.  TRBP is a Texas general partnership, governed by the Texas Business

Organizations Code, which allows partners to specify activities that will not constitute breaches

of the duty of loyalty in the partnership agreement.  *See* Tex. Bus. Org. Code § 152.002.  The

Second Amended and Restated Partnership Agreement of TRBP (a true and correct copy of

which is attached hereto as Exhibit A), Section 4.8, provides that the partners are not liable to

each other or the partnership absent willful misconduct, improperly receiving a personal benefit,

or a lack of good faith. Here, no conduct approaching those exceptional categories is alleged, and the evidence will show that such conduct did not in fact occur. Moreover, Tex. Bus. Org. Code § 152.204, which defines the duty of loyalty required of a partner in a general partnership to the partnership, provides that '[a] partner does not violate a duty or obligation under this chapter or under the partnership agreement merely because the partner's conduct furthers the partner's own interest." To the degree that the Lenders allege that some improper benefit inured to HSG or an affiliate in the transaction, this alone cannot constitute a breach of duty of loyalty to the partnership, as no injury *to the partnership or other partners* is alleged. As set forth in Tex. Bus. Org. Code § 152.210, a "partner is liable *to a partnership and the other partners* for … a violation of a duty to the partnership or other partners under this chapter *that causes harm to the partnership or the other partners*." (emphasis added).

Rangers Equity Holding LP is a limited partnership under Delaware law, which expressly permits the limitation or elimination of fiduciary duties.[8] Because Paragraph 13 of the Rangers Equity Holdings LP Limited Partnership Agreement (a true and correct copy of which is attached hereto as Exhibit D) sets forth that the "other business" of the general partner "shall not be deemed improper," except when it conflicts with the specific terms of an employment

---

[8] *See* 6 Del. Code § 17-1101(d):

> (d) To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement, the partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

agreement—not alleged here—no duty of loyalty could be found to be breached as alleged by the Lenders.  Similarly, Paragraph 13 of the Amended and Restated Limited Liability Company Agreement (a true and correct copy of which is attached hereto as Exhibit E) governing Rangers Equity Holding GP, LLC, provides that "all duties and liabilities" of members are waived except as specifically stated in the Agreement, which does not provide for a duty of loyalty or a duty of care.  The Texas code provision governing Rangers Equity Holding GP, LLC, expressly provides that a "company agreement of a limited liability company may expand or restrict any duties, including fiduciary duties, and related liabilities that a member, manager, officer, or other person has to the company or to a member or manager of the company."  Tex. Bus. Org. Code §101.401.

In sum, because there can be no dispute that the valid provisions in the relevant agreements effectively limit the duties the Lenders would allege have been breached, their claims cannot stand.

### D. Even If the Court Found That the Lenders Are Owed Fiduciary Duties, the Lenders Cannot Show That They Would Be Breached By Proceeding with the Plan.

Under the Texas Business Organizations Code, partners in a general partnership owe duties of care and loyalty to the partnership and other partners.  *See* Tex. Bus. Org. Code §§ 152.204-206; *McBeth v. Carpenter*, 565 F.3d 171, 177 (5th Cir. 2009).[9]  This is also consistent with the law of Delaware governing limited partnerships, although under Delaware law, the

---

[9]  The court in *McBeth* discusses the duties owed by partners under the statute cheek by jowl with case law that predates—and contradicts—the statutory clarification that the duties owed by partners are not tantamount to that owed by a trustee and the beneficiary of a trust.  *See* Tex. Bus. Org. Code § 152.204 (defining the duty of care and providing that a partner "is not a trustee and is not held to the standards of a trustee").  In fact, commentators have construed the Texas statutory duties as being narrower than traditional common law fiduciary because of this provision.  *See* Tex. Rev. Civ. Stat. Ann. art. 6132b-4.04, Comment of Bar Committee – 1993.

duties of limited partners may be significantly circumscribed depending on the level of control the limited partner exercises. *See RJ Assocs., Inc. v. Health Payors' Org.L.P.*, No. 16873, 1999 WL 550350 (Del. Ch. July 16, 1999).

To fulfill the duty of care under Texas or Delaware law, a partner subject to that duty must exercise the same degree of care as an ordinarily careful and prudent person under similar circumstances. *See* Tex. Bus. Org. Code § 152.206; 6 Del. Code § 15-404(c) (articulating similar negligence standard). In the corporate context, under common law the focus is on whether a director or officer made decisions through a deliberate process and with sufficient information such that he discharged his duties with "diligence and prudence." *Gearhart Indus., Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 720 (5th Cir. 1984); *see also Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000). As detailed *infra* and in the Disclosure Statement, TRBP aggressively marketed the Texas Rangers to obtain a broad pool of bidders and engaged in a painstakingly careful review of potential buyers, taking into account factors such as closing risk and the provisions of MLB regulations by which it is bound, including the likelihood that a potential bidder would obtain the requisite MLB and MLB owner approval. The evidence will show that the process by which Baseball Express was selected was conducted with prudence and diligence as required to fulfill the duty of care.

Evaluating the Debtor's sale of the Rangers in light of the business judgment rule further confirms the Debtor's fulfillment of its duties. That rule provides that if decisions were made in good faith, on an informed basis, independently, without fraudulent intent, and with the belief that the action is in the company's best interest, a court will not second-guess a director's actions. *Weaver*, 216 B.R. at 584; *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (articulating similar standard in Delaware). Under the Texas business judgment rule,

"Texas law imposes liability only for grossly negligent violations of the duty of care,"
*Resolution Trust Corp. v. Acton*, 844 F. Supp. 307, 313 (N.D. Tex. 1994), and the standard is
similar in Delaware, *Brehm*, 746 A.2d at 264 n.66. "[The] negligence of a director, no matter
how unwise or imprudent, does not constitute a breach of duty if the acts of the director were
'within the exercise of their discretion and judgment in the development or prosecution of the
enterprise in which their interests are involved.'" *Resolution Trust Corp.*, 844 F. Supp. at 313-14
(quoting *Cates v. Sparkman*, 11 S.W. 846, 849 (Tex. 1889)). With respect to uninterested
members, Texas law does not impose liability unless the challenged action is *ultra vires* or
tainted by fraud or unless the director fails to exercise any judgment. *Gearhart*, 741 F.2d at 723-
24; *Cede*, 634 A.2d at 360 (articulating similar standard in Delaware).

      Here, it is the Lenders' burden to show that the rule should not apply, a burden that they
cannot carry in this instance. The business judgment rule is not merely a defense to potential
claims of a breach of fiduciary duty. The "Texas business judgment rule is a substantive rule of
law that requires of [the Lenders] both pleading and proof to avoid its reach." *FDIC v. Benson*,
867 F. Supp. 512, 521 (S.D. Tex. 1994) (citing *FDIC v. Brown*, 812 F. Supp. 722, 724 (S.D. Tex.
1992); *Resolution Trust Corp. v. Holmes*, Civ. No. H-92-0753, 1992 WL 533256 (S.D. Tex.
Aug. 7, 1992); *Resolution Trust Corp. v. Norris*, 830 F. Supp. 351 (S.D. Tex. 1993). TRBP does
not have to prove that the business judgment rule applies. Rather, the Lenders would bear the
burden of proving that it does not. *Benson*, 867 F. Supp. at 521; *Cede*, 634 A.2d at 361
(establishing that plaintiff has the burden at the outset to rebut the rule's presumption). The
Lenders must plead specific facts sufficient to defeat the applicability of the business judgment
rule in order for the rule not to apply. *Kane Enters. v. McGregor (USA), Inc.*, 322 F.3d 371, 374
(5th Cir. 2003) (pointing to the need to plead specific facts in support of any claim); *Benson*, 867

F. Supp. at 522 (finding that plaintiff has the burden to plead and prove an exception to the business judgment rule); *Cede*, 634 A.2d at 361 (providing that "plaintiff assumes the burden of providing evidence" of breach).

To fulfill the duty of loyalty, a partner must act in good faith in the best interest of the corporation and its shareholders without allowing personal or adverse interests to interfere with discharging his or her duties. Tex. Bus. Org. Code § 152.205; 6 Del. Code. § 15-404(b). As construed in case law, the common law duty of loyalty has been interpreted to prohibit an officer or director from deriving any "unauthorized" benefit from the relationship with the partnership. *Gearhart*, 741 F.2d at 719. Although all members of every relevant entity related to TRBP have "authorized" the Plan, the Lenders have hinted that the breach of fiduciary duty committed by proceeding with the Plan would be based on the benefit derived by an entity (BRE) unrelated to the Debtor and its parents. Specifically, the Lenders appear to believe that because BRE, an entity in which Mr. Hicks has an ownership interest, stands to make money from the sale of the real estate in its possession—an asset that has been in its possession prior to the Loan Agreements being executed—that Mr. Hicks, as an officer of TRBP, is necessarily improperly interested.

Neither Mr. Hicks nor BRE is a guarantor of the Lender's debt and the Lenders have no lien or other interest in BRE or its assets, leaving them with no contractual duties owed by Mr. Hicks or BRE. In negotiating and executing the loan documents, the Lenders were represented by highly paid, highly skilled counsel who knew exactly what the Lenders were foregoing in the way of security. The Lenders made an affirmative choice to proceed without collateral or a guaranty from Mr. Hicks or BRE. There is no legitimate cause of action in this proceeding to

relive them of that choice.[10]

### E. Proceeding As the Lenders Request Would Likely Constitute a Breach Of Duty Owed To All Creditors.

Allowing the Lenders to hijack a process leading to the swift and complete payment of all creditors merely because the Lenders want more money from entities not in this proceeding (through theories not supported by Texas law) would be tantamount to compelling a breach of TRBP's duties.[11] The Plan provides that all creditors of TRBP, including the Lenders, will be paid all amounts owed to them by TRBP. Conversely, the Lenders can point to nothing that will guarantee, should the Plan be scuttled, that the creditors will receive payment in full. Accordingly, were TRBP or its partners to bend to the will of the Lenders and abandon the Plan, they would be breaching their duty to not prefer one party over another by risking payment in full for many creditors in favor of the Lenders alone. This Court has already recognized the difficulty of giving in to "economic blackmail." *See In re CoServ, L.L.C.*, 273 B.R. 487, 499 (Bankr. N.D. Tex. 2002) (serving the interests of a single creditor "is a most dubious rationale" for invoking the Doctrine of Necessity."); *see also See Big Lots Stores, Inc. v. Bain Captial Fund, Inc.*, 922 A.2d 1169, 1172 (Del. Ch. 2008) (dismissing derivative breach of fiduciary duty claims by creditor, noting "the well-established proposition that derivative claims cannot be used by a single creditor to upset the structured bankruptcy process"); *Mann v. GTCR Golder Rauner,*

---

[10] Although under both Texas and Delaware law courts may be reluctant to apply the business judgment rule where the officer or director is on both sides of a transaction or expects to gain financially from the transaction, *Norris*, 830 F. Supp. at 356 (S.D. Tex. 1993); *Cede*, 634 A.2d at 362, the challenged parties may show that the transaction was in the best interests of the corporation using an "entire fairness" standard. *Weaver,* 216 B.R. at 581; *Cede*, 634 A.2d at 361. Here, the entire fairness standard is met, with only the Lenders complaining of unfairness because the raw number attached to the price offered by Baseball Express is not—they speculate—the highest price attainable.

*LLC*, 483 F. Supp. 884 (D. Ariz. 2007) (quoting *Big Lots* for same proposition).

Foregoing the Plan in favor of the Lenders' riskier approach—essentially allowing the Lenders to participate in this proceeding as investors in creditors' clothing—would turn the principles of bankruptcy law on their head. The case law on point with respect to this situation (where a creditor is seeking to risk its own complete recovery) is non-existent. And the cases considering the nature of a creditor's interest in bankruptcy finds that it is precisely because creditors are risk averse that they earn the right to bring derivative claims for breach of fiduciary duties. *See, e.g., Floyd I*, 2006 WL 2844245, at *18 ("Because creditors have no interest beyond the debts owed to them, they have no incentive (and much to risk) by encouraging business strategies that would risk the payment of the bulk of their claims but provide some hope that the firm's value will increase to the level at which there could be a return for the equity."). The *Floyd I* court reasoned that acting as fiduciaries of creditors was likely to cause "directors to adopt excessively conservative strategies, a problem that this court has no reason to believe is any less dangerous to shareholders than excessively risky strategies are to debt holders." *Id.*

III. **IN A SOLVENT DEBTOR CASE, DEBTOR'S DUTY IS TO ACT IN THE BEST INTERESTS OF THE ESTATE FOR THE BENEFIT OF CREDITORS AND INTEREST HOLDERS.**

A. **The Use of "Value Maximization" in Insolvent and Solvent Cases Contexts**

A chapter 11 debtor-in-possession owes a fiduciary duty to both the holders of claims against and holders of interests in the bankruptcy estate. That duty is to act in the best interest of such claimants and interest holders. Stated otherwise, "[t]he principal concern of Debtors and their managers… must be preservation of Debtors' going concern value and their successful emergence from chapter 11. That will occur through confirmation of a plan of reorganization." *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 218 (Bankr. N.D. Tex. 2009) (granting motion to appoint equity committee at a point where solvency of debtor was not a given fact). While it is

sometimes stated by litigants and courts that the debtor's duty is " to maximize the value of the estate," often citing *Commodity Futures Trading Commission. v. Weintraub*, 471 U.S. 343, 350 (1985), there is no *per se* duty to do so. An examination of Justice Marshall's opinion in *Weintraub* reveals that the sources cited for that phrase do not support its wording. Neither section 704 nor 1106 of the Bankruptcy Code employ terminology of maximization. Similarly, the case cited for this proposition in *Weintraub*, *In re Washington Group, Inc.*, 476 F. Supp. 246, 250 (M.D.N.C. 1979), *aff'd sub nom. Johnston v. Gilbert*, 636 F.2d 1213 (4th Cir. 1980), *cert. denied*, 452 U.S. 940 (1981), speaks in terms of the trustee's duty to act in the "best interests of the estate." *Id.* In *Washington Group*, the court examined whether a trustee could expend estate funds in support of litigation that would not directly benefit the estate, in addition to doing so in litigation that would provide direct recovery. This Court has cited *Weintraub*, and another case, *In re National R.V. Holdings, Inc.,* 390 B.R. 690, 698 (Bankr. C.D. Cal. 2008), in connection with the issue of "maximization." *See In re Pilgrim's Pride Corp.*, 407 B.R. at 218. In *National R.V.*, the court denied a motion to form an equity committee, primarily because the court found the debtor likely to be insolvent. The *National R.V.* court drew its "maximization" reference from *Hirsch v. Pennsylvania Textile Corp.* (*In re Centennial Textiles, Inc.*), 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998). In *Hirsch*, however, the court considered the actions of a chapter 7 trustee pursuing claims against debtor management. There was no sale or plan involved in the court's analysis.

Here, the Lenders argue that the proposed Sale does not maximize their recovery as alleged equity holders of TRBP (which argument is not conceded). However, the vocabulary of maximization is a carryover from "the vast majority of reorganization cases, [wherein]the debtor corporation is insolvent and, upon confirmation of a plan of reorganization or liquidation, equity

holders will receive *nothing*.  In almost every case, *all* of the property of the estate will ultimately go to the creditors."  *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 250-51 (5th Cir. 1988) (emphasis added).  Attempting to gain a speculative return for equity is contrary to the overall obligations of a debtor.  Those rights and duties, and within a case, those of a debtor's officers and directors, begin with the rights conferred by the Bankruptcy Code.[12]

### B.  During Exclusivity Period, Fulfillment of § 1129 Criteria, Not Maximization

When analyzing whether a plan is confirmable under 11 U.S.C. § 1129, the court must determine whether the "[proponent] proposed the Plan in good faith . . . [and that] the terms of [all documents] that relate to the Plan or are contemplated by the Plan are fair and reasonable, reflecting the Debtor's exercise of prudent business judgment consistent with its fiduciary duties."  *In re M.B.S. Mgmt. Servs., Inc.*, No. 07-12151, 2008 Bankr. LEXIS 1459, at *7-8 (Bankr. E.D. La. May 2, 2008).  Even where certain creditors point to a so-called "better deal," the debtor's refusal to pursue the alleged "better deal" does not, on its own, demonstrate "bad faith."  *In re Spansion, Inc.*,. 426 B.R. 114, 140 (Bankr. D. Del. 2010).

In *Spansion*, the Court recognized the significance of considering a plan during the exclusivity period and determined that if a plan is confirmable under section 1129 of the Bankruptcy Code, the hypothetical improvements suggested by creditors are not to be considered.  The court's analysis is worth citation at length:

> The objecting parties, in particular the Creditors' Committee, also have argued that confirmation of the Debtors' Plan should be conditioned upon the Debtors' acceptance of the Alternative Rights Offering proposed by the Convert Committee. The Creditors' Committee, the Convert Committee, AHEC, and

---

[12]   As stated before the Court, Baseball Express believes that the Plan, if confirmed speedily, provides maximum value for all creditors and interest holders of TRBP.  Delay will destroy value.  A supposed "parallel process" would subvert the exclusivity rights of the Debtor, discussed immediately below.

others argue that the $112 million Alternative Rights Offering is superior to the Silver Lake Rights Offering. They argue that the Debtors' failure to accept the Alternative Rights Offering is evidence of the Debtors' bad faith in proposing the Plan (because, *inter alia,* it imputes a higher share value than asserted by the Debtors).

In response, the Debtors assert that they are entitled to have the Plan judged as a whole for satisfaction of the requirements of § 1129: creditors are not free to pick the provisions they like and excise the provisions they dislike. The Debtors note that the Plan has been proposed, voted on, and the Confirmation Hearing has been completed within the exclusivity period of Bankruptcy Code § 1121(b), as extended by order of this Court. The purpose of the exclusivity period is to provide a debtor, at the outset of a chapter 11 case, with "the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests." *In re Texaco, Inc.,* 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988) (citing H.R. Rep. No. 595, 95th Cong., 2d Sess. 221-222 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6180-82). The Debtors write that compelling them to reconceptualize their reorganization would deprive the Debtors of their exclusive right to formulate and propose their manner of reorganization as they see fit, subject, of course, to the limitations of the Bankruptcy Code. (Debtors' Response to Statement of Position of Official Committee of Unsecured Creditors, D.I. 2863 at ¶ 12.) I agree. *See In re Adelphia Commc'ns Corp.,* 336 B.R. 610, 676 (Bankr. S.D.N.Y. 2006) (citing *In re Geriatrics Nursing Home, Inc.,* 187 B.R. 128, 134 (Bankr. D.N.J. 1995) (noting that a creditor constituency's unhappiness or dissatisfaction with a debtor's proposed plan, without more, does not constitute cause to end exclusivity and undermine the debtor's chance of obtaining confirmation of its plan during that period)).

Even assuming the Alternative Rights Offering provides "a better deal" for some creditors, the Debtors' refusal to accept the proposal does not, on its own, demonstrate "bad faith." As noted in the confirmation opinion in *Celotex*:

This Court's responsibility with respect to consideration of the Plan is to consider as a matter of law (i) whether the Plan Proponents have met their burden under the Bankruptcy Code, (ii) whether each impaired class has accepted the Plan and (iii) the merits of any timely filed objections to the Plan. The Court need not and ought not consider if a proposed plan is the "best" plan of reorganization that could be promulgated, providing for the highest return to creditors of the Debtors' Estates. Instead, the chapter 11 process is controlled by the various constituencies in a case, including holders of Claims and Interests. It is not the Bankruptcy Court's role to substitute its judgment for the judgment of the various classes of creditors who have voted overwhelmingly in favor of the Plan. Accordingly, the Bankruptcy Court is not required to compare the Plan to a hypothetical plan. Therefore, in order to meet their obligations under Section 1129(a)(7) of the Bankruptcy Code, Plan Proponents must prove that the distribution to creditors

under the Plan is no less valuable, as of the Effective Date of the Plan, than the distribution such creditors would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. *In re Celotex Corp.,* 204 B.R. 586, 611-12 (Bankr. M.D. Fla. 1996).

426 B.R. at 139-40 (footnote omitted).

In a comment that is resonant with the Lenders' approach to the case before the Court,

the *Spansion* court wrote as follows:

This case is illustrative of what has been and is now occurring in many of the larger chapter 11 cases filed in this Court: "Trading of claims in advance of Chapter 11 or shortly afterward ensures that [various constituencies in Chapter 11] consist largely of seasoned professionals who specialize in recapitalizing distressed businesses." Baird, *supra,* n. 16, at 1938. "The contest is most often among seasoned investors (banks hedge funds, and other institutional investors) who hold debt at different levels of the debtor's capital structure." *Id.* at 1933. The history of this chapter 11 proceeding is replete with evidence of behavior by such parties clearly designed to further competing strategies. Nowhere is this more apparent than in connection with the disclosure and confirmation process, but I cannot conclude, on this record, that the Debtors' rejection of the Alternative Rights Proposal demonstrates a lack of good faith in seeking confirmation of the Plan. Absent some demonstrable impropriety in the confirmation process, it is not for the Court to supplant the Debtors' business judgment with its own.

As this Court has noted, a proposed plan must be "fair and equitable" and "in the best

interests of [the debtor] its Estate and *all* other parties in interest, including all creditors and

equity holders." *In re Mirant Corp.*, No. 03-46590, 2007 Bankr. LEXIS 3241, at *18 (Bankr.

N.D. Tex. Sept. 19, 2007) (Lynn, J.) (emphasis added); *see also In re MCorp Fin., Inc.*, 160 B.R.

941, 950 (Bankr. S.D. Tex. 1993) (stating that when analyzing the propriety of a course of action

pursuant to a plan, the analysis must come from the estate's view and must maximize value to

the estate, not any single interest holder).

C.     **Non-Monetary Factors in the Section 363 Context Support the *Spansion* Approach.**

Additionally, in Section 363 sales contexts, the definition of "highest and best" bid is that

bid which results in the highest attainable return to creditors. Two common components of the

definition of the "highest and best" bid are factors affecting the speed of consummating the transaction as well as the certainty that the transaction will succeed in closing. *See, e.g., In re Fortunoff Fine Jewelry & Silverware, LLC,* No. 08-10353, 2008 WL 618986 (Bankr. S.D.N.Y. 2008.) (approving bid procedures that specifically refer to certainty of closing as a factor for approval). In *In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998), the court recognized the importance of non-monetary factors in connection with a sale of assets, and in connection with approving a chapter 7 trustee's selection of a best offer, wrote as follows:

> This Court finds no cogent reason to disagree or interfere with the Trustee's judgment. The Trustee concluded that the Holdings bid was the most advantageous to the estate, basing his decision on a totality of relevant considerations, including the dollar amount offered. The Trustee carefully weighed the competing bids rather than mechanistically recommending the facially higher bid. Not only has the Trustee used reasonable business judgment in selecting the Holdings bid, he convincingly articulated the reasons for recommending the bid of Holdings and supported his reasoning at the subsequent evidentiary hearings. **A bankruptcy trustee is a conservator of the estate and must, to the extent possible, be risk averse. The Trustee declined the temptation of jeopardizing virtually assured benefits by supporting a bid that exposes the estate to a much greater risk of, among other things, a failed closing and the associated chance of being left with a devalued asset.** Accordingly, the Court ratifies the Trustee's recommendation and approves the sale to Holdings.

*Id.* at 532 (emphasis added).

Here, the proposed sale not only reflects the highest and best price received through the marketing efforts of TRBP and its professionals, but also ensures a highly likely and speedy consummation of the transaction, thereby fulfilling the debtor-in-possession's duty to "close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(1). As set forth in the Disclosure Statement, TRBP exists by virtue of and is constrained by the provisions of the Major League Constitution. The general partnership agreement establishing TRBP itself sets forth a specific section entitled "Compliance with Baseball Rules," which

provides that "any sale . . . of any interest in the Partnership, any Partner or the Texas Rangers . . . shall be subject to and made in accordance with the Major League Agreement, the Constitution of the American League, the Major League Rules and any other rules, guidelines, regulations, or requirements of the applicable Baseball Authority." (Disclosure Statement at 16.) No sale of the Texas Rangers franchise can be consummated without first obtaining the requisite approval from the BOC and 75% of the MLB clubs. (Kellie Fischer Decl. ¶ 53.) As of May 24, 2010, the Debtor was not aware of any opposition by the requisite percentage of MLB clubs required to consent to the Sale. (*Id.*) As the Debtor noted in its Disclosure Statement, MLB supports the sale. *See supra* at 16 in the Statement of Facts. The Lender can point to no alternative buyer that MLB has indicated it will approve.

A bidder not approved by Major League Baseball, thus, could not, by its very nature, be the "highest and best" bidder because it would not lead to the consummation of the transaction. As set forth in Ms. Fischer's declaration, TRBP was obligated to determine whether the Purchasers would likely be approved by the BOC and at least 75% of the MLB clubs. (*Id.*)

Simply put, the Lenders' argument is that TRBP must pursue the highest price from a nonexistent bidder notwithstanding the fact that without MLB approval of the purchaser, there is no certainty that the transaction will succeed. The Lenders' argument blatantly disregards the debtor-in-possession's duty to maximize the value of the estate for the benefit of all creditors and equity holders and to do so expeditiously.

## IV. THE LENDERS CANNOT SPEAK FOR TRBP OR ITS EQUITY HOLDERS, NOR CAN THEY PROPOSE AN ALTERNATIVE PLAN OR SALE

### A. The Loan Documents and Formational Agreements Preclude Lenders From Exercising Control Over TRBP, Rangers Equity LP or Rangers Equity GP's Respective Rights to Govern the Texas Rangers or Dispose of the Team's Assets.

As demonstrated above, the Lenders have no rights to take control of either TRBP,

Rangers Equity LP or Rangers Equity GP in the absence of Major League Baseball's approval. Sections 2.4, 2.5, 4.1, 4.2, 4.3, 4.4 and 5.3 of the TRBP Agreement recognize and incorporate the need for MLB approval for any change in control over the Texas Rangers. Likewise, under Sections 10.5 and 10.23 of the Credit Agreement and Section 11 of the HSG Pledge Agreement, the Lenders bound themselves to the restrictions required by MLB. The Lenders cannot prove such approval has or will be given in accordance with Section 11 of the HSG Pledge Agreement. As secured creditors, they simply cannot extricate the property rights held by their obligors from the framework in which they exist. *See In re Ferandos*, 402 F.3d 147 ("It is hornbook law that the debtor can only grant a security interest in whatever rights he has in the collateral."); *see also In re McConnell*, 122 B.R. 41, 45 (Bankr. S.D. Tex. 1989) (a debtor can only convey a security interest on what he has at the time of conveyance).

MLB need not prove that it would never give such consent, or that it would only approve sale of TRBP's assets to Purchaser. Rather, it is the Lenders' burden to prove that they can rightfully exercise control over TRBP and its owners. This is a burden they cannot meet. MLB has not given the Lenders consent to control TRBP or its owners.

### B. Lenders Cannot Force TRBP to Assume and Assign the Major League Constitution to Another Party

Because the sale of TRBP's assets would need to be accompanied by assumption and assignment of executory contracts,[13] including the MLB Constitution, the Lenders cannot propose a transaction that is even remotely feasible. Pursuant to § 365(c)(1), the Debtors cannot

---

[13] An agreement is "executory" if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party. *See In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 n.8 (5th Cir. 1994). Here, the applicable contracts, including the MBL Constitution, are executory contracts because failure by either party to the contract to perform would constitute a material breach that would excuse performance by the other party.

assume and assign the relevant executory contracts, including the MLB Constitution, "if applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . . ." Here, both Delaware and Texas state law expressly condition to the admission of new members or partners in a private and closely held enterprise, such as TRBP, Rangers Equity LP, Rangers Equity GP or MLB, upon the *unanimous* consent of the other members or partners.

Specifically, the Delaware LLC Act codifies the view that, absent a contractual provision to the contrary, members of a Delaware limited liability company need not fear that they will have as fellow members, bankruptcy trustees or assigns of bankruptcy trustees. *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 754 (Del. Ch. 2004). Indeed, the Delaware LLC Act expressly recognizes the unique relationships that exist among members of limited liability companies and protects solvent members from being forced into relationships they did not choose, that result from the bankruptcy of one of their chosen co-investors. *Id.* In this regard, and in examining the interplay between Bankruptcy Code §§ 365(c)(1), 365(e)(1) and the Delaware LLC, the court in *Milford* held that

> [t]hese sections, taken together, bear on this case because they express a federal policy limitation on the Bankruptcy Code's invalidation of *ipso facto* clauses. In essence, § 365(e)(2) and § 365(c)(1) (taken together, the "Assumability Exceptions") are an expression of Congress's recognition that certain types of executory contracts to which debtors are parties (e.g., personal services contracts) should not be assumable by a Bankruptcy Trustee in circumstances when state law would not require the non-debtor parties to accept substitute performance. In the case of an LP or LLC agreement that makes the debtor-partner or member a key part of the entity's management on a going-forward basis, there is . . . a strong argument that these sections preclude a Bankruptcy Trustee from assuming at least those aspects of the contract granting the debtor managerial rights even if the Trustee is

> the debtor in possession- i.e., when the debtor itself is in charge of
> the bankrupt estate.

866 A.2d at 752.  Section 18-702 of the Delaware LLC Act restricts assignability of a limited

liability company agreement.  It provides:

> (a) A limited liability company interest is assignable in whole or in
> part except as provided in a limited liability company agreement.
> The assignee of a member's limited liability company interest shall
> have no right to participate in the management of the business and
> affairs of a limited liability company except as provided in a
> limited liability company agreement and upon:  (1) *The approval
> of all of the members of the limited liability company other than
> the member assigning the limited liability company interest; or  (2)
> Compliance with any procedure provided for in the limited liability
> company agreement.*

(emphasis added).

Similarly, the Section 152.201 of the Texas Business Organizations Code provides that

"[a] person may become a partner *only with the consent of all partners*."  (emphasis added).  In

addition, as with the Delaware LLC Act, the Section 152.402 of the Texas Business Organization

Code also provides that a transfer of partnership interest does not entitle the transferee, "during

the continuance of the partnership, to participate in the management or conduct of the

partnership business."

The United States Court of Appeals for the Fifth Circuit has held that in this context, §

365 prohibits assumption and assignment, absent the non-debtor partner's consent.  *In re

O'Connor*, 258 F.3d 392 (5th Cir. 2001).  In *O'Connor*, the Fifth Circuit held that (1) under §

365(c)(1), a partnership agreement for a Louisiana partnership was not assumable absent the

other partners' consent and (2) the focus "for determining whether the agreement is *not* subject

to assumption under § 365(c)(1) is . . .  'applicable law'" (i.e., Louisiana State law). *Id*. at 402.

In reaching its conclusion that the partnership agreement was not subject to assumption

under § 365(c)(1), the *O'Conner* court reasoned that the agreement was not assumable under 11

U.S.C. § 365(c)(1) because, under the applicable non-bankruptcy (Louisiana) law, the non-debtor

partners had not consented to performance by a third party (in this case the Trustee), and further

stated that "a partner cannot make a third person a member of the partnership *without* his

partners' consent." *Id*. at 402; *see also In re Dews*, 152 B.R. 982 (D. Colo. 1993) (under

Colorado law, purported transfer of partnership interest is executory contract pending consent of

other partners; absent consent, the contract cannot be assumed); *In re Catron*, 158 B.R. 629

(E.D. Va. 1993) (holding that: (1) under Virginia law, debtor's general partnership interest

constituted personal services contract with other partners; (2) partner as debtor in possession was

separate entity from partner as prepetition partner, and thus, requirement of consent of partners

for assumption was applicable; (3) clause in partnership agreement giving partners right to

purchase debtor-partner's interest was not *ipso facto* discrimination against debtor in violation of

Bankruptcy Code; and (4) partners were entitled to relief from stay to purchase debtor's

partnership interests); *In re Manor Place Dev. Assocs., L.P.*, 144 B.R. 679 (Bankr. D.N.J. 1992);

*In re Priestley*, 93 B.R. 253 (Bankr. D.N.M. 1988) (finding New Mexico law prohibits

assignment of partnership interest without consent, and thus contract, was not assumable without

consent.).

It is also well established that Congress imposed the cure and adequate assurance

requirements found in § 365 of the Bankruptcy Code in order to ensure that the contracting

parties receive the full benefit of their bargain if they are forced to continue performance. *See E.

Air Lines, Inc. v. Ins. Co. of State of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999 (2d Cir.

1996); *see also S. Blvd., Inc. v. Martin Paint Stores (In re Martin Paint Stores)*, 207 B.R. 57, 62

n.2 (S.D.N.Y. 1997) (finding cure and adequate assurance requirements were aimed at ensuring

that the parties receive the full benefit of their bargain); *In re Ames Dep't Stores, Inc.*, No. 01-

42217, 2005 WL 1000263, at *6 (Bankr. S.D.N.Y. Apr. 29, 2005) (holding that excising a percentage rent clause would improperly deprive landlord of the benefit of its bargain, whereas, enforcing it would continue the "bargained for status quo"); *In re E-Z Serv. Convenience Stores, Inc.*, 289 B.R. 45, 51 (Bankr. M.D.N.C. 2003) (where the court refused to excise a "right of first refusal" clause, on the grounds that it was clearly a bargained for item in the lease).

Although the United States Court of Appeals for the Third Circuit notes that the terms "adequate assurance" is not defined in the Bankruptcy Code, it is intended to have a practical, pragmatic construction. *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001). However when the party assuming a contract cannot perform a material term of that contract, the Third Circuit has found a lack of adequate assurance, and therefore barred assumption and assignment. *In re Fleming Co.*, 499 F.3d 300, 307 (3d Cir. 2007) (holding that when the contract required supplying goods from a specific warehouse which would no longer be in operation, the inability to comply with a material and economically significant term of the contract failed to provide adequate assurance). In the absence of demonstrating that a proposed transaction will be accompanied by cure of any defaults under the Major League Constitution and adequate assurance of future performance thereunder, no supposed competing bid should be given even hypothetical consideration.

Accordingly, because both applicable state law and the MLB Constitution prohibit the assumption and assignment of the applicable executory contracts, the Lenders are unable to propose at transaction that would be permissible or feasible under the Bankruptcy Code.

## V. THOUGH NOT REQUIRED, THE DISCLOSURE STATEMENT COMPLIES WITH BANKRUPTCY CODE § 1125 AND IS SUFFICIENT FOR PARTIES TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

Because all Classes under the Prepackaged Plan are unimpaired, balloting and solicitation with regard to the Prepackaged Plan are not required under Section 1125 of the Bankruptcy

Code.  The adequacy of the Disclosure Statement is not a question that need be addressed for confirmation of the Prepackaged Plan.  Nonetheless, the Debtor's Disclosure Statement provides adequate information, as required under 11 U.S.C. § 1125(b).  The Bankruptcy Code defines "adequate protection" as that term is used in § 1125(b) to include "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable a hypothetical reasonable investor typical of holders of claims or interest of the relevant class to make an informed judgment about the plan."  11 U.S.C.§ 1125(a)(1); *see In re Cajun Elec. Power Co-op, Inc.*, 150 F.3d 503, 518 (5th Cir. 1998).  In determining whether a disclosure statement provides "adequate information," both the "'kind and form of information are left essentially to the judicial discretion of the court,'" and the "'information required will necessarily be governed by the circumstances of the case.'"  *Id.* (quoting S. Rep. No. 95-989, at 121 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5907).

Courts have held, however, that in order to provide adequate information, a disclosure statement should include the following: (a) the events which led to the filing of the chapter 11; (b) a description of the available assets and their value; (c) the scheduled claims; (d) the estimated return to creditors under a chapter 7 liquidation; and (e) litigation likely to arise in a non-bankruptcy context.  *See Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993).  Here, the  Disclosure Statement provides a detailed description of all of these items, as applicable.  Indeed, the fact that the Lenders have objected to the Plan reinforces the fact that the Disclosure Statement provides sufficient information on which a creditor can make an informed decision with regard to the Plan.  Therefore, the Debtors' Disclosure Statement provided adequate information to satisfy the requirements of 11 U.S.C. § 1125(b).  Moreover, should the Lender's propose that additional language be required to reflect

their positions, and should the Debtor agree to a "qualified inclusion" to note that the Debtor does not agree with the position taken by the Lenders, and that it reflects only their position, the Court could approve the Disclosure Statement as so modified.

## CONCLUSION

Delaying confirmation of the Prepackaged Plan would reduce distributions to equity holders of TRBP because post-petition borrowings would of necessity increase. Undermining the closing of the Sale in order to entertain a speculative opportunity to explore hypothetical competing bids, notwithstanding the prior exercise of TRBP's business judgment, would raise a material risk of reducing the value produced by a transfer of TRBP's assets. There is no cause present to end the Debtor's rights of exclusivity under Section 1121, and the Lenders' attempts to circumvent the process contemplated by the Bankruptcy Code should not be rewarded.

June 11, 2010

Respectfully submitted,

**BARLOW GARSEK & SIMON, LLP**

By:  /s/ Robert A. Simon
      Henry W. Simon, Jr.
      Texas Bar No. 18394000
      Robert A. Simon
      Texas Bar No. 18390000

3815 Lisbon Street
Fort Worth, Texas 76107
Telephone: (817) 731-4500
Facsimile: (817) 731-6200

Michael J. Small
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60610
Telephone: (312) 832-5832
Facsimile: (312) 832-4700

Mary Kay Braza

FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
Telephone: (414) 297-5505
Facsimile:  (414) 297-4900
Attorneys for Rangers Baseball Express, LLC

**CERTIFICATE OF SERVICE**

On this 11th day of June, 2010, I hereby certify that a true and correct copy of the foregoing Brief of Interested Party Rangers Baseball Express was served upon all ECF filers in this case and upon the parties in interest listed on the Debtor's Creditor Matrix by electronic mail (not the ECF service.

/s/ Robert A. Simon
Robert A. Simon