Exhibit "B"

# AMENDED AND RESTATED
# FIRST LIEN CREDIT AND GUARANTY AGREEMENT

dated as of December 19, 2006

among

**HICKS SPORTS GROUP LLC,**

**HICKS SPORTS GROUP HOLDINGS LLC,**

**CERTAIN SUBSIDIARIES OF HICKS SPORTS GROUP LLC,**
as Guarantors,

**VARIOUS LENDERS,**

**JPMORGAN SECURITIES INC.,**
as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent,

**BARCLAYS CAPITAL INC.,**
as Joint Lead Arranger and Joint Bookrunner,

**BARCLAYS BANK PLC,**
as Co-Syndication Agent,

and

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent and Collateral Agent,

---

**$425,000,000 Senior Secured First Lien Credit Facilities**

---

# TABLE OF CONTENTS

**Page**

SECTION 1. DEFINITIONS AND INTERPRETATION .............................................. 2
    1.1. Definitions................................................................................................2
    1.2. Accounting Terms....................................................................................31
    1.3. Interpretation, etc. ...................................................................................32

SECTION 2. LOANS AND LETTERS OF CREDIT ............................................... 32
    2.1. Term Loans..............................................................................................32
    2.2. Revolving Loans......................................................................................33
    2.3. [Reserved.]..............................................................................................34
    2.4. Issuance of Letters of Credit and Purchase of Participations Therein ......34
    2.5. Pro Rata Shares; Availability of Funds....................................................37
    2.6. Use of Proceeds.......................................................................................38
    2.7. Evidence of Debt; Register; Lenders' Books and Records; Notes. ...........38
    2.8. Interest on Loans......................................................................................39
    2.9. Conversion/Continuation ........................................................................41
    2.10. Default Interest......................................................................................42
    2.11. Fees .......................................................................................................42
    2.12. Scheduled Payments .............................................................................43
    2.13. Voluntary Prepayments/Commitment Reductions ..................................43
    2.14. Mandatory Prepayments/Commitment Reductions .................................45
    2.15. Application of Prepayments/Reductions.................................................46
    2.16. General Provisions Regarding Payments.................................................47
    2.17. Ratable Sharing......................................................................................48
    2.18. Making or Maintaining Eurodollar Rate Loans ......................................49
    2.19. Increased Costs; Capital Adequacy ........................................................50
    2.20. Taxes; Withholding, etc. ........................................................................52
    2.21. Obligation to Mitigate............................................................................54
    2.22. Defaulting Lenders................................................................................55
    2.23. Removal or Replacement of a Lender .....................................................55

SECTION 3. CONDITIONS PRECEDENT ............................................................ 56
    3.1. Amendment and Restatement Effective Date............................................56
    3.2. Conditions to Each Credit Extension.......................................................60

SECTION 4. REPRESENTATIONS AND WARRANTIES...................................... 61
    4.1. Organization; Requisite Power and Authority; Qualification....................61
    4.2. Capital Stock and Ownership...................................................................61
    4.3. Due Authorization...................................................................................62
    4.4. No Conflict..............................................................................................62
    4.5. Governmental Consents ..........................................................................62
    4.6. Binding Obligation..................................................................................62
    4.7. Historical Financial Statements ...............................................................62
    4.8. Projections...............................................................................................63
    4.9. No Material Adverse Change....................................................................63

NY\1212304.11

4.10. Adverse Proceedings, etc. ........................................................................63
4.11. Payment of Taxes...................................................................................63
4.12. Properties .............................................................................................64
4.13. Environmental Matters...........................................................................64
4.14. No Defaults ..........................................................................................65
4.15. Governmental Regulation ......................................................................65
4.16. Margin Stock.........................................................................................65
4.17. Employee Matters .................................................................................65
4.18. Labor Matters .......................................................................................66
4.19. Employee Benefit Plans .........................................................................66
4.20. Certain Fees .........................................................................................67
4.21. Solvency...............................................................................................67
4.22. Compliance with Statutes, etc. ..............................................................67
4.23. Disclosure ............................................................................................67
4.24. Patriot Act ............................................................................................68

SECTION 5. AFFIRMATIVE COVENANTS.............................................................. 68
5.1. Financial Statements and Other Reports....................................................68
5.2. Existence................................................................................................72
5.3. Payment of Taxes and Claims..................................................................72
5.4. Maintenance of Properties .......................................................................72
5.5. Insurance................................................................................................72
5.6. Inspections .............................................................................................73
5.7. Lenders Meetings.....................................................................................73
5.8. Compliance with Laws .............................................................................73
5.9. Environmental.........................................................................................73
5.10. Subsidiaries...........................................................................................75
5.11. Additional Material Real Estate Assets ....................................................75
5.12. Interest Rate Protection.........................................................................75
5.13. Further Assurances................................................................................75
5.14. Non-Consolidation..................................................................................76
5.15. Interest Reserve Account ........................................................................76
5.16. Team Proceeds Accounts ........................................................................76
5.17. Post-Closing Covenant............................................................................76

SECTION 6. NEGATIVE COVENANTS ....................................................................76
6.1. Indebtedness...........................................................................................77
6.2. Liens......................................................................................................78
6.3. Equitable Lien .........................................................................................80
6.4. No Further Negative Pledges ...................................................................80
6.5. Restricted Junior Payments......................................................................81
6.6. Restrictions on Subsidiary Distributions ...................................................81
6.7. Investments ............................................................................................82
6.8. Financial Covenants.................................................................................83
6.9. Fundamental Changes; Disposition of Assets; Acquisitions ........................84
6.10. Disposal of Subsidiary Interests...............................................................85
6.11. Sales and Lease-Backs............................................................................86

NY\1212304.11

6.12. Transactions with Shareholders and Affiliates. ..........................................86
6.13. Conduct of Business ..........................................................................86
6.14. Permitted Activities of Holdings ............................................................86
6.15. Amendments or Waivers of the Second Lien Credit Agreement ............................87
6.16. [Reserved.] ....................................................................................87
6.17. Fiscal Year ....................................................................................87

SECTION 7. GUARANTY ....................................................................................87
7.1. Guaranty of the Obligations.....................................................................87
7.2. Contribution by Guarantors .....................................................................87
7.3. Payment by Guarantors...........................................................................88
7.4. Liability of Guarantors Absolute ...............................................................89
7.5. Waivers by Guarantors ..........................................................................90
7.6. Guarantors' Rights of Subrogation, Contribution, etc. .........................................91
7.7. Subordination of Other Obligations..............................................................92
7.8. Continuing Guaranty.............................................................................92
7.9. Authority of Guarantors or Company .............................................................92
7.10. Financial Condition of Company.................................................................92
7.11. Bankruptcy, etc. ..............................................................................93
7.12. Discharge of Guaranty Upon Sale of Guarantor ..................................................93

SECTION 8. EVENTS OF DEFAULT ...........................................................................93
8.1. Events of Default ..............................................................................93

SECTION 9. AGENTS ......................................................................................97
9.1. Appointment of Agents...........................................................................97
9.2. Powers and Duties...............................................................................97
9.3. General Immunity ...............................................................................98
9.4. Agents Entitled to Act as Lender ...............................................................99
9.5. Lenders' Representations, Warranties and Acknowledgment.........................................99
9.6. Right to Indemnity .............................................................................100
9.7. Successor Administrative Agent and Collateral Agent ............................................101
9.8. Collateral Documents and Guaranty ..............................................................101

SECTION 10. MISCELLANEOUS ..............................................................................102
10.1. Notices .......................................................................................102
10.2. Expenses ......................................................................................103
10.3. Indemnity .....................................................................................104
10.4. Set-Off........................................................................................104
10.5. Amendments and Waivers ........................................................................105
10.6. Successors and Assigns; Participations ........................................................107
10.7. Independence of Covenants .....................................................................110
10.8. Survival of Representations, Warranties and Agreements ........................................111
10.9. No Waiver; Remedies Cumulative ................................................................111
10.10. Marshalling; Payments Set Aside ..............................................................111
10.11. Severability .................................................................................111
10.12. Obligations Several; Independent Nature of Lenders' Rights ...................................111

10.13. Headings ............................................................................................................112
10.14. APPLICABLE LAW ........................................................................................112
10.15. CONSENT TO JURISDICTION .....................................................................112
10.16. WAIVER OF JURY TRIAL .............................................................................112
10.17. Confidentiality ..................................................................................................113
10.18. Usury Savings Clause .......................................................................................114
10.19. Counterparts .....................................................................................................114
10.20. Effectiveness ....................................................................................................114
10.21. Patriot Act ........................................................................................................114
10.22. Electronic Execution of Assignments ...............................................................114
10.23. Major League Baseball Requirements ..............................................................115
10.24. Acknowledgment ..............................................................................................115
10.25. Reaffirmation and Grant of Security Interest....................................................116

**APPENDICES:**

| A-1 | Additional Term Loan Commitments |
| A-2 | Revolving Commitments |
| B | Principal Office; Notice Addresses |

**SCHEDULES:**

| 3.1(f) | Mortgaged Properties |
| 4.1 | Jurisdictions of Organization |
| 4.2 | Capital Stock and Ownership |
| 4.12 | Real Estate Assets |
| 4.18 | Labor Matters |
| 6.1 | Certain Indebtedness |
| 6.2 | Certain Liens |
| 6.6 | Certain Restrictions on Subsidiary Distributions |
| 6.7 | Certain Investments |
| 6.12 | Certain Affiliate Transactions |

**EXHIBITS:**

| A-1 | Funding Notice |
| A-2 | Conversion/Continuation Notice |
| A-3 | Issuance Notice |
| B-1 | Term Loan Note |
| B-2 | Revolving Loan Note |
| C | Compliance Certificate |
| D | Opinions of Counsel |
| E | Assignment Agreement |
| F | Certificate Re Non-bank Status |
| G | Closing Date Certificate |
| H | Counterpart Agreement |
| I | Amended and Restated First Lien Pledge and Security Agreement |
| J | Mortgage |
| K | NHL Consent Letter |
| L | Intercreditor Agreement |
| M | The Bank of New York Form of Acknowledgment |

NY\1212304.11

# AMENDED AND RESTATED
## FIRST LIEN CREDIT AND GUARANTY AGREEMENT

This **AMENDED AND RESTATED FIRST LIEN CREDIT AND GUARANTY AGREEMENT**, dated as of December 19, 2006, is entered into by and among **HICKS SPORTS GROUP LLC**, a Texas limited liability company (formerly known as Southwest Sports Group LLC) (**"Company"**), **HICKS SPORTS GROUP HOLDINGS LLC**, a Texas limited liability company (formerly known as Southwest Sports Group Holdings LLC) (**"Holdings"**), **CERTAIN SUBSIDIARIES OF COMPANY**, as Guarantors, the Lenders party hereto from time to time, **JPMORGAN SECURITIES INC. ("JPMorgan")**, as Joint Lead Arranger, Joint Bookrunner, and Co-Syndication Agent, **BARCLAYS CAPITAL INC.**, as Joint Lead Arranger and Joint Bookrunner, (**"BarCap"**, and together with JPMorgan, the **"Arrangers"**), **BARCLAYS BANK PLC ("Barclays")**, as Co-Syndication Agent, and **JPMORGAN CHASE BANK, N.A. ("JPMCB")** as administrative agent (together with its permitted successor in such capacity, the **"Administrative Agent"**) and collateral agent (together with its permitted successor in such capacity, the **"Collateral Agent"**).

## RECITALS:

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS,** Lenders have extended certain credit facilities to Company on December 22, 2005, in an aggregate amount not to exceed $325,000,000 consisting of (i) $285,000,000 aggregate principal amount of term loans, and (ii) up to $40,000,000 aggregate principal amount of revolving commitments, the proceeds of which were used (i) to refinance Existing Indebtedness (as defined in the Existing Credit Agreement) of Company and its Subsidiaries; (ii) to refinance the Amended and Restated Credit Agreement dated as of September 13, 2004 among Holdings, the lenders party thereto and JPMCB, as administrative agent and collateral agent; (iii) to refinance a portion of the Subordinated Notes; (iv) to pre-fund the Interest Reserve; (v) to pay transaction costs, fees and expenses in connection with the December 22, 2005 financing; and (vi) for working capital and general corporate purposes of Company and its Subsidiaries.

**WHEREAS,** Lenders have extended certain additional credit facilities to Company on June 30, 2006, pursuant to the First Amendment, in an aggregate amount not to exceed $75,000,000 consisting of (i) $40,000,000 aggregate principal amount of term loans, and (ii) up to $35,000,000 aggregate principal amount of revolving commitments, the proceeds of which were used (i) to fund the additional amount required to be deposited in the Interest Reserve; (ii) to pay transaction costs, fees and expenses in connection with the First Amendment; and (iii) for working capital and general corporate purposes of Company and its Subsidiaries.

**WHEREAS,** Lenders have agreed to extend Additional Term Loans to Company on the Amendment and Restatement Effective Date pursuant to this Agreement in an aggregate principal amount of $25,000,000, the proceeds of which will be used (i) to fund the partial redemption of the Fox Preferred Stock; (ii) to fund the partial repayment of the existing Subordinated Notes; (iii) to fund the additional amount required to be deposited in the Interest

Reserve; (iv) to pay transaction costs, fees and expenses in connection with this Agreement; and (v) for working capital and general corporate purposes of Company and its Subsidiaries.

**WHEREAS,** Company has agreed to secure (and continue to secure) all of its Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of its assets, including a pledge of all of the Capital Stock of each of its Domestic Subsidiaries and 65% of all the Capital Stock of each of its Foreign Subsidiaries; and

**WHEREAS,** Guarantors have agreed to guarantee (and continue to guarantee) the obligations of Company hereunder and to secure (and continue to secure) their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a First Priority Lien on substantially all of their respective assets, including a pledge of all of the Capital Stock of each of their respective Domestic Subsidiaries (including Company) and 65% of all the Capital Stock of each of their respective Foreign Subsidiaries.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS AND INTERPRETATION

**1.1. Definitions.** The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Act**" as defined in Section 10.21.

"**Additional Term Loan**" means the Loans made by the Lenders to Company pursuant to Section 2.1(a).

"**Additional Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund an Additional Term Loan and "**Additional Term Loan Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Additional Term Loan Commitment, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Additional Term Loan Commitments as of the Amendment and Restatement Effective Date is $25,000,000.

"**Adjusted Eurodollar Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (and rounding upward to the next whole multiple of 1/16 of 1%) (i) (a) the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate which appears on the page of the Telerate Screen which displays an average British Bankers Association Interest Settlement Rate (such page currently being page number 3740 or 3750, as applicable) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (b) in the event the rate referenced in the preceding clause (a) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum (rounded to the nearest 1/100 of 1%) equal

to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the offered quotation rate to first class banks in the London interbank market by Administrative Agent for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan of Administrative Agent, in its capacity as a Lender, for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (a) one minus (b) the Applicable Reserve Requirement.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened against Holdings or any of its Subsidiaries or any property of Holdings or any of its Subsidiaries.

"**Affected Lender**" as defined in Section 2.18(b).

"**Affected Loans**" as defined in Section 2.18(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 5% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agent**" means each of the Administrative Agent, Co-Syndication Agents and Collateral Agent.

"**Aggregate Amounts Due**" as defined in Section 2.17.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

**"Amendment and Restatement Effective Date"** means the date on which the Additional Term Loans are made.

**"Applicable Margin"** means (i) with respect to Term Loans and Revolving Loans that are Eurodollar Rate Loans an amount equal to 2.5% per annum, and (ii) with respect to Term Loans and Revolving Loans that are Base Rate Loans, an amount equal to 1.5% per annum.

**"Applicable Reserve Requirement"** means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including, without limitation, any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors of the Federal Reserve System or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans. A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

**"Applicable Revolving Commitment Fee Percentage"** means 0.50% per annum.

**"Arrangers"** as defined in the preamble hereto.

**"Asset Sale"** means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person, in one transaction or a series of transactions, of all or any part of Company's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including, without limitation, the Capital Stock of any of Company's Subsidiaries.

**"Assignment Agreement"** means an Assignment and Assumption Agreement substantially in the form of Exhibit E, with such amendments or modifications as may be approved by Administrative Agent.

**"Assignment Effective Date"** as defined in Section 10.6(b).

**"Authorized Officer"** means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

4

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**BarCap**" as defined in the preamble hereto.

"**Barclays**" as defined in the preamble hereto.

"**Baseball Expos Disposition**" means any sale, transfer or other disposition, whether pursuant to a single transaction or a series of related transactions, of the Capital Stock in, or all or substantially all of the assets or properties of, Baseball Expos L.P., a Delaware limited partnership, or Baseball Expos GP, Inc., a Delaware corporation.

"**Base Rate**" means, for any day, a rate per annum equal to the greater of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Beneficiary**" means each Agent, Issuing Bank, Lender and Lender Counterparty.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "**Business Day**" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

NY\1212304.11

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"**Center Operating Company**" means Center Operating Company, L.P., a Texas limited partnership.

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit F.

"**Change of Control**" means, at any time, (i) Hicks shall cease to beneficially own and control at least 51% on a fully diluted basis of the voting interests and 35% of the economic interests in the Capital Stock of Holdings; (ii) Holdings shall cease to beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of Company; or (iii) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Company cease to be occupied by Persons who either (a) were members of the board of directors of Company on the Amendment and Restatement Effective Date or (b) were nominated for election by the board of directors of Company, a majority of whom were directors on the Amendment and Restatement Effective Date or whose election or nomination for election was previously approved by a majority of such directors.

"**Class**" means (i) with respect to Lenders, each of the following classes of Lenders: (a) Lenders having Term Loan Exposure and (b) Lenders having Revolving Exposure, and (ii) with respect to Loans, each of the following classes of Loans: (a) Term Loans and (b) Revolving Loans.

"**Closing Date**" means December 22, 2005.

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit G.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Capital Stock) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the Pledge and Security Agreement, the Intercreditor Agreement, the Mortgages, and all other instruments, documents and agreements delivered by Holdings or any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of Holdings or that Credit Party as security for the Obligations.

"**Commitment**" means any Revolving Commitment or Additional Term Loan Commitment.

"**Company**" as defined in the preamble hereto.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Consolidated Adjusted EBITDA**" means, for any period, an amount determined for Company and its Subsidiaries on a consolidated basis equal to (i) the sum, without duplication, of the amounts for such period of (a) Consolidated Net Income, (b) Consolidated Interest Expense, (c) provisions for taxes based on income, (d) total depreciation expense, (e) total amortization expense, (f) cash dividends or distributions received in respect of equity investments in Center Operating Company, (g) cash proceeds received in respect of the Baseball Expos Disposition, (h) cash dividends or distributions received in respect of equity investments in MLB Advanced Media or proceeds from the MLB Advanced Media Disposition, (i) non-recurring, upfront cash payments received from concessionaire(s), (j) cash receipts in the ordinary course of the operations of the business and not otherwise included in the calculation of Consolidated Net Income and (k) other non-Cash items reducing Consolidated Net Income (excluding any such non-Cash item to the extent that it represents an accrual or reserve for potential Cash items in any future period or amortization of a prepaid Cash item that was paid in a prior period), minus (ii) (a) other non-Cash items increasing Consolidated Net Income for such period (excluding any such non-Cash item to the extent it represents the reversal of an accrual or reserve for potential Cash item in any prior period, but including any such non-Cash items to the extent recognized as a cash payment or cash receipt pursuant to clauses (i)(i) or (i)(j), respectively, in a prior period), (b) Consolidated Capital Expenditures, (c) cash expenses in respect of signing bonuses to Players and paid to the New York Yankees in connection with the trade of Alex Rodriguez, (d) cash paid as deferred compensation to Players, (e) cash withheld by MLB or the NHL from distributions to clubs to the extent included in Consolidated Net Income, (f) expenses under Capital Leases, including the implied principal component thereof and (g) cash payments made in connection with non-cash accruals to the extent included in Consolidated Net Income in a prior period.

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of Company and its Subsidiaries during such period determined on a

consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the consolidated statement of cash flows of Company and its Subsidiaries.

"**Consolidated Cash Interest Expense**" means, for any period, Consolidated Interest Expense for such period, excluding any amount not payable in Cash.

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of Company and its Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding Cash and Cash Equivalents.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of Company and its Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of long term debt.

"**Consolidated Excess Cash Flow**" means, for any period, an amount (if positive) equal to: (i) the sum, without duplication, of the amounts for such period of (a) Consolidated Adjusted EBITDA, plus (b) the Consolidated Working Capital Adjustment, minus (ii) the sum, without duplication, of the amounts for such period of (a) Consolidated Cash Interest Expense, (b) provisions for current taxes based on income of Holdings and its Subsidiaries and payable in cash with respect to such period, (c) expenses in connection with payments made by the Rodeo Entities with respect to the industrial revenue bonding financing existing on the Closing Date, (d) cash amortization, including in respect of the MLB Facility and the Plano Loan, (e) cash dividends or distributions received in respect of equity investments in MLB Advanced Media or proceeds from the MLB Advanced Media Disposition, (f) cash dividends or distributions received in respect of equity investments in Center Operating Company, (g) cash proceeds received in respect of the Baseball Expos Disposition, (h) non-recurring, upfront cash payments received from concessionaire(s) and (i) Restricted Junior Payments made by the Credit Parties pursuant to Section 6.5(b), (c) or (d).

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Company and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of Company and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any amounts referred to in Section 2.11(d) payable on or before the Amendment and Restatement Effective Date.

"**Consolidated Net Income**" means, for any period, (i) the net income (or loss) of Company and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus (ii) (a) the income (or loss) of any Person (other than a Subsidiary of Company) in which any other Person (other than Company or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to Company or any of its Subsidiaries by such Person during such period, (b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Company or is merged into or consolidated with Company or any of its

Subsidiaries or that Person's assets are acquired by Company or any of its Subsidiaries, (c) the income of any Subsidiary of Company to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (d) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan, and (e) (to the extent not included in clauses (a) through (d) above) any net extraordinary gains or net extraordinary losses.

"**Consolidated Total Debt**" means, as at any date of determination, (without duplication) the aggregate of (i) Indebtedness for borrowed money of Company and its Subsidiaries (excluding Indebtedness under Section 6.1(b)) and (ii) Indebtedness pursuant to the Rangers MLB Facility.

"**Consolidated Working Capital**" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities.

"**Consolidated Working Capital Adjustment**" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit H delivered by a Credit Party pursuant to Section 5.10.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, any documents or certificates executed by Company in favor of Issuing Bank relating to Letters of Credit, and all other documents, instruments or agreements executed and delivered by Holdings or a Credit Party for the benefit of any Agent, Issuing Bank or any Lender in connection herewith.

"**Credit Extension**" means the making of a Loan or the issuing of a Letter of Credit.

"**Credit Party**" means Company and the Guarantor Subsidiaries.

"**Currency Agreement**" means, with respect to any Person, any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (other than such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all Loans of such Defaulting Lender.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable, (ii) the date on which (a) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of Section 2.13 or Section 2.14 or by a combination thereof) and (b) such Defaulting Lender shall have delivered to Company and Administrative Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its Commitments, and (iii) the date on which Company, Administrative Agent and Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing.

"**Defaulted Loan**" as defined in Section 2.22.

"**Defaulting Lender**" as defined in Section 2.22.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Dollars**" and the sign "$" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Eligible Assignee**" means (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities

Act) and which extends credit or buys loans as one of its businesses; provided, no Affiliate of Holdings shall be an Eligible Assignee.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or, within the five (5) plan years preceding the date of this Agreement, was sponsored, maintained or contributed to by, or required to be contributed by, Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to the preservation or protection of the environment, natural resources or human health and safety (as it relates to environmental protection) or the regulation of Hazardous Materials Activity.

"**Equity Cure Issuance**" as defined in the definition of Equity Cure Proceeds.

"**Equity Cure Proceeds**" means, with respect to any exercise of Company's rights under Section 8.1, the net cash proceeds received by the Company pursuant to a capital contribution to its common equity from Holdings, which capital contribution shall be funded by the substantially concurrent sale or issuance by Holdings of its Capital Stock to any current equity investor or its Affiliates (and any other Person investing with a current equity investor) or the substantially concurrent issuance of Indebtedness of Holdings to the extent permitted by Section 6.14 (an "**Equity Cure Issuance**"), net of, for the avoidance of doubt, all taxes and reasonable and customary fees, commissions, costs and other expenses incurred by Company and the Subsidiaries in connection therewith.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Holdings or any of its Subsidiaries shall continue to be considered an ERISA

11

Affiliate of Holdings or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Holdings or such Subsidiary and with respect to liabilities arising after such period for which Holdings or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Holdings, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

NY\1212304.11

**"Event of Default"** means each of the conditions or events set forth in Section 8.1.

**"Exchange Act"** means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

**"Existing Credit Agreement"** means the Credit Agreement, dated as of December 22, 2005, among Southwest Sports Group LLC, as borrower, the guarantors party thereto from time to time, lenders party thereto from time to time, Goldman Sachs Credit Partners L.P., as joint lead arranger, joint bookrunner, co-administrative agent and collateral agent, JPMCB, as co-administrative agent, JPMorgan, as joint lead arranger and joint bookrunner, and CIT Lending Services Corporation, Galatioto Sports Partners LLC, West LB, AG New York Branch and Wachovia Bank, National Association, as documentation agents, as amended by the First Amendment.

**"Existing Revolving Loans"** means revolving loans made by the Lenders to Company pursuant to the Existing Credit Agreement.

**"Existing Revolving Commitment"** means the commitment of a Lender to make or otherwise fund an Existing Revolving Loan and **"Existing Revolving Commitments"** means such commitments of all Lenders in the aggregate. The amount of each Lender's Existing Revolving Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Existing Revolving Commitments as of the First Amendment Effective Date is $75,000,000.

**"Existing Term Loan"** means the term loans made by the Lenders to Company pursuant to the Existing Credit Agreement. The aggregate amount of the Existing Term Loans as of the First Amendment Effective Date is $325,000,000.

**"Facility"** means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Holdings or any of its Subsidiaries or any of their respective predecessors or Affiliates.

**"Fair Share"** as defined in Section 7.2.

**"Fair Share Contribution Amount"** as defined in Section 7.2.

**"Federal Funds Effective Rate"** means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by Administrative Agent.

13

"**Financial Covenant Grace Period**" as defined in Section 6.8(e).

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer, the executive vice president or the vice president of finance of Company that such financial statements fairly present, in all material respects, the financial condition of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Financial Plan**" as defined in Section 5.1(i).

"**First Amendment**" means that certain First Amendment to Credit and Guaranty Agreement dated as of June 30, 2006 among Company, the Arrangers, the guarantors party thereto and the lenders listed on the signature pages thereto.

"**First Amendment Effective Date**" means June 30, 2006.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Holdings and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a Mortgage and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Fox Preferred Stock**" means the Capital Stock issued under the Series B Preferred Unit Agreement.

"**Funding Default**" as defined in Section 2.22.

"**Funding Guarantors**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Grantor**" as defined in the Pledge and Security Agreement.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each of Holdings and each Domestic Subsidiary of Holdings (other than Company, the Rodeo Entities, Rangers Club Trust, StarCenter and any Immaterial Subsidiary).

"**Guarantor Subsidiary**" means each Guarantor other than Holdings.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any chemical, material or substance that are: (i) regulated, characterized or classified as hazardous, toxic, a pollutant or a contaminant under Environmental Laws or (ii) the exposure to which or Release of which could reasonably be expected to give rise to liability under Environmental Laws.

"**Hazardous Materials Activity**" means any activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hedge Agreement**" means an Interest Rate Agreement or a Currency Agreement entered into with a Lender Counterparty in connection (including in connection with Section 6.7(p)) with or to satisfy the requirements of this Agreement.

"**Hicks**" means Thomas O. Hicks, an individual residing in the state of Texas.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Amendment and Restatement Effective Date, (i) the audited financial statements of Holdings and its Subsidiaries, for the

immediately preceding three calendar years, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, and (ii) the unaudited financial statements of Holdings and its Subsidiaries as at the most recently ended calendar quarter, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three-, six-or nine-month period, as applicable, ending on such date, and, in the case of clauses (i) and (ii), certified by the chief financial officer of Holdings that they fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Holdings**" as defined in the preamble hereto.

"**Immaterial Subsidiary**" means any Subsidiary of Company that accounts for less than 2% of assets or annual revenue; provided that such Immaterial Subsidiaries shall not exceed 10% of assets or annual revenue in the aggregate.

"**Increased-Cost Lenders**" as defined in Section 2.23.

"**Indebtedness**", as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA), which purchase price is (a) due more than six months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vi) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (vii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (viii) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (ix) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (ix), the primary purpose or intent thereof is as described in clause (viii) above; and (x) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including, without limitation, any Interest Rate Agreement and Currency Agreement, whether entered into for hedging or speculative purposes; provided, in no event shall obligations under any Interest

Rate Agreement and any Currency Agreement be deemed "Indebtedness" for any purpose under Section 6.8.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), reasonable out-of-pocket costs (including the reasonable out-of-pocket costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), reasonable expenses and disbursements of any kind or nature whatsoever (including the reasonable out-of-pocket fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any reasonable out-of-pocket fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the statements contained in the commitment letter delivered by any Lender to Company with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries.

"**Indemnitee**" as defined in Section 10.3.

"**Intercreditor Agreement**" means the Intercreditor Agreement substantially in the form of Exhibit L, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Interest Payment Date**" means with respect to (i) any Revolving Loan that is a Base Rate Loan, each March 31, June 30, September 30 and December 31 of each year, commencing on the first such date to occur after the Closing Date and the final maturity date of such Loan; (ii) any Revolving Loan that is a Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided, in the case of each Interest Period of longer than three months "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period; and (iii) Term Loans, each April 1, July 1, October 1 and January 1 of each year, commencing on January 1, 2006 through the final maturity date of such Loan.

"**Interest Period**" means, in connection with a Eurodollar Rate Loan, an interest period of one-, two-, three- or six-months and, to the extent agreed by each affected Lender, nine- or twelve-months, as selected by Company in the applicable Funding Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conver-

sion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clauses (c) and (d), of this definition, end on the last Business Day of a calendar month; (c) no Interest Period with respect to any portion of the Term Loans shall extend beyond the Term Loan Maturity Date; and (d) no Interest Period with respect to any portion of the Revolving Loans shall extend beyond the Revolving Commitment Termination Date.

"**Interest Rate Agreement**" means with respect to any Person, any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Company's and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Interest Reserve**" means, for any period of six months, an amount equal to the projected cash-pay interest expense (excluding any interest arising from non-recourse debt) in respect of this Agreement which Company is obligated to pay during such six month period, such amount to be calculated at the beginning of each Fiscal Quarter to take into account reduced or increased interest costs, in a manner reasonably satisfactory to Administrative Agent, and, for the purpose of calculating the Interest Reserve for any period, based upon the Adjusted Eurodollar Rate with respect to a 3 month Interest Period determined on the date that is two Business Days prior to the first day of each six month period, subject to any Hedge Agreement entered into in connection with this Agreement.

"**Interest Reserve Account**" means the account established by Company at an institution selected by and subject to the control of Administrative Agent for the purpose of holding the Interest Reserve.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Company or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than a Guarantor Subsidiary); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Company from any Person (other than Company or any Guarantor Subsidiary), of any Capital Stock of such Person; and (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Company or any of its Subsidiaries to any other Person (other than Company or any Guarantor Subsidiary), including all indebtedness and

18

accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Issuance Notice**" means an Issuance Notice substantially in the form of Exhibit A-3.

"**Issuing Bank**" means JPMCB as Issuing Bank hereunder, together with its permitted successors and assigns in such capacity.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**JPMCB**" as defined in the preamble hereto.

"**JPMorgan**" as defined in the preamble hereto.

"**Labor Event**" means the failure to play (i) at least eight (8) scheduled regular season home games for the Rangers or (ii) at least four (4) scheduled regular season home games of the Stars, in each case as a result of a strike, lock-out or other labor dispute among the Rangers, Stars, MLB, the NHL or any other MLB or NHL franchise, as applicable, by the players or officials.

"**Landlord Consent and Estoppel**" means, with respect to any Leasehold Property, a letter, certificate or other instrument in writing from the lessor under the related lease, pursuant to which, among other things, the landlord consents to the granting of a Mortgage on such Leasehold Property by the Credit Party tenant, such Landlord Consent and Estoppel to be in form and substance reasonably acceptable to Collateral Agent in its reasonable discretion, but in any event sufficient for Collateral Agent to obtain a Title Policy with respect to such Mortgage.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"**Lender Counterparty**" means each Lender or any Affiliate of a Lender counterparty to a Hedge Agreement (including any Person who is a Lender (and any Affiliate thereof) as of the Closing Date but subsequently, whether before or after entering into a Hedge Agreement, ceases to be a Lender) including, without limitation, each such Affiliate that enters into a joinder agreement with Collateral Agent.

"**Letter of Credit**" means a commercial or standby letter of credit issued or to be issued by Issuing Bank pursuant to this Agreement.

"**Letter of Credit Sublimit**" means the lesser of (i) $5,000,000 and (ii) the aggregate unused amount of the Revolving Commitments then in effect.

"**Letter of Credit Usage**" means, as at any date of determination, the sum of (i) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Letters of Credit then outstanding, and (ii) the aggregate amount of all drawings under Letters of Credit honored by Issuing Bank and not theretofore reimbursed by or on behalf of Company.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Liquidity**" means the sum of (i) unused amounts in respect of the Revolving Commitment, (ii) unrestricted cash that MLB requires the Rangers to hold to offset deferred compensation; provided Company has the ability to use the same for general corporate purposes, (iii) any other unrestricted cash of Company and its Subsidiaries (including any Equity Cure Proceeds) as long as Company has access to such funds and the ability to use the same for general corporate purposes, and (iv) capital commitments by the equity holders of Holdings, provided that reasonably satisfactory evidence of such commitments is supplied to the Administrative Agent.

"**Loan**" means a Term Loan and a Revolving Loan.

"**Margin Stock**" as defined in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings and its Subsidiaries taken as a whole; (ii) the ability of Holdings or any Credit Party to fully and timely perform its Obligations; (iii) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

"**Material Contract**" means any contract or other arrangement to which Holdings or any of its Subsidiaries is a party (other than the Credit Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Material Real Estate Asset**" means (i) (a) any fee-owned Real Estate Asset having a fair market value in excess of $1,000,000 as of the date of the acquisition thereof and (b) all Leasehold Properties other than those with respect to which the aggregate payments under the term of the lease are less than $1,000,000 per annum or (ii) any Real Estate Asset that the Requisite Lenders have determined is material to the business and operations of Holdings or any Subsidiary thereof, including Company.

"**MLB**" means the Office of the Commissioner of Baseball, the American League of Professional Baseball Clubs (to the extent of any continuing applicability), the National League of Professional Baseball Clubs (to the extent of any continuing applicability), the individual Major League clubs, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., Major League Baseball Properties Canada, Inc., MLB Advanced Media, L.P., MLB Advanced Media, Inc., MLB Media Holdings, L.P., MLB Media Holdings, Inc., MLB Online Services, Inc. and any other entity owned equally by the Major League Baseball Clubs, directly or indirectly.

"**MLB Advanced Media**" means MLB Advanced Media, L.P., a Delaware limited partnership.

"**MLB Advanced Media Disposition**" means any sale, transfer or other disposition, whether pursuant to a single transaction or a series of related transactions, of the Capital Stock in, or all or substantially all of the assets or properties of, MLB Advanced Media.

"**MLB Documents**" as defined in Section 10.23.

"**MLB Facility**" means the Second Amended and Restated Club Trust Revolving Credit Agreement dated as of December 16, 2003, as amended, among Major League Baseball Trust, Fleet National Bank, as facilitating agent and the club trusts deemed to be parties thereto.

"**MLB Rules**" means the Major League Constitution, the Major League Rules and all agreements, rules, guidelines, regulations, policies or requirements of MLB or any other Person with authority to bind any MLB member in connection with any of the foregoing, all as the same may now exist or may be amended or adopted in the future.

"**Moody's**" means Moody's Investor Services, Inc.

"**Mortgage**" means each of the Amended and Restated Mortgages substantially in the form of Exhibit J, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Mortgaged Property**" as defined in Section 3.1(f)(i).

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the general overview and material occurrences of Company and its Subsidiaries for the applicable Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate.

21

**"Net Asset Sale Proceeds"** means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Company or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnitee and representations and warranties to purchaser in respect of such Asset Sale undertaken by Company or any of its Subsidiaries in connection with such Asset Sale.

**"Net Insurance/Condemnation Proceeds"** means an amount equal to: (i) any Cash payments or proceeds received by Company or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder (excluding proceeds of business interruption insurance or disability insurance) or (b) as a result of the taking of any assets of Company or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Company or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Company or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes payable as a result of any gain recognized in connection therewith.

**"NHL"** means the National Hockey League, a joint venture organized as a not-for-profit unincorporated association.

**"NHL Consent Letter"** means the letter agreement dated December 19, 2006 by and among the Stars, Company, the NHL, JPMCB and BarCap on behalf of the Lenders, attached hereto as Exhibit K, as amended, amended and restated, supplemented or otherwise modified from time to time.

**"NHL Rules"** means the Constitution and Rules of the NHL and all agreements, rules, guidelines, regulations, policies or requirements of the NHL or any other Person with authority to bind any NHL member in connection with any of the foregoing, all as the same may now exist or may be amended or adopted in the future.

**"Non-Consenting Lender"** as defined in Section 2.23.

**"Nonpublic Information"** means information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

**"Non-US Lender"** as defined in Section 2.20(c).

**"Note"** means a Term Loan Note or a Revolving Loan Note.

**"Notice"** means a Funding Notice, an Issuance Notice, or a Conversion/Continuation Notice.

**"Obligations"** means all obligations of every nature of each Credit Party under the Credit Documents, including obligations from time to time owed to the Agents (including former Agents), the Lenders or any of them and Lender Counterparties, under any Credit Document or Hedge Agreement (including, without limitation, with respect to a Hedge Agreement, obligations owed thereunder to any person who was a Lender or an Affiliate of a Lender at the time such Hedge Agreement was entered into), and cash management obligations with any Lender Counterparty, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under Letters of Credit, payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

**"Obligee Guarantor"** as defined in Section 7.7.

**"Organizational Documents"** means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

**"PBGC"** means the Pension Benefit Guaranty Corporation or any successor thereto.

**"Pension Plan"** means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

**"Permitted Acquisition"** means any acquisition by Company or any of its wholly-owned Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all of the Capital Stock of, or a business line or unit or a division of, any Person; provided,

        (i)     immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

        (ii)     all transactions in connection therewith shall be consummated, in all material respects, in accordance with all applicable laws and in conformity with all applicable Governmental Authorizations;

23

(iii)    in the case of the acquisition of Capital Stock, all of the Capital Stock (except for any such Securities in the nature of directors' qualifying shares required pursuant to applicable law) acquired or otherwise issued by such Person or any newly formed Subsidiary of Company in connection with such acquisition shall be owned 100% by Company or a Guarantor Subsidiary thereof, and Company shall have taken, or caused to be taken, as of the date such Person becomes a Subsidiary of Company, each of the actions set forth in Sections 5.10 and/or 5.11, as applicable;

(iv)    Holdings and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 6.8 on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended (as determined in accordance with Section 6.8 (d));

(v)    Company shall have delivered to the Administrative Agent (A) at least ten (10) Business Days prior to such proposed acquisition, a Compliance Certificate evidencing compliance with Section 6.8 as required under clause (iv) above, together with all relevant financial information with respect to such acquired assets, including, without limitation, the aggregate consideration for such acquisition and any other information required to demonstrate compliance with Section 6.8; and

(vi)    any Person or assets or division as acquired in accordance herewith (y) shall be in same business or lines of business in which Company and/or its Subsidiaries are engaged as of the Closing Date and (z) shall have generated positive cash flow for the four quarter period most recently ended prior to the date of such acquisition.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (d) the terms and conditions (including, if applicable, as to collateral) of any such modified, refinanced, refunded, renewed or extended Indebtedness are not materially less favorable to the Credit Parties or the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended, (e) such modification, refinancing, refunding, renewal or extension is incurred by the Person who is the obligor on the Indebtedness being modified, refinanced, refunded, renewed or extended, (f) the weighted

24

average life to maturity of such modified, refinanced, refunded, renewed or extended Indebtedness shall not be less than that of the Indebtedness being modified, refinanced, refunded, renewed or extended, (g) the average life to maturity thereof is greater than or equal to that of the Indebtedness being modified, refinanced, refunded, renewed or extended, (h) the Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being modified, refinanced, refunded, renewed or extended is not included, and (i) such modification, refinancing, refunding, renewal or extension shall not be incurred, created or assumed if any Default or Event of Default has occurred and is continuing or would result therefrom.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Plano Loan**" means the Plano Ice Arena Facility pursuant to that certain Loan Agreement, dated September 11, 1998, between General Electric Capital Corporation and Plano Ice Arena, LLC (n/k/a Plano StarCenter LLC), as amended, amended and restated, restated or otherwise modified from time to time.

"**Platform**" as defined in Section 5.1(n).

"**Player**" means any professional baseball player employed from time to time by the Rangers or any professional hockey player employed from time to time by the Stars, as applicable.

"**Player Contract**" means any contract now or hereafter arising between any Player and the Rangers or the Stars, as applicable, and any substitutions, amendments, modifications or restatements of the foregoing.

"**Pledge and Security Agreement**" means the Amended and Restated First Lien Pledge and Security Agreement to be executed by Company and each Guarantor substantially in the form of Exhibit I, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Prime Rate**" means the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means, for each of the Administrative Agent and Issuing Bank, such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Company, the Administrative Agent and each Lender.

"**Projections**" as defined in Section 4.8.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Term Loan of any Lender, the percentage obtained by dividing (a) the Term Loan Exposure of that Lender by (b) the aggregate Term Loan Exposure of all Lenders; and (ii) with respect to all payments, computations and other matters relating to the Revolving Commitment or Revolving Loans of any Lender or any Letters of Credit issued or participations purchased therein by any Lender, the percentage obtained by dividing (a) the Revolving Exposure of that Lender by (b) the aggregate Revolving Exposure of all Lenders. For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Term Loan Exposure and the Revolving Exposure of that Lender, by (B) an amount equal to the sum of the aggregate Term Loan Exposure and the aggregate Revolving Exposure of all Lenders.

"**Rangers**" means the Texas Rangers Baseball Partners, a Texas general partnership and indirect wholly-owned Subsidiary of Company.

"**Rangers Club Trust**" means Rangers Club Trust, a Delaware business trust and indirect, non-wholly owned Subsidiary of Company.

"**Rangers Franchise**" means the Major League Baseball club owned and operated by the Rangers to play professional baseball.

"**Rangers MLB Facility**" means the lending facility made available to the Rangers under the terms of the MLB Facility.

"**Rangers MLB Facility Increase**" has the meaning assigned to such term in Section 6.1(r).

"**Rangers Proceeds Account**" means the account established by Company at an institution reasonably acceptable to and subject to the control of the Administrative Agent into which all proceeds of the sale or disposition of the Rangers shall be immediately and directly deposited.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Record Document**" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sublease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to Collateral Agent.

"**Recorded Leasehold Interest**" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in Collateral Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third-party purchasers and encumbrancers of the affected real property.

26

**"Register"** as defined in Section 2.7(b).

**"Regulation D"** means Regulation D of the Board of Governors, as in effect from time to time.

**"Regulation FD"** means Regulation FD as promulgated by the US Securities and Exchange Commission under the Securities Act and Exchange Act as in effect from time to time.

**"Reimbursement Date"** as defined in Section 2.4(d).

**"Related Fund"** means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

**"Release"** means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

**"Replacement Lender"** as defined in Section 2.23.

**"Requisite Class Lenders"** means, at any time of determination, (i) for the Class of Lenders having Term Loan Exposure, Lenders holding more than 50% of the aggregate Term Loan Exposure of all Lenders; and (ii) for the Class of Lenders having Revolving Exposure, Lenders holding more than 50% of the aggregate Revolving Exposure of all Lenders.

**"Requisite Lenders"** means one or more Lenders having or holding Term Loan Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders and the aggregate Revolving Exposure of all Lenders.

**"Restricted Junior Payment"** means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Company or any of its Subsidiaries now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Company or any of its Subsidiaries now or hereafter outstanding; and (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Company or any of its Subsidiaries now or hereafter outstanding.

**"Revolving Commitment"** means the commitment of a Lender to make or otherwise fund any Revolving Loan and to acquire participations in Letters of Credit hereunder and **"Revolving Commitments"** means such commitments of all Lenders in the aggregate. The amount of each Lender's Revolving Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms

27

and conditions hereof. The aggregate amount of Revolving Commitments as of the Amendment and Restatement Effective Date is $75,000,000.

**"Revolving Commitment Period"** means the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

**"Revolving Commitment Termination Date"** means the earliest to occur of (i) December 22, 2010; (ii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.13(b) or 2.14, and (iii) the date of the termination of the Revolving Commitments pursuant to Section 8.1.

**"Revolving Exposure"** means, with respect to any Lender as of any date of determination, (i) prior to the termination of the Revolving Commitments, that Lender's Revolving Commitment; and (ii) after the termination of the Revolving Commitments, the sum of (a) the aggregate outstanding principal amount of the Revolving Loans of that Lender, (b) in the case of Issuing Bank, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender (net of any participations by Lenders in such Letters of Credit) and (c) the aggregate amount of all participations by that Lender in any outstanding Letters of Credit or any unreimbursed drawing under any Letter of Credit.

**"Revolving Loan"** means, collectively (i) the Existing Revolving Loans and (ii) a Loan made by a Lender to Company pursuant to Section 2.2(a).

**"Revolving Loan Note"** means a promissory note in the form of Exhibit B-2, as it may be amended, supplemented or otherwise modified from time to time.

**"Rodeo Disposition"** means any sale, transfer or other disposition, whether pursuant to a single transaction or a series of related transactions, of the Capital Stock of, or all or substantially all of the assets or properties of, the Rodeo Partnership.

**"Rodeo Entity"** means, collectively, Rodeo Partnership and Rodeo Promotions.

**"Rodeo Partnership"** means Southwest Rodeo LP, a Texas limited partnership and indirect wholly-owned subsidiary of Company.

**"Rodeo Promotions"** means Arena Promotions, Inc., a Texas corporation and wholly-owned subsidiary of Company.

**"S&P"** means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation.

**"Second Lien Credit Agreement"** means the Second Lien Credit and Guaranty Agreement, dated as of the Amendment and Restatement Effective Date among the Company, as borrower, the Guarantors, lenders party thereto from time to time, JPMorgan and BarCap as joint lead arrangers and joint bookrunners, JPMorgan and Barclays, as co-syndication agents, and Barclays as administrative agent and collateral agent, as may be amended, amended and restated, replaced, supplemented or modified from time to time.

**"Second Lien Term Loan"** means the senior secured second priority term loan of Company under the Second Lien Credit Agreement.

**"Second Lien Term Loan Indebtedness"** means Indebtedness incurred pursuant to the Second Lien Credit Agreement.

**"Secured Parties"** has the meaning assigned to that term in the Pledge and Security Agreement.

**"Securities"** means any stock, shares, partnership interests, membership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

**"Securities Act"** means the Securities Act of 1933, as amended from time to time, and any successor statute.

**"Series B Preferred Unit Agreement"** means the Series B Preferred Unit Agreement by and between Holdings and Fox Sports Ventures, LLC dated November 30, 1999, as amended as of the date hereof.

**"Settlement Confirmation"** as defined in Section 10.6(b).

**"Settlement Service"** as defined in Section 10.6(d).

**"Solvent"** means, with respect to the Credit Parties, taken as a whole, that as of the date of determination, both (i) (a) the sum of the Credit Parties debt on a consolidated basis (including contingent liabilities) does not exceed the present fair saleable value of such Credit Parties' present assets on a consolidated basis; (b) the Credit Parties' capital is not unreasonably small in relation to their respective businesses as contemplated on the Closing Date and reflected in the Projections or with respect to any transaction contemplated or undertaken after the Closing Date; and (c) the Credit Parties have not incurred and do not intend to incur, or believe (nor should they reasonably believe) that they will incur, debts beyond their collective ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) the Credit Parties are "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

**"StarCenter"** means StarCenter Clubs, Inc., a Texas corporation and indirectly wholly-owned Subsidiary of Company.

"**Stars**" means the Dallas Stars, L.P., a Delaware limited partnership and indirectly wholly-owned Subsidiary of Company.

"**Stars Entity**" shall mean the Stars and each existing and subsequently acquired or organized Subsidiary that is a subsidiary of the Stars.

"**Stars Non-Relocation Agreement**" means that certain Stars Non-Relocation Agreement, dated as of April 23, 1999, by and between the Stars and The Bank of New York, as collateral trustee, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time

"**Stars Proceeds Account**" means the account established by Company at an institution reasonably acceptable to and subject to the control of Administrative Agent into which all proceeds of the sale or disposition of the Stars shall be immediately and directly deposited.

"**Subject Transaction**" as defined in Section 6.8(d).

"**Subordinated Notes**" means (i) the Subordinated Promissory Note dated November 7, 2003 by and between Holdings and Hicks; (ii) the Subordinated Promissory Note dated September 27, 2002 by and between Holdings and Hicks; (iii) the Holdings Convertible Subordinated Note dated May 8, 2002 by and between Holdings and Hicks; (iv) the Subordinated Promissory Note dated September 27, 2002 by and between Holdings and Donald J. Carter; (v) the Subordinated Promissory Note dated November 18, 2002 by and between Holdings and Jack. D. Furst; (vi) the Subordinated Promissory Note dated January 18, 2003 by and between Holdings and John R. Muse; (vii) the Subordinated Promissory Note dated November 7, 2003 by and between Holdings and Donald J. Carter; (viii) the Subordinated Promissory Note dated October 30, 2003 by and between Holdings and Hicks; (ix) the Subordinated Promissory Note dated March 29, 2004 by and between Holdings and Hicks; and (x) the Subordinated Promissory Note dated June 25, 2004 by and between Holdings and Hicks.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Syndication Agent**" as defined in the preamble hereto.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed; provided, "Tax on the overall net income" of a Person shall be construed as a reference to taxes including, without

limitation, any net income (or gross income in lieu of net income) or franchise or similar tax, imposed by the jurisdiction (i) in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its applicable lending office) is located, (ii) in which that Person (and/or, in the case of a Lender, its applicable lending office) is deemed to be doing business on all or part of the net income (or gross income in lieu of net income), profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

"**Team Subsidiaries**" means the Rangers and Stars.

"**Terminated Lender**" as defined in Section 2.23.

"**Term Loan**" means, collectively, an Existing Term Loan and/or Additional Term Loan.

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender; provided, at any time prior to the making of the Additional Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Existing Term Loans and Additional Term Loan Commitment.

"**Term Loan Maturity Date**" means the earlier of (i) December 22, 2010, and (ii) the date that all Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Term Loan Note**" means a promissory note in the form of Exhibit B-1, as it may be amended, supplemented or otherwise modified from time to time.

"**Title Policy**" as defined in Section 3.1(f)(iv).

"**Total Utilization of Revolving Commitments**" means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Revolving Loans (other than Revolving Loans made for the purpose of reimbursing Issuing Bank for any amount drawn under any Letter of Credit, but not yet so applied) and (ii) the Letter of Credit Usage.

"**Type of Loan**" means, with respect to either Term Loans or Revolving Loans, a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

1.2. **Accounting Terms.** Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP, as in effect from time to time. Financial statements and other information required to be delivered by Company to Lenders pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable). Subject to the

31

foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements; provided that, if Company notifies the Administrative Agent that Company wishes to amend any covenant in Section 6.8 or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if the Administrative Agent notifies Company that the Requisite Lenders wish to amend Section 6.8 or any related definition for such purpose), then Company's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until such covenant is amended in a manner satisfactory to Company and the Requisite Lenders.

**1.3. Interpretation, etc.** Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

## SECTION 2. LOANS AND LETTERS OF CREDIT

### 2.1. Term Loans.

(a) <u>Loan Commitments</u>. Subject to the terms and conditions hereof, (i) each Lender, severally and not jointly, agrees to make, on the Amendment and Restatement Effective Date, an Additional Term Loan to Company in an amount equal to such Lender's Additional Term Loan Commitment and (ii) each Lender having an Existing Term Loan shall be deemed to have made such Existing Term Loan hereunder. Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed. Subject to Sections 2.13(a) and 2.14, all amounts owed hereunder with respect to the Term Loans shall be paid in full no later than the Term Loan Maturity Date. Each Lender's Additional Term Loan Commitment shall terminate immediately and without any further action on the funding thereunder on the Amendment and Restatement Effective Date after giving effect to the funding of such Lender's Additional Term Loan Commitment on such date.

(b) <u>Borrowing Mechanics for Term Loans</u>.

(i) Company shall deliver to Administrative Agent a fully executed Funding Notice no later than one day prior to the Amendment and Restatement Effective Date. Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

(ii) Each Lender shall make its Additional Term Loan available to Administrative Agent not later than 12:00 p.m. (New York City time) on the Amendment

and Restatement Effective Date, by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent. Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Additional Term Loans available to Company on the Amendment and Restatement Effective Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the account of Company at the Principal Office designated by Administrative Agent or to such other account as may be designated in writing to Administrative Agent by Company.

### 2.2. Revolving Loans.

(a) <u>Revolving Commitments</u>.   During the Revolving Commitment Period, subject to the terms and conditions hereof, each Lender, severally and not jointly, agrees to make Revolving Loans available to Company in an aggregate amount up to but not exceeding such Lender's Revolving Commitment; <u>provided</u>, that after giving effect to the making of any Revolving Loans in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect.  Amounts borrowed pursuant to this Section 2.2(a) may be repaid and reborrowed during the Revolving Commitment Period; <u>provided</u> that Revolving Loans to Company shall not be available during any Labor Event, until the date the first MLB or NHL game, as applicable, is played or the situation giving rise to such Labor Event is resolved to the satisfaction of the Requisite Lenders.  Each Lender's Revolving Commitment shall expire on the Revolving Commitment Termination Date and all Revolving Loans and all other amounts owed hereunder with respect to the Revolving Loans and the Revolving Commitments shall be paid in full no later than such date.

(b) <u>Borrowing Mechanics for Revolving Loans</u>.

(i)  Except pursuant to 2.4(d), Revolving Loans that are Base Rate Loans shall be made in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount, and Revolving Loans that are Eurodollar Rate Loans shall be in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.

(ii)  Whenever Company desires that Lenders make Revolving Loans, Company shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 1:00 p.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a Eurodollar Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Revolving Loan that is a Base Rate Loan.  Except as otherwise provided herein, a Funding Notice for a Revolving Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and Company shall be bound to make a borrowing in accordance therewith.

(iii)  Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by Administrative Agent to each

applicable Lender by telefacsimile with reasonable promptness, but (provided Administrative Agent shall have received such notice by 10:00 a.m. (New York City time)) not later than 2:00 p.m. (New York City time) on the same day as Administrative Agent's receipt of such Notice from Company.

(iv) Each Lender shall make the amount of its Revolving Loan available to Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Revolving Loans available to Company on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by Administrative Agent from Lenders to be credited to the account of Company at the Principal Office designated by Administrative Agent or such other account as may be designated in writing to Administrative Agent by Company.

**2.3.    [Reserved.]**

**2.4.    Issuance of Letters of Credit and Purchase of Participations Therein.**

(a) Letters of Credit. During the Revolving Commitment Period, subject to the terms and conditions hereof, Issuing Bank agrees to issue Letters of Credit for the account of Company in the aggregate amount up to but not exceeding the Letter of Credit Sublimit; provided, (i) each Letter of Credit shall be denominated in Dollars; (ii) the stated amount of each Letter of Credit shall not be less than $50,000 or such lesser amount as is acceptable to Issuing Bank; (iii) after giving effect to such issuance, in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect; (iv) after giving effect to such issuance, in no event shall the Letter of Credit Usage exceed the Letter of Credit Sublimit then in effect; (v) in no event shall any standby Letter of Credit have an expiration date later than the earlier of (1) the Revolving Commitment Termination Date and (2) the date which is one year from the date of issuance of such standby Letter of Credit; and (vi) in no event shall any commercial Letter of Credit (x) have an expiration date later than the earlier of (1) the Revolving Loan Commitment Termination Date and (2) the date which is 180 days from the date of issuance of such commercial Letter of Credit or (b) be issued if such commercial Letter of Credit is otherwise unacceptable to Issuing Bank in its reasonable discretion. Subject to the foregoing, Issuing Bank may agree that a standby Letter of Credit will automatically be extended for one or more successive periods not to exceed one year each, unless Issuing Bank elects not to extend for any such additional period; provided, Issuing Bank shall not extend any such Letter of Credit if it has received written notice that an Event of Default has occurred and is continuing at the time Issuing Bank must elect to allow such extension; provided, further, in the event a Funding Default exists, Issuing Bank shall not be required to issue any Letter of Credit unless Issuing Bank has entered into arrangements satisfactory to it and Company to eliminate Issuing Bank's risk with respect to the participation in Letters of Credit of the Defaulting Lender, including by cash collateralizing such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage; provided, further, that the issuance of Letters of Credit shall not be made during any Labor Event until the date the first MLB or NHL game, as applicable, is played or the situation giving rise to such Labor Event is resolved to the satisfaction of the Requisite Lenders.

(b) <u>Notice of Issuance</u>. Whenever Company desires the issuance of a Letter of Credit, it shall deliver to Issuing Bank an Issuance Notice no later than 12:00 p.m. (New York City time) at least three Business Days (in the case of standby letters of credit) or five Business Days (in the case of commercial letters of credit), or in each case such shorter period as may be agreed to by Issuing Bank in any particular instance, in advance of the proposed date of issuance. Upon satisfaction or waiver of the conditions set forth in Section 3.2, Issuing Bank shall issue the requested Letter of Credit only in accordance with Issuing Bank's standard operating procedures. Upon the issuance of any Letter of Credit or amendment or modification to a Letter of Credit, Issuing Bank shall promptly notify the Administrative Agent and the Administrative Agent shall notify each Lender of such issuance, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit and the amount of such Lender's respective participation in such Letter of Credit pursuant to Section 2.4(e).

(c) <u>Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments</u>. In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit. As between Company and Issuing Bank, Company assumes all risks of the acts and omissions of, or misuse of the Letters of Credit issued by Issuing Bank, by the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, Issuing Bank shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of Issuing Bank's rights or powers hereunder. Without limiting the foregoing and in furtherance thereof, any action taken or omitted by Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of Issuing Bank to Company. Notwithstanding anything to the contrary contained in this Section 2.4(c), Company shall retain any and all rights it may have against Issuing Bank for any liability arising solely out of the gross negligence or willful misconduct of Issuing Bank.

(d) <u>Reimbursement by Company of Amounts Drawn or Paid Under Letters of Credit</u>. In the event Issuing Bank has determined to honor a drawing under a Letter of Credit, it shall immediately notify Company and Administrative Agent, and Company shall reimburse

Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the **"Reimbursement Date"**) in an amount in Dollars and in same day funds equal to the amount of such honored drawing; provided, anything contained herein to the contrary notwithstanding, (i) unless Company shall have notified Administrative Agent and Issuing Bank prior to 10:00 a.m. (New York City time) on the date such drawing is honored that Company intends to reimburse Issuing Bank for the amount of such honored drawing with funds other than the proceeds of Revolving Loans, Company shall be deemed to have given a timely Funding Notice to Administrative Agent requesting Lenders to make Revolving Loans that are Base Rate Loans on the Reimbursement Date in an amount in Dollars equal to the amount of such honored drawing, and (ii) subject to satisfaction or waiver of the conditions specified in Section 3.2, Lenders shall, on the Reimbursement Date, make Revolving Loans that are Base Rate Loans in the amount of such honored drawing, the proceeds of which shall be applied directly by Administrative Agent to reimburse Issuing Bank for the amount of such honored drawing; and provided further, if for any reason proceeds of Revolving Loans are not received by Issuing Bank on the Reimbursement Date in an amount equal to the amount of such honored drawing, Company shall reimburse Issuing Bank, on demand, in an amount in same day funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Revolving Loans, if any, which are so received. Nothing in this Section 2.4(d) shall be deemed to relieve any Lender from its obligation to make Revolving Loans on the terms and conditions set forth herein, and Company shall retain any and all rights it may have against any Lender resulting from the failure of such Lender to make such Revolving Loans under this Section 2.4(d).

(e) <u>Lenders' Purchase of Participations in Letters of Credit</u>. Immediately upon the issuance of each Letter of Credit, each Lender having a Revolving Commitment shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from Issuing Bank a participation in such Letter of Credit and any drawings honored thereunder in an amount equal to such Lender's Pro Rata Share (with respect to the Revolving Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder. In the event that Company shall fail for any reason to reimburse Issuing Bank as provided in Section 2.4(d), Issuing Bank shall promptly notify each Lender of the unreimbursed amount of such honored drawing and of such Lender's respective participation therein based on such Lender's Pro Rata Share of the Revolving Commitments. Each Lender shall make available to Issuing Bank an amount equal to its respective participation, in Dollars and in same day funds, at the office of Issuing Bank specified in such notice, not later than 12:00 p.m. (New York City time) on the first business day (under the laws of the jurisdiction in which such office of Issuing Bank is located) after the date notified by Issuing Bank. In the event that any Lender fails to make available to Issuing Bank on such business day the amount of such Lender's participation in such Letter of Credit as provided in this Section 2.4(e), Issuing Bank shall be entitled to recover such amount on demand from such Lender together with interest thereon for three Business Days at the rate customarily used by Issuing Bank for the correction of errors among banks and thereafter at the Base Rate. Nothing in this Section 2.4(e) shall be deemed to prejudice the right of any Lender to recover from Issuing Bank any amounts made available by such Lender to Issuing Bank pursuant to this Section in the event that it is determined that the payment with respect to a Letter of Credit in respect of which payment was made by such Lender constituted gross negligence or willful misconduct on the part of Issuing Bank. In the event Issuing Bank shall have been reimbursed by other Lenders pursuant to this Section 2.4(e) for all or any portion of any drawing

36

honored by Issuing Bank under a Letter of Credit, such Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under this Section 2.4(e) with respect to such honored drawing such Lender's Pro Rata Share of all payments subsequently received by Issuing Bank from Company in reimbursement of such honored drawing when such payments are received. Any such distribution shall be made to a Lender at its primary address set forth below its name on Appendix B or at such other address as such Lender may request.

(f) <u>Obligations Absolute</u>. The obligation of Company to reimburse Issuing Bank for drawings honored under the Letters of Credit issued by it and to repay any Revolving Loans made by Lenders pursuant to Section 2.4(d) and the obligations of Lenders under Section 2.4(e) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set-off, defense or other right which Company or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), Issuing Bank, Lender or any other Person or, in the case of a Lender, against Company, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between Company or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by Issuing Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings or any of its Subsidiaries; (vi) any breach hereof or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; <u>provided</u>, in each case, that payment by Issuing Bank under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of Issuing Bank under the circumstances in question.

(g) <u>Indemnification</u>. Without duplication of any obligation of Company under Section 10.2 or 10.3, in addition to amounts payable as provided herein, Company hereby agrees to protect, indemnify, pay and save harmless Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (i) the issuance of any Letter of Credit by Issuing Bank, other than as a result of (1) the gross negligence or willful misconduct of Issuing Bank or (2) the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act. Notwithstanding the foregoing, nothing in this Section 2.4(g) shall be deemed to apply to matters governed by Section 2.20.

## 2.5. Pro Rata Shares; Availability of Funds.

(a) <u>Pro Rata Shares</u>. All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Term Loan Commitment or any Revolving Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b) <u>Availability of Funds</u>. Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Company a corresponding amount on such Credit Date. If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the Base Rate. If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Company and Company shall immediately pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for Base Rate Loans for such Class of Loans. Nothing in this Section 2.5(b) shall be deemed to relieve any Lender from its obligation to fulfill its Additional Term Loan Commitments and Revolving Commitments hereunder or to prejudice any rights that Company may have against any Lender as a result of any default by such Lender hereunder.

**2.6. Use of Proceeds.** The proceeds of the Additional Term Loans and the Revolving Loans, if any, made on the Amendment and Restatement Effective Date shall, together with the proceeds of the Second Lien Term Loan, be applied by Company (i) to fund the partial redemption of the Fox Preferred Stock, including interest accrued thereon; (ii) to fund the partial repayment of the existing Subordinated Notes, including interest accrued thereon; (iii) to fund the additional amount required to be deposited in the Interest Reserve; (iv) for working capital and general corporate purposes of Company and its Subsidiaries; and (v) to pay transaction costs, fees and expenses in connection with this Agreement. The proceeds of the Revolving Loans and Letters of Credit shall be applied by Company for working capital and general corporate purposes of Company and its Subsidiaries. No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

**2.7. Evidence of Debt; Register; Lenders' Books and Records; Notes.**

(a) <u>Lenders' Evidence of Debt</u>. Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Company to such Lender,

38

including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on Company, absent manifest error; provided, that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Commitments or Company's Obligations in respect of any applicable Loans; and provided further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b) Register. Administrative Agent (or its agent or sub-agent appointed by it), acting for this purpose as an Agent of the Company, shall maintain at the Principal Office a register for the recordation of the names and addresses of Lenders and the Revolving Commitments and Loans of each Lender from time to time (the "**Register**"). The Register, as in effect at the close of business on the preceding Business Day, shall be available for inspection by Company or any Lender at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record, or shall cause to be recorded, in the Register the Revolving Commitments, the Loans and the Letter of Credit obligations, in accordance with the provisions of Section 10.6, and each repayment or prepayment owing to and paid to each Lender in respect of the principal amount of, and any interest on, such Loans and Letter of Credit obligations, and any such recordation shall be conclusive and binding on Company and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Commitments or Company's Obligations in respect of any Loan. Company hereby designates Administrative Agent to serve as Company's agent solely for purposes of maintaining the Register as provided in this Section 2.7, and Company hereby agrees that, to the extent Administrative Agent serves in such capacity, Administrative Agent and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "Indemnitees."

(c) Notes. If so requested by any Lender by written notice to Company (with a copy to Administrative Agent) at least two Business Days prior to the Amendment and Restatement Effective Date, or at any time thereafter, Company shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is a permitted assignee of such Lender pursuant to Section 10.6) on the Amendment and Restatement Effective Date (or, if such notice is delivered after the Amendment and Restatement Effective Date, promptly after Company's receipt of such notice) a Note or Notes to evidence such Lender's Term Loan or Revolving Loan, as the case may be.

**2.8. Interest on Loans.**

(a) Except as otherwise set forth herein, each Class of Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i) if a Base Rate Loan, at the Base Rate plus the Applicable Margin; or

(ii) if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate plus the Applicable Margin;

provided, that during the existence of a Labor Event, each Class of Loan shall bear interest as set forth above plus 0.50% per annum, such interest to accrue from the first date of such Labor Event until the date the first MLB or NHL game, as applicable, is played or the situation giving rise to such Labor Event is resolved to the satisfaction of the Requisite Lenders.

(b)     The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any Eurodollar Rate Loan, shall be selected by Company and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice; provided, the Loans initially shall be made as either (i) Base Rate Loans or (ii) Eurodollar Rate Loans having an Interest Period of no longer than one month. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c)     In connection with Eurodollar Rate Loans there shall be no more than six (6) Interest Periods outstanding at any time. In the event Company fails to specify between a Base Rate Loan or a Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a Eurodollar Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan). In the event Company fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, Company shall be deemed to have selected an Interest Period of one month. As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Company and each Lender.

(d)     Interest payable pursuant to Section 2.8(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Term Loan, the last Interest Payment Date with respect to such Term Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)     Except as otherwise set forth herein, interest on each Loan (i) with respect to Revolving Loans, shall accrue on a daily basis and shall be payable in arrears on each Interest

Payment Date with respect to interest accrued on and to each such payment date; (ii) with respect to Term Loans, shall accrue on a daily basis on and to the March 31st, June 30th, September 30th and December 31st most recently ended prior to such payment date and shall be payable in arrears on each Interest Payment Date; (iii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iv) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans; provided, however, with respect to any voluntary prepayment of a Base Rate Loan, accrued interest shall instead be payable on the applicable Interest Payment Date.

(f) Company agrees to pay to Issuing Bank, with respect to drawings honored under any Letter of Credit, interest on the amount paid by Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of Company at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest otherwise payable hereunder with respect to Revolving Loans that are Base Rate Loans, and (ii) thereafter, a rate which is 2% per annum in excess of the rate of interest otherwise payable hereunder with respect to Revolving Loans that are Base Rate Loans.

(g) Interest payable pursuant to Section 2.8(f) shall be computed on the basis of a 365/366-day year for the actual number of days elapsed in the period during which it accrues, and shall be payable on demand or, if no demand is made, on the date on which the related drawing under a Letter of Credit is reimbursed in full. Promptly upon receipt by Issuing Bank of any payment of interest pursuant to Section 2.8(f), Issuing Bank shall distribute to each Lender, out of the interest received by Issuing Bank in respect of the period from the date such drawing is honored to but excluding the date on which Issuing Bank is reimbursed for the amount of such drawing (including any such reimbursement out of the proceeds of any Revolving Loans), the amount that such Lender would have been entitled to receive in respect of the letter of credit fee that would have been payable in respect of such Letter of Credit for such period if no drawing had been honored under such Letter of Credit. In the event Issuing Bank shall have been reimbursed by Lenders for all or any portion of such honored drawing, Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under Section 2.4(e) with respect to such honored drawing such Lender's Pro Rata Share of any interest received by Issuing Bank in respect of that portion of such honored drawing so reimbursed by Lenders for the period from the date on which Issuing Bank was so reimbursed by Lenders to but excluding the date on which such portion of such honored drawing is reimbursed by Company.

**2.9. Conversion/Continuation.**

(a) Subject to Section 2.18, Company shall have the option:

(i) to convert at any time all or any part of any Term Loan or Revolving Loan equal to $500,000 and integral multiples of $100,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a Eurodollar Rate Loan may only be converted on the expiration of the Interest Period applicable to such Eurodollar Rate Loan unless Company shall pay all amounts due under Section 2.18 in connection with any such conversion; provided further, a Base Rate Loan may only be converted to a

41

Eurodollar Rate Loan so long as no Event of Default shall have occurred and then be continuing, or

(ii) upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, and so long as no Event of Default shall have occurred and then be continuing to continue all or any portion of such Loan equal to $500,000 and integral multiples of $100,000 in excess of that amount as a Eurodollar Rate Loan.

(b) Company shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 1:00 p.m. (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Eurodollar Rate Loans (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Company shall be bound to effect a conversion or continuation in accordance therewith.

**2.10. Default Interest.** Upon the occurrence and during the continuance of an Event of Default under Section 8.1(a), the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) payable on demand at a rate that is 2% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.10 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

**2.11. Fees.**

(a) Company agrees to pay to Lenders having Revolving Exposure:

(i) commitment fees equal to (1) the average of the daily difference between (a) the Revolving Commitments and (b) the aggregate principal amount of all outstanding Revolving Loans and Letter of Credit Usage, times (2) the Applicable Revolving Commitment Fee Percentage; and

(ii) letter of credit fees equal to (1) the Applicable Margin for Revolving Loans that are Eurodollar Rate Loans, times (2) the average aggregate daily maximum amount available to be drawn under all outstanding Letters of Credit (regardless of

42

whether any conditions for drawing could then be met and determined as of the close of business on any date of determination).

All fees referred to in this Section 2.11(a) shall be paid to Administrative Agent at its Principal Office and upon receipt, Administrative Agent shall promptly distribute to each Lender its Pro Rata Share thereof.

(b) Company agrees to pay directly to Issuing Bank, for its own account, the following fees:

(i) a fronting fee in an amount to be agreed by Company and Issuing Bank, times the average aggregate daily maximum amount available to be drawn under all Letters of Credit (determined as of the close of business on any date of determination); and

(ii) such documentary and processing charges for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with Issuing Bank's standard schedule for such charges and as in effect at the time of such issuance, amendment, transfer or payment, as the case may be.

(c) All fees referred to in Section 2.11(a) and 2.11(b)(i) shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable quarterly in arrears on April 1, July 1, October 1 and January 1 of each year during the Revolving Commitment Period, commencing on the first such date to occur after the Closing Date, and on the Revolving Commitment Termination Date.

(d) In addition to any of the foregoing fees, Company agrees to pay to Agents such other fees in the amounts and at the times separately agreed upon.

**2.12. Scheduled Payments.** The outstanding principal amount of the Term Loans and all amounts outstanding under the Revolving Loans shall be repaid in full on the Term Loan Maturity Date. Such payment shall be reduced in connection with any voluntary or mandatory prepayments of the Loans in accordance with Sections 2.13, 2.14 and 2.15, as applicable.

**2.13. Voluntary Prepayments/Commitment Reductions.**

(a) <u>Voluntary Prepayments</u>.

(i) Any time and from time to time:

(1) with respect to Base Rate Loans, Company may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount; and

(2) with respect to Eurodollar Rate Loans, Company may prepay any such Loans on any

Business Day in whole or in part in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.

    (ii)   All such prepayments shall be made:

        (1)    upon not less than one Business Day's prior written or telephonic notice in the case of Base Rate Loans; and

        (2)    upon not less than three Business Days' prior written or telephonic notice in the case of Eurodollar Rate Loans.

in each case given to Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit such telephonic or original notice for Term Loans or Revolving Loans, as the case may be, by telefacsimile or telephone to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein; provided, that any such notice delivered by Company may state that such notice is conditioned upon the effectiveness of other financing arrangements, in which case such notice may be revoked by the Company (by notice to the Administrative Agent at least one Business Day prior to the specified effective date) if such condition is not satisfied. Any such voluntary prepayment shall be applied as specified in Section 2.15(a).

    (b)   <u>Voluntary Commitment Reductions</u>.

    (i)   Company may, upon not less than three Business Days' prior written or telephonic notice confirmed in writing to Administrative Agent (which original written or telephonic notice Administrative Agent will promptly transmit by telefacsimile or telephone to each applicable Lender), at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, the Revolving Commitments in an amount up to the amount by which the Revolving Commitments exceed the Total Utilization of Revolving Commitments at the time of such proposed termination or reduction; provided, any such partial reduction of the Revolving Commitments shall be in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.

    (ii)   Company's notice to Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Revolving Commitments shall be effective on the date specified in Company's notice and shall reduce the Revolving Commitment of each Lender proportionately to its Pro Rata Share thereof; provided, that any such notice delivered by Company may state that such notice is conditioned upon the effectiveness of other financing arrangements, in which case such notice may be revoked

44

by Company (by notice to the Administrative Agent at least one Business Day prior to the specified effective date) if such condition is not satisfied.

### 2.14. Mandatory Prepayments/Commitment Reductions.

(a) <u>Asset Sales</u>. No later than the first Business Day following the date of receipt by Company or any of its Subsidiaries of any Net Asset Sale Proceeds in respect of Asset Sales permitted by Section 6.9(j), (k) or (r) or not otherwise permitted by this Agreement in excess of $1,000,000 in any Fiscal Year, Company shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate amount equal to the amount of such Net Asset Sale Proceeds; <u>provided</u> that in the case of any Net Asset Sale Proceeds arising from the disposition of or by any Subsidiary other than a disposition of the Rangers or the Stars or the disposition of any Capital Stock of Center Operating Company (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Asset Sale Proceeds from the Closing Date through the applicable date of determination do not exceed $2,000,000, Company shall have the option, directly or through one or more of its Subsidiaries, to invest such Net Asset Sale Proceeds within two hundred seventy days of receipt thereof (or commit to invest such Net Asset Sale Proceeds within an additional 90 day period) in long-term productive assets of the general type used in the business of Company and its Subsidiaries.

(b) <u>Insurance/Condemnation Proceeds</u>. No later than the first Business Day following the date of receipt by Company or any of its Subsidiaries, or Collateral Agent as loss payee, of any Net Insurance/Condemnation Proceeds in excess of $1,000,000, Company shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; <u>provided,</u> (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Insurance/Condemnation Proceeds from the Closing Date through the applicable date of determination do not exceed $2,000,000, Company shall have the option, directly or through one or more of its Subsidiaries to invest such Net Insurance/Condemnation Proceeds within two hundred seventy days of receipt thereof (or commit to invest such Net Insurance/Condemnation Proceeds within an additional 90 day period) in long term productive assets of the general type used in the business of Company and its Subsidiaries, which investment may include the repair, restoration or replacement of the applicable assets thereof.

(c) <u>Issuance of Equity Securities</u>. On the date of receipt by Company of any Cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, Company or any of its Subsidiaries (other than (i) pursuant to any employee stock or stock option compensation plan, (ii) the Equity Cure Issuance, (iii) issuances of equity of Holdings to any current equity investor, their Affiliates and/or any other Person that makes an equity investment with a current equity investor, the proceeds of which are promptly used to fund working capital of the Company's Subsidiaries, (iv) issuances of directors qualifying shares, and (v) in the case of the Company or any of its Subsidiaries, any issuance to or receipt of any capital contribution from Holdings (in the case of Company) or Company or any of its Subsidiaries (in the case of a Subsidiary) the proceeds of which are promptly used to fund working capital of the Company's Subsidiaries), Company shall prepay the Loans and/or the Revolving Commitments shall be

permanently reduced as set forth in Section 2.15(b) in an aggregate amount equal to 50% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(d) Issuance of Debt. On the date of receipt by Company or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Company or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1) Company shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(e) Consolidated Excess Cash Flow. In the event that there shall be Consolidated Excess Cash Flow for any Fiscal Year (commencing with Fiscal Year 2006), Company shall, no later than ten days after the delivery of financial statements pursuant to Section 5.1(c), prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate amount equal to (i) 50% of such Consolidated Excess Cash Flow minus (ii) voluntary and scheduled repayments of the Term Loans, the Revolving Loans (to the extent of a concurrent permanent reduction of the Revolving Commitments) and the Rangers MLB Facility.

(f) Prepayment Certificate. Concurrently with any prepayment of the Loans and/or reduction of the Revolving Commitments pursuant to Sections 2.14(a) through 2.14(e), Company shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds or Consolidated Excess Cash Flow, as the case may be. In the event that Company shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Company shall promptly make an additional prepayment of the Loans and/or the Revolving Commitments shall be permanently reduced in an amount equal to such excess, and Company shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

### 2.15. Application of Prepayments/Reductions.

(a) Application of Voluntary Prepayments by Type of Loans. Any prepayment of any Loan pursuant to Section 2.13(a) shall be applied as specified by Company in the applicable notice of prepayment; provided, in the event Company fails to specify the Loans to which any such prepayment shall be applied, such prepayment shall be applied as follows:

> first, to repay outstanding Revolving Loans to the full extent thereof; and

> second, to prepay the Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(b) Application of Mandatory Prepayments by Type of Loans. Any amount required to be paid pursuant to Sections 2.14(a) through 2.14(e) shall be applied as follows:

*first*, to prepay the Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof);

*second*, to prepay the outstanding Revolving Loans to the full extent thereof;

*third*, to prepay outstanding reimbursement obligations with respect to Letters of Credit; and

*fourth*, to cash collateralize Letters of Credit.

(c) <u>Application of Prepayments of Loans to Base Rate Loans and Eurodollar Rate Loans</u>. Considering each Class of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Company pursuant to Section 2.18(c).

**2.16. General Provisions Regarding Payments.**

(a) All payments by Company of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 12:00 p.m. (New York City time) on the date due at the Principal Office designated by Administrative Agent for the account of Lenders; for purposes of computing interest and fees, funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Company on the next succeeding Business Day.

(b) All payments in respect of the principal amount of any Loan (other than voluntary prepayments of Revolving Loans) shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid.

(c) Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by Administrative Agent.

(d) Notwithstanding the foregoing provisions hereof, if any Conversion/ Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e) Subject to the provisos set forth in the definition of "Interest Period" as they may apply to Revolving Loans, whenever any payment or performance to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment or performance shall be made on the next succeeding Business Day and, with respect to Revolving Loans only, such extension of time shall be included in the computation of the payment of interest hereunder or of the Revolving Commitment fees hereunder.

(f)  Administrative Agent shall deem any payment by or on behalf of Company hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Administrative Agent shall give prompt telephonic notice to Company and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.10 from the date such amount was due and payable until the date such amount is paid in full.

(g)  If an Event of Default shall have  occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.1, all payments or proceeds received by Agents hereunder in respect of any of the Obligations, shall be applied in accordance with the application arrangements described in Section 7.2 of the Pledge and Security Agreement.

**2.17.  Ratable Sharing.**  Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, amounts payable in respect of Letters of Credit, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the **"Aggregate Amounts Due"** to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be. deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Company or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Company expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by Company to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

48

**2.18. Making or Maintaining Eurodollar Rate Loans.**

(a) <u>Inability to Determine Applicable Interest Rate</u>.  In the event that Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Adjusted Eurodollar Rate, Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Company and each Lender of such determination, whereupon (i) no Loans may be made as, or converted to, Eurodollar Rate Loans until such time as Administrative Agent notifies Company and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Funding Notice or Conversion/Continuation Notice given by Company with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by Company.

(b) <u>Illegality or Impracticability of Eurodollar Rate Loans</u>.  In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Company and Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such Lender shall be an **"Affected Lender"** and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to Company and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender).  Thereafter (1) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (2) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (3) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans (the **"Affected Loans"**) shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination.  Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, Company shall have the option, subject to the provisions of Section 2.18(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender).  Except as provided in the immediately preceding sentence, nothing in this Section 2.18(b) shall affect the obligation of any Lender other than an

Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms hereof.

(c) <u>Compensation for Breakage or Non-Commencement of Interest Periods</u>. Company shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid by such Lender to Lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Company.

(d) <u>Booking of Eurodollar Rate Loans</u>. Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e) <u>Assumptions Concerning Funding of Eurodollar Rate Loans</u>. Calculation of all amounts payable to a Lender under this Section 2.18 and under Section 2.19 shall be made as though such Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of such Lender to a domestic office of such Lender in the United States of America; <u>provided</u>, <u>however</u>, each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.18 and under Section 2.19.

**2.19. Increased Costs; Capital Adequacy.**

(a) <u>Compensation For Increased Costs and Taxes</u>. Subject to the provisions of Section 2.20 (which shall be exclusively controlling with respect to the matters covered thereby), in the event that any Lender (which term shall include Issuing Bank for purposes of this Section 2.19(a)) shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or Governmental Authority, in each case that becomes effective after (A) the Closing Date (in the case of each Lender listed on the signature pages of the Existing Credit Agreement on the Closing Date) or after the Amendment and Restatement

Effective Date (in the case of each Lender listed on the signature pages hereof that is not a Lender under the Existing Credit Agreement), (B) the date of the Assignment Agreement pursuant to which an assignee becomes a Lender, (C) the date of a successor Administrative Agent becomes the Administrative Agent hereunder, or (D) the date a successor Issuing Bank becomes a party hereto or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law): (i) subjects such Lender (or its applicable lending office) to any additional Tax (other than any Tax governed by Section 2.20 and any Tax on the overall net income of such Lender) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to Eurodollar Rate Loans that are reflected in the definition of Adjusted Eurodollar Rate); or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Company shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.19(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b) Capital Adequacy Adjustment. In the event that any Lender (which term shall include Issuing Bank for purposes of this Section 2.19(b)) shall have determined that the adoption, effectiveness, phase-in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Revolving Commitments or Letters of Credit, or participations therein or other obligations hereunder with respect to the Loans or the Letters of Credit to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within five Business Days after receipt by Company

51

from such Lender of the statement referred to in the next sentence, Company shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after-tax basis for such reduction. Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.19(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

### 2.20. Taxes; Withholding, etc.

(a) Payments to Be Free and Clear. All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any Lender (which term shall include Issuing Bank for purposes of this Section 2.20(a)) or the Administrative Agent) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b) Withholding of Taxes. If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by any Credit Party to Administrative Agent or any Lender (which term shall include Issuing Bank for purposes of this Section 2.20(b)) under any of the Credit Documents: (i) Company shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender; (ii) the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, Administrative Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made; and (iii) within thirty days after paying any sum from which it is required by law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (i) above to pay, Company shall deliver to Administrative Agent evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority; provided, no such additional amount shall be required to be paid to Administrative Agent or Lender under clause (ii) above except to the extent that any change (A) after the Closing Date (in the case of each Lender listed on the signature pages of the Existing Credit Agreement on the Closing Date) or after the Amendment and Restatement Effective Date (in the case of each Lender listed on the signature pages hereof that is not a Lender under the Existing Credit Agreement), (B) after the effective date of the Assignment Agreement pursuant to which such Lender became a Lender (in the case of each other Lender) (C) after the appointment of a successor Administrative Agent, or (D) after the date a successor Issuing Bank becomes a party hereto in any such requirement for a deduction, withholding or payment as is mentioned therein shall result in an increase in the rate of such deduction, withholding or payment from that in effect at the date hereof or at the date of such Assignment Agreement successor Administrative

Agent or successor Issuing Bank, as the case may be, in respect of payments to such Administrative Agent or Lender.

(c) Evidence of Exemption From U.S. Withholding Tax. Each Lender that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a **"Non-US Lender"**) shall deliver to Administrative Agent and to Company, on or prior to (i) the Amendment and Restatement Effective Date (in the case of each Lender listed on the signature pages hereof on the Amendment and Restatement Effective Date) (ii) the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), (iii) the date a successor Administrative Agent becomes the Administrative Agent hereunder, (iv) the date a successor Issuing Bank becomes a party hereto, and (v) at such other times as may be necessary in the determination of Company or Administrative Agent, (A) two original copies of Internal Revenue Service Form W-8BEN or W-8ECI (or any successor forms), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Company to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Credit Documents, or (B) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and cannot deliver either Internal Revenue Service Form W-8ECI pursuant to clause (A) above, a Certificate re Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Company to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of interest payable under any of the Credit Documents. Each Lender organized under the Laws of the United States (a "US Lender") shall deliver to Administrative Agent and to Company, on or prior to (i) the Amendment and Restatement Effective Date (in the case of each Lender listed on the signature pages hereof on the Amendment and Restatement Effective Date), (ii) the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), (iii) the date a successor Administrative Agent becomes the Administrative Agent hereunder, (iv) the date a successor Issuing Bank becomes a party hereto, and (v) at such other times as may be necessary in the determination of Company or Administrative Agent, two completed original copies of Form W-9 (or any successor forms) to establish that such US Lender is entitled to an exemption from U.S. backup withholding tax. Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.20(c) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent and to Company two new original copies of Internal Revenue Service Form W-8BEN or W-8ECI, a Certificate re Non-Bank Status and two original copies of Internal Revenue Service Form W-8BEN, or an Internal Revenue Service Form W-9 (or any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Company to confirm or establish that such Lender is not subject to deduction, withholding, or backup withholding of United States federal income tax with respect to payments to such Lender

53

under the Credit Documents, or notify Administrative Agent and Company of its inability to deliver any such forms, certificates or other evidence. Unless Administrative Agent and Company have received forms or other documents satisfactory to them indicating that payments under this Agreement or any other Credit Documents to or for a Non-US Lender are not subject to U.S. withholding tax or are subject to such tax at a rate reduced by any applicable tax treaty, the Administrative Agent and Company shall withhold amounts required to be withheld by applicable law at the applicable statutory rate. Company shall not be required to pay any additional amount to any Non-US Lender under Section 2.20(b)(iii) if such Lender shall have failed (1) to deliver the forms, certificates or other evidence referred to in the second sentence of this Section 2.20(c), or (2) to notify Administrative Agent and Company of its inability to deliver any such forms, certificates or other evidence, as the case may be; provided, if such Lender shall have satisfied the requirements of the first sentence of this Section 2.20(c) on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Lender, as applicable, nothing in this last sentence of Section 2.20(c) shall relieve Company of its obligation to pay any additional amounts pursuant this Section 2.20 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender is not subject to withholding as described herein.

(d) If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Tax as to which it has been indemnified by Company or with respect to which Company has paid additional amounts pursuant to this Section 2.20, it shall pay over such refund to Company (to the extent of indemnity payments made, or additional amounts paid, by Company under this Section 2.20 with respect to any indemnified Tax giving rise to such refund), including any interest paid by the relevant Governmental Authority, provided, that Company agrees to repay the amount over to it in the event that such Lender is required to repay such refund to such Governmental Authority.

**2.21. Obligation to Mitigate.** Each Lender (which term shall include Issuing Bank for purposes of this Section 2.21) agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans or Letters of Credit, as the case may be, becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.18, 2.19 or 2.20, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use its best efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.18, 2.19 or 2.20 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Revolving Commitments, Loans or Letters of Credit through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Revolving Commitments, Loans or Letters of Credit or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.21 unless Company agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other

office as described above. A certificate as to the amount of any such expenses payable by Company pursuant to this Section 2.21 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Company (with a copy to Administrative Agent) shall be conclusive absent manifest error.

**2.22. Defaulting Lenders.** Anything contained herein to the contrary notwithstanding, in the event that any Lender, other than at the direction or request of any regulatory agency or authority, defaults (a **"Defaulting Lender"**) in its obligation to fund (a **"Funding Default"**) any Revolving Loan or its portion of any unreimbursed payment under Section 2.3(b)(iv) or 2.4(e) (in each case, a **"Defaulted Loan"**), then (a) during any Default Period with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "Lender" for purposes of voting on any matters (including the granting of any consents or waivers) with respect to any of the Credit Documents; (b) to the extent permitted by applicable law, until such time as the Default Excess with respect to such Defaulting Lender shall have been reduced to zero, (i) any voluntary prepayment of the Revolving Loans shall, if Company so directs at the time of making such voluntary prepayment, be applied to the Revolving Loans of other Lenders as if such Defaulting Lender had no Revolving Loans outstanding and the Revolving Exposure of such Defaulting Lender were zero, and (ii) any mandatory prepayment of the Revolving Loans shall, if Company so directs at the time of making such mandatory prepayment, be applied to the Revolving Loans of other Lenders (but not to the Revolving Loans of such Defaulting Lender) as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender, it being understood and agreed that Company shall be entitled to retain any portion of any mandatory prepayment of the Revolving Loans that is not paid to such Defaulting Lender solely as a result of the operation of the provisions of this clause (b); (c) such Defaulting Lender's Revolving Commitment and outstanding Revolving Loans and such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage shall be excluded for purposes of calculating the Revolving Commitment fee payable to Lenders in respect of any day during any Default Period with respect to such Defaulting Lender, and such Defaulting Lender shall not be entitled to receive any Revolving Commitment fee pursuant to Section 2.11 with respect to such Defaulting Lender's Revolving Commitment in respect of any Default Period with respect to such Defaulting Lender; and (d) the Total Utilization of Revolving Commitments as at any date of determination shall be calculated as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender. No Revolving Commitment of any Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in this Section 2.22, performance by Company of its obligations hereunder and the other Credit Documents shall not be excused or otherwise modified as a result of any Funding Default or the operation of this Section 2.22. The rights and remedies against a Defaulting Lender under this Section 2.22 are in addition to other rights and remedies which Company may have against such Defaulting Lender with respect to any Funding Default and which Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default.

**2.23. Removal or Replacement of a Lender.** Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an **"Increased-Cost Lender"**) shall give notice to Company that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.18, 2.19 or 2.20, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within

five Business Days after Company's request for such withdrawal; or (b) (i) any Lender shall become a Defaulting Lender, (ii) the Default Period for such Defaulting Lender shall remain in effect, and (iii) such Defaulting Lender shall fail to cure the default as a result of which it has become a Defaulting Lender within five Business Days after Company's request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.5(b), the consent of Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a **"Non-Consenting Lender"**) whose consent is required shall not have been obtained; then, with respect to each such Increased-Cost Lender, Defaulting Lender or Non-Consenting Lender (the **"Terminated Lender"**), Company may, by giving written notice to Administrative Agent and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans and its Revolving Commitments, if any, in full to one or more Eligible Assignees (each a **"Replacement Lender"**) in accordance with the provisions of Section 10.6 and Terminated Lender shall pay any fees payable thereunder in connection with such assignment; provided, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender, (B) an amount equal to all unreimbursed drawings that have been funded by such Terminated Lender, together with all then unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Lender pursuant to Section 2.11; (2) on the date of such assignment, Company shall pay any amounts payable to such Terminated Lender pursuant to Section 2.18(c), 2.19 or 2.20; or otherwise as if it were a prepayment and (3) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender; provided, Company may not make such election with respect to any Terminated Lender that is also an Issuing Bank unless, prior to the effectiveness of such election, Company shall have caused each outstanding Letter of Credit issued thereby to be cancelled, cash collateralized or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent. Upon the prepayment of all amounts owing to any Terminated Lender and the termination of such Terminated Lender's Revolving Commitments, if any, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.

## SECTION 3.  CONDITIONS PRECEDENT

**3.1.  Amendment and Restatement Effective Date.**  The obligation of each Lender to make a Credit Extension on the Amendment and Restatement Effective Date is subject to the satisfaction of the following conditions on or before the Amendment and Restatement Effective Date:

(a)  Credit Documents.  Administrative Agent shall have received copies of this Agreement, executed and delivered by a duly Authorized Officer of each of Holdings, Company and the Lenders under the Existing Credit Agreement (who may provide written consent via a consent supplement to this Agreement).  The Administrative Agent shall also have received