copies of the Intercreditor Agreement, originally executed and delivered by Holdings and each applicable Credit Party for each Lender.

(b) <u>Organizational Documents; Incumbency.</u> Administrative Agent shall have received (i) copies of each Organizational Document executed and delivered by Holdings and each Credit Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official; (ii) signature and incumbency certificates of the officers of such Person executing the Credit Documents to which it is a party; (iii) resolutions of the Board of Directors or similar governing body of Holdings and each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Amendment and Restatement Effective Date, certified as of the Amendment and Restatement Effective Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of Holdings and each Credit Party's jurisdiction of incorporation, organization or formation each dated a recent date prior to the Amendment and Restatement Effective Date; and (v) such other documents as Administrative Agent may reasonably request; <u>provided</u> that in lieu of delivery of each of the items set forth in clauses (i) through (iii), Company may deliver a certificate executed by a duly authorized officer of such Credit Party certifying that there have been no material amendments to those documents previously delivered to the Administrative Agent on the Closing Date.

(c) [Reserved.]

(d) <u>Subordinated Notes.</u> On the Amendment and Restatement Effective Date, Company and its Subsidiaries shall have (i) repaid or repurchased in part certain indebtedness of Holdings to Hicks in the amount of $53.0 million, (ii) partially redeemed the Fox Preferred Stock in the amount of $42.9 million, (iii) executed and delivered to the Administrative Agent a binding letter of intent with Fox for the amendment of the Series B Preferred Unit Agreement relating to the Fox Preferred Stock and (iv) delivered to Collateral Agent all documents or instruments necessary to release all Liens, if any, securing the Subordinated Notes or other obligations of Company and its Subsidiaries thereunder being repaid on the Amendment and Restatement Effective Date.

(e) <u>Governmental Authorizations and Consents.</u> Holdings and each Credit Party shall have obtained all material Governmental Authorizations and all material consents of other Persons, in each case that are necessary or advisable in connection with the transactions contemplated by the Credit Documents and each of the foregoing shall be in full force and effect. All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose material adverse conditions on the transactions contemplated by the Credit Documents and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired. Company shall have received a consent from both MLB and the NHL relating to and approving the Loans.

(f) <u>Real Estate Assets</u>. In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in certain Real Estate Assets, Collateral Agent shall have received from Company and each applicable Guarantor:

(i) fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each Real Estate Asset listed in Schedule 3.1(f) (each, a "**Mortgaged Property**");

(ii) an opinion of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) in each state in which a Mortgaged Property is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent;

(iii) in the case of each material Leasehold Property that is a Mortgaged Property, use commercially reasonable efforts to obtain (1) if required by the terms of the related lease, a Landlord Consent and Estoppel and (2) evidence that such Leasehold Property is a Recorded Leasehold Interest;

(iv) (a) ALTA mortgagee title insurance policies or unconditional commitments therefor issued by one or more title companies reasonably satisfactory to Collateral Agent with respect to each Mortgaged Property (each, a "**Title Policy**"), in amounts not less than the fair market value of each Mortgaged Property, together with a title report issued by a title company with respect thereto, dated not more than thirty days prior to the Amendment and Restatement Effective Date and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to Collateral Agent and (B) evidence satisfactory to Collateral Agent that such Credit Party has paid to the title company or to the appropriate governmental authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages for each Mortgaged Property in the appropriate real estate records; and

(v) evidence of flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors, in form and substance reasonably satisfactory to Collateral Agent.

(g) [Reserved.]

(h) <u>Financial Statements; Projections</u>. Lenders shall have received from Holdings and Company (i) the Historical Financial Statements, and (ii) the Projections.

(i) [Reserved.]

58

(j) <u>Opinions of Counsel to Credit Parties</u>. Lenders shall have received originally executed copies of the written opinions of Weil, Gotshal & Manges LLP, counsel for Credit Parties, in the form of Exhibit D and as to such other matters as Administrative Agent may reasonably request, dated as of the Amendment and Restatement Effective Date and otherwise in form and substance reasonably satisfactory to Administrative Agent (and each Credit Party hereby instructs such counsel to deliver such opinions to Agents and Lenders).

(k) <u>Fees</u>. Company shall have paid to Agents actual and invoiced fees payable on the Amendment and Restatement Effective Date referred to in Section 2.11(d).

(l) <u>Closing Date Certificate</u>. Holdings and Company shall have delivered to Administrative Agent an originally executed Closing Date Certificate, together with all attachments thereto.

(m) <u>Closing Date</u>. Lenders shall have made the Additional Term Loans to Company on or before December 19, 2006.

(n) <u>No Litigation</u>. There shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that, in the reasonable opinion of the Administrative Agent, singly or in the aggregate, materially impairs the transactions contemplated by the Credit Documents, or that could have a Material Adverse Effect.

(o) <u>Delivery of the Second Lien Credit Agreement</u>. On or before the Amendment and Restatement Effective Date, Company shall have delivered to the Administrative Agent a complete and correct copy of the Second Lien Credit Agreement. All conditions to funding under the Second Lien Credit Agreement as set forth therein shall have been satisfied or the fulfillment of such conditions shall have been waived, and Company shall have received $115,000,000 in gross proceeds thereunder.

(p) <u>Interest Reserve Account</u>. Company shall have deposited an additional amount into the existing Interest Reserve Account to ensure that the balance of such account is an amount not less than the Interest Reserve.

(q) <u>Completion of Proceedings</u>.  All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all shall be satisfactory in form and substance to Administrative Agent and its counsel, and Administrative Agent and its counsel shall have received all such counterpart originals or certified copies of such documents as Administrative Agent or Syndication Agent may reasonably request.

(r) <u>Interest Periods</u>. All interest accrued up to and including the Amendment and Restatement Effective Date on each Term Loan shall have been paid in full on the Amendment and Restatement Effective Date, and Company shall terminate all outstanding Interest Periods with respect thereto and shall designate new Interest Periods from the Amendment and Restatement Effective Date.

Each Lender, by delivering its signature page to this Agreement and funding a Loan on the Amendment and Restatement Effective Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Amendment and Restatement Effective Date.

## 3.2.  **Conditions to Each Credit Extension.**

(a) <u>Conditions Precedent</u>. The obligation of each Lender to make any Loan, or Issuing Bank to issue any Letter of Credit, on any Credit Date, including the Amendment and Restatement Effective Date, are subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions precedent:

(i) Administrative Agent shall have received a fully executed and delivered Funding Notice or Issuance Notice, as the case may be;

(ii) after making the Credit Extensions requested on such Credit Date, the Total Utilization of Revolving Commitments shall not exceed the Revolving Commitments then in effect;

(iii) as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(iv) as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute an Event of Default or a Default; and

(v) on or before the date of issuance of any Letter of Credit, Issuing Bank shall have received all other information required by the applicable Issuance Notice, and such other documents or information as Issuing Bank may reasonably require in connection with the issuance of such Letter of Credit.

Any Agent or Requisite Lenders shall be entitled, but not obligated to, request and receive, prior to the making of any Credit Extension, additional information reasonably satisfactory to the requesting party confirming the satisfaction of any of the foregoing if, in the good faith judgment of such Agent or Requisite Lenders such request is warranted under the circumstances.

(b) <u>Notices</u>. Any Notice shall be executed by an Authorized Officer in a writing delivered to Administrative Agent. In lieu of delivering a Notice, Company may give Administrative Agent telephonic notice by the required time of any proposed borrowing, conversion/continuation or issuance of a Letter of Credit, as the case may be; <u>provided</u> each such notice shall be promptly confirmed in writing by delivery of the applicable Notice to Administrative Agent on or before the applicable date of borrowing, continuation/conversion or issuance. Neither Administrative Agent nor any Lender shall incur any liability to Company in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a duly authorized officer or other person authorized on behalf of Company or for otherwise acting in good faith.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

In order to induce Lenders and Issuing Bank to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to each Lender and Issuing Bank, on the Amendment and Restatement Effective Date and on each Credit Date, that the following statements are true and correct:

**4.1. Organization; Requisite Power and Authority; Qualification.** Each of Holdings and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified, as of the date hereof, in Schedule 4.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except, in the case of clause (a) (other then with respect to Company) and clause (c) where such failure to be so organized, existing and in good standing or so qualified and in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

**4.2. Capital Stock and Ownership.** The Capital Stock of each of Holdings and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable. Except as set forth on Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which Holdings or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of Holdings or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Holdings or any of its Subsidiaries of any additional membership interests or other Capital Stock of Holdings or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of Holdings or any of its Subsidiaries. Schedule 4.2 correctly sets forth the ownership interest of

NY\1212304.11

Holdings and each of its Subsidiaries in their respective Subsidiaries as of the Amendment and Restatement Effective Date.

**4.3. Due Authorization.** The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

**4.4. No Conflict.** The execution, delivery and performance by Holdings and the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents (i) have been approved by MLB and the NHL and (ii) do not and will not (a) violate any provision of any law or any governmental rule or regulation applicable to Holdings or any of its Subsidiaries, any of the Organizational Documents of Holdings or any of its Subsidiaries, or any order, judgment or decree of any court or other agency of government binding on Holdings or any of its Subsidiaries, except as could not reasonably be expected to have a Material Adverse Effect, (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contractual Obligation of Holdings or any of its Subsidiaries; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Holdings or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of Collateral Agent, on behalf of Secured Parties and the Liens created pursuant to the Second Lien Credit Agreement); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any material Contractual Obligation of Holdings or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Amendment and Restatement Effective Date and disclosed to Lenders.

**4.5. Governmental Consents.** The execution, delivery and performance by Holdings and the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority or MLB or the NHL, except for (i) consents, approvals and notices which will be obtained on or before the Amendment and Restatement Effective Date, (ii) filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Agent for filing and/or recordation, as of the Amendment and Restatement Effective Date and (iii) registrations, consents, approvals, notices or other actions which are not material.

**4.6. Binding Obligation.** Each Credit Document has been duly executed and delivered by Holdings and each Credit Party that is a party thereto and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**4.7. Historical Financial Statements.** The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such

unaudited financial statements, to changes resulting from audit and normal year-end adjustments. As of the Amendment and Restatement Effective Date, neither Company nor any of its Subsidiaries has any contingent liability or liability for taxes, long-term lease or unusual forward or long-term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Company and any of its Subsidiaries taken as a whole.

**4.8. Projections.** On and as of the Amendment and Restatement Effective Date, the Projections of Company and its Subsidiaries for the period of Fiscal Year 2007 through and including Fiscal Year 2010 (the **"Projections"**) are based on good faith estimates and assumptions the management of Company believed to be reasonable at the time prepared; provided, the Projections are not to be viewed as facts and that actual results during the period or periods covered by the Projections may differ from such Projections and that the differences may be material.

**4.9. No Material Adverse Change.** Since December 31, 2005, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

**4.10. Adverse Proceedings, etc.** There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**4.11. Payment of Taxes.** Except as otherwise permitted under Section 5.3, all material tax returns and reports of Company and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all material assessments, fees and other governmental charges upon Company and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable (excluding, in each case, (i) any taxes the amount or validity of which are being actively contested by Company or such Subsidiary in good faith and by appropriate proceedings and (ii) any taxes the failure of which to file or pay would not reasonably be expected to have a Material Adverse Effect). Company knows of no proposed material tax assessment against Company or any of its Subsidiaries which is not being actively contested by Company or such Subsidiary in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

NY\1212304.11

**4.12. Properties.**

(a) <u>Title</u>. Each of Company and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets material to its business and reflected in their respective Historical Financial Statements referred to in Section 4.5 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for (A) assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.9 or (B) minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes. Except as permitted by this Agreement, all such material properties and assets are free and clear of Liens.

(b) <u>Real Estate</u>. As of the Amendment and Restatement Effective Date, Schedule 4.12 contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment. Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and Company does not have knowledge of any material default that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

**4.13. Environmental Matters.** Each of Company and its Subsidiaries is in compliance with all applicable Environmental Laws with respect to any Real Estate Assets or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Company or any of its Subsidiaries, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Neither Company nor any of its Subsidiaries nor any of their respective Facilities or operations is subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. There are and, to each of Holdings' and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Company nor any of its Subsidiaries nor, to either the Company or its Subsidiaries' knowledge, any predecessor of Company or its Subsidiaries has

64

been issued or been required to obtain a permit for the treatment, storage or disposal of hazardous waste for any of its Facilities pursuant to the federal Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq. ("RCRA"), or any equivalent State law, nor are any such Facilities regulated as "interim status" facilities required to undergo corrective action pursuant to RCRA or any state equivalent. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. No event or condition has occurred or is occurring with respect to Company or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

**4.14. No Defaults.** Neither Holdings nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its material Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.

**4.15. Governmental Regulation.** Neither Holdings nor any of its Subsidiaries is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. Neither Holdings nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.16. Margin Stock.** Neither Holdings nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors.

**4.17. Employee Matters.** Neither Company nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect. There is (a) no unfair labor practice complaint pending against Company or any of its Subsidiaries, or to the knowledge of Company, threatened against any of them before the National Labor Relations Board that could reasonably be expected to have a Material Adverse Effect and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Company or any of its Subsidiaries or to the knowledge of Company, threatened against any of them that could reasonably be expected to have a Material Adverse Effect, (b) no strike or work stoppage in existence or to the knowledge of Company threatened involving Company or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, and (c) to the knowledge of Company, no union

65

representation question existing with respect to the employees of Company or any of its Subsidiaries and, to the knowledge of Company, no union organization activity that is taking place, except as is not reasonably likely to have a Material Adverse Effect.

**4.18. Labor Matters.** Except as set forth on Schedule 4.18, as of the date hereof, there are no strikes, lockouts, slowdowns or stoppages against MLB, the NHL, or any Credit Party pending or, to the knowledge of Company, threatened. Neither Company nor any Subsidiary will be engaged in unfair labor practice that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Except as set forth on Schedule 4.18, as of the date hereof, there is (a) no unfair labor practice or complaint pending or overtly threatened against any Credit Party or, to the knowledge of any Credit Party, MLB or the NHL, before the National Labor Relations Board, (b) no grievance or arbitration proceeding arising out of or under any collective bargaining agreement pending or overtly threatened against any Credit Party or, to the knowledge of any Credit Party, MLB or the NHL, (c) no labor dispute pending or overtly threatened against any Credit Party or, to the knowledge of Company, MLB or the NHL, (d) to the knowledge of any Credit Party, no union representation question existing with respect to the employees of any Credit Party, MLB or the NHL and (e) to the knowledge of any Credit Party no union organizing activities taking place with respect to the employees of any Credit Party, except in each case, such as could not be reasonably expected to result, individually or in the aggregate, in a Material Adverse Effect. Any representation of any Credit Party made in the preceding sentence and qualified as to the knowledge of such Credit Party shall be made without any obligation of such Credit Party to make any inquiry in regard to such representation. The hours worked by and payments made to employees of Company and the Subsidiaries have not been in material violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. All payments due from Company or any Subsidiary, or for which any claim may be made against Company or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or, if required, will be accrued as a liability on the books of Company or such Subsidiary in accordance with GAAP. The consummation of the transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Company or any Subsidiary is bound.

**4.19. Employee Benefit Plans.** Holdings, each of its Subsidiaries and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan except for such non-compliance or non-performance that could not reasonably be expected to have a Material Adverse Effect. Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status except for such non-qualification that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. No material liability to the PBGC (other than required premium payments), or with respect to any Employee Benefit Plan under Title IV of ERISA has been or is reasonably expected to be incurred by Holdings, any of its Subsidiaries or any of their ERISA Affiliates. No ERISA Event has occurred or is reasonably

NY\1212304.11

expected to occur that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by Holdings, any of its Subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan. As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of Holdings, its Subsidiaries and their respective ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA could not reasonably be expected to have a Material Adverse Effect.

**4.20. Certain Fees.** No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby.

**4.21. Solvency.** On the Amendment and Restatement Effective Date, the Credit Parties, taken as a whole, are Solvent.

**4.22. Compliance with Statutes, etc.** Each of Holdings and its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities (including those of MLB and the NHL), in respect of the conduct of its business and the ownership of its property (but excluding compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Holdings or any of its Subsidiaries which is covered by Section 4.14), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.23. Disclosure.** All factual information (other than projections and information of a general economic or industry specific nature) of Holdings or any Credit Party contained in any Credit Document or in any other documents, certificates or written statements furnished to Lenders by or on behalf of Holdings or any of its Subsidiaries by their representatives for use in connection with the transactions contemplated hereby does not contain any untrue statement of a material fact or omit to state a material fact (known to Company, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made. Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Company to be reasonable at the time made, it being recognized by Lenders that such projections as to future events are not to be viewed as facts, that actual results during the period or periods covered by any such projections may differ from the projected results and that such variances may be material. There are no facts known (or which should upon the reasonable exercise of diligence be known) to Company (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to Lenders for use in connection with the transactions contemplated hereby.

67

**4.24. Patriot Act.** To the extent applicable, Holdings and each Credit Party is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the Untied States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001). No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

## SECTION 5. AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full of all Obligations (other than indemnification obligations) and cancellation or expiration of, or other provision for in a manner reasonably satisfactory to the Administrative Agent, all Letters of Credit, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

**5.1. Financial Statements and Other Reports.** Company will deliver to Administrative Agent and Lenders:

(a) [Reserved.]

(b) Quarterly Financial Statements. As soon as available, and in any event within forty-five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year, the consolidated and consolidating balance sheets of Company and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(c) Annual Financial Statements. As soon as available, and in any event within ninety (90) days after the end of each Fiscal Year, (i) the consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Year and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and the corresponding figures from the Financial Plan for the Fiscal Year covered by such financial statements, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto; and (ii) with respect to such consolidated financial statements a report thereon of KPMG LLP or other independent certified public accountants of

68

recognized national standing selected by Company, and reasonably satisfactory to the Administrative Agent (which report shall be unqualified as to going concern and scope of audit, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) together with a written statement by such independent certified public accountants stating whether, in connection therewith, any condition or event that constitutes an Event of Default under Section 6.8(a), (b) or (c) has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof;

(d) <u>Compliance Certificate</u>. Together with each delivery of financial statements of Holdings and its Subsidiaries (or Company and its Subsidiaries, as applicable) pursuant to Sections 5.1(b) and 5.1(c), a duly executed and completed Compliance Certificate;

(e) <u>Statements of Reconciliation after Change in Accounting Principles</u>. If, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Company and its Subsidiaries delivered pursuant to Section 5.1(b) or 5.1(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance reasonably satisfactory to the Administrative Agent;

(f) <u>Notice of Default</u>. Promptly upon any Authorized Officer of Holdings or Company obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Holdings or Company with respect thereto; (ii) that any Person has given any notice to Holdings or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.1(b); or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action Company has taken, is taking and proposes to take with respect thereto;

(g) <u>Notice of Litigation</u>. Promptly upon any Authorized Officer of Holdings or Company obtaining knowledge of (i) the institution of, or non-frivolous threat of, any Adverse Proceeding not previously disclosed in writing by Company to Lenders, or (ii) any material development in any Adverse Proceeding that, in the case of either clause (i) or (ii), could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the credit transactions contemplated hereby, written notice thereof together with such other information as

69

may be reasonably available to Holdings or Company to enable Lenders and their counsel to evaluate such matters;

(h) ERISA. (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event that, individually or in the aggregate, could reasonably be expected to result in a liability to Holdings or any of its Subsidiaries in excess of $1,000,000, a written notice specifying the nature thereof, what action Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Pension Plan or Multiemployer Plan as each Administrative Agent shall reasonably request;

(i) Financial Plan. As soon as practicable and in any event no later than thirty (30) days prior to the beginning of each Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year and each of the two subsequent Fiscal Years (or portion thereof through the final maturity date of the Loans) (a "**Financial Plan**"), including (i) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of Company and its Subsidiaries for each such Fiscal Year, together with pro forma Compliance Certificates for each such Fiscal Year and an explanation of the assumptions on which such forecasts are based, and (ii) forecasted consolidated statements of income and cash flows of Company and its Subsidiaries for each quarter of each such Fiscal Year and (iii) forecasts demonstrating projected compliance with the requirements of Section 6.8 through the next two subsequent Fiscal Years;

(j) Insurance Report. Together with delivery of the financial statements required pursuant to Section 5.1(e), a report in form satisfactory to Collateral Agent outlining any material changes in the insurance coverage from that maintained by Holdings and its Subsidiaries in the immediately preceding Fiscal Year;

(k) Information Regarding Collateral. (a) Company will furnish to Collateral Agent prompt written notice of any change (i) in Holdings or any Credit Party's corporate name, (ii) in Holdings or any Credit Party's identity or corporate structure or (iii) in Holdings or any Credit Party's Federal Taxpayer Identification Number. Company agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated in the Collateral Documents. Company also agrees promptly to notify Collateral Agent if any material portion of the Collateral is damaged or destroyed;

(l) Annual Collateral Verification. Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.1(c), the

Company shall deliver to Collateral Agent a certificate of its Authorized Officer (i) either confirming that there has been no change in the information (other than such changes which individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect) set forth in the Schedules delivered on the Amendment and Restatement Effective Date (as such information may have been updated, supplemented or modified prior to the delivery of such certificate pursuant to the Credit Documents) or the date of the most recent certificate delivered pursuant to this Section and/or identifying such changes; and (ii) certifying that all Uniform Commercial Code financing statements (including fixtures filings, as applicable) or other appropriate filings, recordings or registrations, have been delivered to Collateral Agent in accordance with the Credit Documents for recordation in each governmental, municipal or other appropriate office in each jurisdiction identified pursuant to the information referred to in clause (i) above to the extent necessary to protect and perfect the security interests under the Collateral Documents;

       (m)  <u>Other Information</u>.  (A) Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by Company to its security holders acting in such capacity or by any Subsidiary of Company to its security holders other than Company or another Subsidiary of Company, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Holdings or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority, (iii) any delivery of communication from or to MLB or the NHL which is material to the operations of Holdings or any Team Subsidiary or which relates to any event which, alone or together with any other events that have occurred, could reasonably be expected to result in a Material Adverse Effect, and (B) such other information and data with respect to Holdings or any of its Subsidiaries as from time to time may be reasonably requested by either Administrative Agent or any Lender;

       (n)  <u>Certification of Public Information</u>.  Concurrently with the delivery of any document or notice required to be delivered pursuant to this Section 5.1, Company shall indicate in writing whether such document or notice contains Nonpublic Information.  Any document or notice required to be delivered pursuant to this Section 5.1 shall be deemed to contain Nonpublic Information unless Company specifies otherwise.  Company and each Lender acknowledges that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material non-public information with respect to Holdings, its Subsidiaries or their securities) and, if documents or notices required to be delivered pursuant to this Section 5.1 or otherwise are being distributed through IntraLinks/IntraAgency or another relevant website (the **"Platform"**), any document or notice which contains Nonpublic Information (or is deemed to contain Nonpublic Information) shall not be posted on that portion of the Platform designated for such public side Lenders;

       (o)  <u>Attendance Data</u>.  Within forty-five (45) days after the end of each Fiscal Quarter, the attendance data relating to each Team Subsidiary and any other related operating data of the Team Subsidiaries reasonably requested by either Administrative Agent, in each case in a form reasonably satisfactory to the Administrative Agent; and

       (p)  <u>Amendments or Modifications to NHL or MLB Rules</u>.  Promptly after the same are adopted by the NHL or MLB, or received by Holdings, the Company or any Team

71

Subsidiary, any copies of amendments of or modifications to the NHL Rules or the MLB Rules and copies of all material reports and other information received from or sent to the NHL or MLB which could reasonably be expected to be material and adverse to the Lenders.

**5.2. Existence.** Except as otherwise permitted under Section 6.9, Holdings and each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect (a) its existence; provided, neither Holdings nor any Credit Party or any of its Subsidiaries other than Company shall be required to preserve any such existence if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Lenders or (b) all rights and franchises, licenses and permits the failure of which to preserve and keep in full force and effect could not reasonably be expected to have a Material Adverse Effect.

**5.3. Payment of Taxes and Claims.** Each Credit Party will, and will cause each of its Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, no such Tax or claim need be paid if (i) it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim or (ii) such non-payment would not reasonably be expected to have a Material Adverse Effect. No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than Holdings or any of its Subsidiaries).

**5.4. Maintenance of Properties.** Each Credit Party will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all material properties used or useful in the business of Holdings and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof.

**5.5. Insurance.** Holdings will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Holdings and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons. Without limiting the generality of the foregoing, Holdings will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors

72

of the Federal Reserve System, and (b) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses. Each such policy of insurance shall (i) name Collateral Agent, on behalf of Secured Parties as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, reasonably satisfactory in form and substance to Collateral Agent, that names Collateral Agent, on behalf of Lenders as the loss payee thereunder and provides for at least thirty days' prior written notice to Collateral Agent of any modification or cancellation of such policy (or ten days in the case of cancellation for non-payment).

**5.6. Inspections.** Each Credit Party will, and will cause each of its Subsidiaries to, permit any authorized representatives designated by Administrative Agent to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to inspect and discuss its and their affairs, finances, financial records and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested, _provided_ that (i) such Person shall notify Company prior to any contact with such accountants and give Company the opportunity to participate in such discussions and (ii) unless an Event of Default shall have occurred and be continuing, neither Agent nor any Lender may exercise its inspection rights hereunder more than twice in any calendar year.

**5.7. Lenders Meetings.** Holdings and Company will, upon the request of either Administrative Agent or Requisite Lenders, participate (via teleconference or otherwise) in a meeting of Administrative Agent and Lenders once during each Fiscal Year to be held at such location as may be agreed to by Company and the Administrative Agent at such time as may be agreed to by Company and the Administrative Agent.

**5.8. Compliance with Laws.** Holdings and each Credit Party will comply, and shall cause each of its Subsidiaries and all other Persons, if any, on or occupying any Facilities to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws), and of MLB and the NHL, noncompliance with which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.9. Environmental.**

(a) _Environmental Disclosure._ Holdings will deliver to Administrative Agent and Lenders:

(i) as soon as practicable following receipt thereof, copies of all environmental assessments, investigations, analyses and reports with respect to environmental matters at any Facility or which related to any environmental liabilities of Holdings or its Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

73

(ii) promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, (2) any remedial action taken by Holdings or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (3) Holdings or Company's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could reasonably be expected to cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii) as soon as practicable following the sending or receipt thereof by Holdings or any of its Subsidiaries, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (3) any request for information from any governmental agency that suggests such agency is investigating whether Holdings or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity that individually or in the aggregate has a reasonable possibility of giving rise to a Material Adverse Effect;

(iv) prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Holdings or any of its Subsidiaries that could reasonably be expected to expose Holdings or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (2) any proposed action to be taken by Holdings or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Holdings or any of its Subsidiaries to any additional obligations or requirements under any Environmental Laws that would have a material financial impact on Holdings or any of its Subsidiaries; and

(v) with reasonable promptness, such other non-privileged documents and information as from time to time may be reasonably requested by Administrative Agent in relation to any matters disclosed pursuant to this Section 5.9(a).

(b) Hazardous Materials Activities, Etc. Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

74

**5.10. Subsidiaries.** In the event that any Person becomes a Domestic Subsidiary of Company, Company shall (a) promptly cause such Domestic Subsidiary to become a Guarantor hereunder and a Grantor under the Pledge and Security Agreement by executing and delivering to Collateral Agent a Counterpart Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.1(b), 3.1(h), 3.1(i), 3.1(j) and 3.1(l). In the event that any Person becomes a Foreign Subsidiary of Company, and the ownership interests of such Foreign Subsidiary are owned by Company or by any Domestic Subsidiary thereof, Company shall take, or shall cause such Domestic Subsidiary to take, all of the actions referred to in Section 3.1(g)(i) necessary to grant and to perfect a First Priority Lien other than Permitted Liens in favor of Collateral Agent, for the benefit of Secured Parties, under the Pledge and Security Agreement in 65% of such ownership interests. With respect to each such Subsidiary, Company shall promptly send to Collateral Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Company, and (ii) all of the data required to be set forth in Schedules 4.1 and 4.2 with respect to all Subsidiaries of Company; provided, such written notice shall be deemed to supplement Schedule 4.1 and 4.2 for all purposes hereof.

**5.11. Additional Material Real Estate Assets.** In the event that any Credit Party acquires a Material Real Estate Asset or a Real Estate Asset owned or leased on the Amendment and Restatement Effective Date becomes a Material Real Estate Asset and such interest has not otherwise been made subject to the Lien of the Collateral Documents in favor of Collateral Agent, for the benefit of Secured Parties, then such Credit Party shall promptly take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions and certificates similar to those described in Section 3.1(f) with respect to each such Material Real Estate Asset that Collateral Agent shall reasonably request to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in such Material Real Estate Assets. In addition to the foregoing, Company shall, at the request of Requisite Lenders, deliver, from time to time, to Collateral Agent such appraisals as are required by law or regulation of Real Estate Assets with respect to which Collateral Agent has been granted a Lien.

**5.12. Interest Rate Protection.** No later than ninety (90) days following the Amendment and Restatement Effective Date and at all times thereafter until the second anniversary of the Amendment and Restatement Effective Date, Company shall obtain and cause to be maintained protection against fluctuations in interest rates pursuant to one or more Interest Rate Agreements in form and substance reasonably satisfactory to the Administrative Agent, in order to ensure that a notional amount of no less than 50% of the aggregate principal amount of (a) the Term Loans of Company and its Subsidiaries and (b) the total Second Lien Term Loan Indebtedness of Company and its Subsidiaries is either (i) subject to such Interest Rate Agreements or (ii) Indebtedness that bears interest at a fixed rate.

**5.13. Further Assurances.** At any time or from time to time upon the reasonable request of Administrative Agent, Holdings and each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Agent may reasonably request in order to effect fully the

purposes of the Credit Documents. In furtherance and not in limitation of the foregoing, Holdings and each Credit Party shall take such actions as Administrative Agent or Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of Holdings and its Subsidiaries and all of the outstanding Capital Stock of Company and its Subsidiaries (subject to limitations contained in the Credit Documents with respect to Foreign Subsidiaries).

### 5.14. Non-Consolidation.

(a) Holdings will: (i) maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity; (ii) not commingle its funds or assets with those of any other entity which is an Affiliate of such entity; and (iii) provide that its board of directors or other analogous governing body will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of other entities; and

(b) Company will and will cause each of its Subsidiaries to: (i) maintain entity records and books of account separate from those of any other entity which is an Affiliate (other than Company and its Subsidiaries) of such entity; (ii) not commingle its funds or assets with those of any other entity which is an Affiliate (other than Company and its Subsidiaries) of such entity; and (iii) provide that its board of directors or other analogous governing body will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of other entities.

### 5.15. Interest Reserve Account. Company shall maintain the Interest Reserve Account at all times the Obligations are outstanding.

### 5.16. Team Proceeds Accounts. No less than 45 days prior to the sale of (i) the Rangers, Company shall establish the Rangers Proceeds Account and (ii) the Stars, Company shall establish the Stars Proceeds Account. Upon the receipt of any proceeds in connection with the sale of (i) the Rangers, Company shall cause the Rangers to distribute to Company the Net Asset Sale Proceeds thereof and immediately deposit such funds into the Rangers Proceeds Account and (ii) the Stars, Company shall cause the Stars to distribute to Company the Net Asset Sale Proceeds thereof and immediately deposit such funds into the Stars Proceeds Account.

### 5.17. Post-Closing Covenant. Company shall use its commercially reasonable efforts to enter into definitive documentation respecting the amendment of the Series B Preferred Unit Agreement relating to the Fox Preferred Stock substantially in accordance with the letter of intent dated December 5, 2006 (the "Letter of Intent") and to enter into any additional agreements required by the Letter of Intent.

## SECTION 6. NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full of all Obligations (other than indemnification obligations) and cancellation or expiration of all Letters of Credit, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

**6.1. Indebtedness.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a) the Obligations;

(b) Indebtedness of any Subsidiary to Company or to any other Guarantor Subsidiary, or of Company to any Guarantor Subsidiary; provided, (i) all such Indebtedness shall be evidenced by promissory notes and all such notes shall be subject to a First Priority Lien pursuant to the Pledge and Security Agreement, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of any applicable promissory notes or an intercompany subordination agreement that, in any such case, is reasonably satisfactory to Administrative Agent, (iii) any payment by any such Guarantor Subsidiary under any guaranty of the Obligations shall result in a pro tanto reduction of the amount of any Indebtedness owed by such Subsidiary to Company or to any of its Subsidiaries for whose benefit such payment is made and (iv) any Investment giving rise to such Indebtedness is permitted by Section 6.7;

(c) Second Lien Term Loan Indebtedness in an aggregate principal amount not to exceed $115,000,000 which shall be subject to the Intercreditor Agreement and Permitted Refinancings thereof;

(d) Indebtedness incurred by Company or any of its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of Company or any such Subsidiary pursuant to such agreements, in connection with Permitted Acquisitions or permitted dispositions of any business, assets or Subsidiary of Holdings or any of its Subsidiaries;

(e) Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(f) Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(g) guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of its Subsidiaries;

(h) guaranties by Company of Indebtedness of a Subsidiary or guaranties by a Subsidiary of Company of Indebtedness of Company or a Subsidiary with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1;

(i) Indebtedness described in Schedule 6.1 and Permitted Refinancing thereof;

(j) Indebtedness with respect to Capital Leases in an aggregate amount not to exceed $2,500,000;

(k)   purchase money Indebtedness in an aggregate amount not to exceed at any time $2,500,000 (including any Indebtedness acquired in connection with a Permitted Acquisition); provided, any such Indebtedness shall be secured only by the asset acquired in connection with the incurrence of such Indebtedness and proceeds thereof;

(l)   Indebtedness with respect to Hedge Agreements;

(m)   Indebtedness of any Person that becomes a Subsidiary after the Closing Date pursuant to a Permitted Acquisition; provided, (A) such Indebtedness exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary and (B) after giving affect to any transaction resulting in such Person becoming a Subsidiary, the requirements of Section 6.7 are satisfied;

(n)   Indebtedness incurred in connection with the financing of insurance premiums in the ordinary course of business;

(o)   Indebtedness in respect of sale and leaseback transactions permitted under Section 6.11;

(p)   Indebtedness (other than for borrowed money) subject to Liens permitted by Section 6.2;

(q)   other unsecured Indebtedness of Company and its Subsidiaries, in an aggregate amount not to exceed at any time $2,500,000;

(r)   Indebtedness resulting from any increase in the Rangers MLB Facility (the "**Rangers MLB Facility Increase**");

(s)   Indebtedness with respect to any Immaterial Subsidiary in an aggregate amount not to exceed at any time $2,000,000; and

(t)   Indebtedness incurred pursuant to the MLB Documents in which substantially all MLB franchises are required to participate, made on substantially the same terms and subject to substantially the same conditions for all MLB franchises.

**6.2.   Liens.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Company or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any State or under any similar recording or notice statute, except:

(a)   Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to any Credit Document;

(b)   Liens for Taxes the payment of which is not required by Section 5.3;

78

(c) statutory Liens of landlords, banks (and rights of set-off), carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any material amounts overdue for a period in excess of fifteen days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(d) Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(e) easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of Holdings or any of its Subsidiaries;

(f) any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(g) Liens solely on any cash earnest money deposits made by Holdings or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(h) purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(i) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j) any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(k) licenses or sub-licenses of patents, trademarks and other intellectual property rights granted by Holdings or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of Company or such Subsidiary;

(l) Liens described in Schedule 6.2 or on a title report delivered pursuant to Section 3.1(h)(iv);

(m) Liens securing Indebtedness permitted pursuant to Section 6.1(j) and (k); provided, any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness;

(n) Liens arising against any Ranger assets under the MLB Rules;

(o) any Lien existing on any property or asset prior to the acquisition thereof by Company or any Subsidiary or existing on any property or assets of any Person that becomes a Subsidiary after the Amendment and Restatement Effective Date prior to the time such Person becomes a Subsidiary; provided, (i) such Lien is not created in contemplation of or in connection with such Person becoming a Subsidiary, (ii) such Lien shall not apply to any other property or assets of Company or any Subsidiary and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be and Permitted Refinancings thereof;

(p) options granted on Players in the ordinary course of business consistent with industry practice;

(q) Liens on assets sold pursuant to a sale and leaseback transaction permitted under Sections 6.1 and 6.11 and general intangibles related thereto;

(r) any obligations or duties affecting any property of Company or its Subsidiaries to any municipality or public authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(s) attachment or judgment liens not constituting an Event of Default under Section 8.1(h);

(t) other Liens on assets other than the Collateral securing Indebtedness in an aggregate amount not to exceed $1,000,000 at any time outstanding; and

(u) Liens on the Collateral securing Second Lien Term Loan Indebtedness and all collateral documents related thereto.

**6.3. Equitable Lien.** If Holdings or any Credit Party shall create or assume any Lien upon any of the Collateral, whether now owned or hereafter acquired, other than Permitted Liens, it shall make or cause to be made effective provisions whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; provided, notwithstanding the foregoing, this covenant shall not be construed as a consent by Requisite Lenders to the creation or assumption of any such Lien not otherwise permitted hereby.

**6.4. No Further Negative Pledges.** Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale, (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions

are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be) (c) restrictions or conditions imposed by law, the MLB Rules, the NHL Rules or by any Credit Document, and (d) restrictions or conditions in the Second Lien Credit Agreement or any other document executed in connection therewith or in respect of permitted Indebtedness of Holdings, neither Holdings nor any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**6.5. Restricted Junior Payments.** No Credit Party shall, nor shall it permit any of its Subsidiaries through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment except:

(a) the distribution made to Holdings on the Amendment and Restatement Effective Date to (i) repay or repurchase in part certain Indebtedness of Holdings to Hicks in the amount of $53.0 million and (ii) partially redeem the Fox Preferred Stock in the amount of $42.9 million;

(b) [Reserved];

(c) Company may make regularly scheduled payments of interest in respect of the Second Lien Term Loans in accordance with the terms of this Agreement, the Second Lien Credit Agreement and the Intercreditor Agreement;

(d) [Reserved];

(e) Company may make Restricted Junior Payments to Holdings, the proceeds of which shall be used to pay administrative, legal and accounting services provided by third parties to Holdings that are reasonable and customary and incurred in the ordinary course of business for such professional services in an aggregate amount not exceeding $250,000 in any Fiscal Year;

(f) each Subsidiary of Company may make Restricted Junior Payments to Company and to Guarantor Subsidiaries; and

(g) So long as the Company is treated as a partnership or a "disregarded entity" for United States federal and state income tax purposes, the Company may make tax distributions to Holdings, from time to time as appropriate, in an amount not to exceed the hypothetical tax that the Company would have been required to pay to the government if it were filing a separate tax return but for this purpose using the highest combined federal and state tax rate applicable to an individual residing in Texas.

**6.6. Restrictions on Subsidiary Distributions.** Except as provided herein, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Company to (a) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by Company or any other Subsidiary of Company, (b) repay or prepay any Indebtedness owed by such Subsidiary to Company or any other Subsidiary of Company, (c) make loans or advances to Company or any other Subsidiary of Company, or

81

(d) transfer any of its property or assets to Company or any other Subsidiary of Company other than restrictions (i) in agreements evidencing Indebtedness permitted by Section 6.1(j) and (k) that impose restrictions on the property so acquired, (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business, (iii) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Capital Stock not otherwise prohibited under this Agreement, (iv) described on Schedule 6.6, (v) in the Second Lien Term Loan or (vi) imposed by applicable law.

**6.7. Investments.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including without limitation any Joint Venture, except:

(a) Investments in Cash and Cash Equivalents;

(b) equity Investments owned as of the Closing Date in any Subsidiary and Investments made after the Closing Date in the Company and any wholly-owned Guarantor Subsidiaries of Company (including a new Subsidiary that becomes a Guarantor Subsidiary);

(c) Investments (i) in any Securities received in satisfaction or partial satisfaction of accounts of financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Holdings and its Subsidiaries;

(d) intercompany loans to the extent permitted under Section 6.1(b);

(e) loans and advances to employees of Company and its Subsidiaries made in the ordinary course of business in an aggregate principal amount not to exceed $500,000 in the aggregate;

(f) Investments made in connection with Liens permitted pursuant to Section 6.2(d) and (g), Restricted Junior Payments made pursuant to Section 6.5 and Permitted Acquisitions permitted pursuant to Section 6.9;

(g) Investments described in Schedule 6.7;

(h) other Investments in an aggregate amount not to exceed at any time $1,000,000;

(i) investments in MLB ventures in which substantially all MLB franchises are required to participate, made on substantially the same terms and subject to substantially the same conditions as the investments made by other MLB franchises;

(j) investments in league-wide licensing or other NHL ventures in which all NHL member clubs are required to participate, made on the same terms and subject to the same conditions as available to other NHL member clubs;

82

(k) capital contributions to the Stars, <u>provided</u> that each such capital contribution is in the form of intercompany debt;

(l) guaranties permitted pursuant to Section 6.1;

(m) promissory notes and other similar non-cash consideration received by Company or any of its Subsidiaries in connection with dispositions permitted by Section 6.9;

(n) Investments in the Rodeo Entities in an aggregate amount not to exceed at any time $1,500,000;

(o) Investments with respect to non-Guarantor Subsidiaries (other than the Rodeo Entities) in an aggregate amount not to exceed at any time $250,000; and

(p) Investments in Currency Agreements with a Lender Counterparty; <u>provided</u> that such Currency Agreements are entered into in the ordinary course of business and not for speculative purposes.

Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.5.

### 6.8. Financial Covenants.

(a) <u>Consolidated Total Debt</u>. Company shall not permit the Consolidated Total Debt to be greater than $600,000,000; <u>provided</u> that such maximum amount shall be reduced by the sum of (i) commitment reductions in the Rangers MLB Facility that are not refinanced in connection with a subsequent Rangers MLB Facility, and (ii) the permanent repayment of the Obligations pursuant to Section 2.15 on a dollar-for-dollar basis.

(b) [Reserved.]

(c) <u>Liquidity Covenant</u>. Company shall not permit Liquidity to be less than $15,000,000 for any period of five consecutive Business Days.

(d) <u>Certain Calculations</u>. With respect to any period during which a Permitted Acquisition or an Asset Sale has occurred (each, a "**Subject Transaction**"), for purposes of determining compliance with the financial covenants set forth in this Section 6.8 (but not for purposes of determining the Applicable Margin or Applicable Revolving Commitment Fee Percentage) such financial covenants (and the financial calculations and components thereof) shall be calculated with respect to such period on a pro forma basis (including pro forma adjustments arising out of events which are directly attributable to a specific transaction, are factually supportable and are expected to have a continuing impact, in each case determined on a basis consistent with Article 11 of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the Securities and Exchange Commission, which would include cost savings resulting from head count reduction, closure of facilities and similar restructuring charges of Company and its Subsidiaries) using the historical audited financial statements of any business so acquired or to be acquired or sold or to be sold and the consolidated financial

statements of Company and its Subsidiaries which shall be reformulated as if such Subject Transaction, and any Indebtedness incurred or repaid in connection therewith, had been consummated or incurred or repaid at the beginning of such period (and assuming that such Indebtedness bears interest during any portion of the applicable measurement period prior to the relevant acquisition at the weighted average of the interest rates applicable to outstanding Loans incurred during such period).

(e) <u>Labor Event</u>. During any Fiscal Quarter in which a Labor Event shall have occurred, Company may request at its option that compliance with Sections 6.8(a) and (c) shall not be measured for such Fiscal Quarter and up to three additional Fiscal Quarters immediately following (in no event to exceed four consecutive Fiscal Quarters) (the "**Financial Covenant Grace Period**").

**6.9. Fundamental Changes; Disposition of Assets; Acquisitions.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and capital expenditures in the ordinary course of business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a) any Subsidiary of Company may be merged with or into Company or any Subsidiary, or be liquidated, wound up or dissolved, <u>provided</u>, in the case of such a merger, Company shall be the continuing or surviving Person and in the case of a merger with a Guarantor Subsidiary the Guarantor Subsidiary shall be the continuing or surviving Person;

(b) [Reserved.]

(c) Asset Sales, the proceeds of which (valued at the principal amount thereof in the case of non-Cash proceeds consisting of notes or other debt Securities and valued at fair market value in the case of other non-Cash proceeds) when aggregated with the proceeds of all other Asset Sales made within the same Fiscal Year, are less than $1,000,000; <u>provided</u> the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of Company (or similar governing body));

(d) disposals of obsolete, worn out or surplus property or property no longer used in the conduct of business;

(e) Permitted Acquisitions, the consideration for which constitutes less than $5,000,000 in the aggregate from the Closing Date to the date of determination;

(f) Investments made in accordance with Section 6.7;

(g) any sale, exchange or other transfer of Player Contracts made in the ordinary course of business;

(h) any sale of memorabilia made in the ordinary course of business;

(i) any sale, transfer, licensing or other disposition of assets required of all MLB clubs by MLB pursuant to the MLB Rules;

(j) the Rodeo Disposition; provided that neither Company nor any Subsidiary shall assume or retain any Indebtedness or other liability related to any Rodeo Entity;

(k) [Reserved.]

(l) the MLB Advanced Media Disposition;

(m) a merger, consolidation or liquidation the purpose of which is to effect an Investment permitted by Section 6.7 or a disposition permitted by this Section 6.9;

(n) sales or discounts of overdue accounts receivable in the ordinary course of business in connection with the compromise or collection thereof;

(o) licenses or sublicenses of intellectual property and general intangibles, and leases, subleases and licenses of other property, in each case made in the ordinary course of business for commercially reasonable value;

(p) Company or any Subsidiary of the Company may convey, sell, lease, transfer or otherwise dispose of, in one or a series of transactions, all or any part of its business, property or assets to Company or any Subsidiary; provided, that if the transferor in such transaction is a Guarantor Subsidiary then the transferee must either be Company or a Guarantor Subsidiary;

(q) transfers of property subject to casualty or condemnation upon receipt of the Net Insurance/Condemnation Proceeds;

(r) dispositions of property pursuant to sale and lease-back transactions permitted by Section 6.11;

(s) Restricted Junior Payments permitted under Section 6.5;

(t) sales, leases, sub-leases, exchanges, transfers or other dispositions so long as the aggregate fair market value thereof does not exceed $1,000,000 in any Fiscal Year.

(u) inventory sold or leased in the ordinary course of business; and

(v) dispositions of Cash Equivalents.

**6.10. Disposal of Subsidiary Interests.** Except for any sale of all of its interests in the Capital Stock of any of its Subsidiaries to the extent permitted by the provisions of Section 6.9 and as provided in the Second Lien Credit Agreement or any agreement executed in connection therewith, no Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or

85

indirectly sell, assign, pledge or dispose of any Capital Stock of any of its Subsidiaries, except to qualify directors if required by applicable law; or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or dispose of any Capital Stock of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualify directors if required by applicable law.

**6.11. Sales and Lease-Backs.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than Holdings or any of its Subsidiaries), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than Holdings or any of its Subsidiaries) in connection with such lease provided that this Section 6.11 shall not prohibit any sale and leaseback arrangement resulting from the incurrence of any lease in respect of any capital asset otherwise permitted hereunder and entered into within 90 days of the acquisition of such capital asset for the purpose of providing permanent financing of such capital asset, provided, further, that financing pursuant to this Section 6.11 shall not exceed 100% of the purchase price of such assets.

**6.12. Transactions with Shareholders and Affiliates.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Company on terms that are less favorable to Company or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided, the foregoing restriction shall not apply to (a) any transaction between Company and any Guarantor Subsidiary; (b) reasonable and customary fees paid to members of the board of directors (or similar governing body) of Holdings and its Subsidiaries; (c) compensation arrangements for officers and other employees of Holdings and its Subsidiaries entered into in the ordinary course of business; (d) transactions described in Schedule 6.12, (e) the making of any Restricted Junior Payments permitted by Section 6.5, (f) the incurrence of Indebtedness permitted by Section 6.1(b) and (g) the making of any investments, loans or advances permitted by Sections 6.7(b) and (d).

**6.13. Conduct of Business.** From and after the Amendment and Restatement Effective Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by such Credit Party on the Amendment and Restatement Effective Date and similar or related businesses and (ii) such other lines of business as may be consented to by Requisite Lenders.

**6.14. Permitted Activities of Holdings.** Holdings shall not (a) engage in any business other than in connection with or incidental to (i) purchasing and owning the Capital Stock of Company, (ii) issuing and selling its Capital Stock or options or warrants in respect thereof, (iii) entering into and performing its obligations under and in accordance with the Credit Documents to which it is a party and (iv) other activities contemplated by this subsection 6.14 or (b) own any assets other than (i) the Capital Stock of Company, (ii) Cash and Cash Equivalents for the purpose of paying general operating expenses of Holdings and (iii) pursuant to a purchase or

86

acquisition of all or substantially all of the property and assets or business or a division of a Person, or all of the Capital Stock in a Person, <u>provided</u> that immediately upon such purchase or acquisition the same is contributed to Company, (c) have any Indebtedness or other liability other than its obligations under the Credit Documents or other unsecured Indebtedness of Holdings which (x) does not require any cash payment until the earlier of the Revolving Commitment Termination Date and the Term Loan Maturity Date and (y) does not mature earlier than six months after the later of the Revolving Loan Commitment Termination Date and the final maturity date of the Term Loans, and (z) is otherwise on terms reasonably satisfactory to the Administrative Agent, or (d) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

**6.15. Amendments or Waivers of the Second Lien Credit Agreement.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, amend or otherwise change the terms of the Second Lien Credit Agreement if the effect of such amendment or change, together with all other amendments or changes made, is to increase materially the obligations of the obligors thereunder or to confer any additional material rights on the lenders under the Second Lien Credit Agreement (or a representative on their behalf) which would be materially adverse to any Credit Party or Lender, except as otherwise expressly permitted by the terms of the Intercreditor Agreement.

**6.16. [Reserved.]**

**6.17. Fiscal Year.** No Credit Party (other than a Stars entity) shall change its Fiscal Year-end from December 31 and, in the case of a Stars Entity, June 30.

## SECTION 7. GUARANTY

**7.1. Guaranty of the Obligations.** Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the **"Guaranteed Obligations"**); <u>provided</u> that notwithstanding anything to the contrary contained in this Agreement or the Second Lien Credit Agreement, in no event shall the (i) Rangers guaranty of the Obligations and the Obligations (as defined in the Second Lien Credit Agreement) exceed in the aggregate $75,000,000 and (ii) Stars Entity guaranty of the principal amount of the Obligations and the Obligations (as defined in the Second Lien Credit Agreement) exceed in the aggregate $100,000,000.

**7.2. Contribution by Guarantors.** All Guarantors desire to allocate among themselves (collectively, the **"Contributing Guarantors"**), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a **"Funding Guarantor"**) under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause

87

each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. **"Fair Share"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed. **"Fair Share Contribution Amount"** means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the **"Fair Share Contribution Amount"** with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. **"Aggregate Payments"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2. Notwithstanding anything herein or in the Second Lien Credit Agreement to the contrary, the Fair Share Contribution Amount together with any Fair Share Contribution Amount (as defined in the Second Lien Credit Agreement) with respect to (i) the Rangers shall be no more than $75,000,000 and (ii) the Stars shall be no more than $100,000,000.

**7.3. Payment by Guarantors.** Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4. Liability of Guarantors Absolute.** Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a) this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b) Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Company and any Beneficiary with respect to the existence of such Event of Default;

(c) the obligations of each Guarantor hereunder are independent of the obligations of Company and the obligations of any other guarantor (including any other Guarantor), and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Company or any of such other guarantors and whether or not Company is joined in any such action or actions;

(d) payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid, except as set forth in the Section 7.2. Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e) any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or the applicable Hedge Agreement and any applicable security agreement,

including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents or any Hedge Agreements; and

(f) this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents or any Hedge Agreements, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, any of the Hedge Agreements or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document, such Hedge Agreement or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or any of the Hedge Agreements or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Holdings or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Company may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7.5.  Waivers by Guarantors.**  Except to the extent limited by applicable law, each Guarantor hereby waives, to the fullest extent possible, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Company, any such other guarantor or any other Person, (iii) proceed against or have resort

to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of Company or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, the Hedge Agreements or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Company and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.6. Guarantors' Rights of Subrogation, Contribution, etc.** Until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor hereby waives to the fullest extent permitted by applicable law any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Company or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including, without limitation, any such right of contribution as contemplated by Section 7.2. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or

91

voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Company, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**7.7. Subordination of Other Obligations.** Any Indebtedness of Company or any Guarantor now or hereafter held by any Guarantor (the **"Obligee Guarantor"**) is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**7.8. Continuing Guaranty.** This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations (other than contingent Obligations) shall have been paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9. Authority of Guarantors or Company.** It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7.10. Financial Condition of Company.** Any Credit Extension may be made to Company or continued from time to time, and any Hedge Agreements may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Company at the time of any such grant or continuation or at the time such Hedge Agreement is entered into, as the case may be. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Company. Each Guarantor has adequate means to obtain information from Company on a continuing basis concerning the financial condition of Company and its ability to perform its obligations under the Credit Documents and the Hedge Agreements, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Company now known or hereafter known by any Beneficiary.

NY\1212304.11

**7.11. Bankruptcy, etc.** (a) So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against Company or any other Guarantor. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Company or any other Guarantor or by any defense which Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b) Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Company of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c) In the event that all or any portion of the Guaranteed Obligations are paid by Company, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**7.12. Discharge of Guaranty Upon Sale of Guarantor.** If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such asset sale.

## SECTION 8. EVENTS OF DEFAULT

**8.1. Events of Default.** If any one or more of the following conditions or events shall occur:

(a) <u>Failure to Make Payments When Due</u>. Failure by Company to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by

notice of voluntary prepayment, by mandatory prepayment or otherwise; (ii) when due any amount payable to Issuing Bank in reimbursement of any drawing under a Letter of Credit; or (iii) any interest on any Loan or any fee or any other amount due hereunder within five days after the date due; or

(b) <u>Default in Other Agreements</u>. (i) Failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) with an aggregate principal amount of $5,000,000 or more, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c) <u>Breach of Certain Covenants</u>. Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.6, Section 5.1(f), Section 5.2 (solely with respect to Company, the Rangers and the Stars) or Section 6; or

(d) <u>Breach of Representations, etc.</u> Any representation, warranty, certification or other statement of fact made or deemed made by Holdings or any Credit Party in any Credit Document or in any statement or certificate at any time given by Holdings or any Credit Party or any of their respective Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e) <u>Other Defaults Under Credit Documents</u>. Holdings or any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this Section 8.1, and such default shall not have been remedied or waived within thirty days after the earlier of (i) an Authorized Officer of such Credit Party becoming aware of such default or (ii) receipt by Company of notice from Administrative Agent or any Lender of such default; or

(f) <u>Involuntary Bankruptcy; Appointment of Receiver, etc.</u> (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Holdings or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against Holdings or any of its Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Holdings or any of its Subsidiaries, or over all or a substantial part of its

94

property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Holdings or any of its Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Holdings or any of its Subsidiaries, and any such event described in this clause (ii) shall continue for sixty days without having been dismissed, unstayed, bonded or discharged; or

(g) Voluntary Bankruptcy; Appointment of Receiver, etc. (i) Holdings or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Holdings or any of its Subsidiaries shall make any assignment for the benefit of creditors; or (ii) Holdings or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of Holdings or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f); or

(h) Judgments and Attachments. Any money judgment, writ or warrant of attachment or similar process involving in the aggregate at any time an amount in excess of $5,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has not denied coverage) shall be entered or filed against Holdings or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty days (or in any event later than five days prior to the date of any proposed sale thereunder); or

(i) Dissolution. Any order, judgment or decree shall be entered against Holdings or any Credit Party decreeing the dissolution or split up of Holdings or such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty days; or

(j) Employee Benefit Plans. (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $5,000,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 412(n) of the Internal Revenue Code or under ERISA the amount of which, individually or in the aggregate, exceeds $5,000,000.

(k) Change of Control. A Change of Control shall occur;

(l) Guaranties, Collateral Documents and other Credit Documents. At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be

95

in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations (other than contingent obligations) in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to take any action within its control, or (iii) Holdings or any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party;

(m) <u>Loss or Diminution of Rights with Respect to Team Subsidiaries</u>. Company shall experience a diminution, for any reason, with respect to its rights or interests (financial or otherwise) in either the Rangers or the Stars franchise, which is reasonably expected to have a Material Adverse Effect;

(n) <u>Relocation</u>. The relocation of either professional sports franchise owned by the Rangers or the Stars from the Dallas/Fort Worth metropolitan area; or

(o) <u>League Action</u>. Any action shall be taken by or involving MLB or the NHL (including entering into of collective bargaining agreements, the changing or effecting of new rules or regulations or enacting other agreements binding on the franchisees thereof, or the taking of any action to terminate either the Rangers or Stars franchise) that could reasonably be expected to have a Material Adverse Effect.

**THEN,** (1) upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), automatically, and (2) upon the occurrence and during the continuance of any other Event of Default, at the request of (or with the consent of) Requisite Lenders, upon notice to Company by Administrative Agent, (A) the Revolving Commitments, if any, of each Lender having such Revolving Commitments and the obligation of Issuing Bank to issue any Letter of Credit shall immediately terminate; (B) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Holdings and each Credit Party: (I) the unpaid principal amount of and accrued interest on the Loans, (II) an amount equal to the maximum amount that may at any time be drawn under all Letters of Credit then outstanding (regardless of whether any beneficiary under any such Letter of Credit shall have presented, or shall be entitled at such time to present, the drafts or other documents or certificates required to draw under such Letters of Credit), and (III) all other Obligations; <u>provided</u>, the foregoing shall not affect in any way the obligations of Lenders under Section 2.3(b)(iv) or Section 2.4(e); (C) Collateral Agent may enforce any and all Liens and security interests created pursuant to Collateral Documents; and (D) Administrative Agent shall direct Company to pay (and Company hereby agrees upon receipt of such notice, or upon the occurrence of any Event of Default specified in Sections 8.1(f) and (g) to pay) to Administrative Agent such additional amounts of cash as reasonable requested by Issuing Bank, to be held as security for Company's reimbursement Obligations in respect of Letters of Credit then outstanding.

Notwithstanding anything to the contrary contained this Agreement, in the event of any Event of Default under Section 6.8 and until the expiration of the fifteenth Business Day after the date on which Company provides the Administrative Agent notice that it intends to exercise its rights under this Section 8.1, Holdings or Company may engage in an Equity Cure Issuance; provided, that Company may only exercise such Equity Cure Issuance no more than two (2) times per Fiscal Year.

The Collateral Agent and the Lenders agree that (i) from the date of delivery of the notice referred to in (and delivered in accordance with) this Section 8.1 until the date that is fifteen Business Days thereafter and (ii) from the date of the election by Company to avail itself of the Financial Covenant Grace Period until the expiration of such Financial Covenant Grace Period, in each case, neither the Collateral Agent nor the Lenders shall exercise any rights or remedies with respect to any Default or Event of Default arising as a result of non-compliance with Sections 6.8(a), (b) and (c), as applicable.

## SECTION 9. AGENTS

**9.1. Appointment of Agents.** JPMorgan and Barclays are hereby appointed Co-Syndication Agents hereunder, and each Lender hereby authorizes JPMorgan and Barclays to act as Co-Syndication Agents in accordance with the terms hereof and the other Credit Documents. JPMCB is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes JPMCB to act as Administrative Agent and Collateral Agent in accordance with the terms hereof and the other Credit Documents. Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents, as applicable. The provisions of this Section 9 are solely for the benefit of Agents and Lenders and neither Holdings nor any Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Holdings or any of its Subsidiaries. Each of the Co-Syndication Agents, without consent of or notice to any party hereto, may assign any and all of its rights or obligations hereunder to any of its Affiliates. As of the Amendment and Restatement Effective Date, neither of JPMorgan nor Barclays, in their capacities as Co-Syndication Agents, shall have any obligations but shall be entitled to all benefits of this Section 9.

**9.2. Powers and Duties.** Each Lender irrevocably authorizes (i) each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto and (ii) JPMCB, as Administrative Agent and Collateral Agent, to enter into the NHL Consent Letter (including, without limitation, any amendment, modifications or restatements) on such Lender's behalf. Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender; and nothing herein or any of the other Credit

Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

### 9.3. General Immunity.

(a) <u>No Responsibility for Certain Matters</u>. No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of Holdings or any Credit Party, and Lender or any person providing the Settlement Service to any Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of Holdings or any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the Letter of Credit Usage or the component amounts thereof.

(b) <u>Exculpatory Provisions</u>. No Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, including any Settlement Confirmation or other communication issues by any Settlement Service, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Holdings and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5).

NY\1212304.11

(c) <u>Delegation of Duties</u>. Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of this Section 9.3 and of Section 9.6 shall apply to any the Affiliates of Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 9.3 and of Section 9.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by the Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against Holdings or any or all of the Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to Administrative Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Holdings, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

**9.4. Agents Entitled to Act as Lender.** The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder. With respect to its participation in the Loans and the Letters of Credit, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Holdings or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Company for services in connection herewith and otherwise without having to account for the same to Lenders.

**9.5. Lenders' Representations, Warranties and Acknowledgment.**

(a) Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the

Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b) (i) Each Lender appoints and any party hereafter becoming a Lender shall, at the time of becoming a Lender, appoint, the Administrative Agent and the Collateral Agent under the Credit Documents to continue in such capacity unless and until replaced pursuant to the terms of the Credit Documents (subject to the NHL Consent Letter), (ii) each Lender authorizes and directs (subject to the NHL Consent Letter) and each future Lender at the time of becoming a Lender shall authorize and direct (unless and until the Collateral Agent has been replaced pursuant to the terms of the Credit Documents subject to the NHL Consent Letter) the Administrative Agent, in its capacity as an Administrative Agent and/or the Collateral Agent, to: (x) take such actions on its behalf, including, without limitation, the execution of the NHL Consent Letter, and the granting of waivers under the NHL Consent Letter and to exercise such powers and to perform such duties as are required under the provisions of the Credit Documents, the NHL Consent Letter, and any other instruments or agreements referred to therein or as are reasonably incidental thereto, (y) make, on each such Lender's behalf, the agreements deemed made by such Lender under the provisions of the NHL Consent Letter, and (z) take such action under the NHL Consent Letter as is authorized by a vote of Requisite Lenders, (iii) each Lender has been provided with a copy of the NHL Consent Letter and each Credit Document and has agreed to be bound by the terms, conditions and other provisions contained in the NHL Consent Letter as fully as if it were a signatory thereto, and (iv) Appendix A attached to the NHL Consent Letter will be a true and complete list of all of the Lenders as of the date of the NHL Consent Letter. Whether or not expressly stated in any provision of the NHL Consent Letter, each Lender shall be fully bound by the provisions of the NHL Consent Letter.

(c) Each Lender, by delivering its signature page to this Agreement or an Assignment Agreement and funding its Term Loan and/or Revolving Loans on the Amendment and Restatement Effective Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Amendment and Restatement Effective Date.

**9.6. Right to Indemnity.** Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by Holdings or any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Credit Documents; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment,

100

suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7. Successor Administrative Agent and Collateral Agent**  Administrative Agent may resign at any time by giving thirty days' prior written notice thereof to Lenders and Company, and Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to Company and Collateral Agent and signed by Requisite Lenders.  Upon any such notice of resignation or any such removal, Requisite Lenders shall have the right, upon five Business Days' notice to Company, to appoint a successor Administrative Agent.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall promptly (i) transfer to such successor Administrative Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder.  After any retiring or removed Administrative Agent's resignation or removal hereunder as Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.  Any resignation or removal of JPMCB as Administrative Agent pursuant to this Section shall also constitute the resignation or removal of JPMCB or its successor as Collateral Agent, and any successor Administrative Agent appointed pursuant to this Section shall, upon its acceptance of such appointment, become the successor Collateral Agent for all purposes hereunder.

**9.8. Collateral Documents and Guaranty.**

(a) Agents under Collateral Documents and Guaranty.  Each Lender hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of Lenders with respect to the Guaranty, the Collateral and the Collateral Documents.  Subject to Section 10.5, without further written consent or authorization from Lenders, Administrative Agent or Collateral Agent may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented, (ii) subordinate its interest in any Collateral to any holder of a Permitted Lien described in Section 6.2(m) on such Collateral (it being understood that Collateral Agent may conclusively rely on a certificate from Company in determining whether the Indebtedness secured by any such Lien constitutes permitted purchase money Indebtedness), (iii) release any Lien granted to or held by Collateral Agent under any Credit

101

Document when all Obligations hereunder have been paid in full or (iv) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented.

(b) <u>Right to Realize on Collateral and Enforce Guaranty</u>. Anything contained in any of the Credit Documents to the contrary notwithstanding, Company, Administrative Agent, Collateral Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of Lenders in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale, Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale.

## SECTION 10. MISCELLANEOUS

### 10.1. Notices.

(a) <u>Notices Generally</u>. Any notice or other communication herein required or permitted to be given to a Credit Party, Issuing Bank or an Agent, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing. Except as otherwise set forth in paragraph (b) below, each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed; <u>provided</u>, no notice to any Agent shall be effective until received by such Agent; <u>provided further,</u> any such notice or other communication shall at the request of the Administrative Agent be provided to any sub-agent appointed pursuant to Section 9.3(c) hereto as designated by the Administrative Agent from time to time.

(b) <u>Electronic Communications</u>. Notices and other communications to the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender or the Issuing Bank pursuant to Section 2 if such Lender or the Issuing Bank, as applicable, has notified Administrative Agent that it is incapable of receiving notices under such Section by electronic communication. Administrative Agent or Company may, in its discretion,

agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications. Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

**10.2. Expenses.** Whether or not the transactions contemplated hereby shall be consummated, Company agrees to pay promptly (a) all the actual and reasonable out-of-pocket costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for Company and the other Credit Parties; (c) the reasonable out-of-pocket fees, expenses and disbursements of counsel to the Administrative Agent in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Company; (d) all the actual and reasonable out-of-pocket costs and expenses of creating and perfecting Liens in favor of Collateral Agent, for the benefit of Lenders pursuant hereto, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to Administrative Agent and of counsel providing any opinions that any Agent or Requisite Lenders as requested through any Agent may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) all the actual and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers; (f) all the actual and reasonable out-of-pocket costs and expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Administrative Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual and reasonable costs and expenses incurred by the Syndication Agent in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit agreements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

103

### 10.3. Indemnity.

(a) In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, Holdings and each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent and Lender and the officers, partners, directors, trustees, employees, agents, sub-agents and Affiliates of each Agent and each Lender (each, an **"Indemnitee"** (each agent and each Lender, together with its respective officers, partners, directors, trustees, employees, agents, sub-agents and Affiliates is referred to collectively as an **"Indemnified Group"**), from and against any and all Indemnified Liabilities; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee or any member of its Indemnified Group. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, Holdings or the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b) To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against Lenders, Agents and their respective Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and Holdings and Company hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

Notwithstanding the foregoing, nothing in this Section 10.3 shall apply to matters governed by Section 2.20.

**10.4. Set-Off.** In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default each Lender is hereby authorized by Holdings and each Credit Party at any time or from time to time subject to the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), without prior notice to any Credit Party or to any other Person (other than the Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of Holdings and any Credit Party against and on account of the obligations and liabilities of Holdings or any Credit Party to such Lender hereunder, the Letters of Credit and participations therein and under the other Credit Documents,

NY\1212304.11

including all claims of any nature or description arising out of or connected hereto, the Letters of Credit and participations therein or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any amounts in respect of the Letters of Credit or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured. Upon exercise of any rights under this Section 10.4 such Lender shall give Company notice of such exercise.

**10.5. Amendments and Waivers.**

(a) <u>Requisite Lenders' Consent</u>. Subject to Sections 10.5(b) and 10.5(c) and except for actions expressly permitted to be taken by an Agent, no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by Holdings or any Credit Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders and, to the extent any amendment has a direct effect on the Rangers or the MLB, the MLB.

(b) <u>Affected Lenders' Consent</u>. Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)  extend the scheduled final maturity of any Loan or Note;

(ii)  waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)  extend the stated expiration date of any Letter of Credit beyond the Revolving Commitment Termination Date;

(iv)  reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.10) or any fee or any premium payable hereunder;

(v)  extend the time for payment of any such interest or fees; <u>provided</u> that the waiver of a prepayment shall not constitute an extension of time hereunder;

(vi)  reduce the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit;

(vii)  amend, modify, terminate or waive any provision of this Section 10.5(b) or Section 10.5(c);

(viii)  amend the definition of **"Requisite Lenders"** or **"Pro Rata Share"**; <u>provided</u>, with the consent of Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of **"Requisite Lenders"** or **"Pro Rata Share"** on substantially the same basis as the Additional Term Loan Commitments, the Term Loans, the Revolving Commitments and the Revolving Loans are included on the Amendment and Restatement Effective Date;

(ix) release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents; or

(x) consent to the assignment or transfer by Holdings or any Credit Party of any of its rights and obligations under any Credit Document.

(c) <u>Other Consents</u>. No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by Holdings or any Credit Party therefrom, shall:

(i) increase any Revolving Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; <u>provided</u>, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Revolving Commitment of any Lender;

(ii) amend the definition of **"Requisite Class Lenders"** without the consent of Requisite Class Lenders of each Class; <u>provided</u>, with the consent of the Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of such **"Requisite Class Lenders"** on substantially the same basis as the Term Loan Commitments, the Term Loans, the Revolving Commitments and the Revolving Loans are included on the Amendment and Restatement Effective Date;

(iii) alter the required application of any repayments or prepayments as between Classes pursuant to Section 2.15 without the consent of Requisite Class Lenders of each Class which is being allocated a lesser repayment or prepayment as a result thereof; <u>provided</u>, Requisite Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered;

(iv) amend, modify, terminate or waive any obligation of Lenders relating to the purchase of participations in Letters of Credit as provided in Section 2.4(e) without the written consent of Administrative Agent and of Issuing Bank; or

(v) amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent.

(d) <u>Execution of Amendments, etc.</u> Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Credit Party in any case shall entitle Holdings or any Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by Holdings or a Credit Party, on Holdings or such Credit Party.

**10.6. Successors and Assigns; Participations.**

(a) <u>Generally.</u> This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders. Neither Holdings nor any Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by Holdings or any Credit Party without the prior written consent of all Lenders (which term shall include Issuing Bank for purposes of this section 10.6). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Register.</u> Company, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt by the Administrative Agent of a processing and recordation fee of $3,500 and (x) a written or electronic confirmation of an assignment issued by a Settlement Service pursuant to Section 10.6(d) (a "Settlement Confirmation") or (y) an Assignment Agreement effecting the assignment or transfer thereof, in each case, as provided in Section 10.6(d). Each assignment shall be recorded in the Register on the Business Day the Settlement Confirmation or Assignment Agreement is received by the Administrative Agent, if received by 12:00 noon New York City time, and on the following Business Day if received after such time, prompt notice thereof shall be provided to Company and a copy of such Assignment Agreement or Settlement Confirmation shall be maintained, as applicable. The date of such recordation of a transfer shall be referred to herein as the "Assignment Effective Date." Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c) <u>Right to Assign.</u> Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including, without limitation, all or a portion of its Commitment or Loans owing to it or other Obligations (<u>provided, however,</u> that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan and any related Commitments):

(i) to any Person meeting the criteria of clause (i) of the definition of the term of "Eligible Assignee" upon the giving of notice to Company and Administrative Agent; and

(ii) to any Person meeting the criteria of clause (ii) of the definition of the term of "Eligible Assignee" upon giving of notice to the Administrative Agent and obtaining consent from each of Company and Administrative Agent (such consent not to be (x) unreasonably withheld or delayed or, (y) in the case of Company, required at any time an Event of Default under Section 8.1(a), (f) or (g) shall have occurred and then be continuing); <u>provided,</u> further each such assignment pursuant to this Section 10.6(c)(ii)

107

shall be in an aggregate amount of not less than (A) $2,500,000 (or such lesser amount as may be agreed to by Company and Administrative Agent or as shall constitute the aggregate amount of the Revolving Commitments and Revolving Loans of the assigning Lender) with respect to the assignment of the Revolving Commitments and Revolving Loans and (B) $1,000,000 (or such lesser amount as may be agreed to by Company and Administrative Agent or as shall constitute the aggregate amount of the Term Loan of the assigning Lender) with respect to the assignment of Term Loans.

Notwithstanding anything herein to the contrary, all assignments shall be subject to the restrictions of the NHL as described in the NHL Consent Letter.

(d) <u>Mechanics</u>. Assignments of Term Loans by Lenders may be made via an electronic settlement system acceptable to Administrative Agent as designated in writing from time to time to the Lenders by Administrative Agent (the **"Settlement Service"**). Each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section 10.6. Each assignor Lender and proposed assignee shall comply with the requirements of the Settlement Service in connection with effecting any transfer of Loans pursuant to the Settlement Service. Administrative Agent's and Company's consent shall be deemed to have been granted pursuant to Section 10.6(c)(ii) with respect to any transfer to a preapproved assignee is effected through the Settlement Service. Subject to the other requirements of this Section 10.6, assignments and assumptions of Term Loans may also be effected by manual execution delivery to the Administrative Agent of an Assignment Agreement with the prior written consent of each of Company and Administrative Agent (such consent not to be (x) unreasonably withheld or delayed or (y) in the case of Company, required at any time an Event of Default shall have occurred and then be continuing). Initially, assignments and assumptions of Term Loans shall be effected by such manual execution until Administrative Agent notifies Lenders to the contrary. Assignments and assumptions of Revolving Loans and Revolving Commitments shall only be effected by manual execution and delivery to the Administrative Agent of an Assignment Agreement. Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date. In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.20(c). Notwithstanding anything herein or in any Assignment Agreement to the contrary and (i) unless notice to the contrary is delivered to the Lenders from the Administrative Agent or (ii) so long as no Default or Event of Default has occurred and is continuing, payment to the assignor by the assignee in respect of the settlement of an assignment of any Term Loan (but not any Revolving Loan or Revolving Commitment) shall include such compensation to the assignor as may be agreed upon by the assignor and the assignee with respect to all unpaid interest which has accrued on such Term Loan to but excluding the Assignment Effective Date. On and after the applicable Assignment Effective Date, the applicable assignee shall be entitled to receive all interest paid or payable with respect to the assigned Term Loan, whether such interest accrued before or after the applicable Assignment Effective Date.

(e) <u>Representations and Warranties of Assignee</u>. Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case

may be, represents and warrants as of the Amendment and Restatement Effective Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course of its business and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(f) _Effect of Assignment_. Subject to the terms and conditions of this Section 10.6, as of the "Assignment Effective Date" (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, (y) Issuing Bank shall continue to have all rights and obligations thereof with respect to such Letters of Credit until the cancellation or expiration of such Letters of Credit and the reimbursement of any amounts drawn thereunder and (z) such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect any Commitment of such assignee and any Revolving Commitment of such assigning Lender, if any; (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Company shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new Revolving Commitments and/or outstanding Loans of the assignee and/or the assigning Lender; and (v) shall deliver to Administrative Agent and to Company the tax forms required to be delivered pursuant to Section 2.20.

(g) _Participations_. Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation; provided (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible for the performance of such obligations, and (iii) Company and the Agents shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Credit Documents. The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled maturity of any Loan, Note or Letter of Credit (unless such Letter of Credit is not extended

hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.13. Headings.** Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.14. APPLICABLE LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

**10.15. CONSENT TO JURISDICTION.** ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST HOLDINGS OR ANY CREDIT PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY HOLDINGS OR CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

**10.16. WAIVER OF JURY TRIAL.** EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/COMPANY RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL

INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.16 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**10.17.  Confidentiality.**  Each Agent and each Lender shall hold all non-public information regarding Holdings, Company and its Subsidiaries and their businesses identified as such by Company and obtained by such Lender pursuant to the requirements hereof in accordance with such Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by Company that, in any event, a Lender may make (i) disclosures of such information to Affiliates of such Lender and to their agents and advisors (and to other persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.17), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by such Lender of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) in Hedge Agreements (provided, such counterparties and advisors are advised of and agree to be bound by the provisions of this Section 10.17), (iii) disclosure to any rating agency when required by it, <u>provided</u> that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to the Credit Parties received by it from any of the Agents or any Lender, (iv) disclosures required or requested by any governmental agency or representative thereof or by the NAIC or pursuant to legal or judicial process; and (v) disclosures of such information that becomes generally available to the public (other than as a result of a breach by the Agents or any Lender of the obligations hereunder) or that is or becomes available to the Agents or such Lender from a source other than Holdings, Company or any of their Subsidiaries and that is not, to the knowledge of the recipient thereof, subject to obligations of confidentiality with respect thereto; <u>provided</u>, unless specifically prohibited by applicable law or court order, each Lender shall make reasonable efforts to notify Company of any request by any governmental agency or representative thereof (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information.

NY\1212304.11

**10.18. Usury Savings Clause.** Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Company shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and Company to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Company.

**10.19. Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**10.20. Effectiveness.** This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Company and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.

**10.21. Patriot Act.** Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Company that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies Company, which information includes the name and address of Company and other information that will allow such Lender or Administrative Agent, as applicable, to identify Company in accordance with the Act.

**10.22. Electronic Execution of Assignments.** The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

114

**10.23. Major League Baseball Requirements.** Notwithstanding any contrary provisions contained in this Agreement or any other Credit Document:

(a) each of the Lenders is aware of the provisions contained in Article V, Section 2(b)(2) of the Major League Constitution, and recognizes that the Ownership Committee of Baseball has issued "Control Interest Transfers – Guidelines & Procedures", dated November 9, 2005 (such document and any successor guidelines, as may be amended from time to time, the **"MLB Control Interest Transfer Guidelines"**);

(b) each of the Lenders acknowledges that Article V, Section 2(b)(2) of the Major League Constitution and the MLB Control Interest Transfer Guidelines require that the transfer of a control interest in either the Rangers Franchise or the Rangers be subject to the approving vote of the Major League Baseball clubs in their absolute discretion. Each of the Lenders also acknowledges the "best interests of baseball" powers held by the Commissioner under the Major League Constitution. Accordingly, each Lender acknowledges that such approvals would be required for any sale or transfer of the Rangers Franchise or the Rangers, or an interest in either the Rangers Franchise or the Rangers, or any sale, transfer, assignment, license, sublease, or other conveyance of the trademarks, trade names and other intellectual property rights owned by the Rangers, to a third party as well as to any Lender, and that each such transaction shall be subject to and made in accordance with the Major League Constitution, the each agency agreement and operating guidelines among the Major League Baseball clubs and an MLB Entity (as defined below) and the MLB Control Interest Transfer Guidelines.

(c) Each Lender acknowledges that any temporary or permanent management of the Rangers Franchise or the Rangers shall be subject to the prior approval of the Commissioner and the Clubs. In the event any Lender(s) desires to operate the Rangers Franchise or the Rangers for its own account on a temporary or permanent basis, such Lenders(s) shall seek the prior approval of the Commissioner and the Major League Baseball clubs in accordance with the Major League Constitution and the MLB Control Interest Transfer Guidelines.

(d) This Agreement and any rights or exclusivities granted by the Rangers hereunder, in respect of the Collateral and other intellectual property rights owned by the Rangers, shall in all respects be subject to each of the following, as may be amended from time to time (collectively, **"MLB Documents"**): (i) any present or future agreements entered into by, or on behalf of, any of the Major League Baseball entities or affiliates (each, an **"MLB Entity"**), or the Major League Baseball clubs acting collectively, including, without limitation, agreements entered into pursuant to the Major League Constitution, the American and National League Constitutions (to the extent of any continuing applicability), the Professional Baseball Agreement, the Major League Rules, the Interactive Media Rights Agreement, and each agency agreement and operating guidelines among the Major League Clubs and an MLB Entity, or (ii) the present and future mandates, rules, regulations, policies, bulletins or directives issued or adopted by the Commissioner or the MLB Entities; provided, however, that the foregoing is not intended to require any Lender to subordinate the security interests granted to it hereunder in favor of any Person.

**10.24. Acknowledgment.** Each Lender acknowledges receipt and review of The Bank of New York Form of Acknowledgment regarding the Dallas Arena Project (as defined in the

Stars Non-Relocation Agreement) attached hereto as Exhibit M and each Lender consents to be bound by the terms thereof, including to be subject to the terms of the Stars Non-Relocation Agreement and to assume the obligations of the Stars under the Stars Non-Relocation Agreement and under the Stars Sublease and Stars Non-Disturbance Agreement (each as defined in the Stars Non-Relocation Agreement), if upon the exercise of their respective rights and remedies, the Lenders, or the Collateral Agent on behalf of the Lenders, become the owners of the franchise granted by the NHL to the Stars, whether in a foreclosure sale or by conveyance in lieu of foreclosure or otherwise. Each Lender further directs the Administrative Agent to execute and deliver on such Lender's behalf The Bank of New York Form of Acknowledgment which execution and delivery shall be binding upon and enforceable against such Lender as if such execution and delivery had been made by such Lender directly. To the extent necessary to comply with the terms of the Stars Non-Relocation Agreement, each Lender agrees to execute and deliver an original counterpart of The Bank of New York Form of Acknowledgment for the benefit of such Collateral Trustee upon request.

**10.25. Reaffirmation and Grant of Security Interest.** Each Credit Party has (a) guarantied the Obligations and (b) created Liens in favor of Lenders on certain Collateral to secure its Obligations hereunder, under the Guaranty. Each Credit Party hereby acknowledges that it has reviewed the terms and provisions of this Agreement and consents to the amendment and restatement of the Existing Credit Agreement effected pursuant to this Agreement. Each Credit Party hereby (a) confirms that each Credit Document to which it is a party or is otherwise bound and all Collateral encumbered thereby will continue to guarantee or secure, as the case may be, to the fullest extent possible in accordance with the Credit Documents, the payment and performance of the Obligations and all Guaranteed Obligations, as the case may be, including without limitation the payment and performance of all such Obligations and all Guaranteed Obligations which are joint and several obligations of each grantor now or hereafter existing, and (b) grants to the Administrative Agent for the benefit of the Secured Parties a continuing lien on and security interest in and to such Credit Party's right, title and interest in, to and under all Collateral as collateral security for the prompt payment and performance in full when due of the Obligations and all Guaranteed Obligations (whether at stated maturity, by acceleration or otherwise).

[Remainder of page intentionally left blank]

116

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**HICKS SPORTS GROUP LLC**

By: _____
Name: Casey Shilts
Title:   Executive Vice President and Secretary

**HICKS SPORTS GROUP HOLDINGS LLC**

By: _____
Name: Casey Shilts
Title:   Executive Vice President and Secretary

**HSG PARTNERSHIP HOLDINGS LLC**

By: _____
Name: Casey Shilts
Title:   Executive Vice President and Secretary

**DALLAS ARENA LLC**

By: _____
Name: Casey Shilts
Title:   Executive Vice President and Secretary

**TEXAS RANGERS BASEBALL PARTNERS**
By: HSG PARTNERSHIP HOLDINGS LLC,
its Managing Partner

By: _____
Name: Casey Shilts
Title:   Executive Vice President and Secretary

**EMERALD DIAMOND, L.P.**
**DALLAS STARS, L.P.**
**SOUTHWEST SPORTS TELEVISION, L.P.**
**SOUTHWEST SPORTS GROUP BASEBALL, L.P.**

By: HSG PARTNERSHIP HOLDINGS LLC, each
      of its General Partner

By: _____
Name: Casey Shilts
Title:  Executive Vice President and Secretary


**DALLAS STARS U.S. HOLDINGS CORP.**

By: _____

Name: Casey Shilts
Title:  Executive Vice President and Secretary

**STARCENTERS LLC**

By: _____
Name: Casey Shilts
Title:  Vice President and Secretary

**JPMORGAN SECURITIES INC.,**
as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent

By: _____
Authorized Signatory

**Thomas H. Kozlark**
**Vice President**

**BARCLAYS CAPITAL INC.,**
as Joint Lead Arranger and Joint Bookrunner

By: _____

Name:     DOUGLAS BERNEGGER
Title:         DIRECTOR


**BARCLAYS BANK PLC,**
as Co-Syndication Agent and a Lender

By: _____

Name:     DOUGLAS BERNEGGER
Title:         DIRECTOR

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent, Collateral Agent, Issuing
Bank and a Lender

By: _____

Name: RICHARD C. WALDEN

Title: MANAGING DIRECTOR