Dennis F. Dunne (admitted *pro hac vice*)
Dennis C. O'Donnell (admitted *pro hac vice*)
**MILBANK, TWEED, HADLEY & MCCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel.: 212.530.5000
Fax: 212.530.5219
ddunne@milbank.com
dodonnell@milbank.com

Andrew M. Leblanc (admitted *pro hac vice*)
**MILBANK, TWEED, HADLEY & MCCLOY LLP**
1850 K Street, N.W., Suite 1100
Washington, DC 20006
Tel.: 202.835.7500
Fax: 202.263.7574
aleblanc@milbank.com

Daniel C. Stewart, SBT #19206500
Paul E. Heath, SBT #09355050
Richard H. London, SBT #24032678
**VINSON & ELKINS LLP**
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.220.7716
dstewart@velaw.com
pheath@velaw.com
rlondon@velaw.com

**ATTORNEYS FOR THE AD HOC
GROUP OF FIRST LIEN LENDERS**

Mitchell A. Seider, SBT #18000550
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022
mitchell.seider@lw.com

Michael R. "Buzz" Rochelle, SBT #17126700
Scott M. DeWolf, SBT #24009990
**ROCHELLE MCCULLOUGH LLP**
325 North Saint Paul St., Suite 4500
Dallas, TX 75201
buzz.rochelle@romclawyers.com
sdewolf@romclawyers.com

**ATTORNEYS FOR JP MORGAN CHASE
BANK, N.A. AS FIRST LIEN AGENT**

Jennifer C. DeMarco (*pro hac* pending)
David A. Sullivan (*pro hac* pending)
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, New York 10019-6131
Tel: 212.878.8000
Fax: 212.878.8375
jennifer.demarco@cliffordchance.com
david.sullivan@cliffordchance.com

Holland N. O'Neil, SBT #14864700
**GARDERE WYNNE SEWELL LLP**
1601 Elm Street, Suite 3000
Dallas, Texas 75201
Tel: 214.999.4961
Fax: 214.999.3961
honeil@gardere.com

**ATTORNEYS FOR GSP FINANCE LLC, AS
SECOND LIEN AGENT**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **TEXAS RANGERS BASEBALL** | § | **Case No. 10-43400 (DML)-11** |
| **PARTNERS** | § | **(Chapter 11)** |
| Debtor. | § | |
| | § | |

## JOINT BRIEF OF AD HOC GROUP OF FIRST LIEN LENDERS, JP MORGAN CHASE BANK, N.A., AS FIRST LIEN AGENT, AND GSP FINANCE LLC, AS SECOND LIEN AGENT, REGARDING CERTAIN ISSUES RELATED TO PROPOSED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................ v

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT FACTUAL BACKGROUND ........................................................................ 4

THE LENDER PARTIES' POSITIONS WITH RESPECT TO THE FIVE ISSUES
RAISED BY THE COURT ................................................................................................. 19

I.    THE HOLDERS OF CLAIMS IN CLASSES 2 (FIRST LIEN LENDERS'
      CLAIMS) AND 3 (SECOND LIEN LENDERS' CLAIMS) AND THE HOLDERS
      OF INTERESTS IN CLASS 12 (TRBP INTERESTS) ARE IMPAIRED AND
      ENTITLED TO VOTE; IMPAIRMENT OF CLASSES 2 AND 3 MAKES THE
      PLAN PATENTLY UNCONFIRMABLE ................................................................. 19

      A.   THE MEASURE OF IMPAIRMENT UNDER SECTION 1124 .................................... 20
      B.   CLASSES 2 AND 3 ........................................................................................ 20
           1.   Classes 2 and 3 Are Impaired ............................................................ 20
           2.   Impairment of Classes 2 and 3 Makes the Plan Unconfirmable ................... 24
      C.   CLASS 12 .................................................................................................... 24
           1.   Class 12 Is Impaired .......................................................................... 24
           2.   Treatment of Class 12 Violates Best Interests Test of Section 1129(a)(7) ......... 27

II.   ONLY THE FIRST LIEN LENDERS ARE AUTHORIZED TO SPEAK FOR AND
      VOTE ON BEHALF OF THE DEBTOR'S EQUITY OWNERS ..................................... 28

      A.   UNDER THE PLEDGE AGREEMENTS, THE COLLATERAL AGENT HOLDS VOTING AND
           CONSENT RIGHTS WITH RESPECT TO THE RELEVANT EQUITY INTERESTS ........................ 28
      B.   THE COLLATERAL AGENT'S VOTING AND CONSENT RIGHTS ARE ENFORCEABLE IN
           BANKRUPTCY ............................................................................................... 29
      C.   CONFLICTED INSIDERS ARE UNABLE TO REPRESENT DEBTOR'S INTERESTS ...................... 33

III.  THE PARTNERS OWE FIDUCIARY DUTIES TO THE DEBTOR'S CREDITORS
      AND THEIR OWN CREDITORS WITH RESPECT TO THEIR CONDUCT IN
      THIS CHAPTER 11 CASE ................................................................................. 35

      A.   THE PARTNERS' FIDUCIARY DUTIES IN CONNECTION WITH THEIR CONDUCT IN
           THIS CASE ................................................................................................... 35
      B.   THE PARTNERS' STATUS AS PUTATIVE DEBTORS IMPOSES AN ADDITIONAL DUTY
           ON THEM TO MAXIMIZE THE VALUE OF THE DEBTOR'S ESTATE FOR THE BENEFIT
           OF THEIR OWN CREDITORS, INCLUDING THE LENDERS ............................................ 37

IV. THE DEBTOR HAS AN INDEPENDENT DUTY TO MAXIMIZE THE VALUE
OF ITS ESTATE FOR BENEFIT OF ALL STAKEHOLDERS AND FAILURE TO
DO SO MAKES THE PLAN UNCONFIRMABLE UNDER SECTION 1129(A)(3)
OF THE BANKRUPTCY CODE ......................................................................39

   A.  A Debtor Has A Duty To Maximize Estate Value...................................39
   B.  The Sale Of A Debtor's Assets In a Competitive Sales Process Promotes
      The Requirement Of Maximizing Estate Value For All Stakeholders ...............40

V. THE PLAN IS UNCONFIRMABLE BECAUSE IT WAS NOT PROPOSED IN
GOOD FAITH................................................................................................43

VI. THE DISCLOSURE STATEMENT IS INADEQUATE ....................................................44

   A.  Adequate Disclosure is Required Even If No Classes Are Impaired....................45
   B.  The Disclosure Statement Contains Inadequate Disclosure ..............................46

Schedule 1    Table of Disclosure Statement Issues
Exhibit A     Email from G. West, Weil, Gotshal & Manges LLP, to T. Ostertag, Office of the Commissioner of Baseball
Exhibit B     Email from G. West, to R. Wicks et al., Latham & Watkins, and R. Walden et al., JP Morgan Chase Bank, N.A.
Exhibit C     Letter from Bud Selig, Commissioner of Baseball, to JP Morgan Chase Bank N.A. and GSP Finance LLC
Exhibit D     Letter from J. Crane to B. DuPuy
Exhibit E     Email from G. West, Weil, Gotshal & Manges LLP, to S. Marrotta et al., Latham & Watkins, and K. Fischer et al., Office of the Commissioner of Baseball
Exhibit F     Email from L. Sherwood, on behalf of Jim Crane, to Thomas O. Hicks and Robert DuPuy, Office of the Commissioner of Baseball
Exhibit G     Evan Grant, Tom Hicks worried lenders won't give approval to sale of Rangers, DallasNew.com SportsDay
Exhibit H     Press Release, the Office of the Commissioner of Baseball, Major League Baseball Statement
Exhibit I     Pledge Agreement (with amendments)
Exhibit J     First Lien Credit Agreement
Exhibit K     Letter from Office of the Commissioner of Baseball to Casey Shilts, Esq., Hicks Sports Group, LLC
Exhibit L     Second Lien Credit Agreement

# TABLE OF AUTHORITIES

Page(s)

CASES

Acequia, Inc. v. Clinton (In re Acequia, Inc.),
787 F.2d 1352 (9th Cir. 1986) ........................................................................ 24, 25

B.M. Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.),
764 F.2d 406 (5th Cir. 1985) ................................................................................. 43

Cadle Co. v. Mims (In re Moore),
No. 09-10604, 2010 WL 2182500 (5th Cir. June 2, 2010) ............................. 28, 40

Carrieri v. Jobs.com,Inc.,
393 F.3d 508 (5th Cir. 2004) ................................................................................. 38

Commodity Futures Trading Comm'n v. Weintraub,
471 U.S. 343 (1985) ......................................................................................... 37, 39

Equitable Life Ins. Co. v. Atlanta Stewart Partners (In re Atlanta-Stewart Partners),
193 B.R. 79 (Bankr. N.D. Ga. 1996) ..................................................................... 21

Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd.
P'ship),
116 F.3d 790 (5th Cir. 1997) ................................................................................. 43

GBL Holding Co. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Group, Ltd.),
331 B.R. 251 (N.D. Tex. 2005) .............................................................................. 40

Gearhart Indus., Inc. v. Smith Int'l, Inc.,
741 F.2d 707 (5th Cir. 1984) ................................................................................. 34

Gen. Trading Co. v. 2927 Eighth Ave. Corp. (In re 2927 Eighth Ave. Corp.),
No. 01 Civ. 8947, 2004 WL 1403362 (S.D.N.Y. June 23, 2004) .......................... 30

In re Adelphia Commc'ns Corp.,
352 B.R. 592 (Bankr. S.D.N.Y. 2006) ...................................................... Schedule 1

In re Am. Solar King Corp.,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ................................................................... 25

In re Applegate Prop., Ltd.,
133 B.R. 827 (Bankr. W.D. Tex. 1991) ............................................................ 44, 47

In re Bidermann Indus. U.S.A. Inc.,
203 B.R. 547 (Bankr. S.D.N.Y. 1997) ............................................................. 41, 42

In re Big Rivers Elec. Corp.,
  233 B.R. 726 (Bankr. W.D. Ky. 1998), aff'd, 233 B.R. 739 (W.D. Ky. 1998)........ 39, 40, 41

In re Combustion Eng'g, Inc.,
  391 F.3d 190 (3d Cir. 2004) ..................................................................................Schedule 1

In re Coram Healthcare Corp.,
  271 B.R. 228 (Bankr. D. Del. 2001) ..................................................................................... 34

In re Crosscreek Apartments, Ltd.,
  213 B.R. 521 (Bankr. E.D. Tenn. 1997)................................................................................ 21

In re Dewey Ranch Hockey, LLC,
  414 B.R. 577 (Bankr. D. Ariz. 2009)..................................................................................... 33

In re Dewey Ranch Hockey, LLC,
  406 B.R. 30 (Bankr. D. Ariz. 2009)....................................................................................... 33

In re East Redley Corp.,
  16 B.R. 429 (Bankr. E.D. Pa. 1982)....................................................................................... 46

In re Eastern Maine Elec. Coop., Inc.,
  125 B.R. 329 (Bankr. D. Me. 1991)....................................................................................... 46

In re Egan,
  33 B.R. 672 (Bankr. N.D. Ill. 1983)....................................................................................... 47

In re Embrace Sys. Corp.,
  178 B.R. 112 (Bankr. W.D. Mich. 1995) ......................................................................... 40, 41

In re Fierman,
  21 B.R. 314 (Bankr. E.D. Pa. 1982)................................................................................. 45, 46

In re Forrest Hills Assocs., Ltd.
  18 B.R. 104 (Bankr. D. Del. 1982) ........................................................................................ 45

In re Foxridge Ltd. P'ship,
  238 B.R. 810 (Bankr. W.D. Mo. 1999).................................................................................. 38

In re Fullmer,
  No. 50086, 2009 Bankr. LEXIS 2428 (Bankr. N.D. Tex. Sept. 1, 2009) .............................. 44

In re Grablowsky,
  180 B.R. 134 (Bankr. E.D. Va. 1995)..................................................................................... 38

In re Greate Bay Hotel & Casino, Inc.,
  251 B.R. 213 (Bankr. D.N.J. 2000)........................................................................................ 21

In re Gulf Coast Oil Corp.,
    404 B.R. 407 (Bankr. S.D. Tex. 2009) ................................................................. 41

In re Hampton Hotel Investors, L.P.,
    270 B.R. 346 (Bankr. S.D.N.Y. 2001) ................................................................. 36

In re Hoffert Marine, Inc.,
    64 B.R. 409 (Bankr. M.D. Fla. 1986) ................................................................. 30

In re Kazis,
    257 B.R. 112 (Bankr. D. Mass. 2001) ................................................................. 39

In re M&S Assocs., Ltd.,
    138 B.R. 845 (Bankr. W.D. Tex. 1992) ................................................................. 20

In re Madison Hotel Assocs.,
    749 F.2d 410 (7th Cir. 1984) ................................................................. 20

In re Malek,
    35 B.R. 443 (Bankr. E.D. Mich. 1983) ................................................................. Schedule 1

In re Master Mortgage Inv. Fund, Inc.,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ................................................................. 25, 27

In re Metrocraft Publ'g Servs., Inc.,
    39 BR. 567 (Bankr. N.D. Ga. 1984) ................................................................. Schedule 1

In re Mount Carbon Metro. Dist.,
    No. 97-20215, 1999 WL 34995477 (Bankr. D. Colo. July 20, 1999) ................................................................. 44

In re Newlin,
    370 B.R. 870 (Bankr. M.D. Ga. 2007) ................................................................. 38

In re Philadelphia Athletic Club, Inc.,
    15 B.R. 60 (Bankr. E.D. Pa. 1981) ................................................................. 40

In re Pilgrim's Pride Corp.,
    407 B.R. 211 (Bankr. N.D. Tex. 2009) ................................................................. 1, 39

In re Pioneer Fin. Corp.,
    246 B.R. 626 (Bankr. D. Nev. 2000) ................................................................. Schedule 1

In re Psychrometric Sys., Inc.,
    367 B.R. 670 (Bankr. D. Colo. 2007) ................................................................. 40, 41

In re Rodriguez Gas & Oil Servs., Inc.,
    No. 08-50152, 2008 Bankr. LEXIS 2718 (Bankr. S.D. Tex. Oct. 2, 2008) ................................................................. 44

In re Scioto Valley Mortgage Co.,
    88 B.R. 168 (Bankr. S.D. Ohio 1988) ................................................................... Schedule 1

In re Sears,
    No. 10-40275, 2010 WL 1463219 (Bankr. D. Neb. April 12, 2010) ..................................... 30

In re Transload & Transp., Inc.,
    61 B.R. 379 (Bankr. M.D. La. 1986) ................................................................................. 45

In re U.S. Brass Corp.,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) .............................................................................. 47

In re Wonder Corp. of America,
    70 B.R. 1018 (Bankr. D. Conn. 1987) .............................................................................. 43

Int'l Bankers Life Ins. Co. v. Holloway,
    368 S.W.2d 567 (Tex. 1963) ............................................................................................. 34

L & J Anaheim Assocs. V. Kawasaki Leasing Int'l, Inc. (In re L & J Anaheim Assocs.),
    995 F.2d 940 (9th Cir. 1993) ............................................................................................ 20

La. World Exposition v. Fed. Ins. Co.,
    858 F.2d 233 (5th Cir. 1988) ...................................................................................... 36, 39

Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.),
    801 F.2d 60 (2d Cir. 1986) ............................................................................................... 30

Meinhard v. Salmon,
    164 N.E. 545 (N.Y. 1928) ................................................................................................. 35

Mission Iowa Wind Co. v. Enron Corp.,
    291 B.R. 39 (S.D.N.Y. 2003) ............................................................................................ 42

Nat'l Convenience Stores Inc. v. Shields (In re Schepps Food Stores, Inc.),
    160 B.R. 792 (Bankr. S.D. Tex. 1993) .............................................................................. 36

North Am Catholic Educ. Programming Found., Inc. v. Gheewhalla,
    930 A.2d 92 (Del. 2007) .................................................................................................... 38

Oneida Motor Freight, Inc. v. United Jersey Bank,
    848 F.2d 414 (3d Cir. 1988) ............................................................................................. 46

Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.),
    2010 WL 1568425 (Bankr. C.D. Cal. 2010) ............................................................... 36, 37

Roth v. Mims,
    298 B.R. 272 (N.D. Tex. 2003) .................................................................................... 27, 42

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
    81 F.3d 355 (3d Cir. 1996) ................................................................................ 46

Simantob v. Claims Prosecutor, LLC (In re Lahijani),
    325 B.R. 282 (B.A.P. 9th Cir. 2005) .................................................................. 41

Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.),
    844 F.2d 1142 (5th Cir. 1988), cert. denied, 488 U.S. 926 (1988) ........................ 45

Tominaga v. Sherwood Invs. Ltd. (In re Tominaga),
    325 B.R. 653 (Bankr. M.D. Fla. 2005) ............................................................... 30

West v. Seiffert (In re Houston Drywall, Inc.),
    No. 05-95161-H4-7, 2008 Bankr. LEXIS 4060 (Bankr. S.D. Tex. July 10, 2008) ............... 35

Wilson v. Cantwell,
    No. 3:06-CV-1913-L, 2007 U.S. Dist. LEXIS 58185 (N.D. Tex. Aug. 8, 2007) .................. 35

STATUTES

11 U.S.C. §1107(a) .......................................................................................... 36

11 U.S.C. § 1124 ............................................................................................. 20

11 U.S.C. § 1125(a)(1) ..................................................................................... 44

11 U.S.C. § 1125(b) ......................................................................................... 45

11 U.S.C. § 1129(a)(3) ..................................................................................... 43

11 U.S.C. § 1129(a)(7) ..................................................................................... 27

11 U.S.C. §1129(a)(10) .................................................................................... 24

Section 152.02 of the Texas Business Organizations Code ....................................... 36

OTHER AUTHORITIES

7 COLLIER ON BANKRUPTCY ¶ 1124.03 (16th Ed. 2010) ........................................... 25

140 Cong. Rec. H10752 (Oct. 4, 1994) ............................................................... 21

On June 2, 2010, the Court entered an order inviting parties wishing to be heard at the hearing scheduled for June 15, 2010 to submit a brief that addresses the five issues set forth in the order. The ad hoc group (the "Ad Hoc Group") of First Lien Lenders (as defined below), JP Morgan Chase Bank, N.A. ("JPMC") as the First Lien Agent (as defined below), and GSP Finance LLC, as the Second Lien Agent (as defined below and, collectively with the Ad Hoc Group and the First Lien Agent, the "Lender Parties"), respectfully submit this joint brief setting forth their position regarding each of these issues.[1]

## PRELIMINARY STATEMENT

The debtor, Texas Rangers Baseball Partners ("TRBP" or the "Debtor"), has proposed a plan of reorganization (the "Plan"[2]) that contravenes fundamental principles of the Bankruptcy Code. The Plan impairs substantial legal, equitable, and contractual rights of the Lenders (as defined below) and equity interest holders whose votes must therefore be solicited, and from whom an impaired accepting class of creditors must emerge before the Plan can be confirmed. The Plan is also premised on an assertion that the Debtor has no obligation to maximize the value of its estate for the benefit of all stakeholders, including its shareholders. This Court has recently held the opposite to be "unquestionably true": "Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors." In re Pilgrim's Pride Corp., 407 B.R. 211, 218 (Bankr. N.D. Tex. 2009).

---

[1]  This submission does not, and is not intended to, cover all objections that any of the Lender Parties may (and intends to) assert with respect to the confirmability of the Plan (as defined blow). The Lender Parties expressly reserve all such objections, regardless of whether they are stated herein. Capitalized terms not defined herein have the meanings ascribed thereto in the Disclosure Statement.

[2]  The Debtor has filed a proposed disclosure statement [D.I. 34] (the "Disclosure Statement") for the Plan.

**Joint Brief By Lender Parties Regarding**
**Proposed Plan of Reorganization and Disclosure Statement**

The Debtor's violation of its duty to maximize value renders the Plan unconfirmable. The good faith requirement of section 1129(a)(3) of the Bankruptcy Code, at a minimum, requires that debtors satisfy their fiduciary duties in proposing reorganization plans, which the Debtor clearly has not done when it premised the Plan on the professed belief that it had no duty to maximize value. Indeed, the evidence available (even in the absence of discovery) demonstrates that the Plan is not based on a sale that reflects even the highest or best bid from the proposed purchaser, notwithstanding that – due to a series of unauthorized transactions on the eve of the bankruptcy filing that are discussed in detail below – the assets being sold under the Plan are **more** valuable than those on which such purchaser's prior bid was based. And even that prior bid did not constitute the highest or best bid received for the Debtor's assets during the sale process. This evidence makes clear that the Plan fails to maximize the value of the Debtor's estate.

Moreover, the deficiencies in the Plan are such that they cannot be remedied by the purported consent of the holders of the Debtor's impaired equity interests (as defined below, the Partners). In March 2009, the right to consent on behalf of the Partners vested contractually in JPMC in its capacity as the collateral agent (in such capacity, the "Collateral Agent" for the Lenders (as defined below).[3] As such, any consent to the sale or the Plan by the Partners is void *ab initio* as *ultra vires*. The absence of a valid consent by the Partners is fatal to the Debtor's attempt to use the Bankruptcy Code's and this Court's imprimatur for consummation of a sale that fails to maximize value.

---

[3]     The "Lenders" are comprised of the "First Lien Lenders" and the "Second Lien Lenders," each as defined below.

Given the unquestionable legal obligation of the Debtor to maximize value for the benefit of all stakeholders, the lack of a valid consent from the Partners to a non-maximizing sale and other legal impediments (such as several highly suspect transactions subject to being unwound), the only reasonable course of action is for the Court not to permit the confirmation hearing to go forward at this time and, instead, to require that the Debtor conduct, on an expedited basis, a fair, open and transparent competitive sale process to seek to maximize the value of its assets. The Lender Parties have no desire to achieve a predetermined outcome or a sale to a predetermined purchaser; they ask only for a fair process. Such a process, which is the minimum that the Bankruptcy Code requires, will yield fair value for the Debtor's assets, which, in turn, will permit a plan of reorganization to be proposed in good faith.

To the extent that the Court permits the Debtor to move forward with the Plan, it should at least require adequate disclosure of all relevant facts, as to which the Disclosure Statement is woefully lacking. In particular, the Debtor's disclosure regarding the sale process it underwent under the control of Major League Baseball ("MLB") inadequately describes what actually occurred. The Disclosure Statement also lacks an adequate description of the extraordinary transactions that were undertaken by the Debtor and its affiliates on Sunday, May 23, 2010, the eve of the Debtor's bankruptcy filing, which transactions had the effect of substantially increasing the cost to the Debtor of pursuing any plan other than the Plan, and of depriving its secured creditors of their contractual rights.

# <u>RELEVANT FACTUAL BACKGROUND</u>[4]

## <u>The Flawed Auction Process</u>

Following its payment defaults in March of 2009, which are discussed below,

HSG Sports Group LLC ("<u>HSG</u>") decided to sell the Texas Rangers Major League Baseball Club

(the "<u>Texas Rangers</u>") to pay down the debt owing to the Lenders. The Lender Parties were not

parties to the sale process, but, as is typical, relied on the various fiduciaries and participants to

conduct a fair and open auction to ensure that they would obtain fair value for the Lenders'

collateral.

In default on its obligations to the Lenders, in the spring of 2009, HSG turned to

MLB for additional financing. On June 29, 2009, the Debtor and certain of its affiliates entered

into that certain Voluntary Support Agreement (the "<u>Original VSA</u>") with MLB as a condition to

MLB's agreement to lend funds to the Debtor. (<u>See</u> Disclosure Statement at 5.) Neither the

Debtor nor MLB has provided the Lender Parties with a copy of the Original VSA or the

Modified VSA (as defined herein). As described in the Disclosure Statement, the Original VSA

conferred upon MLB certain rights with respect to oversight of the Debtor's operations, and

appointed a "lead monitor," John McHale, Jr. (<u>Id.</u>) On November 25, 2009, the Original VSA

was amended (as amended, the "<u>Modified VSA</u>") to impose a timetable on the efforts of the

---

[4] The description of events herein is presented jointly by the Lender Parties. The Agents (as defined below) do not have first hand knowledge of all communications and events described herein. To the extent that events outside the knowledge and beyond the involvement of the Agents are described herein, the Agents do not adopt such description, and instead rely upon the account presented by the Ad Hoc Group. Where possible, the Lender Parties have attached documentary evidence in support of the factual assertions made herein. Because discovery had just commenced at the time of filing this brief, not all assertions are supported by reference to an attached document. Nevertheless, the Lender Parties expect that evidence at trial will establish the veracity of all such assertions. In addition, although the Lender Parties have provided chambers and the parties identified in the service list set forth in the Court's order dated June 2, 2010 with unredacted copies of the attached documents, they have, out of an abundance of caution, submitted redacted copies of such documents for filing on the Court's docket.

Debtor and its affiliates to conclude a sale of the Debtor's assets, including an obligation to select a winning bidder by December 15, 2009 and enter into a definitive sale agreement by January 15, 2010. (Id.) Immediately prior to the December 15, 2009 deadline imposed by MLB, HSG was negotiating with three different bidding groups for the Texas Rangers. (See Disclosure Statement, at 8.) Subsequent correspondence demonstrates that on December 15, 2009, Jim Crane ("Crane"), a prominent Houston businessman, was the highest bidder, offering greater value than a group (the "Greenberg Group") assembled by Chuck Greenberg, a Pittsburgh-based lawyer. (See Ex. A (Email from G. West to T. Ostertag (12/31/09).)

At some point on December 15, 2009, Jesse Jacobs, an employee of the Raine Group, a financial advisory firm appointed by MLB to participate in the sale process, told HSG that Chuck Greenberg had agreed orally to substantially modify the Greenberg Group's bid to eliminate a working capital adjustment. (Id.). Relying on this reported oral modification, the Debtor selected the Greenberg Group as the winning bidder despite the higher written bid submitted by Crane. (Id.)

Shortly thereafter, Chuck Greenberg denied ever making any such modification. (Id.) As explained by Glenn West of Weil, Gotschal & Manges LLP, HSG's legal counsel, shortly after the selection of the Greenberg Group bid, "what has become increasingly clear to us in the last few days is that while Jesse Jacobs is absolutely clear on what he believes he was told by Greenberg as to important oral modifications to Greenberg's written bids, Greenberg is equally adamant that he did not make them or intend to make them." (Id.) Mr. West then explained: "Without the oral modifications upon which we relied in selecting Greenberg, Greenberg was not the economic winning bidder." (Id.) In even blunter terms, Mr. West

explained that "[a]s we stand now, **Greenberg was in fact a losing bidder, and Crane was the actual winning bidder**--and we cannot pretend otherwise regardless of a prior good faith selection that turned out to have been in error (and if necessary, we should now officially deselect him)." (Id. (emphasis added)). In a later email to the First Lien Agent's counsel, Mr. West stated that MLB's "intent seems to be to lock us into Greenberg even though **Crane now has a clearly superior economic deal**--and may always have had based on Greenberg's current position." (Id. (emphasis added)).

Nevertheless, MLB refused to allow HSG to continue to negotiate with Crane. On December 31, 2009, MLB directed HSG that "you have our permission to negotiate only with the Greenberg group toward a definitive purchase agreement by the deadline of January 15." (Id.) In response, Mr. West stated: "**It appears Greenberg is using your position to simply refuse to negotiate in good faith; and the result will be a bad one for the team and our lenders (whose consent is absolutely required, just like yours, for whatever is ultimately done here).**" (Id. (emphasis added)).

Despite MLB's direction, HSG continued to negotiate with both the Greenberg Group and Crane toward a definitive agreement. (See Decl. of K. Fischer [D.I. 30] (the "Fischer Declaration") ¶ 29.) By January 16, 2010, the day after the deadline imposed under the Modified VSA for completion of a definitive purchase agreement, Mr. West's update to JPMC's counsel stated:

> But, despite all efforts, the gap between the economics on the Greenberg proposal and the Crane proposal remain very wide. **It is unlikely we can recommend that we proceed forward with Greenberg** based on where we are with their proposal and assuming we can proceed forward with Crane. It is not clear to me that any additional amount of time is going to further narrow the gap between Greenberg and Crane.
>
> . . .

> In contrast [to the Greenberg Group's proposal], the Crane proposal could be ready to sign in less than a day ... . Crane [] is at least $13 million and perhaps more than $20 million ahead of Greenberg with a lot more certainty of closing, assuming of course that he can get MLB approval.
>
> We have provided all of the above facts to MLB. We are awaiting word on how to proceed.

(See Ex. B (Email from G. West to R. Wicks et al. (Jan. 16, 2010) (emphasis added).)

MLB's decision, however, was immediate and decisive: on the same day, it exercised its previously undisclosed rights under the Modified VSA and directed the Debtor to finalize the agreement with the Greenberg Group. In an April 30, 2010 letter to JPMC, Bud Selig, the Commissioner of Baseball, explained what MLB had done: "on January 16, 2010, Major League Baseball [ ] assumed control of the sale process in accordance with MLB Documents (as such term is defined in the HSG Credit Agreements) and authorized the Hicks parties to conclude their negotiations with [the Greenberg Group] and execute and deliver the APA, which provides a fair value to the Rangers." (See Ex. C (Letter from Bud Selig to JPMC (April 30, 2010).)

On January 18, 2010, Crane provided a letter to HSG and MLB that further improved his prior offers. (See Ex. D (Letter from J. Crane to B. DuPuy (Jan. 18, 2010).) Crane's proposal indicated his continued interest in owning the Texas Rangers. He stated that he had (i) a fully-committed equity investment, much of which was his own cash; (ii) agreed to personally guarantee, a $20 million termination payment (payable if he did not close the transaction) to protect the Texas Rangers; (iii) a demonstrated ability to close within a matter of a several weeks; (iv) a desire to keep Nolan Ryan in his present capacity; and (v) a commitment to the Texas Rangers' fans.

Notwithstanding Crane's improved offer, on January 23, 2010, HSG, acting under MLB's control, executed the original purchase agreement with the Greenberg Group (the "January APA").[5] The January APA paid the Lenders approximately $231 million cash at closing, with $30 million to be held in escrow (which might only become available to the First Lien Lenders more than a year after closing). (See Fischer Decl. ¶ 30.) On January 25, 2010, Mr. West, still representing HSG and its affiliates, provided a comparison of economic recoveries between the January APA and Crane's latest offer, conclusively showing that the Crane bid was higher and better than the January APA. (See Ex. E (Email from G. West to S. Marrotta et al. (Jan. 25, 2010).)

**The BRE Land Sale Agreement**

In connection with the execution of the January APA, the Greenberg Group also entered into that certain Land Sale Agreement, dated January 23, 2010 (the "Land Sale Agreement"), with Baseball Real Estate L.P. ("BRE") – an entity owned and controlled by Hicks (but not party to the Credit Agreements). Pursuant to the Land Sale Agreement, BRE agreed to sell its right, title and interest in certain real property surrounding the Ballpark at Arlington (the "BRE Property"). BRE stood to receive the following consideration in connection with the Land Sale Agreement: (i) $5,000,000 of cash, (ii) a $53,158,991.04 promissory note paying interest of 4.1% per annum, (iii) a 1% equity interest in Rangers Baseball Express, (iv) forgiveness of a $12,800,000 debt owed to Emerald Diamond, L.P. ("Emerald Diamond"), a guarantor under the Credit Agreements and (v) assumption of certain liabilities associated with or related to the BRE Property, and (vi) repayment of the Overdraft Protection Line of Credit (as defined below).

---

[5]     The actual Purchaser is Rangers Baseball Express LLC, which is the legal entity controlled by the Greenberg Group.

## Negotiations with the Lender Parties

Following execution of the January APA and the Land Sale Agreement, the Greenberg Group, HSG, MLB and the Lender Parties immediately began negotiations regarding the terms under which the Lenders would consent to the sale of the Texas Rangers pursuant to the January APA. The Lender Parties' good faith negotiations proceeded as follows:

- On or about February 2, 2010, the First Lien Agent communicated a proposal to MLB, the Greenberg Group and HSG.

- On April 2, 2010, HSG and the Greenberg Group made an informal proposal (not reflected in any executable documents) regarding certain improvements to the January APA, which MLB calculated as providing $282 million of value to the Lenders. Although this was higher value to the Lenders, most of the improvements were economic concessions made by Hicks and his affiliates.

- On or about April 15, 2010, the Ad Hoc Group provided to MLB and the other parties a marked-up version of the January APA that had, in a matter of only a few hours, gained the consent of more than 90% of the First Lien Lenders.

- On April 28, 2010, the Ad Hoc Group was asked by MLB's counsel to provide, within two hours, a "bottom line" position that was less complicated than the marked-up version of the January APA, which they described as "confusing." The Ad Hoc Group communicated a proposal as requested.

The Greenberg Group did not make any written proposal after the April 2, 2010 informal proposal. Other efforts to maximize the value of the Texas Rangers were blocked by MLB. Most notably, on April 2, 2010, Crane, who had not been part of the sale process since MLB seized control, sent an email to MLB and Tom Hicks stating as follows:

We are writing to advise you that if the parties to the proposed transaction elect, for their own reasons, not to complete the proposed deal **we would be prepared to reaffirm (and potentially to improve)** our last offer of January 19, 2010, provided that the Office of the Commissioner advises us at that time that it would welcome our re-engagement, we receive confirmation that all other consents necessary for our re-engagement have been obtained and that all parties with

rights with respect to the Rangers and their affiliates commit to prompt and exclusive  mutual efforts to consummate a transaction."

(See Ex. F (Email from Jim Crane to Tom Hicks and Bob DuPuy (April 2, 2010) (emphasis added).)  MLB did not respond; Mr. West on behalf of HSG told Crane that they were bound by their contract with the Greenberg Group not to engage in discussions with him.  (Id.)

**MLB Invokes "Best Interests of Baseball"**

MLB used extraordinary measures to try to force the Lenders to consent to the sale to the Greenberg Group.  When faced with resistance, MLB became only more aggressive. On April 21, 2010, when Mr. Hicks was quoted as saying that he was "concerned" about whether the sale to the Greenberg Group would close because "I think the lenders feel that [the Greenberg-Ryan] group may not be the highest option."  He went on to say

> It's something that has to be worked out between MLB, the lenders and the Greenberg group.  When we agreed to this sale in January, we said it was a complicated deal and it's only getting more complicated.  **At the end of the day, the lenders have the final say.**

(See Ex. G (Evan Grant, Tom Hicks worried lenders won't give approval to sale of Rangers, DallasNew.com SportsDay (April 21, 2010) (emphasis added).)  Within hours of those quotes being published, MLB issued a press release saying that "Major League Baseball is currently in control of the sale process and **will use all efforts to achieve a closing with the chosen bidder**." (See Ex. H (Press Release, the Office of the Commissioner of Baseball, Major League Baseball Statement (April 21, 2010).)  In what the Lender Parties could only interpret as a warning to them and any competing bidders who might want to pay more, MLB stated that "[a]ny deviation from or interference with the agreed upon sale process by Mr. Hicks or any other party, or any actions in violation of MLB rules or directives will be dealt with appropriately by the Commissioner."

Thereafter, on April 30, 2010, the Commissioner of Baseball wrote to the Agents stating his view that the Lenders are contractually bound to consent affirmatively to the sale and to release their liens if the Commissioner concluded that the transaction was "in the best interests of baseball." (See Ex. C.) As such, Mr. Selig said, "I expect the Lenders to honor their contractual obligations–which require them to respect any action taken by the Commissioner in the best interests of Baseball–and in doing so, to consent to the Transaction and to release their liens at the Closing." (Id.) Mr. Selig followed this up by stating that "MLB expressly reserves all of its rights and remedies in respect of this matter generally **and against the Lenders particularly**, should the Lenders refuse to provide the requested confirmation of the Lenders' consent to the Transaction and agreement to release their liens at the Closing." (Id. (emphasis added)).

In the early weeks of May, the Lender Parties continued to offer alternatives and suggestions that they believed would make the Greenberg Group's offer acceptable to the Lenders. The Debtor and its affiliates were not responding. On May 24, 2010 (the "Petition Date"), without any warning to the Lenders, but with the backing and support of MLB, the Debtor filed for bankruptcy. (See Fischer Decl. ¶ 32.)

**Events on the Eve of Bankruptcy Filing**

The first-day pleadings filed by the Debtor have shed some light on the machinations of Tom Hicks, the Texas Rangers and MLB in the days and weeks leading up to the bankruptcy filing. Immediately before the Petition Date, TRBP entered into a series of extraordinary affiliate transactions – including several on Sunday, May 23, 2010 – in an effort to deprive the Lenders of their consent rights under their agreements with the Debtor and its various affiliates, and to make it prohibitively expensive for a better transaction to be approved. These

extraordinary transactions constitute, to borrow from the MLB press release, "**all efforts to achieve a closing with the chosen bidder**," and they should shock the Court.

Among the most egregious transactions are the following (collectively, the "Eve of Filing Transactions"):

- On May 23, 2010, the Land Sale Agreement was modified to provide that TRBP (i) would pay fees and expenses of BRE and its affiliates, including Mr. Hicks, (ii) would release those same people, and (iii) would indemnify them with respect to any claims asserted against them relating to the sale of the BRE Property. (See Fischer Decl. ¶¶ 47, 50.) TRBP was not previously a party to the Land Sale Agreement, and was added only for the purpose of incurring these liabilities and granting releases. Based on these changes, any claim that Mr. Hicks breached his fiduciary duties through self-dealing in respect of the sale of the BRE Property would be indemnified by the Debtor. Moreover, the Debtor's equity holders would be deprived of the ability to bring claims against Mr. Hicks for self-dealing transactions.

- On May 23, 2010, TRBP and the Greenberg Group terminated the January APA and immediately executed a new agreement (the "May APA") that provides for materially worse terms for TRBP as compared to the January APA, including (1) a $10 million termination fee payable to the Greenberg Group if the transaction does not close (both agreements provide for only a $1.5 million deposit by the Greenberg Group if it cannot close); (2) a reduction in cash payable by the Greenberg Group; (3) a $30 million escrow for a one-year period (despite the Greenberg Group's offer to reduce the escrow to $15 million for nine months in the April 2 proposal), as well as changes to make it easier for the Greenberg Group to claim against the escrow; and (4) substantially increased reimbursement for fees, including those incurred by BRE, which were not previously required.

- As compared to the January APA, the May APA removed from assumed liabilities indemnification obligations to Lynn Nolan Ryan, Jr., Thomas O. Hicks, Lori K. McCutcheon, Thomas O. Hicks, Jr., Joseph B. Armes, Mack H. Hicks. Because these liabilities will not be assumed, they will remain with the Debtor after the sale closes, providing the Greenberg Group with more valuable assets than had ever been offered to other bidders.

- The Greenberg Group executed a side letter with Hicks pursuant to which Hicks would be named "Chairman Emeritus" of the Texas Rangers and would receive season tickets and other benefits. (See id. ¶ 52.) These newly-added benefits are in addition to substantial value that Hicks is receiving as part of the Land Sale Agreement.[6]

- On May 23, 2010, TRBP signed a Shared Charter Services Agreement with HSG, whereby TRBP became obligated to pay HSG, at a price substantially above market, for a charter aircraft lease that HSG had entered into with an entity in which Hicks has an interest. TRBP was not previously a party to this contract.

- TRBP, which was not previously obligated to certain financial advisors retained by HSG signed new agreements with those entities to reimburse them for at least $9 million in transaction costs. (See Disclosure Statement, at 11.) In the absence of the new agreement with TRBP, these financial advisors would have been unsecured creditors of HSG, a non-debtor affiliate of TRBP that has more than $600 million of secured debt.

- On May 23, 2010, Emerald Diamond, a limited partnership in which TRBP's general partner owns a 1% partnership interest and TRBP's limited partner owns a 99% partnership interest, transferred its lease of an office building adjacent to the Ballpark at Arlington and other assets to TRBP in return for a promissory note of approximately $15 million, without any effort to market these assets. (See id. ¶ 19.) Such sale was effectuated without an approval of the Collateral Agent, who was the only entity capable of granting such approval. (See Ex. I (Pledge Agreement) §§ 4.4.1(c)(3), 4.4.2(b).) Emerald Diamond is obligated to the Lenders for the full amount of the claims under the Credit Agreements.

- On May 23, 2010, the lease for the Texas Rangers to play in Arlington Stadium, to which Rangers Ballpark LLC ("Rangers Ballpark"), an entity obligated to the Lenders for the full amount of the claims under the Credit Agreements, was a party, was transferred to TRBP for no consideration. (See Fischer Decl. ¶ 34(ii).) Such transfer was effectuated without an approval of the Collateral Agent, who was the only entity capable of granting such approval. (See Ex. I §§ 4.4.1(c)(3), 4.4.2(b). Additionally, the transfer is void ab initio under the terms of the deeds of trust. The lease is scheduled to be sold to Rangers Baseball Express LLC (the "Purchaser") under the May APA, (see Fischer Decl. ¶ 36), but no value is expected to be provided to Rangers Ballpark in return for its rights under the lease.

- Other contractual rights belonging to HSG, against which the Lenders have a full claim, were transferred to TRBP, and are to be sold to the Purchaser under the May APA. No consideration was provided to HSG in return for these contract rights, nor was the Collateral Agent's approval obtained.

---

[6]     Hicks improperly refers to the funds that he infused into TRBP as "Overdraft Protection" in an attempt to characterize them as "permitted indebtedness" under the Credit Agreements (defined below), which have a permitted indebtedness basket for loans that are designed for overdraft protection. The Lender Parties reserve the right to challenge the distribution of any funds to Hicks resulting from a violation of the Credit Agreements.

- On May 23, 2010, TRBP executed a Second Amended and Restated VSA and an Interim Services Agreement with MLB that purports to provide a complete indemnification of MLB for all actions it took pre-petition.  (See id. ¶ 33.)   As such, MLB would have the right to complete indemnification for any actions it took when it was in control of the sale process, including those actions taken to close a transaction with the "chosen bidder," the Greenberg Group.

In summary, the Debtor shifted significant assets, without the corresponding liabilities, from certain affiliates where the liability to the Lenders is not limited, to TRBP, where the guaranty liability is capped at $75 million.  As a result, the Lenders' recourse to such assets was limited in amount to $75 million, i.e., the limit of TRBP's guaranty.  The Debtor also shifted to TRBP new liabilities for which it had not been previously liable and which it was not obligated to assume.  Among these liabilities were new, contingent and unlimited indemnification obligations to insiders and a $10 million termination obligation to the Purchaser.

The Eve of Filing Transactions, if given effect, would make a sale to any other purchaser extraordinarily costly.  Moreover, if any of these transactions were unwound, the May APA could not go forward, the Debtor might become obligated to pay the Purchaser the $10 million termination fee, and it would be unclear if the Debtor were solvent.  Collectively, they evidence a concerted effort on the part of the Debtor and MLB to hinder, delay and defraud the Lenders in order to prevent them from receiving fair value for their claims against TRBP and its affiliates.

The aggregate negative effect of these changes on the recoveries of the Lenders cannot be determined based on the information available to date.  It is clear, however, that the transaction the Debtor is asking this Court to approve as part of the Plan does not provide the estate with value equal to that which the Greenberg Group agreed to provide in the January APA, let alone its proposal of April 2, 2010, or the proposal presented by Crane.  Because the January APA was not the highest or otherwise best offer for the Debtor's assets, the consideration offered

under the May APA, by definition, plainly does not represent the fair value of such assets. Indeed, no other putative buyer has ever even had the opportunity to bid on the *quantum* of assets and liabilities that are being sold under the May APA because the Eve of Filing Transactions changed the composition of those assets and liabilities substantially.

**Corporate Structure and Prepetition Financing**

The Debtor is a general partnership which owns and operates the Texas Rangers and wholly owns Rangers Ballpark. (See Fischer Decl. ¶ 5.)Rangers Equity Holdings, L.P. ("Rangers Equity LP") is TRBP's limited partner and owns a 99% interest in TRBP, whereas Rangers Equity Holdings, GP, LLC ("Rangers Equity GP" and together with Rangers Equity LP, the "Partners") is TRBP's general partner and owns a 1% interest in TRBP. (Id. ¶ 6.) The Partners are holding companies with no operating assets. (Id.) While Rangers Equity GP is a wholly owned subsidiary of Rangers Equity LP, Rangers Equity LP is owned 99% by HSG and 1% by HSG Partnership Holdings LLC ("HSG Partnership" and, together with HSG, the "Parents"). Under the operative documents, the power to act for or on behalf of Rangers Equity LP is vested solely and exclusively in HSG Partnership, its general partner.[7] All of the

---

[7] These documents are as follows: (a) Agreement of Limited Partnership of Rangers Equity LP, dated as of August 25, 2008 (the "Rangers Equity LP Agreement"), (b) Amended and Restated Limited Liability Company Agreement of Rangers Equity GP, dated August 25, 2008 (the "Rangers Equity GP Agreement"), (c) Second Amended and Restated General Partnership Agreement for TRBP, dated as of June 2, 1999, as amended by that certain Partner Substitution Agreement of the Partnership, dated as of August 25, 2008, and as further amended by (i) that certain First Amendment to Second Amended and Restated General Partnership Agreement of the Partnership, dated as of November 25, 2009 and (ii) that certain Second Amendment to Second Amended and Restated General Partnership Agreement of the Partnership dated as of May 23, 2010 (the "TRBP Partnership Agreement"). The Lender Parties possess only the version of the TRBP Partnership Agreement dated June 2, 1999, and thus all citations herein to the TRBP Partnership Agreement are to that version. The Lender Parties have no reason to believe that a materially different version of the TRBP Partnership Agreement was in effect as of the relevant times.

foregoing companies are direct or indirect, wholly owned subsidiaries of HSG, which, in turn, is a wholly owned subsidiary of HSG Sports Group Holdings LLC ("HSGH").

Thomas O. Hicks, the ultimate owner of the Debtor and its affiliates, is the Chairman of the Board and CEO of the Debtor, and each Partner. He serves as Chairman of the Board, President and CEO of HSG, HSGH and HSG Partnership as well. Additionally, he is an indirect owner of BRE, the seller of the BRE Property.

Among the other officers of the Debtor is Lynn Nolan Ryan, Jr., who serves as President of the Debtor and Rangers Equity LP. Mr. Ryan is also a principal of the Purchaser.

Prior to the Petition Date, TRBP's operations were partially funded with the proceeds of (i) the Amended and Restated First Lien Credit and Guaranty Agreement dated December 19, 2006 (as amended, modified or supplemented and in effect from time to time, the "First Lien Credit Agreement"), among HSG, as borrower, HSGH and various subsidiaries of HSG, including TRBP, the Partners and the Parents, as guarantors, the lenders party to it from time to time (the "First Lien Lenders"), and JPMC, as the Administrative Agent (the "First Lien Agent") and Collateral Agent, and (ii) the Second Lien Credit and Guaranty Agreement dated December 19, 2006 (as amended, modified or supplemented and in effect from time to time, the "Second Lien Credit Agreement", and together with the First Lien Credit Agreement, the "HSG Credit Agreements"[8]), among HSG, as borrower, HSGH and various subsidiaries of HSG, including TRBP, the Partners and the Parents, as guarantors, the lenders party to it from time to time (the "Second Lien Lenders", and together with the First Lien Lenders, the "Lenders"), and

---

[8]     The Credit Documents (as defined in the Second Lien Credit Agreement) are materially the same as the Credit Documents (as defined in the First Lien Credit Agreement). For ease of reference herein, any reference to a term or provision of any Credit Document (as defined in the First Lien Credit Agreement) shall also refer to the corresponding term or provision contained in the corresponding Credit Document (as defined in the Second Lien Credit Agreement).

GSP Finance LLC, as the Administrative Agent (the "Second Lien Agent," and, together with the First Lien Agent, the "Agents").

As of the Petition Date, approximately $446 million was outstanding under the First Lien Credit Agreement, consisting of $350 million principal amount of term loans, approximately $61 million of revolving loans and approximately $35 million in accrued interest.[9] In addition, as of the Petition Date, approximately $130 million was outstanding under the Second Lien Credit Agreement, consisting of $115 million principal amount of term loans and approximately $15 million in accrued interest.

Pursuant to that certain Amended and Restated First Lien Pledge and Security Agreement dated December 19, 2006 (as amended and supplemented from time to time, the "Pledge Agreement"), the First Lien Lenders' claims under the First Lien Credit Agreement are secured by a first lien on substantially all the assets of HSGH, HSG, and certain of HSG's direct or indirect subsidiaries, including the pledge of (and control over) the equity interests in TRBP (the "TRBP Interests"), in Emerald Diamond (the "ED Interests"), in Rangers Ballpark (the "Ballpark Interests"), in each of the Partners (the "Partners' Interests"), and in each of the Parents (the "Parents' Interests" and, together with the TRBP Interests, the ED Interests, the Ballpark Interests and the Partners' Interests, the "Relevant Equity Interests").[10] (See Fischer Decl. ¶ 15.) Pursuant to Section 7.1 of the First Lien Credit Agreement, however, TRBP's guaranty of the borrower's obligations under the First Lien Credit Agreement is capped at $75 million. (Id. ¶ 16.)

---

[9] Such amounts do not include any amounts that may be outstanding on account of unpaid letter of credit fees, revolving commitment fees, advisor fees or obligations under related swaps agreements.

[10] Unless otherwise noted, the Pledge Agreement entered into in respect of the Second Lien Credit Agreement contains comparable provisions to those cited herein.

Prior to an Event of Default, the Partners, TRBP, and the Parents are granted a limited right to vote and consent (the "Voting and Consent Rights") with respect to the Relevant Equity Interests. The Pledge Agreement provides that following the occurrence and continuation of an Event of Default:

> All rights of each grantor to exercise or refrain from exercising voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto **shall cease and all such rights shall thereupon become vested in the Collateral Agent who shall thereupon have the sole right to exercise such voting and other consensual rights . . . .**
>
> (Ex. I § 4.4.2(c)(i)(3)(A) (emphasis added)).

Upon the occurrence of an Event of Default, the Voting and Consent Rights of the Parents, TRBP, and the Parents cease and automatically vest in the Collateral Agent. (See Ex. I § 4.4.1(c)(i)(3)(A).) Accordingly, when an Event of Default occurred on March 31, 2009 (which is continuing), all authority to vote and grant consents with respect to the Relevant Equity Interests automatically, fully and completely vested in the Collateral Agent.

**Default Under the Credit Agreements**

On March 31, 2009, HSG defaulted under both Credit Agreements by failing to make interest payments when due. (Id. ¶ 23.) On April 7, 2009, by a Notice of Event of Default, the First Lien Agent notified HSG that the revolving commitments of the First Lien Lenders were terminated and the debt under the First Lien Credit Agreement was accelerated. (Id.) The debt under the Second Lien Credit Agreement was also accelerated by the Second Lien Agent. For more than a year prior to the Petition Date, neither HSG nor any of HSG's affiliates made any interest payments to the Lenders.

**The Involuntary Petitions**

On May 28, 2010, involuntary chapter 11 petitions (the "Involuntary Cases") were filed against each Partner in the United States Bankruptcy Court for the Northern District of Texas. As of June 4, 2010, both of the Involuntary Cases were assigned to this Court and are now pending under case numbers 10-43624 (DML)-11 and 10-43625 (DML)-11, respectively. A conference regarding entry of the orders for relief in the Involuntary Cases is scheduled for June 22, 2010.

**THE LENDER PARTIES' POSITIONS WITH RESPECT TO
THE FIVE ISSUES RAISED BY THE COURT**

I. **THE HOLDERS OF CLAIMS IN CLASSES 2 (FIRST LIEN LENDERS' CLAIMS) AND 3 (SECOND LIEN LENDERS' CLAIMS) AND THE HOLDERS OF INTERESTS IN CLASS 12 (TRBP INTERESTS) ARE IMPAIRED AND ENTITLED TO VOTE; IMPAIRMENT OF CLASSES 2 AND 3 MAKES THE PLAN PATENTLY UNCONFIRMABLE[11]**

The Debtor maintains that no class of claims or interests is impaired under the Plan and thus that sections 1129(a)(7) and 1129(a)(10) of the Bankruptcy Code are inapplicable. The Debtor's position on impairment is untenable. Setting aside the Debtor's self-serving descriptions of Classes 2, 3 and 12 as unimpaired, those classes are impaired under clearly established law. Accordingly, (i) the Plan cannot be confirmed without the Debtor soliciting votes from the holders of the Class 2 and 3 Claims and the Class 12 Interests, (ii) the treatment of Classes 2, 3 and 12 under the Plan must comply with the best interests test of section 1129(a)(7) of the Bankruptcy Code, and (iii) because the Lenders will not vote to accept the Plan, the Plan

---

[11] The First Lien Agent and the Ad Hoc Group join in this section I to the extent it addresses impairment of Classes 2 and 12, but not to the extent it addresses impairment of Class 3. The First Lien Agent and the Ad Hoc Group take no position with respect to impairment of Class 3, and reserve all rights with respect thereto. The Second Lien Agent joins in this section I to the extent it addresses impairment of Classes 3 and 12, but not to the extent it addresses impairment of Class 2. The Second Lien Agent takes no position with respect to impairment of Class 2, and reserves all rights with respect thereto.

will not comply with section 1129(a)(10) of the Bankruptcy Code and is therefore patently unconfirmable.

## A.    The Measure of Impairment Under Section 1124

Section 1124 of the Bankruptcy Code provides that a

> class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124. The plain language of section 1124 makes clear that any alteration of a holder's rights constitutes impairment. See id. Indeed, courts have held that the Bankruptcy Code contains a presumption of impairment that has been interpreted to include even minimal impairment. See In re M&S Assocs., Ltd., 138 B.R. 845, 853 (Bankr. W.D. Tex. 1992). "Congress defined impairment in the broadest possible terms . . . ." L & J Anaheim Assocs. V. Kawasaki Leasing Int'l, Inc. (In re L & J Anaheim Assocs.), 995 F.2d 940, 942 (9th Cir. 1993) (citing In re Madison Hotel Assocs., 749 F.2d 410, 418 (7th Cir. 1984)). "Any alteration of the rights constitutes impairment even if the value of the rights is enhanced." L & J, 995 F.2d at 942. By contrast, a creditor or equity holder can only be unimpaired if its rights are left completely "unaltered" by the plan. Id. at 943.

## B.    Classes 2 and 3

### 1.    Classes 2 and 3 Are Impaired

Payment in full does not leave a class of claims unimpaired if material defaults or covenant breaches under the contract governing such claims remain uncured. The Debtor's apparent contention to the contrary is incorrect as a matter of law. In so contending, the Debtor fails to take into account the 1994 amendment to section 1124 of the Bankruptcy Code that

deleted section 1124(3)[12] and specifically eliminated a debtor's ability to unimpair a class by simply paying its claims in full.  See e.g., Equitable Life Ins. Co. v. Atlanta Stewart Partners (In re Atlanta-Stewart Partners), 193 B.R. 79, 82 (Bankr. N.D. Ga. 1996) (citing legislative history and finding congressional intent that the deletion of § 1124(3) implies "a class of creditors which will receive payment in full upon the effective date of the plan is impaired within the meaning of the Bankruptcy Code"); In re Crosscreek Apartments, Ltd., 213 B.R. 521, 535 (Bankr. E.D. Tenn. 1997) (applying In re Atlanta-Stewart Partners and finding that "there is no longer an exception to the general rule that all classes are deemed impaired for claims paid in full upon the effective date of the plan or, in other words, a class of creditors which will receive payment in full upon the effective date of the plan is now impaired within the meaning of the Bankruptcy Code"); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213 (Bankr. D.N.J. 2000).  The legislative history reveals Congress's clear intent: "[a]s a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired entitling creditors to vote for or against the plan of reorganization."  140 Cong. Rec. H10752 (Oct. 4, 1994).

Here, the Plan does not leave unaltered the fundamental and bargained-for rights of the holders of Class 2 and Class 3 Claims – the claims of the Lenders under the Credit Agreements.  Although the Plan purports to pay the Classes 2 and 3 Claims in full,[13] payment in

---

[12]     Section 1124(3) of the Bankruptcy Code provided that a class of claims was unimpaired under a plan if such plan provided that "on the effective date of the plan, the holder of such claim . . . receives, on account of such claim . . ., cash equal to . . . the allowed amount of such claim."

[13]     The Lenders, in the aggregate, are entitled to a single distribution of $75 million from the Debtor, all of which is payable to the First Lien Lenders because of their lien priority.  However, this may not satisfy even the monetary claims of the Lenders in full.  Although the Debtor's guaranty of the "Obligations" under the Credit Agreements is limited to $75 million, such limitation does not apply to claims the Lenders may have arising from (among others) the Debtor's and its affiliates'

full does not cure or remedy the many material covenant breaches and events of default that have occurred and continue under the Credit Agreements. Pursuant to the terms of the Credit Agreements, the Debtor agreed to comply with specified covenants at all times until repayment in full of all "Obligations" under the Credit Agreements. (See Ex. J § 6.) Those "Obligations" include the approximately $416,000,000 in outstanding principal under the First Lien Credit Agreement, $115 million under the Second Lien Credit Agreement, plus, in both cases, accrued interest, fees and other costs. Thus, the repayment of $75,000,000 of the Obligations to the Lenders as holders of Class 2 and 3 Claims, as contemplated by the Plan, does not excuse the Debtor from compliance with protective covenants and does not cure Events of Default arising from the Debtor's failure to comply with such covenants.

These protective covenants were intended to impose limits on the Debtor's ability to take actions that are potentially detrimental to the rights of the Lenders, including (i) incurring indebtedness, (ii) transacting with affiliates, and (iii) disposing of assets. These covenants remain a crucial part of the Lenders' bargain for as long as there remains **any** balance owing to the Lenders, even if the $75 million portion of the Obligations that TRBP directly guaranteed has been paid in full.

Moreover, in a calculated manner in the months and days leading up to the Petition Date, the Debtor breached numerous covenants as though they did not exist. The Plan does not and cannot cure these debilitating breaches, including, without limitation, the following:

(a) <u>Incurrence of Indebtedness</u>: In April of 2009, after HSG missed a scheduled interest payment, Mr. Hicks sought to infuse the Debtor with a capital contribution. Rather than doing so as an equity infusion, he purported to issue debt to the Debtor. In an attempt to circumvent the covenant limiting incurrence of indebtedness (Section 6.1 of each Credit Agreement), Mr. Hicks attempted to take advantage of a carve-out from the negative

---

willful breaches of the Credit Agreements, their fraudulent transfers of property, and their insider transactions.

covenant that enabled the Debtor to incur indebtedness relating to overdraft protection – not as a mechanism for capital infusion for general business purposes. The parties entitled the transaction an "Overdraft Protection Line of Credit Agreement," but in substance it was an infusion of capital for general business purposes. By permitting overdraft protection under Section 6.1 of the First Lien Credit Agreement, the parties intended to allow HSG to take out a line of credit and draw on such line of credit in the event HSG inadvertently issued checks in excess of its account balance, to reduce or eliminate the cost of overdraft fees borne by HSG. In contrast, the Overdraft Protection Line of Credit operated as an open check book for HSG to use funds extended by Hicks "to fund the day-to-day operating expenses of HSG." <u>See</u> Overdraft Protection Line of Credit Agreement. The Overdraft Protection Line of Credit has every characteristic of an equity infusion by Mr. Hicks, and the Lenders believe the Overdraft Protection Claim will be re-characterized as an equity contribution to HSGH and equitably subordinated to the level of equity. Alternatively, if the Overdraft Facility is deemed debt, the incurrence thereof violated Section 6.1 of the First Lien Credit Agreement because it does not constitute overdraft protection in substance. Therefore, at best, the Debtor breached its "incurrence of indebtedness" covenant. Absent re-characterization and subordination to equity (for which the Plan does not provide), the covenant breach and related event of default cannot be cured under the Plan.

(b) <u>Transactions with Affiliates</u>: Section 6.12 of each Credit Agreement provides that the Debtor cannot "enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of [HSG] on terms that are less favorable to [HSG] or [its] Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate."[14] As described in more detail above, the Debtor engaged in the Eve of Filing Transactions with affiliates in violation of Section 6.12 of the Credit Agreements. Such affiliates transferred all or substantially all of their assets to the Debtor, but the Debtor failed to demonstrate the adequacy of the consideration exchanged or that such assets were marketed. In the case of Rangers Ballpark, for example, the valuable lease of the Ballpark at Arlington was transferred to the Debtor for no consideration. Such transactions were not done at arm's length, were not fair, and impaired the rights of the Lenders.

(c) <u>Asset Dispositions</u>: Section 6.9 of each Credit Agreement provides that, subject to certain exceptions not relevant to the transaction contemplated by the May APA, "[n]o Credit Party shall . . . convey, sell . . . transfer or otherwise dispose of . . . all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible." The very transaction of which the Debtor

---

[14]    Transactions between HSG and its subsidiaries that guaranteed HSG's obligations under the First Lien Credit Agreement are excluded from this covenant, as are other specified transactions not relevant here; however, transactions among guarantor subsidiaries are not excluded from this covenant.

seeks approval pursuant to the Plan violates Section 6.9 of the Credit Agreements and therefore impairs the rights of the Lenders.[15]

As a result of the Debtor's failure to cure the existing breaches under the Credit Agreements, which will continue after the effectiveness of any reorganization or liquidation plan for the Debtor, the Plan alters the legal, equitable and contractual rights of the Lenders as holders of claims in Classes 2 and 3. Classes 2 and 3 are accordingly impaired under the Plan, and the payment of $75,000,000 on account of the Debtor's limited guaranty does not change this result. Thus, the Lenders are entitled to vote to accept or reject the Plan.

### 2. Impairment of Classes 2 and 3 Makes the Plan Unconfirmable

Because the Debtors insist that there are no other impaired classes of claims under the Plan, in order to comply with section 1129(a)(10) of the Bankruptcy Code and confirm the Plan, the Debtor will need an affirmative vote of either Class 2 or Class 3. See 11 U.S.C. §1129(a)(10). As the Lenders will vote to reject the Plan, the Plan is patently unconfirmable.

### C. Class 12

### 1. Class 12 Is Impaired

Courts have held that any modification to the legal rights of the holder of an equity interest constitutes an impairment of such interest. For example, in Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352 (9th Cir. 1986), the Ninth Circuit held that a plan which proposed to leave existing equity interests outstanding but would amend the articles of

---

[15] Additional Events of Default under the First Lien Credit Agreement occurred and were continuing as of the Petition Date, including, without limitation: (i) under section 8.1(a) for failure to make payments when due, (ii) under 8.1(b) for the existence of an Event of Default under the Second Lien Credit Agreement and (iii) under section 8.1(e) for failure to provide or deliver (a) financial statements, (b) a compliance certificate, (c) a notice of default, (d) certain communications from or to MLB or the NHL, (e) attendance data, (f) a perfection certificate, (g) a pledge supplement in respect of Specified Indebtedness and (h) deposit account control agreements.

incorporation and bylaws of the reorganized debtor to remove the right of the equity holders to vote during the pendency of the plan constituted a modification of the legal rights of such holders and, therefore, constituted an impairment of such interests. Acequia, 787 F.2d at 1363 ("[T]he Plan significantly alters each shareholder's power to exercise his or her shareholder vote. [The equity interests], therefore, are impaired by this modification of shareholder rights . . . ."); see also In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 932-33 (Bankr. W.D. Mo. 1994) (finding that equity interests were impaired where holders were to retain such interests but would be permanently enjoined from commencing actions against non-debtor third party). A leading treatise notes that "[i]f the plan provides for the sale of substantially all of the debtor assets, in the absence of the shareholder consent required by state law, the legal rights of the shareholders would be 'impaired.'" 7 COLLIER ON BANKRUPTCY ¶ 1124.03 (16th Ed. 2010).

Here, the very objective of the Plan is to strip the contractual, legal and equitable rights of the TRBP Interests. The Plan is premised on the sale of substantially all of the Debtor's assets, including the Debtor's chief asset, the Texas Rangers, without obtaining the consent of the holders of the TRBP Interests. Not only is the right to vote on the sale of substantially all the assets of an entity a traditional right of an equity owner, in this case the TRBP Partnership Agreement specifically provides that a majority of the Partners (or, pursuant to the Pledge Agreement and subsequent to the occurrence of an Event of Default, the Collateral Agent) must approve any such sale.

Indeed, the right to approve or not approve a sale of substantially all of the assets is the fundamental element of the bargain that the holders of common equity usually make: instead of a fixed return, they have bargained for a share of the increase (or decrease) in the value of the business in which they are investing. See In re Am. Solar King Corp., 90 B.R. 808,

821 n.21 (Bankr. W.D. Tex. 1988) (equity holders have "a right to share in the company's good fortunes."). The Plan, however, would strip this fundamental right from the holders of the TRBP Interests without letting them vote on their proposed treatment by the simple expedient of declaring their rights "unimpaired."

Even if, in some circumstances, holders of equity interests could be unimpaired when a plan allows them to retain their equity interests while replacing the assets that formerly comprised the estate with the cash received from the realization of such assets, such a finding of unimpairment would undoubtedly require that the assets be sold in a manner that maximizes value to the equity holders. There can be no argument that the Plan and the asset sale contemplated therein maximizes the value of the TRBP Interests (as opposed to maximizing value to the Debtor's self-dealing insiders). Both Crane and the Greenberg Group were willing to pay a price higher than the current purchase price for a smaller bundle of assets and liabilities of lesser aggregate value. Accordingly, it is highly likely that a competitive bidding process will quickly produce offers that, as compared to the May APA, provide better value to the Debtor.

Additionally, a condition precedent to closing the May APA is that the sale of the BRE Property pursuant to the Land Sale Agreement has occurred or is occurring simultaneously with the closing of the May APA. The Plan also "authorizes and approves" all actions contemplated by the May APA, which includes consummation of the Land Sale Agreement. Plan §6.2(a). The Debtor is a party to the Land Sale Agreement, but **solely** to give a release (on behalf of itself, and among others, its partners, shareholders, beneficiaries, and fiduciaries) to BRE, and, among others, its managers, officers, agents, Affiliates, representatives, shareholders, members and principals from all claims arising or in any way related to such parties. Notably, among the litany of released parties will be Thomas O. Hicks, as well as numerous entities

controlled or owned by Thomas O. Hicks and his family.  By purporting to release the claims of the holders of interests in Class 12 (the Partners ), without their valid consent or any consideration, the Plan clearly impairs their rights.  See Master Mortgage, 168 B.R. at 932-33 (equity interests were impaired where the holders of such interests were to be enjoined from pursuing actions against third parties).  It is indisputable that the rights of the holders of Class 12 Interests are impaired and, therefore, should be afforded the right to vote on the Plan.[16]

### 2. Treatment of Class 12 Violates Best Interests Test of Section 1129(a)(7)

As explained in Part II below, the First Lien Lenders, acting through their Collateral Agent, are the only entities entitled to vote the interests in Class 12, and they will vote to reject the Plan because it fails to maximize the value of the estate.  Accordingly, the Plan cannot be confirmed unless the treatment of Class 12 satisfies the best interests test set forth in Section 1129(a)(7) of the Bankruptcy Code.  The best interests test requires the proponent of a plan to demonstrate, with respect to each holder of an impaired interest, either that such holder has voted in favor of the plan or such holder will "receive or retain on account of such . . . interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive . . . if the debtor were liquidated under chapter 7 . . . on such date."  11 U.S.C. § 1129(a)(7).

---

[16]  In that event, the First Lien Lenders will vote to reject the Plan because it fails to maximize the estate's value, in violation of the Debtor's fiduciary duty to do so.  To the extent the First Lien Lenders are not afforded the right to vote on behalf of the Partners, the control persons of the insolvent Partners have a fiduciary duty to vote in the best interests of their creditors – i.e. the Lenders.  However, the Partners' officers and directors appear to be self-interested in the transaction and, therefore, any vote exercised by such officers and directors contrary to the expressed direction of the First Lien Lenders should be carefully scrutinized.  Under Texas state law, a self-dealing officer or director bears the burden of proving that the challenged action is fair.  See Roth v. Mims, 298 B.R. 272, 288 (N.D. Tex. 2003).

If this case were to be converted to chapter 7, based on the bidding history described above, it is very likely that the chapter 7 trustee would be able to sell the Texas Rangers at a purchase price higher than that represented by the May APA. As noted, both Crane and the Greenberg Group were willing to pay more cash for fewer assets when compared to the sale underlying the Plan. Additionally, it is possible that an auction conducted by the trustee could bring in even more value because "entertaining overbids often triggers a bidding sequence that may lead to a much higher price." Cadle Co. v. Mims (In re Moore), No. 09-10604, 2010 WL 2182500, at *9 (5th Cir. June 2, 2010). As the costs and expenses incurred by a chapter 7 trustee are unlikely to be very high because it is reasonable to expect that a relatively quick sale of the Texas Rangers would occur, a chapter 7 liquidation should provide the holders of the TRBP Interests in Class 12 with more value than they stand to receive under the Plan. Accordingly, the Plan cannot be confirmed because it does not comply with section 1129(a)(7) of the Bankruptcy Code.

## II. ONLY THE FIRST LIEN LENDERS ARE AUTHORIZED TO SPEAK FOR AND VOTE ON BEHALF OF THE DEBTOR'S EQUITY OWNERS

### A. Under the Pledge Agreements, the Collateral Agent Holds Voting and Consent Rights With Respect to the Relevant Equity Interests

Ninety-nine percent (99%) of the TRBP Interests – more than enough to control any vote by the Partners – are owned by Rangers Equity LP, a Delaware limited partnership. Pursuant to the Rangers Equity LP Agreement, the power to act on behalf of Rangers Equity LP is, in turn, vested in HSG Partnership, its general partner. Accordingly, absent an Event of Default, HSG Partnership would have the power, through its control of Rangers Equity LP, to consent to/vote on the Partners' approval of both the May APA and the Plan. Under the Pledge Agreement, Rangers Equity LP granted the Collateral Agent, for the benefit of the First Lien

Lenders, a security interest in all of its right, title and interest in the TRBP Interests, just as HSG Partnership granted the Collateral Agent a security interest in all of its right, title and interest in Rangers Equity LP. MLB's consent was required and obtained for the parties to enter into the Pledge Agreement and the Credit Agreements. (See Ex. K (Letter from R. McGlarry to Casey Shilts (Dec. 19, 2006.) The Pledge Agreement provides that following the occurrence and continuation of an Event of Default, the Voting and Consent Rights of the Parents, TRBP, and the Parents cease. (Ex. I § 4.4.1(c)(i)(3)(A) (emphasis added)). Because, commencing on or about March 31, 2009, multiple Events of Default occurred and are continuing, all Voting and Consent Rights of Rangers Equity LP with respect to the TRBP Interests ceased, and automatically vested in the Collateral Agent, as did all Voting and Consent Rights of HSG Partnership with respect to its general partnership interest in Rangers Equity LP – the Partners were no longer entitled to any Voting and Consent Rights.

Therefore, through the exercise of the Voting and Consent Rights, the Collateral Agent has the exclusive power to vote the TRBP Interests directly and also has the exclusive authority to direct Ranger Equity LP as to how the interest should be voted through the exercise of its consent rights with respect to the HSG Partnership. In sum, based on these contractual rights, the Collateral Agent has the sole authority to consent to both the terms of any sale of the Texas Rangers and to elect whether to accept or reject the Plan on behalf of the Class 12 Interests.

    **B.**    **The Collateral Agent's Voting and Consent Rights Are Enforceable In Bankruptcy**

The preceding conclusion – that the Collateral Agent is the only entity with authority to vote the TRBP Interests – is not affected by the Debtor's bankruptcy filing. The general rule is that, absent clear abuse, a bankruptcy filing does not affect the exercise of an

equity holder's voting and other governance rights.  See Manville Corp. v. Equity Sec. Holders

Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 64 (2d Cir. 1986) (equity holder's right to

govern debtor is "a prerogative ordinarily uncompromised by reorganization").  Where the

equity interests in a debtor are properly pledged, courts have extended this concept to permit the

pledgee to exercise such rights, absent a showing that the pledgee's exercise of equity rights

would jeopardize the reorganization.  In re Hoffert Marine, Inc., 64 B.R. 409, 411 (Bankr. M.D.

Fla. 1986) (granting secured creditor relief from automatic stay to enforce its rights under pledge

agreement to vote stock and elect representatives to debtors' boards of directors; holding, among

other things, that pledge agreement constituted proxy that automatically transferred right to vote

stock to secured creditor);  see also Gen. Trading Co. v. 2927 Eighth Ave. Corp. (In re 2927

Eighth Ave. Corp.), No. 01 Civ. 8947, 2004 WL 1403362, at *6-7 (S.D.N.Y. June 23, 2004)

(enforcing secured creditor's right to vote pledged equity interests in debtor where secured

creditor complied with terms of pledge documents).  Additionally, the commencement of a

bankruptcy case with respect to the owner of equity interests does not necessarily deprive a

pledgee of their pledged voting and consent rights with respect to such equity interests.  See

Tominaga v. Sherwood Invs. Ltd. (In re Tominaga), 325 B.R. 653, 659 (Bankr. M.D. Fla. 2005)

(holding that, under Florida state law that permits contracting parties to agree how and when

voting rights transfer under stock pledge agreements, voting and control rights with respect to

shares pledged by debtor automatically transferred to secured creditor upon event of default,

notwithstanding fact that debtor retained record ownership of the shares); In re Sears, No. 10-

40275, 2010 WL 1463219, at *3-5 (Bankr. D. Neb. April 12, 2010) (granting secured creditor

relief from automatic stay to exercise its rights under pledge agreement to vote shares of

corporation owned by debtors).

Accordingly, the commencement of TRBP's chapter 11 case does not affect the Collateral Agent's rights under the Pledge Agreement to exercise the Voting and Consent Rights with respect to the pledged TRBP Interests held by the Partners.[17]

Section 11 of the Pledge Agreement contains an acknowledgement by the Collateral Agent that any sale of the Texas Rangers is subject to the approval by MLB in accordance with the Major League Constitution and MLB Control Interest Transfer Guidelines:[18]

> [T]he Collateral Agent acknowledges that [certain approvals under the Major League Constitution and MLB Control Interest Transfer Guidelines] would be required for any sale or transfer of the Rangers Franchise or the Rangers, or an interest in either the Rangers Franchise or the Rangers, or any sale, transfer, assignment, license, sublease, or other conveyance of the

---

[17] Even absent an Event of Default, the Voting and Consent Rights of the Partners are limited by certain restrictions and covenants in the Pledge Agreement that prevent them from selling the Texas Rangers without Collateral Agent's consent. Section 4.4.1 of the Pledge Agreement requires the Partners to give the Collateral Agent written notice prior to exercising any Voting and Consent Rights with respect to the TRBP Interests. (See Ex. I § 4.4.1(c)(i)(1).) Section 4.4.1 of the Pledge Agreement also provides the Collateral Agent with veto rights upon receiving such notice:

> no Grantor shall exercise or refrain from exercising any such right if the Collateral Agent shall have notified such Grantor that, *in the Collateral Agent's reasonable judgment,* such action would have a *material adverse effect on the value of material Investment Related Property* or any part thereof.

(Id. § 4.4.1(c)(i)(1), emphasis added.) The Plan's proposed disposition of substantially all of TRBP's assets outside of a fair and open sale process is ample grounds for the Collateral Agent to reasonably determine that the value of TRBP Interests will be materially adversely affected. Accordingly, under the terms of the Pledge Agreement, the Partners' purported consent to the sale to the Greenberg Group violated the Collateral Agent's right to veto such sale and should be invalidated and voided. (Id. § 4.4.2(b)(ii)) (Partners agreed that, absent prior written consent of the Collateral Agent, they would not take any action towards permitting TRBP to dispose of a material portion of its assets).)

[18] A similar acknowledgement by the First Lien Lenders is contained in section 10.23 of the First Lien Credit Agreement. To be precise, this acknowledgement does not apply to the sale of many other assets used in Texas Rangers' baseball operations but owned by other legal entities. For example, the Lenders would have sole discretion to approve the sale of the Emerald Diamond office building and the Ballpark Lease. MLB would have no consent rights over the sale or transfer of this collateral.

> trademarks, trade names and other intellectual property rights
> owned by the Rangers, to a third party as well as to any Lender.

(Ex. I § 11(b).) That acknowledgement, however, does not deprive the Collateral Agent of its

Voting and Consent Rights with respect to the Relevant Equity Interests. It also does not

eliminate the requirement under the Pledge Agreement that the Partners obtain the Collateral

Agent's written consent prior to selling the Texas Rangers. Rather, they are separate and wholly

independent requirements. MLB seems to be operating under the mistaken belief that their

consent right vitiates the Voting and Consent Rights of the Collateral Agent, ignoring the clear

language of the documents that sets out the parties' respective consent rights as cumulative, and

not competing, conditions.

Section 11 of the Pledge Agreement does not shift any Voting and Consent Rights

from the Collateral Agent to MLB or the Commissioner, nor does it cause such rights to revert to

the Partners. Not surprisingly, section 11 of the Pledge Agreement likewise does not provide

MLB or the Commissioner with any rights to take affirmative steps towards a sale of the Texas

Rangers, to market the Texas Rangers or to direct any sale process whatsoever. Moreover, it

clearly does not give MLB or the Commissioner the right to ratify a sale of the Texas Rangers

over the Collateral Agent's objections. Rather, once a sale process has identified a potential

purchaser that is approved by the Collateral Agent on behalf of the First Lien Lenders, MLB and

the Commissioner have a right to approve or disapprove of such potential purchaser. The extent

of MLB's rights in this regard are, however, of questionable validity in bankruptcy and, at a

minimum, would have to be exercised in good faith after presentation of a winning bid.[19] See In re Dewey Ranch Hockey, LLC, 406 B.R. 30, 32 (Bankr. D. Ariz. 2009) (holding that, in approving bidding procedures, given language of Section 365(f)(1) that authorizes the assumption and assignment of an executory contract "notwithstanding a provision in an executory contract . . . or in applicable law, that prohibits, restricts, or conditions the assignment of such contract . . . "); id. at 36 ("the NHL can not declare a default solely due to the change in ownership terms of the APA.").[20] In all events, until such time as the MLB club owners exercise their purported rights, the Debtor must abide by its duty to obtain the highest and best recovery for its assets and then, to the extent necessary, put such higher and best offer to a vote of the MLB club owners.

### C. Conflicted Insiders Are Unable to Represent Debtor's Interests

None of the current officers of the Debtor can effectively represent the interests of the Debtor's creditors or interest holders in connection with the proposed sale under the May APA due to the disabling conflicts of interest each of them possesses. Under Texas law,

---

[19]    At MLB's request, this issue is not being briefed as part of this submission. As such, the Court should apply an inference that MLB would consent to any proposed purchaser. MLB should not be permitted to use the specter of its not consenting to a particular bidder to influence the question of whether higher bids must be considered, while simultaneously taking its position that the enforceability of its consent right should not be tested until that issue is ripe.

[20]    The Dewey Ranch case, which relates to the sale of the Phoenix Coyotes hockey team, resulted in two decisions that have relevance to the issues that may come before the Court. The first decision, as noted above, held that the NHL could not reject a potential purchaser based solely on the NHL consent rights. After the bankruptcy court supervised a competitive bidding process, two bids were tendered. Both bids provided for payment in full of all creditors, but one of the bids required relocation of the team to Hamilton, Ontario against the NHL's wishes. After extensive briefing and trial, the court held that "[i]n the final analysis, the court can not find or conclude that the interests of the NHL can be adequately protected if the Coyotes are moved to Hamilton without first having a final decision regarding the claimed rights of the NHL and the claims of the debtors and [the proposed buyer]." In re Dewey Ranch Hockey, LLC, 414 B.R. 577, 591 (Bankr. D. Ariz. 2009). Based on those facts, the court rejected the sale to the proposed buyer and ultimately permitted the sale to the NHL, which paid in full all creditors and kept the team in Phoenix.

fiduciary duties include a duty of loyalty which holds officers and directors to an "extreme measure of candor, unselfishness and good faith," particularly in the context of an interested transaction. Int'l Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, 577 (Tex. 1963); see Gearhart Indus., Inc. v. Smith Int'l, Inc., 741 F.2d 707, 719-20 (5th Cir. 1984). In a transaction involving a conflict of interest, an officer or director may not rely upon the business judgment rule as a defense. Post-petition, the officers and directors of a debtor include the same duty of loyalty which existed pre-petition. See, e.g., In re Coram Healthcare Corp., 271 B.R. 228, 235 (Bankr. D. Del. 2001) ("[a] debtor in possession is bound by a duty of loyalty that includes an obligation to refrain from self dealing, to avoid conflicts of interests and the appearance of impropriety.")

The Disclosure Statement identifies three "principal executive officers" for the Debtor – Thomas O. Hicks, Lynn Nolan Ryan, Jr., and Kellie L. Fischer. (See Disclosure Statement at 2-4.) Nolan Ryan, the Debtor's President, is, by the Debtor's own admission, one of the principals of the Purchaser. (Id. at 8.) Thomas O. Hicks is to receive equity in the Purchaser, payment of tens of millions of dollars, valuable indemnity rights, as well as various continuing perquisites from the Purchaser. (Id. at 15-16.) Kellie L. Fischer, although she may not be directly conflicted herself, by her own admission, would not make a sale decision on her own, but would consult Thomas O. Hicks and Bud Selig to determine whether to accept a bid that was tens of millions dollars higher than the one on the table. (Hr'g Tr. (May 26, 2010), at 85:25-87:1.) Thus, the only non-conflicted officer would abdicate her fiduciary duties to a conflicted, self-dealing insider and to MLB, which has explicitly disclaimed any fiduciary relationship to the Debtor or its stakeholders. (See Interim Support Agreement [Exhibit to DI 20] at ¶10.) Accordingly, it is clear that none of the Debtor's officers or directors is capable of

acting in a manner consistent with their fiduciary duties such that they can represent the interests of any of the Debtor's estate.

## III. THE PARTNERS OWE FIDUCIARY DUTIES TO THE DEBTOR'S CREDITORS AND THEIR OWN CREDITORS WITH RESPECT TO THEIR CONDUCT IN THIS CHAPTER 11 CASE

### A. The Partners' Fiduciary Duties In Connection With Their Conduct In This Case

A partner's duty of loyalty under applicable Texas law[21] has been described as a "rule of undivided loyalty [that] is relentless and supreme." West v. Seiffert (In re Houston Drywall, Inc.), No. 05-95161-H4-7, 2008 Bankr. LEXIS 4060, at *99 (Bankr. S.D. Tex. July 10, 2008) (quoting Meinhard v. Salmon, 164 N.E. 545, 548 (N.Y. 1928)). Furthermore, "it is axiomatic that a partner owes a fiduciary duty to the other partners" and the partnership as a whole. Id. at *98. Section 152.204(a) of the Texas Business Organizations Code prescribes that a partner owes to the partnership and the other parties both a duty of loyalty and a duty of care. See also Wilson v. Cantwell, No. 3:06-CV-1913-L, 2007 U.S. Dist. LEXIS 58185, at *9 (N.D. Tex. Aug. 8, 2007) ("Under Texas law, partners owe the partnership and partners the fiduciary duties of loyalty and care."). Section 152.204(b) of the Texas Business Organizations Code further provides that "[a] partner shall discharge the partner's duties to the partnership and the other partners under this code or under the partnership agreement and exercise any rights and

---

[21] The Debtor is a Texas general partnership organized under the laws of Texas. Section 2.1 of the Partnership Agreement provides that the rights and liabilities of the Partners shall be as provided under the Texas Revised Partnership Act, except as otherwise expressly provided therein.

powers in the conduct . . . of the partnership business . . . (1) in good faith and (2) in a manner the partner reasonably believes to be in the best interest of the partnership."[22]

In addition to these state law obligations, upon the Debtor's chapter 11 filing, the Debtor became a debtor in possession under Section 1107 of the Bankruptcy Code.  In the context of a debtor in possession, the fiduciary duties of partners are no different than that of officers and directors in a corporation.  See In re Hampton Hotel Investors, L.P., 270 B.R. 346, 361-62 (Bankr. S.D.N.Y. 2001) (finding general partner of limited partnership subject to same fiduciary duties as director of corporation).  Pursuant to Section 1107, with specified exceptions not relevant here, the Debtor, as debtor in possession "shall have all rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter." 11 U.S.C. §1107(a).  Among the functions and duties of a trustee in chapter 11 is a fiduciary duty owed to the debtor's estate, its creditors, and its shareholders.  See Nat'l Convenience Stores Inc. v. Shields (In re Schepps Food Stores, Inc.), 160 B.R. 792, 797 (Bankr. S.D. Tex. 1993) (holding that trustee owes fiduciary duty to debtor, estate, and creditors); see also La. World Exposition v. Fed. Ins. Co., 858 F.2d 233, 246 (5th Cir. 1988) (holding trustee accountable for all property received and has duty to maximize value of estate).

Debtors in possession are subject to the heightened fiduciary duty applicable to a trustee.  See Schepps 160 B.R. at 797-98; see also Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.), 2010 WL 1568425, at *10 (Bankr. C.D. Cal. 2010) ("a debtor in possession stands in the shoes of a trustee and is a fiduciary for the estate and its

---

[22]    Although the TRBP Partnership Agreement purports to supplant any conflicting provision of the Texas Revised Partnership Act, Section 152.02 of the Texas Business Organizations Code provides that a partnership agreement may not eliminate any of the duties of loyalty or care or the obligation of good faith.  Tex. Bus. Orgs. Code § 152.02.

creditors.")  When a debtor in possession is a corporation or other business entity, the fiduciary duties fall upon such entity's directors, managers, and officers.  See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) ("if a debtor remains in possession–that is, if a trustee is not appointed–the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession"); Prime Healthcare 2010 WL 1568425 at *11 ("the debtor in possession's fiduciary obligations to the corporation, its creditors and shareholders, fall upon the officers and directors.").  Thus, under Texas law, the Partners owe fiduciary duties of loyalty and care to each other and to the Debtor.

B.     **The Partners' Status as Putative Debtors Imposes An Additional Duty On Them To Maximize The Value of the Debtor's Estate For The Benefit Of Their Own Creditors, Including The Lenders**

In addition, each Partner, in its capacity as a putative chapter 11 debtor, owes its own creditors (including the Lenders) the same fiduciary duties as described above.  As explained in detail in Part IV below, a debtor in possession has a fiduciary duty to maximize the value of its estate for the benefit of its creditors and other stakeholders.  Here, each Partner's estate will consist solely of such Partner's interests in the Debtor.[23]  Therefore, the Partners must seek to maximize the value of those interests in order to satisfy their fiduciary duties to their own

---

[23]     By the Debtor's own admission, the Partners are "holding companies with no operating assets." Disclosure Statement at 2 ¶ B1.

creditors.[24] See, e.g., In re Foxridge Ltd. P'ship, 238 B.R. 810, 818-9 (Bankr. W.D. Mo. 1999)

(noting that "[e]xposing the limited partnership interests to the market will result in maximizing

their value" which "honors the well-recognized policies underlying Chapter 11" of "preservation

of going concerns and the maximization of recovery to creditors and interest holders."); In re

Newlin, 370 B.R. 870, 877-8 (Bankr. M.D. Ga. 2007) (upholding creditor's objection to trustee's

proposed sale of bankrupt partner's partnership interest for $35,000 where interest had

previously been valued in excess of $500,000); In re Grablowsky, 180 B.R. 134, 138 (Bankr.

E.D. Va. 1995) (finding that provision of partnership agreement that precluded sale of debtor's

partnership interest to third parties was invalid and ordering "Trustee . . . to sell the estate's

interests to third parties in the most appropriate manner to maximize the values of those assets.").

Thus, the Partners can satisfy their own duties as putative debtors only by seeking to obtain the

best price possible for the Texas Rangers.

---

[24]    In addition, under applicable Delaware law (governing Rangers Equity LP) and Texas law (governing Rangers Equity GP), the Partners owed fiduciary duties to their creditors on May 23, 2010, the date on which the Partners authorized the sale of the Texas Rangers to the Greenberg Group, because the Partners were insolvent. See North Am Catholic Educ. Programming Found., Inc. v. Gheewhalla, 930 A.2d 92, 790-91 (Del. 2007) (holding that when company is insolvent, creditors of that company may enforce fiduciary duties that officers and directors owe to company.); Carrieri v. Jobs.com,Inc., 393 F.3d 508, 534 n.24 (5th Cir. 2004) ("When a corporation reaches the 'zone of insolvency', as with actual insolvency, the officers and directors have an expanded fiduciary duty to all creditors of the corporation, not just the equity holders.") As of May 23, 2010, the Partners were jointly liable for the approximately $446 million balance owed to the First Lien Lenders, an amount that significantly exceeded the value of their sole assets (their interests in the Debtor), based upon the Greenberg Group's offer for the Texas Rangers. Thus, as of that date, the Partners were insolvent and owed a duty to their creditors, including the Lenders, not to deplete the value of their assets. The Partners' approval of a sale of the Texas Rangers without requiring a value-maximizing process violated that fiduciary duty.

IV. **THE DEBTOR HAS AN INDEPENDENT DUTY TO MAXIMIZE THE VALUE OF ITS ESTATE FOR BENEFIT OF ALL STAKEHOLDERS AND FAILURE TO DO SO MAKES THE PLAN UNCONFIRMABLE UNDER SECTION 1129(A)(3) OF THE BANKRUPTCY CODE**

Regardless of impairment of any claim or interest, the Debtor has an independent duty to maximize the value of its estate for the benefit of all stakeholders, including its equity owners.  This Court recently found it to be "unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors."  In re Pilgrim's Pride., 407 B.R. at 218.  It is inconceivable that the Debtor could contest this premise.

A.     **A Debtor Has A Duty To Maximize Estate Value**

In a reorganization case under chapter 11, the debtor in possession "performs the same functions as a trustee," and, in that capacity, "*has the duty to maximize the value of the estate*." La. World Exposition v. Fed. Ins. Co., 858 F.2d at 245-46 (emphasis in original), quoting Weintraub, 471 U.S. at 352.  It is "beyond dispute" that the debtor's duty to maximize estate value runs not only to its creditors but to all "interest holders of its bankruptcy estate." In re Big Rivers Elec. Corp., 233 B.R. 726, 734 (Bankr. W.D. Ky. 1998), aff'd, 233 B.R. 739 (W.D. Ky. 1998).

The duty to maximize estate value applies equally in cases where the debtor is solvent and the proceeds of the sale are to benefit both creditors and equity holders.  This Court's decision in Pilgrim's Pride recognized that the duty to maximize the estate runs to the "benefit of shareholders." Pilgrim's Pride, 407 B.R. at 218.  Indeed, the duty to maximize estate value runs to any party who has "a legally protected interest that could be affected by a bankruptcy proceeding." In re Kazis, 257 B.R. 112, 114 (Bankr. D. Mass. 2001) (approving trustee's proposed sale in a manner that sought to maximize value for the benefit of solvent debtor and its

owners); see also In re Big Rivers, 233 B.R. at 735 (noting that duty to maximize estate value is owed to "all of [the debtor's] Chapter 11 constituencies."). As one court noted, upholding this duty is particularly important where a control person attempts to consummate an insider transaction that provides insufficient recovery to the company's shareholders. In re Philadelphia Athletic Club, Inc., 15 B.R. 60, 62 (Bankr. E.D. Pa. 1981) ("[The insider] contends that, since his plan would pay all creditors and all administrative expenses in full, there is no need to seek any higher bids. We disagree.").

> **B.** **The Sale Of A Debtor's Assets In a Competitive Sales Process Promotes The Requirement Of Maximizing Estate Value For All Stakeholders**

Less than two weeks ago, the Fifth Circuit held that, as a general matter, a proposed sale of a debtor's assets should be at the "highest and best offer" available. In re Moore, 2010 WL 2182500, at *7 (reversing and remanding bankruptcy court's approval of trustee's settlement of estate's claims against defendant where creditor offered price, greater than defendant's settlement, for the claims); see also GBL Holding Co. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Group, Ltd.), 331 B.R. 251, 254 (N.D. Tex. 2005) (affirming grant of motion to sell debtor's property at auction where sale would, *inter alia*, maximize value of property, thereby satisfying trustee's fiduciary duties). Thus, when a debtor intends to sell an asset, "its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." In re Embrace Sys. Corp., 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995). An objection to a proposed sale based "simply on the fact that there is a higher offer" is a "valid objection," and in that event the sale should be strictly scrutinized by the bankruptcy court. In re Psychrometric Sys., Inc., 367 B.R. 670, 676 (Bankr. D. Colo. 2007).

Sale of an estate asset pursuant to an open, fair, competitive process is the most effective way to obtain the highest and best offer because "competitive markets are the assurance of *bona fide* sales for highest value." In re Gulf Coast Oil Corp., 404 B.R. 407, 424 (Bankr. S.D. Tex. 2009) (noting that the asset purchase agreement at issue "should clearly be designed to facilitate competitive bidding."). Thus, in the bankruptcy context, disputes over asset prices are often resolved by the court "ordering an auction." Simantob v. Claims Prosecutor, LLC (In re Lahijani), 325 B.R. 282, 287 (B.A.P. 9th Cir. 2005). Resolving disputes in this manner promotes the "strong policy favoring competitive bidding and finality to sales in bankruptcy proceedings." In re Psychometric, 367 B.R. at 676, 677 (denying trustee's motion to approve settlement that included sale of assets where objector offered potentially higher bid which had not been "pursued, negotiated or developed.").[25]

The need for a competitive bidding process is particularly acute where, as here, the proposed sale "smacks of a 'sweetheart deal'" that was motivated by the self-interest of the debtor's management, insiders or affiliates. In re Embrace, 178 B.R. at 126-27 (denying deal to insiders that had not been tested at "an auction sale which permits competitive bidding."). In a case that presented similar circumstances of self-dealing, a bankruptcy court found it "astounding" that the debtor had entered into a purchase agreement that benefited its management and insiders and that sought to restrict the debtor's ability to "test the marketplace for other expressions of interest." In re Bidermann Indus. U.S.A. Inc., 203 B.R. 547, 551-52

---

[25] Moreover, in furtherance of the duty to maximize estate value, the bankruptcy court should decline to enforce prepetition agreements that prevent the debtor from obtaining the best price possible for its assets. See, e.g., In re Big Rivers Elec. Corp., 233 B.R. at 734-36 (holding that prepetition omnibus agreement between debtor and prospective purchaser, which contained "no shop" provision prohibiting debtor from soliciting better offers, was "void and unenforceable" because it violated debtor's fiduciary duty to estate, especially where competing bid would provide $50 million of additional value to creditors).

(Bankr. S.D.N.Y. 1997).  The <u>Bidermann</u> court observed that the sale process "should have followed an intensive effort to drum up the best price obtainable," yet was hampered by the "illicit manipulation of a board's deliberative process by self-interested corporate fiduciaries." <u>Id.</u> at 551, 552 (internal citation and quotation marks omitted).  Furthermore, where, as here, the transaction was tainted by the self-interestedness of the Debtor's CEO and Chairman of the Board, Texas state law demands that the self-interested director prove the fairness of the transaction to shareholders.  <u>Roth v. Mims</u>, 298 B.R. at 288.

Moreover, because BRE, an affiliate of the Debtor's CEO Hicks, is selling assets to the Purchaser in connection with the May APA, the Court must scrutinize the transaction to determine whether Hicks fulfilled his fiduciary duties to maximize the value of the Debtor's estate, or whether he abdicated such duty in favor of higher recovery for BRE.  <u>See</u> <u>Mission Iowa Wind Co. v. Enron Corp.</u>, 291 B.R. 39 (S.D.N.Y. 2003) (remanding order approving sale of substantially all assets to bankruptcy court for determination of fairness of purchase price allocation where estate assets and assets of non-debtor affiliate were sold to same purchaser in single transaction).

Here, the only parties that improved their positions in the days leading up to the Petition Date were Mr. Hicks, who gained the title "Chairman Emeritus," obtained valuable indemnification and releases, and maintained an extraordinarily favorable price for selling land rights that were granted to him to service the Texas Rangers' need for parking; and the Greenberg Group, who were able to shed certain assumed liabilities, lower the purchase price they were paying, and gain $10 million in breakup fee protection.  Absent judicial scrutiny, there is no one on the scene to protect the interests of TRBP, at whose expense all these benefits were obtained.  Furthermore, Hicks' conflicting roles as (i) the Debtor's CEO and Chairman of the

Board, (ii) ultimate owner of HSG, (iii) purported creditor of the Debtor, (iv) seller of assets to the Purchaser in a related transaction and (v) proposed minority shareholder of the Purchaser, call Hicks' motives into question and cast serious doubts on his ability to fulfill his fiduciary duties to the Debtor's estate.

Given that previously more than one bidder was willing to pay more for assets with fewer liabilities assumed, there can be little doubt that even a short competitive bidding process will result in offers yielding significantly more value to the Debtor's estate (and thus the holders of the TRBP Interests and their creditors, such as the Lenders) as compared to the May APA.

## V.  THE PLAN IS UNCONFIRMABLE BECAUSE IT WAS NOT PROPOSED IN GOOD FAITH

Section 1129(a)(3) requires that a debtor's plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3).   In the Fifth Circuit, the good faith inquiry focuses on examining the totality of the circumstances surrounding the proposed plan, and whether the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success.  B.M. Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.), 764 F.2d 406, 408 (5th Cir. 1985).  The plan proponents have the burden of proof to show that the plan is proposed in good faith by a preponderance of the evidence. See Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997).

Even assuming *arguendo* that no claims or interests are impaired by the Plan, this does not eliminate the Court's obligation to determine whether the proponents have satisfied their burden of proving that the Plan is proposed in good faith.  See In re Wonder Corp. of America, 70 B.R. 1018, 1023 (Bankr. D. Conn. 1987) (determining that even though objecting

creditor is unimpaired, court still has responsibility to determine whether plan satisfies provisions of §1129); see also, In re Mount Carbon Metro. Dist., No. 97-20215, 1999 WL 34995477, at *4 (Bankr. D. Colo. July 20, 1999) (finding that although unimpaired creditor may not have standing to object to its treatment pursuant to section 1129(a)(7), unimpaired creditor would have standing to object to plan on other §1129(a) grounds).

As discussed in detail above, the Plan is premised on violations of the Debtor's fiduciary duties, including the duty to maximize value for all stakeholders, of state law and of valid prepetition contracts. As such, the Plan was proposed in bad faith, violates section 1129(a)(3) of the Bankruptcy Code, and cannot be confirmed.

## VI.    THE DISCLOSURE STATEMENT IS INADEQUATE

The Lender Parties also object to the approval of the Disclosure Statement because it fails to provide "adequate information," as mandated by Section 1125(b) of the Bankruptcy Code. Section 1125(a) provides, in relevant part, that:

> 'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class *to make an informed judgment about the plan* . . . .

11 U.S.C. § 1125(a)(1) (emphasis added).

A disclosure statement that meets the requirements of Section 1125(a)(1) is a prerequisite to plan confirmation. See, e.g., In re Applegate Prop., Ltd., 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) (ruling that confirmation could not proceed due to misleading disclosure statement); In re Fullmer, No. 50086, 2009 Bankr. LEXIS 2428, at *5-6 (Bankr. N.D. Tex. Sept. 1, 2009) (finding disclosure statement inadequate where creditor's position was not fully disclosed); In re Rodriguez Gas & Oil Servs., Inc., No. 08-50152, 2008 Bankr. LEXIS

2718, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) (holding that disclosure statement failed to meet statutory requirements for approval); Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988), cert. denied, 488 U.S. 926 (1988) (judging disclosure statement adequate where requirements of 11 U.S.C. § 1125(a)(1) were met); In re Fierman, 21 B.R. 314, 315 (Bankr. E.D. Pa. 1982) (opining that disclosure statement lacked adequate information for court approval and was insufficient for parties to informatively vote on plan).

### A.    Adequate Disclosure is Required Even If No Classes Are Impaired

While it is the position of the Lender Parties that there are in fact at least three impaired classes under the Plan, a disclosure statement must be filed and approved even when a plan of reorganization purports to leave all classes of claims and interests unimpaired.  Courts have required the filing and distribution of a disclosure statement even where a plan purports to leave all classes "unimpaired."  For example, in In re Forrest Hills Assocs., Ltd., ("Forrest Hills") 18 B.R. 104 (Bankr. D. Del. 1982), the court denied a debtor's request to be relieved from filing a disclosure statement, finding that a debtor's "statement that a class is not impaired does not necessarily make it so."  Id. at 104;  see also In re Transload & Transp., Inc., 61 B.R. 379 (Bankr. M.D. La. 1986) (citing Forrest Hills with approval).  Thus, the Debtor's mere contention that its proposed plan leaves all classes of claims and interests unimpaired does not excuse the Debtor from providing adequate disclosure to all parties in interest, as well as to the Court.  The Court has an independent obligation to determine whether a disclosure statement includes adequate information within the meaning of the Bankruptcy Code. 11 U.S.C. § 1125(b).

### B. The Disclosure Statement Contains Inadequate Disclosure

The "disclosure" mandated by section 1125(a) is required to be "full and honest," which means, at a minimum, the laying of a factual predicate for assertions contained in the Disclosure Statement. "[O]pinions without factual support are not proper content of a disclosure statement and do not provide the parties voting on the plan with adequate information." In re Fierman, 21 B.R. at 315 (quoting In re East Redley Corp., 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982)); see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996) ("These disclosure requirements are crucial to the effective functioning of the federal bankruptcy system. Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

The Court must evaluate a disclosure statement's adequacy "in light of the facts unique to the case [and] [t]he debtor's particular circumstances." In re Eastern Maine Elec. Coop., Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991). Although the type and amount of information required to be contained in a disclosure statement varies from case to case, section 1125 of the Bankruptcy Code favors more rather than less disclosure. See, e.g., Ryan Operations, 81 F.3d at 362 (opining that "[b]ecause creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated"); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988) (stating that fact that creditors and courts heavily rely on disclosure statements increases debtor's obligation to provide necessary, adequate information upon which such parties can make informed decisions regarding proposed plan).

Adequate information, however, is not simply an issue of quantity. Rather, the debtor must demonstrate that the disclosure statement contains information of a sufficient quality that holders of claims and interests can make an informed decision on the plan. Courts have held that a disclosure statement that does not provide sufficient factual support for its position cannot be approved. See, e.g., In re Egan, 33 B.R. 672, 675-76 (Bankr. N.D. Ill. 1983) (noting that disclosure statement is "intended to be a source of factual information upon which one can make an informed judgment about a reorganization plan").

Case law interpreting section 1125 of the Bankruptcy Code has produced a reference list of categories of information which a plan proponent may need to provide in order to meet the "adequate information" requirement. These categories include (i) a description of the available assets and their value, (ii) the scheduled claims against the debtor, (iii) the estimate of administrative expenses, including attorneys' and accountants' fees and (iv) financial information, data, valuations or projections relevant to the decision to vote to accept or reject a plan. In re U.S. Brass Corp., 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996). Specific facts must also be disclosed, particularly with regard to issues bearing on the relationship of the debtor with its affiliates. In re Applegate, 133 B.R. at 831 ("The relationship of a debtor with affiliates is the type of information that should ordinarily be disclosed. Information concerning the status of various partnerships in which the debtor may have an interest, including the nature or extent of any such interest or relationship, is also normally expected to be disclosed. Finally, disclosure statements which are misleading, or which contain unexplained inconsistencies, should not be approved.") (citations omitted).

Here, the Disclosure Statement contains material omissions and misleading statements regarding a number of items, which are detailed on the chart attached hereto as

Schedule 1.  For all the reasons set forth above and in the chart, the Disclosure Statement does not contain "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code, and should not be approved.

[Remainder Of Page Intentionally Left Blank]

WHEREFORE, the Lender Parties respectfully request that an order be entered (i) finding that the holders of Claims in Class 2 and Interests in Class 12 are impaired; (ii) finding that only the First Lien Lenders are authorized to speak for and vote on behalf of the Partners; (iii) finding that the Partners owe fiduciary duties of loyalty and care to the Debtor and each other and owe fiduciary duties to maximize value to the Debtor, its estate, its creditors, and its equity interest holders; (iv) finding that the Debtor has an independent duty to maximize the value of its estate for the benefit of all stakeholders; (v) finding that a disclosure statement is required; (vi) denying approval of the Disclosure Statement because it does not contain adequate information and because the Plan is patently unconfirmable; and (vii) granting such other and further relief as the Court deems just and proper.

Dated: June 11, 2010

Respectfully submitted,

Dennis F. Dunne (admitted *pro hac vice*)
Dennis C. O'Donnell (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413
Tel.: 212.530.5000
Fax: 212.530.5219
ddunne@milbank.com
dodonnell@milbank.com

-and-

Andrew M. Leblanc (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & MCCLOY LLP
1850 K Street, N.W., Suite 1100
Washington, DC  20006
Tel.: 202.835.7500
Fax: 202.263.7574
aleblanc@milbank.com

-and-

By:    */s/ Daniel C. Stewart*
Daniel C. Stewart, SBT #19206500
Paul E. Heath, SBT #09355050
Richard H. London, SBT #24032678
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.220.7716
dstewart@velaw.com
pheath@velaw.com
rlondon@velaw.com

**ATTORNEYS FOR THE AD HOC
GROUP OF FIRST LIEN LENDERS
ATTORNEYS FOR THE AD HOC GROUP OF
FIRST LIEN LENDERS**


By:    */s/ M. Seider*
Mitchell A. Seider, SBT #18000550
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022

-and-

Michael R. "Buzz" Rochelle, SBT #17126700
Scott M. DeWolf, SBT #24009990
Rochelle McCullough LLP
325 North Saint Paul St., Suite 4500
Dallas, TX 75201

**ATTORNEYS FOR JP MORGAN CHASE
BANK, N.A. AS FIRST LIEN AGENT**

Jennifer C. DeMarco (*pro hac* pending)
David A. Sullivan (*pro hac* pending)
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019-6131
Tel: 212.878.8000
Fax: 212.878.8375
jennifer.demarco@cliffordchance.com
david.sullivan@cliffordchance.com

-and-

By:    */s/ Holland N. O'Neil*
Holland N. O'Neil, SBT #14864700
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201
Tel: 214.999.4961
Fax: 214.999.3961
honeil@gardere.com

**ATTORNEYS FOR GSP FINANCE LLC, AS
SECOND LIEN AGENT**