# DISCLOSURE STATEMENT ISSUES

**1. The Disclosure Statement does not include adequate information related to the Sale process**

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| The Disclosure Statement does not include adequate information related to the Sale process | To contain adequate information, a disclosure statement may not contain misleading or deceptive information. See In re Adelphia Commc'ns Corp, 352 B.R. 592, 600-601 (Bankr. S.D.N.Y. 2006) (to not be misleading, that means "that any facts presented be accurate, and that the disclosure not leave out facts necessary to ensure that whatever is said isn't misleading or deceptive."). | With respect to the sale process – the centerpiece of the Plan, the Disclosure Statement omits basic, crucial information, and what information is included is often misleading. The Disclosure Statement fails to fully explain the sale process and the events that led to the filing of the case and the development of the Plan. The information detailed below is necessary for any party in interest to make an informed decision as to whether the Debtor has managed to obtain the best possible value for the Texas Rangers or even whether the purchase price underlying the Plan was adequately tested by the alleged sale process. The failure to provide this information establishes a misleading portrayal of an open bidding process that has purportedly culminated in the highest and otherwise best bid. |
| The statement that "On December 15, 2009, when TRBP and HSG selected the Purchaser as the winning bidder, they believed that the Purchaser's offer was the best offer . . . ." is incomplete and misleading  Disclosure Statement at 9. | | The Disclosure Statement fails to disclose in any way why the Debtor had that belief at that time and whether the Debtor still maintains that belief. Given the circumstances surrounding the sale process, this description is at best incomplete and at worst potentially misleading.  For example, the Disclosure Statement does not disclose:  <ul><li>That on December 31, 2009, the Debtor's own counsel acknowledged that Crane's offer was "clearly superior economically" as compared to the Purchaser's bid.</li><li>That on January 25, 2010, the Debtor's counsel prepared a comparison sheet, again reflecting the fact that Crane's final offer was significantly higher than the January APA in every respect.</li><li>That on April 2, 2010, after the sale process had lingered for more than a month and a half, the Greenberg Group sent an email to MLB and Hicks stating that they "would be prepared . . . potentially to improve. . . our last offer of January 19, 2010."</li></ul> |

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| | | Accordingly, the bid that is reflected in the Plan is not even the best bid that has been put forth by the Greenberg Group, who, on April 2, proposed various modifications that would have improved the January APA, and which changes are not reflected in the Asset Purchase Agreement. |
| | | The Disclosure Statement must be revised to accurately reflect the facts and circumstances surrounding the selection of the Purchaser as the winning bidder. |
| The statement that the current Plan "enables holders of Claims and Equity Interests . . . to realize the greatest value under the circumstances. . . ." is incomplete and misleading. Disclosure Statement at 45. | | The Disclosure Statement fails to identify what the "circumstances" informing the conclusion are, or explain how the current Plan can realize the greatest value in light of the way the sale process was conducted. |
| | | The Disclosure Statement should be revised to fully describe these "circumstances" and how they lead the Debtor to assert that a lower bid provides the greatest value. |
| The Disclosure Statement lacks adequate information concerning Thomas O. Hick's role in the Sale and the Sale Process. | Courts often require detailed disclosure of proposed insider transactions in a plan. In re Malek, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983) ("[t]he disclosure statement must describe fully, completely, and in detail all transactions with[] insiders.") | The Disclosure Statement fails to fully disclose Hicks' role in the transaction and his self interestedness. Under the Plan, the Asset Purchase Agreement and the Land Sale Agreement, Hicks stands to receive substantial recovery on account of the Overdraft Protection Claim and the sale of BRE assets to Rangers Baseball Express. As Chairman and CEO of the Debtor and owner of BRE, Hicks presumably played a central role in the negotiation of both the Asset Purchase Agreement, on behalf of the Debtor, and the Land Sale Agreement, on behalf of BRE. |
| | | The Disclosure Statement fails to discuss, among other things, his involvement in negotiating the related transactions, the substance of the negotiations over the Land Sale Agreement, and the details surrounding |

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| | | Hicks' ownership of BRE. More importantly, the Disclosure Statement fails to address the substantive fairness of the consideration payable to BRE and Hicks pursuant to the Land Sale Agreement. |

**2. The Disclosure Statement does not include adequate information related to the Eve of Filing Transactions**

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| The Disclosure Statement does not include adequate information related to the Eve of Filing Transactions | To contain adequate information, a disclosure statement may not contain misleading or deceptive information. See In re Adelphia Commc'ns Corp, 352 B.R. at 600-601 (to not be misleading, that means "that any facts presented be accurate, and that the disclosure not leave out facts necessary to ensure that whatever is said isn't misleading or deceptive."). | The Disclosure Statement currently describes, in general terms, the Eve of Filing Transactions that the Debtor entered into with its affiliates, insiders, and related parties just before it filed for bankruptcy. The Disclosure Statement fails to describe whether these transactions were properly authorized by the Debtor and the counterparties and how (or even if) the property that was transferred was valued. In fact, the Disclosure Statement does not identify any consideration that was given to the Debtor in exchange for the Debtor assuming liability for the Transaction Fees of HSG's financial advisors, for which the Debtor had not been previously liable.<br><br>The Disclosure Statement must be revised to accurately reflect the facts and circumstances surrounding the Eve of Filing Transactions. |

**3. The Disclosure Statement does not include adequate information related to risks surrounding the Plan**

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| The Disclosure Statement does not include adequate information related to risks surrounding the Plan | In determining whether a disclosure statement contains adequate information, courts will often look to whether the disclosure statement discloses "[i]nformation relevant to the risks being taken by the creditors and interest holders" In re Scioto Valley Mortgage Co., 88 B.R. 168, 171 (Bankr. S.D. Ohio 1988). | The Disclosure Statement currently fails to discuss many of the serious risks surrounding both the confirmation and implementation of the Plan. Specifically, it fails to address risks arising from (i) the possibility that the sale, the Plan, and/or the Eve of Filing Transactions are void *ab initio* as they are the product of insider-self dealing, (ii) the potential avoidability and unwinding of the Eve of Filing Transactions, and (iii) the fact that the sale, the Plan, and the Eve of Filing Transactions were not properly approved by the party who controls the voting rights with respect to the Partners' equity interests in the Debtor. |

| | | |
|---|---|---|
| | | The Disclosure Statement should be revised to provide the missing information and analysis. |
| Risks related to Eve of Filing Transactions | | It appears that several of the Eve of Filing Transactions may be fraudulent as against the creditors of the Debtor or as against the creditors of their affiliates that participated in these transactions. For example, it appears that Rangers Ballpark did not receive any consideration whatsoever for its transfer of the ballpark lease to the Debtor on the eve of the bankruptcy filing. As such, the transfer is likely fraudulent as against the creditors of Rangers Ballpark (such as the Lenders) and may be unwound. The Disclosure Statement does not disclose this risk, nor does it disclose what effect having such transfers avoided would have on the Plan, the sale or the Debtor's estate generally. |
| Risks related to conflicted transactions | | It is well-established that officers and directors may not authorize a transaction involving an actual conflict of interest pursuant to their fiduciary duties. Mr. Hicks would receive a one percent stake in the Texas Rangers, approximately $58 million, as well as "certain perquisites . . . customary to former owners . . . of professional sports teams" including season tickets and parking passes, and the title of Chairman Emeritus for three years. Disclosure Statement at I.E.2. Purportedly, these benefits are on account of the sale of the BRE Property. Without an independent valuation of this transaction, however, it is impossible to verify whether the benefits being provided to Hicks relate, either in whole or in part, to the sale of the BRE Property or the sale of the Texas Rangers to the Greenberg Group. Not disclosed in the Disclosure Statement is what the effect would be on the Plan, the sale, and the Debtor's estate of a finding that the Debtor's conflicted insider management had entered into the Asset Purchase Agreement as well as the Eve of Filing Transactions" in violation of their duty of loyalty. |

| Risks related to *Ultra Vires* Acts | | As described more fully in Part II of the Submission, the Parents have not had the right to exercise the voting and consent rights attached to their equity interests in the Debtor in over a year. As such, the purported consents to the sale transaction itself and the Plan were not valid, and constituted *ultra vires* acts. The Disclosure Statement fails to disclose the risks that arise from these circumstances. |
|---|---|---|

**4. The Disclosure Statement does not include adequate information related to equity recovery**

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| The Disclosure Statement does not include adequate information related to equity recovery | | The Disclosure Statement and exhibits thereto do not contain "adequate information" regarding the estimated distribution to the Partners and the timing of such distribution. The Debtor's decision to petition the Court for relief from filing schedules and statements further exacerbates this information deficiency and the fact that parties in interest are not being adequately informed with respect to distributions to the Partners. |
| The Disclosure Statement does not include adequate information related to amount of equity recovery | In the context of a "pot plan," one court has found that to meet its "adequate information" burden, the debtor must indicate the amount of claims sharing the pot. See In re Metrocraft Publ'g Servs., Inc., 39 BR. 567, 570 (Bankr. N.D. Ga. 1984). The court also noted that "[s]ome discussion of the nature of unsecured claims, their approximate value and the approximate amount by which such claims may be subject to setoff for settlement purposes shall be disclosed to creditors." Id. | The Debtor describes the Plan as a "full-pay" plan. See Disclosure Statement at ix. Because the Debtor asserts that all creditors will be paid in full, the primary economic consideration in this case is how much value will flow to the Partners. Yet nowhere in the thousands of pages it filed with the Court on the Petition Date does the Debtor discuss – let alone state clearly – the expected recovery for the Partners.<br><br>Under the Asset Purchase Agreement, the Purchaser is assuming certain liabilities of the Debtor while other liabilities (the "Non-Assumed Liabilities") are being left behind to be paid by the Debtor in accordance with the Plan. See Disclosure Statement at 12; Asset Purchase Agreement §§ 2.3, 2.4. Under the Plan, every dollar of allowed Non-Assumed Liabilities satisfied by the Debtor reduces the Partners' recovery by a dollar. See Plan at 4.12. Therefore, information regarding the scope of the Non-Assumed Liabilities is essential for the parties in interest to understand the expected recovery by the Partners under the Plan. The fate |

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| | | of the Partners is analogous to that of a creditor sharing its recovery *pro rata* with the other members of a class pursuant to a "pot plan." |
| | | Other than the generic statement that "the Purchase will [ ] assume virtually all of the obligations of the Texas Rangers," Disclosure Statement at 12, the Disclosure Statement contains scant discussion of the scope of Non-Assumed Liabilities. Nowhere does the Debtor undertake an estimate of such liabilities. Without the benefit of schedules and statements, parties in interest are left to mere guesswork. |
| | | Specifically, the Non-Assumed Liabilities under Section 2.4 of the Asset Purchase Agreement include open-ended categories such as (i) "all liabilities of Seller arising out of or related to the Excluded Assets, including Excluded Contracts (including the outstanding accounts payable by HSG, on behalf of Seller, to BRE under the Existing BRE Land Use Arrangement)", (ii) "all Liabilities for any debtor-in-possession financing and for all fees, costs and expenses directly related to the bankruptcy of TRBP, including all administrative claims and expenses, except for such administrative claims and expenses in respect of any Liabilities that would otherwise constitute Assumed Liabilities arising from and after the filing of the Voluntary Petition through and including the Closing" and (iii) "all Liabilities to proposed purchasers or bidders not party hereto and who are unaffiliated with any Purchaser arising from the negotiations of or on behalf of the Debtor, HSG, Rangers Ballpark or Emerald Diamond with such Persons." See Asset Purchase Agreement § 2.4. In order for parties in interest to obtain a clear understanding about the scope of Non-Assumed Liabilities, the Debtor must (at the very least) provide detailed information concerning the following:<br><br>• Contracts with affiliates of the Debtor that are not assumed by the purchaser |

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| | | - Contracts with affiliates listed on Schedule 1.1(a)(ii) to the Asset Purchase Agreement<br><br>- Non-Assumed Liabilities relating the BRE Land Use Agreement<br><br>- Liabilities of Emerald Diamond and Ballpark LLC<br><br>- Unassumed employee pension plan liabilities<br><br>- Unassumed tax liabilities<br><br>- Extent of un-assumed intercompany claims<br><br>- Extent of claims relating to excluded assets<br><br>- Whether any proofs of claim filed to date relate to Non-Assumed Liabilities.<br><br>See Asset Purchase Agreement § 2.4.<br><br>Furthermore, one component of the consideration provided by the Purchaser is a non-interest bearing Contingent Note, under which the Purchaser promises to pay HSG (not the Debtor) 1% of certain revenues for each of the fiscal years 2010-2016, capped at $10,000,000 in total. See Dkt. No 34, Ex. C-2. Payments under the Contingent Note for any given year become due only if the Texas Rangers' revenue is in the top 5 of all MLB clubs for such year. Id., Disclosure Statement at 13. The Disclosure Statement fails to present any information that would enable one to determine the likelihood that the Texas Ranger's revenue will be in the top five of all MLB club revenues, such as projections of their future revenue compared to those of other clubs. |

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| The Disclosure Statement does not include adequate information related to timing of equity recovery | | There is no way to determine when distributions will be made available to the Partners and their creditors, such as the First Lien Lenders. The Plan provides, "[o]n or after the Effective Date, TRBP shall be authorized to distribute the proceeds received by TRBP from the consummation of the transactions contemplated by the Asset Purchase Agreement to the holders of Equity Interests in accordance with its existing partnership agreement after making any appropriate reserves for Claims not yet paid and as required under the Asset Purchase Agreement." Plan § 6.2. The Plan does not disclose terms of such "appropriate reserves," such as the amount that will be reserved and for how long. Without this information, parties in interest are unable to determine when proceeds of the sale will become available to the Partners. |

**5. Disclosure Statement Contains other Deficiencies.**

| Issue | Legal Standard (If Applicable) | Discussion |
|---|---|---|
| Referring to the Plan as a "Prepackaged Plan" is misleading | A "prepackaged plan" is one where a debtor obtains "votes of its creditors on a plan of reorganization before actually filing a petition for Chapter 11 relief. At the time the debtor files for relief, it presents the bankruptcy court with a plan of reorganization and a tally of creditors' votes approving the plan." In re Combustion Eng'g, Inc., 391 F.3d 190, 201 n.4 (3d Cir. 2004); see also In re Pioneer Fin. Corp., 246 B.R. 626, 630 (Bankr. D. Nev. 2000) ("With a 'prepackaged' plan, however, which is authorized under 11 U.S.C. §1126(b), a plan proponent has negotiated a plan and solicited votes prior to the filing of a Chapter 11 petition"). | Prior to filing the Plan, the Debtor did not obtain the consent, approval, or votes of any of its constituencies. Simply put, the Plan is not a "prepackaged plan," and it is incorrect and misleading to refer to it as such. |