| | |
|---|---|
| Sander L. Esserman | Brad S. Karp |
| State Bar No. 006671500 | Stephen J. Shimshak |
| Steven A. Felsenthal | Jordan E. Yarett |
| State Bar No. 06889900 | Susanna M. Buergel |
| Heather J. Panko | **PAUL, WEISS, RIFKIND,** |
| State Bar No. 24049516 | **WHARTON & GARRISON LLP** |
| **STUTZMAN, BROMBERG,** | 1285 Avenue of the Americas |
| **ESSERMAN & PLIFKA** | New York, New York 10019-6064 |
| **A PROFESSIONAL CORPORATION** | Telephone: (212) 373-3000 |
| 2323 Bryan Street, Suite 2200 | Facsimile: (212) 757-3990 |
| Dallas, Texas 75201-2689 | |
| Telephone: (214) 969-4900 | |
| Facsimile: (214) 969-4999 | |

*Attorneys for the Office of the Commissioner of Baseball*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **In re**<br>**TEXAS RANGERS BASEBALL PARTNERS,**<br>　　　　　　Debtor. | **Chapter 11**<br><br>**Case No. 10-43400 (DML)** |

**RESPONSE OF THE OFFICE OF THE COMMISSIONER OF BASEBALL
TO CERTAIN FACTUAL ALLEGATIONS AND LEGAL POSITIONS OF
THE AD HOC GROUP OF FIRST LIEN LENDERS, JP MORGAN CHASE
BANK, N.A., AS FIRST LIEN AGENT, AND GSP FINANCE LLC, AS
SECOND LIEN AGENT, REGARDING CERTAIN ISSUES RELATED TO
<u>PROPOSED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT</u>**

## Preliminary Statement

In its Statement of the Office of the Commissioner of Baseball in Support of the Legal Positions of the Debtor and Rangers Express LLC dated June 11, 2010, the Office of the Commissioner of Baseball ("BOC") reserved at paragraph 3 the right to respond to the position of any other party in interest (including by written submission), concerning, without limitation, any matter that the BOC determined implicates the interests of Major League Baseball. The BOC has now reviewed the account submitted by the Lenders[1] of the events that preceded the chapter 11 filing of the Debtor, Texas Rangers Baseball Partners ("TRBP"), including the attack on the role of the BOC in the sale process. It has also reviewed the Lenders' incomplete and inaccurate depiction of their collateral rights, one that asserts an ability on their part to control the business affairs of TRBP. Now that the BOC has received the Lenders' account of the facts and their version of their collateral rights, it wishes to address both.[2]

## THE LENDERS' "RELEVANT FACTUAL BACKGROUND" DISTORTS THE FACTS OF THE SALE PROCESS AND THE ROLE OF THE BOC

The Lenders devote over fifteen pages of their brief to reciting what they characterize as the "Relevant Factual Background" before the bankruptcy filing. That lengthy description is neither relevant to the June 15 Issues nor fairly descriptive of the facts. The June 15 Issues listed in this Court's June 2, 2010 Order concern questions of

---

[1] The Lenders filed their *Joint Brief of Ad Hoc Group of First Lien Lenders, JP Morgan Chase Bank, N.A., as First Lien Agent, and GSP Finance LLC, as Second Lien Agent, Regarding Certain Issues Related to Proposed Plan of Reorganization and Disclosure Statement* (the "Lenders' Brief") on June 11, 2010.

[2] As previously noted, the BOC supports the legal positions of the Debtor and Rangers Express LLC on all June 15 Issues. The BOC expects that both will address thoroughly the deficiencies of the Lenders' flawed legal arguments on those Issues.

law, something that the Lenders do not appear to dispute. Indeed, the Lenders' legal arguments on the five June 15 Issues do not contain a single reference to the "Relevant Factual Background," much less any attempt to explain the relevance of the account recited there to any of the June 15 Issues. (*See* Lenders' Brief at 19-49). Nevertheless, so that the Lenders' account of the auction and sale process that took place in 2009 and early 2010 does not mislead this Court, the BOC provides a short response to that account here.

*First*, though the Lenders attempt to portray the 2009 auction process as "flawed," they fail to identify any actual or even any alleged flaw in that process. The Lenders' account begins with December 15, 2009, the date on which HSG Sports Group LLC ("HSG") and TRBP chose Rangers Baseball Express LLC ("Baseball Express") as the winning bidder. But December 15 marked the *end* of the auction process, not its beginning. That process, which began in the summer of 2009 and lasted nearly six months, was full, fair, and open. As set forth in the May 24, 2010 Declaration of Kellie Fischer, "HSG and TRBP, in conjunction with their financial advisors, canvassed a broad group of prospective buyers and investors." (*Declaration of Kellie L. Fischer in Support of Debtors' Chapter 11 Petition and Request for First Day Relief*, dated May 24, 2010 ("Fischer Dec.") ¶ 25). In August 2009, HSG and TRBP "received six initial bids . . . and selected three of those bidders to participate in the second round of bidding" and to submit final bids. (*Id*.). After receiving final bids from all three prospective purchasers, "HSG and TRBP selected Rangers Baseball Express LLC" as the winning bidder on December 15, 2009, having concluded that Baseball Express's offer "was the best offer

2

and in the best interests of both TRBP and HSG and indirectly their creditors." (*Id*. ¶¶ 28, 29).

The Lenders (kept apprised of developments throughout the sale process) do not dispute any of these facts. Instead, they insinuate that HSG and TRBP did not select Baseball Express voluntarily or based on full information. To these ends, the Lenders characterize December 15, 2009 as a "deadline imposed by" the BOC. (Lenders' Brief at 5). But, as the Lenders admit, the auction process, including the December 15 deadline, was governed by certain terms of the Amended and Restated Voluntary Support Agreement ("Amended VSA") -- a contract that HSG and TRBP voluntarily entered into with the BOC in exchange for the financial, operational, and logistical support that the BOC would provide to the Texas Rangers. (*Id*. at 4-5; *see also* Fischer Dec. ¶ 27).

*Second*, the Lenders take issue with the BOC for "refus[ing] to allow HSG to continue to negotiate with Crane," one of the two losing bidders, after the close of the auction on December 15, 2009. (Lenders' Brief at 6). However, in consideration of the BOC's continued financial and operational support at a time when no other party (including the Lenders) would provide it, HSG had agreed under the Amended VSA to meet a timetable intended to ensure an orderly and efficient auction and sale process, one which ironically had as a principal objective the prompt payment of the Lenders. That agreement prevented HSG from continuing to negotiate with other bidders after December 15 in a never-ending auction, not some unilateral "refusal" by the BOC to permit a competing bid within the auction. (Lenders' Brief Ex. A at 3). The BOC's position that HSG should comply with its contractual obligations under the Amended

3

VSA by negotiating in good faith to reach a definitive purchase agreement with the party that HSG had *itself* chosen as the winning bidder – as the single e-mail chain that the Lenders rely on for most of their allegations shows -- is neither surprising nor unreasonable. (*See id*.). In any case, the only concrete negotiations that did take place after December 15 -- as indicated by the very e-mails the Lenders cite -- produced an *improvement* in Baseball Express's already winning bid.

*Finally*, the Lenders imply that the BOC somehow acted improperly by taking control of the sale process on January 16, 2010, when HSG did not negotiate a definitive purchase agreement with Baseball Express by January 15, as its contractual commitment under the Amended VSA required. The BOC did not assume control of the sale process to elect a winning bidder or to shut out competing bids, as the Lenders insinuate. By January 16, 2010, the six-month auction process had concluded and HSG had already chosen the winning bidder. The BOC only exercised control to press HSG to complete the process to which it had agreed. Thus, the BOC "authorized the Hicks parties to conclude their negotiations" with Baseball Express, the bidder that HSG and TRBP had chosen, and to execute and deliver a purchase agreement -- all in accordance with the agreed-upon terms of the Amended VSA. (Lenders' Brief Ex. C at 2).

While the Lenders assail the Commissioner's invocation of his "best interests of baseball" powers on April 30, 2010 (Lenders' Brief at 10), they do not mention that the very loan documents on which they purport in their Brief to base their own claim to "sole-authority" to exert control over the proposed sale expressly state that "[e]ach of the Lenders . . . acknowledges the 'best interests of baseball' powers held by the Commissioner under the Major League Constitution." (*Id*. Ex. J § 10.23 at 115; Ex. L

4

§ 10.23 at 101). The Lenders' primary complaint over the Commissioner's statements is that those statements could discourage "any competing bidders who *might* want to pay more" than Baseball Express had agreed to pay to purchase the Texas Rangers. (Lenders' Brief at 10 (emphasis added)). That complaint reveals the fallacy that underlies all of the Lenders' arguments regarding the sale process: with the conclusion of the auction on December 15, 2009, there was no "bidding process" taking place with which the BOC or anyone else could have interfered. The process took place before December 15, 2009 was a fair and open one for all participating bidders, resulting in the selection of Baseball Express as the winning bidder. Whether there were competing bidders who "might" have wanted to pay more than Baseball Express *after* the auction had already closed is beside the point.

In sum, the Lenders ignore that a six-month auction process started, took place, and ended. By taking out of context the negotiations that occurred after the conclusion of that auction process, they attack the justified and reasonable actions of the BOC. For these reasons, in addition to the irrelevance of the "Relevant Factual Background" to the June 15 Issues, this Court should decline to consider the Lenders' account of the sale process or the BOC's role in it for purposes of the hearing on June 15.

### THE LENDERS DO NOT HAVE THE RIGHT TO SPEAK FOR AND VOTE ON BEHALF OF THE DEBTOR'S EQUITY OWNERS

The Lenders maintain that under the terms of the Amended and Restated First Lien Pledge and Security Agreement dated as of December 19, 2006 and the Second Lien Pledge and Security Agreement dated as of December 19, 2006 (together, the "Pledge Agreements"), they now hold through the First Lien Collateral Agent the 99% Voting and Consent Rights of general partner Rangers Equity Holdings LP, a Delaware

5

limited partnership, as well as the 1% Voting and Consent Rights of general partner Rangers Equity Holdings GP, LLC, a Texas limited liability company and the Managing Partner of TRBP (each, a "Partner;" together, the "Partners"). (Lenders' Brief at 28-33).

The Lenders arrive at their position through a selective and incomplete reading of the Pledge Agreements and the obligations of the Collateral Agent on behalf of the Lenders thereunder. The Lenders maintain that following the occurrence and continuation of an Event of Default, under § 4.4.1(c)(i)(3)(A) of the Pledge Agreement "all Voting and Consent Rights [of the Partners] ceased, and automatically vested in the Collateral Agent." (Lenders' Brief at 29). Section 4.4.1(c)(i)(3)(A) recites:

> Upon the occurrence and during the continuation of an Event of Default:
>
> (A) all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease and all such rights shall thereupon become vested in the Collateral Agent who shall thereupon have the sole right to exercise such voting and other rights.

The Lenders further maintain that through the Collateral Agent's purported acquisition of the Voting and Consent Rights, the Collateral Agent "has the exclusive power to vote the TRBP interests directly . . . ." (*Id.*). They add that "[i]n sum, because of these contractual rights, the Collateral Agent has the sole authority to consent to both the terms of any sale and to elect whether to accept or reject the Plan on behalf of the Class 12 Interests." (*Id.*).

In reaching their conclusions, the Lenders disregard the language and effect of controlling provisions of the Pledge Agreements, the operative documents of Major League Baseball, and the terms of the June 2, 1999 General Partnership Agreement for TRBP, as amended from time to time (the "TRBP Partnership

6

Agreement"). Those instruments together determine the nature, extent, and enforceability of the Collateral Agent's interests, if any, in the Voting and Consent Rights of the Partners.

Let us start with the Pledge Agreements and the Collateral Agent's express acknowledgement of key terms of those documents, as well as the effect of those documents on the voting and consent rights otherwise granted by the Partners to the Collateral Agent under the Pledge Agreements. Section 11 of the Pledge Agreements provides in pertinent part that:

> *"Notwithstanding any contrary provisions contained in this Agreement or any other Credit Document:*
>
> (a) *the Collateral Agent is aware of the provisions contained in Article V, Section 2(b)(2) of the Major League Constitution, and recognizes that the Ownership Committee of Baseball has issued "Control Interest Transfers – Guidelines & Procedures," dated November 9, 2005 (such document and any successor guidelines, as may be amended from time to time, the "MLB Control Interest Transfer Guidelines");*
>
> (b) *the Collateral Agent acknowledges that Article V, Section 2(b)(2) of the Major League Constitution and the MLB Control Interest Transfer guidelines require that **the transfer of a control interest in either the Rangers Franchise or the Rangers be subject to the approving vote of the Major League Baseball clubs in their absolute discretion. The Collateral Agent also acknowledges the "best interests of baseball" powers held by the Commissioner under the Major League Constitution. . . ;*[3]

---

[3] The "approving vote" requirement recites that "[t]he vote of three-fourths of the Major League Clubs shall be required for the approval of . . . [t]he sale or transfer of a control interest in any Club. . . ." Major League Constitution, Article V, Sec. 2(b)(2). Importantly, "control" for purposes of this provision means "the possession by the transferee, directly or indirectly, of the power or authority to influence substantially the management policies of the Club." (*Id.*).

> (c) the Collateral Agent acknowledges that *any temporary or permanent management of the Rangers Franchise or the Rangers shall be subject to the prior approval of the Commissioner and the Clubs. In the event the Collateral Agent desires to operate the Rangers Franchise or the Rangers for its own account on a temporary or permanent basis, the Collateral Agent shall seek the prior approval of the Commissioner and the Major League Baseball clubs in accordance with the Major League Constitution and the MLB Control Interest Transfer Guidelines.*
> (Emphasis supplied.)

Reading these provisions of the Pledge Agreements with § 4.4.1(c)(i)(3)(A) leads inescapably to the following conclusions. *First*, the Collateral Agent has expressly acknowledged its awareness and the controlling nature of operative Major League Baseball documents and guidelines, including the control interest transfer requirements that these documents and guidelines contain. By agreement, those requirements condition the rights of the Collateral Agent and the Lenders "[n]otwithstanding any contrary provisions contained in the [Pledge Agreements] or any other Credit Document."

*Second*, and contrary to the assertions of the Lenders, the Voting and Consent Rights of the Partners have not "ceased and automatically vested in the Collateral Agent" (Lenders' Brief at 29); at this time, those Voting and Consent Rights remain with the Partners and the existing owners of the Partners. This conclusion follows because the automatic termination and vesting of the Voting and Consent Rights of the Partners would result in a control interest transfer to the Collateral Agent, a transfer that would leave the Collateral Agent with possession "directly or indirectly of the power or authority to influence substantially the management policies of the Club," without the approving vote of three-fourths of the Major League Clubs, as required by the MLB

Constitution. (*See* footnote 3). Furthermore, Section I of the MLB Control Interest Transfer Guidelines provides that:

> (A) There must be within each ownership structure a clearly designated person who is accountable to Baseball for the Club's operation and its compliance with the Rules of Baseball and responsible for and empowered solely to make all Club decisions, whether player-related, operational, business or financial. . . . A change in the single person in control, regardless of how it is effected, will constitute a control interest transfer and may not occur without all required [Baseball] approvals.
>
> . . .
>
> (D) Ownership of a control interest in a Club other than by an individual, for instance by a corporation, LLC or partnership, creates the potential for effective change in control of the Club through a change in ownership or management of the ownership entity or any parent company. ***Therefore, a change in control in any such entity, or a change in the individual designated by, for instance, the corporate owner to make all Club decisions, shall be deemed to be a control interest transfer.*** . . . All corporate, LLC or partnership documents must reflect that any Club control or non-control interest transfer must receive the appropriate Baseball approvals.

(MLB Control Interest Transfer Guidelines, Section I.A at 2 and I.D at 3 (Emphasis supplied).

In this respect, § 4.4.1(c)(i)(3)(A) is a "contrary provision" within the meaning of § 11 of the Pledge Agreements. In simple terms, no matter what § 4.4.1(c)(i)(3)(A) says in isolation, the Voting and Consent Rights can never move to the Collateral Agent without the advance approval of the Major League Clubs. *See*, *e.g.*, *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (N.Y. 2003) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole . . . [t]he meaning of a writing may be distorted where undue force is given to

9

single words or phrases.") (internal quotations and citation omitted); *South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272, 277 (N.Y. 2005) (same); *Bombay Realty Corp. v. Magna Carta, Inc.*, 100 N.Y.2d 124, 127 (N.Y. 2003) (same); *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App. - Houston [14th Dist.] 2005, no pet.) ("When parties use the clause 'notwithstanding anything to the contrary contained herein' in a paragraph of their contract, they contemplate the possibility that other parts of their contract may conflict with that paragraph, and they agree that this paragraph must be given effect regardless of any contrary provisions of the contract."); *Cleere Drilling Co. v. Dominion Explor. & Prod., Inc.*, 351 F.3d 642, 649 & n.13 (5th Cir. 2003) ("notwithstanding anything to the contrary contained herein" provision constitutes an express declaration by the parties that it supersedes all other provisions of the contract).[4]

*Third*, the Lenders have not shown and cannot show that they ever obtained the approval of three-fourths of the Major League Clubs for the vesting in them "of the authority to influence substantially the management policies of the Club" -- the very power that they now claim that the Collateral Agent possesses ("In sum, based on these contractual rights, the Collateral Agent *has the sole authority* to consent to both the

---

[4] The arguments speculatively and erroneously attributed by the Lenders to the BOC that the consent rights of the Major League Clubs "vitiate the Voting and Consent Rights of the Collateral Agent," and that "Section 11 of the Pledge Agreement does not shift any Voting and Consent Rights from the Collateral Agent to MLB or the Commissioner, nor does it cause such rights to revert to the Partners" (Lenders' Brief at 32) never enter the equation. The Partners' Voting and Consent Rights never move from the Partners and those managing the Partners to vest in the Collateral Agent without the Collateral Agent's first obtaining the approval of the Major League Clubs of that movement or "transfer." The filing of involuntary petitions by members of the Ad Hoc Group likely imposes the automatic stay as an additional obstacle to any transfer of those rights, as the Debtor pointed out in the *Debtor's Memorandum of Law Regarding Legal Issues to Be Addressed at June 15, 2010 Hearing* ("Debtor's Brief"). (*See* Debtor's Brief at 25-27).

10

terms of any sale of the Texas Rangers and to elect whether to accept or reject the Plan on behalf of the Class 12 Interests.") -- following the occurrence of an Event of Default.

Let us turn next to the TRBP Partnership Agreement. Any attempt by the Collateral Agent on behalf of the Lenders to exercise the Voting and Control Rights of the Partners in any case would have no legal effect. Section 2.5 of the TRBP Partnership Agreement provides, in pertinent part, that . . . "***any change in the . . . control of any Partner**. . .*

> ***Shall be subject to and made in accordance with the Major League Agreement [an earlier name of the Major League Constitution], the Constitution of the American League, the Major League Rules and any other rules, guidelines, regulations, or requirements of the applicable Baseball Authority, all as the same now exist or may be amended or adopted in the future;*** (ii) any such sale, transfer, assignment, gift or bequest, grant of a security interest, pledge, encumbrance, change, admission, issuance or amendment that requires the consent of any Baseball authority is prohibited and **shall be null and void unless all applicable consents are obtained in advance**; and (iii) any such consent may be withheld at the sole and absolute discretion of any applicable Baseball Authority. (Emphasis supplied.)

Without the requisite approvals of the BOC and the Major League Clubs, the "transfer" of "control of any Partner" -- again, the very thing that the Lenders insist has already occurred -- is "null and void." *See Harris v. Archer*, 134 S.W.3d 411 (Tex. App. - Amarillo 2004, pet. denied) (holding that where a partnership agreement prohibits a transfer of partnership interest, any such transfer is void).

Finally, the TRBP Partnership Agreement specifically proscribes a transfer of any interest in any partnership interest that would result in a change of control

11

of TRBP without the approval of the applicable Baseball Authorities recognized in Section 2.5 of the TRBP Partnership Agreement:

> Subject to the provisions of <u>Section 2.05</u> [sic] of this Agreement [really Section 2.5, previously discussed], ***any Partner may pledge***, mortgage or hypothecate or otherwise encumber ***his Partnership interest*** for any purpose whatsoever ***as long as such pledge, mortgage, hypothecation or other encumbrance shall in no manner entitle any assignee or successor Partner, in this regard either before or after foreclosure, to (a) admission as a substituted Partner, or (b) any right to vote on any Partnership matters***. (Emphasis supplied.)

(TRBP Partnership Agreement § 5.3, at 18). Thus, Section 5.3 of the Partnership Agreement specifically prohibits any attempt by the Lenders to control TRBP through the Pledge Agreements with the Partners. Without the consent of the applicable Baseball Authority, the effect of any such pledge is null, void and otherwise unenforceable.

In sum, upon the occurrence of an Event of Default and notwithstanding § 4.4.1(c)(i)(3)(A) of the Pledge Agreements considered in isolation, the Collateral Agent on behalf of the Lenders never obtained the Voting and Control Rights of the Partners. The Collateral Agent's ability to obtain those rights has always remained conditional and subject to Section 11 of the Pledge Agreements, as well as the express terms of the Partnership Agreement, requirements with which the Lenders have failed to comply. This does not mean that the Partners' pledge of their Voting and Consent Rights was a hollow or meaningless exercise; it only means that before the control interest transfer of "vesting" of the Voting and Consent Rights of the Partners in the Collateral Agent can occur, the Collateral Agent must first come to Major League Baseball for consent and approval -- something that it has not done. As a result, those in control of the Partners

and TRBP before the occurrence of the Events of Default under the Pledge Agreements remain in control of the Partners and TRBP now, and they, and they alone, have the power to exercise the Voting and Consent Rights of the partnership interests in TRBP.

## **NOTICE**

No trustee or examiner has been appointed in this chapter 11 case. Notice of this statement has been provided in accordance with the Order (I) Scheduling a Hearing to Consider Issues Relating to the Disclosure Statement and Issues Relating to Plan Confirmation; (II) Establishing Deadlines with Respect Thereto; (III) Approving the Form and Manner of Notice of the Deadlines and the Hearing; and (IV) Granting Related Relief [Docket No. 119] to: (i) counsel to the Debtor, Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201, Attn: Martin A. Sosland, Esq. (martin.sosland@weil.com) and Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Ronit J. Berkovich, Esq. (ronit.berkovich@weil.com); (ii) counsel to the Purchaser, Foley & Lardner LLP, 777 East Wisconsin Avenue, Milwaukee, Wisconsin 53202, Attn: Mary K. Braza, Esq. (mbraza@foley.com) and Kevin R. Schulz, Esq. (kschulz@foley.com) and Foley & Lardner LLP, 321 North Clark Street, Suite 2800, Chicago, Illinois 60610, Attn: Michael J. Small, Esq. (msmall@foley.com); (iii) counsel to the Purchaser, Sherrard, German & Kelly, P.C., 28th Floor, Two PNC Plaza, 620 Liberty Avenue, Pittsburgh, Pennsylvania 15222, Attn: David J. Lowe, Esq. (djl@sgkpc.com); (iv) counsel to the Purchaser, Barlow Garsek Simon, LLP, 3815 Lisbon Street, Fort Worth, Texas 76107, Attn: Robert A. Simon, Esq. (rsimon@bgsfirm.com); (v) counsel to the Committee of Unsecured Creditors; (vi) the U.S. Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242, Attn: Lisa L. Lambert, Esq. (Iisa.l.lambert@usdoj.gov) and Meredyth A. Kippes, Esq.

(meredyth.a.kippes@usdoj.gov); (vii) counsel to JPMorgan Chase Bank, N.A., Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attn: Mitchell Seider, Esq. (mitchell.seider@lw.com) and Joseph Fabiani, Esq. (joseph.fabiani@lw.com); (viii) counsel to GSP Finance LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, New York 10019, Attn: Jason P. Young, Esq. (Jason.Young@cliffordchance.com); (ix) counsel to the Ad Hoc Group of First Lien Lenders, Vinson & Elkins LLC, Trammell Crow Center, 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201, Attn: Daniel C. Stewart, Esq. (dstewart@velaw.com); (x) counsel to the Ad Hoc Group of First Lien Lenders, Milbank, Tweed, Hadley & McCloy LLP, Suite 1100, International Square Building, 1850 K Street, N.W., Washington, DC 20006, Attn: Andrew M. LeBlanc, Esq. (aleblanc@milbank.com); (xi) counsel to JPMorgan Chase Bank, NA., Rochelle McCullough, LLP, 325 N. St. Paul Street, Suite 4500, Dallas, Texas 75201, Attn: Buzz Rochelle, Esq. (buzz.rochelle@romclawyers.com) and Scott DeWolf, Esq. (sdewolf@romclawyers.com); and (xii) counsel to GSP Finance LLC, Agent for the

Second Lien Lenders, Gardere Wynne Sewell LLP, 1601 Elm Street, Suite 3000, Dallas, Texas 75501, Attn: Holland N. O'Neil, Esq. (honeil@gardere.com).

Dated: June 14, 2010
      Fort Worth, Texas

    STUTZMAN, BROMBERG,
    ESSERMAN & PLIFKA
    A PROFESSIONAL CORPORATION

    By: */s/ Sander L. Esserman*
        Sander L. Esserman
        State Bar No. 006671500
        Steven A. Felsenthal
        State Bar No. 06889900
        Heather J. Panko
        State Bar No. 24049516

    2323 Bryan Street, Suite 2200
    Dallas, Texas 75201-2689
    Telephone: (214) 969-4900
    Facsimile: (214) 969-4999

    -and-

    Brad S. Karp
    Stephen J. Shimshak
    Jordan E. Yarett
    Susanna M. Buergel
    **PAUL, WEISS, RIFKIND,**
    **WHARTON & GARRISON LLP**
    1285 Avenue of the Americas
    New York, New York 10019-6064
    Telephone: (212) 373-3000
    Facsimile: (212) 757-3990

    **ATTORNEYS FOR THE OFFICE OF**
    **THE COMMISSIONER OF BASEBALL**

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 14th day of June 2010, she caused a true and correct copy of the foregoing Response of the Office of the Commissioner of Baseball to Certain Factual Allegations and Legal Positions of the Ad Hoc Group of First Lien Lenders, JP Morgan Chase Bank, N.A., as First Lien Agent, and GSP Finance LLC, as Second Lien Agent, Regarding Certain Issues Related to Proposed Plan of Reorganization and Disclosure Statement to be served via electronic mail on the parties listed below, and via first class mail, postage prepaid on all parties on the Official Limited Service List Effective June 2, 2010.

/s/ Heather J. Panko
Heather J. Panko

**Counsel for the Debtor**

Weil, Gotshal & Manges LLP
Attn: Martin A. Sosland
200 Crescent Court, Suite 300
Dallas, Texas 75201
martin.sosland@weil.com

Weil, Gotshal & Manges LLP
Attn: Ronit J. Berkovich
767 Fifth Ave.
New York, New York 10153
ronit.berkovich@weil.com

**Counsel to the Purchaser**

Sherrard, German & Kelly, P.C.
Attn: David J. Lowe
28th Floor, Two PNC Plaza
620 Liberty Avenue
Pittsburgh, Pennsylvania 15222
djl@sgkpc.com

**Counsel to the Purchaser**

Foley & Lardner LLP
Attn: Mary K. Braza
Kevin R. Schulz
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
mbraza@foley.com
kschulz@foley.com

Foley & Lardner LLP
Attn: Michael J. Small
321 North Clark Street, Suite 2800
Chicago, Illinois 60610
msmall@foley.com

**Counsel to the Purchaser**

Barlow Garsek & Simon LLP
Robert A. Simon
3815 Lisbon Street
Fort Worth, Texas 76107
rsimon@bgsfirm.com

| Counsel to the Committee | United States Trustee |
|---|---|
| K&L Gates LLP<br>Jeffrey R. Fine<br>James H. Billingsley<br>Daniel I. Morenoff<br>1717 Main Street, Suite 2800<br>Dallas, Texas 75201<br>Jeff.fine@klgates.com<br>James.billingsley@klgates.com<br>dan.morenoff@klgates.com | Office of the United States Trustee<br>Lisa L. Lambert<br>Meredyth A. Kippes<br>1100 Commerce Street, Room 976<br>Dallas, Texas 75242<br>lisa.l.lambert@usdoj.gov<br>meredyth.a.kippes@usdoj.gov |
| **Counsel to JPMorgan Chase Bank, N.A.** | **Counsel to GSP Finance LLC** |
| Latham & Watkins LLP<br>Attn: Mitchell Seider<br>Joseph Fabiani<br>885 Third Avenue<br>New York, New York 10022<br>mitchell.seider@lw.com<br>joseph.fabiani@lw.com | Cliffard Chance US LLP<br>Attn: Jason P. Young<br>31 West 52nd Street<br>New York, New York 10019<br>Jason.young@cliffordchance.com |
| **Counsel to the Ad Hoc Group of First Lien Lenders** | **Counsel to JPMorgan Chase Bank, N.A.** |
| Vinson & Elkins LLC<br>Attn: Daniel Stewart<br>Trammel Crow Center<br>2001 Ross Avenue<br>Suite 3700<br>Dallas, Texas 75201<br>dstewart@velaw.com<br><br>Milbank, Tweed, Hadley & McCloy LLP<br>Attn: Andrew M. LeBlanc<br>Suite 1100, International Square Building<br>1850 K Street, N.W.<br>Washington, D.C. 20006<br>aleblanc@milbank.com | Rochelle McCullough, LLP<br>Attn: Buzz Rochelle<br>Scott DeWolf<br>325 N. St. Paul Street, Suite 4500<br>Dallas, Texas 75201<br>buzz.rochelle@romclawyers.com<br>sdewolf@romclawyers.com |

| **Counsel to GSP Finance LLC, Agent for the Second Lien Lenders** | **MLB Players Association** |
|---|---|
| Gardere Wynne Sewell LLP<br>Attn: Holland O'Neil<br>1601 Elm Street, Suite 3000<br>Dallas, Texas 75501<br>honeil@gardere.com | Baker Botts L.L.P<br>Attn: Jack Kinzie<br>C. Luckey McDowell<br>Ian E. Roberts<br>2001 Ross Avenue<br>Dallas, Texas 75201<br>jack.kinzie@bakerbotts.com<br>luckey.mcdowell@bakerbotts.com<br>ian.roberts@bakerbotts.com<br><br>Cohen, Weiss and Simon LLP<br>Attn: Richard M. Seltzer<br>Babette A. Ceccotti<br>Bruce S. Levine<br>Joshua J. Ellison<br>330 West 42nd Street, 25th Floor<br>New York, New York 10036<br>rseltzer@cwsny.com<br>bceccotti@cwsny.com<br>jellison@cwsny.com |