```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                              FORT WORTH DIVISION

  In Re:                        )    Case No. 10-43400-dml
                                )    Chapter 11
  TEXAS RANGERS BASEBALL        )
  PARTNERS,                     )    Fort Worth, Texas
                                )    Tuesday, June 1, 2010
          Debtor.              )     1:15 p.m. Docket
                                )
                                )    STATUS CONFERENCE
                                )
  _____)
```

                       TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE D. MICHAEL LYNN,
                     UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For GSP Finance, LLC:         John Ford
(*Telephonic Appearance*)     Thomas K. Schulte
                              Jason Young
                              CLIFFORD CHANCE U.S., LLP
                              31 West 52nd Street
                              New York, NY  10019-6131
                              (212) 878-8134

For the Office of the         Diane Meyers
Commissioner of Baseball:     PAUL, WEISS, RIFKIND, WHARTON &
(*Telephonic Appearance*)        GARRISON LLP
                              1285 Avenue of the Americas
                              New York, NY  10019-6064
                              (212) 373-3133

For the Office of the         John Bromberg
Commissioner of Baseball:     STUTZMAN BROMBERG ESSERMAN &
(*Telephonic Appearance*)        PLIFKA, PC
                              2323 Bryan Street, Suite 2200
                              Dallas, TX 75201
                              (214) 969-4900

For the Debtor:               Martin A. Sosland
                              Vance Beagles
                              Yolanda Garcia
                              WEIL, GOTSHAL & MANGES LLP
                              200 Crescent Court, Suite 300
                              Dallas, TX  75201-6950
                              (214) 746-7730

```
 1   APPEARANCES, cont'd.

 2   For the Debtor:              Ronit J. Berkovich
                                  WEIL, GOTSHAL & MANGES LLP
 3                                767 Fifth Avenue
                                  New York, NY  10153-0119
 4                                (212) 310-8534

 5   For Ad Hoc Group of First    Daniel C. Stewart
     Lien Holders:                VINSON & ELKINS LLP
 6                                Trammell Crow Center
                                  2001 Ross Avenue, Suite 3700
 7                                Dallas, TX  75201-2975
                                  (214) 220-7761
 8
     For Ad Hoc Group of First    Andrew M. LeBlanc
 9   Lien Holders:                MILBANK, TWEED, HADLEY & MCCLOY
                                     LLP
10                                International Square Building
                                  1850 K Street, NW
11                                Washington, DC  20006
                                  (202) 835-7574
12
     For Ad Hoc Group of First    Dennis Dunne
13   Lien Holders:                MILBANK, TWEED, HADLEY & MCCLOY,
                                     LLP
14                                One Chase Manhattan Plaza
                                  New York, NY  10005-1413
15                                (212) 530-5770

16   For the U.S. Trustee:        Meredyth Kippes
                                  OFFICE OF THE UNITED STATES TRUSTEE
17                                1100 Commerce Street, Room 976
                                  Dallas, TX  75242
18                                (214) 767-8967

19   For Rangers Baseball         Robert A. Simon
     Express, LLC:                Zack Garsek
20                                BARLOW GARSEK & SIMON LLP
                                  3815 Lisbon Street
21                                Fort Worth, TX  76107
                                  (817) 731-4500
22
     For Rangers Baseball         Michael J. Small
23   Express, LLC:                FOLEY & LARDNER LLP
                                  321 North Clark Street, Suite 2800
24                                Chicago, IL  60610-4764
                                  (312) 832-5832
25
```

1  APPEARANCES, cont'd.

2  For RTKL Associates, Inc.    Jeffrey Fine
   and Vratsinas Construction   K&L GATES LLP
3  Company:                     1717 Main Street, Suite 2800
                                Dallas, TX  75201-7342
4                               (214) 939-5567

5  For JPMorgan Chase:          Michael Rochelle
                                Scott DeWolf
6                               ROCHELLE MCCULLOUGH LLP
                                325 N. St. Paul St., Suite 4500
7                               Dallas, TX  75201
                                (214) 953-0182
8
   For JPMorgan Chase:          Joseph S. Faviani
9                               Mitchell Seider
                                LATHAM & WATKINS LLP
10                              53rd at Third 855 Third Avenue
                                New York, NY  10022-4834
11                              (212) 906-1200

12 For GSP Finance, LLC:        Holland N. O'Neil
                                GARDERE, WYNNE AND SEWELL LLP
13                              1601 Elm Street, Suite 3000
                                Dallas, TX  75201
14                              (214) 999-4961

15 For the Office of the        Sander Esserman
   Commissioner of Baseball:    Peter D'Apice
16                              STUTZMAN BROMBERG ESSERMAN &
                                  PLIFKA PC
17                              2323 Bryan Street, Suite 2200
                                Dallas, TX  75201
18                              (214) 969-4900

19 For the Office of the        Stephen J. Shimshak
   Commissioner of Baseball:    William B. Michael
20                              Susanna M. Buergel
                                PAUL, WEISS, RIFKIND, WHARTON &
21                                GARRISON, LLP
                                1285 Avenue of the Americas
22                              New York, NY 10019-6064
                                (212) 373-3133
23

24

25

```
 1   APPEARANCES, cont'd.

 2   For Major League Baseball    Ian Roberts
     Players Association:         BAKER BOTTS LLP
 3                                2001 Ross Avenue
                                  Dallas, TX  75201
 4                                (214) 953-6719

 5   For Alexander Rodriguez:     Joseph J. Wielebinski, Jr.
                                  MUNSCH, HARDT, KOPF, & HARR, P.C.
 6                                3800 Lincoln Plaza
                                  500 North Akard Street
 7                                Dallas, TX  75201-6659
                                  (214) 855-7561
 8
     Court Recorder:              Sandy Maben
 9                                UNITED STATES BANKRUPTCY COURT
                                  510 W. 10th Street
10                                Fort Worth, TX  76102
                                  (817) 333-6015
11
     Transcription Service:       Kathy Rehling
12                                209 Bay Circle
                                  Coppell, TX  75019
13                                (972) 304-1998

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

1

2     THE COURT: Please be seated. All right. We have the

3 Texas Rangers Baseball Partners case. This is a status

4 conference. Let me call the telephone roll first, and then

5 I'll ask for in-court appearances.

6    First, we have Mr. Ford for GSP Finance?

7     MR. YOUNG: Yes, hi. It's John Ford and Jason Young

8 from Clifford Chance, and Tom Schulte, for GSP Finance.

9     THE COURT: All right. And we have Ms. Meyers for the

10 Office of the Commissioner of Baseball?

11     MS. MEYERS: Yes, Your Honor. Thank you. Diane

12 Meyers of Paul Weiss Rifkind Wharton & Garrison on behalf of

13 Major League Baseball.

14     THE COURT: And Mr. Bromberg also for the Commissioner

15 of Baseball?

16     MR. BROMBERG: Present, Your Honor.

17     THE COURT: All right. Could I have appearances in

18 the courtroom, please?

19     MR. SOSLAND: Good afternoon, Your Honor. Martin

20 Sosland, Ronit Berkovich, Vance Beagles and Yolanda Garcia for

21 the Debtor, Texas Rangers Baseball Partners.

22     MR. STEWART: On behalf of the Ad Hoc Group of First

23 Lien Lenders, Your Honor, Dan Stewart of Vinson & Elkins and

24 Andrew LeBlanc and Dennis Dunne of Milbank.

25     MS. KIPPES: Good afternoon, Your Honor. Meredyth

1  Kippes on behalf of the United States Trustee.

2          MR. SIMON:  Good afternoon, Your Honor.  Robert Simon,

3  Zack Garsek and Michael Small for Rangers Baseball Express,

4  LLC.

5          MR. FINE:  Good afternoon, Your Honor.  Jeffrey Fine

6  on behalf of Vratsinas Construction Company and RTKL

7  Associates, Inc.

8          MR. ROCHELLE:  Good afternoon, Your Honor.  Michael

9  Rochelle and Mitchell Seider, Joseph Faviani and Scott DeWolf

10 for JPMorgan Chase, the agent bank.

11         MS. O'NEIL:  Good afternoon, Your Honor.  Holly O'Neil

12 on behalf of GSP Finance.  And for purposes of today, Your

13 Honor, I have several -- as Mr. Young announced, there are

14 several parties from Clifford Chance on the phone, and I would

15 ask the Court, there may be a topic that comes up that they may

16 need to weigh in on, and if the Court will indulge them today.

17 Thank you.

18         THE COURT:  All right.

19         MR. ESSERMAN:  Good afternoon, Your Honor.  Sandy

20 Esserman and Peter D'Apice of Stutzman Bromberg Esserman &

21 Plifka for MLB.  And present also in the courtroom is Steve

22 Shimshak, Susanna Buergel and Bill Michael from Paul Weiss.

23 Thank you.

24         THE COURT:  All right.

25         MR. ROBERTS:  Good afternoon, Your Honor.  Ian Roberts

1   of Baker Botts on behalf of the Major League Baseball Players

2   Association.

3         THE COURT:  All right.

4         MR. WIELEBINSKI:  Good afternoon, Your Honor.  Joe

5   Wielebinski with Munsch Hardt.  I represent Alex Rodriguez, a

6   creditor.

7         THE COURT:  All right.  All right.  Well, this -- I

8   guess if I can get this kind of attendance for this, the

9   Rangers ought to be getting better attendance, too, because

10   this is just a status conference.

11     What I wanted to do was establish or discuss what issues,

12   legal issues, we thought we could address earlier in the

13   process than at the time of a confirmation hearing.  And I

14   believe where we left things last week was that we expected to

15   have a hearing on June 15th.  And during the June 15th hearing,

16   we would, number one, address the disclosure statement to the

17   extent that there might be objections to it.  Number two, we

18   would address the United States Trustee's issue respecting

19   impairment of unsecured creditors.  Number three, we would

20   address the issue raised by the Ad Hoc Lender Group regarding

21   the Debtor's duty to maximize value in terms of recovery based

22   on estate assets.

23     Was there anything else that we had at that point?  Did we

24   have any other issues?  Yes, Ms. O'Neil?

25         MS. O'NEIL:  Your Honor, to the extent you're

outlining issues to discuss today, we had discussed at the last

hearing a confidentiality agreement. I think the parties were

to attempt to reach agreement on a confidentiality agreement to

disclose certain information with Major League Baseball. And

so we'd like to add that to the agenda, because, from my

clients' perspective, which are the second lien holders, we

have not worked out an agreement.

THE COURT: All right. Anything else? And what I'm

looking for here is it seems to me -- okay, Mr. Dunne?

MR. DUNNE: Yes. Good afternoon, Your Honor. Dennis

Dunne; Milbank Tweed; on behalf of the Ad Hoc Group of First

Lien Lenders.

On the impairment point, I thought it included both

impairment to the unsecured creditors and impairment of the

equity.

THE COURT: Well, it was my understanding that the

issue raised by the U.S. Trustee was impairment of unsecured

creditors by reason of the absence of interest in the plan.

And I mean, I'm happy -- one of the purposes of asking is to

ask you to formulate issues that we can address. And I think

it's important that we do formulate them with some accuracy,

because there will not be a briefing schedule where you'll have

time to decide about whether or not you're talking about the

same thing.

So I don't have a problem with the question of whether or

1  not equity is impaired under the plan, addressing that at that

2  time.

3      I'm aware that the lender group has commenced involuntary

4  cases for both of the equity owners of the Debtor, and I have

5  requested -- I've taken the liberty of requesting that those

6  cases be, to the extent that they are not in this Court, be

7  transferred to this Court, because it does not make sense to me

8  to have Judge Nelms hearing those.  And especially, as you're

9  all aware, Judge Nelms is going to have another role to play in

10  the case that I hope will be much more fruitful than anything

11  he could do in connection with one of the two equity partners.

12      But if you -- I mean, is this the question of whether, by

13  virtue of retaining their interest in the partnership by virtue

14  of this being an asset sale, since the assets of the

15  partnership will not be there anymore, that the equity owners

16  are in fact impaired?  Or is this some other issue?

17          MR. DUNNE:  No, it's precisely that, Your Honor.

18          THE COURT:  All right.

19          MR. DUNNE:  That, unlike in a standalone

20  reorganization case, where the number of shares for equity

21  remain constant -- whatever the value is of the company, it is;

22  they get that entire residual value -- it's clearly being

23  capped here.  It's being capped by virtue of the sale, as Your

24  Honor just referenced.  So we believe that constitutes

25  impairment and we'd like to address it in the briefing.

1          THE COURT:  All right.  Well, that's fine.  I mean, I

2     think we should.

3          Yes, Mr. Sosland?

4          I didn't mean to cut you off, Mr. Dunne.  Were you done,

5     Mr. Dunne?

6          MR. DUNNE:  Yes, I was.

7          THE COURT:  Okay.

8          MR. DUNNE:  Thank you, Your Honor.

9          THE COURT:  Thank you.  Then, Mr. Sosland?

10         MR. SOSLAND:  No issues to add, and I don't know

11    whether this subtracts or not.  From the Debtor's perspective,

12    this case should proceed as -- we want the case to proceed as

13    we've proposed that it proceed, moving to confirmation as

14    quickly as possible.  And the Court suggested, subject to

15    rulings on June 15th, a July 9th date.

16         THE COURT:  Yes.

17         MR. SOSLAND:  And to the extent that any issue that

18    was outlined last week or otherwise can be heard by the Court

19    on -- briefed in advance, heard by the Court on the 15th, and

20    we can then dispose of that issue or adjust accordingly, then

21    the Debtors are in favor of doing so.

22         With regard to the impairment issue, we filed a plan that

23    didn't pay interest to general unsecured creditors because at

24    the same time we filed a motion to --

25         THE COURT:  Yes.  I understand.

1    MR. SOSLAND: -- pay those in full. The UST objected.

2 The UST objected, the Court sustained the objection, and --

3    THE COURT: Right.

4    MR. SOSLAND: -- and if --

5    THE COURT: Well, my assumption --

6    MR. SOSLAND: My point is -- pardon me.

7    THE COURT: My assumption is that if I address the

8 issue and rule that you have to pay interest, you'll pay

9 interest and make a modification to the plan accordingly. It

10 doesn't strike me that this is a debilitating number in this

11 particular case. If you want to -- I mean, I understand what

12 you're saying. Go ahead.

13    MR. SOSLAND: I was -- what you just -- I was going to

14 jump ahead, if you will.

15    THE COURT: All right.

16    MR. SOSLAND: We can amend the plan even in advance to

17 provide that we pay interest to the extent that the Court

18 determines --

19    THE COURT: That's --

20    MR. SOSLAND: You don't have to guess how we would

21 react if the Court rules.

22    THE COURT: Okay. That's -- all right.

23    MR. SOSLAND: We can amend the plan to provide that,

24 to the extent the law requires that we pay --

25    THE COURT: That's fine.

1    MR. SOSLAND:  -- interest, that we would pay the

2  interest.

3    THE COURT:  And I would typically allow you in a case

4  like this to, at confirmation, amend the plan if I concluded

5  that you were required to provide interest.  I don't think it's

6  a negative.  I don't think it's an adverse change.  I would

7  think it would fall under Rule 3019, and the only people who

8  would be hurt by it are your equity owners, who may or may not

9  be able to advise the Court that they have not changed their

10  views on the plan.

11    So, I mean, I don't care.  You can do whatever you want to

12  do on that, Mr. Sosland.

13    MR. SOSLAND:  Okay.

14    THE COURT:  My guess is, and I'm not deciding the case

15  today, but we've had similar issues, as you know, in other

16  cases, and it's pretty clear that if there is an unsecured

17  claim that was due and payable as of the commencement of the

18  case, that between commencement and effective date, the Debtor

19  must pay interest to the extent provided for by contract, law,

20  or otherwise, in order for the claim to be unimpaired.  So you

21  can do what you want to do on that.

22    MR. SOSLAND:  I think here what we have most -- by and

23  large, --

24    THE COURT:  I think it is -- I think --

25    MR. SOSLAND:  -- what we're going to have are claims

1   that come due after --

2           THE COURT:  Shh.  Shh.

3           MR. SOSLAND:  I'm sorry.

4           THE COURT:  Yes.  I think that this is not a big

5   issue, but you can address it whatever way you want.  I don't

6   care.  I would ask that you let everybody know if you're going

7   to file a modification of the plan to provide for interest, so

8   that the other folks don't take up the time necessary to brief

9   it.  Okay?

10          MR. SOSLAND:  That's fine.  And the only other point I

11  was going to make, Your Honor, was that, by and large, what we

12  have here are unsecured claims coming due after the

13  commencement --

14          THE COURT:  Right.

15          MR. SOSLAND:  -- date but prior to confirmation, --

16          THE COURT:  Right.

17          MR. SOSLAND:  -- that we --

18          THE COURT:  Right.

19          MR. SOSLAND:  But there may be a few that were due on

20  the --

21          THE COURT:  Right.

22          MR. SOSLAND:  -- commencement date.

23       There's also, obviously, an overlap between the impairment

24  and the disclosure issue.  If there is no one impaired, there

25  isn't -- the purpose of the disclosure -- we would be briefing

1  the --

2          THE COURT:  I understand the Debtor's theory on this.

3          MR. SOSLAND:  Thank you.

4          THE COURT:  All right.  Okay.

5          MR. SMALL:  Good afternoon, Your Honor.  Michael Small

6  on behalf of Rangers Baseball Express.

7      And perhaps as a housekeeping matter, since we've gotten

8  down to correctly referring to the Ad Hoc Group as the Ad Hoc

9  Group and not only with regard to one member, when we refer to

10  the proposed purchaser, that we say Rangers Baseball Express or

11  the Greenberg/Ryan Group for counsel.

12      We agree that the issues that have been brought up today

13  are better handled sooner rather than later, but we are also

14  concerned that there not be an impression before the Court that

15  the deal presented through the plan and the asset purchase

16  agreement is not the highest value, because --

17          THE COURT:  I've made no such determination, Mr.

18  Small, nor do I intend to until I need to.

19          MR. SMALL:  Thank you, Your Honor.

20          THE COURT:  Okay.  Anybody else?  Ms. O'Neil?

21          MS. O'NEIL:  I'm sorry, Your Honor.  I didn't get here

22  early enough to get a front-row seat.

23          THE COURT:  You should have gotten into the owner's

24  box.

25          MS. O'NEIL:  Apparently.

1    I was a little troubled by Mr. Sosland's comments, and want

2  to just ask for clarification.  And I had actually tendered the

3  question to Weil Gotshal over the weekend, but I did not get a

4  response.  Which is that:  is it the Court's anticipation --

5  maybe I should ask it in a positive way.  The Court is not

6  expecting that all 1129 issues would be resolved by June 15th,

7  the purpose being that this isn't intended to circumvent, to

8  the extent that there are other confirmation issues when the

9  Court sets a schedule today or whenever on the confirmation

10  schedule of the plan, that the parties would have the

11  opportunity to raise whatever other issues there are.

12         THE COURT:  I do not intend to preclude anything along

13  those lines.

14         MS. O'NEIL:  Okay.

15         THE COURT:  What I want to do -- look.  Here's the way

16  I see this.  It does not seem to me -- and we're going to talk

17  more about this in a little bit -- and I think the parties

18  would, to a large extent, agree:  it does not seem to me that

19  it is beneficial for any of the parties in this case to have

20  this case last two or three years while matters are litigated

21  in this Court.  While it might be more interesting than my

22  average Chapter 11 case, I don't think that a baseball club is

23  well-suited to being administered while in the custody of a

24  court.

25         So I would prefer that we, first of all, identify if there

are any dispositive issues that would -- particularly of a

legal nature; in fact, only have a legal nature, really -- that

would derail this plan such that it is facially unconfirmable.

By way of example, and this is not the case so far as I

know, and I haven't read the plan yet -- sorry, but I haven't

read it yet -- but if there were a release in the plan that was

a necessary element of the plan, which release was barred under

applicable Fifth Circuit precedent, it would be nice to address

that and determine that in advance of the confirmation hearing

so that you have an answer on that.

It seems to me at this point the only potential -- and I've

got a couple of others that I want to ask you about and I want

you to tell me what you think -- but it seems to me that at

this point the only potentially dispositive issue that is being

faced here -- and as Mr. Small notes, I haven't determined that

this is not the highest and best offer for the club -- but is

whether or not the Debtor has an obligation in Chapter 11 to

pursue and accept only the highest and best offer.

And at this point -- and I would also like you to couch

that for me in terms that are not quite so vague, Mr. Stewart.

I would like to know -- I would like you to relate them to

where you have in mind that they would fall in in a

confirmation analysis. What are we talking about? And I'll

give you an example. Are we talking about 1129(a)(6), which

obviously is inapplicable but has the advantage that, by

1    telling you that, I don't reveal to you what I'm thinking,

2    which I don't want you to know quite yet.

3         So, does that make it clearer what I'm talking about here?

4    This will not prevent you from contesting, for example,

5    feasibility.  What I would ask is, if there is something that

6    is facially problematic with this plan, that we deal with this,

7    if we can, in advance.  Okay?

8              MS. O'NEIL:  And would -- and is that in advance by

9    June 15th?  That's just the --

10             THE COURT:  That is --

11             MS. O'NEIL:  Is the question.

12             THE COURT:  On the June 15th schedule.

13             MS. O'NEIL:  Okay.

14             THE COURT:  I'm not going to prevent you, assuming

15   that we reach confirmation of the plan on July 9th, I'm not

16   going to prevent you from standing up and saying, "We have now

17   realized that Section 1129(a)(1) has not been complied with

18   because the plan contains this provision."  I'm going to ask

19   you to explain to me why you didn't raise that before, but I'm

20   not going to preclude you necessarily from raising it.  I mean,

21   if you say, "Well, we didn't raise it before because we wanted

22   to blindside the Debtor," then I probably won't let you pursue

23   it at that time.  But if you can explain to me, "No, we didn't

24   realize that this would work this way because of such-and-

25   such," fine.

1    Am I making myself clear?  In other words, I want the legal

2  issues.  I'm not talking about the facts.

3         MS. O'NEIL:  I understand.

4         THE COURT:  I'm talking about the legal issues at this

5  point.  Okay?

6         MS. O'NEIL:  Thank you, Your Honor.  I mean, that does

7  clarify it of -- for purposes of this --

8         THE COURT:  Perhaps not to your satisfaction, but

9  probably --

10         MS. O'NEIL:  Perhaps not to my satisfaction.

11         THE COURT:  -- as much as you're going to get.

12         MS. O'NEIL:  Thank you.

13         THE COURT:  Okay.  Mr. LeBlanc?

14         MR. LEBLANC:  Thank you, Your Honor.  Andrew LeBlanc

15  of Milbank Tweed on behalf of the Ad Hoc Group.

16    Your Honor, we -- just responding or adjusting ourselves to

17  the comments Your Honor just made, I think we do envision what

18  has to happen on the 15th, or at least the questions that have

19  been raised as raising evidentiary issues.

20    For example, one of the questions that was raised is:  who

21  can speak for equity?  I think we need to begin by

22  understanding who has spoken here for equity.  And that, in our

23  view, is an evidentiary issue that needs to be presented.

24  Because what we learned last week is there were a few people

25  that it might have been.  It was not the one that was

1    testifying, and the two people that it could have been that she

2    identified are people that we don't think are in a position to

3    speak for equity, given their other interests here.

4          THE COURT:  Well, let me ask you this, Mr. LeBlanc.

5    And let me cut to the chase here.  Is it the position of the Ad

6    Hoc Group that, by virtue of the lending transaction with the

7    partners, that the lenders can speak for equity?

8          MR. LEBLANC:  It is, Your Honor.

9          THE COURT:  All right.

10          MR. LEBLANC:  We do believe that, pursuant to the

11    pledge agreement, we can.

12          THE COURT:  All right.  All right.  Then that's --

13          MR. LEBLANC:  And we could have at the time.

14          THE COURT:  That's going to be determined basically

15    based on documents, right?

16          MR. LEBLANC:  That question, I think, Your Honor, will

17    be, although I do think it has changed now because of the

18    involuntary filing on Friday, and I do think that that -- the

19    question is different now than it was when the Debtors filed

20    the plan.

21        The entities that signed the petition, signed the plan,

22    signed the asset purchase agreement on the eve of bankruptcy,

23    those entities are now debtors in their own right pursuant to

24    the involuntaries, and they won't be before your Court before

25    June 15th.  And we don't know what the Debtor's response to

1  that will be.  They've given statements over the weekend that

2  it was unsurprising that that happened.

3      But I think that that actually changes the question fairly

4  fundamentally that's before the Court, because I think the

5  question of who could speak for them -- which we view was us,

6  pursuant to the pledge agreement, which we can show you

7  documents that would establish that -- is now different than

8  who can speak for them today, given that they're debtors in

9  their own right.

10      So I think that is -- that question has changed.  In our

11  view, it's somewhat overcome by events, as are, in our view, --

12          THE COURT:  All right.  Well, is it a fair statement,

13  Mr. LeBlanc, that you would like to then add to our agenda for

14  the 15th the question of who can speak for the equity owners of

15  the Debtor, and that you would like an opportunity to present

16  evidence as well as providing briefs on that question?

17          MR. LEBLANC:  It is, Your Honor.  We would -- we do

18  think -- we think it's necessary to understand, Your Honor, in

19  the first instance, to respond to the question that was posed,

20  who can speak for equity, to understand who did speak for

21  equity when equity chose to enter into this plan.  That's an

22  evidentiary question without any -- I don't think there can be

23  fair dispute that that's an evidentiary question.

24      We haven't had discovery, but given what we heard last

25  week, it's not entirely clear who made the decisions to file

1  the team in bankruptcy, and we think that's a fair question

2  with the issues that have been posed.

3       THE COURT:  Well, I'm not sure -- I'm not satisfied

4  that I agree with you on that.  It's here.  If you think the

5  case should be dismissed, then I suppose that's another issue.

6  But that hasn't been raised at all to date.  I mean, last week,

7  you were telling me you kind of liked the idea of being here so

8  that you'd have a judge to oversee it.  And if you're content

9  to be here, I'm not sure that it matters how we got here.

10      The question, it seems to me, is whether or not equity has

11  properly -- or, whether or not there is, on some basis, there

12  is a reason why the equity partners, either because of your

13  pledge or because they are now alleged debtors, are in a

14  position such that their consent to the plan should be

15  disregarded.  Isn't that it?

16      MR. LEBLANC:  It is, Your Honor.  And I think, to be

17  clear, we're not at this moment in time -- we do like being in

18  front of the Court.  We think that's the right place for this

19  issue to be resolved.  We're not advocating dismissal of the

20  petition.

21      But the Debtor made -- took a variety of actions on the

22  23rd of May in connection with advocating the plan.  The

23  affidavit of Ms. Fischer, which says that the Debtor -- the

24  equity holders support the plan, someone had to make that

25  decision to articulate that.  I don't think what we're talking

1  about here is the decision to put the Debtor into bankruptcy,

2  but rather, Your Honor, the decision, as you've articulated it,

3  to support this plan, to support this asset purchase -- to

4  execute the asset purchase agreement, and to move this forward.

5  And I think that --

6         THE COURT:  Well, what I'm saying to you is, at this

7  point -- I mean, let's suppose for a minute, *arguendo*, okay,

8  very clear -- I have not looked at your documents; I don't know

9  -- but let's suppose that you have an irrevocable proxy to vote

10 the stock of those two companies, and you can take over the

11 companies and you can now come in and say to me, "Whatever we

12 said before, we're 'unsaying' it, and we now want to oppose

13 this plan."  I don't see -- I mean, it seems to me that's --

14 perhaps at that point you can say, "We was robbed," to use a

15 baseball expression --

16        MR. LEBLANC:  Uh-huh.

17        THE COURT:  -- "by the filing of this to begin with."

18 But I'm going to tell you that, I mean, if you come in and show

19 me that you have now taken over and you have a right to vote

20 the stock and to vote the equity interests in the Debtor, I

21 very probably -- I don't want to speak out of turn, but the

22 odds are pretty good that I'm going to let you vote it and

23 change the vote.  I mean, in fact, there hasn't been a vote.

24        MR. LEBLANC:  Correct.  And under their view of the

25 world, there wouldn't be a vote because of the decisions made

prepetition to file the plan of reorganization, in their view,
unimpairing equity.  So I think the vote that has happened
seeks to preclude a later vote by the equity holder.  So I --

THE COURT:  Well, okay.

MR. LEBLANC:  But if Your Honor --

THE COURT:  I mean, let me ask you this.

MR. LEBLANC:  I apologize.

THE COURT:  And I'm not trying to be difficult.  But
are you saying that, in your view, you think there is a real --
that there is a real likelihood that the corporate formalities
have been inadequately observed such that the decisions of the
two equity partners to join in the filing of the plan and the
asset purchase agreement, that that was not done properly?

MR. LEBLANC:  Yes, Your Honor.  We think that -- we
haven't had the benefit of discovery, but we think that there
are real questions about those decisions and whether they were
permitted under the corporate documents, whether they were
*ultra vires*, whether the people making those decisions were
necessarily conflicted, given other interests.  We think those
are all fair questions about who in fact acted and what effect
those acts had.

And again, Your Honor, this is without the benefit of
discovery, which we're seeking from the Debtor in connection
with the issues that are to be raised both on the 15th of June
and on the 9th of July.

1    And so I think -- the reason, Your Honor, for addressing

2    this is just to make the point that we believe that the issues

3    as we understand them today are quite possibly going to be

4    evidentiary issues and not just legal issues.  And I think

5    holding these predicate issues, be they factual or legal, until

6    the 9th of July doesn't, in our view, make a lot of sense.  I

7    think we should be --

8         THE COURT:  Well, I don't have a problem, as I said,

9    if you -- I will give you an opportunity to present evidence on

10   the 15th.  You can still brief the issue based on what you

11   believe the evidence to be.  I think that's called a trial

12   brief.  And that will do fine for me.  And I don't want this to

13   turn into a five-day trial.  If it looks like it's going to be

14   a five-day trial, well, we'll revisit that when we get closer

15   to the date.

16        MR. LEBLANC:  Your Honor, and I appreciate that.  Your

17   Honor, there's another issue that I think we want to touch

18   upon, and this draws in some respects on Mr. Small's comment

19   that they're -- to the effect that the evidence will show or

20   they believe that they're the highest bidder.  Your Honor, we

21   have been in contact with other bidders for these assets over

22   the last week, following up on Your Honor's direction to the

23   Debtors of last week with respect to the role of the Debtors in

24   this process.

25        We are prepared, Your Honor, to advise the Court and we're

1   pleased to advise the Court that we've been in contact with a

2   particular bidder who was, in the view of the Debtors, at least

3   at various times, the high bidder for these assets prepetition.

4   That bidder's representatives are here in the courtroom, and

5   that bidder has told us that they're ready, willing and able to

6   participate in an auction of these assets to the extent that

7   it's open, fair and transparent, the requirements we think are

8   necessary under the Bankruptcy Code.

9        THE COURT:  Well, and, it seems to me, goes to your

10   maximization of value issue.

11     I do not understand -- it's my understanding of the law

12   that so long as either creditors agree with the treatment and

13   equity owners agree with the treatment or the equity owners and

14   creditors are being fully satisfied within the meaning of the

15   Code, that if the Debtor or the Debtor's equity owners elect to

16   -- and this is what you're going to try to convince I'm wrong

17   on, Mr. LeBlanc -- that if the equity owners say, "Yes, we'll

18   give up some money because we'd rather see this guy own this

19   deal" -- and let's take an example.  Okay?  We're not talking

20   about this, but let's suppose we had two buyers who wanted to

21   buy this club.  And one said, "I'm going to pay $20 million

22   less or $30 million less, but I will keep it in Arlington" and

23   the other said, "I want to pay $30 million more, but I've

24   always wanted to have a team in Anchorage, Alaska.  And my plan

25   is, as soon as possible, to get Major League Baseball to

1    approve my moving it there."

2        I think at that point for the owners to say -- for the

3    equity owners to say, "Well, we'd rather take less and know

4    that the club is going to stay here" is not something that I

5    would find improper, per se.  But you're going to try to

6    persuade me on the 15th that the Debtors have an obligation to

7    seek the highest and best offer, whether that occurs through an

8    auction -- and how we'd do an auction, I don't know, but we'll

9    get to that on the 15th.

10            MR. LEBLANC:  Your Honor, I agree with you to some

11    extent.  I think everything Your Honor said was true, up until

12    the point that -- well, when two things were true, or two facts

13    that need to be added to that.  The first is that we heard

14    testimony last week that the equity holder itself is an

15    insolvent institution, and therefore the persons who act on

16    behalf of that institution owe their duties to their creditors.

17    And so that debtor, when faced with that same decision, I don't

18    believe can make the decision --

19            THE COURT:  All right.  All right.  And I don't at

20    this point agree or disagree with you.

21            MR. LEBLANC:  Right.

22            THE COURT:  I understand what you're saying.  And I've

23    understood that this was the key dynamic of the case here.  But

24    that's something that you're going to have to convince me on

25    one way or another.

1          And that leads to two issues.  The first is what duty I can

2    impose on whatever it is that is the insolvent entity -- and

3    that may be the two involuntary or the two alleged debtors, --

4          MR. LEBLANC:  Uh-huh.

5          THE COURT:  -- or it may be their parent or their

6    parent's parent or Mr. Hicks; I don't know -- but what duty, if

7    any, I can impose on them.  And the second issue, it seems to

8    me, is whether or not the Debtor, *qua* debtor, is obligated for

9    the benefit of the creditors of its non-filing parent's parent

10   to maximize value.  You're going to have a chance to make that

11   argument.

12         MR. LEBLANC:  And Your Honor, I appreciate that.  And

13   drawing upon something the Court said a few minutes ago with

14   respect to the timing, none of us believe that it serves the

15   interests of anybody in this case for this case to linger for

16   any length of time in bankruptcy, given the nature of the team.

17   We think, given the willingness of a bidder to compete in this

18   process, --

19         THE COURT:  Okay.  Look.  I don't -- this is a status

20   conference, Mr. LeBlanc, and I don't want -- you're going to go

21   on and argue why I should have an auction.  I have not crossed

22   the bridge that I should, must, should or must require an

23   auction in this case.  So after you're done, Mr. Sosland is

24   going to get up and then Mr. Shimshak is going to get up and

25   they're going to argue the other side, and I don't want to

1    argue those points yet.  Okay?

2       So what I want to do is to identify issues that we can

3    address on the 15th, in an effort to ensure that we don't go

4    through a process that will turn out to be fruitless in terms

5    of arriving at a final disposition of this case.  That's my

6    purpose in setting the June 15th hearing.  And today, I don't

7    -- I mean, I'm not going to tell them, "You've got to do an

8    auction" today, and I'm not going to tell you that I won't

9    decide later that they should do an auction.  Okay?  We're not

10   going to decide that today, and I don't want to hear argument

11   on it today.  And you know that: --

12           MR. LEBLANC:  Right.

13           THE COURT:  -- the more you talk, the more they're

14   going to talk.

15           MR. LEBLANC:  I understand.

16           THE COURT:  Right?  I mean, that's what lawyers do,

17   right?

18           MR. LEBLANC:  Yes.  Absolutely.

19           THE COURT:  Okay.  So what I want, then:  what is

20   there about the issue, other than what we've talked about

21   already, that I need to address?

22           MR. LEBLANC:  Well, Your Honor, I think there are two

23   things that would be -- that could be fairly put on the agenda,

24   then, for the 15th.

25           THE COURT:  All right.

1          MR. LEBLANC:  The first issue is, to the extent that

2     the Court does require an auction or concludes that the

3     Debtor's fiduciary duties obligate them, in the instance of

4     having more than one interested bidder, to go through some

5     auction process, what bid procedures should be in place for

6     such an auction?  Because I think delaying the decision until

7     the 15th -- until after the 15th of June to begin the process

8     of establishing bid procedures I don't think benefits the

9     estate or any of the constituencies.  So I think that would be

10    a fair question to consider on the 15th.

11        Your Honor, the other question I think that would be fair

12    to consider on the 15th is to understand whether there are

13    people at the Debtor who can act in a nonconflicted way or

14    whether there needs to be a fiduciary put in place at the

15    Debtors and a Chief Restructuring Officer of some sort who can

16    make decisions with respect to the questions that --

17          THE COURT:  Okay.

18          MR. LEBLANC:  -- we've just been discussing.

19          THE COURT:  All right.  Well, let me give you two

20    answers.  The first is I am not going to establish bidding

21    procedures on June 15th.  If I determine that there has to be a

22    methodology for maximizing the value of the Debtor beyond what

23    has already been done, we'll deal with that after the 15th.

24    I'm sorry, but I'm not going to put the parties in a position

25    of developing an alternative to the existing plan that's on the

1   table, and that's what that amounts to.  And it may be we'll

2   get there, but we aren't there yet.  My guess is the bidders

3   all know what's going on here and that it could be done fairly

4   quickly.  And heaven knows, any of the law firms represented in

5   this courtroom today has about 26 forms each of bidding

6   procedures for an asset sale or the sale of an entity.  So I'm

7   not going to do that.

8        Secondly, if you think a fiduciary needs to be appointed in

9   this case -- and notwithstanding the 2005 amendments to Section

10  1104, I am inclined to believe that the Code still is biased in

11  favor of leaving a debtor in possession -- if you think

12  something like that needs to be done, there are mechanisms

13  available to you under Section 1104 to move for appointment of

14  a trustee or an examiner, and under Section 1108 to seek an

15  order that otherwise limits the Debtor's authority to manage

16  the business.

17       At this point, at this point, I do not see that there is a

18  need to believe that the Debtor is managing its business

19  improperly at all.  I've not heard any evidence to that effect.

20  Ms. Fischer clearly, whether or not she was cognizant of her

21  fiduciary responsibilities in connection with potential

22  financing transactions, it's very clear that she is acutely

23  aware of her responsibilities as an officer of the Texas

24  Rangers Baseball Partners and that she will operate this

25  business properly and in a fashion such that we can all be

1  pleased with the way it goes forward.

2      But if you think we need another fiduciary, there are ways

3  you can raise that.  I do not believe that that is something

4  that need be addressed in connection with getting from here to,

5  if we do, a July 9th hearing on confirmation of a plan.  And

6  that's all I'm interested in right now.

7              MR. LEBLANC:  Okay.

8              THE COURT:  Okay?

9              MR. LEBLANC:  Your Honor, unless Your Honor wants me

10  to address the issue that you raised earlier with respect to

11  Judge Nelms, or would like to handle that separately, --

12              THE COURT:  We're going to talk about that in a

13  minute.

14              MR. LEBLANC:  Fair enough.

15              THE COURT:  But does anyone else, again, without

16  arguing the issues that we're going to talk about on the 15th,

17  is there anyone else who has an issue that you think is what I

18  would refer to as a gatekeeper issue between now and reaching a

19  plan?  Mr. Rochelle?  We'll let him talk first.

20              MR. ROCHELLE:  I apologize, Your Honor.  I'm a little

21  confused.  And if I am, I hope maybe some others are and I'm

22  not the goat in the class.

23      The Court has asked for briefing on such issues as may be

24  resolved between now and the 15th of June, or can be addressed

25  between now and the 15th of June and addressed before a

1  confirmation hearing.  The question in my mind, then, is where

2  do we go from there?  Is the Court then saying that, after the

3  15th, we will -- a process will be set out by the Court for how

4  we will get to wherever the Court deems it appropriate to be

5  heading at that point, be it confirmation, conflagration, you

6  name it?

7          THE COURT:  Possibly.  I don't know yet.  I mean, I

8  don't know what we're going to get to.  But among the things

9  that seem possible to me is that the Court would conclude that

10 the plan is not facially unconfirmable and would go forward

11 toward a confirmation hearing.  Another possibility would be

12 that the Court would conclude that it could go forward to a

13 confirmation hearing, but at that confirmation hearing the

14 Debtor would be required to demonstrate that, indeed, the

15 Greenberg/Ryan Group's offer is the highest and best offer.

16 The Court might say, "No, it appears at this point that you

17 need to re-shop this deal."

18    I don't know what's going to happen, and I won't know until

19 I know more about the case.  You guys are all way ahead of me.

20 Keep that in mind.

21          MR. ROCHELLE:  Thank you, Your Honor.

22          THE COURT:  Does that help?

23          MR. ROCHELLE:  The world -- yes.  I felt we were

24 outdriving our lights, and now I think I have a sense of what

25 the Court's sense is.

1          THE COURT:  Okay.

2          MR. ROCHELLE:  Thank you.

3          THE COURT:  All right.  Did you want to add something,

4     Mr. Sosland?  I have two issues that I want to raise and ask

5     you if they're things that should be addressed.

6          MR. SOSLAND:  Your Honor, the -- I won't argue whether

7     or not there should be an auction.  You know our position on

8     that.

9          In the colloquy between the bench and Mr. LeBlanc a few

10    minutes ago, there was a suggestion by Mr. LeBlanc that the

11    filing of the involuntaries, of the involuntary petitions

12    against the two general partners, somehow changed the landscape

13    as it relates to the impairment and voting issue.  And if the

14    Court expects there will be briefing on that issue as part of

15    the June 11th briefing for the June 15th hearing, and evidence

16    on that, which I think might -- some could be largely

17    documentary, then there's another issue that I think all the

18    parties are aware of but the Court is probably not, because I

19    don't think it was raised in any of the First Day pleadings,

20    but you can't argue one without the other.  And that would be

21    whether or not the Court should be adjusting contractual rights

22    that involve not just the Debtor and its creditors or the

23    Debtor's fiduciary duties, but third parties as well.  And I

24    refer specifically, Your Honor, to provisions in the loan

25    documents that -- in which each lender acknowledges that the

1  change of control of a major league baseball club, and in

2  particular, with this loan, the Texas Rangers, is subject to --

3  and I'm not going to read it all to Your Honor, but basically

4  the Constitution of Major League Baseball, the rules and

5  regulations --

6        THE COURT:  Okay.  That was -- you're raising one of

7  the two issues that it seems to me we could add to our list.

8  And one of them is whether or not -- and I understand -- I

9  haven't looked at it, but I understand the Phoenix hockey team

10  addressed this issue to some extent, though it may be different

11  with Major League Baseball than it is with the Phoenix hockey

12  team case.  I don't know.  You're all way ahead of me, I'm

13  sure.

14     But it seems to me the two issues that we need to consider

15  or we might consider would be whether or not this Court may

16  approve and cause the Debtor to effect a sale that has not been

17  approved by Major League Baseball, and the same thing with

18  respect to, as I understand it, the lenders have restrictions

19  in their documents that, outside of court, at least, have given

20  them some power to prevent a sale of the team other than with

21  their consent.

22     And it seems to me that both of those questions are

23  questions that would be suitable to address on the 15th.  That

24  is, number one, whether in any event if Major League Baseball

25  says, "We don't care what the price is.  It makes no difference

1 to us.  The only person you're going to sell to is the

2 Greenberg/Ryan Group," if that is something that they can

3 indeed enforce in this Chapter 11 case.  And similarly, whether

4 the restrictive -- which I understand to be contractual but I

5 don't know, so don't jump on me, Mr. LeBlanc.  I haven't seen

6 any of the documents yet.  But from what I've seen in the

7 newspaper -- and of course, they're always accurate.  By the

8 way, whichever was the reporter that promoted me to District

9 Judge, thank you.

10      (Laughter.)

11           THE COURT:  But, in any event, it seems to me that

12 those are questions as to the extent to which those

13 restrictions on the ability of the club to be transferred are

14 going to be enforceable in the Chapter 11 context.  Does

15 anybody disagree with that?

16           MR. SHIMSHAK:  Your Honor, I'd like to be heard on

17 that point.

18           THE COURT:  All right.  Mr. Shimshak?

19           MR. SHIMSHAK:  Let me take them in order and take them

20 -- and speak with some precision about where we are in this

21 case, first concerning the provisions of the loan documentation

22 and the contention that the lenders are precluded from

23 objecting or opposing the transaction that's on the table by

24 reason of those provisions.

25    It is not necessary at this juncture to implicate those

1    issues under the terms of the present plan, because the

2    position of Major League Baseball as it relates to the

3    structure of the plan is that the plan is providing for full

4    payment of the lenders' claims.  They're getting every cent

5    that they're owed under the loan documents.  They therefore are

6    not impaired.

7        And they have not filed an objection or stated an objection

8    to the transaction, save for their concern about opening up the

9    process, which I understand that we're not addressing until the

10   15th or some later date.

11       So, in that perspective, I question whether there is a ripe

12   controversy that's justiciable for purposes of dealing with

13   that issue.

14           THE COURT:  Well, would you not agree, Mr. Shimshak,

15   that if the sale requires Major League Baseball's approval, and

16   if this Court determines that, that that also disposes of

17   potential controversies down the road?  I mean, --

18           MR. SHIMSHAK:  I can see --

19           THE COURT:  And why --

20           MR. SHIMSHAK:  I can see both sides of the issue, Your

21   Honor.

22           THE COURT:  All right.

23           MR. SHIMSHAK:  I can certainly understand the view

24   that if it's determined in Major League Baseball's favor, then

25   that's a tremendous result and it's very time-saving and

1  everything of the sort. But this is an important issue, and we

2  should think about when, if ever, we have to litigate it. I

3  would -- and it's the same point, I think, on the question of

4  Major League Baseball's approval as it relates to any other

5  potential bid.

6      At present, there is a transaction on the table which Major

7  League Baseball has indicated it does not disapprove. And to

8  get into the weeds a little bit, the approval requirement in

9  Major League Baseball is a three-quarters vote of the owners of

10  the teams. So there is no, at this point, preapproval of Mr.

11  Greenberg. There is an indication, as the papers reflect and

12  as Ms. Fischer's declaration reflects, that Major League

13  Baseball is supporting the effort that's underway here, but it

14  does not rise to the level of an approval at this time. That's

15  a more formal requirement.

16      Again, to --

17      THE COURT: Well, don't you think, though, that the

18  question of the Debtor's duty to maximize value, I mean, if I

19  were the Debtor, one of the things that I'd say to me is,

20  "Look. Whatever duty we have to maximize value is subject to

21  the requirement that any transfer of the club be approved by

22  Major League Baseball, and we know this one or we're confident

23  this one will be approved and we're not so confident the other

24  one will be approved." I'd make that argument, wouldn't you?

25      MR. SHIMSHAK: I understand that. But in that

1  hypothetical, you've touched on some key facts which I think
2  are imperative to any consideration of the issue.  You heard
3  Mr. LeBlanc stand here and say that there were bidders who were
4  prepared to come forward and to make offers.  But we're not at
5  that point.  In that sense, the consideration of this question
6  is purely hypothetical.

7  There is no other offer on the table.  There has not been
8  any -- despite the Court's comments last week that the Debtor
9  was free to receive offers, there have been none that have been
10 received.  There has been no record of decision-making by the
11 Debtor either way.  And while the Court, I think, can fairly
12 speculate about what the thought process of the Debtor might be
13 in that regard, it hasn't taken place.  And on June 15th, as we
14 presently stand, --

15         THE COURT:  Okay.

16         MR. SHIMSHAK:  -- I would suggest --

17         THE COURT:  All right.  We'll do it your way, Mr.
18 Shimshak.

19         MR. SHIMSHAK:  Thank you.

20         THE COURT:  We won't touch that issue.  And if it
21 winds up extending the case by a month, so be it.

22         MR. SHIMSHAK:  Thank you, Your Honor.

23         THE COURT:  All right.  All right.  Anybody have
24 anything else?

25    (No response.)

1      THE COURT:  All right.  It is my understanding that

2  the parties are of the view that it would be useful for there

3  to be a mediation process, and I have taken the liberty of

4  visiting with my colleague, Judge Russell Nelms, to see if he

5  would participate as a mediator in this case, and he's agreed

6  to do so.  And what I propose to do, if there is not an

7  objection -- boy, is that an invitation.  What I propose to do

8  is to design an order with Judge Nelms -- actually, I asked him

9  to write an order that would make it satisfactory to him -- and

10 what I'm asking him to do is to mediate at two levels.

11     And one would be if there are operating issues that would

12 involve transactions outside the ordinary course of business

13 during the time that this Debtor is before this Court, and my

14 view is that it would be beneficial for the parties to have a

15 less formal avenue, should there be disagreements about such a

16 transaction, to address the transaction before coming to court,

17 rather than doing it in court.  To be blunt with you, what I'm

18 thinking of is that some player transactions, should the team

19 want to engage in them, it might be better to exchange your

20 information other than through a hearing on a motion to enter

21 into a transaction.  Okay?  So that's one level.

22     And then the other level, though I'm not sure that it's

23 going to do much good, the other level is the hope that the

24 mediator might assist the parties to find common ground such

25 that the Rangers' exit from bankruptcy court could be

1   consensual rather than a matter of dispute.

2       Now, have I correctly -- is that inconsistent with what

3   anyone understood?  Mr. Sosland?

4           MR. SOSLAND:  No, Your Honor, although the Debtor's

5   belief is that any player transaction that I can conceive of

6   would be an ordinary course transaction.  I suppose it could

7   conceivably involve use of cash collateral.  But subject to

8   that, we believe that, in the ordinary course of business, that

9   --

10          THE COURT:  So you think the acquisition of Mr.

11  Rodriguez was in the ordinary course?  Because it sure was an

12  expensive ordinary course transaction.

13          MR. SOSLAND:  Sometimes ordinary course transactions

14  are expensive, Your Honor.

15          THE COURT:  Yes.  Well, I will leave it to you on

16  that, though I will tell you that -- well, I will leave it to

17  you on that.  I'm not going to --

18          MR. SOSLAND:  I could say I'm fairly --

19          THE COURT:  I'm not going --

20          MR. SOSLAND:  I'm sorry.

21          THE COURT:  I'm not going to express an opinion as to

22  whether or not those things are ordinary course.  But my view

23  is, in any event, whether ordinary course or not, there is some

24  value to having some means of communication other than by

25  putting witnesses on the witness stand and examining them.  Is

 1  that okay?

 2          MR. SOSLAND:  Yes, Your Honor.

 3          THE COURT:  Okay.  All right.  Ms. Kippes?

 4          MS. KIPPES:   Thank you, Your Honor.  The United

 5  States Trustee has a couple of points with regard to the

 6  mediation.  The U.S. Trustee, first, doesn't envision

 7  participating in the mediation, but wanted to make, first, a

 8  request:  that no mediation occur until after the Committee is

 9  appointed and has had the opportunity to obtain counsel.  We

10  had the Committee formation meeting this Thursday at 10:00 a.m.

11      And second, cognizant of the fact that the Court is going

12  to be out of town for a period of time, to the extent that any

13  emergency hearings need be held, --

14          THE COURT:  If there are any emergency hearings, one

15  of my Dallas colleagues will hear them.

16          MS. KIPPES:  That would be our request, Your Honor.

17          THE COURT:  All right.  Judge Nelms understands that

18  this eliminates him as a potential adjudicator of disputes if

19  there should be a need for an emergency hearing.

20      As to the first request, I anticipate that the mediator and

21  the parties will design whatever they believe is an appropriate

22  way to proceed with the mediation.  If anything occurs in the

23  next 48 hours, I doubt that it will be dispositive of the case.

24  I would encourage -- and this is up to you.  I mean, I'm aware

25  that the parties have some disagreement about whether the

1  mediator should defer consideration of -- or, any effort to

2  find common ground among the parties until after the June 15th

3  hearing, or should begin now.  And my suggestion would be that

4  you see what Judge Nelms thinks on that.  And I'm guessing that

5  he would like to at least start not necessarily mediating but

6  at least talking about how to talk sometime in the fairly near

7  future.

8      In other words, it's my understanding there's also some

9  question about who should participate in this, and there are a

10  number of potential participants, and it would be my

11  expectation that Judge Nelms would attempt to resolve who

12  should be involved in what discussions fairly early on, even

13  though those discussions may not begin.  All right?

14          MS. KIPPES:  Okay.

15          THE COURT:  And so -- but I'm not going to tell him

16  what to do.

17          MS. KIPPES:  Okay.

18          THE COURT:  Okay?

19          MS. KIPPES:  Thank you, Your Honor.

20          THE COURT:  Okay.  Anything else?  Mr. Rochelle?

21          MR. ROCHELLE:  The Court may not remember this, but in

22  the *Mirant* case, Your Honor appointed Professor Warren as a

23  mediator between the Debtor and --

24          THE COURT:  I remember it very well.  And if Professor

25  Warren were not currently employed by a gentleman named Obama,

1  I would have considered her, possibly, for this equally

2  difficult mediation.

3      MR. ROCHELLE:  Speaking as a participant in that

4  mediation in Boston, I would remind the Court that one of the

5  things Your Honor did was tell the mediator that if agreement

6  were not achieved, that one of the mediator's duties was to

7  report to this Court why it was not achieved.  I think that

8  might be useful here as well.

9      THE COURT:  Well, what I'm going to do, what I intend

10 to do in the order -- and I'm going to pass on the order; it

11 will be my order, though I've asked Judge Nelms to draft it --

12 is I am going to direct that the parties will participate in

13 whatever efforts the mediator engages in in good faith, and the

14 mediator will tell me if they did not.

15     MR. ROCHELLE:  Well enough.  Thank you, Your Honor.

16     THE COURT:  All right.  Yes, Mr. Small?

17     MR. SMALL:  Your Honor, again, Michael Small on behalf

18 of Rangers Baseball Express.

19    It's not our intention to ask Your Honor to inform Judge

20 Nelms how to run his mediation, but I did want the record to be

21 very clear that we believe we should be included in that

22 mediation and that it should take place as soon as possible.

23     THE COURT:  Well, he -- as I say, he's going to -- I

24 can tell you what I would do if I were he, which is I would

25 probably start with the Ad Hoc Lender Group, the second lien

1    holder, the Debtor, and Major League Baseball, and then decide

2    whom to add.  But I don't -- and that may include you.  I don't

3    know whether it will or not.  I think that that's going to be,

4    in part, up to what happens in those discussions.

5         And I'm not trying to be difficult about that.  I just

6    think, if I were doing it, that is where I would start, not in

7    terms of saying, "Okay, let's try to cut a deal here without

8    Mr. Small here" but rather in terms of "Who are we going to

9    have in this process and how will they participate?"  Because I

10   think those are the four key parties.  That's where your

11   dispute, at this point, truly lies.  You are on one side, and

12   you have some good advocates there.  Heaven knows, Mr. Shimshak

13   is a very strong advocate, just as Mr. Leblanc is.  All right?

14             MR. SMALL:  Thank you, Your Honor.  I believe the

15   Debtor and Major League Baseball may have positions on that as

16   well.  Thank you.

17             THE COURT:  I am confident that they will.  And I

18   don't mean -- I'm not saying that you would be excluded, Mr.

19   Small.  I don't mean that at all.  Nor am I saying that if

20   someone actually puts an offer on the table, since there are

21   none at this point, whether that party would have a right to

22   participate in the mediation.

23        That's one of the problems that you have with it.  If you

24   are there and someone else makes an offer, shouldn't they be

25   there as well?  And I'm not entirely sure that that would be

1    entirely beneficial to a mediation process.  And since I'm not

2    the mediator, I'm not going to pass on it, other than to make

3    the observation.

4         MR. SMALL:  An important distinction between that

5    hypothetical party and Rangers Baseball Express is that we're a

6    party to a contract that's the center of the plan that's been

7    filed with the Court.

8         THE COURT:  I understand.  I understand.  And the day

9    after confirmation, even before the effective date, I guarantee

10   you that you will be a participant in any mediations that

11   occur.  Okay?

12        MR. SMALL:  Thank you, Your Honor.

13        THE COURT:  All right.  Anything further?

14      (No response.)

15        THE COURT:  All right.  All right.  Well, I appreciate

16   your participation in the status conference.  I will look

17   forward -- as I understand it, at this point, the issues that

18   you are going to ask me to address on the 15th are, first, if

19   the Debtor has not obviated the issue, impairment.  Second, who

20   -- whether equity is being properly spoken for at this point.

21   And third, whether the Debtor has an independent obligation to

22   maximize the value received for its assets.

23      Have I missed anything?  Ms. Kippes?

24        MS. KIPPES:  Your Honor, I had also understood that,

25   to the extent there are objections, adequacy of disclosure.

1      THE COURT:  Yes.  The disclosure.  This will be also a

2  disclosure statement hearing.

3      Okay.  Anything else?  Mr. Sosland?

4      By the way, before I forget, because I forgot before, the

5  Clerk's Office advises me that CM/ECF is going to be shut down

6  on June 10th and will continue to be shut down until the 14th

7  of June.  So if anyone is filing a brief, please keep in mind

8  you must provide a hard copy to chambers, because otherwise I

9  won't get it and I won't have read it.

10      Go ahead, Mr. Sosland.

11      MR. SOSLAND:  Your Honor, if we've finished with the

12  status conference, we did leave open last week the form of

13  notice and objections and -- objection deadline, form of notice

14  of commencement, the dates.  Ms. Berkovich has handled that,

15  and if the Court would entertain that now, so we can send out

16  the notice --

17      THE COURT:  Okay.  This is on the notice for the 15th,

18  correct?

19      MR. SOSLAND:  Yes, Your Honor.

20      THE COURT:  Right.  All right.  Ms. Berkovich, do you

21  have -- is there any -- does anyone want to fight about this?

22  No, Ms. Kippes, please.  Not the U.S. Trustee.

23      MS. KIPPES:  Your Honor, I would just like some time

24  to review the form of --

25      THE COURT:  Okay.

1              MS. KIPPES:  -- the document.

2              THE COURT:  You're going to have very little time,

3    because we need to get it done today if we're looking at June

4    15th.

5              MS. KIPPES:  Yes, Your Honor.  We had asked for a copy

6    of it prior to the hearing, but it somehow didn't make it to

7    us.

8              MS. BERKOVICH:  For the record, we did send a copy of

9    the revised notice to the U.S. Trustee early in the weekend,

10   but we have a further revised notice that we did not send to

11   her before the hearing.

12             THE COURT:  Okay.  All right.  I'll tell you what.  As

13   far as I'm concerned, on the form of notice and the order

14   setting dates and objection deadline, first of all, I'd suggest

15   objection deadlines be the 11th, but I'm going to leave it up

16   to you.  What I'd like to do is allow the parties to go over

17   this, including Ms. Kippes, see if you're satisfied with what

18   they've got, and I'll approve anything that you all can agree

19   to.  I recognize that anything you all can agree to may be a

20   really rare thing, but perhaps you can find some common ground

21   on objection deadlines and so on.  Is that all right with you,

22   Ms. Berkovich?

23             MS. BERKOVICH:  Yes, Your Honor.

24             THE COURT:  Okay.  Anybody have a problem with that?

25   Yes, Mr. Small?

1          MR. SMALL:  I was just switching seats --

2          THE COURT:  Oh, okay.

3          MR. SMALL:  -- to raise a different issue once Ms.

4     Berkovich is finished, Your Honor.

5          THE COURT:  All right.  Okay.  Then what we'll do,

6     when we recess, I'm going to ask you -- and from your side and

7     over there, you each can -- each party designate one guy, okay?

8     We don't need too much drafting-by-committee here.  Okay?

9       All right.  Mr. Small?

10          MR. SMALL:  Your Honor, I was going to ask if we could

11    have about a 15-minute break to discuss a potential additional

12    issue for the hearing as a result of the comments already made

13    at today's hearing, to discuss with the Debtor and with MLB.

14          THE COURT:  That's fine.  I'll tell you what.  It's

15    2:20.  Why don't we recess until 2:35?  During that time,

16    perhaps the parties can agree on a notice and you can determine

17    whether or not you want to address any other issues.  Okay?

18    Anybody have any problem with that?

19       (No response.)

20          THE COURT:  Okay.  Well, thank you very much.  We'll

21    be in recess for 15 minutes.

22          THE CLERK:  All rise.

23       (A recess ensued from 2:19 p.m. until 2:47 p.m.)

24          THE COURT:  Please be seated.  I'm sorry.  I was

25    misinformed.  I was told that you needed a little bit more

```
 1  time, and I do apologize for keeping --

 2          MR. SHIMSHAK:  It wasn't as long as we thought.

 3          THE COURT:  Okay.

 4          MR. SHIMSHAK:  Thank you, Your Honor.

 5          THE COURT:  All right.  Yes?  Mr. Sosland or Mr.

 6  Small?  And Mr. Small won the race.

 7          MR. SMALL:  Thank you, Your Honor.  We believe there's

 8  a full agenda for the 15th and for the briefing deadline for

 9  that, so we're not going to ask for additional items.

10          THE COURT:  All right.  Very good.  Well, I will get

11  out to you as soon as I can an order on Judge Nelms.  And do I

12  understand that we've reached an accord on the form of notice?

13  No?  Of course not.  Okay.  Mr. LeBlanc?

14          MR. LEBLANC:  Your Honor, I apologize.  The notice

15  that we were presented at the break to review and consider is

16  the notice of the confirmation hearing on July 9th.  We had

17  understood that what Your Honor was referring to was the notice

18  of the hearing for the 15th of June.  In fact, there was

19  colloquy last week about the confirmation hearing notice, and

20  Your Honor had offered that you would be amenable to a motion

21  to shorten notice of the confirmation hearing after the June

22  15th hearing determined that there was going to be a

23  confirmation --

24          THE COURT:  Yes.  That was my understanding as well,

25  was that this notice related to the June 15th hearing.  Ms.
```

1  Berkovich?

2  MS. BERKOVICH:  Your Honor, when we had discussed this

3  last week, I had asked whether we could delay sending notice

4  until after the 15th, and I had understood from our discussion

5  that we should send notice prior to the 15th.  So what we had

6  prepared was a notice of the June 15th hearing.  That notice

7  also provides that if the Court rules at the June 15th hearing

8  that a confirmation hearing can proceed on July 9th, that the

9  confirmation hearing would proceed on July 9th.

10  Both from a sort of efficiency perspective, in terms of not

11  having to do the cost of a duplicative notice, plus for the

12  purposes of giving creditors more notice of our plan rather

13  than less notice, we think, if we are going to send out a

14  notice now of the June 15th hearing, that it makes sense to

15  also include the July 15th [*sic*] hearing in that notice.

16  THE COURT:  Well, I'm inclined not to do that, and

17  I'll tell you why.  It seems to me that, depending -- that I'm

18  not prepared at this point to say what's going to go into the

19  notice, assuming one goes out, of July 9th.  And I have two

20  concerns.  First, that we may not get everything we need in now

21  and then we're going to have to send a second notice anyway.

22  And second, that if we have two notices, people are going to

23  get confused.

24  And I am inclined to say that what we ought to do at this

25  point -- and if I misspoke last week, I do apologize to you;

1 I'm sure it was my fault -- but I -- and look.  I don't want

2 anybody to misunderstand here.  I have not -- first of all,

3 I've not decided anything about the plan, the sale or anything

4 else.  Secondly, my natural reaction, like I think that of many

5 bankruptcy judges, is that 100 percent plans are beautiful

6 things that you don't encounter all the time, and therefore

7 they should be looked upon with favor.

8      I'm not telling you and I've not come to any final

9 conclusions on anything, but I don't want anyone to get the

10 idea from the fact that I am doing my best to ensure that this

11 case proceeds in a proper fashion that I have arrived at a

12 conclusion that I am not going to approve the deals that the

13 Debtor is proposing to the Court.

14      I'm saying that because you've got some -- you and Mr.

15 Sosland now and Mr. Shimshak, for that matter, and Mr. Small

16 all have a few bruises on you from today and last week, and I

17 don't want you to misunderstand that.  I don't want anybody to

18 think, particularly to the extent that there's media in the

19 courtroom, I don't want any of them to think that this is a

20 case where these are signals about what's going to happen on

21 June 15th or July 9th.  They're not.

22      But, that said, I think that this notice should be limited

23 to June 15th, and we should get out an additional notice

24 thereafter.  Because I don't know what it's going to say yet

25 for sure.

1          MS. BERKOVICH:  Yes, Your Honor.  So, procedurally, in

2    order to modify this notice to make it really relate just to

3    June 15th, I would ask that we can work on that in our office

4    and then e-mail it to chambers after the parties have agreed on

5    the form.

6          THE COURT:  Well, if you can get that, --

7          MS. BERKOVICH:  Because I think it would just be

8    tortured --

9          THE COURT:  -- but I want that to go out by tomorrow.

10     And I'll tell you what.  I'm going to let you do that.  Can

11   you agree on the deadlines?  We agree?  Can we agree that

12   objections to the disclosure statement must be received in hard

13   copy by the Court by the 11th of June at 4:30 p.m.?

14         MS. BERKOVICH:  I believe that every party that I

15   spoke to was okay with that deadline.

16         THE COURT:  All right.  And the same thing for briefs

17   on those issues to be addressed on June 15th.  Is that a fair

18   statement?  Can we agree to that?   Okay.

19         MS. BERKOVICH:  And --

20         THE COURT:  Go ahead.

21         MS. BERKOVICH:  I'm sorry.  One more matter,

22   procedurally.  We would probably circulate in advance of the

23   June 15th hearing a notice that we would propose to be --

24         THE COURT:  That's --

25         MS. BERKOVICH:  -- our notice in the event that you do

1 rule that the July 9th confirmation hearing can proceed.

2 THE COURT:  I think that's an excellent idea.

3 MS. BERKOVICH:  Okay.  And our existing motion is a

4 motion to approve a notice for the confirmation hearing, so I

5 don't think that we have to file a separate motion or a motion

6 to shorten notice.  We would just circulate the order to the

7 parties and then submit it to Your Honor on the 15th.

8 THE COURT:  Well, if -- let me put it this way again.

9 To the extent that you wish to shorten time on the confirmation

10 hearing or if you want an order shortening time on the

11 disclosure hearing, I will be happy to enter both orders and I

12 will so rule right now that I will shorten the time on the

13 hearings to conform to the schedule that we've just discussed.

14 All right?

15 MS. BERKOVICH:  Great.  Do we need a separate order?

16 THE COURT:  That's up to you.

17 MS. BERKOVICH:  Okay.  Thank you.

18 THE COURT:  Mr. Sosland?

19 MR. SOSLAND:  One --

20 THE COURT:  And by the way, if we don't -- just let me

21 add one thing.  If we don't have an agreed scheduling order or

22 notice by tomorrow, we'll write it, and then you're going to be

23 stuck with whatever I say, which nobody -- I promise you, no

24 one will like it.  You will all dislike it.  I will say bad

25 things about all of you in the notice.

1      (Laughter.)

2          MR. SOSLAND:  One suggestion, Your Honor, since we

3  know that the electronic filing system will be down --

4          THE COURT:  Yes.

5          MR. SOSLAND:  -- at this point in time, is that each

6  of us -- each party filing a brief commit to, by the same

7  deadline that we give a hard copy to the Court, to serve by e-

8  mail the copies on the other parties.

9          THE COURT:  Yes.  I would suggest that that is

10  accurate.  I think that is a fair request and a fair

11  requirement.

12     Let me ask you.  I want -- who, other than the Ad Hoc Group

13  of Lenders, the second lien holder, JPMorgan Chase, the Debtor,

14  Major League Baseball and Rangers Express, intends, if anyone,

15  to file a brief on the issues that we've indicated we're going

16  to take up on the 15th?  Is there anyone else?  The U.S.

17  Trustee?  That's --

18          MS. KIPPES:  Your Honor, I'm not going to commit to

19  the U.S. Trustee filing a brief, but I just wanted to --

20          THE COURT:  There may be a Creditors' Committee brief

21  on --

22          MS. KIPPES:  There may be a Creditors' Committee who

23  may wish to weigh in.

24          THE COURT:  I understand that.  Anyone else?

25      (No response.)

1          THE COURT:  Okay.  Good.  I would -- and this -- I

2     trust you will understand when I ask you that, to the extent

3     that you have common interests and can work together such that

4     I do not have to read the same thing three or more times, I

5     would be most grateful.  In other words, to the extent that you

6     can file either a joint brief or can piggyback one another.  I

7     had a case not long ago with 35 defendants in it.  Mr. Simon

8     remembers it.  And we had a motion to dismiss, and every

9     defendant filed an almost-but-not-quite-identical brief of

10    about 40 pages.  So I got to read about 1,200 pages of briefs

11    in that case, which annoyed me no end.  And I would be most

12    grateful if you can save me from that.

13       Anybody else?  Yes, Mr. LeBlanc?

14          MR. LEBLANC:  Your Honor, we have one other issue that

15    we want to address, but I wonder if the Court might indulge us

16    in a chambers conference to address the issue, rather than

17    doing it publicly.  I'm prepared to do so, but I'm not sure

18    that the other parties --

19          THE COURT:  All right.

20          MR. LEBLANC:  -- would like that.

21          THE COURT:  Well, I have no problem with that.  Let's

22    go ahead and we'll adjourn into chambers.  This will be lawyers

23    only, correct?

24          MR. LEBLANC:  Yes, Your Honor.  And I would -- given

25    the topic, I would suggest that we include the parties that you

1  had identified previously as the first people you would speak

2  to in a mediation.  That would be the --

3        THE COURT:  No, I'm not going to -- I'm not going to

4  exclude any attorney.  I would ask you, to the extent that we

5  have three or four from one firm or seven or eight representing

6  one client, that we limit ourselves to perhaps two in chambers,

7  simply because of the number of chairs that I have.

8        MR. LEBLANC:  Understood.

9        THE COURT:  All right?  All right.  Very good.  We'll

10  see you in chambers in a minute.  Thank you.

11        THE CLERK:  All rise.

12     (Proceedings adjourned to chambers at 2:57 p.m. and

13  concluded at 3:17 p.m.)

14                          --oOo--

15

16

17

18

19                        CERTIFICATE

20     I certify that the foregoing is a correct transcript from

21  the electronic sound recording of the proceedings in the above-

22  entitled matter.

23

24  _____     _____

    Kathy Rehling                          Date
25  Certified Electronic Court Transcriber
    CET**D-444

1                                    INDEX

2

3    PROCEEDINGS                                                      5

     WITNESSES
4
     -none-
5
     EXHIBITS
6
     -none-
7
     RULINGS
8
     Notice of Hearing and Objection Deadlines              50
9    Order Shortening Time                                 53

10   END OF PROCEEDINGS                                    56

11   INDEX                                                 57

12

13

14

15

16

17

18

19

20

21

22

23

24

25