IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| In Re: | ) **Case No. 10-43400-dml-11** |
| | ) Chapter 11 |
| TEXAS RANGERS BASEBALL | ) |
| PARTNERS, | ) Dallas, Texas |
| | ) Monday, June 28, 2010 |
| Debtor. | ) 4:00 p.m. Docket |
| | ) |
| | ) - MOTION TO COMPEL RESPONSE TO |
| | ) REQUESTS FOR PRODUCTION [260] |
| | ) - CROSS-MOTION TO COMPEL [281] |
| | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:            Martin A. Sosland
                           Yolanda Garcia
                           WEIL, GOTSHAL & MANGES, LLP
                           200 Crescent Court, Suite 300
                           Dallas, TX  75201-6950
                           (214) 746-7730

For Ad Hoc Group of First   Daniel C. Stewart
Lien Lenders:               VINSON & ELKINS, LLP
                           Trammell Crow Center
                           2001 Ross Avenue, Suite 3700
                           Dallas, TX  75201-2975
                           (214) 220-7761

For Ad Hoc Group of First   Andrew M. Leblanc
Lien Lenders:               MILBANK, TWEED, HADLEY & MCCLOY,
*(Via Telephone)*              LLP
                           International Square Building
                           1850 K Street, NW
                           Washington, DC  20006
                           (202) 835-7574

For the Unsecured           James H. Billingsley
Creditors' Committee:       K&L GATES, LLP
                           1717 Main Street, Suite 2800
                           Dallas, TX  75201-7342
                           (214) 939-5562

```
 1   APPEARANCES, cont'd.:

 2   For the Office of the        Peter D'Apice
     Commissioner of Baseball:    Sander Esserman
 3                                STUTZMAN BROMBERG ESSERMAN &
                                     PLIFKA, PC
 4                                2323 Bryan Street, Suite 2200
                                  Dallas, TX 75201
 5                                (214) 969-4900

 6   For Rangers Baseball         Robert A. Simon
     Express, LLC:                BARLOW GARSEK & SIMON, LLP
 7                                3815 Lisbon Street
                                  Fort Worth, TX  76107
 8                                (817) 731-4500

 9   For GSP Finance, LLC:        Holland N. O'Neil
                                  GARDERE, WYNNE AND SEWELL, LLP
10                                1601 Elm Street, Suite 3000
                                  Dallas, TX  75201
11                                (214) 999-4961

12   For GSP Finance, LLC:        Jason Young
     (Via Telephone)              David Sullivan
13                                CLIFFORD CHANCE U.S., LLP
                                  31 West 52nd Street
14                                New York, NY  10019-6131
                                  (212) 878-8134
15
     For JPMorgan Chase:          Michael R. "Buzz" Rochelle
16                                Scott DeWolf
                                  ROCHELLE MCCULLOUGH, LLP
17                                325 N. St. Paul St., Suite 4500
                                  Dallas, TX  75201
18                                (214) 953-0182

19   For JPMorgan Chase:          Melinda C. Franek
     (Via Telephone)              LATHAM & WATKINS, LLP
20                                53rd at Third
                                  885 Third Avenue
21                                New York, NY  10022-4834
                                  (212) 906-4605
22
     For William Snyder,          Kristian Gluck
23   CRO, Rangers Equity          FULBRIGHT & JAWORSKI, LLP
     Holdings:                    2200 Ross Avenue, Suite 2800
24                                Dallas, TX  75201-2784
                                  (214) 855-8000
25
```

```
1   APPEARANCES, cont'd.

2   For Major League Baseball        Ian Roberts
    Players Association:             BAKER BOTTS, LLP
3                                    2001 Ross Avenue
                                     Dallas, TX  75201
4                                    (214) 953-6719

5   For Major League Baseball        Richard M. Seltzer
    Players Association:             COHEN, WEISS AND SIMON, LLP
6   (Via Telephone)                  330 West 42nd Street
                                     New York, NY  10036-6976
7                                    (212) 563-4100

8   For Rangers Baseball             Mary K. Braza
    Express:                         FOLEY & LARDNER, LLP
9   (Via Telephone)                  777 East Wisconsin Avenue
                                     Milwaukee, WI  53202
10                                   (414) 297-5505

11  For George Postolos:             Jeremy B. Coffey
    (Via Telephone)                  BROWN RUDNICK, LLP
12                                   One Financial Center
                                     Boston, MA  02111
13                                   (617) 856-8595

14  For JPMorgan Chase:              Joseph S. Fabiani
    (Via Telephone)                  Mitchell Seider
15                                   LATHAM & WATKINS, LLP
                                     53rd at Third 855 Third Avenue
16                                   New York, NY  10022-4834
                                     (212) 906-1200
17
    For the Unsecured                Jeffrey Fine
18  Creditors' Committee:            K&L GATES, LLP
    (Via Telephone)                  1717 Main Street, Suite 2800
19                                   Dallas, TX  75201-7342
                                     (214) 939-5567
20
    For the Office of the            William B. Michael
21  Commissioner of Baseball:        PAUL, WEISS, RIFKIND, WHARTON &
    (Via Telephone)                      GARRISON LLP
22                                   1285 Avenue of the Americas
                                     New York, NY  10019-6064
23                                   (212) 373-3648

24

25
```

1  Court Recorder:                    Dawn E. Harden
                                      UNITED STATES BANKRUPTCY COURT
2                                     1100 Commerce Street, 12th Floor
                                      Dallas, TX  75242
3                                     (214) 753-2065

4  Transcription Service:            Kathy Rehling
                                      209 Bay Circle
5                                     Coppell, TX  75019
                                      (972) 304-1998
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24         Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
25

1    DALLAS, TEXAS - JUNE 28, 2010 - 4:03 P.M.

2         THE COURT:  Okay.  Please be seated.  All right.  The

3    Court is ready to begin a setting we have on a document

4    production dispute that apparently has arisen over the weekend

5    in the bankruptcy case of Texas Rangers Baseball Partners, Case

6    No. 10-43400.

7      Let's start by getting appearances from counsel in the

8    courtroom.

9         MR. SOSLAND:  Good afternoon, Your Honor.  Martin

10   Sosland and Yolanda Garcia of Weil Gotshal & Manges for the

11   Debtor, Texas Rangers Baseball Partners.

12        THE COURT:  Good afternoon.

13        MR. STEWART:  Your Honor, I'm Dan Stewart of Vinson &

14   Elkins, and we, along with Milbank Tweed Hadley & McCloy, and

15   in particular Mr. Andrew Leblanc, who's on the phone and who

16   will primarily argue this afternoon, represent what we refer to

17   as the Ad Hoc Group of First Lien Lenders, the principal

18   activist creditor group.

19        THE COURT:  Okay.  Thank you.  Mr. Leblanc, are you

20   there on the phone?

21        MR. LEBLANC:  Yes, I am, Your Honor.

22        THE COURT:  Okay.  Good afternoon.

23        MR. LEBLANC:  Thank you, Your Honor.

24        THE COURT:  All right.

25        MR. BILLINGSLEY:  James Billingsley of K&L Gates on

1   behalf of the Official Committee of Unsecured Creditors.

2          THE COURT:  Okay.  Good afternoon.

3          MR. D'APICE:  Good afternoon, Your Honor.  Peter

4   D'Apice and Sandy Esserman of Stutzman Bromberg Esserman &

5   Plifka for the Office of the Commissioner of Baseball.

6          THE COURT:  Okay.  Good afternoon.

7          MR. SIMON:  Good afternoon, Your Honor.  Robert Simon

8   for Rangers Baseball Express.  We're an interested party.

9          THE COURT:  Okay.  Good afternoon.

10         MS. O'NEIL:  Good afternoon, Your Honor.  Holly O'Neil

11  with Gardere Wynne on behalf of the Second Lien Agent, GSP

12  Finance.  And on the phone are a couple of my colleagues from

13  Clifford Chance, I believe:  Mr. David Sullivan and Mr. Jason

14  Young.

15         THE COURT:  All right.  Mr. Sullivan and Mr. Young,

16  are you there?

17         MR. SULLIVAN:  Good afternoon, Your Honor.  This is

18  David Sullivan.

19         THE COURT:  Okay.

20         MR. DEWOLF:  Good afternoon, Your Honor.  Scott DeWolf

21  and Buzz Rochelle on behalf of JPMorgan Chase, First Lien

22  Agent.  And on the phone is Melinda Franek from Latham &

23  Watkins.  And while, Your Honor, I do not anticipate our client

24  being a subject today, if there is any issue, I would ask the

25  Court to extend the courtesy of the bar to Ms. Franek.  *Pro hac*

papers were filed this morning, and the fee has been paid.

THE COURT:  Okay.  Ms. Franek, are you there?

MS. FRANEK:  Yes, I am.  Good afternoon.

THE COURT:  All right.  We will give you permission to talk today, if you choose to.  Thank you.

MR. GLUCK:  Good afternoon, Your Honor.  Kristian Gluck of Fulbright & Jaworski on behalf of William Snyder, the Chief Restructuring Officer for the equity of the Debtors, of the Rangers.  It's Rangers Equity Holdings, LP and Rangers Equity Holdings, GP, LLC.  And they're also debtors, Your Honor.

THE COURT:  Okay.  Understood.  And that's official as of this morning.  If people have not seen it, Judge Lynn did sign an order this morning before he left --

MR. GLUCK:  Correct.

THE COURT:  -- with regard to that appointment.

MR. GLUCK:  Yes.

THE COURT:  All right.

MR. ROBERTS:  Good afternoon, Your Honor.  Ian Roberts of Baker Botts on behalf of the Major League Baseball Players Association.  Also on the phone, I believe, is Richard Seltzer of the law firm of Cohen Weiss & Simon, also counsel to the Players Association.

THE COURT:  All right.  Mr. Seltzer, are you there?

MR. SELTZER:  Yes, I am, Your Honor.

1          THE COURT:  Okay.  That concludes the appearances in

2   the courtroom.  I'm going to take a quick roll call of people

3   on the phone who I think wanted to participate live and

4   possibly speak today.

5      Do we have Susanna Buergel?

6      (No response.)

7          THE COURT:  Okay.  Not here.  Mary Braza?

8          MS. BRAZA:  Yes, Your Honor.  I'm here.  I'm here on

9   behalf of Rangers Baseball Express.

10          THE COURT:  Okay.  Good afternoon.  Jeremy Coffey, are

11  you there?

12          MR. COFFEY:  Good afternoon, Your Honor.

13          THE COURT:  All right.  Mr. Esserman is here in the

14  courtroom.  He was on the phone list.

15      Mr. Fabiani, are you here for Chase?

16          MR. FABIANI:  Good afternoon, Your Honor.

17          THE COURT:  Okay.  Jeffrey Fine?

18          MR. FINE:  Yes, Your Honor.  Good afternoon.  Although

19  I don't anticipate talking, and Mr. Billingsley is in the

20  office, I'm in New York on other matters --

21          THE COURT:  Okay.

22          MR. FINE:  -- and I may not be able to stay on this

23  line.

24          THE COURT:  All right.  What about William Michael?

25          MR. MICHAEL:  Good afternoon, Your Honor.

1        THE COURT:  Okay.  Mitchell Seider?

2        MR. SEIDER:  Good afternoon, Your Honor.

3        THE COURT:  Okay.  Stephen Shimshak?

4    (No response.)

5        THE COURT:  Not there?  All right.  Was there anyone

6    else on the phone who wished to appear and speak today?

7    (No response.)

8        THE COURT:  All right.  Well, before we begin here, I

9    thought it might be helpful, since you're dealing with a

10   visiting judge, essentially, to let the parties know what I

11   have read before the hearing, so you can frame your arguments

12   accordingly.

13   I have read the motions that are set for hearing today.  I

14   have read Judge Lynn's June 22, 2010 memorandum opinion.  I

15   have read today the CRO order entered in the equity owners'

16   involuntary cases.  And I did briefly visit with Judge Lynn as

17   well as Judge Nelms over the weekend, with Judge Nelms only

18   sharing public information.  So you're not going to be at

19   square one on giving an overview of the case or anything like

20   that.  You may have to explain a little bit more along the way

21   to me than perhaps you would to Judge Lynn, but I will

22   interrupt if I need you to clarify.

23   So, anyway, that's what you're dealing with.  I think I do

24   understand the timing concerns here, the unusual dynamics of

25   this case, and somewhat the context of this discovery dispute.

1  So, with that, I guess I'll hear first from the Lenders.  And I

2  guess we need to start with what it is you think you still need

3  in the way of documents and why, and then, of course, we'll

4  hear from the Debtor and Commissioner of Baseball.  So, Mr.

5  Stewart, will that be you starting off the argument?

6        MR. STEWART:  Actually, that will be Mr. Leblanc, if

7  that's all right with the Court.

8        THE COURT:  All right.  That's fine.  Mr. Leblanc, you

9  may proceed.

10       MR. LEBLANC:  Thank you, Your Honor.  And I appreciate

11  the Court both hearing us on such an expedited basis, stepping

12  in for Judge Lynn, and also permitting me to appear

13  telephonically.  I also am in New York today, and I do

14  appreciate the courtesy.

15       THE COURT:  Okay.

16       MR. LEBLANC:  Your Honor, I think, as we sit here

17  today right now, we believe that there are two open issues,

18  essentially.  The first is whether Major League Baseball will

19  make production of any documents to us, and their assertions

20  that the documents that we're requesting are not relevant.

21     The second is the question of whether there is a common

22  interest agreement that should be recognized between the Debtor

23  on the one hand and one of its creditor constituencies for the

24  period of time when it was negotiating exclusively with that

25  creditor a plan of reorganization for this Debtor.

1      What we do not believe to be in dispute --

2           THE COURT:  Mr. Leblanc, let me -- and that would be a

3  period commencing in April 2010.  Is that correct?

4           MR. LEBLANC:  We haven't been advised of the specific

5  date, Your Honor, but we understand at some point in late April

6  --

7           THE COURT:  Okay.

8           MR. LEBLANC:  -- of 2010, --

9           THE COURT:  Okay.  We'll get to that.

10           MR. LEBLANC:  -- the Debtors assert that they entered

11  into a common interest agreement --

12           THE COURT:  Okay.

13           MR. LEBLANC:  -- or became commonly interested with

14  Major League Baseball.

15      Now, Your Honor, the reason I set it up that way is we do

16  not understand, despite a fair amount of argument by the Debtor

17  in their papers about the relevance of the documents that we

18  are seeking from them in the narrowed requests, we do not

19  understand them to take the position that they're not going to

20  produce.  In fact, they've asserted that they will produce

21  voluntarily, notwithstanding what they contend to be a stay of

22  discovery that continues to be in place.  And I'm happy to

23  address the stay of discovery, which obviously we think was

24  vitiated by the Debtors' retrade of our agreement to adjourn

25  the confirmation hearing.  But to the extent that they want to

maintain that there's a stay of discovery in place, we're
certainly happy to address that.

But we do not believe there is a dispute as to the scope of
the production of documents from the Debtors, and we understand
from their papers and from our discussions with them that they
intend to produce documents to us responsive to our request,
with the exception of the common interest agreement.

Major League Baseball, for its part, though, has maintained
that the documents we're seeking are not relevant to any of the
issues before the Court on the 9th of July with respect to
confirmation of this plan of reorganization. And that's a
proposition with which we fundamentally disagree.

The crux of the argument, as we understand it, Your Honor,
is that Baseball -- and the Debtors, to a lesser extent --
raised the argument that what happened in the prepetition world
is not relevant to the question of confirmation of a plan of
reorganization. And they cite two cases from Texas that stand
for that proposition, one from the Fifth Circuit, one from
Texas. Interestingly, Your Honor, neither of those deal in any
respect with a plan of reorganization that was negotiated
entirely prepetition.

To the extent that one were to accept Baseball's argument
that the conduct prior to the petition was wholly irrelevant to
the question of good faith, then a debtor in a pre-negotiated
bankruptcy would be entitled to avoid producing any documents

1  whatsoever on the good faith proposal of the plan.  Not
2  surprisingly, no court has ever so held.  The cases they cite
3  are inapposite in that they do not deal with plans of
4  reorganization that were negotiated prior to the petition date.

5      In fact, the Debtor cites the *In re Madison Hotel*
6  *Associates* case from the Seventh Circuit, which is in many
7  respects a seminal case on this question.  And it posits the
8  question of good faith as one that must be viewed in light of
9  "the totality of the circumstances surrounding confection of
10  the plan."  And although I may have chosen to use a different
11  word than "confection," the principle obviously stands quite
12  strongly that if a debtor negotiates prepetition the terms of a
13  plan and if a plan seeks to consummate a sale that was -- a
14  sale that was conducted and negotiated entirely prepetition,
15  the doctrine or the notion that that prepetition conduct is
16  free from discovery simply doesn't apply.

17      THE COURT:  Okay.  Let me interrupt, Mr. Leblanc.  So
18  your primary argument is that all of this document discovery is
19  relevant to the issue of 1129(a)(3), whether the Debtor has
20  proposed this plan in good faith, and that is still a live
21  issue that is very much out there, despite the fact that we
22  have a modified plan that pays the Lender in full with interest
23  and puts back intact the Lender's rights under its contracts
24  post-effective date, and in spite of that Judge Lynn opinion?
25  I mean, is that the gist of it, that the 1129(a)(3) prong is

1    still very, very relevant on July 9th and you need --

2              MR. LEBLANC:  Yes, Your Honor.  And I think, Your

3    Honor, not to argue confirmation of the plan, but we certainly

4    think that the Debtors' amended plan filed on Friday night

5    falls far short of what Judge Lynn contemplated to unimpair the

6    Lenders.  And I'm happy to discuss that to the extent the Court

7    would like to deal with that.  But certainly the question of

8    impairment under 1124 is a distinct question from that of the

9    good faith proposal of a plan under 1129(a)(3).

10   Your Honor, we also believe that the items that we seek

11   discovery of from the Debtors and from Major League Baseball

12   also turn on other questions that continue to be relevant.  For

13   example, feasibility of the plan.  Certainly, the last of the

14   narrowed requests that we identified deal squarely with the

15   question of feasibility and whether the plan that's proposed is

16   feasible.  But at a minimum, --

17             THE COURT:  You mean, whether the purchaser is going

18   to come through with the money, or --

19             MR. LEBLANC:  Yes, Your Honor.

20             THE COURT:  Okay.

21             MR. LEBLANC:  At a minimum, Your Honor, each of the

22   items do deal with the question of good faith, which is

23   squarely -- continues to be an issue that is disputed as

24   between the parties and we'll be heard on.

25             THE COURT:  Okay.  Let me interrupt again.  I mean, I

1  get what you're saying, that the production may be relevant to

2  more things than 1129(a)(3) good faith.  But focusing on this

3  good faith factor, which is the main thing addressed in the

4  pleadings, all of the -- most of the case law talks about

5  prepetition conduct, prepetition activity not being relevant.

6  And you're saying that none of the case law deals with a

7  prepack, a pre-negotiated plan.  Okay.  So I understand that

8  argument, but -- okay.

9      I'm going to make an analogy.  And I'm sorry; I don't mean

10  to get overly academic.  But Chapter 13, okay.  Chapter 13,

11  1325, is the analog to 1129.  It lists the factors that must be

12  met for a Chapter 13 plan to be confirmed.  If you look at

13  1325(a)(3), it's identical to 1129(a)(3):  "The plan has been

14  proposed in good faith and not by any means forbidden by law."

15      But Chapter 13 has something in it that Chapter 11 does

16  not:  1325(a)(7).  There is also a requirement that a Chapter

17  13 plan, the action of the debtor in filing the petition was in

18  good faith.  So there are two good faith standards that apply

19  with a Chapter 13 plan, but only one with a Chapter 11.  So

20  doesn't Congress's silence in 1129 as far as addressing pre-

21  filing conduct being in good faith, isn't that meaningful here?

22  What do you think?

23          MR. LEBLANC:  Your Honor, I do not.  And this is

24  actually an issue that we discussed to some extent or a

25  question that was posed by Judge Lynn to Mr. Sosland at the

1 15th of June hearing as to what the implication of both that

2 inclusion in 1225 and in 1325, --

3         THE COURT:  Okay.

4         MR. LEBLANC:  -- and whether that made a difference.

5 He did not pose the same question to us.  Had he done so,

6 however, we would have answered as follows, and I'll try to be

7 as responsive to the Court as possible.  I don't think it makes

8 any difference under these circumstances, for two fundamental

9 reasons.

10    The first is that it's not clear to us that the doctrine of

11 *expressio unius est exclusio alterius* would even apply to

12 obviate the Debtor from needing to show that the petition was

13 filed in good faith.  But even if it were true in any other

14 context, it can't possibly be true under these circumstances,

15 where the plan was -- I'm sorry, the plan was filed within

16 minutes of the filing of the petition.  So when the plan, the

17 petition, the negotiations of the sale are all part of an

18 integrated whole, it can't possibly be the case that we're

19 precluded from taking discovery with respect to prepetition

20 conduct that negotiated the plan of reorganization simply

21 because 1129 does not include the same provision as in 1225 and

22 1325.

23         THE COURT:  Okay.

24         MR. LEBLANC:  It absolutely -- whether that might be

25 true, Your Honor, in the normal course where a plan is filed

1   6 months, 12 months, 17 months, 29 days before the -- after the

2   petition is filed, whether that might be true in those

3   contexts, it certainly can't be true here, because to hold that

4   it were true here, that we couldn't take discovery of

5   prepetition conduct, would mean that we wouldn't be entitled to

6   take any discovery of the Debtors' good faith in proposing the

7   plan, because the plan -- and the Debtors have admitted this --

8   the plan was simply a step in a process to try and consummate a

9   sale that they couldn't accomplish outside of bankruptcy.  And

10  it was in an effort to try to take away the right of the

11  Lenders to consent to that sale, which they believe that they

12  have done effectively through the changes they've made to the

13  plan, which we'll take issue with that next week.

14      So, I think, Your Honor, it absolutely is the case that,

15  under these circumstances, we would be entitled, we are

16  entitled to take discovery of prepetition conduct.  To hold

17  otherwise would just mean that we couldn't have any discovery

18  on the Debtors' good faith.  Or, alternatively, as I think the

19  Debtors seem to argue, that simply the fact that they're paying

20  Lenders the $75 million guaranty excuses them from having to

21  satisfy good faith, which I don't think anyone could possibly

22  support and there is certainly no case law to support that.

23      And now, to give -- and I know Your Honor is not as

24  familiar with the entire case, but I think it bears noting that

25  the way that the Debtor got to this point of paying the Lenders

1 in full is it engaged in a series of eve-of-filing

2 transactions, moving assets into the Debtor, loading the Debtor

3 with liabilities that it was not obligated for on the day

4 before, and signing new agreements with, for example, the City

5 of Arlington, moving its ballpark, which was held outside of

6 the Debtor and held by an entity that was obligated in full on

7 the full $525 million in face value of the debt, into the

8 Debtor, who had a limited guaranty.

9     Now, those are all circumstances that led to the filing

10 both of the petition and the plan.  They were done literally on

11 the eve of bankruptcy, on Sunday, May 23rd.  And to the extent

12 that we couldn't take discovery into whether those were good

13 faith actions, I think that would be a clear violation of due

14 process.

15     Included among those transactions, Your Honor, are

16 transactions that serve to benefit the equity owner, Tom Hicks,

17 through an entity that he controls separate and apart from the

18 obligors.  Mr. Hicks is slated to receive $75.2 million in

19 value from this plan, notwithstanding the fact that he is

20 completely underwater in his equity, as well as repayment of a

21 $5 million claim.  Those transactions were negotiated

22 substantially in the period of time from December 15, 2009

23 forward, the period of time that we're seeking discovery on.

24 And so to the extent that we couldn't take discovery of those

25 transactions to determine whether the plan, which was the

culmination of those negotiations over a very lengthy period of time, was proposed in good faith, I think wouldn't comport, again, with due process requirements.

THE COURT: Okay. Your clients' loans went in default in March '09, correct?

MR. LEBLANC: That's correct, Your Honor.

THE COURT: Okay. All right. Did you wish to make any more argument?

MR. LEBLANC: I did, Your Honor. I wanted to turn to the question of the common interest privilege that has been asserted from some point in April.

THE COURT: All right.

MR. LEBLANC: It's interesting, Your Honor, that Baseball has not asserted the common interest but the Debtors have asserted a common interest with Baseball. We don't think it applies even if both had asserted it, but it certainly is interesting that one has claimed it and one has not.

Quite simply, Your Honor, while we agree that a common interest can apply where there is, in fact, a common interest, it cannot apply under these circumstances, where the Debtor has chosen to join forces with one of its creditor constituencies to try to formulate and, in their words, negotiate a plan of reorganization, to the great detriment of the rest of its creditors. And whatever may be said of the technical rights that the Lenders have, there is no question that this plan is

1   to the detriment of the Lenders.

2     Now, there's a couple of things that I think need to be

3   unpacked through that, Your Honor.  And the first is that there

4   is no case that we're aware of, and the Debtors have certainly

5   cited none, where a debtor has asserted successfully a common

6   interest with one creditor constituency, when it has

7   obligations to all of its creditors and its other shareholders,

8   through the negotiation of a plan.  And so first is that it's

9   -- the Debtor selected one creditor to negotiate with and wants

10   to assert a common interest with respect to them, despite the

11   fact that they have fiduciary duties across their entire

12   capital structure, and arguably only to their -- to the extent

13   that they're solvent, to their equity holders.  But certainly

14   to the extent they have duties to any creditors, they have them

15   to all.

16     Second, Your Honor, the Debtors, tellingly, in our view,

17   concede that -- throughout their pleading that what they're

18   asserting common interest over are negotiations of the plan.

19   To the extent that a party is negotiating with another party,

20   that necessarily means that they're not in a common interest.

21     So, for example, Rangers Baseball Express has informed us

22   that they do not assert a common interest with the Debtors.

23   And in fact, at the Weil Gotshal retention hearing, Mr. Sosland

24   was questioned by Rangers Baseball Express, by their counsel,

25   and Mr. Sosland testified that they were negotiating with

1 Rangers Baseball Express and that was being done at arm's

2 length.

3      Now, how they can turn around and then argue that when

4 they're negotiating with Major League Baseball, they were doing

5 so in a common interest, because the negotiation necessarily

6 implies adverse interests.  You're trying to figure out what

7 you'll settle on and how you'll treat the Lenders.  And the

8 notion that they could be negotiating while in a common

9 interest simply runs afoul of any logic or common sense.

10      Your Honor, moreover, in our view, it's telling to the

11 extreme that the Debtors seem to be abrogating their fiduciary

12 duties in asserting a common interest with Major League

13 Baseball.  What the Debtor says in its pleading, and it says

14 this repeatedly, is that Major League Baseball's approval is

15 necessary for any proposed sale, whether pursued within or

16 outside of bankruptcy.

17      Now, that issue, that particular issue, is a fulcrum issue

18 in this case, whether Major League Baseball's consent rights

19 apply in a bankruptcy.  The Debtors have stated repeatedly in

20 their opposition to our motion to compel that they concede that

21 they have to comply with it in bankruptcy.  And that's a real

22 question here.  In fact, it's a question that Major League

23 Baseball implored Judge Lynn not consider.  And this is at Page

24 13 of his June 22nd decision, Footnote 21.  He writes, "The

25 Court, at the insistence of the BOC" -- which is Baseball's

1   Office of the Commissioner -- "does not in this memorandum

2   opinion address the effectiveness of the Major League

3   Constitution limitations on Debtor or the Rangers' equity

4   owners in a bankruptcy context.  Consequently, while the Major

5   League Constitution assuredly can affect the Lenders'

6   contractual rights, the Court assumes for the purposes of this

7   memorandum opinion that the Major League Constitution does not

8   prevent Debtor and its Rangers equity owners from considering

9   alternatives to the APA."

10      So the Debtor appears in this pleading to have given to

11  Major League Baseball a right that Major League Baseball hasn't

12  asserted, has asked the Court not to consider whether it has.

13  And that's one example, we think, Your Honor, where the Debtor

14  and its fiduciary duties are inconsistent with the assertion of

15  a common interest privilege.  If the Debtor was exercising its

16  fiduciary obligations, including its obligations to its equity

17  holders, which decisions in respect of will now be made by Mr.

18  Snyder, then it wouldn't take the position as it does here that

19  Baseball has these consent rights.  Instead, it would argue, as

20  we do, that there is a real question as to those consent rights

21  that would have to be litigated at an appropriate time.  It

22  wouldn't give away the keys to the store, which it seems to

23  have done in this pleading.

24      So I think that's just an example, Your Honor, of how the

25  assertion of a common interest agreement between one creditor

1  and the Debtor simply doesn't fit with either common sense or,

2  frankly, any of the case law that they cite.  And I'm happy to

3  distinguish any of the cases that they rely on, because all of

4  them are distinguishable and not a single one deals with the

5  question posed here, which is:  Does a creditor have the right

6  to enter into a common interest -- a single creditor have the

7  right to enter into a common interest agreement with a debtor,

8  to the abrogation of the rights of all other creditors, when

9  they're negotiating a plan?  And we just don't think that the

10  law provides that.

11       So, Your Honor, we would ask that the Court compel the

12  production by Major League Baseball of the documents requested

13  in our narrowed request and that the Court conclude that there

14  is not a common interest between the Debtor and one particular

15  creditor and require the production of documents that are

16  otherwise being withheld on the basis of that asserted common

17  interest.

18            THE COURT:  All right.  A couple of questions before

19  we hear the other arguments.  As I understood your

20  representation, you said there are no cases from the bankruptcy

21  world that apply a common interest privilege in a context like

22  this.  I think *Quigley*, a case from the Southern District of

23  New York, was one case that was cited from the bankruptcy

24  world.  How do you distinguish that case?

25            MR. LEBLANC:  Sure, Your Honor.  And I think -- we

distinguish it in our papers in a couple of different ways, but
I think the most relevant distinction is the following.  The
asserted common interest in *Quigley* was between Quigley and
Pfizer.  Pfizer had owned Quigley for more than 15 years prior
to divesting it a year before it filed for bankruptcy.  Quigley
and Pfizer had cooperated through that 15-year period in a
common interest in litigating asbestos claims.  And Pfizer,
when the bankruptcy was filed, Pfizer in fact asserted a common
interest with -- Pfizer and Quigley asserted a common interest
with one another with respect to the asbestos litigation.

I think that falls squarely within a different set of
common interest assertions, which are the common interests that
apply between joint defendants in a litigation.  It really
speaks not at all to the question that's before the Court,
which is whether the Debtor can pick one particular creditor to
enter into a common interest agreement with, to the detriment
of all others.

I'll also note, Your Honor, that while the Fifth Circuit
has recognized in some limited circumstances assertions of
common interest, it certainly is not nearly as liberal as the
circuit in which I currently am sitting, which is the Second
Circuit in New York.  And so I think you have to apply the
context of the *Quigley* decision as it relates to where it was
decided.  The Fifth Circuit hasn't recognized a privilege as
expansive as the one asserted in the *Quigley* case.

1          THE COURT:  Okay.

2          MR. LEBLANC:  And even that one is far different than

3    the one that's been asserted here.

4          THE COURT:  Okay.  I agree with that.  All right.  And

5    one last thing.  Paragraph 6, I think it was, of your motion to

6    compel contains what I think you considered -- called the

7    "Narrowed Topic" list.  So that is the universe of documents

8    we're talking about today, correct?

9          MR. LEBLANC:  Yes, Your Honor.  And as I said earlier,

10   I think that the Debtors have indicated a willingness to

11   produce documents responsive to those.  Major League Baseball,

12   I do not believe has.

13         THE COURT:  Okay.  Okay.

14         MR. LEBLANC:  But, yes, those are the narrowed topics.

15         THE COURT:  Okay.  Thank you.  All right.  Mr.

16   Sosland, do you care to go next, or yield the podium to the

17   Commissioner?

18         MR. SOSLAND:  Whatever pleases you, Your Honor.

19         THE COURT:  Why don't you go next, Ms. Sosland?

20         MR. SOSLAND:  My partner, Ms. Garcia, will --

21         THE COURT:  Okay.  Very good.  Ms. Garcia?

22         MS. GARCIA:  Your Honor, Yolanda Garcia with Weil

23   Gotshal & Manges on behalf of the Debtors, for the record.

24       Your Honor, I don't believe that Mr. Leblanc is being

25   deliberately disingenuous when he says that Major League

1  Baseball has not also asserted a common interest privilege.

2  The purpose of the hearing as to Major League Baseball is that

3  they have not produced any documents.  Until such time as you

4  actually review and produce documents is when you would

5  identify which documents you would assert an attorney-client

6  privilege or a common interest privilege to.  So I just want to

7  bring that to your attention from this point.

8      It's our understanding that Major League Baseball would

9  assert a common interest privilege, should they be compelled to

10 produce documents that they believe are not relevant and should

11 Your Honor find that the documents requested by the Lenders, by

12 the Ad Hoc Lenders, excuse me, are not relevant in the question

13 of whether or not this privilege, common interest privilege,

14 would even need to be asserted, would be vitiated by the fact

15 that they would no longer even be called for.  So I wanted to

16 get that clear from the outset.

17         THE COURT:  All right.  And to clarify one other

18 thing, there is no agreement, there's nothing like a joint

19 defense agreement or a common interest agreement in place here,

20 a written agreement?

21         MS. GARCIA:  Your Honor, we do not have a written

22 common interest agreement.

23         THE COURT:  Okay.

24         MS. GARCIA:  Fifth Circuit law and Texas law do not

25 require --

1       THE COURT:  Right.

2       MS. GARCIA:  -- a written joint defense agreement.

3  What we do have are documents that, on their face, are marked

4  "Common Interest" and "Subject to a Joint Defense Privilege."

5       THE COURT:  Okay.

6       MS. GARCIA:  And so they evidence that the intent of

7  the parties was to protect those particular communications as

8  privileged, and they began to arise during the time frame of

9  April 25th/April 26th forward.

10      THE COURT:  Okay.

11      MS. GARCIA:  And it is for that reason that we have

12  limited the applicability of the common interest privilege to

13  the very late April/three-week time frame in May prepetition.

14      THE COURT:  Okay.

15      MS. GARCIA:  Now, Your Honor, I understand that you

16  asked Mr. Leblanc to comment on the question of the *In re*

17  *Quigley* case, which I agree is very helpful and bolsters the

18  Debtors' position that common interest is applicable in a

19  bankruptcy proceeding.  But I would like to direct your

20  attention, since I know you've had very limited time to get up

21  to speed on this particular argument, to two cases which I

22  think are very critical in you assessing whether or not this

23  common interest privilege should apply.

24      The first is the *In re Harwood* case.  That's out of the

25  Western District of Texas.  It is a bankruptcy case.  It is a

Fifth Circuit district court bankruptcy case. And in that

case, the Court found that the common interest privilege

protected a debtor and a group of its creditors -- namely, the

Committee as well as the Lenders -- because they had a joint

interest in prosecuting what in that case was a liquidation

plan for the benefit of the estate.

Similarly with Major League Baseball, which has dual roles

with regard to the Debtors. One hat, they are a creditor of

the estate, a creditor that's getting paid in full, as are the

Ad Hoc Lenders under the proposed plan. The other hat, they

are the regulator of the Debtors. The Debtors are subject to

the Major League Baseball Constitution. And as such, the

Debtors outside of bankruptcy -- and the question is open as to

what the obligations are within bankruptcy, according to the

Lenders. I understand that. But outside of bankruptcy, are

subject to multiple agreements that limit the ability of the

Debtors to take certain actions without the consent or approval

of Major League Baseball. Many of those documents were entered

into evidence during the June 15th hearing that we had in front

of Judge Lynn, and those documents show that there was a level

of obligation between the Debtors and Major League Baseball

with regard to obtaining consents for the filing of a

bankruptcy plan.

The reason that -- the *In re Harwood* case, Your Honor, for

that reason is extraordinarily on point here. It is Fifth

Circuit --

THE COURT: Were these creditors co-proponents of the plan in that case?

MS. GARCIA: It is my understanding from the case, Your Honor, that at the time that the Court recognizes a joint defense agreement, that there was not a plan. The documents were created before there was a joint plan. I think eventually they became proponents of a plan, co-proponents of a plan. The actual case is not very clear, and I haven't had time to go back through and pull stuff off of the docket. I'm willing to, Your Honor. I simply did not have time in preparing for today's emergency hearing.

THE COURT: Okay.

MS. GARCIA: I believe they may have later become co-proponents of a plan, but I will say the Judge did not rest its finding of a common interest in any way on the fact that they were co-proponents of the plan. Rather, the Judge focused its rationale on the fact that the test for a common interest in the Fifth Circuit is simply that: Is there a palpable threat of litigation, and is there a common legal interest that unites the two? The Court found that it does not have to be a palpable threat of litigation as a defendant, so in this case, if you consider the Debtor the Plaintiff, the fact of filing a plan would be considered litigation. In fact, Judge Lynn has already found in the *Brown v. Adams* case that bankruptcy itself

1  constitutes litigation.

2     And the Court also focused on the *Harwood* case, on the fact

3  that these discussions took place during the critical period of

4  trying to ascertain what the strategy should be for the filing

5  of the case, and that they had a common legal goal of filing a

6  plan that was confirmable for the benefit of increasing the

7  assets of the estate.  Nothing in the Court's holding, Your

8  Honor, focuses in on the fact that they were joint proponents

9  of the plan.  Rather, the Court went underneath the analysis to

10  see:  Do they have a common legal interest and was there a

11  palpable threat of litigation?

12     And Your Honor, for the period of time for which we assert

13  a common interest, the four weeks prepetition, as well as the

14  fact that we clearly have a common legal interest in proposing

15  and confirming a plan of reorganization that allows this Debtor

16  to reorganize and exit bankruptcy successfully, I believe that

17  we meet that test.

18        THE COURT:  Let me interject.  I'm going to use one of

19  those overused legal phrases.  Is this a slippery slope, as

20  lawyers like to say?  We all know that bankruptcy is said to

21  make strange bedfellows, and there are lots of allies,

22  typically, in a Chapter 11 case.  A debtor needs allies to get

23  through a case.  Where would I draw the line here?  I mean,

24  it's been said that Express and the Debtor have not asserted

25  any common interest privilege, but I can see this doctrine, if

1   you will, of a common interest being expanded to levels that it

2   really probably shouldn't be in bankruptcy.  I mean, if you've

3   got, you know, a Creditors' Committee on board with your plan,

4   if you've got other major constituents on board, I mean, where

5   do I draw the line?  Everything could be protected from

6   everybody at some point.

7           MS. GARCIA:  I understand, Your Honor, that the

8   bankruptcy proceedings are different from a traditional

9   litigation.  But I would say two things.  First, I think the

10  Fifth Circuit is who has drawn the line.  I think the Fifth

11  Circuit, as Mr. Leblanc has already recognized, has an

12  extraordinarily narrow interpretation of what is the common

13  interest privilege.  And I think that extraordinarily narrow

14  interpretation provides the bright line test that's going to

15  prevent a slippery slope of people simply backdating privilege

16  to a time period that simply is untenable.  And I think this

17  Court should rely on the dictates of the Fifth Circuit.  That

18  is, --

19          THE COURT:  Well, just to be clear, how is the

20  Commissioner different from Express or, you know, the

21  Creditors' Committee, if they're on board, or other allies the

22  Debtors may have in this case?

23          MS. GARCIA:  Your Honor, I can tell you specifically

24  how it's different in this case.  In the first instance, there

25  was an actual understanding between the Debtors and the Office

1   of Major League Baseball that they were going to, together, try

2   to figure out legally how to proceed in a bankruptcy

3   proceeding. And that meeting of the minds elementary to create

4   a common interest so that both sides are there has got to be

5   there. And Your Honor, that is one factual distinction, which

6   probably is not very useful in future cases but is certainly

7   one of the reasons here.

8      The second reason is that while the Greenberg Group is

9   critical to the successful implementation of the plan, the

10   Greenberg Group is not a creditor of the estate in the same way

11   that Mr. Leblanc's argument is. So I don't think that

12   necessarily they would be -- a potential purchaser under a plan

13   is not necessarily somebody who would be subject to the kind of

14   alignment or switching sides that you're talking about in a

15   traditional bankruptcy.

16      I also think that the fact that Major League Baseball wears

17   the two hats in which we were subject under the amended VSA,

18   which was put into evidence, as well as the Major League

19   Constitution, to very strict requirements of coordination as

20   well as consent for many different things, that places our

21   necessity to align ourselves with Major League Baseball as

22   obvious in the weeks leading up to the actual filing.

23      With regard to your slippery slope, I did want to point you

24   to the Fifth Circuit, because I think that's one major reason

25   that this Court should not be concerned that we're going to

1    begin to suddenly have extraordinary claims of privilege.  I

2    also want to caution on the other side.  If a common interest

3    privilege for whatever reason would be applicable outside of

4    bankruptcy that is not recognized in the bankruptcy context, we

5    are going to stifle the exact kinds of alliances that allow a

6    debtor to gradually gain the consent over the life of a

7    bankruptcy and eventually emerge.  The debtor has to be free to

8    speak with those whom are on -- who is on its side temporally,

9    whatever that particular time period is, in order to try to

10   effectuate a consensual plan.  And if this Court does not

11   recognize a common interest, those kinds of actions could be

12   severely curtailed, as people would be afraid to speak freely

13   with those with whom it is aligned for purposes of offering up

14   a consensual plan.

15        THE COURT:  What about Rule of Evidence 408?  Isn't

16   that some protection on that idea?

17        MS. GARCIA:  Your Honor, I have tried to test the

18   bounds of Rule 408 in many different proceedings, because I am

19   actually normally a litigator and not always in Bankruptcy

20   Court, though I have spent the last several years doing a lot

21   of that.  And I will tell you that 408 is oftentimes construed

22   very narrowly.

23        The question of whether or not it can be admissible for

24   purposes of establishing liability is a far different question

25   from whether or not people can get in the evidence of the

communications with the protection for the communications

themselves that allow the kind of strategic thinking that are

often necessary for parties to a plan to actually discuss in

order to develop what the strategy is going to be.  So I think

that Rule 408 just does not provide the kind of protection that

the common interest privilege does for parties such as Major

League Baseball and the Debtors here.

THE COURT:  Okay.  All right.  So does that conclude

your argument on common interest?

MS. GARCIA:  If you do not have any other questions,

Your Honor, it does.

THE COURT:  I don't think I do.  What about the whole

relevancy argument?  I guess you've -- the Debtor has produced

everything other than what it says is subject to the common

interest privilege, right?  So perhaps --

MS. GARCIA:  Yes.  But let me explain, --

THE COURT:  -- at this point we hear from the other --

MS. GARCIA:  -- because I think this background would

be helpful to you, --

THE COURT:  Okay.

MS. GARCIA:  -- because it is not that we admit these

documents are relevant.  The Debtors have produced as of today

80,000 pages of documents.

THE COURT:  Okay.

MS. GARCIA:  And those were all produced before the

1   June 15th hearing.  After that June 15th hearing, we had a

2   second discovery conference -- excuse me; after the June 22nd

3   order -- because we believed that based on that June 22nd

4   order, any other discovery beyond the 80,000 or so pages was no

5   longer relevant.

6        We were told by the Ad Hoc Lenders that they disagreed, and

7   therefore they filed their original motion to compel.  We

8   continue to believe that this discovery is not relevant, but it

9   is in the Debtors' greatest interest to try to exit bankruptcy

10  as quickly as possible.  And for that reason, we are providing

11  all the documents that they've requested.  There may be other

12  documents that are subject to this common interest privilege,

13  but we had a team working the entire weekend.  We plan on

14  making a supplemental production this week.  I'm not certain

15  what the volume of those additional documents will be.

16            THE COURT:  Okay.  Thank you.

17       All right.  Who wishes to make the argument for the

18  Commissioner?  Mr. D'Apice?

19            MR. D'APICE:  Thank you, Your Honor.  Peter D'Apice of

20  Stutzman Bromberg Esserman & Plifka for the Office of the

21  Commissioner of Baseball.

22       Your Honor, we take a very pragmatic view of this discovery

23  dispute.  We agree with the Debtor.  We think that the

24  documents requested by the Ad Hoc Group are irrelevant to these

25  issues teed up for confirmation.  Your Honor has touched on

1  some of those points.  You've obviously read the papers.  You

2  know the cases.  I won't belabor the good faith argument and

3  why the prepetition conduct is irrelevant.

4      Notwithstanding all of that, we're willing to produce what

5  they want, subject, obviously, to preserving the common

6  interest privilege as well as our attorney-client and work

7  product privilege.  If the Ad Hoc Group, the Lenders want to

8  get into the prepetition conduct of the parties, then we think

9  that we are entitled to defend ourselves.  If they're going to

10 get into the prepetition conduct of the parties to get bids

11 that occurred prepetition, communications between the Debtor

12 and Baseball that occurred prepetition, valuations of any bids

13 that came in, and use that information to try to show, as

14 they've indicated in other pleadings and proceedings, that

15 there's either some sort of wrongdoing on our part or that

16 Major League Baseball was unduly controlling of the process,

17 we're entitled to defend ourselves against those charges.  And

18 in fact, we are entitled to show, as the evidence we've seen so

19 far suggests, that the Lenders actually invited Major League

20 Baseball to get involved in the sale process, that the Lenders

21 knew all the time, all along, what was going on in the process

22 that they are now complaining about.  And we're entitled to

23 discovery from them.  They have refused to give us any shred of

24 paper in response to our discovery requests.

25          THE COURT:  Okay.  I forgot.  That's the other part of

today's hearing.  Is there a formal document request pending --

        MR. D'APICE:  Yes, Your Honor.

        THE COURT:  -- to the Lenders?  Okay.

        MR. D'APICE:  Yes, Your Honor.  Formal document requests have been served by all the parties.

        THE COURT:  Okay.

        MR. D'APICE:  By Major League Baseball on the Lenders and by the Lenders on Major League Baseball.

        THE COURT:  Okay.

        MR. D'APICE:  And responses have been served.  The Ad Hoc Group refuses to give us a piece -- any paper on the issues relating to these prepetition events, because they maintain it's irrelevant.

    Your Honor, if they're entitled to get into prepetition conduct, we're entitled to defend ourselves against those accusations that they're going to cobble together for confirmation and show, for example, that they did ask us to get involved, that they were communicating among themselves about bids or proposals that they had seen, that they were communicating with the Hicks entities, with the Debtor, and were not only aware of what was going on but were at some points consenting to it and at other points later on trying to undermine it.

    All of that goes not so much to the good faith of the Debtor but it goes to the good faith of their good faith

1  argument.  It goes to show that they're coming into the process
2  with sort of unclean hands.  If, for example, they have --
3  there's evidence that they've reviewed a bid, determined it was
4  not a better bid, and are now claiming that we should have
5  accepted that -- that Baseball -- that the Debtors should have
6  accepted that bid, we're entitled to show that, Your Honor.
7  We're entitled to see how they valued the different proposals
8  that were made, and whether those evaluations are any different
9  from what the other parties have done, to show that what we're
10 doing is not in bad faith but is, in fact, in good faith, to
11 the extent any of that's relevant.

12      Now, we maintain our objection and we'll maintain it at
13 confirmation that these documents are irrelevant, given the
14 June 22nd ruling of His Honor and the good faith cases that you
15 pointed to early in today's hearing.  But if they want to get
16 into it, we are happy to do it.  We'll do it.  It just has to
17 be a two-way street.

18      So we filed a cross-motion to compel them, in turn, to
19 produce documents to us that relate to, for example, bids and
20 offers, valuations of bids -- the Lenders' valuations of bids
21 and offers, documents relating to the financial wherewithal of
22 any bidder.  Is this, in fact -- are these credible bids?  We
23 have asked for, and it's in our cross-motion, communications
24 that the Lenders have had with any of these bidders, that
25 they've had among themselves about the bids, communications

1  with the Office of the Commissioner of Baseball and his staff,

2  communications with the Debtor, communications with the Hicks

3  entities, all concerning the sale or potential sale of the

4  assets in question.

5      That's what we're asking for, Your Honor.  It's a two-way

6  street, and we respectfully request that if you're going to

7  order us to produce documents to the Lenders -- which we're

8  happy to do that and we will do that -- we think it ought to be

9  reciprocal, that we ought to be entitled to get documents from

10  them to show that we can -- to use in our own defense at

11  confirmation against the charges we're certain are going to fly

12  around.

13      It's very simple, Your Honor.  It's, as I said earlier,

14  it's a pragmatic decision on our part.  We stand with the

15  Debtor in trying to grease the skids to get this case to

16  confirmation and this plan confirmed.  And we're happy to

17  cooperate, but it's got to be a two-way street.  So we would

18  urge that you grant our cross-motion to compel.

19      Now, with respect to the issue that Mr. Leblanc raised

20  about the Major League Baseball consent, the Major League

21  Baseball consent issue, I don't want to get into that today

22  because it's not at issue today and there's no reason for Your

23  Honor to decide that issue today.  And that's the point I

24  wanted to make, is that Judge Lynn didn't want to decide it, we

25  don't think it's an issue that needs to be addressed, certainly

1  not today, if at any point in this case, and it's the kind of

2  issue that ought to be set aside until it's absolutely

3  necessary to address, and I don't think we've reached that

4  point yet.

5          THE COURT:  Okay.  Do you have anything at all to add

6  on the common interest privilege?  I'm wondering, has your

7  client ever convinced a court in some litigation context that

8  this type of privilege applies?

9          MR. D'APICE:  Has my client, Major League Baseball, --

10         THE COURT:  Uh-huh.

11         MR. D'APICE:  -- convinced a court?  I don't know the

12  answer to that, Your Honor.

13         THE COURT:  Okay.

14         MR. D'APICE:  This is my first representation with the

15  client.

16         THE COURT:  Okay.

17         MR. D'APICE:  I don't know what they've done.

18         THE COURT:  Okay.  All right.

19         MR. D'APICE:  Thank you, Your Honor.

20         THE COURT:  Thank you.  Let me ask you, before you sit

21  down.  Do I have, in the papers that have been filed, the list

22  of documents that are subject to your client's motion to

23  compel?  It was just argument made in your pleading filed last

24  night.

25         MR. D'APICE:  Yes, Your Honor.  We have put it in Page

1  8 of our response and cross-motion, where we state that, "Thus,

2  the BOC is entitled to full production of all documents and

3  communications."

4            THE COURT:  Okay.

5            MR. D'APICE:  It's in the first full paragraph,

6  second-to-last paragraph.  And the discussion leading up to

7  that, obviously, Your Honor, tells -- informs the Court as to

8  why we believe we're entitled to those materials.

9            THE COURT:  Okay.  Tell me again which paragraph.

10           MR. D'APICE:  It's Page 8, --

11           THE COURT:  Okay.

12           MR. D'APICE:  -- and it's the first full paragraph,

13  that begins, "In addition, the BOC is entitled to..."

14           THE COURT:  Okay.

15           MR. D'APICE:  Do you see it, Your Honor?

16           THE COURT:  Yes, I do.  All right.

17           MR. D'APICE:  All right, Your Honor?

18           THE COURT:  All right.

19           MR. D'APICE:  Thank you, Your Honor.

20           THE COURT:  Thank you.  Does anyone else wish to be

21  heard on this issue?  Mr. Simon?

22           MR. SIMON:  Yes, Your Honor.  Robert Simon, Your

23  Honor, for Rangers Baseball Express.  We are a party in

24  interest, we're a creditor, and of course we're the potential

25  purchaser, the proposed purchaser under the plan of

1  reorganization.

2  The first thing I'd like to say briefly is we support the

3  position of Major League Baseball and the position of the

4  Debtor.  We believe they're correct on the law.

5  Secondly, Your Honor, I'd like to correct what I think is a

6  misconception that Mr. Leblanc created in his presentation to

7  the Court.  Your Honor, Rangers Baseball Express has not said

8  we will not assert a common interest privilege.  Our discovery

9  deadline under the discovery they sent us is June the 30th.

10  The deadline isn't here yet.  We have not yet asserted a common

11  interest privilege, though we may well assert a common interest

12  privilege when we make a production, if we decide to go ahead

13  and do that.

14  What Mr. Leblanc was talking about, Your Honor, was in the

15  employment application for Weil Gotshal, when Mr. Sosland was

16  testifying, I asked Mr. Sosland questions about the termination

17  fee or break-up fee that's contained in the APA, in the asset

18  purchase agreement that's part of the plan.  And Mr. Sosland

19  testified very directly that the negotiation of that fee was

20  arm's-length, contested, between, you know, different economic

21  parties, each looking out for its own economic interest, trying

22  to get the best deal it can for itself.  That's correct.  We

23  would not contend that the negotiation of that would be subject

24  to any common interest privilege.  It's not.

25  However, once the APA is signed, Your Honor, with regard to

1  the pursuit of confirmation of the plan, we very much have a

2  common interest with the Debtor and we may very well assert the

3  common interest privilege with the Debtor when the time comes.

4  And Your Honor, as to other issues, we may well assert a common

5  interest privilege.

6      You know, as the Court pointed out, bankruptcy makes

7  strange bedfellows.  You have different interests at different

8  points in the case, and there may be things on which you do not

9  have a common interest and you are, in fact, adverse, and

10  matters in which you have a common interest that you are

11  pursuing jointly.  And so I do not want the Court to be left

12  with the false impression that we will not assert a common

13  interest privilege.

14          THE COURT:  Mr. Simon, I have said, so many times

15  people are probably sick of hearing it, that in bankruptcy it's

16  open kimono.  Okay?  I didn't invent that phrase, but, you

17  know, transparency, full disclosure.  I mean, again, the

18  slippery slope I was worried about in talking with Ms. Garcia,

19  I'm even now more worried about.  I mean, --

20          MR. SIMON:  Your Honor, -- oh, I'm sorry.

21          THE COURT:  To me, this is not really how bankruptcies

22  normally operate.  Am I wrong about that?  I mean, --

23          MR. SIMON:  I don't want to say you're wrong about

24  that, Your Honor, but I think Ms. Garcia addressed the issue

25  appropriately.  You know, bankruptcy is many different things.

1  You know, there are many different proceedings that happen in

2  bankruptcy.

3          THE COURT:  Right.

4          MR. SIMON:  And there are different contested matters,

5  and you may have common interests as to some and not to others.

6  On matters in which there is no common interest, there's no

7  common interest privilege to be asserted.  But there are issues

8  that are distinct and are not difficult to distinguish.

9      When we're talking about the negotiation of the asset

10  purchase agreement, we and the Debtor are adverse.  No common

11  interest or privilege applies to that.  When you're talking

12  about the very distinct issue of pursuing confirmation of a

13  plan of reorganization, where we are on the same side, we are a

14  party to the plan, working for confirmation of the plan, that's

15  an issue where a common interest privilege clearly applies

16  because of the nature of what you are doing.  That is, it meets

17  every definition of common interest under Fifth Circuit case

18  law.

19          THE COURT:  Okay.

20          MR. SIMON:  Thank you, Your Honor.

21          THE COURT:  Thank you.  Anyone else?

22          MR. LEBLANC:  Your Honor, may I?  This is Andrew

23  Leblanc from Milbank Tweed.  May I be heard in reply?

24          THE COURT:  Okay.  Very briefly.

25          MR. LEBLANC:  Yes, Your Honor.

1    With respect to the argument of Mr. Simon, my statement

2 that they were not asserting a common interest privilege was

3 actually -- I can read to Your Honor from an e-mail from their

4 national counsel, Paul Bargren at Foley & Lardner, who on

5 Saturday sent us an e-mail saying, "We have determined that we

6 will not (repeat, not) assert a common interest privilege

7 relating to Debtor or MLB.  Such a privilege will not be a

8 factor in our production."

9    So I apologize if I left the Court with a misimpression,

10 but that was the information we had.  And that's, again, from

11 Rangers Baseball Express's national counsel.  I know Ms. Braza

12 was copied on that e-mail, and she's on a live line as well.

13         THE COURT:  And that was on Saturday?

14         MR. LEBLANC:  That was on Saturday, June 26th, at 5:24

15 p.m. Eastern Time.

16         THE COURT:  Okay.

17         MS. BRAZA:  And Your Honor, it's Mary K. Braza, if I

18 may speak to that issue.  That's accurate.  We will not be

19 asserting a common interest privilege.

20         THE COURT:  Okay.

21         MR. LEBLANC:  Your Honor, just briefly with respect to

22 the argument that the Debtors made.  The *Harwood* case I think

23 bears some mention only because what was at issue there, Your

24 Honor, was whether the common interest privilege protected a

25 litigation analysis conducted by a Creditors' Committee when

the litigation was being passed to a litigation trustee.
That's a very different question.  Nothing at issue in *Harwood*
was plan documents or anything of the like.  And what the Court
concluded was that the Debtor/Trustee, the Lenders and the
Committee have common legal interests to pursue and liquidate
the estate's legal causes of action in order to realize the
value of those assets for the benefit of creditors.

That's a very different question.  When you have a common
interest with a group of other constituencies or stakeholders
to pursue claims belonging to the Debtor, that's where a common
interest should apply.  But it runs completely afoul of the
notion that you should have it when you're negotiating what the
terms of the plan of reorganization should be.

And the idea suggested by Ms. Garcia that this would
somehow chill discussion really misses the mark.  When there
are discussions about the formulation of a plan and the
negotiation of what those terms would look like, that's exactly
what the good faith test is intended to discover and intended
to test.  And the idea that you could assert a common interest
privilege because you were negotiating that and thereby prevent
discovery and analysis of those questions just misses the mark,
in our view.  The common interest privilege shouldn't apply
when you're negotiating the plans with a particular creditor
that you choose to favor at that point in time.

Now, the only other thing I'd like to respond to, Your

1   Honor, because I thought you were taking it up as the second

2   motion, was the cross-motion by Baseball to get discovery from

3   us.  I'll note, Your Honor, that the Debtors are not pursuing

4   discovery of us.  They've served discovery requests on us, but

5   they do not believe that discovery is a, to borrow the phrase

6   of MLB's counsel, a two-way street.

7       Discovery isn't a two-way street.  What it is is parties

8   that have the burden of proof and have relevant information are

9   obligated to produce documents.  Those parties that don't have

10  a burden of proof, don't have an obligation to come forth with

11  anything, aren't obligated to produce documents.  If documents

12  requested from us are not relevant and documents requested from

13  other parties are relevant, then discovery is not a two-way

14  street.  It's not a -- I'll borrow the phrase that the Debtors'

15  counsel said to us in a meet-and-confer:  It's not a tit-for-

16  tat.  It instead -- it turns on the question of whether

17  information is relevant.

18      Major League Baseball's contention that it should punish us

19  for seeking discovery from us by requiring us to produce

20  documents isn't the way that discovery should work.  As far as

21  I'm aware, no case has ever held that there's an unclean hands

22  defense to good faith.  It's not whether we have opposed the

23  plan in good faith; it's whether the Debtors have proposed the

24  plan in good faith.  And that's the only test.

25      Now, lastly, Your Honor, we have collected documents from

our client, but to the extent that we are ordered to produce
documents, I do not believe we could complete that production
before July 9th.  Now, that Debtor has said in its pleadings
that notwithstanding what it told the Court, it's fine with --
it is fine with July 22nd as a confirmation date.  If the
Debtor wants to adjourn and Major League Baseball wants to get
production from us, I'm certain that we could comply with that.
But producing documents in advance of a July 9th hearing date,
when the parties had understood last Thursday it was going to
be July 22nd and the Debtors have now said they're fine with
July 22nd, is not something that -- I just don't think can
happen.  I think that's an undue burden to impose on the
Lenders in this case, given the limited, if any, relevance of
the information.

So, unless the Court has any questions, we'd ask that the
Court deny the motion, the cross-motion to compel, and grant
our motion to compel.

THE COURT:  Okay.  Elaborate to me on why it would be
so burdensome for you to produce what the Commissioner has
asked for before the 9th.

MR. LEBLANC:  Your Honor, the Commissioner served on
us something in the nature of 89 discovery requests.  We have
collected documents using search terms derived from those -- we
have collected those from our clients, but we have not begun
searching them.  At last count, we had approximately 40,000

documents that we would have to review for production.  In

addition to that, we have noticed seven depositions.  We

anticipate noticing a 30(b)(6) deposition.  We have mediation

beginning on the 6th of July.  We have an objection to

confirmation due on the 2nd of July.  And we have, obviously,

the confirmation hearing on the 9th of July.  I just don't

know, Your Honor, that there are sufficient resources available

for us to comply with a production of the volume of documents

that have been requested by the Commissioner in advance of the

July 9th hearing.

Again, if the hearing is adjourned and if, as the Debtor

suggested, all that they intended to do was to remove the stay

of discovery and we'd go forward on the 22nd of July, that's

fine with us and we would be able to comply in a timely manner

with the Commissioner's request.  But we're not -- I don't

believe -- we'll move heaven and earth, Your Honor, to try to

comply, but I can't commit now that we can review 40,000

documents over the next several days, four of which are a

holiday.

THE COURT:  All right.

MR. D'APICE:  Your Honor, may I, briefly?

THE COURT:  Yes.

MR. D'APICE:  Your Honor, Peter D'Apice for the Office

of the Commissioner.  I just would point out two things.  We

served our discovery requests on May 30th.  They've had a lot

1 of time. And it's Milbank Tweed we're talking about and Vinson

2 & Elkins, and they have other firms that represent the Ad Hoc

3 Lenders. If anyone can move heaven and earth, it's those

4 firms, Your Honor.

5             THE COURT:  Okay.

6             MR. D'APICE:  Thank you.

7             THE COURT:  Thank you.  Ms. Garcia, very briefly.

8             MS. GARCIA:  Your Honor, I wanted to clear up one

9 thing.  We are not asserting the common interest privilege with

10 Greenberg.  This is just with MLB.  Because I wanted to address

11 that, since it was raised.

12     The second is, we have had document requests outstanding

13 since on or about June 1st.  I don't have my calendar in front

14 of me, but that's the approximate date.  And we have sought

15 them, and they have continued to refuse to produce any

16 documents.  When MLB did the cross-motion, we believed that we

17 would get direction from Your Honor as to whether or not the

18 documents that we have requested should be produced by the

19 Lenders, and we would negotiate with them to ensure that

20 there's not a duplication.  And we have proposed to them very

21 narrowed requests from our broader requests that we sent on

22 June 1st.  They've also refused to produce those narrowed

23 requests.

24     We produced -- we reviewed much more than 40,000 documents

25 to get everything done in the five days we had before we went

1   to that June 15th hearing, and we are reviewing once again tens

2   of thousands of documents to get there again.  So I'm just

3   afraid that 'burden' probably isn't the right argument as to

4   the Debtors' request.

5       And finally, Your Honor, I would just ask that Your Honor

6   look at the *In re Harwood* case, because Mr. Leblanc's attempt

7   to distinguish it misconstrued the case.  The documents that

8   were being held subject to the common interest privilege were

9   created well before the litigation trustee ever came on board.

10   They were created during the time frame when the lenders and

11   the debtors were attempting to propose a plan of

12   reorganization.  And therefore the distinction that he is

13   trying to make simply does not hold water when you look at the

14   actual documents that were being protected by the common

15   interest privilege.

16       THE COURT:  Okay.  Well, I've asked a lot of questions

17   here today.  You're probably not surprised about that.  But I

18   have to say that we were a little perplexed, my law clerk and

19   I, about the focus on the good faith topic, the 1129(a)(3)

20   topic in the pleadings.  Reading Judge Lynn's June 22nd

21   memorandum opinion, we sort of had the impression that the sole

22   focus of the July 9th hearing, in his view, was going to be a

23   focus on the yes/no vote of the equity owners and whether he

24   would accept the yes or no vote as a proper exercise of

25   reasonable business judgment and a proper exercise of fiduciary

1  duties vis-à-vis the lenders who are creditors of the equity

2  owners.  So, you know, phrasing this in terms of 1129(a)(3)

3  good faith sort of confused us, but I understand the arguments

4  better now.

5      I think the documents the Lenders seek are relevant to the

6  confirmation hearing, and the reason is, if this Court's

7  interpretation of Judge Lynn's order is the correct one, this

8  is the scenario.  Judge Lynn is going to have to approve the

9  vote for or against the plan by the equity owners.  Presumably,

10  Mr. Snyder will be the one proposing what that vote is.  And I

11  think, in evaluating whether the vote is an exercise of

12  reasonable business judgment and an exercise of proper

13  fiduciary duties of the equity owner alleged debtors, the Court

14  will be evaluating, potentially, evidence of whether there were

15  higher and better -- higher or better offers out there.  Of

16  course, he also will be focusing on the legal issue of the

17  Commissioner's right to veto the sale and how that squares with

18  the Bankruptcy Code and the Bankruptcy Court's authority to

19  decide on the appropriateness of a sale.

20      So I think, whether 1129(a)(3) is a debatable issue on July

21  9th or not, I think these issues pertaining to the other

22  options of this Debtor and the Debtors' analysis of that and

23  the equity owners' analysis of that could be germane on July

24  9th, and therefore are relevant and the Lenders ought to be

25  able to discover the information they seek.

1    Now, turning to the question of the common interest

2 privilege, just to be clear, this is essentially expanding the

3 attorney-client and work product privilege.  It's an exception

4 in the law to what would otherwise be a waiver of attorney-

5 client or work product privilege, so that there is a protection

6 when there's been a communication exchanged among parties and

7 when those communications are made in furtherance of a so-

8 called common interest.

9    Relevant to the Court is that the parties asserting a

10 common interest privilege have the burden of demonstrating that

11 the privilege exists.  The Fifth Circuit says the privilege

12 should be narrowly construed because it's an obstacle to truth-

13 seeking.  One would think it also should be narrowly construed

14 in the unique world of bankruptcy, since we do favor

15 transparency and full disclosure in bankruptcy proceedings.

16 But also parties asserting it must really identify specifically

17 the legal interests or the factual or strategic basis that

18 exists for asserting a common interest privilege.

19    Here, while the Court certainly acknowledges there's

20 alignment between the Debtor and the Commissioner of Baseball,

21 I do think we kind of open the floodgates if that's the simple

22 test.  There is alignment among a debtor and many parties in

23 interest on many issues in the unique world of bankruptcy.  And

24 I don't think there is possibly a chilling effect on prepacks

25 generally if I don't opine that there is a common interest

1   privilege in this kind of context.

2       As I said, I think Federal Rule of Evidence 408 still

3   serves as a gatekeeper on keeping out confidential settlement

4   discussions under certain circumstances, but not all.  So Judge

5   Lynn can be the gatekeeper at the confirmation hearing if

6   someone wants to introduce evidence and someone thinks there's

7   a valid 408 objection.  But I don't think that the Debtor and

8   Commissioner have met their burden here of substantiating a

9   common interest privilege.

10      So I am going to grant the motion to compel of the Lenders

11  -- the Ad Hoc Committee, I should say -- and order the

12  production of those documents they have sought in their

13  Paragraph 6, their "Narrowed Topics," as they call it.

14      Likewise, though, I am going to grant the cross-motion of

15  the Commissioner.  I don't think this is just kind of a tit-

16  for-tat.  You know, if the Debtors and Commissioner have to

17  produce, well, in fairness, it's a two-way street, so should

18  the Lenders.  I think, in fairness, that if the Lenders are

19  going to be putting on evidence challenging this plan, making

20  various confirmation objections, good faith, whatever those

21  objections are, they have to open their kimono, too.  And the

22  Debtor and Commissioner get to see what their evidence is.

23      With regard to slowing this down, I hope this wasn't a

24  backdoor way of trying to get a continuance.  I think that

25  subject was exhausted, from what I can tell, last week.  First

1    it's going to be the 9th, then it's going to be the 22nd, then

2    it's going to be the 9th again.  Absent a motion for

3    continuance that is joined in by all of the key constituents

4    here, the Court sure isn't going to continue the 9th based on

5    the discovery.  So I guess I should say, be careful what you

6    ask for.  The cross-motion is granted, and people need to get

7    their act together and produce by early next week.

8        You all say you have mediation scheduled on the 6th now?

9            MS. GARCIA:  That's correct, Your Honor.

10            THE COURT:  Okay.  Well, you all are going to have to

11   produce by the 6th.  So I'm sorry for whoever's Fourth of July

12   holiday I'm ruining, but everyone keeps saying time is of the

13   essence here, and it sounds like everyone's had close to a

14   month to review the document requests.  So I guess we'll have

15   production -- I would order the parties to cooperate and

16   produce it in waves, as the saying goes, but absent agreement

17   of the parties, it needs to be produced by the 6th.

18       All right.  Who is going to volunteer to be the scrivener

19   on the order, and is there any question or housekeeping matter?

20            MR. STEWART:  It probably ought to be us.  It was our

21   motion, Your Honor.

22            THE COURT:  Okay.  Okay.  And we have to address the

23   cross-motion as well.  So do you want to just lump them all

24   into one order?

25            Mr. STEWART:  Sure.

1          THE COURT:  Okay.

2          MS. GARCIA:  Your Honor, our housekeeping matter has

3   to do with our outstanding document requests that weren't

4   subject to a motion to compel today.  I would like to believe

5   that we can reach an agreement without coming to you to file a

6   motion to compel the documents that are responsive to our

7   requests.  But you had indicated in what you just said in

8   giving your oral order that you believed the Debtors would be

9   entitled to documents, too.  I just wanted to clarify if I

10  needed to file a motion as well.

11         THE COURT:  I'll just orally address it now.  They are

12  required to produce.  Okay?

13         MS. GARCIA:  Thank you, Your Honor.

14         THE COURT:  All right.  There might be other

15  housekeeping matters.  But my law clerk has just handed me a

16  note.  If there are any issues with regard to objection

17  deadlines in connection with the plan, the objection deadline

18  is July 2nd at 4:00 p.m. Central Time.

19     Now, Laura, that's pursuant to one of Judge Lynn's prior

20  orders.  You have Document #243?

21     (The Clerk advises the Court.)

22         THE COURT:  Okay.  So that is the governing deadline.

23  As far as briefing deadline, July 6th at 4:30 p.m. Central Time

24  is the briefing deadline.

25     And I think Judge Lynn's order appointing Mr. Snyder

1  earlier today gave a deadline for the equity owner ballot of

2  the 8th, correct?  I have it in front of me.  Does anyone --

3          MR. SOSLAND:  That's correct, Your Honor.

4          A VOICE:  That's right, Your Honor.

5          MR. SOSLAND:  Noon on July 8th, I believe.

6          THE COURT:  Noon on July 8th?  Okay.  Everyone is

7  confirming, and, yes, here it is.  Noon Central Time on July

8  8th.

9      Okay.  Any other housekeeping matters?

10     (No response.)

11         THE COURT:  All right.  Well, thank you.  We stand

12 adjourned.

13     (Proceedings concluded at 5:20 p.m.)

14                          --oOo--

15

16

17

18

19                       CERTIFICATE

20     I certify that the foregoing is a correct transcript from

21 the electronic sound recording of the proceedings in the above-

22 entitled matter.

23

24 _____        _____
   Kathy Rehling                            Date
   Certified Electronic Court Transcriber
25 CET**D-444

INDEX

PROCEEDINGS                                                      5

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Motion to Compel Texas Rangers Baseball Partners and            54
the Office of the Commissioner of Baseball's Response
to Ad Hoc Group's Requests for Production filed by
Creditor Ad Hoc Group of First Lien Lenders (260) -
*Granted*

Cross-motion to Compel filed by Creditor Office of the          54
Commissioner of Baseball (281) - *Granted*

END OF PROCEEDINGS                                              57

INDEX                                                          58