# ASSET PURCHASE AGREEMENT

between

# TEXAS RANGERS BASEBALL PARTNERS

and

# RANGERS BASEBALL EXPRESS LLC

_____

Dated as of May 23, 2010

# TABLE OF CONTENTS

Page

Article I            DEFINITIONS ...................................................................................... 3

1.1     Certain Definitions ................................................................... 3

1.2     Terms Defined Elsewhere in this Agreement ...................................... 16

1.3     Other Definitional and Interpretive Matters ...................................... 19

Article II          PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ................................................................................... 21

2.1     Purchase and Sale of Assets .................................................... 21

2.2     Excluded Assets ................................................................... 22

2.3     Assumption of Liabilities ........................................................ 24

2.4     Excluded Liabilities .............................................................. 24

2.5     Further Conveyances and Assumptions; Consent of Third Parties .................... 25

2.6     Bulk Sales Laws ................................................................... 26

2.7     Purchase Price Allocation ....................................................... 27

Article III        CONSIDERATION ............................................................ 27

3.1     Consideration ..................................................................... 27

3.2     Payment of Purchase Price ....................................................... 28

Article IV          CLOSING AND TERMINATION ............................................... 28

4.1     Closing Date ....................................................................... 28

4.2     Termination of Agreement ....................................................... 28

4.3     Procedure Upon Termination ..................................................... 30

4.4     Effect of Termination ............................................................. 31

Article V          REPRESENTATIONS AND WARRANTIES OF SELLER ............................ 33

5.1     Organization and Good Standing ................................................. 33

5.2     Authorization of Agreement ..................................................... 33

5.3     Conflicts; Consents of Third Parties ............................................. 34

5.4     Capitalization. ..................................................................... 35

5.5     Financial Statements .............................................................. 35

5.6     Title to Purchased Assets; Sufficiency .......................................... 36

5.7     Absence of Certain Developments ............................................... 37

5.8     Taxes ............................................................................... 37

5.9     Real Property ...................................................................... 38

5.10 Tangible Personal Property ....................................................................... 39

5.11 Intellectual Property ................................................................................. 39

5.12 Material Contracts ..................................................................................... 40

5.13 Employee Benefits ..................................................................................... 43

5.14 Labor .......................................................................................................... 44

5.15 Litigation .................................................................................................... 44

5.16 Compliance with Laws; Permits ............................................................... 45

5.17 Environmental Matters .............................................................................. 45

5.18 Insurance .................................................................................................... 46

5.19 Major League Baseball Matters ................................................................ 46

5.20 Player Matters ............................................................................................ 47

5.21 Suites .......................................................................................................... 47

5.22 Accounts Receivable .................................................................................. 47

5.23 The Rangers Subsidiary ............................................................................. 47

5.24 No Undisclosed Liabilities ........................................................................ 47

5.25 Books of Account ....................................................................................... 48

5.26 Deferred Compensation Liability .............................................................. 48

5.27 Financial Advisors; Specified Advisor Fees ............................................. 48

5.28 Paradigm Aircraft Agreement ................................................................... 48

5.29 Indebtedness for Borrowed Money ........................................................... 49

5.30 Acquisition Proposal Materials ................................................................. 49

5.31 Assumed Liabilities of Affiliates .............................................................. 49

5.32 Non-reliance of Seller ............................................................................... 49

Article VI       REPRESENTATIONS AND WARRANTIES OF PURCHASERS .................. 50

6.1 Organization and Good Standing ............................................................... 50

6.2 Authorization of Agreement ...................................................................... 50

6.3 Conflicts; Consents of Third Parties ......................................................... 50

6.4 Litigation .................................................................................................... 51

6.5 Financial Advisors ..................................................................................... 51

6.6 Investment Intention .................................................................................. 51

6.7 MLB Information Requirements ................................................................ 51

| | | | |
|---|---|---|---|
| | 6.8 | Non-reliance of Purchasers | 51 |
| | 6.9 | Financial Capability | 52 |
| Article VII | | COVENANTS | 53 |
| | 7.1 | Access to Information | 53 |
| | 7.2 | Conduct of the Business Pending the Closing | 54 |
| | 7.3 | Consents | 56 |
| | 7.4 | Regulatory Approvals. | 57 |
| | 7.5 | Further Assurances | 58 |
| | 7.6 | Confidentiality | 58 |
| | 7.7 | Preservation of Records | 59 |
| | 7.8 | Publicity | 59 |
| | 7.9 | MLB Approvals | 60 |
| | 7.10 | MLB Funding | 61 |
| | 7.11 | Nonprofit Entities | 61 |
| | 7.12 | Acquisition Financing | 61 |
| | 7.13 | Pre-Closing Escrow Agreement | 62 |
| | 7.14 | Disclosure Schedules; Supplementation and Amendment of Schedules | 62 |
| | 7.15 | Title, Survey and Lot J Easement | 63 |
| | 7.16 | Negotiations | 66 |
| | 7.17 | Media JV Agreement | 67 |
| | 7.18 | Insurance | 67 |
| | 7.19 | Transfer Documents | 68 |
| | 7.20 | Transition Services Agreement | 68 |
| | 7.21 | Agreement to Negotiate | 68 |
| | 7.22 | Bankruptcy Matters | 69 |
| Article VIII | | EMPLOYEES AND EMPLOYEE BENEFITS | 70 |
| | 8.1 | Employment | 70 |
| | 8.2 | Employee Benefits. | 71 |
| | 8.3 | No Further Obligations | 74 |
| Article IX | | CONDITIONS TO CLOSING | 74 |
| | 9.1 | Conditions Precedent to Obligations of Purchasers | 74 |

| | | |
|---|---|---|
| 9.2 | Conditions Precedent to Obligations of Seller | 75 |
| 9.3 | Frustration of Closing Conditions | 77 |
| Article X | INDEMNIFICATION; EXCLUSIVE REMEDIES | 77 |
| 10.1 | Survival of Representations, Warranties and Covenants | 77 |
| 10.2 | Indemnification by Seller | 78 |
| 10.3 | Indemnification by Purchasers | 79 |
| 10.4 | Indemnification Procedures. | 79 |
| 10.5 | Certain Limitations on Indemnification | 81 |
| 10.6 | Calculation of Losses | 82 |
| 10.7 | Indemnity Escrow | 83 |
| 10.8 | Tax Treatment of Indemnity Payments | 84 |
| 10.9 | Specific Performance; Purchaser Termination Amount | 84 |
| 10.10 | Exclusive Remedy | 84 |
| 10.11 | Nature of Representations and Warranties; Schedules | 85 |
| 10.12 | DTPA WAIVER | 85 |
| Article XI | MISCELLANEOUS | 86 |
| 11.1 | Payment of Sales, Use or Similar Taxes | 86 |
| 11.2 | Expenses | 86 |
| 11.3 | Submission to Jurisdiction; Consent to Service of Process; Costs and Expenses Paid by Prevailing Party | 87 |
| 11.4 | Entire Agreement | 87 |
| 11.5 | Amendments and Waivers | 88 |
| 11.6 | Governing Law | 88 |
| 11.7 | Notices | 88 |
| 11.8 | Severability | 90 |
| 11.9 | Binding Effect; Assignment | 90 |
| 11.10 | Non-Recourse | 91 |
| 11.11 | Legal Representation | 91 |
| 11.12 | General Releases | 91 |
| 11.13 | Counterparts | 93 |
| 11.14 | Payments by Seller | 93 |

Exhibit 1.1(a)(i)        Non-Excluded Affiliate Contracts
Exhibit 1.1(a)(ii)       Excluded Contracts
Exhibit 1.1(b)           Knowledge of Seller
Exhibit 1.1(c)           Shared Assets
Exhibit 3.1              Emerald Diamond Payoff Agreement and Release
Exhibit 5.29             Indebtedness
Exhibit 5.31             Assumed Liabilities of Affiliates
Exhibit 7.2(a)           Conduct of the Business Pending Closing – Required Conduct
Exhibit 7.2(b)           Conduct of the Business Pending Closing – Prohibited Conduct
Exhibit 9.1(e)           Consents Required by Purchasers
Exhibit 9.1(m)           Required Lessor Estoppels
Exhibit 9.2(d)           Consents Required by Seller

Exhibit A                Form of Media JV Agreement
Exhibit B                Shared Charter Services Agreement
Exhibit C                Contingent Note
Exhibit D                Plan of Reorganization
Exhibit E                Voluntary Petition
Exhibit F                Lot J Easement
Exhibit G                First Day Motions
Exhibit H                Existing BRE Land Use Arrangement

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated as of May 23, 2010, between Texas Rangers Baseball Partners, a Texas general partnership ("**TRBP**" or "**Seller**"), and Rangers Baseball Express LLC, a Delaware limited liability company ("**Baseball Express**" and collectively with one or more of its direct or indirect wholly-owned subsidiaries that Baseball Express designates as its permitted assignee pursuant to Section 11.9 of this Agreement, "**Purchasers**" and each, a "**Purchaser**").

## RECITALS:

1.      TRBP, a wholly-owned indirect subsidiary of HSG Sports Group LLC, a Texas limited liability company ("**HSG**"), owns and operates the Texas Rangers Major League Baseball Club, a professional baseball team that is a Major League Club (the "**Texas Rangers**"), in the Dallas/Fort Worth Metroplex pursuant to the Major League Constitution and the Membership Agreement, dated as of November 18, 1960, by and between The American League of Professional Baseball Clubs, now the Office of the Commissioner of Baseball, and WBC Baseball Club, Inc., as assumed by TRBP pursuant to an Assumption Agreement, dated as of June 16, 1998;

2.      Prior to the date of this Agreement, Rangers Ballpark LLC, a Texas limited liability company and a wholly-owned subsidiary of TRBP ("**Rangers Ballpark**"), assigned to TRBP the Ballpark Lease Agreement (as defined herein);

3.      Pursuant to the Ballpark Lease Agreement, TRBP leases and operates the home ballpark of the Texas Rangers, now known as Rangers Ballpark in Arlington (the "**Ballpark in Arlington**");

4.      Pursuant to the terms of this Agreement, TRBP will file the Voluntary Petition (as defined herein) in the Bankruptcy Court (as defined herein) and immediately thereafter will file the Plan of Reorganization (as defined herein) for the purposes of obtaining approval of the Bankruptcy Court and facilitating consummation of the transactions contemplated by this Agreement;

5.      In addition, prior to the date of this Agreement, Emerald Diamond, L.P., a Texas limited partnership and indirect wholly-owned subsidiary of HSG ("**Emerald Diamond**"), transferred the Centerfield Office Lease Agreement (as defined herein), the subtenants agreements and certain other assets and liabilities to TRBP at their agreed upon fair value;

6.      As a result, TRBP now leases and operates certain land and improvements known as the Centerfield Office Building that is adjacent to the Ballpark in Arlington (the "**Centerfield Office**");

7.      Ballpark Real Estate, L.P., a Texas limited partnership and Affiliate of HSG ("**BRE**"), owns and has leasehold interests in certain real property adjacent to the Ballpark in

Arlington that Seller uses pursuant to the Existing BRE Land Use Arrangement (as defined herein), which real property includes parking lots, a greenbelt, a lake, an irrigation system, and other amenities currently used for the benefit of the Texas Rangers and the Centerfield Office;

8.      It is a condition precedent to Purchasers' agreement to acquire the Purchased Assets (as defined herein) hereunder that BRE has agreed to sell to Baseball Express the BRE Land (as defined herein), and BRE has agreed to do so pursuant to that Amended and Restated Land Sale Agreement, dated as of the date hereof, by and among BRE, Baseball Express and Seller (as amended and restated, the "**BRE Land Purchase Agreement**"), which agreement amended and restated that certain Land Sale Agreement, dated as of January 23, 2010;

9.      HSG previously held certain assets and was subject to certain liabilities, including certain Contracts, related to the Business, which HSG treated as pure pass-through assets and liabilities for TRBP;

10.      Because, as pass-through assets, there is currently no economic benefit to HSG of holding such assets and because HSG would have no ability to perform the obligations under such Contracts if TRBP sold the Business, prior to the date of this Agreement, HSG transferred such assets, together with such liabilities, to TRBP;

11.      TRBP owns 90% of the trust interests, and Major League Baseball Trust owns the remaining 10% of the trust interests, of Rangers Club Trust, a Delaware business trust (the "**Rangers Subsidiary**"), which is the borrower under certain league-wide credit facilities and is an indirect subsidiary of HSG;

12.      Seller, Baseball Express, HSG, Rangers Ballpark and Emerald Diamond were parties to that certain Asset Purchase Agreement, dated January 23, 2010, pursuant to which Seller, HSG, Rangers Ballpark and Emerald Diamond agreed to sell to Purchasers the assets of the Texas Rangers and related assets, and Purchasers agreed to purchase such assets and assume certain liabilities related thereto, in each case subject to certain terms and conditions (the "**Original APA**");

13.      To facilitate the filing of the Voluntary Petition, the Original APA was terminated pursuant to its terms by mutual written consent of the parties thereto concurrently with the execution hereof; and

14.      Seller desires to sell, transfer and assign to Purchasers, and Purchasers desire to acquire and assume from Seller, the Business, Purchased Assets and Assumed Liabilities, all as more specifically provided herein.

In consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

# ARTICLE I

## DEFINITIONS

1.1 <u>Certain Definitions</u>. For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"**<u>Acquisition Financing</u>**" means the equity and debt financing for the transactions contemplated by this Agreement to be obtained by Purchasers.

"**<u>Affiliate</u>**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**<u>Approval Orders</u>**" means Orders entered by the Bankruptcy Court in form and substance mutually agreed upon by Purchasers and Seller, such agreement not to be unreasonably withheld, conditioned or delayed, (a) confirming the Plan of Reorganization and (b) otherwise authorizing and approving consummation of all of the transactions contemplated by this Agreement and related hereto.

"**<u>Ballpark Lease Assignment</u>**" means that certain Assignment and Assumption Agreement, dated as of May 23, 2010, by and between Rangers Ballpark and TRBP.

"**<u>Bankruptcy Case</u>**" means the case commenced by the filing of the Voluntary Petition in the Bankruptcy Court.

"**<u>Bankruptcy Code</u>**" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

"**<u>Bankruptcy Court</u>**" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

"**<u>Baseball Finance Note</u>**" means the Amended and Restated Secured Revolving Promissory Note, dated November 25, 2009, by TRBP in favor of Baseball Finance LLC, in the principal amount of up to $25,000,000, as the same may be amended, increased or amended and restated from time to time.

"**<u>BRE Land</u>**" means all parcels of real property owned or leased by BRE as of the date of this Agreement and located in Tarrant County, Texas.

"**<u>Business</u>**" means the business of the Seller and the Rangers Subsidiary, including the business of operating the Ballpark in Arlington, the Centerfield Office and the Texas Rangers (including any minor league, little league, hall of fame and foreign operations affiliated with the Texas Rangers and the spring training facilities of the Texas Rangers, in each case, subject to the control of Seller or its Affiliates, but excluding the 2.4995% limited partnership interest in RoughRiders Baseball Partners, L.P. (f/k/a Mandalay Baseball Partners, L.P.) held by Southwest

Sports Group Baseball, L.P.), and the business of operating and maintaining the BRE Land for the benefit of the Ballpark in Arlington, BRE, the Centerfield Office and the Texas Rangers pursuant to the Existing BRE Land Use Arrangement.

"**Business Day**" means any day of the year on which national banking institutions in Texas are open to the public for conducting business and are not required or authorized to close.

"**Centerfield Office Lease Assignment**" means that certain Assignment and Assumption Agreement, dated as of May 23, 2010, by and between Emerald Diamond and TRBP.

"**Centerfield Office Note**" means the promissory note, dated as of May 23, 2010, payable in the original principal amount of $15,055,081, by TRBP to Emerald Diamond.

"**Clayton Act**" means the Clayton Antitrust Act of 1914, as amended, and the rules and regulations promulgated thereunder.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Collective Bargaining Agreement**" means the Basic Agreement, effective December 20, 2006, between the 30 Major League Clubs and the Major League Baseball Players Association, including any side agreement or collectively bargained employee benefit plan contained or referenced therein or maintained pursuant thereto.

"**Commissioner**" means the Commissioner of Baseball as elected under the Major League Constitution or, in the absence of a Commissioner, any Person succeeding to the powers and duties of the Commissioner pursuant to the Major League Constitution.

"**Contract**" means any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease or license.

"**Creditors Committee**" means an official committee of unsecured creditors, if any, appointed in the Bankruptcy Case pursuant to Section 1102 of the Bankruptcy Code.

"**Currency Agreement**" means, with respect to any Person, any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with HSG's and its Subsidiaries' operations and not for speculative purposes.

"**Dallas Stars**" means Dallas Stars, L.P., a Delaware limited partnership, which is currently an indirect wholly-owned subsidiary of HSG.

"**Data Site**" means the online data site maintained by Merrill Corporation under the project name "Homerun" in connection with the transactions contemplated by this Agreement. For the avoidance of doubt, a document will be deemed to have been added to the Data Site at such point as Purchasers were given online access to view such document (but only after notice of such access has been given by Merrill Corporation's automatically generated e-mail notice

4

system to any of Purchasers or their representatives who has, at the time of such notice, properly configured any necessary settings on the Data Site to receive automatic e-mail notices or written notice of such access has been given by or on behalf of Seller to Purchasers in accordance with this Agreement).

"**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related exclusively to, or necessary for the operation of, the Business or the Purchased Assets in each case whether or not in electronic form.

"**Emerald Diamond Deed of Trust**" means the Deed of Trust recorded under Instrument Number D198132989 in the Official Public Records of Tarrant County, Texas on June 17, 1998, as modified by that Modification of Deed of Trust, Security Agreement, Assignment of Rents And Leases And Fixture Filing recorded under Instrument Number D207206986 in the Official Public Records of Tarrant County, Texas on June 14, 2007, securing the Emerald Diamond Note.

"**Emerald Diamond Note**" means the promissory note dated as of June 16, 1998, payable in the original principal amount of $11,400,000 by BRE to Emerald Diamond, together with all sums from time to time owing under the Emerald Diamond Deed of Trust.

"**Employee Benefit Plan**" means: (a) any material* "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"); and (b) any other material* employee benefit plan or arrangement, including any stock option, stock purchase, stock award, deferred compensation, pension, retirement, savings, profit sharing, incentive compensation, bonus, health, life insurance, cafeteria, flexible spending, dependent care, fringe benefit, vacation pay, holiday pay, disability, sick pay, workers' compensation, unemployment, severance pay, employee loan, or educational assistance plan or arrangement.

"**Environmental Law**" means any applicable Law currently in effect relating to the protection of the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), and the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), as each has been amended and the regulations promulgated pursuant thereto.

"**Equity Commitment Letters**" means written commitments from one or more equity sources pursuant to which such sources agree to provide cash equity to Purchasers for the transactions contemplated hereby.

"**ERISA Affiliate**" means any trade or business, whether or not incorporated, which together with another trade or business would be deemed to be a "single employer" within the meaning of Section 414 of the Code or Section 4001(b) of ERISA.

"**Excluded Contracts**" means the following Contracts (and the rights thereunder): (i) this Agreement and the other documents related to this Agreement or the transactions contemplated hereby, (ii) all Contracts between Seller (or any of its Subsidiaries) and any broker, investment banker or similar advisor relating to this Agreement or the transactions contemplated hereby or otherwise, (iii) all Contracts between Seller (or any of its Subsidiaries) and any Affiliate of Seller or any other Hicks Affiliate (including the Overdraft Protection Agreement, the Centerfield Office Note, the BRE Land Purchase Agreement and any expense sharing or reimbursement arrangement between Seller and any Affiliate of Seller), except as set forth in Exhibit 1.1(a)(i), (iv) the Contracts listed on Exhibit 1.1(a)(ii), (v) the Existing BRE Land Use Arrangement, (vi) the Interim Transition Services Agreement, and (vii) all Contracts of Seller or any Subsidiary of Seller relating to the Senior Indebtedness.

"**Existing BRE Land Use Arrangement**" means the Memorandum Regarding Existing Land Use Arrangement by and between BRE and TRBP, dated as of May 20, 2010, attached as Exhibit H.

"**Federal Trade Commission Act**" means the Federal Trade Commission Act of 1914, as amended, and the rules and regulations promulgated thereunder.

"**Final Order**" means an Order that has been entered on the docket of the Bankruptcy Court and that is in full force and effect and has not been stayed.

"**First Day Motions**" means the motions listed on Exhibit G, in each case in form and substance mutually agreed upon by Seller and Purchasers.

"**First Lien Credit Agreement**" means that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among HSGH, HSG, certain Subsidiaries of HSG, as guarantors, the lenders party thereto from time to time, JPMorgan Securities Inc., as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent, Barclays Capital Inc., as Joint Lead Arranger and Joint Bookrunner, Barclays Bank PLC, as Co-Syndication Agent and JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent.

"**Former Rangers Employee**" means each individual (including common law employees) who (i) has terminated his or her employment before the date hereof with HSG or any of its Subsidiaries and whose salary, wages or other similar compensation expense during such employment was allocated in an amount greater than or equal to 50% to TRBP or any of its Subsidiaries, either directly or by reimbursement or (ii) is a Rangers Employee and has terminated such employment on or before the Closing Date.

"**FTC**" means the Federal Trade Commission.

"**Furniture and Equipment**" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned by Seller, including all artwork, desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"**GAAP**" means generally accepted accounting principles in the United States as of the date hereof.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"**Hardware**" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"**Hazardous Materials**" means and includes each substance designated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance or as designated with words of similar meaning and regulatory effect under any Environmental Law, including petroleum and petroleum products or derivatives, asbestos, urea formaldehyde, and polychlorinated biphenyls.

"**Hedge Agreement**" means an Interest Rate Agreement or a Currency Agreement entered into with a lender counterparty in connection with or to satisfy the requirements of the First Lien Credit Agreement or the Second Lien Credit Agreement, including the (i) ISDA Master Agreement, dated as of December 5, 2001, as amended and supplemented from time to time, between JPMorgan Chase Bank, N.A. and HSG, (ii) ISDA Master Agreement, dated as of February 9, 2006, as amended and supplemented from time to time, between Wachovia Bank, National Association and HSG, (iii) ISDA Master Agreement, dated as of March 9, 2006, as amended and supplemented from time to time, between Goldman Sachs Capital Markets, L.P. and HSG, (iv) ISDA Master Agreement, dated as of June 26, 2006, as amended and supplemented from time to time, between Sovereign Bank and HSG, (v) ISDA Master Agreement, dated as of June 28, 2006, as amended and supplemented from time to time, between JPMorgan Chase Bank, N.A. and HSG and (vi) ISDA Master Agreement, dated as of September 15, 2006, as amended and supplemented from time to time, between Barclays Bank Plc. and HSG.

"**Hicks**" means Thomas O. Hicks.

"**Hicks Affiliate**" means Hicks, his family or any trust for the benefit of him or his family or any entity (other than Seller or the Rangers Subsidiary) a majority of the outstanding equity interests of which are owned, directly or indirectly, by Hicks, his family or any trust for the benefit of him or his family.

"**HSGH**" means HSG Sports Group Holdings LLC, a Texas limited liability company, which wholly owns HSG as its direct subsidiary.

"**HSG Partnership**" means HSG Partnership Holdings LLC, a Texas limited liability company, which is the wholly-owned direct subsidiary of HSG.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Indebtedness**" of any Person means, without duplication, (i) the principal of, and accreted value, accrued and unpaid interest, fees and penalties in respect of, (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities); (iii) all obligations of the type referred to in clauses (i) and (ii) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (iv) all obligations of the type referred to in clauses (i) through (iii) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Intellectual Property**" means all intellectual property rights arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, reexaminations and reissues of any of the foregoing (collectively, "**Patents**"); (ii) all trademarks, service marks, trade names, service names, brand names, trade dress, logos, corporate names and other source or business identifiers, together with the goodwill associated with any of the foregoing, and all applications, registrations, renewals and extensions of any of the foregoing (collectively, "**Marks**"); (iii) copyrights and works of authorship, and all registrations, applications, renewals and extensions and reversions of any of the foregoing (collectively, "**Copyrights**"); (iv) all trade secrets (collectively, "**Trade Secrets**"); and (v) all Internet domain names, and all registrations, applications, renewals and extensions of any of the foregoing (collectively, "**Domain Names**").

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with HSG's and its Subsidiaries' operations and not for speculative purposes.

"**Interim Agreement**" shall have the meaning given to it in the Plan of Reorganization.

"**Interim Support Agreement**" shall have the meaning given to it in the Plan of Reorganization.

"**Interim Transition Services Agreement**" means the Interim Transition Services Agreement by and between Seller and HSG, dated as of May 20, 2010.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge of Seller**" means the actual knowledge of those Persons identified on Exhibit 1.1(b).

"**Law**" means (i) any foreign, federal, state, or local law, common law, statute, code, ordinance, rule or regulation or (ii) any Order. Without limitation, Laws include the Bankruptcy Code and the rules, decrees, oversight and approvals of the Bankruptcy Court.

"**Legal Proceeding**" means any judicial, administrative or arbitral actions, suits or proceedings (public or private) by or before a Governmental Body.

"**Lender**" means, with respect to the Senior Indebtedness, each financial institution listed on the signature pages thereto as a Lender, and any other Person that becomes a Lender pursuant to an assignment agreement in accordance therewith.

"**Liability**" means any debt, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including all costs and expenses relating thereto.

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, interest (as such term is used in section 363(f) of the Bankruptcy Code), easement or servitude.

"**Lot J Easement**" means that certain Access Agreement and Easement, in the form attached hereto as Exhibit F, to be executed by and among BRE, TRBP and Arlington Sports Facilities Development Authority.

"**Major League Baseball**" or "**MLB**" means, depending on the context, any or all of (a) the Office of the Commissioner of Baseball, each other Major League Baseball Entity and/or all boards and committees thereof, including the Executive Council and the Ownership Committee, and/or (b) the Major League Clubs acting collectively.

"**Major League Baseball Documents**" means, collectively, the following documents as in effect from time to time and any amendments, supplements or other modifications thereto and all replacement or successor documents thereto that may in the future be entered into: (a) the Major League Constitution, (b) the Collective Bargaining Agreement, (c) the Professional Baseball Agreement between the Office of the Commissioner of Baseball, on behalf of itself and the Major League Clubs, and the National Association of Professional Baseball Leagues, (d) the Major League Rules (and all attachments thereto), (e) the Interactive Media Rights Agreement, effective as of January 20, 2000, by and among the Office of the Commissioner of Baseball, the various Major League Clubs, MLB Advanced Media, L.P. and various other Major League Baseball Entities, and (f) each agency agreement and operating guidelines among the Major League Clubs and any Major League Baseball Entity, including the Amended and Restated Agency Agreement, effective as of November 1, 2006, by and among Major League Baseball Properties, Inc., the various Major League Clubs and the Office of the Commissioner of Baseball (and the Operating Guidelines related thereto).

"**Major League Baseball Entity**" means any entity, whether now existing or formed after the date hereof, that is owned, directly or indirectly, by a majority of the Major League Clubs and/or one or more of the entities directly or indirectly owned by a majority of the Major League Clubs, including each of the following entities: the Office of the Commissioner of Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., MLB Advanced Media, L.P., MLB Network Holdings, LLC, The MLB Network, LLC and each of their respective present and future affiliates, successor or assigns.

"**Major League Baseball Trust**" means the Major League Baseball Trust, a Delaware statutory trust formed pursuant to the Trust Agreement, dated as of May 22, 1992, among the Wilmington Trust Company and the Major League Clubs party thereto.

"**Major League Club**" means any professional baseball club that is entitled to the benefits, and bound by the terms, of the Major League Constitution.

"**Major League Constitution**" means the Major League Constitution adopted on January 19, 2000 (which amended and superseded the Major League Agreement, dated January 1, 1975, the Agreement, in re Major Leagues Central Fund dated as of December 8, 1983, as amended, and the respective constitutions of the former American and National Leagues of Professional Baseball Clubs), as the same may be amended, supplemented or otherwise modified from time to time in the manner provided therein and all replacement or successor agreements that may in the future be entered into by the Major League Clubs.

"**Material Adverse Effect**" means (i) a material* adverse change in, or a material* adverse effect upon, the business, assets, liabilities (actual or contingent), properties, operations or condition (financial or otherwise) of Seller, (ii) a material* impairment of the rights and remedies of Purchasers under this Agreement or any Seller Document or Purchaser Document, (iii) a material* adverse effect upon the legality, validity, binding effect or enforceability against Seller of this Agreement or any Seller Document or Purchaser Document to which it is a party, or (iv) a material* adverse effect on the ability of Seller to consummate the transactions contemplated by this Agreement; provided, however, that in each instance the commencement and pendency of the Bankruptcy Case, and any changes or effects resulting directly from such filing itself, shall not in and of themselves be deemed a Material Adverse Effect.

"**MLB Approvals**" means, with respect to the Major League Clubs, the Commissioner, the Office of the Commissioner of Baseball or any other Major League Baseball Entity, any consents, waivers, approvals, orders, authorizations or no-objection letters required to be obtained from such Person(s) pursuant to the MLB Rules and Regulations (as exercised in the sole and absolute discretion of such Person(s)).

"**MLB League-Wide Credit Facility**" means (i) that certain Fourth Amended and Restated Club Trust Credit Agreement, dated as of December 8, 2009, by and among Major League Baseball Trust, Bank of America, N.A. and the Club Trusts from time to time party thereto, (ii) that certain Ratification Agreement, dated as of December 8, 2009, between the Rangers Subsidiary, Bank of America, N.A., and Wells Fargo Bank, National Association, (iii) that certain Third Amended and Restated Club Trust Pledge and Security Agreement, dated as of December 8, 2009, by and between the Rangers Subsidiary and Major League Baseball Trust,

(iv) that certain ISDA Master Agreement, dated as of October 10, 2006, as amended and supplemented from time to time, between JPMorgan Chase Bank, N.A. and the Rangers Subsidiary, and (v) all other agreements, notes, instruments and other documents entered into by TRBP or any of its Subsidiaries in connection with any or all of the foregoing.

"**MLB Rules and Regulations**" means (i) the Major League Baseball Documents, (ii) any present or future agreements or arrangements entered into by, or on behalf of, the Office of the Commissioner of Baseball, any other Major League Baseball Entity or the Major League Clubs acting collectively, including agreements or arrangements entered into pursuant to the Major League Baseball Documents and (iii) the present and future mandates, rules, regulations, policies, practices, bulletins, by-laws, directives or guidelines issued or adopted by, or on behalf of, the Commissioner, the Office of the Commissioner of Baseball or any other Major League Baseball Entity as in effect from time to time, including the Guidelines.

"**Office of the Commissioner of Baseball**" means the Office of the Commissioner of Baseball, an unincorporated association comprised of the Major League Clubs who are party to the Major League Constitution, and any successor organization thereto.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of the Business.

"**Overdraft Protection Advance**" means the principal amount of $5,000,000, outstanding and payable to Hicks pursuant to the Overdraft Protection Agreement, which together with interest equals $5,602,773.97 as of May 19, 2010, and with interest continuing to accrue at a per-diem rate of approximately $1,643.84.

"**Overdraft Protection Agreement**" means the Overdraft Protection Line of Credit Agreement dated as of April 30, 2009 between Hicks, HSG, HSG Partnership, TRBP and the Dallas Stars pursuant to which Hicks agreed to provide an overdraft protection line of credit in the principal amount of up to $15,000,000, of which the Overdraft Protection Advance was funded by Hicks, and as to which Hicks suspended his obligation to make future advances of principal under the overdraft protection line of credit pursuant to that certain letter from Hicks to HSG dated June 29, 2009.

"**Parking Agreements**" means (a) that Parking Agreement and Easement dated April 13, 2003, among TRBP, TCDFW SPDA BTS, LP, and Siemens Dematic Postal Automation L.P., and (b) that Commercial License Agreement dated April 1, 2009, between TRBP and Oncor Electric Delivery Company LLC (as it may be renewed on substantially similar terms as exist as of the date of this Agreement).

"**Permit**" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"**Permitted Exceptions**" means:

(a)     with respect to assets other than real property, (i) Liens for Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; and (iii) title of a lessor under a capital or operating lease; and

(b)     with respect to real property, (i) subject to the requirements herein, the title exceptions listed on Schedule B of the Title Commitment; (ii) any Lien, reservation, exception, limitation or title defect, in each case, that is caused by the acts of Purchasers or their representatives; (iii) rights of landlords under the Ballpark Lease Agreement or the Centerfield Office Lease Agreement; (iv) rights of tenants, licensees and parties having a right to use the Ballpark in Arlington or the Centerfield Office Building (to the extent set forth on the rent roll attached as Schedule 5.9), and rights of licensees, sponsors and concessionaires under, the Purchased Contracts; (v) any document evidencing obligations of Seller under the Ballpark Lease Agreement or the Centerfield Office Lease Agreement and the leases of real property and licenses of real property, in each case, that are included in the Purchased Contracts; (vi) any title exceptions or other Liens that Seller removes or satisfies on or prior to the Closing Date; (vii) any title exception or other Liens that Purchasers cause the Title Company to remove, satisfy or insure over on or prior to the Closing Date; and (viii) any Lien for Taxes, assessments or other governmental charges not yet due or payable or the amount or validity of which is being contested in good faith by appropriate proceedings.

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"**Plan of Reorganization**" means the plan of organization attached hereto as Exhibit D, or such amended plan of reorganization as may be mutually agreed upon by Purchasers and Seller, such agreement not to be unreasonably withheld, conditioned or delayed.

"**Purchased Contracts**" means all Contracts (other than Excluded Contracts) to which Seller is a party.

"**Purchased Intellectual Property**" means all Intellectual Property, including the Registered Intellectual Property, owned by Seller, including (i) any and all Copyright and other Intellectual Property rights, title and interests of Seller in and to any and all telecasts and radio, Internet or other interactive media broadcasts of any game, contest or other broadcast in which the Texas Rangers were a participant, subject to the terms and conditions set forth in the Contracts listed on Schedule 5.12(a), and (ii) all registrations and pending applications for Intellectual Property relating to the Texas Rangers registered in the name of any Major League Baseball Entity (including Major League Baseball Properties, Inc. or MLB Advanced Media, L.P.) exclusively on behalf of the Seller pursuant to the Amended and Restated Agency Agreement, effective as of November 1, 2006, by and among Major League Baseball Properties, Inc., the various Major League Clubs and the Office of the Commissioner of Baseball and the Interactive Media Rights Agreement, effective as of January 20, 2000, by and among the Office of the Commissioner of Baseball, the various Major League Clubs, MLB Advanced Media, L.P. and various other Major League Baseball Entities.

"**Rangers Employees**" means the Rangers Non-Player Employees and Rangers Player Employees.

"**Rangers Non-Player Employee**" means, as of any date, each individual who is employed on such date (including common law employees) by HSG or any of its Subsidiaries exclusively in connection with the Business or is listed on Schedule 8.1(a) as a shared employee, in each case, other than a Rangers Player Employee.

"**Rangers Player Employee**" means, as of any date, each baseball player on such date on the 40-man roster of the Texas Rangers and each other major league or minor league baseball player employed by Seller or any of its Subsidiaries, in each case, in connection with the Business.

"**Registered Intellectual Property**" means all issued Patents, pending Patent applications, registered Marks, pending applications for registration of Marks, registered Copyrights and Domain Name registrations owned, filed or applied for by Seller.

"**Second Amended and Restated VSA**" shall have the meaning given to it in the Plan of Reorganization.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit and Guaranty Agreement, dated as of December 19, 2006, among HSGH, HSG, certain subsidiaries of HSG, as guarantors, the lenders party thereto from time to time, JPMorgan Securities Inc., as Joint Lead Arranger, Joint Bookrunner and Co-Syndication Agent, Barclays Capital Inc., as Joint Lead Arranger and Joint Bookrunner, Barclays Bank PLC, as Administrative Agent, Collateral Agent and Co-Syndication Agent.

"**Seller Expenses**" means, without duplication, collectively, (i) Seller's share of the filing fees required by the HSR Act or any other Antitrust Laws, (ii) the costs of Surveys provided by Seller to Purchasers, (iii) the costs of the Title Commitment, the Title Update and any other costs or expenses for which Seller is expressly responsible under Section 7.15, (iv) the costs of all filings made in the Bankruptcy Case, and (v) without duplication of any Specified Advisor Fees, to the extent incurred and paid by Seller, Rangers Ballpark or the Rangers Subsidiary after November 1, 2009, all Liabilities, fees, costs, expenses (including any Expenses (as defined in the BRE Land Purchase Agreement)), losses and damages (including any Damages (as defined in the BRE Land Purchase Agreement)) of any Hicks Affiliate or any other Affiliate of Seller that Seller, Rangers Ballpark or the Rangers Subsidiary agreed to assume or for which Seller, Rangers Ballpark or the Rangers Subsidiary agreed to reimburse or indemnify such Hicks Affiliate or other Affiliate (including pursuant to Seller's obligations under Section 6.12(ii) of the BRE Land Purchase Agreement). The parties hereto agree that Seller Expenses equal $69,126 as of (and including) the date hereof.

"**Seller MLB Amounts**" means, without duplication, all amounts payable by Seller to or on behalf of MLB, whether incurred before or after the date that the Voluntary Petition is filed, including attorneys' fees, with respect to the following, including the negotiation, preparation, administration, approval or enforcement thereof:  (a) the Baseball Finance Note, including the outstanding principal amount of any loans evidenced thereby and any interest, fees, expenses,

penalties and other amounts payable with respect thereto, (b) any debtor-in-possession credit facility provided to TRBP by MLB, including the outstanding principal amount of any loans outstanding thereunder and any interest, fees, expenses, penalties and other amounts payable with respect thereto, (c) the Voluntary Support Agreement, the Second Amended and Restated VSA, the Interim Agreement and the Interim Support Agreement, including any amounts due to MLB or any of its representatives thereunder, (d) the sale or other disposition of the assets of or equity in Seller, including the sale of the Business and the Purchased Assets as contemplated by this Agreement, (e) the Plan of Reorganization, (f) the events leading up to the commencement of the Voluntary Petition and prosecution thereof, and (g) to the extent not already included in the foregoing, this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby, any other contemplated Acquisition Transaction (whenever contemplated), whether generally or with any Person other than a Purchaser, including all fees and expenses of any legal counsel engaged by MLB in connection with any of the foregoing and all expenses related to background checks and investigations performed by MLB in connection with consideration of various bidders.

"**Senior Employee**" means, collectively, (i) each of the officers of TRBP or any of its Subsidiaries and (ii) any employee of TRBP or any of its Subsidiaries (other than a Rangers Player Employee) whose annual salary exceeds $150,000.

"**Senior Indebtedness**" means the obligations arising under, in connection with or in respect of (i) the First Lien Credit Agreement, (ii) the Second Lien Credit Agreement and (iii) including the amounts due under, or otherwise due in connection with the termination of, the Hedge Agreements.

"**Shared Assets**" means assets of HSG (other than any Employee Benefit Plans or Insurance Policies) that are used or held for use by HSG for the benefit of both the Texas Rangers and the Dallas Stars, all of which are listed on Exhibit 1.1(c).

"**Shared Charter Services Agreement**" means that certain Shared Charter Services Agreement, dated May 23, 2010, between HSG and TRBP with respect to the rights and obligations of TRBP regarding its use solely in the Business of the aircraft provided for under that certain Aircraft Charter Agreement, dated as of June 21, 2007, by and between Paradigm Air Operators, Inc. (d/b/a SportsJet Air Operators, LLC) and HSG, as amended from time to time (the "**Paradigm Aircraft Agreement**"), which Shared Charter Services Agreement shall be deemed to amend and supersede in its entirety the oral lease agreement regarding TRBP's use solely in the Business of such aircraft under which HSG and TRBP have historically operated, and which written lease agreement is attached hereto as Exhibit B.

"**Sherman Act**" means the Sherman Antitrust Act of 1890, as amended, and the rules and regulations promulgated thereunder.

"**Specific Rangers Assumed Liabilities**" means (i) the balance outstanding and attributable to TRBP or its Subsidiaries under the MLB League-Wide Credit Facility, (ii) the aggregate amount of gross deferred compensation owed by TRBP to current or former players of the Texas Rangers as of the Closing Date, (iii) the aggregate lease obligations of TRBP pursuant

to the Ballpark Lease Agreement between Arlington Sports Facilities Development Authority, Inc. and TRBP (as successor to Rangers Ballpark under such lease agreement) dated as of June 13, 2007, as amended (the "**Ballpark Lease Agreement**"), (iv) the aggregate lease obligations of TRBP pursuant to the Centerfield Office Building Lease Agreement between Arlington Sports Facilities Development Authority and TRBP (as successor to Emerald Diamond under such lease agreement) dated as of June 13, 2007 (the "**Centerfield Office Lease Agreement**"), and (v) the aggregate obligations of TRBP pursuant to the Parking Agreements.

"**Specified Advisor Fees**" means, to the extent incurred, directly by Seller or indirectly through a Hicks Affiliate or other Affiliate of Seller, after November 1, 2009, (i) the fees and expenses of Weil, Gotshal & Manges LLP ("**WGM**"), McGuire, Craddock & Strother, P.C. and Forshey & Prostok, L.L.P. in each case paid out of the cash of Seller or Rangers Ballpark, (ii) the out-of-pocket expenses and the portion of the monthly fee of Perella Weinberg Partners, in each case to the extent allocated to Seller and (iii) the out-of-pocket expenses of Raine Advisors LLC and Bank of America Merrill Lynch & Co.  The parties hereto agree that Specified Advisor Fees equal $6,668,466 as of (and including) the date hereof.

"**Specified Fees and Expenses**" means Specified Advisor Fees and Seller Expenses.

"**Subsidiary**" means, with respect to a Person, any Person of which a majority of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person.

"**Subsidiary Equity Interests**" means the trust interests in the Rangers Subsidiary that are held by TRBP.

"**Suite License**" means a Contract that gives a party thereto the right to use a suite at the Ballpark in Arlington for more than one game in any season.

"**Suite Sales Tax Liability**" means Tax Liability with respect to sales of Suite Licenses or other tickets to use suites at the Ballpark in Arlington.

"**Tax**" or "**Taxes**" means (i) all federal, state, local or foreign taxes, charges, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, assessments and charges of any kind whatsoever, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i).

"**Taxing Authority**" means the IRS and any other Governmental Body responsible for the administration of any Tax.

"**Tax Return**" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Tax, and

including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes Seller, any of its Subsidiaries, or any of their Affiliates.

"**Transfer Documents**" means (i) the bill of sale in form and substance to be mutually agreed upon by Purchasers and Seller (the "**Bill of Sale**"), (ii) the assignment and assumption agreement in form and substance to be mutually agreed upon by Purchasers and Seller (the "**Assignment and Assumption Agreement**"), and (iii) any other documents required to effect the transfer of Purchased Assets contemplated by this Agreement, including assignments of Purchased Intellectual Property and instruments of conveyance of the certificates evidencing the Trust Interests (along with the originals of such certificates), in each case, in form and substance to be mutually agreed upon by Purchasers and Seller.

"**TRB Foundation**" means the Texas Rangers Baseball Foundation, a Texas non-profit corporation.

"**Voluntary Petition**" means the voluntary petition for relief under chapter 11 of the Bankruptcy Code attached hereto as Exhibit E, as the same may be modified upon the mutual agreement of Purchasers and Seller, such agreement not to be unreasonably withheld, conditioned or delayed.

"**Voluntary Support Agreement**" shall have the meaning given to it in the Plan of Reorganization.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988) and any similar state or local "mass layoff" or "plant closing" laws.

1.2     Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|---|---|
| Acquisition Proposal | 7.16(a) |
| Acquisition Proposal Materials | 5.30 |
| Acquisition Transaction | 7.16(a) |
| Action | 7.7 |
| Aggregate Purchaser Termination Amount | 4.4(f) |
| Aggregate Seller Termination Amount | 4.4(f) |
| Agreement | Preamble |
| Antitrust Laws | 7.4(b) |
| Asset Acquisition Statement | 2.7 |
| Assignment and Assumption Agreement | 1.1 (in Transfer Documents definition) |
| Assumed Liabilities | 2.3 |
| Balance Sheet | 5.5 |
| Balance Sheet Date | 5.5 |
| Ballpark in Arlington | Recitals |
| Ballpark Lease Agreement | 1.1 (in Specific Rangers Assumed Liabilities |

| Term | Section |
|------|---------|
| | definition) |
| Baseball Express | Preamble |
| Basket | 10.5(a) |
| Bill of Sale | 1.1 (in Transfer Documents definition) |
| BRE | Recitals |
| BRE Land Purchase Agreement | Recitals |
| Cap | 10.5(a) |
| Centerfield Office | Recitals |
| Centerfield Office Lease Agreement | 1.1 (in Specific Rangers Assumed Liabilities definition) |
| Claims | 11.12(a) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA Coverage | 8.2(g) |
| Commitment Letters | 6.9 |
| Confidential Information | 7.6(b) |
| Confidentiality Agreement | 7.6(a) |
| Contingent Note | 9.2(m) |
| Continuing Employees | 8.1(c) |
| Copyrights | 1.1 (in Intellectual Property definition) |
| Debt Financing | 7.12(b) |
| DIP Financing | 2.4(j) |
| Domain Names | 1.1 (in Intellectual Property definition) |
| Emerald Diamond | Recitals |
| Environmental Permits | 5.17(a) |
| ERISA | 1.1 (in Employee Benefit Plan definition) |
| Escrow Account | 10.7 |
| Escrow Agent | 10.7 |
| Escrow Agreement | 10.7 |
| Escrow Amount | 10.7 |
| Exception Documents | 7.15(c) |
| Excluded Assets | 2.2 |
| Excluded Insurance Claim | 7.18(b) |
| Excluded Insurance Policy | 7.18(b) |
| Excluded Liabilities | 2.4 |
| Financial Advisors | 5.27 |
| Financial Advisory Fees | 5.27 |
| Financial Statements | 5.5 |
| Guidelines | 7.9(d) |
| HSG | Recitals |
| HSG Benefit Plan | 5.13(a) |
| HSG Flex Plan | 8.2(d) |
| Inactive Rangers Employee | 8.1(b) |
| Indemnification Claim | 10.4(b) |

| Term | Section |
| --- | --- |
| Insurance Policies | 5.18(a) |
| Investment Vehicles | 5.19(f) |
| Leased Property | 7.15(b) |
| Leasehold Policy | 7.15(b) |
| Loss(es) | 10.2(a) |
| Marks | 1.1 (in Intellectual Property definition) |
| Material Contracts | 5.12(a) |
| Media JV Agreement | 7.17 |
| MEPPA Plan | 8.2(h) |
| MLB Benefit Plans | 5.13(a) |
| MLB Expense Reimbursement | 7.9(c) |
| Nonassignable Assets | 2.5(b) |
| Original APA | Recitals |
| Paradigm Aircraft Agreement | 1.1 (in Shared Charter Services Agreement definition) |
| Patents | 1.1 (in Intellectual Property definition) |
| Personal Property Leases | 5.10 |
| Post-Closing Covenant Survival Period | 10.1(b) |
| Post-Closing Covenants | 10.1(b) |
| Pre-Closing Covenants | 10.1(b) |
| Pre-Closing Negotiated Agreement | 7.21 |
| Prior Pre-Closing Escrow Agreement | 7.13 |
| Proposed Allocation | 2.7 |
| Purchased Assets | 2.1 |
| Purchase Price | 3.1 |
| Purchaser(s) | Preamble |
| Purchaser Documents | 6.2 |
| Purchaser Flex Plan | 8.2(d) |
| Purchaser Indemnified Parties | 10.2(a) |
| Purchaser Plans | 8.2(a)(i) |
| Purchaser Termination Amount | 4.4(b)(i) |
| Rangers Ballpark | Recitals |
| Rangers Benefit Plan | 5.13(a) |
| Rangers Pension Plan | 5.13(b) |
| Rangers Subsidiary | Recitals |
| RB Interests | 5.4(b) |
| Real Property Lease(s) | 5.9(b) |
| Resolving Accounting Firm | 2.7 |
| Revised Statements | 2.7 |
| Securities Act | 6.6 |
| Seller | Preamble |
| Seller Documents | 5.2(a) |
| Seller Indemnified Parties | 10.3(a) |
| Seller Released Parties | 11.12(a) |

| Term | Section |
|------|---------|
| Seller Releasing Parties | 11.12(b) |
| Seller Termination Amount | 4.4(c)(i) |
| Sub-Basket | 10.5(a) |
| Subsidiary Released Parties | 11.12(b) |
| Subsidiary Releasing Parties | 11.12(a) |
| Surveys | 7.15(b) |
| Survival Period | 10.1(a) |
| Tax Benefit | 10.6(b) |
| Termination Date | 4.2(a) |
| Texas Rangers | Recitals |
| Title Commitment | 7.15(c) |
| Title Company | 7.15(b) |
| Title Defect | 7.15(e) |
| Title Review Date | 7.15(e) |
| Title Update | 7.15(e) |
| Total Consideration | 3.1 |
| Trade Secrets | 1.1 (in Intellectual Property definition) |
| TRBP | Preamble |
| Trust Interests | 5.4(c) |
| Underwriter | 7.15(b) |
| Unresolved Claims | 10.7 |
| WARN Act Obligations | 8.2(i) |
| WGM | 1.1 (in Specified Advisor Fees definition) |

1.3     Other Definitional and Interpretive Matters

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  The Schedules to this Agreement shall be arranged in sections and subsections corresponding to the numbered section and lettered subsections of this Agreement, and the exceptions and disclosures in each Schedule shall, except as provided in the next sentence, apply only to the correspondingly numbered section and lettered subsection of this Agreement.  Any matter or item disclosed on one Schedule shall be

deemed to have been disclosed on each other applicable Schedule if the applicability of such information to such other Schedules is reasonably apparent on its face. No representation or warranty shall be qualified or otherwise affected by any fact or item disclosed on any Schedule unless such representation or warranty contains a reference to a Schedule. Disclosure of any item on any Schedule shall not constitute an admission or indication that such item or matter is material or would have a Material Adverse Effect. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv) <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and unless the context otherwise clearly requires, defined terms imparting the singular number only shall include the plural and vice versa.

(v) <u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi) <u>Herein</u>. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise clearly requires.

(vii) <u>Including</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise clearly requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii) <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related specifically to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statements or (c) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(b) The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

# ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1  Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing Purchasers shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchasers, all of Seller's right, title and interest in, to and under the Purchased Assets free and clear of any and all Liens other than Permitted Exceptions.  "**Purchased Assets**" shall mean all assets of Seller (other than Excluded Assets), including:

(a)  the Purchased Contracts;

(b)  all cash, cash equivalents (not including the Purchase Price), bank deposits or similar cash items and accounts receivable of Seller;

(c)  all inventory;

(d)  all rights of Seller in and to minor league (including associated rights to membership and franchise in Minor League Baseball), little league, hall of fame and foreign baseball operations affiliated with the Texas Rangers;

(e)  all rights of Seller in and to the spring training facilities of the Texas Rangers;

(f)  all deposits (including customer deposits and security deposits for rent, electricity, telephone, tickets, concessions, suite fees or otherwise) and prepaid charges and expenses, including any prepaid rent, of Seller related to any Purchased Assets, including all prepaid charges, expenses and rent under the Real Property Leases or Personal Property Leases, whether attributable to any period beginning prior to, on or after the Closing Date and ending prior to, on or after the Closing Date;

(g)  all rights of Seller under each Real Property Lease and each Parking Agreement, together with all rights of Seller in and to all improvements, fixtures and other appurtenances thereto or in respect thereof;

(h)  all rights and privileges held by Seller associated with Major League Baseball, including rights to membership and franchise of the Texas Rangers in Major League Baseball and all ownership interests of Seller in any Major League Baseball Entity;

(i)  the Subsidiary Equity Interests;

(j)  the Furniture and Equipment;

(k)  the Purchased Intellectual Property;

(l)  all Documents, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, and all files,

customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises leased under a Real Property Lease, but excluding personnel files of all individuals (including common law employees and independent contractors) other than personnel files for Continuing Employees, Former Rangers Employees and former employees of any entity that previously operated the Texas Rangers (or any predecessor baseball club to the Texas Rangers) and personnel files, if any, for independent contractors who are a party to a Contract which is a Purchased Contract, in each case, as specified in <u>Section 2.2(c)</u>, and excluding such files as may be required under applicable Law regarding privacy; provided that, Seller shall be permitted to retain copies of any or all Documents, subject to all obligations and restrictions applicable to Confidential Information set forth in <u>Section 7.6(b)</u>;

(m)     all Permits of Seller, but only to the extent such Permits are assignable or otherwise transferable;

(n)     all supplies owned by Seller;

(o)     all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Rangers Employees and Former Rangers Employees or with third parties;

(p)     all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Seller or to the extent affecting the Business or any Purchased Assets;

(q)     all goodwill and other intangible assets associated with the Business, including the goodwill associated with the Purchased Intellectual Property;

(r)     to the extent assignable, all of Seller's rights to insurance proceeds under the Insurance Policies and condemnation proceeds relating to the damage, destruction, taking or other impairment of other Purchased Assets (or assets that would have been Purchased Assets but for such damage, destruction, taking or other impairment), including insurance for direct property loss and business interruption or other time element losses;

(s)     all rights of Seller to any archives of Texas Rangers (or any predecessor baseball club to the Texas Rangers) video and audio footage, memorabilia, pictures, recordings, team records and other information and materials related to baseball, the Texas Rangers, any predecessor baseball club to the Texas Rangers, the Ballpark in Arlington or any other home ballpark of the Texas Rangers or any such predecessor baseball club; and

(t)     to the extent assigned to and assumed by Purchaser, all Insurance Policies.

2.2     <u>Excluded Assets</u>.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchasers, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.  "**<u>Excluded Assets</u>**" shall mean the following

assets, properties, interests and rights of Seller and its Subsidiaries (other than the Rangers Subsidiary):

        (a)     the Excluded Contracts;

        (b)     all minute books, organizational documents, stock or other equity registers and such other books and records of Seller as pertain to ownership, organization or existence of Seller and duplicate copies of such Documents as are necessary to enable Seller to file Tax Returns and reports and comply with any applicable Laws; provided, however, that duplicates of any records or documents that are reasonably necessary for the conduct of the Business by or on behalf of Purchasers shall be included among the Purchased Assets;

        (c)     any personnel files pertaining to any individuals (including common law employees and independent contractors) other than personnel files for Continuing Employees, Former Rangers Employees and former employees of any entity that previously operated the Texas Rangers (or any predecessor baseball club to the Texas Rangers) and personnel files, if any, for independent contractors who are a party to a Contract which is a Purchased Contract;

        (d)     any (i) other Documents or other books and records that any Seller is required by Law to retain or that Seller reasonably determines are necessary for the conduct of its business following the Closing, in each case only to the extent Seller notifies Purchasers in writing; provided, however, that Purchasers shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (ii) documents relating to proposals to acquire the Business by Persons other than Purchasers;

        (e)     any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes that are Excluded Liabilities, together with any interest due thereon or penalty rebate arising therefrom;

        (f)     all Tax Returns and financial statements of Seller and the Business and all records (including working papers) related thereto;

        (g)     all ownership interests (other than the Subsidiary Equity Interests and any equity interests in any Major League Baseball Entities) of Seller in any Person;

        (h)     all of Seller's causes of action, claims, credits, demands or rights of set-off against third parties, to the extent related exclusively to any Excluded Asset or Excluded Liability;

        (i)     all of Seller's causes of action, claims, credits, demands or rights of set-off against Seller's Affiliates;

        (j)     any claim, right or interest of Seller with respect to any Excluded Liability; and

        (k)     all rights of Seller arising directly from the relationships between Seller and legal counsel representing Seller and its Affiliates with respect to the transactions

contemplated in this Agreement and in the BRE Land Purchase Agreement, including rights with respect to privileged communication.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchasers shall assume, effective as of the Closing, and thereafter in due course shall perform, pay and discharge, all Liabilities of Seller other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), including the following Liabilities:

(a)     all Liabilities of Seller under the Purchased Contracts;

(b)     all Liabilities arising out of or relating to the employment or termination of employment by Seller of any individual to the extent related to the Business before, on or after the Closing Date, including Liabilities relating to Rangers Employees or Former Rangers Employees, except to the extent specifically excluded by Section 8.2(f);

(c)     all Liabilities arising from the sale of products sold or services provided in the Ordinary Course of Business pursuant to product or service warranties, returns and rebates;

(d)     all Liabilities constituting, or arising in connection with, accounts payable existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(e)     all sales, use, stamp, transfer and other similar Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(f)     all Liabilities for Taxes relating to the Purchased Assets for all taxable periods (or portions thereof) beginning after the Closing Date (as determined in accordance with Section 11.1(b)) and Suite Sales Tax Liability;

(g)     all Specific Rangers Assumed Liabilities; and

(h)     all Liabilities under the Existing BRE Land Use Arrangement (excluding the outstanding accounts payable to BRE by HSG under the Existing BRE Land Use Arrangement) arising on or prior to the Closing Date.

2.4     Excluded Liabilities.  Purchasers will not assume or be liable for any Excluded Liabilities.  "**Excluded Liabilities**" shall mean the following Liabilities:

(a)     except as otherwise provided in Section 2.3(h), all Liabilities of Seller arising out of or related to the Excluded Assets, including Excluded Contracts (including the outstanding accounts payable by HSG, on behalf of Seller, to BRE under the Existing BRE Land Use Arrangement);

(b)     all Liabilities of HSG (except all Liabilities arising out of or relating to the employment or termination of employment of Rangers Employees or Former Rangers Employees, including Sections 8.1(e) and 8.2(c), (d), (e), (f), (g) and (i)), Rangers Ballpark, Emerald Diamond or any other Affiliates of Seller;

24

(c)     all Liabilities relating to amounts required to be paid by Seller hereunder (including all amounts paid by Purchasers on behalf of Seller pursuant to Section 3.2);

(d)     all Liabilities relating to the Senior Indebtedness;

(e)     all Liabilities to proposed purchasers or bidders not party hereto and who are unaffiliated with any Purchaser arising from the negotiations of or on behalf of Seller, HSG, Rangers Ballpark or Emerald Diamond with such Persons;

(f)     any Liabilities to the extent covered by any Insurance Policies (including any extension of any "claims made" liability insurance policies effected pursuant to Seller's obligations under Section 7.18 and any renewals of any Insurance Policies), to the extent such Insurance Policies and the benefits of such Insurance Policies are not assigned to and assumed by Purchasers, and only to the extent that Seller, after fulfilling all obligations set forth in Section 7.18, actually recovers amounts under the applicable policies;

(g)     all Liabilities based upon or resulting from any employee pension benefit plan that is subject to Section 302 or Title IV of ERISA (other than a Rangers Benefit Plan or MLB Benefit Plan) directly maintained or contributed to by any member (other than Seller or any of its Subsidiaries) of a group under common control (under Section 414(b) or (c) of the Code) with Seller or any of its Subsidiaries prior to the Closing Date;

(h)     all Liabilities that are Excluded Liabilities as set forth in Section 8.2(f), if any;

(i)     all Liabilities of Seller under this Agreement, including any indemnification obligations under Article X;

(j)     all Liabilities for any debtor-in-possession financing ("**DIP Financing**") and for all fees, costs and expenses directly related to the bankruptcy of TRBP, including all administrative claims and expenses, except for such administrative claims and expenses in respect of any Liabilities that would otherwise constitute Assumed Liabilities arising from and after the filing of the Voluntary Petition through and including the Closing; and

(k)     except as otherwise provided in Section 2.3(e) or 2.3(f), all Liabilities for Taxes (i) for all taxable periods, in the case of Taxes relating to the Excluded Assets, (ii) for all taxable periods (or portions thereof) ending on or prior to (or, to the extent attributable to the portion of such period ending on the Closing Date, including) the Closing Date, in the case of Taxes relating to the Purchased Assets (as determined in accordance with Section 11.1(b)) and (iii) under any Tax allocation, sharing or similar agreement.

2.5     Further Conveyances and Assumptions; Consent of Third Parties.

(a)     From time to time following the Closing, Seller and Purchasers shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to fully convey and assign to Purchasers and their successors

or assigns, all of the rights, title and interest intended to be conveyed to Purchasers under this Agreement and the Transfer Documents and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchasers under this Agreement and the Transfer Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(b) Nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign any Contract, Permit or other right that is a Purchased Asset, in each case which by its terms or by Law is nonassignable without the consent of a third party (including MLB) or a Governmental Body or is cancelable by a third party in the event of an assignment ("**Nonassignable Assets**") unless and until such consent shall have been obtained or the Bankruptcy Court shall have authorized such assignment. With respect to Material Contracts or Permits that, individually or in the aggregate, are material for the Business as a going concern after the Closing Date, Seller shall use its commercially reasonable efforts to promptly obtain all such consents prior to Closing and, if the Closing occurs, after the Closing Date; provided, however, that such efforts shall not require Seller or any of its Affiliates to incur any expenses or Liabilities or provide any financial accommodation or to remain secondarily or contingently liable for any Assumed Liability to obtain any such consent. Purchasers and Seller shall use their respective commercially reasonable efforts to obtain, or cause to be obtained, any consent, substitution, approval or amendment required to novate all Liabilities under any and all Purchased Contracts or other Liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of Seller and its Affiliates so that, in any such case, Purchasers shall be solely responsible for such Liabilities. To the extent permitted by applicable Law and the terms of the Nonassignable Assets, in the event consents to the assignment thereof cannot be obtained, such Nonassignable Assets shall be held, as of and from the Closing Date, by Seller in trust for Purchasers and the covenants and obligations thereunder shall be performed by Purchasers in Seller's name and all benefits and obligations existing thereunder shall be for Purchasers' account. Seller shall take or cause to be taken at Purchasers' expense such actions in their name or otherwise as Purchasers may reasonably request so as to provide Purchasers with the benefits of the Nonassignable Assets and to effect collection of money or other consideration that becomes due and payable under the Nonassignable Assets, and Seller shall promptly pay over to Purchasers all money or other consideration received by it in respect of all Nonassignable Assets. As of and from the Closing Date, Seller authorizes Purchasers, to the extent permitted by applicable Law and the terms of the Nonassignable Assets, at Purchasers' expense, to perform all the obligations and receive all the benefits of Seller under the Nonassignable Assets and appoints Baseball Express its attorney-in-fact to act in its name on its behalf, and Purchasers agree to indemnify and hold Seller and its Affiliates, agents, successors and assigns harmless from and against any and all Liabilities and Losses based upon, arising out of or relating to Purchasers' performance of, or failure to perform, such obligations under the Nonassignable Assets. Following the Closing, Seller shall not terminate, modify or amend any Nonassignable Asset without Purchasers' prior written consent.

2.6     Bulk Sales Laws. Except as may otherwise be required by the Bankruptcy Court, Purchasers hereby waive compliance by Seller with the requirements and provisions of any

"bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Purchasers.

2.7     Purchase Price Allocation.  Within ninety (90) days after the Closing, Purchasers shall prepare and deliver to Seller an allocation of the Total Consideration and any other items that are treated as additional purchase price for Tax purposes among the Purchased Assets and the assets of the Subsidiary set forth in the definition of Subsidiary Equity Interests in accordance with Section 1060 of the Code (the "**Proposed Allocation**").  Seller shall have thirty (30) days after receipt of the Proposed Allocation to notify Purchasers in writing of any objections.  If Seller does not object in writing during such thirty (30) day period, then the Proposed Allocation shall be final and binding on all Parties.  If Seller objects in writing during such thirty (30) day period, then the parties hereto shall cooperate in good faith to reach a mutually agreeable allocation of the Total Consideration and any other items that are treated as additional purchase price for Tax purposes, which allocation shall be binding on all parties.  If the parties are unable to reach an agreement within sixty (60) days of Seller's receipt of the Proposed Allocation, then any disputed items shall be referred to a reputable accounting firm mutually selected by Purchasers and Seller (the "**Resolving Accounting Firm**") for resolution, and the determination of the Resolving Accounting Firm shall be final and binding upon all parties. The fees and expenses of the Resolving Accounting Firm shall be paid fifty percent (50%) by the Escrow Agent out of the Escrow Amount and fifty percent (50%) by Purchasers. In accordance with such allocation, Seller shall prepare and deliver to Purchasers copies of Form 8594 and any required exhibits thereto (the "**Asset Acquisition Statement**").  Purchasers shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "**Revised Statements**") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation.  The parties shall, and shall cause their respective Affiliates to, use the allocations set forth in the Asset Acquisition Statement or, if applicable, the last Revised Statement for all Tax purposes, file all Tax Returns in a manner consistent with such allocation statement and take no position contrary thereto unless required to do so by a change in applicable Tax Laws or a good faith resolution of a Tax contest.

ARTICLE III

CONSIDERATION

3.1     Consideration.  The aggregate consideration for the Business and the Purchased Assets shall be (a) an amount (the "**Purchase Price**") in cash equal to (i) $304,000,000, minus (ii) $3,637,592, which is the amount by which the total amount of Specified Fees and Expenses paid from the cash of Seller or any Subsidiary of Seller after November 1, 2009 through (and including) the date hereof exceeds $3,100,000, minus (iii) an amount necessary to discharge in full the outstanding principal, interest, fees and expenses payable as of the Closing pursuant to the Emerald Diamond Note, as determined in accordance with that certain Emerald Diamond Payoff Agreement and Release, dated as of May 23, 2010, by and between Emerald Diamond and BRE, attached as Exhibit 3.1; (b) the assumption of the Assumed Liabilities; and (c) the delivery by Purchasers to Seller of the Contingent Note (together with the payment of the Purchase Price and the assumption of the Assumed Liabilities, the "**Total Consideration**").

3.2    Payment of Purchase Price.  On the Closing Date, Purchasers shall pay the Purchase Price by wire transfer of immediately available funds into the accounts and in the amounts as follow: (i) to an account designated by MLB, an amount necessary to discharge in full all amounts payable by TRBP to or on behalf of MLB as of the Closing Date for Seller MLB Amounts, whether incurred before or after the date that the Voluntary Petition is filed; (ii) to an account designated by the Lenders or, if the Lenders have not designated an account, to an account for the Lenders designated by Seller in accordance with the terms of the Senior Indebtedness, $75,000,000 in respect of Seller's guarantee of the Senior Indebtedness; (iii) to an account designated by Emerald Diamond, an amount necessary to discharge in full the outstanding principal, interest, fees, expenses, penalties and other amounts payable as of the Closing pursuant to the Centerfield Office Note; (iv) to an account designated by Hicks, an amount necessary to discharge in full the outstanding principal, interest, fees and expenses payable as of the Closing pursuant to the Overdraft Protection Agreement in respect of the Overdraft Protection Advance; (v) to accounts designated by the Financial Advisors, the Financial Advisory Fees shall be paid; (vi) to the Escrow Account, the Escrow Amount; and (vii) to an account designated by TRBP, the remainder of the Purchase Price, with the intention that it will be disbursed in accordance with the Plan of Reorganization.  Seller shall cause all wire transfer instructions needed for payment of the Purchase Price under this Section 3.2 to be delivered to Purchasers at least three (3) Business Days prior to Closing.  At the Closing, Purchasers shall deliver, or cause to be delivered, to Seller evidence of the wire transfers referred to in this Section 3.2.

ARTICLE IV

CLOSING AND TERMINATION

4.1    Closing Date.  The consummation of the transactions contemplated by this Agreement provided for in Article II hereof (the "**Closing**") shall take place at the offices of WGM located at 200 Crescent Court, Suite 300, Dallas, TX 75201 (or at such other place as the parties may designate in writing) at 10:00 am CDT on a date to be specified by the parties (the "**Closing Date**"), which date shall be no later than the third (3rd) Business Day after the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), or, if later, at Purchasers' option, the fifth (5th) Business Day following Seller's last amendment or supplement to the Schedules in accordance with Section 7.14, unless another time, date or place is agreed to in writing by the parties hereto.

4.2    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)    at the election of TRBP or Baseball Express on or after August 12, 2010 (such date, as it may be extended under this Section 4.2(a), the "**Termination Date**"), if the Closing shall not have occurred by the close of business on such date; provided that either Purchasers or Seller, upon written notice to the other party prior to the Termination Date then in effect, shall have the option to extend, from time to time, the Termination Date for additional periods of time up to the earliest date that any of the Commitment Letters expire as determined at the time of the giving of such notice, but in any event no later than October 31, 2010; provided

28

<u>further</u> Purchasers and Seller may mutually agree to extend, from time to time, the Termination Date for additional periods of time;

        (b)     by mutual written consent of TRBP and Baseball Express;

        (c)     by TRBP or Baseball Express, upon written notice to the other, if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that subject to <u>Section 7.4(b)</u> hereof, the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 4.2(c)</u> shall not be available to a party if such Order was due primarily to the failure of such party to perform any of its obligations under this Agreement;

        (d)     by written notice from TRBP to Baseball Express in the event that either party has received a formal notification from an appropriate MLB representative stating that Purchasers will not obtain (it being understood that the receiving party is obligated to promptly deliver such notification to the other parties) all required MLB Approvals prior to the Termination Date; <u>provided</u>, <u>however</u>, that the right of TRBP to terminate this Agreement under this <u>Section 4.2(d)</u> shall not be available to TRBP if such failure to obtain such MLB Approval was due primarily to the failure of TRBP to perform any of its obligations under this Agreement;

        (e)     by written notice from Baseball Express to TRBP in the event that either party has received a formal notification from an appropriate MLB representative stating that Purchasers will not obtain (it being understood that the receiving party is obligated to promptly deliver such notification to the other parties) all required MLB Approvals prior to the Termination Date; provided, however, that the right of Baseball Express to terminate this Agreement under this <u>Section 4.2(e)</u> shall not be available to Baseball Express if such failure to obtain such MLB Approval was due primarily to the failure of Baseball Express to perform any of its obligations under this Agreement;

        (f)     by written notice from TRBP to Baseball Express in the event that any Purchaser is in material breach of any representations, warranties or covenants in any provision of this Agreement; <u>provided</u>, <u>however</u>, that the breach has not been cured within thirty (30) days after written notice of such breach has been delivered to Purchasers; <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 4.2(f)</u> shall not be available to TRBP if it is in material breach of any representations, warranties or covenants in any provision of this Agreement;

        (g)     by written notice from Baseball Express to TRBP in the event that TRBP is in material breach of any representations, warranties or covenants in any provision of this Agreement; <u>provided</u>, <u>however</u>, that the breach has not been cured within thirty (30) days after written notice of such breach has been delivered to TRBP; <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 4.2(g)</u> shall not be available to Baseball Express if any Purchaser is in material breach of any representations, warranties or covenants in any provision of this Agreement;

(h)     by Baseball Express, upon written notice to TRBP in accordance with Section 7.14;

(i)     by Baseball Express, upon written notice to TRBP in accordance with Section 7.15(e);

(j)     immediately and without further action by Seller or Purchasers upon a valid termination of the BRE Land Purchase Agreement pursuant to its terms;

(k)     by Baseball Express, upon written notice to TRBP, if (i) a plan of reorganization with respect to Seller, other than the Plan of Reorganization filed with the Bankruptcy Court in accordance with this Agreement, is filed with the Bankruptcy Court or any other court, (ii) a trustee is appointed in the Bankruptcy Case, (iii) the Bankruptcy Case is dismissed, (iv) an Order is entered in the Bankruptcy Case that renders it impossible to obtain confirmation of the Plan of Reorganization prior to the Termination Date, (v) an Order is entered in the Bankruptcy Case denying confirmation of the Plan of Reorganization, or (vi) an Order is entered in the Bankruptcy Case that causes or is reasonably likely to cause a Material Adverse Effect, even if such Material Adverse Effect is not immediate upon entry of such Order;

(l)     by TRBP, upon written notice to Purchasers in each instance within ten (10) Business Days after the right to terminate under this Section 4.2(l) arises, if (i) a Commitment Letter shall have expired or have been terminated or (ii) (A) Purchasers have provided notice to TRBP pursuant to Section 7.12 or (B) Seller requests that Purchasers deliver to Seller an officer's certificate stating that a Commitment Letter is in full force and effect and that, after inquiry of the financing source who is a party to the Commitment Letter, Purchasers do not know of any facts that would reasonably be expected to impair or delay in any material respect or prevent the consummation of the financing in accordance with the terms of such Commitment Letter and Purchasers do not within ten (10) Business Days of the receipt of such request deliver such certificate to Seller; provided, however, that the right to terminate this Agreement under this Section 4.2(l) shall not be available to Seller if within ten (10) Business Days of receiving notice by Seller of its intention to terminate this Agreement under this Section 4.2(l), Purchasers (I) secure an extension of such Commitment Letter (if expired or terminated), (II) secure an amendment of such Commitment Letter that allows them to deliver the certificate referenced in this Section 4.2(l), or (III) secure a Commitment Letter for alternate or additional financing upon terms that would not reasonably be expected to materially hinder or delay the Closing or that is otherwise reasonably acceptable to Seller; and

(m)     by Baseball Express, upon written notice to TRBP prior to June 4, 2010, if TRBP does not deliver to Purchasers on or prior to June 2, 2010, a letter confirming that the Media JV Agreement, substantially in the form attached as Exhibit A hereto, with any non-material changes that the National Hockey League may request, is in compliance with applicable rules and regulations of the National Hockey League.

4.3     Procedure Upon Termination.  In the event of termination and abandonment by Purchasers or Seller, or both, pursuant to Section 4.2 hereof, written notice thereof shall forthwith be given by the terminating party or parties to the other party or parties, and to the Office of the Commissioner of Baseball, and this Agreement shall terminate, and the purchase of

the Purchased Assets hereunder shall be abandoned, without further action by Purchasers or Seller.

   4.4  Effect of Termination.

     (a)  In the event that this Agreement is validly terminated in accordance with Sections 4.2 and 4.3, then each of the parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to any Purchasers or Seller; provided that, the obligations of the parties set forth in this Section 4.4, Section 7.6, and Articles X and XI hereof shall survive any such termination in accordance with their terms and shall be enforceable hereunder.

     (b)  Purchasers and Seller agree that if this Agreement shall be terminated:

       (i)  pursuant to Section 4.2(a) and at the time of such termination, any Purchaser is in material and deliberate breach of any representations, warranties or covenants in any provision or Seller, Purchasers shall be required to pay to Seller an amount equal to $1,500,000 (the "**Purchaser Termination Amount**") payable within three (3) Business Days after the Termination Date in cash or by wire transfer of immediately available funds to an account specified in writing by Seller (but in no event in duplication of any amount paid pursuant to Section 4.4(b)(ii)); or

       (ii)  pursuant to Section 4.2(f), but only if the breach giving rise to such right of termination is deliberate, Purchasers shall be required to pay to Seller an amount equal to the Purchaser Termination Amount payable within three (3) Business Days after the Termination Date in cash or by wire transfer of immediately available funds to an account specified in writing by Seller.

     (c)  Purchasers and Seller agree that if this Agreement shall be terminated:

       (i)  pursuant to Section 4.2(a) and at the time of such termination, Seller is in material and deliberate breach of any representations, warranties or covenants in any provision of this Agreement, Seller shall be required to pay to Purchasers an amount equal to $1,500,000 (the "**Seller Termination Amount**") payable within three (3) Business Days after the Termination Date in cash or by wire transfer of immediately available funds to an account specified in writing by Purchasers (but in no event in duplication of any amount paid pursuant to Section 4.4(c)(ii)); or

       (ii)  pursuant to Section 4.2(g), but only if the breach giving rise to such right of termination is deliberate, Seller shall be required to pay to Purchasers an amount equal to the Seller Termination Amount payable within three (3) Business Days after the Termination Date in cash or by wire transfer of immediately available funds to an account specified in writing by Purchasers.

     (d)  Subject to Section 4.4(f), but otherwise notwithstanding anything in this Agreement to the contrary, in the event that this Agreement is validly terminated, each of the parties shall be relieved from all claims for damages or other liability arising from a breach of

any of its covenants, agreements, or representations and warranties contained in this Agreement occurring prior to the date of termination or in connection with such termination, except that no provision of this Agreement shall relieve Seller or any Purchaser from any express obligation to pay an amount of money under the terms of this Agreement.

(e)     The Confidentiality Agreement shall survive any termination of this Agreement in accordance with the terms of the Confidentiality Agreement and nothing in this Section 4.4 shall relieve Purchasers or Seller of their obligations under the Confidentiality Agreement.  If this Agreement is terminated in accordance with Sections 4.2 and 4.3, Purchasers agree that the prohibition in the Confidentiality Agreement restricting each Purchaser's ability to solicit any employee of Seller or its Affiliates to join the employ of Purchasers or any of their Affiliates shall be extended to a period of two (2) years from the date of this Agreement.

(f)     Each of Seller and Purchasers acknowledge and agree that Seller's receipt of the Purchaser Termination Amount, or Purchasers' receipt of the Seller Termination Amount, shall constitute a payment of liquidated damages and not a penalty and that the Purchaser Termination Amount or the Seller Termination Amount, as applicable, is reasonable in light of the substantial but indeterminate harm anticipated to be caused if the transactions contemplated by this Agreement are not consummated, the difficulty of proof of loss and damages, the inconvenience or non-feasibility of otherwise obtaining an adequate remedy, and the value of the transactions to be consummated hereunder.  Further, each of Seller and Purchasers acknowledges and agrees that the agreements contained in this Section 4.4 are an integral part of the transactions contemplated by this Agreement.  In the event that Purchasers or Seller shall fail to pay the Purchaser Termination Amount or the Seller Termination Amount, as applicable, when due, the parties responsible for payment of such amount shall reimburse the parties entitled to receive such amount for all reasonable costs and expenses actually incurred or accrued by such entitled parties in connection with the collection under and enforcement of this Section 4.4.  Notwithstanding anything to the contrary in this Agreement, in the event this Agreement is terminated and Seller or Purchasers have a right to receive payment of the Purchaser Termination Amount or the Seller Termination Amount, as applicable, pursuant to this Section 4.4, together with any cost or expenses referenced in the foregoing sentence (collectively, with the Purchaser Termination Amount or Seller Termination Amount, as applicable, the "**Aggregate Purchaser Termination Amount**" or the "**Aggregate Seller Termination Amount**," respectively), such right shall be the sole and exclusive remedy of the parties receiving such amount against the parties paying such amount, for any and all Losses or Claims arising under, out of, or related to this Agreement, including the termination of this Agreement, or the sale or purchase of the Purchased Assets, including the failure to consummate such sale or purchase.  Nothing in this Agreement shall prevent the enforcement of the remedy of specific performance set forth in Section 10.9 in lieu of termination of this Agreement.

(g)     Seller acknowledges that Purchasers, by their prior efforts and in continuing to cooperate with Seller to obtain approval of this Agreement by the Bankruptcy Court, have provided and will provide a significant and tangible direct benefit to Seller's estate and all holders of claims and interests in the Bankruptcy Case.  Seller also acknowledges that Purchasers have incurred and will incur substantial costs in connection with the same and will also devote substantial time and effort after filing of the Voluntary Petition.  Notwithstanding anything in this Agreement to the contrary, and without limiting the provisions of Section 10.9,

if, after entry of an Approval Order confirming the Plan of Reorganization, the Closing does not take place, Purchasers may deliver a demand that Seller pay to Purchasers an amount equal to $10,000,000, which amount represents reasonable compensation for out of pocket costs and time and effort, though not adequate compensation for the non-occurrence of the Closing.  Upon delivery of such demand, Seller shall have an obligation to pay that amount; provided, however, Seller shall not be obligated to make such payment if (i) this Agreement is or may be terminated by Seller pursuant to Section 4.2(f), (ii) the Closing did not occur because the condition set forth in Section 9.1(f) was not capable of being satisfied as of the time of termination of the Agreement, (iii) prior to such demand, Purchaser has terminated this Agreement pursuant to Section 4.2(a) or (iv) and for so long as the Closing has been delayed solely due to a stay of the Approval Order.  Seller acknowledges that Purchasers' right to payment under this Section 4.4 shall be entitled to treatment as an allowed administrative expense claim under section 503(b) of the Bankruptcy Code and entitled to priority treatment. under section 507(a)(2) of the Bankruptcy Code, and shall be allowed notwithstanding any revocation or withdrawal of an Approval Order confirming the Plan of Reorganization.  If Seller has an obligation to pay the amount described in this Section 4.4(g), then Seller will not also be obligated to pay the Seller Termination Amount (or Aggregate Seller Termination Amount).  If Seller has already paid the amount described in that certain letter agreement dated the date hereof, regarding Termination of Old Asset Purchase Agreement, then Seller will not also be obligated to pay the amount provided for in this Section 4.4(g).

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchasers as of the date of this Agreement and as of the Closing Date that:

5.1    Organization and Good Standing.  TRBP is a general partnership duly organized, validly existing and in good standing under the laws of the State of Texas.  The Rangers Subsidiary is a business trust duly organized, validly existing and in good standing under the laws of the State of Delaware.  Subject to any limitations imposed on Seller and the Rangers Subsidiary as a result of filing the Voluntary Petition, Seller and the Rangers Subsidiary each has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Seller and the Rangers Subsidiary each is duly qualified or authorized to do business and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not, individually and in the aggregate, have a Material Adverse Effect.

5.2    Authorization of Agreement. Subject to the approval of the Bankruptcy Court:

(a)    Seller has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the

33

transactions contemplated by this Agreement (together with this Agreement, the "**Seller Documents**"), and to consummate the transactions contemplated hereby and thereby;

(b) the execution, delivery and performance of this Agreement and each of the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite action on behalf of Seller; and

(c) this Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto and the approval of the Bankruptcy Court) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

5.3    Conflicts; Consents of Third Parties.

(a) Except as set forth on Schedule 5.3(a), and subject to approval of the Bankruptcy Court, none of the execution and delivery by Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, or create any Lien on any of the Purchased Assets as a result of, any provision of (i) the certificate of organization, partnership agreement or comparable organizational documents of Seller or of the Rangers Subsidiary; (ii) any Contract or Permit to which Seller or the Rangers Subsidiary is a party or by which any of the properties or assets of Seller or the Rangers Subsidiary are bound; (iii) any Order of any Governmental Body applicable to Seller or the Rangers Subsidiary or by which any of the properties or assets of Seller or the Rangers Subsidiary are bound; or (iv) any applicable Law, other than, in the case of foregoing subsections (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that, individually and in the aggregate, would not have a Material Adverse Effect.

(b) Except as set forth on Schedule 5.3(b), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by Seller with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the MLB Approvals, (iii) approval of the Bankruptcy Court, and (iv) such other consents, waivers, approvals, Orders, Permits or authorizations the failure of which to obtain, individually and in the aggregate, would not have a Material Adverse Effect.

5.4    Capitalization.

(a)    Schedule 5.4(a) sets forth the name of each Subsidiary of HSGH and, with respect to each such Subsidiary, the jurisdiction in which it is incorporated or organized, the jurisdictions, if any, in which it is qualified to do business, the names of all equity owners and the amount of equity owned by each equity owner.

(b)    TRBP owns a 100% limited liability company interest in Rangers Ballpark and is the sole member of Rangers Ballpark.  The limited liability company interests of Rangers Ballpark (the "**RB Interests**") are not certificated.  The RB Interests have not been registered under the Securities Act or any applicable state securities laws.  Rangers Ballpark is not invested in the Indebtedness of any other Person.

(c)    TRBP owns a 90% trust interest in the Rangers Subsidiary.  The trust interests of the Rangers Subsidiary (the "**Trust Interests**") are certificated.  The Trust Interests have not been registered under the Securities Act or any applicable state securities laws.  The Major League Baseball Trust (of which the Texas Rangers are a participating Major League Club) owns the remaining 10% trust interest of the Rangers Subsidiary.  The Rangers Subsidiary is not invested in the Indebtedness of any other Person.

(d)    All of the Subsidiary Equity Interests were duly authorized for issuance and are validly issued, fully paid and non-assessable.

(e)    Except with respect to any Contract that the Major League Baseball Trust may have with respect to its interests in the Rangers Subsidiary, there exists no option, warrant, call, right, or Contract requiring, and there are no equity securities outstanding which upon conversion or exchange would require, the issuance of any equity interests in Rangers Ballpark or the Rangers Subsidiary or other equity securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase equity interests in Rangers Ballpark or the Rangers Subsidiary.  Neither of Seller or the Rangers Subsidiary is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Subsidiary Equity Interests.

(f)    Schedule 5.4(f) identifies the name and jurisdiction of incorporation or organization of each Person (other than a Subsidiary or Major League Baseball Entity) in which Seller or the Rangers Subsidiary holds an equity interest, the nature and class of such interest, and the number of shares or other equity interests of such class held by Seller or the Rangers Subsidiary.

5.5    Financial Statements.  Seller has made available to Purchasers copies of (i) the audited consolidated balance sheets of TRBP and its Subsidiaries as at December 31, 2006, 2007, 2008 and 2009 and the related audited consolidated statements of income and of cash flows of TRBP and its Subsidiaries for the years then ended, (ii) the unaudited consolidated balance sheet of TRBP and its Subsidiaries as at March 31, 2010, and the related unaudited consolidated statements of income and cash flows of TRBP and its Subsidiaries for the three (3) month period then ended, and (iii) the unaudited consolidated balance sheet of TRBP and its Subsidiaries as at October 31, 2009, and the related unaudited consolidated statements of income

and cash flows of TRBP and its Subsidiaries for the ten (10) month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "**Financial Statements**").  Except as set forth in the notes thereto and as disclosed in Schedule 5.5, each of the Financial Statements has been prepared in accordance with GAAP consistently applied (except with respect to the unaudited financial statements for normal recurring year-end adjustments, none of which would, in the aggregate, be material\*, and the lack of footnotes thereto) and presents fairly in all material\* respects the financial position, results of operations and cash flows of TRBP and its Subsidiaries as at the dates and for the periods indicated therein.  Except as set forth on Schedule 5.5, there are no off-balance sheet transactions (including transactions for services) relating to the Business, the Purchased Assets and/or the Assumed Liabilities, in each case existing between and/or among Seller or the Rangers Subsidiary, on the one hand, and any Hicks Affiliate, on the other hand.  For the purposes hereof, the audited consolidated balance sheet of TRBP and its Subsidiaries as at December 31, 2009 is referred to as the "**Balance Sheet**" and December 31, 2009 is referred to as the "**Balance Sheet Date**."

      5.6       Title to Purchased Assets; Sufficiency.

      (a)      Except as set forth on Schedule 5.6(a), to the Knowledge of Seller, the Purchased Assets that are tangible assets of any kind or description taken as a whole are in good operating condition and repair, ordinary wear and tear excepted, except where the failures to be in such condition and repair, individually and in the aggregate, would not have a Material Adverse Effect\*.

      (b)      Except as set forth on Schedule 5.6(b) and except for Excluded Assets, all of the assets reflected on the Balance Sheet included in the Financial Statements are included in the Purchased Assets or in the assets of the Rangers Subsidiary unless disposed of or abandoned in the Ordinary Course of Business after the Balance Sheet Date and prior to the date hereof or in the Ordinary Course of Business and in compliance with this Agreement after the date hereof. All Purchased Assets and assets of the Rangers Subsidiary reflected on the Balance Sheet are owned by Seller or the Rangers Subsidiary, as applicable, unless disposed of or abandoned in the Ordinary Course of Business after the Balance Sheet Date and prior to the date hereof or in the Ordinary Course of Business and in compliance with this Agreement after the date hereof.

      (c)      Except as set forth in Schedule 5.6(c)(i), Seller owns and has good title to each of the Purchased Assets, free and clear of all Liens other than, with respect to the Purchased Assets (other than Subsidiary Equity Interests and ownership interests in any Major League Baseball Entity), Permitted Exceptions.  At Closing, Purchasers will receive good title to each of the Purchased Assets, free and clear of all Liens other than, with respect to the Purchased Assets (other than Subsidiary Equity Interests and ownership interests in any Major League Baseball Entity), Permitted Exceptions.  The Purchased Assets (including, for this purpose, any assets subject to leases that are included in the Purchased Assets) and assets of the Rangers Subsidiary, together with the real property and assets to be acquired by Purchasers pursuant to the BRE Land Purchase Agreement, constitute all of the assets used or held for use in the Business as currently conducted or otherwise necessary for Purchasers to conduct the Business as of the Closing Date without interruption and in the Ordinary Course of Business, except for (i) those insurance, management, legal, corporate, administrative and other services provided by HSG pursuant to

the Interim Transition Services Agreement, (ii) Employee Benefit Plans of HSG, (iii) Insurance Policies to the extent they are Excluded Assets and (iv) any Shared Assets listed on Exhibit 1.1(c). All assets at the Ballpark in Arlington, other than the Shared Assets that are identified on Exhibit 1.1(c), are either Purchased Assets or leased pursuant to leases included in the Purchased Assets.

(d)     No Affiliate of HSG (other than Seller and the Rangers Subsidiary) or Hicks Affiliate owns, in whole or in part, directly or indirectly (other than by virtue of any such entities' direct or indirect interest in Seller or the Rangers Subsidiary), any asset (other than Shared Assets) used or held for use in the operation of the Business, except that BRE owns and has leasehold interests in the BRE Land. For the avoidance of doubt, the land formerly used as a trailer park located near the Ballpark in Arlington, which is owned by Stonegate Home Park, L.P., a Texas limited partnership, is not an asset used in or otherwise necessary for the operation of the Business.

5.7     Absence of Certain Developments. Except as expressly contemplated by this Agreement or as set forth on Schedule 5.7, since the Balance Sheet Date, Seller and its Affiliates have conducted the Business only in the Ordinary Course of Business and there has been no:

(a)     event, change, occurrence or circumstance that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect*;

(b)     any commitments for capital expenditures (to the extent unpaid) with respect to the Business, other than commitments for capital expenditures that do not exceed $200,000 individually or $500,000 in the aggregate;

(c)     other than in the Ordinary Course of Business or pursuant to a Contract with any Senior Employee set forth in Schedule 5.7, material* increase in the base salary of, or payment of any material* bonus to, any Senior Employee;

(d)     change in any method of accounting or accounting practice relating to the Business, except, after the date of this Agreement, to the extent required by Law;

(e)     any authorization, approval, agreement or commitment to do any of the foregoing; or

(f)     any distribution in cash or property in respect of the equity interest of Seller or the Rangers Subsidiary.

5.8     Taxes. Except as set forth in Schedule 5.8:

(a)     Seller (and each of its Subsidiaries) has timely filed all material Tax Returns required to be filed by it or requests for extensions to file such Tax Returns have been timely filed, granted and have not expired, and Seller (and each of its Subsidiaries) has timely paid all Taxes shown as due on such Tax Returns. All such Tax Returns are correct and complete in all material* respects. Seller (and each of its Subsidiaries) has complied in all material respects with all applicable Laws relating to the withholding of Taxes and has paid to

the proper Taxing Authority on a timely basis all material Taxes required to have been withheld and paid. There are no Liens for Taxes upon any of the Purchased Assets other than those Permitted Exceptions set forth in clause (ii) of the definition of Permitted Exceptions. No deficiencies for any Taxes have been proposed, asserted or assessed, in each case in writing, against Seller or any of its Subsidiaries that are still pending. No requests for waivers of the time to assess any such Taxes have been made that are still pending. No Tax Return of Seller or its Subsidiaries is under current examination by the IRS or by any state, local, or foreign Taxing Authority and no such Tax audit is threatened in writing. All assessments for Taxes due from Seller or any of its Subsidiaries with respect to any concluded litigation or audit have been fully paid. None of Seller or any of its Subsidiaries is liable (i) for the Taxes of any other Person as a result of any indemnification provision, tax allocation or tax sharing agreement, or other contractual obligation (other than customary Tax indemnifications contained in credit or other commercial agreements the primary purpose of which does not relate to Taxes) or (ii) for any unpaid Taxes of any Affiliate other than Seller or its Subsidiary. Seller is a disregarded entity 100% owned by HSGH for U.S. federal income tax purposes. Rangers Subsidiary is not taxable as a corporation for U.S. federal income tax purposes.

(b)     HSGH is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

5.9     Real Property.

(a)     Schedule 5.9 sets forth a complete list of all real property (other than the BRE Land) used or held for use by Seller and the Rangers Subsidiary in connection with, or that is necessary for the operation of, the Business and having a value in excess of $5,000. Except as set forth on Schedule 5.9, as of the date hereof, there is no current/pending insurance claim involving $150,000 or more with respect to any of the real property that is used or held for use in connection with, or that is necessary for the operation of, the Business. Neither Seller nor the Rangers Subsidiary own any real property. To the Knowledge of Seller, except as, individually and in the aggregate, would not have a Material Adverse Effect, the Ballpark in Arlington and the Centerfield Office are structurally sound and the building systems and related equipment located upon such real property, taken as a whole, are not fundamentally flawed. To the Knowledge of Seller, there are adequate sanitary and storm sewer, public water, gas, electrical, telephone and other utilities and facilities at such real property (including the Ballpark in Arlington and the Centerfield Office), and neither Seller nor any of its Affiliates has received within the prior three (3) years written notice from any provider of such services of any changes required to any facilities used in connection with such utilities.

(b)     Schedule 5.9 sets forth (i) a complete list of all leases of real property (individually, a "**Real Property Lease**" and collectively, the "**Real Property Leases**") by Seller or the Rangers Subsidiary as lessee, (ii) a complete list of all Real Property Leases by Seller and the Rangers Subsidiary as lessor, and (iii) a rent roll for all Real Property Leases by Seller and the Rangers Subsidiary as lessor. To the Knowledge of Seller, neither Seller nor the Rangers Subsidiary has received any written notice of any default or event that, with notice or lapse of time, or both, would constitute a default by Seller or the Rangers Subsidiary under any of the Real Property Leases. Seller and the Rangers Subsidiary are current in their rental payments

under all of the Real Property Leases (including the Ballpark Lease Agreement and the Centerfield Office Lease Agreement).

5.10    Tangible Personal Property.  Schedule 5.10 sets forth all leases of personal property by Seller involving annual payments in excess of $75,000 ("**Personal Property Leases**").  To the Knowledge of Seller, Seller has not received any written notice of any default or event that, with notice or lapse of time, or both, would constitute a default by Seller under any of the Personal Property Leases.

5.11    Intellectual Property.

(a)    Schedule 5.11(a) sets forth a true and correct list of all material* Registered Intellectual Property, including, for each such item of Registered Intellectual Property, (i) the owner of such item of Registered Intellectual Property, (ii) the jurisdiction in which such item of Registered Intellectual Property is issued, registered or pending and (iii) the date and number of such item of Registered Intellectual Property.  Except as would not have a Material Adverse Effect, individually and in the aggregate, to the Knowledge of Seller, each material* issuance and registration included in the Registered Intellectual Property is valid and enforceable, and all fees and filings in connection with the material* Registered Intellectual Property have been paid to or filed with the relevant Governmental Bodies and domain name registrars in the United States or foreign jurisdictions, as the case may be, as necessary to maintain the material Registered Intellectual Property in full force and effect.

(b)    To the Knowledge of Seller, Schedule 5.11(b) sets forth a true and correct list of all material* registrations and pending applications for Intellectual Property relating to the Texas Rangers registered in the name of any Major League Baseball Entity (including Major League Baseball Properties, Inc. or MLB Advanced Media, L.P.) exclusively on behalf of TRBP, pursuant to the Amended and Restated Agency Agreement, effective as of November 1, 2006, by and among Major League Baseball Properties, Inc., the various Major League Clubs and the Office of the Commissioner of Baseball.

(c)    Schedule 5.11(c) lists all Contracts or agreements of any kind relating to the use of any Purchased Intellectual Property, other than licenses, sublicenses or other contracts granting a right to use any Purchased Intellectual Property entered into by MLB.

(d)    Except as set forth on Schedule 5.11(d), Seller owns or has valid licenses to use all material* Purchased Intellectual Property as the same is used by Seller in the Ordinary Course of Business as of the date hereof, except to the extent the failure to be the owner or a valid licensee thereof, individually and in the aggregate, would not have a Material Adverse Effect.

(e)    Except as set forth on Schedule 5.11(e) and except as would not have a Material Adverse Effect, individually and in the aggregate, to the Knowledge of Seller (i) none of the Purchased Intellectual Property owned by Seller nor the conduct of the Business as of the date hereof infringes, constitutes or results from a misappropriation of or violates any Intellectual Property of any Person, and (ii) Seller has not received any written notice alleging that Seller is infringing, misappropriating or violating any Intellectual Property of any Person or challenging

the ownership, use, validity or enforceability of any of the Purchased Intellectual Property owned by Seller.

(f)     Except as set forth on Schedule 5.11(f) and except as would not have a Material Adverse Effect, individually and in the aggregate, to the Knowledge of Seller, none of the Purchased Intellectual Property owned by Seller is being infringed, misappropriated or violated by any Person.

(g)     Any and all Copyright and other Intellectual Property rights, title and interests of Seller in and to any and all telecasts and radio, Internet or other interactive media broadcasts of any game, contest or other broadcast in which the Texas Rangers were a participant are included in the Purchased Intellectual Property, subject to the terms and conditions set forth in the Contracts listed on Schedule 5.12(a).

5.12     Material Contracts.

(a)     Schedule 5.12(a) sets forth all of the following Contracts to which either Seller or the Rangers Subsidiary is a party or by which it is bound (providing a brief summary of any oral Contract), each of which is a Purchased Contract (other than (x) any Contract with the Rangers Subsidiary to which Seller is not also a party, (y) any Contract that is an Excluded Contract, or (z) any Contract that is otherwise an Excluded Asset) (all of the Contracts required to be listed on Schedule 5.12(a), together with the Real Property Leases, the "**Material Contracts**"):

(i)     Contracts between Seller and any Affiliate of Seller, Hicks Affiliate or current officer, partner or manager of Seller who is also a Rangers Non-Player Employee;

(ii)     Contracts with any labor union or association representing any Rangers Employees;

(iii)     Contracts for the sale of any of the Purchased Assets, other than the sale of inventory in the Ordinary Course of Business;

(iv)     Contracts under which (A) Seller grants to any Person a license under any material* Intellectual Property owned by Seller or (B) any Person grants to Seller a license under any Intellectual Property material* to the Business (excluding licenses for software used pursuant to shrink-wrap or click-through Contracts on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $100,000);

(v)     Contracts relating to any acquisition (whether in the form of a merger, the acquisition of equity, the acquisition of assets, or otherwise) to be made by Seller of any operating business or the capital stock of any other Person;

(vi)     Contracts relating to Indebtedness, or the making of any loans;

(vii)     Contracts relating to any guaranty, direct or indirect, primary or secondary, of any obligation for Indebtedness or otherwise (other than endorsements for collection or deposit made in the Ordinary Course of Business);

(viii)    Contracts granting any Person a Lien that is not a Permitted Exception on any of the Purchased Assets;

(ix)     Contracts for the use of personal property involving payments in excess of $75,000 per annum;

(x)     Contracts, other than Contracts with Rangers Employees: (A) containing non-competition, non-solicitation or other similar limitations restricting the conduct of the Business, or the ability of the Business to compete with any Person or to solicit the employees or customers of any Person; (B) that grant to the other party "most favored nation" status; or (C) that grant to the other party any material* exclusive right or rights;

(xi)     Contracts imposing any material* restrictions or limitations on the sale or other transfer of any of the Purchased Assets, other than, for purposes of this clause (xi), anti-assignment provisions;

(xii)    Contracts for a partnership, joint venture or similar agreement;

(xiii)   Contracts involving any Liability as surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligations of any Person (other than endorsements for collection or deposit made in the Ordinary Course of Business);

(xiv)    Contracts containing or providing for any Tax sharing, Tax allocation or Tax indemnification;

(xv)     any purchase, license, sale or contribution agreement, other than Intellectual Property licenses, relating to the pending acquisition, licensing or disposition of any business or, other than the sale of inventory in the Ordinary Course of Business, any Purchased Assets;

(xvi)    Contracts, other than Contracts with Rangers Employees, which involve the expenditure of more than $100,000 in the aggregate or require performance by any party more than one (1) year from the date hereof that, in either case, are not terminable by Seller without penalty on notice of ninety (90) days or less;

(xvii)   marketing or advertising Contracts (A) with anticipated revenue to Seller, any Affiliate of Seller or any Hicks Affiliate in any 12-month period reasonably expected to be greater than $100,000 or (B) granting any material* exclusive rights;

(xviii)  Purchased Contracts with any independent contractor that performs services in connection with the Business with a remaining term of longer than 12 months or involving the payment of more than $100,000 per year, other than Contracts that either (A) are terminable by either party on notice of ninety (90) days or less without imposing

any material* obligation or liability or (B) do not require any material* future payments by the Texas Rangers;

        (xix)    Contracts pursuant to which material* services remain to be performed with developers, architects, contractors, tenants or potential tenants;

        (xx)    Contracts that would change the name of, or grant the right to any Person to change the name of, the Ballpark in Arlington (including by adding the association with another name);

        (xxi)    Contracts related to non-baseball events scheduled to occur after the date hereof at the Ballpark in Arlington pursuant to which Seller, an Affiliate of Seller or a Hicks Affiliate will or would reasonably be expected to receive $350,000 or more in each case;

        (xxii)   other than league-wide broadcast Contracts entered into pursuant to the Major League Baseball Documents, Contracts granting any rights to broadcasts, whether radio, television or otherwise, of MLB games in which the Texas Rangers is a participant;

        (xxiii)  Contracts providing for concession services at the Ballpark in Arlington providing for payments to Seller or any Affiliate of Seller; and

        (xxiv)  a power of attorney.

        (b)      With such exceptions as, individually and in the aggregate, do not have, and are not reasonably likely to have, a Material Adverse Effect, except for Major League Baseball Documents and any Contract currently in effect between Seller and MLB, as listed on Schedule 5.12(b), or as a result of the Bankruptcy Case: (i) all of the Material Contracts are in full force and effect and are valid and binding on and enforceable against Seller or the Rangers Subsidiary, as applicable, and, to the Knowledge of Seller, the other parties thereto in accordance with their terms; (ii) neither Seller nor the Rangers Subsidiary is in payment default under or monetary breach of, or to the Knowledge of Seller, otherwise in default under or in breach of, any Material Contract; (iii) neither Seller nor the Rangers Subsidiary has waived any material* future right under any Material Contract; (iv) to the Knowledge of Seller, no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any Material Contract; and (v) to the Knowledge of Seller, neither Seller nor the Rangers Subsidiary has given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any Material Contract that has not been resolved.

        (c)      Seller has previously delivered or otherwise made available to Purchasers correct and complete copies (including any and all amendments) of each written Material Contract.

5.13    Employee Benefits.

(a)    Schedule 5.13(a) lists each Employee Benefit Plan maintained by (i) Seller (each, a "**Rangers Benefit Plan**") or (ii) HSG for the benefit of any Rangers Employee or Former Rangers Employee (each, an "**HSG Benefit Plan**"), but does not list any Employee Benefit Plans that are maintained or administered by or on behalf of MLB for the benefit of the Rangers Player Employees and certain Rangers Non-Player Employees (the "**MLB Benefit Plans**").  Seller has made available to Purchasers correct and complete copies of each Rangers Benefit Plan and HSG Benefit Plan (or, in the case of any such Rangers Benefit Plan or HSG Benefit Plan that is unwritten, descriptions thereof) set forth in Schedule 5.13(a), and if applicable, as to each such Rangers Benefit Plan: (i) the most recent annual report on Form 5500, including all required schedules (if any such report was required), (ii) the most recent summary plan description, and (iii) the most recent trust agreement or insurance contract.

(b)    Each Rangers Benefit Plan has been administered in accordance with its terms and the applicable provisions of ERISA, the Code and all other applicable Laws, except for any non-compliance that, individually and in the aggregate, would not have a Material Adverse Effect.  Further, to the Knowledge of Seller, (i) all Rangers Benefit Plans that are intended to be tax qualified under Section 401(a) of the Code (each, a "**Rangers Pension Plan**") are so qualified and (ii) no event has occurred since the date of the most recent determination letter or application therefor relating to any such Rangers Pension Plan that would adversely affect the qualification of such Rangers Pension Plan.  Seller has made available to Purchasers a correct and complete copy of the most recent determination letter received with respect to each Rangers Pension Plan, as well as a correct and complete copy of each pending application for a determination letter, if any.

(c)    Except as set forth on Schedule 5.13(c), all contributions, premiums and benefit payments under or in connection with the Rangers Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the Rangers Benefit Plans have been timely made.  All contributions under or in connection with the MLB Benefit Plans that are required to have been made as of the date hereof by HSG or Seller in accordance with the terms of such plans have been timely made, except as set forth on Schedule 5.13(c) or as would not have a Material Adverse Effect.  No Rangers Pension Plan has an "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA or Section 412 of the Code), whether or not waived.

(d)    Except as set forth on Schedule 5.13(d), there are no actions (other than an audit or investigation), suits or claims (other than routine claims for benefits) with respect to any Rangers Benefit Plan pending or, to the Knowledge of Seller, threatened, which could give rise to a material liability of Seller or the Rangers Subsidiary, and to the Knowledge of Seller, there are no facts that are reasonably likely to give rise to any such actions (other than an audit or investigation), suits or claims (other than routine claims for benefits).  There is currently no audit or investigation by any Governmental Body against or involving any Rangers Benefit Plan pending, and to the Knowledge of Seller, there is no such audit or investigation threatened by any such Governmental Body.

(e)     Except as set forth on <u>Schedule 5.13(e)</u>, neither the execution or delivery of this Agreement, nor the consummation of the transactions contemplated herein, will, with respect to any Rangers Non-Player Employee and solely as a result of the consummation of such transactions: (i) increase any benefits otherwise payable under any Rangers Benefit Plan or HSG Benefit Plan; (ii) result in any acceleration of the time of payment or vesting of any such benefits; (iii) result in the payment of any retention, stay bonus, change of control, enhanced severance, or similar payments or (iv) require the funding of any trust or other funding vehicle.

(f)     Except for any representations and warranties in this <u>Article V</u> regarding Contracts with employees or compensation payable to employees, this <u>Section 5.13</u> represents the sole and exclusive representation and warranty of Seller regarding employee benefit matters. Seller makes no representations or warranties to Purchasers regarding the MLB Benefit Plans except as expressly set forth herein.

(g)     <u>Schedule 8.1(a)</u> lists all Rangers Non-Player Employees, as of the date hereof, including, for each such employee, his or her (i) name, (ii) job title, (iii) department, (iv) base salary or wage rate, (v) date of hire, (vi) status as a full-time or part-time employee, (vii) location, (viii) exempt or non-exempt status, and (ix) 2009 bonus or commission with respect to non-exempt clerical personnel.  <u>Schedule 8.1(a)</u> also lists (x) the name of each Rangers Non-Player Employee who is on a leave of absence as of such date, as well as the names of all Rangers Player Employees as of such date and (y) the bonus pool for non-executive employees with respect to 2009 and the bonus pool for executive employees with respect to 2009.

5.14    <u>Labor</u>.

(a)     Except as set forth on <u>Schedule 5.14(a)</u>, neither Seller nor HSG is a party to any labor or collective bargaining agreement with respect to any Rangers Employees.

(b)     Except as set forth on <u>Schedule 5.14(b)</u>, there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of Seller, threatened against or involving Seller or HSG involving any Rangers Employees, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Seller, threatened by or on behalf of any Rangers Employee, Former Rangers Employee or group of Rangers Employees and/or Former Rangers Employees, except in each case as, individually and in the aggregate, would not have a Material Adverse Effect.

5.15    <u>Litigation</u>.  Except for the Bankruptcy Case (with respect to Seller) or as otherwise set forth on <u>Schedule 5.15</u>, there are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller or the Rangers Subsidiary, including relating to the Senior Indebtedness or any guarantee in whole or in part of the Senior Indebtedness or the nonpayment of any Assumed Liability.  Except for any Order that may be entered by the Bankruptcy Court in the Bankruptcy Case (it being understood that Seller is obligated to promptly deliver any such Order to Purchasers), neither Seller nor the Rangers Subsidiary is subject to any material* Order of any Governmental Body.  Except for the Bankruptcy Case with respect to Seller, none of Seller, HSG, Rangers Ballpark, Emerald Diamond, the Dallas Stars or any of their respective Affiliates is a debtor in any insolvency proceedings or subject to an involuntary bankruptcy petition.

5.16    Compliance with Laws; Permits.

(a)    Except as set forth on Schedule 5.16, Seller is in compliance with all Laws applicable to the Purchased Assets or the Business, except where the failure to be in compliance, individually and in the aggregate, would not have a Material Adverse Effect.  Seller has not received any written notice of or been charged with the violation of any Laws, except where such violation, individually and in the aggregate, would not have a Material Adverse Effect.

(b)    Seller currently has all Permits which are required for the operation of the Business as presently conducted, other than those the failure of which to possess, individually and in the aggregate, would not have a Material Adverse Effect.  Seller is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which Seller is a party, except where such default or violation, individually and in the aggregate, would not have a Material Adverse Effect.

5.17    Environmental Matters. The representations and warranties contained in this Section 5.17 are the sole and exclusive representations and warranties of Seller pertaining or relating to matters arising under any Environmental Laws or related to Hazardous Materials. Except as set forth on Schedule 5.17 and except in each case as, individually and in the aggregate, would not have a Material Adverse Effect:

(a)    the operations of HSG related to the Business and the Purchased Assets, of Rangers Ballpark, of Emerald Diamond and of Seller are, and have been, in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with any Permits required under all applicable Environmental Laws necessary to operate its business ("**Environmental Permits**");

(b)    none of Seller, HSG, Rangers Ballpark or Emerald Diamond is subject to any pending or, to the Knowledge of Seller, threatened claim alleging that any such Person may be in violation of any Environmental Law or any Environmental Permit or may have any liability under any Environmental Law;

(c)    to the Knowledge of Seller, there are no pending or threatened investigations of the Business under Environmental Laws, which would reasonably be expected to result in Seller incurring any material liability pursuant to any Environmental Law;

(d)    to the Knowledge of Seller, there is no current condition at any of the Purchased Assets (including, for purposes of this Section 5.17(d), any real property leased pursuant to a lease included in the Purchased Assets (including the Ballpark in Arlington and the Centerfield Office) or leased by the Rangers Subsidiary), or relating to the operations of HSG, Rangers Ballpark or Emerald Diamond related to the Business or the Purchased Assets or relating to the operations of Seller or the Rangers Subsidiary, that would reasonably be expected to result in Seller or Rangers Subsidiary incurring Liabilities under Environmental Laws;

(e)    there has been no release of any Hazardous Material by Seller or, to the Knowledge of Seller, (i) at or from any Purchased Asset (including, for purposes of this Section

5.17(e), any real property leased pursuant to a lease included in the Purchased Assets (including the Ballpark in Arlington and the Centerfield Office) or leased by the Rangers Subsidiary) or (ii) offsite relating to the operations of HSG, Rangers Ballpark or Emerald Diamond related to the Business or the Purchased Assets or relating to the operations of Seller or the Rangers Subsidiary, in any case that would reasonably be expected to result in Seller or Rangers Subsidiary incurring Liabilities under Environmental Laws.

5.18    Insurance.

(a)     Schedule 5.18 contains a list of all insurance policies that are currently in force, or under which there are any open claims, and:  (i) that are owned or held by Seller or Rangers Subsidiary, (ii) under which Seller or Rangers Subsidiary is insured, or (iii) that cover the Business, any Rangers Player Employees or any Purchased Assets (collectively, the "**Insurance Policies**").  Additionally, for each of the Insurance Policies, Schedule 5.18 indicates whether such policy was purchased under an insurance program offered by MLB or was separately purchased by Seller or any of its Subsidiaries or Affiliates.  All such policies are in full force and effect, all premiums with respect thereto have been paid to the extent due, and no written notice of cancellation, termination or non-renewal has been received by Seller or Rangers Subsidiary with respect to any such policy.

(b)     To the Knowledge of Seller, Seller and the Business have complied in all material respects with the provisions of each of the Insurance Policies under which they and the Purchased Assets are insured, and all material* claims under the Insurance Policies have been filed in a timely fashion.

5.19    Major League Baseball Matters.

(a)     TRBP is the owner, holder and operator of a valid, subsisting and effective MLB franchise, which permits and authorizes TRBP to operate the Major League Club currently known as the "Texas Rangers."

(b)     Except as set forth on Schedule 5.19(b), to the Knowledge of Seller, the Texas Rangers are not subject to any pending investigation by MLB nor is any investigation involving the Texas Rangers, the Business or the Purchased Assets threatened by MLB.

(c)     Except as set forth on Schedule 5.19(c), since January 1, 2005, Seller has made all required and currently due contributions to, and paid all material* assessments, fines and other charges that have been assessed by MLB and that are due, and there are no material* outstanding unpaid contributions to, or assessments, fines or other charges, that have been assessed by MLB against Seller but have not been paid.

(d)     Except as set forth on Schedule 5.19(d), all material* contracts and Rangers Player Employee contracts, in each case currently in full force and effect, required to be filed with MLB have been filed with MLB, and, to the Knowledge of Seller, no such material* contract or Rangers Player Employee contract has been disapproved or rejected by MLB.  Except as set forth on Schedule 5.19(d), MLB has not notified Seller in writing that any of those material* contracts or Rangers Player Employee contracts violates MLB's substantive

46

requirements in any material respects, including the requirements set forth in the MLB Rules and Regulations.

(e)     Schedule 5.19(e)(i) lists and attaches all MLB revenue sharing rulings issued to the Texas Rangers since January 1, 2000.  Schedule 5.19(e)(ii) lists all pending requests by the Texas Rangers for a revenue sharing ruling.  Schedule 5.19(e)(iii) lists all years subject to a revenue sharing audit by MLB or for which MLB has not provided final notice that such audit is completed, and with respect to each year, identifies the issues under review.

(f)     There are no annuities or life insurance contracts (collectively, the "**Investment Vehicles**") purchased by Seller intended to fund deferred compensation obligations of TRBP during the lifetime of an individual.

(g)     Schedule 5.19(g) sets forth a true and complete copy of the list provided to Seller by MLB that sets forth (i) the name of each Major League Baseball Entity in which Seller or the Rangers Subsidiary directly owns an equity interest, and (ii) a description of the percentage interest held by Seller or the Rangers Subsidiary, in each case, as of the date specified by MLB in such list.

5.20    Player Matters.  To the Knowledge of Seller, except as disclosed on Schedule 5.20, no Rangers Player Employee is subject to suspension by the Texas Rangers or MLB, and no Rangers Player Employee is subject to any investigation by MLB or the Texas Rangers that may result in suspension, expulsion or material* fines.  Schedule 5.20 sets forth a list of each Rangers Player Employee and his service time under the MLB Rules and Regulations.

5.21    Suites.  Set forth on Schedule 5.21 is a list of all Suite Licenses to which Seller is a party with a term that extends beyond the 2010 MLB season other than Contracts regarding marketing or sponsorship that provide for the use of suites for longer periods, which are listed on Schedule 5.12(a).

5.22    Accounts Receivable.  All accounts receivable related to the Business that either are reflected on the Balance Sheet or were created subsequent to the date of the Balance Sheet have arisen in the Ordinary Course of Business.

5.23    The Rangers Subsidiary.  The Rangers Subsidiary is a bankruptcy remote special purpose entity whose sole purpose is limited by its organizational documents to dealing with certain specified financial assets and certain specified activities related thereto and whose assets consist primarily of such specified financial assets and proceeds thereof.  To the Knowledge of Seller, the Rangers Subsidiary is currently in compliance with (a) its organizational documents and (b) all of its representations, warranties and covenants under the Transaction Documents (as defined in the Second Amended and Restated Indenture, dated as of December 8, 2009, among Major League Baseball Trust, as Issuer, Wells Fargo Bank, National Association, as Indenture Trustee and as Collateral Agent, and Bank of America, N.A., as Administrative Agent).  The Rangers Subsidiary does not have any employees.

5.24    No Undisclosed Liabilities.  Neither Seller nor the Rangers Subsidiary has any Liability that will be an Assumed Liability (or, in the case of the Rangers Subsidiary, will

continue to be a Liability of the Rangers Subsidiary) following the consummation of the transactions contemplated by this Agreement, except for Liabilities (a) reflected on or set forth in the Balance Sheet, (b) incurred in the Ordinary Course of Business after the Balance Sheet Date that, individually and in the aggregate, are not material*, (c) consisting of obligations under Purchased Contracts and/or Rangers Benefit Plans, HSG Benefit Plans or MLB Benefit Plans, and/or (d) listed on Schedule 5.24.

  5.25 Books of Account.  The books, records and accounts of Seller and the Rangers Subsidiary maintained with respect to the Business accurately and fairly reflect, in reasonable detail and in all material* respects, the transactions and the assets and liabilities of the Business.

  5.26 Deferred Compensation Liability.  Seller has made available to Purchasers a schedule (current as of December 31, 2009) which sets forth all deferred compensation payable by TRBP to any current or former MLB player relating to such current or former MLB player's service as a MLB player.

  5.27 Financial Advisors; Specified Advisor Fees .  Except for the fees payable at Closing to the Persons listed on Schedule 5.27 (the "**Financial Advisors**") in the respective amounts set forth on Schedule 5.27 (the "**Financial Advisory Fees**") and the monthly fees of Perella Weinberg Partners LP, no Person is entitled to payment with respect to having acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transactions contemplated by this Agreement.  Except for the Specified Advisor Fees and the Financial Advisory Fees (none of which Financial Advisory Fees have been paid since November 1, 2009), neither Seller nor any Subsidiary of Seller has, since November 1, 2009, directly by Seller or such Subsidiary or indirectly through a Hicks Affiliate or other Affiliate of Seller, incurred or paid any legal, financial advisory, consulting or similar fees or expenses in connection with the negotiation and execution of this Agreement, the Original APA or the BRE Land Purchase Agreement (whether as originally executed, as amended and restated, or as otherwise amended), the transactions contemplated hereby or thereby, any similar transactions or proposed transactions, any negotiations or meetings with the Lenders, any bankruptcy proceedings, or any restructuring or sale transactions, whether with Purchasers or any other Person.  The total amount of Specified Fees and Expenses paid from the cash of Seller or any Subsidiary of Seller after November 1, 2009 through (and including) the date of this Agreement is set forth in Schedule 5.27, including a breakdown of the total amounts owed to each payee of such Specified Fees and Expenses.  None of Seller, Rangers Subsidiary or Rangers Ballpark has paid any MLB Seller Amounts since November 1, 2009.

  5.28 Paradigm Aircraft Agreement.  (a) The Paradigm Aircraft Agreement is in full force and effect and is valid and binding on and enforceable against HSG and, to the Knowledge of Seller, the other party thereto in accordance with its terms; (b) HSG is not in payment default under or monetary breach of, or to the Knowledge of Seller, otherwise in default under or in breach of, the Paradigm Aircraft Agreement; (c) HSG has not waived any material* future right under the Paradigm Aircraft Agreement; (d) to the Knowledge of Seller, no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, the Paradigm Aircraft Agreement; and (e) to the Knowledge of Seller, HSG has not given to or received from any other Person any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, the

Paradigm Aircraft Agreement that has not been resolved. Seller has previously delivered or otherwise made available to Purchasers correct and complete copies (including any and all amendments) of the Paradigm Aircraft Agreement.

5.29  Indebtedness for Borrowed Money.  Except for Seller's Liabilities as a guarantor of the Senior Indebtedness in an aggregate amount of $75,000,000 and except as provided on Exhibit 5.29, Seller has no Liabilities relating to Indebtedness for borrowed money (other than purchase money Indebtedness for personal property included in the Purchased Assets), whether as a borrower, guarantor or otherwise.

5.30  Acquisition Proposal Materials.  Promptly following the execution of the Original APA, Seller, HSG and the other Hicks Affiliates party thereto notified all other Persons previously provided with information, documentation and other materials (whether in hard copy or electronic format) relating to any Acquisition Proposal (collectively, the "**Acquisition Proposal Materials**") that Seller, HSG and such Hicks Affiliates had executed the Original APA with Purchasers, that Seller, HSG and such Hicks Affiliates were in exclusive dealings with Purchasers as a result and that such other Persons shall not use the Acquisition Proposal Materials for any purpose.

5.31  Assumed Liabilities of Affiliates.  Since the date of the Original APA, except as set forth in Exhibit 5.31, Seller has not assumed any Liabilities of HSG, Emerald Diamond, Rangers Ballpark or any other Hicks Affiliate.

5.32  Non-reliance of Seller.  Except for the specific representations and warranties expressly made by Purchasers in Article VI of this Agreement, Seller (1) acknowledges and agrees that no Purchaser or any other Person is making or has made any representation or warranty, expressed or implied, at Law or in equity, in respect of Purchasers or any of any Purchaser's respective business, assets, liabilities, operations, prospects, or condition (financial or otherwise), including with respect to the prospects of Purchasers, or any of any Purchasers' respective business, assets, liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Purchasers or any of any Purchaser's respective business, assets, liabilities, operations, investors, lenders, prospects, or condition (financial or otherwise) furnished to Seller or its representatives or made available to Seller and its representatives in any form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; (2) specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Purchasers have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person; (3) specifically disclaims any obligation or duty by any Purchaser to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in Article VI of this Agreement or by applicable Law; and (4) acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transactions contemplated hereby, including selling the Purchased Assets, subject only to the specific representations and warranties set forth in Article VI of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in Article X.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers hereby jointly and severally represent and warrant to Seller as of the date of this Agreement and as of the Closing Date that:

6.1     Organization and Good Standing.  Each Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business.

6.2     Authorization of Agreement.  Each Purchaser has full limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by such Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "**Purchaser Documents**"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by each Purchaser of this Agreement and each Purchaser Document, to which such Purchaser is a party, have been duly authorized by all necessary limited liability company action on behalf of such Purchaser.  This Agreement has been, and each Purchaser Document, to which such Purchaser is a party, will be at or prior to the Closing, duly executed and delivered by each such Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

6.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 6.3 hereto, none of the execution and delivery by any Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by any Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of formation and limited liability company agreement of any Purchaser, (ii) any Contract or Permit to which any Purchaser is a party or by which any Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Body applicable to any Purchaser or by which any of the properties or assets of any Purchaser are bound or (iv) any applicable Law.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Purchaser in connection with the execution and delivery of this Agreement or the

Purchaser Documents, the compliance by any Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby, the taking by any Purchaser of any other action contemplated hereby or for Purchasers to conduct the Business, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the MLB Approvals, and (iii) approval of the Bankruptcy Court.

6.4　　Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchasers, threatened against any Purchaser, or to which any Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would be reasonably likely to prohibit or restrain the ability of Purchasers to enter into this Agreement, to perform their obligations under this Agreement or to consummate the transactions hereby.  No Purchaser is subject to any Order of any Governmental Body except to the extent the same would not be reasonably likely to prohibit or restrain the ability of Purchasers to enter into this Agreement, to perform their obligations under this Agreement or to consummate the transactions contemplated hereby.

6.5　　Financial Advisors.  Except as set forth in Schedule 6.5, no Person is entitled to payment with respect to having acted, directly or indirectly, as a broker, finder or financial advisor for any Purchaser in connection with the transactions contemplated by this Agreement.

6.6　　Investment Intention.  Each Purchaser is an accredited investor as defined in Regulation D under the Securities Act of 1933, as amended (the "**Securities Act**").  Each Purchaser is acquiring the Subsidiary Equity Interests for its own account, for investment purposes only and not with a view to the distribution thereof (as such term is used in Section 2(11) of the Securities Act).  Each Purchaser understands that the Subsidiary Equity Interests have not been registered under the Securities Act or any applicable state securities laws, and that the Subsidiary Equity Interests cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

6.7　　MLB Information Requirements.  As of the date hereof, each Purchaser, and for the purpose of clarity, including any Affiliate of such Purchaser to which such Purchaser intends to assign any right hereunder prior to Closing pursuant to Section 11.9 of this Agreement, has provided substantially all, and as of the Closing Date, each Purchaser, will have provided all information to MLB concerning itself and its Affiliates in compliance with and as required by MLB Rules and Regulations, which information is accurate in all material respects and does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements therein not misleading, including completing and filing any and all necessary applications, background information forms, and any other documents and information required of them by MLB to obtain the MLB Approvals in connection herewith.  Purchasers and their Affiliates do not own any interest in any Major League Club.

6.8　　Non-reliance of Purchasers.  Except for the specific representations and warranties expressly made by Seller in Article V of this Agreement, each Purchaser (1) acknowledges and agrees that neither Seller nor any other Person is making or has made any representation or warranty, expressed or implied, at Law or in equity, in respect of Seller, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of Seller's business, assets, liabilities, operations, prospects, or condition

(financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets including any Purchased Assets, the nature or extent of any liabilities including the Assumed Liabilities, the prospects of Seller, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of Seller's business, assets, liabilities, operations, the effectiveness or the success of any operations, or the accuracy or completeness of any information including any Documents, confidential information memoranda, projections, materials or other information (financial or otherwise) regarding Seller, the Business, or the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or any of Seller's business, assets, liabilities, operations, prospects, or condition (financial or otherwise) furnished to Purchasers or its representatives or made available to Purchasers and their representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; (2) specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that Seller has specifically disclaimed and does hereby specifically disclaim any such other representation or warranty made by any Person; (3) specifically disclaims any obligation or duty by Seller to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in <u>Article V</u> of this Agreement or by applicable Law; and (4) acknowledges and agrees that it is entering into this Agreement, and upon the Closing will be consummating the transaction contemplated hereby, including acquiring the Purchased Assets and assuming the Assumed Liabilities, subject only to the specific representations and warranties set forth in <u>Article V</u> of this Agreement as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Article X</u>.

6.9    <u>Financial Capability</u>.  On or prior to the date hereof, Purchasers have delivered to Seller true and complete copies of the following:

(a)    fully executed Equity Commitment Letters to provide equity financing on the terms contemplated thereby to Purchasers in the aggregate amount of $260 million for the transactions contemplated by this Agreement; and

(b)    fully executed bank commitment(s) letter to provide debt financing on the terms contemplated thereby to Purchasers in the aggregate amount of $130 million to $160 million for the transactions contemplated by this Agreement.

The letters referred to in paragraphs (a) and (b) of this <u>Section 6.9</u> (collectively, as amended, restated, supplemented or otherwise modified or replaced from time to time, in each case in accordance with this Agreement, the "**Commitment Letters**") provide for funding in an aggregate amount sufficient to pay the Purchase Price in accordance with <u>Section 3.2</u> and to consummate the transactions contemplated by this Agreement, including payments of any fees or expenses contemplated hereunder.  None of the Commitment Letters has been withdrawn, and Purchasers are not aware of any facts, circumstances or events that would cause Purchasers to be unable to obtain financing in accordance with the terms of the Commitment Letters, other than any such facts, circumstances or events which result from any material breach by Seller and/or any of its Affiliates of any covenant contained herein or in any other Seller Document or from

any representation or warranty of Seller and/or any of its Affiliates contained herein or in any other Seller Document having been or becoming untrue in any material respect.

ARTICLE VII

COVENANTS

7.1    <u>Access to Information</u>.

(a)    From and after the date of this Agreement and until the Closing, Seller shall, and shall use commercially reasonable efforts to cause HSG and its Subsidiaries, to permit Purchasers, through their officers, employees and representatives (including their legal advisors and accountants), to make such investigation of the properties (including the real property required to be set forth on <u>Schedule 5.9(a)</u>), businesses and operations of Seller, the Business and such examination of the books and records of Seller, the Business, the Purchased Assets and the Assumed Liabilities as Purchasers reasonably request and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances.  Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller to cooperate with Purchasers and Purchasers' representatives in connection with such investigation and examination, and Purchasers and their representatives shall cooperate with Seller and its representatives and shall use their commercially reasonable efforts to minimize any disruption to the Business.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller to disclose information subject to attorney-client privilege.  Notwithstanding anything to the contrary contained herein, prior to the Closing, without the prior written consent of Seller, which may be withheld for any reason, Purchasers shall not contact any suppliers to, or customers of, Seller or, except as permitted by <u>Section 7.6</u> hereof, any lenders to Seller.

(b)    Seller will also permit a firm engaged in the regular business of environmental engineering retained by Purchasers to conduct such environmental assessments of the real estate included in the Purchased Assets (or underlying any such Purchased Asset) or used or held for use by the Rangers Subsidiary, in each case as Purchasers in their discretion consider necessary or appropriate; provided that Purchasers and such firm shall use their commercially reasonable efforts to avoid interference with the activities of Seller on such real estate.  Purchasers must obtain HSG's prior approval of the scope and method of any environmental studies or assessments of such real estate (other than a Phase I environmental site assessment), which approval will not be unreasonably withheld, conditioned or delayed and, with respect to any leased real property, approved by the landlord in its sole discretion or as otherwise provided in the applicable lease.  Neither Purchasers nor such firm may perform a Phase II environmental site assessment of any portion of such real estate unless such assessment is (i) recommended by a Phase I environmental site assessment due to the discovery of a condition associated with such real property that could reasonably be expected to result in the owner or operator of such real property incurring any material Liability under any Environmental Law and (ii) approved by Seller, which approval will not be unreasonably withheld, conditioned or delayed and, with respect to any leased real property with any Person other than an Affiliate of HSG or a Hicks Affiliate, approved by the landlord in its sole discretion or as otherwise provided

53

in the applicable lease. If the transactions under this Agreement are not consummated for any reason, then Purchasers shall deliver to Seller, upon Seller's request, copies of all third party environmental studies or assessments of the real estate included in the Purchased Assets (or underlying any such Purchased Asset) or used or held for use by the Rangers Subsidiary prepared for or otherwise obtained by Purchasers in connection with its assessment of the transactions contemplated by this Agreement.

      7.2     Conduct of the Business Pending the Closing.

      (a)     Prior to the Closing, except (I) as set forth on Exhibit 7.2(a), (II) to the extent required by applicable Law (with Seller giving Purchasers prompt written notice thereof), (III) to the extent otherwise contemplated by this Agreement, (IV) to the extent required by MLB Rules and Regulations or (V) with the prior written consent of Purchasers (which consent shall not be unreasonably withheld, delayed or conditioned) and subject to any limitations imposed by the Bankruptcy Case, Seller shall, and shall cause the Rangers Subsidiary to:

      (i)     except as permitted or waived by MLB (orally or in writing), at all times comply with (A) the Interim Support Agreement and Interim Agreement and (B) all obligations under its post-petition financing arrangements, including the Order approving the DIP Financing;

      (ii)     except to the extent restricted or required by the terms of this Agreement, the Bankruptcy Code or the rules, decrees, oversight or approvals of the Bankruptcy Court, conduct the Business only in the Ordinary Course of Business;

      (iii)     use its commercially reasonable efforts to preserve the present business operations, organization and goodwill of Seller and of the sponsors, advertisers and broadcasters of the Business, which shall not require Seller to renew any Contracts or exercise any rights thereunder outside of the Ordinary Course of Business;

      (iv)     promptly deliver notice to Purchasers in writing of any specific event or circumstance of which Seller receives notice that: (A) to the Knowledge of Seller, has resulted or could reasonably be expected to result in any of the conditions set forth in Section 9.1 or 9.2 not being satisfied; or (B) any action is pending or, to the Knowledge of Seller, threatened that relates to the transactions contemplated by this Agreement; or (C) any of the covenants or agreements of Seller contained in this Agreement is breached in any material respect; and

      (v)     continue in full force and effect all Insurance Policies.

      (b)     Prior to the Closing, except (I) as set forth on Exhibit 7.2(b), (II) to the extent required by applicable Law (with Seller giving Purchasers prompt written notice thereof), (III) to the extent otherwise contemplated by this Agreement, (IV) to the extent required by MLB Rules and Regulations or (V) with the prior written consent of Purchasers (which consent shall not be unreasonably withheld, delayed or conditioned) and subject to any limitation imposed by the Bankruptcy Case, Seller shall not, and shall not permit the Rangers Subsidiary to:

(i)    other than in the Ordinary Course of Business or as required by applicable Law, any Contract provided to Purchasers prior to the date hereof, Rangers Benefit Plan or HSG Benefit Plan or MLB, (A) materially increase the annual level of compensation of any Senior Employee, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any Senior Employees, (C) adopt, or materially increase the coverage or benefits available under, any Rangers Benefit Plan or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) with any Senior Employee (except with respect to new hires approved by Purchasers);

(ii)    subject any of the Purchased Assets to any Lien, except for Permitted Exceptions;

(iii)    acquire any material properties or assets that would be Purchased Assets or sell, assign, license, transfer, convey, lease or otherwise dispose of a material portion of the Purchased Assets (except pursuant to an existing Contract previously provided to Purchasers that is listed in Exhibit 7.2(b), inventory in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets or to the extent required by MLB);

(iv)    cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)    enter into any commitment for capital expenditures of the Business except to the extent required by MLB;

(vi)    other than in the Ordinary Course of Business or as required by applicable Law or MLB, enter into any agreement that would amend any Real Property Lease, or otherwise affect the operation of any real property subject to a Real Property Lease or any real property set forth on Schedule 5.9(a);

(vii)    make any distribution in cash or property in respect of the equity interest of Seller or the Rangers Subsidiary;

(viii)    (i) sell, assign, transfer, issue or otherwise dispose of any trust interest of the Rangers Subsidiary, or any securities or obligations convertible into or exchangeable for any such trust interest, or any options, warrants or conversion or other rights to acquire any such trust interest, or any such securities or obligations; (ii) effect any reorganization or recapitalization; or (iii) split, combine or reclassify any trust interest of the Rangers Subsidiary, or issue or authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for any trust interest of the Rangers Subsidiary;

(ix)    propose or adopt any amendments to the governance documents of the Rangers Subsidiary;

    (x)  enter into or agree to enter into any merger or consolidation with any Person;

    (xi)  waive any provisions under or amend or terminate the Centerfield Office Note or the Shared Charter Services Agreement;

    (xii)  make any contribution, loan or other payment to Rangers Subsidiary or Rangers Ballpark;

    (xiii)  enter into or assume any transition services agreement with the Dallas Stars, HSG or any other Hicks Affiliate;

    (xiv)  amend the Existing BRE Land Use Arrangement to increase the amounts owing from Seller or HSG thereunder; or

    (xv)  agree to do anything prohibited by this <u>Section 7.2(b)</u>.

Notwithstanding the foregoing, nothing herein shall limit or otherwise impair Seller's operation of the Texas Rangers, or give Purchasers, directly or indirectly, any right to control or direct the operations of the Texas Rangers, including (i) the making or not making of any player trades, acquisitions, dispositions, waivers, drafts, or the like, (ii) hiring or firing of any manager, coach, scout, trainer, or Rangers Player Employee and (iii) the conduct of, performance or management of any baseball activities; provided, however, that prior to (A) entering into any Contract with any Rangers Player Employee that provides for (I) potential payments during any season in an amount greater than $1,000,000 or a signing bonus in an amount greater than $1,000,000, or (II) potential payments over the life of the Contract in an aggregate amount greater than $5,000,000 or (III) a remaining term of three (3) years or more, (B) hiring or firing any manager of the Texas Rangers, or (C) trading any Rangers Player Employee who has been on the Texas Rangers' 40-man roster during the 2009 season, in each case (with respect to clauses (A), (B) or (C)), prior to the taking of any such action, to the extent reasonably practicable and in compliance with MLB Rules and Regulations, Seller shall give reasonable notice thereof to Purchasers and shall consult with Purchasers with respect thereto but, for the avoidance of doubt, the taking of any action set forth in clauses (A)-(C) (following such notice and consultation to the extent reasonably practicable and in compliance with MLB Rules and Regulations) shall not be a breach of this Agreement. For purposes of this paragraph, delivery of notice to, and consultation with, Purchasers shall require delivery of notice to, and consultation with, Chuck Greenberg.

  7.3  <u>Consents</u>. Subject to the respective and specific responsibilities of the parties under this Agreement to obtain certain consents and approvals, Seller and Purchasers shall use their commercially reasonable efforts, and Purchasers and Seller shall (and shall cause their Affiliates to) cooperate, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including the consents and approvals referred to in <u>Section 5.3(b)</u> and <u>Section 6.3(b)</u> hereof and confirmation by the Bankruptcy Court of the Plan of Reorganization; <u>provided</u> <u>however</u>, that no party shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested, commence or participate in any litigation, offer or grant any accommodation or

undertake any obligation or liability (in each case financial or otherwise) to any third Person, except as otherwise specifically contemplated by this Agreement.

7.4    Regulatory Approvals.

(a)    Purchasers and Seller shall (i) make or cause to be made all filings required of each of them or any of their respective subsidiaries or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within fifteen (15) Business Days after the date of this Agreement in the case of all filings required under the HSR Act and within four weeks in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective subsidiaries or Affiliates from the FTC, the Antitrust Division or any other Governmental Body in respect of such filings or such transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction.  Each such party shall use its commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.  Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction.  No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.  Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Seller, on the one hand, or Purchasers, on the other hand, may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 7.4 as "outside counsel only."  Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(b)    Each of Purchasers and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "**Antitrust Laws**").  In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any

transaction contemplated by this Agreement as in violation of any Antitrust Law, each of Purchasers and Seller shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by reasonably pursuing available avenues of administrative and judicial appeal, unless, by mutual agreement, Purchasers and Seller decide that litigation is not in their respective best interests. Each of Purchasers and Seller shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as possible after the date of this Agreement.

(c)     All filing fees associated with filings required by the HSR Act or any other Antitrust Laws shall be shared equally by Purchasers and Seller. All other fees, costs and expenses incurred by Purchasers or Seller in connection with notifying and obtaining the regulatory approvals as described in Sections 7.4(a) and/or 7.4(b) shall be paid in accordance with Section 11.2(a).

7.5     Further Assurances. Subject to, and not in limitation of, Sections 7.3 and 7.4, each of Seller and Purchasers shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to the parties' obligations to consummate the transactions contemplated by this Agreement, including executing and delivering, or causing the execution and delivery of, all documents to be executed by it or its Affiliates that serve as conditions to any of the parties' obligations in Section 9.1 or 9.2. Without limitation, as reasonably requested by Purchasers, Seller shall exercise any right to request further assurances from any Affiliate of Seller regarding any prior transfer of Purchased Assets from such Affiliate to Seller.

7.6     Confidentiality.

(a)     Subject to Section 7.6(c), each Purchaser acknowledges that the information provided to it in connection with this Agreement and the transactions contemplated hereby is subject to the terms of the confidentiality agreement between Baseball Express and HSG (with HSG having assigned to Seller prior to the date hereof HSG's rights under such agreement with respect to Purchasers and their Affiliates) dated July 1, 2009 (the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference and remain in full force and effect with the following modifications: Purchasers and their Representatives (as defined in the Confidentiality Agreement) are permitted to (i) communicate with banks and other financial institutions who are lenders to Seller, HSG or HSG's Subsidiaries in connection with Purchasers exploring and potentially obtaining debt financing for (A) the acquisition of the Business or (B) the operation of the Business post-Closing and (ii) communicate with MLB in connection with (A) the MLB approval process and related issues with respect to Purchasers, and (B) Purchasers' compliance with MLB Rules and Regulations; provided that, before any Purchaser communicates with any lender to Seller, HSG or any Subsidiary of HSG on any subject other than those set forth in the foregoing clauses (i)(A) and (i)(B), such Purchaser shall coordinate such communications through Hicks or WGM. Effective

upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Purchasers acknowledge that any and all other Confidential Information provided to it by Seller or its representatives concerning the Excluded Liabilities or any Excluded Asset shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(b)     From and after the Closing, Seller shall, and shall use commercially reasonable efforts to cause its Affiliates and the Hicks Affiliates to, maintain the confidentiality of, and shall not use for the benefit of themselves or others, any confidential information relating to the Business, the Purchased Assets or the Assumed Liabilities (the "**Confidential Information**"); provided, however, that Confidential Information shall be deemed not to include information that (i) is or becomes generally available to the public other than as a result of a disclosure, in violation of this Agreement or the Original APA, by Seller, any of its Affiliates or any Hicks Affiliate, or (ii) is or becomes available to Seller on a non-confidential basis from a source not known by Seller to be bound by an obligation or duty of confidentiality.

(c)     Notwithstanding anything in this Agreement, the Confidentiality Agreement or the BRE Land Purchase Agreement to the contrary, Purchasers and Seller acknowledge and agree that in connection with seeking the Approval Order and the implementation thereof, this Agreement and the BRE Land Purchase Agreement will be filed with the Bankruptcy Court and made publicly available.

7.7     Preservation of Records.  Seller and Purchasers agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date and, except with respect to any action (at law or in equity), suit, arbitration or proceeding (each, an "**Action**") between Seller and Purchasers, shall provide reasonable access to and make such records and personnel available to the other as may be reasonably required by such party during regular business hours and upon reasonable advance notice in connection with, among other things, preparation of regulatory filings, Tax Returns, any insurance claims by, Legal Proceedings or Tax audits or examination against or governmental investigations of Seller or Purchasers or any of their Affiliates or in order to enable Seller or Purchasers to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  Seller or Purchasers, as applicable, at their sole cost and expense may make copies of the books and records to which they are entitled to access pursuant to this Section 7.7.

7.8     Publicity.  Prior to Closing, except as required by applicable Law or MLB Rules and Regulations or necessary in connection with the Bankruptcy Case, neither Seller nor Purchasers shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld, conditioned or delayed; provided that, to the extent required by applicable Law or MLB Rules and Regulations or necessary in connection with the Bankruptcy Case, the party intending to make such disclosure shall use its commercially reasonable efforts consistent with such applicable Law, provision of the MLB Rules and Regulations or the Bankruptcy Code and the rules, decrees, oversight and approvals of the Bankruptcy Court to consult with the other party with respect to the timing and

content thereof, and if such other party states in writing that it intends to file a motion for relief from the Bankruptcy Court to prohibit such disclosure (if possible), then such disclosure shall not be made until the Bankruptcy Court has denied such motion. Any press release or public announcement issued pursuant to this <u>Section 7.8</u> shall comply with all applicable MLB Rules and Regulations, except as may be required by or necessary in connection with the Bankruptcy Case, and neither Seller nor Purchasers shall issue any press release or public announcement pursuant to this <u>Section 7.8</u> in violation of any MLB Rules and Regulations.

7.9   <u>MLB Approvals</u>.

(a)   Purchasers and Seller shall complete and file all necessary applications, background information forms, and any other documents and information required of them by MLB to obtain MLB Approvals in connection herewith.

(b)   Purchasers and Seller shall (and shall cause their Affiliates to) use their commercially reasonable efforts to obtain, as promptly as possible, all MLB Approvals, including becoming a party to any and all agreements required by the Commissioner, the Major League Clubs, the Office of the Commissioner of Baseball or any other Major League Baseball Entity and, in the case of Purchasers, to the extent required by MLB, divesting any interest of Purchasers or their Affiliates in conflicting businesses or sports teams. In connection with the foregoing, Purchasers and Seller shall (and shall cause their Affiliates to) furnish MLB with all information and assistance as may be required to obtain all MLB Approvals. The parties acknowledge that, as a condition to granting the MLB Approvals, MLB may require modifications to be made to the form and/or structure of the transactions contemplated by this Agreement or Purchasers, and to obtain the MLB Approvals, it shall be necessary to implement such modifications. Notwithstanding anything in this Agreement to the contrary, neither Purchasers nor Seller, without Purchasers' (in the case of Purchasers) or Seller's (in the case of Seller) prior written consent, shall be required to agree to any such modification.

(c)   Purchasers shall pay all amounts payable to MLB relating to the application filed by Purchasers with MLB in connection with the transactions contemplated under the terms of this Agreement, including fees and expenses (including attorneys fees related to such application) of MLB (the "**MLB Expense Reimbursement**"). Seller shall use commercially reasonable efforts to assist Purchasers in obtaining MLB Approvals; provided that nothing shall obligate Seller or any Affiliate of Seller to incur any additional expense or liability or to continue any existing obligation to MLB. Purchasers shall promptly provide Seller a copy of all MLB Approvals from MLB. Purchasers shall use commercially reasonable efforts in obtaining receipt of MLB Approvals at the earliest possible date.

(d)   The parties are aware of the provisions contained in the Major League Constitution and the "Control Interest Transfers -- Guidelines & Procedures" issued by the Commissioner on November 9, 2005 (as the same may be amended, supplemented or otherwise modified from time to time, the "**Guidelines**"). Seller, as required by the MLB Rules and Regulations, represents to Major League Baseball and Purchasers that it has notified the Commissioner and the Office of the Commissioner of Baseball of the proposed transaction and has applied for approval of such transaction pursuant to the Major League Constitution, the Guidelines and any other applicable MLB Rules and Regulations. Such approval, as required by

the MLB Rules and Regulations, is recognized by the parties to be in the sole and absolute discretion of the Commissioner, the Office of the Commissioner of Baseball and the Major League Clubs, as applicable. Each of the Seller and the Purchasers, as required by the MLB Rules and Regulations, represents to Major League Baseball that to date it has acted, and covenants to Major League Baseball that it will continue to act, in full and strict compliance with the Major League Constitution and the Guidelines in connection with the proposed transaction. Each party, as required by the MLB Rules and Regulations, further represents to Major League Baseball that all information contained in documents or statements provided, or to be provided, by or on behalf of it or its Affiliates to the Commissioner, the Office of the Commissioner of Baseball or any other Major League Baseball Entity shall be true, complete and correct in all material respects and, to its knowledge, shall not contain any untrue or misleading information.

(e)     Each party, as required by the MLB Rules and Regulations, acknowledges and agrees that the Closing is conditioned upon and subject to the prior approval of the Commissioner, the Office of the Commissioner of Baseball and the Major League Clubs, in each case, in its or their sole and absolute discretion under the Major League Constitution, the Guidelines and any other applicable MLB Rules and Regulations.

(f)     If Purchasers or Seller have a reasonable basis to believe that MLB Approval is not likely to be obtained on a timely basis, such party shall promptly, upon becoming aware of such basis, notify the other thereof.

7.10     MLB Funding. Purchasers agree to use their commercially reasonable efforts to meet MLB's standards regarding the required financial condition of MLB franchise owners, including initial equity capital funding, sufficient working capital, surety, bonding, guaranty arrangements and other financial conditions. Further, Purchasers agree to use their commercially reasonable efforts to satisfy MLB's requirements in order to obtain the MLB Approvals, and to fund the amount of the deferred compensation obligations of the Texas Rangers as required under the Collective Bargaining Agreement.

7.11     Nonprofit Entities.

(a)     At an effective time on or after the Closing to be designated by Purchasers, Seller shall use commercially reasonable efforts to secure resignations of those current officers and directors of the TRB Foundation identified by Purchasers and to cause the TRB Foundation to elect such replacement officers and directors as directed by Purchasers.

(b)     At or after the Closing, at the request of Purchasers, Seller shall cooperate with Purchasers to take similar actions with respect to the officers, directors and members of Texas Rangers Baseball Club Dominican Republic Inc.

7.12     Acquisition Financing.

(a)     Purchasers shall use commercially reasonable efforts to obtain and effectuate the Acquisition Financing on the terms and conditions contemplated by the Commitment Letters. Purchasers shall perform all obligations required to be performed by them in accordance with the terms of the Commitment Letters, and shall use commercially reasonable

efforts (including commercially reasonable actions reasonably requested by Seller) to maintain the Commitment Letters in full force and effect through the Closing. Purchasers shall from time to time provide such information to Seller as Seller may reasonably request regarding the status of the Acquisition Financing. Purchasers agree to notify Seller promptly if, at any time prior to the Closing Date, (i) any of the Commitment Letters shall expire or be terminated or replaced for any reason; (ii) any financing source that is a party to a Commitment Letter notifies Purchasers that such source no longer intends to provide financing to Purchasers thereunder; or (iii) for any reason Purchasers no longer believe, in good faith, that they will be able to obtain any of the financing substantially on the terms described in the Commitment Letters. Purchasers shall not, or permit any of their Affiliates to, without the prior written consent of Seller (not to be unreasonably withheld, conditioned or delayed), take any action or enter into any material transaction, including any merger, acquisition, joint venture, or disposition, that would reasonably be expected to materially impair, delay or prevent the consummation of the financing contemplated by the Commitment Letters. Purchasers shall not amend, alter or replace, or agree to amend, alter or replace, the Commitment Letters in any manner without the prior written consent of Sellers, provided that such consent will not be required if such amendment, alteration, replacement or agreement to amend, alter or replace would not reasonably be expected to materially hinder or delay the Closing. Purchasers shall provide Seller with copies of all Commitment Letters (or modifications thereto) promptly following the execution thereof.

(b)     Seller agrees to use its commercially reasonable efforts to provide all cooperation reasonably requested by Purchasers in connection with the Acquisition Financing, including (i) providing and causing its advisors to provide all available information reasonably deemed necessary by Purchasers or the providers of the debt financing portion of the Acquisition Financing (the "**Debt Financing**") to complete the syndication of the Debt Financing, including available financial information that is customarily provided in such financings and is deemed necessary by Purchasers or the providers of such Debt Financing for the consummation of such Debt Financing; (ii) assisting in the preparation and updating of materials to be used in connection with the Debt Financing and any related syndication efforts, including, as applicable, participating in due diligence and drafting sessions; and (iii) making the officers and advisors of Seller available from time to time to attend and make presentations regarding their respective business and prospects at one or more meetings of prospective lenders.

7.13    Pre-Closing Escrow Agreement. Concurrently herewith, Purchasers and Seller shall cause the Pre-Closing Escrow Agreement, dated as of February 12, 2010, among HSG, TRBP, Rangers Ballpark, Emerald Diamond, Baseball Express, and U.S. Bank National Association, as escrow agent (the "**Prior Pre-Closing Escrow Agreement**"), to be amended to the minimum extent necessary to apply to the transactions contemplated by this Agreement rather than the transactions contemplated by the Original APA. Purchasers and Seller acknowledge that Purchasers have already deposited into escrow under the Prior Pre-Closing Escrow Agreement an amount equal to the Purchaser Termination Amount, which deposit the parties agree can be used as security for Purchasers' obligations under this Agreement with respect to the Purchaser Termination Amount.

7.14    Disclosure Schedules; Supplementation and Amendment of Schedules. Seller may, in its reasonable discretion, include in the Schedules items that are not material in order reasonably to avoid any misunderstanding, and such inclusion, or any references to dollar

amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other applicable Schedule if the applicability of such information to such other Schedules is reasonably apparent on its face. From time to time prior to the Closing, Seller shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement to have been omitted in error; provided that, if such supplement or amendment reflects any matters other than actions taken by Seller following the date of this Agreement in the Ordinary Course of Business that either this Agreement required Seller to take or are not prohibited by this Agreement, then Baseball Express shall have the right to terminate this Agreement by providing written notice to Seller within five (5) Business Days following delivery of such supplement or amendment by Seller. If Baseball Express fails to deliver a written notice of termination within such five-Business-Day period, Purchasers shall be deemed to have accepted such supplement or amendment, and such supplement or amendment shall thereafter be deemed to modify the applicable Schedule or Schedules (both as of the date hereof and as of the Closing Date) for all purposes under this Agreement, including for the purpose of determining whether the conditions to Closing set forth in Section 9.1(a) have been satisfied and for the purpose of indemnification subject to Article X. For purposes of this Section 7.14, any items included or described in the Schedules that are based on documents that have not been made available to Purchasers at any time prior to the date hereof shall be deemed to have been provided in a supplement to the Schedules delivered by Seller on the date hereof. Within two (2) Business Days following the date of this Agreement, Seller shall deliver to Purchasers the CD labeled "Material Contracts: Schedule 5.12(a)" that is listed in Schedule 5.12(a), such delivery to be deemed effective as of the date of this Agreement; however, notwithstanding the foregoing, if any item included or described on such CD was not included in the Data Site prior to the execution of this Agreement, then such item shall be deemed to have been provided in a supplement to such Schedule as of the date on which such CD is delivered to Purchasers. No supplement or amendment to a Schedule pursuant to this Section 7.14 shall be deemed to be an amendment to this Agreement for purposes of Section 11.5. In conjunction with Seller's delivery to Purchasers of any supplement or amendment to a Schedule pursuant to this Section 7.14, Seller shall also deliver to Purchasers such underlying documentation and information as reasonably necessary for Purchasers to be able to understand and analyze the matter(s) reflected in such supplement or amendment.

      7.15    Title, Survey and Lot J Easement.

          (a)    Lot J Easement, Ballpark Lease Assignment and Centerfield Office Lease Assignment. Seller, at Seller's sole cost and expense, shall use commercially reasonable efforts to cause the Lot J Easement to be executed in full and recorded in the County Clerk's Office for Tarrant County, Texas. Seller, at Seller's sole cost and expense, shall cause the Ballpark Lease Assignment and Centerfield Office Lease Assignment to be recorded in the County Clerk's Office for Tarrant County, Texas. Seller shall provide Purchasers with fully executed and recorded (as applicable) copies of the Lot J Easement, Ballpark Lease Assignment and Centerfield Office Lease Assignment when available, but in any event prior to the issuance of the Title Update.

(b)    Survey.  Seller, at Seller's sole cost and expense, has caused surveys for the Ballpark in Arlington and the Centerfield Office (each, a "**Leased Property**" and collectively, the "**Leased Properties**"), to be drawn by Graham Associates, Inc. (collectively, the "**Surveys**"), to be made with respect to the parcels of real property comprising the Leased Properties by a licensed surveyor or registered professional engineer.  The Surveys meet or exceed the minimum standard detail requirements for ALTA/ACSM Land Title Surveys as adopted most recently by the American Land Title Association and American Congress on Surveying and Mapping, including items 1, 2, 3, 4, 6, 7(a), 7(c), 8, 9, 10, 11(a), 12, 13, 14, and 16 contained in Table A thereof.  Seller has furnished Purchasers and their counsel and Seller's counsel with two (2) copies each of the field notes and survey plats prepared by such surveyor or engineer.  Seller has also provided a copy of such field notes and survey plats to Republic Title of Texas, Inc. (the "**Title Company**"), 2626 Howell Street, 10th Floor, Dallas, Texas 75204, attention Becky Etter, as agent for First American Title Insurance Company (the "**Underwriter**").  Purchasers shall have the right, at such time or times as Purchasers deem necessary, at Purchasers' sole cost and expense, to (i) cause the surveyor to add additional ALTA Table A items and certifications to the Surveys, (ii) cause the surveyor to revise the Surveys, if required, so that the Surveys are sufficient to permit the Title Company to modify, at Purchasers' expense, the standard printed exception in the Texas form leasehold policy of title insurance to be issued to Purchasers with respect to the Leased Properties (the "**Leasehold Policy**") pertaining to discrepancies, conflicts, shortages in area or boundary lines, encroachments, overlapping of improvements or similar matters to read "shortages in area" only, and (iii) cause the surveyor to re-certify the Surveys.  Purchasers shall have the right to request any and all endorsements the Title Company agrees to issue with respect to the Leasehold Policy.  Purchasers shall be solely responsible for any costs incurred in connection with the issuance of such endorsements.  Seller shall cooperate with Purchasers in connection with Purchasers' endorsement requests; provided, however, that Seller shall have no obligation to make any payment, incur any liability or indemnify any party (including Purchasers or the Title Company) as a part of such cooperation.

(c)    Title Commitment.  Seller, at Seller's sole cost and expense, has caused the Title Company to issue and deliver to Purchasers a current commitment for title insurance with an issue date of May 13, 2010, effective April 27, 2010, with the Underwriter GF No. 09R43987E ND6 (the "**Title Commitment**") showing the current status of title to the Ballpark in Arlington and the Centerfield Office, accompanied by legible copies of the documents referenced in the Title Commitment (the "**Exception Documents**").  Following execution and recordation of the Lot J Easement, Seller, at Seller's sole cost and expense, shall cause the Title Company to add the Lot J Easement as an insured parcel under the Title Commitment.  Purchasers shall have the right, at such time or times as Purchasers deem necessary, at Purchasers' sole cost and expense, to cause the Title Company to issue an updated Title Commitment.

(d)    Permitted Exceptions.  Seller shall assign its interest in the Leased Properties to Purchasers free and clear and subject to no Liens of any kind or character other than the Permitted Exceptions.  Seller shall cause the Title Company to issue the Leasehold Policy without exception for any of the following items on Schedule C of the Title Commitment:  (i) 2 (except tenants, licensees and parties in possession under Purchased Contracts), (ii) 4 (except to

the extent waived by Purchasers hereunder), (iii) 7, (iv) 9, (v) 10, (vi) 11, (vii) 12, (viii) 13, (ix) 14, (x) 15, (xi) 16, and (xii) 17. Seller shall remove or cause to be removed as encumbrances on the Leased Properties at or prior to Closing, and shall cause the Title Company to delete any objection to title for (all at Seller's sole cost and expense) (i) any financing or other voluntary Liens or Tax Liens (other than voluntary Liens or Tax Liens that constitute Permitted Exceptions), (ii) any mechanic's Liens encumbering the Leased Properties as of the date of this Agreement (other than mechanic's Liens that are Permitted Exceptions), (iii) any mechanic's Liens that hereafter arise by reason of Seller's failure to pay amounts properly due and payable by Seller, (iv) all deeds of trust, and (v) all financing statements.

(e)     Cure of Title Defects.  Seller shall cause the Title Commitment to be updated (the "**Title Update**"), at Seller's sole cost and expense, and delivered to Purchasers at least five (5) Business Days, but no more than ten (10) Business Days, before Closing (the "**Title Review Date**").  If Purchasers learn, through any Title Update or otherwise, of a Lien affecting either Leased Property that is not a Permitted Exception, Purchasers shall give written notice thereof to Seller within five (5) Business Days after delivery of any Title Update (but in any event prior to the Closing Date).  If Purchasers fail to give such title objection notice within such five (5)-Business Day period,  Purchasers' right to object to any matters that are not a Permitted Exception shown on the Title Update (a "**Title Defect**") shall be deemed to be unconditionally waived.  For the purposes of this Agreement, any Title Defect subject to which Purchasers are not required to accept title shall be deemed cured and not an objection to title (and such Title Defect shall be a Permitted Exception as of the Closing Date) if the Title Company will agree to issue the Leasehold Policy to Purchasers taking no exception for such Title Defect or provides affirmative or express coverage therefor (at Purchasers' option), and (i) is issued for no additional premium upon the Closing Date, or (ii) if an additional premium is required to provide such affirmative or express coverage, Seller agrees to pay such additional premium.  If Purchasers object in writing to any Title Defect, Seller shall have the right to cure, eliminate or modify any such Title Defect to the reasonable satisfaction of Purchasers.  Seller shall notify Purchasers in writing whether Seller is willing to cure such Title Defect or is unable or unwilling to satisfy Purchasers' objections with respect to any such Title Defect within five (5) Business Days after receipt of timely notice thereof from Purchasers.  If Seller elects to cure such Title Defect and so notifies Purchasers, Seller shall have ten (10) Business Days to do so (or such longer period as may be reasonably necessary under the circumstances to cure such Title Defect, but in no event more than thirty (30) Business Days).  If Seller provides Purchasers with written notice that Seller is unwilling or unable to cure such Title Defect, Purchasers may, at their option, within five (5) Business Days following receipt of Seller's notice, by delivery of written notice to Seller, elect to either (A) accept the Title Defect, (B) terminate this Agreement, or (C) if the Title Defect is a voluntary Lien securing Indebtedness and cannot be insured over (if the Title Defect is capable of being insured over, it being understood that Seller must pay any additional premium required to provide such insurance), then Purchasers may, at their option, within five (5) Business Days following Seller's notice to Purchasers of Seller's inability or unwillingness to satisfy Purchasers' objections, elect, by delivery of written notice to Seller, to offset the Purchase Price by the amount of such Title Defect until the amount of such Lien is paid.  If Seller fails to deliver written notice to Purchasers within such five (5)-Business Day period, Seller shall be deemed to have agreed to satisfy Purchasers' objections with respect to such Title Defect prior to Closing.  If Purchasers fail to deliver written notice to Seller within such five (5)-Business Day

period, Purchasers shall be deemed to have agreed to accept such Title Defect.  Any Title Defects waived, deemed waived or accepted under this <u>Section 7.15</u> shall be a Permitted Exception as of the Closing Date.  Seller and Purchasers acknowledge and agree that time is of the essence with respect to the time periods set forth in this <u>Section 7.15</u>.

      7.16    <u>Negotiations</u>.

      (a)    From and after the date of this Agreement until the termination of this Agreement in accordance with its terms:  (i) Seller shall, and shall cause its Affiliates to, negotiate exclusively and in good faith with Purchasers with respect to any Acquisition Transaction; and (ii) Seller shall not, and shall cause their Affiliates not to: (A) solicit or initiate or knowingly encourage any inquiries, proposals or offers (an "**Acquisition Proposal**") from any Persons other than Purchasers and their Affiliates for or relating to (or which may reasonably be expected to lead to) any investment in, acquisition of, transfer of, purchase of or other disposition of, directly or indirectly, all or any portion of the ownership interests or any of the assets of the Business or any of the Purchased Assets, whether by way of merger, business combination, reorganization, joint venture, sale of stock or sale of assets (other than sales of assets in the Ordinary Course of Business not expressly prohibited by this Agreement) (any of the foregoing, an "**Acquisition Transaction**"); (B) participate in any discussions, conversations, negotiations or other communications with any Person other than Purchasers and their Affiliates, or furnish to or continue to provide access to (whether directly or indirectly through third party hosting sites or other means) any Person other than Purchasers and their Affiliates any information with respect to, or afford access to the business, properties, assets, books or records of the Business or any of the Purchased Assets in connection with, or otherwise assist or participate in, or knowingly facilitate or encourage any effort or attempt by any other Person relating to or in connection with, any Acquisition Proposal; or (C) enter into any agreement, arrangement or understanding with any other Person with respect to or in connection with any Acquisition Proposal.  Seller shall immediately cease and cause to be terminated all existing discussions, conversations, access to information, negotiations and other communications with any Persons other than Purchasers and their Affiliates, with respect to any Acquisition Proposal.  Upon the receipt by Seller or its Affiliate of any bona fide written Acquisition Proposal, Seller shall notify Purchasers in writing as soon as practicable (such notice to include the terms of such Acquisition Proposal and the identity of the Person making the Acquisition Proposal), and shall promptly notify the Person making the Acquisition Proposal of Seller's obligations under this <u>Section 7.16(a)</u>.

      (b)    Prior to the Closing, if Seller reasonably believes that any Person previously provided with Acquisition Proposal Materials is violating in any material respect the terms of any confidentiality or non-disclosure agreement between Seller (or HSG or any other Hicks Affiliate) and such Person, Seller shall provide, or cause to be provided, notice of such violation to such Person (with copies to Baseball Express and to the Office of the Commissioner of Baseball).  Promptly following the Closing, Seller shall request, or cause to be requested, all such other Persons previously provided with Acquisition Proposal Materials either to return all such tangible documentation and other materials (including such Person's notes) to HSG or to destroy, and certify the destruction of, such tangible documentation and other materials.

7.17 <u>Media JV Agreement</u>. Promptly following the date of this Agreement, Seller shall use its commercially reasonable efforts to obtain a letter from the National Hockey League confirming that the agreement for the potential joint venture between Purchasers and the Dallas Stars regarding the media rights of the Texas Rangers and of the Dallas Stars hockey club, substantially in the form attached hereto as <u>Exhibit A</u> (the "**Media JV Agreement**"), with any non-material changes that the National Hockey League may request, is in compliance with applicable rules and regulations of the National Hockey League. In connection with the pending sale of the Dallas Stars hockey club, as reasonably requested by Purchasers or a potential purchaser of the Dallas Stars (whether through acquisition of stock, of assets, or otherwise), Seller shall use its commercially reasonable efforts to facilitate discussions between Purchasers and such potential purchaser of the Dallas Stars regarding the Media JV Agreement. Prior to the Closing, Seller shall not enter into, amend or terminate any Contract regarding the media rights of the Texas Rangers. So long as the Dallas Stars are still owned directly or indirectly by HSG or any Hicks Affiliate, Seller shall use commercially reasonable efforts to cause the Dallas Stars not to enter into, amend or terminate any Contract regarding the media rights of the Dallas Stars hockey club that are contemplated to be included in the Media JV Agreement.

7.18 <u>Insurance</u>.

(a) To the extent any Insurance Policy that is not assigned to Purchasers pursuant to <u>Section 2.1(t)</u> provides "occurrence based" liability insurance, Seller shall use its commercially reasonable efforts, prior to the Closing, to cause, or to ensure that any applicable Affiliate of Seller (including, as applicable, HSG, Emerald Diamond and Rangers Ballpark) causes, Purchasers to be added as an additional insured, on a primary and noncontributory basis, under such Policy for the current policy year and the preceding six (6) policy years solely with respect to pre-closing occurrences, injury and/or damage. Additionally, to the extent any Insurance Policy that is not assigned to Purchasers pursuant to <u>Section 2.1(t)</u> provides "claims made" liability insurance coverage, Seller shall use its commercially reasonable efforts, prior to Closing, to ensure that such Insurance Policy continues to provide similar coverage, in all material respects, for pre-Closing wrongful acts, errors or omissions arising from or relating to the Business or the Purchased Assets for a period of not less than six (6) years following the Closing. Notwithstanding the foregoing, Seller shall not be required to make any payment to any insurance provider in order to secure coverage for Purchasers under any Insurance Policy prior to or after Closing, nor will Seller have any obligation to continue to make any premium payments or to take any other affirmative actions with respect to the Insurance Policies from and after the Closing Date; <u>provided</u>, <u>however</u>, that if prior to or after Closing Seller determines that any payments are necessary to secure coverage for Purchasers under any Insurance Policy, as provided in this <u>Section 7.18(a)</u>, then Seller shall notify Purchasers of the amount of such payment and to the extent permitted by Applicable Law and the terms of such Insurance Policy, Purchasers, in their sole discretion and at their cost, shall have the option to make such payment on behalf of Seller.

(b) If Purchasers provide a written notice to Seller after the Closing that any claim has arisen, or otherwise exists, that is covered under any Insurance Policy that is not assigned to Purchasers under <u>Section 2.1(t)</u> (an "**Excluded Insurance Policy**") and under which Purchasers have not then been added as an additional insured as provided in <u>Section 7.18(a)</u> relating to a matter that would be an Assumed Liability if not covered by such Excluded

Insurance Policy (such claim, an "**Excluded Insurance Claim**"), and if such notice is accompanied by instructions regarding the process for reporting and pursuing recovery on such Excluded Insurance Claim under the relevant insurance policies, then promptly following receipt of such written notice from Purchasers, Seller shall use its commercially reasonable efforts to report such Excluded Insurance Claim within such time and in such manner as required under such Excluded Insurance Policy (to the extent such time period has not expired) and shall further use their commercially reasonable efforts to pursue recovery on such Excluded Insurance Claim, all in accordance with Purchasers' instructions, and upon the receipt by Seller of any insurance proceeds, Seller shall promptly pay Purchasers such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any losses, damages or other amounts borne by Purchasers arising from such Excluded Insurance Claim). However, Purchasers shall be responsible for and reimburse Seller for any out-of-pocket costs (which shall include a reasonable charge for wages, salaries, benefits or other overhead expenses associated with Seller's own employees) incurred by Seller in pursuing any Excluded Insurance Claim for the benefit of Purchasers pursuant to their obligations under this Section 7.18(b), along with the amount of any deductibles, self-insured retentions, coinsurance or similar expenses that would otherwise be borne by Seller as a result of any such Excluded Insurance Claim. At the reasonable request of Seller, Purchasers shall advance such out-of-pocket costs to Seller. Seller (in its sole discretion) may elect to authorize Purchasers, to the extent permitted by applicable Law and the terms of such Excluded Insurance Policies, at Purchasers' expense, to perform all the obligations and receive all the benefits of Seller under such Excluded Insurance Policies relating to any Excluded Insurance Claim and appoint Baseball Express its attorney-in-fact to act in its name on its behalf, in which case, (i) Purchasers agree to indemnify and hold Seller and its Affiliates, agents, successors and assigns harmless from and against any and all Liabilities and Losses based upon, arising out of or relating to Purchasers' performance of, or failure to perform, such obligations under such Excluded Insurance Policies and (ii) Seller shall be relieved of its obligations under this Section 7.18(b) with respect to such Excluded Insurance Claim, but only to the extent Purchasers are allowed to perform such obligations under Applicable Law and the terms of such Excluded Insurance Policies. Nothing herein shall be deemed to require Seller to maintain its existence for any period of time following the Closing.

7.19    Transfer Documents. As part of the Closing, Purchasers and Seller shall execute and deliver to each other all applicable Transfer Documents.

7.20    Transition Services Agreement. If requested by the Dallas Stars, the Dallas Stars and Purchasers shall negotiate in good faith to execute an agreement at Closing pursuant to which Purchasers will continue to provide to the Dallas Stars, at cost until December 31, 2010, the services then being provided by TRBP to the Dallas Stars, but Purchasers shall have such obligation to negotiate in good faith only if the Dallas Stars negotiate in good faith to execute an agreement at Closing pursuant to which the Dallas Stars will provide Purchasers, at cost until December 31, 2010, with use of such software and other assets then being provided by HSG or the Dallas Stars to TRBP, if Purchasers request the Dallas Stars to do so.

7.21    Agreement to Negotiate. Subject in each case to any provisions of this Agreement that contemplate specific terms with respect to any such agreement or other document, as soon as practicable after the date hereof, the parties hereto, acting reasonably and in good faith, shall negotiate regarding the terms of the following agreements and other

documents to reach agreement concerning such terms:  (a) the Escrow Agreement (including the entity that will serve as escrow agent thereunder); (b) the Assignment and Assumption Agreement; (c) the Bill of Sale; and (d) any other agreements or documents contemplated by this Agreement the form of which is not attached to this Agreement.  If the parties reach agreement on the terms of any such agreement or other document, they shall evidence such agreement in writing, and such agreement or other document shall be executed in accordance with the terms of this Agreement.  Notwithstanding anything in this Agreement to the contrary, to the extent the execution and delivery of any of the agreements or documents contemplated by this <u>Section 7.21</u> (each a "**Pre-Closing Negotiated Agreement**") is a condition to a party's obligations under this Agreement pursuant to <u>Article IX</u>, (i) so long as such party has complied with its obligations under this <u>Section 7.21</u>, the failure of the parties to agree on mutually agreeable terms for such Pre-Closing Negotiated Agreement shall constitute a failure of such condition, and (ii) if the parties are unable to agree on mutually agreeable terms for such Pre-Closing Negotiated Agreement due to Seller or Purchasers breaching their obligations under this <u>Section 7.21</u>, then Seller or Purchasers, as applicable, shall not have the right to terminate this Agreement based on the failure of such condition.

      7.22   <u>Bankruptcy Matters</u>.  As soon as practicable following the execution of this Agreement, Seller shall file the Voluntary Petition, the First Day Motions, the Plan of Reorganization and the related Disclosure Statement (as defined in the Plan of Reorganization) with the Bankruptcy Court.  If, prior to the filing of the Voluntary Petition, an involuntary petition under the Bankruptcy Code is filed naming Seller as a debtor and seeking relief under chapter 7 or 11 of the Bankruptcy Code, then Seller shall promptly take all commercially reasonable steps to obtain an order for relief under a voluntary chapter 11 case under the Bankruptcy Code and shall undertake the rest of its obligations under this Agreement consistent with the Voluntary Petition and Plan of Reorganization.  Before any motion or other filing may be made by or on behalf of Seller in the Bankruptcy Case with regard to any matters that affect this Agreement, the other Seller Documents, the Purchaser Documents, the Plan of Reorganization or any Approval Order in any material manner, Seller shall (a) provide a draft thereof to Purchasers and (b) make such changes thereto as are reasonably requested by Purchasers with regard to any matters that affect this Agreement, the other Seller Documents, the Purchaser Documents, the Plan of Reorganization or any Approval Order in any material manner.  In addition, unless Seller and Purchasers otherwise agree, any such motion or other filing shall be consistent in all material respects with the terms of this Agreement, the other Seller Documents, the Purchaser Documents, the Plan of Reorganization, any other document contemplated by this Agreement or any Approval Order, and any such motion or other filing shall not disallow or impair, or attempt to disallow or impair, any allowed administrative priority claims granted to Purchasers or any Affiliate of Purchasers under and in accordance with the terms of this Agreement, the other Seller Documents, the Purchaser Documents, the Plan of Reorganization, any other document contemplated by this Agreement or any Approval Order.  Seller shall use commercially reasonable efforts to oppose the inclusion of any provision in any motion or other filing in the Bankruptcy Case, whether or not proposed by Seller, that is materially inconsistent with the terms of this Agreement, the other Seller Documents, the Purchaser Documents, the Plan of Reorganization, any other document contemplated by this Agreement, any Approval Order or the consummation and carrying out of the transactions contemplated by this Agreement.  From and after the filing of the Voluntary Petition, Seller shall

keep Purchasers informed on a current basis with respect to all material objections (whether or not filed) to approval or consummation of the transactions contemplated by this Agreement raised by or on behalf of the Creditors Committee or any other Person. Upon the request of any Purchaser, Seller shall facilitate meetings and communications among Purchasers, Seller and the Creditors Committee. Purchaser shall cooperate with Seller in any matter reasonably requested by Seller to obtain Bankruptcy Court approval of this Agreement, the other Seller Documents, the Purchaser Documents, the Plan of Reorganization, any other document contemplated by this Agreement or any Approval Order.

ARTICLE VIII

EMPLOYEES AND EMPLOYEE BENEFITS

8.1 <u>Employment</u>.

(a) <u>Employees</u>. Seller shall update <u>Schedule 8.1(a)</u> within three (3) Business Days prior to the Closing for any changes thereto and shall deliver the updated <u>Schedule 8.1(a)</u> to Purchasers at the Closing.

(b) <u>Offer of Employment</u>. Prior to the Closing, Purchasers shall offer employment to each Rangers Non-Player Employee who is not a party to a Purchased Contract, to commence employment with Purchasers immediately following the Closing under terms and conditions that are in the aggregate substantially similar to the then-current terms and conditions of his or her employment with Seller or any of its Affiliates. Notwithstanding the foregoing, any such offer of employment to a Rangers Non-Player Employee who is not a participant in an MLB Benefit Plan as of the Closing and who is on a leave of absence on the Closing Date, including short-term or long-term disability, family, maternity or military leave, whether such leave is paid, unpaid or otherwise (an "**Inactive Rangers Employee**"), may be conditioned upon: (i) the Closing occurring, and (ii) such Inactive Rangers Employee commencing active employment with the Purchasers on a date that is the later of (A) nine months after the Closing Date (or the next applicable work-day to the extent such date does not fall on a work-day) or (B) such longer period of time as required by Law.

(c) <u>Continuing Employees</u>. All Rangers Non-Player Employees who actually commence employment with Purchasers (including all Inactive Rangers Employees who commence employment with Purchasers as described in <u>Section 8.1(b)</u>), as well as all Rangers Player Employees, are referred to as "**Continuing Employees**."

(d) <u>Severance</u>. Notwithstanding anything to the contrary contained in <u>Section 8.1(b)</u>, Purchasers shall provide each Continuing Employee who incurs a termination of employment on or before the first anniversary of the Closing Date with severance payments and severance benefits that are no less favorable than the severance payments and severance benefits to which such individual would have been entitled with respect to such termination under the severance policies (including any applicable Contracts with such Continuing Employee) in place immediately prior to the Closing, as described in any such applicable Contracts and in the HSG guidelines for severance pay as set forth in <u>Schedule 5.13(a)</u>; <u>provided</u>, <u>however</u>, Purchasers shall not be obligated to provide to any Continuing Employee who is not a party to a written

70

employment, collective bargaining, severance or similar agreement with cash severance payments in excess of eight (8) weeks of such Continuing Employee's base salary as in effect immediately prior to the Closing Date.

(e)     Inactive Employee Reimbursement.  Following the Closing, Purchasers shall reimburse Seller for any short-term disability pay, compensation and other out-of-pocket costs of Seller relating to each Inactive Rangers Employee, including costs of coverage under the applicable Rangers Benefit Plans or HSG Benefit Plans for each Inactive Rangers Employee. Notwithstanding the foregoing, Purchasers shall not be obligated to reimburse Seller for such costs incurred with respect to any Inactive Rangers Employee after the later of (i) the date such individual is able to return to active employment and (ii) the scheduled date of employment reasonably established by Purchasers.  To the extent Seller has a right, in its capacity as an employer, to make a determination as to the ability of any Inactive Rangers Employee to return to active employment, such determination (other than disability) shall be reasonably and in good faith made by Purchasers in consultation with Seller, and Purchasers shall indemnify and hold harmless Seller for all claims, losses, Liabilities and expenses arising from or relating to such decision.

8.2     Employee Benefits.

(a)     Benefits.

(i)     Following the Closing until December 31, 2010 or such longer period of time required by applicable Law, Purchasers shall provide eligibility to Continuing Employees to participate in benefit plans, programs, arrangements or policies that provide each Continuing Employee with compensation and benefits (including opportunities for commissions, bonuses, incentive pay, overtime and premium pay) that are, in the aggregate, substantially comparable to those provided to such Continuing Employee immediately prior to the Closing, or if better, as may be offered to similarly situated employees of Purchasers (or their respective Affiliates) in accordance with the terms of such plans ("**Purchaser Plans**").

(ii)     For purposes of eligibility, vesting and calculation of vacation and severance benefits (but not other benefit accruals) under the Purchaser Plans, Purchasers shall credit each Continuing Employee with his or her years of service with Seller or its Affiliates, and any predecessor entities, to the same extent as such Continuing Employee was entitled to credit for such service under any similar Rangers Benefit Plan, HSG Benefit Plan or MLB Benefit Plan.  The Purchaser Plans shall not deny Continuing Employees coverage on the basis of pre-existing conditions and shall credit Continuing Employees for any deductibles and out-of-pocket expenses paid in the calendar year of initial participation in the Purchaser Plans.

(b)     Savings Plan.  Each Continuing Employee shall be 100% vested in his or her benefits under the Hicks Sports Group 401(k) Savings Plan, effective as of the date such individual commences employment with Purchasers.

(c)     Vacation and Sick Days.  Effective as of the date a Continuing Employee commences employment with Purchasers in accordance with Section 8.1, Purchasers shall recognize and be responsible for all accrued, but unpaid, vacation time and sick days of such Continuing Employee, but in the case of vacation time only to the extent specifically reflected, accrued for or reserved for by Seller or any of its Affiliates.

(d)     Cafeteria Plan.  Subject to Purchasers' receipt of an amount, in cash, representing the aggregate 2010 contributions of each Continuing Employee then participating in the Southwest Sports Group, LLC Section 125 Cafeteria Plan, Restated effective September 1, 1999 as adopted by HSG (the "**HSG Flex Plan**"), net of reimbursements paid prior to the date of transfer (but not less than zero), the Purchasers shall cause such amounts to be credited to each such Continuing Employee's accounts under the Purchasers' corresponding health care spending account plan (the "**Purchaser Flex Plan**") which shall be established and in effect for such employees as of the Closing, and all claims for reimbursement which have not been paid as of the date of the transfer to Purchasers and credited under the Purchaser Flex Plan shall be paid pursuant to and under the terms of the Purchaser Flex Plan.

(e)     Incentive Compensation and Commissions Plans.  Following the Closing, Purchasers agree to pay all incentive compensation and commissions which may be earned by Continuing Employees during the calendar year 2010 under those applicable incentive compensation or commission plans in accordance with the terms of such plans.

(f)     Worker's Compensation.  Purchasers hereby agree to assume, as of the Closing, all obligations and Liabilities, if any, of Seller with respect to worker's compensation relating to Rangers Employees and Former Rangers Employees, if applicable, but only to the extent that such obligations and Liabilities, if any, are not covered by the Insurance Policies. Otherwise, if such obligations and Liabilities are covered by the Insurance Policies, then the portion of such obligations and Liabilities covered by the Insurance Policies shall be Excluded Liabilities.

(g)     COBRA.  Purchasers agree to provide continuation coverage (within the meaning of Section 4980B(f) of the Code and Sections 601 to 608 of ERISA ("**COBRA Coverage**")) to any Continuing Employee, and the qualified beneficiaries and other covered individuals of such persons who are entitled to such coverage, with respect to qualifying events which occur after the Closing Date.  Likewise, Purchasers agree to provide COBRA Coverage to any Continuing Employee or Former Rangers Employee, and the qualified beneficiaries and other covered individuals of such persons who are entitled to such coverage, with respect to qualifying events which occur prior to the Closing Date.

(h)     Multiemployer Pension Plan.  With respect to the Major League Baseball Players Pension Plan ("**MEPPA Plan**"), the parties hereto agree to comply with Section 4204 of ERISA as follows:

(i)     from and after the Closing (subject to its right to withdraw), the Purchasers shall continue to contribute to the MEPPA Plan with respect to the operations associated with the Purchased Assets in at least substantially the same number of contribution base units for which Seller had an obligation to contribute to the MEPPA

Plan (within the meaning of Section 4204(a)(1)(A) of ERISA) to the extent necessary to comply with Section 4204 of ERISA;

(ii)     to the extent required by ERISA Section 4204(A)(1)(B) and the regulations issued thereunder, Purchasers shall timely provide to the MEPPA Plan a bond, letter of credit or amount in escrow in such form and amount as is acceptable to the MEPPA Plan that conforms to all the requirements of Section 4204(a)(1)(B) of ERISA; provided, that to the extent reasonably requested by Purchasers, Seller will cooperate with Purchasers in preparing and submitting a request for waiver of such bond obligation to the PBGC pursuant to Pension Benefit Guaranty Corporation Regulation Section 4204.21 and 4204.22;

(iii)     If Purchasers withdraw from the MEPPA Plan in a complete withdrawal, or a partial withdrawal with respect to the operations associated with the Purchased Assets, from the MEPPA Plan during the first five (5) plan years commencing with the first plan year that begins after the Closing, (i) Purchasers shall pay any withdrawal liability to the MEPPA Plan and (ii) to the extent required by ERISA Section 4204(a)(1)(C) and the regulations issued thereunder, Seller shall be secondarily liable to the MEPPA Plan for any withdrawal liability if the liability of Purchasers with respect to the MEPPA Plan is not paid.  If the liability of Purchasers with respect to the MEPPA Plan is not paid, Purchasers shall notify Seller and its ERISA Affiliates as soon as practicable following Purchasers' withdrawal from the MEPPA Plan, and Purchasers agree to indemnify and hold harmless Seller and its ERISA Affiliates for, from, and against any such withdrawal liability that arises due to Purchasers' withdrawal as described in this <u>Section 8.2(h)</u> and to which Seller and its ERISA Affiliates become secondarily liable to the MEPPA Plan;

(iv)     To the extent required by Section 4204(a)(3)(A) of ERISA, if, all, or substantially all, of the assets of Seller or its ERISA Affiliates are distributed, or if Seller and its ERISA Affiliates are liquidated before the end of the five (5) plan year period commencing with the first plan year that begins after Closing, then Seller and its ERISA Affiliates shall provide to the MEPPA Plan a bond or amount in escrow equal to the present value of the withdrawal liability such entities would have to the MEPPA Plan but for this Section and compliance with Section 4204 of ERISA; and

(v)     If only a portion of the assets of Seller and its ERISA Affiliates are distributed during the period described in <u>Section 8.2(h)(iv)</u> above, Seller and its ERISA Affiliates shall provide a bond or an amount in escrow as required by Section 4204 of ERISA and the regulations thereunder.

(i)     <u>WARN Act</u>.  The parties do not anticipate that there will be any "employment losses" (as defined in the WARN Act) as a consequence of the transactions contemplated by this Agreement that trigger obligations under the WARN Act (the, "**<u>WARN Act Obligations</u>**").  Notwithstanding the foregoing,  Purchasers shall be solely liable for any WARN Act Obligations resulting from any such "employment loss" occurring on or after the Closing Date (including as a result of the consummation of the transactions contemplated by this Agreement) with respect to Rangers Employees and Former Rangers Employees.

(j)     Cooperation.  Upon request, prior to and following the Closing, Seller shall provide Purchasers, and Purchasers shall provide Seller such documents, data and information as may reasonably be necessary (i) to implement the provisions of Section 8.1 or Section 8.2, (ii) to administer their respective benefit plans and (iii) in connection with purchasers becoming bound by and subject to any MLB Benefit Plan.

8.3     No Further Obligations.  Nothing in this Agreement shall be construed as requiring Purchasers to continue any specific employee benefit plan or to continue the employment of any specific person.  Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan or arrangement of Purchasers, any of their Affiliates or any Rangers Benefit Plan or HSG Benefit Plan, nor shall anything in this Agreement create or be construed as creating any Contract of employment or as conferring upon any Continuing Employee or upon any Person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

ARTICLE IX

CONDITIONS TO CLOSING

9.1     Conditions Precedent to Obligations of Purchasers.  The obligation of Purchasers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchasers in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Seller set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date);

(b)     Seller shall have performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date;

(c)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(d)     there shall not have been or occurred any event, change, occurrence or circumstance that, individually or in the aggregate, has had or which could reasonably be expected to have a Material Adverse Effect since the Balance Sheet Date;

(e)     Seller shall have obtained those consents listed on Exhibit 9.1(e) in a form reasonably satisfactory to Purchasers and copies thereof shall have been delivered to Purchasers;

(f)     Purchasers shall have received all required MLB Approvals;

(g)     the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted;

(h)     Seller shall have delivered, or caused to be delivered, to Purchasers a duly executed Bill of Sale;

(i)     Seller shall have delivered, or caused to be delivered, to Purchasers a duly executed Assignment and Assumption Agreement;

(j)     the transactions contemplated by the BRE Land Purchase Agreement shall have occurred, or shall occur simultaneously with the Closing;

(k)     Seller shall have caused the Title Company to issue to Purchasers leasehold title policies for each Leased Property, which title policies shall contain only those title exceptions agreed upon by Purchasers in accordance with Section 7.15;

(l)     Seller shall have delivered, or caused to be delivered, to Purchasers the Surveys;

(m)     Seller shall have delivered, or caused to be delivered, to Purchasers a lessor estoppel certificate, duly executed by the lessor, for each Real Property Lease identified on Exhibit 9.1(m), in the form prescribed by such Real Property Lease or a form agreed upon by Seller, Purchasers and the lessor promptly following the date of this Agreement;

(n)     Seller shall have delivered, or caused to be delivered, to Purchasers the applicable Seller Documents;

(o)     Seller shall have furnished Purchasers with a certificate dated as of the Closing Date and signed by Seller to the effect that, except as set forth therein, (i) the representations and warranties of Seller set forth in this Agreement were true and correct as of the date of this Agreement and are true and correct as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties were true and correct on and as of such earlier date) and (ii) Seller has performed and complied with all covenants, obligations and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing Date; and

(p)     entry by the Bankruptcy Court of all Approval Orders and all such Approval Orders have become Final Orders.

9.2     Conditions Precedent to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)       the representations and warranties of Purchasers set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date);

(b)       Purchasers shall have performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by Purchasers on or prior to the Closing Date;

(c)       there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(d)       Seller shall have obtained those consents listed on Exhibit 9.2(d) in a form reasonably satisfactory to Seller;

(e)       Purchasers and Seller shall have received all required MLB Approvals;

(f)       Purchasers shall have paid or deposited funds with MLB in cash (or otherwise funded in a form approved by MLB) in an amount that satisfies the requirement for funding of the deferred compensation obligations of the Texas Rangers as of Closing pursuant to the Collective Bargaining Agreement or any other funding, deposit or payment obligation of the Texas Rangers or Purchasers required by MLB in connection with the transactions contemplated by this Agreement;

(g)       the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted;

(h)       Purchasers shall have delivered, or caused to be delivered, to Seller a duly executed Assignment and Assumption Agreement;

(i)       the transactions contemplated by the BRE Land Purchase Agreement shall have occurred, or shall occur simultaneously with the Closing;

(j)       Purchasers shall have delivered, or caused to be delivered, to Seller the applicable Purchaser Documents;

(k)       Purchasers shall have furnished Seller with a certificate dated as of the Closing Date and signed by Purchasers to the effect that, except as set forth therein, (i) the representations and warranties of Purchasers set forth in this Agreement were true and correct as of the date of this Agreement and are true and correct as of the Closing Date as though made at and as of the Closing Date, except where such representations or warranties expressly speak as of an earlier date (in which case such representations and warranties were true and correct on and as of such earlier date) and (ii) Purchasers have performed and complied with all covenants,

obligations and agreements required by this Agreement to be performed or complied with by Purchasers on or prior to the Closing Date;

(l)     Purchasers shall have paid the Title Company an aggregate amount equal to the total premiums due for the leasehold title policies for the Leased Properties and shall have paid the surveyors for the Surveys;

(m)     Purchasers shall have delivered, or caused to be delivered, to Seller, the promissory note in the principal amount of $10,000,000 payable by Purchasers (the "**Contingent Note**"), substantially in the form of Exhibit C hereto, duly executed by Purchasers; and

(n)     entry by the Bankruptcy Court of all Approval Orders and all such Approval Orders have become Final Orders.

9.3     Frustration of Closing Conditions.  None of Seller nor Purchasers may rely on the failure of any condition set forth in Section 9.1 or 9.2, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE X

INDEMNIFICATION; EXCLUSIVE REMEDIES

10.1     Survival of Representations, Warranties and Covenants.

(a)     The representations and warranties of the parties contained in this Agreement shall survive the Closing and claims may be asserted with respect thereto to the extent permitted by this Article X.  The party claiming indemnification must give notice to the other party of any claim for indemnification under this Article X in writing setting forth the specific claim and the basis therefor in reasonable detail prior to the one (1)-year anniversary of the Closing Date (the "**Survival Period**"); provided, however, that the Survival Period shall extend until the two (2)-year anniversary of the Closing Date with respect to any claim for indemnification under this Article X arising from the breach of any representation or warranty of a party contained in this Agreement if such breach arose from intentional fraud committed with the Knowledge of Seller or the actual knowledge of Purchasers, as applicable.  Any claim for indemnification not made by the party claiming indemnification on or prior to that date will be irrevocably and unconditionally released and waived.

(b)     All of the covenants or other agreements of the parties contained in this Agreement shall survive until the earlier of such covenant or agreement being fully performed or fulfilled or until the termination of the applicable survival period referenced in the next sentence, unless and to the extent only that non-compliance with such covenants or agreements is waived in writing by the party entitled to such performance.  No claim for a breach of a covenant or other agreement set forth in this Agreement that (i) by its nature is required to be performed at or prior to Closing (the "**Pre-Closing Covenants**") may be made or brought by any party hereto after the Survival Period and (ii) by their nature are required to be performed after Closing (the "**Post-Closing Covenants**") may be made or brought by any party hereto after the one (1)-year anniversary of the last date on which each such Post-Closing Covenant was required to be

performed (in each case, a "**Post-Closing Covenant Survival Period**"); provided, however, that any obligation under Sections 10.2(a)(ii), 10.2(a)(iv), 10.3(a)(ii) and 10.3(a)(v) shall not terminate with respect to any Losses to which the Person to be indemnified shall have given notice in writing setting forth the specific claim and the basis therefor in reasonable detail to the indemnifying party in accordance with Section 10.4 before the termination of the applicable Survival Period or Post-Closing Covenant Survival Period.

(c)     Subject to the survival period set forth in Section 10.1(a), the representations, warranties, covenants and agreements of Seller, on the one hand, and Purchasers, on the other hand, and the related rights of the other parties (or the other Persons to be indemnified along with such other parties under Section 10.2(a) or 10.3(a), as the case may be) to indemnification with respect to any breach of any such representation, warranty, covenant or agreement, shall survive the Closing notwithstanding any investigation at any time by or on behalf of such other parties, and shall not be considered waived by such other parties' consummation of the transactions contemplated hereby with knowledge acquired (or capable of being acquired) of any breach of any such representation, warranty, covenant or agreement.

10.2     Indemnification by Seller.

(a)     Subject to Sections 10.1 and 10.5 hereof, Seller hereby agrees, from and after the Closing, to indemnify and hold Purchasers and their respective managers, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "**Purchaser Indemnified Parties**") harmless from and against any and all losses, liabilities, claims, demands, judgments, damages, fines, suits, actions, costs and expenses (individually, a "**Loss**" and, collectively, "**Losses**"):

(i)     based upon or resulting from the failure of any of the representations or warranties made by Seller in this Agreement to be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, in each case, unless such representations or warranties relate to an earlier date and are true and correct on and as of such earlier date; provided that, (A) for purposes of determining if there is any such failure, to the extent any representation or warranty is qualified by any reference to "material," "materiality," or "Material Adverse Effect" contained in such representation or warranty (except for any such references that are marked with an asterisk (*), and except when the word "material" appears as part of the defined term "Material Contract"), such representation or warranty shall be treated as if it did not contain any such qualification, and (B) for purposes of calculating any Losses arising from such failure, to the extent any representation or warranty is qualified by any reference to "material," "materiality," or "Material Adverse Effect" contained in such representation or warranty, such representation or warranty shall be treated as if it did not contain any such qualification;

(ii)     based upon or resulting from the breach of any Post-Closing Covenant on the part of Seller;

(iii)     based upon or arising directly from any Excluded Asset or any Excluded Liability; and

(iv)     based upon or resulting from the breach of any Pre-Closing Covenant on the part of Seller.

(b)     Purchasers acknowledge and agree that Seller shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss is directly caused by any action taken by Purchasers after the Closing Date in breach of this Agreement. Purchasers shall take and shall cause their Affiliates to take reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

10.3     Indemnification by Purchasers.

(a)     Subject to Sections 10.1 and 10.5, Purchasers hereby agree, jointly and severally, from and after the Closing, to indemnify and hold Seller and its managers, partners, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "**Seller Indemnified Parties**") harmless from and against any and all Losses:

(i)     based upon or resulting from the failure of any of the representations or warranties made by Purchasers in this Agreement to be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, in each case, unless such representations or warranties relate to an earlier date and are true and correct on and as of such earlier date;

(ii)     based upon or resulting from the breach of any Post-Closing Covenant on the part of Purchasers;

(iii)     based upon or arising directly from any Assumed Liability;

(iv)     based upon or arising directly from Purchasers' ownership of any Purchased Asset or Purchasers' operation of the Business after the Closing Date; and

(v)     based upon or resulting from the breach of any Pre-Closing Covenant on the part of Purchasers.

(b)     Seller acknowledges and agrees that Purchasers shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss is directly caused by any action taken by Seller after the Closing Date in breach of this Agreement. Seller shall take and cause their Affiliates to take reasonable steps to mitigate any Loss upon becoming aware of any event, which would reasonably be expected to, or does, give rise thereto.

10.4     Indemnification Procedures.

(a)     A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

(b)     In the event that any Legal Proceedings shall be instituted or that any claim or demand shall be asserted by any third party in respect of which payment may be sought

under <u>Sections 10.2</u> and <u>10.3</u> hereof (regardless of the limitations set forth in <u>Section 10.5</u>) (an "**<u>Indemnification Claim</u>**"), the indemnified party shall promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying party. The failure of the indemnified party to give reasonably prompt notice of any Indemnification Claim shall not release, waive or otherwise affect the indemnifying party's obligations with respect thereto except to the extent that the indemnifying party is prejudiced as a result of such failure. The indemnifying party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified party, and to defend against, negotiate, settle or otherwise deal with such Indemnification Claim, which relates to any Losses indemnified against by it hereunder. If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against by it hereunder, it shall within fifteen (15) days (or sooner, if the nature of the Indemnification Claim so requires) notify the indemnified party of its intent to do so. If the indemnifying party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the indemnified party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim at the indemnifying party's expense (with such expense only to be satisfied out of the Escrow Amount in a case where the underlying indemnification obligation is limited to the Escrow Amount). If the indemnifying party shall assume the defense of any Indemnification Claim, the indemnified party may participate, at its own expense, in the defense of such Indemnification Claim; <u>provided</u>, <u>however</u>, that such indemnified party, at its election, shall be entitled to assume sole control over or participate in any such defense with separate counsel at the expense of the indemnifying party (with such expense only to be satisfied out of the Escrow Amount in a case where the underlying indemnification obligation is limited to the Escrow Amount) if (i) so requested by the indemnifying party, (ii) in the reasonable opinion of counsel to the indemnified party, a conflict or potential conflict exists between the indemnified party and the indemnifying party that would make such representation by the indemnified party advisable, (iii) such Indemnification Claim seeks an order, injunction or other equitable relief against the indemnified party or any of its Affiliates, or (iv) the indemnifying party is Seller and such Indemnification Claim is made pursuant to <u>Section 10.2(a)(i)</u> prior to such time as the aggregate amount of the Losses of the Purchaser Indemnified Parties pursuant to such claims under <u>Section 10.2(a)(i)</u> are reasonably expected to exceed the Basket or after such time as the aggregate amount of the Losses of the Purchaser Indemnified Parties pursuant to such Indemnification Claim and all prior claims pursuant to <u>Section 10.2(a)(i)</u> are reasonably expected to exceed the Cap; and <u>provided</u>, <u>further</u>, that the indemnifying party shall not be required to pay for more than one such counsel (plus any appropriate local counsel) for all indemnified parties in connection with any Indemnification Claim. The parties hereto agree to reasonably cooperate with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this <u>Section 10.4</u> to the contrary, neither the indemnifying party nor the indemnified party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Indemnification Claim. Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant (which includes an unqualified release of the indemnified party from all liability in respect of the Indemnification

Claim), and the indemnifying party notifies the indemnified party in writing of the indemnifying party's willingness to accept the settlement offer and, subject to the applicable limitations of Sections 10.5 and 10.6, pay the amount called for by such offer, and the indemnified party declines to accept such offer, the indemnified party may continue to contest such Indemnification Claim, free of any participation by the indemnifying party (except as otherwise set forth in this Section 10.4(b)), and the amount of any ultimate liability with respect to such Indemnification Claim that the indemnifying party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified party declined to accept plus the Losses of the indemnified party relating to such Indemnification Claim through the date of its rejection of the settlement offer or (B) the aggregate Losses of the indemnified party with respect to such Indemnification Claim.

(c)     The indemnified party shall forward to the indemnifying party notice of any sums due and owing by the indemnifying party pursuant to this Agreement with respect to any Indemnification Claim hereunder.

10.5     Certain Limitations on Indemnification.

(a)     Notwithstanding the provisions of this Article X, Seller shall not have any indemnification obligations for Losses under Section 10.2(a)(i), (i) for any individual item, or group of items arising out of the same event, where the Loss relating thereto is less than $50,000 (the "**Sub-Basket**") and (ii) in respect of each individual item, or group of items arising out of the same event, where the Loss relating thereto is equal to or greater than the Sub-Basket, unless the aggregate amount of all such Losses exceeds $3,000,000 (the "**Basket**"), and then only to the extent exceeding $2,000,000.  In no event shall the aggregate indemnification to be paid by Seller under this Article X exceed the Escrow Amount (the "**Cap**"); provided, however, that (w) neither the Sub-Basket nor the Basket shall apply to any indemnification obligations for Losses under Section 10.2(a)(i) based on the failure of the representations and warranties in Section 5.6(c) to be true and correct, (x) neither the Sub-Basket nor the Basket shall apply to any indemnification obligations for Losses arising from the breach of any representation or warranty of Seller contained in this Agreement if such breach arose from intentional fraud committed with the Knowledge of Seller, (y) neither the Sub-Basket nor the Basket shall apply to any indemnification obligations for Losses under Section 10.2(a)(i) based on the failure of the representations and warranties in Section 5.27, 5.29 or 5.31 to be true and correct, and (z) even if in excess of the Cap, Purchasers shall be permitted to set off against any payments to be made under the Contingent Note for (I) any indemnification obligations under Sections 10.2(a)(ii) or (iii), or (II) any indemnification obligations under Section 10.2(a)(i) if the relevant breach of representation or warranty arose from intentional fraud committed with the Knowledge of Seller.

(b)     Notwithstanding the provisions of this Article X, Purchasers shall not have any indemnification obligations for Losses under Section 10.3(a)(i), (i) for any individual item, or group of items arising out of the same event, where the Loss relating thereto is less than the Sub-Basket and (ii) in respect of each individual item, or group of items arising out of the same event, where the Loss relating thereto is equal to or greater than the Sub-Basket, unless the aggregate amount of all such Losses exceeds the Basket, and then only to the extent exceeding $2,000,000.  In no event shall the aggregate indemnification to be paid by Purchasers under this Article X exceed $30,000,000; provided, however, that neither the Sub-Basket nor the Basket

shall apply to any indemnification obligations for Losses arising from the breach of any representation or warranty of Purchasers contained in this Agreement if such breach arose from intentional fraud committed with the actual knowledge of Purchasers.

(c) Notwithstanding anything in this <u>Article X</u> to the contrary, the limitation requiring notice of any indemnification claim within a specific time period set forth in <u>Section 10.1(a)</u> or <u>10.1(b)</u> shall not apply to claims for indemnification in respect of Losses related to or arising out of the matters set forth in <u>Section 10.2(a)(iii)</u>, <u>Section 10.3(a)(iii)</u>, or <u>Section 10.3(a)(iv)</u>.

(d) Seller shall not be required to indemnify any Purchaser Indemnified Party and Purchasers shall not be required to indemnify any Seller Indemnified Party to the extent of any Losses that a court of competent jurisdiction shall have determined by final judgment to have resulted from the bad faith, gross negligence or willful misconduct of the party seeking indemnification.

10.6 <u>Calculation of Losses</u>.

(a) The amount of any Losses for which indemnification is provided under this <u>Article X</u> shall be reduced by, and the indemnified party shall remain legally responsible for, such Losses to the extent, following use of commercially reasonable efforts, the indemnified party actually recovers such Losses under insurance policies or otherwise (net of any Tax or expenses incurred in connection with such recovery and of any increase in premiums as a result of such recovery). Additionally, the indemnified party waives its rights of recovery against the indemnifying party to the extent of the amount paid under any insurance policy for Losses, if such waiver is allowed under such insurance policy. If an indemnified party recovers under insurance policies or otherwise in respect of a Loss subject to indemnification hereunder after payment has been made by the indemnifying party, then the indemnified party shall reimburse the indemnifying party for amounts it has paid to the indemnified party in respect of such Loss to the extent that the aggregate amounts received by the indemnified party under such insurance policies or otherwise (net of any Tax or expenses incurred in connection with such recovery and of any increase in premiums as a result of such recovery) and from the indemnifying party in respect of such Loss exceed the amount of such Loss.

(b) The amount of any Indemnification Claim shall be (i) increased to take account of any net Tax cost incurred by the indemnified party arising from the receipt of indemnity payments hereunder (grossed up for such increase, if any) in the event that the tax treatment of such indemnity payment prescribed by <u>Section 10.8</u> is not permitted by applicable Law and (ii) reduced to take account of any net Tax Benefit currently realizable by the indemnified party arising from the incurrence or payment of any such Loss. To the extent such Indemnification Claim does not give rise to a currently realizable Tax Benefit, if the amount with respect to which any Indemnification Claim is made gives rise to a subsequently realized Tax Benefit to the indemnified party that made the Indemnification Claim, such indemnified party shall refund to the indemnifying party the amount of such Tax Benefit (grossed-up to reflect any Tax Benefit currently realized by the indemnified party as a result of making such refund payment) when, as and if realized (it being understood that such indemnified party shall use its commercially reasonable efforts to realize such Tax Benefit). For purposes of this <u>Section 10.6</u>,

a "**Tax Benefit**" means an amount by which the Tax liability of the party (or group of Persons including the party) or, if the party is a pass-through entity for Tax purposes, the members of the party is actually reduced (including by deduction, reduction of income by virtue of increased tax basis or otherwise, entitlement to refund, credit or otherwise) plus any related interest received from the relevant Taxing Authority. In computing the amount of any such Tax cost or Tax Benefit, the indemnified party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt of any indemnity payment hereunder or the incurrence or payment of any indemnified Loss. For purposes of this Section 10.6, a Tax Benefit is "currently realizable" to the extent that such Tax Benefit can be realized in the current taxable period or year or in any Tax Return with respect thereto (including through a carryback to a prior taxable period) or in any taxable period or year prior to the date of the payment of the Indemnification Claim. The amount of any increase, reduction or payment hereunder shall be adjusted to reflect any final determination (which shall include the execution of Form 870-AD or successor form) with respect to the indemnified party's liability for Taxes, and payments between the parties to this Agreement to reflect such adjustment shall be made if necessary.

      (c)     Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any Losses that are not legally recoverable under applicable Law as actual breach of contract damages of such other Person.

      10.7     Indemnity Escrow. On the Closing Date, Purchasers shall pay to a financial institution to be mutually agreed upon, as agent to Purchasers and Seller (the "**Escrow Agent**"), in immediately available funds, to the account designated by the Escrow Agent (the "**Escrow Account**"), an amount equal to $30,000,000 (the "**Escrow Amount**"), in accordance with the terms of this Agreement and an Escrow Agreement, which will be executed at the Closing, by and among Baseball Express, Seller and the Escrow Agent (the "**Escrow Agreement**"). Any payment Seller is obligated to make to any Purchaser Indemnified Parties pursuant to this Article X (except amounts setoff under the Contingent Note pursuant to its terms with respect to (a) any indemnification obligations under Sections 10.2(a)(ii) or (iii), or (b) any indemnification obligations under Section 10.2(a)(i) if the relevant breach of representation or warranty arose from intentional fraud committed with the Knowledge of Seller) shall be paid solely from the funds in the Escrow Account, by release of funds to the Purchaser Indemnified Parties from the Escrow Account by the Escrow Agent pursuant to the terms and conditions of the Escrow Agreement and shall accordingly reduce the amount in the Escrow Account; provided that, in no event, including if the amount in the Escrow Account is insufficient to pay any remaining sums due, will Seller be required to pay any amounts (other than amounts paid to Purchaser Indemnified Parties out of the Escrow Account or amounts setoff under the Contingent Note pursuant to its terms) to Purchasers for indemnification obligations under this Article X. As will be more fully set forth in the Escrow Agreement, on the first anniversary of the Closing Date, the Escrow Agent shall release the amount then in the Escrow Account (to the extent not utilized to pay Purchasers for any indemnification claim) to TRBP, which shall be paid by wire transfer of immediately available funds into an account designated by TRBP, except that the Escrow Agent shall retain an amount (up to the total amount then held by the Escrow Agent) equal to the amount of claims for indemnification under this Article X asserted prior to such first anniversary but not yet resolved ("**Unresolved Claims**"). The amount in the Escrow Account retained for

Unresolved Claims shall be released by the Escrow Agent (to the extent not utilized to pay Purchasers for any such claims resolved in favor of Purchasers) upon their resolution in accordance with this <u>Article X</u> and the Escrow Agreement to TRBP, which shall be paid by wire transfer of immediately available funds into an account designated by TRBP.

      10.8    <u>Tax Treatment of Indemnity Payments</u>.  Seller and Purchasers agree to treat any indemnity payment made pursuant to this <u>Article X</u> as an adjustment to the Purchase Price for federal, state, local and foreign income tax purposes, except as required by applicable Law.

      10.9    <u>Specific Performance; Purchaser Termination Amount</u>.  Seller, on the one hand, and Purchasers, on the other hand, acknowledge and agree that a breach of this Agreement would cause irreparable damage to the other party and such other party will not have an adequate remedy at Law.  Therefore, all obligations of Seller under this Agreement, including the obligations of the Seller to sell the Purchased Assets, on the one hand, and all obligations of Purchasers under this Agreement, on the other hand, including any obligation of Purchasers under <u>Section 4.4</u> to pay the Aggregate Purchaser Termination Amount (in the case of which obligations under <u>Section 4.4</u>, Seller shall only be entitled to pursue the remedy of specific performance against Purchasers in respect of enforcing their respective obligations to pay the Aggregate Purchaser Termination Amount), shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction and appropriate injunctive relief may be applied for and granted in connection therewith.  Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any party may have under this Agreement; <u>provided</u>, <u>that</u>, if this Agreement is terminated and Purchasers have an obligation under this Agreement to pay the Aggregate Purchaser Termination Amount, then Seller shall only be entitled to pursue the remedy of specific performance against Purchasers in respect of enforcing their respective obligations to pay the Aggregate Purchaser Termination Amount.  Each of the parties hereto hereby agrees that specific performance is an agreed upon contractual remedy of the parties and waives any defense in respect of an action of specific performance that would be available to the parties in the absence of this provision.  Each of the parties hereto waives any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.  If, prior to the Termination Date, any party brings any Legal Proceeding to enforce specifically the performance of the terms and provisions hereof by any other party, the Termination Date shall automatically be extended by (x) the amount of time during which such Legal Proceeding is pending, plus twenty (20) Business Days or (y) such other time period established by the court presiding over such Legal Proceeding.

      10.10   <u>Exclusive Remedy</u>. Following the Closing, the sole and exclusive remedy for any and all claims arising under, out of, or related to this Agreement, or the sale and purchase of the Purchased Assets, shall be the rights of indemnification and specific performance set forth in this <u>Article X</u> and no Person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise; it being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the parties hereto to the fullest extent permitted by Law.  If the Closing has not occurred, the maximum aggregate liability of Purchasers, on the one hand, or Seller, on the other hand, for any breach of this Agreement will be limited to the Aggregate Purchaser Termination Amount or the Aggregate Seller Termination Amount, respectively, and no Person shall have any other entitlement, remedy or recourse, whether in contract, tort or otherwise (other than rights to specific performance pursuant to <u>Section 10.9</u>); it

being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the parties hereto to the fullest extent permitted by Law.  The provisions of this Section 10.10, together with the limited remedies provided in Section 4.4, Article X, Section 11.4 and Section 11.10, were specifically bargained-for between Purchasers and Seller and were taken into account by Purchasers and Seller in arriving at the Purchase Price.  Seller has specifically relied upon the provisions of Section 4.4 and this Section 10.10, together with the limited remedies provided in Section 4.4, Article X, Section 11.4 and Section 11.10, in agreeing to the Purchase Price and in agreeing to provide the specific representations and warranties set forth herein.

10.11   Nature of Representations and Warranties; Schedules.  Except for the representations and warranties contained in Article V, neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller or any of its Affiliates, officers, managers, partners, equityholders, employees, agents or representatives.  Except for the representations and warranties contained in Article V, Seller hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchasers or their Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchasers by any manager, partner, officer, equityholder, employee, agent, consultant, or representative of Seller or any of its Affiliates).  Seller makes no representations or warranties to Purchasers regarding the probable success or profitability of the Business.  Except for the representations and warranties contained in Article VI, neither Purchasers nor any other Person makes any other express or implied representation or warranty with respect to Purchasers or the transactions contemplated by this Agreement, and Purchasers disclaim any other representations or warranties, whether made by Purchasers or any of their respective Affiliates, officers, managers, equityholders, employees, agents or representatives.  Except for the representations and warranties contained in Article VI, Purchasers hereby disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any partner, officer, member, employee, agent, consultant, or representative of Purchasers or any of their respective Affiliates).  Purchasers make no representations or warranties to Seller regarding the probable success or profitability of the Business.  All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.  The sole purpose of the representations and warranties set forth in this Agreement is to allocate financial responsibility pursuant to the express provisions of this Agreement should the representations and warranties prove to have been inaccurate; and no other rights, remedies or causes of action (whether in Law or in equity or whether in contract or in tort) are permitted to any party hereto as a result of the untruth of any such representation and warranty.

10.12   **DTPA WAIVER.  TO THE GREATEST EXTENT ALLOWED BY LAW, PURCHASERS HEREBY WAIVE AND RELINQUISH ALL PROVISIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT**

(CHAPTER 17, SUBCHAPTER E, OF THE TEXAS BUSINESS AND COMMERCE CODE) IN CONNECTION WITH THE SALES TRANSACTION CONTEMPLATED BY THIS AGREEMENT.  PURCHASERS REPRESENT AND WARRANT TO SELLER THAT: (A) PURCHASERS ARE NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION; (B) PURCHASERS ARE REPRESENTED BY EXPERIENCED AND KNOWLEDGEABLE LEGAL COUNSEL OF THEIR OWN CHOOSING WHO HAVE FULLY NEGOTIATED THE TERMS OF THIS AGREEMENT (INCLUDING THE FORM OF ALL CONVEYANCE DOCUMENTS ATTACHED TO OR ENTERED INTO IN CONNECTION WITH THE EXECUTION OR CONSUMMATION OF THIS AGREEMENT); AND (C) PURCHASERS ARE KNOWLEDGEABLE AND EXPERIENCED IN THE PURCHASE AND SALE OF SPORTS TEAMS, AND ARE FULLY ABLE TO EVALUATE THE MERITS AND RISKS OF THIS TRANSACTION.

ARTICLE XI

MISCELLANEOUS

11.1    Payment of Sales, Use or Similar Taxes.

(a)    Purchasers shall be responsible for (and shall indemnify and hold harmless Seller and its managers, partners, officers, employees, equityholders, Affiliates, agents, successors and permitted assigns against) any sales Taxes applicable to the Purchased Assets and for all other applicable sales, use, stamp, documentary, filing, recording, transfer or similar fees or Taxes or governmental charges (including real property transfer Taxes, UCC-3 filing fees, FAA, ICC, DOT, real estate and motor vehicle registration, title recording or filing fees and other amounts payable in respect of transfer filings) resulting from the transactions contemplated by this Agreement (but not including income, franchise or gains Taxes or any other Taxes measured by or with respect to income imposed on Seller or its Affiliates).  Seller shall file all necessary documents (including all Tax Returns) with respect to all such amounts in a timely manner; provided, however, that any such documents or Tax Returns shall be subject to the review and approval of the Purchasers (not to be unreasonably withheld, delayed or conditioned) prior to filing.

(b)    For purposes of Sections 2.3(f) and 2.4(k), in the case of a taxable period that includes the Closing Date, Taxes relating to the Purchased Assets shall be allocated to the periods before and after the Closing Date as follows:  (i) real, personal, and intangible property Taxes shall be allocated to periods before and after the Closing Date on a per diem basis and (ii) in the case of all other Taxes, the portion of such Taxes allocable to the period before the Closing Date shall be computed on the assumption that the taxable period ended on the Closing Date.

11.2    Expenses.

(a)    Except as otherwise provided in this Agreement, (i) TRBP shall bear all fees, costs and expenses (including legal, financial advisory, consulting or similar fees and expenses) incurred by TRBP, HSG, Emerald Diamond, BRE, Rangers Ballpark or the Rangers

Subsidiary in connection with the negotiation, execution and performance of this Agreement and each other agreement, document and instrument contemplated by this Agreement, the consummation of the transactions contemplated hereby and thereby and any similar transactions or proposed transactions, whether with Purchasers or any other Person, and all costs and expenses to be borne by Seller under this Agreement, including all Specified Fees and Expenses; and (ii) Purchasers shall bear all expenses incurred by them in connection with the negotiation, execution and performance of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby. Notwithstanding the foregoing, (x) Seller shall be solely responsible for the Financial Advisory Fees, which Financial Advisory Fees shall be paid at Closing pursuant to Section 3.2(v)), and (y) Purchasers shall not be responsible for any Specified Fees and Expenses.

(b)     Except as otherwise set forth in this Agreement, Purchasers shall be responsible for, and shall pay directly or promptly reimburse Seller for amounts paid by or on behalf of Seller for any filing fees lawfully payable to or at the request of any Governmental Body in connection with this Agreement, the Seller Documents, the Purchaser Documents and the consummation of the transactions contemplated hereby and thereby.

11.3    Submission to Jurisdiction; Consent to Service of Process; Costs and Expenses Paid by Prevailing Party.

(a)     The parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal court located within the Northern District of the State of Texas, including the Bankruptcy Court, over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such court; provided, however, that, with respect to the foregoing, so long as the Bankruptcy Case is pending, the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection, which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by the delivery of a copy thereof in accordance with the provisions of Section 11.7.

11.4    Entire Agreement. This Agreement (including the Schedules and Exhibits hereto and any certificate delivered pursuant hereto) contains the entire agreement of the parties respecting the transactions contemplated by this Agreement and supersedes all prior agreements among the parties respecting the transactions contemplated by this Agreement. The parties hereto have voluntarily agreed to define their rights, liabilities and obligations respecting the transactions contemplated by this Agreement exclusively in contract pursuant to the express terms and provisions of this Agreement; and the parties hereto expressly disclaim that they are

owed any duties or are entitled to any remedies not expressly set forth in this Agreement. Furthermore, the parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's length negotiations; all parties to this Agreement specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's length transaction.  The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the transactions contemplated by this Agreement shall be those remedies available at Law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort) for any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

      11.5   <u>Amendments and Waivers</u>.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by all of the parties hereto and for which all necessary MLB Approvals have been obtained in advance.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

      11.6   <u>Governing Law</u>.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by the internal laws of the State of Texas.

      11.7   <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, prior to the Closing, to:

> Texas Rangers Baseball Partners
> c/o Texas Rangers Baseball Club
> 1000 Ballpark Way, Suite 400
> Arlington, Texas 76011
> Facsimile: (817) 273-5144
> Attention: Kellie Fischer
> Email: kfischer@texasrangers.com

If to Seller, following the Closing, to:

> Texas Rangers Baseball Partners
> c/o HSG Sports Group LLC
> 100 Crescent Court, Suite 1200
> Dallas, Texas 75201
> Facsimile: (214) 615-2287
> Attention: Thomas O. Hicks
> Email: thicks@hicksholdings.com

With a copy (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas 75201
> Facsimile: (214) 746-7777
> Attention: Glenn D. West
> Email: gdwest@weil.com

If to Purchasers, to:

> Rangers Baseball Express LLC
> 500 Grant Street, 50th Floor
> One Mellon Center
> Pittsburgh, PA 15219
> Facsimile: (412) 291-2731
> Attention: Chuck Greenberg
> Email: chuck@gsg-sports.com

With copies (which shall not constitute notice) to:

> Sherrard, German & Kelly, P.C.
> Two PNC Plaza, 28th Floor
> 620 Liberty Avenue
> Pittsburgh, PA 15222
> Facsimile: (412) 261-6221

Attention: David J. Lowe
Email: djl@sgkpc.com

and

Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Facsimile: (414) 297-4900
Attention: Mary K. Braza and Kevin R. Schulz
Email: mbraza@foley.com and kschulz@foley.com

If to the Office of the Commissioner of Baseball, to:

Office of the Commissioner of Baseball
245 Park Avenue
New York, New York 10167
Facsimile: (212) 949-5653
Attention: Thomas J. Ostertag
Email: tom.ostertag@mlb.com

11.8     Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.9     Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement except (a) as provided in Article X, Section 7.9, this Section 11.9 and Sections 11.10, 11.11 and 11.12, (b) only after the Closing has occurred, the rights of MLB to receive payment pursuant to Section 3.2(i), (c) only after the Closing has occurred, the rights of Lenders to receive payment pursuant to Section 3.2(ii), (d) only after the Closing has occurred, the rights of Emerald Diamond to receive payment pursuant to Section 3.2(iii), (e) only after the Closing has occurred, the rights of Hicks to receive payment pursuant to Section 3.2(iv), and (f) only after the Closing has occurred, the rights of the Financial Advisors to receive payment pursuant to Section 3.2(v). No assignment of this Agreement or of any rights, interests or obligations hereunder may be made by either Seller or Purchasers, directly or indirectly, without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Baseball Express may assign its rights and interests to purchase any Purchased Assets hereunder to any subsidiary of Baseball Express that is a Delaware limited liability company and that is 100% owned by

Baseball Express either directly or indirectly (through one or more wholly-owned subsidiaries), provided that, such assignment, which shall be in writing, (i) must require such Affiliate to jointly and severally perform Baseball Express's obligations under this Agreement, (ii) must not unreasonably delay Closing or receipt of any necessary third party consent and (iii) shall not relieve Baseball Express of any of its obligations pursuant this Agreement.  Upon any such permitted assignment by Baseball Express, the references in this Agreement to Purchasers shall also apply to any such assignee.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.

11.10   <u>Non-Recourse.</u>  No past, present or future director, officer, employee, incorporator, member, manager, partner, equityholder, employee, Affiliate, agent, attorney or representative of Seller, the Rangers Subsidiary, Purchasers or any of their respective Affiliates shall have any liability (whether in contract or in tort) for any obligations or liabilities of Seller, the Rangers Subsidiary or Purchasers arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement, including any alleged non-disclosure or misrepresentations made by any such Persons.

11.11   <u>Legal Representation.</u>  Each of the parties to this Agreement hereby agrees, on its own behalf and on behalf of its directors, members, partners, officers, employees and Affiliates, that WGM serves as counsel to Seller, on the one hand, and, for periods prior to the Closing, to the Rangers Subsidiary, on the other hand, in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transaction contemplated hereby.  Seller and the Rangers Subsidiary hereby agree that, in the event that a dispute arises after the Closing between Seller or any of its Affiliates (other than the Rangers Subsidiary) and Purchasers or the Rangers Subsidiary, WGM may represent Seller and any of its Affiliates (other than the Rangers Subsidiary) in such dispute even though the interests of Seller or its Affiliates (other than the Rangers Subsidiary) may be directly adverse to Seller, and even though WGM has previously represented the Rangers Subsidiary.  The Rangers Subsidiary agrees that, as to all communications among WGM, the Rangers Subsidiary and Seller or its Affiliates protected by the attorney or solicitor-client privilege that relate in any way to the transactions contemplated by this Agreement, such attorney or solicitor-client privilege and the expectation of client confidence belongs to Seller and may be controlled by Seller and shall not pass to or be claimed by the Rangers Subsidiary or Purchasers.  Notwithstanding the foregoing, in the event that a dispute arises between the Rangers Subsidiary and a third party other than a party to this Agreement after the Closing, the Rangers Subsidiary may assert the attorney or solicitor-client privilege to prevent disclosure of confidential communications by WGM to such third party.

11.12   <u>General Releases.</u>

(a)     Effective as of immediately prior to the Closing, the Rangers Subsidiary, for itself and for its present subsidiaries (as well as each of their respective predecessors, successors, and assigns) and each of its past and present directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, beneficiaries, trustees and fiduciaries (as well as each of their predecessors, successors, assigns and heirs), in each case in their respective capacities as such (collectively, the "**Subsidiary Releasing Parties**"), for and in consideration of the execution and delivery of this Agreement

91

and the consummation of the transactions contemplated by this Agreement, the receipt and sufficiency of which are hereby acknowledged, do hereby fully, finally, and forever release, acquit, and discharge Seller (as well as each of its predecessors, successors, and assigns) and each of their respective past and present directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, Affiliates, subsidiaries, beneficiaries, trustees and fiduciaries (as well as each of their respective predecessors, successors, assigns and heirs), in each case in their respective capacities as such (collectively, the "**Seller Released Parties**"), from: any and all proceedings, agreements, contracts, debts, defaults, complaints, grievances, promises, duties, orders, rulings, audits, settlements, cross-actions, controversies, indemnities, causes of action, Losses, liability, obligations, rights against the Seller Released Parties, rights to reimbursement for fees, costs, and expenses including consultants' and attorney's fees and expenses (including any of the foregoing that would arise with the giving of notice and/or the passage of time) of every nature whatsoever (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) whether based upon tort, fraud, usury, act, omission, representation, failure to disclose, breach of any duty of fair dealing, default, breach of confidence, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate or other governance or prospective business advantage, breach of contract, deceptive trade practices, libel, slander, breach of fiduciary duty, breach of any duty of fair dealing or good faith, breach of confidence, breach of finding commitment, breach of any duty of loyalty, breach of any duty to account to the Rangers Subsidiary, breach of any other duty, appropriation of any business opportunity of the Rangers Subsidiary, dealing with the Rangers Subsidiary in an adverse manner, competitive business activity of any kind or nature, conspiracy or any other claim (such items being referred to collectively as "**Claims**"), now held, owned or possessed by any of the Subsidiary Releasing Parties, or that any of the Subsidiary Releasing Parties may hereafter hold or claim to hold from the beginning of time to the date of this Agreement, whether under contract, tort, common law, statutory right or other legal or equitable theory of recovery, known or unknown, arising, directly or indirectly, proximately or remotely, out of, concerning, or in any way related to any and all documents, instruments, certifications, guaranties, indemnity agreements and other agreements of whatever kind or nature made, executed and/or delivered by Seller.

(b)     Effective as of immediately prior to the Closing, Seller, for itself and for its present subsidiaries (as well as each of their respective predecessors, successors, and assigns) and each of their respective past and present directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, beneficiaries, trustees and fiduciaries (as well as each of their predecessors, successors, assigns and heirs), in each case in their respective capacities as such (collectively, the "**Seller Releasing Parties**"), for and in consideration of the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, the receipt and sufficiency of which are hereby acknowledged, do hereby fully, finally, and forever release, acquit, and discharge the Rangers Subsidiary and its present subsidiaries (as well as each of its predecessors, successors, and assigns) and each of their respective past and present directors, managers, officers, employees, agents, representatives, shareholders, members, partners, owners, principals, Affiliates, subsidiaries, beneficiaries, trustees and fiduciaries (as well as each of their respective

predecessors, successors, assigns and heirs), in each case in their respective capacities as such (collectively, the "**Subsidiary Released Parties**"), from any and all Claims now held, owned or possessed by any of the Seller Releasing Parties, or that any of the Seller Releasing Parties may hereafter hold or claim to hold from the beginning of time to the date of this Agreement, whether under contract, tort, common law, statutory right or other legal or equitable theory of recovery, known or unknown, arising, directly or indirectly, proximately or remotely, out of, concerning, or in any way related to any and all documents, instruments, certifications, guaranties, indemnity agreements and other agreements of whatever kind or nature made, executed and/or delivered by the Rangers Subsidiary or any of its subsidiaries.

(c)     Notwithstanding anything to the contrary in this Agreement, the provisions of this Section 11.12 shall not apply to any rights, actions, causes of action, claims or demands that now exist or that may hereafter accrue by and among Seller, the Rangers Subsidiary and/or any Purchaser relating to or arising in connection with this Agreement, the BRE Land Purchase Agreement or any agreement or document executed pursuant hereto or thereto, including those arising under Article X of this Agreement.  The releases provided in this Section 11.12 are intended to survive indefinitely and shall remain enforceable after the Closing of the transaction contemplated by this Agreement.

11.13   Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

11.14   Payments by Seller.  Any payments due, owed or to be made by Seller to Purchasers pursuant to this Agreement (including, to the extent applicable, pursuant to Section 4.4 or Article X) shall be treated as payment of an allowed (on a final, and not provisional or interim, basis) administrative priority claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, without further order of the Bankruptcy Court, and shall be included, and deemed approved, in any budget otherwise subject to approval by the Bankruptcy Court or by any other party in interest, shall not be subject to discharge, modification or impairment in any plan filed by Seller, and shall not be subject to disallowance or estimation and shall not be discharged or affected by any plan of reorganization.

**\*\* REMAINDER OF PAGE INTENTIONALLY LEFT BLANK \*\***

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized officers, as of the date first written above.

**TEXAS RANGERS BASEBALL PARTNERS**

By: Rangers Equity Holdings GP, LLC,
    its managing partner

By: _____
    Name: Kellie Fischer
    Title:   Chief Financial Officer and Secretary

**RANGERS BASEBALL EXPRESS LLC**

By: _____
    Name:  Chuck Greenberg
    Title:  Chief Executive Officer