IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| In Re: | )  **Case No. 10-43400-dml-11** |
| | )  Chapter 11 |
| TEXAS RANGERS BASEBALL | ) |
| PARTNERS, | )  Fort Worth, Texas |
| | )  Tuesday, July 20, 2010 |
| Debtor. | )  9:00 a.m. Docket |
| | ) |
| | )  EXPEDITED JOINT MOTION OF |
| | )  LENDER PARTIES FOR |
| | )  RECONSIDERATION OF COURT'S |
| | )  ORDER ADOPTING BIDDING |
| | )  PROCEDURES |
| _____ | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE D. MICHAEL LYNN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Office of the          Peter D'Apice
Commissioner of Baseball:      STUTZMAN BROMBERG ESSERMAN &
*(Via Telephone)*                 PLIFKA, PC
                               2323 Bryan Street, Suite 2200
                               Dallas, TX 75201
                               (214) 969-4900

For Major League Baseball      Richard M. Seltzer
Players Association:           COHEN, WEISS AND SIMON, LLP
*(Via Telephone)*              330 West 42nd Street
                               New York, NY  10036-6976
                               (212) 563-4100

For Finn Dixon Herling,        Henry Baer
LLP, Interested Party:

For the Debtor:                Martin A. Sosland
                               Vance Beagles
                               Yolanda Garcia
                               WEIL, GOTSHAL & MANGES, LLP
                               200 Crescent Court, Suite 300
                               Dallas, TX  75201-6950
                               (214) 746-7730

```
1   APPEARANCES, cont'd.:

2   For Rangers Baseball        Craig H. Averch
    Express:                    WHITE & CASE, LLP
3                               633 West Fifth Street, Suite 1900
                                Los Angeles, CA  90071-2007
4                               (213)620-7704

5   For Rangers Baseball        Glenn M. Kurtz
    Express:                    WHITE & CASE, LLP
6                               1155 Avenue of Americas
                                New York, NY  10036
7                               (212) 819-8200

8   For the U.S. Trustee:       Meredyth Kippes
                                OFFICE OF THE UNITED STATES TRUSTEE
9                               1100 Commerce Street, Room 976
                                Dallas, TX  75242
10                              (214) 767-8967

11  For the Office of the       Sander Esserman
    Commissioner of Baseball:   STUTZMAN BROMBERG ESSERMAN &
12                                 PLIFKA, PC
                                2323 Bryan Street, Suite 2200
13                              Dallas, TX 75201
                                (214) 969-4900
14
    For the Office of the       Stephen J. Shimshak
15  Commissioner of Baseball:   PAUL, WEISS, RIFKIND, WHARTON &
                                   GARRISON, LLP
16                              1285 Avenue of the Americas
                                New York, NY 10019-6064
17                              (212) 373-3133

18  For Rangers Equity          Louis Strubeck
    Holding Entities:           Michael Steindorf
19                              FULBRIGHT & JAWORSKI, LLP
                                2200 Ross Avenue Suite 2800
20                              Dallas, TX  77010
                                (214) 855-8000
21
    For Ad Hoc Group of First   Daniel C. Stewart
22  Lien Lenders:               VINSON & ELKINS, LLP
                                Trammell Crow Center
23                              2001 Ross Avenue, Suite 3700
                                Dallas, TX  75201-2975
24                              (214) 220-7761

25
```

1  APPEARANCES, cont'd.:

2  For Ad Hoc Group of First        Andrew M. Leblanc
   Lien Lenders:                    MILBANK, TWEED, HADLEY & MCCLOY,
3                                       LLP
                                    International Square Building
4                                   1850 K Street, NW
                                    Washington, DC  20006
5                                   (202) 835-7574

6  For the Debtor as                Jeff Prostok
   Conflicts Counsel:               Bobby Forshey
7                                   FORSHEY & PROSTOK LLP
                                    777 Main Street, Suite 1290
8                                   Fort Worth, TX  76102
                                    (817) 877-8855
9
   For GSP Finance, LLC:            Holland N. O'Neil
10                                  GARDERE, WYNNE AND SEWELL, LLP
                                    1601 Elm Street, Suite 3000
11                                  Dallas, TX  75201
                                    (214) 999-4961
12
   For Major League Baseball        Ian Roberts
13 Players Association:             BAKER BOTTS, LLP
                                    2001 Ross Avenue
14                                  Dallas, TX  75201
                                    (214) 953-6719
15
   For JPMorgan Chase:              Scott DeWolf
16                                  ROCHELLE MCCULLOUGH, LLP
                                    325 N. St. Paul St., Suite 4500
17                                  Dallas, TX  75201
                                    (214) 953-0182
18
   For JPMorgan Chase:              Joseph S. Fabiani
19                                  LATHAM & WATKINS, LLP
                                    53rd at Third 855 Third Avenue
20                                  New York, NY  10022-4834
                                    (212) 906-1200
21
   For Undisclosed Bidder:          Clifton R. Jessup, Jr.
22                                  GREENBERG TRAURIG, LLP
                                    2200 Ross Avenue, Suite 5200
23                                  Dallas, TX  75201
                                    (214) 665-3638
24

25

```
 1   Court Recorder:              Sandy Maben
                                  UNITED STATES BANKRUPTCY COURT
 2                                510 W. 10th Street
                                  Fort Worth, TX  76102
 3                                (817) 333-6015

 4   Transcription Service:       Kathy Rehling
                                  209 Bay Circle
 5                                Coppell, TX  75019
                                  (972) 304-1998
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

1          FORT WORTH, TEXAS - JULY 20, 2010 - 9:02 A.M.

2                THE COURT:  Please be seated.  All right.  This is the

3     Texas Rangers Baseball Partners case.  I'll call the telephone

4     roll first.  Mr. D'Apice for the Commissioner of Baseball?

5                MR. D'APICE:  Present, Your Honor.

6                THE COURT:  Mr. Seltzer for Major League Baseball?

7                MR. SELTZER:  For the Players Association.  Good

8     morning, Your Honor.

9                THE COURT:  I'm sorry.  Okay.  We got you wrong on

10    that.  I apologize.

11        And Mr. Baer for Finn Dixon Herling, LLP, an interested

12    party?

13               MR. BAER:  Good morning, Your Honor.

14               THE COURT:  All right.  Could I have appearances in

15    the courtroom, please?

16               MR. SOSLAND:  Good morning, Your Honor.  Martin

17    Sosland, Vance Beagles and Yolanda Garcia for Texas Rangers

18    Baseball Partners.

19               THE COURT:  All right.

20               MR. AVERCH:  Good morning, Your Honor.  Craig Averch

21    and Glenn Kurtz with White & Case on behalf of Rangers Baseball

22    Express.

23               THE COURT:  Welcome back, Mr. Kurtz.

24               MR. KURTZ:  Thank you, Your Honor.

25               THE COURT:  I imagine you're just thrilled to be in

1   Fort Worth in late July.

2           MR. KURTZ:  It's as warm as I remember, Your Honor.

3           THE COURT:  Yes.

4           MS. KIPPES:  Meredyth Kippes for the United States

5   Trustee.

6           MR. ESSERMAN:  Good morning, Your Honor.  Sandy

7   Esserman of Stutzman Bromberg Esserman & Plifka, and Steve

8   Shimshak of Paul Weiss, for Major League Baseball.

9           THE COURT:  All right.

10          MR. STRUBECK:  Good morning, Your Honor.  Louis

11  Strubeck and Mike Steindorf from Fulbright & Jaworski on behalf

12  of the Rangers Equity Holdings entities.

13          MR. STEWART:  Dan Stewart of Vinson & Elkins and Andy

14  Leblanc of Milbank Tweed on behalf of the Ad Hoc Group of First

15  Lien Lenders.

16          MR. PROSTOK:  Jeff Prostok and Bobby Forshey,

17  conflicts counsel for the Debtor.

18          MS. O'NEIL:  Good morning, Your Honor.  Holly O'Neil

19  with Gardere Wynne and David Sullivan with Clifford Chance on

20  behalf of GSP Finance, the Second Lien Agent.

21      While I'm at the podium, Your Honor, I wanted to comment

22  that one of the witnesses that the Court requested be in

23  attendance is one of the lender's principals.  Mr. Sal

24  Galatioto is on a plane -- actually, I think they just landed

25  -- and he will be here shortly.  I just wanted to let the Court

1  know.  He is unable to stay tomorrow, but can come back on

2  Thursday.  But we are going to end up or try to present him to

3  the Court today.

4            THE COURT:  Thank you.

5            MS. O'NEIL:  Thank you.

6            MR. ROBERTS:  Good morning, Your Honor.  Ian Roberts

7  of Baker Botts on behalf of the Major League Baseball Players

8  Association.

9            MR. DEWOLF:  Good morning, Your Honor.  Scott DeWolf,

10  Rochelle McCullough, and Joe Fabiani, Latham & Watkins, on

11  behalf of JPMorgan Chase.

12            THE COURT:  All right.

13            MR. JESSUP:  Good morning, Your Honor.  Clifton Jessup

14  and Bruce White of the firm Greenberg Traurig on behalf of an

15  undisclosed potential bidder.  Pursuant to Page 4 of the

16  bidding procedures, we're not permitted to announce who that

17  is, but we'd be happy to announce it to the Court in chambers

18  if the Court would like.

19            THE COURT:  No.  That's fine.

20            MR. JESSUP:  Thank you, Your Honor.

21            THE COURT:  Anyone else?

22       (No response.)

23            THE COURT:  All right.  This is the Lenders' Motion to

24  Reconsider the Order Establishing Bidding Procedures.  Mr.

25  Leblanc, am I correct in assuming that you'll be lead counsel

1  for the Bank Group?

2          MR. LEBLANC:  Your Honor, that is correct.

3          THE COURT:  All right.  Call your first witness.

4          MR. LEBLANC:  Your Honor, I actually believe Mr.

5  Strubeck is going to call Mr. Snyder as the first witness.

6          THE COURT:  All right.  Mr. Strubeck?

7          MR. STRUBECK:  Yes, Your Honor.  I'd call William

8  Snyder as the first witness, Your Honor.

9          THE COURT:  Okay.  Mr. Snyder, step over here, the

10 court reporter will swear you in, and then you may be seated.

11          WILLIAM K. SNYDER, LENDERS' WITNESS, SWORN

12          MR. STRUBECK:  Your Honor, we only have two exhibits

13 for Mr. Snyder's testimony, that I don't think are

14 controversial, as we disclosed it on our witness and exhibit

15 list yesterday evening.  One is the engagement letter, and the

16 second is Your Honor's order that authorized the employment of

17 Mr. Snyder.  I'd approach the bench now if you'd like to get

18 copies of it.  It might be simpler to do it --

19          THE COURT:  I presume that the order is part of the

20 Court's record and that therefore it need not be offered as an

21 exhibit.  The Court will take judicial notice of it.

22          MR. STRUBECK:  Thank you, Your Honor.

23          THE COURT:  If you wish -- does any party object to

24 the engagement letter being introduced?

25          MR. SOSLAND:  No, Your Honor.  You know, we've never

1  seen a fully executed version, and so we'd like to have a copy

2  of it.

3          THE COURT:  All right.  Mr. Kurtz?

4          MR. KURTZ:  Your Honor, we have no objection, but I

5  did want to raise -- because there are timing issues here --

6  that our understanding is the CRO produced documents last

7  night to the Debtor and perhaps others.  We have requested

8  copies of those documents, and that request has been refused.

9  So we have an objection to, really, any evidence that's

10  submitted by the CRO if they refuse to produce the documents

11  he was in connection with this proceeding.

12          THE COURT:  I'll keep that in mind.  Thank you, Mr.

13  Kurtz.

14          MR. STRUBECK:  All right.  Your Honor, would the

15  Court --

16          THE COURT:  I will admit the exhibit.  You will

17  provide a copy to Mr. Kurtz.

18      (Rangers Equity Holdings Exhibit 1 is received into

19  evidence.)

20          MR. STRUBECK:  Sure, Your Honor.  I thought that we

21  have provided a copy yesterday, but -- I'm referring to the

22  production that was made last night.

23          THE COURT:  Yes.  Well, --

24          MR. STRUBECK:  Well, we have some issues to discuss

25  in connection with that, Your Honor.  I'm happy to do it now

1  or when the Court thinks it's appropriate.

2          THE COURT:  Just proceed with your witness, Mr.

3  Strubeck.

4          MR. STRUBECK:   May I approach, Your Honor?  I have

5  some extra courtesy copies of these.

6          THE COURT:  Yes.

7     (Pause.)

8                    DIRECT EXAMINATION

9  BY MR. STRUBECK:

10  Q   Good morning, Mr. Snyder.

11  A   Good morning.

12  Q   Would you please state your full name for the record?

13  A   William Knight Snyder.  K-N-I-G-H-T is the middle name.

14  Q   And Mr. Snyder, what do you do for a living?

15  A   I'm what's termed normally a crisis manager or turnaround

16  manager.  I work for CRG Partners Group, LLC.

17  Q   All right.  And what is your role in the case?  Why are

18  you here testifying today?

19  A   Well, I was chosen to be the CRO about June 23rd of the

20  equity holder, the parent of the Texas Rangers baseball team.

21  And so that -- and then on June the 24th, I hired you after

22  you cleared call conflicts.  And then spent that weekend

23  defining my role as CRO.  You know, that scope was defined.

24  And then the order defining my scope was entered on June the

25  28th, I believe.

1  Q    And Mr. Snyder, you haven't testified before the Court in

2  this case yet, have you?

3  A    No, I have not.

4  Q    This is your first appearance, correct?

5  A    In this case, yes.

6        MR. STRUBECK:  Your Honor, may I approach?

7        THE COURT:  Yes.

8  BY MR. STRUBECK:

9  Q    Mr. Snyder, I'm going to hand you what's been marked, I

10  think, as Rangers Exhibit 2.  And is that the order that you

11  referred to with respect to your retention or the Court's

12  approval of your retention as the Chief Restructuring Officer

13  for the Ranger Equity Holding entities?

14  A    Yes.

15  Q    All right.  And if you would, would you describe for the

16  Court the process that you went through in order to be engaged

17  by the Texas -- or, by the Rangers Equity Holding entities?

18  A    Um, --

19  Q    And let me help you a little bit, to speed up the

20  testimony.  You had said that you were retained -- you were

21  retained pursuant to the Court's direction around June the

22  22nd, correct?

23  A    Correct.

24  Q    And what process did you go through to actually get

25  formally engaged by the Ranger Equity Holding entities?

1   A    Well, once you were engaged, the big issue was just

2   defining the scope and my employment agreement.  So that --

3   that was actually pretty laborious.  I would say it's probably

4   the most difficult scope I've ever had to negotiate in 22

5   years.

6   Q    And why was that?

7   A    Well, I think there was a huge dispute amongst the Lenders

8   and the Debtor as to what my scope and authority would be.

9   And so there was a lot of nitpicking to the Judge's -- from

10  the Judge's comments, trying to decipher what was meant.  And

11  so there was -- we finally did reach an agreement that weekend

12  amongst the parties.  And we ended up actually, I think,

13  trying to put together two forms of an order, and then having

14  the Judge enter one or one of his own so I could get working.

15         MR. STRUBECK:  May I approach, Your Honor?

16         THE COURT:  Yes.

17    (Pause.)

18  BY MR. STRUBECK:

19  Q    Mr. Snyder, I'm going to -- Mr. Snyder, I've just handed

20  you what's been marked as Exhibit 1, Rangers Equity Exhibit 1.

21  A    This is the engagement letter between CRG and Ranger

22  Equity Holdings, GP and Ranger Equity Holdings, LP.

23  Q    All right.  Just so that we can eliminate any confusion

24  and hopefully make for a clear record, if I were to refer to

25  the Ranger Equity Holding entities, do you know what I mean by

1   that?

2   A    Yes.

3   Q    And what do I mean by that?

4   A    Those are the entities that sit above the Ranger baseball

5   team.

6   Q    Are those the entities that hold the equity interest in

7   the Rangers?

8   A    Yes.

9   Q    And are those the entities for which you act as the Chief

10  Restructuring Officer?

11  A    Yes.

12  Q    All right.  Exhibit 1 is the engagement letter, and it is

13  between you and which entities?

14  A    Oh, the Ranger Equity Holdings, GP and Ranger Equity

15  Holdings, LP.  My firm and those two.

16  Q    All right.  I'm --

17  A    The Ranger Equity.

18  Q    Sorry.

19  A    I'm sorry.

20  Q    On behalf of the Ranger Equity Holding entities, who

21  executed the engagement letter?

22  A    Oh, that was executed by Tom Hicks.

23  Q    All right.  Would you describe for the Court your

24  understanding of what you're supposed to be doing as the Chief

25  Restructuring Officer for the Ranger Equity Holding entities?

1   A    Well, three primary issues.  One is evaluating the plan of

2   reorganization that had been filed, trying to understand it

3   and determine, you know, everything involved with it.  Also,

4   voting on -- I had to vote the stock.  And then advising the

5   Equity as needed as to issues.

6   Q    Was part of the scope of your authority, as contained in

7   Exhibit 1, advising the Court as to your findings and as to

8   your conclusions regarding the plan of reorganization?

9   A    (no immediate response)

10  Q    If you'll look at the second paragraph, --

11  A    Yes.

12  Q    -- Romanette, --

13  A    Yes.  Advising the Ranger Equity and the Court --

14  Q    All right.

15  A    -- on my views and of the plan.  Yes.

16  Q    Okay.  You mentioned that at the time that you were

17  appointed -- and the order that appointed you was entered on

18  the 28th of June.  Is that correct?  That would be Exhibit 2.

19  A    That's correct.

20  Q    All right.  You said that there was a plan on file.

21  Generally describe your understanding of what the plan

22  provided for.

23  A    Well, the plan provided for a sale.  It was a sale of the

24  team to the Greenberg Group.  I'll just call them that.  And

25  it was for approximately $520 million of total consideration.

1   And it was being sold pursuant to a plan of reorganization,

2   rather than a 363 sale.  And it also provided a -- the APA was

3   cross-linked to an APA to purchase basically the parking lots

4   from Baseball Rangers Real Estate.  I guess BRE Group, we call

5   them.  And so that was a -- approximately a $70 million

6   transaction.  So BRE is not in bankruptcy, but the APA did

7   reference it.  And that -- and then that's basically it.  It's

8   a sales-through.

9   Q   All right.  And the sale that you just described in the

10  plan that was on file at the time you got appointed, it didn't

11  provide for any kind of an auction of the Rangers, did it?

12  A   No.  It was sold on an exclusive basis to Mr. Greenberg.

13  So there was no auction.

14  Q   All right.  And at the time you got appointed, when was

15  the confirmation hearing scheduled on that plan?  Do you

16  recall?

17  A   Oh, yeah.  The -- I had to vote, I think, on July the 8th,

18  and the confirmation was on July the 9th.  So I had about two

19  weeks.

20  Q   All right.  Since this is the first opportunity you've had

21  to tell that Court what you've done since you were appointed

22  as the Chief Restructuring Officer, --

23          MR. SOSLAND:  Objection, Your Honor.  This question

24  in several preceding it, --

25          MR. STRUBECK:  All right.

1           MR. SOSLAND:  -- there's a fact not in evidence that

2    this -- the appointment of Mr. Snyder.  In fact, Mr. Snyder

3    was retained by the two equity partners, and the Court's order

4    authorized, then, the retainment.  I don't think -- believe

5    the Court appointed Mr. Snyder to do anything.  And it's

6    misleading in the record.

7           THE COURT:  All right.  You're objecting to form,

8    then?

9           MR. SOSLAND:  Yes, Your Honor.

10          THE COURT:  I'll sustain the objection.  Proceed --

11          MR. STRUBECK:  All right.

12          THE COURT:  -- accordingly, Mr. Strubeck.

13   BY MR. STRUBECK:

14   Q   Mr. Snyder, following your retention as the Chief

15   Restructuring Officer by the Ranger Equity Holding entities,

16   tell the Court generally what you did.

17   A   Well, I mean, immediately we just tried to meet with all

18   the parties.  I think even before the Judge entered the order,

19   I had already met with Marty and his group.  I've spoken to

20   the Ad Hoc Group, the Agent for the First Lien Lenders.  I

21   spoke to the mediator several times, at length.  And I think

22   when the order was entered, I was in New York with you, you

23   know, meeting with the MLB, the Ad Hoc Group, and meeting with

24   the First Lien Lenders and their advisor.

25       So I spent the first four days just vivacious, literally

1   meeting everybody and gathering documents and trying to

2   understand the -- you know, what was all involved, because

3   this took a long time to put this deal together, and just

4   trying to understand all the pieces and getting the data rooms

5   was, you know -- just trying to absorb all the data.  It was

6   like drinking out of a fire house.

7   Q   All right.  And based upon that initial due diligence that

8   you just described, did you have any concerns as to whether

9   July the 8th was going to give you enough time to formulate an

10  opinion as to whether to vote in favor as to the plan?

11  A   Well, after the -- by the time I met with Greenberg, I was

12  -- you know, at that point, with everything, I only had a week

13  to go before I voted, and I -- at that point, after that first

14  week of the diligence, I was probably inclined not to vote for

15  the plan.  I had a lot of concerns.  You know, there was just

16  a lot of issues involved in that plan that -- you know, for

17  instance, the prepetition process, there was still arguing

18  over what was really the best and highest offer.  There's a

19  lot of argument amongst the parties as to what was the best

20  deal.  There was -- it was sold pursuant to a plan, and so

21  there were a lot of things wrapped up in that plan.  There are

22  indemnities and such that, you know, was there really adequate

23  consideration?  There was transfers of debt and items into the

24  Debtor right prior to the sale.

25      So there were a lot of issues that tainted it.  You know,

1  like a stinky process.  It was a tainted process.

2      So, at that point, I had to decide:  Are we going to get a

3  fair price or a fair process?  That's what it came down to:

4  Can we get a fair price or a fair process?  And because of the

5  way the deal was structured -- and I think Judge Nelms was

6  going to have a very, very hard time getting a fair price.  I

7  think the mediator was going to struggle mightily to try to

8  get a fair price under the structure of the deal.

9      So I started focusing on a fair process.  Is there a way a

10  process could be derived, whatever the outcome, that everybody

11  agreed they would live with it?  So that's where I was after

12  the first week.

13 Q   All right.  And you said that in the days that immediately

14  followed your retention as the Chief Restructuring officer,

15  that you went to New York and you met with the Lenders, you

16  met with Major League Baseball, and you met with the Second

17  Lien Holders as well, correct?

18 A   Correct.

19 Q   And following those meetings, did you have a chance to

20  meet with anybody who represented or who spoke for RBE, the

21  purchaser under the plan?

22 A   Well, when we came back from New York, I did meet with the

23  Ranger Baseball Express.  Greenberg.  I'll call them

24  Greenberg's Group, because that's who -- that's really the

25  face of that group, of Chuck.  And so that following

1   Wednesday, I did go out and met with the Debtor first.  I met

2   with the Debtor, and then that afternoon Greenberg came out

3   with his counsel.  And it was Mr. Lauria.  It was like old

4   home week.  So, Tom Lauria was there, and Averch, and they --

5   and he had retained them.

6       So we had a meeting with Greenberg and Lauria, and we

7   broke, and we took time to meet with the mediator and talked

8   to the mediator about how we could get something going in the

9   construct of a fair process.

10  Q   And then you testified earlier about your focus being on

11  whether there be a fair process or a fair price.  As a result

12  of that meeting with Mr. Greenberg and his group that you just

13  described, did you and Mr. Greenberg reach any agreement in

14  terms of proceeding with a process to sell the Rangers?

15  A   Well, after talking to the mediator about --

16          MR. SOSLAND:  Your Honor, I object to discussions

17  with the mediator being made.  I believe the Court's order has

18  provided that all discussions in mediation be confidential.

19          THE COURT:  Mr. Strubeck?

20  BY MR. STRUBECK:

21  Q   Let me phrase it this way, Mr. Snyder.  After your meeting

22  with Mr. Greenberg, did you and Mr. Greenberg's group agree to

23  a procedure that involved the sale of the Rangers?

24  A   Yes.  Yes.  So what we did is, after meeting with Mr.

25  Greenberg that afternoon and Tom Lauria, agreed that a sale

1  process would at least have a definitive beginning and end,

2  and might be the best way to resolve the issue.  So, yes, we

3  -- that was the -- that was -- at the -- by the end of the

4  day, that's where we were, was trying to find a sale process

5  that we could all agree on.

6  Q   And again, at the time that you were having your meeting

7  with Mr. Greenberg and his group, at that point in time the

8  confirmation hearing on the plan was still scheduled for July

9  the 9th, correct?

10  A   That's correct.

11  Q   And your vote was due on July the 8th?

12  A   Correct.

13  Q   As part of the discussions that you had with Mr.

14  Greenberg, did you reach an agreement with him that provided

15  for a continuance of the confirmation hearing and also the

16  date on which you would have to vote on the plan?

17  A   Yes.  That, I believe, got moved to the 22nd or 23rd --

18  Q   All right.

19  A   -- and allowed for a different process.  So part of that

20  agreement on that day was to not move forward on the 9th.

21  Q   And you referred to this agreement that was reached with

22  Mr. Greenberg's group.  Other than the extension or

23  continuance of the time for the confirmation hearing and your

24  vote, what else did the agreement with Mr. Greenberg entail?

25  A   Well, what it did was entail trying to come up with a sale

1   process that would incorporate his timelines and also

2   incorporate that the other bidders could participate in.  So I

3   got Greenberg's timelines, and then I called Mr. Beck and I

4   called Mr. Crane and asked them if they could live with those

5   timelines.

6   Q   Okay.  Let's take a step back.  Just so the record is

7   clear, who is Mr. Beck and who is Mr. Crane?

8   A   I'm sorry.  Mr. Beck and Mr. Crane were two of the parties

9   that had participated earlier, prepetition, in the sale

10  process.  They were the other, quote, "bidders"  that -- well,

11  there were other bidders, too, but they were the final.  There

12  were three final bidders.  There was the Beck Group.

13  Remember, these are groups.  They'll have a face.  And then

14  you had -- Jim Crane was a group and Mr. Greenberg was a

15  group.  Those three groups.  And those were the three groups

16  that went into the quote "auction process" and, you know,

17  prepetition.  And so they are the ones that I had called back

18  and talked about this process with Greenberg and asked them if

19  they could participate on those timelines, after we had laid

20  out the timeline that Greenberg said he needed to get

21  completed by to get the sale done.  And --

22  Q   What did you do next after you had that conversation or

23  those conversations with Mr. Beck and Mr. Crane?

24  A   Well, at that point, I went back and we worked through the

25  night.  Lauria and -- we worked through the night with -- and

1   we called Marty Sosland.  We called Marty.  And Marty started

2   drafting the sale agreement, the sale procedures motion.  So

3   Marty worked on that.  And then we have several drafts of it

4   and we had arguments over, you know -- well, maybe I'd call

5   them discussions, I guess, over the different processes.  And

6   so we reached an agreement, I think, Sunday night or Monday,

7   the day before the mediation, because we were having a

8   mediation on the 6th.

9   Q   And just so that we've got the right timeline in mind

10  here, would that have been over the July 4th weekend?  Is that

11  the weekend that you're talking about now --

12  A   Yes.

13  Q   -- in terms of these discussions?

14  A   It was the July 4th weekend, yes.

15  Q   All right.  And you said that on July the 5th, which was a

16  Monday, that a motion got filed?

17  A   That's correct.

18  Q   Now, did you file that motion?  Did you -- or did you

19  cause me to file that motion?

20  A   No, no.  We asked Marty to file it, and Marty filed the

21  motion.

22  Q   Okay.  Why did you ask Mr. Sosland to file the motion?

23  A   Well, in my retention agreement, if I'm going to file

24  anything, I have to ask for permission to do it.  So it's

25  easier just to ask Marty to file that motion, which he did.

1   Q    And so that motion filed on July the 5th, correct?

2   A    Correct.

3   Q    And the following day was the mediation?

4   A    Correct.

5   Q    All right.  Did anything happen at the mediation that

6   affected your willingness to go forward with those sale

7   procedures?

8   A    Yes.

9   Q    And what was that?

10  A    Well, the mediation occurred that Tuesday, and --

11         THE COURT:  Just a minute.

12         MR. SOSLAND:  Objection, Your Honor.  I mean, a

13  mediation is confidential.  You're not supposed to come out of

14  a mediation and say, "Something happened in there that I want

15  to talk about as a basis for my activity."

16         THE COURT:  Mr. Strubeck?

17  BY MR. STRUBECK:

18  Q    Well, Mr. Snyder, let me ask it this way.  The mediation

19  was on July the 6th, correct?

20  A    Correct.

21  Q    On July the 6th, did you inform the BRE Group, Mr.

22  Greenberg, that you were no longer supporting the bid

23  procedures?

24  A    On the 6th?  I did, yes.

25  Q    And why did you do that?

1  A    Well, after meeting --

2           MR. SOSLAND:  Your Honor, if he's about to testify

3  that his reason concerned something that happened in the

4  mediation, then I renew my objection.

5           THE COURT:  All right.  Mr. Kurtz and Mr. Strubeck,

6  come over here.  You are welcome to join, Mr. Sosland, or, in

7  reason, anyone who wants to who's a lawyer.

8      (Sidebar conference.)

9           THE COURT:  All right.  My understanding is that the

10 discussions that Mr. Snyder is going to testify to were not

11 before the mediator and therefore were not, in my judgment,

12 subject to the confidentiality requirements.  And therefore

13 I'm going to overrule the objection and allow Mr. Snyder to

14 answer.

15 BY MR. STRUBECK:

16 Q    And let me rephrase it to make it easier for you, Mr.

17 Snyder, I hope.  Did anything happen on July 6th that caused

18 you to withdraw your support for these procedures you

19 testified you had agreed to with Mr. Greenberg's group?

20 A    Yes.

21 Q    And what happened?

22 A    Well, I had -- I met with Mr. Greenberg -- Mr. -- well, I

23 met with Mr. Crane and Mr. Beck.  They came to the -- to

24 Dallas.  They came to the mediator.  I met with them

25 individually, and it was clear that, what they told me on

1   Thursday and Friday, they could live with those timelines, was

2   wrong, that they could not.  And they had worked over the

3   weekend trying to get prepared to live with that timeline,

4   and, for instance, Mr. Beck, even though he'd participated in

5   the process prepetition, he wasn't really yet qualified.  I

6   mean, he thought he had, but he wasn't.

7        Now, he has been since.  I mean, the MLB has been working

8   with us, I mean, trying to help us out.  But at that point, he

9   wasn't even qualified, had been cleared, you know.  He thought

10  he had been, but he hadn't.  He wasn't.  And so we had issues

11  where, you know, people that thought they were in a position

12  to bid were not, and they could not.  And he didn't know how

13  long that would take to get cleared.

14       And then we also had an issue where the financing that

15  some of the -- that people thought they had, some of those

16  lenders were also in the Greenberg deal and so they had to go

17  through a process where those lenders could be allowed to be

18  bidding on two deals.  You know, financing two deals.  So the

19  buyer that thought that he could just pick up the pieces on

20  his financing over the weekend discovered that he could not do

21  that because there was a -- so, we had a financing issue, we

22  had an approval issue.

23       And so it became apparent that that time frame wouldn't

24  work, and so we would have a one-legged auction.  We'd have an

25  auction with one guy showing up, and then not a true market

1   test.  And they needed a few more weeks.  And I went back and

2   met with Greenberg and told him I couldn't live with those

3   time frames and is there another time frame he could live with

4   so that these guys could get prepared and could bid for real?

5   And we couldn't come to an agreement, so I pulled my support

6   because having a one-legged auction was not my idea of a fair

7   process.

8   Q   Okay.  Now, you said you pulled your support.  Did you

9   file anything to cause the motion that you testified to

10  earlier involving these procedures with the Greenberg Group to

11  be withdrawn?

12  A   No.  No.  I asked Mr. Sosland to pull that support, and he

13  did.

14  Q   And he did?

15  A   He did.  Yeah.

16  Q   When was the first time that you learned that Mr.

17  Sosland's clients were proposing new bid procedures that would

18  involve the Greenberg Group as the stalking horse?

19  A   Oh, that was last Tuesday morning, I think.  Last Tuesday

20  morning, you called me and the Debtor had filed new bidding

21  procedures.

22  Q   And prior to the filing of that motion, did the Debtors

23  consult with you?  Did the Debtor, Texas Rangers Baseball

24  Partners, consult with you about those bid procedures?

25  A   No.  I did not know they were going to submit new bid

1  procedures, no.

2  Q    And so you learned of them for the first time last Tuesday

3  morning?  Is that your testimony?

4  A    Correct.  And you told me you were -- there was a hearing

5  and you were going over there in four or five hours.

6  Q    Now, were you able to attend at that hearing?

7  A    No.

8  Q    And why not?

9  A    I had another hearing in Austin that I was traveling to

10 that day.

11 Q    All right.  Now, in connection with that hearing, you had

12 instructed me to advise the Court that you in your capacity as

13 the Chief Restructuring Officer for the Ranger Equity Holding

14 entities didn't support those sale procedures.  Correct?

15 A    Correct.

16 Q    And why didn't you support those sale procedures?

17 A    Well, I wasn't sure that the other bidders could come up

18 to speed that quickly.  You know, I did not -- because I was

19 working -- because one of the bidders from the previous -- you

20 know, we were running a previous sale process.  One of the

21 bidders was pulling together his information.  And in fact, he

22 was putting together a bid to be the stalking horse in a new

23 procedure.  So we were right in the middle of that and had

24 gotten all the way to a marked-up APA and everything else.  So

25 we had another bidder that was willing to go forward on a 363

1  basis, not a plan.  A cleaner deal.  It didn't involve the

2  airplane.  It doesn't involve the land.  It didn't involve the

3  parking.  Insiders.  It was a cleaner deal.

4      So that deal was left over from the previous sale process.

5  And so I did not think that re-filing that sale process under

6  the plan, under the current plan, made any sense when we could

7  get a cleaner deal just under a straight 363 sale, without any

8  insider ever having to sign one piece of paper.  So -- and

9  therefore you might end up, once again, where I -- the mistake

10 I made.  You end up with a one-legged auction, right?

11     And so, in four hours, in the little time we had, I wasn't

12 sure that I could get the other bidders or anybody could get

13 the other bidders up to speed quick enough to go under those

14 auction procedures.  So I was, once again, fair price/fair

15 process is trying to find a bidder that could fit in there.

16 Until you know you've got two bidders, you know, you don't

17 call an auction, because then you don't necessarily have a

18 fair outcome, a fair test.

19 Q   Now, if you were presented with a choice of whether to

20 support the auction procedures that are currently in place

21 that we're here talking about today or to revert back to just

22 having a plan go forward that has an exclusive opportunity for

23 Mr. Greenberg to purchase the Rangers, which would you think

24 is the correct course, in your capacity as the CRO for the

25 Ranger Equity Holding entities?

A    Well, if there is another bidder that can work with those

auction procedures -- and they may have just walked in through

that door; you know, they may actually be here right now -- if

there's somebody that can work with those auction procedures

or tweak them to work, I'm in favor of that sale process.

Okay.  I think the sale process is a better process.

If we can't have a fair auction, then I'd rather go back

to the plan with the exclusive bidder.  I'd rather go back

with Chuck being the exclusive guy, with the threat of vetoing

the plan to get his bid up and get Mr. Hicks to throw more

money in.

So, you know, I think if we can -- we've got to do one of

two things.  We've either got to get a sale process where we

have a true market test -- which may work; actually, what the

Judge has out there maybe could work with some tweaking -- or,

if we can't get there, just go back to the plan and let Chuck

be the exclusive guy and sit down and have a mediation and let

Judge Nelms whack everybody over the head and see if we can

get the price up.  So, I think that -- but right now, today,

unless there's another bidder that can come in and work with

those procedures, I'd rather go back to the plan and the veto

vote.

Q    Let me ask you a question.  You had testified earlier

that, you know, in a perfect world, you would like for there

to be a sale that ran separately from the plan under Section

1  363 of the Code.  Is that correct?

2  A    Yes.  Under --

3  Q    All right.

4  A    In this case, I would prefer to sell it under 363 rather

5  than through a plan.  That's --

6  Q    And why is that?

7  A    Well, the plan, there's so much stuff in there.  There are

8  -- after looking at this case, you know, I think you could

9  argue -- there might be a sub-con argument and some other

10 arguments.  So there could be some serious causes of action

11 that are barred from the plan.  You know, if the plan goes

12 through, then there are some causes of action that could be

13 barred, and there could be some serious recoveries after a

14 sale.

15     So it seems to me like, with those things lingering out

16 there -- you've got transfers, you've got a possible sub-con,

17 you've got possible things that can be -- Chapter 5 actions --

18 so it seems to me, with all of that out there, that the

19 smarter thing is just to have a straight-up 363 sale.  363.

20 Clean.  And then file a -- you know, get a plan done after

21 you've researched all these possible causes of action and make

22 sure you're not leaving something on the table.  Because once

23 the plan goes through, I think you're sort of barred.  You

24 know, there -- you're sort of barred from going back and

25 fixing some of the stuff that was done prepetition.

1  Q   And from your perspective as someone who's had a fair

2  amount of experience as acting as a chief restructuring

3  officer in other cases, do you see that there would be any

4  prejudice to a potential bidder if it were to purchase the

5  Rangers pursuant to a Section 363 sale as opposed to under a

6  plan?

7          MR. KURTZ:  Objection.  Foundation.

8          MR. STRUBECK:  That's --

9          THE COURT:  Well, I think it calls for a legal

10 conclusion.  And while I recognize Mr. Snyder is a well-versed

11 layman in the law, I'm going to sustain the objection.

12 BY MR. STRUBECK:

13 Q   All right.  Mr. Snyder, let me ask you a question.  You

14 had made it known earlier that you thought, if an auction

15 process were approved, that August the 6th might be an

16 appropriate date for an auction to be held.  Do you remember

17 that was your view at one time?

18 A   Yes.

19 Q   Is that still your view?

20 A   Well, yeah.  I mean, it's -- the guy, the other stalking

21 horse deal, was set for that date.  I mean, so -- when we were

22 going through the previous sale process, the guy that said he

23 wanted to be the stalking horse, before this new process was

24 filed, had sort of targeted August the 6th as the date for a

25 close.

1  Q    And you had referenced a second ago an attempt to

2  substantively consolidate the Debtors in this case.  Have you

3  filed a motion asking the Court for authority to file a

4  substantive consolidation motion?

5  A    Last night, yes.

6  Q    And why did you decide to file that motion?

7  A    Well, I thought there was some important facts that I had

8  uncovered in the last two weeks that I think it was important

9  for the Court to know.  That I think if there's really a

10 possible sub-con action and recoveries out of that, then you

11 would not want to do anything to bar those potential

12 recoveries down the road.

13 Q    In your view, what is the effect, if any, of that

14 substantive consolidation motion on a sale of the Rangers?

15 A    Well, if it's sold through a 363 sale, without indemnities

16 and the like, that sub-con actually isn't going to be

17 affected.  But if it's sold through the present plan, with all

18 the indemnities and releases under the plan, and the plan is

19 confirmed, I don't think you can substantially consolidate a

20 reorganized debtor.  I may be wrong.  That's a legal issue.

21 But I don't think you can do it.

22 Q    All right.  I've got, I think, one last question for you

23 for now, and that's this.  If Judge Lynn were to say to you,

24 as the Chief Restructuring Officer that's been retained at the

25 Ranger Equity Holding levels, "You can propose whatever sale

1  procedures you want to propose that you think maximize value

2  for the Equity," what sale procedures would you propose?

3         MR. KURTZ:  Objection.

4         THE COURT:  Basis?

5         MR. KURTZ:  Legal conclusion.  It's not relevant what

6  this witness -- it's not within his authority to propose

7  sales.  This is a motion to reconsider the bidding procedures

8  that have been implemented by Your Honor, --

9         THE COURT:  Okay.

10        MR. KURTZ:  -- and Mr. Snyder's views on what he

11 would do if he were able to control the case is just not

12 relevant.

13        THE COURT:  Overruled.  You may answer.

14        THE WITNESS:  What I would do is take those

15 procedures that the Judge outlined and I'd have Judge Nelms

16 get those bidders in and this undisclosed guy sitting in the

17 audience and say, "Guys, is it the 6th?  Is it the 4th?  Is it

18 the 13th?  But which one of you, in all honesty, can close a

19 deal and tell us if you can live with these procedures?"  And

20 share them with the four bidders.  And say, "Well, Your

21 Honor," -- and let the mediator come up with the date and the

22 milestones that are effective and ensure that when you have

23 that process that you can close it.

24    So the procedures that are out there right now are pretty

25 good, the one that Judge proposed.  I think we've just got to

1  get another party to agree.  I don't even know if Chuck has

2  agreed to those, you know.

3      But if we could get two parties to agree on a date and to

4  move forward, then I think you would have a real auction,

5  you'd have a real market test, and you could say, "Guess what?

6  It was a fair process."  Whatever the outcome is.

7  BY MR. STRUBECK:

8  Q   When you just referred to "Chuck" a second ago, were you

9  referring to Mr. Greenberg?

10 A   Yeah.  I'm sorry.  Yeah, Mr. Greenberg.

11         MR. STRUBECK:  Your Honor, pass the witness.

12         THE COURT:  All right.  Anyone else on this side of

13 the room?  Mr. Leblanc?

14         MR. LEBLANC:  Thank you, Your Honor.

15                         CROSS-EXAMINATION

16 BY MR. LEBLANC:

17 Q   Mr. Snyder, good morning.  Andrew Leblanc on behalf of

18 Milbank Tweed -- of Milbank Tweed Hadley & McCloy on behalf of

19 the Ad Hoc Group of First Lien Lenders.

20     What effect, if any, do you believe that the transactions

21 that happened right leading into the bankruptcy -- we've

22 called them the eve-of-filing transactions or the midnight

23 transactions -- what effect do you think those have had on the

24 ability of other parties to bid on these assets?

25 A   Well, --

1          MR. KURTZ:  Objection.  Foundation.

2          THE COURT:  Explain

3          MR. KURTZ:  On what basis is this witness able to

4    testify as to the impact of the transfers on willingness of

5    any particular party to bid?  Have they had conversations, in

6    which it's hearsay?  What's his basis for this testimony?

7          THE COURT:  All right.  I'll let you ask that if you

8    want, Mr. Leblanc.

9          MR. LEBLANC:  I'm sorry, Your Honor?

10         THE COURT:  If you wish, you may lay a foundation.

11         MR. LEBLANC:  Is the objection sustained?

12         THE COURT:  Yes.

13         MR. LEBLANC:  Okay.

14   BY MR. LEBLANC:

15   Q   Mr. Snyder, do you believe that the transactions that

16   happened on the eve of filing have an effect -- just a yes or

17   no question.  Do you believe they have an effect on the

18   willingness of parties to bid?

19         THE COURT:  Mr. Sosland?

20         MR. SOSLAND:  Objection, Your Honor, as to

21   foundation, that Mr. Snyder even knows what transactions Mr.

22   Leblanc is referring to.  It's also an objection as to form as

23   to vague.

24         THE COURT:  Okay.  Do you understand the term "eve-

25   of-filing transactions," Mr. Snyder?

1          THE WITNESS:  I believe I do, and I think I can tell

2    him what I think it is.

3          THE COURT:  Well, why don't you tell me what you

4    think the eve-of-filing transactions were?

5          THE WITNESS:  Those eve-of-filing transactions would

6    involve the transfer of a 757 lease, --

7          THE COURT:  Yes?

8          THE WITNESS:  -- charter agreement.  It would involve

9    transferring down debt, over-advanced debt, from HSG down to

10   the Rangers.

11         THE COURT:  This is speaking of, for example,

12   Perella?

13         THE WITNESS:  No, they're next.  This would be debt

14   that was advanced -- debt that wasn't on the books of the

15   Rangers --

16         THE COURT:  All right.

17         THE WITNESS:  -- but was transferred from the Hicks

18   Sports Group down to the Rangers --

19         THE COURT:  All right.

20         THE WITNESS:  -- the night before the filing.

21         THE COURT:  All right.

22         THE WITNESS:  And then you've got the Perella and the

23   other fees, the $9 million --

24         THE COURT:  All right.

25         THE WITNESS:  -- that were transferred down.  And

1  then you have also the indemnifications that were transferred

2  down.

3          THE COURT:  All right.

4          THE WITNESS:  I mean, that were implemented the night

5  before the filing.  And then the break-up fee that was given

6  -- that was added, the break-up the letter, the $10 million.

7      Those are the -- those are my understanding of the --

8          THE COURT:  Well, also the stadium lease?

9          THE WITNESS:  The stadium lease, I don't think is

10  that critical.  It is one of the midnight things, --

11          THE COURT:  All right.

12          THE WITNESS:  -- but I don't believe --

13          THE COURT:  We're just talking about what they are

14  now, not --

15          THE WITNESS:  Yes.  And then there was also the

16  transfer of a -- the lease on an office building, too.

17          THE COURT:  All right.  All right.

18          THE WITNESS:  So there's an office building, the

19  stadium, the professional fees, the over-advance, the 757, and

20  the indemnities.

21          THE COURT:  All right.  All right.  You may answer

22  whether you believe that those -- but I don't know.  I mean, I

23  honestly don't know that it's relevant, because there's no

24  requirement under the existing bidding procedures that those

25  assets be taken, just as there is no requirement that the

1  property not be sold under a 363 motion as opposed to a plan.

2      Finally, with all due respect to Mr. Snyder, the way I

3  read Section 1123, causes of action can be carved out of a

4  plan and preserved.  In fact, isn't that really what the

5  *United Operating* case teaches us, is not only that you can

6  lose them, but that you can preserve them if you specify them?

7  So, am I mistaken, Mr. Leblanc, about the law?

8      MR. LEBLANC:  No.  You're not mistaken about anything

9  that you just said, Your Honor.  The question that I'm trying

10  to lead to, that I started with that I'm now trying to lay a

11  foundation for, is whether the fact of those transactions have

12  an impact on the ability of other parties to come in and bid

13  on these assets, even those that did their diligence back in

14  December.  That's the question.  It's a timing question, in

15  large part.

16      THE COURT:  All right.  All right.  Let me see if I

17  can phrase it to your satisfaction in a fashion that will not

18  too much offend Mr. Kurtz or Mr. Sosland.  Is it your view

19  that eve-of-filing transactions so changed the situation that

20  they will be an impediment to other offers?  Is that a fair

21  statement of what you're trying to get to, Mr. Leblanc?

22      MR. LEBLANC:  I think -- that's a fair statement of

23  Question 1.  I'll ask a follow-up, if okay with Your Honor.

24      THE COURT:  All right.  Go ahead and answer.

25      THE WITNESS:  Well, it depends on the form of the

1  sale procedures.  Okay?  If the sale procedures, those people

2  are allowed to pick and choose, you know, what they take, then

3  I don't think they're that concerned about it.  And the only

4  concern they may have is the break-up fee.  Because if they're

5  going to bid, they have to overbid the break-up fee.  Right?

6  So that would affect them.

7     So out of those issues, the only one that has a direct

8  effect that they have no control over -- because they can pick

9  the jet or not, right?  They can pick whether or not -- and

10  the fact that the fees and the debt get paid that were

11  transferred down doesn't affect a sale in a sense of what they

12  pay.  It affects what goes to the Lenders, but it doesn't

13  affect the buyer.

14     So the only thing I think that's a huge concern to them

15  would be the amount of the break-up fee, because they have to

16  overbid that.

17            THE COURT:  All right.

18            THE WITNESS:  And so that could be an impediment.

19            THE COURT:  All right.  All right.  You may proceed,

20  Mr. Leblanc.

21            MR. LEBLANC:  Thank you, Your Honor.

22  BY MR. LEBLANC:

23  Q   Do you understand what the amount of the break-up he is

24  under the Court's bidding procedures?

25  A   Well, I've read that.  From what I understand, it can --

1  it's up to -- up to $10 million, as long as they prove it's --

2  you've got to prove that you spent that -- 125 percent of that

3  spending.  So if Mr. Greenberg spent $7.5 million, then he

4  could get up to $10 million.  That's my understanding.

5  Q   Do you understand it to be --

6         THE COURT:  It's incorrect.  And what they are, I

7  will -- I mean, the document will speak for itself, Mr.

8  Leblanc.  But go ahead.

9         MR. LEBLANC:  Well, Your Honor, and the document

10  speaks for itself.  But I wanted --

11         THE COURT:  I think for purposes of this hearing we

12  can assume that it's going to be $10 million.

13         MR. LEBLANC:  Well, I would want to -- that's the

14  question I want to ask, because I want to know if the witness

15  has an understanding.

16  BY MR. LEBLANC:

17  Q   Do you understand whether Mr. Greenberg has incurred fees

18  in excess of $8 million?

19  A   He has told me he has, so -- but I have not seen the

20  bills.  But he has informed me.  And just hiring Tom Lauria

21  alone would add to that.

22     (Laughter.)

23         THE COURT:  You know, I can't help but think -- and

24  Mr. Averch, I hope you'll pass this on -- that when Mr. Lauria

25  speaks about vacationing at his villa in Tuscany, that he was

1  once a baby associate working for me.  In fact, you were a

2  year senior to him, were you not, Mr. Averch?

3          MR. AVERCH:  That's correct, Your Honor.

4          THE COURT:  Yes.  Ah, how times have changed in a

5  world where success is measured by income.

6  BY MR. LEBLANC:

7  Q   Now, so it was your understanding that he had incurred in

8  excess of $8 million in fees, and that was even before Mr.

9  Lauria had been retained by Mr. Greenberg's group.  Is that

10  right?

11  A   That's what I was told.

12  Q   Now, let me represent to you -- and anyone can take issue

13  with this -- but let me represent that the bid procedures that

14  have been proposed by the Court order $10 million or 125

15  percent of the fees and expenses that have been incurred,

16  whichever is greater.

17  A   That's right.  It's whatever is greater.

18  Q   Greater?  Okay.

19  A   That's correct.

20  Q   So, as you sit here today, do you know what number you

21  would advise a bidder he needs to overbid to be the winning

22  bidder in that auction process?

23  A   Well, he'd have to cover that, plus the minimum overbid,

24  right, which is --

25  Q   Okay.

1      THE COURT:  Again, with all due respect, I wrote

2  those and it says $15 million is the overbid, period.  And if

3  it turns out that you've got to pay $16 million to Mr.

4  Greenberg for some reason or other, so be it.  That comes out

5  of your pocket, not theirs.  But please, let's not -- we get

6  enough misinformation in this case without misunderstanding

7  the agreement.  That is, as I indicated to you in yesterday's

8  e-mail, the overbid is $15 million, period.

9      MR. LEBLANC:  Your Honor, just to be --

10      THE COURT: And I might add that the expenses are

11  subject to my review.

12      MR. LEBLANC:  And I understand that point quite

13  clearly, Your Honor.  But to the extent that the break-up fee

14  payable to Mr. Greenberg is $16 million, a $15 million overbid

15  is not the winning bid.  That's --

16      THE COURT:  No, this $15 million overbid is at that

17  point the winning bid because I haven't determined the break-

18  up fee yet.  So, just that's the way the procedures read.

19  That's the way they're intended to be read.  I recognize it

20  makes an ugly dent in your case, but please proceed.

21      MR. LEBLANC:  Understood, Your Honor.

22  BY MR. LEBLANC:

23  Q   Mr. Snyder, do you have -- have you -- you mentioned

24  earlier the questions or discussions you had with bidders

25  about their ability to gain financing.  Is that right?

1  A    Yes.

2  Q    Do you expect that other bidders will be able to get third

3  party financing in advance of an August 6th auction date?

4            MR. KURTZ:  Objection.  Hearsay.

5            THE COURT:  Or speculation.  Mr. Leblanc, any

6  response?

7            MR. LEBLANC:  I think it's an appropriate question.

8  He's already answered the question about having discussions

9  with other bidders about their financing.  It's a question of

10 whether the timing is appropriate.  It doesn't -- what his

11 views are as to whether the timing is appropriate.  Whether in

12 fact they can get financing, that's going to be determined at

13 some other point.

14           THE COURT:  Mr. Kurtz?

15           MR. KURTZ:  If -- in the first place, this witness

16 has no foundation for having knowledge about whether other

17 bidders can or can't finance a deal.  If he does, then it's

18 either documentary and that's the best evidence, or he's being

19 told it, in which case it's hearsay.  The bidders are free to

20 come in here and speak to whether or not they can finance the

21 transaction.  They are not free in a way where they can't be

22 cross-examined to get the same information out through Mr.

23 Snyder.

24           THE COURT:  I will allow you to give your opinion,

25 Mr. Snyder.  To that extent, the objection is overruled.

1          THE WITNESS:  This is from talking to these bidders,

2    is --

3          THE COURT:  Now, just -- all right.  Go ahead.

4          THE WITNESS:  Yeah.  So, in my opinion, --

5          THE COURT:  This is a bench trial.

6          THE WITNESS:  In my opinion, --

7          THE COURT:  This is a bench trial.

8          THE WITNESS:  Yeah.  In my opinion, talking, is that

9    some of them, in the compressed time frame, would require the

10   existing banks to bridge some kind of loan, because they could

11   not get third party financing in time.  So I think, to answer

12   your question, some of them, talking to them, they would

13   require -- they could not get third party financing in time to

14   close this deal.  They would require a bridge.

15   BY MR. LEBLANC:

16   Q   When you say "the existing banks," to whom are you

17   referring?

18   A   The people you represent, and the Second Lien Lenders.

19   So, the entire Bank Group.  They would require them to bridge

20   some kind of transaction.

21         MR. LEBLANC:  Nothing further, Your Honor, at this

22   time.

23         THE COURT:  All right.  Anyone else on this side?

24      (No response.)

25         THE COURT:  All right.  Then who's going to take him

1  first on the other side of the room?  Mr. Sosland, --

2              MR. SOSLAND:  Me, Your Honor.

3              THE COURT:  -- please proceed.

4       By the way, while Mr. Sosland is getting up, just to give

5  you an idea of scheduling, we will continue until

6  approximately 10:30, when I have a *Pilgrim's Pride* hearing,

7  which should be very brief, and we will recess then so that I

8  can hear them.  We will also recess at noon, when I must go

9  out to meet with the consumer debtors, and resume at

10 approximately 1:15.  We will go until approximately 5:00 p.m.

11 today.   And I will let you know as soon as I can what is

12 going on with my trial that is currently scheduled for

13 tomorrow.

14      Please proceed, Mr. Sosland.

15                      CROSS-EXAMINATION

16 BY MR. SOSLAND:

17 Q   Good morning, Mr. Snyder.

18 A   Good morning.

19 Q   Do you still have Rangers Equity Exhibit 1 in front of

20 you?  It's your engagement letter.

21 A   Yes.

22 Q   Was -- the copy of Rangers Equity Exhibit 1 that's

23 introduced into evidence has Mr. Hicks' signature on it.  You

24 testified that he signed it on behalf of the two equity

25 partners.  Is that correct?

1   A    That's correct.

2   Q    And has this engagement letter ever been executed by CRG?

3   By you or any of your partners?

4   A    Not this one.  I signed one -- I did not sign one.

5   Epstein did.  It was signed, but it got e-mailed, and I don't

6   know what happened to the signature page, but it -- it was

7   countersigned, but not when -- with Mr. Hicks' signature on

8   there.

9   Q    Okay.  But you believe that it was signed and the

10  signature was delivered to Mr. Hicks?

11  A    The what, now?

12  Q    Do you believe that Exhibit 1 was signed by someone with

13  authority at CRG?

14  A    Yes.  I believe Mr. Epstein signed --

15  Q    Okay.

16  A    -- a copy, but it was not -- it wasn't countersigned.  In

17  other words, there's a signed copy somewhere in our files, but

18  it doesn't have Tom's --

19        THE COURT:  He signed it in counterpart?

20        THE WITNESS:  Yes.

21  BY MR. SOSLAND:

22  Q    Would that have been on or around either the date of the

23  letter or the date of Mr. Hicks' signature --

24  A    I think it was --

25  Q    -- on the signature page?

1  A    I think it would've been the following -- it would have

2  been on the Monday, I believe.

3  Q    On Monday, June 28th?

4  A    Correct.

5  Q    That's the -- also the date that the order was entered

6  that's Rangers Equity Exhibit 2.  Is that correct?

7  A    Correct.

8  Q    And do you believe that Exhibit 1 is an agreement between

9  yourself and CRG and the two equity partners?

10  A    Yes.

11  Q    Now, you testified that it was difficult -- the

12  negotiations of the sale were difficult, right?

13  A    Yes.

14  Q    Because the Lenders wanted one scope of your retention,

15  and the Equity Partners wanted a different scope of your

16  retention?  Am I correctly characterizing your testimony?

17  A    Well, we never really negotiated with Tom on this much.

18  It was we were negotiating, I think, more with you and --

19  Q    But, well, actually, my question is:  The difficulty --

20  didn't you testify that the difficulty was because Rangers

21  Equity Holdings wanted one scope and the Lenders wanted

22  another scope, --

23  A    (no immediate response)

24  Q    -- a broader scope.  Is that correct?

25          MR. STRUBECK:  Your Honor, I object to that question

1  because I think it mischaracterizes the testimony.  I thought

2  Mr. Snyder testified that he wanted a broader scope and he

3  thought a broader scope was intended.

4         THE COURT:  Well, I'm not sure that I care because,

5  despite the importance and significance of Tom Hicks in the

6  world, in this courtroom I am the most important guy, and I

7  entered an order that specified what I think is the key part

8  of the scope of Mr. Snyder's duties.

9     So you can go ahead and ask the question, and I'm not sure

10  I care what the answer is.  Go ahead.

11  BY MR. SOSLAND:

12  Q   Can you answer the question?

13  A   I forgot what the question was.  What was it?  What was

14  it?

15  Q   I'll ask a different question.

16  A   Okay.

17  Q   You did testify that on Sunday, June 27th -- the date

18  wasn't clear, but I believe the date was June 27th -- that you

19  or you caused your counsel to send two forms of order to the

20  Court.  Is that right?

21  A   Correct.

22  Q   Okay.  And one of the forms of order reflected the

23  agreement that had been reached between you and CRG on the one

24  hand and Mr. Hicks and the equity partners on the other hand.

25  Correct?

1    A    (no immediate response)

2    Q    One form of order --

3    A    Yeah.

4    Q    -- matched the engagement letter?

5    A    Right.  And one form -- there was one that was broader in

6    scope and one more narrow in scope.  Yeah.

7    Q    So even though you had entered into an agreement regarding

8    the scope of your engagement, you nevertheless forwarded a

9    different form of order to the Court?

10   A    Correct.

11   Q    And that was different also than the order that was

12   actually entered by the Court, correct?

13   A    Yeah.

14   Q    The Court's order was neither of the two orders --

15   A    Correct.

16   Q    -- that was delivered on Sunday?  Okay.  And then -- so

17   that was on -- and the order was entered on Monday, June 28th,

18   correct?  It's on Exhibit 2 in front .

19   A    Yes.

20   Q    So, two days later, on Wednesday, June 30th, was the date

21   of the meetings at the ballpark that you testified about.  Is

22   that correct?

23   A    Uh, cor...

24   Q    So, Wednesday before --

25   A    Yes.

1  Q    -- July 4th?

2  A    That was a meeting with the Debtor.  And then I also met

3  with Mr. Greenberg later that day.

4  Q    Okay.

5  A    On Wednesday.

6  Q    And that evening, you and Mr. Strubeck -- by that evening,

7  you and Mr. Strubeck had reached agreement with Mr. Lauria and

8  his client regarding bidding procedures, or at least the term

9  sheet for bidding procedures.  Is that correct?

10 A    I think we had a general agreement, but those -- you know,

11 the final form of that was not finished until Sunday.  So --

12 but by Wednesday night, we had an idea of what -- you know,

13 some general guidelines on how it would work, yes.

14 Q    Okay.

15 A    But I don't -- we didn't actually have agreed-on final

16 wording until Sunday night.

17 Q    Right.  But the evening of -- in fact, on the evening of

18 June 30th, you and Mr. Strubeck and Mr. Lauria, perhaps Mr.

19 Prostok, I don't recall, were in a room together out at the

20 ballpark and you called me, right?

21 A    Yes.  Correct.  Correct.

22 Q    And you said, "We've reached agreement on bidding

23 procedures, and please start preparing the motion."  Is that

24 correct?

25 A    Correct.

1   Q   And I asked you to affirm that that agreement -- that the

2   agreement that you discussed with me was something that you

3   wanted us to file in the TRBP case, correct?

4   A   That's correct.

5   Q   In fact, I told you that I wouldn't file it in the TRBP

6   case unless I knew that you supported it.  Isn't that correct?

7   A   I believe that's right.  No, and you did -- you did ask me

8   if I supported it, and I told you I did support the bidding

9   procedures.

10  Q   And then we, my law firm, prepared a draft.  Then, after

11  we prepared the -- and there were discussions about that, I

12  believe, Thursday and Friday.  But then throughout the

13  weekend, drafts went back and forth between you on the -- you

14  or your counsel on the one hand and Rangers Baseball Express

15  on the other hand.  Correct?

16  A   That's correct.

17  Q   Weil Gotshal and TRBP were not involved in the discussions

18  over the weekend.  Is that correct?

19  A   Well, I wouldn't know that.  I don't know if you had

20  talked to Greenberg or Strubeck.  I don't know.  But I know

21  that there was numerous conversations between my counsel and

22  Greenberg's counsel.

23  Q   Okay.  And then -- and on -- and you testified that on --

24  by Monday, July 5th, you had reached the final form of

25  agreement and you requested that TRBP file a motion, and TRBP

1  filed the motion.  Is that correct?

2  A    That's correct.

3  Q    Okay.  And then the next day you changed your mind,

4  correct?

5  A    That's correct.

6  Q    Okay.  Now, you also testified that the bidding procedures

7  that were filed with the Court last week, you didn't see until

8  the day they were filed on last Tuesday, the 13th of July.  Is

9  that correct?

10 A    Correct.

11 Q    But on the previous Friday, you had -- you had a meeting

12 with, among other people, Mr. Greenberg's -- Mr. Greenberg and

13 his counsel and me, correct?

14 A    Here in Fort Worth?  Yes.

15 Q    Yes.

16 A    Yes.  We did.

17 Q    And do you recall at that meeting being advised that the

18 Debtor thought they could get Mr. Greenberg to improve his

19 bid, even though he had told you that he would not increase

20 his bid, and enter into bidding procedures that we thought

21 would allow other parties to bed?  Do you recall that

22 conversation?

23          MR. LEBLANC:  Objection, Your Honor.  Hearsay.  If

24 Mr. Sosland wants to testify, we can cross-examine him.  If he

25 doesn't want to testify, then he shouldn't introduce it

1  through a witness.

2       THE COURT:  Mr. Sosland?

3       MR. SOSLAND:  It's -- Mr. Snyder testified that he

4  didn't know anything about the -- that -- about bidding

5  procedures prior to Tuesday, and this shows that there was at

6  least a discussion of them several days earlier.

7       THE COURT:  You mean the ones filed by the Debtor?

8       MR. SOSLAND:  Right.

9       THE COURT:  Yes.  All right.  I'll allow the

10  question.  Overruled.  Go ahead.

11       THE WITNESS:  Yes.  There were discussions on Friday

12  about a possible sales process that would work, timing,

13  changing bids.  We talked about a lot of stuff, and there was

14  -- and some of it was pretty heated.  I mean, so, I mean, we

15  discussed a range of issues, and one of them was what sales

16  process would work.  We did discuss that.

17  BY MR. SOSLAND:

18  Q   Okay.  Now, at last Tuesday's hearing, are you aware that

19  your counsel told the Court that he thought you would oppose

20  the procedures that were first circulated with a July 22nd --

21  or, July 21st and 22nd auction and confirmation date, that you

22  would support an auction on August 6th?  Are you aware of

23  that?

24  A   So, he said that I said that I would support an auction

25  that ended on August the 6th?

1  Q    Correct.

2  A    Yeah.  If it had two bidders, I would, yes.

3  Q    And one that would allow a 363 sale?

4  A    Yes.

5  Q    And is there a material difference between an auction that

6  ends on August 4th and one that ends on August 6th?

7  A    Only if you have two bidders.  That's the only difference.

8  Q    Okay.  And the current auction procedures -- the auction

9  procedures you're asking the Court to reconsider today allow

10 for an auction on August 4th and a 363 sale, don't they?

11 A    Yes, although -- that's my understanding, yes.

12 Q    So what is it that you're asking the Court to reconsider

13 today?  Is it just the break-up fee?

14 A    No.  No.  What I'm asking the Court to do, I think I

15 testified earlier, is to let Judge Nelms grab these three

16 bidders or four bidders, put them in a room, and get them to

17 commit that they can bid by a certain date, and go forward.

18 Q    So your counsel was authorized last week to tell the Court

19 that you would auction procedures on August 6th and a 363

20 sale, and the Court entered it, and you've changed your mind

21 again.  Is that your testimony?

22 A    No.  I -- no.  I --

23         MR. STRUBECK:  Excuse me one second.  I'm going to

24 object to that question because I think it mischaracterizes

25 what I told the Court at the hearing last week.  I guess I'd

1   let the transcript speak for what I specifically said, but I

2   think Mr. Sosland is taking some liberties with exactly what I

3   represented to the Court and what I said at the hearing this

4   week.

5          THE COURT:  All right.  Do you want to take a copy of

6   the transcript and read it to Mr. Snyder?

7          MR. SOSLAND:  I can do that, Your Honor.

8          THE COURT:  I thought you probably could..

9      (Pause.)

10         MR. SOSLAND:  And for the parties in the courtroom,

11  Your Honor, this is the transcript of the August 13 -- I mean,

12  I'm sorry, of the July 13th hearing.  It is also Lenders'

13  Exhibit F for this hearing, Your Honor.  So, on the following

14  discussion that took place at the July 13th hearing, I'm

15  reading from Page 17 of the transcript at Line 11.  The Court

16  asked, "How long does he want?"  Mr. Strubeck said, "I think

17  he would like to until about August the 6th, Your Honor, for

18  an auction, which is one week longer than what Your Honor has

19  been talking about."

20     So, was Mr. Strubeck authorized to tell the Court that you

21  wouldn't want an auction until on August the 6th?

22         THE WITNESS:  Well, what do I say about that?

23  BY MR. SOSLAND:

24  Q   I'm asking whether Mr. Strubeck had been authorized by you

25  to express that the to the Court.

1  A    Yeah, if there was a bidder that could bid in that time

2  frame, that -- which we thought we had, as a stocking horse,

3  that that date worked.  But I also told him, if there's not

4  two bidders, you're better off just going with Chuck as the

5  exclusive person under the plan.  So maybe -- I don't know the

6  context of that one statement, but if there is two bidders, if

7  it's August 4th, August 6th, August the 3rd -- I don't care

8  what the date is -- if there are two bidders that can bid and

9  come to the table, then I'm totally in favor of that.

10 Absolutely.

11 Q   But you don't know as you sit here today whether there are

12 any bidders or not, correct?

13 A    No, I don't.

14 Q   But you have been negotiating an asset purchase agreement

15 with another bidder, right?

16 A   Correct.

17 Q    In fact, you were negotiating an asset purchase agreement

18 with another bidder the weekend before the July 13th hearing,

19 correct?

20 A   That's correct.

21 Q   And Mr. Strubeck also said at the hearing on July 13th,

22 when the date was August 4th -- this is on Page 74 beginning

23 at Line 1 -- "And so when I said earlier that a sale by August

24 4th is something that earlier Mr. Snyder thought perhaps could

25 take place, his mindset was that there would be a sale under

1  Section 363."  And that's consistent with your testimony today

2  also, right?

3  A    That's correct.

4  Q    And so Mr. Strubeck was authorized to advise the Court of

5  that on September -- on July -- at the hearing on July 13th,

6  correct?

7  A    That's correct.

8  Q    And you'd been negotiating a 363 sale the weekend before

9  this hearing, correct?

10 A    Correct, but with a different stalking horse.

11 Q    Right.

12 A    So, --

13 Q    But my -- so I ask the question again.  If there's a

14 bidding procedure that allows a 363 sale offer being made on

15 August 3rd with an auction on August 4th, where you asking to

16 reconsider today?

17 A    Just to reconsider that there is another bidder that can

18 meet that timeline.  That's all.

19 Q    Now, the asset purchase agreement that you were negotiating

20 the weekend before the July 13th hearing, you didn't share that

21 with Texas Rangers Baseball Partners, did you?

22 A    I think we sent that to you.  Only to you.

23 Q    At about midnight last night, right?

24 A    Yeah.  Well, --

25 Q    Subject to attorney's eyes only?

1  A    That's correct.

2  Q    And it's a bid for -- it's a bid for the assets of Texas

3  Rangers Baseball Partners, correct?

4  A    Correct.

5  Q    But there's no way we could have -- the Debtor could have

6  known anything about it, the Debtor in this case could have

7  known anything about it if you didn't share it, was there?

8  A    That's correct.

9          MR. SOSLAND:  Just a second, Your Honor.

10         THE COURT:  All right.

11     (Pause.)

12         MR. SOSLAND:  I'd pass the witness, Your Honor.

13         THE COURT:  All right.  Who's next on this side?  Mr.

14  Kurtz?

15         MR. KURTZ:  Thank you, Your Honor.

16         THE COURT:  All right.  Mr. Kurtz, we're going to go

17  for about 10 or 12 more minutes, and then give you about three

18  minutes to go out into the hall -- I mean, all of you -- and go

19  off to get coffee or whatever you want while I take the

20  *Pilgrim's Pride* case.  So go ahead and I'll let you know when I

21  want you to stop.  Okay?

22         MR. KURTZ:  Okay.  Thank you very much.

23                         CROSS-EXAMINATION

24  BY MR. KURTZ:

25  Q    Good morning, Mr. Snyder.

1    A    Good morning.

2    Q    First place, I didn't have the opportunity to depose you in

3    this matter, right?

4    A    Correct.

5    Q    And you have not provided any documents for me, right?

6    A    Well, I think they give you my contract.  I think that's

7    the only thing you got.

8    Q    Okay.  But you've made a production of documents in this

9    case to the Debtor, right?

10   A    I'm not aware of that, no.

11   Q    Okay.  You're not aware that your counsel produced, after

12   midnight last night, a number of documents to the Debtor?

13   A    They were working on it.  I didn't know if they got it out

14   in time or not.

15   Q    All right.  Are you aware that those documents have not

16   been produced to RBE and your counsel says that he won't

17   produce them?

18   A    That's what I just heard him say --

19   Q    Okay.

20   A    -- in the court.  But he said there are some issues he had

21   to discuss.

22   Q    Let me start with your testimony about the sale process and

23   what a sale process should look like.  You have never actually

24   run a sales process to sell a Major League Baseball team, have

25   you?

1    A    No.

2    Q    You've never had a role in the sale of a Major League

3    Baseball team, have you?

4              MR. LEBLANC:  Your Honor?

5              THE COURT:  Yes?

6              MR. LEBLANC:  Your Honor, I'm going to object to any

7    questioning by Rangers Baseball Express.  We raised a question

8    as to their standing.

9              THE COURT:  Yes, and it's overruled.  The case law

10   that you've cited involved bidders who were involved in a

11   postpetition agreement.  As far as I can tell, Rangers Baseball

12   Express is a party to a prepetition contract.  Whatever force

13   and effect that contract will have, nonetheless, it gives them

14   the right either to assumption of the contract or to a claim in

15   the event of a rejection.  If they have a claim in the event of

16   a rejection, they clearly would be a party in interest in that

17   they would be a creditor.  As a contingent creditor, which I'll

18   call them for purposes of this hearing, I think that they have

19   the same right to be heard as a party in interest under Section

20   1109(b).

21        You may proceed, Mr. Kurtz.

22              MR. KURTZ:  Thank you, Your Honor.

23   BY MR. KURTZ:

24   Q    Mr. Snyder, you've never had a role in connection with the

25   sale of a baseball team before this case, right?

1   A   Correct.

2   Q   You have never valued a Major League Baseball team, right?

3   A   No.

4   Q   Have you performed a valuation of the assets at issue in

5   this case?

6   A   Oh, I haven't performed -- I haven't performed one myself.

7   I have looked at several documents that were produced to me

8   from lenders and from the Debtor, the Debtor themselves.

9   Q   My question is whether or not you have performed a

10  valuation of the assets at issue in this case.

11  A   No.  I've just looked at other people's.

12  Q   Okay.  Have you retained an expert to perform a valuation

13  of the assets in this case?

14  A   Oh, not in the three weeks, no.

15  Q   Okay.  And have you ever been involved in any way in the

16  operation of a Major League Baseball team?

17  A   No.

18  Q   Have you ever run a sales process with respect to the sale

19  of any sports team?

20  A   Let me think.  (Pause.)  The only thing I was involved in

21  was selling some companies that had -- Kiladores (phonetic),

22  and they had some teams in Mexico, and that's the only thing I

23  can recall.

24  Q   Okay.  Have you ever been involved in any role in the sale

25  of a sports team in the United States?

1    A    No.  No.  Huh-uh.

2    Q    And have you value a sports team before?

3    A    No.

4    Q    All right.  And have you ever had any role in connection

5    with the operation or the assisting of the operation of a

6    sports team?

7    A    No.

8    Q    And you have not retained any experts to assist you in

9    reviewing the operation of the Texas Rangers, correct?

10   A    No.

11   Q    And although you spoke about your interest in fair price,

12   you've taken no steps to hire anybody to supply you with a

13   valuation of the assets that are being sold, right?

14   A    Correct.

15   Q    Now, you do understand, of course, that RBE has agreed to

16   provide aggregate consideration of around $570 million?

17   A    $570 [million]?

18   Q    Aggregate consideration, including the assumption of

19   liabilities.

20   A    (Pause.)  Well, let's see.  The sheet that I have was $520

21   million.  There's $304 million of cash, and there's $220

22   million of assumed liabilities.  And that doesn't add up to

23   $570 [million].

24   Q    All right.  We'll go through that.  But you understand it's

25   a committed deal to purchase the assets at issue, right?

1   A    Correct.

2   Q    And you understand that all of the contract terms have been

3   negotiated and agreed to, right?

4   A    Correct.

5   Q    And you understand that RBE has, of course, been approved

6   by Major League Baseball, right?

7   A    Correct.

8            MR. LEBLANC:  Objection, Your Honor.

9            MR. KURTZ:  And that's important, isn't it?

10            MR. LEBLANC:  Objection, Your Honor.  That assumes

11   facts not in evidence.

12            THE WITNESS:  Well, they've been --

13            THE COURT:  Well, I think they are now.  Overruled.

14   Go ahead, Mr. Kurtz.

15   BY MR. KURTZ:

16   Q    Well, that's --

17   A    Well, they've been cleared.

18   Q    That's --

19   A    They've been cleared.  I guess "approved" is -- in other

20   words, they've been cleared to bid --

21   Q    To buy the team, right?

22   A    Yeah.  The 75 percent --

23            THE COURT:  He's correct.  You --

24            THE WITNESS:  -- people haven't voted yet.

25            THE COURT:  Yes.  There has not been the vote of 75

1  percent of Major League owners.

2          MR. KURTZ:  Okay.

3          THE COURT:  So that issue remains open.

4          MR. KURTZ:  Okay.

5  BY MR. KURTZ:

6  Q   But the approval to date is obviously an important aspect

7  of a transaction in this case, right?

8  A   The clearing?  Yes.  Absolutely.

9  Q   Because Major League Baseball enjoys the right to not

10 approved a particular bidder, which would bar the sale of the

11 team, right?

12         MR. STRUBECK:  Yeah, I object to the form of that

13 question.  It calls for a legal conclusion.

14 BY MR. KURTZ:

15 Q   Is it your understanding, sir?

16         THE COURT:  Well, well, it also is inconsistent with

17 the bidding procedures that we are discussing today.  Why

18 don't you try rephrasing your question or move on to something

19 else, Mr. Kurtz?

20 BY MR. KURTZ:

21 Q   You understand that if Major League Baseball does not

22 approve a particular bidder, then no sale can take place,

23 subject, of course, to whatever this Court chooses to do in

24 response to that?

25 A   Well, I think it's being cleared, right?  I think -- you

1  keep saying approved.  MLB, all they do is they clear

2  somebody.  They do a pre-clearing of them to make sure, you

3  know, they don't have criminal offenses or what-all, whatever.

4  So they do a pre-clearing, and so they are -- they are cleared

5  to bid.  But when you say they've been approved, I don't

6  believe that happens until after the sale.  So you could

7  possibly have a sale and have the MLB vote someone down.  So

8  --

9  Q   Mr. Snyder, a bidder has to be ready, willing and able to

10 close on the transaction to have any value in this case,

11 right?

12 A   The what?

13 Q   A bidder has to be ready, willing and able to close the

14 transaction, right?

15 A   Right.

16 Q   And to be able to close the transaction, among other

17 things, you need the approval of all of the owners of the

18 baseball teams, right?

19         MR. LEBLANC:  Objection.

20         THE COURT:  Yes?

21         MR. LEBLANC:  Same objection that was just raised by

22 Mr. Strubeck and sustained by the Court.

23         THE COURT:  I'm going to sustain it, because your

24 statements are of -- the factual basis of your question is

25 inaccurate.  Rangers Express does not have the approval of

1  Major League Baseball at this point.  Rangers Express has the

2  approval to bid.  It's been cleared.  It's Major League

3  Baseball-cleared, as the term is used in the bidding

4  procedures.

5           MR. KURTZ:  I understand that, but my question was

6  just whether this witness understands that, ultimately, in

7  order for a bidder to be able to close, they will need to be

8  approved --

9           THE COURT:  All right.  So --

10          MR. KURTZ:  -- by the baseball owners.

11          THE COURT:  Do you understand that any bidder,

12 ultimately, to close, is going to have to receive the 75

13 percent vote required by the Major League Constitution?

14          MR. LEBLANC:  Your Honor, if I may, I think that

15 issue is one that has expressly been left open.

16          THE COURT:  Well, my understanding -- yes, I

17 understand that, that that issue has not been -- let's put it

18 -- let's rephrase that.  That Major League Baseball claims

19 that it has the ability to veto any buyer of the Rangers under

20 the Major League Baseball Constitution if 75 percent of the

21 owners do not approve the sale.

22          THE WITNESS:  I agree with that.

23          THE COURT:  Do you understand that to be true?

24          THE WITNESS:  I agree with that.

25          THE COURT:  All right.

1          THE WITNESS:  Yeah.

2          THE COURT:  And you understand no bidder has received

3    that approval as yet.  Is that true?

4          THE WITNESS:  That's correct.

5          THE COURT:  All right.  You may proceed, Mr. Kurtz.

6          MR. KURTZ:  Okay.

7    BY MR. KURTZ:

8    Q   And it is important to understand whether or not a bidder

9    will receive such approval, right?

10         MR. LEBLANC:  Your Honor, I'm going to object to the

11   line of questioning as to relevance.  I think we're now

12   getting into whether or not the Greenberg-Ryan bid should be

13   approved as a plan.  We're happy to get to that.  That's,

14   frankly, what we want.  But if that's the purpose of today,

15   it's going to be a very different hearing then what I expected

16   we would have.

17         THE COURT:  Well, --

18         MR. KURTZ:  Your Honor, that's not at all what I'm

19   getting at.  I'm trying to explore with this witness his

20   understanding of what has to happen for there to be bidders,

21   because there is a question now as to whether a committed deal

22   should be allowed to expire, potentially, in the hopes that

23   some other bidder will come along and that that bidder will be

24   able and willing to close.

25         THE COURT:  Well, but I think -- Mr. Kurtz, I think

1  the problem is that you're confusing two things, the approval

2  of the Office of the Commissioner -- that is, the approval to

3  be a bidder at all -- and then the approval of the new

4  ownership in the event that the bidder is selected.  And no

5  bidder, not your client or any the other bidder, has received

6  the 75 percent vote, and I don't see how the 75 percent vote

7  is relevant to this discussion.  It raises a number of issues,

8  some of which send chills up and down the spines of Major

9  League Baseball's counsel, and some of which are factual and

10 would ultimately be subject to being presented to this Court,

11 at least under the existing bidding procedures.

12    So I don't see that the 75 percent and the ultimate

13 approval necessary to closing is relevant.

14            MR. KURTZ:  All right.

15            THE COURT:  All that's relevant at this point is

16 whether a person can bid, which your client can, and which,

17 subject to the other members of their group, as I understand

18 it, Crane and Beck can.  As I understand it, Major League

19 Baseball has undertaken and has so far kept its undertaking to

20 promptly review any request to be approved to bid.

21            MR. KURTZ:  Your Honor, my understanding is there is

22 a qualification issue that basically looks to see whether you

23 have been convicted of a felony and matters like that.  That

24 makes you qualified.  Then it goes to Baseball for a

25 recommendation approval, which has been provided, as I

1    understand it, to RBE.  Then it goes to all of the owners for

2    the 75 percent vote.

3        All of those requirements to the successful closing of a

4    transaction are relevant.  I am simply trying to explore with

5    this witness whether he understands that's relevant, because

6    whether you get through qualification, approval, or ultimate

7    approval is important.  Any one of those three steps would bar

8    a bidder.

9            THE COURT:  All right.  Well, go ahead, Mr. Leblanc.

10   Then we're going to take a recess for *Pilgrim's Pride*.

11           MR. LEBLANC:  Your Honor, personally, I think I see

12   Mr. DuPuy in the back of the courtroom.  He testified as to

13   these issues yesterday.  There is a process that happens after

14   a bidder is -- in this process, after a bidder is selected,

15   that goes through three different steps.  There's a Membership

16   Committee, Executive Council, and then there is a vote of the

17   owners.  Those three processes, to the best of our

18   understanding, have not started -- if Mr. DuPuy wants to take

19   the stand, we can question him about it today -- with respect

20   to any bidder, including Mr. Greenberg.

21       And I think Your Honor is absolutely correct in separating

22   those two elements.

23           THE COURT:  All right.

24           MR. LEBLANC:  And my understanding is the purpose of

25   the provisions of the bid procedures that Your Honor imposed

1  last week, which with respect to this point we agree with,

2  were to allow for the Court to investigate or to consider

3  whether the denial in any of those processes was not in good

4  faith.  And that's something that is totally irrelevant to the

5  question of the bid procedures.  It doesn't -- again, it's an

6  effort to try to get Greenberg over the finish line.

7           THE COURT:  I understand.  I'm going to sustain the

8  objection.  We'll be in recess until approximately 15 minutes

9  of 11:00.

10          THE CLERK:  All rise.

11     (A recess ensued from 10:27 a.m. until 10:47 a.m.)

12          THE COURT:  Please be seated.  All right.  Where is

13 Mr. Kurtz?  (Pause.)  Okay.  Mr. Kurtz, you may proceed.

14          MR. KURTZ:  Thank you, Your Honor.

15                CROSS-EXAMINATION, CONTINUED

16 BY MR. KURTZ:

17 Q   Mr. Snyder, you're aware that the Commissioner of Major

18 League Baseball has said that he will recommend the approval

19 for the RBE deal, right?

20 A   I have been told -- I've been told that.  I have not

21 spoken to the Commissioner myself, but I have been told that

22 he would recommend them.

23 Q   Okay.  And you certainly haven't been told that Major

24 League Baseball said that they would -- that the Commissioner

25 said that he would recommend bids by either Beck or Crane,

1  right?

2          MR. LEBLANC:  Objection, Your Honor.  Calls for

3  hearsay.

4          THE COURT:  I'm going to sustain that objection.  You

5  may proceed, Mr. Kurtz.

6  BY MR. KURTZ:

7  Q   You understand that the RBE financing expires on August

8  12th, correct?

9  A   Unless they pay the commitment fee.  Unless they pay the

10  fee, yes, it will.

11  Q   I'm sorry.  Is it -- do you -- are you operating under the

12  misunderstanding that RBE is entitled to extend its financings

13  beyond August 12?

14          THE COURT:  Just a minute.

15          MR. LEBLANC:  Objection, Your Honor, to the form of

16  the question: --

17          THE COURT:  Okay.

18          MR. LEBLANC:  -- "Are you operating under the

19  misunderstanding?"

20          THE COURT:  Sustained.

21  BY MR. KURTZ:

22  Q   Is it your understanding, are you operating under an

23  understanding that the RBE financing can be extended beyond

24  August 12th by paying a fee?

25  A   It goes hard.  If you pay -- if he pays the fee -- I think

1  it's 1.75 percent; it's a lot of money; it's like $2.6 million

2  plus $45,000 -- the financing goes hard.  But then he has a

3  loan, you know, at that point.  But it's -- the commitment

4  cannot be extended beyond the 12th, but the loan can go hard

5  on the 12th, but he'd have to -- you have to pay the fee.

6  Q   All right.  So you have an understanding -- in the first

7  place, do you understand RBE has raised $260 million in equity

8  financing?

9  A   The what?

10 Q   Do you understand that RBE has raised $260 million in

11 equity financing?

12 A   $260 [million]?  Well, the numbers I saw were slightly

13 less than that, but it's close, yes.

14 Q   Are you aware that the equity financing expires on August

15 12th?

16 A   Now, that I have not seen.  The only document I saw that

17 expired on the 12th was the credit commitment.

18 Q   You --

19 A   That's the only thing I've seen.

20 Q   You have no idea, therefore, whether the equity

21 commitments expire on August 12th.  Is that right?

22 A   I have no idea.

23 Q   Okay.  And you're operating on the assumption that, so

24 long as RBE is willing to pay money, they can extend their

25 financing beyond August 12th?

1   A    The bank financing, if they pay the fee, yeah.

2   Q    Okay.  Your understanding is the bank financing is

3   available even if the equity financing is not funded?

4   A    I would have -- I would not have any visibility on that.

5   I've not seen the equity agreements, --

6   Q    Okay.  You --

7   A    -- so I don't know.

8   Q    You have no idea, therefore, whether or not the equity --

9   whether any of RBE's financing can be extended beyond August

10  12th, right?

11  A    Okay.  Let me see if I can answer your question.  The only

12  thing I've read is the financing agreement, okay, from the

13  banks.  And it can be extended if they pay the fee.

14  Q    It --

15  A    But the -- I have not seen any of the equity financing

16  agreements, so I don't have any visibility on that side.

17  Q    And it's your testimony that the debt financing can be

18  extended even if the equity financing expired.  Is that right?

19       MR. STRUBECK:  Your Honor, I object to the form of

20  the question.  That's not what he testified to.

21       THE COURT:  I think what he's testified to is -- I

22  think the question has been asked and answered.  As I

23  understand it, he says he doesn't know anything about the

24  equity financing.  And if I understand your question, which I

25  think you asked before, and I'm not sure he didn't duck the

1  question, whether intentionally otherwise, is:  Does the

2  financing commitment from the lenders depend upon the equity

3  financing?  Is that correct?

4        MR. KURTZ:  I have asked him, though, since he has

5  testified that he believes it can be extended, --

6        THE COURT:  Well, I understand that.  Do you

7  understand that the agreement with the lenders contains a term

8  that requires that the equity financing remain in place for

9  the lenders to be obligated to lend?

10        THE WITNESS:  You know, I --

11        THE COURT:  Do you just not remember?

12        THE WITNESS:  I just don't remember that.

13        THE COURT:  All right.

14        THE WITNESS:  I just don't.

15        MR. KURTZ:  Okay.

16        THE COURT:  That's your answer, then, Mr. Kurtz.

17        MR. KURTZ:  Okay.

18        THE COURT:  Proceed.

19  BY MR. KURTZ:

20  Q   Well, you've made a lot of your notion that there needs to

21  be a number of bids, or at least two bids, in order to have a

22  process that you're comfortable with.  Is that correct?

23  A   That's correct.

24  Q   Okay.  One of the bids right now is RBE, right?

25  A   Correct.

1   Q    In fact, that's a committed deal, right?

2   A    Correct.

3   Q    And if that deal expires on August 12th, then that's one

4   of the bids that you want that is been lost, right?

5            MR. LEBLANC:  Objection, Your Honor, to the form of

6   the question.

7            THE WITNESS:  Well, --

8            THE COURT:  Overruled that time.  Go ahead and

9   answer, if you can.

10           THE WITNESS:  Can I go ahead and answer, or --

11           THE COURT:  Yes.

12           THE WITNESS:  Oh, okay.  Well, you know, you don't

13  know.  You don't know if Chuck would -- Mr. Greenberg, I'm

14  sorry; I keep calling him Chuck -- would extend, could extend

15  it or not.  I don't know if that bid is lost or not.  But if

16  he doesn't pay, you know, I'm saying, a substantial amount of

17  money just to keep the financing in place, if he can't get

18  extended, his bid could be lost.  Yeah.  I totally understand

19  that.

20  BY MR. KURTZ:

21  Q    Sir, you've already testified that you don't understand

22  whether his financing expires on August 12th, right?

23  A    No, I just told you I understood it could expire, yes.

24  Q    Okay.  And you don't understand -- you don't have enough

25  familiarity with the debt documents to know whether or not

1  even the debt could stay around after August 12th, right?

2  A    No.  The only provision I read in there is that if he pays

3  --

4  Q    Sir, I'm just asking whether you know or not.  Do you --

5         MR. LEBLANC:  Objection.  Asked and answered.

6         THE COURT:  Sustained.

7  BY MR. KURTZ:

8  Q    Could RBE close a transaction without equity financing?

9  A    No, I don't believe they could.  Absolute not.

10  Q    Okay.  And so if the equity financing, in fact, expires on

11  August 12th, then that puts the Debtor at great risk, correct?

12  A    Well, it puts that deal at risk.  I don't know what it

13  puts the Debtor at risk, but it puts the deal --

14  Q    Well, you've --

15  A    -- with Mr. Greenberg at risk, yes.

16  Q    You've just testified for some period of time about the

17  importance of having bidders, right?

18  A    Yes.

19  Q    So, clearly, it's a problem if this bid expires, right?

20  A    Well, no one wants to lose a bidder, no.

21  Q    So it's a problem if the bid expires, right?

22  A    Yes.  Losing a bidder is a bad thing.

23  Q    That's right.  It's bad for the Debtor, right?

24  A    Well, it's bad for the sale process.  I mean, if they come

25  -- if this Debtor did not sell for three months, I don't know

1  if it's the end of the world.  Okay?  So --

2  Q   So let me stop you there.  You don't know because --

3           MR. LEBLANC:  Objection, Your Honor.

4           MR. KURTZ:  -- you don't have the requisite

5  experience --

6           THE COURT:  Okay.

7           MR. KURTZ:  -- or informa...

8           THE COURT:  Let's -- one at a time.

9           MR. LEBLANC:  I just think the witness should be

10  permitted to finish his answer.

11           THE COURT:  If the Greenberg-Ryan Group went away,

12  you would consider that a negative effect on the case.  Is

13  that true?

14           THE WITNESS:  Yes, Your Honor.

15           THE COURT:  All right.  Go ahead, Mr. Kurtz.  Move

16  on.

17  BY MR. KURTZ:

18  Q   And as it stands today, of course, the RBE agreement is

19  being used as a stalking horse, right?

20  A   Correct.

21  Q   And a stalking horse is a positive for a sale process,

22  correct?

23  A   Corr...

24           MR. LEBLANC:  Objection, Your Honor.  If he's -- is

25  he asking for an expert conclusion, just generally?  I don't

1   -- I don't understand the question.

2          MR. KURTZ:  Your Honor, I'm finding these objections

3   to be, you know, basically without legal foundation, more of

4   an opportunity to argue.  They are disruptive, and I would ask

5   that counsel be limited to raising an objection with a legal

6   ground and not to continue to treat this like it's a

7   deposition.

8          THE COURT:  Well, --

9          MR. KURTZ:  It's cross-examination.

10         THE COURT:  Well, if I understood Mr. Leblanc's

11  objection, it was that you're treating Mr. Snyder as an

12  expert.  I'm not sure that you are, and I'm going to overrule

13  the objection.  But I'm not going to constrain any lawyer from

14  making an objection that he thinks he needs to make to protect

15  the record.

16     I would hope, and I would ask all of you to keep this in

17  mind -- and Mr. Leblanc, in particular, as you've pointed out

18  to me many times -- your clients are paying for this, and I

19  suspect it's costing them many, many thousands of dollars per

20  hour.  And the longer this takes, the more that they will wind

21  up paying.  So I would ask you to keep that in mind and make

22  objections both that have foundation and that really matter.

23  And I'm not saying that you haven't been doing that.  I'm just

24  saying keep that in mind.  And I would ask all the parties to

25  keep that in mind.

1      This is a bench trial, again.

2      Mr. Kurtz, I remember a seven-day hearing in which you

3   were on your feet objecting to form about every third

4   question, so that's --

5          MR. KURTZ:  I was actually recalling Your Honor

6   restricting me to identifying the evidentiary rule by number

7   without argument.

8          THE COURT:  I tried that, and it didn't work for a

9   well.

10     (Laughter.)

11         THE COURT:  So it didn't work for the lawyers, and I

12  found that I spent more time looking up the rules than I did

13  ruling on objections.  So you're just going to have to have

14  faith in me that this is a bench trial, and I am going to take

15  that into account when I review the transcript.

16     You may proceed.

17         MR. KURTZ:  Thank you, Judge.

18  BY MR. KURTZ:

19  Q   A stalking horse is a positive transaction to have in

20  connection with trying to realize the best possible value for

21  the assets in a sale process, correct?

22  A   In -- well, not all sale processes.  In this sales

23  process, I think having a stalking horse with other potential

24  bidders is a positive, yes.

25  Q   Right.  It's enough of a positive that you're looking to

1   put together one yourself, right?

2   A   Well, I mean, the banks -- really, the Ad Hoc Committee

3   negotiated most of that, because they were going to have to

4   bridge the financing.  But, yeah, they -- having two people

5   want to be the stalking horse is even better.

6   Q   All right.  So you agree:  A stalking horse is positive

7   for the sale process in this case, right?

8   A   I agree.

9   Q   And stalking horses set a floor on value, don't they?

10  A   Yes.

11  Q   And -- because another bidder can't prevail unless it

12  exceeds the amount that's provided for in a stalking horse,

13  right?

14  A   Correct.

15  Q   And a bidder cannot prevail unless it comes forward with a

16  committed transaction with all terms, correct?

17         MR. LEBLANC:  Objection, Your Honor.  I think the bid

18  procedures set forth the requirements for a qualified bid.

19         THE COURT:  Yes, I believe that that's true.  And

20  also they set forth that he doesn't have to come prepared to

21  close if he's prepared to give up $15 million.

22      Go ahead, Mr. Kurtz.

23         MR. KURTZ:  Okay.

24  BY MR. KURTZ:

25  Q   Now, if the stalking horse expires, then of course the

1  bidders no longer have to exceed the value provided in the

2  deal, right?

3  A   If the stalking horse expires, then what?

4  Q   Then the other potential bidders no longer have to exceed

5  the amount that was set forth in the stalking horse, right?

6  A   Oh, yeah.  They can bid whatever the Debtor is willing to

7  take as their stalking horse bid, yes.

8  Q   They cannot prevail without providing as much money as the

9  stalking horse provided, right?

10        THE COURT:  He's asking you if they no longer have to

11  compete against the stalking horse is a stalking horse goes

12  away.

13        THE WITNESS:  That's correct.

14        THE COURT:  Okay.

15  BY MR. KURTZ:

16  Q   Now, you have no committed transaction at this point with

17  any other potential bidder, right?

18  A   That's correct.

19  Q   You have no bidder that is committed to a purchase price,

20  correct?

21  A   There is no -- there is a bidder committed to a purchase

22  price.  That's Mr. Greenberg.

23  Q   Correct.  Other than Mr. Greenberg, you have no other

24  bidder that has committed to pay a purchase price for the

25  purchase of the assets that are at issue in this motion,

1  right?

2  A    Correct.

3  Q    And you have no bidder that's committed to nonfinancial

4  terms, either, right?

5  A    Correct.

6  Q    And so you're placing at risk the one committed deal

7  that's been determined is the highest and best deal to date in

8  order to chase other bidders that potentially will come in and

9  offer more, right?

10  A    That's correct.  I --

11  Q    All right.

12  A    I polled the banks and they gave me in writing that they

13  would run the risk of losing Greenberg rather than go forward

14  with the process.

15  Q    All right.  You agree that your recommendations and your

16  approach in this case are based on what the banks are asking

17  you to do, right?

18  A    No.  I said that that's one -- that's one point.  In other

19  words, up where I am at the parent company, the only money

20  that flows up there is the equity money that goes to the Bank

21  Groups.  And I polled them and they actually said that they

22  would risk losing Greenberg and having to start from scratch

23  rather than accept his bid in the form that it was done.

24  Q    It was the Lenders that you polled about whether they

25  wanted the sale to go forward, right?

1   A    Correct.

2   Q    And you've adopted the Lenders' view about whether or not

3   the sale should go forward, right?

4   A    I had the what?

5   Q    You have adopted the Lenders' view about whether or not

6   the sale should go forward, right?

7   A    Well, no.  I view that a sale process -- I already said a

8   sale process -- I think if Judge Nelms grabbed the bidders and

9   put together a sales process, I would endorse that.  I'm not

10  sure the banks would, but I would.

11  Q    By putting -- well, strike that.  By permitting

12  potentially the RBE deal to expire, you are putting an

13  enormous amount of faith in the ability to sell the assets at

14  a higher value to a potential new bidder, right?

15  A    Correct.

16  Q    So let's find out from you who these new bidders are that

17  we're putting so much faith in.  Who are they?

18           MR. LEBLANC:   Objection, Your Honor.  I think this is

19  wholly inappropriate.  I think it's inconsistent with the bid

20  procedures.  I also think it's inappropriate to air this type

21  of testimony in open court.

22       To the extent that there is any question about whether

23  this process could chill bidding, which is the objection that

24  we had to producing this in discovery to Rangers Baseball

25  Express, asking this witness or any witness to identify the

1  other bidders who he is in discussions with we believe is

2  wholly inappropriate.  There is no more chilling prospect than

3  requiring real-time communications with bidders to be aired in

4  open court.

5          MR. KURTZ:  Your Honor, I have a number of responses.

6  First, this witness has testified at length about the

7  potential bidders, and I don't know if there's more or not

8  then Mr. Beck and Mr. Crane, but he's already been testifying

9  about potential bidders.  So that's been opened on direct.

10      Two, the CRO and the Lenders are taking the position that

11  a committed deal that's been determined to be the highest and

12  best should be permitted to expire in favor of the potential

13  for new bidders, and they have a burden of proving there is a

14  prospect, but beyond a prospect, that there is a probability,

15  maybe a certainty, that there will be new bidders at a higher

16  number, which requires that these new bidders be identified.

17      And at this time, nobody is trying to ask any questions

18  that would chill the process.  At this point, the only

19  question on the table is who these bidders are, from an

20  identification standpoint.  I don't know what the secret is.

21  There's no secret to RBE.

22          THE COURT:  All right.

23          MR. KURTZ:  There's no secret to Crane.

24          THE COURT:  All right.  I'm ready to rule on this.

25  You can answer as to Mr. -- until further questioning gets to

1  the point where I think you should stop and it's objected to,

2  you can answer with respect to Mr. Beck and Mr. Crane.  You

3  may also answer in generalities as to whether there are any

4  other bidders of whom you are aware, without naming them.

5      And the reason why we are doing that is because, under the

6  existing bidding procedures, we don't advertise who the

7  bidders are until Major League Baseball has cleared them.  And

8  unless there is someone else that's been cleared that I am not

9  aware of, Beck and Crane are the only two that have been

10  cleared.  Is that correct, Mr. Snyder?

11             THE WITNESS:  Yes.

12             THE COURT:  All right.

13  BY MR. KURTZ:

14  Q   Is Mr. Crane one of the potential new bidders that you're

15  relying on in this case?

16  A   Yes.

17  Q   Is Mr. Beck one of the potential new bidders that you're

18  relying on in this case?

19  A   Yes.

20  Q   Is there any other potential new bidders that you're

21  relying on in this case?

22  A   There's -- there's been another one represented here in

23  the courtroom, but they can't say who they're with, but there

24  is another one that's been pretty public.

25      And I need to correct you on one thing you said.  You

1    misquoted me to the Judge.  You said that I was relying on a

2    higher bid to let the Greenberg offer expire, and that's not

3    what I said.

4    Q    No, I never said that.

5    A    Well, yes, you did.  You told the Judge that.

6              THE COURT:  All right.  All right.  All right.

7    Again, I'm going to look at the transcript.  I'll know who

8    said what.

9         I think I understand what you're saying, which is you'd

10   rather run the risk that there will be a higher bidder than go

11   through with the Greenberg-Ryan deal if you think that the

12   Greenberg-Ryan deal has not been adequately subjected to a

13   market test.  Is that a correct statement?

14             THE WITNESS:  Yes, Your Honor.

15             THE COURT:  All right.  Please proceed, Mr. Kurtz.

16             MR. KURTZ:  All right.  The --

17             THE COURT:  I don't want arguments between the

18   witness and the lawyer.

19             THE WITNESS:  Uh-huh.

20             THE COURT:  Okay?

21             MR. KURTZ:  Your Honor, I accurately characterized

22   what my question was.  It was for a potential higher bidder.

23   BY MR. KURTZ:

24   Q    Is Mr. Cuban an interested potential bidder?

25             MR. LEBLANC:  Object.  Your Honor, I object.  I think

1   we may have to -- and what I might suggest, Your Honor, is we

2   clear the courtroom, seal the transcript.  I think we're --

3   there's a clear effort.  I mean, there's no question, by the

4   person asking the question, they would like nothing more than

5   to chill the bidding, and that's exactly what they're trying

6   to endeavor to do here.

7           MR. KURTZ:  Your Honor, that is --

8           MR. LEBLANC:  And by airing in open --

9           MR. KURTZ:  -- unprofessional and offensive.

10          THE COURT:  Shh.  One at a time.

11          MR. LEBLANC:  By airing in open court -- they're

12  trying to air in open court the process by which other parties

13  may be interested in bidding on the assets.  To the extent

14  that the Court doesn't reconsider, then we're living under the

15  bid procedures.  To the extent the Court does, --

16          THE COURT:  Okay.  That's fine.  I understand.

17  Response?

18          MR. KURTZ:  Your Honor, Mr. Cuban has been identified

19  in the press for weeks as having been a potential bidder in

20  the process.  I have seen his name come up in discovery that's

21  been produced in this case.  So I -- so the idea that this is

22  a secret is false.

23          THE COURT:  Well, it doesn't --

24          MR. KURTZ:  The idea that there's a --

25          THE COURT:  It doesn't make any difference.  We're

1   going to abide by what I said before.  You can -- he is aware

2   that there is an actual human being or entity that has

3   indicated an interest in bidding.  You can -- he can answer

4   generally to that effect, and not on the basis of "Mr. Jessup

5   is in the courtroom representing someone and I have no idea

6   who it is."

7       If you actually have been contacted by another bidder

8   other than Crane, Beck or their representatives, you may

9   answer that you have been contacted by another bidder.

10      You may further inquire, if you wish, Mr. Kurtz, into

11  whether or not he's done any investigation to determine the

12  financial capability of that bidder and whether he has been

13  convicted or it has been convicted.  For example, if it's

14  British Petroleum.  If it is someone that we would not want

15  owning a Major League Baseball team.

16      (Laughter.)

17          THE COURT:  Or perhaps a drug cartel in Mexico.  You

18  may inquire in that vein to the extent that he has knowledge,

19  but we're not going to mention any names in court.  And I

20  adjure you that I have not always found that the media is the

21  most reliable source for hard facts in this case.

22          MR. KURTZ:  Thank you, Your Honor.

23  BY MR. KURTZ:

24  Q   Mr. Snyder, am I correct in understanding that you are

25  relying on three potential new bidders:  Mr. Crane, Mr. Beck,

1   and somebody that we're not going to identify at this point?

2   A   Well, I think the Judge said in generalities.  We have

3   been contacted by somebody that does represent Mr. --

4   Q   Sir, I'm just asking whether it's three, four, five or

5   six.

6   A   Well, then there's -- I got contacted by another group

7   that said they were interested and -- and I gave them some

8   general parameters, I pointed them to the Web site, they could

9   look up the prices that are out there and whether they were,

10  you know, in the mood to pay over $500 million for a baseball

11  team.

12  Q   So --

13  A   And I --

14  Q   -- are you saying there are four persons that you have

15  spoken with about potentially bidding?

16  A   Four new ones, correct.  That's correct.

17  Q   "New ones" meaning Mr. Crane, Mr. Beck, and two

18  additional?

19  A   Correct.

20  Q   All right.  We'll refer to the first potential additional

21  bidder as Bidder 1, or Putative Bidder 1, and the second one

22  you referred to as Putative Bidder 2.  Is that understandable

23  to you?

24  A   Okay.

25          THE COURT:  So we have Crane, Beck, and Putative 1

1  and Putative 2, for purposes of your examination.  Is that

2  correct?

3           MR. KURTZ:  Correct.

4           THE COURT:  All right.  Go ahead.

5  BY MR. KURTZ:

6  Q   Mr. Crane participated in the initial auction process,

7  correct?

8  A   Are you talking about the one that culminated in January

9  of this year?

10 Q   Are you aware of any others?

11 A   Well, there was -- remember, we tried to get another one

12 going and we couldn't, right, the postpetition one.  So I

13 guess we're talking about the prepetition one, right?

14 Q   Yes.

15 A   Okay.

16 Q   Yes, Mr. Snyder.  Do you understand that there was a

17 process that marketed, negotiated and ultimately documented

18 the sale of the organization that is at issue in this lawsuit?

19 A   Yes.

20 Q   Okay.  And Mr. Crane participated in that sale process,

21 correct?

22 A   Correct.

23 Q   So he was provided with all of the due diligence that was

24 provided to RBE, correct?

25 A   Correct.

1   Q    He was provided months of opportunity to take due

2   diligence, correct?

3   A    Correct.

4   Q    And he was also provided with months of opportunity to

5   negotiate the nonfinancial terms of a transaction, correct?

6   A    Correct.

7   Q    And he has had months of time to review the purchase

8   agreement with RBE, correct?

9   A    Correct.

10  Q    And he's had months of time to evaluate and determine

11  whether he's prepared to accept a transaction on the same

12  nonfinancial terms, correct?

13            MR. DEWOLF:  Objection, Your Honor.  Can I take the

14  witness on *voir dire*, whether he has a foundation as to what

15  Mr. Crane was able to do prepetition in the bidding process?

16  This witness doesn't have any personal knowledge of this and

17  he's being asked to commit to what Mr. Crane was given

18  prepetition.  This is not the right witness.

19            MR. KURTZ:  This is a witness that is here taking the

20  position in this case, Your Honor, based on his understanding

21  of what the bidding procedures' impact will be on bids and the

22  availability --

23            THE COURT:  Okay.  Okay.  I'm going to overrule the

24  objection, but I understand that at some point Mr. Crane or

25  someone competent to speak to what his involvement in the

1  case, both prepetition and postpetition, has been will

2  testify.  But I do think Mr. Snyder's understanding of Mr.

3  Crane's situation, both prepetition and currently, is relevant

4  to the case today.

5          MR. DEWOLF:  As long as it's his understanding, Your

6  Honor.  Thank you.

7          THE COURT:  Yes.  I understand that.  Go ahead.  And

8  you understand.  I'm not  -- and Mr. Kurtz, you understand.

9  I'm not necessarily accepting this as evidence of what Mr.

10  Crane's position was.  I'm accepting it as evidence of Mr.

11  Snyder's assumptions.  All right?

12          MR. KURTZ:  That's correct, Your Honor.

13          THE COURT:  All right.  Go ahead.

14          MR. KURTZ:  I mean, they are free to call a witness

15  if they dispute the understandings.

16  BY MR. KURTZ:

17  Q   Mr. Snyder, Mr. Crane has had months and months to pull

18  together financing if he wants to purchase the assets at

19  issue, correct?

20  A   A month.  Let's see.  He was contacted on the Friday

21  before the mediation, so that's not a month that he's --

22  Q   Let me be clear.  When Mr. Crane participated in the sale

23  process back in 2009, he had, between then and now, months and

24  months of time to pull together any financing necessary for

25  him to consummate a transaction.

1          MR. DEWOLF:  Objection, Your Honor.

2          MR. KURTZ:  Correct?

3          MR. DEWOLF:  It assumes -- I'm sorry.  The question

4    assumes facts not in evidence as to how long the process went

5    prepetition, when Mr. Crane was involved or was not.  And the

6    testimony is misleading as to any answer because there has

7    been no evidence put on, through this witness or otherwise, to

8    date as to what Mr. Crane's involvement was and when it

9    stopped.  Only Mr. Snyder testifying about when he reengaged

10   in the process with discussions with Mr. Snyder is all we

11   have.

12         MR. KURTZ:  Your Honor, there is no basis for a

13   dispute, and we will adduce all the evidence we need that Mr.

14   Crane participated in a process back in 2009.  If that's

15   seriously being denied, I think that speaks to --

16         THE COURT:  Well, I think that there is -- and I'm

17   going to let Mr. Snyder answer the question, but I think the

18   form is a little bit misleading.  It's my understanding that

19   in January of this year the Rangers and your client entered

20   into an agreement, and I would assume at that point Mr.

21   Crane's enthusiasm to pay fees to a bank or anyone else to put

22   up financing would have stopped or ended, at least until the

23   commencement of this Chapter 11 case.

24       So I'm not sure that your question is not a little bit

25   misleading, but I'm going to let you ask it.  You understand

1  what I'm saying, Mr. Snyder?

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  All right.  So I don't know that --

4          MR. KURTZ:  Okay.

5          THE COURT:  -- he had those six months.

6          MR. KURTZ:  Let me -- let me --

7          THE COURT:  Or five months.

8          MR. KURTZ:  Okay.

9  BY MR. KURTZ:

10 Q   But you understand Mr. Crane had ample time to pull

11 together financing in connection with any bid he was making

12 for the assets at issue back in 2009 and early 2010, correct?

13 A   Correct.

14 Q   And he could go back and revise any such transaction,

15 potentially, if he's really interested in buying the assets

16 now, correct?

17         MR. LEBLANC:  Objection, Your Honor.  Calls for

18 speculation.

19 BY MR. KURTZ:

20 Q   Your understanding, sir?

21 A   That's exactly the problem:  It didn't work.  That's what

22 I testified to earlier.  He thought he could.  So when I

23 called him on Friday, he went to New York, he met with the

24 banks, and they had already given -- the same banks who are

25 financing him are financing Mr. Greenberg.  They had already

1  given commitments to Greenberg.  And so there was a problem.

2  And so that's why, when we convened on the mediation day, just

3  to say he could turn it back on, it didn't work.  He thought

4  it could, but it didn't.

5  Q    All right.

6  A    That did not happen.

7  Q    Sir, do you have any personal knowledge of whether or not

8  Mr. Crane is able to raise financing?

9  A    Well, the only knowledge I have is I was involved in

10  discussions between the existing lenders and Crane, to see if

11  there would be a way to putting a bridge, because the lenders

12  that were in the group earlier in the year, being that they

13  were backing Greenberg at that point, whether or not they --

14  they would have to go back to Committee and decide whether

15  they could issue two loan agreements to two different parties,

16  and whether that could be done in time.  And so the existing

17  lenders, I was involved where they were going to try to step

18  up and see if they could bridge Crane to get a sale done.  So

19  I do have personal --

20  Q    Who are the existing lenders?

21  A    I'm sorry?

22  Q    You keep referring to the term "existing lenders."  Who

23  are you referring to?

24            THE COURT:  Just a minute.

25            MR. LEBLANC:  I just want to make sure, Your Honor,

1    that the witness has a chance to finish his answers.  There

2    was another interruption there.  And I think it's appropriate

3    to let the witness finish his answers.

4         MR. KURTZ:  Your Honor, this cross-examination.  I'm

5    trying to move this along.

6         THE COURT:  Well, I'm inclined to agree.  I don't

7    want you interrupting him, just as I don't want the witness

8    interrupting you or lawyers interrupting each other.

9      You may answer the question.

10        THE WITNESS:  Okay.  The existing lenders, there are

11   two groups.  There's a --

12        THE COURT:  Whose existing lenders are you speaking

13   up, Mr. Snyder?

14        THE WITNESS:  That would be the lenders of my client,

15   the equity -- that guaranteed -- my client that guarantees the

16   debt, and which the sub guarantees for $75 million.  So

17   there's a -- there --

18        THE COURT:  Are you speaking of, when you're speaking

19   of the existing lenders, are you talking about Mr. Leblanc's

20   client and Ms. O'Neil's clients?

21        THE WITNESS:  Yes.

22        THE COURT:  Okay.  Thank you.

23   BY MR. KURTZ:

24   Q   That's all I'm asking, sir.  Is it Monarch and JPM?

25   A   Well, Monarch is only one person out of that whole group.

1  There are about --

2  Q   Okay.

3  A   There's 15 to 20 different banks that are in the first and

4  second lien.  But those are the people -- I guess the best way

5  to define it, they are represented by Mr. Leblanc, but also by

6  Holly O'Neil and --

7  Q   Okay.  I don't need the appearances.  Sir, the First Lien

8  Lenders and the Second Lien Lenders are prepared to offer

9  bridge financing to Mr. Crane in connection with a bid to

10 purchase the assets here at issue?

11 A   Now, those were the conversations I was involved in, where

12 they were putting together --

13 Q   Is the -- is the answer yes?

14 A   -- a bridge financing.  Yes.

15 Q   Okay.

16       MR. LEBLANC:  Your Honor, it's -- again, it's just

17 almost constant interruption of the witness's answers.

18       THE COURT:  Okay.  Go ahead, Mr. Kurtz.

19 BY MR. KURTZ:

20 Q   And the existing lenders have told you that they are

21 prepared to provide the financing to Mr. Crane necessary to

22 support his bid for the assets here at issue?

23 A   I believe, on the proper terms, they would provide bridge

24 financing, yes.

25 Q   Okay.  And they can do that quickly, correct?

1   A    Well, not as quickly as you might think.  That's -- one of

2   the issues was trying to get him up to --

3            THE COURT:  Why don't you say about how long it would

4   take?

5            THE WITNESS:  It would take several weeks for them to

6   pull that together.

7            THE COURT:  Okay.  Go ahead.

8   BY MR. KURTZ:

9   Q    Why would it take several weeks for this large group of

10  lenders to simply commit to provide financing to Mr. Crane if

11  Mr. Crane is a good credit risk who was worthy of the

12  financing?

13  A    I think it has to do with the inter-creditor agreements

14  between the first and second lien, and also the amount of

15  votes they need to extend the credit.  So it's not as simple

16  as, you know, two people going to dinner and agreeing to do

17  this.  There are several banks in that group, and they have to

18  agree to the terms and conditions.  And then, if the second

19  lien participates, what the inter-creditor would look like.

20  So it's a new loan.  It's a new loan.

21  Q    Yes, I see.  I see what you're saying.  You're saying that

22  the First Lien and Second Lien Lenders, that any delay that

23  they would have in extending the financing necessary to permit

24  bidding under the existing bidding procedures is as a result

25  of their own inability to reach an agreement among themselves

1  as to their inter-creditor rights?

2          THE COURT:  Just a minute.

3          MR. LEBLANC:  Objection.  Argumentative.

4          THE COURT:  I don't find it so.  Overruled.

5      What you're saying is it's like herding cats?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  Okay.

8  BY MR. KURTZ:

9  Q   And the First Lien Lenders and the Second Lien Lenders are

10 the cats, right?

11 A   Yes.

12 Q   And if they'd simply stop behaving like a herd of cats and

13 instead cooperate, they could easily put together a commitment

14 to backstop or finance Mr. Crane's bid within the time period

15 provided --

16         THE COURT:  Okay.  Okay, Mr. --

17         MR. KURTZ:  -- in the bidding procedures.  Correct?

18         THE COURT:  Mr. Snyder, wait a minute.

19         MR. LEBLANC:  Objection to the form of the question.

20         THE COURT:  Sustained.

21 BY MR. KURTZ:

22 Q   Your understanding is the only thing preventing the

23 existing lenders from financing a bid for Mr. Crane within the

24 time period allowed in the existing bidding procedures is

25 their own inability to reach an agreement among them about

1  their inter-creditor rights, correct?

2         MR. LEBLANC:  Object to the form of the question.

3         THE COURT:  Sustained.

4         MR. KURTZ:  Your Honor, I'm not sure I understand why

5  I can't adduce this testimony.  It seems critical to me.

6         THE COURT:  I don't -- your -- the --

7         MR. KURTZ:  Under the prevention doctrine and

8  otherwise.

9         THE COURT:  Don't interrupt me, Mr. Kurtz.

10        MR. KURTZ:  I was just trying to complete the

11 thought, Your Honor.  Sorry.

12        THE COURT:  Don't interrupt me.  Do you understand?

13        MR. KURTZ:  I do.

14        THE COURT:  Okay.  Let me put it this way.  Your

15 understanding is it's going to take time to get the various

16 lenders in the First and Second Lienholder Group to agree to

17 terms under which they would lend to Mr. Crane.  Is that

18 correct?

19        THE WITNESS:  That's correct.

20        THE COURT:  And we're talking about about 20

21 entities?

22        THE WITNESS:  I believe so.

23        THE COURT:  All right.  Go ahead, Mr. Kurtz.

24 BY MR. KURTZ:

25 Q   And that's the only -- that's the only matter that would

1  prevent them from financing Mr. Crane within the time period

2  provided under the existing bidding procedures, correct?

3  A    I believe so.

4  Q    And by the way, if the lenders finance Mr. Crane, they

5  will of course obtain fees outside their scope as an equity

6  holder in this case, right?

7  A    I had no visibility on that at all.

8  Q    You have no understanding as to whether the lenders would

9  charge fees in order to extend credit to Mr. Crane?

10  A    Oh, well, I mean, there's -- I don't know -- I never saw

11  the extent of the interest rate.  You know, I was not -- I

12  didn't participate in those conversations.  So I never really

13  saw, you know, the terms of the -- I've never seen the -- I

14  never saw any paperwork between those two entities on what the

15  terms of the debt would be.

16  Q    Do you have an understanding that the lenders would charge

17  interest, which would be a recovery for them outside their

18  scope as equity holders in this case?

19              MR. DEWOLF:  Objection, Your Honor.  Relevance.

20              THE COURT:  Overruled.  Go ahead and answer.

21              THE WITNESS:  Yes, they were negotiating an interest

22  rate.  Absolutely, they would get paid interest, my

23  understanding.

24  BY MR. KURTZ:

25  Q    And what's the amount of the loan, if you know?

1  A    Well, --

2              MR. LEBLANC:  Objection, Your Honor.  We're getting

3  now I think necessarily into the terms of competing proposals,

4  which I don't think is ever going to be appropriate to give to

5  White & Case or Rangers Baseball Express, and certainly not in

6  open courtroom.

7              MR. KURTZ:  Your Honor, I'm just trying to establish

8  the motivations for the lenders in this case.  This is a

9  recovery outside of any position they hold as an equity holder

10 or creditor in this case.  It's economics, it's dollars to

11 them, it would explain some of their behavior here, and I

12 think it's relevant.

13             MR. LEBLANC:  Your Honor, then with that explanation,

14 I question the relevance of the testimony that's being sought.

15 As well, Your Honor, as the appropriateness of it in a forum

16 with Rangers Baseball Express present.

17             THE COURT:  Any response, Mr. Kurtz?

18             MR. KURTZ:  I'm sorry, Your Honor.  I'll just repeat

19 that I think that the amounts that the Lenders would receive

20 outside of their capacity as a party in interest in this case

21 is relevant to the issue of the bidding procedures and the

22 fairness of the bidding procedures.

23             THE COURT:  Okay.  I'm going to sustain the

24 objection.

25             MR. KURTZ:  Okay.

1          THE COURT:  You may proceed.

2    BY MR. KURTZ:

3    Q    Do you know who Mr. Crane is?

4    A    I'm sorry.  Do I know him?

5    Q    Yes.

6    A    I've met him.  I've shook his hand.  I talked to him on

7    the phone several times, if that's what you mean.

8    Q    Do you have some understanding of his net worth?

9    A    No, I do not.

10   Q    Do you know what Mr. Crane does for a living?

11   A    No.  He just invests money, as far as I know.  He sold his

12   logistics company.

13   Q    Do you know his access -- or, strike that.  What's Mr.

14   Crane's ability to raise equity financing in connection with

15   the bid?

16   A    Well, I actually spoke to the MLB about this, and their

17   understanding, back -- and I also spoke to Weil about this.

18   When Crane was bidding back in December or January, the amount

19   of equity that he was raising, what I was told, was well

20   within the range of what his financial net worth was and that

21   -- I was told that was never an issue, the amount of equity he

22   would need to bring to the table.

23   Q    Okay.  So your understanding is Mr. Crane has sufficient

24   net worth to be able to provide himself the equity commitment

25   necessary to bid for the assets at issue in accordance with

1  the existing bidding procedures, correct?

2  A   On the equity side, yes.

3  Q   And is it your understanding that Mr. Crane's net worth is

4  sufficient to cover any debt that he would otherwise choose to

5  raise?

6  A   No.  I never was told that, no.

7  Q   The second bidder that you identified is Mr. Beck,

8  correct?

9  A   Correct.

10 Q   Mr. Beck participated in the initial sale process in 2009-

11 2010, correct?

12 A   Correct.

13 Q   So he too was provided access to the same due diligence as

14 was provided to RBE, correct?

15 A   That's my understanding, yes.

16 Q   And Mr. Beck also has had sufficient due diligence to put

17 himself in a position to bid on the assets here at issue,

18 correct?

19 A   Correct.

20 Q   And --

21       MR. DEWOLF:  I'm going to object.  On this line of

22 questioning, I have the same objection as to Mr. Beck, that

23 it's just Mr. Snyder's understanding, because this witness I

24 don't think has any personal knowledge --

25       THE COURT:  I understand.  Overruled.  You may

1    proceed.

2    BY MR. KURTZ:

3    Q   By the way, going back to -- well, I'm sorry.  Is the

4    answer yes?

5    A   Yes.

6    Q   Do we have an answer?  Okay.  When did Mr. Crane start

7    talking to anybody again about the possibility of making a bid

8    for the assets that are at issue in this motion?

9    A   Oh, I don't know.  Because I know he had spoken to

10   lenders, but my first conversations with Crane happened -- my

11   first conversations with him were after we had spoken with

12   Greenberg and Marty about going forward with a new sales

13   process.  So that's when I spoke to Mr. Crane, at that point.

14   Q   You have no information about when Mr. Crane started

15   speaking to the Debtors or Major League Baseball about

16   continuing to try to purchase the assets at issue?

17   A   Are you talking about after the filing?

18   Q   After the -- an agreement was reached with RBE.

19   A   No.  I don't know.

20   Q   Okay.  So let's move back to Mr. Beck.  Does Mr. Beck have

21   financing available to bid for the assets at issue?

22   A   Not that I'm aware of, no.

23   Q   Do you know what Mr. Beck's approximate net worth is?

24   A   No, I do not.

25   Q   Do you know whether Mr. Beck has any possibility of

1  raising financing to support a bid for the assets at issue?

2  A   My understanding with Mr. Beck was that he believed he

3  could get the financing together with third parties.  He might

4  not necessarily need the existing bridge.  And so he may -- he

5  may need a little more time than Crane, but he -- I don't

6  believe -- from talking to him, he believed he could raise his

7  own third party financing.

8  Q   Mr. Beck believes that he can raise his own third party

9  financing, correct?

10  A   He could raise it.

11  Q   He could?  Did he mention who he could raise that from?

12  A   No.

13  Q   Do you know what Mr. Beck's ability is to raise equity

14  financing?

15  A   I do know some.  I believe that he had a -- I hate to say

16  the number.  I saw it.  But it's a huge -- it's a very large

17  number that he personally committed --

18        THE COURT:  Why don't you say it's about the same as,

19  more than, or somewhat less than the equity in the Greenberg-

20  Ryan did?

21        THE WITNESS:  Okay.  It's less -- his -- just, this

22  is his -- just without anybody else, just his own equity was

23  less than the Greenberg deal.

24  BY MR. KURTZ:

25  Q   Close, though?

1    A    I'm sorry?

2    Q    Close, though?

3    A    They're both nine-digit numbers.  They're big numbers.  I

4    mean, it's -- it's pretty close.  I mean, --

5            THE COURT:  And that's just him personally, as

6    opposed to his partners?

7            THE WITNESS:  Correct.

8            THE COURT:  Okay.  Go ahead.

9    BY MR. KURTZ:

10   Q    So Mr. Beck has the ability to raise nearly the same

11   amount of equity financing -- strike that.  Mr. Beck has the

12   ability to supply nearly the same amount of equity financing

13   himself as is contained in the RBE agreement?

14   A    Well, it's -- it's significant.  I wouldn't say close.

15   It's significant.

16   Q    More than half?

17   A    Yes.

18   Q    More than three-quarters?

19   A    I'm --

20           THE COURT:  I think we've got the picture.

21           MR. KURTZ:  Okay.  Okay.

22           THE COURT:  Keeping in mind that he has partners who

23   he presumably would want more than goodwill from.

24           MR. KURTZ:  Okay.

25   BY MR. KURTZ:

1   Q    And as Judge Lynn has said, Mr. Beck also has access to

2   third parties with an interest that would provide additional

3   equity financing for him?

4   A    Correct.

5   Q    All right.  And in addition to that, Mr. Beck can receive

6   debt financing, to the extent he wants debt financing, from

7   the existing lenders.  Correct?

8   A    Well, no.  Maybe -- I'm not aware of any discussions with

9   Beck and existing lenders to do a bridge, because I thought

10  Beck -- I thought I already testified that Beck thought he

11  could raise the landing from third -- from third party banks

12  without getting a bridge.

13  Q    Okay.

14          THE COURT:  He thinks he's got good enough

15  connections with financial institutions that he could raise

16  his additional financing without the requirement of a bridge

17  loan from the existing lenders.  Is that correct?

18          THE WITNESS:  That's -- that's correct.

19  BY MR. KURTZ:

20  Q    And Mr. Beck could do so within the time periods provided

21  for in the existing bidding procedures, correct?

22  A    Not -- that's not my understanding.

23  Q    Do you know whether or not Mr. Beck could raise financing

24  within the time periods provided under the existing bidding

25  procedures?

1    A    Based on my conversations with him, I am not sure he could

2    do it.

3    Q    You have no personal knowledge that he could not do so,

4    right?

5    A    Correct.

6    Q    Do you know who his lenders are?

7    A    I do not.

8    Q    Do you know whether he's asked his lenders to finance a

9    bid procedure within -- I'm sorry.  Do you know whether he's

10   asked his lenders to finance a bid within the time periods

11   provided for in the existing bidding procedures?

12   A    I have no knowledge of that.

13   Q    And you certainly have no knowledge that he can't raise

14   the debt financing within the time periods provided for under

15   the existing bidding procedures, correct?

16   A    Correct.

17   Q    Putative Bidder #1, has he indicated -- has he had access

18   to due diligence?

19   A    No.

20   Q    Has Putative Bidder #1 made any type of an offer?

21   A    No.

22   Q    Has Putative Bidder #1 indicated it intended to make an

23   offer?

24   A    No.

25   Q    Has Putative Bidder #1 supplied any information that would

1   suggest that he or his group was financially able to

2   consummate on a bid for the assets at issue?

3   A    Yes.

4   Q    Okay.  But what information was supplied?

5   A    It's just, I guess, general knowledge of that person.

6   Q    In other words, you're saying that the person is of such

7   high net worth that -- and such strong connections that he

8   could finance any bid that he would make in connection with

9   the assets here at issue?

10  A    I believe so.

11          MR. LEBLANC:  Objection, Your Honor.  That was -- to

12  the extent that was attempting to characterize what Mr. Snyder

13  just answered, I think it mischaracterizes it.

14          MR. KURTZ:  It's a question on cross-examination.

15          THE COURT:  All right.  Do you understand, Mr.

16  Snyder, are you saying that you think this Putative Bidder #1

17  can make an acceptable bid because, like, let us take as an

18  example Bill Gates, he is reputed to have the net worth

19  necessary to do so?

20          THE WITNESS:  Yes.  In the public.

21          THE COURT:  Yes.

22          THE WITNESS:  Yeah, in the public eye, --

23          THE COURT:  Yes.

24          THE WITNESS:  -- reputed to be that wealthy.

25          THE COURT:  All right.

1  BY MR. KURTZ:

2  Q    In other words, Putative Bidder #1 could finance a bid in

3  the periods provided for under the existing bidding

4  procedures, correct?

5  A    Well, I didn't say that.  I said --

6  Q    Well, I'm asking you that question, sir.

7  A    Oh, you're asking that?  Okay.  No, I -- what I said, I

8  believe they can do it.  Whether they could do it in three

9  weeks, I don't know.  Maybe four weeks.

10 Q    You --

11 A    They might be able to do it.  I don't know.

12 Q    Okay.  You have no reason to believe -- well, strike that.

13 You believe that the person has enough net worth to finance it

14 himself, correct?

15 A    Yes.

16 Q    Is that it?  So he can finance himself a bid between today

17 or two weeks from now or any other time because he doesn't

18 have to herd any cats, right?

19 A    Well, I didn't say that.  I mean, people who have a lot of

20 net worth, they also -- that doesn't mean it's laying around

21 in checking accounts, right?  So, --

22 Q    Well, you --

23 A    You know, I just don't know.  Is it -- I don't -- I'm not

24 aware of whether it would take two weeks or three weeks or

25 four weeks for him to garner the money.  And they'd also have

1  to put some financing in place.  Even if they guaranteed it,

2  they'd still have to put it in place, and that might take two

3  weeks.  So, even if they used some bank financing, they even

4  backstopped, that still has to be put together and syndicated.

5  Q   Has Putative Bidder #1 told you he cannot come up with

6  adequate financing to support a bid within the period -- the

7  existing periods in the bidding procedures?

8  A   They have not said that.

9  Q   Okay.  And obviously Putative -- well, strike that.  Has

10 Putative Bidder #1 provided any form agreement?

11 A   No.  No.

12 Q   Has Putative Bidder #1 commented on the existing

13 purchasing agreement with RBE?

14 A   No.

15 Q   Has Putative Bidder #1 put a price on the assets?

16 A   No.

17 Q   Has Crane put a price on the assets?

18 A   Who?

19       MR. LEBLANC:  Objection, Your Honor.

20 BY MR. KURTZ:

21 Q   Has Crane made --

22       THE COURT:  Just --

23       MR. KURTZ:  -- an offer for the purchase?

24       THE COURT:  Just a minute.  Well, all right.  Finish

25 your existing question --

1        MR. KURTZ:  I --

2        THE COURT:  -- and then let him object.

3        MR. KURTZ:  I was going to make it just a little more

4 precise.

5 BY MR. KURTZ:

6 Q   Did Mr. Crane make a specific offer to purchase the assets

7 at issue?

8        THE COURT:  Okay.  Do you have an objection?

9        MR. LEBLANC:  If it's a yes/no question, I don't.

10 But if it goes any -- even an inch beyond that, Your Honor,

11 then I've got a real problem.

12       THE COURT:  Well, let's hear the answer, then.  Do

13 you have an objection?

14       MR. SOSLAND:  I actually agree with Mr. Leblanc on

15 this one, so I'm alone.

16       THE COURT:  All right.

17    (Laughter.)

18       THE COURT:  Okay.  Answer yes or no.

19       THE WITNESS:  So that's simply yes or no, right?

20       THE COURT:  Yes.

21       THE WITNESS:  Yeah. Yes.

22       THE COURT:  Okay.

23 BY MR. KURTZ:

24 Q   Okay.  Has Mr. Beck specific offer?

25 A   No.

1  Q   Has Mr. Beck indicated an amount he would be prepared to

2  pay for the assets here at issue?

3  A   Mr. Beck?

4  Q   Yes.

5  A   In general terms, yes, but it's not -- it wasn't boiled

6  down to a definitive agreement, no.

7  Q   Has Mr. Crane offered a bid with a definitive agreement

8  attached?

9  A   No, I wouldn't say that.  He gave -- he offered a

10  definitive agreement, but I wouldn't say that was a final bid,

11  no.

12  Q   But there is a form agreement for Mr. Crane that's

13  available?

14  A   It's been produced to Weil, yes.

15  Q   And that sets forth a purchase price?

16  A   Yes.

17  Q   And it identifies the assets that are subject to the

18  purchase?

19  A   Yes.

20  Q   Okay.

21          MR. KURTZ:  And Your Honor, I'm going to ask the

22  question.

23  BY MR. KURTZ:

24  Q   And how much is it?

25          MR. LEBLANC:  Objection.

1        THE COURT:  Sustained.

2        MR. KURTZ:  All right.

3  BY MR. KURTZ:

4  Q    Has Putative Bidder #2 performed any due diligence?

5  Actually, let me go back to Putative -- are you sure Putative

6  Bidder #1 has had no access to due diligence with respect to

7  the Texas Rangers?

8  A    Who are we talking about?  The --

9  Q    Putative Bidder #1.

10 A    Yeah.  What about him?

11 Q    Are you certain he has not had access to due diligence

12 with respect to the Texas Rangers organization?

13 A    Oh, I don't believe so, no.

14 Q    Okay.  And you're certain that he did not participate in

15 the initial sale process?

16 A    I know, I -- you know, he may have.  I don't know.

17 Q    And --

18 A    It may have initially, because there were like nine people

19 initially, so I don't know.

20 Q    Okay.  You don't know?  So therefore you don't know

21 whether Putative Bidder #1 has had access to the due diligence

22 in this case, right?

23 A    Yeah.  I really don't know.  They have signed a CA.

24 Q    Are you aware of the fact that Mr. Cuban has had access to

25 due diligence in connection with the first sales process?

1            THE COURT:  Just a minute.

2            MR. LEBLANC:  Objection, Your Honor.  I think we're

3    -- I thought we had covered this ground, but --

4            THE COURT:  Yes.

5            MR. KURTZ:  I --

6            THE COURT:  What's the basis for your objection?

7            MR. LEBLANC:  The basis for the objection, Your

8    Honor, is that I thought the bid procedures were quite clear

9    that we weren't supposed to identify any other potential

10   bidders besides those that have been preapproved by Major

11   League Baseball.

12           THE COURT:  Well, I don't think he's identified him

13   as a bidder.  But is your objection limited to the bidding

14   procedure requirement?

15           MR. LEBLANC:  Well, it's that.  I'm not sure of the

16   relevance of this, if there's --

17           THE COURT:  Okay.  I'll sustain the objection based

18   on relevance.  If he is a bidder, then you can't talk about

19   it.  If he isn't a bidder, then it's not relevant.  So, either

20   way, you go down in flames.

21           MR. KURTZ:  But that may leave a misimpression on the

22   Court as to the -- who had access to due diligence.

23           THE COURT:  I understand that, and -- but at this

24   point, I'm assuming Putative Bidder #1 is nothing more than a

25   ghost who may or may not take shape, human shape, --

1       MR. KURTZ:  Okay.

2       THE COURT:  -- before us someday.

3       MR. KURTZ:  Okay.

4       THE COURT:  Okay?

5       MR. KURTZ:  And I'll move on.  I was going to ask the

6    question in case Your Honor received this information in

7    camera and would link it together himself.

8       THE COURT:  Okay.

9    BY MR. KURTZ:

10   Q    Putative Bidder #2, has that person had access to due

11   diligence in this matter?

12   A    No.

13   Q    Okay.  Has Putative Bidder #2 made an offer?

14   A    No.

15   Q    Has Putative Bidder #2 committed -- strike that.  Has

16   Putative Bidder #2 suggested any type of nonfinancial terms

17   that would be agreeable?

18   A    No.

19   Q    Has Putative Bidder #2 established its financial ability

20   to consummate a transaction?

21   A    No.

22   Q    Are you familiar with the approximate net worth or

23   standing of Putative Bidder #2 --

24   A    No.

25   Q    -- or its group?  Do you have any information that

1  Putative Bidder #2 will ever have the financial ability to

2  consummate a transaction?

3  A    No.

4  Q    Would you agree that Putative Bidder #2 was also just a

5  ghost in this process?

6          MR. LEBLANC:  Objection, Your Honor.

7          THE COURT:  Well, I'm going to have trouble hitting

8  him on form because I used it before.  But as I understand it,

9  he's a tire-kicker at this point, right?

10         THE WITNESS:  It's two phone calls.

11         THE COURT:  Okay.

12         THE WITNESS:  That's --

13         THE COURT:  So he's a tire-kicker at this point?

14         THE WITNESS:  I wouldn't even put it that far.  It's

15 two phone calls.

16         THE COURT:  Not even a tire-kicker?

17         THE WITNESS:  No.

18 BY MR. KURTZ:

19 Q    He hasn't even walked up to kick the tires yet?

20 A    That's right.

21         THE COURT:  He's saying, "Which league is this team

22 in?"

23     (Laughter.)

24 BY MR. KURTZ:

25 Q    He watched the car drive by?

1  A    Yes.  It's a drive-by tire-kicker.

2       (Static.)

3            COURT RECORDER:  Somebody has a BlackBerry.

4            THE COURT:  Okay.  If anybody has a BlackBerry

5  anywhere near a microphone, you need to get it out of there,

6  because the -- aha.

7            MR. KURTZ:  I had taken it out before the break and I

8  forgot to take it out this time.

9            THE COURT:  Yes.  Yes.

10           MR. KURTZ:  I apologize, Your Honor.

11           THE COURT:  Well, that causes Ms. Maben considerable

12  pain, and I know you don't want that.

13           MR. KURTZ:  I took the ringer off, so at least I'm

14  not going to be sanctioned.

15           THE COURT:  Well, work on it.  You might get there.

16       (Laughter.)

17           MR. KURTZ:  Well, if it will result in a *Donde* essay

18  for Mr. Lauria, I'm happy to accommodate.

19           THE COURT:  Oh, you want him to have an essay?  Good.

20  I'm glad to hear that.

21  BY MR. KURTZ:

22  Q    You testified that you would support the bidding

23  procedures as they exist if simply it would result in two

24  bids, right?

25  A    Absolutely.

1  Q   Okay.  And you have one did in RBE, right?

2  A   Yes.

3  Q   So you're really just looking for a second bidder.  Is

4  that right?

5  A   Correct.

6  Q   And you say you have an offer from Crane, correct?

7  A   Well, it was a stalking horse offer.

8  Q   Okay.  But it would be a bid, right?

9  A   Well, we'd have to go back and talk to him, but it's --

10       THE COURT:  Okay.  Let me ask you, Mr. Snyder.  Is

11 what you're saying that you don't know whether he will make

12 that bid under these bidding procedures?

13       THE WITNESS:  Exactly.

14       THE COURT:  All right.  Go ahead, Mr. Kurtz.

15       MR. KURTZ:  Okay.

16 BY MR. KURTZ:

17 Q   But you have from Mr. Crane an offer that includes the

18 purchase price amount and the nonfinancial terms, the form of

19 the contract, and matters like that, right?

20 A   Correct.

21 Q   And so Mr. Crane is certainly in a position to submit that

22 offer as a bid within the time period provided for under the

23 existing bidding procedures, correct?  If he chooses to do so?

24 A   Well, I don't know that, because that whole -- once the

25 Debtor filed their new motion for the sale process, our whole

1  Crane thing unraveled.  So, you know, I honestly can't say.

2  You could bid in the two weeks, so I'd be lying to say -- I

3  don't know.

4  Q   Well, Crane's evaluated the assets to an extent that he's

5  been able to offer you a transaction, right?

6  A   Correct.

7  Q   So he stands ready and willing -- whether or not he's able

8  -- to bid, correct?

9  A   Well, I'd have to go back to him under a different

10 circumstance, so I'm saying that I've not gone back to him now

11 and said, "Okay, we have this whole new procedure.  What do

12 you want to do?"  So --

13 Q   Let me be more general.  You have Mr. Crane, who has fully

14 evaluated the assets and fully negotiated a transaction which

15 included a purchase price, and that you say he's willing to go

16 forward, at least if it's a stalking horse bid.  Correct?

17 A   He was, yeah.

18 Q   Okay.  So that means he had been able to perform enough

19 work to put himself in a position to be able to bid for the

20 assets, correct?

21 A   Correct.

22 Q   And he's put himself in a position to be able to bid for

23 the assets before August 4th, correct?

24 A   No.  It was beyond August 4th.

25 Q   Well, he -- you're saying he's already bid for the assets,

1  right, to you?

2  A    Well, it was never finalized.  I mean, I don't have a

3  signed document with the escrow agreement and -- all I have

4  are drafts, preliminary drafts of APAs.  I've got preliminary

5  drafts of this, and the financing with the Bank Group never

6  finalized.  So I think it would be a mischaracterization -- I

7  think it would be a mischaracterization to say that guy was

8  plugged in, ready to go.  I'd have to go back and -- I'd have

9  to go back -- we'd have to go -- the Debtor would have to go

10 back, and Marty's kind, to see if there was a way to make that

11 work.

12 Q    I'm not asking whether he will now actually stand behind

13 his offer.  What I'm asking you is, wasn't Mr. Crane able to

14 put together an offer and provide it to you for the assets at

15 issue?

16          THE COURT:  Okay.

17          MR. LEBLANC:  Object to the form of the question.

18 The first half of it was just a -- was just some form of

19 argument, an effort to send a message, I guess, to Mr. Crane.

20 I think that's inappropriate.

21          THE COURT:  Overruled.  You can answer the question.

22          THE WITNESS:  I do not know if Crane could bid and be

23 willing to bid under this bid procedure.  I don't know.

24 BY MR. KURTZ:

25 Q    Sir, that's not my question.

1    A    Okay.

2    Q    Mr. Crane was able to assess all the assets and submit a

3    full and complete offer to buy the company and to do so before

4    July 20th, correct?

5    A    No.

6    Q    He didn't submit a bid to -- an offer to you before July

7    20th?

8    A    No.  I think -- not -- it was not full.  It was a draft of

9    a draft APA, a marked-up APA, and it is -- it's not complete

10   and the financing isn't in place and everything else.

11              THE COURT:  To your knowledge, was Mr. Crane prepared

12   to enter into a commitment, a binding commitment, to buy the

13   assets of TRBP at an earlier date than this?

14              THE WITNESS:  Possibly.

15              THE COURT:  All right.

16              THE WITNESS:  Possibly.

17              THE COURT:  All right.

18              THE WITNESS:  Possibly, we could -- it -- if we -- if

19   the --

20              THE COURT:  In other words, what you're saying is you

21   don't know, if you'd finally reached agreement on the form of

22   the contract, that he would have signed it?

23              THE WITNESS:  Correct.

24              THE COURT:  But you do know that he was working

25   toward the form of a contract that would have committed him.

1  Correct?

2          THE WITNESS:  That's correct.

3          MR. KURTZ:  And he's indicated --

4          THE COURT:  All right.  Proceed, Mr. Kurtz.

5          MR. KURTZ:  Thank you.

6  BY MR. KURTZ:

7  Q   And he's indicated that that's an agreement he'd be

8  prepared to go forward on, correct?

9  A   As long as he had financing, yes.

10  Q   Okay.  So it's still subject to contingencies, right?

11  A   And he was a stalking horse.  So, I mean, it had other

12  conditions to it, you know.

13  Q   Okay.  But I'm going to get to the --

14  A   Okay.

15  Q   -- stalking horse.  But certainly, before today's date,

16  Mr. Crane was able to put together a deal that he says he'd be

17  prepared to enter into, right?

18  A   As long as it had the proper financing and everything

19  else, yes.

20  Q   The financing we could be provided by the existing

21  lenders, right?

22  A   Which they were working on.

23  Q   Yeah.  Okay.  And but the real -- the real problem that

24  you're referring to in his commitment is he wants to be a

25  stalking horse, right?

1  A   That was the deal -- that's the deal that he submitted it
2  on.
3  Q   Right.  In other words, he wants to be paid at this point
4  to put in a bid, right?
5  A   He wanted to be in the lead position.
6  Q   Yeah.  Okay.  But it's a little late to be in the lead
7  position, isn't it?
8          MR. LEBLANC:  Object to the form.  Argumentative.
9          THE COURT:  Sustained.
10 BY MR. KURTZ:
11 Q   And what -- Mr. Crane, has he said to you that he won't
12 bid unless somebody will pay him to bid?
13 Q   He never --
14         MR. LEBLANC:  Objection, Your Honor.  Calls for
15 hearsay.  Argumentative.
16         MR. KURTZ:  It's relevant, Your Honor, to this
17 party's underst...
18         THE COURT:  Yes.  I'm going to let you -- Mr. Snyder,
19 I'm going to let you answer to the extent that you know.  And
20 I thought you had answered before that you do not know whether
21 Mr. Crane would bid if he is not the stalking horse.
22         THE WITNESS:  I do not know if he would or would not.
23         THE COURT:  All right.
24 BY MR. KURTZ:
25 Q   But did he tell you that he would not bid unless he was

1  paid to bid?

2          MR. LEBLANC:  Objection, Your Honor.  It was just

3  asked and answered, and I thought Your Honor formulated a

4  question that was not objectionable and that was answered.

5          THE COURT:  I'm going to let you answer again.  And I

6  don't -- I understand you're saying, among other things, that

7  that's hearsay, but it isn't introduced for the purpose of

8  proving the truth of the statement; it's for his

9  understanding.  So you can go ahead and answer so that we're

10  very clear.

11          THE WITNESS:  He -- Mr. Crane never told me he would

12  not bid unless he was paid, although I don't know if he would

13  offer the amount of money he offered unless he was the

14  stalking horse bidder.

15  BY MR. KURTZ:

16  Q   Okay.  So Mr. Crane certainly indicated to you that he

17  would not offer as high a bid if he wasn't going to be paid

18  for his bid, right?

19          MR. DEWOLF:  Objection.  That mischaracterizes his

20  answer.  He didn't say that.

21          THE COURT:  Okay.  I think we've covered the ground

22  here, Mr. Kurtz.  Why don't you move along?

23          MR. KURTZ:  Okay.

24  BY MR. KURTZ:

25  Q   By the way, if the RBE deal was underpriced, then the

1  market would show up and bid for the assets even without being

2  paid to do so, right?

3  A    Under the current bidding procedure, for someone to come

4  and bid, you're asking if they would require a break-up fee?

5  Q    No, I'm asking whether people would come and bid for

6  assets that were underpriced even if you didn't pay them,

7  through a break-up fee or otherwise, to submit a bid.

8           THE COURT:  And let's -- yes, Mr. Leblanc?

9           MR. LEBLANC:  Calls for speculation, Your Honor.

10          MR. KURTZ:  Again, Your Honor, this witness is

11  testifying about how he thinks a sales procedure should go

12  forward, so his understanding as to how a sales procedure can

13  go forward and does go forward is certainly relevant.

14          THE COURT:  Whether it's relevant doesn't mean it's

15  not speculation.

16      I am going to allow you to answer whether, in your

17  opinion, leaving aside these bidding procedures, if the

18  Express offer is too low, would other bidders be prepared to

19  come forward, regardless of whether they were the stalking

20  horse?  In other words, if the Rangers are worth $600 million

21  as opposed to let's call it $520 million, would you -- is it

22  your opinion that, nonetheless, no other bidders would come

23  forward?

24          MR. LEBLANC:  Your Honor, can I just make sure the

25  clarification -- your qualification is clear that it's not

1    under these bid procedures but at any point in time?

2              THE COURT:  Yes.  We're talking about generally.

3              THE WITNESS:  Generally, given the right amount of

4    time, I believe you could get another bidder for these assets,

5    yes.

6    BY MR. KURTZ:

7    Q   By the way, there's a limited universe of people who are

8    either qualified or willing and able to purchase a

9    professional sports franchise like the Texas Rangers, correct?

10   A   Oh, I believe it's a very exclusive club, yes.

11   Q   Yeah.  And in fact, the same -- the very same people who

12   participated in the first process are back now participating

13   in connection with this motion, right?

14   A   Well, there were nine people in the first process, from

15   what I was told, and six dropped out, three stayed in.  I have

16   not spoken to the other six to see if they would come back.  I

17   don't know.

18   Q   There was a broader group of people that were marketed to

19   in the first sales process, correct?

20   A   Oh, yes.

21   Q   And it included those that are still expressing putative

22   interest in the assets, right?

23   A   Yes.

24   Q   Okay.  And we've been through a month-long sales process

25   that was run by a well-regarded investment bank, Perella

1  Weinberg, right?

2            MR. LEBLANC:  Objection.  There's a lot in there to

3  object to.  I don't -- I'm not sure I know what time it is.  I

4  don't think he needs to characterize -- if he wants to ask a

5  question about Perella, he can do so.

6            THE COURT:  I'm not sure -- I don't think Mr. Snyder

7  has personal knowledge of that.  If you -- it seems to me you

8  can elicit that elsewhere better than you can from Mr. Snyder.

9            MR. KURTZ:  Okay.

10 BY MR. KURTZ:

11 Q   Do you agree, at least, the sale of the Texas Rangers

12 hasn't been any kind of secret, right?

13 A   Oh, it has not been a secret, no.

14 Q   It's been very well publicized, correct?

15           THE COURT:  Okay.

16           THE WITNESS:  Yes.

17 BY MR. KURTZ:

18 Q   So anybody who has had a real interest in purchasing the

19 assets has had the ability to come in and make offers, right?

20           THE COURT:  Okay.  Mr. --

21           THE WITNESS:  Well, no.  I --

22           THE COURT:  Mr. Kurtz and -- I'm sorry, Mr. Snyder.

23 I need to ask you.  In the next -- you've got about three or

24 four minutes, and then we're going to have to recess so that I

25 can go out to North Richland Hills for the consumer debtors.

1          MR. KURTZ:  Okay.

2          THE COURT:  All right?

3          MR. KURTZ:  Okay.  Thank you, Judge.

4          THE COURT:  Okay.  Go.  Go ahead.  I'm sorry.  And I

5    interrupted, so the witness -- but I was having trouble

6    getting a word in edgewise there.  You may need to repeat your

7    question for Mr. Snyder.

8          MR. KURTZ:  You know what?  I'm going to move on.

9    BY MR. KURTZ:

10   Q   The delay in this case, --

11         MR. DEWOLF:  Your Honor, I'd like the witness to

12   answer that question, if the court reporter could read it

13   back.  Because he started to give his answer --

14         MR. KURTZ:  Your Honor, I --

15         MR. DEWOLF:  -- and I think his answer was no.

16         MR. KURTZ:  I wonder what makes counsel believe that

17   he's going to control my cross-examination.

18         THE COURT:  Well, --

19         MR. KURTZ:  I've withdraw my question.  I'm going to

20   proceed.

21         THE COURT:  You're going to be free to ask Mr. Snyder

22   the same question, if you wish to.

23   BY MR. KURTZ:

24   Q   Mr. Snyder, delay doesn't benefit the Debtor, correct?

25   A   Doesn't what?

1  Q   Delay does not benefit the Debtor, correct?  Delay --

2  strike -- remaining in bankruptcy for a longer period of time

3  does not benefit the Debtor, correct?

4          MR. STRUBECK:  Your Honor, just for clarification

5  purposes, I'm assuming that the Debtor is Texas Rangers

6  Baseball Partners, because we have more than one.

7          THE COURT:  I believe that that's the case that is

8  before the Court at this point.

9          THE WITNESS:  I'm -- at this point, I'm not sure, you

10  know, if this -- the Debtor is ahead on their cash flow and

11  they're winning and they're doing fairly well.  I'm -- and

12  they picked up a great pitcher coming in now.  I'm not sure

13  that this team is a melting ice cube.  You know, I've run

14  melting ice cubes.  I know what they look like.  And so I'm

15  not sure that this Debtor staying in bankruptcy an extra month

16  or even two is like the end of the world for this Debtor.  So

17  I --

18  BY MR. KURTZ:

19  Q   Sir, do you think the Debtor's stay in bankruptcy resulted

20  in its ability to acquire Cliff Lee in a trade?

21          MR. LEBLANC:  Objection, Your Honor.

22          THE COURT:  Just a minute.

23          MR. LEBLANC:  He was still in the middle of his

24  answer.

25          THE COURT:  I thought he was done, but that's okay.

1  Did you have something more to say?

2          THE WITNESS:  Oh, and I was just generally saying I

3  think most debtors, most debtors, because of the cost and

4  expense and that, you do want to get out.  But there are

5  instances where staying in and having a better process or

6  riding out a commodity curve or something like that makes

7  sense.  So I don't think you can just -- and on this club, I'm

8  not sure that --

9  BY MR. KURTZ:

10  Q   So you --

11  A   -- staying in bankruptcy is -- a little more time is going

12  to hurt it that much.  That's all I'm saying.

13  Q   Did you analyze what the impact of what the stay in

14  bankruptcy has been on the Debtors' operations?

15  A   No, because I --

16  Q   Okay.  Are you an expert in --

17          THE COURT:  Okay.  Now, you've been told before.

18  Don't interrupt him.  If you ask him a question, let him

19  answer it.  And just each of you talk in turn, if for no other

20  reason than for the sake of Ms. Maben.  Okay?

21      All right.  Go ahead and finish your answer, Mr. Snyder,

22  and then you may follow up, and then we're going to recess.

23          THE WITNESS:  According to my assignment, I have no

24  direct responsibility for operations in any way, shape or

25  form.

1  BY MR. KURTZ:

2  Q   So my question is simply, you have not studied and don't

3  have any expertise to make a determination that a stay in

4  bankruptcy is not harming the team and the Debtor, correct?

5  A   I have not totally analyzed that, no.

6  Q   And certainly when you spoke about a trade for Cliff Lee,

7  was it your understanding that the Debtor's stay in bankruptcy

8  resulted in their ability to trade for Cliff Lee?

9  A   I didn't even know they traded him.

10          THE COURT:  Okay.

11          THE WITNESS:  I didn't know it until I heard it on

12  the press, so --

13          THE COURT:  Okay.  We're going to recess for lunch.

14          MR. KURTZ:  Okay.

15          THE COURT:  I will expect you back here at 1:15,

16  because I cannot predict the traffic and other things.  We may

17  wind up starting a little bit later than that, but we'll start

18  as soon as we can.  All right?

19          MR. KURTZ:  Thank you, Judge.

20          THE COURT:  We'll be in recess.

21          THE CLERK:  All rise.

22    (A luncheon recess ensued from 11:57 a.m. until 1:16 p.m.)

23          THE COURT:  Please be seated.  All right.  Mr. Kurtz,

24  you may proceed.

25          MR. KURTZ:  Thank you, Your Honor.

1  WILLIAM K. SNYDER, RANGERS EQUITY HOLDINGS' WITNESS, PREVIOUSLY SWORN

2                       CROSS-EXAMINATION, RESUMED

3  BY MR. KURTZ:

4  Q    Mr. Snyder, I noticed you were having a conversation with

5  attorneys who then caucused to my left.  Did you talk about

6  the substance of your testimony?

7  A    I'm sorry?  Did I talk to them about my testimony?

8  Q    The substance of your testimony?

9  A    Yes.

10 Q    Are you aware of a rule that would prevent you from

11 discussing the substance of your testimony while you were

12 still on the stand?

13 A    Yeah.  Well, no, I talked with my attorney, --

14 Q    Okay.

15 A    -- Lou Strubeck.

16 Q    Okay.  Can you tell me what he said to you and what you

17 said to him?

18 A    Yes.  Lou and I talked about he thought I did very well on

19 the stand.  And I stick -- I was calm, collected.  And, let's

20 see, we talked about --

21 Q    This happened about two minutes ago, right?

22 A    I'm sorry?

23 Q    You had this conversation two minutes ago, right?

24 A    No.  I was talking about Strubeck during lunch asked me

25 that.

1   Q   Okay.  Well, I just saw counsel to my left speak to you

2   two minutes ago, then proceed over to counsel table and have a

3   lengthy conversation with his colleagues.

4   A   Oh.

5   Q   What was that about?

6   A   Okay.  I'm sorry.  That was -- I thought you were talking

7   about what I talked my counsel about during lunch.  No, we --

8   he asked me if I had produced an e-mail, if I had produced an

9   e-mail -- or, what correspondence I produced to -- from the

10  Lenders about the fact that they would be willing to let the

11  Greenberg deal fall away for a different process.  That's what

12  he asked.

13          MR. LEBLANC:  Judge, just so the record is clear, I

14  didn't have any conversation with Mr. Snyder.  I've been

15  sitting here.

16          MR. KURTZ:  No, it was --

17          MR. LEBLANC:  So I'm not quite sure what counsel is

18  suggesting.  I've been sitting here with Mr. Stewart the whole

19  time.

20          MR. KURTZ:  No, who was the gentleman who was talking

21  to you?

22          THE WITNESS:  That was -- that's -- I -- that's --

23          MR. STRUBECK:  Mr. Steindorf?

24          THE WITNESS:  Yes.

25          MR. STRUBECK:  Okay.

 1  BY MR. STRUBECK:

 2  Q   Now, you testified that there were certain aspects of the

 3  APA that made it hard for new bidders to compete or to make

 4  bids, right?

 5  A   On the what, now?  I'm sorry.

 6  Q   You testified that there were certain aspects of the APA

 7  that had a chilling effect on new bidders, right?

 8  A   On the current -- from the Greenberg APA?

 9  Q   Yes.

10  A   Yes.

11  Q   You mentioned the 757 lease, right?

12  A   On the original bid, yes.  There was a -- there were some

13  --

14  Q   Sir, I'm just asking if that's -- if you mentioned that.

15  A   I did say that.

16  Q   Okay.  Now, are you aware that an amendment to the APA was

17  filed along with the bidding procedures that resolved the 757

18  lease issue?

19  A   Yes.

20  Q   Okay.

21  A   In the revised bid, they have resolved that issue.

22  Q   Okay.  So that's not an issue at all anymore, right?

23  A   No.

24  Q   All right.  You mentioned the break-up fee, right?

25  A   Yes.

1  Q   Okay.  A break-up has absolutely no impact on what a

2  purchaser will pay, correct?

3  A   Well, it -- well, the only impact a break-up fee has is

4  how much they have to overbid --

5  Q   Sir, my question is, do you agree that a break-up fee is

6  not relevant to what somebody's prepared to bid for?

7          THE COURT:  I assume you mean, --

8          THE WITNESS:  No.  I don't --

9          THE COURT:  -- counsel, except to the extent that it

10  requires or sets the amount of and overbid?

11          MR. KURTZ:  Sure.

12          THE COURT:  Okay.

13          THE WITNESS:  Yeah.  The break-up fee requires an

14  overbid, and it -- a break-up fee can be chilling.  It can be

15  so big that the next guy doesn't want to overbid that much.

16  BY MR. KURTZ:

17  Q   Well, if a break-up fee is so large that no one will

18  overbid, then you're saying that you wouldn't have got that

19  large a bid to begin with, right?

20  A   (no immediate response)

21  Q   If somebody won't pay the amount of the stalking horse

22  plus the overbid protection, that's because they haven't

23  offered that much money, right?

24  A   Correct.

25  Q   Okay.  And here, the break-up fee is 2 percent of the

1  transaction fee?

2  A    $10 million of $500 million.   Yeah.

3  Q    About 2 percent?

4  A    Yeah, about 2 percent.

5  Q    Two percent is not a chilling number, right?

6  A    I don't believe so.

7  Q    Okay.  And it's certainly consistent with or less than

8  typical break-up fees in cases, right?

9  A    Yeah.  Most break-up fees in this circuit tend to be 2 to

10  3 percent.

11  Q    Okay.  So this is well within the range of typical break-

12  up fees, right?

13  A    Yes.  Absolutely.

14  Q    And the break-up fee would be paid out of the proceeds for

15  the purchase of the assets, right?

16  A    Correct.

17  Q    So it would be paid by the lenders or the equity holders

18  here, not by any of the possible bidders, right?

19  A    Well, it just comes out of the proceeds.  Yes.  Yes.

20  Q    Okay.  You mentioned the stadium leases and the office

21  building leases, right?

22  A    Yes.

23  Q    You said something about both are subject to fraudulent

24  conveyance actions, right?

25  A    Correct.

1  Q    But those were assets that were transferred to the Debtor,

2  correct?

3  A    Correct.

4  Q    And those are assets that are valuable to the Debtor,

5  correct?

6  A    Correct.

7  Q    And in fact, those are assets that need to be sold along

8  with the other assets, correct?

9  A    Yes.

10  Q    So whether you go through the plan confirmation process or

11  you go through the 363 sale that you favor, those stadium

12  leases and those office building leases have to be included in

13  the assets that are subject to the transaction, right?

14  A    Yes.

15  Q    You mentioned overdraft protection, correct?

16  A    I'm talking about the overdraft protection note that was

17  transferred.  Is that what you're talking about?

18  Q    Yes.

19  A    Yes.

20  Q    Okay.  That's -- the claim for overdraft protection is a

21  claim by Mr. Hicks, right?

22  A    Correct.

23  Q    In his personal capacity, right?

24  A    Correct.

25  Q    And you are free to object to this claim, correct?

1  A   Well, --

2          MR. LEBLANC:  Objection, Your Honor.  I think that

3  calls for a legal conclusion.

4          THE COURT:  Sustained.

5  BY MR. KURTZ:

6  Q   Do you have an understanding that you will be free to

7  object to Mr. Hicks' claim for any amounts in connection with

8  the overdraft protection?

9          MR. LEBLANC:  Same objection, Your Honor.  I think

10  that's totally inconsistent with the terms of the stalking

11  horse bid --

12          THE COURT:  Well, I'm --

13          MR. LEBLANC:  -- and with the plan that's our

14  proposal.

15          THE COURT:  To the extent that he has an

16  understanding, I'm going to let him answer.

17      But let me assure you, before you even get up, Mr.

18  Strubeck, that there will be an opportunity one way or another

19  to object to any claims by any insider, at least, and there

20  will be an opportunity to object to releases and other things,

21  regardless, and -- to the extent that they don't affect the

22  purchaser, and that I will not approve any releases,

23  indemnities or otherwise inconsistent with *Pacific Lumber*.

24  All right.  Go ahead, Mr. Kurtz.

25          MR. KURTZ:  Okay.

1  BY MR. KURTZ:

2  Q   Certainly, based on your other -- whatever prior

3  understanding you had and based on the statement by the Court,

4  you understand you have the ability to object to that claim by

5  Mr. Hicks, right?

6  A   I understand that --

7          MR. STRUBECK:  Your Honor, I'm going to object

8  because it's also inconsistent with the order that resulted in

9  the recognition of Mr. Snyder's retention in his capacity as

10  the CRO for the Ranger Equity Holding entities.

11         THE COURT:  Well, someone is going to be able to

12  object to those, and I think that, since you're trying -- I

13  presume, Mr. Kurtz, the person that you're trying to persuade

14  is me, and I'm persuaded of your point, --

15         MR. KURTZ:  Okay.

16         THE COURT:  -- I don't see that you need to spend a

17  lot of time with --

18         MR. KURTZ:  Okay.

19         THE COURT:  -- Mr. Snyder on it.

20         MR. KURTZ:  Understood.

21         THE COURT:  I think Mr. Leblanc and Mr. Stewart and

22  their colleagues have proven sufficient competence to bring a

23  claim objection, if that's appropriate.  And I don't mean to

24  talk down to you, Mr. Leblanc.

25         MR. LEBLANC:  No.  And I wanted the Court to be aware

1  that I believe that over the weekend, if not on Friday, that

2  that claim objection to Hicks' overdraft protection was in

3  fact filed.

4         THE COURT:  All right.  Go ahead, Mr. Kurtz.

5         MR. KURTZ:  Okay.

6  BY MR. KURTZ:

7  Q   And you mentioned the claim for the payment of financial

8  advisors, right?

9  A   Yes.

10 Q   And, likewise, that's a claim by Mr. Hicks?  Or a non-

11 debtor affiliate?

12 A   Yes.  A non-debtor affiliate.

13 Q   Okay.  And subject to the same type of objection, right?

14 A   Correct.

15 Q   And so that won't actually chill any bidders, correct?

16 A   No, I don't believe it will.

17 Q   All right.  The amounts that are being paid by RBE in the

18 event of a closing are available no matter how they're

19 distributed, correct?

20 A   Correct.

21 Q   All right.  And I think the last thing you identified was

22 indemnifications.  You understand that a bidder would be free

23 to make a bid under the existing bidding procedures and

24 exclude the indemnifications that are included in the stalking

25 horse bid, correct?

1    A    Yes.  I think, under 363, I think that those -- because

2    there are indemnifications built into the APA, and -- for

3    instance, there's an indemnification in the purchase of the

4    land, which is a non-debtor, and there's an indemnification

5    from the Debtor to a non-debtor.  So there are some

6    indemnifications woven through those APAs.

7    Q    Yeah.  My question is, can -- and new bidders can decline

8    to offer those indemnifications, right?

9    A    Yes, as long as it wasn't pursuant to the plan, too.

10   Q    Right.

11   A    In other words, if they just did a straight-up 363, they

12   could redline those out.

13   Q    So is your understanding that bidders could not come in,

14   new bidders could not come in with an offer under the bidding

15   procedures, exclude the indemnities and simply price the

16   transaction any way they want, subject to the Debtor and the

17   Court's consideration of what's the highest and best bid?

18   A    Yes.

19   Q    They could do so?

20   A    I think under the new procedures they can bid under 363

21   instead of the plan.

22        THE COURT:  To be clear, they also -- to the extent

23   that they make an offer that they wish to make under a plan as

24   opposed to a 363 sale, I would anticipate that the Debtor

25   would entertain such an offer, even if it would require

1  modification of the plan, to the extent that the modifications

2  would fit within Rule 3019.  And the modifications that we're

3  speaking of here would I think fairly clearly fit within Rule

4  3019.

5          MR. KURTZ:  Okay.

6  BY MR. KURTZ

7  Q  So, again, the issue with respect to indemnifications is

8  not in fact going to chill bidding, correct?

9  A  No.  No.

10 Q  And all of the issues that you've identified speak to the

11 distribution of the bidding proceeds, not the bids themselves,

12 correct?

13 A  All of the issues you -- well, not all the issues.  I told

14 you the timing was an issue.  But if you --

15 Q  No, all the issues we've discussed since we've been back

16 from lunch?

17 A  Yes.  Uh-huh.

18 Q  Thank you.

19 A  They would not chill the bidding.

20 Q  Okay.

21         MR. KURTZ:  No further questions, Judge.

22         THE COURT:  All right.  Mr. Strubeck, I believe --

23 well, now wait a minute.  I'm sorry.  Major League Baseball?

24 No questions?

25         MR. ESSERMAN:  No questions, Your Honor.

1          THE COURT:  All right.  Mr. Strubeck?

2          MR. STRUBECK:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. STRUBECK:

5    Q   Mr. Snyder, just a couple of follow-up questions to some

6    of the questions that Mr. Kurtz and Mr. Sosland asked you.

7    You've never run a baseball team before, correct?

8    A   No, I never have.

9    Q   And --

10   A   Well, not a major one.  Little League, you know.

11       (Laughter.)

12   A   I don't want to lie here.  I've run little guys, yeah.

13   Q   Do you believe that the scope of your employment as the

14   Chief Restructuring Officer for the Ranger Equity Holding

15   entities permits you to do anything in terms of operating the

16   Texas Rangers?

17   A   No.  It's very clear that Mr. Nolan runs the Rangers, Mr.

18   Nolan Ryan, and I am overseeing the bankruptcy issues.  It's

19   very clear.

20   Q   When you say you're overseeing the bankruptcy issues, what

21   are you focusing on?

22   A   Well, right now, I'm focusing on the plan and the bidding

23   procedures and trying to get a fair process.  So I'm not -- I

24   don't talk to Mr. Ryan or the CFO at all about operations.

25   Q   Say, so, for example, the Cliff Lee trade, you didn't have

1  anything to do with that, did you?

2  A   It surprised me as much as everybody else.

3  Q   And the fact that the Rangers have the best record in

4  baseball since they filed for bankruptcy, you have nothing to

5  do with that either, do you?

6  A   No.

7  Q   All right.  You talked about a fair process.  This

8  bankruptcy case, the Texas Ranger bankruptcy case, was filed

9  when?

10 A   I think May 24th, something like that.

11 Q   All right.  And at that time, there was a plan that was

12 filed, too, correct?

13 A   Correct.

14 Q   And under that plan, what was the proposal, if any, as to

15 who the Texas Rangers should be sold to?

16 A   Well, at that time, it was an exclusive deal with

17 Greenberg --

18 Q   All right.

19 A   -- when they filed that plan.

20 Q   And was it your understanding that the reason that

21 Greenberg and the Greenberg Group was identified in the plan

22 as being the purchaser of the Rangers because they emerged

23 from the pre-bankruptcy process that involved the marketing of

24 the Rangers?

25 A   Yes.

1  Q   And did you form a conclusion in the three weeks-plus

2  you've been involved as to whether that pre-bankruptcy process

3  was in your mind a fair process?

4  A   Well, I --

5        MR. KURTZ:  Objection.  The witness testified on

6  cross-examination that he wasn't familiar with who

7  participated and wasn't familiar with the extent of due

8  diligence and the like.  I don't see how he can speak now and

9  offer an opinion as to the prior process.

10        THE COURT:  Mr. Strubeck?

11        MR. STRUBECK:  Your Honor, I think there are a lot of

12  questions Mr. Kurtz posed as to the highest and best offer in

13  terms of what Mr. Greenberg has proposed, and --

14        THE COURT:  Yes, but I cut off -- and Mr. Leblanc's

15  objection, I cut off Mr. Snyder's testimony with respect to

16  that process, so I'm going to sustain the objection.  You can

17  move on.

18        MR. STRUBECK:  All right.

19  BY MR. STRUBECK:

20  Q   Mr. Snyder, what is your position regarding whether a sale

21  of the Rangers should go forward?

22  A   Oh, I believe a sale is the best way to resolve these

23  issues under 363, as long as it provides that you will have at

24  least two bidders.  So I believe that it is absolutely the

25  best way to resolve this issue.

1   Q    And do you have in your mind a process that would increase

2   the likelihood that there will be more than one bidder to

3   purchase the Rangers?

4   A    I think the best way to do it is get all these bidders

5   back in a room with Judge Nelms and these bidding procedures

6   and find out how they can be tweaked to get the most people to

7   the table quickly, and then go ahead and have the auction and

8   ensure -- and then you can honestly say that it was a fair

9   process and it was a fair market process.  And that would

10  resolve the taint around this plan right now.

11  Q    You were asked a question toward the very end that had to

12  do with the 757 airplane lease issue.  Do you recall that

13  question?

14  A    Yes.

15  Q    And you were asked whether that issue had been, quote,

16  "resolved" as a result of the amendment -- the APA that was

17  filed recently.  Do you remember that?

18  A    Correct.

19  Q    What did you mean by it had been resolved?

20  A    Well, from my understanding, the new bid, that airplane

21  lease will not be going forward after a certain period of

22  time.  And so the -- Greenberg is not going to have to take

23  over, you know, pay $27 million of payments on a 757.  And he

24  also increased his bid, too, for that.  I mean, the new bid

25  that Greenberg offered at closing, at closing, had

1  substantially more money coming to the banks, almost I think

2  20 -- almost $17-1/2 million more than the original did.

3  Q   But when you said that the lease issue had been resolved

4  as a result of the amended APA being filed, you weren't

5  suggesting that the transfer of the lease down to the Rangers

6  had been resolved, had you?

7  A   Oh, no, not that part of it.  That's still got to be

8  resolved.  And so the Rangers still are a party, I guess, to a

9  charter agreement for a 757 that they're on the hook for for,

10  you know, almost 30 million bucks.

11  Q   All right.  I think I have just a handful of more

12  questions to ask you.  You're familiar with the bid procedures

13  that are currently the procedures that are in place, which is

14  why we're here today, to talk about whether they should remain

15  in place, right?

16  A   Correct.

17  Q   And is it your understanding that based upon those bid

18  procedures a prospective purchaser would have to purchase all

19  of the assets that the current APA from the Greenberg Group

20  requires be purchased?

21  A   I don't believe so.

22  Q   And in fact, based upon your discussions and

23  communications with other potential bidders, do you understand

24  that they may be interested in purchasing less than the assets

25  that are currently provided for under the Greenberg APA?

1  A    Yes.

2  Q    And why do you say that?

3  A    Well, I mean, the biggest issue are the parking lots.

4  Greenberg is buying the parking.  That's why Kurtz said, you

5  know, the total deal was $580 million and I --

6  Q    That's Mr. Kurtz you're referring to?

7  A    Yeah, Mr. Kurtz.  And I said, "No, I think it's $520

8  [million]."  It's the rest are the parking lots that are being

9  bought from a Hicks-controlled entity separately.  And some of

10 the other bidders don't feel they need to buy the parking

11 lots; they can just lease them under the current arrangements.

12 And the City of Arlington has ordinances on all that parking

13 -- on all that -- most of that land that requires whoever owns

14 it to provide parking to the Rangers.  So some of the other

15 bidders don't feel it's necessary to even buy the parking

16 lots.

17      So that's why it's -- it's very important that people be

18 able to pick and choose the assets, because some people will

19 not entertain negotiating with Mr. Hicks for the parking.

20 They'll rely on the ordinances and the leases.

21 Q    But that's one part of -- and you've testified earlier as

22 to why you believe that the bid procedures aren't going to

23 have the effect that was, I believe, intended by Judge Lynn,

24 and that was to stimulate bidding.  But one aspect of the bid

25 procedures that Judge Lynn has approved that you would agree

1  with is that other purchasers get to decide what assets they

2  want to buy, correct?

3  A   Absolutely.  That is a critical component and absolutely

4  critical to this deal.

5  Q   All right.

6         MR. STRUBECK:  Your Honor, I pass the witness.

7         THE COURT:  Mr. Leblanc?

8         MR. LEBLANC:  Your Honor, just a couple of topics.  I

9  think I've learned not to say "questions," but a couple of

10  topics.

11        THE COURT:  I've always found that one of the least

12  true statements in the English language is the lawyer who

13  says, "I have just one more question, Your Honor."  So now

14  we're all -- yes.

15        MR. LEBLANC:  That's why I try to say one more topic.

16  Yes, Your Honor.

17        THE COURT:  All right.  Go ahead.

18                      RECROSS-EXAMINATION

19  BY MR. LEBLANC:

20  Q   Just a moment ago, Mr. Snyder, you testified that the

21  current -- the new amended APA provides $17.5 million more in

22  value to the Lenders.  Is that what you testified?

23  A   At closing.

24  Q   At closing?  And let's just break that down just a little

25  bit.  There were two fundamental changes.  One was the

1   expiration or the termination of the continued assumption of

2   the aircraft lease.  Is that right?

3   A   Correct.

4   Q   And what was the amount of the savings that you estimated?

5   Or the amount of the costs avoided by the Greenberg Group

6   going forward?

7   A   Well, I think Greenberg increased their cash by $2-1/2

8   million.  I'm trying to remember this.  And then they reduced

9   their escrow -- was it $15 million?  I'm sorry.  Or was it $12

10  [million]?  I'm trying to remember it.  But they reduced their

11  escrow and they increased the cash, and so at closing more

12  money flows to the Lenders at closing under the revised bid.

13  Q   Right.  So, and one portion of that was an increase in the

14  amount of money that they're actually going to show up at

15  closing, right?

16  A   Correct.

17  Q   And that was approximately $2.5 million?

18  A   Correct.

19  Q   And you mentioned a minute ago in some colloquy with Mr.

20  Strubeck with respect to the aircraft lease that they're now

21  not assuming, the amount of savings over time, I think you --

22  the number you used was $27 million that they're not spending

23  over time.  Is that correct?

24           THE COURT:  Just a minute.

25           MR. SOSLAND:  Objection, Your Honor.  I believe that

1    that mischaracterizes the testimony of Mr. Snyder.

2              THE COURT:  All right.  Why don't you move back and

3    --

4    BY MR. LEBLANC:

5    Q   How much was the airplane going to cost the Greenberg

6    Group if they owned the Rangers over the life of that lease?

7    A   Well, from what I understand, the lease payments were $27

8    million.  Now, you realize they're still now going to have to

9    lease a charter airplane, so it's not a hundred percent

10   savings.  Okay?  So after they're done with this, they're

11   going to have to go charter an airplane from somebody.  So,

12   yes, they're saving $27 million on that airplane, but I don't

13   believe the net savings is $27 million.

14   Q   Okay.  Do you have any estimate of what that net savings

15   is?

16   A   No, I do not.

17   Q   Okay.  And the other change is a reduction in the amount

18   of the money that -- from their purchase that's being put

19   aside in -- put aside for escrow.  Is that right?

20   A   That's correct.

21   Q   And what's the purpose of escrow account?

22   A   Well, it's -- originally, this was going to be done out of

23   a bankruptcy, and so the Greenberg APA had a certain amount of

24   money escrowed for contingent liabilities and the such.

25   Right?  I guess in a bankruptcy it's much less important

1  because you're buying it free and clear of liens, encumbrances

2  and claims.  So, but the original APA did -- it has an escrow

3  for unforeseen claims, you know, and stuff like that.  So

4  they'd have a way to -- they'd have some kind of an escrow to

5  hit against if something pops up.

6  Q   Okay.  And that, as part of the most recent offer, is

7  being reduced to some number, either $15 or $12 million?

8  A   I'm trying to remember if it's $12 or $15 [million].  It's

9  -- I thought it was $15 [million].  Maybe it's $12 [million].

10 But those -- that number is being reduced and they increased

11 the cash.  So --

12 Q   And you had a discussion with Mr. Kurtz about other

13 purchasers could choose not to take, for example, and I'll

14 give one example, the indemnification agreement.  Do you

15 recall asking questions about that?

16 A   Well, yeah.  There's -- in the APA, there are some

17 indemnifications, but there's also an indemnification

18 agreement.  You know, that's separate.  I don't think they'd

19 be buying that.  But they're in the asset -- in the APAs,

20 there are some indemnifications, and they could scratch those

21 if they chose.

22 Q   And how would you value eliminating indemnifications for

23 Mr. Hicks as part of this process?

24 A   Well, it's a lot more complicated than that, because you

25 also have indemnification agreements that the Debtor entered

1    into on the night before the filing.  So I think that's a

2    really complicated question that I can't answer because you

3    would have to look at the indemnifications in that agreement

4    versus the APA and how they all wrap together, and then you

5    even have a non-debtor entity, you know, that's involved.

6    That's pretty complicated.  It's a lot more complicated than

7    we could figure out in two weeks.

8    Q    And another -- you also had some questions asked of you

9    about the Hicks overdraft payment of $5.7 million.  Do you

10   recall those questions?

11   A    Yes.

12   Q    And is -- it's my understanding of your testimony that

13   another purchaser could come in and choose not to pay, as part

14   of its APA, that $5.7 million.  Is that right?

15   A    That's correct.

16   Q    Now, how would you value the nonpayment of the $5.7

17   million on the overdraft?

18   A    Well, and if they all knocked it out, you know, you give

19   them all credit, right, that hopefully you can knock that out

20   later on.  If a buyer was going to actually assume it, it's

21   something that the company may not have to pay in the future,

22   so you might actually give somebody credit if they were going

23   to actually specifically assume that.  But if they weren't

24   going to assume it -- I can't imagine anybody would -- but if

25   they did, you would have to give them credit for paying that.

1   You know, if they assumed that liability and didn't leave it

2   behind.

3   Q    So if a buyer, for example, said, "I don't need to pay the

4   Hicks overdraft protection agreement as part of my bid," they

5   could come in and make a bid on that basis, correct?

6   A    Absolutely.

7   Q    And would that -- how would -- would that make it their

8   bid more favorable on a -- just comparing those two terms than

9   the Greenberg deal which requires the payment of that

10  overdraft protection?

11  A    Well, --

12       MR. KURTZ:  I'm going to object to form.  I mean, the

13  Debtor is going to make that decision and the Court is going

14  to make that decision.  Maybe the witness would have a view as

15  to how it would impact his vote, but he certainly doesn't know

16  what would be required.

17       MR. LEBLANC:  Your Honor, the bidders are asked to

18  come in and put in a $15 million overbid, and this presumably

19  would factor into how they would consider it, and I would

20  expect that other people who don't have the same issues as the

21  Greenberg Group wouldn't necessarily jump at the chance to pay

22  or cause the Debtor to pay the $5.7 million out of proceeds,

23  as one example.

24       THE COURT:  Well, all right.  It seems to me that

25  under the existing bidding procedures, which is what we're

1   talking about today, among the people who are evaluating the

2   bid will ultimately be Mr. Snyder.  And therefore how he would

3   evaluate the bid that included or excluded that $5.7 million

4   would have some relevance.  So I'm going to -- and keeping in

5   mind, for both of you, Mr. Kurtz and Mr. Leblanc -- am I

6   correct that you haven't analyzed the likelihood of prevailing

7   or losing on an objection to that overdraft claim?

8          THE WITNESS:  Correct, Your Honor.  I have not had

9   the time to --

10          THE COURT:  All right.

11          THE WITNESS:  -- determine whether that's really an

12   avoidable transaction yet.

13          THE COURT:  All right.  So, keeping in mind that he

14   can't give you a straight answer, I'm going to allow the

15   question.  I mean, he's not going to be able to give you a

16   number.

17          MR. LEBLANC:  I think, Your Honor, we've sort of

18   highlighted what the problem is here.  For bidders to come

19   into this, to know what a $15 million overbid is, if they

20   exclude these liabilities, they don't know if they're $15

21   million or higher.

22          THE COURT:  Well, at some point, he's going to have

23   to evaluate it, and that would be true in any bidding process.

24   You're always going to have some differences like that.

25      But go ahead, Mr. Leblanc.

1          MR. LEBLANC:  Okay.

2   BY MR. LEBLANC:

3   Q   And similarly with respect to the payment of the financial

4   advisors.  Do you understand that the payment of the financial

5   advisors of $9 million is a requirement of the Greenberg APA?

6   A   I believe so.

7          MR. KURTZ:  I'm going to object to the

8   characterization of the agreement.  I mean, there's no -- Your

9   Honor has already said that these are all subject to

10  objections, and it has nothing to do with bidding.  It has to

11  do with distribution of proceeds after Your Honor makes

12  determinations about what claims are allowed and what claims

13  aren't allowed.

14         THE COURT:  All right.  Go ahead, Mr. Leblanc.  I

15  think he already answered the question, so there's not much

16  sense in sustaining the objection.  Go ahead.

17         MR. LEBLANC:  Well -- okay.  That's fine, Your Honor.

18  BY MR. LEBLANC:

19  Q   And a bidder who dispensed with the obligation by the

20  Debtor to pay those $9 million in professional fees, would

21  that be a -- just on those two non-economic -- or, those two

22  non-cash terms, which would be the more attractive bid, the

23  one that required it or the one that did not?

24  A   I honestly don't know that answer today.

25  Q   Okay.  Now, you testified about a meeting on the past

1    Friday, not this past Friday but the Friday before, with

2    respect -- with Mr. Lauria, Mr. Sosland, and I guess Mr.

3    Greenberg was there, too?

4    A    Yes.

5    Q    Okay.  And that --

6    A    In Fort Worth.

7    Q    I'm sorry.  Go ahead.

8    A    Yeah.  In Fort Worth, I think.

9    Q    And that meeting is the one that followed the status

10   conference or the chambers conference that we had here in

11   court.  Is that right?

12   A    Yes.

13   Q    How did that meeting end?

14   A    We -- we ended up walking out of the meeting.

15   Q    And why did --

16   A    Well, it didn't -- and it wasn't a happy meeting.

17   Q    And why did you walk out of the meeting?

18   A    Well, it's just a lot of harsh words were exchanged and it

19   turned into an acerbic meeting and we walked out.

20   Q    And then the next -- did you have any further discussions

21   with Mr. Lauria or Mr. Greenberg between walking out of that

22   meeting on Friday and when the bid procedures were proposed by

23   the Debtor on Tuesday morning, the following Tuesday?

24   A    Yes.

25   Q    When did you have those discussions?

1   A   I was in the hotel getting an affidavit signed, and Mr.

2   Greenberg came down and he -- he was very polite.  He said,

3   "I'd like to just talk to you."  And I said, "Okay."  And he

4   started asking about the bidding -- about the bids.  You know,

5   what was the issue with the bid on the timing, what was the

6   issue with Crane?  So we started talking about some issues

7   about the bids.  And we spoke for probably 20 minutes.

8   Q   And when did that discussion happen?

9   A   That was right after we stormed out of the other meeting.

10  Q   Okay.

11          MR. LEBLANC:  Okay.  No further questions, Your

12  Honor.

13          THE COURT:  All right.  Mr. Sosland?

14          MR. SOSLAND:  No questions, Your Honor.

15          THE COURT:  Mr. Kurtz?

16          MR. KURTZ:  I have nothing further either, Your

17  Honor.

18          THE COURT:  All right.  Anyone else?

19      (No response.)

20          THE COURT:  All right.  I've got some questions for

21  you, Mr. Snyder.

22                  EXAMINATION BY THE COURT

23          THE COURT:  To your knowledge, have -- in the time --

24  well, first of all, let's take the time since the 13th, which

25  was when we had the hearing on bidding procedures last week.

1  Right?  A week ago today?

2           THE WITNESS:  Yes.

3           THE COURT:  Since the 13th of July.

4           THE WITNESS:  Yes.

5           THE COURT:  Have Beck and Crane continued to advance

6  their due diligence or other efforts in connection with the

7  purchase of the Rangers, to your knowledge?

8           THE WITNESS:  Not to my knowledge, Your Honor.  I

9  have not spoken to Mr. Crane since -- since the Debtor filed

10 the new bid procedures.

11          THE COURT:  All right.  So you don't know whether

12 they have or not?

13          THE WITNESS:  I don't --

14          THE COURT:  Is that correct?

15          THE WITNESS:  So I don't know where -- I think he's

16 very mad.  I don't know where he's at on the process, no.

17          THE COURT:  All right.  Is Mr. Crane's impediment to

18 doing a deal just financing, or are there other impediments?

19          THE WITNESS:  Financing is -- I believe the major

20 impediment is getting a bank group in there to -- in enough

21 time to bid properly.

22          THE COURT:  All right.  What if the bidders tell you,

23 "We need until June of 2011"?  Would you consider that

24 reasonable?

25          THE WITNESS:  You know, I would -- I would actually

1  have to take that under consideration, because MLB has run

2  teams for a very long time, and the question is, if you were

3  going to come out with a process that would be fair and it

4  would also not involve insiders and dealings and stuff like

5  that, and you had to wait, June is unfortunate.  I mean, I

6  would think this fall would be better.  This fall, before the

7  start of the next season.

8       THE COURT:  Well, don't you think that there ought to

9  be some time limit on how long this Chapter 11 case goes on?

10      THE WITNESS:  Well, I would think the logical thing

11  would be to get somebody in place before the end of this

12  season, for next season.  So I would think that is -- that

13  would be a critical factor, is to get somebody in place so

14  that they can have a meaningful, you know, impact on next

15  year.

16      THE COURT:  All right.  You're counsel did state on

17  the record, as Mr. Sosland, I think, pointed out, and you said

18  several times that the bidders have indicated to you that they

19  need a few more weeks.  Now we're talking about a year.

20      THE WITNESS:  Correct.  I mean, I've been told by the

21  bidders that -- needed weeks.  This was not a thing of a year.

22  It was weeks, always.

23      THE COURT:  All right.  All right.  Let me ask you.

24  This is a question that runs to other testimony.  You, as you

25  have noted in your testimony, have filed pleadings seeking

1 substantive consolidation of the equity partners with this

2 Debtor, correct?

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  And why didn't you seek to have the

5 entire Hicks Sports Group declared the alter ego of this

6 Debtor?

7          THE WITNESS:  Your Honor, my scope is these two

8 entities for today.  You know, today.

9          THE COURT:  Yes.  But you're familiar -- I know

10 you're familiar with the *SI Acquisition* case, which says that

11 essentially the estate, which would be the estate in which you

12 are CRO, has, as property of the estate, the ability to assert

13 an alter ego claim against non-debtors, right?

14          THE WITNESS:  Oh, Your Honor, we -- I did not discuss

15 that with my counsel.

16          THE COURT:  Okay.

17          THE WITNESS:  To be honest with you, we focused on

18 this Debtor, my debtor and the debtor below us, and determined

19 that we believed, just in that one instance, there's

20 sufficient data -- I'm sorry, sufficient evidence to warrant

21 looking at --

22          THE COURT:  Well, but your testimony was, the entire

23 group, there was sufficient evidence.  I think you indicated

24 in your testimony that companies upstream from the two

25 entities for which you are CRO would be subject to the same

1   arguments.

2          THE WITNESS:  That may very well be the case, yes.

3          THE COURT:  All right.  Mr. Snyder, you have

4   experience in valuing litigation, don't you?

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  So you understand the methodology of

7   calculating a likelihood of success and using that likelihood

8   of success to determine the value of a given claim, right?

9          THE WITNESS:  Yes, Your Honor.

10          THE COURT:  All right.  All right.  Now, I have a

11   number of questions to ask you.  We prepared in chambers, my

12   law clerks prepared in chambers a comparison of the deal that

13   you negotiated with Baseball Express and the Debtor and the

14   bidding procedures that I put into place last week.  All

15   right?  And I want to talk about those for a few minutes.  All

16   right?

17          THE WITNESS:  Okay.

18          THE COURT:  Now, the first thing is that, as I

19   understand it, the deal that you negotiated with Express did

20   not allow for the possibility of pursuing a sale under Section

21   363.

22          THE WITNESS:  Correct.

23          THE COURT:  Okay.  And the procedures that I directed

24   be in place does make such provision, right?

25          THE WITNESS:  Yours -- do you have a better

 1   procedure, yes.

 2          THE COURT:  All right.  And that would require,

 3   presumably, and I assume the Debtor would do this, filing more

 4   or less a shell 363 motion, invoke that, so that we follow

 5   notice procedures, right?

 6          THE WITNESS:  Yes, Your Honor.

 7          THE COURT:  All right.  Now, we talked before about

 8   the ability to include or to exclude assets from the sale of

 9   the plan, and you didn't provide for that in your deal, did

10   you?

11          THE WITNESS:  Well, I did provide that the bidders

12   could submit a marked-up APA, so in the mark-up they could

13   exclude assets.  That was a major issue, and a hotly argued

14   one, with --

15          THE COURT:  All right.  And that's pretty well

16   resolved in the existing bidding procedures, isn't it?

17          THE WITNESS:  Yes, it is.

18          THE COURT:  Okay.  And the existing bidding

19   procedures require only that another bidder must substantially

20   follow for bid purposes the form of the APA and the amendment

21   to it, right?

22          THE WITNESS:  Correct.

23          THE COURT:  And otherwise the sale that ultimately is

24   negotiated, if the bidder is successful, he may enter into a

25   contract in whatever form he chooses, so long as it embodies

1  the bid he's made, right?

2          THE WITNESS:  Correct.

3          THE COURT:  All right.  Now, under your procedures,

4  there had to be MLB approval prior to bidding, right?  That's

5  qualification; I'm sorry.  MLB qualification.  Right?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8          THE WITNESS:  Yes, that's correct.

9          THE COURT:  All right.  However, under the procedures

10 that I imposed, the approval, number one, was automatically

11 accorded to Beck and Crane, understanding that other members

12 of their group might be required to submit additional

13 paperwork to prove that they're up to date.  Right?

14         THE WITNESS:  That's correct.

15         THE COURT:  Okay.  And the existing bidding

16 procedures also say that Major League Baseball and the Office

17 of the Commissioner may not unreasonably withhold

18 qualification, right?

19         THE WITNESS:  That's correct.

20         THE COURT:  Okay.  Yours didn't provide that, did it?

21         THE WITNESS:  No, it did not.

22         THE COURT:  Okay.

23         THE WITNESS:  They could be unreasonable in mine.

24         THE COURT:  Okay.  And who decides under the existing

25 procedures whether MLB has acted reasonably?

1              THE WITNESS:  I believe that rests with the Court.

2              THE COURT:  Okay.  And how quick?  Did you provide

3    for quick qualification in your procedures?

4              THE WITNESS:  No, we did not.

5              THE COURT:  Okay.  And in the procedures that we now

6    have in place, that's provided, isn't it?

7              THE WITNESS:  Yes, Your Honor.

8              THE COURT:  All right.  Now, with respect to MLB

9    sales clearance, again, if -- under the existing procedures,

10   unlike yours, as I understand it or as I recall, the bidding

11   procedures provide that if Major League Baseball has

12   previously approved someone, qualified someone, and now

13   changes its mind, that will be presumed to be unreasonable,

14   subject to them having an opportunity to show me why they

15   changed their minds.  Right?

16             THE WITNESS:  That's correct.

17             THE COURT:  Okay.  Okay.  Now, in the bids in the

18   auction, how much was the break-up fee under your procedures?

19             THE WITNESS:  It was up to $15 million.

20             THE COURT:  All right.  And how much is it under the

21   bidding procedures?  $10 million or 125 percent of actual

22   costs, right?

23             THE WITNESS:  Correct.

24             THE COURT:  Okay.  How much was the overbid under

25   your procedures?

1              THE WITNESS:  Well, that would have been $20 million.

2              THE COURT:  Okay.  How much is --

3              THE WITNESS:  It was a $5 million overbid.

4              THE COURT:  Okay.  How much more than under --

5              THE WITNESS:  Yours is $15 [million].  Less.

6              THE COURT:  Okay.  Now, your sale procedures required

7    that any bidder's offer be no more contingent than the asset

8    purchase agreement, right?

9              THE WITNESS:  Right, as determined by Perella.

10             THE COURT:  All right.

11             THE WITNESS:  Uh-huh.

12             THE COURT:  And under the existing bidding

13   procedures, there is an exception to that, isn't there, where

14   effectively a bidder can buy time if he's the successful

15   bidder to put financing in place, right?

16             THE WITNESS:  That's correct.

17             THE COURT:  Okay.  So a $15 million deposit -- by the

18   way, under Mr. Crane's prior offer, not necessarily the one in

19   this case but under his prior offer last year, did he have a

20   deposit that he was prepared to forfeit?

21             THE WITNESS:  I believe there was $10 million.

22             THE COURT:  Okay.  Maybe it was.  All right.  Under

23   your bidding procedures, any bid must be made by the bid

24   deadline, right?

25             THE WITNESS:  Correct.

1        THE COURT:  And under the existing procedures, that

2   can be extended by the Court, right?

3        THE WITNESS:  That's correct.

4        THE COURT:  Okay.  Under your bidding procedures,

5   financial backing could be no more contingent than that in the

6   Express deal, right?

7        THE WITNESS:  Correct, as determined by Perella.  We

8   were relying on them.

9        THE COURT:  Right.  Right.  And now it's you that

10  determines it, along with the Debtor, right?

11       THE WITNESS:  Correct.

12       THE COURT:  Okay.  And also the contingency on

13  finances is subject to the $15 million deposit exception,

14  right?

15       THE WITNESS:  That's correct.

16       THE COURT:  Okay.  Your bidding procedures provided

17  for closing on or soon after July 22md, right?

18       THE WITNESS:  Correct.

19       THE COURT:  Okay.  And these bidding procedures

20  provide for closing by August 16th, unless the Debtor and the

21  general partners agree otherwise, right?

22       THE WITNESS:  Correct.

23       THE COURT:  And that's subject to the fact that, with

24  that $15 million deposit, the bidder can extend the time to

25  mid-October, right?

1          THE WITNESS:  That's correct.

2          THE COURT:  Okay.  Okay.  Now, under the -- the

3    deposits that were going down before, under your bidding

4    procedures, would become an asset of the Texas Rangers, right?

5          THE WITNESS:  Correct.

6          THE COURT:  And it would pass to the buyer, so that

7    if -- the successful bidder, whoever that was, would get

8    whatever deposits remained on hand, right?

9          THE WITNESS:  That's correct.

10          THE COURT:  Okay.

11          THE WITNESS:  Uh-huh.

12          THE COURT:  Now the deposit becomes part of the

13    estate and therefore runs to the benefit of the Lenders if it

14    is forfeited, right?

15          THE WITNESS:  Correct.

16          THE COURT:  Okay.  Under your bidding procedures, the

17    auction and confirmation was going to be July 22nd, right?

18          THE WITNESS:  I believe so.  Uh-huh.

19          THE COURT:  Okay.  And under the existing procedures,

20    it's going to be August 4th, right?

21          THE WITNESS:  Correct.

22          THE COURT:  Okay.  Now, with respect to the winning

23    bid, under your procedures, Major League Baseball had an

24    absolute right to approve or disapprove the successful bidder,

25    right?

1          THE WITNESS:  That's correct.

2          THE COURT:  And under the existing procedures, to the

3  extent that the party raises the issue of whether they acted

4  in good faith, that's subject to the Court's review.  Is that

5  correct?

6          THE WITNESS:  That is correct.

7          THE COURT:  Finally, if there's a dispute arising

8  under the procedures, your procedures didn't talk about who

9  would resolve that dispute or how it would be resolved, right?

10          THE WITNESS:  I don't believe it did, no.

11          THE COURT:  Okay.  And these procedures that we've

12  got now provide that I will resolve all disputes under the

13  bidding procedures, right?

14          THE WITNESS:  Correct.

15          THE COURT:  Okay.  Now, Mr. Snyder, as I understand

16  it, and perhaps I'm mistaken, the two greatest concerns you

17  have is the ability to proceed under Section 363 and the

18  timing, correct?

19          THE WITNESS:  Exactly.

20          THE COURT:  Okay.  Now, the existing bidding

21  procedures give you the ability to proceed under Section 363,

22  correct?

23          THE WITNESS:  Correct.

24          THE COURT:  Okay.  And as for the timing, essentially

25  it requires that the bid be available in time for August 4th,

1   but it allows a potential bidder time after that in excess of

2   two months within which to put his financing together, right?

3               THE WITNESS:  I believe so, on the financing, yes.

4               THE COURT:  Yes.  All right.  Thank you.  You may

5   step down.

6               THE WITNESS:  Okay.  Thank you.

7          (The witness steps down.)

8               THE COURT:  All right.  Who's next?  Mr. Leblanc,

9   have you got a witness to call?

10              MR. LEBLANC:  We do, Your Honor.  We're prepared to

11  call Mr. Galatioto, but as Ms. O'Neal mentioned earlier, he

12  does have a requirement to be back in New York tomorrow.  I

13  expect that our direct of him will be less than 30 minutes,

14  but I need to understand -- I don't -- I can't put him on

15  unless we're going to hold him until Thursday if the cross is

16  going to exceed --

17              THE COURT:  Well, if he runs over and he has to be

18  back in New York tomorrow, we'll make allowances for him.

19              MR. LEBLANC:  Okay.

20              THE COURT:  I'm not sure I can hear you tomorrow.

21  I've got a trial set all day, as I told you in my e-mail.  I

22  will tell you now that it is my expectation to take up your --

23  Express' discovery concerns at the noon hour.  So you will all

24  be able to come in and hear that then.  And if my trial --

25  it's a dischargeability trial, and you know -- well, you guys

1 probably don't know, but those things can run anywhere from a

2 couple of hours to a couple of days.  But if it runs over past

3 the day, they will have to go to the next week.

4        MR. LEBLANC:  Can I just, as a housekeeping matter,

5 can I just inquire as to the -- you said the discovery issue.

6 I'm not aware of any motions been filed.

7        THE COURT:  I understand, but I'm going to suggest

8 that they get their motion on file this afternoon so that we

9 can hear that tomorrow.  You know we're on a very compressed

10 schedule here, and --

11        MR. LEBLANC:  I do, Your Honor.  It's -- we got our

12 first production from RBE last night --

13        THE COURT:  Right.

14        MR. LEBLANC:  -- at about 11:00 o'clock.

15        THE COURT:  Okay.  Well, I appreciate the fact that

16 you're staying up until 11:00 o'clock.  It makes me feel

17 better about how much money all of you make, --

18        MR. LEBLANC:  I was actually on a plane --

19        THE COURT:  -- knowing that you're getting no sleep.

20        MR. LEBLANC:  I was on a plane at the time, so it

21 wasn't --

22        THE COURT:  Well, that's even better.

23        MR. LEBLANC:  Yes.

24        THE COURT:  So, first class?

25        MR. LEBLANC:  I was yesterday, Your Honor.

1          THE COURT:  Uh-huh.

2      (Laughter.)

3          THE COURT:  Okay.  All right.  Mr. Leblanc, go ahead

4   and call your witness, but I will accommodate -- now, the

5   first witness we're going to take on Thursday morning is Mr.

6   Washington, because that's his choice of time and his

7   availability, and I want him back on the field winning games,

8   not talking to us.  But I do think it's important that we hear

9   from him.

10          MR. LEBLANC:  Understood, Your Honor.

11          THE COURT:  All right.

12          MR. LEBLANC:  And I'm hopeful that we can get Mr.

13   Galatioto back on and off before we leave here today.

14          THE COURT:  All right.  Go ahead.

15          MR. LEBLANC:  And I will say, Your Honor, I'm a very

16   good American Airlines customer, so I'm not charging my clients

17   for a first-class ticket.

18          THE COURT:  I see.  Well, I'm not -- I don't care if

19   you charge your clients.  As long as you don't charge the

20   estate, you can --

21          MR. LEBLANC:  Understood, Your Honor.

22          THE COURT:  Nothing makes me happier than to see

23   clients paying those kind of bills.  Hire a private jet.  Hire

24   a 757.

25          MR. LEBLANC:  Well, there's apparently one for --

1          THE COURT:  Yes.

2       (Laughter.)

3          MR. LEBLANC:  Your Honor, the Lenders would call

4   Salvatore Galatioto to the stand.

5          THE COURT:  All right.  Mr. Galatioto, if you'll step

6   over here, the court reporter will swear you in, and then you

7   may be seated.

8              SALVATORE GALATIOTO, LENDERS' WITNESS, SWORN

9                      DIRECT EXAMINATION

10  BY MR. LEBLANC:

11  Q   Mr. Galatioto, do you have some water up there?  Can I get

12  you some?

13  A   I'm fine.

14  Q   Okay.

15  A   I don't need any water.  Thank you.

16  Q   Could you just begin by introducing yourself to the Court?

17  A   I am Salvatore Galatioto.  I am president of Galatioto

18  Sports Partners, which is a boutique sports investment bank.

19  We specialize in baseball, football, basketball, hockey.  We

20  do a little business in European soccer.  But that's all we

21  do.

22  Q   When you say "That's all we do," what do you mean by

23  "That's all"?

24  A   We have no other businesses.  We are in the sports

25  business 24/7.  We're in the markets 24/7.

1  Q   And what does Galatioto do in the sports business?

2  A   We have two subsidiaries, a securities company which

3  advises buyers and sellers on the purchase and sale of

4  professional sports franchises, and we have a financing arm,

5  which is a lender.  And you know, we've been in business about

6  five years, but in my career we've probably lent $1.5 billion

7  into the sports business and over $500 million into the

8  baseball business.

9  Q   Now, what's your relationship to the Hicks Sports Group

10  family of loans?

11  A   We are a First Lien Lender as well as a Second Lien

12  Lender.

13  Q   And does Galatioto -- can I use the phrase GSP, just --

14  A   Yeah, please.

15  Q   Your last name's a little bit tough to get out from time

16  to time.

17  A   My son played football for four years and they only

18  announced his number when he made a tackle.

19  Q   And are you -- do you also have a capacity as an agent

20  with respect to the Second Lien debt?

21  A   Yes.  We have a Second Lien agent.

22  Q   And when did you become -- when did GSP become the Second

23  Lien agent?

24  A   We became Second Lien Agent when Barclay's Bank resigned

25  after HSG defaulted on its debt.  And I don't know the exact

1    date.  It was roughly a month after that.  And we did it by

2    necessity because we had no agent.

3    Q    And when you say "We had no agent," you're referring to

4    the Second Lien Lenders?

5    A    I'm referring -- excuse me.  I'm referring to the Second

6    Lien Lenders.  I'm sorry.

7    Q    Okay.  Can you just describe generally your background?

8    A    Certainly.  I hold a Bachelor's degree from Hunter College

9    of the City University of New York, *magna cum laude*.  I have a

10   Master's degree from the Fletcher School of Law and Diplomacy

11   at Tufts University.  I have an MBA with distinction and high

12   honors from the Thunderbird School of Global Management.  I

13   have a Series 7/Series 63 qualification as a registered

14   securities dealer, and I am an adjunct associate professor of

15   Finance and Economics at the Columbia University Graduate

16   School of Business.

17   Q    And is there a particular focus that you have at Columbia?

18   A    Yes, I teach one course in the business school called "The

19   Business of Sport."  I've been doing it for I guess nine years

20   now.  It's the, as you might imagine, the largest course in

21   the business school because it's a great topic.

22   Q    And you're a product of the Brooklyn Public School system.

23   Is that right?

24   A    I am a proud graduate of the New York City Public Schools.

25   And for those who don't know City University, when I went to

1  school it was free.  My dad was a longshoreman.  My mom worked

2  in the garment district.  So I am no limousine investment

3  banker.

4  Q   Now, you --

5          THE WITNESS:  And by the way, Your Honor, I fly

6  coach.

7          THE COURT:  Good.  Now you need to get your lawyers

8  to do it, too.

9          THE WITNESS:  That's a little more difficult.

10         THE COURT:  Yes.

11 BY MR. LEBLANC:

12 Q   And Mr. Galatioto, you said you're not a Wall Street

13 investment banker, but describe for us a little bit your

14 career history.

15 A   Well, I -- before I got into the sports business -- I've

16 been in the sports business for about 15 or 16 years -- I was

17 the head of the East Coast region for Societe Generale, which

18 is a large French bank.  I founded the sports business there.

19 I then moved the business to Lehman Brothers.  I was at Lehman

20 Brothers about four and a half years.  Was lucky enough -- not

21 smart enough -- to leave about five and a half years ago, to

22 form GSP.  And for the last 15 or so years, we've been in the

23 sports business, all sports, all the time.

24 Q   And have you been involved in sales involving Major League

25 Baseball teams before?

1  A    Yes.  We represented the Ricketts family in the record

2  acquisition of the Cubs last year.  We represented the Disney

3  Company in the sale of the Anaheim Angels.  At the time the

4  Anaheim Angels, now the Los Angeles Angels of Anaheim, the one

5  team that can be in two places at once.  We represented bidder

6  groups in the Atlanta Braves transaction, the Washington

7  Nationals transaction, and the Boston Red Sox transaction.  I

8  believe we had a bidder group involved in the Los Angeles

9  Dodgers purchase.  We also do business with the San Francisco

10  Giants, the New York Yankees, and we represented Fred Wilpon

11  when he purchased the 50 percent of the Mets which he did not

12  own from Nelson Doubleday to gain 100 percent control of the

13  team.

14     So we've done many, many -- and those are just the

15  investment banking transactions.  We've done -- obviously, we

16  do a significant amount of lending into the Major League

17  Baseball business.

18  Q   And have you been involved -- and you've been involved

19  recently in other sports transactions outside of Baseball.  Is

20  that correct?

21  A   Yes, we just signed a purchase and sale agreement for the

22  sale of the Golden State Warriors for the highest price ever

23  for an NBA franchise of $450 million.  The previous record

24  price was $401 million, which was the sale of the Suns, which

25  we also did.  We sold the Charlotte Bobcats earlier in the

1  year.  We're involved in numerous transactions.

2  Q   And one of the -- you just described the Golden State

3  Warriors transaction.  When was that transaction, or --

4  A   We signed the purchase and sale agreement only a couple of

5  days ago.  It was a full and very competitive auction, and we

6  were able to get a very handsome price, I think.

7  Q   And what role did you guys have, did GSP have in that

8  auction?

9  A   We represented the seller, Mr. Christopher Cohan, who was

10  the owner of the Warriors, in that transaction.

11     I should say:  We also obviously do business with the

12  Texas Rangers.  I missed them when I was talking about

13  baseball.

14  Q   Now, let me just focus for a second on discussions you've

15  had or involvement you've had with respect to this team since

16  the filing for bankruptcy.  Have you been involved on

17  occasions in discussions with potential bidders for the Texas

18  Rangers' assets?

19  A   Yes, I have.

20  Q   Can you just describe generally for me what types of

21  discussions you've been involved with?

22  A   We talked to numerous people who I talk to about sports

23  transactions all the time who have expressed interest at

24  varying levels in the Texas Rangers.

25  Q   What issues do you understand there are in the ability of

1  people to put forward a bid for the Rangers?

2  A   Part of the problem is that for a long time it was -- to

3  the market, it was murky whether or not the team was for sale

4  or was already sold to Mr. Greenberg.  Baseball has never

5  really, to my knowledge, come out and endorsed the full and

6  open auction.  A number of the prospective bidders have

7  mentioned to me that they want to buy a baseball team, whether

8  it's this one or another one, and they don't really want to

9  get on the wrong side of Major League Baseball.  So that's

10  sort of chilled the bidding.

11      Obviously, the largest problem that we have with the

12  bidders that have come forward is timing, in terms of getting

13  financing in this market.

14  Q   Describe for me what you understand or what you mean by

15  the issues with timing, getting financing in this market.

16  A   Well, I was interested in listening to some of the cross-

17  examination today when it was --

18      (Static.)

19         THE COURT:  Just a minute.  We've got a -- whose

20  BlackBerry is up near to the microphone?  Okay.  Because I

21  could hear that, too.  You've got to understand.  I'm sure

22  it's not you.  You've got to understand that that also messes

23  up your record, so you'll have this blur in the transcript.

24         MR. LEBLANC:  He's my witness, Your Honor.  I want a

25  clear record.

1        THE COURT:  That's what I thought.  I was confident

2   it wasn't you, either.  Okay.  All right.  We're going to --

3   if someone is caught with a BlackBerry that's on, Ms. Maben

4   will have the opportunity to smash it underfoot, so that gives

5   you an incentive to turn it off.

6        THE WITNESS:  I like that.

7        THE COURT:  Okay.  Go ahead.

8        THE WITNESS:  I like that.  I'm sorry.  Now I don't

9   remember the question.  Was the -- oh, --

10  BY MR. LEBLANC:

11  Q   The question related to timing with respect to financing.

12  A   Well, I mean, the current regulatory environment is very

13  difficult.  I was interested in listening to some of the

14  cross-examination characterizing the banks as being

15  unresponsive.  The fact is that we're regulated by the Fed, by

16  the Comptroller of the Currency, by the states in which we are

17  incorporated.  And right now, in the current regulatory

18  environment, there's a lot of regulatory oversight.  We have

19  to make sure ever T is crossed, every I is dotted.  There are

20  Patriot Act considerations.

21      I only met Mr. Crane once.  If I were to put together a

22  new financing facility for them, I'd have to do background

23  research on him.  I'd have to do due diligence.  And of course

24  the bidders have to do a high level of due diligence on the

25  assets as well.  We'd have to structure a transaction, and we

1  can only move at the rate that the slowest bank moves, because

2  there are several dozen banks in this transaction.  I don't

3  remember the exact amount, but I think it's more than 20.  I

4  think it's closer to 30.  And that's difficult to do.  It just

5  -- in a regular financing, if we -- forget about the

6  bankruptcy process.  If we started today with a clean sheet of

7  paper with a new buyer that we didn't know, it would take us

8  at least 60 days to deliver a commitment.

9  Q    What effect, if any, have the transfers that occurred

10 right before the bankruptcy filing had on the ability of

11 bidders to come forth and bid on this?

12 A    It's made it more complicated.  People have a lot of

13 questions about them, and it will slow up the timing.  They're

14 going to have to -- whether or not they have any material

15 effect, I'm not a lawyer, and I don't even play one on TV.

16 But I can tell you that if I were a lender looking at this

17 thing, or a prospective buyer, I would want to go through

18 every single one of those transactions and understand how they

19 affect the asset that I'm buying.  And that just takes time.

20 And it's something that you can't substitute for.

21 Q    Now, are you familiar generally with the situation of the

22 land around the stadium in Arlington?

23 A    Yes, in general terms, I am.  All right.

24 Q    And what effect, if any, has the land issue had on the

25 ability of bidders to put forward a bid in the time frame

1 provided?

2 A    Again, it's very cloudy.  I mean, one of the things that a

3 number of prospective bidders have asked us about is the

4 parking:  Will they have access to parking?  Do they have to

5 buy the land?  Don't they have to buy the land?  Can they get

6 a lease on the land on commercially reasonable terms?  Again,

7 it's another question that's going to take time to ferret out.

8 It's a very complicated transaction with a lot of moving

9 parts.

10 Q    And do you know if any negotiations have occurred between

11 any bidders and anyone with respect to the land side of the

12 transaction?

13 A    I'm not sure.  We discussed the land with Mr. Crane at the

14 one meeting that we had, about really getting him parking on

15 the land.  But we didn't come to a conclusion because

16 financing issues kind of overtook the discussion.

17 Q    Is securing parking an important thing for the Texas

18 Rangers, given the location of their stadium?

19 A    Absolutely.  It's a suburban stadium.  If you don't have

20 parking, you're a minor league baseball team.

21 Q    Do you believe that period of time that's been provided

22 for in the bid procedures is adequate for alternative bidders

23 to consider putting forth an alternative transaction?

24 A    Look.  Could somebody throw in a bid?  Yes.  Would it be

25 the best bid you're going to get?  No.  I think, if I were

1  advising a prospective buyer, and I've done it many times, I

2  would tell the buyer that, given the amount of time they have,

3  they would not be able to do the level of due diligence they

4  need to do to make a reasoned bid here.

5  Q   And is that true even out through the period of August

6  4th, as is currently in the proposed bid procedures?

7  A   Yes.  I believe so.  I believe that to get a deal done the

8  right way, and I mean, to do due diligence at the level you

9  need it and for the banks to deliver a standard financing

10 commitment that makes sense that could pass muster with the

11 regulators, in my opinion it would take roughly 90 days to do

12 that.  I don't think it's years, but I think, if we all worked

13 hard, in 90 days we could get a deal done.

14 Q   And how does that 90-day period compare to other sports

15 deals that you've been involved with?

16 A   It's accelerated.  Some are very clean transactions, and

17 you can get them done fast.  But it always takes, you know, 70

18 to 90 days to get a deal done.  I've never been involved in a

19 transaction that's taken less time than that.

20 Q   Do you have a sense of how long Mr. Greenberg had to

21 diligence the assets that are under consideration?

22 A   I think he had months.

23 Q   And how about to secure his financing?

24 A   I think the same.

25 Q   What about even the process of negotiating an asset

1  purchase agreement?  Do you recall when Mr. Greenberg was

2  identified as the winning bidder?

3  A    I don't remember it precisely.

4  Q    Okay.  That's fine.  We'll leave those dates aside.  I

5  wanted to just turn to one other topic, the question -- you're

6  familiar with the break-up fee that's provided for?

7  A    Yes, sir.

8  Q    What effect do you believe the break-up fee will have on

9  the willingness of other parties to bid?

10  A    I think --

11         THE COURT:  Just a minute.  Just a minute.

12         THE WITNESS:  Sorry.

13         MR. KURTZ:  Objection.  I mean, Your Honor, I've sat

14  quietly for a while.  This is supposed to be a fact witness.

15  This is not an expert witness.  We were not provided with

16  expert disclosure, reports or otherwise.  And to have a

17  witness come in and start leaving his capacity -- he's

18  supposed to be a lender representative.  He's not supposed to

19  be an expert on the process and how you sell the process, nor

20  has he run the process, so he's not providing any factual

21  evidence.  He's simply talking about what, you know, he'd like

22  to think would be consistent with non-bankruptcy deals that

23  haven't been through one process already.

24         THE COURT:  Mr. Leblanc?

25         MR. LEBLANC:  Your Honor, I don't believe Mr.

1  Galatioto is providing expert testimony.  He's talking about

2  -- he's had these discussions with bidders.

3          THE COURT:  Okay.

4          MR. LEBLANC:  We've not sought to qualify him as an

5  expert.  I think we certainly could seek to qualify him as an

6  expert.  I think, under 9014, we wouldn't be required to

7  provide expert disclosures, in any event.  But we're not doing

8  that.  We're not asking to qualify him as an expert.  I

9  certainly think his experience is relevant to the Court.

10         THE COURT:  Okay.  Mr. Galatioto?  Did I get that

11  right?

12         THE WITNESS:  Don't worry about it, Your Honor.

13         THE COURT:  Close enough for government work?

14         THE WITNESS:  I'm not even going to bite at that one.

15  I'd be getting myself in trouble.

16         THE COURT:  All right.  Have you seen break-up fees

17  in other agreements for the acquisition of a sports club?

18         THE WITNESS:  I'm trying to think, because I've done

19  many, many deals.  In the last five or six transactions I've

20  done, I have not.  That does not mean that there are not

21  break-up fees in these transactions.

22         THE COURT:  Okay.  You understand that, under this,

23  the only thing that the break-up fee -- the only effect that

24  the break-up fee has on a bidder is it fixes the amount of the

25  initial overbid?

1          THE WITNESS:  Yes, I do, Your Honor.

2          THE COURT:  All right.  All right.  So, do you think

3    that -- I mean, other than the fact that obviously a bidder

4    would rather go up by 30 cents at a time, do you think that

5    that's going to make any difference to whether or not someone

6    chooses to bid?  Do they care where the money goes once

7    they've paid it and gotten what they bought?

8          THE WITNESS:  What's the size of the break-up fee

9    here?  I'm sorry.  Is it $10 million or $15 million?  I've

10   heard both numbers.

11         THE COURT:  Well, the overbid is $15 million.  The

12   $10 million --

13         THE WITNESS:  The overbid is $15 million?

14         THE COURT:  The $10 million, it strikes me, is

15   irrelevant.

16         THE WITNESS:  Okay.  So it's $15 million?

17         THE COURT:  Yes.

18         THE WITNESS:  Look.  If I were a motivated buyer and

19   I wanted to buy this team, I would buy it.

20         THE COURT:  All right.  Go ahead, Mr. Leblanc.

21         MR. LEBLANC:  Your Honor, just to be clear, I'm going

22   to ask a series of questions that I think could be reserved

23   for argument but I want to get the witness to it because

24   there's a statement that the Court just made that we just --

25   we don't think is accurate as it relates to the effect of the

1   break-up fee.  So I'm going to ask some questions of the

2   witness.  I think I can do it in argument, but I think it

3   might --

4          THE COURT:  Well, you go ahead.  I suspect Mr. Kurtz

5   will be very vigilant to see --

6          MR. LEBLANC:  Sure.

7          THE COURT:  -- if there's a basis for objection.  So

8   go ahead.  Or Mr. Sosland or perhaps Mr. Shimshak or Mr.

9   Esserman.

10         MR. LEBLANC:  Fair enough.

11  BY MR. LEBLANC:

12  Q   Mr. Galatioto, to the extent that, at the end of the

13  bidding process, Mr. Greenberg has a bid of, let's say, $290

14  million in cash to the banks, and the number two bidder is --

15  I'm sorry, the other bidder is $292 million in cash to the

16  banks, in that process, under your understanding of the

17  procedures, who wins that auction?

18  A   Mr. Greenberg.

19         MR. KURTZ:  Objection.  The witness' understanding is

20  irrelevant.  It's a matter for Your Honor.  Counsel has

21  already conceded that these questions are not designed to

22  elicit factual evidence but instead are designed to make an

23  argument to you, which seems unusual to me not only because

24  it's not proper but because he's just announced to the

25  courtroom that this witness has a short period of time that

1  he's available to be questioned.

2           MR. LEBLANC:  Your Honor, if I may respond to that,

3  the reason is to then ask the question that I'm about to ask

4  of the witness before he leaves.

5           THE COURT:  Okay.  I'm going to let him answer the

6  question, Mr. Kurtz.  Again, this is a bench trial, and if I

7  later decide that it was an inappropriate question and that

8  the evidence is not probative, I will not take it into

9  account.

10      Go ahead.

11           MR. LEBLANC:  Okay.

12  BY MR. LEBLANC:

13  Q   So, under the scenario I gave you, where another bidder is

14  $2 million higher than Mr. Greenberg, under your understanding

15  of the bid procedures, who wins that auction?

16  A   Mr. Greenberg.

17  Q   And what if Mr. Greenberg is $7 million lower than the

18  next-high purchaser?

19  A   He would win.

20  Q   Okay.  What effect do you think that that fact has on the

21  willingness or interest of other people to bid on this?

22  A   Look.

23           MR. KURTZ:  Objection.  It's an opinion.  You know,

24  if he's not offering the witness as an expert, his opinion is

25  irrelevant.  If he has any competent evidence, he can try to

1  elicit it, but just asking this witness, without having

2  qualified him as an expert, having provided expert disclosure,

3  to come in here and tell us what he thinks would happen is

4  improper.

5          MR. LEBLANC:  It's the same objection we heard just a

6  moment ago, Your Honor, just to a different question.  I think

7  it continues to be a fair --

8          THE COURT:  Okay.  Restate the question for me.

9          MR. LEBLANC:  Sure.

10  BY MR. LEBLANC:

11  Q   Mr. Galatioto, based on your discussions with other

12  bidders in this case, what effect do you think it would have

13  on the bid process to have Mr. Greenberg have the protection

14  of at least $10 million worth of overbid value?

15          THE WITNESS:  Am I allowed to answer the question,

16  Your Honor?

17          THE COURT:  Yes.  I'm going to let him answer it.

18      Go ahead.

19          THE WITNESS:  Thank you.  I think it's going to make

20  it more difficult for any bidder, obviously.

21  BY MR. LEBLANC:

22  Q   Mr. Galatioto, that's all I have.  Thank you very much for

23  your time.

24  A   Thank you.

25          THE COURT:  All right.  Anyone else on this side?

1  Okay.  Mr. Sosland?  All right.  Mr. Beagles?  How long are

2  you going to be, Mr. Beagles?  Do you know?

3          MR. BEAGLES:  Under 10 minutes.

4          THE COURT:  Okay.  Then we'll go ahead with you and

5  then we'll take a recess.  Go ahead.  What time is your flight

6  on coach?

7          THE WITNESS:  I'll be leaving around 5:00, Your

8  Honor.

9          THE COURT:  All right.  We have flights back to New

10  York until quite late here.

11          THE WITNESS:  Seven o'clock is the last one,

12  unfortunately, and I'm in coach.  I don't get that first class

13  upgrade, you know.  I don't have a villa in Tuscany, either,

14  if it makes you feel any better.

15          MR. LEBLANC:  Mr. Galatioto simply --

16          THE COURT:  Pardon?

17          MR. LEBLANC:  Your Honor, Mr. Galatioto just simply

18  should come back to Fort Worth more often, I guess.

19          THE COURT:  I'm sure, like everybody else, he

20  thoroughly enjoys this city in the middle of July.  Though New

21  York isn't a great deal better, is it?

22          THE WITNESS:  It is horrible.

23          THE COURT:  Yes.

24          THE WITNESS:  So it's pretty much the same.

25          THE COURT:  All right.  Go ahead, Mr. Beagles.

1                        CROSS-EXAMINATION

2    BY MR. BEAGLES:

3    Q    Good afternoon, Mr. Galatioto.

4    A    How are you?

5    Q    My name is Vance Beagles, and I'm with the law firm of

6    Weil Gotshal & Manges, representing the Debtor.

7         Now, you're aware that, from the very first day of the

8    hearings in this case, that the Ad Hoc Lender Group reported

9    that all it really wanted was a fair, transparent and open

10   auction?  Are you aware of that?

11   A    That's correct.

12   Q    And that was almost two months ago, correct?

13   A    I believe so.

14   Q    And, conversely, the Debtor wanted to confirm a plan with

15   a sale to the Greenberg-Ryan Group without opening up the

16   auction, right?

17   A    I believe that's correct.

18   Q    Okay.  But in the almost -- and you have a lot of

19   experience, as you've testified, selling sports teams and

20   buying sports teams on behalf of clients, correct?

21   A    Yes, sir.

22   Q    Okay.  But nevertheless, in the almost two months that

23   have transpired since the filing of this case, the Ad Hoc

24   Lender Group, despite wanting an auction, has never filed any

25   bidding procedures that it believes would be acceptable,

1  correct?

2  A    As far as I know, yes.

3  Q    Did you earlier hear Mr. Snyder testify that each of the

4  lenders had stated in writing that they are willing to run the

5  risk of losing the Greenberg-Ryan deal?

6  A    I believe I did.

7  Q    And did you sign such a document saying that your group

8  was willing to run the risk of losing that bird in the hand,

9  so to speak?

10         MR. LEBLANC:  Your Honor, just to be clear, when he

11  says "your group," I assume he means GSP?

12         THE COURT:  GSP.

13         MR. BEAGLES:  I do mean GSP.  I'm sorry.

14         THE WITNESS:  You mean GSP?  I'm sorry.  Yeah.

15  BY MR. BEAGLES:

16  Q    Yeah.

17  A    Because I am the agent on the Second Lien and I can't

18  speak --

19  Q    I'm sorry.  For, yes, GSP.

20  A    Okay.  Yes.

21  Q    And so you did sign such a document?

22  A    I believe so.

23  Q    All right.  So even though Mr. Snyder testified that in

24  his opinion as the CRO and in his experience in bankruptcy and

25  reorganizations that losing the Greenberg-Ryan deal would be a

 1  detriment or I think as the Court put it a negative on the

 2  estate, you nevertheless are willing to run that risk?

 3  A    Absolutely.

 4  Q    I believe you testified that the largest issue that you

 5  have with the current bidding procedures is the timing.  Is

 6  that correct?

 7  A    I believe that that's one of the major points, yes, sir.

 8  Q    And you said that you think that a compressed time frame

 9  but a doable time frame would be 90 days.  Is that right?

10  A    Yes, sir.

11  Q    Are you aware that on June 1st Mr. Leblanc informed the

12  Court that there was a buyer that was ready, willing and able

13  to participate in an auction that was fair and transparent?

14  A    I don't know the exact date, but if you tell me it was

15  that date, yes.

16  Q    Okay.  And so that was roughly -- we're about 50 days past

17  that date now, correct?

18  A    Yes.

19  Q    And as the bidding procedures are laid out, there's

20  another 30 days or so before bids are due, or 20 days before

21  bids are due, and then that can be extended, as you heard the

22  Court earlier explain, or Mr. Snyder explain, can even be

23  further extended to October.  Is that right?

24  A    That's correct.

25  Q    So that would get us well past the 90-day issue, right?

1  A    Except for the fact that a prospective bidder would have

2  to put up $15 million and risk losing it if he can't get

3  financing in a difficult financing market.  That is a very

4  high hurdle, sir.

5  Q    You testified earlier it was your understanding that Mr.

6  Greenberg had several months to do his due diligence.  Do you

7  remember saying that?

8  A    Yes, sir.

9  Q    Isn't it true also that Mr. Crane had that same

10  opportunity back in the December-January time frame to do due

11  diligence?

12  A    That's correct, but a lot of time has passed and so you

13  have to do a lot more due diligence, and of course all of the

14  -- I don't know how to describe them, Your Honor.  If I -- the

15  midnight transfers, I think some people have characterized

16  them as, they need to be diligenced as well.

17  Q    But those can be --

18  A    The financial dynamics of the team have changed.  So he

19  has to restart his due diligence.

20  Q    Well, but so you're saying that it takes longer to bring

21  diligence up to date than it does to start due diligence from

22  scratch back in the beginning?

23  A    No, I'm not saying that.  I'm saying that a lot has

24  happened since last year, not the least of which is this

25  bankruptcy and all the changes that have been made through

1  those transfers.  And any prospective buyer would have to

2  diligence that.  And obviously his financing commitments are

3  gone.  No one keeps financing commitments for six months.  He

4  has to restart the clock.  So it's going to take time.

5  Q   But if he was an interested bidder, he could have

6  continued -- as I think has been established, this bankruptcy

7  and the sale of the team has been well publicized.  Would you

8  agree with that?

9  A   Yes, sir.

10  Q   So he could have maintained his lending relationships and

11  continued that through this process, right?

12  A   I don't think that's reasonable.  I mean, once a lender

13  finds out the team has been awarded to someone else, they're

14  not going to keep a commitment in place.  It's gone.  I mean,

15  as a lender, when I find out someone else has one, unless

16  someone is foolish enough to continue to pay me some kind of

17  fee to keep my commitment in place, I drop the commitment.

18          MR. BEAGLES:  Your Honor, may I approach the witness?

19          THE COURT:  Yes.

20      (Pause.)

21  BY MR. BEAGLES:

22  Q   Mr. Galatioto, I have handed you now what's been marked as

23  Defendant's -- I'm sorry, Debtor's Exhibit #1.  Do you have

24  that?

25  A   Yes, I do.

1   Q    And on the bottom of -- you'll see in the bottom right-

2   hand corner of each of the pages there's a control number.

3   And on the -- a control number.

4   A    Yes, sir.

5   Q    And on the first page, --

6   A    Yes, I see it.

7   Q    The first page begins with AHG 00008271, and then it

8   continues on, the last page is 8280.  Is that correct?

9   A    Yes, sir.

10  Q    All right.  Now, I notice a lot of reactions here, but if

11  you'll ignore the reductions this appears to be a copy of

12  three different e-mails that were sent on April 29th and April

13  30th by Andrew Herenstein.  Do you see that?

14  A    Yes, sir.

15  Q    Who is Andrew Herenstein?

16  A    Andrews Herenstein is one the principals of Monarch

17  Alternative Asset, I think is the name of his company.

18  Q    All right.  And you received -- you're shown as a

19  recipient on these e-mails as well, correct?

20  A    Yes, I am.

21  Q    All right.  If you'll turn with me to the bottom of the

22  page that ends on the bottom right-hand corner of 8275.

23  A    75?

24  Q    Correct.  This e-mail that appears on this page, and it

25  carries over to the next page, is an e-mail from Mr.

1  Herenstein to you, among others, about a call he had just

2  finished with Mr. DuPuy.  Do you see that?

3  A    Yes, sir.

4  Q    Do you recall getting this e-mail?

5  A    Frankly, I don't.  It's been a while.  But --

6  Q    All right.  Looking down in the paragraph that's #3, --

7  A    Uh-huh.

8  Q    -- and it's two lines up is where I'm going to focus your

9  attention, then we'll carry over to the next page.

10  A    Okay.

11  Q    He's reporting -- Mr. Herenstein is reporting on a

12  conversation with Mr. DuPuy where he refers to Mr. DuPuy as

13  "he" and he refers to himself as "I" in it.  So it says, "He

14  said, 'I believe you'll get a lower bid if you don't accept

15  the extra value I got you.'"

16      Do you see that?

17  A    Hold on just for a moment.  I want to --

18  Q    It's just two lines up from the bottom.

19  A    Yes.  Yes, I do see it.

20  Q    And then it goes on to say, "I said, 'You believe?'"

21      And if you'll turn over the next page, Mr. Herenstein

22  says, "That doesn't do it for us.  Let's find out the truth.

23  Let's run a process.  Baseball can run it and see what the

24  best bid is.  He [Mr. DuPuy] said the operating costs over the

25  next six months will be very expensive.  I said, 'Six months?

1  How about a month?  How about ONE WEEK?  Give us one week to

2  run a process and see if there is a buyer who will pay the

3  price.'"

4      Do you see that?

5  A   Yes, sir, I do.

6          MR. BEAGLES:  Your Honor, I would move that Debtor's

7  Exhibit #1 be admitted into evidence.

8          THE COURT:  Any objection?

9          MR. LEBLANC:  No objection, Your Honor.  Just for the

10  Court's benefit, Your Honor, this was marked "Confidential."

11  The Debtor conferred with us beforehand.  We agreed to de-

12  designate the document so there wouldn't be an issue with

13  having to file it under seal, which would otherwise be

14  required.

15          THE COURT:  All right.  It'll be admitted.  This is

16  Debtor's 1, you say?

17          MR. BEAGLES:  Yes, Your Honor.

18      (Debtor's Exhibit 1 is received into evidence.)

19  BY MR. BEAGLES:

20  Q   Mr. Galatioto, to your knowledge, do the attorneys for the

21  Ad Hoc Lender Group, or for any of the Lenders, represent any

22  of the potential bidders?

23  A   I don't believe so.

24  Q   You haven't given them permission to represent any

25  potential bidders, have you?

1  A    No.

2  Q    And I believe you testified earlier that you've had

3  communications with certain bidders, right?

4  A    Yes, sir.

5  Q    Do you have -- have any of those communications been by e-

6  mail or other written form of communication?

7  A    No.

8  Q    You have no e-mails or other written communications with

9  any bidders?

10  A    I think you have everything that I have in discovery, and

11  you'll notice that I like to have the personal touch with

12  people.

13  Q    All right.  Well, I'll --

14       THE COURT:  It also shows a certain -- provides

15  certain advantages in connection with discovery.  Perhaps you

16  want to suggest that to Mr. West, Mr. Sosland.

17       (Laughter.)

18       MR. BEAGLES:  I'll --

19       THE WITNESS:  Sorry.

20       (Pause.)

21  BY MR. BEAGLES:

22  Q    Okay.  Well, I'll represent to you, Mr. Galatioto, that

23  your attorneys have refused to produce any documents, any

24  written communications between either them and potential

25  bidders -- "them" being the attorneys for the Lenders --

1  A    Uh-huh.

2  Q    -- or any Lenders with potential bidders.  And so --

3         MR. LEBLANC:  Your Honor, we -- we're -- I'm happy to

4  deal with the discovery issue at the appropriate time.  I can

5  deal with it now if you'd like to.  I don't know that it's

6  appropriate to ask these questions of the witness.

7         THE COURT:  Well, I don't think he's asked a question

8  yet, so why don't we hear the question and then you can decide

9  whether or not you want to object to it?  Okay?

10        MR. LEBLANC:  That's fine, Your Honor.

11        THE COURT:  Go ahead, Mr. Beagles.

12  BY MR. BEAGLES:

13  Q   We've received a document from somewhere else that

14  indicates your signature on it on behalf of GSP Finance, LLC,

15  title, President, to Jim Crane dated July 12, 2010.  Do you

16  recall writing a letter or signing a letter to Mr. Crane

17  around July 12th?

18  A    I do.

19  Q    Okay.  So let me go back to my other question about

20  whether you have any written documents or written

21  communications with potential bidders.  I believe you said no.

22  A    Oh, I'm sorry.  That document was a document signed by I

23  think all the members of the Ad Hoc Committee.  It wasn't -- I

24  thought you were referring to e-mails and other things, as --

25  Q    Just to be clear, let's break it down.

1   A    Okay.

2   Q    Do you have any -- do you or does GSP have any e-mail

3   communications with potential bidders?

4   A    I do not believe so.

5   Q    Okay.  Do you or GSP have any written communications other

6   than e-mail with any potential bidders?

7   A    I'm not certain.  I have a staff of people also working on

8   this transaction.  I don't believe so.  I can only speak for

9   myself.  I don't believe I have any written communication.

10          THE COURT:  Well, you mean you don't other than the

11  letter Mr. Beagles has just referred to?

12          THE WITNESS:  That's correct, Your Honor.

13          THE COURT:  All right.

14          THE WITNESS:  Not that I recall.

15          MR. BEAGLES:  I'll pass the witness, Your Honor.

16          THE COURT:  All right.  We're going to take a 10-

17  minute recess.  We'll resume in 10 minutes.

18          THE CLERK:  All rise.

19      (A recess ensued from 2:37 p.m. until 2:51 p.m.)

20          THE COURT:  Please be seated.  All right.  Mr. Kurtz?

21          MR. KURTZ:  Thank you, Your Honor.  May I proceed?

22          THE COURT:  Please.

23                        CROSS-EXAMINATION

24  BY MR. KURTZ:

25  Q    Sir, did you vote in favor of the RBE bid on -- I'm sorry,

1   did GSP vote in favor of the RBE bid on April 2nd?

2   A    I'm sorry.  I'm not -- what is the RBE bid of April 2nd?

3   Q    The --

4          THE COURT:  The Greenberg-Ryan bid.

5          THE WITNESS:  Did we vote in favor of it?

6   BY MR. KURTZ:

7   Q    Yes.

8   A    I don't believe so.

9   Q    You have never indicated your approval, preliminarily or

10  otherwise, of the April 2nd bid by the Greenberg-Ryan Group?

11  A    I believe I haven't.

12  Q    Did anybody else to your knowledge indicate an initial

13  approval of the bid on April 2nd?

14         MR. LEBLANC:  Your Honor, just to be -- I don't know

15  what he means by "anybody else."  Does he mean another lender?

16  Does he mean someone else within --

17         THE COURT:  Why don't you narrow the question, Mr.

18  Kurtz?

19  BY MR. KURTZ:

20  Q    Anyone within the Lender Group.

21  A    I can't speak for the Lender Group.  I'm sorry.

22  Q    Okay.  You have no knowledge of any of that?

23  A    No.

24  Q    Okay.  Can you direct your attention to Debtor's Exhibit

25  1, which is the exhibit counsel ran you through about the one-

1  week process that the Lenders anticipated back in April?

2  A    I'm sorry.  Can you tell me what page that's on again?

3  Q    That was on Page -- the page with the Bates stamp 8276.

4  A    276?  Yeah.  I have it.  Thank you.

5  Q    All right.  Now, after saying that who needs six months

6  and who needs a month, you could do all this stuff in a week,

7  it goes on to say that -- where it starts in all caps, he

8  says, "You ran a process.  It failed.  The buyer couldn't

9  finance his deal.  His deal expired on April 1st and is

10 terminable."  That refers to the Greenberg-Ryan transaction,

11 right?

12 A    I believe so.

13 Q    Then if you look at the bottom, the two lines from the

14 bottom of that carryover paragraph, it said, "I said his deal

15 expired.  It's over.  It's done.  His deal will never get

16 done."  That was the other statements that your Lender Group

17 was making to MLB, right?

18        MR. LEBLANC:  Objection, Your Honor.  Characterize --

19 these aren't statement made by the Lender Group.  It's an e-

20 mail by one individual.

21        THE COURT:  You can clarify that if you want.  That's

22 a fair enough comment.

23        MR. KURTZ:  Sure.

24 BY MR. KURTZ:

25 Q    Is Mr. Herenstein a member of the Lender Group?

1    A    Yes, he is.

2    Q    Is he the spokesperson, somebody charged with

3    responsibility in connection with this matter on behalf of the

4    Lender Group?

5    A    No.

6    Q    He hasn't been active in -- is Mr. Herenstein the person

7    that's been speaking -- have been speaking with MLB about the

8    bidding process?

9    A    I don't beli... is that the question?

10   Q    Yeah, that --

11   A    Was he the person speaking with them?

12   Q    That is the question.

13   A    I thought -- or is the question --

14   Q    Did -- was Mr. Herenstein --

15           THE COURT:  Okay.  Okay.

16           THE WITNESS:  I don't know what the question is.

17           THE COURT:  I've been through this before.  Again,

18   one at a time.

19           THE WITNESS:  Okay.  I'm just -- want clarification.

20   BY MR. KURTZ:

21   Q    That's the question.  Did Mr. Herenstein -- was Mr.

22   Herenstein speaking to MLB on behalf of the Lender Group?

23   A    No.  I believe he was speaking on his own behalf.

24   Q    And was Mr. Herenstein sending e-mails about his

25   conversations with MLB to other members of the Lender Group?

1    A   Yes, he was, clearly.

2    Q   And that included you as well, right?

3    A   Absolutely.

4    Q   Okay.  And you understood that Mr. Herenstein was speaking

5    to MLB and was making comment about Greenberg and Ryan not

6    being able to finance the transaction, right?

7    A   That is his opinion, yes.

8    Q   Okay.  Well, that -- did you ever write back to him and

9    say, "I disagree with you.  Please clarify that with the MLB"?

10   A   No, I did not write back to him.

11   Q   Did you ever call Major League Baseball and say, "One

12   member of the Lender Group has said that the Greenberg-Ryan

13   bid will fail and can't be financed.  I don't agree"?

14   A   No, I did not.

15   Q   Now, can you turn to Page 8274 of the same exhibit?

16   A   274?

17   Q   Correct.  That's another e-mail from Mr. Herenstein,

18   right?

19   A   Yes, sir.

20   Q   And that goes to other members of the Lenders Group,

21   including yourself, right?

22   A   I'm trying to find my name on it.  Yes, it does.

23   Q   And Mr. Herenstein again is communicating about a

24   conversation he had with MLB, right?

25   A   Can you give me a moment to read it?

1    Q    Sure.

2    A    Thank you.

3    Q    It says, "Just spoke to DuPuy."

4    A    Yeah.  Yes, sir.  Just -- yes.

5    Q    And he says that he gave MLB a proposal, right?

6    A    Yes.

7    Q    And he said, "I told him Baseball should announce that

8    Greenberg couldn't finance his deal and that Baseball has

9    taken over the process and is running a short auction to find

10   a substitute buyer," right?

11   A    That's what it says.

12   Q    Okay.  By the way, it wasn't accurate that Mr. Greenberg

13   couldn't finance his deal, right?

14   A    I have no idea.

15   Q    And a short auction -- and it also talks about a

16   contemplated "short auction," right?

17   A    I'm sorry?

18   Q    Talks about contemplating a "short auction," right?

19   A    A short auction, yes.  That's what it says.

20   Q    Which was clarified in the next e-mail as being a one-week

21   auction, right?

22           MR. DEWOLF:  Objection.

23           MR. LEBLANC:  Objection to form.

24           THE WITNESS:  The next e-mail being 8275?

25           THE COURT:  Just --

1          MR. KURTZ:  Through -- well, the actual language --

2          THE COURT:  Just -- okay.

3          MR. KURTZ:  -- is on 8276.

4          THE COURT:  Okay.  What was the question again, and

5   then let me hear Mr. Leblanc's objection.

6          MR. KURTZ:  I had said, and the short auction was

7   clarified in the next e-mail as being "about one week,"

8   correct?

9          MR. LEBLANC:  And I object to the form of that

10  question, Your Honor.  The document speaks for itself. You've

11  got it.  We've admitted it into evidence.  I don't think you

12  need to -- it doesn't -- one doesn't necessarily clarify the

13  other.  In fact, the one that he describes as then being

14  clarified actually predates the e-mail that he was just

15  referring to.

16         THE COURT:  That's true.

17         MR. KURTZ:  Well, that's why -- that's why it needed

18  clarification to the group, because the next day is when he

19  said that short auction would be one week.  That was my point.

20         THE COURT:  No.

21         MR. LEBLANC:  No.  It's --

22         THE COURT:  The same -- both of those e-mails are on

23  April 29th.  8274 is 9:06 p.m., and 8275 is 8:00 p.m., --

24         MR. KURTZ:  Okay.  I --

25         THE COURT:  -- which means that the one preceded the

 1  other.

 2            MR. KURTZ:  Okay.  I'll rephrase.

 3  BY MR. KURTZ:

 4  Q   So the short auction was what was addressed in the

 5  preceding e-mail, which spoke about a one-week auction, right?

 6  A   That's what it says.

 7  Q   All right.  And then if you'll look to the cover page of

 8  the e-mail, --

 9  A   I'm sorry?

10  Q   -- the first page, I should say, the first page of the e-

11  mail.  Do you see that?

12  A   Is that 8271?

13  Q   It is.  That's an e-mail again from Mr. Herenstein, right?

14  A   Yes, it is.

15  Q   And this is again to other members of the Lender Group,

16  including yourself, right?

17  A   Yes.

18  Q   And this is yet another e-mail by Mr. Herenstein

19  discussing a conversation he was having with Major League

20  Baseball, right?

21  A   Yes.

22  Q   And he says in the second sentence, "They cannot accept

23  our proposal to start a new process.  They are aware that we

24  are doing things like forgiving secured claims to get an

25  unsecured claim to file the bankruptcy."  So you were aware

1  even back in April that the Lender Group was taking steps to

2  position itself in connection with the bankruptcy, right?

3  A    That is Mr. Herenstein's position.   If you would like to

4  know what I was doing during that time, --

5  Q    No.

6  A    -- I'd be happy to do that.

7  Q    I wanted to just --

8  A    Okay.

9  Q    -- know whether you were made aware by Mr. Herenstein that

10 --

11 A    Of his position.   Yes, I was.

12 Q    Well, okay.

13 A    Of his position.

14 Q    Let me just get it on the record.   You were made aware --

15 you and other members of the Lenders Group were made aware by

16 Mr. Herenstein that they were already taking action like

17 forgiving secured claims to pick up an unsecured claim in

18 order to position themselves in bankruptcy to block the

19 Greenberg-Ryan proposal.   Correct?

20        MR. LEBLANC:   Objection.   Your Honor, that's an

21 absolute, total mischaracterization.

22        MR. KURTZ:   This is cross-examination, Your Honor.

23        THE COURT:   In what way?

24        MR. LEBLANC:   Your Honor, I'll tell you, Your Honor.

25 There isn't a reference to block a sale in here at all.   And

1  I'm happy to explain.

2         THE COURT:  All right.  All right.

3         MR. LEBLANC:  But if he wants to ask a question -- if

4  he wants to argue this, we should --

5         THE COURT:  All right.  All right.  What's your

6  question again?

7         MR. KURTZ:  Your Honor, just to respond.  I'm not

8  required to read an e-mail verbatim.  I'm entitled to ask

9  questions on cross-examination.  If the witness agrees with

10  me, he'll say yes.  If he doesn't, he'll say no.  It is not

11  for counsel to make legal arguments during the course of the

12  examination.

13         THE COURT:  Are you going to ask him about his

14  personal knowledge --

15         MR. KURTZ:  Yes.

16         THE COURT:  -- or what his position was at that time?

17  To the extent that you're asking him to characterize other

18  people's positions, I think you ought to look at the e-mail.

19  Go ahead.

20         MR. KURTZ:  Okay.

21  BY MR. KURTZ:

22  Q   Okay.  Well, you were made aware that the Lender Group was

23  forgiving secured claims to get an unsecured claim to file for

24  bankruptcy, right?

25  A   I was made aware of this e-mail.  I did not agree with the

1  e-mail and GSP did not take that action.  We were negotiating

2  in good faith with Major League Baseball to get a higher and

3  better bid at that time.

4  Q   Well, except instead of just saying you want a higher and

5  better bid, you repeatedly mischaracterized or Mr. Herenstein

6  repeatedly mischaracterized that the Greenberg-Ryan bid

7  couldn't be financed, right?

8          MR. LEBLANC:  Objection.  Argumentative.

9          THE COURT:  Okay.  Just a minute.

10         THE WITNESS:  I'm sorry.  Would you like me to answer

11 that, Your Honor?

12         THE COURT:  No.  Wait a minute.  Mr. Kurtz, why don't

13 you rephrase?

14         MR. KURTZ:  Okay.

15 BY MR. KURTZ:

16 Q   During the course of your purported efforts to obtain a

17 fair process -- well, strike that.  Would a fair process

18 include misrepresentations about the ability of a bidder to

19 obtain financing?

20 A   I'm not certain whether they were or weren't

21 misrepresentations.  I have no knowledge of Mr. Greenberg's

22 financing at that point.

23 Q   Sir, my question is simply this.  Would a fair process

24 include misrepresentations about the ability of a bidder to

25 finance a transaction?

1              THE COURT:  He's speaking hypothetically.

2              THE WITNESS:  Oh, hypothetically.  I'm sorry, Your

3    Honor.  Hypothetically, no.

4    BY MR. KURTZ:

5    Q   Okay.  So if these e-mails that -- repeatedly stated that

6    Greenberg and Nolan Ryan could not finance their bid, they'd

7    be mischaracterizations, right?

8    A   If indeed they were able to finance their bid.  At that

9    time, I don't know if they were or weren't --

10   Q   Okay.

11   A   -- able, or whether they had syndicated a deal or whether

12   there are conditions precedents they couldn't meet.

13   Q   So you're --

14   A   I've never seen their documents.

15   Q   All right.  So you're not aware that, in fact, the

16   Greenberg-Ryan Group had commitments for financing for their

17   full transaction well before April 2010, right?

18             THE COURT:  Just a minute.

19             MR. LEBLANC:  Assumes facts not in evidence.

20             THE COURT:  Sustained.

21             MR. KURTZ:  They'll be in evidence shortly, Your

22   Honor.

23             THE COURT:  That's fine.

24             MR. KURTZ:  Subject -- can I ask the question subject

25   to proof?

1          THE COURT:  Say it based on an assumption, all right?

2          MR. KURTZ:  Okay.

3   BY MR. KURTZ:

4   Q   If you assume that, in fact, Greenberg and Ryan had their

5   financing in place, then Mr. Herenstein's statements to MLB

6   would have been mischaracterizations, right?

7   A   If I assume that they did indeed have a financing

8   commitment and they could meet the condition precedents to

9   close, then I would say that that's possible.  I don't know

10  what he said directly to Mr. DuPuy or anyone else.  I was not

11  there.

12  Q   But we know what he says he said to Mr. DuPuy, correct?

13  A   You will have to ask Mr. Herenstein exactly what he said.

14  Q   No, no.  You're aware because you received the e-mail --

15         THE COURT:  Okay.  Okay.  The statement in the e-

16  mail, then, based on the assumption that he's posed to you,

17  would be incorrect.  Is that not true?

18         THE WITNESS:  Yes, sir.  Yes, Your Honor.

19         THE COURT:  Okay.  All right.  Go ahead.

20  BY MR. KURTZ:

21  Q   And don't you think it would be unreasonable to make a

22  statement about another group's ability to finance a bid if

23  you had not obtained knowledge about whether your statement

24  was true or not true?

25         MR. LEBLANC:  Your Honor, this is an argument being

1  done through cross-examination.

2          THE COURT:  Well, I will grant you that I'm not sure

3  how probative Mr. Galatioto's -- did I get it right?

4          THE WITNESS:  Well, just put the S -- get rid of the

5  S and you had it perfect.

6          THE COURT:  Galatioto.

7          THE WITNESS:  Perfect.

8          THE COURT:  All right.  It is -- it does not seem to

9  me that his testimony about Mr. Herenstein's state of mind is

10 going to be very useful to me, and I'm not sure that you're

11 getting very far with it, that Mr. Galatioto may disagree with

12 what Mr. Herenstein says or may have comments on it.  I'm not

13 sure where that gets you, Mr. Kurtz.

14         MR. KURTZ:  My point here is that this witness has

15 testified as to what needs to happen in a process and what

16 he's looking for in a fair process, and I'm trying to explore

17 whether a fair process includes making misrepresentations

18 about one bidder's financial wherewithal.  And I'm asking this

19 witness whether he thinks it would be reasonable to actually

20 determine that matter before you made statements to Major

21 League Baseball about any bidder's abilities to close.

22         THE COURT:  Again, it seems to me you're talking

23 about what someone else would testify to, and you're asking

24 him to testify to what Mr. Herenstein would or would not,

25 should or should not, could or could not have said.  Is that

 1  the essence of your objection, Mr. Leblanc?

 2          MR. LEBLANC:  And also, given the argument that's now

 3  been made, I think there's a huge relevance question.

 4          THE COURT:  Well, --

 5          MR. LEBLANC:  The fair process -- I'll submit, a fair

 6  process shouldn't involve misrepresentations by anybody.

 7          THE COURT:  All right.  Then that's fine.  And we

 8  have a stipulation to that effect, I think, --

 9          MR. KURTZ:  Okay.

10          MR. LEBLANC:  And we --

11          THE COURT: -- based on your statement.  Does anyone

12  disagree with that?

13      (No response.)

14          THE COURT:  Okay.

15          MR. KURTZ:  Your Honor, I will note that the Lenders

16  were asked to produce a representative.  We were advised, and

17  it's reflected on their witness list, --

18          THE COURT:  Yes.

19          MR. KURTZ:  -- that it would either be Mr. Herenstein

20  or it would be --

21          THE COURT:  Well, we may --

22          MR. KURTZ:  -- the witness on the stand.

23          THE COURT:  We may yet require Mr. Herenstein's

24  presence.

25          MR. KURTZ:  Okay.  Okay.

1          MR. LEBLANC:  Your Honor, let me address that, if I

2    could, because --

3          THE COURT:  Sure.

4          MR. LEBLANC:  -- Mr. Galatioto has the scheduling

5    issue that we described, --

6          THE COURT:  Yes.

7          MR. LEBLANC:  -- so we -- if we needed somebody here,

8    we were going to fill with Mr. Herenstein.  Mr. Herenstein's

9    deposition has been noticed by all of the parties on that side

10   of the courtroom.  His deposition, I believe, is scheduled for

11   the 27th of July.

12         THE COURT:  All right.  All right.

13         MR. LEBLANC:  They'll have every opportunity to ask

14   him whatever questions they'd like to.

15         THE COURT:  Why don't you move on past that, and

16   we'll -- let me express -- well, no, let me keep my mouth shut

17   for now.

18         MR. KURTZ:  Okay.

19         THE COURT:  Go ahead, Mr. Kurtz.

20         MR. KURTZ:  Okay.

21   BY MR. KURTZ:

22   Q   Now, you're aware, of course, that there was a sale

23   process that was run by Perella Weinberg, right?

24   A   Yes.

25   Q   Okay.  And you've heard of Perella Weinberg?

1    A    Not in the sports space, sir.  I don't believe they've

2    never sold a Major League Baseball team.  I could be wrong,

3    but if you can show me what team they sold, I'd be all ears.

4    Q    My question -- so maybe you can use all your ears -- is,

5    have you heard of Perella Weinberg?

6              THE COURT:  Okay.  Mr. Kurtz, you watch that.  I

7    don't want you to demeaning the witness in my court.

8              MR. KURTZ:  I apologize, Your Honor.

9              THE COURT:  Do you understand me?

10             MR. KURTZ:  I -- I --

11             THE COURT:  You apologize to him.

12             MR. KURTZ:  I apologize, sir.  But --

13             THE COURT:  And you watch your mouth.

14             MR. KURTZ:  Your Honor, --

15             THE COURT:  You may proceed.

16             MR. KURTZ:  -- if --

17   BY MR. KURTZ:

18   Q    Well, sir, if you could try to listen to the question that

19   I'm asking you and give me a precise response, it will move

20   things along faster.  Have you heard of Perella Weinberg?

21   A    Yes.  Of course.

22   Q    Are they a highly regarded investment bank?

23   A    I have no opinion of Perella Weinberg.  The first time

24   I've ever dealt with them was in this process.  They're not in

25   my field, so I can't really talk about --

1   Q    Okay.  Have you heard of Merrill Lynch?

2   A    Of course I've heard of Merrill Lynch.

3   Q    Okay.  Are they a reputable investment bank?

4   A    Yes, of course.

5   Q    And were they involved in this process of selling the

6   Rangers?

7   A    I believe they were.  They have no sports expertise,

8   especially the people --

9   Q    Sir, --

10  A    -- in Dallas, but that's fine.

11          THE COURT:  Okay.  Okay.  You just answer the

12  question of what he asks.

13          THE WITNESS:  I'm sorry, Your Honor.

14          THE COURT:  And trust --

15          THE WITNESS:  I'm sorry.  Yes, I've heard of them.

16          THE COURT:  Trust Mr. Leblanc --

17          THE WITNESS:  I apologize, Your Honor.

18          THE COURT:  -- to correct any misinterpretations that

19  I might reach.

20          THE WITNESS:  I apologize.

21  BY MR. KURTZ:

22  Q    And irrespective of whatever prior experience they had,

23  they managed to obtain bidders that are still involved in this

24  matter today, correct?

25  A    That's correct.

1  Q   Okay.  So it doesn't look like they've missed any

2  potential bidders when they ran their sale process, right?

3  A   Um, I don't know how you want me to answer that.  You can

4  always get bidders.  You may not get the highest and best

5  price if you're not experienced in this business.

6  Q   Well, you --

7  A   So, is the question, did they get the highest and best

8  offers they could have, or did they just get any bidders?

9  Because anybody can get a bidder.

10  Q   By the way, do you know Joe Ravatelle -- Ravitch and --

11  who's this?  And Raine?

12  A   Yes.  And I believe when this transaction was launched,

13  Raine was a brand new firm.  I don't even think they were in

14  existence more than a couple of weeks, if they were even in

15  existence when it was launched.

16  Q   They came from Goldman, right?

17  A   Yes, they did.  Yeah.

18  Q   Didn't you say you came from Goldman?

19  A   No, I did not.

20  Q   All right.  Did you --

21  A   My mother would be very upset if she thought I had worked

22  at Goldman Sachs, so --

23          THE COURT:  I think he said Lehman Brothers, did you

24  not?

25          THE WITNESS:  That's correct.

1          MR. KURTZ:  Lehman Brothers.  Okay.

2    BY MR. KURTZ:

3    Q    And when -- your firm was hired to provide valuation

4    services in connection with the assets, correct?

5    A    I'm sorry.  In connection with what assets?

6    Q    The assets that are the subject of this motion in this

7    case.  The assets that are the subject of --

8    A    No.

9    Q    All right.  So have you -- has GSP provided, I'm sorry,

10   prepared no memorandum where it's addressed the value issues

11   in connection with the Greenberg-Ryan transaction?

12   A    We may have for internal use or use for other people in

13   the Bank Group, but we weren't hired by anyone to do that.

14   Q    All right.  But you did perform valuation services?

15   A    We have to value the assets if we're going to look at a

16   recovery.

17   Q    And did you also value the Greenberg-Ryan transaction?

18   A    I believe we did.

19   Q    Okay.

20   A    Well, hold -- excuse me.  Which?  The current one or the

21   previous one?  Because Mr. Ryan's bid before bankruptcy was

22   significantly higher than his current bid.

23   Q    Either one.

24   A    I believe we looked at both of them.

25   Q    All right.  And did you recognize in your valuation work

1  that the process included the marketing of the ownership

2  opportunity to a number of interested suitors?

3  A    I'm sorry.  Say that again.  That was kind of a -- I

4  apologize.  It was a disjointed question.  You stopped in the

5  middle.

6  Q    All right.  Did you state the core of all Ranger valuation

7  levels reflect the fact that the team represents an above-

8  average MLB franchise ownership opportunity and a number of

9  interested suitors in the franchise?

10  A    I clearly said -- it's a non sequitur.  I clearly said

11  that this is an above-average MLB franchise.  I believe that.

12  This is a top media market.  It has great demographics, great

13  growth rates.  That's why we firmly believe that it's an

14  attractive asset and numerous bidders should be very

15  interested in it.  But I don't understand the last part of

16  what you said.

17  Q    Okay.  Well, I --

18  A    And I apologize.  Maybe I'm just dense.

19  Q    I don't have a copy, but I'll represent and present later

20  that that's a direct quote from a GSP memo dated April 21,

21  2010 on Page 4.

22  A    If you can show me --

23  Q    What you referred to as a non sequitur was a direct quote,

24  and I'll just -- I'll get the document later.

25           THE COURT:  Just a minute.

1          THE WITNESS:  I'm not arguing --

2          THE COURT:  Just a minute.

3          THE WITNESS:  -- that we think it's an above-average

4    franchise.

5          THE COURT:  Just a minute.

6          MR. LEBLANC:  I don't -- we'd obviously like to see

7    whatever it is that they're talking about.  I don't think

8    reading -- with all due respect, reading from a BlackBerry as

9    part of cross-examination, I'm not sure that that makes a lot

10   of sense.

11         THE COURT:  Well, I don't care what he reads from.  I

12   think the witness's answer stands at this point.  And if at a

13   later time you want to bring to my attention a document that's

14   contrary to his testimony, I'll of course consider it.

15         MR. KURTZ:  I will present the document that I quoted

16   from.

17         THE COURT:  All right.

18   BY MR. KURTZ:

19   Q    Sir, you're not aware of any commitment to purchase the

20   assets at issue by anyone other than RBE, the Greenberg-Ryan

21   Group, correct?

22   A    That's correct.

23   Q    And have you engaged in discussions with any potential

24   bidders for the assets?

25   A    Yes.

1  Q   And who have you been discussing that with?

2            MR. LEBLANC:  Your Honor, --

3            MR. KURTZ:  Let me take it a step at a time.

4  BY MR. KURTZ:

5  Q   Have you spoken to him with Mr. Crane?

6  A   Yes, sir.

7  Q   Have you spoken with Mr. Beck?

8  A   Yes, sir.

9  Q   Have you spoken with anyone else?

10 A   Yes, sir.

11 Q   How many others have you spoken with?

12 A   Two other groups.

13 Q   Okay.  Do you know whether those are the two other groups

14 that Mr. Snyder testified about?

15 A   I believe at least one is, potentially both.

16 Q   Is the one you're referring to, Putative Debtor #1, who

17 was the person with the financial wherewithal and high net

18 worth, or Putative Bidder #2 who never got around to kicking

19 the tires?

20 A   One is -- this is confusing.  One is Putative Bidder #1.

21 I don't know if the other group that's approached us and we

22 will be meeting with next week is the same group that Mr.

23 Snyder is talking about.

24 Q   Okay.  So your second putative bidder reference, have they

25 performed any due diligence?

1    A    No, they have not.

2    Q    Have they made any commitment to purchase the assets?

3    A    No.

4    Q    Have they made an offer of a purchase price?

5    A    No.

6    Q    Have they made any indication of the nonfinancial terms or

7    the form of the contract?

8    A    No, of course not.

9    Q    Okay.  Do they have the financial wherewithal to

10   consummate a transaction?

11   A    They have the financial wherewithal to write the check.

12   Q    Okay.  And they could write the check immediately?

13   A    They could write the check about as fast as you can write

14   the check.

15   Q    Okay.  And the other putative bidder that Mr. Snyder

16   referred to, that bidder likewise has the financial ability to

17   write a check to purchase the assets?

18   A    I have not done due diligence on his personal financial

19   position, but from everything I hear, from other people in the

20   industry, he does.

21   Q    Okay.  You have no reason to believe that the other

22   putative bidder you're referring to would not be able to

23   finance the transaction on his own?

24   A    No, I don't.

25   Q    Okay.  Are you part of the discussions towards financing a

1  bid by Mr. Crane?

2  A    I was in one meeting.  Yes, sir.

3  Q    All right.  And are you familiar with Mr. Crane's

4  approximate net worth?

5  A    Through the agent bank, the agent bank being JPMorgan,

6  they know Mr. Crane and they have told us that he has the

7  financial wherewithal to do a transaction.

8  Q    Okay.  And so Mr. Crane has the financial wherewithal to

9  fund a transaction on his own?

10  A    I believe so, but I have not done my own personal due

11  diligence, --

12  Q    Okay.

13  A    -- so I'm just telling you what --

14  Q    That's your understanding, though, right?

15  A    That is my understanding.  Yes, sir.

16  Q    And you have that information, in fact, from a bank,

17  right?

18  A    Yes, sir.

19  Q    And JPM has a banking relationship with Mr. Crane?

20  A    I'm not certain.

21  Q    They indicated, though, they were familiar with his net

22  worth?

23  A    Yes, sir.

24  Q    Are you familiar with Mr. Beck's approximate net worth?

25  A    No, I am not.

1  Q   Do you know whether he has the financial wherewithal to

2  fund a bid?

3  A   He purports to, but I have not done independent due

4  diligence at this point, so --

5  Q   Mr. Beck has represented he has the financial wherewithal

6  to fund a bid?

7  A   That's correct.

8  Q   On his own?

9  A   No, I believe he needs to bring in some partners, but the

10 bulk of -- he's represented the bulk of the equity would be

11 his.

12 Q   Okay.  And he's represented that, with respect to any

13 portion of the equity that was not his, he has third parties

14 that would supply it?

15 A   He believes that he does.  Yes, sir.

16 Q   And Mr. Beck believes he could also raise the debt

17 financing?

18 A   Yes, he's very confident.

19 Q   And now, you're obviously -- you said you're not a Wall

20 Street investment banker, but you're obviously an energetic

21 banker with respect to sports franchises, correct?

22 A   Thank you.  Yes.  I hope so.

23 Q   Okay.  Well, and if you were actually representing anybody

24 who's interested in buying these assets, you would have known

25 how to guide them through the process, right?

1  A    Yes, I would have.

2  Q    And if they were interested in purchasing the assets, you

3  would have guided them to put their financing in place all

4  through the period of their interest.  Is that right?

5  A    No.  That's not the way it works, sir.

6  Q    Would you not have -- would you have -- would you not

7  guide an interested party towards pulling together financing

8  even before you sign on the dotted line, so they'd -- it is

9  available to be finalized --

10  A    In --

11  Q    Shh.  Hold on a second.

12  A    I'm sorry.

13  Q    On short notice?

14  A    The way this transaction is occurring right now, numerous

15  potential bidders have questions as to whether or not there

16  really is an auction going on.  To spend the money, the time,

17  the effort, legal fees, financial advisor fees, banking fees,

18  to get commitments without knowing whether or not you're going

19  to be given a fair shot at buying the asset, no one's going to

20  take that risk.

21  Q    Okay.  But let's just say you were hired to help somebody

22  buy these assets.  Okay?

23  A    Uh-huh.

24  Q    And they came to you.  Would you counsel them to start

25  exploring financing?

1    A    No.  What I would counsel them to do is get me in there,

2    let me see if you can actually buy these assets.  If you have

3    a real shot at buying them, then let's go to work, roll up our

4    sleeves, start talking to banks.  But banks aren't going to

5    give you any kind of financing commitment unless they know you

6    have a real asset that you're going to buy.

7    Q    Well, but you are aware that these significant

8    individuals, people that are in a position to buy and own a

9    Major League Baseball team, have banking relationships,

10   normally, right?

11   A    Certainly.

12   Q    Okay.  And so they can contact their banking relation and

13   start a conversation about their interest in making an

14   acquisition, right?

15   A    Sure.  You can have informal talks.

16   Q    Sure.

17   A    But it's not --

18   Q    And you can --

19   A    -- having your financing lined up.

20   Q    And you can -- well, but you can start to get the bank

21   thinking about a potential transaction, right?

22   A    Yes.

23   Q    And --

24   A    Thinking about a potential transaction.  That's correct.

25   Q    And if you have a good relationship with them, they'll

1   start to give you indications about whether or not they'll

2   finance the transaction, right?

3   A   They will give you a very amorphous indication if you

4   don't have details of the transaction.  You won't even know at

5   that point what you're paying, how much equity you're putting

6   in.  You don't know anything.

7   Q   But you can give the bank a series of assumptions and ask

8   them if they'll finance under those circumstances, right?

9   A   Banks don't finance under series of assumptions.  They

10  finance under facts, financial statements, and cooked deals.

11  Q   We're not at the point where the financing is actually

12  provided.  We're at the point where we're trying to get geared

13  up to make a bid for these assets, just like people are doing

14  now.  Okay?  Just, are you with me so far?

15  A   You're starting to lose me, but I'll try.

16  Q   Okay.  Well, let me start again.  Somebody comes to you

17  and says, "I want to buy the Texas Rangers.  I want to buy the

18  assets at issue.  Help me get myself in a position to do so."

19  A   Right.

20  Q   Is that understandable?

21  A   Yes.

22  Q   Okay.

23  A   Absolutely.

24  Q   Do you understand that you could set out a series of

25  assumptions about the structure of a transaction and talk to a

1  banker about whether --

2  A    Sure.

3  Q    -- the banker will provide financing?

4  A    And the marketing officer will come back to you and say,

5  "Eh, might pass the sniff test, but come back to me when you

6  have a real deal."

7  Q    Well, they'll ask you for some more information, right?

8  A    A lot more information.

9  Q    And you'll supply the information as it's available to

10  you, right?

11  A    That's correct.  But you're leaving out one important

12  component.  You have to know whether the asset is for sale and

13  whether you have a realistic chance of being able to buy it,

14  or else you're not going to hire lawyers and financial

15  advisors.  No one's going to hire me, Mr. Kurtz, and say, "You

16  know, I'm going to pay you to do a deal.  May be a deal there,

17  may not be a deal there.  Spend a month working on this thing.

18  Bill me.  And if it's not there, I'll just pay you and then

19  I'll walk away and do something else."

20  Q    So it's your understanding that when a person like a Mr.

21  Crane, with his standing and his relationships with bankers,

22  approaches his relationship banker to talk about possibly

23  getting involved in a deal, that the banker will say, "I'm not

24  going to talk to you about it because I'm not sure whether

25  it's really for sale"?

1   A    That's not what I said.

2   Q    Okay.  So you'll agree --

3   A    I said the buyer --

4          THE COURT:  Okay.

5          THE WITNESS:  The buyer would do that.

6   BY MR. KURTZ:

7   Q    Okay.  But you agree that the banker will talk to the

8   potential bidder about whether or not they're interested in

9   potentially financing the transaction, right?

10  A    Yeah.  Of course.  The banker will talk about anything.

11  Q    That's right.  And they could start putting in place all

12  the information they think they would need to get approval, so

13  that if they actually won the auction, they could get --

14  they'd be able to close.  Right?

15  A    To get that level of information, the level of due

16  diligence you're talking about, you're going to have to hire a

17  financial advisor.  You're going to have to go in.  You're

18  going to have to do some forensic accounting.  You're going to

19  have to spend a lot of time with the assets.  You have to

20  structure a deal.  Before you do that, you are going to want

21  to know whether or not it's a real process.

22  Q    Well, Mr. Crane and Mr. Beck had already gone through that

23  process, correct?

24  A    They had gone through some of it.

25  Q    They had done --

1   A    Mr. Crane --

2   Q    -- their due diligence, right?

3            THE COURT:  Hold --

4            THE WITNESS:  I'm sorry.  I'm -- can I answer your

5   question?

6   BY MR. KURTZ:

7   Q    They had done their due diligence.  I'm going to break it

8   up.  They had done their due diligence, right?

9   A    Not correct.  Mr. Crane did his due diligence way back in

10  January, I believe, and he dropped out.  Or even before then.

11  It was probably December.  Mr. Beck, the same thing.  They

12  have to do a lot of due diligence to see what the transaction

13  looks like today, what the condition of the asset is today.

14  Q    Okay.  But everybody seems to think the asset is doing

15  even better, right?

16  A    That's fine, but you still have to do your due diligence.

17  You don't go to your bankers and say, "It's doing better.

18  They're winning more games."  You have to look at the effect

19  it's had on attendance.  You have to look at all the other --

20  the other things that are going on around the asset right now,

21  --

22  Q    That's right.  And --

23  A    -- not the least of which is it's in bankruptcy.

24  Q    And people can get through that process pretty quickly,

25  right?

1  A   Mr. Kurtz, in today's financing environment, it takes

2  three weeks to get an auto loan.  We're not talking about

3  buying a bagel here.  We're talking about a financing

4  commitment that would be several hundreds of millions of

5  dollars.  It takes a long time for banks to commit to that,

6  especially in this regulatory environment, with the Fed and

7  the Comptroller of the Currency clamping down on banks.  Every

8  T has to be crossed, every I has to be dotted.

9  Q   Okay.

10 A   And plus you have the Patriot Act.  You don't do this in

11 two weeks.

12 Q   Because this is a risky kind of a credit?

13 A   No.  Because banks -- I don't -- if you read the press,

14 and I'm sure you do, you'd see that one of the complaints that

15 the federal government has right now about banks is they're

16 not lending.  The bank lending environment is very tight right

17 now.  The banks are taking a lot of time to go through and

18 make these commitments because they don't want criticized

19 assets.  And so when your regulators come in, they're going to

20 ask you, have you crossed every T, have you dotted every I,

21 have you done every bit of due diligence?  And you're going to

22 have to say yes.  And if you don't, you have a serious

23 problem.

24 Q   Okay.  As you just pointed out, and I do read the papers,

25 banks are not lending now, right?

1   A    Banks --

2   Q    Did -- sir, did you say that?

3   A    Banks are lending now?  I --

4   Q    You just said this is the --

5   A    I said it's a --

6   Q    Sir, --

7   A    It's a challenging environment, I said.

8   Q    Well, didn't you say, "You read the paper.  Banks aren't

9   lending.  It's a tight credit market"?

10  A    Aren't lending.

11  Q    Did you say that?

12  A    Aren't.

13          THE COURT:  Okay.  Now, wait a minute.

14          THE WITNESS:  I'm sorry.

15          THE COURT:  Both of you stop.  One more time of you

16  both going at the same time, Mr. Kurtz knows about the essays

17  I assign, and he'll get to write it himself this time, and so

18  you will, Mr. Galatioto.

19          THE WITNESS:  I apologize.

20          THE COURT:  All right?  So I want you to be very

21  careful about not talking over each other.  It messes up our

22  record, and it causes distress to my reporter, of whom I am

23  very fond.

24          THE WITNESS:  I apologize.  I'm sorry.  I didn't --

25  maybe --

1  BY MR. KURTZ:

2  Q    Based on --

3  A    I'm sorry.  I didn't mean to talk over you.  I --

4  Q    No, I'm going to --

5  A    Can you --

6  Q    I'm going to pose you a new question.

7  A    Thank you.

8  Q    Based on the tight credit markets, the concerns with

9  regulatory approval and the like, that creates risk that

10 bidders won't be able to finance their bids, right?

11 A    It creates -- it creates -- there's always risk in getting

12 credit approved.  If the bidder is well-capitalized, the banks

13 will do the deal.  It just takes longer.  It's not that they

14 won't do it.  I mean, look.  We -- I do more sports

15 transactions that anyone.  We can get the financing in place.

16 It just takes time.  If it's properly capitalized -- I'm

17 sorry.  Am I too close to this?  If it's properly capitalized

18 and properly structured, the banks will lend.  But it takes

19 time.

20     Even if it's the incumbent banker group -- by that, I mean

21 the incumbent first lien banker group -- you still have to go

22 through the same level of due diligence, the same level of

23 reporting, the same credit committees.  It takes time.

24 Q    No, it doesn't take time if it's an easy credit, right?

25 A    It takes time even if it's an easy credit.  You still have

1  to do the Patriot Act paperwork.  You have to do everything.

2  Q    All right.

3  A    It takes time.

4  Q    It --

5  A    And that's what's -- that's the problem.  It's been

6  slowing up.  The credit markets are jammed up because the

7  regulators are watching every move the banks make, and banks

8  are going to be more cautious.

9  Q    So --

10  A    Whether it's a risky credit or not.

11  Q    So it is your testimony that a bank cannot commit a loan

12  in less than what period of time, sir?

13  A    Well, what size loan are we talking about?  I'm not -- my

14  --

15  Q    $200 million.

16  A    A $200 million loan would take three to four weeks to get

17  done.

18  Q    So it'd take three to four weeks to loan $100 million to

19  Bill Gates or Microsoft?

20  A    Bill Gates or Microsoft?

21  Q    Yes.  That's my question.

22  A    Well, since Bill Gates has probably $10 billion in cash on

23  hand, I don't think he's going to be borrowing all that much.

24  But if Bill Gates came and wanted a signature loan, no.  We're

25  not talking about Bill Gates, though.

1  Q   Well, I'm trying to explore this difficult market.  You're

2  telling me that Bill Gates can get a $100 million loan, a $200

3  million loan, in less than three or four weeks, right?

4  A   You're talking about a nonrecourse loan --

5  Q   Sir, --

6  A   -- to a money-losing -- I'm trying to answer your

7  question, sir.  To a money-losing entity.  It's a far cry from

8  lending money to Bill Gates.

9  Q   Sir, we're going to get to -- first of all, you -- so this

10 is, again, a risky credit, since it's a money-losing

11 enterprise, right?

12 A   No.  It's a complicated credit.  Because it's not doing a

13 signature loan to Bill Gates.

14 Q   No, but --

15 A   A signature loan to Bill Gates --

16        THE COURT:  Let him finish, Mr. Kurtz.

17        MR. KURTZ:  All right.

18        THE WITNESS:  A signature loan to Bill Gates is easy.

19 All right?  You know what he has, he gives you his personal

20 financial statement, and you make the loan.  Here, --

21        THE COURT:  So you're saying if, in this case, for

22 example, Mr. Crane, not to pick on him, were willing to do

23 this as a signature loan, then you might get it done more

24 quickly?

25        THE WITNESS:  That's correct.  But if he's --

1        THE COURT:  All right.

2        THE WITNESS:  If he's doing --

3        THE COURT:  All right.  That's -- the answer is yes.

4   Go ahead, Mr. Kurtz.

5        THE WITNESS:  I'm sorry.

6   BY MR. KURTZ:

7   Q   Okay.  And another way other than to do it as a signature

8   loan would be to offer an operating support agreement, right?

9   A   That's correct.

10  Q   Okay.  Which is commonplace in the purchase of sports

11  franchises, right?

12  A   Yes, it is commonplace.

13  Q   And if they offer guarantees and if they offer operating

14  support agreements, then it wouldn't take long to put their

15  financing in place.  Correct?

16  A   That's not true, sir.  You have to negotiate the operating

17  support agreement, you have to negotiate the level, you have

18  to negotiate the mechanism.  Every operating support agreement

19  is slightly different.  It takes time.  It's not as simple as

20  you make it out to be.  I do this all the time.  I can assure

21  you, you don't do it in a week.

22  Q   Okay.  So is a guarantee a complicated item that has to be

23  -- that have to have the terms negotiated over a period of

24  time, or is a guarantee a pretty simple boilerplate form by

25  banks?

1  A    If you --

2              MR. LEBLANC:  Objection.  Compound.

3              THE WITNESS:  I'm sorry.  Am I allowed to answer?

4              THE COURT:  Just a minute.  Go ahead and break it

5  down.

6  BY MR. KURTZ:

7  Q    Is a guarantee a complicated, highly-negotiated document?

8  A    I have never seen a sports loan where an individual

9  guarantees the loan.

10 Q    No, no, no.  Sir, I'm asking about a guarantee.

11 A    It's --

12 Q    Is a guarantee -- have you ever -- surely, you've seen

13 personal guarantees, right?

14 A    I have seen personal guarantees, but --

15 Q    Okay.

16 A    -- someone who's going to buy the team under a personal

17 guarantee might have to do a signature loan.

18 Q    Okay.  So you've seen signature loans, you've seen

19 personal guarantees, right?

20 A    That's not the market.  No one does that.

21 Q    Shh.  Shh.  Okay.  No.  You've seen them, right?

22 A    Not in sports loans.

23 Q    Okay.  Well, would it take a long time to put in place a

24 signature loan or a guarantee?

25 A    In order to get a signature loan, you would have to be a

1    person of such high net worth that you're at the very tip of

2    the pyramid here.  There aren't many people that can write a

3    signature loan for hundreds of millions of dollars.

4    Q    But are you familiar with Mr. Crane's net worth?

5    A    I believe that I testified that I've not done due

6    diligence.

7    Q    Okay.  So --

8    A    That JPMorgan has told me he has the financial wherewithal

9    to close the deal.  They did not say to me, "He has the

10   financial wherewithal to do an all-cash deal."  No one would

11   do that.  It's just not market standard.  Yeah.  I've never --

12   maybe you can find one instance, but, you know, I've done

13   many, many deals; I've never seen that happen before.

14   Q    You spoke about being involved in the Warriors

15   transaction?

16   A    Yes, sir.

17   Q    And the Warriors did not accept the highest bidder, right?

18   A    That is not true.

19   Q    Were you quoted in *ESPN* last night saying that you didn't

20   accept the highest bidder?

21   A    No.  I said -- I said -- I don't care what it says in the

22   newspaper.  I will tell you what happened in the process,

23   since I've been very public about it.  We were at -- we were

24   ready to sign the purchase and sale agreement.  Another party

25   came in with a marginally higher bid that was not negotiated.

1  I felt I was morally bound, because I had a handshake, to the

2  buyer group.  People on Wall Street get criticized all the

3  time for walking away from deals and giving it somebody else.

4  That's not the way I operate.

5  Q   Okay.

6  A   And my seller agreed with me.  So we did morally and

7  ethically the right thing.

8  Q   Okay.  The moral and ethical thing you did was you went

9  forward with the bidder that had prevailed at the time, right?

10 A   We went forward with the bidder that we thought we had the

11 highest likelihood of closing.  And after all the adjustments

12 were done, we did not know what the true cash proceeds to the

13 lenders would be if we took the other bid.

14 Q   Okay.  And here, of course, RBE was the prevailing bidder

15 that had the handshake before now, right?

16 A   I'm -- I'm con...

17 Q   Sir, you're confused.  You just said to me that you did

18 the morally, ethical right thing by staying with the bidder

19 that had prevailed at the time.  And I'm asking you, isn't

20 that in this case RBE?  Aren't they the party that prevailed

21 at the time of the first auction, and are still the stalking

22 horse agreement today?

23 A   After I looked at all the transactions -- and I'm not a

24 legal expert, but the financial legerdemain, if you will --

25 done it before the bankruptcy, I am amazed that you would make

1  that statement, that they won in a fair and open process.  But

2  that's just my opinion.

3          MR. KURTZ:  I'm going to move to strike.  I didn't

4  say a fair and open process.  My question to this witness was

5  whether they were the party that had the handshake agreement

6  following the process and through the stalking bid agreement

7  that's before the Court today.

8          MR. LEBLANC:  Your Honor, I think that's obviously a

9  topic for a much lengthier discussion, if we're going to have

10  it.  And if he wants to have that discussion, we're happy to

11  have it.

12          THE COURT:  I'm not sure where it gets you, Mr.

13  Kurtz, but you do agree that Rangers Baseball Express was the

14  chosen bidder after the process run initially by Perella and

15  then by Major League Baseball.  Is that not so?

16          THE WITNESS:  I believe so.  Yes, Your Honor.

17          THE COURT:  All right.  And that Rangers Baseball

18  Express understood that it had the support of both the owner

19  of the Rangers as well as Major League Baseball?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  All right.  Move on, Mr. Kurtz.

22          MR. KURTZ:  Thank you.

23  BY MR. KURTZ:

24  Q   And what was the purchase price for Golden State that was

25  accepted?

1  A    $450 million.

2  Q    4-5-0?

3  A    4-5-0.

4  Q    And what was the purchase price offered by the other

5  bidder that you say was not the highest bidder?

6  A    I believe that I'm bound by confidentiality.

7  Q    More than $450 million?

8  A    No.  Oh, was it more than four hundred --

9  Q    Yes.

10 A    I thought you said more than four -- yes.  It was

11 marginally more.

12 Q    Okay.  So it was, in fact, a higher bid?

13 A    No, it wasn't, because it wasn't a fully negotiated bid.

14 And as you know, there are deductions and adjustments that are

15 done.  And we had a very clean deal.  We didn't know what the

16 other deal was going to look like.

17 Q    Okay.  And there is a clean deal in place with RBE right

18 now, right?

19 A    A very low price.  Even lower than Mr. Greenberg's initial

20 bid.

21         MR. KURTZ:  Move to strike.

22         THE COURT:  Overruled.  Go ahead.

23 BY MR. KURTZ:

24 Q    Is there an agreement fully negotiated and committed with

25 RBE right now?

1  A   I believe so.

2  Q   And isn't it true that any bidder that now comes along

3  does not have a negotiated agreement?

4  A   Obviously.

5  Q   All right.  And Mr. Crane and Mr. Beck have been around

6  for months, right?

7  A   No, they have not.

8  Q   Were they around in December 2009 and January 2010, --

9  A   Yes.

10 Q   -- looking at these assets?

11 A   Yes.

12 Q   Are they still here?

13 A   Well, there was a gap.  You're mischaracterizing it.  They

14 weren't here the whole time.  They left, their financing fell

15 away, and now they're restarting.  So you can't -- it's a

16 mischaracterization to say they've been here all along.  I

17 don't believe they've been here all along.

18 Q   So you have firsthand personal knowledge that they didn't

19 continue to look at these assets for the interim period?

20 A   My negotiations -- my conversations with Mr. Crane,

21 certainly, he stopped.  And I know Mr. Beck stopped looking at

22 them.

23 Q   Sir, do you have personal knowledge as to whether Mr.

24 Crane and Mr. Beck stopped looking at these assets at any

25 point in time between December 2009 and today?

1  A    Can you define personal knowledge?

2  Q    Yeah.

3  A    I can tell you what they told me.

4  Q    That would be --

5  A    Is that personal knowledge?

6  Q    No, that would be hearsay.

7  A    Well, then I don't know how to respond.

8  Q    Okay.

9        THE COURT:  Well, you could say, "No, I don't have

10 any personal knowledge."  That might be --

11       THE WITNESS:  Okay.

12       THE COURT:  -- a good way to respond.

13       THE WITNESS:  All right.  I'll try it.  No, I don't

14 have any personal knowledge.  Thank you, Your Honor.

15 BY MR. KURTZ:

16 Q  Okay.  You mentioned a break-up fee.  Now, obviously, the

17 break-up fee -- strike that.  The amount of the break-up fee

18 shouldn't impact any bidder who was prepared to bid the amount

19 of the RBE agreement plus the amount of the break-up fee,

20 right?

21 A    Well, it would have to be more than the amount of the

22 break-up fee, right?

23 Q    Or more, right?

24 A    Well, not or more.  If it's the same, --

25 Q    They'd have to exceed it?

1  A    Significantly, I would think.

2  Q    I don't know -- what's your basis for saying they have to

3  exceed it significantly?

4  A    Oh, if it's $100,000 more and you have a negotiated deal,

5  you're obviously, you know, better off taking what you have.

6  Q    Okay.  At what point are you still better off taking what

7  you have?

8  A    I think, in this instance, what you have -- are you asking

9  my opinion?

10  Q    I'm asking you what's your opinion as to the amount in

11  excess of the break-up fee that the Debtor would still be

12  better off taking what they have.

13  A    $10 million.  $15 million.

14  Q    Okay.  So some amount, and maybe more than $15 million?

15  A    It could be $50 million.

16  Q    Could be $50 million.  So the Debtor would be better off

17  staying with the committed deal it has now even if a bidder

18  came along with more money, correct?

19  A    No.  That's not what I said.  I'm sorry.  Maybe I'm

20  confused.  What you asked me was -- oh, the Debtor?  I

21  apologize.  I think the Debtor would be better off taking a

22  higher bid of $10 to $15 million.

23  Q    In excess of --

24  A    Of the break-up fee, yes.

25  Q    Of the break-up fee?  So you think the Debtor would be

1  better off taking a bid that equals RBE's bid plus the break-

2  up fee plus an amount of $10 to $15 million more?

3  A    That's correct.

4  Q    And anything beneath that, they'd be better off sticking

5  with RBE, correct?

6  A    No.  Economically, anything beneath that would have to,

7  correct?

8  Q    Okay.

9  A    I mean, it's a mathematical calculation.

10 Q    Okay.  And the break-up fee is paid not by the bidder;

11 it's just something that gets distributed to the Equity,

12 right?

13 A    It's actually paid by us.

14 Q    I'm sorry.  Gets distributed to RBE, right?

15 A    It's paid by the banks.

16 Q    It's paid by the banks, effectively?

17 A    So it's not paid by no one.

18 Q    So, bidders don't care whether the banks have to pay that

19 amount, right?

20 A    No.

21 Q    Okay.

22          MR. KURTZ:  No further questions.

23          THE COURT:  Major League Baseball?

24          MR. ESSERMAN:  No questions.

25          THE COURT:  All right.  Mr. Leblanc?  Do you want to

1  give Mr. Kurtz time to get away from the lectern?  I don't

2  want bloodshed in the court.

3          MR. LEBLANC:  Thank you, Your Honor.

4                  REDIRECT EXAMINATION

5  BY MR. LEBLANC:

6  Q   Okay.  Good afternoon, Mr. Galatioto.  Let me start with

7  the Golden State Warriors.

8  A   Yes, sir.

9  Q   How much did their lenders take relative to their debt,

10 based on the sale?

11 A   The lenders were paid out 100 cents on the dollar,

12 obviously.

13 Q   So the decision to take an offer other than the one that

14 came in after the bid --

15 A   Uh-huh.

16 Q   -- after the bid process closed that you described in your

17 discussions, whose ox was gored in that?

18 A   It was the seller, Mr. Cohan.  He made the decision, and

19 it was money going to him.

20 Q   And who did you represent in that matter?

21 A   I represented Mr. Cohan.

22 Q   And what decision did he make with respect to which offer

23 to take?

24 A   He decided to take a slightly lower bid.

25 Q   Okay.  Now, you were asked some questions about the level

1  of risk associated with this loan --

2  A    Uh-huh.

3  Q    -- and was this a risky credit, or something, words to

4  that effect.  Do you recall those questions?

5  A    Yes, sir.

6  Q    Are you aware of any other situation in Major League

7  Baseball where lenders have not been paid in full?

8          MR. KURTZ:  Objection.  What's the relevance to the

9  capital structure of other baseball teams that have been sold?

10         THE COURT:  Well, I'm going to sustain the objection.

11  In terms of payment in full, that $75 million from the

12  perspective of the Rangers, I understand you're owed a lot

13  more by the HSG Group, but I think that I've already held that

14  in terms of your monetary obligation, the $75 million plus

15  interest takes care of the Rangers.  Now, that doesn't mean

16  that you don't have rights vis-à-vis Equity, but I'm going to

17  sustain the objection.  Move on, Mr. Leblanc.

18         MR. LEBLANC:  Well, Your Honor, am I permitted to ask

19  other questions to get to the same --

20         THE COURT:  Well, you can ask other questions and

21  we'll see what happens.

22         MR. LEBLANC:  Okay.

23         THE COURT:  I'm not going to foreclosure you.  I

24  mean, you can ask him if he has a date tonight, if you want,

25  and I would probably sustain an objection to that.

1          THE WITNESS:  My wife would be very upset.  That's

2   probably not a good one.

3          THE COURT:  Well, especially if the answer is yes,

4   right?

5       (Laughter.)

6          THE WITNESS:  On the record, the answer is no.

7          THE COURT:  Okay.  Well, I'm sure that you'll be glad

8   to have that reported.

9          THE WITNESS:  Oh, yeah.  I don't want any reporters

10  writing anything different.

11         THE COURT:  All right.

12         THE WITNESS:  Yes.  Thank you.

13         THE COURT:  Well, but you understand what I'm saying.

14  You can ask anything you want.  I may sustain an objection to

15  it again.  Go ahead.

16         MR. LEBLANC:  That's fine, Your Honor.

17  BY MR. LEBLANC:

18  Q   The structure --

19         THE COURT:  If I get tired on the line, I'll tell you

20  to move on.

21         MR. LEBLANC:  Okay.  I wanted to make sure you hadn't

22  yet done that with the first question I asked him.  That was

23  the main point.

24  BY MR. LEBLANC:

25  Q   With the structure that's in place for this loan, where

1  there's a limited guarantee and then a larger loan to the

2  holding company, is that a structure that is common in sports

3  financing?

4  A   Yes, it is.

5  Q   Okay.  And are you aware of a situation in any Major

6  League Baseball sale where the lenders to the holding company

7  are not paid in full from the disposition of assets by the

8  team?

9         MR. KURTZ:  Objection.  Relevance.  The lender to the

10  Debtor is being paid in full.  What's the difference?

11         THE COURT:  I'm going to sustain the objection, Mr.

12  Leblanc.  I understand your point.

13         MR. LEBLANC:  Your Honor, can I respond before I

14  lose?

15         THE COURT:  All right.  Go ahead.  Not necessarily.

16  I'm happy to let you lose before you respond.  It makes life

17  much easier.

18         MR. LEBLANC:  That's in large part why we're here

19  today, Your Honor.  So --

20         THE COURT:  Yes.  Yes.  Well, it's why I'm here.

21         MR. LEBLANC:  Yes.

22         THE COURT:  Go ahead.

23         MR. LEBLANC:  Your Honor, there was a lot of

24  questions -- there were a lot of questions asked of the

25  witness about whether this was a risky loan, a risky credit,

1   things like that.  I'm just trying to elicit testimony with

2   respect to whether a loan to a baseball team is in fact a

3   risky credit or if this one stands somewhat unique in the

4   world of baseball finance.

5            THE COURT:  Well, you can ask -- how about if you ask

6   him that question?

7   BY MR. LEBLANC:

8   Q   Do you believe that a loan to a prospective purchaser

9   here, in light of what's happened in this bankruptcy, is a

10  risky creditor?

11  A   No, I do not.

12  Q   Okay.  Now, you were asked some questions about Merrill

13  Lynch, and I think you had an answer you wanted to give.  Can

14  you describe for us your experience with Merrill Lynch in the

15  sports finance or sports investment banking --

16  A   They are extremely marginal players.  I believe it was

17  handled out of the Dallas office, which I don't believe does

18  any substantive sports transactions.

19  Q   And have you worked with Merrill Lynch on a sports deal

20  before?

21  A   I don't believe so.

22  Q   You were asked some questions, and if you still have

23  Debtor Exhibit 1 there -- I don't know if you need to refer to

24  it.  That's the e-mail from Mr. Herenstein.  And you had begun

25  to give an answer of:  Do you want me to tell you what I was

1  doing at around this time?  I wanted to give you an

2  opportunity.  What were you doing at or around the time that

3  these e-mails were being sent?

4  A   I was talking to representatives of Major League Baseball

5  about getting an improved bid and hopefully doing a consensual

6  transaction to avoid a bankruptcy.

7  Q   At some point in time, were you asked to provide

8  financing?

9  A   Yes, sir.

10 Q   Okay.  Who were you asked to provide -- who asked you to

11 provide financing?

12 A   I believe Mr. DuPuy asked me to go to a meeting at Major

13 League Baseball, where I met with Mr. Greenberg and some of

14 his representatives.

15 Q   And what amount of financing were you asked to provide?

16 A   I was asked to provide $40 million in financing, $20

17 million in the first lien, which they had not obviously closed

18 out, or I assume they hadn't, and $20 million of second lien

19 financing so that they could raise their bid by $11 million.

20 Q   And so what -- the net effect to you would be the bid

21 would be raised by what amount of money?

22 A   $11 million.

23 Q   And how much would you lend for that bid being raised by

24 $11 million?

25 A   $40 million.

1  Q   Now, and did you continue after the April 30th time frame

2  to try to negotiate a consensual deal with Major League

3  Baseball?

4  A   Yes.

5  Q   And how -- when did you -- how long did those discussions

6  continue?

7  A   Right up until the Friday before the filing.  The filing,

8  I believe, occurred on a Monday, if I'm not mistaken.

9  Q   Were you advised by anyone in advance of that Monday that

10 there was going to be a filing by the Rangers?

11 A   No, sir.

12 Q   How did you find out about it?

13 A   Actually, we were on a conference call and it came in over

14 the wire.

15 Q   Now, you were asked a series of questions about --

16 hypothetical questions about a hypothetical buyer coming in

17 and saying -- talking about a hypothetical process.  Do you

18 recall those questions?

19 A   Yes, sir.

20 Q   Do you believe that -- let's try to take it from the world

21 of hypotheticals and take it to this particular circumstance.

22 Do you believe that bankers would have had the series of

23 discussions that you're describing prior to there being an

24 open auction process here?

25 A   If there were an open auction process, absolutely.

1   Q   But prior to there being an open auction process, do you

2   believe those discussions would have happened?

3   A   No.

4   Q   Why not?

5   A   People are going to concentrate their resources on

6   transactions that look they're going to happen.  Every

7   institution has limited resources.  They're going to allocate

8   those resources to deals that have a high probability of

9   closing.

10  Q   Are there -- in your experience, are there banks that

11  routinely lend to Major League Baseball teams?

12  A   Yes, sir.

13  Q   What was your understanding at least of the public

14  statements made by Major League Baseball of their support for

15  the Greenberg-Ryan Group until two weeks ago today?

16  A   It appeared that they were squarely in the corner of the

17  Greenberg Group and they were pushing forward with this

18  transaction.

19  Q   And what effect, if any, do you think that those public

20  statements would have on the willingness of bankers in those

21  situations to get involved in a proposed bid by somebody

22  before the process was open?

23  A   It would have a clearly chilling effect.

24  Q   Now, when in your view is the latest or the time when the

25  process might be considered to be open?

1  A    In a transaction like this?  You mean when --

2  Q    In a transaction like this.

3  A    -- when is the deal done?

4  Q    In a transaction like this.  When would there be an open

5  process, in your view?

6          THE COURT:  Just a minute.

7          MR. KURTZ:  Your Honor, I object.  I mean, we've done

8  a lot of leeway on this.  I have no expert report.  He's not

9  here to talk about when processes end and don't.  He's not

10  giving factual evidence.  He's just speculating, and he's

11  trying to offer opinions.  He doesn't have a right to offer

12  opinions.  He didn't comply with any of the expert discovery

13  rules.

14          MR. LEBLANC:  I'll give two responses.  As I said

15  before, under Rule 9014, Rule 726 does not apply.  And I'm not

16  offering him as an expert testimony.  I just think he's wrong

17  as a matter of law.

18      So, secondly, more importantly, I think, Mr. Beagles asked

19  a series of questions that dealt with the fact that the

20  process, the bankruptcy process, started way back on May 24th,

21  so haven't bidders had two months, four days from now, two

22  months to investigate and look at these assets?  What I'm

23  going to try to ask the witness is whether in fact he believes

24  that bidders have had two months to look at the process.  If

25  it was fair for Mr. Beagles to ask those questions, which I

1  believe it was, I just think that they were incorrect, the

2  premise behind them was --

3           THE COURT:  Well, I had thought that he had testified

4  to the length of time that he thought the process required.

5  But since I was going to ask essentially the same question

6  that Mr. Leblanc is currently going to ask -- you figured that

7  one out when you started to sit down, Mr. Kurtz.  Since I was

8  going to ask the same question, I'm going to let Mr. Leblanc

9  ask it.  If you have an objection to the form of the question

10 or otherwise, such as on the basis that it's leading, I'm -- I

11 will entertain that objection.  But I'm going to let you ask

12 your question.

13 BY MR. LEBLANC:

14 Q   When do you believe the process -- do you believe -- let

15 me ask it in a -- try to ask it in a non-leading way.  What

16 effect, if any, do you think the filing of the bankruptcy had

17 on opening up the process to other bidders?

18 A   I think it chilled the process.

19 Q   Okay.  When do you believe, if at all, the process for the

20 sale of the Texas Rangers has become an open process?

21 A   I don't believe it's become a completely open process even

22 now.

23 Q   How long do you think from the time that it becomes an

24 open process, how long do you believe that is an adequate time

25 not for people to get in their bids, but to get their best

1  bids in?

2  A   I think it'll take 90 to 120 days.  On an expedited basis,

3  you might be able to do it in 90 days if everybody pulls

4  together.  Obviously, it's -- August is coming up and I'm a

5  realist.  Let's be honest.  It's hard to get things done in

6  August.  But if everybody pulls together and the bidders

7  really want to put in their best bids, they can do this in 90

8  days, 120 on the outside.

9  Q   You had given some answers -- or, been asked some

10 questions about personal guarantees.  Have you seen any sports

11 deals done with a personal guarantee?

12 A   You know what?  There may have been one.  I cannot recall

13 one.  With a full personal guarantee?  No.

14 Q   Have you seen any sports teams bought on a signature loan?

15 A   That's a good question.  Not that I have been a party to,

16 but I believe Paul Allen, when he purchased the Portland Trail

17 Blazers, may have borrowed under a signature loan.

18 Q   Mr. Allen is a person of substantial means, is that fair

19 to say?

20 A   Oh, Forbes says he's worth $20 to $22 billion.

21 Q   Is it common for purchasers of sports teams to do so, to

22 pay cash for them?

23 A   It's almost never done.

24     MR. KURTZ:  Your Honor, we're into expert testimony.

25 There's no factual basis for this witness.  This is not a part

1  of this transaction.  This is purely opinion testimony.

2          THE COURT:  Mr. Leblanc, I think you've covered about

3  what you can there.

4          MR. LEBLANC:  Overall, or just on this topic?

5          THE COURT:  No, you can --

6      (Laughter.)

7          THE COURT:  You can go onto another subject, but I

8  think I understand, and I think we've covered this ground

9  before with this witness already.  So, go ahead.  Move on to

10  something else.

11          MR. LEBLANC:  Well, Your Honor, I think, then, I will

12  conclude my questioning of the witness.

13          THE COURT:  All right.

14          MR. LEBLANC:  I appreciate Your Honor -- the Court's

15  time.

16          THE COURT:  All right.  Thank you, Mr. Leblanc.

17          MR. LEBLANC:  Thank you, Your Honor.

18          THE COURT:  Mr. Beagles?

19                      RECROSS-EXAMINATION

20  BY MR. BEAGLES:

21  Q   You have been -- you've testified at length about what

22  you've called the very tight lending environment.  Do you

23  remember that?

24  A   Yes, sir.

25  Q   And you said, I believe, that it would take three to four

1  weeks to do a $200 million loan for a baseball team.  Did you

2  say something like that?

3  A   I believe a baseball team that's cash flow negative, yes,

4  sir.

5  Q   All right.  Earlier today, Mr. Snyder testified that he

6  believed one of the four potential bidders, in addition to the

7  Greenberg-Ryan Group, was negotiating with the Lender Group

8  about what he called bridge financing.  Do you recall that?

9  A   Yes, sir, I do.

10 Q   Is that true, that the Lender Group has been negotiating

11 bridge financing with one of the bidders?

12 A   We did briefly.  I cannot give you the date.  It was here

13 in Dallas.  With -- I believe it was part of a mediation that

14 Judge Nelms was holding.

15            THE COURT:  All right.  I might point out to you, Mr.

16 Galatioto, --

17            THE WITNESS:  Thank you.

18            THE COURT:  -- that there are folks here who would

19 resent this being called Dallas.

20            THE WITNESS:  I'm sorry.  Oh, I apologize.

21            THE COURT:  That's perfectly all right.  It's a

22 common mistake.  But --

23            THE WITNESS:  Well, no, actually, we did negotiate it

24 in Dallas.  It was at the offices of one of the law firms.  So

25 it was in Dallas.

1          THE COURT:  Yes.  But it wasn't here in Dallas.

2          THE WITNESS:  Oh, I see.  Very good point.  I will --

3          THE COURT:  Go ahead.  I'm sorry.

4    BY MR. BEAGLES:

5    Q    Are you familiar with the term "take-back notes"?

6    A    Yes, sir.

7    Q    Is the bridge financing that we're talking about now the

8    same as the take-back notes that you've been negotiating with

9    one of the bidders?

10          THE COURT:  Just a minute.

11          MR. LEBLANC:  Your Honor, --

12          THE WITNESS:  I'm sorry.

13          MR. LEBLANC:  -- I'm looking at my notes, but I

14   object.  I believe this well exceeds the scope of the

15   redirect.

16          THE COURT:  Well, that may be, but in this case I had

17   both requested and my questions are going to exceed the scope

18   not only of redirect but of direct.  And this witness was to

19   be produced for both sides.

20      So it seems to me, unless you want to commit Mr. Galatioto

21   to necessarily return here -- and I assume you'd rather stay

22   in New York?

23          THE WITNESS:  I like it here.  Fort Worth is really

24   nice.

25          THE COURT:  Well, you may get a lot of time to spend

 1  here.  You could move down here.

 2          THE WITNESS:  That'd be nice.

 3          THE COURT:  Yes.  Well, there you go.

 4     But what I'm saying is I'm going to let this go forward,

 5  rather than requiring that they recall the witness.

 6          MR. LEBLANC:  And that's fine, Your Honor, as long as

 7  I get my opportunity to ask my first questions of the witness

 8  about this topic, if they want -- if I --

 9          THE COURT:  If you -- well, you've had your direct,

10  and this is their direct, as I see it.  So we'll see when we

11  get there what the questions are.  But I'm pretty flexible on

12  those types of issues, as I think by now you've recognized.

13          MR. LEBLANC:  That's fine, Your Honor, as long as I'm

14  not foreclosed from asking questions.  I would have redirected

15  if I felt the need to, if we get to a point that I feel we

16  need to.

17          THE COURT:  Well, let's see where we go.  Mr.

18  Beagles?

19          MR. BEAGLES:  Thanks, Your Honor.  And I'll be brief.

20  Why don't I just cut to the chase here?

21  BY MR. BEAGLES:

22  Q   Isn't it true that eight days ago the Lender Group agreed

23  to provide nine-figure financing in take-back notes to one of

24  the potential bidders?

25  A   No, not the Bank Group.

1  Q   We discussed it.  We never settled on terms and

2  conditions.  We never went to the general bank group.  So it

3  was very preliminary.

4  Q   Did GSP agree to those terms?

5  A   No, I did not get approval.  I did not even go for

6  approval.  We didn't get that far.  So I can't agree until I

7  get formal approval from my investors.

8  Q   All right.  So you're denying that you signed a letter to

9  one of the bidders agreeing to take over nine figures back in

10 take-back notes as part of a --

11 A   I'm not denying that.  What I'm saying is we proposed it

12 but we needed to get internal approval.  So I'm saying, yes,

13 I'm going to consider that.  This is something we're going to

14 consider doing.  But we didn't have formal credit approval,

15 and did not go to the general bank group.  That's what I'm

16 saying.

17          MR. BEAGLES:  No further questions.

18          THE COURT:  Mr. Kurtz?

19                    CROSS-EXAMINATION

20 BY MR. KURTZ:

21 Q   On redirect you spoke about Merrill Lynch and the Dallas

22 office and your view of their level of experience, right?

23 A   I'm sorry.  Say that again?

24 Q   Yeah.  On redirect, you spoke about Merrill Lynch and

25 their Dallas office and --

1   A    I --

2   Q    -- your view of their experience.  Right?

3   A    Yes, sir.

4   Q    But the process was run by Joe Ravitch, right?

5   A    Joe Ravitch came very late to the process.

6   Q    You know who Joe Ravitch is, right?

7   A    Oh, of course I do.

8   Q    He's an experienced banker, right?

9   A    Yes, sir.

10       MR. LEBLANC:  Asked and answered.

11  BY MR. KURTZ:

12  Q    He represents --

13       THE COURT:  Wait.

14       MR. LEBLANC:  Asked and answered, Your Honor.  That

15  was -- Joe Ravitch was the subject -- the name was a little

16  mispronounced, but that was the subject of the cross-

17  examination earlier.

18       THE COURT:  All right.

19       MR. KURTZ:  Asked and answered?  I didn't realize I

20  was at a deposition, Your Honor.  I'm recrossing on the idea

21  about whether this process was run by --

22       THE COURT:  All right.  Go ahead with your question,

23  Mr. Kurtz.

24  BY MR. KURTZ:

25  Q    Mr. Ravitch represents MLB, right?

1   A    Represents MLB?

2   Q    Yes.

3   A    Not to my knowledge.

4   Q    Okay.  You're not aware of that?

5   A    No.

6   Q    Are you aware that he represented the seller in the San

7   Diego Padres transaction?

8   A    No.

9   Q    Are you aware that Mr. Ravitch represented the buyer in

10  the Boston Red Sox transaction?

11  A    Yes.

12  Q    Okay.  And are you aware that Mr. Ravitch represents the

13  NBA with respect to Chinese operations?

14  A    Actually, Goldman Sachs does, not Mr. Ravitch.

15  Q    Mr. Ravitch is -- is a Goldman Sachs investment banker, or

16  formerly Goldman Sachs, and he represented the NBA in China,

17  correct?

18  A    I believe that -- the engagement letter between the NBA

19  and Goldman Sachs.  I don't know if Joe Ravitch personally

20  represented the NBA in China.

21  Q    You don't know one way or the other?

22  A    No.

23          MR. KURTZ:  No further questions.

24          THE COURT:  All right.  Anything else?

25      (No response.)

1          THE COURT:  Okay.  I've got a few questions for you,

2    Mr. Galatioto.

3          THE WITNESS:  I'm loving the way you're saying my

4    name.  I could definitely move down here.

5          THE COURT:  Well, I wouldn't do it on that basis, if

6    I were you.  You might want to stand outside for about 15

7    minutes before you decide you want to come here.

8          THE WITNESS:  It's just as hot where I come from.

9                    EXAMINATION BY THE COURT

10         THE COURT:  All right.  What is the value -- what

11   effort has the Lender Group made, to your knowledge, to

12   evaluate other sources of repayment besides the Texas Rangers?

13         THE WITNESS:  We are also -- GSP has been engaged by

14   Mr. Hicks to sell the Dallas Stars, and his 50 percent

15   interest in COC, which is Center Operating Company, which owns

16   50 percent of the American Airlines Arena.  So that will be a

17   source of repayment as well.  And we are in active discussions

18   currently with three prospective buyers on that transaction.

19         THE COURT:  All right.  What about the British soccer

20   team?

21         THE WITNESS:  We are not a party to that.  I can't

22   speak for all the banks.  GSP is certainly not involved in

23   that.

24         THE COURT:  Well, is that owned by a member of the

25   HSG group?

1    THE COURT:  No, it is not, Your Honor.

2    THE COURT:  All right.  All right.  What do you think

3  you're going to realize from assets other than the Texas

4  Rangers?

5    THE WITNESS:  I think throughout this process we

6  thought a fair price would be -- are you asking me what we

7  think we'll realize under this bid, or what we should realize?

8    THE COURT:  No, I'm asking you --

9    THE WITNESS:  Okay.

10    THE COURT:  -- what do you think you will realize

11  other than from the sale of the Texas Rangers?

12    THE WITNESS:  Oh, what do we think we'll realize

13  other than the sale of the Texas Rangers?

14    THE COURT:  Right.

15    THE WITNESS:  It's a little murky right now with the

16  Stars sale.  Net proceeds to the banks are fluctuating between

17  $140 and $150 million.

18    THE COURT:  All right.  And that's all the assets of

19  HSG?

20    THE WITNESS:  I believe substantially all the assets

21  of HSG.  If it has any others -- I don't want to misspeak, but

22  those are substantively all the assets, --

23    THE COURT:  All right.

24    THE WITNESS:  -- I believe.

25    THE COURT:  And do I understand that the banks do not

1    have Mr. Hicks' personal liability at all?  Is that correct?

2              THE WITNESS:  That's correct, Your Honor.

3              THE COURT:  Okay.

4              MR. LEBLANC:  Your Honor, can I just -- just to be

5    clear, contractually, you mean, correct?

6              THE COURT:  Yes.

7              MR. LEBLANC:  Okay.  All right.

8              THE COURT:  I'm referring to guarantees, signatures,

9    --

10             MR. LEBLANC:  Okay.

11             THE COURT:  -- what-have-you.

12             MR. LEBLANC:  I wanted to make sure that we're not --

13   we're obviously reserving all rights to bring whatever tort

14   cases --

15             THE COURT:  I understand that you may sue Mr. Hicks,

16   and that that may -- I may have the dubious pleasure of

17   hearing that soon.

18      All right.  Now, you have indicated how difficult it is in

19   the present environment to make a loan, right?  Would be $40

20   million be a hard loan to make, say, to this club?

21             THE WITNESS:  $40 million?

22             THE COURT:  Yes.

23             THE WITNESS:  No.

24             THE COURT:  Okay.  As you know, you offered, your

25   counsel offered on your behalf, basically at the drop of a hat

 1  on the second day of this case, to provide $40 million of

 2  financing at LIBOR plus 1 percent.  So you'd come up with $40

 3  million pretty easily?

 4          THE WITNESS:  Yes.  On a DIP basis?  Absolutely.

 5          THE COURT:  All right.  I gather you've done at least

 6  one other bankruptcy sale, the Cubs sale?

 7          THE WITNESS:  Yes, sir.

 8          THE COURT:  All right.  How long did that process

 9  last in bankruptcy?

10          THE WITNESS:  Oh, I don't remember when the Tribune

11  Companies went into bankruptcy.  They were in bankruptcy for

12  quite a while the Cubs operated.

13          THE COURT:  Uh-huh.

14          THE WITNESS:  The Cubs themselves did not file.  We

15  filed the Cubs after we had a fully-negotiated transaction

16  with the Ricketts, and it went in and out of bankruptcy very

17  quickly on a prepackaged basis with consent of all the

18  lenders.

19          THE COURT:  All right.  So you do not have any other

20  experience other than that with bankruptcy auctions?

21          THE WITNESS:  That is correct, Your Honor.

22          THE COURT:  Okay.  And you understand -- or, do you

23  understand that a sale out of the Bankruptcy Court is cleaner

24  than a sale that you get in the real world?

25          THE WITNESS:  Absolutely.

1      THE COURT:  All right.  So, nevertheless, you feel

2  that the bankruptcy negatively impacts the ability to find

3  bidders for this team?

4      THE WITNESS:  I believe that bankruptcy put a halt to

5  the momentum that you would have.  Yes, I think it's more

6  difficult until the bidders understand that it is a fair and

7  open process through the bankruptcy.

8      THE COURT:  What momentum was there before the filing

9  of the bankruptcy?

10      THE WITNESS:  I think the momentum I'm talking about

11  is negotiating with Mr. Greenberg and Major League Baseball to

12  get a higher and better bid for the team.

13      THE COURT:  From Mr. Greenberg?

14      THE WITNESS:  That's correct.

15      THE COURT:  All right.  I have in front of me -- at

16  least I had in front of me -- transcripts of the first two

17  days of May 26th, okay, in this Court, at which point -- and

18  again, I recognize that outside this courtroom, people may not

19  see my statements as being significant in this regard, but the

20  lawyers all certainly did.

21    I have made the statement, and I'll quote myself:  "Let me

22  make it very clear.  It would be my view that the Debtor in

23  Possession has an obligation to at least explore to some

24  extent alternatives that may be available to it as

25  alternatives to the asset purchase agreement and the

 1  presently-filed plan of reorganization.  I'm not saying that

 2  they have an obligation to adopt these alternatives, but I do

 3  think that they have that."

 4      Okay?

 5          THE WITNESS:  Yes, sir.

 6          THE COURT:  So, really, at that point, Debtors would

 7  have known that they had the ability to start shopping this

 8  deal.  Would that be fair?

 9          THE WITNESS:  That would be fair if that statement

10  were the only -- was the only -- I want to be precise here.

11  Yes, that statement should open up a bidding process.  The

12  problem was, there was a lot of cognitive dissonance in the

13  market about Major League Baseball's view that they were

14  backing the Greenberg-Ryan Group and that it was a foregone

15  conclusion that they were going to win.

16          THE COURT:  Okay.  Do you understand -- are you aware

17  that Mr. Crane had a representative in the courtroom on May

18  25th and 26th?

19          THE WITNESS:  I believe that I did know that, Your

20  Honor.

21          THE COURT:  All right.  I happen to know because he's

22  a former law clerk of mine.  I didn't know who he was

23  representing then, but I now know who he's representing.

24      And are you aware that Mr. Crane and Mr. Beck, I believe,

25  had conversations with the mediator even prior to the July 6th

1    mediation?

2              THE WITNESS:  I believe that they did.  Yes, sir.

3              THE COURT:  Yes.

4              THE WITNESS:  I think I do know that, Your Honor.

5              THE COURT:  And you know that they both came to the

6    July 6th mediation?

7              THE WITNESS:  I only saw Mr. Crane, but --

8              THE COURT:  Yes.  I'm told.  That's what I think Mr.

9    Strubeck told me, that Mr. Beck was there, or someone did, who

10   said he shook hands with Mr. Beck and that's how he knew he

11   was there, but it was somebody on this side of the room.

12      So, really, these parties have been looking at this team

13   at least since May 25th.  Wouldn't that be a fair statement?

14             THE WITNESS:  Yes.

15             THE COURT:  All right.  Now, you testified before, I

16   believe, that your view was that you would have trouble

17   getting financing until you had a deal.  Is that right?

18             THE WITNESS:  I believe until you had the parameters

19   of a transaction.  You could get -- you could get a handshake

20   kind of -- but to get really firm financing, you need a deal.

21             THE COURT:  All right.  Well, let me ask you this.

22   If we have a bidding process with three bidders, none of those

23   bidders will have a deal, now, will they, when they bid?

24             THE WITNESS:  No, but there is an installed bank

25   group right now that I think would work with the bidders to

1  get interim financing, so when --

2          THE COURT:  All right.  So what you're saying is if

3  you have a bidder that is real, at a bare minimum, the bidder

4  could at least, quote, "borrow" from the Bank Group what the

5  Bank Group would get under his deal?

6          THE WITNESS:  I can't commit the Bank Group to that,

7  --

8          THE COURT:  I understand.  I understand.

9          THE WITNESS:  -- but that certainly would be GSP's

10  position.  Yes.

11          THE COURT:  Yes.  I understand.  So, effectively, if

12  a buyer came in and had, as we've had testimony, as Mr. Beck

13  may have the equity all lined up, or if Mr. Crane had the

14  ability to finance -- let's say his bid was $600 million.

15          THE WITNESS:  Uh-huh.

16          THE COURT:  And he came in with $400 million.  Then

17  the other $200 million could be temporarily footed by the Bank

18  Group, potentially?

19          THE WITNESS:  Yes, sir.  I would certainly recommend

20  that to the Bank Group.  Obviously, I --

21          THE COURT:  I understand.  I understand.

22          THE WITNESS:  And so --

23          THE COURT:  I'm not trying to pin you down on that.

24          THE WITNESS:  But just my opinion, yes, --

25          THE COURT:  All right.

1          THE WITNESS:  -- I believe the Bank Group would be

2     favorably disposed to any bidder that would give us the

3     highest net proceeds, and so we would finance that bidder.

4          THE COURT:  All right.  Thank you.  You may step

5     down.

6          THE WITNESS:  Thank you very much, Your Honor.

7        (The witness steps down.)

8          THE COURT:  We're going to take a recess for about

9     ten minutes, then we're going to resume for about 45 minutes,

10    and we'll quit at approximately 5:00 o'clock.  I may go a

11    little past that.  I do apologize to you.  I know in other

12    courts they go longer, but I start losing my edge by about

13    5:00 o'clock, and I don't think it does anybody any good for

14    that to happen.

15       All right.  We'll be in recess.

16       All right.  Ms. O'Neil?

17         MS. O'NEIL:  Your Honor, may Mr. Galatioto be

18    dismissed?

19         THE COURT:  Does anyone want Mr. Galatioto to be

20    retained?  (No response.)  Can I release him?  (No response.)

21    You're excused, Mr. Galatioto.

22         MR. GALATIOTO:  Thank you very much, Your Honor.

23         THE COURT:  Enjoy your trip back to New York and your

24    date with your wife.

25         THE WITNESS:  It's going to be great.  Middle seat in

coach will be awesome.

THE COURT:  Been there, done that.

THE CLERK:  All rise.

THE COURT:  The federal judiciary does not pay for first class seats.

THE WITNESS:  I know.  Thank you.

(A recess ensued from 4:04 p.m. until 4:19 p.m.)

THE COURT:  Please be seated.  All right.  Mr. Leblanc, who will you have next?

MR. LEBLANC:  Your Honor, we -- the Lenders would call Glenn West.

THE COURT:  All right.  Mr. West?

MR. LEBLANC:  And I believe there's going to be a little argument before this happens, --

THE COURT:  All right.

MR. LEBLANC:  -- so that's why I stayed over here.

THE COURT:  All right.  Okay.

MS. GARCIA:  For the record, Yolanda Garcia on behalf of Weil Gotshal & Manges.

Your Honor, as I know you're aware, the bedrock rule in the Fifth Circuit is that before a party's attorney can be compelled to testify, there must be a demonstration by the party seeking to call them -- in this case, the Ad Hoc Lenders Group -- a two-part test that has to be met.  Specifically, the *U.S. v. Crockett* case in the Fifth Circuit, which can be

1    found at 506 F.2d 759, states that for an attorney to be

2    compelled to testify, his testimony must be both necessary to

3    adjudicating the issue before the Court and must be

4    unobtainable from any other sources.

5        And the reason that the Fifth Circuit and other courts in

6    every circuit require that these stringent circumstances be

7    met before a party's attorney be allowed to testify is

8    obviously because of the nature of privileged communications.

9    There is obviously a chilling effect if a party's attorneys

10   can be called to testify regarding the nature of the

11   representation.

12       Moreover, it is very difficult if an attorney is called to

13   testify to ensure that that attorney does not go into the

14   communications regarding the nature of the legal advice.  And

15   even more broadly, because work product is identified and

16   protected so broadly in the Fifth Circuit -- it protects an

17   attorney's mental impressions, their thoughts, their strategy

18   -- any kind of testimony that could be elicited might delve

19   into that work product that the Fifth Circuit as well as the

20   U.S. Supreme Court in the *Hickman* case say must be protected.

21       And therefore, Your Honor, I think that before Mr. Leblanc

22   and the Ad Hoc Lenders Group be allowed to call Mr. West, they

23   need to demonstrate the reason why they need him, how it is

24   probative, and to meet the burden to show that that factual

25   information is only available from Mr. West.

1          THE COURT:  All right.  Mr. Leblanc?

2          MR. LEBLANC:  Your Honor, I -- well, let me begin by

3    noting that I understood that Mr. West was appearing at the

4    Court's direction.

5          THE COURT:  Well, I wanted him here.

6          MR. LEBLANC:  Okay.  And we certainly have asked for

7    his deposition.  They told us they won't make him available.

8    We do think he's an appropriate witness to put on the stand

9    with respect to the issues that are before the Court now.  The

10   unredacted version of our motion sets forth certain of the

11   communications, the prior e-mails that the Court has seen that

12   show the central role that Mr. West played in this process.

13        We did have a dispute with the Debtors, who had asserted

14   previously that their communications prepetition with Major

15   League Baseball were subject to a common interest.  Judge

16   Jernigan ruled on that and concluded that it was not, and as a

17   result of that we got a substantial trove of production that

18   details exactly what the plans -- the derivation, the delivery

19   of these plans.

20        And we're not here on the good faith test yet under this

21   plan of reorganization.  But as Your Honor well knows from the

22   attachments, unredacted attachments to our brief, there are

23   real questions about whether this Debtor really wants to have

24   an open auction or is intending to do what it can to avoid

25   exposing the sale to the real risk of a higher and better

1  offer.

2      And so we think the Debtor's support -- and if the Debtors

3  have asserted, as I believe they have, although they haven't

4  put on any evidence, but if they believe that it's consistent

5  with their business judgment or any of the other tests for

6  approval of bid procedures, to have these bid procedures, then

7  I think we're entitled to make this inquiry of Mr. West.

8          THE COURT:  All right.

9          MS. GARCIA:  May I respond, Your Honor?

10         THE COURT:  Yes, you may.  Briefly.

11         MS. GARCIA:  Your Honor, we are here today on a

12  motion for reconsideration.  The party bearing the burden on a

13  motion for reconsideration is the party seeking that

14  reconsideration, and that would be the Ad Hoc Lenders Group.

15  Therefore, we do not have the burden to present evidence

16  regarding anything to do with the bid procedures.  And

17  moreover, --

18         THE COURT:  Well, I always understood that the burden

19  of proof in a situation like this was preponderance of the

20  evidence.  And the Supreme Court has further regularly said

21  that that means if a fact is more likely than not to be true,

22  then it is met -- you've met your burden.  If they put on all

23  the evidence and you put on none, then you're going to lose.

24         MS. GARCIA:  On the motion to reconsider, Your Honor,

25  I was simply stating that, as it is their motion, they have

1 the burden to show that there is new evidence that they have

2 discovered that makes your ruling last week subject to being

3 overturned. And I think, you know, to focus on the issue of

4 whether or not Mr. West should be called to testify and

5 compelled to testify by this Court, given the Fifth Circuit

6 law, in this context, it simply is the case that these bid

7 procedures were only on file for a week, and ultimately it was

8 this Court's version of the bid procedures that were entered.

9 They have not articulated any factual inquiry that they need

10 from Mr. West for the last, you know, ten-day period of time,

11 and instead are seeking -- and they still have not articulated

12 exactly what they're seeking and why it would be relevant to

13 testing these bid procedures, but information from him that

14 far predates the question of whether or not these bid

15 procedures that this Court has entered should stand.

16 Under the U.S. -- under the Fifth Circuit case in

17 *Crockett*, Your Honor, they simply have failed to meet their

18 burden to show a necessity for Mr. West's testimony, and

19 therefore he should not be compelled to testify under these

20 circumstances.

21 THE COURT: All right. Here's what we're going to

22 do, Mr. Leblanc. We're going to make Mr. West come back on

23 Thursday, and I'm going to look into it overnight.

24 Now, let me stress to you, Ms. Garcia, two things. Number

25 one, the Lenders correctly point out that to the extent that I

1  relied on evidence in entering the bid procedures, that

2  evidence was elicited in other contexts, and there was no

3  evidence put on in support necessarily of those bid

4  procedures.

5       Number two, what we do here today and tomorrow is going to

6  be subsumed, if you will, into consideration of confirmation

7  of Debtor's plan.

8       And number three, that to the extent that Mr. West's

9  testimony would be appropriate in the last context, even if

10  this is not the best context in which to receive it, I will

11  consider receiving it.  All right?

12          MS. GARCIA:  And I appreciate that, Your Honor.  And

13  if it is that he wants to make a showing that it's relevant

14  for a context beyond simply these bid procedures, you know, I

15  am prepared to hear that --

16          THE COURT:  Well, I think --

17          MS. GARCIA:  -- and try to --

18          THE COURT:  I already think that it is.  Based on

19  looking at the e-mails, it seems to me, among other things,

20  there is a question about the degree to which there was a

21  chilling of bidding procedures and other similar issues, or a

22  chilling of bidding or other similar issues.

23       So I've already decided, based on the e-mails, that his

24  testimony is potentially relevant and probative.  The question

25  is whether it should be sheltered on some other basis.

1          MS. GARCIA:  Yes, exactly, on the basis that perhaps

2    another witness could testify to it.

3        Obviously, Your Honor, though, our biggest concern here is

4    protecting privilege and not waiving any kind of work product.

5    Because as attorneys for our clients, we cannot unilaterally

6    waive privilege for them.  We have to vigorously protect

7    privilege for the benefit of our clients.  And so perhaps if

8    we can tailor his testimony in a way in this proceeding -- you

9    know, I don't want to jump up and object --

10         THE COURT:  Well, we're going --

11         MS. GARCIA:  -- every minute for privilege, --

12         THE COURT:  We're -- we're --

13         MS. GARCIA:  But that is our greatest sensitivity.

14         THE COURT:  When I start talking, Ms. Garcia, you

15   stop talking.

16         MS. GARCIA:  Excuse me, Your Honor.

17         THE COURT:  All right.  The same rule for you as

18   everybody else.  Okay?

19         MS. GARCIA:  I understand.

20         THE COURT:  Okay.  And what we're going to do is

21   we're going to -- I'm going to look at it between now and

22   Thursday and come to a conclusion, because there is a mass of

23   Fifth Circuit precedent on this issue, and some of it does not

24   go the same way that you're referring to.  For example, in

25   connection with a debtor's preparation of schedules, just by

1 way of example.  That's been called to my attention recently.

2 So I want to take a closer look at the question.

3     And Mr. West can come back Thursday, and after we hear

4 from Mr. Washington, perhaps we will hear from Mr. West.  All

5 right?

6          MS. GARCIA:  Okay, Your Honor.  Thank you.

7          THE COURT:  Thank you.  All right, Mr. Leblanc?  Do

8 you have any other witnesses besides Mr. West whom you wish to

9 call?

10          MR. LEBLANC:  Well, Your Honor, I think the answer to

11 that is no, although I'd defer to my colleagues at the bar

12 with respect to the other lender groups.

13     I want to make sure.  We do anticipate vigorously cross-

14 examining any witnesses that are put on by the Debtors.  We

15 anticipated that this would have been the Debtor's opportunity

16 to support the business justification, to the extent that

17 that's the standard that the Court deploys, from the

18 *Integrated Resources* case, that today would have been that

19 opportunity, and we would have had the opportunity to cross-

20 examine them.

21     We're happy to take Mr. West out of order, --

22          THE COURT:  Yes.

23          MR. LEBLANC:  -- but I think, subject to that, we

24 don't have -- I don't believe we have a burden of proof in an

25 evidentiary basis on a motion for reconsideration where there

1  wasn't a hearing actually held and there was no evidence

2  presented.  I think the burden still lies with the party

3  moving for the substantive relief, which is the imposition of

4  the bid procedures and the approval of the stalking horse.

5       THE COURT:  Frankly, Mr. Leblanc, I think they'd be

6  just as happy to -- if they're going to bear the burden, I

7  think they'd rather propose their own bid procedures.  If you

8  like, I'm the one that has the burden here.

9       MR. LEBLANC:  Well, Your Honor, they certainly -- and

10 everybody had something to say last week, but it was certainly

11 based upon the procedures that the proposed, and they

12 certainly -- I didn't hear much of a complaint from Mr.

13 Sosland about the bid procedures.  So, to the extent that

14 there's -- I assume there's some justification, and they

15 certainly, I presume, were prepared to present evidence at

16 some point in time on those.

17      THE COURT:  Well, we'll see.  We'll see.  We'll see.

18   First of all, does anyone else on this side have evidence

19 that they wish to produce?  All right.  Mr. Sosland?

20      MR. SOSLAND:  Your Honor, we had consulted with

21 chambers and we were told that the order of presentation would

22 be the Lenders, the CRO, Greenberg, and then the Debtor.  We

23 submitted -- and Your Honor, --

24      THE COURT:  Okay.

25      MR. SOSLAND:  -- we submitted a declaration of Kevin

1  Cofsky, who's not --

2         THE COURT:  Yes.

3         MR. SOSLAND:  -- able to be here today because, as is

4  stated in the declaration, he's actually meeting with a

5  potential bidder in New York today.

6         THE COURT:  Yes.

7         MR. SOSLAND:  He, however, will be here when we

8  reconvene on Thursday morning.

9         THE COURT:  All right.  All right.

10        MR. SOSLAND:  And --

11        THE COURT:  Well, if you're suggesting that we should

12  go to -- I assume, since Mr. Strubeck didn't jump to his feet,

13  that the CRO does not wish to present further evidence.  Am I

14  correct, Mr. Strubeck?

15        MR. STRUBECK:  That's correct, Your Honor.

16        THE COURT:  All right.  Then, if Express wants to

17  proceed.  Frankly, I have some doubt that we'll be able to get

18  done with Mr. Greenberg today, but we can start.  What's your

19  pleasure, Mr. Kurtz?

20        MR. KURTZ:  Can I respond from here, Your Honor?

21        THE COURT:  Sure.

22        MR. KURTZ:  You know, this was on relatively short

23  notice.  We thought these witnesses would go before.  We

24  intended to speak with Mr. Greenberg, organize his documents,

25  which aren't presently organized for the Court, including, you

1  know, loan documents and the like, and present them tomorrow.

2  I don't think he'll be a lengthy witness on -- or Thursday, as

3  the case may be -- on direct, either he or Mr. Nolan Ryan, but

4  we intended to present them both tomorrow.  Or Thursday.

5           THE COURT:  All right.  Well, do I understand, then,

6  that it's your pleasure to at this point recess for the day,

7  or --

8           MR. KURTZ:  It is.

9           THE COURT:  All right.  Anybody object to that?

10     (No response.)

11          THE COURT:  All right.  Before we do, there's a

12  couple things that I want to make very clear, and I thought I

13  made them clear before.  You can sit down, Mr. Sosland.  This

14  is for everybody.

15     Number one, this is going to be an open process.  We've

16  overlooked in our discussions today perhaps the fact that

17  under the bidding procedures that I directed be put in place,

18  unlike in the real world, absent the intervention of a court,

19  this Court has the ability to ensure that Major League

20  Baseball does not distort the process.  I'm not suggesting

21  that you would or that you have, but you will not now, and I

22  think that that's very clear.

23     I've retained the ability, which ordinarily would not be

24  the case in the sale of a Major League Baseball team, to

25  second-guess, if you will, both the qualification of a bidder

1  and the actual decision on the part of the owners to accept

2  the winning bidder as an owner.  That's something you don't

3  get in the real world.  So let's start off by understanding:

4  This playing field is as level as I can get it.

5       Now, I haven't decided the motion for reconsideration, but

6  I want it very clear.  I expect the parties to go forward as

7  if that order is in place.  We're sitting here having this

8  hearing when perhaps we might be working toward getting other

9  bids on the table, and I'm glad Mr. -- I'm sorry, Mr. Cofsky

10  -- is speaking with other bidders.

11       Mr. Snyder, are you going to have any trouble complying

12  with my order if I leave these bidding procedures in place?

13            MR. SNYDER:  No, Your Honor.

14            THE COURT:  All right.  So we're going to go forward.

15  And until I decide this motion to reconsider, we are going to

16  go forward as if those bidding procedures are going to be in

17  place.

18       I am going to share with those who were not a party to the

19  e-mail that I sent to principal counsel yesterday the

20  statement that I included in that e-mail.  And that is that

21  bidders should assume that this is their opportunity to

22  acquire the Rangers and that there won't be one after this.

23  And the Debtor and Express should assume that I will not

24  consider the bid of Express to have been market-tested if we

25  get no other bidders, unless, of course, the reason we get no

others is because we have truncated the three weeks we started
with to two weeks by virtue of this hearing.  All right?

    All right.  On that note, we will be adjourned for the
day.

    Now, let me tell you first.  What I'm going to do
tomorrow, I have a trial scheduled, as I've told you several
times.  And I've just glanced at it, and it's far messier than
I feared.  So my suspicion is that we will not be able to
resume the trial tomorrow.  If you are prepared to and you
wish to do so, I will hear discovery disputes at noon.  In
other words, instead of lunch, which I don't eat anyway, I
will hear your discovery disputes.  I will have noon until
about 1:15, probably.  And if you are able -- and I would ask
you attorneys to try to agree on what those disputes are so
that we can get these matters resolved.  The sooner we get
them resolved, the better it is for everyone.

    And I would also remind you that, like all judges, I have
a very strong distaste for discovery disputes.  And in fact,
hearing them motivates me to get -- to cause as much
discomfort to the lawyers as possible.  So you can keep that
in mind.

    I think to some extent my ruling earlier today respecting
Express being a party in interest may help resolve some of
those disputes.  I hope so.

    But I will hear you if you are prepared to go forward at

1    noon.  You may contact Mr. Vasek or Mr. Lynch.  I don't know

2    which one will be back in the Clerk's Office tomorrow, but you

3    can contact either one during the morning to let them know.

4    Please let them know by, say, 11:30 in the morning.  All

5    right?

6        Yes, Mr. Leblanc?

7            MR. LEBLANC:  Your Honor, in connection with the

8    discovery -- potential discovery dispute conference or

9    setting, do you want motions to compel, or can we just arrive

10   --

11           THE COURT:  You can arrive naked, if you -- please,

12   just without motions.  But you can arrive *sans* motions if you

13   wish.

14       But I'd like the parties to have agreed on what the issues

15   are, and perhaps you could provide them by e-mail to my law

16   clerk so that I will at least know what I'm going to be

17   hearing before I get out on the bench.

18           MR. LEBLANC:  Yes.

19           THE COURT:  All right?

20           MR. LEBLANC:  Thank you, Your Honor.

21           THE COURT:  Any other questions?  Any other concerns?

22       (No response.)

23           THE COURT:  All right.  Well, thank you all very

24   much.  I appreciate the fact that this has been as civil as it

25   has been.  We'll be adjourned.

1          THE CLERK:  All rise.

2      (Proceedings concluded at 4:36 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                    CERTIFICATE

20      I certify that the foregoing is a correct transcript from

21  the electronic sound recording of the proceedings in the above-

22  entitled matter.

23  _____        _____
24  Kathy Rehling                      Date
    Certified Electronic Court Transcriber
25  CET**D-444

# INDEX

PROCEEDINGS                                                5

WITNESSES

| Rangers Equity Holdings' Witnesses | Direct | Cross | Redirect | Recross | Court |
|---|---|---|---|---|---|
| William K. Snyder | 10 | 34/45/59 | 145 | 151 | 160 |

| Lenders' Witnesses | Direct | Cross | Redirect | Recross | Court |
|---|---|---|---|---|---|
| Salvatore Galatioto | 175 | 193/203 | 250 | 261/265 | 268 |

EXHIBITS

| Rangers Equity Holdings' Exhibits | | Identified | Received |
|---|---|---|---|
| 1 | CRO Engagement Letter | 8 | 9 |
| 2 | Order Authorizing Employment as CRO | 8 | Jud.Notice |

| Debtor's Exhibits | | | |
|---|---|---|---|
| 1 | Emails from Andrew Herenstein, Dated 4/29/2010 @ 8:00 p.m., 4/29/2010 @ 9:06 p.m. and 4/30/2010 @ 1:56 p.m. | 197 | 200 |

RULINGS

Testimony of Glenn West                                      283

Motion for Reconsideration of Court's Order Adopting        288
Bidding Procedures

END OF PROCEEDINGS                                          291

INDEX                                                       292