1   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF TEXAS
2                FORT WORTH DIVISION

3   IN RE:                      .   Case No. 10-43400-dml-11
                                .   Chapter 11
4   TEXAS RANGERS BASEBALL      .
    PARTNERS,                   .   Fort Worth, Texas
5              Debtor.          .   Wednesday, August 4, 2010
                                .   2:45 p.m.
6                               .
                                .   Auction Proceedings
7   . . . . . . . . . . . . . . .

8
                    TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE RUSSELL F. NELMS
               UNITED STATES BANKRUPTCY JUDGE
10

11  APPEARANCES:

12  For the Debtor:             MR. MARTIN A. SOSLAND
                                Weil, Gotschal & Manges, LLP
13                              200 Crescent Court, Suite 300
                                Dallas, Texas  75201-6950
14                              (214) 746-7730

15  For Rangers Baseball        MR. THOMAS E. LAURIA
    Express:                    White & Case, LLP
16                              Wachovia Financial Center
                                200 South Biscayne Boulevard
17                              Suite 4900
                                Miami, Florida  33131-2352
18                              (305) 995-5282

19  For Radical Pitch, LLC:     MR. CLIFTON R. JESSUP, JR.
                                MR. BRUCE WHITE
20                              Greenberg Traurig, LLP
                                2200 Ross Avenue, Suite 5200
21                              Dallas, Texas  75201
                                (214) 665-3638
22
    For GSP Finance, LLC:       MS. HOLLAND O'NEIL
23                              Gardere, Wynne and Sewell, LLP
                                1601 Elm Street, Suite 3000
24                              Dallas, Texas  75201
                                (214) 999-4961
25

1  <u>APPEARANCES</u>: (Cont.)

2  For Rangers Equity              MR. LOUIS STRUBECK
   Holding Entities:               Fulbright & Jaworski, LLP
3                                  2200 Ross Avenue, Suite 2800
                                   Dallas, Texas  77010
4                                  (214) 855-8000

5  Chief Restructuring Officer:    MR. WILLIAM K. SNYDER
                                   CRG Partners Group LLC
6                                  13355 Noel Road, Suite 1825
                                   Dallas, Texas  75240
7                                  (214) 415-7167

8  For Ad Hoc Group of First       MR. ANDREW M. LEBLANC
   Lien Lenders:                   Milbank, Tweed, Hadley &
9                                    McCloy, LLP
                                   International Square Building
10                                 1850 K Street, NW
                                   Washington, DC  20006
11                                 (202) 835-7574

12 Court Reporter:                 MS. ANA P. WARREN
                                   U.S. District Court Reporter
13                                 501 W. 10th Street, Room 201
                                   Fort Worth, Texas  76102-3637
14                                 (817) 850-6681

15

16

17

18

19

20

21

22

23

24 Proceedings recorded by mechanical stenography; transcript
   produced by computer-aided transcription.
25

### P R O C E E D I N G S

(Commencing, 2:45 p.m.)

THE COURT:  Good afternoon, parties, bidders.  Thank you for your patience so far today.

We're convening the hearing in the auction of Texas Rangers Baseball Partners.  Because it's taken us a little while to get to this point, I'm going to dispense with the parties making appearances.  Also, I should tell those parties who are monitoring this hearing telephonically that you're not going to have a very good experience because this particular courtroom is not well-suited for picking up announcements here in the courtroom.  So you're just going to have to bear with us.

But at this time, I'm going to ask the counsel for the debtor to make the announcement with respect to the determination of highest and best bid as of this point.

MR. SOSLAND:  Good afternoon.  Martin Sosland, Weil, Gotshal & Manges, for the debtor, Texas Rangers Baseball Partners.

We have received a qualified bid as defined by the bidding procedures order from Radical Pitch, LLC, which is the Crane-Cuban bid, that exceeds the value by -- it exceeds the value of the bid in the stalking horse bid from Rangers Baseball Express by an amount I'm about to give, but it doesn't take into account the two factors that we -- one in

1   particular that we just learned about. I think we can

2   calculate it, but we haven't yet had time to calculate it.

3      It exceeds the bid before subtraction of the break-up fee

4   by approximately $25 million. This does not take into account

5   time value of money discount that we will apply based on the

6   fact that we assume a significant difference in time between

7   when the Greenberg-Ryan, the Rangers Baseball Express, bid

8   would close, given that it's basically already teed up for

9   Major League Baseball approval, and the time it would take

10  this bid to go through the process, which it hasn't done yet,

11  receiving Major League Baseball approval, which we think will

12  take some period of time. We will apply a discount to that.

13  We're not able to -- but we're in the process of calculating

14  that amount.

15     There may also be additional discounts that we're not

16  applying at this time related to a certainty of approval in

17  closing, but we are not at this stage of the auction applying

18  a discount for that. Although, we reserve the right to do so

19  at a later point in time.

20         THE COURT: Okay. Thank you, Mr. Sosland.

21         MR. SOSLAND: And the revised bid has been

22  memorialized. It's in the process of being memorialized in

23  written form for those parties who are entitled to receive it

24  under the bidding procedures order. That should be available

25  shortly, but it's not quite done, Your Honor.

1    THE COURT:  Will you have documents that you can

2    provide, Mr. Sosland, to Rangers Baseball Express?

3    MR. SOSLAND:  We will have them.  We think we will

4    have them fairly quickly, within half an hour, Your Honor.

5    THE COURT:  Mr. Lauria?

6    Mr. Lauria, do you have an estimate of the amount of time

7    that you will need to make your initial evaluation, please?

8    MR. LAURIA:  Your Honor, sight unseen, I don't think

9    I can give the Court meaningful guidance.  We, to be clear,

10   received a bid package from Radical Pitch last night at

11   approximately 8 o'clock, or at least we had part of it at

12   8:00.  It kind of came in over the next hour or two.  I guess

13   what I want to start out by doing is reserving our rights with

14   respect to what's happened since then.

15   We understand that there is a Court order in place in this

16   case and that the bidding procedures which are attached to

17   that Court order are made part of the Court's order, and

18   the bid that was, perhaps, timely received, we do not believe

19   was either higher than our bid or a qualified bid, and there

20   are numerous reasons for these defects.  If Your Honor

21   believes it's appropriate or necessary to preserve our issues

22   for review, I will do so on the record, but I do want to make

23   clear that we do not intend to waive our objections to what's

24   happening by virtue of continuing to participate in the

25   process.  And if that is a condition of continuing, then we

1 probably need to move down to Judge Lynn's courtroom and press

2 these issues and present evidence in connection with our

3 grievances.

4 THE COURT: On that point, Mr. Lauria, your right --

5 all of your rights will be reserved concerning the initial

6 evaluation of whether or not this was a qualifying bid,

7 whether that bid is higher than your bid, the timing of the

8 bid. So any and all of that is reserved. So I don't think

9 that you really need to elucidate the details of why you

10 believe that it didn't conform with Judge Lynn's bidding

11 requirements because I'm going to preserve all of your rights

12 in that respect.

13 MR. LAURIA: I appreciate that, Your Honor. Thank

14 you very much.

15 As far as review and being in a position to respond in

16 some fashion, I must confess I'm not really sure how Your

17 Honor envisions this process going forward. I will say that

18 the bidding procedures that had been approved by the Court

19 envisioned that we would have on the order of 12 hours to

20 understand, assess, review, talk to the debtor and CRO about

21 and make a decision about how we wanted to respond, if at all,

22 to a competing qualified bid. While I certainly hope that we

23 don't need that kind of time, I think that it's -- that the

24 fairness of the process certainly requires that we have an

25 adequate opportunity to do our homework and to engage with the

1  folks who, apparently, in the first instance are going to

2  evaluate the bids, namely the CRO and debtors.

3      In that regard, I have to profess some bit of confusion by

4  the comments of counsel preceding me. Number one, to say that

5  that the Radical Pitch bid exceeds ours by approximately $25

6  million and then to say that there are some discounts that

7  should or may apply but that they haven't been applied really

8  doesn't give us much guidance as far as what will be expected

9  from us next.

10     We certainly think if there are appropriate discounts to

11  be applied, those discounts should be applied. We should be

12  told what they are, and so we can have some guidance as to

13  what will be required to make a responsive bid. If the idea

14  is that we're just going to bid against this on a head's up

15  basis, I think there is probably the likelihood that there

16  will be no competing bid, because we do not believe that in

17  any fair view of the two bids that they can be valued on a

18  head's up basis.

19     More simplistically, as counsel acknowledged, there is

20  going to be a delay in the delivery of the consideration under

21  the Radical Pitch bid. It's relatively easy to calculate what

22  the cost of that delay is, just using an acceptable discount

23  rate, making assumptions about the time it will take for

24  Radical Pitch to be in a position to close, based on the MLB

25  approval process, and I think it's incumbent upon those who

1  are going to be evaluating those bids to tell us how that

2  works, because for us to make a cash bid that will pay on

3  August 12, obviously, that can't be evaluated on the basis of

4  a bid that will not pay until sometime in the future.  And

5  absent guidance, we're not going to be able to respond.

6  There are other issues.  We, of course, are very focused

7  on the approvability issue.  We are well through the approval

8  process with Major League Baseball and believe that no

9  discount would probably be applied to our bid.

10  With respect to approvability, we believe, on the other

11  hand, that the facts, as we understand them, make it

12  absolutely clear that that is not true with respect to the

13  Radical Pitch bid, and if necessary, it would be our intention

14  to make an evidentiary record on either or both of these

15  issues.

16  I want to also point out to the Court that there are other

17  issues that create uncertainty.  There are financial

18  covenants.  There are representations and warranties, at least

19  in the version that we saw, that are different and create

20  risks about the ability of a debtor to close.  There are other

21  issues that are fairly simple to assess.

22  Our bid closes upon entry of an order that is in effect,

23  that is, that is not stayed.  The Radical Pitch bid that we

24  saw closes only upon an order approving it becoming final and

25  not appealable.  So the mere filing of a notice of appeal,

1  which I can assure parties is going to come from my client if
2  we can't get these issues resolved and if we are not a
3  successful bidder, puts the Radical Pitch bid in indefinite
4  suspension raising further uncertainty as to the time by which
5  closing would occur.

6  I think the Court's getting the message, you know, that
7  we've been in the process for some time, and there has been
8  great concern about chilling bids. One of the things that is
9  required to avoid chilling of bids is transparency. This
10 process as it's evolved over the past 24 hours involved a lack
11 of transparency from our perspective. Decisions are being
12 made behind closed doors. We don't know what the basis of
13 those decisions are, and if this process is to proceed and we
14 are to participate in it, some action has to be taken to level
15 the playing field and ensure the transparency and fairness of
16 the process.

17 THE COURT: Thank you, Mr. Lauria.

18 Well, let me hear from Mr. Jessup and then from
19 Mr. Sosland.

20 MR. JESSUP: Your Honor, Clifton Jessup and Bruce
21 White of the firm Greenberg Traurig along with Jeremy Coffey
22 on behalf of Radical Pitch, LLC.

23 Your Honor, we are the other bidder, the one that was
24 announced to be the highest and best at this time. I wanted
25 to respond to some of the comments that were made, because

1   it's interesting that my esteemed colleague would talk about

2   transparency and would talk about things being done openly,

3   when we've had a subterranean auction going on for the last

4   week.  They have made offers to the lenders on Friday, which

5   there was a hearing on.  They made an offer yesterday that

6   there was some conference with the judge on, and then today

7   they come into court and say, because we have had discussions

8   with the debtor's counsel and with others about our APA, which

9   they will get a copy of in a moment, that there is no      .

10  transparency begs the question here.

11      We are very concerned that, even though there has been a

12  determination that there will be an auction, it is apparent to

13  us that the other bidder is not anxious in moving this process

14  forward.  To ask for 12 hours to see a marked APA that they

15  received yesterday we believe is unreasonable.

16      We believe that there needs to be a process in place, for

17  instance, Your Honor, that follows what you sent out yesterday

18  that said these would be the governing rules.  They received a

19  copy of it, and it says, in between rounds it will be 20

20  minutes, not 12 hours.  And so we believe at this juncture,

21  because they could not stop the auction, what they are trying

22  to do is slow it down, to delay it, to push it past the time

23  when Judge Lynn has told all of us that he will not be

24  available tomorrow at noon.  They don't want a sale to my

25  client approved before Judge Lynn leaves.

1     So we would implore the Court to not permit these kind of

2 delaying tactics in an auction where the debtor, the CRO and

3 others, have determined that there is a viable bid, that the

4 only party who is now objecting is the one we are opposing or,

5 clearly, has a conflict, and to permit this process to go

6 forward in an orderly fashion so that in the next few hours we

7 can have the auction. We can then proceed to a sale

8 confirmation hearing where they run a re-bid until this

9 process is not killed by stealth the way they tried to do it

10 by making offers to parties without disclosing it to my client

11 during the last two days.

12     So we would ask the Court to permit this process to move

13 forward so that we have an auction as was noticed today

14 that -- actually, now it's starting six hours after the time

15 it was noticed. Thank you.

16           THE COURT: Thank you, Mr. Jessup.

17           MR. LAURIA: Your Honor, if I may respond?

18     I hate to be tit-for-tat, but let's make a couple of quick

19 points here, okay.

20     The last thing we want to do is see undue delay. We have

21 financing that expires on August 12. We want to get to the

22 finish line. In fact, we were suppose to be at the finish

23 line at 9 o'clock this morning. It's astounding to me that

24 counsel would stand here and say that somehow we're trying to

25 slow this process down when, in fact, Radical Pitch didn't

1    have a bid that the debtor was prepared to tell us was a

2    qualified bid until about ten minutes ago.

3        So we are the ones who have not had an opportunity to

4    review what we're competing against.  We want to move as fast

5    as possible, and I assure you that we will.  We still don't

6    have the bid that we have been told is the highest and best

7    bid at this time, and I don't know how we're suppose to

8    formulate a response when we don't even have the bid, much

9    less have an opportunity to visit with people who are

10   evaluating it and understand how they are evaluating it.

11            THE COURT:  Thank you.

12       Mr. Strubeck?

13            MR. STRUBECK:  Good afternoon, Your Honor.  Louis

14   Strubeck with Fulbright and Jaworski on behalf of the Ranger

15   Equity Holding Entities.  Some people think of me as being the

16   attorney for the CRO, and so that's fine for purposes of this

17   proceeding.

18       Being mindful of the nature of this procedure and Your

19   Honor trying to determine where we stand in terms of bids, I'm

20   going to hold off on any argument until we move over to the

21   other courtroom, but I just want to say a couple of very quick

22   things.

23       One, as I think Your Honor knows, even though I think it

24   probably only took one of the two of us, the debtor's counsel

25   or the CRO's counsel, in order to determine there has been a

1   qualified bid, we agree with what Mr. Sosland said.  We

2   believe, the CRO believes, the Ranger equity holding entities

3   believe, that there is a qualified bid, and that the qualified

4   bid that was made was made by Mr. Jessup's client, and I think

5   he did a nice job outlining just what the qualified bid was in

6   concert with Mr. Sosland.

7        We're kind of stuck here, Judge, and we have got to live

8   with the process as it exists in terms of having to move this

9   quickly -- this forward as quickly as possible, and we just

10  have to deal with those circumstances, and with all do respect

11  to Mr. Lauria, any suggestion that there needs to be another

12  12 hour period for them to study the marked up APA that they

13  are going to get -- which my understanding is it's going to be

14  red-lined against theirs.  So they can look at it and figure

15  out pretty quickly what's going on -- I just suggest, Judge,

16  that it's important to keep the process moving.  I know

17  there's been some considerable delay today, which was

18  necessary because of what had to be done, but I would ask the

19  Court to try to keep the process on the fastest time track as

20  possible, and I would suggest that from the time Mr. Lauria

21  sees the revised APA that's marked up, that we come back here

22  in an hour and then continue the bidding process pursuant to

23  your procedures and as envisioned by Judge Lynn.

24            THE COURT:  Thank you.

25        Mr. Sosland?

MR. SOSLAND: On the one hand, Your Honor, I would say we're happy we have such energized buyers or bidders in the courtroom, but to respond to just a couple of things.

First of all, we will have the contract so that the differences between -- as Mr. Strubeck stated, so that Mr. Lauria and his client can review that.

We will also provide to the -- because we've been working all since early this morning with Radical Pitch in order to get them to the point where we could stand before the Court and say that they have a qualified bid, we don't have -- we didn't have one of the discounts applied. But when we give the agreement to Mr. Lauria to review, we will tell him and we will tell Radical Pitch what that discount is so everyone will know that number. There won't be the discount with respect to the time value of money.

With regard to the other issues, we are not, as I stated when we first came out, we, the debtor, and the CRO, the equity of the debtor, agree on this, that we are not currently applying a discount for the other, perhaps, less tangible or less easily calculable discounts that might be appropriate to apply, but we are reserving the right to apply them at some point in the future. If either of the bidders has questions for us, we will be happy to answer them as we go forward. We, counsel and the professionals for the Rangers, as well as the CRO for equity and his counsel and other advisors, we're here

1    to help facilitate the process, Your Honor.

2        I did not interpret Mr. Lauria's request to be that he

3    needed 12 hours today to review the agreement.  Simply, that

4    he needs some reasonable amount of time to review the

5    agreement, and he earlier suggested that was at least an hour,

6    and I think that having time to review an agreement he has not

7    yet seen is a perfectly reasonable request.  I would hope that

8    we could go forward in a reasonable and competitive fashion in

9    this bidding process.

10       I don't see any reason, Your Honor, as long as you're

11   willing to indulge us, that we can't conclude the auction

12   today at a minimum, and then I get whatever the highest and

13   best bidder is approved by Judge Lynn in the courtroom

14   tomorrow.

15            THE COURT:  Thank you.

16       Well, as I think the attorneys present in the courtroom

17   today know, bid procedures and auctions aren't easy, and the

18   reason that they aren't easy is because it's almost impossible

19   when drafting bid procedures to anticipate every contingency

20   or exigency that's going to arise.  Both as a legal matter and

21   as well as just a practical matter, it's just almost

22   impossible to address all of those things.

23       So we ultimately end up in courses -- or during the course

24   of auctions dealing with the cracks between the lines, which

25   is what we're doing today, and I'm sorry that it's not more of

a clean compact process, but, really, this what we are
experiencing today is the rule rather than the exception to
the rule. And I know it's frustrating. It's frustrating for
all parties, and it's particularly frustrating for stalking
horse bidders who feel like maybe they are being held to a
different set of standards than others.

Be that as it may, I think we should continue with the
auction, and we will. I'm going to give Mr. Lauria and his
group -- what I'm going to ask, Mr. Lauria, is that in an
hour, you let me know where you are in terms of your
evaluation of the bid of Mr. Cuban's group. I'm hoping that
your analysis of it will be expedited, because at least my
understanding of it is that, at least as a template, it's
closer to your bid than it may have been previously, which may
facilitate your analysis of it.

And, also, you're going to have the opportunity during the
break here to speak with the debtor and the CRO to better
quantify those particular economic issues that involve
discounts and get as good a feel, I guess, as you can as to
those type of issues that may be economically harder to
quantify in terms of how that impacts your bid. So we're
going to give you the opportunity to do all that.

Once we've done that and should the Rangers Baseball
Express decide that it wants to continue with the auction,
then I'm hoping that going forward we're going to be able

1  to -- at least after that next announcement is made, that

2  we're going to be able to move forward much more rapidly,

3  hopefully, in 30 minute increments, because at that point in

4  time, I think everyone will appreciate and understand the

5  other's bid.

6      It may very well be that some of these issues regarding

7  approvability and the like become more pressing as we go later

8  into the rounds and play a bigger part in the evaluation of

9  the CRO and the debtor, but for the time being, I think that

10  we can anticipate that we should be able to move forward more

11  rapidly with subsequent bids after you're able to respond to

12  this one.

13      So we are in recess.

14          (Hearing recesses, 3:10 - 5:40 p.m.)

15          THE COURT:  We're reconvening in the auction of Texas

16  Rangers Baseball Partners.  The Court understands that there

17  is a topping bid to be submitted.

18      Is Mr. Lauria here?

19      (Brief pause in proceedings)

20          MR. LAURIA:  Sorry, Your Honor.

21          THE COURT:  Mr. Lauria.

22          MR. LAURIA:  Your Honor, we'd like to make a bid that

23  we believe is a topping bid, and although there is some

24  uncertainty as to exactly what the numbers are and there will

25  be some tweaks to the marked up APA that was submitted with

1    the Rapid whoever-they-are bid, we are going to top the cash

2    portion of their bid by $2 million, which I think is the

3    minimum required topping bid.  I think we have a general

4    understanding that that -- that their cash is 318, and so I

5    think that means our cash is 320, but I think we'll rely on

6    the debtor's professionals to provide us some clarity as to

7    exactly what the numbers are so that we know what our number

8    is, but it's a $2 million top, all cash.

9        The one thing I want to clarify is that, you know, when we

10   met last week, we were concerned about not knowing what kind

11   of discount is being applied because of time value of money

12   and what kind of discount is going to be applied because of

13   the approvability difference between the two competitors.  It

14   is our intention that this bid be used for the purpose of

15   fleshing that out a bit, and let's find out how the debtor and

16   the CRO are evaluating the bids and what the rules are going

17   forward, but we wanted to get this thing moving forward, and

18   so that's our bid.

19           THE COURT:  Okay.  Mr. Jessup, can you give me an

20   estimate as to the time that is going to be required to

21   respond to that bid?

22           MR. JESSUP:  Your Honor, I, on behalf of Radical

23   Pitch, am prepared to make a topping bid right now.

24           THE COURT:  Okay.  Would you do that, please?

25           MR. JESSUP:  I would, Your Honor.

U.S. DISTRICT COURT

1    Reserving all the rights with regard to issues that we

2    still have out there involving discounts that we're not sure

3    we understand nor do we agree to, we would like to make a bid

4    at this time of $15 million over what was just announced for a

5    total of $335 million total cash at this time.

6         THE COURT:  Mr. Lauria?

7         MR. LAURIA:  Your Honor, I think we need the debtor

8    and the CRO to tell us what the numbers are and how they

9    evaluate the two bids, and then we can decide what our next

10   move is.

11        THE COURT:  Okay.  Do you have an estimate of how

12   long you think that will take?

13        MR. LAURIA:  I think you should ask the evaluators.

14        MR. STRUBECK:  Well, Judge, maybe I can help.

15   We're prepared to meet with Mr. Lauria as soon as we adjourn,

16   and we'll explain what we've come up with as far as the

17   discount is concerned.

18        MR. JESSUP:  Your Honor, I think we need to have the

19   explanation, also.

20        THE COURT:  All right.  Both bidders will be given

21   that explanation, I take it?

22        MR. JESSUP:  That would be great.

23        MR. STRUBECK:  That's fine, Your Honor.

24        MR. LAURIA:  We prefer it separately.  We want to

25   have the opportunity to have a conversation with the

1   evaluators --

2        THE COURT:  No, I understand that.  I understood that

3   was Mr. Strubeck's proposal is to meet separately.

4        Isn't that correct?

5        MR. STRUBECK:  The reason I say that, Your Honor, is

6   in all fairness to Mr. Lauria and people know we have had our

7   differences in this case, but we haven't had a chance to meet

8   with them yet separately.  So I think it's appropriate for us

9   to spend a couple of minutes -- it's going to be a transparent

10  process.  We're not going to say anything to them that we're

11  not going to be able to talk to Mr. Jessup about, but we

12  haven't had a chance to visit with them yet.

13       THE COURT:  Okay.

14       MR. LAURIA:  I mean, I presume their position is

15  their position, but I would like to be able to ask questions

16  not in the company of the competition.

17       THE COURT:  All right.  Well, right now, I have it as

18  a quarter to 6:00.  I'm going to plan to reconvene at 6:15

19  unless I get a request for an extension.  So 6:15 unless

20  further continued.  We'll be adjourned.

21       (Hearing recesses, 5:45 - 9:05 p.m.)

22       THE COURT:  We're back on the record in Texas Rangers

23  Baseball Partners.

24       I'm going to take the announcements from the debtor and

25  court restructuring officer as to their determination of

highest and best bid, but before we take that, let me say this.

I don't know what the nature or the tenor of that announcement is going to be, but I do think that we're at a point in time where we really do need to move the proceedings along. And so to the extent that one party or the other needs additional time to evaluate its own bid, we're going to break for 30 minutes to do that evaluation, and if that party is ready to bid that sooner than that, then we will be back here sooner than 30 minutes.

I will also say one other thing about that. Bidders, parties, and others have approached me during the course of the day taking issue with procedures, taking issues with the debtor's and the CRO's determination of what is and is not the highest and best bid. They have stated their positions quite articulately. I don't think it's any surprise to anyone here today that the parties are represented by skilled advocates.

At this particular point, though, I think it's not going to be very helpful for parties to come and make their arguments or cases to me any longer. To the extent that you need to make your argument or your case, you need to make it to those people who are making the determination, and that's the CRO and the debtor.

So I think that if we cut out some of those interludes here where parties have appealed to at least me to make one

1  determination or another, then that will help move things

2  along, which is not to say that I'm not available for any type

3  of determination, but I'm really going to ask the parties to

4  do their best to curtail it.

5  So having said that, I'm going to ask Mr. Sosland to make

6  his announcements with respect to the state of bidding.

7  MR. SOSLAND: Your Honor, the Texas Rangers Baseball

8  Partners is a solvent estate. It has a CRO appointed to act

9  for equity, and we have provided the CRO with the debtor's

10  input, and we're deferring to the CRO's determination of the

11  high bid. So I'm going to yield the podium to Mr. Strubeck to

12  announce the state of bidding because, quite frankly, I'm not

13  certain what it is.

14  THE COURT: Okay. Mr. Strubeck.

15  MR. STRUBECK: Thanks, Your Honor. I know it's been

16  a late day for everybody.

17  Judge, we're waiting for the most recent spreadsheet to

18  come down. We had printer problems up in our office, and the

19  reason that this is an issue is, at this point in time, the

20  CRO believes that the two bids are neck-and-neck. The problem

21  is I can't see this now because my eyes have gotten tired,

22  Your Honor. If I can have just two minutes to look at this

23  sheet and tell you which bid we believe is in the lead at this

24  point in time.

25  THE COURT: We'll take a break right here in place.

1       (Brief pause in proceedings)

2               MR. STRUBECK:  Your Honor, may I approach?

3               THE COURT:  Yes, please.

4               MR. STRUBECK:  Your Honor, you can see now, I think,

5       if you look at this chart why I was hesitating earlier when

6       you were asking me what the current highest and best offer

7       was, because the two bids, the Greenberg bid and the last bid

8       from Mr. Cuban, are effectively even, neck-and-neck.  The

9       procedures that have been proposed by the chief restructuring

10      officer in terms of bidding going forward and agreed to, as I

11      understand it, by the Cuban team, is that with respect to any

12      additional bids by the Greenberg team, that the Cuban team

13      will bid in increments that are $10 million above that bid.

14      So I think they are effectively neck-and-neck right now, and

15      it would be the CRO's position that we will look for the next

16      bid to come from the Cuban group.

17              THE COURT:  Mr. Jessup -- oh, I'm sorry.

18              MR. LAURIA:  Your Honor, I have to tell you that on

19      behalf of Greenberg-Ryan, or Rangers Baseball Express, we are

20      at this time protesting the process, and we are not prepared

21      to continue without a ruling from Judge Lynn.

22          We submitted a competing bid at approximately 5:45 today

23      in the amount of $320 million cash.  We were unable to come

24      back within the half hour requested by the Court because the

25      debtor needed additional time to tell us how it was valuing

1    the bids at that time.

2        After about 45 minutes, the debtor came down with the CRO

3    and explained to us that they had made the following

4    determinations as exercise of their elective business judgment

5    and that it was not for us to debate.  That there would be a

6    $6.7 million deduction to the Cuban bid because of the time

7    value of money.  That was based on a five percent interest

8    rate that would be applied to the bid and an assumption of

9    value when they would be able to close.

10       There was a $4.7 million deduction for, apparently, other

11   items in their contract that were not comparable to ours, and

12   it would be a $23.5 million deduction based on their

13   assessment of the risk that the Cuban group would not be able

14   to close, either because they didn't get their deal pulled

15   together.  They currently don't have an organization, a

16   business plan, a capital structure, working capital, or even

17   an organizational agreement as to who is running that team,

18   and they do not have Baseball approval, and without any of

19   those things, they will not get Baseball approval.

20       We were told that that bid was discounted on the basis of

21   a sliding scale that was started at a five percent discount

22   and would go up to nine percent.  We were very unhappy with

23   that discount.  Based on everything we understand, it is at

24   best a 50/50 shot that they would get Major League Baseball

25   approval.

1    We understand that there is a view that, perhaps, this

2    Court or some other Court can intercede and overrule

3    Baseball's ability to make a decision regarding the best

4    interest of baseball.  We don't know of any precedent for

5    that.  So it's hard to assess what that means, but we don't

6    under any circumstance see that they are a 90 to 95 percent

7    likelihood of being able to consummate their transaction given

8    all of the risks that exist.

9    Nevertheless, we were told at that time by the debtor and

10   the CRO that that was the exercise of the business judgment.

11   It was not negotiable by us and that we needed to live with

12   it.

13   Based on those deductions, which total $34.9 million,

14   their last bid of $335 million was at $300 million even.  When

15   you deduct the break-up fee, which is either $10 million --

16   the greater of $10 million or 125 percent of our out-of-pocket

17   fees and expenses up to 13, their bid was $287 million or $290

18   million.  That was being valued by the debtor and the CRO

19   together.  That's what we were told.

20   So we were told that the Cuban group was going to have to

21   make a new bid of approximately $40 million to properly top

22   our bid.  We thought that that deduct was not adequate, but we

23   were told that we had to live with it.

24   Before the CRO and the debtor left, we raised another

25   issue, that we had been told by the lenders respectively, by

the debtor, and by other parties in the negotiations that there was, apparently, a misunderstanding regarding the Cuban financing. In particular, as the Court is aware, the Cuban financing contemplates $130 million of take-back notes. We were told that this structure got around Judge Lynn's ruling on July 22 where he said that lenders could -- that a bidder could come to the court with a plan that included take-back notes but that it would have to satisfy two requirements.

Number one, such a bid would have had to have been accepted by two-thirds an amount and 50 percent plus in number of all senior secured lenders. And, number two, it would have to be brought pursuant to a Chapter 11 plan of reorganization so that the debtor would have access to Sections 1123, 1124, and 1129 of the Bankruptcy Code to be able to implement a plan that would provide non-cash consideration to creditors who were not presently represented before the Court.

I note for the Court's information that the ad hoc lender group is comprised, I believe, today of four lenders who hold approximately 48 percent of the senior secured debt. There are, by our understanding, 68 lenders in that group, and the other 64 are not represented, and the other just over 50 percent of that debt is not represented.

We were told that the way this had been addressed is that the lender group, the ad hoc lender group members, had all agreed that they were going to take the debt so that there

1   would be no use of this proceeding to force people who are not

2   before the Court to take non-cash consideration without their

3   consent. So all of the $130 million of debt, the take-back

4   debt in the Cuban bid, was going to go to the ad hoc lender

5   group who was providing financing for their transaction.

6        That surprised us because we were aware of the fact that

7   the senior lender credit agreement contained an equal and

8   rateable sharing clause which says that, basically, every

9   lender has the right to get its fair share of all

10   consideration distributed. So, in other words, each lender

11   would be entitled to a pro rata share of the debt and a pro

12   rata share of the cash.

13        We asked the debtor how they were going to get around

14   that, and the debtor told us it was their understanding that

15   the ad hoc lender group had determined to waive that

16   requirement. So they would take all of the notes and allow

17   the other people who were not before this Court to take the

18   cash.

19        Subsequently, we went and met with the ad hoc lender

20   group, and they told us that they had reached no such

21   agreement. After studying the matter, they came to us and

22   they told us that there were other problems with the financing

23   and that the financing being proffered by the Cuban group was

24   not conforming. It did not satisfy this requirement.

25        Now, whether or not the lenders are willing to say now

that the financing qualifies or not, Judge Lynn's ruling was quite clear, that there would be no take-back paper for the senior secured lenders absent two-thirds an amount and more than 50 percent approval by the full secured lender group and that it will not be done without the protections of a plan or organization. Neither one of those criteria have been met with respect to the Cuban financing, and so we don't believe that there is a bid that we are being asked to bid against because it does not at this point have financing.

Your Honor, this process has devolved to the point where we have no faith in its efficacy, and I feel bad about that, but we've been sitting here for four hours waiting for a bid. We were told the last time we spoke with the CRO and the debtor that we were $33 million ahead, and I just heard the CRO say that we're now dead even. It's not because the Cuban bid has been increased by one penny, but because the CRO, after telling us that there were nonnegotiable standards regarding how our bid was being viewed and the other bid was being viewed decided that he should change them, without consulting with us, without any explanation, without any further meeting.

And, by the way, the CRO and the lender -- the debtor never got back to us on the issue of whether or not our competitor, in fact, has financing or not. So before any proceedings continue, we want to have these issues resolved by

1    Judge Lynn. We are dead set on getting a determination as to

2    whether or not the ad hoc lenders have agreed to take all the

3    take-back notes because, if they haven't, there is no

4    financing for the other bid and there is no other bid. And we

5    feel the process is unfair, and we are not prepared to

6    continue making responsive bids to a bid that has no financing

7    as far as we know and that is in a process that does not have

8    consistently applied or enforced rules.

9        This is not an auction. An auction has rules. You make a

10   bid. You make a counter. You make a bid. You don't take a

11   bid and then spend four hours changing the rules to extract a

12   bid from the other bidder. So we're not prepared to continue,

13   Your Honor.

14       THE COURT: Mr. Leblanc, would you like to address

15   the issue on behalf of lenders with respect to rateable

16   sharing on take-back debt?

17       MR. LEBLANC: Your Honor, there is no issue. From

18   our perspective, there has been no issue with the financing

19   that's been proposed by the Cuban-Crane bid. We have a

20   commitment, a support letter, and the terms of that are clear,

21   and there is no issue with the financing that's been proposed

22   by their bid, Your Honor.

23       MR. LAURIA: Your Honor, with respect, counsel has

24   not answered the question as to whether or not the ad hoc

25   lender is here in court today accepting take-back paper, all

1   of it, because if any of it is to go to lenders that are not

2   here, Judge Lynn's rules do not permit that.

3           MR. LEBLANC:  Your Honor, I don't think -- Judge Lynn

4   will, obviously, decide what his rules are.  What we have

5   committed to and what I understand the Crane-Cuban group to

6   have committed to as a backstop, provides only the amount of

7   take-back notes that will be provided to the ad hoc group.  If

8   at the end of the day the ad hoc group is forced to take all

9   of the take-back paper, we don't think that that's the result

10  that will happen, but to the extent that it does, we have

11  signed a commitment letter that provides that we will do so.

12          THE COURT:  Okay.  Thank you.

13          MS. O'NEIL:  Your Honor?

14          THE COURT:  Ms. O'Neil.

15          MS. O'NEIL:  Thank you, Your Honor.

16      Just for the record as well, Mr. Leblanc is no longer

17  representing GSP as part of the ad hoc, or maybe I should say,

18  GSP is not in the ad hoc, but, nonetheless, GSP, as part of

19  the agreement to take the take-back paper, adopts the

20  statements of Mr. Leblanc, vis-a-vis, the Cuban and Crane bid.

21  Thank you.

22          THE COURT:  Thank you.

23      Mr. Jessup.

24          MR. JESSUP:  Your Honor, my esteemed colleague seems

25  to remember things that I don't with regard to what the judge

said. At a hearing or it was in chambers, when we were talking to Judge Lynn with regard to the issue of the notes, I specifically asked him, did there need to be the voting requirements if it was a 363 sale, and he said, no. He said what I was talking about was a plan, because at that time, there wasn't a 363 motion.

So those percentages he was talking about are the percentages for voting under a plan. There is no plan before the Court in this auction. This is a 363 sale. So he's talking about something the judge did say, but the judge was saying it in a different context. I asked him specifically did that abide him with regard to the other, and he said no, just so long as the lenders who were taking the notes agreed to it, and that's what we have here. Forty-eight percent -- we only have 48 percent of the notes that are going to be covered by them.

But, Your Honor, let me pull the cover back. This is reminiscent of what happened in the Wizard of Oz. There is a lot of noise. There are a lot of things going on, but the bottom line is this particular stalking horse has only bid $2 million all day. They have gone up $2 million from where they started. They haven't done anything else, and now they're saying, because the process is not going the way they'd like, they want to back out and they want talk to Judge Lynn. That's fine, but they have attempted from the beginning to not

1  have an auction, and if they couldn't stop the auction before

2  the auction, now they are going to stop it today because of

3  procedures that they don't like because they are not the

4  determiner of what happens in this proceeding.  It's the CRO

5  and the debtor.  They don't like that.  They would rather have

6  their own way, and we would, too, but we're restraining

7  ourselves letting the parties who are selling make the

8  decisions, not the bidders.

9      And if you listen to the bidder's counsel, you would think

10  he is debtor's counsel.  We are here just to make bids, to get

11  the highest value for the estate, and not to run the auction.

12  And so we would ask the Court to put things back in order with

13  the CRO and the debtor running the auction, bidders only

14  making comments with regard to bidding, and if they have a

15  problem with it, they can raise it at the sale hearing, but we

16  have been delayed all day in bidding.

17      We have made two or three bids.  They have attempted by

18  getting penalties and other things considered by CRO or the

19  debtor to lower that amount, but the bottom line is, Your

20  Honor, we have bid tens of millions of dollars above where

21  they started, and, yet, they would have the Court find that

22  we're in the hole.

23      I'm prepared, Your Honor, to make another bid.  My client

24  wants to own this ball club, and we're here to put money on

25  the table to benefit the estate, not arguments, not bluster,

1    not a lot of fluff. We're here today, Your Honor, to make a
2    bid. So we would ask the Court to consider the proper
3    parameters of what the judge said as the rules for this
4    particular proceeding so that we can move forward with the
5    auction.

6    Let me say one last thing, also, Your Honor. There are
7    issues that have come up that will need to be addressed.
8    There is an issue that was alluded to by counsel, and that was
9    that we only have a 50/50 shot of getting approved by Major
10   League Baseball. How does he know that? Where did that come
11   from? Is our competitive bidder going to Major League
12   Baseball and getting information that we don't have? Are they
13   telling Major League Baseball things that would hurt our
14   ability to get approved?

15   It's a very disturbing statement that was made in
16   connection with the bidding that we need to have resolved,
17   because if they have already done something to hurt our
18   ability to get approved, then that is actionable, and it's
19   something that we would bring to the Court's attention.

20           THE COURT: Thank you.

21   Mr. Strubeck?

22           MR. STRUBECK: Your Honor, I just want to respond to
23   a couple of things because I didn't have much chance to talk
24   initially. I just want to give the Court an update on where I
25   thought everybody was.

1    Part of the reason that we're where we are right now,
2    Judge, is because this process was a very difficult process.
3    There are some very complex issues as the Court knows, and all
4    this has to be done within a very short time frame.  And so
5    when last we left you, Judge, we had a $335 million bid from
6    the Cuban camp, and we had a $320 million bid from the
7    Greenberg camp.

8    Usually, the way these auctions go is at the end of the
9    auction you decide what's the highest and best offer, and I
10   think in an effort to try to streamline the process, maybe we
11   got sidetracked a little bit because we tried to see if we
12   couldn't maybe narrow the fight that was going to exist at the
13   end of the day as to what was the highest and best offer.  If
14   you just look at where things stood, again, the last time we
15   were in here, you had bids that were approximately $15 million
16   apart, and what the CRO and what the debtor tried to do was to
17   try to figure out a way to kind of fully value those binds.

18   When Mr. Lauria talks about the visit that the CRO and the
19   debtor paid to him, this was just part of the process to see
20   if we could get a consensus going.  It was never an offer that
21   Mr. Snyder made that was accepted by Mr. Lauria with respect
22   to what discount, if any, would apply to the Cuban bid, and
23   the same was true when we visited with Mr. Jessup and
24   Mr. Cuban and with the lenders.

25   So we were trying to streamline this process, and the

1    Court knows from all the visits you have had today from all

2    the different parties, this is a tough process, and I think we

3    started this at 9:00 this morning, and as Mr. Lauria said, we

4    got a total of, I think, three or four bids.

5        We think that what ought to happen -- and Mr. Lauria is

6    well within his rights to contest this auction if he thinks

7    it's not fair, if he thinks the process is inappropriate, and

8    Judge Lynn will tell us, but we have got somebody who is

9    willing to take another bid, and I don't understand why we

10   just don't take advantage of that today.  If they don't want

11   to participate, fine, but that shouldn't preclude any bid from

12   coming from the Cuban camp, which Mr. Jessup has just said

13   they're prepared to make.

14            THE COURT:  Okay.  Thank you.

15       Mr. Lauria, last word.

16            MR. LAURIA:  Your Honor, let's just be clear how the

17   timelines worked here.  The competing bid was due at 8 o'clock

18   last night.  It was delivered to us at 4:20 this afternoon.

19   We made our bid at 5:45.  Just to be clear, the Cuban camp was

20   on the clock for 20 hours coming up after the bid deadline

21   with a bid that the debtor and CRO were prepared to tell us

22   was a qualified bid.  We were on the clock for approximately

23   an hour and 25 minutes.  Since then, the ball has been on the

24   other side's court.  So the notion that we're the ones holding

25   this up is beyond ridiculous.  We made a bid not even knowing

the bid we were bidding against, and we didn't increase our bid by $2 million.

We increased it by $30 million, sir.

Our bid was 290. We increased it to 320. That's $30 million, not 2 million. We topped a bid that we didn't believe should be valued dollar for dollar by 2 million, but we topped it by 2 million because that's what the bidding procedures require.

Now, we do not believe this process is holding together at this point, and I would just ask Your Honor to think about what we need to do to have a process that the parties believe is fair because if it's not in the party's perception as fair, it's not going to work. And the goal is to get to the end. The goal is to get a high bid.

And I want to be very clear. We are the ones who have the most to lose from delay here. In fact, I find it ironic, ironic, that Cuban would accuse us of delay when they have been on the clock, basically, the entire time that this auction has been going forward. We were on the clock for an hour and 25 minutes in the last 24 hours, an hour and 25 minutes in the last 24 hours.

Now, why is it that we want to go fast, and they need all this time? Our bid expires on August 12. We lose our financing. We lose our equity commitments. I'm sure that the competitor would love to be in an environment where there

1  isn't a competing bid against him.

2      So if we're talking about who has tried to time who out

3  here, we're the ones who don't have the time for this, but we

4  have sat here and not been asked to do anything except for an

5  hour and 25 minute span, and we made a $30 million enhancement

6  to our bid, and we did so against a bid that we didn't even

7  know how it was being valued at the time, just to set the

8  record straight.

9      So, Your Honor, we ask again that this be brought to Judge

10  Lynn and let him sort this out because the process is a mess

11  right now.

12          THE COURT:  Thank you.

13      Mr. Leblanc?

14          MR. LEBLANC:  Your Honor, I'll just briefly respond.

15  I certainly don't need to defend Mr. Jessup and his clients.

16  They certainly can do so, but just to be clear, my

17  recollection was that -- I didn't time it, but I think it was

18  approximately 30 seconds after the last bid by the Greenberg

19  group that Mr. Cuban and Mr. Crane made a competing bid, and I

20  believe it was a $15 million increment.

21      Your Honor, I wanted to stand to echo the comments of

22  Mr. Strubeck, that to the extent that there is a bid -- I

23  understood him to say to Mr. Cuban and Mr. Crane are on the

24  clock in the sense that it has now been determined that their

25  bid is -- they need to bid next.  I think we should receive

1    that bid to the extent that they have a bid to make. And this

2    process, I believe, from this point forward can move with

3    great speed, because the issues that we've sorted out

4    throughout the day have now been resolved, and the issues now

5    before us is a bid on increments that have now been determined

6    by the CRO as to how we're going to proceed for the rest of

7    the day. The procedures now have ironed themselves out, and

8    it's late in the day, but it's now the time to get this

9    auction really going.

10       So I would ask that Your Honor have the bid from the Cuban

11   group received without further delay, and let's move the

12   process forward.

13            THE COURT: Thank you, Mr. Leblanc.

14       Thank you, parties. Well, first of all --

15            MR. JESSUP: Your Honor, if I may? If I may?

16            THE COURT: Yes, you may.

17            MR. JESSUP: I appreciate it, Your Honor.

18       I have just been consulting with my client, and they would

19   like me to make another bid right now.

20            THE COURT: Before you make a bid, let me make a

21   ruling.

22            MR. JESSUP: Okay. Thank you.

23            THE COURT: With respect to the issue of rateable

24   sharing of take-back debt, I think that Mr. Leblanc has

25   addressed that issue adequately, and Mr. Leblanc is going to

1    be bound by his representations both to this Court as well as

2    to the group that he represents.

3        On the issue of the procedures and whether the procedures

4    are fair and have been properly modified, or whether the CRO

5    has correctly exercised his judgment and discretion

6    determining the relative bids up to this point in time -- of

7    course, Mr. Lauria, I am going to preserve all rights that you

8    had to argue that those procedures have not been complied with

9    and that the CRO has not properly exercised his judgment.  So

10   any and all of those issues are preserved, but I just do not

11   see any benefit to delaying this, either for your client or

12   for the other parties here today, so that we can have a

13   hearing or to have a hearing before Judge Lynn on those

14   issues.

15       So your rights are preserved in that respect, and the

16   Court will -- the CRO has made the determination that Cuban

17   group needs to -- that that is the party that should make a

18   bid, and I will permit Mr. Jessup to make that bid.

19           MR. LAURIA:  Your Honor, may I ask for some

20   clarification?

21           THE COURT:  Yes.

22           MR. LAURIA:  Apparently, somewhere along the line

23   there was a decision made that there would be zero discount to

24   the Cuban bid based on approvability and execution issues, but

25   there was a $6.7 million discount as a consequence of time

1    value of money that was based on a five percent discount. I

2    don't understand if that has gone away, but if it hasn't, just

3    that and the break-up fee put the Cuban bid below our bid.

4        In addition, there is another deduction, which the debtor

5    never explained to us, for differences between our proposal

6    and the Cuban bid of 4.7. So right now, there is an

7    unexplained $11.4 million deduct that was previously on the

8    table that everybody agreed was suppose to be there that I

9    don't know where it went, but when you take that into account

10    together with the break-up fee, we still are above the bid. I

11    think that we are entitled to an explanation from the CRO or

12    from the debtor about where those deductions went.

13        THE COURT: Well, what we're going to do next is

14    we're going to accept the Cuban bid, and we'll see -- if

15    you're saying that the Greenberg bid is superior by some $11.4

16    million or should be judged to be such by the CRO, let's see,

17    based upon the Cuban bid, if that's currently relevant or not

18    relevant.

19        So Mr. Jessup?

20        MR. JESSUP: Your Honor, we believe we're already

21    higher, but we're not here to play games with the numbers, nor

22    are we here it find deducts every time the other person bids.

23    We're here to bid. I've been authorized by my client to make

24    a bid of $20 million to take us to $355 million.

25        THE COURT: Okay. CRO, you've got an additional bid.

1    Tell me how long you'll need to evaluate that bid because

2    Mr. Lauria is going to want to know.

3            MR. STRUBECK:  Mr. Jessup, am I correct in assuming

4    it's cash?

5            MR. JESSUP:  Yes.

6            MR. STRUBECK:  I think probably five minutes is all

7    we'll need.

8            THE COURT:  Okay.

9            MR. STRUBECK:  By the way, Judge, the sheet that I

10   handed up earlier when Mr. Lauria was saying that the $4.7

11   million adjustment had magically disappeared, if you look at

12   the sheet, it's still in there.  It hasn't gone anywhere, but

13   if we could have five minutes, Judge, we'll come back.

14   Actually, we can just sit here if you'd rather us just stay

15   here and talk about it.

16           THE COURT:  All right.  Why don't we just break in

17   place while you do that and provide that information to

18   Mr. Lauria.

19           MR. STRUBECK:  Okay.

20           THE COURT:  And we'll give Mr. Lauria -- Mr. Lauria,

21   I had announced at the beginning of this session that we would

22   try to move forward in 30 minute increments --

23           MR. LAURIA:  Pardon me, Your Honor?

24           THE COURT:  I had announced at the beginning of this

25   session that we would attempt to move forward in 30 minute

1    increments after we've taken the next high bid.  Is that going

2    to be adequate for you?

3         MR. LAURIA:  Well, Your Honor, I would like to have

4    30 minutes after the debtor tells us.

5         THE COURT:  Okay.  Then we'll take a break in place

6    right here, and we will get that information to you, and from

7    that point forward, we'll take our break.

8         (Hearing recesses, 10:00 p.m. - 10:35 p.m.)

9         THE COURT:  I said we were going to reconvene at

10   10:30.  So we're reconvening a little bit after 10:30, but I

11   notice that we don't have representatives of Rangers Baseball

12   Express.  So we're going to sit here until they get here.

13        Will somebody let them know that court is in session?

14        MR. STRUBECK:  Your Honor, I mentioned to the Court

15   before we went on the record that we just paid them a visit

16   and told them what their next bid needed to be, and they said

17   they were going to caucus, and they would be here as soon as

18   they could be here.

19        THE COURT:  Okay.  Well, and if they only come in

20   here at least to let me know they needed more time, that would

21   be fine.

22        MR. STRUBECK:  Would you like me to pass that along

23   to them?

24        THE COURT:  Yes.  If you could pass that along for

25   me, but I would like for somebody from that group to let me

1   know that they want some additional time.

2       (Brief pause in proceedings)

3           MR. LAURIA:  Your Honor, we're in the process of

4   assessing our progress, and we need some more time.

5           THE COURT:  Okay.  Can you estimate that, Mr. Lauria?

6           MR. LAURIA:  You know, I guess I'd say 15 to 30

7   minutes?

8           THE COURT:  Okay.  Why don't we reconvene at 11:00?

9           MR. LAURIA:  All right.

10          THE COURT:  Thank you.

11      (Hearing recesses, 10:40 - 11:35 p.m.)

12          THE COURT:  We're reconvening the auction hearing in

13  Texas Rangers Baseball Partners.

14      Mr. Lauria?

15          MR. WHITE:  Your Honor, if we may, Bruce White.

16  We're missing a few individuals here, if I may take a moment

17  to locate them?

18          THE COURT:  Sure.  Thank you.

19      Mr. Strubeck?

20          MR. STRUBECK:  Your Honor, I thought it would be

21  helpful -- I kind of have been the master of ceremonies.  I

22  thought it would be helpful before Mr. Lauria says what he

23  wants to say for me to let the Court know, since it's been a

24  while since we were here, just where I think we are.

25      So the last bid, Judge, that I believe you heard made was

1  $355 million bid from the Crane side.  I handed out this

2  chart.  I think almost everybody has it, and I know Your Honor

3  does, and, really, just to make sure everything is clear, the

4  total bid is actually $563 million.  So when you hear these

5  bid increments being discussed like the last $355 million

6  number, those do not include the assumed liabilities of $208

7  million, and this may be the only thing that's the same and

8  everybody can agree on it.  Those are the same under both the

9  Greenberg bid and under the Crane-Cuban bid.  So, Your Honor,

10  based upon our calculation, the next overbid that needs to be

11  made is going to be an overbid of $22 million, and I'm sure

12  Mr. Lauria will talk about that in just a second.

13      I wanted to mention one other thing that I've been asked

14  to mention by Mr. Cuban's group, and that is, Judge, that

15  there are some revisions that were made to the asset purchase

16  agreement that, actually, result in about another million

17  dollars worth of value to the Cuban-Crane bid, and on that

18  sheet that you have got in front of you, very simply it

19  involves some costs to Major League Baseball that are being

20  assumed by the Cuban group, in addition, a land use agreement

21  expanse item and McKinney store, slash, office space lease

22  rejection.  Those are all on the chart, and, basically, it

23  adds another million dollars, Judge, of value.

24      And with that, I think I'll yield the podium.

25          THE COURT:  So does that mean then that the Cuban

1  bid -- that the trustee's valuing it at 356?

2        MR. STRUBECK:  356, correct, Your Honor.

3        THE COURT:  Okay.

4        MR. STRUBECK:  So I guess, really, what that means is

5  the Greenberg bid would need to be, actually, $1 million

6  higher than I said.  So the next bid, from at least the CRO's

7  perspective, would need to be $23 million.

8        THE COURT:  Okay.  Mr. Lauria?

9        MR. LAURIA:  I guess we'd better bid quick because

10  it's going up on its own.

11     Your Honor, we're going to reserve all of our rights, and

12  we're going to increase our bid to $365 million, and we're

13  going to eliminate the escrow that is in our contract of $12

14  million, which we understand is also in the Cuban contract.

15        THE COURT:  Okay.  Mr. Strubeck, how long to evaluate

16  that, please?

17        MR. STRUBECK:  I'm being told 15 minutes, Your Honor,

18  and I've also been asked to clarify that we understand that's

19  all cash.

20        MR. LAURIA:  All cash.  All of our bids are cash.  We

21  have no take-back paper.

22        MR. STRUBECK:  So if you can give us 15 minutes, Your

23  Honor, we'll try very hard even to give you some time back.

24        THE COURT:  Okay.

25        MR. STRUBECK:  Thank you.

1          THE COURT:  We'll be in recess for 15 minutes.

2          (Hearing recesses, 11:40 p.m. - 12:05 a.m.)

3          THE COURT:  Mr. Jessup.

4          MR. STRUBECK:  Judge, would you like for me to serve

5     as the master of ceremonies?

6          THE COURT:  Mr. Strubeck, I'd be pleased for you to

7     serve as master of ceremonies.

8          MR. STRUBECK:  I'll just tell you, Judge, from the

9     CRO's perspective where we are, and I think Your Honor and

10    everybody else probably has the new chart.  So based upon the

11    $365 million offer that was just -- or bid that was just made

12    by Mr. Lauria, we believe that the next topping bid by the

13    Cuban-Crane group needs to be $388.8 million, and in addition

14    to that, of course, as Mr. Lauria said, the escrow is being

15    eliminated from the Greenberg APA.  So that's where we are.

16         THE COURT:  Thank you.

17         MR. JESSUP:  Your Honor, on behalf of my client, we

18    are bidding $390 and cutting the $12 million escrow.

19         MR. SNYDER:  This is William Snyder.  We're going to

20    calculate this.

21         THE COURT:  All right.

22         MR. SNYDER:  Mr. Greenberg does not have to bid in

23    increments that Mr. Crane does and Mr. Cuban.  Thank you.

24         (Brief pause in proceedings)

25         MR. STRUBECK:  Your Honor, the CRO has finished his

1    analysis of this bid, and so I guess the Greenberg group is

2    back on the clock.

3              THE COURT:  Okay.  What do you think, Mr. Lauria?  I

4    was going to say 30 minutes.  Do you need that much time or

5    less?

6              MR. LAURIA:  Five minutes.

7              THE COURT:  Five minutes.  Okay.  Let's just -- we'll

8    recess in place then.

9         (Brief pause in proceedings)

10             THE COURT:  Okay.  I'll ask -- since Mr. Strubeck

11   wants to serve as the master of ceremonies, I'll permit him to

12   do so and then to recap where we are.

13             MR. LAURIA:  Why don't we just go to 385.

14        (Brief pause in proceedings)

15             MR. STRUBECK:  I'm just going to announce, Your

16   Honor.  We've already done our evaluation.  It's getting a

17   little bit easier at this point.  So I think we're done, and

18   that will put Mr. Jessup back on the clock.

19             THE COURT:  Okay.

20             MR. JESSUP:  Your Honor, may I have five minutes --

21   ten minutes?

22             THE COURT:  Ten minutes?

23             MR. JESSUP:  It takes five minutes to walk down

24   there.

25             THE COURT:  Then we'll take a recess in place.

1     (Hearing recesses, 12:25 - 12:40 a.m.)

2          THE COURT:  Okay.  Mr. Strubeck?

3          MR. STRUBECK:  Thank you, Your Honor.

4     I think this is the last you'll hear from me this morning,

5     which will probably make you very happy.  I think you probably

6     have the updated sheet, and I've just been informed by

7     Mr. Jessup that the Cuban-Crane group -- well, I guess, he can

8     make the announcement.

9          MR. JESSUP:  Your Honor, on behalf of Radical Pitch,

10    we would like to congratulate Rangers Baseball.

11    (Applause)

12         THE COURT:  Okay.  Well, Mr. Cuban, Mr. Crane, thank

13    you.

14    And Mr. Greenberg, Mr. Ryan, congratulations.  We're

15    adjourned.  9 o'clock tomorrow morning.

16    (End of proceedings, 12:40 a.m.)

17

18                         -oOo-

19

20

21

22

23

24

25

U.S. DISTRICT COURT

1                              CERTIFICATE

2          I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled matter, and
3      that the transcript was prepared by me and under my
       supervision.
4
       s/  Ana P. Warren                    August 5, 2010
5      Ana P. Warren, CSR #2302                  Date
       U.S. District Court Reporter
6

7

8                                -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25