U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed April 06, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § | CHAPTER 11 |
| TEXAS RANGERS BASEBALL PARTNERS, | § § | |
| DEBTOR. | § § § | CASE NO. 10-43400 (DML) |

## MEMORANDUM OPINION

Before the court is the *First and Final Application of Perella Weinberg Partners, LP as Financial Advisor and Investment Banker for the Debtor for Allowance of Compensation and Reimbursement of Expenses (for the period May 24, 2010 through August 12, 2010)* (the "Application") filed by Perella Weinberg Partners, LP ("Perella") and objections (collectively, the "Objections") to the Application filed by the United States Trustee (the "UST"); GSP Finance, LLC ("GSP"), agent for the Second Lien Lenders to Debtor; and Alan Jacobs as Plan

Administrator (the "Administrator" and, together with the UST and GSP, the "Objectors"). The court conducted a hearing (the "Hearing") on the Application and Objections[1] over 5 days,[2] during which it heard testimony from Christopher Meekins, Perella's assistant general counsel; Sheldon Stein, a former managing director for Merrill; Kevin Cofsky ("Cofsky"), a managing director for Perella; Kellie Fischer ("Fischer"), Debtor's chief financial officer; Brandon Gardner ("Gardner"), Raine's chief operating officer; Jeffrey Wong ("Wong"), an associate at Raine; and William Snyder ("Snyder"), chief restructuring officer for Rangers Equity Holdings GP, LLC and Rangers Equity Holdings, L.P.[3] The court also received into evidence exhibits identified as necessary below.[4]

This matter is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A). This memorandum opinion represents the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and 9014.

I.  Background

The events leading up to Debtor's chapter 11 filing are described in *In re Texas Rangers Baseball Partners*, 434 B.R. 393 (Bankr. N.D. Tex. 2010) (the "6/22 Opinion"), familiarity with which is assumed. Pertinent facts are set forth as follows.

---

[1] The Hearing also addressed the claim of Raine Advisors LLC ("Raine") and was originally to consider the claim of Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill"). Merrill, however, reached agreement with the Objectors on the eve of the Hearing. The court will address Raine's claim in a separate writing.

[2] The Hearing dates were December 20, 2010, December 22, 2010, January 20, 2011, January 21, 2011, and January 24, 2011.

[3] Cofsky's testimony was principally concerned with the Application and Gardner's and Wong's testimony was concerned with Raine. For reasons that will become obvious, the court considers the testimony of all witnesses to the extent relevant to disposition of the Application.

[4] Exhibits will be designated by "PX," "MX," "RX," or "OX" representing exhibits provided respectively by Perella, Merrill, Raine, and the Objectors.

Merrill, Raine and Perella all served as financial advisors to Debtor's ultimate parent HSG Sports Group, LLC[5] ("HSG") during the period when HSG was seeking first an investor, and then a buyer for Debtor's principal asset: the Texas Rangers Baseball Club (the "Rangers"). Merrill was first retained to seek investors to shore up HSG's financial condition; later Merrill's assignment was modified to serve as one of the financial advisors to HSG regarding a potential sale of the stock, assets, or business of Rangers Equity Holdings, L.P., Ballpark Real Estate, L.P., and/or Debtor. *See* MX 2, 3. With respect to the latter role as financial advisor, Merrill was to receive a transaction fee of $10,000,000. *See* MX 3.

When it became clear HSG's problems could not be resolved by an investor, HSG also retained Raine to find potential buyers of the Rangers and oversee a sales process. As a result of these duties, Raine was to receive a transaction fee which, had the original sale (discussed below) to Rangers Baseball Express, LLC ("Express") been consummated, would have totaled approximately $5,000,000. *See* RX 33. Perella was retained to assist HSG in negotiating with HSG's lenders and was to receive, under the original engagement letter (the "2009 Perella Agreement"), monthly payments of $175,000 and a transaction fee equal to $975,000 plus the greater of (1) $2,925,000 less fifty percent of the Monthly Fees (as defined in the 2009 Perella Agreement) earned after September 1, 2009, or (2) $2,000,000.[6] *See* PX 2. The process set in motion by HSG eventually led in January 2010 to an agreement to sell the Rangers to Express.

As discussed in the 6/22 Opinion, HSG and Debtor were unable to close the sale of the Rangers to Express, and Debtor therefore sought relief in this court. On the eve of Debtor's chapter 11 filing, HSG renegotiated the transaction fees for Merrill and Raine and caused Debtor

---

[5] F/k/a Hicks Sports Group, LLC.

[6] This amount would actually be due upon consummation of a "Total Restructuring," as defined in the 2009 Perella Agreement. Had only a "Partial Restructuring" (as defined in the 2009 Perella Agreement) occurred, Perella would have been entitled to a transaction fee of $975,000. *See* PX 2.

to enter into new letter agreements with those advisors – thus arguably changing the party obligated to them. Perella also entered into a letter agreement with Debtor (the "2010 Perella Agreement"). *See* PX 4. Unlike the new agreements with Merrill and Raine, the 2010 Perella Agreement contemplated that Perella would act as Debtor's financial advisor during its chapter 11 case. Debtor and Perella agreed that for these services Perella would receive a monthly fee of $87,500 and a transaction fee of $1,500,000 (the "Transaction Fee"). *See* PX 4.

As described in the 6/22 Opinion, Debtor filed a plan of reorganization (referred to by Debtor as a "prepackaged plan") contemporaneously with commencement of its chapter 11 case. This plan was designed to effect the sale to Express as negotiated by HSG and Debtor prepetition. Because the sale would have constituted a transaction as defined in the 2010 Perella Agreement,[7] had all gone as planned, Perella would have been entitled to the Transaction Fee despite its insignificant role in negotiating the sale.

When Debtor sought court approval of its arrangement with Perella, the court, though approving the $87,500 monthly fee, declined to authorize in advance the Transaction Fee; rather,

---

[7] The 2010 Perella Agreement defines a transaction entitling Perella to the $1,500,000 Transaction Fee as "any transaction constituting a Sale or a Restructuring . . . ." "Sale" is defined as:

> [T]he disposition in one or a series of related transactions (i) of all or a significant portion of the equity securities of the Company by the security holders of the Company or (ii) of all or a significant portion of the assets or businesses of the Company or its subsidiaries, in either case, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business. [sic] combination, a tender offer, the formation of a joint venture, partnership or similar entity, or any similar transaction (other than a Restructuring).

"Restructuring" is defined as:

> [A]ny recapitalization, modification or restructuring of the Company's equity and/or debt securities and/or other indebtedness, obligations or liabilities (including partnership interests, lease obligations, trade credit facilities and/or contract or tort obligations) . . . including pursuant to any repurchase, exchange, conversion, cancellation, forgiveness, retirement, plan, solicitation of consents, waivers, acceptances, authorizations and/or a modification or amendment to the terms, conditions or covenants thereof.

PX 4.

4

the UST objected to the firm's retention and the court reserved the ability to assess under section 330 of the Bankruptcy Code (the "Code")[8] what compensation Perella would be entitled to. Thus, the order approving Perella's employment (the "Employment Order") provided:

> 3. [Perella] shall receive monthly compensation in accordance with the terms described in the Engagement Letter pursuant to the standard of review under 11 U.S.C. § 328(a); *provided*, that such compensation may be reviewed by the Court, the Debtor, the Ad Hoc Group of First Lien Lenders, GSP Finance LLC, as Second Lien Agent, the Official Committee of Unsecured Creditors and the United States Trustee under 11 U.S.C. § 330 and in accordance with the Court's comments on the record at the [hearing respecting employment]; *provided, further*, that such compensation shall be subject to approval by this Court, any order established in these Chapter 11 cases setting forth procedures for interim compensation and reimbursement of expenses, the Bankruptcy Code, the Bankruptcy Rules, the United States Trustee's fee guidelines and the Local Rules and orders of this Court; *provided, further*, that none of the compensation payable to [Perella] shall be, absent a finding by the Court, deemed to constitute a "bonus" or fee enhancement under applicable law.

Following the commencement of Debtor's bankruptcy case on May 24, 2010, and until July 15, 2010, Perella did not actively seek to market the Rangers. However, once the court entered its order adopting bidding procedures,[9] Perella, using both its own resources and lists of potential bidders provided by Raine and Merrill, undertook to find persons interested in bidding on the Rangers. Once potential bidders had been located, Perella assisted them in going through the necessary steps to qualify to participate in the auction of the Rangers set by the court for August 4, 2010 (the "Auction").

Two bidders appeared at and participated in the Auction: Express and Radical Pitch LLC ("Pitch"). Prior to actual commencement of the Auction, Pitch had to qualify its bid – a process in which Perella, through Cofsky, played an important part. *See* TR (Cofsky) December 20 at

---

[8] 11 U.S.C. §§ 101 *et seq.*

[9] The events surrounding entry of that order are discussed in *In re Texas Rangers Baseball Partners*, 431 B.R. 706 (Bankr. N.D. Tex. 2010) (the "7/30 Opinion").

pp. 214:5 – 216:2. Cofsky also was active in determining the discount to be applied to Pitch's bid – a function the Objectors contend was less than beneficial. *See* TR (Cofsky) December 20 at pp. 209:22 – 211:10; TR (Cofsky) December 22 at pp. 149:10 – 150:13; TR (Snyder) January 20 at pp. 136:10 – 140:8.

Express proved to be the winning bidder. The price resulting from the Auction was over $90,000,000 more than Express's opening, stalking-horse bid, and the direct and indirect return to creditors (through equity) improved by approximately $120,000,000. *See* TR (Cofsky) December 22 at pp. 157:24 – 158:3.

Though the court did not require Perella to maintain careful records of employee time (as is normally required of professionals), it did require that Perella provide "records (in summary format) that contain reasonably detailed descriptions of those services provided to . . . Debtor, the approximate time expended on providing those services and the individuals who provided professional services." Employment Order ¶4. At the Hearing, Perrella provided an exhibit that reflected a total of 357 hours spent on work for Debtor during this case. *See* PX 13. Of these, 197 hours were spent by Cofsky (a senior, second-tier Perella employee) and 102.5 hours were spent by Ben Funk ("Funk"), an analyst. Only 57.5 hours were expended by Michael Kramer ("Kramer"), the most senior member of the team. *See* PX 13.

II. Discussion

A. The transaction fee

Perella is of the view that, in order to determine its fees, the court need only look to what constitutes a normal fee – including a transaction fee – for a financial advisor. To that end, Perella submitted a summary analysis of fees paid to financial advisors in other large chapter 11

6

cases, which it contends proves its entitlement to the Transaction Fee. *See* PX 12A.[10] The Objectors, on the other hand, insist that the monthly payments to Perella were more than sufficient to compensate it for its efforts – especially given the facts of this case.

The court, however, concludes that neither Perella nor the Objectors have it right. The court, while typically retaining the ability to review fees for reasonableness, has always in the past approved the fees of financial advisors as sought. As discussed below, however, facts peculiar to this case necessitate awarding fees less than the amount sought by Perella. On the other hand, transaction fees are an integral part of a financial advisor's compensation. The court thus views payment of a transaction fee to Perella as appropriate given the very satisfactory outcome of Debtor's case.

As an initial observation, the court must note a very real difference between the present context – chapter 11 – and out-of-court situations.[11] In the case at bar, there can have been little doubt that Debtor's chapter 11 proceedings would lead to a "transaction" triggering a transaction fee. *See* TR (Cofsky) January 20 at pp. 90:7 – 18. The likelihood that the Rangers would not be bought (or Debtor's finances otherwise restructured through a plan) was so small as to be insignificant. On the other hand – as evidenced by Debtor's failure to consummate the sale to Express prepetition – in the out-of-court context a financial advisor risks performing considerable work without realizing the ultimate reward of the compensation resulting from success. Because there was little chance in this case of there not being a consummated

---

[10] Perella also supplemented PX 12A with several binders of materials from those chapter 11 cases in support of the summary data contained in the exhibit (the "Supplement to PX 12A").

[11] It is for this reason that the court is more inclined to test Perella's fees against fees in other chapter 11 cases rather than, as section 330(a)(3)(F) provides, fees charged outside of bankruptcy.

7

"transaction," the risk to the financial advisor was minimized, and thus it is reasonable that the rewards of success should be less.

As the court, under the Employment Order, may review the Application under Code § 330, the court turns to the tests fixed by that section for assessing fees.[12] Section 330(a)(3) provides:

> (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

Of the six factors set out in the statute, courts in this circuit have recently focused on the third, the benefit the professional's services provided to the estate or the chapter 11 proceedings. This factor also is the principal basis on which Perella claims entitlement to the Transaction Fee.

---

[12] Courts are required also to consider those additional factors cited in *Matter of First Colonial Corporation of America*, 544 F.2d 1291 (5th Cir. 1977), and *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). In the case at bar, many of these factors – e.g., length of the relationship with the client and preclusion of other employment – are of minimal significance.

Thus, it is appropriate that, as would be the case with other professionals, the court conduct a retrospective analysis of Perella's entitlement to fees. *See In re Pro-Snax Distribs., Inc.*, 157 F.3d 414, 426 (5th Cir. 1998) (adopting a "hindsight" approach requiring services for which compensation is requested to have actually resulted in an identifiable, tangible, and material benefit to the bankruptcy estate); *Kaye v. Hughes & Luce, LLP*, 3:06CV01863 B, 2007 WL 2059724, at *12 (N.D. Tex. 2007) (services rendered by counsel are "actual, necessary services" within the meaning of section 330(a)(1)(A) only if they resulted in an identifiable, tangible, and material benefit to the bankruptcy estate). In this analysis, the court must consider (1) work done prepetition by Merrill and Raine as well as Perella; (2) claims asserted by Merrill and Raine for fees; (3) work done by Perella during Debtor's chapter 11 case; (4) Perella's contribution relative to that of other participants in the case; and (5) the positive – and negative – contributions of Perella to the successful outcome of Debtor's case. The court must also consider fees typically earned by financial advisors in chapter 11 cases.

The prepetition work of all three of HSG's prepetition advisors is relevant because Perella's assignment changed. It is not uncommon for a financial advisor to begin work prepetition which carries over into a chapter 11 case. *See, e.g.*, *In re Metaldyne Corp.*, 409 B.R. 661, 663 n.2 (Bankr. S.D.N.Y. 2009). But that work typically has a continuity that Perella's did not. Perella was retained prepetition to interface with HSG's lenders[13] – an effort which was not successful. Its postpetition assignment was different: to assist Debtor in the disposition of the

---

13      Under the 2009 Perella Agreement, Perella was entitled to a transaction fee upon consummation of a "Partial Restructuring" or a "Total Restructuring." *See* PX 2; n.6, *supra*. The 2009 Perella Agreement defined "Partial Restructuring" as "a modification or restructuring of the Company's (i) Amended and Restated First Lien Credit and Guaranty Agreement . . . and (ii) Second Lien Credit and Guaranty Agreement . . . ( . . ., collectively, the '<u>Credit Agreements</u>') that requires consent of 51% [sic] the Lenders . . . ." PX 2. "Total Restructuring" was defined as "a modification or restructuring of the Company's Credit Agreements that requires consent of 100% of the Lenders . . . ." To earn a transaction fee, Perella was thus required to broker a deal with HSG's lenders with respect to the company's credit agreements.

Rangers.[14] *See* PX 4; TR (Cofsky) December 20 at pp. 178:2 – 179:19. In this task, Perella took advantage of the work performed by Merrill and Raine. Merrill had already done much of the work necessary to sell the team: development of offering materials and design and implementation of an on-line data room for prospective investors. *See* MX 6, 22, 23. Raine had not only modified these efforts to suit the search for a buyer, but had also developed lists of prospective purchasers and prepared materials respecting the development of a regional sports network. *See* TR (Gardner) January 21 at pp. 36:10 – 37:4; RX 17, 18. Raine's work respecting a regional sports network, though not necessarily of interest to Express, helped attract Pitch to the Auction. *See* TR (Gardner) January 21 at pp. 37:5 – 38:18.

Perella thus stepped into a situation in which much had been done to encourage bidding and there existed a proposed transaction designed and obtained by the work of others.[15] And those others – Merrill and Raine – have made claims totaling $7,500,000 in this case for that

---

[14] In the 2009 Perella Agreement, Perella undertook to provide "General Financial Advisory and Investment Banking Services" and "Restructuring Services." *See* PX 2. In the 2010 Perella Agreement, Perella promised to provide the aforementioned services, and, additionally, "Financing Services" and "Sale Services." With respect to Sale Services, Perella promised to:

    (a)    Provide financial advice to the Company in structuring, evaluating and effecting a Sale [], identify potential acquirers and, at the Company's request, contact and solicit potential acquirers; and

    (b)    Assist in the arranging and executing a Sale, including identifying potential buyers or parties in interest, assisting in the due diligence process, and negotiating the terms of any proposed Sale, as requested.

PX 4.

The 2010 Perella Agreement provided that Perella would be entitled to the Transaction Fee upon consummation of a "Transaction," defined as a "Sale or a Restructuring." *See* PX 4. The 2010 Perella Agreement defined "Restructuring" as "any recapitalization, modification or restructuring of the Company's equity and/or debt securities and/or other indebtedness, obligations or liabilities . . . ." PX 4. "Sale" was defined as "the disposition in one or a series of related transactions (i) of all or a significant portion of the equity securities of the Company by the security holders of the Company or (ii) *of all or a significant portion of the assets or businesses of the Company or its subsidiaries* . . . ." (emphasis added). PX 4. Unlike the 2009 Perella Agreement, the 2010 Perella Agreement therefore contemplated the award of a transaction fee to Perella for assisting Debtor in the sale of the Rangers.

[15] The outlines of the transaction were complete by the time Debtor's chapter 11 case was filed. Not only was Express established as a purchaser, but the paperwork – asset purchase agreement, etc. – necessary to implement a sale was in place largely in the form that would ultimately effect the sale.

10

work.[16] *See* MX 1; RX 41. Regardless of the disposition of those claims, Perella is not now entitled to the Transaction Fee as if it were the principal architect of the sale of the Rangers to Express.

The original arrangements made by HSG would have provided for transaction fees to financial advisors of at least $18,000,000 – an amount agreed to by HSG, perhaps, because it would reduce the return to HSG's creditors, not its owners. While that total was reduced by agreement to $9,000,000, that substantial sum must still be considered as Debtor's exposure in assessing Perella's entitlement to the Transaction Fee at this juncture.[17]

Given Perella's noninvolvement in laying the prepetition groundwork for the sale of the Rangers, and considering that Perella's efforts to deal with Debtor's lenders prepetition were unsuccessful, the court must focus on Perella's role from commencement of Debtor's chapter 11 case through implementation of the sale to Express. In this assessment, the court must consider the extent to which Perella's impact on the chapter 11 process was positive, the extent to which it was negative, and what other participants brought to the table.

There is no question that Perella made a positive contribution in this case. As Fischer testified, Perella assisted Debtor in many areas, such as updating the data room. *See* TR (Fischer) December 22 at p. 18:6 – 20; TR (Cofsky) December 22 at p. 113:3 – 18; 128:12 – 19. Perella's efforts in qualifying Pitch with the Office of the Commissioner of Baseball – especially

---

[16] Debtor's plan provides for cash payment in full with interest of unsecured claims. Thus, to the extent allowed, the claims of Raine and Merrill would be paid in full. Merrill has, in fact, settled for $3,500,000.

[17] The court recognizes that the extent of the assignments of the financial advisors changed; HSG owned not only the Rangers but also the Dallas Stars hockey team, and disposition of that plus an interest in an arena – and associated possibilities attractive to a buyer or investor such as a regional sports television network (*see, e.g.*, RX 17, 18) – were under consideration for addressing HSG's financial difficulties. Thus, the transaction fees agreed to at various points in time are not perfectly comparable.

given the short time available – were important.[18] Likewise, Perella's aid to Pitch in qualifying its initial bid was a key step in a successful auction process. *See* TR (Snyder) January 20 at pp. 101:23 – 102:13. Cofsky's testimony played a significant role in the court's consideration of the Debtor's lenders' motion to reconsider the order approving bid procedures, a critical step in the process that led to the Auction. Finally, Cofsky was an important participant in the discussions accompanying the auction process and the evaluation of bids.

The other side of the coin is that Perella did no more than facilitate Pitch's participation – other players (in addition to the publicity surrounding this case) kindled Pitch's interest. The bid procedures were developed with virtually no input from Perella. *See* TR (Cofsky) January 20 at pp. 84:21 – 85:12. The Auction was successful as much through the efforts of Debtor, Snyder, and, especially, the Honorable Russell Nelms,[19] as through Cofsky's input. Indeed, Cofsky recognized that the ultimate sale to Express was the result of a team effort. *See* TR (Cofsky) December 22 at p. 141:8 – 15; pp. 161:15 – 23. The transaction with Express, as mentioned above, was in form and substance the work of others.

Perella, in the Application, claims much of the credit for the $90,000,000 increase in the sales price of the Rangers. *See* PX 10, Application at 9-10. But, as testified to by Snyder, Express's ability to increase its bid – a necessary prerequisite to that price increase – resulted from Snyder's research respecting the parking facilities of the Rangers.[20] *See* TR (Snyder)

---

[18] The Commissioner's counsel also assured the court that the Commissioner would act quickly in determining the qualifications of potential buyers.

[19] The court appointed Judge Nelms to serve as mediator and auctioneer. Judge Nelms's patience, good humor, and stamina were critical throughout the case, particularly during the Auction. The court takes this opportunity to express its gratitude to and admiration for Judge Nelms.

[20] The original purchase by Express contemplated acquisition of the parking facilities from another entity owned by Thomas O. Hicks, Ballpark Real Estate, LP, for $75,000,000. Snyder, through his research, determined that, due to limits placed on the use of the land by the City of Arlington, acquisition of the

January 20 at pp. 156:3 – 158:25. Thus, while Perella's work in getting Pitch to the Auction and qualifying its bid was significant in achieving the enhanced sales price of the Rangers, it amounted to no more than a piece of the overall puzzle.

Nor was Perella's work entirely satisfactory. In late May 2010, during hearings on first day motions, the court directed Debtor to explore alternatives to the original sale agreement with Express. Despite this direction, Perella made no effort to seek out alternatives until entry of the order approving bidding procedures on July 15. Perella was all too ready to proceed with the original Express transaction despite creditor discontent and the court's admonitions. Had Perella begun soliciting potential buyers earlier, more parties might have participated in the Auction.

With respect to the discount rate complained of by the Objectors – i.e., the discount to be applied to Pitch's bid to account for delays and uncertainty in closing, in comparison to a transaction with Express – Cofsky's recommendation that a sliding scale apply was no doubt defensible in theory. It was, however, impractical and hardly conducive to the aim of the Auction: to maximize recovery from Debtor's estate. *See* TR (Snyder) January 20 at pp. 136:10 – 138:4; 161:8 – 16. The court nonetheless must reject the Objectors' contention that Cofsky's advice concerning a discount rate is a proper basis for reducing Perella's fees. To do otherwise would penalize Perella for giving honest advice and encourage professionals to instead weigh their advice to debtors and other bankruptcy fiduciaries on an ends-justify-the-means basis.

The court concludes that, while Perella was an important member of a team that produced an excellent result, its contribution was not all that ordinarily would be required of a financial advisor, and was not wholly positive. This court has previously noted that a financial advisor should have to justify its fees – particularly a transaction fee – based on either the results

---

parking facilities by a buyer of the Rangers was unnecessary. This discovery freed up funds for bidding on the Rangers that would have been used to purchase the parking facilities.

achieved by the advisor or the effort – i.e., hours – expended. *See In re Mirant Corp.*, 354 B.R. 113, 128-29 (Bankr. N.D. Tex. 2006). In the case at bar, while the result of Debtor's case was excellent, the court concludes that Perella's role in producing it was not, in and of itself, sufficient to warrant an award of the entire Transaction Fee. The court thus turns to the other factors delineated by section 330(a)(3) to determine whether the Transaction Fee would be justified under all of that section's tests.[21]

Section 330(a)(3)(A) and (B) directs that, in deciding compensation, a court consider time spent and the rate charged. Perella spent a total of 357 hours. Taking account of Perella's monthly fee, if awarded the $1,500,000 Transaction Fee, Perella would be receiving $4,937[22] for each hour spent by Kramer, Cofsky or Funk. *See* PX 4, 13. The court cannot find such remuneration at that hourly rate to be reasonable.[23]

Another measure, as advocated by Perella, is comparable fees charged by professionals for similar work outside of bankruptcy. *See* Code § 330(a)(3)(F). It is under this heading that PX 12A must be considered.[24]

The problem with the cases summarized in PX 12A is that none that the court has researched involved facts parallel to the case at bar. In those cases in which prepetition work was used postpetition in connection with the ultimate transaction, the same advisor performed all

---

[21] One of the factors (board certification) has no application to the case at bar. As to section 330(a)(3)(D), Debtor's case required little time relative to most large chapter 11 cases, and certainly Perella did not expend excessive time performing its services to Debtor.

[22] Based on the following formula: ($1,500,000 + (87,500 x 3)) / 357 = $4,937. Debtor's chapter 11 case, from petition filing to plan confirmation, took approximately three months, for which Perella was paid.

[23] Indeed, if Funk's compensation were commensurate with that hourly rate, many highly respected, experienced lawyers (and some judges) would be lining up for junior level jobs with Perella. To be worth $5,000 per hour in America one must be an athlete or rock star.

[24] Actually, PX 12A summarizes awards in other chapter 11 cases rather than in a non-bankruptcy context as specified in section 330(a)(3)(F).

of the work. *See, e.g.*, *Metaldyne Corp.*, 409 B.R. at 664-65 & n.2; *In re Erickson Retirement Communities, LLC, et al.*, Supplement to PX 12A, *First and Final Application of Houlihan Lokey Howard & Zukin Capital, Inc. as Investment Banker to the Debtors for Compensation for Services Rendered and Reimbursement of Expenses for the Period October 19, 2009 through April 30, 2010* ("Erickson Fee App") at 3-13. In many of the cases, the chapter 11 lasted much longer and required more work on the part of the financial advisor than the case at bar. *See, e.g.*, *Metaldyne*, 409 B.R. at 664-65; *Erickson Retirement*, Erickson Fee App at 3-13; *In re Pilgrim's Pride Corporation, et al.*, Supplement to PX 12A, *Final Fee Application of Lazard Frères & Co. LLC, Debtors' Investment Banker, for Compensation for Professional Services Rendered and for Reimbursement of Actual and Necessary Expenses Incurred for the Period from December 1, 2008 to December 10, 2009* at 2-10.

With respect to one case with which the court is quite familiar – *Pilgrim's Pride Corporation* – the value of the transaction is not stated properly in PX 12A. In that case, the true value of the transaction was not $800,000,000 as reflected on PX 12A; rather, $800,000,000 was the amount of the equity investment that underwrote the cash requirements of the plan of reorganization. The transaction actually provided a return to creditors and shareholders of approximately $2,736,000,000.[25] Applying that transaction value to the financial advisor's transaction fee of $4,208,677 yields a transaction fee percentage of .15%.[26] Applying that percentage to the total value of the Rangers' transaction yields a transaction fee of $912,450.

---

[25] *See In re Pilgrim's Pride Corp., et al.*, Case No. 08-45664, docket no. 3767, Amended Disclosure Statement at 82-83. As was true in *Pilgrim's Pride*, the transaction here – the sale to Express – left substantial debt in place in addition to a cash component.

[26] If the court were to add the claims of Merrill and Raine to Perella's proposed $1,500,000, the total transaction fees sought by Debtor's financial advisors would equal more than 1.5% of the transaction's value – ten times the rate in *Pilgrim's Pride*.

15

Even this amount, when added to monthly payments during the case of $87,500, yields an hourly rate for Perella's employees of $3,291 per hour.[27] While this is high, the court is cognizant of the importance of compensating financial advisors well enough to encourage their service in bankruptcy cases, and thus concludes that it constitutes reasonable compensation for Perella. In the first place, it duly compensates Perella for its important role in the excellent result reached in this case. Second, it is consistent with, but nearer to the low end of, the range of transaction fees paid to financial advisors in other large chapter 11 cases. Third, to base Perella's transaction fee solely on hours expended multiplied by a reasonable rate would fail to recognize that Debtor's arrangement with Perella – the basis on which Perella agreed to work on this case – contemplated a short stay by Debtor in chapter 11, and, consequently, a relatively high return to Perella on an hourly basis.

On a different set of facts, the court might arrive at a different conclusion, but in this case on these facts, the court is satisfied that a transaction fee of .15% of the sale price of the Rangers is warranted. Accordingly, the court will grant the Application to the extent of $912,450 plus expenses and monthly fees as reflected therein, with the exception of attorneys' fees owed to Perella's counsel, as discussed below, and subject to any reductions in expenses reflected in the record at the Hearing.[28]

B. Attorneys' fees

Perella requests reimbursement for $15,406 in legal fees and expenses incurred by the law firm of Kane, Russell, Coleman & Logan, PC ("KRCL") in connection with the filing of the Application. Perella also reserves in the Application the right to request reimbursement for

---

[27] Based on the following formula: ($912,450 + (87,500 x 3)) / 357 = $3,291.
[28] On December 20, 2010, at the beginning of the Hearing, the parties stipulated on the record that Perella had agreed to waive certain hotel lodging and airfare charges, in addition to a "collective administrative charge." *See* TR (Attorney Kevin M. Lippman appearing for the Administrator) December 20 at pp. 12:10 – 13:9.

16

additional legal expenses incurred subsequent to the filing of the Application. Perella points to paragraph 3 of the 2010 Perella Agreement in support of this request. Paragraph 3 provides:

> 3. <u>Expenses.</u> In addition to [Perella's] fees for professional services, [Debtor] agrees that it will promptly reimburse [Perella] for all of [Perella's] reasonable expenses incurred in connection with this Engagement ("<u>Expenses</u>"), (including, but not limited to, professional and legal fees, charges and disbursements of [Perella's] legal counsel . . .; provided that, in no event shall these Expenses exceed an average of $15,000 per month without [Debtor's] consent . . .; and further provided that, [Perella] will use [its] reasonable efforts to avail [itself] of [Debtor's] outside legal counsel, [Weil, Gotshal & Manges], unless the legal advice sought by [Perella] pertains to (1) [Perella's] own legal obligations or rights under this Agreement . . . .

Though the UST and GSP object only to the Transaction Fee, the Administrator states in his objection that he reserves the right to amend his objection to address any concerns he has with respect to reimbursement of Perella's expenses once supporting documents for the expenses are provided to him. The court thus cannot determine whether to grant Perella reimbursement of its legal expenses until Perella finally determines what fees it is asking be paid and provides the Administrator with any supporting documents and the Administrator waives any objection (and the court finds that such reimbursement complies with applicable provisions of the Code), or until the Administrator objects to the requested reimbursement and is overruled. The court therefore declines to determine at this time whether Perella is entitled to reimbursement for legal fees and expenses owed to KRCL.

III. Conclusion

The Application is accordingly GRANTED to the extent of $912,450, plus any additional unpaid monthly fees and expenses as reflected in the Application, and subject to any reductions in expenses reflected in the record; provided, however, that the court awards no reimbursement

at this time for any legal fees and expenses owed by Perella to KRCL. Counsel for Perella is directed to prepare and submit an order consistent with this memorandum opinion.

# # # # END OF MEMORANDUM OPINION # # # #