U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

Signed September 25, 2012

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| TEXAS RANGERS BASEBALL PARTNERS, | § § | CHAPTER 11 |
| DEBTOR. | § § § | CASE NO. 10-43400-DML |

## MEMORANDUM OPINION

Before the court is the *Post-Effective Date Debtor's and Plan Administrator's Objection to Hicks Advisor Claims (Claim Nos. 53 and 64)* (the "Plan Administrator's Objection"), filed by Alan Jacobs as Plan Administrator (the "Administrator") under Debtor's confirmed plan of reorganization, as well as the *Objection of First Lien Agent to Claims of Financial Advisors* (the "First Lien Agent's Objection" and, together with the Plan Administrator's Objection, the "Objections"), filed by JP Morgan Chase Bank, N.A., as administrative and collateral agent (the "First Lien Agent" and, together with the Administrator, the "Objectors"). The Objections seek disallowance of the proof of claim (the "Claim") filed in this case by Raine Advisors, LLC

1

("Raine").[1] The court conducted a hearing (the "Hearing") on the Objections over five days,[2] during which it heard testimony from Kellie Fischer ("Fischer"), chief financial officer of Texas Rangers Baseball Partners ("Debtor"); Brandon Gardner ("Gardner"), Raine's chief operating officer; Jeffrey Wong, an associate at Raine; William Snyder, chief restructuring officer for Rangers Equity Holdings GP, LLC, and Rangers Equity Holdings, LP; and two officers of Perella Weinberg Partners, LP ("Perella").[3] The court also received into evidence exhibits, identified as necessary below.

This matter is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B). This memorandum opinion represents the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and 9014.

## I. Background

The events leading up to Debtor's chapter 11 filing are described in *In re Texas Rangers Baseball Partners*, 434 B.R. 393 (Bankr. N.D. Tex. 2010) (the "6/22 Opinion"), while the events leading to the Claim are set out in part in the 4/6 Opinion. Familiarity with both opinions is assumed.

Raine, along with Merrill and Perella, served as a financial advisor to Debtor's ultimate parent HSG Sports Group, LLC[4] ("HSG") during the period when HSG first sought an investor,

---

[1]  The Objections also address the proof of claim filed by Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill"). Merrill, however, reached agreement with the Objectors on the eve of the Hearing (defined below). Therefore, this memorandum opinion only addresses the Claim.

[2]  The Hearing was held on December 20, 2010, December 22, 2010, January 20, 2011, January 21, 2011, and January 24, 2011.

[3]  The Hearing also addressed the *First and Final Application of Perella Weinberg Partners, LP as Financial Advisor and Investment Banker for Debtor for Allowance of Compensation and Reimbursement (for the period May 24, 2010 through August 12, 2010)*, which has been addressed in a prior memorandum opinion of the court. *See In re* Texas Rangers Baseball Partners, No. 10-43400-DML, 2011 WL 1323777 (Bankr. N.D. Tex. Apr. 6, 2011) (the "4/6 Opinion").

[4]  F/k/a Hicks Sports Group, LLC.

then a buyer, for Debtor's principal asset, the Texas Rangers Baseball Club (the "Rangers"). Specifically, Raine was retained by HSG when it became clear that HSG's problems could not be solved by additional investors, and to that end Raine was to find potential buyers for the Rangers and oversee the sale process, pursuant to an engagement agreement (the "Original Agreement") entered into by Raine, HSG, and HSG Sports Group Holdings, LCC[5] ("Hicks Holdings" and, together with HSG, the "Hicks Parent Entities") on September 25, 2009.

In return for financial services provided by Raine, Raine was to receive in addition to a monthly payment a transaction fee (the "Original Transaction Fee") which would have totaled $5,000,000.00 had the original sale of the Rangers to Rangers Baseball Express, LLC ("Express"), agreed to by Debtor following an auction overseen by Major League Baseball at the end of 2009, been consummated prior to the commencement of the chapter 11 case.[6] A "Rangers Transaction," which would have triggered payment of a transaction fee, is defined extremely broadly in the Original Agreement.[7] Additionally, the Original Agreement contained a tail provision (the "Original Tail Provision"), which stipulated that Raine was entitled to the Original Transaction Fee if a Rangers Transaction was consummated within twelve months after termination of the Original Agreement by the Hicks Parent Entities. *See* Original Agreement, p. 6.

---

[5]  F/k/a Hicks Sports Group Holdings, LLC.

[6]  Express was the eventual purchaser of the Rangers during Debtor's chapter 11 case, but the terms of the sale were considerably more favorable to Debtor and to creditors than those negotiated prepetition.

[7]  The Original Agreement defines a "Rangers Transaction" as:

> [w]hether in one or a series of transactions, the sale, transfer or other disposition, directly or indirectly, of all or a significant portion of [the Rangers] to a third party…whether by way of a merger or consolidation, reorganization, recapitalization or restructuring, negotiated purchase of all or a portion of [the Rangers], leveraged buyout, private placement of equity or debt securities, minority or majority investment or partnership, collaborative venue or otherwise, or any other extraordinary corporate transaction involving the [Rangers] . . . .

Original Agreement, p. 2.

3

As discussed in the 6/22 Opinion, HSG and Debtor were unable to close the sale of the Rangers to Express prepetition, and Debtor thereafter sought relief in this court on May 24, 2010 (the "Petition Date"). Shortly before the Petition Date, Raine entered into a new engagement letter with Debtor, dated "[e]ffective as of September 25, 2009" (the "Replacement Agreement"). *See* Replacement Agreement, p. 1. Pursuant to the Replacement Agreement, Raine was designated to act as financial advisor to Debtor[8] in connection with a sale of the Rangers.[9] Similar to the Original Agreement, Raine was to be paid a transaction fee (the "Replacement Transaction Fee") in the event a Rangers Transaction[10] was consummated, although the fee in the Replacement Agreement was reduced to $2,500,000.00. Finally, the Replacement Agreement contained its own tail provision (the "Replacement Tail Provision"), by which Raine was entitled to receive the Replacement Transaction Fee if a Rangers Transaction was consummated within twelve months after termination of the Replacement Agreement by Debtor. Simultaneously with the Replacement Agreement, HSG and Raine executed an agreement terminating the Original Agreement, purporting to replace it with the Replacement Agreement.

On May 23, 2010, Debtor and Express entered into the Asset Purchase Agreement (the "APA"), pursuant to which Debtor again agreed to sell the Rangers to Express. The APA replaced the agreement by which Express had previously intended to purchase the Rangers. The transactions contemplated by the APA (the "Sale"), following postpetition amendments to the APA that ultimately increased the return to Debtor's (and HSG's) principal creditors, closed on

---

[8] Because Raine was unwilling to serve as a financial advisor in a chapter 11 case, Debtor never retained Raine in its chapter 11 case; thus the period of its "services" under the Replacement Agreement was only a matter of days. The record does not reflect that Raine performed any services in those few days.

[9] Raine did not, however, serve as a financial advisor to Debtor prepetition, and its "services" to Debtor after execution of the Replacement Agreement were limited to providing Perella with previously identified names of potential purchasers of the Rangers.

[10] The Replacement Agreement defines a "Rangers Transaction" substantially the same as the Original Agreement. Therefore, the court will henceforth refer to either as a "Rangers Transaction."

the day Debtor's plan of reorganization (the "Plan") became effective, August 12, 2010 (the "Effective Date").

Following these events, and in accordance with the Replacement Agreement, Raine, relying on the Replacement Tail Provision, filed the Claim seeking a Replacement Transaction Fee of $2.5 million. The Administrator and the First Lien Agent then filed the Objections.

## II. Discussion

A proof of claim constitutes prima facie evidence of the claim's validity and amount. FED. R. BANKR. P. 3001(f); *see also Raleigh v. Ill. Dept. of Rev.*, 530 U.S. 15, 22 n.2 (2000); *McGee v. O'Connor (In re O'Connor)*, 153 F.3d 258, 261 (5th Cir. 1998). Such a claim "is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449 (2007). Even when a party in interest objects, the court must allow the claim except to the extent the claim fits within one of the exceptions enumerated in section 502(b) of the Bankruptcy Code ("Code").[11] *See Travelers*, 549 U.S. at 449. Section 502(b)(1) provides that a claim shall be disallowed to the extent it is unenforceable against the debtor under any agreement or applicable law. *See Travelers*, 549 U.S. at 450.

In the case at bar, the court must address two questions. The first is whether, based on the Replacement Tail Provision, Raine is entitled to claim a transaction fee for the sale of the Rangers to Express after the commencement of Debtor's chapter 11 case. Put a different way, did the tail—i.e., the obligation of Debtors to pay Raine the Replacement Transaction Fee—survive the filing of Debtor's chapter 11 petition?

Second, the First Lien Agent has asserted that any obligation of Debtor to Raine was incurred in fraud of creditors. The First Lien Agent contends that Debtor had no obligation to

---

[11] 11 U.S.C. §§ 101 *et seq.*

Raine prior to its execution of the Replacement Agreement. As Raine performed no services for Debtor under the Replacement Agreement, the First Lien Agent argues that any obligation of Debtors to Raine is voidable pursuant to Code section 548.[12]

### A. Does a Tail Survive a Bankruptcy Filing?

The court must first be satisfied that Raine would have been entitled to the Replacement Transaction Fee under applicable law outside of bankruptcy. In this analysis, the court interprets the Original Agreement and the Replacement Agreement based on New York law, in accordance with the provisions of those contracts. *See* Original Agreement, p. 8; the Replacement Agreement, p. 7; *see also Caton v. Leach Corp.*, 896 F.2d 939, 942–43 (5th Cir. 1990) (holding that Texas law gives effect to choice of law clauses if the law chosen by the parties has a reasonable relationship with the parties and the chosen state[13]).

Under New York law, the court should construe a contract so as to "give effect to the intention of the parties as expressed in the unequivocal language employed." *In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) (quoting *Morlee Sales Corp. v. Mfrs. Trust Co.*, 9 N.Y.2d 16, 19 (1961)), *aff'd, Peter J. Solomon Co., L.P. v. Oneida, Ltd.*, No. 09 Civ. 2229, 2010 WL 234827 (S.D.N.Y. Jan. 22, 2010). It is clear from the very broad language used to define a Rangers Transaction that Debtor and Raine intended for almost any transaction involving the sale of the Rangers to constitute a Rangers Transaction within the meaning of the contract, and

---

[12] Debtor was clearly solvent at the time the Replacement Agreement was entered into (Express had sought prepetition to purchase the Rangers for about twice Debtor's total debt). However, the Replacement Agreement arguably substituted Debtor's obligation for that of its affiliate, was entered into in contemplation of bankruptcy and was executed by officers common to Debtor and the Parent Entities. Taken with a want of consideration, Debtor's obligation under the Replacement Agreement is arguably tainted with badges of fraud. *See* Code § 548(a)(1); *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008).

[13] Raine is based in New York.

for Raine to be entitled to the Replacement Transaction Fee. Additionally, the Replacement Tail Provision is written without any further restrictions to the Replacement Agreement's definition of a Rangers Transaction.[14] Therefore, the court must give credence to the parties' intent in the language of the Replacement Agreement that essentially any sale of the Rangers within twelve months of termination of the Replacement Agreement gives rise to Raine's entitlement to the $2.5 million Replacement Transaction Fee, regardless of whether such sale was brought about as a result of services rendered after execution of the Replacement Agreement to Debtor or related entities by Raine. The Sale easily fits within these parameters.

For the court's purposes, the Replacement Agreement is considered rejected as a result of certain provisions in both the APA and the Plan. "Excluded Contracts" are defined in the APA to include "all contracts between [Debtor or any of its subsidiaries] and any broker, investment banker or similar advisor relating to this Agreement or the transactions contemplated hereby or otherwise . . . ." *See* APA, § 1.1. The Replacement Agreement falls within this provision. In the Plan, Excluded Contracts are "terminated by their terms or assumed by the Post-Effective Date Debtor." *See* Plan, § 9.1(c).[15]

In determining the effect of the rejection of the Replacement Agreement on any claim of Raine, the court must first treat it as a breached contract. The Effective Date, the date on which the Sale took place as set forth above, was less than three months after the Petition Date, well

---

[14] *See* Cohen-Sagi v. ProFinance Assocs., Inc., No. 04-08-00181-CV, 2009 WL 540217, at *1 (Tex. App. Mar. 4, 2009), *pet. denied* (tail provision in question only satisfied if the company was sold to a buyer that was previously identified by the financial advisor). In the case at bar, Raine, in any event, was instrumental in striking the original deal for the sale of the Rangers to Express.

[15] The use of the word "terminated" in the Plan is not dispositive. Under the Code, contracts may be "rejected," which essentially causes the contract to be breached. *See* 11 U.S.C. § 365; 11 U.S.C. § 502(g); *In re* Nat. Gypsum Co., 208 F.3d 498, 506 (5th Cir. 2000); Wainer v. A.J. Equities, Ltd., 984 F.2d 679, 684–85 (5th Cir. 1993). Nothing in the Code allows for the "termination" of a contract other than as permitted under non-bankruptcy law. Unlike a termination, rejection does not eliminate all effects of a contract. *See Nat. Gypsum*, 208 F.3d at 505; *In re* Continental Airlines, 981 F.2d 1450, 1459 (5th Cir. 1993); *In re* CVA Gen. Contractors, Inc., 267 B.R. 773, 777 (Bankr. W.D. Tex. 2001).

within the twelve months of the Replacement Tail Provision. In a non-bankruptcy situation, in determining Raine's entitlement to a claim resulting from breach of the Replacement Agreement, Raine could rely on the Replacement Tail Provision to preserve its claim to the Replacement Transaction Fee. *See Westminster Sec. Corp. v. Petrocom Energy Ltd.*, No. 10 CIV 7893 DLC, 2011 WL 166924, at *1-6 (S.D.N.Y. Jan. 19, 2011). Therefore, according to the terms of the Replacement Agreement alone, Raine would appear to be entitled to the Replacement Transaction Fee. The court, however, was initially concerned about the interplay between the tail provision of a contract and the bankruptcy proceedings of a party to that contract: would the filing of a bankruptcy case cut off the tail?

In a case factually analogous in pertinent part to the matter at hand, the Bankruptcy Court for the District of Maryland allowed a claim filed by an investment bank whose engagement agreement was rejected during the bankruptcy proceedings of its counterparty. *See In re Nat'l Energy & Gas Transmission, Inc.*, No. 03–30459 PM, 2006 WL 4595947 (Bankr. D. Md. Aug. 28, 2006). Similar to the Replacement Agreement, the engagement agreement in *National Energy* was a prepetition agreement, with a transaction fee that was to be paid pursuant to a tail provision in the right circumstances. The term of the tail provision in *National Energy* extended into the bankruptcy case and the relevant transaction in *National Energy* took place within that term but months into the bankruptcy case, just as the Sale took place months after the Petition Date. The *National Energy* court did not find that the bankruptcy proceedings cut off or affected the tail provision in any way and allowed the claim. *See id.* at *2–3.

Although the court in *Oneida*, 400 B.R. at 393, disallowed a prepetition financial advisor's claim which was based on a tail provision extending into an advisee's bankruptcy case, it did so on the grounds that the transaction contemplated by the contract had already taken place

8

before the bankruptcy, and therefore full performance had already been rendered by the advisor under the contract. *See id.* at 390–91. The *Oneida* court made no mention of the bankruptcy case having any effect on the enforceability or length of the tail provision.

The court concludes that the analysis in *National Energy* is consistent with the law of contracts. Under Code section 365, rejection of a contract—here, the Replacement Agreement—constitutes only a breach of the contract,[16] leaving the rights of the parties to the contract, including the debtor's counterparty's entitlement to damages, intact and unaffected.[17] Thus, in the case at bar, Raine may claim damages as it would in the event of a breach outside of bankruptcy. Outside of bankruptcy, following a breach, Raine would be entitled to rely on the Replacement Tail Provision in a calculation of its damages. Accordingly, the court holds that the Replacement Tail Provision ran through the bankruptcy proceedings of Debtor until the Sale was consummated, and therefore the Claim can be properly traced to its origin based on the Replacement Agreement.

### B. Debtor's Obligation to Raine under the Original Agreement

The Objectors allege that the Replacement Agreement was a fraudulent incurrence of an obligation under section 548(a)(1) of the Code.

Under the Code, an incurrence of an obligation is fraudulent if it was incurred by the debtor within two years of the petition date with either (a) actual intent to defraud creditors or (b) a lack of reasonably equivalent value received in exchange for such obligation while the debtor

---

[16] *E.g.*, NLRB v. Bildisco & Bildisco, 465 U.S. 513, 530 (1984).

[17] *See, e.g.*, COLLIER ON BANKRUPTCY ¶ 365.10[1] (16th ed. 2012) ("Rejection and section 365(g)'s deemed breach do not affect the parties' substantive rights under the contract or lease, such as the amount owing or a measure of damages for breach . . . .").

was insolvent.[18] These alternative types of transactions are known as actual fraud and constructive fraud, respectively. *See In re Hannover Corp.*, 310 F.3d 796, 799 (5th Cir. 2002); *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 262-66 (Bankr. N.D. Tex. 2003).

Constructive fraud is not applicable to this case, because Debtor was solvent at the time the Replacement Agreement was executed. The court is intimately familiar with the facts of Debtor's bankruptcy proceedings, and concludes that the value of Debtor's assets far outweighed its liabilities at the time of the Replacement Agreement's execution.

Finding no constructive fraud, the court must then consider whether Debtor incurred an obligation under the Replacement Agreement with actual intent to defraud creditors, an incurrence voidable under section 548(a)(1)(A). Although actual fraud is difficult to prove, it may be inferred from circumstances surrounding the transaction. *See In re Soza*, 542 F.3d 1060,

---

[18] "The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business."

11 U.S.C. § 548(a)(1).

1067 (5th Cir. 2008) (citing *Roland v. United States*, 838 F.2d 1400, 1402–03 (5th Cir. 1988)). Courts have identified various "badges of fraud" that tend to evidence a transfer made with intent to defraud under section 548:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*Id*. at 1067; *Chastant v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989).[19] "Not all, or even a majority of the 'badges of fraud' must exist to find actual fraud." *Soza*, 542 F.3d at 1067. Rather, the mere presence of a few of these indicia can be sufficient to infer fraud. *Id*. (citing *Roland*, 838 F.2d at 1403).

The court, like the Objectors, is primarily concerned with the first badge of fraud: a potential lack of consideration in the execution of the Replacement Agreement. This question hinges on whether Debtor would have been liable to Raine under the Original Agreement. If it was liable, and Raine could have filed an allowable claim under the Original Agreement, then Debtor's obligation under the Replacement Agreement simply takes the place of the Original Agreement.[20] If Debtor was not liable under the Original Agreement, then the Replacement Agreement was an obligation incurred by Debtor without consideration.

---

[19] *In re Chastant* dealt with the denial of discharge under section 727(a)(2)(A) of the Code, for which the standard is also actual intent to defraud. Recent opinions of bankruptcy courts within the Fifth Circuit have continued the trend of examining 548(a)(1)(A) fraudulent transfer claims using the *Soza/Chastant* "badges of fraud" standard. *See* Cash Rewards, Inc. v. Griggs (*In re* Cash Rewards, Inc.), No. 09-33685-HDH-7, 2012 WL 967862, at *9-10 (Bankr. N.D. Tex. 2012); Chow v. Prince (*In re* Prince), No. 09-43627, 2012 WL 1095506, at *7 (Bankr. E.D. Tex. 2012).

[20] That is, the obligation incurred through the Replacement Agreement was in satisfaction of an antecedent debt. *See* Code § 548(d)(2)(A).

In interpreting the Original Agreement to determine the liability, if any, of Debtor pursuant to that agreement under New York law, the court should construe the agreement so as to give full meaning and effect to the material provisions. "A reading of the contract should not render any portion meaningless. Further, a contract should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." *Oneida*, 400 B.R. at 389 (quoting *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324–25 (2007)).

Support for the positions taken by both the Objectors and Raine can be found within the four corners of the Original Agreement. The Objectors argue that the Original Agreement was not executed by Debtor. Additionally, section 10(i) of the Original Agreement clearly states that Hicks Holdings is the primary obligor with respect to that agreement, and that the Hicks Parent Entities "agree to be liable for and to cause the [Debtor] to perform, all obligations of HSG, [Hicks Holdings], and [Debtor] under [the Original Agreement] . . . ." Original Agreement, p. 8.

However, section 10(b) provides that the document is "binding on [Hicks Holdings], HSG, [Debtor], [Raine] and their respective successors." *See* Original Agreement, p. 7. Moreover, section 10(i) of the Original Agreement states "[Raine] shall be entitled to treat [Hicks Holdings] as primary obligor with respect thereto and has no obligation to first seek recovery against HSG or [Debtor] in respect to the obligations hereunder." *Id.* at 8. If the parties to the contract intended that Debtor not be held liable under the Original Agreement, there would be no reason to include language stipulating Raine would "first seek recovery" other than from Debtor. That Debtor was not the primary obligor under the Original Agreement is not dispositive to the court's inquiry; a debtor's contingent liability will support an allowable claim. Thus, interpreting the language of the Original Agreement, the court finds that Debtor was

12

indeed liable under that agreement,[21] meaning that the Replacement Agreement simply took the place of the Original Agreement and, thus, Debtor incurred the obligation to pay the Replacement Transaction Fee for adequate consideration.[22]

The Objectors also raise concerns about the sixth badge of fraud: the general chronology of events. *See Soza*, 542 F.3d at 1067. Specifically, Objectors are troubled by the simultaneous termination of the Original Agreement and execution of the Replacement Agreement on the eve of bankruptcy, when, for all intents and purposes, Raine had completed its work and would do no further substantive work under either agreement. Because this court has determined that Debtor was liable under the Original Agreement, and therefore that the Replacement Agreement simply took the place of the Original (with a change in the amount of the transaction fee that benefited Debtor), this chronology is not nearly as worrisome.[23] Accordingly, considering the totality of the circumstances, the court finds no actual intent of Debtor to defraud creditors under Code section 548(a)(1)(A).[24]

Therefore, with no possibility of constructive fraud, and no finding of actual intent to defraud creditors, the court finds that Debtor's undertaking in the Replacement Agreement was not a fraudulent incurrence of an obligation.

### C. Amount of Damages

---

[21] That Debtor did not execute the Original Agreement is not significant. The persons executing for the Hicks Parent Entities were also positioned to act for Debtor.

[22] There is no question that Raine performed its duties under the Original Agreement and so earned the fees specified therein. The Replacement Agreement thus satisfied an antecedent debt. *See* Code § 548(d)(2)(A).

[23] The court need not decide if Raine could assert the good faith defense of Code section 548(c). The record, however, would support a finding that Raine, which relinquished obligors and half of its transaction fee in the Replacement Agreement, believed the Replacement Agreement a valid continuation of Debtor's obligation – at a reduced amount – under the Original Agreement.

[24] While some additional badges of fraud—e.g., that the Parent Entities were relieved of their obligations under the Original Agreement by the Replacement Agreement—are present in this case, others, e.g., insolvency, secrecy, are not.

During the Hearing, the court asked that the parties advise it whether the court could limit the amount of the Claim to the value of Raine's services, rather than fully allowing or wholly disallowing it. Raine was of the view that the court could adjust the amount of the Claim, but the Objectors saw the question as requiring an all-or-nothing result.

The court concurs with the Objectors. If Raine would have been entitled to the entire Replacement Transaction Fee absent Debtor's bankruptcy, *see Westminster*, 2011 WL 166924, at *1-6, that is the proper amount of its damages. As the court concludes Raine would have been entitled to the entire Replacement Transaction Fee absent Debtor's chapter 11 filing, that is the proper measure of its damages for purposes of calculating the allowable amount of the Claim.

That this means Raine is better off for not having performed services for Debtor during the chapter 11 case than Perella, who did (*see* 4/6 Opinion) but whose transaction fee was subject to a reasonableness analysis, is a consequence of the peculiarity of Debtor's case: payment in full of all general unsecured claims with interest. In another case, a claimant like Raine could expect no more than a percentage of its damages.

### III.  Conclusion

For the foregoing reasons, the court holds that (1) the Replacement Tail Provision is effective and entitles Raine to the Replacement Transaction Fee for the Sale; and (2) that contract did not effect the fraudulent incurrence of an obligation. Therefore, Raine's Claim shall be allowed in its entirety.

It is so ORDERED.

# # # # END OF MEMORANDUM OPINION # # # #